ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :     **SEALED INDICTMENT**
                                 :
          - v. -                 :     15 Cr.
                                 :
KALEIL ISAZA TUZMAN and          :     15 CRIM 536
ROBIN SMYTH,                     :
                                 :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - x

<u>COUNT ONE</u>

(Conspiracy To Commit Securities Fraud: Market Manipulation)

The Grand Jury charges:

<u>RELEVANT PERSONS AND ENTITIES</u>

1.   At all times relevant to this Indictment, KIT digital, Inc. ("KITD") was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York.

2.   From in or about May 2008 to on or about August 12, 2009, KITD's common stock was traded on the OTC Bulletin Board, which is an electronic quotation system for over-the-counter securities that are not listed on a national securities exchange.  Beginning on or about August 13, 2009, KITD's common stock was traded on the NASDAQ.

3.     At all times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, was the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of KITD.   At all times relevant to this Indictment, TUZMAN signed the quarterly and annual financial statements that KITD filed with the United States Securities and Exchange Commission (the "SEC").

4.     At all times relevant to this Indictment, ROBIN SMYTH, the defendant, was the Chief Financial Officer ("CFO") of KITD. At all times relevant to this Indictment, SMYTH signed the quarterly and annual financial statements that KITD filed with the SEC.

5.     From at least in or about 2007 up to in or about September 2009, KITD employed Accounting Firm-1 as an independent auditor.   Accounting Firm-1 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.   Thereafter, from in or about October 2009 up to in or about 2012, KITD employed Accounting Firm-2 as an independent auditor.   Like Accounting Firm-1, Accounting Firm-2 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.

6.     From in or about October 2006 to in or about June 2012, a co-conspirator not named as a defendant herein ("CC-1") operated a hedge fund (the "Hedge Fund") in North Carolina.

2

## PUBLIC COMPANY REPORTING REQUIREMENTS

7.   At all times relevant to this Indictment, KITD was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and disclosed to the public.  Specifically, at all times relevant to this Indictment, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, KITD was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected KITD's business transactions.

8.   At all times relevant to this Indictment, KITD's quarterly and annual financial statements were transmitted to the New York, New York offices of Vintage Filings ("Vintage"), a filing agent that assisted companies in electronically filing periodic reports with the SEC, and were thereafter transmitted electronically by Vintage to the SEC for filing.

## THE SCHEME TO DEFRAUD

9.   Between in or about December 2008 and in or about September 2011, KALEIL ISAZA TUZMAN, the defendant, and CC-1 engaged in efforts to artificially inflate the share price and trading volume of KITD shares.  During this time period, during

3

which KITD shares traded OTC and on the NASDAQ, CC-1, at TUZMAN's behest, purchased and sold shares of KITD through the Hedge Fund, at times for the purpose of manipulating the stock price and at times for the purpose of creating the illusion of greater volume in the trading for KITD shares. TUZMAN personally invested his own money into the Hedge Fund, and also arranged for KITD to invest money in the Hedge Fund, thereby using the Hedge Fund as a vehicle by which KITD, at Tuzman's direction, invested in itself, without disclosing that fact or the scheme to manipulate KITD's stock to the investing public.

### Trading In KITD Shares

10. In or about December 2008, KALEIL ISAZA TUZMAN, the defendant, entered into a written agreement with CC-1 and another co-conspirator not named as a defendant herein ("CC-2"), in which CC-1 agreed to purchase at least $400,000 of common stock in KITD in the open market over the next 30 days and to hold it for at least 90 days. In return, TUZMAN agreed in part to pay CC-1 money and make efforts to induce KITD to retain the Hedge Fund to provide various services. One of the purposes of this agreement was to increase the share price of KITD, in order to make KITD more attractive to potential buyers and to help KITD procure financing from potential investors.

11. Shortly after entering into the agreement in December 2008, CC-1 acquired over $400,000 worth of KITD shares.

4

12. Over the subsequent years, with the knowledge and approval of KALEIL ISAZA TUZMAN, the defendant, CC-1 bought and sold additional KITD shares. At times, those trades were made at the express request of TUZMAN and at times were funded with money from KITD and from TUZMAN, personally. During the relevant time period, CC-1 repeatedly engaged in transactions in which CC-1 caused an account under CC-1's control to buy or sell KITD stock, and on the same day caused the same or another account under CC-1's control to take the opposite position. The result of these transactions was that CC-1 was effectively taking both sides of a single transaction in KITD stock in order to artificially inflate the trading volume in KITD stock. For instance:

a. On or about March 9, 2009, CC-1 sold approximately 28,571 shares of KITD stock using one trading account used by the Hedge Fund and bought the same number of shares of KITD stock using another trading account used by the Hedge Fund. CC-1 purchased and sold the KITD shares at the same price, approximately $7 per share.

