this goal, KITD required Sezmi to cancel its existing contractual relationship with Totalmovie and Iusacell and then negotiate two new contracts on KITD's behalf: one contract between KITD and Totalmovie and one contract between KITD and Iusacell, and that both new contracts be styled as perpetual license agreements.

69. In or about December 2011, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and others, including a co-conspirator not named as a defendant herein ("CC-4"), discussed KITD's strategy for breaking the contractual relationship between Sezmi and Totalmovie and Iusacell. On or about December 4, 2011, CC-4 sent SMYTH a document titled "Sezmi/Iusacell Deal Revenue Analysis." The document contained a series of forward-looking fictions that KITD could use to rationalize its revenue recognition goals, including that Sezmi lacked the resources and software capability to complete the Sezmi Product.

70. The same day, on or about December 4, 2011, ROBIN SMYTH, the defendant, responded and agreed with CC-4's analysis. SMYTH then instructed CC-4: "Important that there is no linkage to other services or revenue to be delivered or received with the perpetual license. No reference to previous contract." In other words, SMYTH instructed CC-4 to separate the services and the software licensing components of the contract into separate contracts which did not refer to each other. Therefore, it

would appear from the face of the license agreement that a finished product had been delivered; meanwhile, the services agreement separately laid out the deadlines for the actual development and delivery of the same product. As SMYTH well knew, the purpose of drafting the documents in this misleading fashion, i.e., separating the licensing and services components of the contract, was to create a fiction in which KITD could justify its recognition of revenue on the license agreement for fiscal year 2011, as the license agreement contained no product completion deadlines, and to disguise the fact that, as the services agreement made clear, no product would be delivered in 2011, as it did not yet even exist.

71. On or about December 8, 2011, KALEIL ISAZA TUZMAN, the defendant, sent an email to Sezmi executives and ROBIN SMYTH, the defendant, in which TUZMAN instructed the Sezmi executives on how to go about breaking the contractual relationship between Sezmi and Totalmovie and Iusacell. In response to TUZMAN's email, SMYTH declared that he would manage the contract renegotiation process and that he would enlist CC-4's help to draft the new contracts. Sezmi executives agreed to KITD's demands that their contracts be renegotiated.

72. Between in or about early December 2011 and on or about December 30, 2011, CC-4 worked with Sezmi executives to draft new contracts with Totalmovie and Iusacell. The new

contracts followed the parameters set forth by KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants. When drafting the new contracts, CC-4, following TUZMAN and SMYTH's instructions, separated the prior Sezmi contract into two separate agreements -- a license agreement and a services agreement -- and removed from the license agreement all references to the services agreement.

73. Although separated into different documents and scrubbed of cross references, the license and services agreements were clearly related. For instance, the Totalmovie services agreement explicitly dictated the various development milestones that KITD had to meet (starting in February 2012 and extending into December 2012) to satisfy its obligations under the Totalmovie license agreement. If KITD failed to meet those milestones, then KITD agreed to pay Totalmovie substantial penalties that would offset the amount of money Totalmovie otherwise would owe KITD pursuant to the license agreement.

74. Drafting the contracts in this manner helped KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and CC-4 to obscure the fact that KITD would not deliver a final product to Totalmovie or Iusacell in 2011, because no product existed in 2011.

75. On or about December 29, 2011, KITD and Sezmi finalized the new Totalmovie and Iusacell contracts. CC-4 sent

the final contracts to ROBIN SMYTH, the defendant, and CC-3 for their review and signature. In response, SMYTH asked CC-4 whether he was "100% happy with these" contracts. CC-4 told SMYTH that he (CC-4) was "worried about the Sezmi folks ability to deliver on the functionality they promised the customers." CC-4 explained that, if Sezmi failed to deliver, then KITD would "have another [TCN] situation."

76. On or about December 30, 2011, KITD purchased Sezmi's assets pursuant to an Asset Purchase Agreement (the "APA").

77. KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and CC-4 caused KITD to recognize approximately $4,800,000 in revenue (approximately $2,500,000 from the Totalmovie license agreement and $2,300,000 from the Iusacell license agreement) in the fiscal quarter ending December 31, 2011. As TUZMAN, SMYTH and CC-4 well knew at the time this revenue was recorded, KITD had not completed and delivered a product to Totalmovie or Iusacell in 2011. Pursuant to KITD's stated accounting policies, this revenue should not have been recognized in 2011. This improper revenue recognition misled the investing public and others about KITD's financial health, including by permitting KITD to exceed its revenue guidance and beat analysts' consensus estimates. KITD's revenue guidance for the fiscal quarter ending December 31, 2011 was $67 million. With the improper revenue from the Totalmovie and Iusacell license

agreements, KITD was able to report quarterly revenue of more than $70 million, thereby beating KITD's previous guidance. Without the improper revenue, KITD would have missed guidance for the quarter. Furthermore, the improper revenue recognition allowed KITD to understate its pre-tax losses for the fiscal year by approximately 15%.

