# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Avi Weitzman
Direct: +1 212.351.2465
Fax: +1 212.351.5265
AWeitzman@gibsondunn.com

November 10, 2015

<u>VIA ECF AND HAND DELIVERY</u>

Judge Paul G. Gardephe
United States District Judge
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007-1312

Re:     *United States v. Kaleil Isaza Tuzman*, No. S1 15 Cr. 536 (PGG)

Dear Judge Gardephe:

We are outside counsel to Kaleil Isaza Tuzman in the above-captioned action. We respectfully move the Court to compel the United States government to expedite Mr. Isaza Tuzman's release from life-threatening conditions in La Picota in Bogotá, Colombia—one of the most dangerous detention facilities in the world—so that Mr. Isaza Tuzman, a U.S. citizen with strong and continuing ties to the United States, can answer securities charges against him and clear his name. Because Mr. Isaza Tuzman is unnecessarily suffering subhuman conditions ██████████████████████████████ while detained in La Picota, this Court should dismiss the arrest warrant that serves as the basis for his provisional arrest and current detention in Colombia, or take any other appropriate relief necessary to ensure his immediate and safe return to the United States to appear before this Court. We also respectfully request oral argument on an expedited basis on this motion.

We are pleading for Mr. Isaza Tuzman's life and the most basic of human rights guaranteed to U.S. citizens. Having been detained for approximately two months already, and likely for many more while his extradition winds its way through the Colombian judicial process, Mr. Isaza Tuzman's mental health, physical condition, and life are in jeopardy. We realize this is a serious statement to make. As officers of the Court, we do not state this lightly or with exaggeration. But the fact is that ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ As his counsel, we are genuinely concerned that Mr. Isaza Tuzman's pre-trial detention in La Picota while awaiting extradition

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

Judge Paul G. Gardephe
November 10, 2015
Page 2

to the United States to answer the charges against him may effectively result in a death sentence, and we are seeking the Court's assistance solely for that limited purpose.[1]

Summary Of The Circumstances And Requested Relief

Mr. Isaza Tuzman is a 44-year-old U.S. citizen with the strongest of ties to the United States. He was born in Boston, grew up in Massachusetts; graduated with a Bachelor of Arts in Government and a Certificate in Latin American Studies from Harvard University; worked for years as an investment banker at Goldman Sachs; and subsequently has been an internet entrepreneur and business leader in the United States, Europe and Latin America—bringing companies public on the NASDAQ, Toronto Stock Exchange, London AIM, and Prague Stock Exchange.

Beginning in early 2012, Mr. Isaza Tuzman learned that the Securities and Exchange Commission ("SEC") was investigating him and KIT digital, Inc., a NASDAQ-listed technology company. From in or about 2012 through in or about April 2014, Mr. Isaza Tuzman's counsel met and communicated with the SEC and the U.S. Attorney's Office in connection with those investigations. Mr. Isaza Tuzman, through his lawyers, made it clear that he was happy to cooperate with respect to any other questions or concerns that may arise in the future. Thereafter, neither the SEC nor the U.S. Attorney's Office ever contacted Mr. Isaza Tuzman or his counsel again, and the SEC did not seek Mr. Isaza Tuzman's deposition or issue a Wells notice. Nevertheless, on or about August 12, 2015, a grand jury returned an 8-count sealed indictment against Mr. Isaza Tuzman on charges of securities fraud, accounting fraud, and wire fraud, and thereafter, the SEC filed a civil action against Mr. Isaza Tuzman as well.

At the time of the return of the indictment, Mr. Isaza Tuzman was spending a plurality of his time in Cartagena, Colombia, developing a luxury hotel project with the Viceroy Hotel Group involving the complex conversion of a 17th century Franciscan convent in Cartagena's old walled city. Mr. Isaza Tuzman, an observant Jew, had planned to return to the United States in or about mid-September 2015 to celebrate Rosh Hashanah with his family in Philadelphia. On or about September 7, 2015, Mr. Isaza Tuzman was arrested in Colombia pursuant to the government's provisional arrest warrant. He was immediately placed in an overcrowded jail called "Mártires," together with violent criminals, where he was exposed to the elements 16 hours per day and quickly became ill.

---

[1]    We have redacted from the public filing of this letter some of the highly personal and sensitive matters addressed herein.

Judge Paul G. Gardephe
November 10, 2015
Page 3

Since in or about September 15, 2015, Mr. Isaza Tuzman has been detained in La Picota, a maximum security prison in Bogotá, Colombia, well-recognized to be one of the most dangerous penitentiaries in the world.  La Picota is, and has been, home to—among other notables—leftist guerrillas and terrorists, right-wing paramilitaries allied with drug traffickers, drug kingpins featured on the FBI's Ten Most Wanted list, and prison guards who look the other way.  Mr. Isaza Tuzman has been placed in a ninth floor maximum security bunker with over 160 such prisoners, under unthinkable conditions (little-to-no running water, overflowing latrines, rotten food, no access to sunlight, practically non-existent medical care).  Mr. Isaza Tuzman is in daily jeopardy.  We fear for his physical and mental health and for his safety ████████████████████████████████████ ██████████████  We fear that he will suffer irreparable physical and psychological harm before being able to return to the United States to face the white collar charges against him— charges he denies and of which he is presumed innocent.

