

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 14, 2015

**By Hand Delivery and ECF**
Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:    <u>United States</u> v. <u>Kaleil Isaza Tuzman</u>, S1 15 Cr. 536 (PGG)

Dear Judge Gardephe:

    The Government respectfully submits this letter as a further update to the Court concerning the conditions of confinement of Kaleil Isaza Tuzman ("the defendant") and in response to the defendant's letter of December 2, 2015 (the "Dec. 2 Letter") in which the defendant again asked the Court to vacate his arrest warrant.

<u>The "Primary Concern" for the Defendant's Safety Has Been Addressed</u>

    The defendant's November 10, 2015 motion (the "Motion") focused on the defendant's safety at the La Picota detention facility. The Motion asked this Court to vacate the warrant issued for the defendant's arrest in order to ensure his "release from life-threatening conditions in La Picota."[1] Motion at 1. During a hearing on the Motion on November 20, 2015, the Court agreed with the Government that "the primary concern [was] to preserve Mr. Tuzman's safety." Transcript of Hearing ("Tr."), attached hereto as Exhibit A, at 27. On November 21, 2015, the defendant was transferred to a detention facility attached to the office of the Attorney General in Colombia (the "AG Facility"). On December 11, 2015 the Government submitted a letter to the Court (the "December 11 Letter") attaching memoranda that summarized the findings of two recent welfare visits, conducted on the defendant's behalf, at the AG Facility (the "Dec. 11 Memoranda").[2] The Government now submits an additional twelve-page memorandum dated

---

[1] The Government's letter dated November 18, 2015 asserted that a "United States serviceman" was detained at La Picota. The serviceman was not included in Exhibit A to the Declaration of Magdalena Boynton (the "Boynton Decl."), attached to the Government's Letter dated November 25, 2015 (the "Nov. 25 Letter"), because Exhibit A was intended to be limited to white collar defendants. Lamar Burton, an active duty US Navy petty officer, was extradited from Colombia on April 29, 2015 on narcotics importation charges. He was housed at La Picota while awaiting extradition.

[2] Both reports were commissioned by Colombia's Inspector General, a neutral and separate body from the Attorney General.

December 12, 2015 and prepared by Miguel Rodriguez Rey, a member of the Attorney General's Technical Investigations Corps ("CTI") and the supervisor of the AG Facility (the "Rodriguez Memorandum," attached hereto as Exhibit B).[3] The Rodriguez Memorandum details the living conditions at the AG Facility and includes a visitor and telephone log, color photos and a video tour led by Rodriguez.

As these materials demonstrate, the defendant's attempts to characterize the conditions at the AG Facility as "punitive," "solitary," or "far worse than those in the MCC's or MDC's Special Housing Unit" fall wide of the mark. Dec. 2 Letter at 10. In addition to the cell where the defendant sleeps, the defendant has access to an adjoining cell where he keeps his personal belongings (including his own clothes, which he is allowed to wear), a common area with a television, and an outdoor patio, all of which appear clean and well maintained. Rodriguez Memorandum at 2-8. The defendant complains that there is no bathroom or running water in his cell. Dec. 2 Letter at 9. The defendant's cell is not locked, even at night, and he has access to the bathroom across the hall. Rodriguez Memorandum at 2. As the log of his daily activities sets forth, the defendant has visits with a rabbi, daily visits with his attorneys (often multiple visits per day), some of which are conducted in the yard or relaxation area, weekly visits with friends and family, daily use of the telephone, food delivery from a restaurant, and the ability to purchase personal items. Rodriguez Memorandum at 8-13. In addition, the defendant has had two medical evaluations and one dental evaluation and is scheduled to see a doctor again tomorrow. *Id.* at 9.

