USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/30/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

KALEIL ISAZA TUZMAN,

                  Defendant.

**MEMORANDUM**
**OPINION & ORDER**

15 Cr. 536 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendant Kaleil Isaza Tuzman faces fraud charges in this District. (Superseding Indictment (Dkt. No. 7) After he was indicted, a warrant was issued for his arrest. Tuzman – who has dual U.S. and Colombian citizenship – was arrested in Colombia and awaits extradition in that country. Tuzman seeks an order vacating the arrest warrant, arguing that he should be permitted to voluntarily surrender to U.S. authorities in Colombia. For the reasons stated below, Tuzman's application will be denied.

## BACKGROUND

### I.    THE CHARGES AGAINST TUZMAN

        Tuzman is the former chief executive officer and chairman of KIT digital, Inc. ("KIT"). (Nov. 10, 2015 Def. Ltr. (Dkt. No. 15) at 2; Superseding Indictment (Dkt. No. 7) at 2) In November 2012, KIT announced that it had discovered errors and irregularities in earlier financial statements, and that it would have to issue re-stated financial statements. (Superseding Indictment (Dkt. No. 7) at 21-22) KIT's stock dropped 64% in response to this announcement, and the company subsequently sought bankruptcy protection. (Id. at 22)

        On August 12, 2015, a grand jury in this District issued an indictment charging Tuzman with conspiracy to commit securities fraud, securities fraud, wire fraud, and making

false statements in SEC filings. (Dkt. No. 4) A warrant for Tuzman's arrest was issued that same day. (Nov. 18, 2015 Govt. Ltr. (Dkt. No. 21) at 5) Tuzman – who holds dual United States-Colombian citizenship – was in Colombia at that time, and he was arrested in Bogota on September 7, 2015, pursuant to the charges pending against him in the United States. (Id. at 2-3; Nov. 10, 2015 Def. Ltr. (Dkt. No. 15) at 2) Tuzman is currently in Colombian detention awaiting extradition.

## II. TUZMAN'S REQUEST THAT THIS COURT VACATE THE ARREST WARRANT

On November 12, 2015, Tuzman's counsel submitted a letter to this Court seeking an order vacating the arrest warrant and directing the Government to arrange for Tuzman's immediate surrender to U.S. authorities in Colombia. (Dkt. No. 15) Counsel claimed that Tuzman was suffering "subhuman conditions" in La Picota – the Bogota prison in which he was being held – that he was suffering serious physical abuse, that his life was in jeopardy, and that he had become suicidal. (Id. at 1-2) Counsel further stated that they had informed the Government of these conditions as early as September 18, 2015, but that repeated attempts to persuade the Government to take steps to improve the circumstances of Tuzman's detention had been unsuccessful. (Id. at 10-13) Counsel asked this Court to vacate the arrest warrant, so that Tuzman could be released from Colombian custody and could then voluntarily surrender to U.S. authorities in Colombia. (Id. at 1, 15)

## III. THE NOVEMBER 20, 2015 HEARING

On November 20, 2015, this Court conducted a hearing concerning Tuzman's application. At that hearing, Tuzman's counsel represented that if this Court vacated the arrest warrant, Tuzman would voluntarily surrender to U.S. authorities in Colombia. (Nov. 20, 2015 Hearing Tr. (Dkt. No. 29) at 11-12) Defense counsel conceded, however, that Tuzman was

2

asking for "unprecedented relief," and that counsel knew of no case in which an individual had been arrested on U.S. charges in Colombia, was held pending extradition, but was then released from custody and permitted to voluntarily surrender to U.S. authorities in Colombia. (Id. at 12, 20)

