```
                                         USDC SDNY
                                         DOCUMENT
                                         ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT             DOC #:
SOUTHERN DISTRICT OF NEW YORK            DATE FILED:  DEC 2 2 2016
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :    SUPERSEDING INDICTMENT
                                 :
          - v. -                 :    S8 15 Cr. 536 (PGG)
                                 :
KALEIL ISAZA TUZMAN,             :
OMAR AMANAT, and                 :
IRFAN AMANAT,                    :
                                 :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - - x
```

## COUNT ONE

**(Conspiracy To Commit Wire Fraud: Maiden Capital Investors)**

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

#### The Amanat Brothers and Related Entities and Accounts

1. At various relevant to this Indictment, OMAR AMANAT, the defendant, was a self-described entrepreneur, filmmaker and investor in media, finance and technology companies.

2. At various times relevant to this Indictment, IRFAN AMANAT, the defendant, (collectively with OMAR AMANAT, the defendant, the "Amanat Brothers") was a trader and consultant. In or about 2006, IRFAN AMANAT was banned by the SEC from associating with any broker or dealer for a period of five years and ordered to cease and desist from committing or causing any violations or future violations of Section 10(b) or Rule 10b-5 of the Securities Exchange Act of 1934.

3.     At various times relevant to this Indictment, the Amanat Brothers raised money for Enable Invest Ltd. ("Enable"), an investment company based in Dubai and managed by IRFAN AMANAT, the defendant. OMAR AMANAT, the defendant, was primarily responsible for, among other things, raising money for Enable.   IRFAN AMANAT was primarily responsible for, among other things, trading strategies and account management, including the preparation of client account statements. Individual-1 was an employee of Enable with whom the Amanat Brothers communicated.

4.     At various times relevant to this Indictment, Enable was affiliated with certain U.S.-based accounts, including a trading account (the "U.S. Enable Trading Account"), certain U.S.-based bank accounts (the "U.S. Enable Bank Accounts"), and certain foreign-based accounts and entities.

KIT digital, Kaleil Isaza Tuzman and KITD-Related Individuals

5.     At all times relevant to this Indictment, KIT digital, Inc. ("KITD") was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York. At various times relevant to this Indictment, KITD maintained a U.S.-based bank account (the "KITD Bank Account").

6. At all times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, was the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of KITD.

7. At all times relevant to this Indictment, Robin Smyth ("Smyth") was the Chief Financial Officer ("CFO") of KITD.

8. At all times relevant to this Indictment, Gavin Campion ("Campion") was the President of KITD.

9. At all times relevant to this Indictment, Rima Jameel, a/k/a "Rima Jameel Al Fahl," ("Jameel") was an attorney based in the United Arab Emirates ("U.A.E.") who served as KITD's outside corporate counsel. Jameel worked at J.B. Legal Consulting, a U.A.E.-based law firm.

10. At various times relevant to this Indictment, Jourdian Invest Ltd. ("Jourdian Invest") was a British Virgin Islands entity created by Smyth and Jameel, with the knowledge of KALEIL ISAZA TUZMAN, the defendant.

11. From at least in or about 2007 up to in or about September 2009, KITD employed Accounting Firm-1 as an independent auditor. Accounting Firm-1 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information. Thereafter, from in or about October 2009 up to in or about 2012, KITD employed Accounting Firm-2 as an independent auditor. Like Accounting Firm-1, Accounting Firm-2

3

performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.

12.  From in or about May 2008 to on or about August 12, 2009, KITD's common stock was traded on the OTC Bulletin Board, which is an electronic quotation system for over-the-counter securities that are not listed on a national securities exchange. Beginning on or about August 13, 2009, KITD's common stock was traded on the NASDAQ.

### Stephen Maiden and Maiden Capital

13.  From in or about October 2006 to in or about June 2012, Stephen E. Maiden ("Maiden") operated the Maiden Capital Opportunity Fund (the "Maiden Fund") in North Carolina through his investment advisory firm, Maiden Capital LLC ("Maiden Capital"). At all times relevant to this Indictment, Maiden Capital maintained an account at a bank located in North Carolina (the "Maiden Capital Account").

14.  At various times relevant to this Indictment, KALEIL ISAZA TUZMAN, OMAR AMANAT, and IRFAN AMANAT, the defendants, and Maiden, through Maiden Capital, were each investors in a privately held special purpose investment vehicle (the "KIT SPIV"), which was controlled by TUZMAN and invested in KITD.

### OVERVIEW OF THE SCHEME TO DEFRAUD MAIDEN CAPITAL INVESTORS

15.  Between in or about March 2009 and in or about June 2012, OMAR AMANAT, the defendant, together with IRFAN AMANAT, the

4

defendant, devised and carried out a scheme to hide the fact that investments by Maiden Capital clients in Enable, including investments OMAR AMANAT had solicited with false and misleading representations, had been lost as a result of poor trading decisions and fraudulent misappropriation. Rather than disclose the Enable losses to investors in Maiden Capital, as Maiden was legally obligated to do, Maiden concealed the Enable losses with the knowledge and assistance of the Amanat Brothers, who also did not want the Enable losses to be exposed.

16. To facilitate the scheme to defraud Maiden Capital investors, IRFAN AMANAT, the defendant, provided Maiden with fictitious Enable account statements, which Maiden then used, with the knowledge and approval of the Amanat Brothers, to generate fictitious Maiden Capital client account statements that failed to disclose the Enable losses. For his part, OMAR AMANAT, the defendant, wired hundreds of thousands of dollars to the Maiden Capital Account to support Maiden Capital, including to allow Maiden to repay investors whose redemption requests could not be forestalled and thus to continue to keep secret from Maiden investors the Enable losses.

17. By providing Maiden with fictitious Enable account statements, and by providing funds to pay redemptions, OMAR AMANAT and IRFAN AMANAT, the defendants, helped Maiden succeed in covering up the losses for over three years. When Maiden Capital's

insolvency was ultimately exposed, Maiden was unable to meet investor redemption requests. Maiden Capital collapsed in July 2012.

### THE AMANAT BROTHERS SOLICIT INVESTMENTS FOR ENABLE

18. In or about June 2008, OMAR AMANAT, the defendant, solicited KALIEL ISAZA TUZMAN, the defendant, to invest in Enable on KITD's behalf. To induce TUZMAN to invest, OMAR AMANAT represented to TUZMAN that he would raise money for and invest in the KIT SPIV, the special purpose investment vehicle controlled by TUZMAN. IRFAN AMANAT, the defendant, also invested in the KIT SPIV.

19. In or about June 2008, Maiden invested approximately $1 million from the Maiden Fund into the KIT SPIV. OMAR AMANAT, the defendant, induced Maiden to make this investment as part of OMAR AMANAT's agreement to raise money for the KIT SPIV.

20. On or about June 16, 2008, IRFAN AMANAT, the defendant, sent an email to OMAR AMANAT, the defendant, in which he acknowledged the quid pro quo arrangement pursuant to which KITD would be investing in Enable in return for investments in the KIT SPIV. IRFAN AMANAT wrote: "It was tricky, [Smyth] voiced the exact concerns about arms length transactions . . . but ironically he offered to open the brokerage accounts and put 250k token money in now . . . ."

6

21.   The same week, OMAR AMANAT, the defendant, emailed IRFAN AMANAT, the defendant, and requested his help to "delete all of my emails from the yahoo site but download them onto my laptop." OMAR AMANAT expressed "concern[] about them subp[o]ening yahoo at some point." IRFAN AMANAT responded: "Set up your outlook to pull all your email from yahoo and delete it. If you need help I can walk you through it." OMAR AMANAT responded: "Can you just get on skype? I just spoke with [K]aleil [Tuzman]."

22.   In or about July 2008, KALEIL ISAZA TUZMAN, the defendant, sought approval from KITD's Board of Directors (the "KITD Board") for KITD's available cash to be placed in Enable for "cash management" purposes, stating:

> [Enable] is associated with Omar Amanat and Irfan Amanat, who are each investors in the KIT [] SPIV, and through that vehicle, investors indirectly in KIT digital. The Amanat brothers have been very helpful to the company over time . . . [and] have played a critical role in facilitating the KIT Media financing through their relationships.

23.   In or about August 2008, after KALEIL ISAZA TUZMAN, the defendant, obtained approval from the KITD Board, KITD invested approximately $6.5 million in Enable. As of September 30, 2008, over 70% of KITD's cash was invested with Enable.

24.   The majority of the funds invested in Enable by KITD were deposited into the U.S. Enable Trading Account. Maiden subsequently learned that TUZMAN had redirected the funds from

Maiden Capital's investment in the KIT SPIV into Enable, as part of KITD's $6.5 million investment, without Maiden's permission or authorization.

## THE AMANAT BROTHERS COVER UP THE ENABLE LOSSES BY SOLICITING MORE INVESTMENTS

25.  The U.S. Enable Trading Account was opened in approximately June 2008. Between June 2008 and September 2008, in excess of $7 million was deposited into the U.S. Enable Trading Account, including more than $5.5 million from the $6.5 million KITD investment.  In July, August and September 2008, the U.S. Enable Trading Account realized losses every month and, in total, incurred trading losses in excess of $5.5 million.

26.  Despite the trading losses sustained in the U.S. Enable Trading Account, IRFAN AMANAT, the defendant, represented to Maiden that Enable's returns were positive.  For example, on or about October 11, 2008, IRFAN AMANAT sent an email to Maiden in which IRFAN AMANAT stated that Enable "ha[s] been making good profits . . . trading has been smooth and profitable – no huge profits, but with the markets [] going psychotic these days, I am happy to be taking things safe."  In truth and in fact, by September 30, 2008, the U.S. Enable Trading Account contained less than $113,000.

