**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

UNITED STATES OF AMERICA,              :

                                                 :

                                               :      No. S8 15 Cr. 536 (PGG)

             v.                        :

                                               :

KALEIL ISAZA TUZMAN, OMAR AMANAT,        :
and IRFAN AMANAT,                             :

                                             :

                               Defendants.     :

-------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT KALEIL ISAZA TUZMAN'S PRETRIAL MOTIONS</u>

Avi Weitzman                           Silvia L. Serpe
GIBSON, DUNN & CRUTCHER, LLP      Paul W. Ryan
200 Park Avenue                    SERPE RYAN LLP
New York, NY 10166              1115 Broadway, 12th Floor
                                     New York, NY 10010

*Attorneys for Defendant Kaleil Isaza Tuzman*

# TABLE OF CONTENTS

<b>Page</b>

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 3

I.  THE S8 INDICTMENT VIOLATES THE RULE OF SPECIALTY ........................................ 3

    A.  The S8 Indictment Adds New Factual Allegations Against Mr. Isaza Tuzman ................ 3

    B.  The Rule of Specialty Requires the Government to Follow the Limitations on
        Extradition Imposed by the Extraditing Country ............................................................ 7

    C.  The S8 Indictment Defies the Unambiguous Conditions Placed on Mr.
        Isaza Tuzman's Extradition by the Colombian Government ............................................ 9

    D.  Mr. Isaza Tuzman Has Standing to Object to the Government's Violation
        of the Rule of Specialty ................................................................................................ 12

II.  MR. ISAZA TUZMAN'S TRIAL SHOULD BE SEVERED FROM THE TRIAL
    OF THE AMANATS ....................................................................................................... 13

    A.  There is a Serious Risk of Spillover Prejudice Stemming from Counts One through
        Three Against the Amanats ........................................................................................... 15

    B.  Evidence of the Amanats' Prior Crimes, Wrongs, or Other Bad Acts Also Presents a
        Serious Risk of Spillover Prejudice ............................................................................. 18

    C.  The Essence of Mr. Isaza Tuzman and the Amanats' Defenses are Mutually
        Antagonistic .................................................................................................................. 21

    D.  A Limiting Instruction Cannot Cure the Potential Prejudice to Mr. Isaza Tuzman ........ 23

    E.  In the Alternative, the Court Should Hold Mr. Isaza Tuzman's Motion for
        Severance in Abeyance Pending the Government's Rule 404(b) Notice........................... 23

III.  THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A LIMITED
     BILL OF PARTICULARS IDENTIFYING THE ALLEGEDLY MANIPULATIVE
     MAIDEN CAPITAL TRADES ....................................................................................... 24

    A.  Count Four of the Indictment Fails to Prevent Surprise and Mr. Isaza Tuzman
        Cannot Adequately Prepare His Defense ...................................................................... 25

    B.  Mr. Isaza Tuzman is Entitled to a Limited Bill of Particulars Identifying the
        Allegedly Manipulative Maiden Capital Trades............................................................ 26

IV.  THE COURT SHOULD ORDER THE EARLY DISCLOSURE OF RULE 404(B)
     EVIDENCE ................................................................................................................... 30

V.  THE GOVERNMENT SHOULD PRODUCE 3500 MATERIAL WELL IN
    ADVANCE OF TRIAL ................................................................................................... 31

VI.  THE COURT SHOULD ORDER THE EARLY IDENTIFICATION OF TRIAL
     EXHIBITS..................................................................................................................... 33

VII.   THE COURT SHOULD ORDER THE EARLY IDENTIFICATION OF TRIAL
       WITNESSES .................................................................................................................. 34

VIII.  THE GOVERNMENT MUST PROMPTLY DISCLOSE AND/OR IDENTIFY
       *BRADY* AND *GIGLIO* MATERIAL ........................................................................ 35

IX.    THE COURT SHOULD PERMIT MR. ISAZA TUZMAN TO JOIN IN HIS CO-
       DEFENDANTS' MOTIONS AND TO FILE ADDITIONAL MOTIONS ......................... 38

CONCLUSION ............................................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

Page

*Amanat v. SEC,*
269 Fed. App'x 217 (3d Cir. Mar. 17, 2008) ............................................................. 20

*Antwi v. United States,*
349 F. Supp. 2d 663 (S.D.N.Y. 2004) ....................................................................... 12

*DiSimone v. Phillips,*
461 F.3d 181 (2d Cir. 2006) ...................................................................................... 35

*MNA Partners Ltd. v. Amanat,*
Dkt. #22, No. 11 Civ. 2327 (DDP) (C.D. Cal. Oct. 4, 2011) ................................... 20

*United States v. Antonakeas,*
255 F.3d 714 (9th Cir. 2001) ..................................................................................... 13

*United States v. Baez,*
349 F.3d 90 (2d Cir. 2003) .................................................................................. 7-9, 12

*United States v. Barrett,*
153 F. Supp. 3d 552 (E.D.N.Y. 2015) ....................................................................... 34

*United States v. Basciano,*
No. 05 Cr. 60 (NGG), 2007 U.S. Dist. LEXIS 78635 (E.D.N.Y. Oct. 23, 2007) ......... 18, 23

*United States v. Bellomo,*
954 F. Supp. 630 (S.D.N.Y. 1997) ............................................................................ 17

*United States v. Bin Laden,*
92 F. Supp. 2d 225 (S.D.N.Y. 2000) ......................................................................... 27

*United States v. Blount,*
291 F.3d 201 (2d Cir. 2002) ...................................................................................... 14

*United States v. Bonventre,*
No. 10 Cr. 228 (LTS), 2013 U.S. Dist. LEXIS 74829 (S.D.N.Y. May 28, 2013) ............ 30, 33

*United States v. Bortnovsky,*
820 F.2d 572 (2d Cir. 1987) ............................................................................. 24, 26, 28

*United States v. Cannone,*
528 F.2d 296 (2d Cir. 1975) ...................................................................................... 34

*United States v. Cardascia,*
951 F.2d 474 (2d Cir. 1991) ...................................................................................... 22

*United States v. Carrasco,*
968 F. Supp. 948 (S.D.N.Y. 1997) .................................................................................................. 14

*United States v. Chalmers,*
474 F. Supp. 2d 555 (S.D.N.Y. 2007) ............................................................................................ 34

*United States v. Contorinis,*
No. 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739 (S.D.N.Y. May 5, 2010) ..................................... 27

*United States v. Cuevas,*
847 F.2d 1417 (9th Cir. 1988) ........................................................................................................ 12

*United States v. Davidoff,*
845 F.2d 1151 (2d Cir. 1988) ............................................................................................... 24, 27, 28

*United States v. DeCicco,*
435 F.2d 478 (2d Cir. 1970) ........................................................................................................... 21

*United States v. DiNome,*
954 F.2d 839 (2d Cir. 1992) ........................................................................................................... 17

*United States v. Drivas,*
No. 10 Cr. 771 (NG), 2012 WL 3011023 (E.D.N.Y. July 19, 2012) ....................................................... 29

*United States v. Dupree,*
No. 10 Cr. 627 (KAM), 2011 WL 5976006 (E.D.N.Y. Nov. 19, 2011) ..................................................... 29

*United States v. Figueroa,*
618 F.2d 934 (2d Cir. 1980) ..................................................................................................... 19, 31

*United States v. Garavito-Garcia,*
827 F.3d 242 (2d Cir. 2016) ........................................................................................................... 13

*United States v. Gelzer,*
50 F.3d 1133 (2d Cir. 1995) ..................................................................................................... 18, 31

*United States v. Giffen,*
379 F. Supp. 2d 337 (S.D.N.Y. 2004) ............................................................................................ 33

*United States v. Gil,*
297 F.3d 93 (2d Cir. 2002) ............................................................................................................. 36

*United States v. Gonzalez,*
275 F. Supp. 2d 483 (S.D.N.Y. 2003) ...................................................................................... 8-9, 12

*United States v. Gonzalez,*
No. 09 Cr. 481 (CM), 2010 WL 339698 (S.D.N.Y. Jan. 28, 2010) ....................................................... 16

*United States v. Gupta,*
848 F. Supp. 2d 491 (S.D.N.Y. 2012) ........................................................................................ 36-37

*United States v. Hernandez,*
No. 09 Cr. 625 (HB), 2010 U.S. Dist. LEXIS 719 (S.D.N.Y. Jan. 6, 2010) ........................................... 32

*United States v. James,*
No. 02 Cr. 778 (SJ), 2007 U.S. Dist. LEXIS (E.D.N.Y. May 31, 2007) ........................................... 18, 23

*United States v. Jurado-Rodriguez,*
907 F. Supp. 568 (E.D.N.Y. 1995) .............................................................................................. 12

*United States v. Kercado,*
No. 91 Cr. 685 (SWK), 1992 WL 196778 (S.D.N.Y. Aug. 3, 1992) ........................................................ 24

*United States v. Khan,*
993 F.2d 1368 (9th Cir. 1993) ..................................................................................................... 9

*United States v. Levine,*
No. 16 Cr. 715 (JSR) (S.D.N.Y. Mar. 30, 2017) .................................................................... 32, 34

*United States v. Levy,*
905 F.2d 326 (10th Cir. 1990) ..................................................................................................... 12

*United States v. Levy,*
25 F.3d 146 (2d Cir. 1994) ......................................................................................................... 12

*United States v. Lino,*
No. 00 Cr. 632 (WHP), 2000 U.S. Dist. LEXIS 18753 (S.D.N.Y. Dec. 29, 2000) ................. 14, 30, 32

*United States v. Lujan,*
529 F. Supp. 2d 1315 (D.N.M. 2007) ...................................................................................... 18-19

*United States v. Martoma,*
No. 12 Cr. 973 (PGG), 2013 WL 2435082 (S.D.N.Y. June 5, 2013) ...................................................... 27

*United States v. Martoma,*
990 F. Supp. 2d 458 (S.D.N.Y. 2014) (Gardphe, J.) ................................................................... 37

*United States v. Martonak,*
187 F. Supp. 2d 117 (S.D.N.Y. 2002) ........................................................................................ 12

*United States v. McDermott,*
245 F.3d 133 (2d Cir. 2006) ...................................................................................................... 23

*United States v. McGuinness,*
764 F. Supp. 888 (S.D.N.Y. 1991) ........................................................................................ 28-29

*United States v. Moss*,
344 F. Supp. 2d 1142 (W.D. Tenn. 2004) ................................................................. 9

*United States v. Nachamie*,
91 F. Supp. 2d 565 (S.D.N.Y. 2000)................................................................28, 35

*United States v. Nekritin*,
No. 10 Cr. 491 (KAM), 2011 WL 2788168 (E.D.N.Y. May 3, 2011) .................................26, 29

*United States v. Ozsusamlar*,
428 F. Supp. 2d 161 (S.D.N.Y. 2006) ................................................................18, 21

*United States v. Paroutian*,
299 F.2d 486 (2d Cir. 1962) ........................................................................9, 12

*United States v. Percevault*,
490 F.2d 126 (2d Cir. 1974) ........................................................................... 32

*United States v. Puentes*,
50 F.3d 1567 (11th Cir. 1995) ......................................................................... 12

*United States v. Rajaratnam*,
No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010)................................... 27

*United States v. Rauscher*,
119 U.S. 407 (1886)...............................................................................9, 12-13

*United States v. Rivas*,
377 F.3d 195 (S.D.N.Y. 2004)......................................................................... 36

*United States v. Rodriguez*,
734 F. Supp. 116 (S.D.N.Y. 1990) ...................................................................... 24

*United States v. Rodriguez*,
496 F.3d 221 (2d Cir. 2007) ........................................................................... 35

*United States v. Rodriguez*,
No. 08 Cr. 1311 (RPP), 2009 WL 2569116 (S.D.N.Y. Aug. 20, 2009) .................................. 24