b. On or about December 4, 2009, CC-1 bought approximately 4,815 shares of KITD stock using one trading account maintained by the Hedge Fund and sold approximately 4,770 shares of KITD stock using the same trading account. That same day, CC-1 bought approximately 5,885 shares of KITD stock

5

using one trading account maintained by the Hedge Fund and sold approximately 5,830 shares of KITD stock using the same trading account. The net effect of these transactions was that the Hedge Fund accumulated only 100 additional shares of KITD stock. Moreover, in both sets of transactions, CC-1 bought shares of KITD stock at a price of approximately $10.64 per share and sold the KITD shares at a price of approximately $10.60 per share. CC-1's trading activity in KITD shares on December 4, 2009 accounted for over approximately 30% of the entire trading volume in KITD that day.

c. On or about July 29, 2010, CC-1 sold approximately 16,072 shares of KITD stock using one trading account used by the Hedge Fund and bought 16,063 shares of KITD stock using the same trading account. The net effect of these transactions was that CC-1 sold only 47 shares of KITD stock. Moreover, CC-1 purchased the KITD shares at a price of approximately $9.62 per share and sold the KITD shares at a price of approximately $9.48 per share. CC-1's trading activity in KITD shares on July 29, 2010 accounted for over approximately 14% of the entire trading volume in KITD that day.

13. As a further part of the scheme, KALEIL ISAZA TUZMAN, the defendant, also directed CC-1 to make timely purchases of KITD stock in an effort to artificially inflate the price of KITD shares at certain critical moments. For example:

a.    On or about March 12, 2009, TUZMAN sent an e-mail to CC-1.   In that e-mail, TUZMAN wrote, "Urgent: in with [financial firm], trying to close.   Where is stock right now?" CC-1 replied, "[n]ow 8.99 last – that is the ask."   TUZMAN replied in part, "[g]reat work."

b.    On or about May 22, 2009, TUZMAN sent an e-mail to CC-1.   In that e-mail, TUZMAN wrote, "[w]here is stock trading?  Getting nervous notes from [a financial firm]."   CC-1 responded, "[i]t is because I was on plane on way to las vegas wher[e] I am until Sunday.   7.50 bid 8.1 ask.   Was 7.50 last till I hit ask.   Thing is heavy every day unless I support it. Sux."  On May 21, 2009, the day prior to this e-mail, CC-1 was responsible for approximately all of the trading activity in KITD stock for that day.

c.    On June 8, 2009, CC-1 sent an e-mail to TUZMAN. In that e-mail, CC-1 wrote, "kdgl stock is 7.60 by 7.70 right now.  you need to find a friend with some deeper pockets to help the cause cuz i'm spent."   TUZMAN replied, "I understand."

d.    On June 15, 2009, CC-1 sent an e-mail to TUZMAN. In that e-mail, CC-1 wrote, "btw I just spen[t] another 75k to buy kdgl stock – to take out the 7.75 offer.   this is why i'm dying here as we wait 4 weeks to get something done.   out of

bullets." TUZMAN replied in part, "[a]s soon as we file initial S-1, we should be in a much better position to address this."[1]

       d.   On June 22, 2009, TUZMAN sent an e-mail to CC-1. In that e-mail, TUZMAN wrote, "[w]e need stock to close as high as possible today."

       e.   On July 9, 2009, TUZMAN sent an e-mail to CC-1. In that e-mail, TUZMAN wrote, "[w]e desperately need the stock to stay strong during this process."

       f.   On or about August 12, 2009, which was the day before KITD shares began trading on the NASDAQ, TUZMAN invested $204,000 with the Hedge Fund with the understanding that it would be used in part to fund additional purchases of KITD shares. On that same day, CC-1 purchased additional shares of KITD. CC-1's trading in KITD stock on that day accounted for over approximately 40% of the total trading volume in KITD stock for that day.

14. As a further part of the scheme to manipulate KITD shares, in or about March 2011, CC-1 was on both sides of the purchase and sale of KITD stock on several occasions, including at prices that were not to CC-1's economic advantage.

---

   [1] "S-1" refers to Form S-1, which is a regulatory filing made by companies in part to register their securities with the SEC in anticipation of a public offering of stock. A Form S-1 includes a prospectus which discloses information about the company that is available to potential investors. KITD's S-1 was filed on or about June 24, 2009.