## THE DEFENDANTS CONDUCT AN ILLEGAL ROUND-TRIP TRANSACTION WITH KITD CASH

78. KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, also used the Sezmi acquisition to conduct an illegal round-trip transaction in which TUZMAN and SMYTH used millions of dollars of KITD's cash, ostensibly escrowed for the Sezmi acquisition, to pay down aged receivables by year-end.

79. After evaluating Sezmi for potential acquisition in the summer of 2011, KITD extended two offers to purchase Sezmi's assets. In or about September 2011, KITD offered Sezmi $12,000,000 in KITD common stock. In or about October 2011, KITD raised its offer to $21,000,000 in KITD common stock. Neither offer contained cash consideration. On or about November 1, 2011, a senior KITD executive responsible for conducting due diligence on Sezmi in connection with the proposed acquisition ("Employee-2[3]") wrote the following email to

---

[3] Employee-2 was previously the CEO of Peerset, a company that KITD acquired in or about June 2011.

KALEIL ISAZA TUZMAN, the defendant, updating him on an idea that

ROBIN SMYTH, the defendant, had for the Sezmi transaction:

> Robin and I are also speaking. He wants to
> go a different direction and see if they
> will do an asset deal where we don't take
> these GAAP and revenue visibility unfriendly
> contracts and instead we would negotiate
> contracts with their two customers
> concurrent with closing the technology asset
> purchase. Robin likes this because the
> optics could look like that groupo
> salinas/televisa wants to work with kit
> digital and our owned technologies so bad
> that they are wilking [sic] to pay us in our
> business model (perpetual license or monthly
> saas) vs how they had planned to pay
> Sezmi. Robin wants this revenue for this q
> and next q so it's worth a shot. Somewhat
> like the Peerset deal Robin also wants to
> take a restructuring charge.

80. Both concepts (recognizing revenue from Sezmi's two largest clients in the fiscal quarter ending December 31, 2011 and including a "restructuring charge" in the deal) became fraudulent features of the Sezmi transaction. As noted above, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, working with CC-4, improperly recognized approximately $4,800,000 in revenue in the fiscal quarter ending December 31, 2011. And, as explained more fully below, TUZMAN and SMYTH also used the concept of a restructuring charge to conduct an illegal round-trip transaction.

81. In response to Employee-2's email, KALEIL ISAZA TUZMAN, the defendant, wrote: "OK, thanks for the update. Makes sense. What's the latest? What can I do to help?"

82. In the days that followed, KALEIL ISAZA TUZMAN, the defendant, edited the term sheet for the Sezmi acquisition, adding a $6,000,000 "restructuring fee" into the KITD offer. The term sheet therefore showed KITD proposing to pay Sezmi $21,000,000 in KITD common stock and $6,000,000 in cash. On or about November 22, 2011, TUZMAN emailed his mark-up to ROBIN SMYTH, the defendant, and CC-3. In response to TUZMAN's term sheet mark-up, SMYTH told TUZMAN: "We cannot put restructuring in like this as auditors would expect an accounting for it if they see this. There really can be no external view."

83. Between in or about November 2011 and in or about December 2011, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, raised the proposed restructuring charge from $6,000,000 to $7,850,000. TUZMAN and SMYTH consistently represented to Sezmi executives that the restructuring charge would be used exclusively to cover the integration costs that KITD would incur when integrating Sezmi into KITD. SMYTH further told Sezmi executives that KITD wanted Sezmi to execute a side-letter agreement, outside of the APA, that would govern KITD's use of the $7,850,000.

84. On or about December 30, 2011, the same day that KITD acquired Sezmi, ROBIN SMYTH, the defendant, completed a side-letter agreement with Sezmi (the "December 30, 2011 Side-Letter Agreement"), which first explained that expected integration costs included expenses related to, among other things, "hardware, software, [and] increasing and training of sales personnel." The December 30, 2011 Side-Letter Agreement then stated that KITD and Sezmi agreed to use $7,850,000 to cover these expected integration costs and that none of the money would "be utilized to compensate any Sezmi shareholder, officer or director, directly or indirectly."