Through counsel, Mr. Isaza Tuzman has made repeated requests to the government (via both the U.S. Attorney's Office and the U.S. Embassy in Bogotá) to return to the United States immediately.  Mr. Isaza Tuzman will take any lawful and government-approved actions to expedite his return to the United States.  He has offered to waive his rights under extradition. He has offered to be accompanied by U.S. and/or foreign law enforcement in handcuffs on any flight back to the United States at his own expense.  He is willing to accept any method of or conditions on his quick return that may be demanded by the U.S. government.  He wants to return and appear before Your Honor.

We know in our hearts that the federal prosecutors in the United States Attorney's Office for the Southern District of New York have not wanted and do not want Mr. Isaza Tuzman to suffer and continue to suffer from the horrific situation at La Picota.  And, we do not intend by this submission to attack the prosecutors in this case.  But for the reasons explained further below, we are compelled to seek this Court's intervention and, more specifically, to respectfully request that Your Honor vacate the arrest warrant and undertake any other relief appropriate under the circumstances to ensure Mr. Isaza Tuzman's immediate return to the United States.

Mr. Isaza Tuzman's Personal Background

Mr. Isaza Tuzman is a U.S. citizen with the strongest of connections to the United States. The oldest of five siblings all born in the United States, Kaleil Isaza Tuzman was born in Boston, Massachusetts on October 12, 1971.  He grew up in Boston and Western Massachusetts and attended high school at Amherst Regional High School in Amherst, Massachusetts.  After spending his freshman year of college at Brown University, Mr. Isaza Tuzman attended and then finished his studies at Harvard University in January 1995 with a

Judge Paul G. Gardephe
November 10, 2015
Page 4


Bachelor of Arts degree (*magna cum laude*) in Government and a graduate-level certificate in Latin American Studies.  Following graduation, he worked for over four years as an emerging markets investment banker at Goldman Sachs, where he helped manage one of the largest pools of capital at the time dedicated to public market arbitrage in Latin America.

In or about 1998, while still at Goldman Sachs, Mr. Isaza Tuzman co-founded govWorks, Inc. an internet start-up—backed by KKR and Mayfield Fund—that permitted people to, among other things, pay fines to local municipalities in the United States and apply for local government jobs on the Internet.  Mr. Isaza Tuzman's early entrepreneurial efforts with this company were profiled in the critically-acclaimed documentary *Startup.com*.[2]   After govWorks eventually succumbed to a Chapter 11 bankruptcy sale in the midst of the dot-com collapse, Mr. Isaza Tuzman served as Chairman & CEO of KPE, Inc., a leading New York-based digital media agency backed by Grey Global Group.  After selling that company, Mr. Isaza Tuzman became the President of JumpTV (an Internet TV broadcaster which had a successful IPO on the Toronto Stock Exchange in 2006 and subsequently listed on the London AIM stock market).  In January 2008, Mr. Isaza Tuzman became the CEO and Chairman of ROO Group, Inc. (re-named KIT digital, Inc. later that year), an Internet video technology provider which was originally an OTC-traded company and eventually completed a full listing on the NASDAQ in 2009. Since his departure from KIT digital in or about April 2012, Mr. Isaza Tuzman has been working primarily on the construction of a luxury hotel project in Cartagena, Colombia, while also tending to several private technology and real estate investments in the U.S. and Europe.

Almost all of Mr. Isaza Tuzman's family—including parents, uncles, aunts, nephews, nieces, and cousins—reside in the United States.  Mr. Isaza Tuzman frequently travels to the United States to visit his U.S. family.  Indeed, he often celebrates family reunions, as well as Jewish and secular holidays in Massachusetts, Philadelphia and New Orleans, where members of his family now reside.  In June 2015, just months prior to his arrest in Colombia, Mr. Isaza Tuzman traveled to the United States to attend business meetings in Miami and his 20-year alumni reunion at Harvard.  He was also only days away from returning to the United States to celebrate the Jewish New Year holidays with his family in Philadelphia at the time of his arrest on or about September 7, 2015.  And while Mr. Isaza Tuzman was recently spending 35-40% of his time in Colombia, he maintained his U.S. tax residency and a home in New York, and intended to return to spending a majority or a plurality of his time in the United States upon the Cartagena hotel project's expected completion in late 2016.

---

[2]   *See* Scott Austin, *Second Act: 'Startup.com' Stars Reflect on Life a Decade Later*, Wall St. J. (July 16, 2010, 1:56 PM), http://blogs.wsj.com/venturecapital/2010/07/16/second-act-startupcom-stars-reflect-on-life-a-decade-later, attached as Ex. 1.

Judge Paul G. Gardephe
November 10, 2015
Page 5


Mr. Isaza Tuzman's Communications with the Government Prior to his Arrest

During the latter half of 2012 and 2013, Mr. Isaza Tuzman, through prior counsel, was in touch with the SEC, in light of a subpoena issued to KIT digital and Mr. Isaza Tuzman in early 2012 and a subsequent class action case against KIT digital.  In or about July 2013, Mr. Isaza Tuzman was served with an additional subpoena for documents by the SEC.  Between the latter half of 2013 and April 2014, Mr. Isaza Tuzman's prior counsel had multiple conversations and meetings with the U.S. Attorney's Office for the Southern District of New York.  During those meetings, counsel was informed that Mr. Isaza Tuzman was a subject of the investigation, but was not identified as a target.  Furthermore, during the course of these communications, the government never once raised a concern about Mr. Isaza Tuzman's frequent travel outside the United States and never indicated any concern that Mr. Isaza Tuzman was a flight risk.  For example, the government never asked him to voluntarily turn over his passport or face arrest.  Although Mr. Isaza Tuzman's retained counsel (Baker Hostetler) advised the government that counsel was available to provide the government further information and to further discuss the investigation should matters escalate, the U.S. Department of Justice ("DOJ") did not again communicate with Mr. Isaza Tuzman's counsel after April 2014.