<u>Release of the Defendant to U.S. Officials Would Be Unlawful and Impractical</u>

Notwithstanding his relocation to the AG Facility, the defendant requests in the Dec. 2 Letter that he be immediately released from Colombian custody rather than proceed through the extradition process. To be sure, the defendant does not contend that his transfer into U.S. custody could be accomplished within the governing Colombian legal framework. This is because it cannot. Colombian law does not allow a defendant to waive extradition.[4] The defendant requests that the arrest warrant be vacated – thereby removing the defendant from the legal extradition framework – and that the defendant then be transferred by Colombian authorities to U.S. officials. Dec. 2 Letter at 14. The defendant states that Colombian officials are willing to participate in such an extra-legal solution, but offers no persuasive support for this assertion. The defendant cites the Declaration of Ivan Dario Arias, a former Consul of Colombia,

---

[3] The AG Facility is administered by CTI, which is analogous to the Federal Bureau of Investigation. Boynton Decl. at ¶ 9. A copy of the photographs and video recorded by Rodriguez will be provided to the Court under seal.

[4] *See* Boynton Decl. ¶ 17 ("In Colombia, waiver of extradition does not exist. If a defendant is arrested on a provisional arrest warrant, regardless of the defendant's wishes, the Supreme Court and the President must review the request for sufficiency and ultimately approve or deny). Not surprisingly, *United States* v. *Molina-Chacon*, 627 F. Supp. 1253, 1257-58 (E.D.N.Y. 1986), *aff'd*, *United States* v. *DiTomasso*, 817 F.2d 201 (2d Cir. 1987), cited by the defendant, *see* Dec. 2 Letter n. 19, as an example of "the transfer of provisionally arrested defendant by a foreign government to U.S. authorities, without proceeding through the formal extradition process," involved a different country (Bermuda) which, unlike Colombia, expressly allows for waiver of extradition.

who speculates that if the arrest warrant were vacated, Colombia would, in his "view and opinion," participate in the process of a voluntary surrender of Tuzman into the custody of U.S. authorities.  Dec. 2 Letter at 14, Exhibit J, Declaration of Ivan Dario Arias.  Arias, who has known the defendant for "over 13 years," left his consular position almost ten years ago in 2006 and concedes that he is "not a representative of the government of Colombia." *Id.* at 2.[5]  In fact, as set forth in the memorandum of Ana Fabiola Castro Rivera, the Director of International Affairs who currently handles extraditions and international affairs for the Colombian Attorney General's Office (the "Castro Memorandum" attached hereto as Exhibit D), Colombian law does not allow a defendant to be transferred to the custody of foreign authorities, regardless of the defendant's consent, unless and until the extradition process has been completed.  Castro Memorandum at 2 ("The only possibility for the delivery of Mr. Kaleil Isaza Tuzman to the authorities of the United States of American can take place once the extradition process in Colombia culminates.").[6]  Were the extradition request to be withdrawn, an event triggered automatically if the arrest warrant were vacated, "it would result in the immediate release of [the defendant]."[7]  *Id.*

Moreover, the office of the Colombian Attorney General has stated that it will not participate in any effort to arrange a voluntary surrender outside its well established extradition process.  *Id.*  ("[I]n case Mr. Isaza Tuzman were to agree to voluntarily surrender in our territory, with officers from the United States of America, the Office of the Attorney General of the Colombian Nation would be unable to intervene in the process to ensure its compliance, thereby making it an act exclusively to his will.").[8]  Accordingly, were the Court to grant the defendant's

---

[5]  The defendant also asserts that Rodriguez, the CTI director who authored the Rodriguez Letter and accompanying video, stated that "organized and voluntary surrenders of the detainees to the U.S. Embassy one block away are possible, if the U.S. is cooperative."  Declaration of Amanda Blaurock, attached to the Dec. 2 Letter, at ¶36.  An interview of Mr. Rodriguez conducted today by a Special Agent with the Federal Bureau of Investigation ("FBI") makes clear that Mr. Rodriguez never made these statements.  *See* Declaration of Special Agent Andres Quintero, attached hereto as Exhibit C, at ¶ 13 (describing as "patently false" the assertion that Rodriguez discussed the possibility of voluntary surrender with the defendant or Blaurock).