The Government confirmed that no individual arrested in Colombia on the basis of a U.S. arrest warrant, and held pending extradition, had ever been informally released or transferred to U.S. authorities, or permitted to voluntarily surrender to U.S. authorities in Colombia in the manner proposed by defense counsel. (Id. at 25) The Government noted that were this Court to vacate the arrest warrant, neither U.S. nor Colombian authorities would have any basis for detaining Tuzman or restricting his movements.[1] (Id. at 25-26) The Government agreed that it "should make sure [Tuzman] is safe," but argued that "[e]xtradition always takes a certain amount of time and Colombia, in the spectrum of extraditing countries, is one of the fastest." (Id. at 28) The Government also emphasized that a treaty between the United States and Colombia governs extradition, and that "[o]nce [the Government] took the path of arresting [Tuzman] abroad, the treaty dictates what comes next." (Id. at 38)

This Court asked the Government to take all steps within its control to ameliorate the circumstances of Tuzman's detention in Colombia. (Id. at 21-23, 34-35, 50-52) This Court also asked the Government to consider whether any mechanism exists that would permit

---

[1] In its submissions, the Government states that during its investigation of Tuzman it became "increasingly concerned about the defendant's ability and willingness to evade prosecution." (Nov. 18, 2015 Govt. Ltr. (Dkt. No. 21) at 2). The Government notes that Tuzman has substantial ties to the United Arab Emirates, which does not have an extradition treaty with the United States. (Id.) Tuzman also retained a lawyer in the UAE who is herself a fugitive, having fled the United States after a conviction in the Eastern District of Pennsylvania for tax fraud. (Id.) The Government also argues that the Defendant's travel patterns "changed dramatically as the investigation quickened in 2014," and that his frequent visits to the United States ended. (Id.)

3

Tuzman's immediate transfer to the United States, noting that it was in the interests of both sides that he arrive in the U.S. as soon as possible. (Id. at 26-27, 50). The Court also asked the Government to submit additional material explaining, inter alia, how the immediate release of Tuzman to U.S. authorities in Colombia would damage U.S.-Colombia relations, as the Government had alleged. (Id. at 39, 41-42; see Nov. 18, 2015 Govt. Ltr. (Dkt. No. 21) at 1-2) The Court also asked the parties to brief the issue of this Court's authority "to vacate an arrest warrant that has already been issued on the grounds that it is causing direct harm to a United States citizen overseas." (Id. at 49)

IV. **POST-HEARING DEVELOPMENTS**

On November 23, 2015, the Government informed this Court that Tuzman had been transferred from La Picota to the Colombian Attorney General's detention facility ("AG Facility").[2] (Nov. 23, 2015 Govt. Ltr. (Dkt. No. 26)) The AG Facility is a "highly secure" detention center in central Bogota that is "used to house high-profile defendants, including former Colombian officials charged with corruption."[3] (Id. at 1) U.S. embassy representatives in Bogota report that Tuzman has a single-occupancy cell at the AG Facility, has access to a common room with a television, and is able to spend one hour a day outdoors. (Id. at 1-2; Dec. 14, 2015 Gov. Ltr., Ex. B (Dkt. No. 40-2) at 13[4]) Moreover, Tuzman is permitted to wear his own clothes and purchase his own food and snacks in addition to the food provided by the detention facility. (Dec. 14, 2015 Gov. Ltr., Ex. B. (Dkt. No. 40-2) at 8, 12) The Government

---

[2] Unlike La Picota – which is operated by the Minister of Justice – the AG Facility is overseen by the Attorney General of Colombia, who serves within the judicial branch of Colombia's government. (Id. at 1 n.1)
[3] Inmates held at the AG facility include the former head of Colombia's Department of Administrative Security, the former Secretary to the President of Colombia, and the former Deputy Inspector General of Colombia. (Id. at 1 and n.2)
[4] Page numbers referenced herein are according to the page numbers designated in ECF.

further notes that Tuzman has received visitors – including his attorneys, friends and family, and a rabbi – almost every day since his transfer to the AG Facility. (Dec. 14, 2015 Gov. Ltr., Ex. B. (Dkt. No. 40-2) at 9-11) Defense counsel reports that Tuzman has received medical care at a clinic near the AG Facility, including appointments with a urologist and a general practitioner. (Dec. 18, 2015 Def. Ltr. (Dkt. No. 41) at 6). The Government represents that Colombian officials intend to house Tuzman at the AG Facility until his extradition to the United States. (Nov. 23, 2015 Govt. Ltr. (Dkt. No. 26) at 2)