27.  In or about November 2008, OMAR AMANAT, the defendant, who was, by that time, well aware that Enable had incurred losses

and was unable to meet redemptions, sought an additional $2 million from Maiden, purportedly for the purpose of investing in Enable. Specifically, on or about November 8, 2008, OMAR AMANAT asked Maiden to make a "$2 million short term (anticipated to be no more than one week) investment into Enable." OMAR AMANAT indicated that Enable would hold the cash as "show money" to induce other investments and then would be returned. In reality, OMAR AMANAT instead intended to misappropriate Maiden's investment to pay redemptions to Enable investors, thereby concealing the Enable losses.

28. At the behest of OMAR AMANAT, the defendant, Maiden, between November 10, 2008 and November 18, 2008, wired a total of $2 million from the Maiden Capital Account to one of the U.S. Enable Bank Accounts. Maiden Capital's investment in Enable was never deposited into the U.S. Enable Trading Account. Instead, OMAR AMANAT, contrary to his representations to Maiden, misappropriated a majority of Maiden Capital's funds for his own purposes, including to meet an Enable redemption demand made by KALEIL ISAZA TUZMAN, the defendant, on behalf of KITD, which had also incurred losses in Enable. Specifically:

a. On or about November 10, 2008, the same day on which Maiden wired $1 million to one of the U.S. Enable Bank Accounts, OMAR AMANAT caused approximately $650,000 of these funds to be wired to the KITD Bank Account. The next day, TUZMAN emailed IRFAN

9

AMANAT, the defendant, to acknowledge receipt of the $650,000 wire and stated that KITD was "still waiting for the $400,000" wire that had purportedly been sent a week earlier.

b.     On or about November 12, 2008, the same day on which Maiden wired $500,000 to one of the U.S. Enable Bank Accounts, OMAR AMANAT caused $400,000 of these funds to be wired to the KITD Bank Account.

c.     On or about December 1 and 2, 2008, shortly after Maiden wired a total of another $500,000 to one of the U.S. Enable Bank Accounts, OMAR AMANAT caused approximately $442,000 to be wired to the KITD Bank Account.

29.    On or about December 18, 2008, OMAR AMANAT, the defendant, emailed IRFAN AMANAT, the defendant, to discuss, among other things, Maiden's attempts to recoup the $2 million investment. OMAR AMANAT stated: "Maiden has tried to reach me and is asking for his $2mln back. In a post madoff world everyone is suspicious. This is a major problem and red flag for me. As u know. I don't have any ability to repay it. . . . This is a major disaster – of madoff proportions – if maiden suspects fraud of some sort and notifies the authorities I'm cooked. All in all this is some pickle of a situation this time."

30.    The next month, on or about January 5, 2009, Maiden questioned IRFAN AMANAT, the defendant, about the Enable statement IRFAN AMANAT had provided to Maiden Capital, stating that he

10

(Maiden) was "confused by the returns," because the Enable statement reflected a profit of approximately $8,000 for the month, as he "expected quite a bit more."    IRFAN AMANAT forwarded the email to OMAR AMANAT, the defendant, who replied: "Coordinate w[ith] me on this.    [Maiden] needs to show good year end returns. Say you didn't include the waiving of the fees or something." After IRFAN AMANAT asked OMAR AMANAT what "annual % return" had been represented to Maiden, OMAR AMANAT responded: "He wants to show closer to 17 percent.    It's all irrelevant since he can't withdraw . . . ."

31.    On or about February 11, 2009, Maiden emailed the Amanat Brothers regarding the return of at least a portion of his $2 million short term investment: "I've spoken to you both about getting [] 500k back – but now [I] really need it.    [I] have redemptions to meet next week . . . .    Not sure the holdup.    But pls pls pls send it over today.    Pls ok this.    I can't operate my business – I have almost no free trading cash in my account and have to meet redemptions."    Minutes later, IRFAN AMANAT, the defendant, forwarded the email to OMAR AMANAT, the defendant, asking "Om[ar], can we do anything?"    OMAR AMANAT responded: "Yes, send him back $500k asap.    Oh I forgot, we don't have it !!!!!!!!!!! That is why this is an absurd question . . . ."

<u>MAIDEN LEARNS OF THE ENABLE LOSSES</u>

11

32.   The next month, in or about March 2009, on a telephone call in which KALEIL ISAZA TUZMAN, OMAR AMANAT, and IRFAN AMANAT, the defendants, participated, Maiden learned that Enable was insolvent and that the Maiden Fund's investment in Enable had been lost.   It was clear to Maiden that, prior to that call, TUZMAN, who had invested millions of dollars in Enable on KITD's behalf, had already learned that Enable was insolvent.

33.   Between in or about 2009 and in or about 2011, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, Maiden and others, discussed solutions to hide the Enable losses from both investors in Maiden Capital and KITD shareholders.   One proposed solution involved OMAR AMANAT and TUZMAN providing Maiden with shares in the KIT SPIV, which Maiden Capital could then record in the Maiden Fund in place of the Enable investment.

THE AMANAT BROTHERS PREVENT DISCOVERY OF THE ENABLE LOSSES

34.   OMAR AMANAT and IRFAN AMANAT, the defendants, took certain steps to prevent the Enable losses from being discovered and causing the collapse of Maiden Capital, including by providing Maiden with fictitious Enable account statements reflecting that Maiden Capital maintained more than $2 million with Enable and providing Maiden with money to pay Maiden Capital investors whose redemption requests could not be forestalled.

35.   After the March 2009 telephone call, Maiden, using fictitious account numbers generated by IRFAN AMANAT, the

12

defendant, and with the knowledge of OMAR AMANAT, the defendant, began generating fraudulent client statements that failed to disclose the Enable losses and were distributed to Maiden Capital's investors.

36. Thereafter, between at least in or about March 2009 and in or about February 2012, IRFAN AMANAT, the defendant, provided Maiden with false account statements purporting to show Maiden Capital's positive balance with Enable and consistently positive monthly returns. For example:

a. On or about July 8, 2010, IRFAN AMANAT emailed Maiden a false statement for June 2010 reflecting an ending balance for Maiden Capital of $2,459,919.88, a purported gain from the prior month's returns.

b. On or about May 6, 2011, Maiden emailed IRFAN AMANAT asking for his purported Enable balance because he "ha[d] to get my num[ber]s out today" to Maiden Capital investors. Later that day, IRFAN AMANAT emailed Maiden a false statement for April 2011 reflecting an ending balance of 2,519,650.95, a purported gain from the prior month's statement.

c. On or about December 12, 2011, IRFAN AMANAT emailed Maiden a false statement for November 2011 reflecting an ending balance for Maiden Capital of $2,556,481.33, a purported gain from the prior month's returns.

13

d.  In or about February 2012, after Maiden emailed IRFAN AMANAT asking for his January 2012 statement, IRFAN AMANAT emailed Maiden both a false balance of $2,580,327.45, another purported gain, and a "template spreadsheet so you can calculate" the desired false return for future months.  Maiden then used the spreadsheet provided by IRFAN AMANAT to create false month-end numbers for Maiden Capital's investment with Enable.

37.  In truth and in fact, during the period in which IRFAN AMANANT, the defendant, sent Maiden account statements showing positive returns and a total Maiden Capital balance of more than $2 million, both IRFAN AMANAT and Maiden, as well as OMAR AMANAT, the defendant, knew, and had known since at least March 2009, that Maiden Capital's investment in Enable had long been lost.

38.  To further facilitate Maiden's efforts to hide the fact that Maiden Capital's investment in Enable had been lost, OMAR AMANAT, the defendant, wired hundreds of thousands of dollars to the Maiden Capital Account to support Maiden Capital, including to allow Maiden to repay investors whose redemption requests could not be forestalled and thus to continue to keep secret from Maiden investors the Enable losses.

39.  For example, in or about April 2011, Maiden received a redemption request from a Maiden Capital investor ("Investor-1") for several hundred thousand dollars.  Maiden told OMAR AMANAT,

14

the defendant, about the redemption request, and that Maiden Capital did not have sufficient funds to meet the redemption.  In an attempt to conceal the Enable losses from Maiden Capital's investors, on or about June 2, 2011, OMAR AMANAT and Maiden entered into a loan agreement (the "June 2011 Loan Agreement") pursuant to which OMAR AMANAT agreed to lend up to $1.25 million to Maiden Capital.  Under the terms of the June 2011 Loan Agreement, OMAR AMANAT required that Maiden provide OMAR AMANAT with a schedule listing the assets held by the Maiden Fund (the "Maiden Fund Schedule").  The Maiden Fund Schedule reflected a cash balance of zero and listed less than $250,000 in saleable securities, apart from Maiden's ostensible stake in KITD entities.  The Maiden Capital Schedule also reflected that Maiden continued to mark the Maiden Fund's Enable investment as worth in excess of $2.5 million. In truth and in fact, KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, OMAR AMANAT, Maiden and others had known for more than two years that Maiden Capital's Enable investment was worthless.

40.  To ensure that Maiden used the funds loaned by OMAR AMANAT, the defendant, to repay investors whose redemption requests could not be forestalled, OMAR AMANAT also required that Maiden resign as the managing member of Maiden Capital.  To further exert control over Maiden, OMAR AMANAT installed his then wife as the managing member of Maiden Capital.

41. On or about June 2, 2011, after the June 2011 Loan Agreement had been executed, OMAR AMANAT, the defendant, wired $250,000 from one of the U.S. Enable Bank Accounts to the Maiden Capital Account. The same day, Maiden Capital wired $250,000 to Investor-1 in partial satisfaction of Investor-1's redemption request.