*United States v. Rueb*,
No. 00 Cr. 91 (RWS), 2001 U.S. Dist. LEXIS 943 (S.D.N.Y. Feb. 6, 2001) ...................... 34-35

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) .................................................................. 16, 21, 31

*United States v. Savin*,
No. 00 Cr. 45 (RWS), 2001 U.S. Dist. LEXIS 2445 (S.D.N.Y. Mar. 7, 2001)........................ 28

*United States v. Serpoosh*,
919 F.2d 835 (2d Cir. 1990) ............................................................................................ 21

*United States v. Siddiqi*,
No. 06 Cr. 377 (SWK), 2007 U.S. Dist. LEXIS 15410 (S.D.N.Y. Dec. 29, 2000)................................ 28

*United States v. Spinelli*,
352 F.3d 48 (2d Cir. 2003) ............................................................................................ 16

*United States v. Stein*,
428 F. Supp. 2d 138 (S.D.N.Y. 2006) ............................................................................ 21

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006) .......................................................................................... 13

*United States v. Stokes*,
726 F.3d 880 (7th Cir. 2013).......................................................................................... 12

*United States v. Strawberry*,
892 F. Supp. 519 (S.D.N.Y. 1995) .............................................................................24, 32

*United States v. Suarez*,
791 F.3d 363 (2d Cir. 2015) ................................................................................... 8, 12-13

*United States v. Thomas*,
981 F. Supp. 2d 229 (S.D.N.Y. 2013) ........................................................................... 36

*United States v. Thirion*,
813 F.2d 146 (8th Cir. 1987).......................................................................................... 12

*United States v. Turkish*,
458 F. Supp. 874 (S.D.N.Y. Aug. 24, 1978) ................................................................. 33

*United States v. Upton*,
856 F. Supp. 727 (E.D.N.Y. 1994) .......................................................................... 16, 33-34

*United States v. Van Hise*,
No. 12 Cr. 847 (PGG), 2013 U.S. Dist. LEXIS 181894 (S.D.N.Y. Dec. 31, 2013) ........................ 21-23

*United States v. Vilar*,
530 F. Supp. 2d 616 (S.D.N.Y. 2008) ......................................................................30, 33-34

*United States v. Wey*,
No. 15 Cr. 611 (AJN), 2017 U.S. Dist. LEXIS 6991 (S.D.N.Y. Jan. 18, 2017)................................27, 33

*United States v. Williams*,
181 F. Supp. 2d 267 (S.D.N.Y. 2001) ........................................................................... 31

*United States v. Zandstra,*
No. Cr. 209 (RWS), 2000 U.S. Dist. LEXIS 13734 (S.D.N.Y. Sept. 20, 2000) ...................................... 28

*Zafiro v. United States,*
506 U.S. 534 (1993) ............................................................................................................................. 14

## **Other Materials**

Fed. R. Crim. P. 7(c)(1) .......................................................................................................................... 24

Fed. R. Crim. P. 7(f) .............................................................................................................................. 24

Fed. R. Crim. P. 8(b) .............................................................................................................................. 13

Fed. R. Crim. P. 14(a) ....................................................................................................................... 13-14

Fed. R. Crim. P. 16(a)(1)(E) ................................................................................................................... 33

Fed. R. Evid. 404(b) .............................................................................................................................. 30

Fed. R. Evid. 404, *Advisory Committee Notes*, 1991 Amendment ........................................................ 30

*United States Attorney's Manual,*
§ 9-5.001(B)(2) ...................................................................................................................................... 37

U.S. Const., amend. VI .......................................................................................................................... 24

U.S. Const., art. VI ................................................................................................................................. 8

## PRELIMINARY STATEMENT

Kaleil Isaza Tuzman faces a quickly approaching trial on three felony counts of conspiracy to commit securities and wire fraud. However, the most recent indictment in this case, despite its sprawling 69 pages of allegations spanning several continents, four years, and multiple separate purportedly fraudulent schemes, still manages to be deficient in several critical ways.

First and foremost, the government has ignored the unambiguous conditions that the Colombian government placed on Mr. Isaza Tuzman's extradition to the United States—specifically, a total prohibition against his being tried "under any circumstances" for any "prior or different acts" other than those identified in the prior indictment on which his extradition was sought. Rather, in violation of the well-established Rule of Specialty doctrine and international comity, the most recent superseding indictment incorporates additional factual allegations, including new theories of liability and new alleged fraudulent schemes, that were not included in the original indictment on which Mr. Isaza Tuzman was extradited. Given the government's previous insistence on strict adherence to the formal rules of extradition—it declined Mr. Isaza Tuzman's repeated offers to self-surrender, relying on the purported sanctity of the extradition process and professed respect for Colombia's sovereignty—its disregard for Colombia's extradition conditions should not be tolerated, and the Court should either dismiss the most recent superseding indictment entirely and force the government to proceed under the conspiracy counts of the indictment on which Mr. Isaza Tuzman was extradited, or in the alternative, strike the new allegations.

Not only has the current indictment been improperly and substantially expanded, but it also prejudicially charges Mr. Isaza Tuzman together with two co-defendants: Omar and Irfan Amanat. These two brothers are primarily alleged to have orchestrated a fraudulent scheme so separate from the allegations against Mr. Isaza Tuzman that Mr. Isaza Tuzman was actually their *victim*. This fact— particularly when considered in combination with the clear prejudice to Mr. Isaza Tuzman that

would result from the government's anticipated reliance on evidence of the Amanats' checkered past and the antagonistic nature of the parties' defenses—creates an untenable risk that the jury will be unable to make a reliable judgment regarding Mr. Isaza Tuzman's innocence. As a result, the Court should sever Mr. Isaza Tuzman's trial from that of the Amanats. At the very least, the Court should order the government to provide the clearly prejudicial Rule 404(b) evidence regarding the Amanats no later than 60 days prior to trial so that defense counsel may effectively litigate its impact and admissibility in a joint trial.

In addition to its improper inclusion of new allegations against Mr. Isaza Tuzman and prejudicial joinder of the Amanats, the latest superseding indictment lacks sufficient detail as to Count Four, which charges Mr. Isaza Tuzman with participating in an alleged market manipulation scheme with cooperating co-defendant Stephen E. Maiden over a nearly three year period. Without additional details in the form of a bill of particulars, Mr. Isaza Tuzman will be left to sift through thousands of securities transactions, searching for clues as to which ones—the proverbial "needles in a haystack"—the government may allege at trial to have been part of the charged market manipulation scheme.

Finally, complicating Mr. Isaza Tuzman's trial preparation even further is the government's voluminous discovery—to date numbering in the millions of pages—and the particular complexities of this white-collar conspiracy case. Together, these factors merit an order from the Court directing the government to produce and/or identify *Brady*/*Giglio* material immediately, as well as to provide its 3500 material, exhibit list, and witness list no later than 60 days before trial. To allow the government to withhold such information until the eve of a likely more than month-long trial serves no purpose—particularly given the length of time between indictment and trial that the government will have had to prepare such materials—and would unfairly prejudice Mr. Isaza Tuzman.

## ARGUMENT

### I.   THE S8 INDICTMENT VIOLATES THE RULE OF SPECIALTY

#### A.   The S8 Indictment Adds New Factual Allegations Against Mr. Isaza Tuzman

On August 12, 2015, the government obtained the sealed first superseding indictment (the

"S1 Indictment") against Mr. Isaza Tuzman, which contained eight counts, summarized as follows:

- <u>Count One</u> alleged conspiracy to commit securities fraud. The factual basis for this charge was allegations that Mr. Isaza Tuzman conspired with "CC-2," who we now know to be cooperating co-defendant Stephen E. Maiden, to "artificially inflate the share price and trading volume" of shares of Mr. Isaza Tuzman's company, KIT digital, Inc. ("KITD") between December 2008 and September 2011, via a series of purchase-and-sale transactions between accounts controlled by Maiden. (Dkt. #7 ("S1 Indict."), ¶¶ 9-14.)

- <u>Count Two</u> alleged the substantive violation of the securities fraud statutes based on the same factual allegations as Count One and over the same period of time (December 2008 through September 2011). (*Id.* ¶ 29.)

- <u>Count Three</u> alleged conspiracy to commit wire fraud from March 2009 through March 2011. The factual basis for the charge was that Mr. Isaza Tuzman caused KITD to invest in Maiden's hedge fund in order to facilitate the purchases of KITD shares described in Count One, but failed to disclose to shareholders that this investment was "not part of an arms-length relationship" and that the investment was instead intended to assist Maiden's fund in its efforts to artificially increase the share price of KITD. (*Id.* ¶ 31.)

- <u>Count Four</u> alleged the substantive violation of the wire fraud statute based on the same factual allegations as Count Three. (*Id.* ¶ 36.)

- <u>Count Five</u> alleged conspiracy to commit securities fraud via false statements in SEC filings and false statements to auditors from 2010 through 2012. (*Id.* ¶ 45.) More specifically, Count Five alleged that Mr. Isaza Tuzman and "CC-1," who we now know to be cooperating co-defendant Robin Smyth, conspired to inflate KITD revenue via (1) improper revenue recognition from a "perpetual license" contract for KITD software in connection with the sale of a product to The Country Network ("TCN") (*id.* ¶¶ 52-66) and various licensing agreements resulting from the purchase by KITD of the assets of Sezmi Corporation ("Sezmi") (*id.* ¶¶ 67-77), and (2) the execution of alleged "round trip" transactions in connection with KITD's acquisition of Sezmi. (*Id.* ¶¶ 78-93.)

- <u>Count Six</u> alleged a substantive violation of the securities fraud statutes from June 2010 through March 2012, but did not identify any particulars as to the factual allegations supporting the charge. (*Id.* ¶ 99.)

- Counts Seven and Eight alleged that Mr. Isaza Tuzman made false statements in two of KITD's SEC filings on August 9, 2011 and March 30, 2012, but did not provide any particulars as to the nature of the false statements. (*Id.* ¶¶ 101-02.)

On September 7, 2015, Mr. Isaza Tuzman was arrested in Colombia pursuant to a provisional arrest warrant. The government requested Mr. Isaza Tuzman's extradition pursuant to the United States-Colombia extradition treaty and Colombian law, which permit Colombia to detain an individual for up to 60 days until the United States presents a formal extradition request to the Colombian foreign ministry, which the United States did on October 21, 2015. (*See* Dkt. #21 (Letter from AUSA Williams to Judge Gardephe, dated Nov. 18, 2015 ("November 18 Letter")) at 3.) As part of the extradition package, the government forwarded the S1 Indictment. (*See* Declaration of Silvia L. Serpe, dated Mar. 31, 2017 ("Serpe Decl."), Ex. 5 ("Extradition Order") at 4; *see also id.*, Ex. 6 (extradition package) at 32-87.)

As explained in greater detail in connection with Mr. Isaza Tuzman's pending Motion for Discovery and a Hearing on the Government's Conduct (*see* Dkt. #237 (memorandum of law) at 14-17), following his provisional arrest in Colombia, and while detained in the infamous La Picota prison, Mr. Isaza Tuzman and his counsel repeatedly requested that Mr. Isaza Tuzman be allowed to voluntarily surrender to United States officials located in Colombia for safe and secure transport to the United States. The government refused, contending that it was bound to follow the precise letter of the extradition procedures under the extradition treaty. (*See* November 18 Letter at 7 ("The Government explained that . . . it was not aware of a situation in which an arrested defendant was released to circumvent the extradition process."); *see also* Dkt. #28-1 (Declaration of Magdalena A. Boynton, dated Nov. 25, 2015 ("Boynton Decl.")), ¶ 24 ("Other than simplified extradition, there is no vehicle under Colombian law that would permit Tuzman's expedited transfer to U.S. custody prior to the Supreme Court and Presidential approval of the pending extradition request.").) The government subsequently submitted affidavits outlining the "strict statutory framework" governing

extradition proceedings in Colombia, wherein the Colombian Supreme Court and President "must review the [extradition] request for sufficiency and ultimately approve or deny." (*See* Boynton Decl. ¶¶ 16-17; *see also* Dkt. #28-8 (Declaration of Virginia P. Prugh, dated Nov. 24, 2015 ("Prugh Decl.")), ¶ 3 ("Colombia extradites fugitives to the United States in accordance with the Extradition Treaty and pursuant to their domestic law."); *id.* ¶ 11 ("The Government of Colombia takes extraditions and the legal rights of the fugitives seriously.").)