## Inducing KITD Investments In The Hedge Fund

15.    In  furtherance  of  the  scheme  to  artificially  inflate
the  share  price  of  KITD,  KALEIL  ISAZA  TUZMAN,  the  defendant,
induced  KITD  to  make  further  investments  in  the  Hedge  Fund  of
$200,000  in  or  about  March  2009  and  $700,000  in  or  about
February 2010.    TUZMAN  portrayed  these  investments  as  efforts  to
safely  invest  assets  of  KITD.    In  reality,  TUZMAN  caused  KITD  to
make  these  investments  in  order  to  help  fund  CC-1's  purchases  of
KITD  shares  through  the  Hedge  Fund,  as  part  of  an  effort  to
manipulate  the  market  for  KITD  shares.

16.    On  March  10,  2009,  CC-1  sent  an  e-mail  to  KALEIL  ISAZA
TUZMAN,  the  defendant.    In  that  e-mail,  CC-1  wrote,  "Kdgl  still
hasn't  traded  outside  of  me  today  –  any  progress  there?    Robyn
and  I  working  out  getting  200k  in  –  should  come  today  I  think  –
tx."    TUZMAN  replied,  "How  much  vol  today?    The  steady  trading
action  and  market  movement  helps  a  lot.    Did  Robin  get  wire
[sending  funds  from  KITD  to  the  Hedge  Fund]  done?"

17.    On  or  about  March  10,  2009,  KITD  wired  $200,000  to  the
Hedge  Fund.

18.    On  June  12,  2009,  CC-1  sent  an  e-mail  to  KALEIL  ISAZA
TUZMAN,  the  defendant.    In  that  e-mail,  CC-1  wrote,  "one  of  the
big  incentives  for  me  to  buy  stock  --  give  up  economics  etc  --
was  for  you  guys  to  put  a  couple  million  into  my  fund."

19.   On   January   29,   2010,   KALEIL   ISAZA   TUZMAN,   the
defendant,   sent   an   e-mail   to   CC-1   and   ROBIN   SMYTH,   the
defendant.   In that e-mail, TUZMAN wrote, "[CC-1] was incredibly
helpful to us through the last offering and over the last year
and a half.   I'd like to put a bit more cash with him at this
time -- maybe another $600 - 800k -- but with very strict and
quick removal terms, audit rights, etc."

20.   On or about February 3, 2010, KITD wired $700,000 to
the Hedge Fund.

21.   No disclosure was ever made to the public in KITD's
SEC filings that a stock purchase agreement existed between
KALEIL ISAZA TUZMAN, the defendant, and CC-1.   Nor was any
public disclosure made that KITD's investments in the Hedge Fund
were made for the purpose of funding additional purchases of
KITD stock.

### Hiding The Scheme

22.   In   an   effort   to   conceal   the   scheme   to   manipulate
KITD's stock price, KALEIL ISAZA TUZMAN, the defendant, misled
KITD auditors about the true reason for KITD's investment in the
Hedge Fund.

23.   In or about August 2009, an auditor from Accounting
Firm-1 ("Auditor-1") inquired about the $200,000 investment that
KITD had made in the Hedge Fund in or about March 2009.   After
learning that the Hedge Fund also owned shares of KITD, Auditor-

1 raised concerns with KALEIL ISAZA TUZMAN, the defendant, and others at KITD about whether the KITD investment in the Hedge Fund should have been disclosed to investors in public filings as a related party transaction. In an attempt to assuage Auditor-1's concerns, TUZMAN misrepresented the nature of his relationship with the Hedge Fund and with CC-1.

24. For instance, on or about August 12, 2009, KALEIL ISAZA TUZMAN, the defendant, sent an email to Auditor-1 stating in part that "[t]here has never been any relationship with [CC-1], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital otherwise." As demonstrated by, among other things, the December 2008 agreement between TUZMAN and CC-1, TUZMAN's representations to Auditor-1 were false and misleading.

## THE CONSPIRACY

25. From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, namely, fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections

78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Object Of The Conspiracy

26. It was a part and object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Overt Acts

27.   In  furtherance  of  the  conspiracy  and  to  effect  its
illegal  object,  the  following  overt  acts,  among  others,  were
committed in the Southern District of New York and elsewhere:

a.   On  or  about  December  31,  2008,  KALEIL  ISAZA
TUZMAN,  the  defendant,  CC-1,  and  CC-2  executed  an  agreement
pursuant  to  which  CC-1  agreed  that  the  Hedge  Fund  would  buy  at
least $400,000 of KITD common stock.

b.   Between  in  or  about  January  2009  and  in  or  about
February  2009,  CC-1  purchased  over  $400,000  of  KITD  common  stock
through the Hedge Fund.