85. The December 30, 2011 Side-Letter Agreement obligated KITD to send $7,850,000 to an escrow account. However, it made clear that Sezmi had no control over or say in the disposition of the $7,850,000, but rather that funds "may be drawn from the Escrow Account at KIT's sole election and absolute discretion to facilitate the Post Acquisition Integration." Finally, the December 30, 2011 Side-Letter Agreement stated that "KIT is under no obligation to provide [Sezmi] with any reports or accounting information with respect to any expenditures related to the [$7,850,000]."

86. Although the December 30, 2011 Side-Letter Agreement was a critical component of KITD's acquisition of Sezmi, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, deliberately

concealed its existence from the investing public, KITD's auditors, and others. Accordingly, on or about January 6, 2012, when KITD issued a Form 8-K announcing that it had acquired Sezmi, TUZMAN and SMYTH intentionally omitted all references to the December 30, 2011 Side-Letter Agreement. Instead, the Form 8-K, which was signed by TUZMAN, falsely stated that the consideration paid to Sezmi included "approximately $8 million of cash" despite the fact that the December 30, 2011 Side-Letter Agreement made clear that none of Sezmi's shareholders, officers or directors were entitled to any of the money and that the money remained under the sole control of KITD. Finally, the Form 8-K attached the APA, but omitted the December 30, 2011 Side-Letter Agreement, as an exhibit. KITD's subsequent Form 10-K for the 2011 fiscal year, which TUZMAN and SMYTH signed, contained similar misrepresentations. For instance, the Form 10-K stated that the Sezmi purchase price included $7,850,000 in cash consideration. However, because the $7,850,000 was not in fact transferred to Sezmi's shareholders, officers or directors, it was not part of the consideration transferred for the Sezmi acquisition. Accordingly, by falsely representing that $7,850,000 was part of the Sezmi purchase price, KITD's balance sheet overstated KITD's assets, specifically goodwill from the Sezmi acquisition, by $7,850,000.

87.  Although the December 30, 2011 Side-Letter Agreement claimed that the $7,850,000 would be used exclusively for KITD's post-acquisition integration costs associated with the Sezmi transaction, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, used the money for an entirely different purpose. Specifically, on or about December 22, 2011, days before KITD acquired Sezmi, TUZMAN caused KITD to wire $7,850,000 from a New York, New York bank account to an escrow account at a bank located in Cyprus.  On the same day, SMYTH signed an escrow agreement (the "Escrow Agreement") with an escrow agent based in Cyprus (the "Escrow Agent").  The Escrow Agreement stated that the $7,850,000 was being placed with the Escrow Agent "in relation to the acquisition of [Company-1]."  Company-1 was a company that KITD also was seeking to purchase in or about December 2011.  The Company-1 acquisition, however, was unsuccessful and negotiations ceased in or about late December 2011.

88.  On or about December 23, 2011, ROBIN SMYTH, the defendant, sent an "Escrow Release Instruction Letter" to the Escrow Agent (the "December 23, 2011 Escrow Letter").  In the December 23, 2011 Escrow Letter, SMYTH directed the Escrow Agent to release the $7,850,000 to various corporate entities, including entities related to certain KITD clients that, at the time, appeared to have outstanding and aging account receivables

with KITD (i.e., revenue that KITD had recognized for agreements as to which the company had not yet been paid). The December 23, 2011 Escrow Letter directed that the $7,850,000 be dispensed in the following manner:

| Recipient | Amount |
|---|---|
| Bimini Trading Ltd | $2,000,000 |
| Alpha Tauri Holdings | $2,600,000 |
| Digigov Operations Ltd | $2,648,000 |
| Visual Unity | $452,000 |
| JB Legal Consulting | $150,000 |

89. Two of the entities listed in the December 23, 2011 Escrow Letter, Alpha Tauri Holdings and Digigov Operations Ltd, made payments on behalf of companies that purportedly held license agreements with KITD that dated back to December 2010 and that had outstanding balances owed to KITD. A third entity, Bimini Trading Ltd, had a license agreement with KITD that dated back to February 2011 and also had an outstanding balance owed to KITD. KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, knew that KITD needed to receive payment on those outstanding receivables within one calendar year. Otherwise, Accounting Firm-2 might have scrutinized these unpaid receivables and

similar aging license agreements and caused KITD to write down the receivables and recognize expenses.