To be clear, DOJ never provided Mr. Isaza Tuzman's counsel process within the U.S. Attorney's Office to demonstrate to the government that charges should not be brought against Mr. Isaza Tuzman.  And, notably, although fully within the SEC's power and customary in its civil investigations, the SEC never deposed Mr. Isaza Tuzman in connection with its parallel investigation, and did not provide Mr. Isaza Tuzman with a Wells notice prior to filing their complaint against him.  Instead, in a sweeping rush to judgment, over sixteen (16) months later, on or about August 12, 2015, the U.S. Attorney's Office obtained an 8-count sealed indictment against Mr. Isaza Tuzman; the SEC filed parallel civil charges against him after he was arrested in Colombia.

Mr. Isaza Tuzman's Provisional Arrest and Detention at La Picota

On or about August 12, 2015, following the return by the grand jury of the sealed indictment against Mr. Isaza Tuzman, United States Magistrate Judge James C. Francis signed a sealed arrest warrant.  Mr. Isaza Tuzman did not know and did not have reason to believe under the circumstances that he would be charged with any crime.

At the time of the return of the indictment, Mr. Isaza Tuzman was on business in Colombia working on the previously mentioned Viceroy Hotel project in Cartegena.  Mr. Isaza Tuzman had planned to return to the United States in mid-September 2015, to celebrate the Rosh Hashanah holidays with his family in Philadelphia.  Indeed, just two months prior to the return of the sealed indictment, Mr. Isaza Tuzman was in the United States, attending

Judge Paul G. Gardephe
November 10, 2015
Page 6


business meetings in Miami and his 20-year reunion at Harvard.  Although the government could have waited for Mr. Isaza Tuzman to return to the United States to make an arrest—something that the undersigned respectfully submit is the standard operating procedure for the government where U.S. citizens are charged in non-violent offenses, the offense conduct is not ongoing, and there is no rational basis to believe the charged individual is attempting to flee and would not return to the United States—the government instead obtained a provisional arrest warrant for the arrest of Mr. Isaza Tuzman in Colombia based on the sealed arrest warrant issued by the Southern District of New York.

On September 7, 2015, Mr. Isaza Tuzman was arrested in Bogotá, Colombia pursuant to the government's request for a provisional arrest warrant.  At the time of his arrest, Mr. Isaza Tuzman was informed by Colombian law enforcement that the arrest occurred as a result of a specific request from U.S. authorities to their Colombian counterparts to arrest and detain Mr. Isaza Tuzman in Colombia. That same day, the U.S. Attorney's Office unsealed an indictment against Mr. Isaza Tuzman, charging him with securities fraud and wire fraud.

Mr. Isaza Tuzman is the rare white collar defendant whose provisional arrest was sought by the United States for extradition from Colombia.  Indeed, we have been unable to find even a single other instance of a U.S. citizen who was provisionally arrested in Colombia on white collar crime charges alone, particularly where, as the government must acknowledge here, the U.S. citizen was not a fugitive on the run and not a danger to the community.  To the contrary, our research reflects that those extradited from Colombia are almost all highly violent defendants, drug kingpins, prominent money launderers and/or narco-terrorists. Examples include:

- In July 2014, seven Colombian nationals were extradited to the United States on charges relating to the kidnapping and murder of DEA Special Agent James Terry Watson.[3]

- In July 2013, the DEA extradited a notorious narcotics kingpin on charges that he had for decades manufactured hundreds of tons of cocaine annually in Colombia and trafficked it to various parts of the world, laundering millions of dollars every step of the way.[4]  This defendant formed alliances with both the Fuerzas Armadas

---

[3]  Press Release, Drug Enforcement Admin., Seven Colombian Nationals Charged in Connection with the Murder of a DEA Agent Extradited to the United States (July 2, 2014), http://www.dea.gov/divisions/hq/2014/hq070214.shtml.

[4]  Press Release, Drug Enforcement Admin., DEA Along with Manhattan, Brooklyn, and Miami U.S. Attorneys Announce Extradition of Colombian Narcotics Kingpin (July 9, 2013), http://www.dea.gov/divisions/hq/2013/hq070913.shtml.

Judge Paul G. Gardephe
November 10, 2015
Page 7


> Revolucionarias de Colombia (FARC) and the Autodefensas Unidas de Colombia (AUC).[5]

- In late 2010 and early 2011, three FARC guerrillas were extradited to the United States on charges involving the kidnapping of a U.S. citizen in Colombia for a period of approximately ten months.[6]

- In 2008, the United States Government secured the extradition of one of the leaders of a prominent Colombian drug cartel who had achieved the distinction of being an FBI Top Ten Fugitive.[7]  This individual was alleged to have been at the center of a two-year drug war that resulted in hundreds of deaths, including those of innocent civilians.[8]

Despite being a white collar defendant who is not a danger to the community and is a U.S. citizen, Mr. Isaza Tuzman has been detained following his provisional arrest at the direction of the U.S. Government in La Picota, one of the most notorious prisons in Colombia.