[6]  *See also* Boynton Decl. ¶ 24 ("Other than simplified extradition, there is no vehicle under Colombian law that would permit Tuzman's expedited transfer to U.S. custody prior to Supreme Court and Presidential approval of the pending extradition request.").

[7]  *See also* Boynton Decl. ¶ 25 ("A dismissal of Colombia's provisional arrest warrant would result in the immediate release of Tuzman from custody."); Declaration of Virginia Prugh ¶ 10, attached to the Nov. 25, 2015 Letter ("Should the U.S. court dismiss the underlying warrant in this case . . . it would then be expected that Mr. Tuzman would be released from incarceration, with no restrictions on movement or travel, and his passports returned to his person.  He would not be released to the custody of U.S. officials, and U.S. officials would have no legal basis to remove him from the country.").

[8]  The Castro Letter suggests one reason why the Colombians require adherence to their extradition framework.  The approach ensures that Colombia does not turn over its citizens to foreign authorities who may impose consequences deemed unacceptable to Colombia, such as the death penalty or life imprisonment.

request and dismiss the arrest warrant,[9] there would be no legal mechanism in place to ensure that the defendant would actually surrender for prosecution in the United States.

### The Government Followed Well-Established Extradition Procedures

The defendant contends that "Mr. Isaza Tuzman should never have been arrested in Colombia." Dec. 2 Letter at 5. Every step the Government has taken has been lawful both under U.S. law and corresponding Colombian law and procedures. As the Court acknowledged at the November 20, 2015 hearing, the Government had legitimate concerns militating in favor of arrest and extradition of the defendant in this case. Indeed, when counsel assured the Court that the defendant was not a flight risk, the Court responded:

> You can understand why the government might be concerned, given that he already has ties to the UAE, that out of all the lawyers in the UAE, he chose to retain the one who had been convicted of a crime here and fled and is currently a fugitive there. You can understand why the government might be troubled about that relationship, can't you?

(Tr. at 7.)

---

[9] The Government respectfully submits that there is no legal authority under which the Court can vacate the arrest warrant without motion from the Government. Federal Rule of Criminal Procedure 9. Following the issuance of a valid arrest warrant, the Executive Branch maintains a "clear and indisputable" right to execute it without curtailment by the court. *United States* v. *Santtini*, 963 F.2d 585, 594 (3d Cir. 1992). Vacating a warrant would violate this separation of powers. In *Santtini*, the Third Circuit granted a writ of prohibition, holding that a district court lacked authority to order the Executive Branch to refrain from arresting an individual in Costa Rica on a valid arrest warrant in order to allow that individual to give a Rule 15 deposition in a criminal case. As the Third Circuit explained, "[i]n spite of [its] belief that the district court's order was the most practical solution given the peculiar circumstances of [that] case," the district court had "cited no statute or case law in support of its asserted authority to so order the government," and its action had no "basis in law." *Id.* at 595. Should the Court desire more briefing on this or any subject, the Government can provide such briefing on any schedule set by the Court.

At every step, the Government has acted in good faith to seek the return of the defendant to face criminal charges against him in this country,[10] steps we would have taken irrespective of whether the defendant was charged with white-collar or violent crime, which the fair application of the law demands.

Respectfully submitted,

PREET BHARARA
United States Attorney

by: /s/ Andrea Griswold

Damian Williams / Edward Y. Kim/
Andrea M. Griswold
Assistant United States Attorneys
(212) 637-2298/2401/1205

cc: Defense Counsel (by e-mail and ECF)

---

[10] In his discussion of Simplified Extradition, the defendant states that on or about December 1, 2015, he waived "the request for identity verification." Dec. 2 Letter at 13. It is not clear from the Dec. 2 Letter, however, if the defendant has requested Simplified Extradition. The Government emailed defense counsel on Friday, December 11, 2015 to ask whether the defendant had requested Simplified Extradition. No response had been received as of the time of this filing.