## V. **EXTRADITION PROCEDURES IN COLOMBIA**

Within 60 days after Colombian officials detain an individual on a provisional arrest warrant due to pending charges in the United States, the U.S. government must submit a formal extradition request to the Colombian Ministry of Foreign Affairs. (Boynton Decl. (Dkt. No. 28-1) ¶ 5; see also Ochoa Decl. (Dkt. No. 27-1) ¶ 11) The Ministry of Foreign Affairs submits the formal extradition request to the Ministry of Justice for approval; the Ministry of Justice then submits the request to the Supreme Court of Colombia, which determines whether the individual is eligible for extradition. (Boynton Decl. (Dkt. No. 28-1) ¶¶ 5, 15; see also Ochoa Decl. (Dkt. No. 27-1) ¶ 11) A defendant can expedite the Supreme Court's approval of the extradition request by submitting a request for expedited extradition. (Id. at ¶ 17; see also Ochoa Decl. (Dkt. No. 27-1) ¶¶ 12-16)

Here, the U.S. Government timely submitted its formal extradition request to the Ministry of Foreign Affairs on October 21, 2015, and the extradition request is currently pending before the Supreme Court of Colombia. (Nov. 18, 2015 Gov. Ltr. (Dkt. No. 21) at 3) On December 1, 2015, Defendant sent a letter to the Supreme Court of Colombia "requesting that the Supreme Court expedite the proceedings." (Dec. 2, 2015 Def. Ltr. (Dkt. No. 32) at 6) Even

assuming that Tuzman's extradition is expedited, he likely faces at least several more months of detention in Colombia before his extradition is accomplished. (See Ochoa Decl. (Dkt. No. 27-1) ¶ 17; Boynton Decl. (Dkt. No. 28-1) ¶ 13)

## DISCUSSION

### I. THERE IS NO BASIS FOR VACATING THE ARREST WARRANT

The grand jury's issuance of an indictment against Tuzman indicates that there is probable cause to believe that he committed the offenses charged in the indictment. Kaley v. United States, 134 S. Ct. 1090, 1097 (2014). Rule 9(a) of the Federal Rules of Criminal Procedure provides that a court "must issue a warrant . . . for each defendant named in an indictment. . . ." Fed. R. Crim. P. 9(a) (emphasis added). The language of Rule 9(a) indicates that the district court has no discretion in connection with the issuance of an arrest warrant once an indictment has been obtained. United States v. Santtini, 963 F.2d 585, 595 (3d Cir. 1992). Tuzman has not argued that the indictment was improperly obtained or that the grand jury lacked probable cause in voting an indictment. Accordingly, there is no basis for this Court to conclude that the arrest warrant was improperly issued, or that it should be vacated now. .

United States v. Mahmood, No. 07-MJ-603 (SMG), 2009 WL 1118085 (E.D.N.Y. Apr. 27, 2009), is instructive. In that case, the defendant was charged in a criminal complaint with international parental kidnapping, in violation of 18 U.S.C. § 1204. The defendant argued that she had left the country with her son to "flee[] a pattern of domestic violence," however, and she sought an order vacating the arrest warrant. Mahmood, 2009 WL 1118085, at *1. While acknowledging that "the[] facts [alleged by the defendant] might establish an affirmative defense," the court found that "[t]he plain language of the Federal Rules of Criminal Procedure . . . precludes the relief [the defendant] seeks." Because the defendant "d[id] not contest the

6

fundamental facts set forth in the prosecution's complaint," there was no basis for vacating the arrest warrant. Id. (citing Fed. R. Crim. P. 4(a)).