42. In or about July 2011, during the period when OMAR AMANAT, the defendant, was wiring funds to Maiden Capital, OMAR AMANAT, KALEIL ISAZA TUZMAN, the defendant, Maiden and others met in Manhattan in part to discuss the Enable losses. In a text message on the day of the meeting, OMAR AMANAT instructed Maiden to demand that TUZMAN contribute to a settlement for Maiden's investors, directing Maiden, "[b]e aggressive today: say it doesn't matter who did what. Paint a stark nightmare scenario if your fund goes under . . . Madoff like trustee is appointed—he will quickly realize all money was lost in KIT Digital and everyone here will be sued. Securities laws violations have occurred. Criminal behavior jail time. Bottom line: fund needs to be made whole or ship will sink."

43. In or about August 2011, Maiden continued to update OMAR AMANAT, the defendant, concerning demands from Maiden Capital investors for redemptions which Maiden, because of the Enable losses, was unable to meet. For example, in a series of text messages OMAR AMANAT and Maiden exchanged on August 10, 2011,

Maiden asked OMAR AMANAT: "Can you talk.  Need to deal with [investor].  I have a call with them at 7:30 a.m.  I need to tell them I can send them 250 to keep them from litigating and blowing everything up.  So what should I tell them.  Not sure why you are ignoring my fund disaster occurring."  After a series of additional text messages regarding Maiden's need to pay redemptions, including one in which Maiden indicated that the "goal is to keep me from blowing up," OMAR AMANAT wired $40,000 from one of the U.S. Enable Bank Accounts to the Maiden Capital Account on or about August 19, 2011.

44.  Between on or about June 6, 2011 and on or about January 20, 2012, OMAR AMANAT, the defendant, wired additional funds from one of the U.S. Enable Bank Accounts to the Maiden Capital Account for the purpose of preventing Maiden Capital from collapsing and exposing the Enable losses.

45.  Between in or about January 2012 and in or about June 2012, Maiden continued to regularly update OMAR AMANAT, the defendant, on the redemption demands from Maiden Capital investors which, because of the Enable losses, Maiden could not meet.  For example, between on or about May 17, 2012 and on or about June 29, 2012, Maiden sent a series of text messages to OMAR AMANAT in which Maiden described his urgent need for money in order to pay investor redemptions.  During this time period, in order to encourage Maiden to continue to hide the Enable losses from Maiden Capital

17

investors, OMAR AMANAT repeatedly promised Maiden that he would wire additional funds for the purpose of paying redemptions, but ultimately failed to send additional funds.

46.  By in or about July 2012, Maiden was unable to continue to forestall redemption requests, and Maiden Capital collapsed. In total, Maiden Capital investors lost more than $8 million, including an investment in Enable of more than $2 million.

## THE CONSPIRACY

47.  From in or about March 2009 through in or about June 2012, in the Southern District of New York and elsewhere, OMAR AMANAT and IRFAN AMANAT, the defendants, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

## Object Of The Conspiracy

48.  It was a part and an object of the conspiracy that OMAR AMANAT and IRFAN AMANAT, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs,

18

signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT TWO

### (Wire Fraud: Maiden Capital Investors)

The Grand Jury further charges:

49.    The allegations contained in paragraphs 1 through 46 are repeated and realleged as though fully set forth herein.

50.    From in or about March 2009 through in or about June 2012, in the Southern District of New York and elsewhere, OMAR AMANAT and IRFAN AMANAT, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, OMAR AMANAT, IRFAN AMANAT and others schemed to defraud Maiden Capital investors by causing Maiden to make material misrepresentations and to omit material facts to Maiden Capital investors about the status of their investments, by wiring hundreds of thousands of dollars to Maiden Capital in order to pay certain redemptions and forestall

19

Maiden Capital's collapse, and by providing Maiden with false account statements regarding Maiden Capital's investment in Enable, knowing that such false account statements were intended to be presented, and were presented, to Maiden Capital investors.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

### (Aiding and Abetting Investment Adviser Fraud)

The Grand Jury further charges:

51.  The allegations contained in paragraphs 1 through 46 are repeated and realleged as though fully set forth herein.

### OVERVIEW OF THE INVESTMENT ADVISOR FRAUD

52.  Maiden Capital, which was an unregistered investment advisory firm, managed portfolios of securities and provided advice on investments for clients.  Maiden was the managing member of Maiden Capital and ran the Maiden Fund.  Compensation took different forms but typically included a fee based on total assets under management and additional performance-based returns. Pursuant to investment advisory agreements, clients empowered Maiden Capital and Maiden to make investment decisions on their behalf.  Maiden, in turn, was obligated to make such decisions based on the best interests of his clients.

53.  As described herein, OMAR AMANAT and IRFAN AMANAT, the defendants, aided and abetted Maiden's fraud on Maiden Capital's investment advisory clients.  Rather than disclose the Enable

losses to investors in the Maiden Fund, as he was legally obligated to do, Maiden concealed the Enable losses, thereby acting in his own self-interest and the interests of OMAR AMANAT and IRFAN AMANAT, his close associates, who did not want the Enable losses to be exposed. By providing Maiden with capital contributions to meet redemption requests knowing that Maiden Capital's investors had been lied to by Maiden about the Enable losses and the status of their investments, and by providing false account statements regarding Maiden Capital's investment in Enable, OMAR AMANAT and IRFAN AMANAT assisted Maiden in carrying out his fraudulent scheme and helped Maiden to succeed in covering up the losses for over three years.

## Statutory Allegation

54.    From in or about March 2009 through in or about June 2012, in the Southern District of New York and elsewhere, OMAR AMANAT and IRFAN AMANAT, the defendants, willfully and knowingly aided and abetted an investment advisor who used the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, to wit, OMAR AMANAT and

21

IRFAN AMANAT aided and abetted fraud by Maiden, an investment advisor, in which Maiden made false and materially omissive statements to investors about the status of their investments in Enable and the payment of redemptions.

(Title 15, United States Code, Sections 80b-6 and 80b-17; Title 18, United States Code, Section 2.)

## COUNT FOUR

**(Conspiracy To Commit Securities Fraud: Market Manipulation)**

The Grand Jury further charges:

55.   The allegations contained in paragraphs 1 through 46 and 52 through 53 are repeated and realleged as though fully set forth herein.

### OVERVIEW OF THE MARKET MANIPULATION SCHEME

56.   Between in or about December 2008 and in or about September 2011, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, Maiden and others, engaged in efforts to artificially inflate the share price and trading volume of KITD shares. During this time period, during which KITD shares traded on the OTC Bulletin Board and on the NASDAQ, Maiden, at OMAR AMANAT and TUZMAN's behest, purchased and sold shares of KITD through the Maiden Fund, at times for the purpose of manipulating the stock price and at times for the purpose of creating the illusion of greater volume in the trading for KITD shares. TUZMAN personally invested his own money into Maiden Capital, and also arranged for

22

KITD to invest money in Maiden Capital, thereby using Maiden Capital as a vehicle by which KITD, at TUZMAN's direction, invested in itself, without disclosing that fact or the scheme to manipulate KITD's stock to the investing public.

57. To facilitate the manipulation of KITD shares, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, agreed to compensate Maiden in several ways, including by making investments in, and loaning money to, Maiden Capital, which agreement OMAR AMANAT and TUZMAN partially fulfilled.

## THE WRITTEN AGREEMENT TO MANIPULATE THE MARKET IN KITD SHARES

58. In or about December 2008, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, and Maiden entered into a written agreement (the "Agreement") in which Maiden agreed to purchase at least $400,000 of common stock in KITD in the open market over the next 30 days through Maiden Capital and to hold it for at least 90 days. Maiden also agreed that he would not seek to redeem Maiden Capital's investments in the KIT SPIV or Enable. Because TUZMAN and OMAR AMANAT knew, as of at least December 2008, that Enable had suffered significant losses, this agreement was valuable to both OMAR AMANAT and TUZMAN. In return, OMAR AMANAT agreed to assign a portion of his interest in the KIT SPIV to Maiden Capital. For his part, TUZMAN agreed to, among other things, make efforts to induce KITD to retain Maiden Capital to provide various services, and to assign to Maiden Capital a portion of TUZMAN's

23

interest in the KIT SPIV. In a second agreement between OMAR AMANAT and TUZMAN, signed the same day, OMAR AMANAT further agreed to facilitate purchases of KITD in open market trading.

59. Shortly after entering into the Agreement, Maiden fulfilled his commitment by acquiring over $400,000 worth of KITD shares through Maiden Capital.

## OMAR AMANAT AND TUZMAN INDUCE MAIDEN TO CONTINUE TO MANIPULATE KITD STOCK PRICE

60. Notwithstanding the fact that Maiden had fulfilled his obligations under the Agreement, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, induced Maiden to continue to manipulate KITD's stock price based in part on representations that Maiden's continued support of KITD's stock price would facilitate Maiden Capital being repaid, thereby permitting Maiden to hide the Enable losses from Maiden Capital investors.

61. To this end, using in part KITD funds provided by KALEIL ISAZA TUZMAN, the defendant, and TUZMAN's own funds, between March 2009 and September 2011, with the knowledge and approval of TUZMAN and OMAR AMANAT, the defendant, Maiden continued to manipulate KITD's stock price, purchasing in excess of $2 million of KITD shares through Maiden Capital. For example:

a. On or about March 9, 2009, Maiden sold approximately 28,571 shares of KITD stock using one trading account used by Maiden Capital and bought the same number of shares of

24

KITD stock using another trading account used by Maiden Capital. Maiden purchased and sold the KITD shares at the same price, approximately $7 per share.

b.  On or about December 4, 2009, Maiden bought approximately 4,815 shares of KITD stock using one trading account maintained by Maiden Capital and sold approximately 4,770 shares of KITD stock using the same trading account.  That same day, Maiden bought approximately 5,885 shares of KITD stock using one trading account maintained by Maiden Capital and sold approximately 5,830 shares of KITD stock using the same trading account.  The net effect of these transactions was that Maiden Capital accumulated only 100 additional shares of KITD stock. Moreover, in both sets of transactions, Maiden bought shares of KITD stock at a price of approximately $10.64 per share and sold the KITD shares at a price of approximately $10.60 per share. Maiden's trading activity in KITD shares on December 4, 2009 accounted for over approximately 30% of the entire trading volume in KITD that day.

c.  On or about July 29, 2010, Maiden sold approximately 16,072 shares of KITD stock using one trading account used by Maiden Capital and bought 16,063 shares of KITD stock using the same trading account.  The net effect of these transactions was that Maiden sold only 9 shares of KITD stock. Moreover, Maiden purchased the KITD shares at a price of approximately $9.62 per

25

share and sold the KITD shares at a price of approximately $9.48 per share.  Maiden's trading activity in KITD shares on July 29, 2010 accounted for over approximately 14% of the entire trading volume in KITD that day.