On March 16, 2016, the Colombian Supreme Court issued its ruling on the government's extradition request. The Court denied extradition under Counts Two, Four, Six, Seven and Eight of the S1 Indictment (the substantive counts), and consented to Mr. Isaza Tuzman's extradition solely on Counts One, Three and Five of the S1 Indictment (the conspiracy counts). (Extradition Order at 95.) The Court also placed several "conditions" on Mr. Isaza Tuzman's extradition. One notable condition was that Mr. Isaza Tuzman "cannot, *under any circumstance*, be tried for *prior or different acts* than those which are reason and authorization for his extradition." (*Id.* at 93 (emphasis added).) Mr. Isaza Tuzman was subsequently extradited to the United States, subject to these conditions.[1]

On December 22, 2016, the government filed the most recent superseding indictment against Mr. Isaza Tuzman (the "S8 Indictment"). (*See* Dkt. #198 ("S8 Indict.").) In addition to charging additional defendants not charged in the S1 Indictment (namely, Mr. Isaza Tuzman's trial co-defendants Omar Amanat and Irfan Amanat (hereinafter, "Omar" and "Irfan" or, collectively, "the Amanats")) and identifying new co-conspirators (*e.g.*, United Arab Emirates-based attorney Rima Jameel), the S8 Indictment substantially expands the nature and scope of the allegations against Mr. Isaza Tuzman, which are contained in Counts Four, Five, and Six of the S8 Indictment.

---

[1] It is Mr. Isaza Tuzman's understanding that, prior to any extradition, the government delivered a diplomatic note in which it likely acceded to these conditions. Despite Mr. Isaza Tuzman's request, the government has refused to provide him with a copy of this diplomatic note. (*See* Serpe Decl. ¶ 12.) The Court should order the government to produce any diplomatic notes regarding the extradition of Mr. Isaza Tuzman, as these communications are directly relevant to Mr. Isaza Tuzman's Specialty objections.

Indeed, the S8 Indictment adds page after page of new factual allegations that the government never presented to the Colombian authorities. A highlighted copy of the S8 Indictment identifying the new allegations in the S8 Indictment that were not contained in the S1 Indictment (and on which Colombian authorities have not authorized the government to prosecute Mr. Isaza Tuzman) is attached as Exhibit 7 to the Declaration of Silvia L. Serpe.

In particular, the S8 Indictment adds extensive allegations regarding the Amanats' Dubai-based investment company, Enable Invest Ltd. ("Enable") and the Amanats' alleged defrauding of Maiden's investors—who were invested in Enable—by hiding trading losses. (*See id.* ¶¶ 14-46.) These new paragraphs also allege that Mr. Isaza Tuzman caused KITD to invest $6.5 million in Enable (*id.* ¶ 23), learned by March 2009 that Enable was insolvent (*id.* ¶ 32), and engaged in efforts to hide the Enable losses from Maiden's investors. (*Id.* ¶ 42.) The S8 Indictment applies these new factual allegations against Mr. Isaza Tuzman in several ways:

- Counts Four, Five and Six incorporate the extensive Enable allegations by reference. (*See* S8 Indict. ¶¶ 55, 77, 83.)

- In Count Four, references to Enable are peppered throughout to tie Maiden's trading in KITD with Maiden's efforts to hide losses associated with Enable. (*See id.* ¶¶ 58, 60, 61, 76(d).) For example, in describing the purposes of a purported December 2008 agreement between Mr. Isaza Tuzman, Omar, and Maiden, the S8 Indictment adds allegations that "Maiden also agreed that he would not seek to redeem Maiden Capital's investments in . . . Enable. Because TUZMAN and OMAR AMANAT knew, as of at least December 2008, that Enable had suffered significant losses, this agreement was valuable to both OMAR AMANAT and TUZMAN." (*Id.* ¶ 58.)[2] In addition, the S8 Indictment alleges that Mr. Isaza Tuzman, Omar, Maiden, and others met in July 2011 "to discuss the losses sustained in Enable" (*id.* ¶ 76(d)), whereas the S1 Indictment alleged that the parties met in July 2011 for an entirely different purpose, namely "to discuss [Maiden Capital's] KITD investment." (S1 Indict. ¶ 27(i).)

- Count Five similarly adds allegations regarding Enable losses to support the underlying allegations that Mr. Isaza Tuzman conspired to defraud KITD's shareholders. (*See* S8 Indict. ¶¶ 79, 80.) For example, the S8 Indictment includes allegations that, in March 2012—a time

---

[2] The S8 Indictment also includes new allegations regarding a "second agreement" entered into by Mr. Isaza Tuzman and Omar in December 2008, in which Omar purportedly "further agreed to facilitate purchases of KITD in open market trading." (*Id.* ¶ 58.)

period outside the charged conspiracy—Mr. Isaza Tuzman and Maiden "took steps to conceal from the KITD Board and Accounting Firm-2 that Maiden Capital did not have the funds invested by KITD." (*Id.* ¶ 80.)

- Count Six relies on the Enable allegations to allege an entirely separate scheme to defraud. In this count, the government alleges that Irfan, with Mr. Isaza Tuzman's knowledge, "repeatedly misrepresented to KITD's auditors that Enable maintained more than $2 million in liquid assets in an asset management account on behalf of KITD when, in truth, . . . Enable was insolvent and KITD's investment in Enable had long been lost." (*Id.* ¶ 98; *see also id.* ¶¶ 137-38, 143(a), 143(e), 143(i); *id.* ¶ 93 (new clause referencing accounting principle relating to added Enable allegation).) With these new allegations, the S8 Indictment also broadens the timeframe of the alleged conspiracy—from "in or about June 2010 through in or about March 2012" (S1 Indict. ¶ 94) to "in or about 2009 through in or about April 2012." (S8 Indict. ¶ 139.)

The S8 Indictment also substantially expands the nature and scope of the allegations regarding the purported scheme to inflate reported revenue set forth in Count Six. The S8 Indictment includes new allegations that Mr. Isaza Tuzman and cooperating co-defendant Smyth employed a method to "recognize[] revenue from contracts that had been fabricated for the sole purpose of boosting KITD's revenue." (S8 Indict. ¶ 99; *see also id.* ¶ 97.) The S8 Indictment also adds new allegations regarding a British Virgin Islands entity, Jourdian Invest., Ltd., including the allegation that it was created by Smyth and previously unidentified accomplice Jameel, with Mr. Isaza Tuzman's "knowledge and approval," and that it was "KITD-funded." (*Id.* ¶¶ 113, 115.) In addition, the S8 Indictment includes new allegations regarding alleged round trip transactions, and alleges that Mr. Isaza Tuzman and Smyth facilitated their "illegal revenue recognition scheme" via an escrow account in the United Arab Emirates controlled by Jameel. (*See id.* ¶¶ 116-119, 143(d), 143(h), 143(k)-(n).)

**B.    The Rule of Specialty Requires the Government to Follow the Limitations on Extradition Imposed by the Extraditing Country**

The "Rule of Specialty" is a rule derived from principles of international comity that "generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country." *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003) (per curiam). The

Rule of Specialty applies both to extraditions granted pursuant to bilateral treaty, which constitute

binding federal law, U.S. Const. art. VI, cl. 2, and to ad hoc extraditions provided outside any treaty

obligations. As the Second Circuit recently explained in the context of extraditions from Colombia:

> Although the United States and Colombia have had a formal extradition treaty since
> 1982, extradition is commonly negotiated on a case-by-case basis through diplomatic
> channels because of amendments to the constitution of Colombia that expressly
> prohibit the extradition of Colombian nationals except for a limited scope of
> offenses. For purposes of our analysis here, extradition documents such as
> Diplomatic Notes implicate the same international legal rights as treaties because a
> violation of an extradition agreement may be an affront to the surrendering
> sovereign.

*United States v. Suarez*, 791 F.3d 363, 367 (2d Cir. 2015) (internal quotation marks and citations

omitted); *see also United States v. Gonzalez*, 275 F. Supp. 2d 483, 486 n.6 (S.D.N.Y. 2003) ("Although,

as noted, Colombia and the United States are not parties to an extradition treaty, the parties agree

that the doctrine of specialty applies with equal force to the extradition agreements at issue here.").

    Because extradition agreements "implicate the foreign relations of the United States," there

are important policy reasons why "[c]ourts should accord deferential consideration to the limitations

imposed by an extraditing nation." *Baez*, 349 F.3d at 93. Thus, courts should interpret the

obligations imposed by extradition agreements and accompanying diplomatic notes "very literally,

applying canons of statutory and treaty construction." *Gonzalez*, 275 F. Supp. 2d at 488. Indeed,

strict application of the Rule of Specialty is needed to protect the United States' interests (not just

the interests of the extraditing country) in two important respects. *First*, the United States has

burdened itself with honoring foreign countries' limitations "so that it may protect its own citizens

in prosecutions abroad" when forced to hand over United States citizens pursuant to reciprocal

extradition requests. *Id.* at 487. *Second*, courts must show "deference to the substantive assurances

made by the United States to an extraditing nation" in order to "allow the United States to secure

the future extradition of other individuals because foreign nations would observe that the limitations

they negotiated with the Executive branch in respect to the prosecution of their extradited citizens

are being honored." *Baez,* 349 F.3d at 93. Thus, honoring the Rule of Specialty is "the classical deference" courts must "afford to the political breaches in matters of foreign policy."[3] *Id.*

The touchstone of the Specialty analysis is determining the intent of the extraditing country. In *United States v. Paroutian*, the Second Circuit explained that, while Specialty would unquestionably "forbid trial of [a defendant] for murder or some other offense totally unrelated to [the indicted offense at the time of extradition]," the real inquiry was the extraditing country's intent: "So the test whether trial is for a 'separate offense' should be not some technical refinement of local law, but whether the extraditing country would consider the offense actually tried 'separate.'" 299 F.2d 486, 490-91 (2d Cir. 1962). More recent decisions continue to emphasize "whether the extraditing country . . . would object to what actually took place after extradition." *Gonzalez,* 275 F. Supp. 2d at 487. Thus, a prosecution on grounds that contravene "the clear language of the extradition resolution" cannot move forward. *United States v. Moss*, 344 F. Supp. 2d 1142, 1146-48 (W.D. Tenn. 2004) (dismissing allegations in indictment that Costa Rican extradition resolution had declared to be non-extraditable); *see also United States v. Khan*, 993 F.2d 1368, 1375 (9th Cir. 1993) (dismissing count from indictment "[b]ecause Pakistan did not unambiguously agree to extradite [the defendant] on the basis of Count VIII").

### C. The S8 Indictment Defies the Unambiguous Conditions Placed on Mr. Isaza Tuzman's Extradition by the Colombian Government

By alleging facts in the S8 Indictment that were not present in the S1 Indictment, the government is subjecting Mr. Isaza Tuzman to a prosecution in violation of the extradition treaty

---

[3] Application of the Rule of Specialty to protect defendants from prosecutions inconsistent with the conditions placed by the extraditing country dates back at least to 1886 when, in *United States v. Rauscher*, the Supreme Court vacated the conviction of a defendant who had been extradited from Great Britain to face a murder charge in the Southern District of New York but then was prosecuted for the crime of inflicting cruel and unusual punishment on the decedent. 119 U.S. 407, 429-433 (1886). Relying on principles of international comity, the Supreme Court reasoned that "the courts are bound to . . . enforce in any appropriate proceeding the rights of persons growing out of [an extradition] treaty" including "any limitation, implied or otherwise, upon [the government's] prosecution of the [extradited] party." *Id.* at 419.

between the United States and Colombia and the express conditions the Colombian government placed on Mr. Isaza Tuzman's extradition.