c.   On  or  about  March  10,  2009,  TUZMAN  induced  KITD
to invest approximately $200,000 with the Hedge Fund.

d.   Over  the  next  30  days,  CC-1  accumulated  over
approximately 125,000 additional shares of KITD common stock.

e.   On  or  about  August  12,  2009,  TUZMAN  invested
approximately $204,000 with the Hedge Fund.

f.   Over  the  next  30  days,  CC-1  accumulated  over
approximately  37,000  additional  shares  of  KITD  common  stock,
which at the time was traded on the NASDAQ.

g.   On  or  about  February  3,  2010,  TUZMAN  induced  KITD
to invest approximately $700,000 with the Hedge Fund.

h.   In or about March 2011, CC-1 bought and sold KITD shares in an effort to artificially inflate the price of KITD shares.

i.   In or about July 2011, TUZMAN met with CC-1, CC-2, and others in Manhattan in part to discuss the Hedge Fund's KITD investment.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Securities Fraud: Market Manipulation)

The Grand Jury further charges:

28.   The allegations contained in paragraphs 1 through 24, and 27 are repeated and realleged as though fully set forth herein.

### The Statutory Allegation

29.   From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to

defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, to wit, TUZMAN engaged in efforts to artificially increase the share price and trading volume of KITD by causing CC-1 to buy and sell KITD shares that were in part funded by TUZMAN and KITD without disclosing that scheme to KITD shareholders or the investing public.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE

### (Conspiracy To Commit Wire Fraud)

The Grand Jury further charges:

30. The allegations contained in paragraphs 1 through 24, and 27, are repeated and realleged as though fully set forth herein.

### THE SCHEME TO DEFRAUD

31. From in or about March 2009 through in or about March 2011, KALEIL ISAZA TUZMAN, the defendant, caused KITD to invest approximately $1,150,000 with the Hedge Fund but failed to disclose to KITD shareholders that KITD's investments with the

15

Hedge Fund were not part of an arms-length relationship. In truth and in fact, KITD's investments with the Hedge Fund were for the purpose of assisting the Hedge Fund in its efforts to artificially increase the share price of KITD through the purchase and sale of KITD shares and, in one instance, to reimburse TUZMAN for a personal investment he made with the Hedge Fund.

## THE CONSPIRACY

32.   From at least in or about March 2009 up to in or about March 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

## Object Of The Conspiracy

33.   It was a part and an object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

Overt Acts

34. In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about March 10, 2009, KALEIL ISAZA TUZMAN, the defendant, caused KITD to wire $200,000 from a bank account in New York, New York to a bank account associated with the Hedge Fund.

b. On or about August 12, 2009, in response to an inquiry from Accounting Firm-1 about KITD's $200,000 investment with the Hedge Fund and whether it reflected a quid pro quo for the Hedge Fund's investment in KITD stock, TUZMAN falsely represented that "[t]here has never been any other relationship with [CC-1], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise. I have only met [CC-1] once in my life, and spoke to him only occasionally. No one at KIT digital or anyone associated with KIT digital has any suasion of any kind over his investments."

c.   On or about February 3, 2010, TUZMAN caused KITD to wire $250,000 from a bank account in New York, New York to a bank account associated with the Hedge Fund.

d.   On or about February 22, 2011, TUZMAN sent an e-mail to CC-1.  In that e-mail, TUZMAN wrote, "I am really sorry to do this to you, but as part of our efforts to wrap up everything outstanding, I have reached a settlement . . . that requires me to pay out an additional $250k . . . .  This is a personal payment . . . and since I have no other available funds at this time, I need to ask you to redeem my personal investment . . . with [the Hedge Fund]."

e.   On or about February 24, 2011, TUZMAN sent an e-mail to a ROBIN SMYTH, the defendant.  In that e-mail, TUZMAN wrote, "[CC-1] has been extremely helpful with respect to our work with [a financial institution] and some Asian corp dev't in particular.  Obviously I don't feel comfortable pay him any commissions on this stuff, given [CC-1's] firm's mandate, the fact that [CC-1] is a shareholder, etc.  In recognition of this contribution, however, I think it makes sense for us to slightly up the amount we have under management with [the Hedge Fund], particularly given the overall percentage of our cash it currently represents and our strategy of cash management diversification.  I was thinking something quite small that

18

sends a positive message, maybe $250k.    [The Hedge Fund] has been performing well also."

       f.    On or about March 1, 2011, TUZMAN caused KITD to wire $250,000 from a bank account in New York, New York to a bank account associated with the Hedge Fund.

       g.    On March 2, 2011, CC-1 sent TUZMAN a text message.  In that text message, CC-1 wrote, "Assumed 20% tax so 288 is num.  Can send u spreadsheet if u like."

       h.    On March 2, 2011, TUZMAN sent CC-1 reply text messages.  In those text messages, TUZMAN wrote, "I trust you. That's fine.  Can you please send to my account?".

       i.    On or about March 3, 2011, CC-1 wired approximately $288,101 to TUZMAN.