90. On or about December 25, 2011, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and CC-3 discussed the status of negotiations with Sezmi and Company-1. SMYTH sent TUZMAN and CC-3 a series of emails revealing his concern about KITD's days sales outstanding, or "DSO," which is a measure of the average number of days a company takes to collect payment on goods and services. DSO is a key metric for investors, as it demonstrates how well a company manages its accounts receivable. SMYTH reported to TUZMAN and CC-3 that "DSO" was "very high." SMYTH expressed concern that at least $5 million of revenue recognized in the previous fiscal year was uncollectable and that KITD's auditors would not allow KITD to enter similar license deals without a track record of collectability. SMYTH told TUZMAN and CC-3 that the "earliest [I] will get the money out of Sezmi is end of first week in January" and stated that "[w]e need to do the deals with all the liabilities first." SMYTH explained that the "only way to get the money in right spot that [I] sent into escrow last week is if it leaves first thing Tuesday [morning] immediately after money arrives in escrow. Even if we could get money out of Sezmi [I] cannot get it into right [spot] in time."

91. On or about December 27, 2011, ROBIN SMYTH, the defendant, sent an updated "Escrow Release Instruction Letter" to the Escrow Agent (the "December 27, 2011 Escrow Letter"). The December 27, 2011 Escrow Letter directed that the $7,850,000 be dispensed in the following manner:

| Recipient | Amount |
|---|---|
| Bimini Trading Limited | $950,000 |
| Alpha Tauri Holdings | $2,600,000 |
| Digigov Operations Ltd | $2,648,000 |
| KIT digital Czech | $452,000 |
| JB Legal Consulting | $1,200,000 |

92. Between on or about December 29, 2011 and on or about December 31, 2011, KITD received, in a round-trip fashion, approximately $4,400,000 from Bimimi Trading Limited, Alpha Tauri Holdings and Digigov Operations. Specifically, Bimini Trading Limited wired KITD $949,985, Alpha Tauri Holdings wired KITD $2,499,985, and Digigov Operations wired KITD $939,000. The round-trip transactions made it appear that KITD customers with outstanding receivables had, in fact, paid their balances. In truth and in fact, however, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, used KITD's own money to pay down KITD's receivables and justify KITD's prior recognition of that

revenue. TUZMAN and SMYTH used the remainder of the $7,850,000 to pay other expenses unrelated to the Sezmi acquisition.

93. As a result of their misconduct, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, caused KITD to, among other things, understate its pre-tax, 2011 year-end losses by at least 14% on its Form 10-K.

## THE CONSPIRACY

94. From in or about June 2010 through in or about March 2012, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a), 78o(d) and 78ff; and (c) to make and cause to be made false and misleading statements and omissions to KITD's auditors, in violation of Title 15, United States Code, Sections

78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

95. It was a part and an object of the conspiracy that KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities issued by KITD, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing KITD to make untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## False Statements In
## Annual And Quarterly SEC Reports

96. It was further a part and an object of the conspiracy that KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and others known and unknown, willfully and knowingly, in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause KITD to make statements that were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a), 78o(d) and 78ff.

## False Statements To Auditors

97. It was further a part and an object of the conspiracy that KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, being officers of KITD, an issuer with a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, (a) make and cause to be made materially false and misleading statements; and (b) omit to state, and cause other persons to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which such statements were made, not misleading to accountants in connection with (i) audits and examinations of the financial statements of KITD, required to be

filed with the SEC pursuant to rules and regulations enacted by the SEC; and (ii) the preparation and filing of documents and reports, required to be filed with the SEC pursuant to rules and regulations enacted by the SEC, in violation of Title 17, Code of Federal Regulations, Section 240.13b2-2 and Title 15, United States Code, Section 78ff.

**Overt Acts**

98.   In furtherance of the conspiracy and to effect its illegal objects, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about August 9, 2010, SMYTH requested that TCN sign a document that falsely claimed that KITD had delivered the VX Manager software to TCN on June 22, 2010.

b.   On or about August 16, 2010, SMYTH participated in a quarterly earnings conference call for the fiscal quarter ending June 30, 2010.   During that conference call, SMYTH reported inflated earnings results that included over $1,388,000 in improperly recorded revenue from the TCN contract.

c.   On or about August 16, 2010, TUZMAN and SMYTH signed KITD's Form 10-Q for the fiscal quarter ending June 30, 2010, which was transmitted electronically to the SEC from New York, New York.