Life in La Picota is Hobbesian: "poor, nasty, brutish, and short."[9]  Mr. Isaza Tuzman is housed in a 90-square-foot cell with two other inmates in Patio 16 of La Picota (who are wanted on drug trafficking and murder charges, respectively).  Patio 16 is reserved for defendants who are wanted for extradition—including those awaiting extradition to the

---

[5]  *Id.*

[6]  Press Release, Drug Enforcement Admin., Three FARC Guerillas Convicted in Manhattan Federal Court of Taking a U.S. Citizen Hostage (June 21, 2011), http://www.dea.gov/divisions/nyc/2011/nyc062111.shtml.

[7]  Press Release, Fed. Bureau of Investigation, Leader of Colombian Drug Cartel and Former FBI Top Ten Fugitive Pleads Guilty to Drug, Murder, and Racketeering Charges (Aug. 11, 2009), https://www fbi.gov/newyork/press-releases/2009/nyfo081109 htm.

[8]  We have only identified one example of a non-violent white collar defendant extradited to the United States. In February 2013, the FBI announced the extradition from Colombia of Magda Luz Lavin, the former owner of at least two HIV Clinics in Florida, who was charged in a 25-count indictment with conspiracy to commit health care fraud, health care fraud, and money laundering.  Press Release, Fed. Bureau of Investigation, Health Care Fraud Fugitive Extradited from Colombia to Serve 2006 Sentence (Feb. 7, 2013), https://www.fbi.gov/miami/press-releases/2013/health-care-fraud-fugitive-extradited-from-colombia-to-serve-2006-sentence.  While this was a white collar case (substantially more egregious than the one against Mr. Isaza Tuzman), Ms. Lavin was provisionally arrested in Colombia several years after failing to appear in court during her criminal trial and fleeing the country.  There is no evidence that she was a U.S. citizen with the types of substantial ties to the United States that Mr. Isaza Tuzman has.  Thus, the government's instigation of Mr. Isaza Tuzman's provisional arrest appears to be without precedent.

[9]  Thomas Hobbes, *Leviathan* 76 (Edwin Curley ed., Hackett Pub. Co. 1994) (1651).

Judge Paul G. Gardephe
November 10, 2015
Page 8

United States.  Inmates in Patio 16 are mostly wanted drug traffickers or narco-terrorists, often violent, with a number being reputed members of the FARC, AUC, or various Colombian mafia organizations.  Mr. Isaza Tuzman has no access to the outdoors, and has little-to-no exposure to natural light.  Running water is available for only 2 hours per day on average, making general hygiene extremely poor and the shared latrines (which are immediately adjacent to the food service area) in a constant state of overflow.  The temperature in the prison drops to freezing temperatures in the evening during this time of year, as the 7,500-foot altitude prison is not heated, and various three-inch-wide slits in the concrete prison walls and non-affixed rooftop elements allow for a continual draft.  His food is often spoiled and he has lost over 20 pounds and continues to lose weight.  His right eye has been infected for weeks and for some period of time was swollen shut.  He has also developed a respiratory ailment.

The subhuman conditions at La Picota are well documented.  According to a 2012 report commissioned by the Colombian Inspector General's Office (Procuradoría), La Picota was overcrowded by 61%, with a population of over 8,000 inmates and a capacity of under 5,000 inmates.[10]  The acute medical needs of all prisoners at La Picota are also disregarded as a matter of course.  According to the British NGO Justice for Colombia, prisoners often don't receive requested medical treatment for a year, if at all.[11]  In addition, terminally ill patients who have contracted HIV do not receive any medical assistance, and the most that inmates are ever prescribed for their medical issues is over-the-counter medication.[12]  In late 2013, the Colombian Constitutional Court (in its decree T-815) ruled that the "extraditable" Patios at La Picota in particular violated numerous "inviolable" rights of prisoners under Colombian law—including lack of regular running water, no time outside, extreme cold and deficient medical care.  Decree T-815 also cited overcrowding and generally "degrading" conditions inconsistent with "human dignity."

Perhaps not surprisingly, given La Picota's prison population, the prison is ruled by violence and the threat of violence.  True to La Picota's reputation, Mr. Isaza Tuzman is presently suffering egregious ███████████████████████████████████████████████

---

[10]  *See Report Describes Appalling Conditions in Bogota's Prisons*, Justice for Colombia (Dec. 21, 2012), http://www.justiceforcolombia.org/news/article/1352/reportdescribesappallingconditionsinbogotasprisons, attached as Ex. 2.

[11]  *See Prisoners in La Picota Go on Hunger Strike, Justice for Colombia* (Oct. 14, 2013), http://justiceforcolombia.org/news/article/1500/prisoners-in-la-picota-go-on-hunger-strike, attached as Ex. 3.

[12]  *See* Ex. 2.