The same analysis applies here. Tuzman does not deny that the grand jury found that there is probable cause to believe that he committed the offenses charged in the indictment. Because a court "must issue a warrant . . . for each defendant named in an indictment. . . ." (see Fed. R. Crim. P. 9(a)), the arrest warrant for Tuzman was properly issued, and there is no basis for vacating that warrant. See Santtini, 963 F.2d at 595 (issuing a writ of prohibition to prevent the district court from enforcing an order barring the government from arresting a defendant; Fed. R. Crim. P. 9(a) "leav[es] the court with no discretion to refuse to issue an arrest warrant once probable cause for its issuance has been shown"). Tuzman has cited no law to the contrary.

Tuzman's application to vacate the arrest warrant will be denied.

## II. THIS COURT IS NOT AUTHORIZED TO REVIEW THE EXECUTIVE BRANCH'S DECISION TO SEEK TUZMAN'S EXTRADITION FROM COLOMBIA

To the extent that Tuzman seeks an order directing the United States to cease its efforts to obtain Tuzman's extradition from Colombia – in favor of an approach that would permit Tuzman to surrender to U.S. authorities in Colombia – this Court has no authority to issue such an order.

The Second Circuit has made clear – in the context of U.S. citizens facing extradition to a foreign country – that the judicial role in considering an extradition request is circumscribed. For example, in Sindona v. Grant, 619 F.2d 167, 174 (2d Cir. 1980), the court stated that "the degree of risk to [appellant's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch." Likewise, in Jhirad v. Ferrandina, 536 F.2d 478, 484-85 (2d Cir. 1976), the Second Circuit emphasized that "[i]t is not the business of

our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." See also Munaf v. Geren, 553 U.S. 674, 700-01 (2008) (rejecting habeas petition seeking to block the transfer of an American citizen to Iraqi custody; "it is for the political branches, not the judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments"). The Supreme Court has also instructed that "[t]he Judiciary is not suited to second-guess [Executive Branch] determinations . . . [where doing so] would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." Munaf, 553 U.S. at 702.

Tuzman argues that this line of precedent is not applicable here, because he is not asking this Court to "pass judgment on a foreign government, foreign judicial system or foreign conduct. Rather, [he] ask[s] that the Court review the propriety of the issuance of an arrest warrant, on which the provisional arrest warrant and extradition request to Colombia rest." (Nov. 10, 2015 Def. Ltr. (Dkt. No. 15) at 15) Even if it were lawful for this Court to vacate the arrest warrant – and, as set forth above, no such action would be lawful – Tuzman's application invites this Court to interfere with matters that are within the purview of the Executive Branch.

The Executive Branch properly obtained a warrant for Tuzman's arrest. After it was determined that Tuzman was in Colombia, the Executive Branch sought the assistance of Colombia in arranging for his arrest and extradition from that country. All of these matters are within the purview of the Executive Branch. To the extent that Tuzman has been mistreated in Colombia, there is no contention that the U.S. Government engineered, arranged for, or induced that mistreatment. Indeed, the evidence before this Court is all to the contrary.

Tuzman argues that it would be more expedient for the Government to abandon the extradition process and accept his voluntary surrender to U.S. authorities in Bogata. The

8

Government maintains that there is no such informal mechanism, and that any attempt on its part to seek an informal transfer – now that extradition proceedings have begun – would harm U.S.-Colombian relations. (See Hearing Tr. (Dkt. No. 29) at 13-14, 39; Prugh Decl. (Dkt. No. 28-8) ¶¶ 7, 11) Setting aside the practical difficulty with Tuzman's proposal – that once the arrest warrant is vacated neither the U.S. nor Colombia has any legal means to restrict Tuzman's movements – whether the formal extradition process should be abandoned, and whether doing so would harm this nation's bilateral law enforcement relationship with Colombia, are matters that "'properly fall[] within the exclusive purview of the [E]xecutive [B]ranch.'" Ahmad v. Wigen, 910 F.2d 1063, 1066 (2d Cir. 1990) (quoting Sindona, 619 F.2d at 174). This Court is not authorized to second-guess the Executive Branch's determinations in this area.[5]