62.  As a further part of the scheme, KALEIL ISAZA TUZMAN, the defendant, also directed Maiden to make timely purchases of KITD stock in an effort to artificially inflate the price of KITD shares at certain critical moments.  For example:

a.  On or about March 12, 2009, TUZMAN sent an e-mail to Maiden.  In that e-mail, TUZMAN wrote, "Urgent: in with [financial firm], trying to close.  Where is stock right now?" Maiden replied, "[n]ow 8.99 last – that is the ask."  TUZMAN replied in part, "[g]reat work."

b.  On or about May 22, 2009, TUZMAN sent an e-mail to Maiden.  In that e-mail, TUZMAN wrote, "[w]here is stock trading? Getting nervous notes from [a financial firm]."  Maiden responded, "[i]t is because I was on plane on way to las vegas wher[e] I am until Sunday.  7.50 bid 8.1 ask.  Was 7.50 last till I hit ask. Thing is heavy every day unless I support it.  Sux."  On May 21, 2009, the day prior to this e-mail, Maiden was responsible for approximately all of the trading activity in KITD stock for that day.

c.  On June 8, 2009, Maiden sent an e-mail to TUZMAN. In that e-mail, Maiden wrote, "kdgl stock is 7.60 by 7.70 right

now. you need to find a friend with some deeper pockets to help the cause cuz i'm spent." TUZMAN replied, "I understand."

d.   On June 15, 2009, Maiden sent an e-mail to TUZMAN. In that e-mail, Maiden wrote, "btw I just spen[t] another 75k to buy kdgl stock – to take out the 7.75 offer. this is why i'm dying here as we wait 4 weeks to get something done. out of bullets." TUZMAN replied in part, "[a]s soon as we file initial S-1, we should be in a much better position to address this."[1]

d.   On June 22, 2009, TUZMAN sent an e-mail to Maiden. In that e-mail, TUZMAN wrote, "[w]e need stock to close as high as possible today."

e.   On July 9, 2009, TUZMAN sent an e-mail to Maiden. In that e-mail, TUZMAN wrote, "[w]e desperately need the stock to stay strong during this process."

f.   On or about August 12, 2009, which was the day before KITD shares began trading on the NASDAQ, TUZMAN invested $204,000 with Maiden Capital with the understanding that it would be used in part to fund additional purchases of KITD shares. On that same day, Maiden purchased additional shares of KITD. Maiden's trading in KITD stock on that day accounted for over

---

[1] "S-1" refers to Form S-1, which is a regulatory filing made by companies in part to register their securities with the SEC in anticipation of a public offering of stock. A Form S-1 includes a prospectus which discloses information about the company that is available to potential investors. KITD's S-1 was filed on or about June 24, 2009.

27

approximately 40% of the total trading volume in KITD stock for that day.

63. As a further part of the scheme to manipulate KITD shares, in or about March 2011, Maiden was on both sides of the purchase and sale of KITD stock on several occasions, including at prices that were not to Maiden's economic advantage.

## INDUCING KITD INVESTMENTS IN MAIDEN CAPITAL

64. In furtherance of the scheme to artificially inflate the share price of KITD, KALEIL ISAZA TUZMAN, the defendant, caused KITD to invest approximately $1.15 million with Maiden Capital. TUZMAN portrayed these investments to KITD's Board, among others, as efforts to safely invest assets of KITD. In reality, TUZMAN caused KITD to make these investments in order to help fund Maiden's purchases of KITD shares through Maiden Capital, as part of an effort to manipulate the market for KITD shares.

65. On March 10, 2009, Maiden sent an e-mail to KALEIL ISAZA TUZMAN, the defendant. In that e-mail, Maiden wrote, "Kdgl still hasn't traded outside of me today – any progress there? [Smyth] and I working out getting 200k in – should come today I think – tx." TUZMAN replied, "How much vol today? The steady trading action and market movement helps a lot. Did [Smyth] get wire [sending funds from KITD to Maiden Capital] done?"

66. On or about March 10, 2009, KITD wired $200,000 to Maiden Capital.

67. On June 12, 2009, Maiden sent an e-mail to KALEIL ISAZA TUZMAN, the defendant. In that e-mail, Maiden wrote, "one of the big incentives for me to buy stock -- give up economics etc -- was for you guys to put a couple million into my fund."

68. On January 29, 2010, KALEIL ISAZA TUZMAN, the defendant, sent an e-mail to Maiden and Smyth. In that e-mail, TUZMAN wrote, "[Maiden] was incredibly helpful to us through the last offering and over the last year and a half. I'd like to put a bit more cash with him at this time -- maybe another $600 - 800k -- but with very strict and quick removal terms, audit rights, etc."

69. On or about February 3, 2010, KITD wired $700,000 to Maiden Capital.

### HIDING THE SCHEME

70. No disclosure was ever made to KITD's shareholders that KITD's "investments" in Maiden Capital were not part of an arm's length relationship but were actually related party transactions for an improper purpose.

71. Instead, in an effort to conceal the scheme to manipulate KITD's stock price, KALEIL ISAZA TUZMAN, the defendant, misled KITD auditors about the true reason for KITD's investment in Maiden Capital.

72. For instance, in or about August 2009, an auditor ("Auditor-1") from Accounting Firm-1 inquired about the $200,000 investment that KITD had made in Maiden Capital in or about March

2009. After learning that Maiden Capital also owned shares of KITD, Auditor-1 raised concerns with KALEIL ISAZA TUZMAN, the defendant, and others at KITD about whether the KITD investment in Maiden Capital should have been disclosed to investors in public filings as a related party transaction. In an attempt to assuage Auditor-1's concerns, TUZMAN misrepresented the nature of his relationship with Maiden Capital and with Maiden.

73. Specifically, on or about August 12, 2009, KALEIL ISAZA TUZMAN, the defendant, sent an email to Auditor-1 stating in part that "[t]here has never been any relationship with Maiden Capital, no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital otherwise." As demonstrated by, among other things, the December 2008 agreement between OMAR AMANAT, the defendant, TUZMAN and Maiden, TUZMAN's representations to Auditor-1 were false and misleading.

## THE CONSPIRACY

74. From in or about December 2008 through in or about September 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, namely, fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections 78j(b) and

30

78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Object Of The Conspiracy

75.    It was a part and object of the conspiracy that KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

## Overt Acts

76.    In furtherance of the conspiracy and to effect its illegal object, KALEIL ISAZA TUZMAN and OMAR AMANAT, the defendants, and their co-conspirators, committed the following

31

overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about December 31, 2008, TUZMAN, OMAR AMANAT and Maiden executed an agreement pursuant to which Maiden agreed that Maiden Capital would buy at least $400,000 of KITD common stock in the open market.

b.    Between in or about January 2009 and in or about February 2009, Maiden purchased over $400,000 of KITD common stock through Maiden Capital.

c:    In or about March 2011, Maiden bought and sold KITD shares in an effort to artificially inflate the price of KITD shares.

d.    In or about July 2011, OMAR AMANAT and TUZMAN met with Maiden and others in Manhattan in part to discuss the losses sustained in Enable.

(Title 18, United States Code, Section 371.)

## COUNT FIVE

### (Conspiracy To Commit Wire Fraud: KITD Shareholders)

The Grand Jury further charges:

77.    The allegations contained in paragraphs 1 through 46, 52 through 53, 56 through 73, and paragraph 76 are repeated and realleged as though fully set forth herein.

### THE SCHEME TO DEFRAUD

78.    From in or about March 2009 through in or about March

32

2011, KALEIL ISAZA TUZMAN, the defendant, in causing KITD to invest approximately $1.15 million with Maiden Capital, misled KITD's shareholders, with the assistance of Maiden, by failing to disclose that KITD's "investments" with Maiden Capital were not part of an arms-length relationship but were actually related party transactions for an improper purpose.

79.  For example, in or about February 2011, KALEIL ISAZA TUZMAN, the defendant, sought to redeem a personal investment in Maiden Capital.  Because of the Enable losses, among other reasons, Maiden was unable to pay this redemption.  To obtain approximately $250,000 for his personal use, TUZMAN caused $250,000 of KITD funds to be wired to Maiden Capital with the understanding that Maiden would then wire those funds back to TUZMAN, which Maiden did. TUZMAN falsely represented to KITD that the $250,000 was for a legitimate investment with Maiden Capital when, as TUZMAN and Maiden had agreed, it was instead to be paid to TUZMAN for his personal use.

80.  Moreover, in or about March 2012, during the month when KALEIL ISAZA TUZMAN, the defendant, was asked to resign as CEO of KITD, the KITD Board and Accounting Firm-2 asked questions about, among other things, KITD's investments in Maiden Capital.  TUZMAN and Maiden took steps to conceal from the KITD Board and Accounting Firm-2 that Maiden Capital did not have the funds invested by KITD. For example, on or about March 16, 2012, Maiden, with TUZMAN's

knowledge, sent a false account balance confirmation to KITD's auditors confirming that there was at least $1 million of KITD's funds at Maiden Capital available for redemption despite the fact that Maiden and TUZMAN knew that Maiden Capital did not have these funds.