The government has already conceded that the extradition of Mr. Isaza Tuzman was requested and provisioned under the United States-Colombia extradition treaty. (*See* November 18 Letter at 1; Prugh Decl. ¶ 3.) Article 15 of the treaty, titled "Rule of Specialty," provides, in relevant part:

> (1) A person extradited under the Treaty shall not be detained, tried or punished in the territory of the Requesting State for an offense other than that for which extradition has been granted . . .
>
> (2) If the offense for which the person was extradited is legally altered in the course of proceedings, that person may be prosecuted or sentenced provided:
>
>> (a) The offense under its new legal description is based on the *same set of facts contained in the extradition request* and its supporting documents, and
>>
>> (b) The defendant is subject to be sentenced to a period of incarceration which does not exceed that provided for the offense for which that person was extradited.

(Serpe Decl., Ex. 8 (emphasis added) at art. 15.)

The Rule of Specialty prohibitions in the extradition treaty were reinforced by the Colombian government in its ruling on Mr. Isaza Tuzman's extradition. In granting extradition on only three of eight counts of the S1 Indictment, the Colombian Supreme Court expressly stated that the extradition was conditioned on Mr. Isaza Tuzman not being tried "under any circumstance . . . for prior or different acts than those which are reason and authorization for his extradition." (Extradition Order at 93.) This condition was reiterated in the April 8, 2016 order from the Colombian President authorizing Mr. Isaza Tuzman's extradition. (Serpe Decl., Ex. 9 (Extradition Resolution) at 3 ("[U]nder no circumstances" may Mr. Isaza Tuzman be "judged on facts prior to or distinct from those which authorized and motivated [his] extradition.").)

Colombia's intent with these conditions is manifest and clear: Mr. Isaza Tuzman cannot be prosecuted for events based on facts or theories not laid out in the S1 Indictment. Indeed, a Colombian treatise on extradition makes this abundantly clear:

2. Principle of specialty

This principle prohibits the extradited person being prosecuted for an event or events other than that or those that specifically motivated their extradition, and it also prohibits the imposition of a penalty other than the penalty set for said event or events.

In this regard, specialty acts as a principle:

"[…] Pursuant to which the requesting State may not extend the prosecution or conviction to events other than those that have specifically led to the extradition, nor subject the delivered person to a different sentence. […]"

(Serpe Decl., Ex. 10 at 9 (brackets in original).)

Here, however, the government has violated the Rule of Specialty and the unambiguous conditions placed on Mr. Isaza Tuzman's extradition by the Colombian government. In the S8 Indictment, the government seeks to try Mr. Isaza Tuzman on conspiracy counts that are much broader and based on new "facts" and theories that were not enumerated in the extradition request. These include, *inter alia*, allegations and theories involving Enable; allegations of complicity in a scheme by Maiden to defraud his own investors; allegations of new co-conspirators; and allegations of new round trip transactions. Each of these allegations and theories were not included in the counts on which the Colombian Supreme Court authorized Mr. Isaza Tuzman's extradition. And yet—notwithstanding the government's prior insistence on strict adherence to Colombian extradition rules—these new and impermissible allegations permeate all of the counts now lodged against Mr. Isaza Tuzman.

**D.      Mr. Isaza Tuzman Has Standing to Object to the Government's Violation of the Rule of Specialty**

Mr. Isaza Tuzman has standing to object to these violations of the Rule of Specialty by the government. Courts throughout the United States, including within the Second Circuit, have found that criminal defendants have standing to challenge indictments as exceeding the basis for extradition under the Rule of Specialty. *See, e.g., United States v. Puentes*, 50 F.3d 1567, 1575 (11th Cir. 1995); *United Sates v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990); *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir. 1988); *United States v. Thirion*, 813 F.2d 146, 151 n.5 (8th Cir. 1987); *Antwi v. United States*, 349 F. Supp. 2d 663, 670 (S.D.N.Y. 2004) ("Antwi has standing to raise a claim grounded on an alleged violation of the doctrine of specialty."); *United States v. Martonak*, 187 F. Supp. 2d 117, 122 (S.D.N.Y. 2002) ("Martonak has standing to argue the issue of specialty."); *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 576 (E.D.N.Y. 1995) ("A person extradited has the right to invoke the rule of specialty absent a waiver of such protection from the surrendering state."). Indeed, the Supreme Court's decision in *Rauscher* 130 years ago granted the defendant full relief without any question regarding his standing to object to a Rule of Specialty violation. *See* 119 U.S. at 432-33; *see also United States v. Stokes*, 726 F.3d 880, 889 (7th Cir. 2013) (*Rauscher* "though old remains good law today."). Thus, on multiple occasions the Second Circuit has decided Rule of Specialty objections without even questioning the defendant's standing to raise the challenge. *See Baez*, 349 F.3d at 93; *United States v. Levy*, 25 F.3d 146, 159 (2d Cir. 1994); *Paroutian*, 299 F.2d at 490-91; *see also Gonzalez*, 275 F. Supp. 2d at 487-90.

Nor does the Second Circuit's ruling in *Suarez* undermine Mr. Isaza Tuzman's standing to raise Specialty objections. There, the Second Circuit denied prudential standing to challenge a sentence based on a diplomatic assurance by the United States that a particular sentence would not be imposed, because any rights the defendant may have to such a challenge were "derivative through the state." 791 F.3d at 367 (citation omitted). Instead, the Court held that the defendant "would only

have prudential standing to raise the claim that his sentence violated the terms of his extradition if the Government of Colombia first makes an official protest." *Id.* at 367. *Suarez*, however, concerned only standing to challenge a *sentence* as a violation of the extradition terms, not standing to challenge prosecutions for offenses outside the scope of extradition terms, and the panel's language more generally discussing Rule of Specialty standing is not central to its core holding. Any broader reading of *Suarez* would contradict the Supreme Court's decision in *Rauscher*, which permitted the defendant to assert his Specialty rights to challenge a conviction even though the extraditing nation raised no such concern.[4] *See Rauscher*, 119 U.S. at 432-33.

Accordingly, this Court should dismiss the S8 Indictment and require the government to proceed on the conspiracy counts in the S1 Indictment on which Mr. Isaza Tuzman was extradited, or, alternatively, strike the offending allegations from the S8 Indictment.

## II.   MR. ISAZA TUZMAN'S TRIAL SHOULD BE SEVERED FROM THE TRIAL OF THE AMANATS

Federal Rule of Criminal Procedure 8(b) permits the joinder of defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). This standard is satisfied when the charges against two or more defendants are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United States v. Stewart*, 433 F.3d 273, 314 (2d Cir. 2006) (citation omitted). However, Rule 14(a) recognizes that the joinder of co-defendants, even when technically appropriate under Rule 8(b), may result in "prejudice [to] a defendant." Fed. R.

---

[4] The Second Circuit's ruling in *United States v. Garavito-Garcia* similarly does not limit Mr. Isaza Tuzman's standing to assert Specialty objections. There, the Second Circuit found that the defendant lacked standing to enforce a requirement that an extradition-eligible person be removed by the requesting country—in that case, the United States—within 30 days. 827 F.3d 242, 246 (2d Cir. 2016). This decision does not stand for a broad proposition against standing, but rather is in line with the law in other circuits that, "[u]nlike specialty, which is a substantive requirement that goes to the heart of the requested country's decision to allow extradition, a deadline is a procedural requirement without similar import." *United States v. Antonakeas*, 255 F.3d 714, 720 (9th Cir. 2001).

Crim. P. 14(a). In such cases, "the court may order separate trials of counts, sever the defendants'

trials, or provide any other relief that justice requires." *Id.* The decision to grant a severance pursuant

to Rule 14 lies within the "sound discretion" of the trial court. *Zafiro v. United States*, 506 U.S. 534,

539 (1993); *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002).

Although joint trials are generally favored in the criminal justice system, the Supreme Court

has stated that severance may be appropriate if a defendant demonstrates a "serious risk that a joint

trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*,

506 U.S. at 539. For example, the Supreme Court in *Zafiro* was troubled by the possibility that

"evidence that the jury should not consider against a defendant and that would not be admissible if

[he] were tried alone," when properly admitted against a co-defendant, "erroneously could lead a

jury to conclude that a defendant was guilty." *Id.* Additional factors relevant to a district court's

determination regarding severance may include: "(i) the complexity of the indictment; (ii) the

estimated length of trial; (iii) disparities in the amount or type of proof offered against the

defendants; (iv) disparities in the degrees of involvement by defendants in the overall scheme; (v)

possible conflict between various defense theories or trial strategies; and (vi) prejudice from

evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular

defendant." *United States v. Lino*, No. 00 Cr. 632 (WHP), 2000 U.S. Dist. LEXIS 18753, at *69

(S.D.N.Y. Dec. 29, 2000). These considerations are not exhaustive. *Zafiro*, 506 U.S. at 539 ("The risk

of prejudice will vary with the facts in each case."). Moreover, the presence of multiple bases for

severance, even if they would be insufficient individually, may raise the risk of prejudice to a level

meriting severance. *See United States v. Carrasco*, 968 F. Supp. 948, 952 (S.D.N.Y. 1997).

Here, the current superseding indictment against Mr. Isaza Tuzman (the S8 Indictment)

charges him in three counts (Counts Four through Six) with conspiracy to commit securities and

wire fraud. (*See* S8 Indict. ¶¶ 55-143.) Mr. Isaza Tuzman's trial co-defendants, the Amanats, are also

14

charged in the same indictment—Omar in Counts One through Four and Irfan in Counts One, Two, Three, and Six. (*See id.* ¶¶ 1-76, 83-143.) Despite the general preference for joint trials, in this case, the amount of evidence regarding the Amanats' wrongdoing which would be inadmissible in a trial against only Mr. Isaza Tuzman—particularly when considered in combination with the antagonistic relationship between the parties—warrants a severance. Without one, there is a grave risk that the prejudice created by a joint trial will prevent the jury from making a reliable judgment about Mr. Isaza Tuzman's innocence.

### A.   There is a Serious Risk of Spillover Prejudice Stemming from Counts One through Three Against the Amanats

Counts One through Three of the S8 Indictment—in which Mr. Isaza Tuzman is *not* charged—relate to an alleged scheme to cover up losses incurred by the Amanats' investment company, Enable. In short, the Amanats allegedly caused Maiden to invest in Enable on behalf of his investment advisory firm, Maiden Capital LLC ("Maiden Capital") and, when Enable sustained large losses, the Amanats and Maiden allegedly conspired to hide that fact from Maiden Capital's investors. (*See* S8 Indict. ¶¶ 15-46.)