      (Title 18, United States Code, Section 1349.)

## COUNT FOUR

### (Wire Fraud)

The Grand Jury further charges:

35.  The allegations contained in paragraphs 1 through 24, paragraph 27 and paragraph 34 are repeated and realleged as though fully set forth herein.

### The Statutory Allegation

36.  From at least on or about February 22, 2011 through on or about March 4, 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, willfully and

knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, TUZMAN induced KITD to wire $250,000 from a bank account in New York, New York to the Hedge Fund, ostensibly for a corporate purpose, knowing that the Hedge Fund would then send the money to TUZMAN to reimburse a purely personal investment, which wire the Hedge Fund sent to a bank account controlled by TUZMAN.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE

### (Conspiracy To Commit Securities Fraud, Make False Statements In Annual And Quarterly SEC Reports And Make False Statements To Auditors)

The Grand Jury further charges:

37. The allegations contained in paragraphs 1 through 8 are repeated and realleged as though fully set forth herein.

### RELEVANT PERSONS AND ENTITIES

38. At all times relevant to this Indictment, The Country Network ("TCN") was a digital multicast network that specialized in broadcasting country music videos.

39.   At   all   times   relevant   to   this   Indictment,   Sezmi
Corporation ("Sezmi") was a cloud-based video delivery platform
company that helped television providers deliver content over
Internet Protocol connected devices.

## BACKGROUND

40.   Between in or about 2008, when KALEIL ISAZA TUZMAN,
the defendant, became Chairman and CEO of KITD, and in or about
the spring of 2012, when TUZMAN resigned his positions at KITD,
KITD, like many start-up technology companies, never reported a
profitable year in its annual financial statements.   Under
TUZMAN's leadership, however, KITD touted itself to the
investing public as a growing company that routinely met or
exceeded the so-called "guidance" that TUZMAN and other KITD
executives communicated to the investing public concerning
KITD's operational and financial results for upcoming reporting
periods.   However, as set forth more fully below, TUZMAN and
ROBIN SMYTH, the defendant, used various false and deceptive
means to misrepresent KITD's true financial health to its
shareholders and the investing public.

41.   On or about November 21, 2012, after an internal
investigation led by KITD's audit committee, KITD filed a Form
8-K, which is a report that public companies must file with the
SEC to announce major events that shareholders should know
about.   In the Form 8-K, KITD announced to the investing public

that KITD had discovered various errors and irregularities in its historical financial statements and that it would have to issue restated financial statements. On the first trading day following this announcement, the price of KITD's common stock plummeted more than 64% from the previous day's closing price. In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.

## CERTAIN RELEVANT ACCOUNTING PRINCIPLES

42. At all times relevant to this Indictment, KITD provided members of the investing public with information concerning KITD's anticipated and actual financial results. KITD provided such information through various methods, including public filings with the SEC, periodic news releases and other corporate announcements, statements made in conference calls with professional securities analysts and investors, and meetings and conferences held with investors. Investors considered the information provided by KITD in deciding whether to purchase, hold, or sell KITD securities.

43. KITD's public filings with the SEC included financial statements which contained, among other things, an Income Statement and a Balance Sheet. A company's Income Statement reports, among other things, revenue recognized, expenses incurred, and net income earned during a stated period of time, usually a fiscal quarter or a fiscal year. Within an Income

Statement, expenses are subtracted from revenue to calculate net income. A company's Balance Sheet reports the company's assets, liabilities, and shareholder equity as of a specific date.

44. At all times relevant to this Indictment, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and others, participated in the process of communicating KITD's financial condition to the investing public by (a) signing and certifying the accuracy of KITD's filings with the SEC, (b) speaking at meetings, conferences, and conference calls with securities analysts and investors, and (c) providing and reviewing information that was included in KITD's financial results, reports, and public disclosures.

## THE SCHEME TO DEFRAUD

45. As set forth more fully below, from at least in or about 2010 through in or about 2012, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, with others, engaged in an illegal scheme to deceive KITD shareholders, members of the investing public, KITD's independent auditors and others concerning KITD's true operating performance and financial results. In furtherance of the scheme, TUZMAN, SMYTH, and their co-conspirators: (a) made and caused KITD to make statements to the public, its independent auditors and others which falsely described KITD's revenues, expenses and other financial results and omitted to disclose material facts necessary to make the

statements made about KITD's financial results complete, accurate, and not misleading; and (b) caused KITD to file financial statements with the SEC that presented a materially false and misleading description of KITD's operating performance and financial results.