d.    On or about March 16, 2011, TUZMAN and SMYTH signed KITD's Form 10-K for the fiscal year ending December 31, 2010, which was transmitted electronically to the SEC from New York, New York.

e.    On or about May 1, 2011, TUZMAN sent an email to Accounting Firm-2 in which he falsely represented that KITD had delivered VX Manager to TCN, despite TCN's representations to the contrary.

f.    On or about August 9, 2011, TUZMAN and SMYTH signed KITD's Form 10-Q for the fiscal quarter ending June 30, 2011, which was transmitted electronically to the SEC from New York, New York.

g.    On or about December 4, 2011, SMYTH sent an email to CC-5 concerning revenue recognition.

h.    On or about December 8, 2011, TUZMAN sent an email to Sezmi executives concerning revenue recognition.

i.    On or about December 22, 2011, TUZMAN caused KITD to wire $7,850,000 from a bank account in New York, New York to a bank account in Cyprus.

j.    On or about December 23, 2011, SMYTH executed the December 23, 2011 Escrow Letter.

k.    On or about December 27, 2011, SMYTH executed the December 27, 2011 Escrow Letter.

l. On or about January 6, 2012, TUZMAN signed KITD's Form 8-K, which was transmitted electronically to the SEC from New York, New York.

m. On or about March 30, 2012, TUZMAN and SMYTH signed KITD's Form 10-K for the fiscal year ending December 31, 2011, which was transmitted electronically to the SEC from New York, New York.

(Title 18, United States Code, Section 371.)

## COUNT SIX

### (Securities Fraud)

The Grand Jury further charges:

99. The allegations contained in paragraphs 1 through 8, paragraphs 38 through 93, and paragraph 98 of this Indictment are repeated and realleged as if fully set forth herein.

100. From in or about June 2010 up to and including March 2012, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN and ROBIN SMYTH, the defendants, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities issued by KITD, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices,

schemes and artifices to defraud; (b) making and causing KITD to make untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNTS SEVEN THROUGH NINE

**(False Statements In Annual And Quarterly SEC Reports)**

The Grand Jury further charges:

101. The allegations contained in paragraphs 1 through 8, paragraphs 38 through 93, and paragraph 98 of this Indictment are repeated and realleged as if fully set forth herein.

102. On or about the dates listed below, in the Southern District of New York and elsewhere, the defendants listed below willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, the defendants listed below caused to be submitted to the SEC the

filings listed below which omitted material facts and contained materially misleading statements:

| COUNT | Defendant(s) | FILING | APPROXIMATE DATE OF FILING |
|-------|--------------|--------|----------------------------|
| SEVEN | ROBIN SMYTH | Form 10-Q for KITD for the fiscal quarter ending June 30, 2010 | August 16, 2010 |
| EIGHT | KALEIL ISAZA TUZMAN, ROBIN SMYTH | Form 10-Q for KITD for the fiscal quarter ending June 30, 2011 | August 9, 2011 |
| NINE | KALEIL ISAZA TUZMAN, ROBIN SMYTH | Form 10-K for KITD for the fiscal year ending December 31, 2011 | March 30, 2012 |

(Title 15, United States Code, Sections 78m(a), 78o(d) and 78ff; Title 17, Code of Federal Regulations, Section 240.13a-1; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

103. As a result of committing one or more of the foregoing securities and wire fraud offenses alleged in Counts One through Nine of this Indictment, KALEIL ISAZA TUZMAN, the defendant (as to acts alleged in Counts One through Six and Counts Eight through Nine of this Indictment), and ROBIN SMYTH, the defendant (as to acts alleged in Counts Five through Nine), shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

## Substitute Asset Provision

104. If any of the above-described forfeitable property, as

a result of any act or omission of the defendants:

     a.   cannot be located upon the exercise of due diligence;

     b.   has been transferred or sold to, or deposited with, a third party;

     c.   has been placed beyond the jurisdiction of the court;

     d.   has been substantially diminished in value; or

     e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

     (Title 18, United States Code, Section 981; Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

57

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

KALEIL ISAZA TUZMAN and
ROBIN SMYTH,

Defendants.

SEALED INDICTMENT

15 Cr.

(18 U.S.C. §§ 2, 371, 1343, & 1349;
15 U.S.C. §§ 78j(b), 78ff, 78m(a),
& 78o(d);
17 CFR §§ 240.10b-5, 240.10b5-2,
240.13a-1, & 240.13b2-2.)

PREET BHARARA
United States Attorney

Foreperson

8/12/15 - Filed Sealed Indictment
ac