Judge Paul G. Gardephe
November 10, 2015
Page 9



████████████████████████████████████████████████████
████████████████████████████████████████████  Mr. Isaza Tuzman has
been living in a constant state of fear, ███████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████    Due to these symptoms, and his ongoing medical needs (including but not
limited to a glandular infection in his right eye and a respiratory ailment), he has been
begging to see medical personnel (along with his counsel, who has been writing to the U.S.
Embassy on his behalf) for several weeks.  He has ██████████████████████████
████████████████████████████████████████████  Mr. Isaza Tuzman
was finally granted a perfunctory medical appointment last week and a blood test was finally
administered on or about November 6, 2015.  Despite Mr. Isaza Tuzman reporting ██████
████████████████████████████████  his medical visit lasted only minutes, and the
attending doctor was "unable" to physically inspect Mr. Isaza Tuzman because, he claimed,
there were "no instructions to do so."  This falls far short of anything that could be described
as appropriate medical or psychological care for someone who has been subject to ██████
████████████████████████████ [13]  We cannot help but wonder if, under the circumstances,
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[13]  The parade of horribles Mr. Isaza Tuzman has been forced to endure at La Picota would easily be declared
    unconstitutional under the Eighth Amendment if they existed in a prison in the United States.  He has been
    denied medical care, █████████████████████████████████████████████████
    ████████████████████████████████████
    Courts likely would consider such conditions, if in a U.S. prison, unconstitutional cruel and unusual
    punishment.  *Cf. Walker v. Schult*, 717 F.3d 119, 128 (2d Cir. 2013) ("[C]onditions that place a prisoner at
    a 'substantial risk of serious harm' from other inmates may constitute cruel and unusual punishment.");
    *Hayes v. N.Y.C. Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996) ("The Eighth Amendment requires
    prison officials to take reasonable measures to guarantee the safety of inmates in their custody." (citing
    *Farmer v. Brennan*, 511 U.S. 825, 832 (1994))); *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) ("The
    failure of custodial officers to employ reasonable measures to protect an inmate from violence by other
    prison residents has been considered cruel and unusual punishment."); *Tyler v. Argo*, No. 14 Civ. 2049
    (CM), 2014 WL 5374248, at *6 (S.D.N.Y. Oct. 10, 2014) ("To allege a constitutional claim arising out of
    unconstitutional conditions of confinement, a prisoner must plead facts that would, if believed, give rise to
    a plausible inference of deliberate indifference to a serious deprivation." (citing *Estelle v. Gamble*, 429
    U.S. 97, 104-05 (1976))).

Judge Paul G. Gardephe
November 10, 2015
Page 10


████████████████████████ The undersigned had also understood from a previous
conversation with the U.S. Attorney's Office that local FBI agents in Colombia would be
coming to interview Mr. Isaza Tuzman to understand the harm he is enduring, but this visit
never took place.

Life is a minute-to-minute struggle for Mr. Isaza Tuzman.  He is not a member of an
organized crime group or a narco-terrorist organization.  As a result, Mr. Isaza Tuzman is
one of the most vulnerable inmates in all of La Picota, and his life and dignity are in constant
jeopardy.  On his own and through counsel, he has tried speaking to the warden's office, the
U.S. Embassy, NGOs and even the press—all in a vain attempt to stay safe. ████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████

<u>Mr. Isaza Tuzman's Efforts to Remedy the Situation Through Non-Judicial Means Fail—The
U.S. Court Is Now Mr. Isaza Tuzman's Last Resort</u>

Since Mr. Isaza Tuzman's provisional arrest, counsel has been in constant communication
with the U.S. Attorney's Office and the U.S. Embassy to alert the government of the
conditions in which Mr. Isaza Tuzman is being housed and the grave dangers to his security,
and to request that the government expedite Mr. Isaza Tuzman's return to the United States.

For example, on or about September 18, 2015, Mr. Isaza Tuzman's counsel at Baker
Hostetler informed the government that Mr. Isaza Tuzman was detained in a section of La
Picota that housed violent criminals, narcotics traffickers, and drug cartel members.████[14]
███████████████████████████████████████

Counsel repeated their concerns about Mr. Isaza Tuzman's safety and well-being to the
government in correspondence dated September 28, 2015 and October 6, 2015.[15]  On
September 28, 2015, counsel informed the government that a U.S. consular official that
visited Mr. Isaza Tuzman at La Picota was shocked that Mr. Isaza Tuzman was detained in

[14]  Email from Jonathan B. New, Attorney at Baker & Hostetler, to Damian Williams, U.S. Attorney's Office
(Sept. 18, 2015, 04:55 PM), attached as Ex. 4.

[15]  Email from Jonathan B. New, Attorney at Baker & Hostetler, to Damian Williams and Edward Kim, U.S.
Attorney's Office (Sept. 28, 2015, 05:15 PM), attached as Ex. 5; Email from Jonathan B. New, Attorney at
Baker & Hostetler, to Damian Williams and Edward Kim, U.S. Attorney's Office, (Oct. 6, 2015, 06:27
PM), attached as Ex. 6.