Defendant's argument that this Court's intervention is necessary to compel the Government to fulfill its duty "to protect – or at least not violate – its citizens' constitutional rights abroad" is not persuasive. (See Nov. 10, 2015 Def. Ltr. (Dkt. No. 15) at 14) As an initial matter, Tuzman's safety concerns have been addressed. See Dec. 2, 2015 Def. Ltr. (Dkt. No. 32) at 8 (noting that "the transfer to the AG [Facility] appears to eliminate the direct and present threat of physical assault from other inmates or [prison officials]"); Dec. 11, 2015 Govt. Ltr. (Dkt. No. 39) at 1 (representing that "the defendant is being housed safely" at the AG Facility). While Tuzman complains about being held "in solitary confinement lock-down under fluorescent

---

[5] Defendant claims that if the U.S. government were to request an immediate transfer – to which Defendant would voluntarily agree – Colombian officials would likely comply and transfer Defendant to U.S. custody without waiting for the Supreme Court of Colombia to approve the extradition request. (Dec. 3, 2015 Def Ltr., Ex. A (Arias Decl.) (Dkt. No. 35-1) at 3) The Government claims that such a voluntary transfer is not possible under Colombian law. (Dec. 14, 2015 Gov. Ltr., Ex. D (Dec. 9, 2015 Ana Fabiola Castro Rivera Ltr.) (Dkt. No. 40-4) at 2) It is not necessary for this Court to resolve this issue, because even assuming that such an option is available to the Government, the question of whether to attempt to informally bypass Colombia's formal extradition procedures is a matter within the discretion of the Executive Branch.

lights" (see Dec. 2, 2015 Def. Ltr. (Dkt. No. 32) at 9), solitary confinement is common in U.S. facilities. In any event, this Court is not authorized to micro-manage prisoners in U.S. Bureau of Prisons facilities, much less a detention facility operated by another sovereign nation.

In any event, any mistreatment Tuzman has been subjected to in Colombia has not been caused by the U.S. Government, and the U.S. Government is not responsible for actions taken by those who are not its agents. United States v. Lira, 515 F.2d 68, 69-70 (2d Cir. 1975) illustrates this point. In that case, the defendant was arrested in Chile at the request of the Drug Enforcement Administration and was allegedly "blindfolded by the Chilean police, beaten, strapped nude to a box spring, tortured with electric shocks, and questioned about the whereabouts of [his alleged co-conspirator]" before being turned over to U.S. custody. Lira, 515 F.2d at 69. After the defendant arrived in the United States, he moved to dismiss the indictment, even though there was no evidence that U.S. authorities had been complicit in the torture. Id. Although the DEA had requested the defendant's arrest, and Chilean officials had kept the DEA apprised of the defendant's place of incarceration, the Second Circuit rejected the argument that the U.S. government was "vicariously responsible" for the treatment the defendant had been subjected to:

> [T]he Government merely asked the Chilean Government to arrest and expel [the defendant] in accord with its own procedures. This action can hardly be faulted. Agencies such as the DEA presumably must cooperate with many foreign governments in seeking transfer to the United States of violators of United States law. The DEA can hardly be expected to monitor the conduct of representatives of each foreign government to assure that a request for extradition or expulsion is carried out in accordance with American constitutional standards.

Id. at 71.

Lira is directly applicable here. The Government has done no more than seek Colombia's assistance in arresting and extraditing Tuzman. There is no evidence that the Government has been complicit in any mistreatment of Tuzman in Colombia.

## CONCLUSION

For the reasons stated above, Defendant Tuzman's application for an order vacating the warrant for his arrest, or compelling the Government to abandon its formal request for Tuzman's extradition from Colombia, is denied.[6]

Dated: New York, New York
December 30, 2015

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

---

[6] Defense counsel's most recent submission reports that Tuzman is presently suffering from a variety of medical conditions, for which he only recently received medical treatment. (Dec. 18, 2015 Def. Ltr. (Dkt. No. 41) at 6, 6 n.8) This Court asks the Government to ensure – to the best of its ability – that Tuzman receives the medical care necessary to address the conditions described in defense counsel's December 18, 2015 letter.