## THE CONSPIRACY

81.   From at least in or about March 2009 up to in or about March 2011, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object Of The Conspiracy

82.   It was a part and an object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

34

(Title 18, United States Code, Section 1349.)

## COUNT SIX

## (Conspiracy To Commit Securities Fraud, Make False Statements In Annual And Quarterly SEC Reports And Make False Statements To Auditors)

The Grand Jury further charges:

83.   The allegations contained in paragraphs 1 through 46, 52 through 53, 56 through 73, 76, and paragraphs 78 through 80 are repeated and realleged as though fully set forth herein.

### RELEVANT PERSONS AND ENTITIES

84.   At all times relevant to this Indictment, The Country Network ("TCN") was a digital multicast network that specialized in broadcasting country music videos.

85.   At all times relevant to this Indictment, Sezmi Corporation ("Sezmi") was a cloud-based video delivery platform company that helped television providers deliver content over Internet Protocol connected devices.

### PUBLIC COMPANY REPORTING REQUIREMENTS

86.   At all times relevant to this Indictment, KITD was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and disclosed to the public.  Specifically, at all times relevant to this Indictment, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, KITD was required to: (a) file with the United States

Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected KITD's business transactions.

87. At all times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, and Smyth signed the quarterly and annual financial statements that KITD filed with the SEC.

88. At all times relevant to this Indictment, KITD's quarterly and annual financial statements were transmitted to the New York, New York offices of Vintage Filings ("Vintage"), a filing agent that assisted companies in electronically filing periodic reports with the SEC, and were thereafter transmitted electronically by Vintage to the SEC for filing.

### BACKGROUND

89. Between in or about 2008, when KALEIL ISAZA TUZMAN, the defendant, became Chairman and CEO of KITD, and in or about the spring of 2012, when TUZMAN resigned from those positions, KITD, like many start-up technology companies, never reported a profitable year in its annual financial statements. Under TUZMAN's leadership, however, KITD touted itself to the investing public as a growing company that routinely met or exceeded the so-called "guidance" that TUZMAN and other KITD executives communicated to

the investing public concerning KITD's operational and financial results for upcoming reporting periods. However, as set forth more fully below, TUZMAN and Smyth used various false and deceptive means to misrepresent KITD's true financial health to its shareholders and the investing public.

90. On or about November 21, 2012, after an internal investigation led by KITD's audit committee, KITD filed a Form 8-K, which is a report that public companies must file with the SEC to announce major events that shareholders should know about. In the Form 8-K, KITD announced to the investing public that KITD had discovered various errors and irregularities in its historical financial statements and that it would have to issue restated financial statements. On the first trading day following this announcement, the price of KITD's common stock plummeted more than 64% from the previous day's closing price. In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.

## CERTAIN RELEVANT ACCOUNTING PRINCIPLES

91. At all times relevant to this Indictment, KITD provided members of the investing public with information concerning KITD's anticipated and actual financial results. KITD provided such information through various methods, including public filings with the SEC, periodic news releases and other corporate announcements, statements made in conference calls with professional securities

analysts and investors, and meetings and conferences held with investors.  Investors considered the information provided by KITD in deciding whether to purchase, hold, or sell KITD securities.

92.  At all times relevant to this Indictment, KITD's public filings with the SEC included financial statements which contained, among other things, an Income Statement and a Balance Sheet.  A company's Income Statement reports, among other things, revenue recognized, expenses incurred, and net income earned during a stated period of time, usually a fiscal quarter or a fiscal year.  Within an Income Statement, expenses are subtracted from revenue to calculate net income.  A company's Balance Sheet reports the company's assets, liabilities, and shareholder equity as of a specific date.

93.  As part of the requirement that KITD keep accurate books and records, KITD was required to accurately report the nature of its purported assets, including whether assets were held in cash or otherwise.

94.  At all times relevant to this Indictment, in each of its annual Form 10-K filings, KITD disclosed to members of the investing public that it followed a revenue recognition policy that required four basic criteria to be met in order for revenue to be recognized.  Specifically, KITD disclosed that it counted revenue on its books and records when (a) there is persuasive evidence that an arrangement exists; (b) the price is fixed or

determinable; (c) collectability is reasonably assured; and (d) product delivery has occurred or services have been rendered. Pursuant to KITD's disclosures, therefore, revenue was not to be recognized when KITD had not in fact delivered a product to a client.

95. At all times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, Smyth and others, participated in the process of communicating KITD's financial condition to the investing public by (a) signing and certifying the accuracy of KITD's filings with the SEC, (b) speaking at meetings, conferences, and conference calls with securities analysts and investors, and (c) providing and reviewing information that was included in KITD's financial results, reports, and public disclosures.

## THE SCHEME TO DEFRAUD

96. From at least in or about 2009 through in or about 2012, KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, Smyth and Campion, with others, engaged in an illegal scheme to deceive KITD shareholders, members of the investing public, KITD's independent auditors and others concerning KITD's true operating performance and financial results. In furtherance of the scheme, TUZMAN, IRFAN AMANAT, Smyth, Campion and their co-conspirators: (a) made and caused KITD to make statements to the public, its independent auditors and others which falsely described KITD's revenues, expenses and other financial results and omitted to disclose

39

material facts necessary to make the statements made about KITD's financial results complete, accurate, and not misleading; and (b) caused KITD to file financial statements with the SEC that presented a materially false and misleading description of KITD's operating performance and financial results.

97. At various times relevant to this Indictment, KALEIL ISAZA TUZMAN, the defendant, and Smyth, with others, devised and executed a scheme to inflate falsely KITD's revenue. This scheme employed two principal methods: (a) the improper recognition of revenue from so-called "perpetual license" contracts for KITD software (contracts that gave the purchasing customer the right to use the licensed software indefinitely), including contracts that were fabricated for the sole purpose of falsely inflating KITD's revenue; and (b) the execution of fraudulent "round-trip" transactions which had the effect of using KITD's own cash, rather than payments received from customers, to pay off bills, known as accounts receivable, that were due and owed to KITD, including those resulting from KITD's improper revenue recognition practices, rather than disclose to KITD's auditors and the investing public the fact that the bills were uncollectible or, in some cases, had resulted from fabricated contracts.

98. At various times relevant to the indictment, IRFAN AMANAT, the defendant, with the knowledge of KALEIL ISAZA TUZMAN, the defendant, and others, further deceived KITD's auditors and

investors about KITD's true financial health by misrepresenting the status of KITD's investment in Enable. Specifically, IRFAN AMANAT, with TUZMAN's knowledge, repeatedly misrepresented to KITD's auditors that Enable maintained more than $2 million in liquid assets in an asset management account on behalf of KITD when, in truth, and as TUZMAN and IRFAN AMANAT well knew, Enable was insolvent and KITD's investment in Enable had long been lost. As TUZMAN and IRFAN AMANAT well knew, these misrepresentations were material to the audit of KITD's financial statements and, ultimately, to the investing public. As a result of IRFAN AMANAT's misrepresentations, of which TUZMAN was aware, various KITD annual financial filings were materially false.

### KITD FRAUDULENTLY INFLATED REPORTED REVENUE

99. To effectuate the scheme to defraud, from at least in or about 2010 up to in or about 2012, KALEIL ISAZA TUZMAN, the defendant, and Smyth, among others, employed two methods to fraudulently boost KITD's reported revenue: (a) recognizing the revenue from certain contracts at the time of sale despite the fact that KITD had not delivered a product to KITD's customers, in violation of KITD's stated accounting policies; and (b) recognizing revenue from contracts that had been fabricated for the sole purpose of boosting KITD's revenue.

100. These fraudulent revenue recognition practices caused KITD to materially overstate its reported revenue, which had the

41

effect of materially overstating KITD's net income and earnings on its annual and quarterly financial reports issued from the fiscal quarter ending June 30, 2010 through the fiscal quarter ending March 31, 2012.

### The Country Network Contract

101. For example, in approximately August 2010, KITD entered into an agreement with TCN to provide TCN with a product that KITD referred to as "VX Manager" or "VX Enterprise" (hereinafter, "VX Manager"). The total contract value was approximately $1,488,000, which consisted of a $1,338,000 perpetual license fee for KITD software and $150,000 for setup fees. A KITD sales representative ("Employee-1") pitched the VX Manager as a groundbreaking technological innovation that would allow TCN to stream video content on various platforms, including mobile devices.

102. On or about June 25, 2010, Employee-1 sent the TCN CEO a KITD proposal dated June 20, 2010 (the "June 20, 2010 Proposal") for VX Manager. Critically, the June 20, 2010 Proposal set forth a "deployment timeline" in which KITD promised to provide TCN with certain components of VX Manager starting in August 2010 and ending in April 2011.

103. Despite this deployment timeline, Smyth caused KITD to record approximately $1,338,000 of revenue -- the entirety of the perpetual license fee from the TCN contract -- during the fiscal quarter ending June 30, 2010. This revenue recognition was

42

improper for three principal reasons: First, as of June 30, 2010, KITD and TCN had not finalized a contract to purchase VX Manager. Second, as of June 30, 2010, KITD had not delivered VX Manager to TCN. Third, as the June 20, 2010 Proposal illustrated on its face, the VX Manager software did not exist as of June 30, 2010 and required significant development by KITD through 2011. Accordingly, pursuant to KITD's stated accounting policies, the TCN perpetual license fee should not have been recorded as revenue for the fiscal quarter ending June 30, 2010. As a result of this improper revenue recognition, KITD's revenue for the fiscal quarter ending June 30, 2010 was overstated by more than 5% and its pre-tax losses were understated by approximately 78%. Furthermore, the consensus estimate among analysts covering KITD's stock was that KITD would earn $22.2 million in revenues in the fiscal quarter ending June 30, 2010. With the revenue from the TCN perpetual license, KITD was able to exceed analysts' revenue estimates. Without the revenue from the TCN perpetual license, KITD would have missed analysts' revenue estimates.