Far from being involved in perpetrating this scheme, Mr. Isaza Tuzman was a direct victim of the Amanats and the Enable losses. Indeed, as the indictment alleges, Omar approached Mr. Isaza Tuzman to invest in Enable, in exchange for Omar's assistance in securing investments in Mr. Isaza Tuzman's own privately held special purpose investment vehicle (the "KIT SPIV"). (S8 Indict. ¶ 18.) Accordingly, in the summer of 2008, Mr. Isaza Tuzman sought and received approval from the board of KITD to invest in Enable. (*Id.* ¶¶ 22-23.) Subsequently, the Enable losses negatively affected KITD, as evidenced by the indictment's allegation that, in November 2008, Omar used Maiden Capital funds for "his own purposes," including to meet a redemption demand by Mr. Isaza Tuzman on behalf of KITD in connection with its losses in Enable. (*Id.* ¶ 28.) As a victim of the Amanats, Mr. Isaza Tuzman should not be forced to act as an additional prosecutor against his co-

defendants. Moreover, although the indictment repeatedly refers to Mr. Isaza Tuzman's eventual "knowledge" that Enable was insolvent (*id.* ¶¶ 32, 39), and alleges that Mr. Isaza Tuzman was present at a July 2011 "meeting," purportedly held to "discuss the Enable losses" (*id.* ¶ 42), Mr. Isaza Tuzman is not charged with having participated in the alleged scheme to defraud Maiden Capital's investors.[5] In fact, Mr. Isaza Tuzman worked for years, with the guidance and involvement of accountants and his company's board of directors, to address and resolve the Enable debt to KITD.

Undue prejudice justifying severance may occur "when proof inadmissible against a defendant becomes part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *United States v. Gonzalez*, No. 09 Cr. 481 (CM), 2010 WL 339698, at *3 (S.D.N.Y. Jan. 28, 2010) (quoting *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998)). Similarly, a defendant may be entitled to severance where failure to sever would force him "to endure a trial involving many incidents of misconduct which do not involve [him]," and which could ultimately confuse or prejudice the jury against him. *United States v. Upton*, 856 F. Supp. 727, 736 (E.D.N.Y. 1994); *accord United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (noting the existence of "cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice").

Here, in a joint trial, the government would certainly seek to introduce a veritable mountain of evidence implicating the Amanats in the scheme to defraud Maiden Capital investors alleged in Counts One through Three. However, but for the fact that Mr. Isaza Tuzman and the Amanats are charged in the same indictment, evidence of a fraud purportedly perpetrated by the Amanats and Maiden on investors in Maiden's investment advisory firm would not be admissible against Mr. Isaza

---

[5] Any suggestion or allegation to the contrary—that Mr. Isaza Tuzman knew of and participated in the alleged scheme to defraud Maiden Capital investors—would only highlight the prejudicial spillover resulting from a joint trial since Mr. Isaza Tuzman is not and cannot be charged with this offense under the Rule of Specialty.

Tuzman. Adding insult to injury is the fact that Mr. Isaza Tuzman's own company, KITD, was *also* a victim of the losses of the Amanat-controlled Enable. Forcing Mr. Isaza Tuzman to participate in a joint trial that will showcase an abundance of evidence of alleged misconduct implicating only his co-defendants presents precisely the type of spillover prejudice that courts in this Circuit have found to warrant severance. *See e.g.*, *United States v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992) (finding reversible trial court's denial of severance as to certain defendants because they had, as a result, been "swamped" by a "mass of irrelevant evidence"); *United States v. Bellomo*, 954 F. Supp. 630, 650 (S.D.N.Y. 1997) ("Absent severance, these defendants would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating . . . which would not be presented at a separate trial and which is not alleged to have been a part of their criminal activity. Thus, there is clear potential for spillover prejudice in this case.").

A severance of Mr. Isaza Tuzman's trial from that of the Amanats is also warranted because the Amanats are only peripherally involved in Counts Four (Omar) and Six (Irfan)—the only counts in which either Amanat is jointly charged with Mr. Isaza Tuzman. Although Count Four alleges the existence of a market manipulation scheme spanning nearly three years and an unidentified number of securities transactions (*see* S8 Indict. ¶¶ 55-76), Omar is alleged to have concretely participated in only the first investment at the outset of the purported conspiracy in December 2008. (*See id.* ¶¶ 58-59). Similarly, Count Six focuses on an alleged scheme to defraud auditors and the investing public, purportedly orchestrated by Mr. Isaza Tuzman and others through the use of an unknown number of allegedly fraudulent "round trip" transactions and perpetual license contracts. (*See id.* ¶¶ 99-136.) Although Irfan is also charged in Count Six, his involvement apparently extended only to purportedly providing false statements indicating that the failed KITD investment in Enable was still profitable—well outside the heartland of the allegations in that count. (*See id.* ¶¶ 98, 137-138.) Particularly in light of Mr. Isaza Tuzman's lack of participation in the scheme charged in Counts

One through Three, to allow the government to force a joint trial of the Amanats and Mr. Isaza Tuzman solely on the basis of the Amanats' peripheral involvement in the allegations constituting Counts Four and Six would be manifestly unjust.

> ### B. Evidence of the Amanats' Prior Crimes, Wrongs, or Other Bad Acts Also Presents a Serious Risk of Spillover Prejudice

In all likelihood, as part of its proof at trial, the government will seek to introduce evidence regarding the Amanats' prior crimes, wrongs, or other bad acts, pursuant to Federal Rule of Evidence 404(b). The introduction of such evidence also presents a serious risk of spillover prejudice to Mr. Isaza Tuzman, which would compromise the integrity of a joint trial and further counsels in favor of severance.

"The Second Circuit recognizes the potential 'spillover' prejudice that a co-defendant may incur in a joint trial where prior-act evidence is admitted against another co-defendant." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 173 (S.D.N.Y. 2006) (citing *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995) ("Where allegedly prejudicial evidence is admitted solely against one defendant in a multi-defendant trial, the prejudice this might cause to his co-defendants . . . may result in the exclusion of such evidence in the joint trial.")). Indeed, in some cases, severance may be an appropriate remedy to prevent the introduction of overly prejudicial Rule 404(b) evidence against co-defendants to whom it does not relate. *See, e.g.*, *United States v. Basciano*, No. 05 Cr. 60 (NGG), 2007 U.S. Dist. LEXIS 78635, at *14 (E.D.N.Y. Oct. 23, 2007) (severance granted based on prejudicial effect of proffered Rule 404(b) evidence that a co-defendant had previously been convicted for the same conduct that the defendant was currently on trial for); *United States v. James*, No. 02 Cr 778 (SJ), 2007 U.S. Dist. LEXIS 39585, at *8 (E.D.N.Y. May 31, 2007) (finding limiting instruction insufficient to cure prejudice if the government was allowed to introduce evidence of a co-defendant's plot to kill witnesses to a crime related to RICO conspiracy, but not to the defendant); *United States v. Lujan*, 529 F. Supp. 2d 1315, 1326 (D.N.M. 2007) (finding that the

introduction of additional murders perpetrated by co-defendant, which would not be admissible against the moving defendants in a separate trial, would create the possibility "that a jury might infer [the defendants'] guilt because of the enhanced likelihood of [the co-defendant's] guilt," and was "a factor weighing in favor of severance"); *cf. United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980) ("Th[e] issue can be considered either as a question of admissibility of evidence or severance. If the justification for a joint trial is outweighed by the prejudice to the co-defendants, the trial court can confront the prosecutor with the choice of forgoing either the evidence or the joint trial.") (remanding for new trial where Rule 404(b) evidence erroneously admitted against one defendant caused sufficient likelihood of prejudice to co-defendants).

Here, although Mr. Isaza Tuzman has not yet received notice from the government of the specific nature of its Rule 404(b) evidence, there is ample reason to believe that the government will seek to admit substantial Rule 404(b) evidence against the Amanats. Indeed, both of the Amanats have a long history of allegations of fraud against them. For example, in a decision dated February 20, 2015, in the High Court of Justice, Chancery Division, in the United Kingdom, Mr. Justice Henderson summarized Omar's "lamentable history," which established his "propensity to fraud" as follows:

> In September 2004, Judge Richard B Lowe III (sitting in the Supreme Court of the State of New York) held that Mr Amanat and other defendants associated with him had "engaged in a pattern of blatant disregard of this Court's orders which rises to a level of wilful, contumacious, bad faith conduct". In a decision handed down in January 2005, Judge Allan L Gropper found that Mr Amanat had induced his chauffeur to file an involuntary bankruptcy petition against him, in order to try to take advantage of an automatic stay. In further judgments handed down in October 2007, March 2009 and March 2010 respectively, Judge Gropper found that Mr Amanat was a "blatant" fraudster who had arranged intentional fraudulent conveyances, that he had fraudulently backdated documents, and that there was "overwhelming evidence" that he had acted in bad faith with actual or constructive knowledge of a fraudulent scheme. Furthermore, in September 2008 the US Financial Industry Regulatory Authority ("FINRA") issued a decision barring Mr Amanat from associating with any FINRA firm in any capacity, having found him guilty of violating various rules of conduct, including wilful failure on seven separate occasions to disclose material information to FINRA, and failure to respond to two

requests for information issued by FINRA.

(*See* Serpe Decl., Ex. 11 (U.K. decision), ¶¶ 28-29; *see also id.*, Ex. 12 (September 2008 FINRA decision).) The mainstream media has also repeatedly chronicled Omar's previous involvement in litigation related to alleged fraudulent conduct. (*See, e.g.*, Serpe Decl., Ex. 13 (Fortune magazine article, dated Sept. 4, 2014).) In addition, Omar has been accused of engaging in threatening conduct to settle a score. (*See, e.g.*, *id.*, Ex. 14 (New York Times article, dated July 23, 2016).)

Similarly, Irfan has been the subject of multiple judgments involving fraudulent conduct. For example, on November 3, 2006, the Securities and Exchange Commission (the "Commission") issued an opinion finding that Irfan willfully violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. As a result, the Commission barred Irfan from associating with any broker-dealer for a period of five years, entered a cease and desist order, and imposed a civil monetary penalty of $60,000. (*See* Serpe Decl., Ex. 15 (Commission Decision).) In denying Irfan's appeal to the Third Circuit, Judge Maryanne Trump Barry summarized the Commission's findings as follows:

> Based on its independent review of the record, the Commission found that Amanat designed and operated his automatic trading program for the sole purpose of capturing rebate revenue, knowingly engaged in thousands of wash sales and matched orders at the end of the financial quarter to meet the eligibility threshold, and—despite having been told that his trades were "wrong"—contacted NASDAQ to request payment. The Commission further found that, as a result of Amanat's conduct, the CTA was deceived into paying money to NASDAQ (some of which was rebated to MarketXT) that it would not have paid had it known the true nature of Amanat's trades.

*Amanat v. SEC*, 269 Fed. App'x 217, 220 (3d Cir. Mar. 17, 2008). In addition, on October 4, 2011, a default judgment in the amount of $7.5 million was entered against Irfan in the United States District Court for the Central District of California, "for actual and punitive damages arising from [Irfan]'s fraudulent embezzlement of funds." *See MNA Partners Ltd. v. Amanat*, Dkt. #22, No. 11 Civ. 2327 (DDP) (C.D. Cal. Oct. 4, 2011).

Proceeding to trial with co-defendants with pasts as checkered as the Amanats' puts Mr. Isaza Tuzman at considerable risk of spillover prejudice. "The concern is that the jury might draw an adverse inference against a co-defendant simply because of his or her association with . . . a defendant previously charged with a particular crime." *Ozsusamlar*, 428 F. Supp. 2d at 173; *see also United States v. DeCicco*, 435 F.2d 478, 483 (2d Cir. 1970) ("'Prior similar acts of misconduct performed by one person cannot be used to infer guilty intent of another person who is not shown to be in any way involved in the prior misconduct, unless it be under a 'birds of a feather' theory of justice."). Given the plethora of prior bad act evidence against both of the Amanats that the government will likely offer at trial, severance is warranted.

### C.    The Essence of Mr. Isaza Tuzman and the Amanats' Defenses are Mutually Antagonistic

Finally, Mr. Isaza Tuzman's trial should be severed from the trial of the Amanats because the antagonism at the essence of the parties' defenses presents an unjustifiable risk that the jury will unfairly convict all three defendants.