46. At various times relevant to this Indictment, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, with others, devised and executed a scheme to inflate falsely KITD's revenue. This scheme involved two principal methods: (a) the improper recognition of revenue from so-called "perpetual license" contracts for KITD software (contracts that gave the purchasing customer the right to use the licensed software indefinitely), and (b) the execution of fraudulent "round-trip" transactions which had the effect of using KITD's own cash, rather than payments received from customers, to pay off bills, known as accounts receivable, that were due and owed to KITD from those customers, rather than disclose to KITD's auditors and the investing public the fact that the bills were uncollectible.

47. With regard to the first method, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, knew that KITD had sold perpetual licenses for software that, at the time of sale, was not complete and required substantial future development. But instead of booking revenue ratably as KITD reached interim development milestones or recognizing revenue in full once

24

software development was complete, TUZMAN and SMYTH caused KITD to recognize the entirety of the revenue from certain contracts at the time of sale despite the fact that KITD had not delivered a product to KITD's customers. This premature revenue recognition violated relevant software accounting principles and was contrary to KITD's statements to the investing public and its independent auditors, among others.

48. With regard to the second method, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, on at least one occasion, caused KITD to use company money, ostensibly escrowed in connection with a KITD corporate acquisition, to pay off suspicious or uncollectible receivables by year-end. Specifically, TUZMAN and SMYTH caused KITD to add an artificial "restructuring fee" to the purchase price of certain companies that KITD sought to acquire. Once the purchase price was raised, TUZMAN and SMYTH established an escrow account that was funded with KITD cash which purported to represent the so-called restructuring fee. The use of the escrowed KITD money was governed by a "side letter" between KITD and the acquired company that TUZMAN and SMYTH created but that both men intentionally hid from KITD's independent auditors and the investing public. The side letter dictated that escrowed funds could be used only to cover the costs KITD expected to incur from integrating the acquired company into KITD. However, as

more fully described below, on at least one occasion, TUZMAN and SMYTH used the escrowed money in a round-trip transaction that resulted in KITD using its own cash to pay down old receivables that, because of their age, might have attracted scrutiny from KITD's independent auditors and could have negatively impacted KITD's financial statements if they had remained unpaid.

### THE DEFENDANTS ARTIFICIALLY INFLATE KITD REVENUE

49.  From at least in or about 2010 up to in or about 2012, KITD improperly recognized revenue from certain perpetual licenses for software that had not been delivered to customers. This fraudulent practice of recognizing revenue caused KITD to materially overstate its reported revenue, which had the effect of materially overstating KITD's net income and earnings on its annual and quarterly financial reports issued from the fiscal quarter ending June 30, 2010 through the fiscal quarter ending March 31, 2012.

50.  In each of its annual Form 10-K filings, KITD disclosed to members of the investing public that it followed a revenue recognition policy that required four basic criteria to be met in order for revenue to be recognized. Specifically, KITD disclosed that it counted revenue on its books and records when (a) there is persuasive evidence that an arrangement exists; (b) the price is fixed or determinable; (c) collectability is reasonably assured; and (d) product delivery

has occurred or services have been rendered. Pursuant to KITD's disclosures, therefore, revenue was not to be recognized when KITD had not in fact delivered a product to a client.

51. As set forth below, on at least two occasions, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, with others, recognized revenue for products that KITD had failed to deliver to its clients. TUZMAN and SMYTH also worked together to conceal their improper revenue recognition from KITD's independent auditors.

### The Country Network Contract

52. In approximately August 2010, KITD entered into an agreement with TCN to provide TCN with a product that KITD referred to as "VX Manager" or "VX Enterprise" (hereinafter, "VX Manager"). The total contract value was approximately $1,488,000, which consisted of a $1,338,000 perpetual license fee for KITD software and $150,000 for setup fees. A KITD sales representative ("Employee-1") pitched the VX Manager as a groundbreaking technological innovation that would allow TCN to stream video content on various platforms, including mobile devices.

53. On or about June 25, 2010, Employee-1 sent the TCN CEO a KITD proposal dated June 20, 2010 (the "June 20, 2010 Proposal") for VX Manager. Critically, the June 20, 2010 Proposal set forth a "deployment timeline" in which KITD

promised to provide TCN with certain components of VX Manager starting in August 2010 and ending in April 2011.