Judge Paul G. Gardephe
November 10, 2015
Page 11

Patio 16, and that the consular official had told Mr. Isaza Tuzman that he had never heard of another Colombian extradition case involving a white collar defendant.[16]

In the correspondence dated October 6, 2015, counsel provided the government with further details regarding the deplorable conditions at La Picota and ███████████████████ ████ Specifically, counsel noted the lack of clean drinking water or healthy food, that the sewage at Patio 16 regularly overflowed and seeped into the kitchen, and that Mr. Isaza Tuzman and the other inmates were forced to use water from the latrine area to wash the dishes from which they eat. In addition, counsel told the government ███████████████



Counsel again advised of Mr. Isaza Tuzman's willingness to waive extradition in order to return to the United States immediately.[17] ██████████████

Despite these communications by Mr. Isaza Tuzman's counsel, by October 15, 2015, nothing had changed. Mr. Isaza Tuzman remained detained in Patio 16 of La Picota pursuant to the United States government's provisional arrest warrant and no actions had been taken to expedite Mr. Isaza Tuzman's safe return. Rather, the government had orally informed counsel that the complaints raised by Mr. Isaza Tuzman rested with the Colombian government, not the United States, and that the U.S. Attorney's Office is largely powerless to remedy Mr. Isaza Tuzman's circumstances. By mid-October, despite the passage of over five weeks since his provisional arrest, the government had yet to submit a request for Mr. Isaza Tuzman's extradition.

Mr. Isaza Tuzman thereafter engaged undersigned counsel to represent him. In correspondence dated October 15, 2015, Gibson Dunn (along with co-counsel and former Assistant Attorney General Viet Dinh) requested to speak with the government regarding recent developments that endangered Mr. Isaza Tuzman's life, and expressed their serious concerns for Mr. Isaza Tuzman's safety.[18] On or about October 16, 2015, counsel spoke with the government and provided the government a further update regarding the extreme conditions facing Mr. Isaza Tuzman, including the fact that he had serious medical problems that were being ignored by prison officials, that Mr. Isaza Tuzman ██████████████

---

[16]   *See* Ex. 5.

[17]   *See* Ex. 6.

[18]   Email from Avi Weitzman, Attorney at Gibson, Dunn & Crutcher, to Damian Williams and Edward Kim, U.S. Attorney's Office (Oct. 15, 2015, 04:01 PM), attached as Ex. 7.

████████████████████████████████████████ Given the absence of an
extradition request, counsel stated that, contrary to the U.S. Attorney's Office's prior
statements, it was squarely within the power of the U.S. Attorney's Office to remedy the
issue. Counsel requested that the U.S. Attorney's Office withdraw Mr. Isaza Tuzman's
provisional arrest in favor of his immediate surrender to U.S. law enforcement in Colombia
for transfer back to the United States. The government acknowledged the possibility of
voluntary surrender from Colombia in lieu of extradition, and informed counsel that the
AUSAs would check with their supervisors and DOJ's Office of International Affairs
("OIA") to determine the feasibility of this proposal.[19]

The government did not thereafter reach out to Mr. Isaza Tuzman's counsel. His counsel
therefore reached back out to the government on October 20, 2015, seeking an update about
withdrawal of the provisional arrest warrant.[20] Counsel also informed the government that
Mr. Isaza Tuzman's complaints filed with the U.S. Embassy were leaked to local press, and,
as a result, ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
Counsel told the government that Mr. Isaza Tuzman was fearful for his life, and that his
repeated requests for medical attention had been ignored.[21]

In a telephone call the following day, on October 21, 2015, the government acknowledged
that withdrawing Mr. Isaza Tuzman's provisional arrest warrant was feasible and within the
government's powers, but nonetheless refused to do so because OIA believed it may pose a
theoretical future risk to diplomatic relations between the United States and Colombia. The
U.S. Attorney's Office then advised that Mr. Isaza Tuzman's extradition papers were
transmitted to the U.S. Department of State on or about October 20, 2015, several days *after*
counsel requested that the provisional arrest be withdrawn. The government further advised
that, despite weeks of respectful but strong complaints by counsel regarding Mr. Isaza
Tuzman's safety, the government would now take action to protect Mr. Isaza Tuzman's
safety and assured counsel that FBI agents located in Colombia would visit the defendant at
La Picota to confirm his dire circumstances.[22] Despite that representation, to date the FBI
has still never arrived to interview Mr. Isaza Tuzman in jail.

---

[19]  Email from Avi Weitzman, Attorney at Gibson, Dunn & Crutcher, to Edward Kim and Damian Williams,
U.S. Attorney's Office (Nov. 3, 2015, 01:16 PM), attached as Ex. 8.

[20]  Email from Avi Weitzman, Attorney at Gibson, Dunn & Crutcher, to Edward Kim, Damian Williams, and
Sarah McCallum, U.S. Attorney's Office (Oct. 20, 2015, 11:38 PM), attached as Ex 9.

[21]  *See id.*

[22]  *See* Ex. 8.

Judge Paul G. Gardephe
November 10, 2015
Page 13

On or about October 27, 2015, Mr. Isaza Tuzman's extradition papers were transmitted to the Colombian authorities.[23]  In the week since that date, counsel has been in regular contact with both the U.S. Attorney's Office and the Judicial Attaché at the U.S. Embassy in Bogotá, and among other things have asked for the government's assistance in having Mr. Isaza Tuzman transferred to "R-Sur," a safer unit at La Picota that houses individuals charged with white collar crimes.[24]  Despite the prosecution's earlier offer of assistance in moving Mr. Isaza Tuzman to a safer location, the only alternative that has actually been offered to Mr. Isaza Tuzman to date is transfer either to a "snitch cell" at La Picota or to La Cómbita, an even more dangerous maximum-security prison in Colombia.  Neither option is palatable. *First*, the cooperator cells at La Picota are adjacent to the central staircases at La Picota, and visible to the entire population in the building.  The cooperator cells have only one solid wall, and are located two levels below Mr. Isaza Tuzman's current cell in Patio 16.  Because inmates typically roam freely, without handcuffs or the accompaniment of guards, Mr. Isaza Tuzman's placement within a cooperator cell would not offer him any relief and would increase the risk of harm to him resulting from a mistaken belief that he is a cooperating witness.  *Second*, La Cómbita is much less accessible—both geographically and procedurally—to legal counsel.  Even more, organized crime groups present at La Cómbita are reported to have as much, if not more, control over that penitentiary than their counterparts do at La Picota.[25]  Indeed, counsel expressed this very concern to the government in its correspondence dated October 20, 2015.[26]  As recently as November 4, 2015, the U.S. Attorney's Office advised that it "d[id] not believe that any additional steps can be taken at this time,"[27] even though the government has not identified any steps it has taken to advocate for Mr. Isaza Tuzman's relocation to R-Sur.