104. Contrary to its promises to TCN that KITD had the capability to develop VX Manager, KITD immediately encountered technological and other problems that imperiled the VX Manager deployment. By in or about December 2010, KALEIL ISAZA TUZMAN, the defendant, was informed by Employee-1 and others that TCN was extremely dissatisfied with the pace of the VX Manager development

43

and that TCN had "no confidence in [KITD's] ability to deliver ANY software functionality." After detailed internal discussions about KITD's chronic delivery failures, TUZMAN and others decided that KITD would cease developing VX Manager for TCN and that, instead, KITD would provide TCN with an alternative, less-sophisticated product called "VX Vision." The result of TUZMAN's decision was that VX Manager was never delivered to TCN.

105. Despite knowing that KITD had failed to deliver VX Manager to TCN, and had no plans to deliver VX Manager to TCN, KALEIL ISAZA TUZMAN, the defendant, included the fraudulently-recognized revenue from the TCN contract on KITD's Form 10-K for the fiscal year ending December 31, 2010.

106. In or about February 2011, as part of its KITD audit, Accounting Firm-2 sent a letter to TCN seeking to confirm whether TCN in fact owed KITD $1,338,882 and $150,000, as stated in two separate invoices. In response to the inquiry, on or about March 4, 2011, TCN's president (the "TCN president") told Accounting Firm-2 that KITD had failed to deliver the product.

107. On or about April 29, 2011, an audit manager with Accounting Firm-2 ("Auditor-2") forwarded the TCN president's response to Smyth and others. Auditor-2 informed Smyth that TCN's total outstanding balance was material and that Accounting Firm-2 needed to "clear this matter, and determine whether there was an

issue as of year-end or in Q1 with collectability, and also clear whether installation was completed."

108. On or about April 29, 2011, Smyth forwarded Auditor-2's email to KALEIL ISAZA TUZMAN, the defendant, and stated: "Seems like I have a problem." In response, TUZMAN wrote: "Aagh. Can you give me a call to discuss?" TUZMAN later sent an email to Smyth and Campion and stated: "In future we should be ahead of these situations. What other client/audit confirmations have gone out, so I am aware of other potential issues and can call ahead?" The same day, TUZMAN contacted the TCN CEO and asked to speak on the phone about "an urgent matter."

109. Instead of telling Accounting Firm-2 that KITD had not, in fact, delivered a product to TCN, KALEIL ISAZA TUZMAN, the defendant, and Smyth executed a plan to cover up KITD's delivery failure and wrongful revenue recognition. Specifically, TUZMAN falsely informed Accounting Firm-2 that TCN's audit response was the result of a business dispute. For instance, on or about May 1, 2011, TUZMAN sent an email to Accounting Firm-2 (copying, among others, Smyth) in which TUZMAN falsely represented that VX Manager

had been delivered and that TCN was consuming the product.[2]   In truth and in fact, and as TUZMAN well knew, TCN's audit response accurately reflected KITD's failure to deliver a product.   TUZMAN's misrepresentations were successful in convincing Accounting Firm-2 that KITD's prior financial statements did not need to be restated.

110. Although KALEIL ISAZA TUZMAN, the defendant, misled Accounting Firm-2 into believing that KITD had, in fact, delivered a product to TCN, TUZMAN and Smyth had a significant problem that remained unresolved: TCN maintained a balance for $1,488,882, which TCN refused to pay.   Because Smyth had caused KITD to fraudulently recognize approximately $1,338,000 from the TCN contract in the fiscal quarter ending June 30, 2010, KITD needed to demonstrate that it was able to collect TCN's receivable within one calendar year.   Without a timely payment from TCN before the end of the fiscal quarter ending June 30, 2011, KITD would not be able to prove that collectability was reasonably assured -- which was one of KITD's four stated criteria for revenue recognition in its annual reports.

---

[2] TCN had been consuming a basic software product that allowed it to stream videos on its website, and it was this product to which KALEIL ISAZA TUZMAN, the defendant, referred the auditors.   This product, however, was originally created by a different company and was not, as TUZMAN well knew, VX Manager, which TCN had contracted to use in August 2010 and had never received.

111. On or about June 1, 2011, Smyth sent KALEIL ISAZA TUZMAN, the defendant, and Campion an email in which he underscored the urgency of resolving TCN's outstanding receivable before the end of the fiscal quarter ending June 30, 2011.  The subject of the email was "TCN and others."  Smyth wrote: "As you are aware we need to solve for TCN.  This perpetual license for $1.38 mil went into revenue Q2 last year which means it needs to be paid within 12 months (by end of June) to keep in revenue.  It will create other credibility issues for other outstanding license deals with auditors if this is not solved.  Can we get on a call to discuss an action plan."  TUZMAN responded: "Agreed.  Am in touch with [the TCN CEO]."

112. Between in or about April 2011 and in or about August 2011, KALEIL ISAZA TUZMAN, the defendant, sought to convince TCN to pay KITD over $1,338,000 despite the fact that KITD had not delivered a product to TCN.  For instance, on or about May 3, 2011, the TCN CEO sent TUZMAN an email and stated: "Correct me if I misunderstand our situations.  You need me to certify to the auditors that the amounts listed are correct and are owed to Kit and then you would like us to also pay Kit these sums for completing the project.  I, on the other hand, need to turn back time or, at the very least, deploy the service as contracted nearly a year ago."

47

113. Ultimately, as the end of the fiscal quarter ending June 30, 2011 neared, KALEIL ISAZA TUZMAN, the defendant, assisted by Smyth, proposed a solution that TCN eventually accepted. On or about June 26, 2011, TUZMAN emailed the TCN CEO, telling him "I have an idea" and emphasizing that "[t]his is extremely timely, given Q2 ends in a few days." TUZMAN later told the TCN CEO that he had secured a loan for TCN in the amount of $1,578,882 from Jourdian Invest. Smyth and Jameel, with TUZMAN's knowledge and approval, previously had created Jourdian Invest for the improper purpose of using KITD money to make purported "loans" to KITD customers who were either unwilling or unable to pay the bills they purportedly owed to KITD.

114. KALEIL ISAZA TUZMAN, the defendant, informed the TCN CEO that TCN would be obligated to use the Jourdian Invest loan to pay its outstanding balance to KITD. However, TCN would not have to repay Jourdian Invest until TCN received a product from KITD. Indeed, in the loan agreement, which Smyth prepared at TUZMAN's direction, this repayment date was tethered to an unspecified point in the future called "Product Delivery."

115. The TCN CEO ultimately agreed to use the loan proceeds to pay TCN's full contract balance. However, pursuant to KITD's stated accounting policies, because no product had been delivered to TCN by the fiscal quarter ending June 30, 2011, KITD should have taken a charge for the revenue it previously recognized in

48

its prior financial statements. Had KITD taken a charge for the TCN contract amount in the fiscal quarter ending June 30, 2011, KITD's reported pre-tax losses would have increased by approximately 6%. Furthermore, by concealing that KITD had failed to develop its highly-touted VX Manager product and by concealing that KITD obtained payment from TCN only via a KITD-funded loan from an offshore entity created by co-conspirators of KALIEL ISAZA TUZMAN, the defendant, TUZMAN not only avoided enhanced scrutiny from the auditors of other, similarly aging perpetual license deals, but TUZMAN also deceived the investing public about matters of material importance.

## FRAUDULENT ROUND-TRIP TRANSACTIONS TO PAY DOWN RECEIVABLES

116. To further effectuate the scheme to defraud, and to hide their illegal revenue recognition scheme, KALEIL ISAZA TUZMAN, the defendant, and Smyth, among others, caused KITD to use company money to pay off fabricated or uncollectible receivables by year-end. TUZMAN and his co-conspirators executed these round-trip transactions using fraudulent escrow accounts, including an escrow account established by TUZMAN and Smyth (and controlled by Jameel) in the U.A.E., and escrow accounts established ostensibly in connection with KITD corporate acquisitions.

### The U.A.E Escrow Account

117. During the scheme to defraud, KALEIL ISAZA TUZMAN, the defendant, established a U.A.E.-based escrow account (the "U.A.E.

49

Escrow Account") through J.B. Legal Consulting, the U.A.E.-based law firm for which Jameel worked and that, at various times, contained millions of dollars of KITD funds. Instead of using the escrowed funds for legitimate corporate purposes, Jameel, at TUZMAN and Smyth's request, caused the escrowed funds to be used to pay down fictitious or uncollectible KITD receivables that might have attracted scrutiny from KITD's independent auditors and could have negatively impacted KITD's financial statements if they had remained unpaid or were discovered.

118. Jameel, working with KALEIL ISAZA TUZMAN, the defendant, and Smyth, among others, sought to conceal the improper usage of the escrowed funds. For instance, on or about March 13, 2012, in connection with KITD's 2011 audit that preceded the filing of KITD's Form 10-K, Jameel e-mailed a balance confirmation to Accounting Firm-2 in which she falsely claimed that the U.A.E. Escrow Account contained approximately $6.1 million when, in truth and in fact, the U.A.E. Escrow Account was empty.

119. To further conceal the improper usage of the escrowed funds, after KITD's Form 10-K had been filed and knowing that the Form 10-K falsely overstated KITD's cash by millions of dollars, KALEIL ISAZA TUZMAN, the defendant, caused KIT Capital, an investment company founded and controlled by TUZMAN, to wire $8 million to J.B. Legal Consulting to replenish the depleted U.A.E. Escrow Account. Jameel thereafter caused J.B. Legal Consulting to

wire $7,999,867 to KITD as a purported release of KITD's escrowed funds.