In certain circumstances, severance may be granted where co-defendants employ defense tactics so mutually antagonistic or irreconcilable that "acceptance of one party's defense would tend to preclude the acquittal of the other." *United States v. Stein*, 428 F. Supp. 2d 138, 144 (S.D.N.Y. 2006) (quoting *Salameh*, 152 F.3d at 116); *see also United States v. Serpoosh*, 919 F.2d 835, 836-38 (2d Cir. 1990) (reversing denial of a severance motion based on antagonistic defenses, when each defendant "described himself as the unwitting dupe of the other," exacerbated by "the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted his story to escape blame"). Significantly, "severance should [also] be granted when antagonism at the *essence* of the defenses prevails to such a degree—*even without being mutually exclusive*—that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty." *United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2013 U.S. Dist. LEXIS 181894, at *36

(S.D.N.Y. Dec. 31, 2013) (quoting *United States v Cardascia*, 951 F.2d 474, 484-85 (2d Cir. 1991)) (first emphasis in original).

In this case, there have been early indications that the Amanats' defenses will consist of pointing the finger at Mr. Isaza Tuzman. Indeed, Omar's counsel has indicated to the Court that, "discovery demonstrates that the issue as to whether Enable suffered trading losses and whether it was insolvent—a fact on which the allegations against [Omar] depend—was the matter of vigorous dispute between [Omar] and Mr. [Isaza] Tuzman for several years." (Dkt. #155 (Letter from Eric M. Creizman, Esq. to Judge Gardephe, dated Nov. 14, 2016) at 3.)

Even more troubling, however, is the fact that the antagonism between the parties has for some time run so deep that, on multiple occasions spanning the course of several years, the Amanats have falsely accused Mr. Isaza Tuzman of threatening violence to intimidate them and others. For example, on March 26, 2009, Omar wrote in an e-mail that Mr. Isaza Tuzman had, in the past, "hired 'special collection agents' from Colombia and Spain to pursue . . . collection efforts . . . [who] if they don't collect from [redacted] . . . will kill [redacted] or his family members." (Dkt. #184-3 at 2.) A month later, on April 29, 2009, Irfan also penned an accusatory e-mail that falsely claimed Mr. Isaza Tuzman threatened him. (Dkt. #184-4 at 1 ("I do not want Kaleil to call my house again. I will sign this agreement, and I am working to repay the investments, but I want to document his threats at the same time in case they are real.").) As a final example, in the past year, Omar went so far as to claim that Mr. Isaza Tuzman threatened him in person with physical violence. (*See* Dkt. #184-8 at 1.)

As set forth at length in previous filings with this Court, the Amanats' allegations against Mr. Isaza Tuzman are *demonstrably false and uncorroborated*, and are substantially identical to allegations the Amanats have previously made against other litigation adversaries, solely to distract from their own wrongdoing. (*See* Dkt. #190 at 3-6.) Without going further into the merits of the Amanats' inflammatory allegations, it suffices to say that the Amanats' repeated attempts to paint Mr. Isaza

Tuzman as dangerous are *prima facie* evidence of the antagonistic positions that the Amanats and Mr. Isaza Tuzman will take at trial with regard to the events charged in this case. Without a severance, the government will be able to use the antagonism at the essence of the interaction between Mr. Isaza Tuzman and the Amanats against all three of them, painting them as untrustworthy and setting up a scenario where a jury may "unjustifiably infer[] that the conflict alone indicate[s] that [all of the] defendants [a]re guilty." *See Van Hise*, 2013 U.S. Dist. LEXIS 181894, at *36.

### D.      A Limiting Instruction Cannot Cure the Potential Prejudice to Mr. Isaza Tuzman

The above-described bases for severance, particularly when considered in combination with one another, create a risk of prejudice to Mr. Isaza Tuzman that cannot be eliminated with a limiting instruction to the jury. Any presumption that jurors will adhere to limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity." *United States v. McDermott*, 245 F.3d 133, 139-40 (2d. Cir. 2001) (noting that in a case where prejudicial spillover is "overwhelming," jury instructions cannot be presumed to be effective); *Basciano*, 2007 U.S. Dist. LEXIS 78635, at *14 (asking jury to ignore one defendant's prior conviction in assessing guilt of co-defendants would require "feats of mental dexterity"); *James*, 2007 U.S. Dist. LEXIS 39585, at *7-8 (noting that while "[g]enerally, a limiting instruction adequately guards against unfair prejudice," a defendant would be unfairly prejudiced if evidence of his co-defendant's "involvement in a plot to kill witnesses to his crime" were admitted).

### E.      In the Alternative, the Court Should Hold Mr. Isaza Tuzman's Motion for Severance in Abeyance Pending the Government's Rule 404(b) Notice

Finally, should the Court decline to grant a severance at this juncture, in the alternative, Mr. Isaza Tuzman respectfully requests that the Court hold his motion for severance in abeyance pending development of the factual record—including but not limited to the government's eventual notice of its intended Rule 404(b) evidence—which counsel expects will further confirm the bases

for severance articulated in this motion. Courts in this district have been amenable to holding motions for severance in abeyance for similar reasons. *See, e.g.*, *United States v. Kercado*, No. 91 Cr. 685 (SWK), 1992 WL 196778, at *2 (S.D.N.Y. Aug. 3, 1992); *United States v. Rodriguez*, 734 F. Supp. 116, 118, n.1 (S.D.N.Y. 1990); *cf. United States v. Rodriguez*, No. 08 Cr. 1311 (SWK), 2009 WL 2569116, at *11 (S.D.N.Y. Aug. 20, 2009) (dismissing motion to sever without prejudice, with leave to amend at a later date).

## III.  THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A LIMITED BILL OF PARTICULARS IDENTIFYING THE ALLEGEDLY MANIPULATIVE MAIDEN CAPITAL TRADES

Rule 7(c)(1) of the Federal Rules of Criminal Procedure mandates that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). This requirement is grounded in the Sixth Amendment's guarantee of a defendant's right "to be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI. When an indictment fails to meet this standard, Rule 7(f) authorizes the trial court to "direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). The court has discretion in deciding whether to order a bill of particulars, *see United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988), and is "informed by considerations of whether the requested particularization is necessary to defendant's preparation for trial and avoidance of unfair surprise at trial." *United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (bill of particulars intended to provide a defendant with the opportunity "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense").

Here, counsel for Mr. Isaza Tuzman and the government met and conferred and were able to come to an agreement with regard to most of Mr. Isaza Tuzman's requests for particulars. (*See*

Dkt. #261; Serpe Decl. ¶¶ 3-5.) However, the government would not agree to provide Mr. Isaza

Tuzman with critical additional information regarding the alleged market manipulation scheme

charged in Count Four (*see* Serpe Decl. ¶ 5), rendering the instant motion necessary.[6]

### A.    Count Four Fails to Prevent Surprise and Mr. Isaza Tuzman Cannot Adequately Prepare His Defense

Count Four of the S8 Indictment charges Mr. Isaza Tuzman with conspiracy to commit

securities fraud based on a scheme to engage in market manipulation over a nearly three-year period

between December 2008 and September 2011. (S8 Indict. ¶¶ 55-76.) This market manipulation

scheme was allegedly based on Maiden's purchase, through Maiden Capital, of over $2.4 million

worth of stock in KITD—$400,000 in January or February 2009 (*id.* ¶¶ 59, 76a), and "in excess of

$2 million" between March 2009 and September 2011. (*Id.* ¶ 61.) However, apart from the initial

$400,000 purchase, the indictment goes on to specifically identify only five purchases on four days,

which together total only approximately $543,371.06—barely a quarter of the "in excess of $2

million" of additional purportedly manipulative KITD stock purchases. (*See id.* ¶¶ 61a-c, 62d.)[7]

Further references in the indictment to Maiden Capital's purchases and/or sales of KITD stock are

vague and unspecific. (*See, e.g., id.* ¶ 62b ("Maiden was responsible for approximately all of the

trading activity in KITD stock for that day"), ¶ 62f ("Maiden purchased additional shares of KITD .

. . account[ing] for over approximately 40% of the total trading volume in KITD stock for that

day"), ¶ 63 ("Maiden was on both sides of the purchase and sale of KITD stock on several

---

[6] Defense counsel and the government also met and conferred as to all other discovery-related requests prior to the filing of the these motions. (*See* Serpe Decl. ¶¶ 6-11.)

[7] The purchases totaling approximately $543,371.06 are as follows: (1) the purchase of 28,571 shares at approximately $7/share on March 9, 2009 (approximately $199,997) (¶ 61a); (2) the purchase of $75,000 of KITD stock on June 15, 2009 (¶ 62d); (3) two purchases for a total of 10,700 shares at $10.64/share on December 4, 2009 ($113,848) (¶ 61b); and (4) the purchase of 16,063 shares at $9.62/share on July 29, 2010 ($154,526.06) (¶ 61c).

occasions [in a certain month], including at prices that were not to Maiden's economic advantage"), ¶ 65 (describing email from Maiden as reading "Kdgl still hasn't traded outside of me today").)

As part of its voluminous discovery, the government has produced spreadsheets which detail thousands of purchases and sales of KITD securities by Maiden Capital. Indeed, these spreadsheets are so large and unwieldy that they are difficult to access on a normal desktop computer. However, the government has not identified which of these thousands of trades are allegedly part of the market manipulation scheme that forms the basis for the charge in Count Four. Nor does the government's bare bones identification of a handful of Maiden Capital purchases of KITD stock (*see* S8 Indict. ¶¶ 61a-c, 62d) help Mr. Isaza Tuzman determine which of the thousands of additional trades make up the missing approximately $1.5 million (or more) of the "in excess of $2 million" worth of manipulative purchases purportedly executed between March 2009 and September 2011. (*See id.* ¶ 61.) As a result, Mr. Isaza Tuzman has been left without answers to such basic questions as: How does the government arrive at the "in excess of $2 million" figure charged in the indictment? Are there hundreds of small allegedly manipulative trades on many days or a handful of large ones? What types of trades does the government consider improper? How does the government believe the allegedly manipulative trades differ from the substantial volume of legitimate purchases and sales of KITD stock Maiden executed before the alleged manipulation scheme began in December 2008?

**B.     Mr. Isaza Tuzman is Entitled to a Limited Bill of Particulars Identifying the Allegedly Manipulative Maiden Capital Trades**

"The Second Circuit has ruled that a bill of particulars is necessary when the government alleges that a few unspecified transactions, part of a larger pool, are fraudulent, because defendants 'were forced to explain the events surrounding legitimate transactions and to confront numerous documents unrelated to the charges pending' against them." *United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 1674799, at *8 (E.D.N.Y. May 3, 2011) (quoting *Bortnovsky*, 820 F.2d at 574-75)). In addition, a bill of particulars is often particularly important in complex conspiracy cases because

"the potential for unfair surprise and the difficulty of preparing a defense are amplified." *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) (citing *United States v. Bin Laden*, 92 F. Supp. 2d 225, 236 (S.D.N.Y. 2000)) (complexity of conspiracy case weighed in favor of the need for particularization of allegations); *accord Davidoff*, 845 F.2d at 1154 ("With the wide latitude accorded the prosecution to frame a [conspiracy charge] comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope.").