54. Despite this deployment timeline, ROBIN SMYTH, the defendant, caused KITD to record approximately $1,338,000 of revenue -- the entirety of the perpetual license fee from the TCN contract -- during the fiscal quarter ending June 30, 2010. To aid this fraudulent scheme, among other things, on or about August 9, 2010, SMYTH directed Employee-1 to ask the TCN CEO to confirm falsely and in writing that KITD had delivered VX Manager to TCN on June 22, 2010. Employee-1 complied with SMYTH's instruction, and the TCN CEO subsequently signed the false confirmation. As SMYTH well knew at the time, this revenue recognition was improper for three principal reasons: First, as of June 30, 2010, KITD and TCN had not finalized a contract to purchase VX Manager. Second, as of June 30, 2010, KITD had not delivered VX Manager to TCN. Third, as the June 20, 2010 Proposal illustrated on its face, the VX Manager software did not exist as of June 30, 2010 and required significant development by KITD through 2011. Accordingly, pursuant to KITD's stated accounting policies, the TCN perpetual license fee should not have been recorded as revenue for the fiscal quarter ending June 30, 2010. As a result of this improper revenue recognition, KITD's revenue for the fiscal quarter ending June 30, 2010 was overstated by more than 5% and

28

its pre-tax losses were understated by approximately 78%. Furthermore, the consensus estimate among analysts covering KITD's stock was that KITD would earn $22.2 million in revenues in the fiscal quarter ending June 30, 2010. With the revenue from the TCN perpetual license, KITD was able to exceed analysts' revenue estimates. Without the revenue from the TCN perpetual license, KITD would have missed analysts' revenue estimates.

55. KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and a co-conspirator not named as a defendant herein ("CC-3") trumpeted the TCN deal to the investing public. For example, on or about August 16, 2010, TUZMAN, SMYTH, and CC-3 participated in an earnings conference call with securities analysts and investors. During the conference call, CC-3 highlighted TCN's contract to purchase VX Manager (a contract that, in reality, did not exist as of June 30, 2010) as one of KITD's operational "wins" for the fiscal quarter ending June 30, 2010. The same day, KITD issued a press release touting the TCN contract in a similar manner, calling it a "select client win."

56. Contrary to its promises to TCN that KITD had the capability to develop VX Manager, KITD immediately encountered technological and other problems that imperiled the VX Manager deployment. By in or about December 2010, KALEIL ISAZA TUZMAN, the defendant, was informed by Employee-1 and others that TCN

was extremely dissatisfied with the pace of the VX Manager development and that TCN had "no confidence in [KITD's] ability to deliver ANY software functionality." After detailed internal discussions about KITD's chronic delivery failures, TUZMAN and others decided that KITD would cease developing VX Manager for TCN and that, instead, KITD would provide TCN with an alternative, less-sophisticated product called "VX Vision." The result of TUZMAN's decision was that VX Manager was never delivered to TCN.

57. Despite knowing that KITD had failed to deliver VX Manager to TCN, and had no plans to deliver VX Manager to TCN, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, included the fraudulently-recognized revenue from the TCN contract on KITD's Form 10-K for the fiscal year ending December 31, 2010.

58. In or about February 2011, as part of its KITD audit, Accounting Firm-2 sent a letter to TCN seeking to confirm whether TCN in fact owed KITD $1,338,882 and $150,000, as stated in two separate invoices. In response to the inquiry, on or about March 4, 2011, TCN's president (the "TCN president") told Accounting Firm-2 that KITD had failed to deliver the product.

59. On or about April 29, 2011, an audit manager with Accounting Firm-2 ("Auditor-2") forwarded the TCN president's response to ROBIN SMYTH, the defendant, and others. Auditor-2 informed SMYTH that TCN's total outstanding balance was material

TCN was consuming the product.[2]  In truth and in fact, and as
TUZMAN well knew, TCN's audit response accurately reflected
KITD's failure to deliver a product.  TUZMAN's
misrepresentations were successful in convincing Accounting
Firm-2 that KITD's prior financial statements did not need to be
restated.

62.  Although KALEIL ISAZA TUZMAN, the defendant, misled
Accounting Firm-2 into believing that KITD had, in fact,
delivered a product to TCN, TUZMAN and ROBIN SMYTH, the
defendant, had a significant problem that remained unresolved:
TCN maintained a balance for $1,488,882, which TCN refused to
pay.  Because SMYTH caused KITD to fraudulently recognize
approximately $1,338,000 from the TCN contract in the fiscal
quarter ending June 30, 2010, KITD needed to demonstrate that it
was able to collect TCN's receivable within one calendar year.
Without a timely payment from TCN before the end of the fiscal
quarter ending June 30, 2011, KITD would not be able to prove
that collectability was reasonably assured -- which was one of
KITD's four stated criteria for revenue recognition in its
annual reports.