---

[23]  Despite assurances from the government that it had requested an expedited translation of Mr. Isaza Tuzman's extradition papers, the extradition papers were transmitted to the Colombian authorities 22 days after counsel informed the government that Mr. Isaza Tuzman intended to waive extradition and wished to return to the United States immediately, and only ten days ahead of the government's deadline to file such papers. *See* Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (entered into force Mar. 4, 1982).

[24]  *See* Ex. 8; *see also* Email from Amanda Blaurock, Acting President, KIT Capital, to Marlon Cobar, Judicial Attaché at the U.S. Embassy in Bogotá, Colombia (Nov. 3, 2015, 7:54 AM), attached as Ex. 10; Email from Marlon Cobar, Judicial Attaché at the U.S. Embassy in Bogotá, Colombia, to Amanda Blaurock, Acting President, KIT Capital (Nov. 3, 2015 3:16 PM), attached as Ex. 11.

[25]  *See* Ex. 10.

[26]  *See* Ex. 9.

[27]  Ex. 8.

Judge Paul G. Gardephe
November 10, 2015
Page 14

The Ends Do Not Justify the Means, and Mr. Isaza Tuzman Should Be Immediately
Returned to the United States

This case involves an avoidable injustice that is the direct result of the United States
government's decision to cause Mr. Isaza Tuzman to be arrested in Colombia.  The U.S.
government-instigated arrest of Mr. Isaza Tuzman in Colombia, and his resulting detention at
La Picota, is unprecedented and unwarranted. Whether intentional or not, the U.S.
government's actions have subjected Mr. Isaza Tuzman to unacceptable and life-threatening
conditions.

Mr. Isaza Tuzman's provisional arrest was simply unnecessary.  Mr. Isaza Tuzman was
neither fleeing from prosecution in the United States nor has he ever been a flight risk, and
he does not pose any danger to the community.  Prior to his arrest, U.S. law enforcement was
aware of Mr. Isaza Tuzman's location in Colombia.  Mr. Isaza Tuzman had last visited the
United States in June 2015, and, at the time of his arrest in September 2015, Mr. Isaza
Tuzman was only days away from returning to the United States to celebrate the Jewish New
Year with his family in Philadelphia.  The government could have easily advised Mr. Isaza
Tuzman's counsel of the charges against him and his need to self-surrender to authorities.
There was no reason to seek his provisional arrest.  Nor was there any reason to rush to indict
before giving Mr. Isaza Tuzman process to persuade authorities not to indict, as is customary
where, as here, the government had already been in touch with a white collar defendant's
counsel.

DOJ policy recognizes that a provisional arrest warrant is reserved for extreme and urgent
situations where a defendant is a "fugitive"—which the government must concede is not the
case here.  *See* U.S. Dep't of Justice, U.S. Attorneys' Manual (USAM) 9-15.230 (1999)
("Because the time involved in preparing a formal request can be lengthy, most treaties allow
for the provisional arrest *of fugitives* in urgent cases." (emphasis added)).  The government
has a duty to protect—or at least not violate—its citizens' constitutional rights abroad.  *See,
e.g., United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir. 1974) (abrogated on other
grounds) ("That the Bill of Rights has extraterritorial application to the conduct abroad of
federal agents against United States citizens is well settled."); *see also Meshal v.
Higgenbotham*, 47 F. Supp. 3d 115, 124-25 (D.D.C. 2014) ("[W]here American citizens'
constitutional interests are at stake, courts have traditionally been far less willing to allow
foreign policy concerns to extinguish the role of the judiciary."), *aff'd*, No. 14-5194, --- F.3d
--- , 2015 WL 6405207 (D.C. Cir. Oct. 23, 2015).  That obligation to protect U.S. citizens
abroad extends to those accused of crimes, as reflected in the State Department's Foreign
Affairs Manual, which "has long stressed the importance the United States places upon [the
Vienna Convention's provisions governing consular relations]." *Sanchez-Llamas v. Oregon*,
548 U.S. 331, 367 (2006) (Breyer, J., dissenting).  In particular, the Foreign Affairs Manual

Judge Paul G. Gardephe
November 10, 2015
Page 15

notes the U.S. consular officer has a duty to protect "the individual U.S. citizen who has been arrested in a foreign country or imprisoned in a foreign jail," 7 Foreign Aff. Manual § 401 (1984), and to that end, the State Department "must be prepared to protest substantiated violations of [the legal and human rights of U.S. citizens and nationals arrested abroad]" including by "impressing on the host government that the U.S. Government . . . will not tolerate a violation of [its citizens'] rights." *Id.* § 426.1(b).