### The Artificial "Restructuring Fee"

120. In addition to the improper usage of the U.A.E. Escrow Account, on more than one occasion, KALEIL ISAZA TUZMAN, the defendant, and Smyth caused KITD to add an artificial "restructuring fee" to the purchase price of certain companies that KITD sought to acquire. Once the purchase price was inflated, TUZMAN and Smyth established an escrow account that was funded with KITD cash purportedly representing the so-called restructuring fee and was governed by a "side letter" between KITD and the acquired company. TUZMAN and Smyth then intentionally hid the side letter from KITD's independent auditors and the investing public.

121. Despite having represented that the restructuring fee was legitimately related to a KITD corporate acquisition, KALEIL ISAZA TUZMAN, the defendant, and Smyth instead used the escrowed money in round-trip transactions to pay down KITD's fictitious or uncollectible receivables.

### The Sezmi Round-Trip Transaction

122. For example, KALEIL ISAZA TUZMAN, the defendant, and Smyth used KITD's December 2011 acquisition of Sezmi to conduct an illegal round-trip transaction in which TUZMAN and Smyth used

millions of dollars of KITD's cash, ostensibly escrowed for the Sezmi acquisition, to pay down aged receivables by year-end.

123. After evaluating Sezmi for potential acquisition in the summer of 2011, KITD extended two offers to purchase Sezmi's assets. In or about September 2011, KITD offered Sezmi $12,000,000 in KITD common stock. In or about October 2011, KITD raised its offer to $21,000,000 in KITD common stock. Neither offer contained cash consideration. On or about November 1, 2011, a senior KITD executive responsible for conducting due diligence on Sezmi in connection with the proposed acquisition ("Employee-2"[3]) wrote the following email to KALEIL ISAZA TUZMAN, the defendant, updating him on an idea that Smyth had for the Sezmi transaction:

> Robin and I are also speaking. He wants to go a different direction and see if they will do an asset deal where we don't take these GAAP and revenue visibility unfriendly contracts and instead we would negotiate contracts with their two customers concurrent with closing the technology asset purchase. Robin likes this because the optics could look like that groupo salinas/televisa wants to work with kit digital and our owned technologies so bad that they are wilking [sic] to pay us in our business model (perpetual license or monthly saas) vs how they had planned to pay Sezmi. Robin wants this revenue for this q and next q so it's worth a shot. Somewhat like the Peerset deal Robin also wants to take a restructuring charge.

---

[3] Employee-2 was previously the CEO of Peerset, a company that KITD acquired in or about June 2011.

Both concepts (recognizing revenue from Sezmi's two largest clients in the fiscal quarter ending December 31, 2011 and including a "restructuring charge" in the deal) became fraudulent features of the Sezmi transaction. Specifically, TUZMAN, working with Smyth and others, improperly recognized approximately $4,800,000 in revenue in the fiscal quarter ending December 31, 2011. And, as explained more fully below, TUZMAN and Smyth also used the concept of a restructuring charge to conduct an illegal round-trip transaction.

124. In response to Employee-2's email, KALEIL ISAZA TUZMAN, the defendant, wrote: "OK, thanks for the update. Makes sense. What's the latest? What can I do to help?"

125. In the days that followed, KALEIL ISAZA TUZMAN, the defendant, edited the term sheet for the Sezmi acquisition, adding a $6,000,000 "restructuring fee" into the KITD offer. The term sheet therefore showed KITD proposing to pay Sezmi $21,000,000 in KITD common stock and $6,000,000 in cash. On or about November 22, 2011, TUZMAN emailed his mark-up to Smyth and Campion. In response to TUZMAN's term sheet mark-up, Smyth told TUZMAN: "We cannot put restructuring in like this as auditors would expect an accounting for it if they see this. There really can be no external view."

126. Between in or about November 2011 and in or about December 2011, KALEIL ISAZA TUZMAN, the defendant, and Smyth raised

the proposed restructuring charge from $6,000,000 to $7,850,000.
TUZMAN and Smyth consistently represented to Sezmi executives that
the restructuring charge would be used exclusively to cover the
integration costs that KITD would incur when integrating Sezmi
into KITD.   Smyth further told Sezmi executives that KITD wanted
Sezmi to execute a side-letter agreement, outside of the APA, that
would govern KITD's use of the $7,850,000.

127. On or about December 30, 2011, the same day that KITD
acquired Sezmi, Smyth completed a side-letter agreement with Sezmi
(the "December 30, 2011 Side-Letter Agreement"), which first
explained that expected integration costs included expenses
related to, among other things, "hardware, software, [and]
increasing and training of sales personnel."   The December 30,
2011 Side-Letter Agreement then stated that KITD and Sezmi agreed
to use $7,850,000 to cover these expected integration costs and
that none of the money would "be utilized to compensate any Sezmi
shareholder, officer or director, directly or indirectly."

128. The December 30, 2011 Side-Letter Agreement obligated
KITD to send $7,850,000 to an escrow account.   However, it made
clear that Sezmi had no control over or say in the disposition of
the $7,850,000, but rather that funds "may be drawn from the Escrow
Account at KIT's sole election and absolute discretion to
facilitate the Post Acquisition Integration."   Finally, the
December 30, 2011 Side-Letter Agreement stated that "KIT is under

54

no obligation to provide [Sezmi] with any reports or accounting information with respect to any expenditures related to the [$7,850,000]."

129. Although the December 30, 2011 Side-Letter Agreement was a critical component of KITD's acquisition of Sezmi, KALEIL ISAZA TUZMAN, the defendant, and Smyth deliberately concealed its existence from the investing public, KITD's auditors, and others. Accordingly, on or about January 6, 2012, when KITD issued a Form 8-K announcing that it had acquired Sezmi, TUZMAN and Smyth intentionally omitted all references to the December 30, 2011 Side-Letter Agreement. Instead, the Form 8-K, which was signed by TUZMAN, falsely stated that the consideration paid to Sezmi included "approximately $8 million of cash" despite the fact that the December 30, 2011 Side-Letter Agreement made clear that none of Sezmi's shareholders, officers or directors were entitled to any of the money and that the money remained under the sole control of KITD. Finally, the Form 8-K attached the APA, but omitted the December 30, 2011 Side-Letter Agreement, as an exhibit. KITD's subsequent Form 10-K for the 2011 fiscal year, which TUZMAN and Smyth signed, contained similar misrepresentations. For instance, the Form 10-K stated that the Sezmi purchase price included $7,850,000 in cash consideration. However, because the $7,850,000 was not in fact transferred to Sezmi's shareholders, officers or directors, it was not part of the consideration transferred for

the Sezmi acquisition. Accordingly, by falsely representing that $7,850,000 was part of the Sezmi purchase price, KITD's balance sheet overstated KITD's assets, specifically goodwill from the Sezmi acquisition, by $7,850,000.

130. Although the December 30, 2011 Side-Letter Agreement claimed that the $7,850,000 would be used exclusively for KITD's post-acquisition integration costs associated with the Sezmi transaction, KALEIL ISAZA TUZMAN, the defendant, and Smyth used the money for an entirely different purpose. Specifically, on or about December 22, 2011, days before KITD acquired Sezmi, TUZMAN caused KITD to wire $7,850,000 from a New York, New York bank account to an escrow account at a bank located in Cyprus. On the same day, Smyth signed an escrow agreement (the "Escrow Agreement") with an escrow agent based in Cyprus (the "Escrow Agent"). The Escrow Agreement stated that the $7,850,000 was being placed with the Escrow Agent "in relation to the acquisition of [Company-1]." Company-1 was a company that KITD also was seeking to purchase in or about December 2011. The Company-1 acquisition, however, was unsuccessful and negotiations ceased in or about late December 2011.

131. On or about December 23, 2011, Smyth sent an "Escrow Release Instruction Letter" to the Escrow Agent (the "December 23, 2011 Escrow Letter"). In the December 23, 2011 Escrow Letter, Smyth directed the Escrow Agent to release the $7,850,000 to

56

various corporate entities, including entities related to certain KITD clients that, at the time, appeared to have outstanding and aging account receivables with KITD (i.e., revenue that KITD had recognized for agreements as to which the company had not yet been paid). The December 23, 2011 Escrow Letter directed that the $7,850,000 be dispensed in the following manner:

| Recipient | Amount |
|---|---|
| Bimini Trading Ltd | $2,000,000 |
| Alpha Tauri Holdings | $2,600,000 |
| Digigov Operations Ltd | $2,648,000 |
| Visual Unity | $452,000 |
| J.B. Legal Consulting | $150,000 |

132. Two of the entities listed in the December 23, 2011 Escrow Letter, Alpha Tauri Holdings and Digigov Operations Ltd, made payments on behalf of companies that purportedly held license agreements with KITD that dated back to December 2010 and that had outstanding balances owed to KITD. A third entity, Bimini Trading Ltd, had a license agreement with KITD that dated back to February 2011 and also had an outstanding balance owed to KITD. KALEIL ISAZA TUZMAN, the defendant, and Smyth knew that KITD needed to receive payment on those outstanding receivables within one calendar year. Otherwise, Accounting Firm-2 might have

scrutinized these unpaid receivables and similar aging license agreements and caused KITD to write down the receivables and recognize expenses.

133. On or about December 25, 2011, KALEIL ISAZA TUZMAN, the defendant, Smyth and Campion discussed the status of negotiations with Sezmi and Company-1. Smyth sent TUZMAN and Campion a series of emails revealing his concern about KITD's days sales outstanding, or "DSO," which is a measure of the average number of days a company takes to collect payment on goods and services. DSO is a key metric for investors, as it demonstrates how well a company manages its accounts receivable. Smyth reported to TUZMAN and Campion that "DSO" was "very high." Smyth expressed concern that at least $5 million of revenue recognized in the previous fiscal year was uncollectable and that KITD's auditors would not allow KITD to enter similar license deals without a track record of collectability. Smyth told TUZMAN and Campion that the "earliest [I] will get the money out of Sezmi is end of first week in January" and stated that "[w]e need to do the deals with all the liabilities first." Smyth explained that the "only way to get the money in right spot that [I] sent into escrow last week is if it leaves first thing Tuesday [morning] immediately after money arrives in escrow. Even if we could get money out of Sezmi [I] cannot get it into right [spot] in time."