For these reasons, courts in this District previously have ordered the government to particularize in cases involving allegedly improper trading activity. For example, in *Rajaratnam*, an insider trading case, the government was directed to identify "the substance of the information provided" and "the date(s) on which it was conveyed" for the tips underlying multiple conspiracy counts. 2010 WL 2788168, at *4-9. Although stopping short of ordering an itemization of the trades at issue, the *Rajaratnam* court did so because it was "not persuaded that more detail [wa]s necessary to prepare a defense" in that particular case, noting that the government had provided specific trade information as to the substantive counts. *Id.* at *9 and n.4;[8] *see also, e.g., United States v. Contorinis*, No. 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739, at *1 (S.D.N.Y. May 5, 2010) (directing the government to "submit a bill of particulars with respect to the material, non-public information allegedly disclosed in connection with" a specified transaction). No such particularity has been provided to Mr. Isaza Tuzman here, as he is not charged with substantive counts and the prior

---

[8] Other courts in this District that have denied requests for an itemization of trades have done so under similar auspices. *See e.g., United States v. Martoma*, No. 12 Cr. 973 (PGG), 2013 WL 2435082, at *6 (S.D.N.Y. June 5, 2013) (denying request for itemization of trades on conspiracy counts of insider trading indictment where specific trades had been identified in companion substantive counts); *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 U.S. Dist. LEXIS 6991, at *58-59, 62-66 (S.D.N.Y. Jan. 18, 2017) (denying request for itemization of trades, in part because government had already provided "substantial" particulars in non-indictment materials, including 97-page search warrant affidavit and the government's opposition brief on the bill of particulars motion).

substantive counts against him (on which Colombia refused to extradite Mr. Isaza Tuzman) contained no such particularity.

Courts have also previously required particularization of similar types of information in comparable contexts. For example, in *United States v. Nachamie*, the court ordered the government to identify via a bill of particulars:

> [E]ach and every one of the 'false and misleading' [Medicare] claims which were allegedly submitted and/or filed as part of the conspiracy, and, for each such claim, specify: (i) who allegedly prepared each such form; (ii) who allegedly submitted each such form; (iii) when and where each such form was prepared and submitted; (iv) each item or entry on each such form which is alleged to be 'false and misleading;' (v) the manner in which such item or entry is allegedly false; (vi) the statement or amount which the Government contends would have been an accurate statement of each such item or entry; and (vii) the manner in which each such amount was calculated.

91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000); *see also, e.g.*, *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 U.S. Dist. LEXIS 2445, at *10 (S.D.N.Y. Mar. 7, 2001) (ordering bill of particulars where defendant would otherwise "be forced to comb through this veritable mountain of documents and to attempt to guess which of the numerous transactions documented therein . . . are alleged by the government to have been improper"); *Bortnovsky*, 820 F.2d at 574-75 (abuse of discretion to deny bill of particulars where indictment alleged the existence of four fabricated insurance claims, but did not provide guidance as to which four out of twelve possible claims were fraudulent); *Davidoff*, 845 F.2d at 1153-54 (error to deny bill of particulars where indictment described allegedly extortionate conduct as "includ[ing] but . . . not limited to" violations set forth in indictment); *United States v. Siddiqi*, No. 06 Cr. 377 (SWK), 2007 U.S. Dist. LEXIS 15410, at *7-9 (S.D.N.Y. Feb. 21, 2007) (ordering bill of particulars specifying the date and amount of alleged illegal cash bribes); *United States v. Zandstra*, No. 00 Cr. 209 (RWS), 2000 U.S. Dist. LEXIS 13734, at *17 (S.D.N.Y. Sept. 20, 2000) (ordering bill of particulars "identifying the approximate dates of the allegedly fraudulent mailings"); *United States v. McGuinness*, 764 F. Supp. 888, 892-93 (S.D.N.Y. 1991) (requiring bill of

particulars listing the payor and the approximate date and amount of payments allegedly made in violation of the Taft-Hartley Act); *cf Nekritin*, 2011 WL 1674799, at *8 (denying particulars where the government had identified the specific Medicare and Medicaid claims alleged to be fraudulent).

In the present case, Mr. Isaza Tuzman can only effectively defend against the government's market manipulation charge if he is aware of which purchases and sales of stock are allegedly manipulative. Without additional direction, he will have no choice but to comb through records of thousands of Maiden Capital purchases and sales of KITD stock in a blind attempt to discern which additional trades the government believes to have been improper. He will also have to prepare a defense as to trades that the government may not even be relying upon for its theory, and will thus be "forced to explain the events surrounding legitimate transactions and to confront numerous documents unrelated to the charges" against him. *Nekritin*, 2011 WL 1674799, at *8 (internal quotation marks and citation omitted).

Nor is this a case where the government has alleged that *every* transaction during a certain time period was fraudulent. *See e.g.*, *United States v. Dupree*, No. 10 Cr. 627 (KAM), 2011 WL 5976006, at *7 (E.D.N.Y. Nov. 29, 2011) (rejecting request for additional information regarding transactions in part because the government alleged that the fraud "permeated and sustained" the entire business and "all of the accounts receivable figures on all financial statements . . . [were] false"); *United States v. Drivas*, No. 10 Cr. 771 (NG), 2012 WL 3011023, at *4 (E.D.N.Y. July 19, 2012) (denying request to identify fraudulent transactions because the government had alleged that all transactions billed to Medicare were fraudulent).

Accordingly, because Mr. Isaza Tuzman's current inability to answer fundamental questions regarding the events underlying the charge in Count Four of the indictment handicaps his trial preparation, deprives him of his right to be protected from unfair surprise, and renders him unable to interpose a plea of double jeopardy in any future prosecutions for the same conduct, a bill of

particulars is warranted to guard against these violations of Mr. Isaza Tuzman's Sixth Amendment rights.

## IV.    THE COURT SHOULD ORDER THE EARLY DISCLOSURE OF RULE 404(B) EVIDENCE

Federal Rule of Evidence 404(b) requires that the government provide "reasonable" notice of its intention to offer evidence of other crimes, wrongs, or bad acts at trial. *See* Fed. R. Evid. 404(b). "While notice is typically provided no more than two to three weeks before trial, a longer period is appropriate where . . . Rule 404(b) evidence is important to th[e] action." *Lino*, 2000 U.S. Dist. LEXIS 18753, at *65 (internal citation and brackets omitted) (ordering Rule 404(b) evidence to be produced 60 days before trial); *see also, e.g.*, *United States v. Vilar*, 530 F. Supp. 2d 616, 640 (S.D.N.Y. 2008) (same); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 U.S. Dist. LEXIS 74829, at *33 (S.D.N.Y. May 28, 2013) (same).

As discussed previously, Mr. Isaza Tuzman has every reason to believe that the government will seek to introduce, pursuant to Rule 404(b), a plethora of evidence at trial regarding the Amanats' prior crimes, wrongs, or other bad acts. The introduction of such evidence will present a serious risk of spillover prejudice to Mr. Isaza Tuzman, and counsels strongly in favor of severance. (*See supra* Section II.) However, in the event that the Court finds severance to be premature at this stage, the Court should, at a minimum, order the early production of Rule 404(b) evidence so that the Court may consider the severance motion again sufficiently in advance of trial to allow for the realistic possibility that severance will be required at that time.

Moreover, even if severance is ultimately deemed unnecessary, the same spillover prejudice that would counsel in its favor will assuredly be the basis for motions *in limine* regarding the admissibility of such evidence. Indeed, the purpose of Rule 404(b)'s reasonable notice provision is "to reduce surprise and *promote early resolution on the issue of admissibility*." Fed. R. Evid. 404, Advisory Committee Note (1991 Amendment) (emphasis added). And the issue of admissibility only becomes

more complex in a multi-defendant trial. As the Second Circuit has cautioned, "[w]hen evidence is offered against one defendant in a joint trial, determination of admissibility against that defendant resolves only the Rule 403 balancing as to him, *i.e.*, that the probative value of the evidence in his 'case' is not substantially outweighed by unfair prejudice to him. But if the evidence creates a significant risk of prejudice to the co-defendants, a further issue arises as to whether the evidence is admissible in a joint trial, even though limited by cautionary instructions to the 'case' of a single defendant." *Figueroa*, 618 F.2d at 944 (remanding for new trial where Rule 404(b) evidence erroneously admitted against one defendant caused sufficient likelihood of prejudice to co-defendants); *see also Gelzer*, 50 F.3d at 1140 ("Where allegedly prejudicial evidence is admitted solely against one defendant in a multi-defendant trial, the prejudice this might cause to his co-defendants . . . may result in the exclusion of such evidence in the joint trial."); *United States v. Williams*, 181 F. Supp. 2d 267, 301-02 (S.D.N.Y. 2001) ("Spillover prejudice" occurs "when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper.") (quoting *Salameh*, 152 F.3d at 115).

Accordingly, Mr. Isaza Tuzman respectfully requests that the Court order the government to disclose its Rule 404(b) evidence no later than 60 days prior to trial.

## V.   THE GOVERNMENT SHOULD PRODUCE 3500 MATERIAL WELL IN ADVANCE OF TRIAL

In light of the complexities of this case, including the millions of pages of discovery and the fact that the trial is expected to last at least one month,[9] Mr. Isaza Tuzman requests that the government provide him with 3500 material 60 days before trial. The government has offered to provide such material two weeks before trial—an offer the government often makes in non-complex cases that are not document intensive and that involve shorter trials—but only if all three defendants

---

[9] In September 2015, the government estimated that the trial would last approximately one month. (*See* Dkt. #126 (status conference transcript, dated Sept. 22, 2016) at 13.) However, this was before Irfan was added to the S8 Indictment as a co-defendant.

agree to stipulations (not yet presented to them) regarding authenticity and/or business records for routine evidence. (*See* Serpe Decl. ¶¶ 9-10; *id.*, Ex. 3.) Production of 3500 material so close to the start of this trial is patently unfair, serves no purpose, and will result in an undue burden on defense counsel given the demands of this highly complex case. *See Strawberry*, 892 F. Supp. at 528 ("[T]here is no reason for the Government to withhold the material for purposes of delay or without good reason."); *see also United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 U.S. Dist. LEXIS 719, at *20 (S.D.N.Y. Jan. 6, 2010) ("The Second Circuit has encouraged [pretrial disclosure of 3500 material] in complex cases."); *see also United States v. Levine*, No. 16 Cr. 715 (JSR) (S.D.N.Y. Mar. 30, 2017) (minute entry in case charging tax conspiracy and wire fraud stating that "Witness and Exhibit Lists plus 3500 material shall be produced: By the Govt to the defense within 50 days of trial").

The government should provide Mr. Isaza Tuzman with adequate time to conduct a meaningful investigation of the government's witnesses and analyze their statements. This will help promote efficiency in the months leading up to trial, as substantial evidentiary issues could then be raised and resolved through motions *in limine* before trial begins. *See Lino*, 2000 U.S. Dist. LEXIS 18753, at *49-50 (early production of 3500 material "promote[s] sound trial management and . . . preserve[s] the integrity of the proceeding"). Similarly, it will lead to a more efficient trial. *See United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974) ("[I]n most criminal cases, pretrial disclosure will redound to the benefit of all parties, counsel, and the court. Indeed, sound trial management would seem to dictate that Jencks Act material should be transmitted prior to trial, especially in complex cases, so that those abhorrent lengthy pauses at trial to examine documents can be avoided.").

Thus, the government should produce all 3500 material no later than 60 days before trial in order to avoid the delay and unwarranted disruption of trial proceedings that will likely ensue without such pretrial disclosure.

## VI.     THE COURT SHOULD ORDER THE EARLY IDENTIFICATION OF TRIAL EXHIBITS

Rule 16(a)(l)(E) of the Federal Rules of Criminal Procedure requires the government to provide documents that it intends to use as evidence in its case-in-chief. *See* Fed. R. Crim. P. 16(a)(l)(E). Although "there is some divergent authority among courts in this Circuit as to whether a district court may compel the Government to *specify* the sub-set of items produced pursuant to Rule 16 that it intends to offer at trial, the *overwhelming majority* of district courts, in accord with Second Circuit authority, favor the view that it is within a district court's authority to direct the Government to *identify prior to trial* the documents it intends to rely on in its case in chief." *Vilar*, 530 F. Supp. 2d at 639 (first emphasis in original) (ordering identification of documents 60 days in advance); *see also, e.g., Bonventre*, 2013 U.S. Dist. LEXIS 74829, at *25 (requiring early identification of exhibits 60 days in advance of trial in part based on the "sheer volume" of documents in the case); *United States v. Giffen*, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) ("[B]ased on the policy concerns of Rule 16 and principles of fairness, it is within a district court's authority to direct the Government to identify the documents it intends to rely on in its case in chief.").