_____

[2] TCN had been consuming a basic software product that
allowed it to stream videos on its website, and it was this
product to which KALEIL ISAZA TUZMAN, the defendant, referred
the auditors.  This product, however, was originally created by
a different company and was not, as TUZMAN well knew, VX
Manager, which TCN had contracted to use in August 2010 and had
never received.

63.   On or about June 1, 2011, ROBIN SMYTH, the defendant,
sent KALEIL ISAZA TUZMAN, the defendant, and CC-3 an email in
which he underscored the urgency of resolving TCN's outstanding
receivable before the end of the fiscal quarter ending June 30,
2011.   The subject of the email was "TCN and others."   SMYTH
wrote: "As you are aware we need to solve for TCN.   This
perpetual license for $1.38 mil went into revenue Q2 last year
which means it needs to be paid within 12 months (by end of
June) to keep in revenue.   It will create other credibility
issues for other outstanding license deals with auditors if this
is not solved.   Can we get on a call to discuss an action plan."
TUZMAN responded: "Agreed.   Am in touch with [the TCN CEO]."

64.   Between in or about April 2011 and in or about August
2011, KALEIL ISAZA TUZMAN, the defendant, sought to convince TCN
to pay KITD over $1,338,000 despite the fact that KITD had not
delivered a product to TCN.   For instance, on or about May 3,
2011, the TCN CEO sent TUZMAN an email and stated: "Correct me
if I misunderstand our situations.   You need me to certify to
the auditors that the amounts listed are correct and are owed to
Kit and then you would like us to also pay Kit these sums for
completing the project.   I, on the other hand, need to turn back
time or, at the very least, deploy the service as contracted
nearly a year ago."

65.   Ultimately, as the end of the fiscal quarter ending June 30, 2011 neared, KALEIL ISAZA TUZMAN, the defendant, assisted by ROBIN SMYTH, the defendant, proposed a solution that TCN eventually accepted.   On or about June 26, 2011, TUZMAN emailed the TCN CEO, telling him "I have an idea" and emphasizing that "[t]his is extremely timely, given Q2 ends in a few days."   TUZMAN later told the TCN CEO that he had secured a loan for TCN in the amount of $1,578,882 from a British Virgin Islands entity called Jourdian Invest Ltd. ("Jourdian Invest"). Under TUZMAN's design, TCN would be obligated to use the money to pay its outstanding balance to KITD.   However, TCN would not have to repay the loan to Jourdian Invest until TCN received a product from KITD.   Indeed, in the loan agreement, which SMYTH prepared at TUZMAN's direction, this repayment date was tethered to an unspecified point in the future called "Product Delivery."

66.   The TCN CEO ultimately agreed to use the loan proceeds to pay TCN's full contract balance.   However, pursuant to KITD's stated accounting policies, because no product had been delivered to TCN by the fiscal quarter ending June 30, 2011, KITD should have taken a charge for the revenue it previously recognized in its prior financial statements.   Had KITD taken a charge for the TCN contract amount in the fiscal quarter ending June 30, 2011, KITD's reported pre-tax losses would have increased by approximately 6%.   Furthermore, by concealing that

34

KITD had failed to develop its highly-touted VX Manager product and by concealing that KITD obtained payment from TCN only via a loan from an offshore entity which was orchestrated by KALEIL ISAZA TUZMAN, the defendant, TUZMAN and ROBIN SMYTH, the defendant, not only avoided enhanced scrutiny from the auditors of other, similarly aging perpetual license deals, but TUZMAN and SMYTH also deceived the investing public about matters of material importance.

### The Totalmovie and Iusacell Contracts

67.   In or about the summer of 2011, KITD began to examine Sezmi as a potential target for acquisition.  At the time, Sezmi had an active contract with two technology companies, Totalmovie and Iusacell.  Under the contract, Sezmi was working to develop technology that would allow Totalmovie and Iusacell to deliver television services and video on demand hosting in Mexico (the "Sezmi Product").  Sezmi was obligated to create and deliver the Sezmi Product in stages over the course of 2011.  However, Sezmi experienced considerable development delays and fell behind schedule for the delivery of the Sezmi Product.

68.   During KITD's negotiations with Sezmi, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, informed Sezmi that -- if KITD acquired Sezmi -- they wanted to recognize revenue immediately for Sezmi's work in creating the Sezmi Product. TUZMAN and SMYTH also made clear to Sezmi that, to accomplish

35