The government has failed Mr. Isaza Tuzman, a United States citizen facing white-collar fraud charges. He has been forced to endure constant horrors at La Picota as a result of the government's own destructive rush to judgment. Once the government was provided an opportunity to right this wrong by withdrawing its provisional arrest warrant and safely transporting him back home to the United States, the government refused, citing only a theoretical future risk to diplomatic relations.

We recognize that the request in this letter is exceptional. However, the circumstances leading to this request are equally unique and exceptional and warrant the Court's intervention. We acknowledge that courts have historically avoided getting entangled in the conduct of foreign governments relating to extraditions for reasons of comity. Almost all of those cases, however, relate to foreign government requests to extradite individuals from the United States to a foreign country. *See, e.g., Ahmad v. Wigen*, 910 F.2d 1063 (2d Cir. 1990). While concerns of comity have long animated the U.S. federal courts' "rule of non-inquiry," *see, e.g., Hilton v. Kerry*, 754 F.3d 79, 89 (1st Cir. 2014),[28] those principles have no place here. We are not seeking that the Court pass judgment on a foreign government, foreign judicial system, or foreign conduct. Rather, we ask that the Court review the propriety of the issuance of an arrest warrant, on which the provisional arrest warrant and extradition request to Colombia rest. The U.S. government has the power to ▇▇▇▇▇▇▇▇▇▇▇

accomplish its goal of having Mr. Isaza Tuzman appear before this Court to face the charges. *Cf. Toscanino*, 500 F.2d at 275 (due process required the district court to "divest

---

[28] In *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir. 1960), the Second Circuit stated in *dicta* that it "can imagine situations where [an individual facing extradition] would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination of [the rule of non-inquiry]." Despite the court's invitation in *Gallina*, courts within the Circuit have instead left for the executive branch any examination of foreign legal proceedings that individuals awaiting extradition *may* face. *See, e.g., Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990) ("It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds."). We believe that the conditions and dangers that Mr. Isaza Tuzman *presently* faces are indeed "antipathetic" to this Court's sense of decency, and we respectfully request that the Court take immediate action to end the injustices that have been forced upon Mr. Isaza Tuzman in Colombia.

Judge Paul G. Gardephe
November 10, 2015
Page 16

itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights"); *United States v. Salinas Doria*, No. 01 Cr. 21 (GEL), 2008 WL 4684229, at *5 (S.D.N.Y. Oct. 21, 2008) (footnote omitted) ("[E]xceptions to the *Ker-Frisbie* doctrine have been recognized in cases involving egregious misconduct on the part of the United States Government[.]").  Mr. Isaza Tuzman's case involves a set of circumstances so unique that we are unable to find any precedent directly on point.  We have not found any other case, in any federal court, in which a (1) U.S. citizen; (2) was arrested abroad; (3) on a provisional arrest warrant; (4) in connection with white collar charges; (5) though he presented no danger to the community, or (6) risk of flight; and (7) was subjected to horrific consequences, including ███████████████, while awaiting extradition.  For these reasons, the comity concerns that have routinely ended inquiries into foreign criminal proceedings should not govern here.

Furthermore, the relief requested here is less extreme than in the above cases challenging extradition *from* the United States.  Unlike in the above cases, we are not seeking the dismissal of the indictment, but instead for the Court to dismiss the warrant for Mr. Isaza Tuzman's arrest, which we believe would require the government to withdraw the provisional arrest.  Accordingly, and unlike in those cases, there is no risk here that Mr. Isaza Tuzman would not face prosecution.  To the contrary, the request seeks to ensure that Mr. Isaza Tuzman does face prosecution in the United States as quickly as possible.  For that reason, we would consent to any conditions the Court may impose in connection with Mr. Isaza Tuzman's return to the U.S., including but not limited to, his immediate transfer to the United States on an airplane while accompanied by U.S. law enforcement.

Given Mr. Isaza Tuzman's willingness to waive extradition rights, surrender to U.S. law enforcement, and travel back to the United States to answer the charges against him, and given the absence of any evidence that Mr. Isaza Tuzman was a fugitive or fleeing, the arrest warrant issued by the Court against Mr. Isaza Tuzman was improvidently granted and should now be vacated.

# GIBSON DUNN

Judge Paul G. Gardephe
November 10, 2015
Page 17

Conclusion

For the above reasons, we respectfully request that the Court vacate the arrest warrant previously issued in the SDNY and on which Mr. Isaza Tuzman's provisional arrest warrant rests or order any other relief appropriate under the circumstances to secure Mr. Isaza Tuzman's immediate and safe return to the United States.

The ends do not justify the means. The U.S. government has lost sight of justice and we ask this Court to ensure Mr. Isaza Tuzman's immediate return to appear before Your Honor. This should be a welcome relief to the prosecutors. We thank the Court in advance for its consideration of these issues.

Respectfully,

Avi Weitzman
Reed Brodsky

AW

cc: Viet Dinh, Esq.
    Edward Young Kyu Kim, USAO/SDNY (*via ECF & E-Mail*)
    Sarah Eddy McCallum, USAO/SDNY (*via ECF & E-Mail*)
    Damian Williams, USAO/SDNY (*via ECF & E-Mail*)