134. On or about December 27, 2011, Smyth sent an updated "Escrow Release Instruction Letter" to the Escrow Agent (the "December 27, 2011 Escrow Letter"). The December 27, 2011 Escrow Letter directed that the $7,850,000 be dispensed in the following manner:

| Recipient | Amount |
|---|---|
| Bimini Trading Limited | $950,000 |
| Alpha Tauri Holdings | $2,600,000 |
| Digigov Operations Ltd | $2,648,000 |
| KIT digital Czech | $452,000 |
| J.B. Legal Consulting | $1,200,000 |

135. Between on or about December 29, 2011 and on or about December 31, 2011, KITD received, in a round-trip fashion, approximately $4,400,000 from Bimimi Trading Limited, Alpha Tauri Holdings and Digigov Operations. Specifically, Bimini Trading Limited wired KITD $949,985, Alpha Tauri Holdings wired KITD $2,499,985, and Digigov Operations wired KITD $939,000. The round-trip transactions made it appear that KITD customers with outstanding receivables had, in fact, paid their balances. In truth and in fact, however, KALEIL ISAZA TUZMAN, the defendant, and Smyth used KITD's own money to pay down KITD's receivables and justify KITD's prior recognition of that revenue. TUZMAN and Smyth

used the remainder of the $7,850,000 to pay other expenses unrelated to the Sezmi acquisition.

136. As a result of their conduct, KALEIL ISAZA TUZMAN, the defendant, and Smyth caused KITD to, among other things, understate its pre-tax, 2011 year-end losses by at least 14% on its Form 10-K.

## MATERIAL MISREPRESENTATIONS TO AUDITORS AND SHAREHOLDERS REGARDING KITD'S ENABLE INVESTMENT

137. KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, also misled KITD's auditors by falsely confirming that Enable maintained more than $2 million of KITD's funds in an asset management account earning a steady interest rate. Specifically:

a. On or about March 4, 2010, approximately a year after the March 2009 telephone call on which the Amanat Brothers informed Maiden of Enable's insolvency, which call TUZMAN also participated in, IRFAN AMANAT emailed Smyth an annual balance confirmation statement, which falsely affirmed, for the benefit of KITD auditors, that Enable maintained an asset management account on KITD's behalf with a balance of $2,031,609.43, earning a rate of interest of 1 Month Libor plus 150 basis points.

b. On or about March 16, 2011, IRFAN AMANAT emailed Smyth another annual balance confirmation statement, which falsely affirmed, for the benefit of KITD auditors, that Enable maintained an asset management account on KITD's behalf with a balance of

60

$2,067,844.14, earning a rate of interest of 1 Month Libor plus 150 basis points.

      c.   The following year, on or about March 14, 2012, IRFAN AMANAT caused an employee of Enable ("Individual-1") to email an annual balance confirmation statement to Smyth, which falsely affirmed, for the benefit of KITD auditors, that Enable maintained an asset management account on KITD's behalf, which contained $2,103,882.38 on deposit.

      138. Moreover, at the time these false annual balance confirmations were prepared, KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, knew that the confirmations were necessary and material to KITD's audited financial statements, and that the resulting financial statements would be misleading to investors. For example:

      d.   On or about March 9, 2011, one week before IRFAN AMANAT submitted the audit confirmation for KITD's fiscal year 2010, TUZMAN emailed IRFAN AMANAT: "[I]rfan, [o]ur auditors require a confirmation note today (which our CFO Robin Smyth sent to you and cc'd [the KITD Auditor]) regarding KIT digital balance with Enable. Without this confirmation KIT digital cannot get a clean audit for 2010. This is vital, as you know from the past."

      e.   On or about March 11, 2012, three days before IRFAN AMANAT caused Individual-1 to submit the audit confirmation for KITD's fiscal year 2011, Tuzman emailed IRFAN AMANAT: "We need the

Enable audit confirmation on KIT digital invested funds, or we cannot complete our 2011 10-K and annual report, and will have a material deficiency in our numbers. This must be done immediately (the 10-K is being completed tomorrow on Tuesday) . . . . Naturally, if we do not get this confirmation, there can be never be any positive outcome of any kind."

**THE CONSPIRACY**

139. From in or about 2009 through in or about April 2012, in the Southern District of New York and elsewhere, KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by KITD, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and (c) to make and cause to be made false and misleading statements and omissions to KITD's auditors, in violation of Title 15, United States Code,

Section 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

140. It was a part and an object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities issued by KITD, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing KITD to make untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

63

## False Statements In
## Annual And Quarterly SEC Reports

141. It was further a part and an object of the conspiracy that KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, and others known and unknown, willfully and knowingly, in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause KITD to make statements that were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

## False Statements To Auditors

142. It was further a part and an object of the conspiracy that KALEIL ISAZA TUZMAN, the defendant, being an officer of KITD, an issuer with a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, IRFAN AMANAT, the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, (a) make and cause to be made materially false and misleading statements; and (b) omit to state, and cause other persons to omit to state, material facts necessary in order to make the statements made, in the light of the circumstances under which such statements were made, not misleading to accountants in connection with (i) audits and examinations of the financial statements of KITD, required to be

filed with the SEC pursuant to rules and regulations enacted by the SEC; and (ii) the preparation and filing of documents and reports, required to be filed with the SEC pursuant to rules and regulations enacted by the SEC, in violation of Title 15, United States Code, Section 78ff and Title 17, Code of Federal Regulations, Section 240.13b2-2.

## Overt Acts

143. In furtherance of the conspiracy and to effect its illegal objects, KALEIL ISAZA TUZMAN and IRFAN AMANAT, the defendants, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.      On or about March 4, 2010, IRFAN AMANAT emailed a false balance confirmation, for the benefit of KITD's auditors, that Enable, an investment company IRFAN AMANAT at times controlled, maintained an account on KITD's behalf with a balance in excess of $2 million.

b.      On or about August 16, 2010, TUZMAN and Smyth participated in a quarterly earnings conference call for the fiscal quarter ending June 30, 2010. During that conference call, Smyth reported inflated earnings results that included over $1,388,000 in improperly recorded revenue.

c.     On or about August 16, 2010, TUZMAN and Smyth signed KITD's Form 10-Q for the fiscal quarter ending June 30, 2010, which was transmitted electronically to the SEC from New York, New York.

d.     On or about December 10, 2010, Jameel and Smyth executed an escrow agreement establishing the U.A.E. Escrow Account and agreeing to place $7.5 million of KITD funds in the U.A.E. Escrow Account.

e.     On or about March 16, 2011, IRFAN AMANAT emailed a false balance confirmation, for the benefit of KITD's auditors, that Enable maintained an account on KITD's behalf with a balance in excess of $2 million.

f.     On or about March 16, 2011, TUZMAN and Smyth signed KITD's Form 10-K for the fiscal year ending December 31, 2010, which was transmitted electronically to the SEC from New York, New York.

g.     On or about January 6, 2012, TUZMAN signed KITD's Form 8-K, which was transmitted electronically to the SEC from New York, New York.

h.     On or about March 13, 2012, Jameel e-mailed a balance confirmation to KITD's independent auditors in which she falsely claimed that the U.A.E. Escrow Account contained approximately $6.1 million.

i.     On or about March 14, 2012, IRFAN AMANAT caused a false balance confirmation to be emailed, for the benefit of KITD's

66

auditors, that stated that Enable maintained an account on KITD's behalf with a balance in excess of $2 million.

j.    On or about March 30, 2012, TUZMAN and Smyth signed KITD's Form 10-K for the fiscal year ending December 31, 2011, which was transmitted electronically to the SEC from New York, New York.

k.    On or about April 13, 2012, TUZMAN caused KIT Capital to wire $3 million to J.B. Legal Consulting to replenish the U.A.E. Escrow Account.

l.    On or about April 19, 2012, Jameel caused J.B. Legal Consulting to wire $2,999,918 to KITD as a purported release of escrowed funds from the U.A.E. Escrow Account.

m.    On or about April 20, 2012, TUZMAN caused KIT Capital to wire $5 million to J.B. Legal Consulting to further replenish the U.A.E. Escrow Account.

n.    On or about April 26, 2012, Jameel caused J.B. Legal Consulting to wire $4,999,949 million to KITD as a purported release of escrowed funds from the U.A.E. Escrow Account.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

144. As a result of committing one or more of the foregoing offenses alleged in Counts One through Six of this Indictment, OMAR AMANAT, the defendant (as to acts alleged in Counts One through Four of this Indictment), KALEIL ISAZA TUZMAN, the

67

defendant (as to acts alleged in Counts Four through Six of this Indictment), and IRFAN AMANAT (as to acts alleged in Counts One through Three and Six of this Indictment) shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

### Substitute Asset Provision

145. If any of the above-described forfeitable property, as a result of any act or omission of KALEIL ISAZA TUZMAN, OMAR AMANAT, and IRFAN AMANAT, the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

68

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

69

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

**KALEIL ISAZA TUZMAN,**
**OMAR AMANAT, and**
**IRFAN AMANAT,**

Defendants.

### SUPERSEDING INDICTMENT

S8 15 Cr. 536 (PGG)

(18 U.S.C. §§ 2, 371, 1343, & 1349;
15 U.S.C. §§ 80b-6 and 80b-17.)

PREET BHARARA
United States Attorney

Foreperson

_TRUE BILL & SUPERSEDING INDICTMENT
- MAG. JUDGE RONALD. L ELLIS
12/22/16