Indeed, just a few months ago in *Wey*, Judge Alison J. Nathan ordered the government to provide certain subsets of its trial exhibits 60 days prior to trial, based on an "amplified" "potential for unfair surprise and the difficulty of preparing a defense." 2017 U.S. Dist. LEXIS 6991, at *68 ("[E]arly identification of certain subsets of the Government's trial exhibits is appropriate . . . in light of the relative scarcity of specific allegedly fraudulent misstatements, omissions, and wire communications."); *see also United States v. Turkish*, 458 F. Supp. 874, 881-82 (S.D.N.Y. Aug. 24, 1978) (directing that the government identify which of 25,000 documents were "intended for use by the government as evidence in chief at the trial" in case alleging "conspiracy covering over fifteen months of [trading] activity"); *Upton*, 856 F. Supp. at 748 ("The *purpose* of requiring the government to identify which documents it will rely upon at trial in a situation such as this—where there are

33

thousands of documents—is to allow the defendant to adequately prepare his or her defense.")
(emphasis in original).

Here, given the millions of pages of documents produced, it is in the interests of justice for
the Court to require identification of the government's exhibit list well in advance of trial. Such early
identification "best serves Defendants' right to a fair trial, and is likely to aid in the orderly
presentation of the government's and the Defendant's respective cases." *Vilar*, 530 F. Supp. 2d at
640. Accordingly, the Court should order the government to identify the exhibits on which it will
rely at trial no later than 60 days in advance of trial.

## VII.   THE COURT SHOULD ORDER THE EARLY IDENTIFICATION OF TRIAL WITNESSES

Similarly, the Court should also order the government to identify the witnesses that it will
call at trial no later than 60 days in advance. Trial courts have the discretion to compel such
disclosure, *see United States v. Cannone*, 528 F.2d 296, 300 (2d Cir. 1975), and they routinely do so in
complex white-collar conspiracy cases. *See, e.g.*, *Levine*, No. 16 Cr. 715 (JSR) (S.D.N.Y. Mar. 30, 2017)
("Witness and Exhibit Lists plus 3500 material shall be produced: By the Govt to the defense within
50 days of trial"); *United States v. Barrett*, 153 F. Supp. 3d 552, 576 (E.D.N.Y. 2015) (ordering
government to produce witness list 45 days prior to trial, in part because the case "allegedly
involve[d] a highly complex health care fraud scheme" and "voluminous documents"); *Vilar*, 530 F.
Supp. 2d at 638-39 (directing government to produce witness list 60 days in advance where
indictment alleged conspiracy to commit securities fraud, substantive securities violations, wire
fraud, money laundering, and other non-violent offenses); *United States v. Chalmers*, 474 F. Supp. 2d
555, 573 (S.D.N.Y. 2007) (granting pretrial disclosure of witness list "given the large volume of
documents produced by the Government"); *United States v. Rueb*, No. 00 Cr. 91 (RWS), 2001 U.S.
Dist. LEXIS 943, at *23-24 (S.D.N.Y. Feb. 5, 2001) (ordering witness list to be disclosed at least 30
days prior to trial because, in part, "offenses charged in the indictment spanned a period of

approximately three years"); *Nachamie*, 91 F. Supp. 2d at 579-80 (granting early disclosure of witness list in health care fraud action).

In this case, where the charges in the indictment concern alleged events beginning at least seven years ago that span the course of over four years and involve multiple unrelated conspiracies—*and* the defense has been buried in the government's production of millions of pages of discovery—the government should be ordered to disclose its witnesses 60 days in advance of trial.

## VIII.   THE GOVERNMENT MUST PROMPTLY DISCLOSE AND/OR IDENTIFY *BRADY* AND *GIGLIO* MATERIAL

"*Brady* and its progeny require the Government to disclose material information that is favorable to the accused, either because it is exculpatory, or because it is impeaching . . . in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 225-26 (2d Cir. 2007) (internal quotation marks and citations omitted); *see also, e.g.*, *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) ("The more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an opportunity for use.") (internal quotation marks omitted).

Here, the government has provided no indication of when it intends to provide defense counsel with *Brady* or *Giglio* material. Rather, as recently as a document production letter dated March 6, 2017, the government has simply continued to repeat its mantra that it "[t]o date . . . is unaware of any *Brady* material . . . but will provide timely disclosure if any such material comes to light," and that it will provide *Giglio* material "in a timely manner prior to trial." (*See* Serpe Decl., Ex. 2 at 2.) However, given such critical factors as the scope of the allegations, the number of cooperating co-defendants, and the fact that the government has been actively investigating this case for at least five years, it seems highly unlikely that the government has not identified any exculpatory or impeachment information. Accordingly, Mr. Isaza Tuzman respectfully requests that the Court

order the government to produce all *Brady/Giglio* material in its possession forthwith.

Similarly, in addition to any *Brady/Giglio* material that has not been produced to date, to the extent any such material exists within the voluminous discovery the government has already produced, the government should also be directed to identify such materials. The government has had many of these materials for several years, putting it in a better position to timely identify *Brady/Giglio* material and avoid forcing the defense to search for "an exculpatory needle in a haystack of discovery materials." *See United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013); *see also, e.g.*, *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002) (vacating judgment for failure to identify two-page piece of *Brady* material out of "reams" of disclosure). In fact, *defense counsel* has identified—and informed the government of its identification of—a critical piece of exculpatory evidence: a timeline created by Maiden in which he acknowledges to his counsel that the supposed agreement to purchase KITD stock at the heart of the government's allegations of market manipulation had no effect on Maiden's purchasing decisions. Even though Maiden says "I was planning to purchase it anyway as I liked the stock so agreed [to the purported agreement]," the government disputes that this document contains exculpatory information (*see* Dkt. #171 at 4 ("Tuzman claims that these documents are exculpatory, even though they are not remotely so.")), further highlighting its stingy and incorrect application of its *Brady* obligations. *See United States v. Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004) (fact that evidence may be viewed as both incriminatory and exculpatory does not disabuse it of its status as *Brady* material).

Finally, Mr. Isaza Tuzman's request for an order requiring the production and/or identification of *Brady/Giglio* material is not limited to documents in the prosecutors' possession. It is well-settled that, when the government conducts a "joint investigation" with another agency, "the prosecutor's duty extends to reviewing the materials in the possession of that other agency for *Brady* evidence." *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012). "[A]ny argument that the

Government's duty" under *Brady* and its progeny does not extend to reviewing materials "merely

because another agency, not the USAO, is in actual possession of the documents created or

obtained as part of the joint investigation is both hypertechnical and unrealistic." *Id.* (internal

quotation marks and citation omitted); *see also United States v. Martoma*, 990 F. Supp. 2d 458, 460

(S.D.N.Y. 2014) (Gardephe, J.) ("Courts in this District apply this 'joint investigation' analysis in

assessing the USAO's obligations with respect to *Brady* and *Giglio* material held by the SEC.") (citing

*Gupta*); United States Attorney's Manual ("USAM") § 9-5.001(B)(2) (defining prosecution team for

purposes of disclosing exculpatory and impeachment material to include "federal, state, and local law

enforcement officers and other government officials participating in the investigation and

prosecution of the criminal case against the defendant").

      The government's duty to search documents outside its possession has previously been the

subject of motion practice in this case. On October 19, 2016, Mr. Isaza Tuzman moved to compel

the government to review material in the SEC's possession for *Brady/Giglio* material. (*See* Dkt. #132-

134.) As a result of that motion, the government agreed to treat its investigative file on Mr. Isaza

Tuzman and the SEC's investigative file on Mr. Isaza Tuzman as if they were compiled pursuant to a

"joint investigation" for purposes of its *Brady/Giglio* disclosure obligations. (*See, e.g.*, Serpe Decl., Ex.

1 (E-mail from USAO to defense counsel, dated Jan. 11, 2017) ("We are aware that we agreed to

discharge our discovery obligations under the assumption of a joint-investigation with [the SEC

investigation]. If we identify materials that warrant production or disclosure, we will produce and/or

disclose."); Dkt. #178 (Joint Letter to Judge Gardephe, dated Nov. 28, 2016) ("[T]he Government

informed defense counsel that it would voluntarily search the entirety of the SEC investigative file . .

. for all Rule 16, *Brady*, *Giglio* and Jencks Act material without limitation to the categories identified

by counsel for Tuzman. . . . The Government further represented that while it maintains that its

investigation was parallel to the civil investigation conducted by the SEC, and reserves all rights in

that regard, the Government agrees that, with respect to all discovery issues in this case—including the scope of discovery review—it will operate as if a finding of a joint investigation had been made."); Dkt. #172 (Letter from USAO to Judge Gardephe, dated Nov. 17, 2016) at 4 n.6 ("[O]nce the Government obtains the SEC's May 20, 2016 Production, those materials will be in the Government's possession and will be subject to the Government's obligations under *Brady*, *Giglio*, and their progeny.") (citations omitted).)

To date, however, the government has not made a single *Brady/Giglio* disclosure from its review of the SEC joint investigation files. Indeed, despite the passage of four months, the government has not even confirmed that it has completed its review of the joint investigation documents for such material. Accordingly, Mr. Isaza Tuzman respectfully renews his request for the Court to order the government to hold to its agreement and immediately produce and/or identify all *Brady/Giglio* material within the SEC's investigative files.

## IX.   THE COURT SHOULD PERMIT MR. ISAZA TUZMAN TO JOIN IN HIS CO-DEFENDANTS' MOTIONS AND TO FILE ADDITIONAL MOTIONS

Finally, Mr. Isaza Tuzman respectfully requests to join the motions of his trial co-defendants, Omar and Irfan Amanat, to the extent that they are applicable to him. Notably, Irfan's deadline to file pretrial motions is not until May 26, 2017.

Additionally, given the large volume of discovery in this case, Mr. Isaza Tuzman respectfully requests that he retain the ability to file motions regarding any deficiencies in the government's document production and/or suppression of evidence, as appropriate.

## CONCLUSION

For the foregoing reasons, Defendant Kaleil Isaza Tuzman respectfully requests that the Court grant his pretrial motions, and enter an order: (1) dismissing the S8 Indictment and requiring the government to proceed on the conspiracy counts in the S1 Indictment on which Mr. Isaza Tuzman was extradited, or, alternatively, striking the offending allegations from the S8 Indictment; (2) severing Mr. Isaza Tuzman's trial from the trial of the Amanats; (3) directing the government to serve a limited bill of particulars; (4) directing the government to disclose its Rule 404(b) evidence no later than 60 days prior to trial; (5) directing the government to produce 3500 material no later than 60 days prior to trial; (6) directing the government to identify its trial exhibits no later than 60 days prior to trial; (7) directing the government to identify the witnesses it will call at trial no later than 60 days prior to trial; (8) directing the government to promptly disclose and identify all *Brady* and *Giglio* material; and (9) permitting Mr. Isaza Tuzman to join in his co-defendants' motions and to file additional motions, as appropriate.

Dated:  March 31, 2017
        New York, New York

                                      **/s/ Silvia L. Serpe**
                                      Silvia L. Serpe
                                      Paul W. Ryan
                                      SERPE RYAN LLP
                                      1115 Broadway, 12th Floor
                                      New York, NY 10010
                                      Tel: 212-257-5010
                                      sserpe@serperyan.com
                                      pryan@serperyan.com

                                      Avi Weitzman
                                      GIBSON, DUNN & CRUTCHER, LLP
                                      200 Park Avenue
                                      New York, NY 10166
                                      Tel: 212-351-4000
                                      aweitzman@gibsondunn.com

                                      *Attorneys for Kaleil Isaza Tuzman*