UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

KALEIL ISAZA TUZMAN,

Defendant.

S8 15 Cr. 536 (PGG)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KALEIL ISAZA
TUZMAN'S  OMNIBUS MOTIONS *IN LIMINE***

GIBSON, DUNN & CRUTCHER LLP

AVI WEITZMAN
AMER S. AHMED
*aweitzman@gibsondunn.com*
*aahmed@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone:      (212) 351-4000
Facsimile:      (212) 351-4035

MARCELLUS ANTONIO McRAE (*pro hac vice*)
*mmcrae@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:      (213) 229-7000
Facsimile:      (213) 229-7520

*Attorneys for Defendant Kaleil Isaza Tuzman*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL STANDARD................................................................................................... 5

ARGUMENT ............................................................................................................... 6

    I.      The Court Should Exclude Evidence of Acts Not Charged in the S1
            Indictment. .......................................................................................... 6

    A.     Relevant Background.......................................................................... 7
    B.     The Rule of Specialty Precludes the Government from Charging Mr. Isaza
            Tuzman with the New Facts and Allegations Contained in the S8
            Indictment and Bill of Particulars Letters. ........................................... 12

    II.     The Court Should Exclude Evidence of Acts Not Charged in the May
            2017 Bill of Particulars Letter That Were Added In August 2017. ..................... 15

    A.     Relevant Background........................................................................... 16
    B.     Allegations in the Government's Belated and Unauthorized Supplement to
            its Bill of Particulars Should be Precluded. ......................................... 18

    III.    The Court Should Exclude Any Evidence or Argument of Rima Jameel's
            Fugitive Status or Her Prior Crimes.................................................... 23

    A.     Relevant Background........................................................................... 23
    B.     The Court Should Exclude Evidence that Rima Jameel is a Fugitive and
            Faces Unrelated Criminal Charges Because Such Evidence is Not
            Relevant under FRE 402 and Unfairly Prejudicial under FRE 403..................... 24

    IV.    The Court Should Preclude the Government from Offering "Other Act"
            Evidence Pursuant to Rule 404(b). ...................................................... 27

    V.     The Court Should Exclude Evidence or Allegations of Unrelated, Alleged
            Threats of Physical Violence by Mr. Isaza Tuzman Against the Amanats. ........ 32

    A.     Relevant Background........................................................................... 32
    B.     The Court Should Exclude Evidence and Testimony Related to Mr. Isaza
            Tuzman's Alleged Threats to the Amanats as Irrelevant, Inflammatory,
            and Unduly Prejudicial. ...................................................................... 33

    VI.    The Court Should Exclude Evidence of Mr. Isaza Tuzman's Wealth or
            Spending Habits. ................................................................................ 37

    A.     Relevant Background........................................................................... 37

# TABLE OF CONTENTS
### (continued)

Page

B. Allegations or Evidence Regarding Mr. Isaza Tuzman's Assets, Income, or Alleged Spending Habits is Irrelevant and Unduly Prejudicial...................... 39

VII. The Court Should Permit the Jury To Hear Evidence and Argument Concerning Mr. Isaza Tuzman's Consciousness of Innocence With Regard to the Charges Against Him. ................................................................................. 41

A. Relevant Background.................................................................................... 41

B. The Court Should Permit the Jury to Hear Evidence and Argument Regarding Mr. Isaza Tuzman's Consciousness of Innocence. ........................... 42

VIII. Before Admitting Out-of-Court Statements Against Mr. Isaza Tuzman Under Rule 801(d)(2)(E), the Court Should Hold a Hearing and Rule on Their Admissibility Outside the Jury's Presence.................................................. 47

A. Relevant Background.................................................................................... 47

B. Governing Legal Principles ......................................................................... 48

C. The Large Number of Alleged Co-conspirators and Anticipated Vast Reliance on Hearsay Make a Hearing Outside the Presence of the Jury Necessary to Determine Whether the Government Can Make its Rule 802 Predicate Showings. ............................................................................... 53

IX. Mr. Isaza.Tuzman Joins In Any Applicable Pretrial Motions In Limine Filed By Co-defendant Omar Amanat. ............................................................. 56

CONCLUSION..................................................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. United States*,
    417 U.S. 211 (1974)........................................................................................................49

*Antwi v. United States*,
    349 F. Supp. 2d 663 (S.D.N.Y. 2004)...........................................................................14

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
    138 F. Supp. 2d 357 (E.D.N.Y. 2001) ......................................................................5, 33

*Bourjaily v. United States*,
    483 U.S. 171 (1987)...........................................................................................49, 52, 54

*Cole v. Arkansas*,
    333 U.S. 196 (1948)........................................................................................................18

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    74 F. Supp. 3d 639 (S.D.N.Y. 2015)..............................................................................43

*Fed. Ins. Co. v. Mertz*,
    No. 12-CV-1597-NSR-JCM, 2016 WL 1572995 (S.D.N.Y. Apr. 18, 2016) ..........................39

*Gonzalez v. Digital Equipment Corp.*,
    8 F. Supp. 2d 194 (E.D.N.Y. 1998) ..............................................................................34

*Huddleston v. United States*,
    485 U.S. 681 (1988)....................................................................................................6, 28

*Ismail v. Cohen*,
    899 F.2d 183 (2d Cir. 1990)...........................................................................................28

*Kinsey v. Cendant Corp.*,
    588 F. Supp. 2d 516 (S.D.N.Y. 2008)............................................................................40

*Luce v. United States*,
    469 U.S. 38 (1984)............................................................................................................5

*McKoy v. N. Carolina*,
    494 U.S. 433 (1990)........................................................................................................43

*Old Chief v. United States*,
    519 U.S. 172 (1997)........................................................................................................34

*Palmieri v. Defaria*,
    88 F.3d 136 (2d Cir. 1996)...............................................................................................5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*U.S. v. Al-Moayad*,
    545 F.3d 139 (2d Cir. 2008)..............................................................................25, 50

*U.S. v. Fahl*,
    No. 2:01-mj-01005-1 (E.D. Pa.) ....................................................................25

*U.S. v. Law*,
    528 F.3d 888 (D.C. Cir. 2008) .......................................................................39

*U.S. v. Vaught*,
    485 F.2d 320 (4th Cir. 1973) ....................................................................25, 26

*United States v. Anderson*,
    575 F. Supp. 31 (S.D.N.Y. 1983) (Sotomayor, J.)...................................34

*United States v. Baez*,
    349 F.3d 90 (2d Cir. 2003) (per curiam).........................................12, 13

*United States v. Bazezew*,
    783 F. Supp. 2d 160 (D.D.C. 2011)...............................................................53

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989)........................................................................49

*United States v. Bender*,
    218 F.2d 869 (7th Cir. 1955) .......................................................................19

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990).....................................................43, 44, 45, 46

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987)..........................................................................18

*United States v. Carrasco*,
    381 F.3d 1237 (11th Cir. 2004) (per curiam).......................................28

*United States v. Cassese*,
    290 F. Supp. 2d 443 (S.D.N.Y. 2003), *aff'd*, 428 F.3d 92 (2d Cir. 2005)..............................40

*United States v. Check*,
    582 F.2d 668 (2d Cir. 1978)..........................................................................35

*United States v. Chen*,
    378 F.3d 151 (2d Cir. 2004)..........................................................................18

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Clark*,
18 F.3d 1337 (6th Cir. 1994) ...................................................................................50

*United States v. Colombo*,
909 F.2d 711 (2d Cir. 1990)...........................................................................34, 36

*United States v. Costello*,
221 F.2d 668 (2d Cir. 1955)...................................................................................34

*United States v. Cuevas*,
847 F.2d 1417 (9th Cir. 1988) ...............................................................................14

*United States v. Cummings*,
858 F.3d 763 (2d Cir. 2017)..........................................................................34, 35, 36

*United States v. Curley*,
639 F.3d 50 (2d Cir. 2011).....................................................................................35

*United States v. Daugerdas*,
No. S3 09 Cr. 581, SDNY Feb 16 2011 WL 573587 ......................................29, 30

*United States v. Detrich*,
865 F.2d 17 (2d. Cir. 1988)....................................................................................43

*United States v. DiMaria*,
727 F.2d 265 (2d Cir. 1984)...................................................................................46

*United States v. Downing*,
297 F.3d 52 (2d Cir. 2002).....................................................................................28

*United States v. Ewings*,
936 F.2d 903 (7th Cir. 1991) ..................................................................................40

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011)...................................................................................49

*United States v. Frank*,
8 F. Supp. 2d 253 (S.D.N.Y. 1998).........................................................................6

*United States v. Gabinskaya*,
829 F.3d 127 (2d Cir. 2016)...................................................................................27

*United States v. Geaney*,
417 F.2d 1116 (2d. Cir. 1969)..........................................................................50, 51

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Germain,*
33 F. App'x 565 (2d Cir. 2002) ........................................................................................19

*United States v. Giffen,*
379 F. Supp. 2d 337 (S.D.N.Y. 2004)...........................................................................28, 29

*United States v. Gigante,*
166 F.3d 75 (2d Cir. 1999)...............................................................................................49

*United States v. Glaze,*
313 F.2d 757 (2d Cir. 1963)..............................................................................................19

*United States v. Goffer,*
721 F.3d 113 (2d Cir. 2013)..............................................................................................45

*United States v. Gonzalez,*
275 F. Supp. 2d 483 (S.D.N.Y. 2003).............................................................................12, 13

*United States v. Gonzalez-Montoya,*
161 F.3d 643 (10th Cir. 1998) ..........................................................................................51

*United States v. Guzman,*
754 F.2d 482 (2d Cir. 1985).............................................................................................18

*United States v. Hatfield,*
685 F. Supp. 2d 320 (E.D.N.Y. 2010) ...........................................................................39, 40

*United States v. Hill,*
279 F. App'x 90 (2d Cir. 2008) ........................................................................................25

*United States v. Hoover,*
246 F.3d 1054 (7th Cir. 2001) ..........................................................................................52

*United States v. Jackson,*
627 F.2d 1198 (D.C. Cir. 1980) ........................................................................................51

*United States v. James,*
590 F.2d 575 (5th Cir. 1979) ........................................................................................50, 51

*United States v. Jasper,*
No. 00-cr-825-PKL, 2003 WL 221740 (S.D.N.Y. Jan. 31, 2003).........................................39

*United States v. Jurado-Rodriguez,*
907 F. Supp. 568 (E.D.N.Y. 1995) ....................................................................................14

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Khan*,
   993 F.2d 1368 (9th Cir. 1993) ............................................................13

*United States v. Kohan*,
   806 F.2d 18 (2d Cir. 1986)...............................................................43

*United States v. Levy*,
   905 F.2d 326 (10th Cir. 1990) ...........................................................14

*United States v. Livoti*,
   8 F. Supp. 2d 246 (S.D.N.Y. 1998)..............................................29, 30

*United States v. Martoma*,
   No. 12 Cr. 973 (PGG), 2014 WL 31213 (S.D.N.Y. Jan. 6, 2014)...............29, 30

*United States v. Martonak*,
   187 F. Supp. 2d 117 (S.D.N.Y. 2002).....................................................14

*United States v. Mitchelson*,
   51 F.3d 283 (9th Cir. 1995) ...........................................................40

*United States v. Morgan*,
   786 F.3d 227 (2d Cir. 2015)...............................................................35

*United States v. Moss*,
   344 F. Supp. 2d 1142 (W.D. Tenn. 2004)..............................................13

*United States v. Mulder*,
   273 F.3d 91 (2d Cir. 2001)................................................................20

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000)..............................................29, 30

*United States v. Paredes*,
   176 F. Supp. 2d 183 (S.D.N.Y. 2001)....................................................53

*United States v. Paredes*,
   176 F. Supp. 2d 192 (S.D.N.Y. 2001)....................................................5

*United States v. Paroutian*,
   299 F.2d 486 (2d Cir. 1962)...............................................................13

*United States v. Perez*,
   489 F.2d 93 (5th Cir. 1987) ...........................................................19

vii

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Puentes*,
    50 F.3d 1567 (11th Cir. 1995) ....................................................................................14

*United States v. Qamar*,
    671 F.2d 732 (2d Cir. 1982)........................................................................................34

*United States v. Rajaratnam*,
    No. S1 13 Cr. 211 (NRB), Dkt. 90 (S.D.N.Y. June 6, 2014)....................................45

*United States v. Rauscher*,
    119 U.S. 407 (1886)....................................................................................................14

*United States v. Reda*,
    765 F.2d 715 (8th Cir. 1985) .....................................................................................52

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007)........................................................................................19

*United States v. Roberts*,
    No. 01 Cr. 410, 2001 WL 1602123 (S.D.N.Y. Dec. 14, 2001) .................................29

*United States v. Saneaux*,
    365 F. Supp. 2d 493 (S.D.N.Y. 2005)..................................................................52, 54

*United States v. Schatzle*,
    901 F.2d 252 (2d Cir. 1990).......................................................................................36

*United States v. Scheffer*,
    523 U.S. 303 (1998) (Stevens, J. dissenting)............................................................46

*United States v. Scott*,
    677 F.3d 72 (2d Cir. 2012)....................................................................................15, 27

*United States v. Solnin*,
    81 F. Supp. 3d 193 (E.D.N.Y. 2015) ...................................................................28, 29

*United States v. Stahl*,
    616 F.2d 30 (2d Cir. 1980).........................................................................................40

*United States v. Sterling*,
    2017 WL 2304024 (S.D.N.Y. May 24, 2017) ..........................................................34

*United States v. Suarez*,
    791 F.3d 363 (2d Cir. 2015).......................................................................................12

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Taveras*,
No. 94 Cr. 766 (LAP), 1995 WL 600860 (S.D.N.Y. Oct. 11, 1995) .....................................29

*United States v. Tellier*,
83 F.3d 578 (2d Cir. 1996) ...................................................................................................50

*United States v. Thevis*,
474 F. Supp. 117 (N.D. Ga. 1979) .......................................................................................20

*United States v. Thirion*,
813 F.2d 146 (8th Cir. 1987) ...............................................................................................14

*United States v. Tipton*,
572 F. App'x 743 (11th Cir. 2014) ......................................................................................52

*United States v. Tomaiolo*,
249 F.2d 683 (2d Cir. 1957) .................................................................................................26

*United States v. Tracy*,
12 F.3d 1186 (2d Cir. 1993) ............................................................................49, 51, 53, 54

*United States v. Ulbricht*,
79 F. Supp. 3d 466 (S.D.N.Y. 2015) ....................................................................................15

*United States v. Valenti*,
60 F.3d 941 (2d Cir. 1995) ..................................................................................................30

*United States v. Williams*,
585 F.3d 703 (2d Cir. 2009) .................................................................................................15

*United States v. Yuras*,
198 F. Supp. 425 (S.D.N.Y. 1961) .......................................................................................19

**Other Authorities**

Lohade, Nikhil, "Dubai Aims to Be a City Built on Blockchain," WALL ST. J.,
April 24, 2017, *available at* https://www.wsj.com/articles/dubai-aims-to-be-a-
city-built-on-blockchain-1493086080; .................................................................................23

U.S. Census Bureau, "Quick Facts," *available at*
https://www.census.gov/quickfacts/fact/table/westchestercountynewyork,dutc
hesscountynewyork,bronxcountybronxboroughnewyork,newyorkcountymanh
attanboroughnewyork,US/INC110215 ..................................................................................38

## TABLE OF AUTHORITIES

(continued)

Page(s)

WALL ST. J., April 13, 2017, *available at* https://www.wsj.com/articles/dubai-aims-to-be-the-transportation-city-of-tomorrow-1492092911 .................................................23

**Treatises**

2 Wigmore on Evidence § 293 (J. Chadbourn rev. ed. 1979)..................................................44, 46

**Constitutional Provisions**

Fifth and Sixth Amendments ........................................................................................18

U.S. Const. Amend. V ...............................................................................................18

U.S. Const. Amend. VI..............................................................................................18

## PRELIMINARY STATEMENT

From the time it first indicted this case in August 2015, the government has relied on prejudicial litigation tactics tantamount to trial by ambush.  Just in the last month, the record lays bare the extent to which Mr. Isaza Tuzman has been handicapped in preparing a vigorous defense to the government's ever-shifting and ever-expanding allegations.  Rather than making full and fair discovery, the government withheld millions of pages from one of the most critical pieces of evidence in this prosecution: the laptop Robin Smyth used contemporaneously with all of the transactions that allegedly underlie the conspiracy counts against Mr. Isaza Tuzman.  *See* Dkt. 379.  Holding true to its pattern of inadequate disclosure—and last-minute supplementation—the government submitted barebones summaries of anticipated expert testimony (making sensible responses all but impossible), and unilaterally amended its bill of particulars just one month before trial (adding brand-new allegations requiring substantial defensive investigation).  *See* Dkt. 379.  And the government issued pretrial subpoenas to third parties from the shadows, without judicial authorization, while insisting on secrecy from the recipients.  Dkt. 365.  All this after the government professed the need to strictly abide by the rules—leaving Mr. Isaza Tuzman languishing in Colombian prison while a formal extradition process played out, even though he had repeatedly volunteered to surrender.

But at trial, rules are essential if the jury is not to be overwhelmed by minutiae and swayed by bias.  In a complex case like this one—involving two co-defendants, many alleged co-conspirators, intricate financial transactions, and potentially dozens of percipient and expert witnesses—the importance of *in limine* rulings cannot be overstated as a means of leveling the playing field and preventing the government from capitalizing on unfairly prejudicial evidence or unfair surprise.  Each of the motions *in limine* Mr. Isaza Tuzman brings herewith is directed at

1

ensuring that only evidence relating to those issues properly before the jury is offered by the government at trial.

The threshold question for pretrial resolution is, of course, precisely what underlying evidence may be submitted for jury deliberation on the three conspiracy counts. As to that question, the Court should preclude the government from presenting evidence of acts or transactions not identified in the first indictment—on the limited basis of which Mr. Isaza Tuzman was extradited from Colombia to the United States—because permitting evidence or argument on those expanded allegations would violate the Rule of Specialty and international comity. The government has never refuted that the Colombian Supreme Court placed clear restrictions on Mr. Isaza Tuzman's extradition to the United States—specifically, a total prohibition against his being tried "under any circumstances" for any "prior or different acts" other than those identified in the first indictment—which limitations restricted, in binding manner, the legitimate scope of any subsequent prosecution. All of the new factual allegations— including new theories of liability, new alleged fraudulent schemes, and new alleged co-conspirators (some of which have been added as recently as August 2017)—that were not included in the original indictment on which Mr. Isaza Tuzman was extradited should be off limits for trial. Indeed, the new allegedly fraudulent transaction noticed by the government for the first time in August 2017 via an unauthorized supplemental bill of particulars was belated and should be stricken entirely.

The government should also be precluded from presenting evidence or argument on purely collateral matters, such as the past fugitive status of the attorney retained by KIT digital, Inc. ("KIT digital" or "KITD"), and Mr. Isaza Tuzman's wealth or spending habits. These topics have no logical connection to any of the issues of consequence for trial, would invite

impermissible inferences, and would only inflame the jury against Mr. Isaza Tuzman.  Likewise,
unverified hearsay statements concerning alleged threats of violence made by Mr. Isaza Tuzman
against the Amanat brothers should be excluded because they come with no indicia of reliability
(indeed, the record suggests they are unreliable), likely cannot be tested via cross-examination,
and are unfairly prejudicial with no redeeming probative value.  The government should also be
precluded from introducing "other act" evidence because it blew through its agreed-upon
deadline to provide any such material to defendants.  Nor should the government be permitted to
publish out-of-court co-conspirator statements to the jury without first making the requisite
predicate showing to this Court that those statements were made by co-conspirators in
furtherance of the charged conspiracy and satisfy each of the elements of Rule 801(d)(2)(E).
Finally, to ensure the mounting of a fair defense with regard to the central issue of scienter, the
jury should be permitted to hear evidence of Mr. Isaza Tuzman's consciousness of innocence, as
reflected in his repeated travels to the United States while under investigation, his offers through
counsel to cooperate with federal authorities, and his repeated efforts to return voluntarily to the
United States following his indictment.

Accordingly, Mr. Isaza Tuzman brings these motions *in limine* to exclude or permit the
following categories of evidence, or request other judicial relief:

I. The Court should exclude evidence or argument regarding acts alleged for the
first time in the S8 Indictment and the government's subsequent Bill of
Particulars that were not included in the S1 Indictment and for which Mr.
Isaza Tuzman is immune from prosecution under the Rule of Specialty;

3

II.    The Court should exclude evidence of acts not charged in the May 2017 Bill of Particulars Letter that were subsequently added by government letter in August 2017 absent judicial leave to supplement;

III.    The Court should exclude evidence or argument that Rima Jameel—an attorney for KIT Digital who, at all relevant times, was a licensed and reputable attorney in the United Arab Emirates—is a fugitive from the United States or has been charged with prior tax-related crimes;

IV.    The Court should preclude the government from offering "other act" evidence pursuant to Rule 404(b) that it has not yet provided defendants in violation of the parties' agreement;

V.    The Court Should exclude evidence or allegations of unrelated, alleged threats of physical violence by Mr. Isaza Tuzman against Omar or Irfan Amanat;

VI.    The Court should exclude evidence of Mr. Isaza Tuzman's wealth or spending habits;

VII.    The Court should permit the jury to hear evidence and argument concerning Mr. Isaza Tuzman's consciousness of innocence with regard to the charges against him;

VIII.    Before admitting out-of-court statements against Mr. Isaza Tuzman under Rule 801(d)(2)(E), the Court should hold a hearing and rule on the statements' admissibility outside the jury's presence; and

IX.    Mr. Isaza Tuzman joins in any applicable pretrial motions in limine filed by co-defendant Omar Amanat.

## **LEGAL STANDARD**

"The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *United States v. Paredes*, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (approving the practice).

The Federal Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is ***of consequence to the determination of the action*** more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). Evidence that is not relevant is not admissible. Fed. R. Evid. 402.

"Relevance is more a concept than a definition, and its determination requires consideration of several factors. The basic concept is that an item of proof is relevant if it tends to prove or disprove any material issue of fact in a case. If the item of proof does not tend to prove or disprove the factual issue then it is irrelevant and inadmissible." 2 Weinstein, Weinstein's Federal Evidence § 401.02 (2009). Materiality is thus often described as the touchstone for evaluating whether evidence or argument should reach the jury. *See, e.g.*, *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 138 F. Supp. 2d 357, 365 (E.D.N.Y. 2001) ("If a proposition of fact is not required to be proved under the applicable rule of substantive law, and thus is not material, any evidence introduced solely to prove or disprove it, directly or indirectly, is irrelevant and inadmissible; an evidentiary proposition is considered 'relevant' only if it is logically related, either directly or through an inferential chain of proof, to at least one of the formal elements of the charges made or defenses raised in the case—*e.g.*, a material proposition of fact.").

The purpose of the relevance limitation is to ensure that "nothing is received into evidence that is not logically probative of some matter to be proved" and, relatedly, to ensure that even arguably probative evidence remain out if "clearly excluded by law or policy." Weinstein, § 402.02; *see United States v. Frank*, 8 F. Supp. 2d 253, 268 (S.D.N.Y. 1998) ("Rule 403 expresses the twin goals of any criminal proceeding: to allow in as much relevant information as would be helpful to the finder of fact, without prejudicing the rights of the defendant."); *see also* Fed. R. Evid. 403 advisory committee's note (1972) ("The case law recognizes that certain circumstances call for the exclusion of evidence which is of unquestioned relevance."). For that reason, even "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading a jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Rule 404(b) further provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence is only admissible for non-character purposes—such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

## ARGUMENT

## I.    The Court Should Exclude Evidence of Acts Not Charged in the S1 Indictment.

On March 16, 2016, the Colombia Supreme Court consented to Mr. Isaza Tuzman's extradition to the United States on only three of the eight counts initially charged by the government in the S1 Indictment, and on the express condition that Mr. Isaza Tuzman "cannot, ***under any circumstance***, be tried for prior or different acts than those which are reason and

6

authorization for his extradition." (*See* Dkt. 264-5 (Ex. 5 to Decl. of Silvia L. Serpe, dated Mar.

31, 2017 ("Serpe Decl.") at 93 ("Extradition Order") (emphasis added).)  Flouting that directive,

the government filed in December 2016 the (operative) S8 Indictment, which substantially

expands the nature and scope of the allegations against Mr. Isaza Tuzman beyond what the

Colombia Supreme Court certified as the basis for his extradition.  Five months later, the

government went further and expanded the allegations against Mr. Isaza Tuzman via a Bill of

Particulars that—for the first time—identified twelve alleged "fabricated" contracts and two

additional companies that were part of the alleged "accounting fraud scheme" but were never

referenced in the S1 Indictment on which Mr. Isaza Tuzman was extradited.  The Rule of

Specialty prohibits the government from prosecuting Mr. Isaza Tuzman on the basis of these

improperly expanded allegations.

### A.    Relevant Background

On August 12, 2015, the government obtained the sealed first superseding indictment (the

"S1 Indictment") against Mr. Isaza Tuzman.  (Dkt. 7.)  Three weeks later, on September 7, 2015,

Mr. Isaza Tuzman was arrested in Colombia pursuant to a provisional arrest warrant.  The

government requested Mr. Isaza Tuzman's extradition pursuant to the United States-Colombia

extradition treaty and Colombian law that together permit Colombia to detain an individual for

up to 60 days until the United States presents a formal extradition request to the Colombian

foreign ministry, which the United States did on October 21, 2015.[1]  (*See* Dkt. 21 (Letter from

---

[1]  Even though Mr. Isaza Tuzman and his counsel repeatedly requested that Mr. Isaza Tuzman
be allowed to voluntarily surrender to United States officials located in Colombia for safe
and secure transport to the United States, the government refused, contending that it was
bound to follow the precise letter of the extradition procedures under the extradition treaty.
(*See* Dkt. 21 (Nov. 18, 2015 Letter) at 7 ("The government explained that . . . it was not
aware of a situation in which an arrested defendant was released to circumvent the
extradition process."); *see also* Dkt. 28-1 (Decl. of Magdalena A. Boynton, dated Nov. 25,
2015 ("Boynton Decl.")), ¶ 24 ("Other than simplified extradition, there is no vehicle under

AUSA Williams to Judge Gardephe, dated Nov. 18, 2015 ("November 18 Letter")) at 3.)  As part

of the extradition package, the government provided the S1 Indictment.  (*See* Dkt. 264 (Serpe

Decl.); Dkt. 264-5 (Extradition Order) at 4; *see also* Dkt. 264-6 (Serpe Decl., Ex. 6 ("extradition

package")) at 32-87.)

On March 16, 2016, the Colombia Supreme Court issued its ruling on the government's

extradition request.  The Court ***denied*** extradition under Counts Two, Four, Six, Seven and Eight

of the S1 Indictment (the substantive counts), and consented to Mr. Isaza Tuzman's extradition

***solely*** on Counts One, Three and Five of the S1 Indictment (the conspiracy counts).  (Extradition

Order at 95.)  The three conspiracy counts with regard to which the Colombia Supreme Court

consented to Mr. Isaza Tuzman's extradition are summarized as follows:

- Count One:  Alleged conspiracy to commit securities fraud.  The government
  alleged that Mr. Isaza Tuzman conspired with "CC-2"—who we now know to be
  cooperating co-defendant Stephen E. Maiden—to "artificially inflate the share
  price and trading volume" of shares of KIT digital between December 2008 and
  September 2011, via a series of purchase-and-sale transactions between accounts
  controlled by Maiden.  (S1 Indictment ¶¶ 9-14.)

- Count Three:  Alleged conspiracy to commit wire fraud from March 2009 through
  March 2011.  The government alleged that Mr. Isaza Tuzman caused KIT digital
  to invest in Maiden's hedge fund in order to facilitate the purchases of KIT digital
  shares, but failed to disclose to KIT digital shareholders that this investment was
  "not part of an arms-length relationship" and that the investment was instead
  intended to assist Maiden's fund in its efforts to artificially increase the share
  price of KIT digital.  (S1 Indictment ¶ 31.)

- Count Five:  Alleged conspiracy to commit securities fraud via false statements in
  SEC filings and false statements to auditors from 2010 through 2012.  (S1
  Indictment ¶ 45.)  The government alleged that Mr. Isaza Tuzman and "CC-1"—
  who we now know to be cooperating co-defendant Robin Smyth—conspired to
  inflate KIT digital revenue via (1) improper revenue recognition from a

_____

Colombian law that would permit Tuzman's expedited transfer to U.S. custody prior to the
Supreme Court and Presidential approval of the pending extradition request.")); Boynton
Decl. ¶¶ 16-17; *see also* Dkt. 28-8 (Declaration of Virginia P. Prugh, dated Nov. 24, 2015
("Prugh Decl.")), ¶ 3 ("Colombia extradites fugitives to the United States in accordance with
the Extradition Treaty and pursuant to their domestic law."); Prugh Decl., ¶ 11 ("The
government of Colombia takes extraditions and the legal rights of the fugitives seriously.").)

"perpetual license" contract for KIT digital software in connection with the sale of a product to The Country Network ("TCN") (S1 Indictment ¶¶ 52-66) and various licensing agreements resulting from the purchase by KIT digital of the assets of Sezmi Corporation ("Sezmi") (S1 Indictment ¶¶ 67-77), and (2) the execution of alleged "round trip" transactions in connection with KIT digital's acquisition of Sezmi.  (S1 Indictment ¶¶ 78-93.)

In addition to limiting Mr. Isaza Tuzman's extradition to these three conspiracy charges exclusively, the Colombia Supreme Court placed several "conditions" on Mr. Isaza Tuzman's extradition.  Most relevant here, the Court ordered that Mr. Isaza Tuzman "***cannot, under any circumstance, be tried for prior or different acts than those which are reason and authorization for his extradition***."  (Extradition Order at 93 (emphasis added).)  This condition was reiterated in the April 8, 2016 order from the Colombian President authorizing Mr. Isaza Tuzman's extradition, in which the President stated that "under no circumstances" may Mr. Isaza Tuzman be "judged on facts prior to or distinct from those which authorized and motivated [his] extradition."  (Dkt. 264-9 (Serpe Decl., Ex. 9) at 3 ("Extradition Resolution").)  Mr. Isaza Tuzman was subsequently extradited to the United States subject to these conditions.

Despite the Colombia Supreme Court's clear directive, on December 22, 2016 the government filed the subsequent (and operative) S8 Indictment.  (Dkt. 198.)  The S8 Indictment charges additional defendants ***not*** charged in the S1 Indictment (namely, Mr. Isaza Tuzman's co-defendants Omar Amanat and Irfan Amanat[2] (collectively, "the Amanats")), and identifies new co-conspirators (*e.g.*, United Arab Emirates-based attorney Rima Jameel).  In violation of the well-established Rule of Specialty doctrine and international comity, the S8 Indictment also includes additional "prior or different acts" allegedly committed by Mr. Isaza Tuzman (*see* Extradition Order at 93)—including new theories of liability and new allegedly fraudulent schemes—that manifestly were not included in the original S1 Indictment on which Mr. Isaza

---

[2]  The Court has severed the charges against Irfan Amanat for trial.

Tuzman was extradited.  These allegations against Mr. Isaza Tuzman are contained in Counts Four, Five, and Six of the S8 Indictment.

In particular, the S8 Indictment adds extensive allegations regarding the Amanats' Dubai-based investment company, Enable Invest Ltd. ("Enable") and the Amanats' alleged defrauding of investors in Maiden Capital—who were invested in Enable—by hiding trading losses.  (S8 Indictment ¶¶ 14-46.)  These new paragraphs also allege that Mr. Isaza Tuzman caused KIT digital to invest $6.5 million in Enable (S8 Indictment ¶ 23); learned by March 2009 that Enable was insolvent (S8 Indictment ¶ 32); and engaged in efforts to hide the Enable losses from Maiden's investors. (S8 Indictment ¶ 42.)  The S8 Indictment applies these brand-new alleged acts to materially expand each of the three conspiracy counts against Mr. Isaza Tuzman.

The S8 Indictment also substantially expands the nature and scope of the accounting-fraud allegations set forth in Count Six.  The S8 Indictment includes new allegations that Mr. Isaza Tuzman and cooperating co-defendant Smyth employed a method to "recognize[] revenue from contracts that had been fabricated for the sole purpose of boosting KITD's revenue."  (S8 Indictment ¶ 99; *see also id*. ¶ 97.)  The S8 Indictment further adds new allegations regarding a British Virgin Islands entity, Jourdian Invest., Ltd., including the allegation that it was created by Smyth and previously unidentified co-conspirator Ms. Jameel with Mr. Isaza Tuzman's "knowledge and approval," and that it was "KITD-funded."  (S8 Indictment ¶¶ 113, 115.) Finally, the S8 Indictment includes new allegations regarding alleged round-trip transactions, and alleges that Mr. Isaza Tuzman and Smyth facilitated their "illegal revenue recognition scheme" via an escrow account in the United Arab Emirates controlled by Ms. Jameel.  (S8 Indictment ¶¶ 116-119, 143(d), 143(h), 143(k)-(n).)

The government did not stop there.  In further disregard for the Colombia Supreme Court's Extradition Order and the Rule of Specialty, in May 2017 the government provided a Bill of Particulars that greatly expanded the S8 Indictment far beyond what the Colombia Supreme Court and the applicable extradition resolution ever authorized.  (*See* Ex. A. Letter from AUSA Williams to S. Serpe and A. Weitzman dated May 1, 2017 ("Bill of Particulars Letter").)  ***More than a year after the Colombia Supreme Court had approved Mr. Isaza Tuzman's extradition on limited grounds***, the government, for the first time in 2017, named twelve alleged "fabricated" contracts entered into as part of the alleged "accounting fraud scheme":  (1) Crosshaven; (2) Wolfgang; (3) Xun-Jia; (4) Reckford; (5) A-Digi; (6) Sollet; (7) Ben Peaks; (8) CP Rights Ltd.; (9) Bimini Trading Ltd.; (10) Stamphill; (11) PVD; and (12) M10.  (Bill of Particulars Letter at 2.)  The government's Bill of Particulars did not expound further on how these entities were used in, or furthered, the accounting-fraud scheme.

In addition to entirely new "fabricated" contracts never previously identified in the S1 Indictment, the government identified in its Bill of Particulars entirely new round-trip transactions involving restructuring reserves.  Initially, in the S1 Indictment, the only such allegation involving allegedly improper restructuring reserves concerned the December 2011 Sezmi transaction.  However, in the government's May 2017 Bill of Particulars Letter, the government identified "the June 2011 Peerset transaction" as another round-trip transaction in which an alleged fraudulent restructuring fee was used.  (Bill of Particulars Letter at 2.)  Later, just five weeks prior to trial on August 24, 2017, the government without authorization supplemented its Bill of Particulars and identified KIT digital's "February 2011 acquisition of Worldwide Broadcast Systems Inc." ("WWB") as yet another alleged transaction that employed

a "fraudulent restructuring fee."  (*See* Ex. B, Letter from AUSA Williams to E. Creizman, J.

Shellow, and A. Weitzman, dated Aug. 24, 2017 ("August 24 Letter").)

> **B.      The Rule of Specialty Precludes the Government from Charging Mr. Isaza Tuzman with the New Facts and Allegations Contained in the S8 Indictment and Bill of Particulars Letters.**

Because the Colombia Supreme Court surrendered Mr. Isaza Tuzman to the United States

only on Counts One, Three, and Five of the S1 Indictment with the ***express condition that Mr.***

***Isaza Tuzman "cannot, under any circumstance, be tried for prior or different acts than those***

***which are reason and authorization for his extradition***," the government cannot now charge

Mr. Isaza Tuzman with the new facts, allegations, and theories contained in the S8

Indictment,Bill of Particulars Letter, and August 24 Letter.  Under any reading of the Colombian

Extradition Order, the litany of new allegations contained in the S8 Indictment and additional

letters constitute "prior or different acts," which the government is barred from including in any

prosecution of Mr. Isaza Tuzman.

The Rule of Specialty "generally requires a country seeking extradition to adhere to any

limitations placed on prosecution by the surrendering country."  *United States v. Baez*, 349 F.3d

90, 92 (2d Cir. 2003) (per curiam).  As the Second Circuit recently explained—in the context of

extraditions from Colombia no less—"extradition documents such as Diplomatic Notes implicate

the same international legal rights as treaties because a violation of an extradition agreement may

be an affront to the surrendering sovereign."  *United States v. Suarez*, 791 F.3d 363, 367 (2d Cir.

2015) (internal quotation marks and citations omitted); *see also United States v. Gonzalez*, 275 F.

Supp. 2d 483, 486 n.6 (S.D.N.Y. 2003).  Thus, courts should interpret the obligations imposed by

extradition agreements and accompanying diplomatic notes "very literally, applying canons of

statutory and treaty construction."  *Gonzalez*, 275 F. Supp. 2d at 488.  Honoring the Rule of

Specialty is "the classical deference" courts must "afford to the political branches in matters of foreign policy." *Baez*, 349 F.3d at 93.

The touchstone of the Specialty analysis is determining the intent of the extraditing country as expressed in the extradition order. *United States v. Paroutian*, 299 F.2d 486, 490-91 (2d Cir. 1962). In conducting this analysis, courts should consider "whether the extraditing country . . . would object to what actually took place after extradition." *Gonzalez*, 275 F. Supp. 2d at 487. A subsequent prosecution on grounds that contravene "the clear language of the extradition resolution" cannot move forward under any circumstances. *United States v. Moss*, 344 F. Supp. 2d 1142, 1146–48 (W.D. Tenn. 2004) (dismissing allegations in indictment that Costa Rican extradition resolution had declared to be non-extraditable); *see also United States v. Khan*, 993 F.2d 1368, 1375 (9th Cir. 1993) (dismissing count from indictment "[b]ecause Pakistan did not unambiguously agree to extradite [the defendant] on the basis of Count VIII").

The extradition treaty between the United States and Colombia at issue here precludes **"[a] person extradited under the Treaty [from being] detained, tried or punished . . . based on . . . facts [that were not] contained in the extradition request"** (*see* Dkt. 264-8 ("Extradition Treaty") art. 15, §§ 1-2(a)), and the Colombia Supreme Court reminded the United States of these limitations by plainly announcing restrictions on Mr. Isaza Tuzman's extradition and subsequent prosecution. The S8 Indictment seeks, however, to try Mr. Isaza Tuzman on far broader conspiracy counts that are premised on new "facts," theories, and affirmative acts that were not enumerated in the extradition request. These include allegations and theories involving Enable; allegations of complicity in a scheme by Maiden to defraud his own investors; allegations of new co-conspirators; and allegations of new round-trip transactions. *See supra*. Not one of these allegations or theories was included in the counts presented to the Colombia

Supreme Court, on the basis of which that Court authorized Mr. Isaza Tuzman's extradition. The government paid lip-service to the importance of strictly adhering to Colombian extradition rules when convenient—leaving Mr. Isaza Tuzman languishing in a Colombian prison for almost one year—yet shoehorned new allegations into every one of the counts against Mr. Isaza Tuzman it now seeks to prosecute. To make matters worse, the government arrogated to itself the authority to expand the allegations against Mr. Isaza Tuzman even further through two Bill of Particulars Letters—identifying twelve alleged "fabricated" contracts and two additional allegedly fraudulent round-trip transactions (Peerset and WWB). *See supra*.

Although the government insists that Mr. Isaza Tuzman lacks prudential standing to assert the Rule of Specialty (*see* Dkt. 282 (April 21, 2017 Opp. To Defs.' Omnibus Pretrial Mot.) at 12-17), the Supreme Court has long held the opposite. In *United States v. Rauscher*, 119 U.S. 407, 431 (1886), the Supreme Court held that the defendant could challenge the government's charging decisions under the Rule of Specialty—even though the extraditing country there (Great Britain) did not officially object. In so doing, the Supreme Court made clear that criminal defendants are entitled to enforce the Specialty rights created by treaty between the United States and the extraditing country. *Id.* at 418-19. Following that clear directive, in the 130 years since *Rauscher*, at least four circuit courts and several district courts in the Second Circuit have endorsed a defendant's standing to assert Specialty rights, regardless of any official challenge by the extraditing country.[3] (*See* Dkt. 263 (March 31, 2017, Tuzman's Pretrial Mot.) at 3-12.)

---

[3] *See, e.g.*, *United States v. Puentes*, 50 F.3d 1567, 1575 (11th Cir. 1995); *United States v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990); *United States v. Cuevas*, 847 F.2d 1417, 1426 (9th Cir. 1988); *United States v. Thirion*, 813 F.2d 146, 151 n.5 (8th Cir. 1987); *Antwi v. United States*, 349 F. Supp. 2d 663, 670 (S.D.N.Y. 2004); *United States v. Martonak*, 187 F. Supp. 2d 117, 122 (S.D.N.Y. 2002); *United States v. Jurado-Rodriguez*, 907 F. Supp. 568, 576 (E.D.N.Y. 1995).

Finally, because—under the Rule of Specialty—the only charges and allegations properly before the Court for trial are those that were included in the S1 Indictment, the Court should bar all evidence and argument concerning conduct alleged for the first time in the S8 Indictment and Bill of Particulars Letters under Rules 404(b) and 403. *See supra* (recounting new alleged facts advanced by government as basis for prosecution). Absent the government's improper supplementation of the S1 Indictment, evidence concerning these acts constitutes classic *extrinsic* evidence that is barred by Rule 404(b) because it will serve no purpose other than to "adversely reflect on [Mr. Isaza Tuzman's] character" and "invite speculation" about his "propensity" to commit the three conspiracy charges that are permissibly at issue. *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012). At a minimum, such evidence of additional charged conduct is unduly prejudicial to Mr. Isaza Tuzman and collateral to the issues properly before the jury.[4]

## II.    The Court Should Exclude Evidence of Acts Not Charged in the May 2017 Bill of Particulars Letter That Were Added In August 2017.

As described herein, the government filed an expansive, yet conspicuously imprecise, Superseding Indictment in December 2016 that violates the Rule of Specialty. *See supra*. Five months later, the government further expanded the allegations against Mr. Isaza Tuzman via a Bill of Particulars Letter. *See id*. This Bill of Particulars Letter enumerated co-conspirators, deceived auditing firms, fraudulent and misleading statements, two round-trip transactions, and identified—for the first time—twelve alleged "fabricated" contracts and two additional companies that were part of the alleged "accounting fraud scheme." *See id*.

---

[4]  Nor is introducing such evidence by any means required to "complete the story of the crimes [properly] charged." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 491 (S.D.N.Y. 2015); *see United States v. Williams*, 585 F.3d 703, 705 (2d Cir. 2009). Notably, in the S1 Indictment the government was able to tell a complete story of the three conspiracy counts at issue without any reference to this extrinsic conduct.

On August 24, 2017, approximately five weeks before trial, the government provided

counsel for Mr. Isaza Tuzman with yet more supplemental allegations to its Bill of Particulars

Letter.  (*See* August 24 Letter.)  The August 24 Letter purports to add an additional co-

conspirator as well as an entirely new corporate acquisition by KIT digital that was allegedly

fraudulently structured.  These late disclosures—as with the many additional late disclosures that

the government has made over the past several weeks (*see* Dkt. 379, 383)—are highly prejudicial

to Mr. Isaza Tuzman and should be precluded because (i) the government did not seek the

Court's permission to amend its Bill of Particulars as is required under Federal Rule of Criminal

Procedure 7(f), and (ii) the belated disclosure of these allegations, compounded with a lack of

particularity, will deprive Mr. Isaza Tuzman of a fair trial.

      **A.**     **Relevant Background**.

The government filed the (operative) S8 Indictment on December 22, 2016.  The S8

Indictment sets forth a nebulous conspiracy allegation in Count Six, which opaquely alleges that

Mr. Isaza Tuzman "and Smyth, **_with others_**, devised and executed a scheme to inflate falsely

KITD's revenue scheme," including through the "improper recognition of revenue" and "the

execution of fraudulent 'round-trip' transactions."  (S8 Indictment ¶ 97 (emphasis added).)  The

S8 Indictment further alleges that Mr. Isaza Tuzman, Smyth, and other unnamed co-conspirators

"recognized the revenue **_from certain contracts_** at the time of sale" and recognized "revenue

from contracts that had been fabricated for the sole purpose of boosting KITD's revenue."  (S8

Indictment ¶ 99 (emphasis added).)

In light of the sprawling S8 Indictment, on March 27, 2017, counsel for Mr. Isaza

Tuzman sent the Court a request to endorse a letter memorializing an agreement with the

government for a bill of particulars that the government agreed to provide by April 28, 2017.

(*See* Dkt. 260 (Letter from S. Serpe to Judge Gardephe dated March 27, 2017 ("March 27

Letter").)  In the March 27 Letter, counsel for Mr. Isaza Tuzman informed the Court that the government had agreed to provide, among other items, (1) "[t]he identity of all presently-known alleged co-conspirators," and (2) a "list of all presently-known alleged round-trip transactions." (*Id.*)  The government further agreed "to supplement the information if and when additional information comes to light."  (*Id.*)  On April 4, 2017, the Court endorsed the agreement regarding a bill of particulars.  (*See* Dkt. 261 (Letter from S. Serpe to Judge Gardephe, endorsed Apr. 4, 2017).)

On May 1, 2017, the government provided counsel for Mr. Isaza Tuzman with the agreed-upon bill of particulars.  The May Bill of Particulars Letter identified the following co-conspirators:  Irfan Amanat, Omar Amanat, Gavin Campion, Rima Jameel, Stephen Maiden, Robin Smyth, Petr Stransky, and David Vogel.  (Bill of Particulars Letter at 1.)  The Bill of Particulars Letter also identified the following corporate acquisitions by KIT digital that allegedly employed fraudulent round-trip transactions: (1) "the June 2011 Peerset transaction" and (2) "the December 2011 Sezmi transaction."  (*Id.* at 2.)

On August 24, 2017—over three months after the government provided defense counsel with its Bill of Particulars and just weeks away from the start of trial—the government impermissibly supplemented the Bill of Particulars Letter with new facts, allegations, and theories.  Notably, the government's August 24 Letter identified, for the first time, a third corporate acquisition by KIT digital incorporating an allegedly fraudulent structure, "the February 2011 acquisition of Worldwide Broadcast Systems Inc.," as well as an additional co-conspirator, Tomas Petru.  (August 24 Letter at 1.)  But the August 24 Letter failed to provide any particulars regarding these new allegations that would allow defense counsel to prepare an

17

adequate defense.  These additions are inconsistent with the government's promise to provide

any such information *four months ago*, as reflected in the March 27 Letter.

> **B.      Allegations in the Government's Belated and Unauthorized Supplement to its
> Bill of Particulars Should be Precluded.**

The government's eleventh-hour supplementation to its Bill of Particulars is contrary to

applicable law, its prior agreement, and basic fairness.  The Fifth and Sixth Amendments protect

Mr. Isaza Tuzman's rights to timely notice of the charges against him and a fair opportunity to

prepare his defense.  *See* U.S. Const. Amends. V & VI.  Indeed, "[n]o principle of procedural

due process is more clearly established than that notice of the specific charge, and a chance to be

heard in a trial on the issues raised by that charge, if desired, are among the constitutional rights

of every accused in a criminal proceeding . . . ."  *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).

An indictment that fails to provide timely notice and a sufficient opportunity to prepare for trial

is constitutionally inadequate, and a criminal defendant may not be tried on charges as to which

he has had insufficient time to prepare his defense.  *See United States v. Guzman*, 754 F.2d 482,

486 (2d Cir. 1985) (reversing conviction where, shortly before trial, superseding indictment

broadened conspiracy period from two days to years and defendant had insufficient opportunity

to prepare a defense against the expanded charge).

Although the indictment, standing alone, must satisfy these constitutional requirements,

Federal Rule of Criminal Procedure 7(f) allows the defendant to seek a bill of particulars "where

the charges of the indictment are so general that they do not advise the defendant of the specific

act of which he is accused."  *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (citing Fed.

R. Crim. P. 7(f)); *United States v. Bortnovsky*, 820 F.2d 572, 572 (2d Cir. 1987) (reversing

conviction and ordering new trial where government failed to provide timely notice of

information "vital to [the defendant's] understanding of the charges pending and the preparation

of a defense").  The purpose of the bill of particulars is to "enabl[e] [the] defendant to prepare for trial" and to "prevent surprise."  *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007).  The government's proof at trial must therefore be "strictly limited to proving what [the bill of particulars] has set forth in it."  *United States v. Germain*, 33 F. App'x 565, 566 (2d Cir. 2002) (quoting *United States v. Glaze*, 313 F.2d 757, 759 (2d Cir. 1963)).  A bill of particulars may only be amended "subject to such conditions as justice requires."  Fed. R. Crim. P. 7(f); *United States v. Perez*, 489 F.2d 93, 94 (5th Cir. 1987) ("[T]he decision to allow an amendment [to a bill of particulars] is within the discretion of the trial court . . . ."); *United States v. Bender*, 218 F.2d 869, 874-75 (7th Cir. 1955) ("Whether or not amendment [of a bill of particulars] should be allowed is in the discretion of the trial court . . . .").  Therefore, "[a]bsent a timely amendment of the bill of particulars, it concludes the rights of all parties to be affected by it, and he who has furnished the bill of particulars under it must be confined to the particulars he has specified as closely and effectually as if they constituted essential allegations in a special declaration."  *United States v. Yuras*, 198 F. Supp. 425, 428 (S.D.N.Y. 1961) (quotation marks omitted).

Here, the government's bid to supplement its May 2017 Bill of Particulars mere weeks before trial must be stricken for several reasons.

*First*, the government did not seek leave of court.  While the government provided some necessary detail to its S8 Indictment in the May 2017 Bill of Particulars Letter, the government now unilaterally seeks to supplement that Bill of Particulars three months later and just weeks before the start of trial.  Such unfair surprise is precisely the reason why court permission is required *before* the government may amend a bill of particulars.  *See Bender*, 218 F.2d at 874 (allowing a last-minute amendment to a bill of particulars only because court found that it "*did not* amount to a surprise allegation which defendant was not given time to meet" where the

amendment simply redefined the term "gross income" (emphasis added)); *United States v. Thevis*, 474 F. Supp. 117, 123 (N.D. Ga. 1979) (allowing amendment to a bill of particulars "on such terms as to avoid prejudicial surprise to the defendant").

**Second**, even had the government sought leave to amend, such belated disclosure of additional alleged conduct just weeks before trial is highly prejudicial to the defense and should be precluded.  In *United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001), the Second Circuit declined to find prejudice after substantive changes were made in a superseding indictment three weeks before trial because the defendants were ***offered, and refused***, additional time to prepare. *Mulder*, 273 F.3d at 100.  When the government later amended its bill of particulars to identify additional construction sites as the basis for a conspiracy count, the court declined to find prejudice because the changes were only minor in nature.  *Id*.  Those mitigating circumstances are not present here.  The defendants have not been afforded additional time to prepare, despite the last-minute expansion of the factual allegations underlying the conspiracy counts.  Nor are the additions minor in any sense: adding a new co-conspirator (Mr. Petru, who resides in Europe) and an entirely new allegedly fraudulent restructuring transaction (WWB) requires the defense to now investigate and respond to a new supposed accounting fraud scheme never before alleged.  Such changes should have been made through a superseding indictment (although the Rule of Specialty would prohibit that here, *see supra*.  These supplements should be rejected weeks before the start of trial when Mr. Isaza Tuzman has received no additional time to prepare a defense.

Indeed, the disclosure of the government's supplemental allegations one month from trial—while defense counsel has diligently been preparing a defense based on the already-overbroad S8 Indictment and Bill of Particulars Letter—is highly prejudicial.  In assembling his

defense, counsel for Mr. Isaza Tuzman has relied on the assumption that WWB was not alleged to be a fraudulent round-trip transaction and the government's prior identification of known co-conspirators.  As a result of this reliance, counsel has diligently been interviewing witnesses, identifying exhibits, and preparing expert disclosures geared only towards the specific allegations contained in the S8 Indictment and the May 2017 Bill of Particulars Letter.  The effort required to prepare an entirely new defense to these supplemental allegations can hardly be overstated.  Such an expansion of the allegations is highly prejudicial because, among other things, the subpoenas to KIT digital and others apparently did not reference WWB, which renders the existing documentary record regarding this new subject incomplete and necessitates intensive investigative efforts.  Nor can it be overstated how detrimental it will be to defense counsel's already-extensive trial-preparation efforts to divert counsel's attention to investigate, prepare, and respond to these wholly new allegations.  This Court recently noted that, "[g]iven the magnitude of discovery, adding defendants, or substantially changing the indictment, is going to disturb the schedule that's in place."  (Jan. 10, 2017 Conference Tr. at 23:21-23.)  Despite that admonition, the government has done just that.

Moreover, while the government agreed in its May 2017 Bill of Particulars Letter to provide supplemental information as it became available, the factual basis for these new allegations were known to the government long ago given the cooperation of government witnesses Robin Smyth since late 2015 and Gavin Campion since early 2016.  The government met with and debriefed Smyth eight times between November 2015 and February 2016, and subsequently met with and debriefed Campion five times in May and June 2016.  The recently-disclosed 3500 materials makes it undeniably plain that the government has known of both the WWB transaction and Mr. Petru's alleged involvement in fraud since at least 2015.  Indeed, the

government discussed Mr. Petru and the WWB transaction extensively with Smyth at Smyth's first two proffer sessions on November 12, 2015 (Petru) and November 20, 2015 (Petru and WWB), and continued to do so in long sessions throughout 2015 and 2016. Similarly, the government discussed Mr. Petru with Campion in Campion's very first proffer session of May 31, 2016, and discussed WWB with Campion on June 3, 2016. In sum, the government had extensive knowledge and a surfeit of opportunities, beginning almost two years ago, to discover and disclose the information contained in the August 24, 2017 supplemental Bill of Particulars, and its abject failure to do so cannot be sanctioned by permitting it to move the goalposts so late in the game.

*Third*, not only has the government supplemented its Bill of Particulars unfairly at a stage where it could not file a superseding indictment, but it has not even provided defense counsel with adequate particulars. The government has failed to identify how the restructuring fee employed in KIT digital's purchase of WWB was fraudulent, whether the restructuring fee allegedly "round-tripped" the restructuring fee as alleged in connection with the Sezmi transaction, and, if so, where that money went and how it had any material effect on KIT digital's quarterly or yearly financial results. Nor has the government identified in what way or with which of the government's equally complex and unclear conspiracy charges Mr. Petru was involved. Absent such particulars, defense counsel simply has no ability to respond or defend against these new allegations.

For all of the foregoing reasons, the Court should preclude the government from introducing evidence of the newly alleged fraudulent transaction and co-conspirator, and hold the government (at least) to the May 2017 Bill of Particulars Letter.

III. **The Court Should Exclude Any Evidence or Argument of Rima Jameel's Fugitive Status or Her Prior Crimes.**

The Court should preclude the government from introducing evidence that Rima Jameel, an attorney who performed corporate legal work for KIT digital from a law firm based in the United Arab Emirates ("UAE"), is a fugitive from the United States because the probative value of such evidence is far outweighed by its unfair prejudice. Evidence concerning Ms. Jameel's legal status in the United States has no bearing on the charges against Mr. Isaza Tuzman; rather, it inaccurately suggests—and could unfairly lead the jury to conclude—that Mr. Isaza Tuzman is guilty of the charged crimes by virtue of his association with someone with a prior criminal record in the United States. Such an inference is impermissible and unduly prejudicial, particularly because Ms. Jameel is a credentialed attorney in the UAE who has worked with, and for, numerous international law firms and companies, and the government cannot credibly show that Mr. Isaza Tuzman had prior knowledge of Ms. Jameel's fugitive status.

A. **Relevant Background.**

In recent years, Dubai has grown into a major hub for trade, technology, and innovation. *See, e.g.*, Lohade, Nikhil, "Dubai Aims to Be a City Built on Blockchain," WALL ST. J., April 24, 2017, *available at* https://www.wsj.com/articles/dubai-aims-to-be-a-city-built-on-blockchain-1493086080; Parasie, Nicolas, "Dubai Aims to Be the Transportation City of tomorrow," WALL ST. J., April 13, 2017, *available at* https://www.wsj.com/articles/dubai-aims-to-be-the-transportation-city-of-tomorrow-1492092911. KIT digital—like many multinational companies—retained law firms around the globe, including in Dubai, to advise it on corporate matters and to perform corporate transactions. One of the international law firms that KIT digital retained was JB Legal Consulting: a UAE-based firm run by Rima Jameel ("JB Legal").

23

Between JB Legal and other global firms similarly retained, KITD contracted to have available reliable legal services 24 hours a day across jurisdictions.

Mr. Isaza Tuzman first began working with Ms. Jameel when she was employed by Motei and Associates—a boutique law firm based in Dubai.  When Ms. Jameel left Motei and Associates to form her own firm, Mr. Isaza Tuzman continued to bring work to her.  In performing work for KIT digital and other U.S. clients, Ms. Jameel often worked across from major global law firms, including, for example, the Palo Alto-based Wilson Sonsini. As is relevant here, the government alleges that Ms. Jameel conspired with Mr. Isaza Tuzman and others by performing fraudulent transactions on behalf of KIT digital.  (S8 Indictment ¶¶ 113, 116.)  Specifically, the S8 Indictment alleges that Robin Smyth and Ms. Jameel created a fake entity called Jourdian Invest "for the improper purpose of using KITD money to make purported 'loans' to KITD customers who were either unwilling or unable to pay the bills they purportedly owed to KITD."  (*Id.*, ¶ 113.)  The Indictment further alleges that Ms. Jameel controlled and later concealed "fraudulent escrow accounts" that Mr. Isaza Tuzman and others used to execute "round-trip transactions."  (*Id.*, ¶ 116; *see also id.* ¶¶ 117-19.)  While the S8 Indictment includes no allegations regarding Mr. Jameel's fugitive status, the government has referenced her fugitive status in connection with bail arguments.

**B.    The Court Should Exclude Evidence that Rima Jameel is a Fugitive and Faces Unrelated Criminal Charges Because Such Evidence is Not Relevant under FRE 402 and Unfairly Prejudicial under FRE 403.**

At trial, the government may seek to introduce evidence that Ms. Jameel is currently a fugitive from the United States in connection with alleged tax crimes that are remote in both time and substance from any matter charged in the Indictment.  But evidence of the charges against her has no conceivable factual or legal relevance to the charges against Mr. Isaza Tuzman.  It is settled that "[i]n a prosecution for conspiracy[,] the acts and words of an alleged co-conspirator"

outside the scope of the charged conspiracy "are totally irrelevant." *U.S. v. Vaught*, 485 F.2d
320, 323 (4th Cir. 1973).  Evidence concerning Ms. Jameel's fugitive status and alleged prior
crimes is therefore inadmissible because such evidence is "entirely outside the scope of the
charged conspiracy," and there is "no evidence or argument that [Mr. Isaza Tuzman] was
involved" in Ms. Jameel's alleged criminal conduct—or even had knowledge of it—"prior to the
time frame charged in the [S8 I]ndictment." *United States v. Hill*, 279 F. App'x 90, 95 (2d Cir.
2008); see also *U.S. v. Al-Moayad*, 545 F.3d 139, 160-62 (2d Cir. 2008); Fed. R. Evid. 402.

The charges against Mr. Isaza Tuzman concern alleged securities violations that occurred
during his tenure as CEO of KIT digital from 2008 to 2012.  In contrast, Ms. Jameel's alleged
prior criminal conduct concerns an alleged tax crime that occurred in 1996—more than a decade
earlier—and involved businesses in the garment-manufacturing industry.  Notably, Ms. Jameel
was named in that criminal complaint as "Rima Fahl," so a search of her professional name in
the UAE, Rima Jameel, would not even have turned up those charges against her. *See U.S. v.
Fahl*, No. 2:01-mj-01005-1 (E.D. Pa.).  Ms. Jameel was charged for her alleged involvement in
this scheme in 2001 and apparently fled the United States in 2002.  We understand that, since
that time, she has remained a licensed attorney in the UAE, was employed by a reputable law
firm, and had numerous multi-national companies as her clients.  The government cannot
plausibly argue that Ms. Jameel's fugitive status and alleged involvement in a tax-evasion
scheme 21 years ago is logically connected to the charges against Mr. Isaza Tuzman.  This
evidence fails at the threshold as "totally irrelevant." *Vaught*, 485 F.2d at 323.

Evidence or argument concerning Rima Jameel's fugitive status or prior crimes should
similarly be excluded under the balancing test prescribed by Rule 403. Even were the
government to cobble together some convoluted theory of relevance to a material issue at trial,

this evidence is bound to unfairly prejudice the jury against Mr. Isaza Tuzman and such unfair prejudice would substantially outweigh any probative value of the evidence.  For instance, such evidence could easily lead a jury to improperly conclude, among other things, that because Mr. Isaza Tuzman had business dealings with a fugitive, he must be a criminal too.  Any such inference would be impermissible, as Mr. Isaza Tuzman met Ms. Jameel in her capacity as a licensed attorney who had been employed by a well-respected UAE law firm, and was now running her own law firm.  The government has not proffered evidence that Mr. Isaza Tuzman **was even aware** of Ms. Jameel's legal troubles in this country at the relevant time.

The Second Circuit has recognized these dangers in analogous circumstances.  In reversing the defendant's conviction in *United States v. Tomaiolo*, 249 F.2d 683 (2d Cir. 1957), the Second Circuit explained that permitting evidence concerning co-conspirators' unrelated crimes is reversible error.  The court reasoned that by allowing such "inadmissible, irrelevant and highly prejudicial testimony, the district court permitted the prosecution to paint the defendant . . . as a bad man, associating with criminal companions, who would do most anything." *Tomaiolo*, 249 F.2d at 690.  The court concluded that such testimony was unfairly prejudicial under Rule 403 because it "made it impossible for the jury to limit its consideration to the charges for which [the defendant] was being tried." *Id*.  The Fourth Circuit reached precisely the same conclusion in *Vaught* and reversed the defendants' conviction on the basis that admission of evidence concerning a co-conspirators' prior bad acts "paint[ed]" the defendants "as bad men associating with a criminal companion," and that "the prejudice resulting from the admission of this evidence so permeated and tainted the entire trial as to require a reversal of [all] convictions." *Vaught*, 485 F.2d at 323-24.

There is an even greater danger that evidence of an alleged co-conspirator's unrelated crimes will unfairly prejudice the defendant, where, as here, the alleged co-conspirator provided legal services to the defendant (and his company).  Directly on point in that regard is *United States v. Gabinskaya*, 829 F.3d 127, 134 (2d Cir. 2016), where the Second Circuit held that the fact that, unbeknownst to the defendant, a lawyer had behaved unethically in the past "ha[d] little or no bearing on [the defendant's] knowing involvement" in the fraudulent scheme the lawyer was subsequently alleged to have assisted.  Mr. Isaza Tuzman indisputably had the right to seek appropriate legal counsel on behalf of KIT digital.  Whether Ms. Jameel allegedly had unrelated criminal dealings in the past "is not probative of [his] guilt or lack of guilt, and could easily . . . confuse[] the jury and waste[] time by diverting attention from the evidence relevant to [Mr. Isaza Tuzman's] conduct to the details of [Ms. Jameel's unrelated] unethical behavior."  *See Gabinskaya*, 829 F.3d at 134.

Because there is a substantial risk that evidence of Ms. Jameel's fugitive status and alleged prior crimes will mislead the jury and the evidence has no conceivable link to any fact of consequence in this action, all evidence, testimony, and argument that Ms. Jameel is a fugitive from the United States or engaged in past crimes should be barred under Rules 402 and 403.

## IV.   The Court Should Preclude the Government from Offering "Other Act" Evidence Pursuant to Rule 404(b).

Because the government did not provide notice of any Rule 404(b) evidence by the deadline of August 18, 2017—a deadline to which it had previously agreed—and because notice at this late hour would be unreasonable, the Court should preclude the government from offering "other act" evidence extrinsic to the offenses charged in the Indictment.

To be admissible, evidence of prior acts of the defendant that are not "direct evidence of or . . . otherwise inextricably intertwined" with the charged acts, *United States v. Scott*, 677 F.3d

27

72, 77 (2d Cir. 2012), must be: "(1) offered for a proper purpose, (2) relevant, . . . (3) substantially more probative than prejudicial . . . [and] (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction," *United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S. 681 (1988)).  The district court has "broad discretion" to decide whether or not to admit evidence related to extrinsic acts.  *Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir. 1990).

In addition, "Rule 404(b) of the Federal Rules of Evidence requires the government to provide 'reasonable notice' in advance of trial of its intent to use other-act evidence."  *United States v. Giffen*, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004).  Specifically, "the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice."  Fed. R. Evid. 404(b)(2).  This notice requirement:

> requires the prosecution to provide notice, regardless of how it intends to use the extrinsic act evidence at trial, *i.e.*, during its case-in-chief, for impeachment, or for possible rebuttal.  The court in its discretion may, under the facts, decide that the particular request or notice was not reasonable, either because of the lack of timeliness or completeness.  Because the notice requirement serves as condition precedent to admissibility of 404(b) evidence, the offered evidence is inadmissible if the court decides that the notice requirement has not been met.

Rule 404(b) advisory committee's note (1991).  The purpose of the pretrial notice requirement is "to reduce surprise and promote early resolution" of any challenge to admissibility of the proffered evidence.  *Id.*; *see also United States v. Solnin*, 81 F. Supp. 3d 193, 210 (E.D.N.Y. 2015).  Failure to comply with the pretrial notice requirement is a serious transgression that can be fatal to a conviction.  *See, e.g.*, *United States v. Carrasco*, 381 F.3d 1237, 1241–43 (11th Cir. 2004) (per curiam) (failure to provide notice of Rule 404(b) incidents that were not inextricably intertwined with charged offenses required reversal of conviction).

The precise meaning of "reasonable notice" for the purposes of Rule 404(b) is

"'determined by the circumstances of the case.'"  *United States v. Martoma*, No. 12 Cr. 973

(PGG), 2014 WL 31213, at *2 (S.D.N.Y. Jan. 6, 2014) (quoting *United States v. Roberts*, No. 01

Cr. 410, 2001 WL 1602123, at *14 (S.D.N.Y. Dec. 14, 2001)).  Courts in this district have

identified factors such as the ability of the defendant and the court to respond to the proffered

evidence, the safety of the prospective witness, and the importance of the evidence.  As one court

explained:

> This notice must occur sufficiently in advance of trial that the Defendant has time
> to object to the evidence and the Court has adequate time to decide such an
> objection.  While notice is typically provided no more than two to three weeks
> before trial, a longer notice period is appropriate [where there is an] absence of
> any threat to the safety of the prospective witness and the . . . Rule 404(b)
> evidence [is important to] this action.

*United States v. Nachamie*, 91 F. Supp. 2d 565, 577 (S.D.N.Y. 2000) (quoting *United States v.*

*Livoti*, 8 F. Supp. 2d 246, 250 (S.D.N.Y. 1998) (alterations in *Nachamie*)); *see also United States*

*v. Taveras*, No. 94 Cr. 766 (LAP), 1995 WL 600860, at *8 (S.D.N.Y. Oct. 11, 1995) (citing

cases).

In accordance with these precepts, courts have widely rejected shorter periods of notice

and insisted on 45 or 30 days' notice when a defendant makes an early demand for Rule 404(b)

notice, the case involves extensive evidence and complex transactions, and the evidence in

question has long been in the government's possession.  *See Solnin*, 81 F. Supp. 3d at 210

(ordering government to provide notice of all Rule 404(b) material no later than 45 days prior to

the start of trial); *United States v. Daugerdas*, No. S3 09 Cr. 581, 2011 WL 573587, at *1–2

(S.D.N.Y. Feb. 16, 2011) (finding one month's notice insufficient to allow defendants to

"adequately prepare to rebut evidence" related to certain transactions, in light of the "magnitude

of th[e] case"); *United States v. Giffen*, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004) (ordering

government to give notice of all Rule 404(b) material no later than 45 days before the start of

trial); *Nachamie*, 91 F. Supp. 2d at 577 (ordering government to notify defendants "no later than

one month prior to trial" when the government "ha[d] offered no good reason why it should not

notify defendants well in advance of trial"); *United States v. Livoti*, 8 F. Supp. 2d 246, 250

(S.D.N.Y. 1998) (ordering government to give notice of all Rule 404(b) material no later than 45

days prior to trial).[5]   In at least one case, a court in this district precluded the government from

introducing as 404(b) evidence certain exhibits disclosed to the defense approximately one

month before the start of trial.  *Daugerdas*, 2011 WL 573587, at *2.

        The reasonable notice period for disclosure of 404(b) has already been set by the parties'

agreement.  Specifically, the government agreed to a deadline to submit the Rule 404(b) material

45 days before trial, or by August 18, 2017, which deadline has long since expired.  On May 4,

2017, the government and predecessor counsel agreed to mutually set certain pretrial scheduling

dates, including that the government would provide Rule 404(b) material 45 days before the start

of trial (a period in line with the caselaw).  (*See* Ex. C (Email from AUSA Williams to S. Serpe

et al. dated May 4, 2017).)  This agreement was again detailed, cited, and attached in prior

briefing in this case.  (*See* Dkt. 284 (May 5, 2017 Tuzman's Reply Pretrial Mot) at 17 & Ex. A.)

This agreement was reasonable and it should be enforceable against the government; the

appropriate sanction for missing its agreed-to deadline should be preclusion of any attempt to

offer evidence under Rule 404(b).

---

[5]   In contrast, when the government disclosed newly-uncovered 404(b) material "as soon as
    practicable," this Court has accepted a shorter notice period as reasonable.  *United States v.
    Martoma*, No. 12 Cr. 973 PGG, 2014 WL 31213, at *2 (S.D.N.Y. Jan. 6, 2014) (citing
    *United States v. Valenti*, 60 F.3d 941, 945 (2d Cir. 1995)).

Even putting aside the government's prior commitment to provide Rule 404(b) material 45 days prior to trial, such a period is particularly reasonable—and indeed necessary—in the context of this case.  Due in no small part to the government's ever-changing and expanding theory of prosecution, this is an uncommonly complex and document-heavy case requiring substantial preparation to understand and defend the transactions at issue.  The discovery to date involves millions of pages of documents.  The transactions named in the latest Indictment involve technical issues of finance, accounting, and cutting-edge digital video technology, all of which counsel must study and discuss with experts to understand.  The case involves tens of fact witnesses and many expert witnesses, and is expected to last at least four weeks.  As extensively recounted herein, the government declared in May 2017 its intent to litigate over a dozen additional new alleged fraudulent transactions not named in the Indictment, and less than two weeks ago sent another letter announcing yet another alleged fraudulent transaction and purported co-conspirator.  *See supra*.  Each time the government adds a new transaction to this trial, the defense must re-review the relevant documents, re-interview witnesses, re-engage potential experts, and re-think its strategy.  The government should be barred from changing gears again on the eve of trial by suddenly identifying alleged 404(b) evidence.

Moreover, the government has investigated this case for over four years.  As a matter of fairness, it should not be able to surprise the defense and distract from trial preparation with Rule 404(b) evidence based on material presumably long in the government's possession.

For the foregoing reasons, the Court should hold the government to its word and preclude the government from any effort to belatedly disclose Rule 404(b) material, which would eviscerate the parties' prior agreement, violate the Rule's reasonable notice requirement, and unfairly prejudice the defense.

V.     **The Court Should Exclude Evidence or Allegations of Unrelated, Alleged Threats of Physical Violence by Mr. Isaza Tuzman Against the Amanats.**

The Court should preclude the government from advancing the highly charged accusation, or introducing any evidence or testimony, that Mr. Isaza Tuzman threatened violence against Irfan or Omar Amanat.  Defense counsel has already identified at least one document— from among the nearly two-thousand trial exhibits identified by the government to date—in which the Amanats make the false claim that Mr. Isaza Tuzman threatened them.  (*See* Dkt. 184-6, email from O. Amanat to S. Maiden and J. Karp dated May 28, 2010.)  Evidence concerning threats against the Amanats is irrelevant to the charges against Mr. Isaza Tuzman and would poison the jury's perception of him.  Pursuant to Rules 402 and 403, evidence or allegations regarding threats to the Amanats should be excluded.

A.     **Relevant Background.**

Mr. Isaza Tuzman believed that the Amanats stole millions of dollars from KIT digital, and was trying to get money back for his company as its CEO and chairman of the Board of Directors.  In what is a far cry from any threat of ***physical*** violence, Mr. Isaza Tuzman stated merely that he would "do everything within my power and ***within the limits of the law*** to enforce KIT digital's right and take action where appropriate" against the Amanats.  (Dkt. 184-3 at 3, email from K. Isaza Tuzman to O. Amanat dated Mar. 26, 2009 (upper-case removed).)   That statement encompasses how Mr. Isaza Tuzman intended to seek recourse after learning of the Amanats' malfeasance.  Nowhere in the emails the government seeks to introduce as evidence is there the remotest indication that Mr. Isaza Tuzman acknowledged threatening physical violence.  To the contrary, he disclaims having made any threats of violence or having hired "special collection agents," even when baited on the topic.  (*Id.* at 2.)

Nonetheless, Omar and Irfan Amanat self-servingly claim in emails and elsewhere that

Mr. Isaza Tuzman threatened them.  For example, Irfan Amanat wrote in an email that Mr. Isaza

Tuzman "screamed he would 'hunt me down'' because I stole his money' and I couldn't hide, if

I didn't sign [a settlement agreement] he would come after me."  (Dkt. 184-5 at 1 (Ex. E to

Government's Opposition to Tuzman's Motion to Modify Bail): February 6, 2011 email from

Irfan Amanat to Omar Amanat.)  Irfan Amanat also accused Mr. Isaza Tuzman of the following:

"He went ahead and hired 'special collection agents' from Colombia and Spain to pursue the

collection efforts.  Kaleil stated that if they don't collect from Mahmood they will kill Mahmood

or his family members as this is how some people do business there."  (Dkt. 184-3 at 2.)

Presumably, the Amanats made these accusations to elicit sympathy, manufacture a record of

signing settlements "under duress," and to distract from their own misconduct.  Regardless of the

Amanats' true reasons for making false accusations, any suggestion that Mr. Isaza Tuzman

allegedly threatened the Amanat brothers is irrelevant, misleading, and prejudicial.

> **B.    The Court Should Exclude Evidence and Testimony Related to Mr. Isaza Tuzman's Alleged Threats to the Amanats as Irrelevant, Inflammatory, and Unduly Prejudicial.**

Under Rules 402 and 403, the Court should exclude as irrelevant and unfairly prejudicial

any evidence or testimony regarding Mr. Isaza Tuzman's alleged threats against the Amanats.

Evidence of Mr. Isaza Tuzman's alleged threats against the Amanats has no relevance to

the charges against Mr. Isaza Tuzman.  "[A]n evidentiary proposition is considered 'relevant'

only if it is logically related, either directly or through an inferential chain of proof, to at least

one of the formal elements of the charges made or defenses raised in the case[.]"  *Philip Morris,

Inc.*, 138 F. Supp. 2d at 365 (citations omitted).

In this case, the ***only*** issue for Mr. Isaza Tuzman's trial is whether he knowingly and

intentionally participated in securities fraud and wire fraud.  The accusations lodged by the

Amanats—that Mr. Isaza Tuzman threatened physical violence against them, in order to secure

payment for a business obligation—have no bearing on the charges against Mr. Isaza Tuzman.

Were the Court to find the alleged threats pertinent to the issues at trial, Rule 403 would

nonetheless preclude admission of any evidence or testimony regarding these alleged threats.

Under Rule 403, evidence must be excluded "if its probative value is substantially outweighed

by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading a

jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  *See United*

*States v. Costello*, 221 F.2d 668, 674 (2d Cir. 1955) (evidence is inadmissible where it tends to

"mislead [rather] than [] enlighten the jury").  Unfair prejudice exists where a particular piece of

evidence has an "undue tendency to suggest decision on an improper basis, commonly, though

not necessarily, an emotional one."  *Gonzalez v. Digital Equipment Corp.*, 8 F. Supp. 2d 194,

199 (E.D.N.Y. 1998) (quoting *Old Chief v. United States*, 519 U.S. 172 (1997)); *see also United*

*States v. Colombo*, 909 F.2d 711, 714 (2d Cir. 1990) (precluding evidence "linking a defendant

to a rape he is not charged with" because "in the circumstance of a very close case[,]" such

evidence would "muddle the jury, and . . . lead them to convict the accused because he was in

general so loathsome"); *United States v. Sterling*, 2017 WL 2304024, at *6 (S.D.N.Y. May 24,

2017) (precluding evidence that was "entirely cumulative" of evidence already "before the jury

and . . . could only have caused further irrelevant distraction") (citations omitted).

While the admissibility of evidence related to death threats (like those the Amanats claim

were made here) is governed by the usual balancing test of Rule 403, *United States v. Anderson*,

575 F. Supp. 31, 33 (S.D.N.Y. 1983) (Sotomayor, J.), the Second Circuit repeatedly has

recognized that "potential prejudice for [alleged] death threats may be great."  *United States v.*

*Cummings*, 858 F.3d 763, 775 (2d Cir. 2017) (citing *United States v. Qamar*, 671 F.2d 732, 736

(2d Cir. 1982)).  Because "severe prejudice can result from the use of death threat testimony," the Second Circuit has instructed that courts "careful[ly] limit[]" its use to "situations where there was a clear need for the prosecution to use such evidence."  *United States v. Check*, 582 F.2d 668, 685 (2d Cir. 1978).  Here, there can be no serious dispute that the Amanats' (false) accusation that Mr. Isaza Tuzman previously "hired 'special collection agents,'" and told the collection targets that they would kill them or their family members (Dkt. 184-3 at 2.), has the extraordinary potential to inflame the jury.  That there is no "clear need" for this evidence to make the government's case is readily apparent.

Moreover, in a trial where the overwhelming majority of the evidence will consist of emails and documents regarding relatively monotonous financial transactions, the accusations of threats to the Amanats will unquestionably stand out as "the government's most dramatic evidence."  *United States v. Curley*, 639 F.3d 50, 63 (2d Cir. 2011); *see also United States v. Morgan*, 786 F.3d 227, 234 (2d Cir. 2015) (introduction of threat evidence was improper where the "testimony was highly charged, the letter read into the record was graphic and profane, and the proposed crime was unrelated to the charged offenses, and far more terrible").  Far from "merely corroborat[ing]" the government's narrative, such evidence would instead introduce the notion of violence into a case about alleged financial crimes.  *Curley*, 639 F.3d at 63.  This highly charged narrative poses an extraordinary risk of inciting the jury and creating unfair prejudice against Mr. Isaza Tuzman.

The risk that threat testimony would unfairly prejudice Mr. Isaza Tuzman is exacerbated by the fact that the documentary evidence of the threats are rank and inadmissible hearsay. While it is true that "hearsay dangers may be mitigated by cross-examination" in the ordinary course, *United States v. Cummings*, 858 F.3d at 777, the Amanats are co-defendants who will not

be subject to cross-examination.  As a result, Mr. Isaza Tuzman will be unable to challenge the veracity of the Amanats' false allegations of threats by Mr. Isaza Tuzman.

Moreover, there is good reason to question the truthfulness of the Amanats' accusation that they were threatened by Mr. Isaza Tuzman.  Mr. Irfan Amanat claims that Mr. Isaza Tuzman "screamed he would '***hunt me down***' because I stole his money.'"  (Dkt. 184-5 at 1.)  But this is not the first time the Amanats have invented threats by creditors screaming "hunt me down," only to be proven wrong.  (*Id.*)  Such contradictory evidence of routine manufacturing of threats would be relevant in all fairness to counteract the prejudice created by accusations that Mr. Isaza Tuzman threatened the Amanats, but all such countervailing evidence would require a "mini trial," and poses the risk of "focusing the jury on the wrong event."  *United States v. Schatzle*, 901 F.2d 252, 256 (2d Cir. 1990).  In addition, were the government to introduce evidence of threats against the Amanats, the jury would be led down a rabbit hole regarding irrelevant events that transpired nearly a decade ago.  In this highly complex and sprawling securities and accounting fraud trial, evidence of alleged threats would only confuse and distract jurors.  *See United States v. Colombo*, 909 F.2d 711, 714, 715 (2d Cir. 1990) (reversing conviction and ordering a new trial where prosecutor improperly dwelled on prejudicial evidence "despite his acknowledgment of the risk and assurance that he would not introduce such proof," where the court reasoned such prejudicial evidence could "muddle the jury, and to lead them to convict the accused because he was in general so loathsome").

Thus, any marginal relevance of this threat evidence is vastly outweighed by the significant risk of unduly prejudicing or biasing the jury against Mr. Isaza Tuzman, and consequently it runs afoul of Rule 403's balancing test.

**VI.    The Court Should Exclude Evidence of Mr. Isaza Tuzman's Wealth or Spending Habits.**

The Court should preclude the introduction of evidence or allegations regarding Mr. Isaza Tuzman's wealth or his spending habits.  Such evidence or argument is entirely irrelevant to the issues in this case, and could serve no purpose other than to unduly prejudice Mr. Isaza Tuzman.

**A.    Relevant Background.**

Mr. Isaza Tuzman has had a successful business career going back well over two decades. After working at Goldman Sachs in the '90s, Mr. Isaza Tuzman launched and turned around multiple companies.  In 1998, he co-founded govWorks Inc., an Internet startup facilitating transactions and interactions between citizens and government agencies (e.g., paying parking tickets and property taxes, applying for hunting and fishing permits, etc.) over the Internet. On or about 2001, Mr. Isaza Tuzman established KIT Capital, LLC (previously called "Recognition Group"), a New York-based business acceleration and investment company that he operates to this day. After developing and selling New York-based digital media services company called KPE, Inc. in 2002, Mr. Isaza Tuzman advised on or managed the turnaround and sale of several companies through KIT Capital. In 2005, Mr. Isaza Tuzman became the President and Chief Operating Officer of JumpTV, Inc., the first large-scale, Internet-based broadcaster, delivering over 300 live television channels to emigrant ethnic communities in North America and Europe living far away from their home countries.  At the peak of JumpTV's stock price in 2007 (the company was listed on the Toronto Stock Exchange and the London AIM stock market), Mr. Isaza Tuzman's shares were worth tens of millions of dollars. Given his business acumen and success, Mr. Isaza Tuzman already had substantial assets when he became CEO of KIT digital.  Between 2007 and 2012, as the CEO and Chairman of KIT digital, Mr. Isaza Tuzman earned hundreds of thousands per year in total compensation. Mr. Isaza Tuzman's

compensation was thus many multiples more than the median household income for the counties from which the jury will be drawn.[6]

Since his departure from KIT digital in 2012, Mr. Isaza Tuzman continued his entrepreneurial business ventures.  For example, KIT Capital is the principal sponsor and developer of a luxury Viceroy hotel and resort on the Convento Obra Pía site in Cartagena, Colombia—a project that involves the rescue and redevelopment of "Obra Pia," an early 17th century Franciscan Order convent located in the UNESCO World Heritage site within Cartagena's Old City.  In 2013, KIT Capital also began developing a luxury hotel and luxury-products distribution and retail business in Colombia and neighboring countries, involving brand representation and the importation of luxury watches, single-malt scotch, yachts, and couture clothing lines for sale on the Obra Pia site, on other prospective KIT Capital-led hotel project sites, and through third-party retailers.

Evidence of Mr. Isaza Tuzman's historical wealth, financial status, or spending history— or attributes of such wealth (including use of business-class flights or luxury hotels or other indicia of spending) presents a considerable risk that jurors will vote not on the basis of evidence relating to the charged conduct, but on improper bases such as emotion, anger, or class prejudice. Introduction of this kind of evidence, or of argument that Mr. Isaza Tuzman has a history of

---

[6] According to the latest data from the United States Census Bureau, the following counties have the following median incomes: New York County (Manhattan): $72,871; Bronx County: $34,299; Putnam County: $96,148; Dutchess County: $71,904; Orange County: $70,848; Rockland County: $84,855; Sullivan County: $50,710; and Westchester County: $83,958.  *See* U.S. Census Bureau, "Quick Facts," *available at* https://www.census.gov/quickfacts/fact/table/westchestercountynewyork,dutchesscountynewyork,bronxcountybronxboroughnewyork,newyorkcountymanhattanboroughnewyork,US/INC110215

making extravagant purchases (whether for his own use or as part of a luxury goods distribution business), should be barred as irrelevant and prejudicial.

> **B.      Allegations or Evidence Regarding Mr. Isaza Tuzman's Assets, Income, or Alleged Spending Habits is Irrelevant and Unduly Prejudicial.**

Evidence of Mr. Isaza Tuzman's past wealth or spending habits does not make any fact of consequence in this case "more or less probable," and is thus irrelevant under Rule 402.

The relevant question is not how Mr. Isaza Tuzman made money over the course of his career, how much money he made at various times, or how much money he spent, but whether he knowingly and intentionally participated in securities fraud and wire fraud.  The instant prosecution is not a case where "inconsistent income and withdrawals" in the defendant's personal accounts may be evidence of wrongdoing.  *Cf. Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 1572995, at *3 (S.D.N.Y. Apr. 18, 2016).  Nor is this a case where "***unexplained*** wealth can be relevant to prove illicit gain."  *United States v. Jasper*, No. 00-cr-825-PKL, 2003 WL 221740, at *3 (S.D.N.Y. Jan. 31, 2003) (emphasis added).  It is thus irrelevant whether Mr. Isaza Tuzman spent money lavishly while he was earning well.  *See United States v. Hatfield*, 685 F. Supp. 2d 320, 326 (E.D.N.Y. 2010) (because question was "whether the stock trades and compensation methods [the defendant] used to acquire this money were legal," it is irrelevant if he "spent his fortune on lavish parties, instead of donating it to starving Malawian orphans."); *see generally U.S. v. Law*, 528 F.3d 888, 897 (D.C. Cir. 2008) (defendant's large mortgage payments had "little or no probative value because [this evidence] does not distinguish mere spending from laundering").  Moreover, evidence of a luxurious lifestyle (quintessential other-act evidence) is not admissible to show motive to engage in

financial crimes.[7]  *Hatfield*, 685 F. Supp. 2d at 326; *United States v. Ewings*, 936 F.2d 903, 906

(7th Cir. 1991) (rejecting government's argument that evidence of defendant's spending was

relevant to show he had an "appetite" for money).

Pitted against the vanishingly small probative value that evidence of Mr. Isaza Tuzman's

past wealth, earnings, or spending habits might have, such evidence carries an outsized risk of

unfairly prejudicing the jury against him.  Indeed, the Second Circuit has reversed a conviction

based on the government's prejudicial use of, and references to, a defendant's wealth and

income.  *United States v. Stahl*, 616 F.2d 30, 33 (2d Cir. 1980).  In holding that the defendant's

conviction in *Stahl* had been wrongfully procured, the Second Circuit specifically held that

evidence relating to his assets and compensation was "intend[ed] to arouse prejudice against the

defendant because of his wealth" and constituted an improper "appeal to class prejudice" to

obtain a guilty verdict.  *Id.* at 33.  Courts in this district have endorsed that analysis and routinely

hold inadmissible evidence of a defendant's wealth or income.  *See United States v. Cassese*, 290

F. Supp. 2d 443, 457 (S.D.N.Y. 2003), *aff'd*, 428 F.3d 92 (2d Cir. 2005) (arguments in front of

the jury regarding defendant's "wealth, salary, and stock holdings" was "highly prejudicial and

inflammatory"); *see also Kinsey v. Cendant Corp.*, 588 F. Supp. 2d 516, 518 (S.D.N.Y. 2008)

("The parties are not permitted to argue to the fact finder's potential economic sympathies or

prejudices.").  The result should be no different here.

---

[7]  To the extent that the government seeks to introduce evidence of Mr. Isaza Tuzman's spending to establish a motive for the conduct charged in the indictment, that evidence constitutes Rule 404(b) material.  *See United States v. Mitchelson*, 51 F.3d 283 (9th Cir. 1995) (evidence of lavish spending to prove motive was governed by Rule 404(b)).  As discussed above, the Court should preclude the government from offering Rule 404(b) evidence because the government did not provide timely notice.  *See supra*.

Thus, the Court should preclude evidence of Mr. Isaza Tuzman's wealth, income, and spending as irrelevant under Rule 402, or, alternatively, as unduly prejudicial under Rule 403.

**VII.   The Court Should Permit the Jury To Hear Evidence and Argument Concerning Mr. Isaza Tuzman's Consciousness of Innocence With Regard to the Charges Against Him.**

The Court should permit the jury to hear evidence from Mr. Isaza Tuzman that he was conscious of his innocence with regard to the case the government was building against him. Specifically, the Court should allow evidence at trial of Mr. Isaza Tuzman's travel amidst ongoing federal investigations into his conduct, his willingness to cooperate at every turn with the ongoing investigations before his arrest, and his readiness (even after his arrest) to surrender to United States law-enforcement authorities and waive formal extradition procedures in order to clear his name—all behavior that is probative of his innocent state of mind and thus properly admissible under Rules 401 and 402.

**A.   Relevant Background.**

Beginning in early 2012, the SEC began investigating Mr. Isaza Tuzman and KIT Digital. During the 2012 to 2014 timeframe, as this investigation was ongoing and another was instituted by the U.S. Attorneys' Office, Mr. Isaza Tuzman expressed his willingness to cooperate through his counsel; as a result, his counsel met and repeatedly communicated with the SEC and federal prosecutors in connection with their respective investigations and expressed to the authorities Mr. Isaza Tuzman's desire to cooperate with law enforcement. Although Mr. Isaza Tuzman made it clear, through his lawyers, that he was ready and willing to continue to cooperate, neither he nor his lawyers were contacted by law enforcement after this timeframe.

Immediately after his indictment in August 2015, Mr. Isaza Tuzman was in Colombia overseeing the Obra Pia hotel project he was developing with the Viceroy Hotel Group in Cartegena, Colombia. While spending a plurality of his time in Colombia during the 2014-2015

41

period focused overseeing the Obra Pia project, Mr. Isaza Tuzman traveled frequently to Europe, North America and elsewhere attending to business projects, and also for pleasure. In June 2015—fully aware of the three-year old investigations and mere months before his indictment and subsequent arrest—Mr. Isaza Tuzman traveled to the United States to attend his 20-year Harvard College reunion. Days prior, Mr. Isaza Tuzman also traveled to Miami to attend business meetings. In fact, Mr. Isaza Tuzman was days away from returning to the United States to celebrate the Jewish New Year with family in Philadelphia at the time of his arrest in Colombia in September 2015. He was also planning to travel to the United States in the fall of 2015 to attend his cousin's wedding and to speak at a business conference. These planned travels reveal that Mr. Isaza Tuzman was not a fugitive on the run, hiding in a foreign country. Indeed Mr. Isaza Tuzman frequently referred to his location and planned travels on social media.

Despite the government's unprecedented step of provisionally arresting Mr. Isaza Tuzman in Colombia, he was convinced of his innocence and offered to surrender to United States authorities and expedite his return to the United States. Mr. Isaza Tuzman, both personally and through his lawyers, repeatedly stated his innocence to representatives of the U.S. Government and expressed his desire to return to the United States to defend himself and clear his name.

**B.     The Court Should Permit the Jury to Hear Evidence and Argument Regarding Mr. Isaza Tuzman's Consciousness of Innocence.**

The Court should rule before trial that evidence of Mr. Isaza Tuzman's consciousness of his innocence is relevant and admissible under Rules 401 and 402. Specifically, the Court should permit the jury to hear evidence of Mr. Isaza Tuzman's repeated decisions to travel to the United States amidst longstanding federal investigations into his actions (of which he was

42

aware), and his willingness to return to the United States and cooperate with law enforcement officials—both of which are highly probative of his innocent state of mind.

Evidence should be deemed relevant and admissible if it tends to make the existence of a fact of consequence more probable that it would be without the evidence.  Fed. R. Evid. 401; *see Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 650 (S.D.N.Y. 2015) (citing *McKoy v. N. Carolina*, 494 U.S. 433, 440 (1990)).  The central issue in this case is whether the government can prove beyond a reasonable doubt that Mr. Isaza Tuzman had the requisite scienter to conspire to commit fraud, with knowledge of the illegal objects of the charged schemes.  Critical to this analysis is Mr. Isaza Tuzman's state of mind with regard to the legality of the transactions that underlie the counts of the indictment.  It is only fair that jurors be allowed to hear that Mr. Isaza Tuzman consistently believed he had done nothing wrong, and was willing to cooperate with federal authorities to clear his name.  *See supra*.

The Second Circuit has "not hesitated to order a new trial" in cases "[w]here evidence of a defendant's innocent state of mind, critical to a fair adjudication of criminal charges, is excluded."  *United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990); *see also*, *e.g.*, *United States v. Detrich*, 865 F.2d 17, 21 (2d. Cir. 1988) (ordering a new trial where evidence of defendant's innocent state of mind was improperly excluded even though it surmounted relevance threshold since it would have "enhanced" defendant's credibility); *United States v. Kohan*, 806 F.2d 18, 21-22 (2d Cir. 1986) (ordering a new trial where evidence of defendant's innocent state of mind—statements showing his lack of knowledge of wrongdoing—was improperly excluded).

As the Second Circuit reasoned in its landmark decision on the admissibility of "consciousness of innocence" evidence, "[t]he probative force of a rejected immunity offer is

clearly strong enough to render it relevant." *Biaggi*, 909 F.2d at 691 (citing Fed. R. Evid. 401).
The rationale for relevance is simple: Where a defendant denies knowledge of wrongdoing at a
time when admitting it would have secured him immunity from prosecution altogether, the
natural inference is that he really lacked knowledge of such wrongdoing. *Id.* at 690.  In other
words, the jury is entitled to hear such evidence and draw the inference that the defendant's
conduct constitutes proof of "consciousness of innocence" of the charged crime.  *See id.*

> In support of its decision, the Second Circuit quoted extensively from Dean Wigmore:

> Let the accused's whole conduct come in; and whether it tells for consciousness
> of guilt or for consciousness of innocence, let us take it for what it is worth,
> remembering that in either case it is open to varying explanations and is not to be
> emphasized.  ***Let us not deprive an innocent person, falsely accused, of the
> inference which common sense draws from a consciousness of innocence and
> its natural manifestations***.

*Id.* (quoting 2 Wigmore on Evidence § 293, at 232 (J. Chadbourn rev. ed. 1979)) (emphasis
added).

> Here, Mr. Isaza Tuzman's decisions to return to the United States multiple times with the
knowledge that he was under intense investigation by federal authorities is probative of his
innocent state of mind because it reveals that he did not think he had anything to worry about
with regard to the conduct being probed.  Mr. Isaza Tuzman had successful business
relationships in various countries worldwide—and the means to leverage those contacts to
relocate to a country without an extradition treaty with the United States should he have had a
guilty conscience and sought to evade U.S. law enforcement.  He did just the opposite, putting
himself in the cross-hairs of an arrest warrant every time he entered the country.  That is proof of
his innocent state of mind.  In fact, in a substantially similar case in this district, Judge Buchwald
held evidence that insider trading defendant Rengan Rajaratnam sought to return to Brazil upon
learning of an indictment against him to be admissible evidence that should be presented to a

jury, over the government's objection.  *See United States v. Rajaratnam*, No. S1 13 Cr. 211 (NRB), Dkt. 90 (S.D.N.Y. June 6, 2014).

In a similar vein, Mr. Isaza Tuzman's willingness to cooperate with, and voluntarily surrender to, U.S. law enforcement and return to answer the charges against him is analogous to rejecting an immunity offer (as in *Biaggi*) because it displays that Mr. Isaza Tuzman genuinely lacked knowledge of wrongdoing.  He risked spending years in prison, the crippling financial toll of preparing for trial, and the emotional turmoil associated with facing federal criminal charges. The jury is entitled to hear that side of his story.

It is true that when considering the relevance and admissibility of consciousness of innocence evidence, courts give weight to the alternative explanations for a defendant's choice. *Compare Biaggi*, 909 F.2d 691 (finding that rejecting an opportunity to avoid conviction entirely is strong evidence of innocence), *with United States v. Goffer*, 721 F.3d 113, 129 (2d Cir. 2013) (finding that, because plea bargain offered to defendant entailed a conviction with "'devastating collateral consequences,'" his decision to reject the deal was not probative because it merely showed he wanted to "take his chances on an acquittal by the jury, rather than accept the certainty of punishment after a guilty plea" (quotation marks omitted)).  Mr. Isaza Tuzman's decisions are not, however, fairly susceptible to a multitude of explanations.  Here, as in *Biaggi*, Mr. Tuzman had many opportunities to avoid the direct and collateral consequences of arrest and prosecution, including by remaining out of the United States while being investigated and taking the chance that the government would not pursue an arrest abroad.  At a minimum, Mr. Isaza Tuzman was under no compulsion to cooperate with investigators, yet he offered to do so through counsel.  In the circumstances here, his choices reveal a consciousness of innocence that—in all fairness—the jury should be able to consider in its deliberations.

And, even if a jury arguably could draw the inference that Mr. Isaza Tuzman's decisions are also consistent with knowledge of guilt, that possibility "does not strip the evidence of probative force." *Biaggi*, 909 F.2d at 690-91 (citing *United States v. DiMaria*, 727 F.2d 265, 271-72 (2d Cir. 1984)).  Just the opposite is true:  Where, as here, there exists a serious factual dispute over the core defense that defendant was unaware of any criminal wrongdoing, evidence of his innocent state of mind is "critical to a fair adjudication of criminal charges." *United States v. Scheffer*, 523 U.S. 303, 331-32 (1998) (Stevens, J. dissenting) (quoting *Biaggi*, 909 F.2d at 691–92).  The Court should "[l]et the accused's whole conduct come in[,] . . . whether it tells for consciousness of guilt or for consciousness of innocence," and permit the jury to "take it for what it is worth." *Biaggi*, 909 F.2d at 690 (quoting 2 Wigmore on Evidence § 293, at 232). Fundamental fairness demands that the jury should be the arbiter of such evidence where, as here, a *prima facie* showing of relevance has been made.

VIII.  **Before Admitting Out-of-Court Statements Against Mr. Isaza Tuzman Under Rule 801(d)(2)(E), the Court Should Hold a Hearing and Rule on Their Admissibility Outside the Jury's Presence.**

A.  **Relevant Background**

The S8 Indictment alleges the existence of multiple distinct conspiracies.  Counts One, Four, Five, and Six charge four different conspiracies: namely, conspiracy to commit wire fraud by defrauding investors in Maiden Capital (Count One); conspiracy to commit securities fraud by market manipulation (Count Four); conspiracy to commit wire fraud by defrauding KIT Digital shareholders (Count Five); and conspiracy to commit securities fraud, make false statements in annual and quarterly SEC reports, and make false statements to auditors (Count Six).  Each of these distinct alleged conspiracies occurred in different time periods and involved different participants and objectives.  Indeed, Count Six—a purported "scheme to deceive KITD shareholders, members of the investing public, KITD's independent auditors and others concerning KITD's true operating performance and financial results"—is itself comprised of multiple alleged sub-schemes, each pertaining to different individuals, objects, methods, and time periods.

In its May 2017 Bill of Particulars Letter, the government provided a generic disclosure of Mr. Isaza Tuzman's alleged co-conspirators:  (1) Irfan Amanat, (2) Omar Amanat; (3) Gavin Campion; (4) Rima Jameel; (5) Stephen Maiden, (6) Robin Smyth; (7) Petr Stransky; (8) David Vogel.  It did not identify which alleged co-conspirators were involved in which conspiracy. (*See* Bill of Particulars Letter.)  In its August 24, 2017 letter purporting to supplement the bill of particulars even further, the government alleged the involvement of a ninth co-conspirator, Thomas Petru, whose involvement was limited to "the accounting fraud conspiracy charged in Count Six of the S8 Indictment."  (*See* August 24 Letter; *see also supra*.)

Proof of each of these conspiracies, and of the precise participants in them, will be a substantial and disputed factual issue in the case.  In particular, the defense submits that, based on the evidence disclosed to date, the government will be unable to prove: (1) that Mr. Isaza Tuzman ever conspired with Irfan and Omar Amanat or Stephen Maiden in the wire-fraud scheme alleged in Count One; (2) that Mr. Isaza Tuzman ever conspired with Omar Amanat or Stephen Maiden with respect to the conspiracies alleged in Count Four; (3) that Mr. Isaza Tuzman ever conspired with Stephen Maiden or Irfan Amanat with respect to Count Six; (4) that any of the other eight alleged co-conspirators participated in the market manipulation alleged in Count Four; (5) that any of the alleged co-conspirators had any role in the wire-fraud scheme alleged in Count Five; or (6) that there was a ***single*** conspiracy as conclusorily alleged in Count Six, given that the Indictment alleges multiple sub-schemes involving different subsets of the co-conspirators alleged, none involving Stephen Maiden or Irfan or Omar Amanat.  As discussed below, the inability of the government to prove these propositions by a preponderance of the evidence would have substantial implications for the admissibility of out-of-court statements of the alleged co-conspirators.

### B.    Governing Legal Principles

Unless an exception applies, hearsay evidence is inadmissible at trial.  Fed. R. Evid. 802. An out-of-court statement is not hearsay if "[t]he statement is offered against an opposing party and . . . (E) was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2).  Thus, in order to admit any out-of-court statement offered for the truth of the matter asserted, as a threshold matter "the court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the

conspiracy." *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

The government must make these predicate showings with sufficient detail. *First,* to show the existence of a conspiracy involving a declarant and the defendant, the government much show that the declarant and defendant had a "unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E)." *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) (defendant's membership in a network of criminal activity, such as organized crime, does not constitute a conspiracy for the purpose of Rule 801(d)(2)(E)). *Second*, to show the statement was made "during" the conspiracy, the government must show that the statement was made *after* the defendant entered into the conspiratorial agreement, but *before* the conspiracy ended. *See Anderson v. United States*, 417 U.S. 211, 218–19 (1974) ("The hearsay-conspiracy exception applies only to declarations made while the conspiracy charged was still in progress, a limitation that this Court has 'scrupulously observed.'" (citation omitted)); *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) ("[T]he district court was required to find that Shah made the statements at issue in furtherance of a then-existing conspiracy between these two men."). *Third*, to show the statement was "in furtherance of" the conspiracy, the government must show that the statement at issue was designed to promote the accomplishment of the conspiracy's objectives. *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989).

Moreover, to establish admissibility, the government must prove each of these predicate facts by a preponderance of the evidence. *See Bourjaily*, 483 U.S. at 175; Fed. R. Evid. 104(a). Under that rule, "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under [subdivision] (E)." Fed. R. Evid.

802(e)(2).  Thus, circuit courts have long imposed a corresponding requirement of "independent corroborating evidence" of the declarant and defendant's participation in the conspiracy in order to establish the statement's admissibility.  *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996) (reversing convictions because the court improperly admitted a hearsay statement under Rule 801(d)(2)(E) without independent corroborating proof); *see also United States v. Clark*, 18 F.3d 1337, 1341-42 (6th Cir. 1994) ("Since *Bourjaily*, all circuits addressing the issue have explicitly held absent some independent, corroborating evidence of defendant's knowledge of and participation in the conspiracy, the out-of-court statements remain inadmissible.").  Failing to make the requisite preliminary findings of a conspiracy to support the invocation of Rule 801(d)(2)(E) has been identified as a basis for reversal of a conviction.  *See United States v. Al-Moayad*, 545 F.3d 139, 173–74 (2d Cir. 2008).

Particularly relevant is the ***timing*** of the Court's determination of admissibility under Rule 801(d)(2)(E).  Several circuit courts have held that district courts should, "whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it ***before*** admitting declarations of a coconspirator."  *United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (emphasis added).  In the seminal Second Circuit case on the issue, *United States v. Geaney*, 417 F.2d 1116 (2d. Cir. 1969), Judge Friendly underscored the danger to a defendant of freely admitting out-of-court statements by alleged co-conspirators without a judicial finding, by a preponderance of the evidence, independent corroborating proof that the declarants had joined the alleged conspiracy:

> [T]he judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. . . .  If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to

> render a cautionary instruction of doubtful utility, as could well have been the
> case here, declare a mistrial if the defendant asks for it.

*Geaney*, 417 F.2d at 1120.  Although Second Circuit precedent allows district courts to admit co-

conspirator statements "subject to connection" later at trial, *see Tracy*, 12 F.3d at 1199, *Geaney*

recognized the substantial risk of prejudice and the "doubtful utility" of a limiting instruction

where out-of-court statements form a large part of the government's case and there is insufficient

independent, corroborating evidence to prove that the declarant is a member of the alleged

conspiracy.  417 F.2d at 1120.

      In *United States v. James*, 590 F.2d 575 (5th Cir. 1979), the Fifth Circuit doubted the

curative effect of admitting co-conspirator hearsay only subject to connection later.  It held that

because of "the danger [to the defendant] of injecting the record with inadmissible hearsay in

anticipation of proof of a conspiracy which never materializes," and "because of the inevitable

serious waste of time, energy and efficiency when a mistrial is required in order to obviate such

danger," "[t]he district court should, whenever reasonably practicable, require the showing of a

conspiracy and of the connection of the defendant with it ***before*** admitting declarations of a

coconspirator."  *James*, 590 F.2d at 582 (internal citations omitted) (emphasis added).

      This pretrial gatekeeping role has been forcefully endorsed by the Fifth, Tenth, and

District of Columbia Circuits to protect the defendant and guard against mistrials.  In *United*

*States v. Jackson*, 627 F.2d 1198 (D.C. Cir. 1980), the D.C. Circuit explained that "[a]s to the

procedural timing of the determination by the trial judge, the better practice is for the court to

determine ***before*** the hearsay evidence is admitted that the evidence independent of the hearsay

testimony proves the existence of the conspiracy sufficiently to justify admission of the hearsay

declarations."  *Jackson*, 627 F.2d at 1218 (emphasis added); *see also United States v. Gonzalez-*

*Montoya*, 161 F.3d 643, 648 (10th Cir. 1998) (reiterating the court's "strong preference for

*James* proceedings where the government relies on co-conspirator statements").

Although it has so far declined to "express an opinion on the proper order of proof that

trial courts should follow in concluding that the preponderance standard has been satisfied in an

ongoing trial," *Bourjaily*, 483 U.S. at 176, the Supreme Court's formulation of the principle also

suggests the requisite analysis should occur "***[b]efore*** admitting a co-conspirator's statement

over an objection that it does not qualify under Rule 801(d)(2)(E)," *id.* at 175 (emphasis added).

As one Southern District opinion noted, "the Supreme Court's use of the term '[b]efore,' implies

a temporal imperative in making such disposition . . . .  In other words, the plain text of *Bourjaily*

supports the procedural mechanism employed by the Fifth Circuit: namely determining the

admissibility of an 801(d)(2)(E) statement before the admission of such a statement." *United*

*States v. Saneaux*, 365 F. Supp. 2d 493, 497 (S.D.N.Y. 2005); *see also* 5 Weinstein's Federal

Evidence § 801.34[6][c][i] ("[P]reliminary questions of fact "must be resolved by the district

court before a challenged statement may be admitted under Rule 801(d)(2)(E).").

In fact, multiple circuit courts have recognized that a pretrial evidentiary hearing is an

appropriate procedure to determine whether co-conspirator statements are admissible as an

exception to the hearsay rule.  *See United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001)

(recognizing pretrial evidentiary hearing is appropriate method to determine whether alleged co-

conspirator statements were admissible); *United States v. Reda*, 765 F.2d 715, 721 (8th Cir.

1985) (stating that the Eighth Circuit has approved such pretrial evidentiary hearings to "avoid

the risk of mistrial"); *United States v. Tipton*, 572 F. App'x 743, 747 (11th Cir. 2014) (approving

use of pretrial hearing to determine whether the alleged co-conspirator statements qualified for

admission pursuant to Rule 801(d)(2)(E)).  And, even where the court does not order a pretrial

hearing, judges have required the government to "promptly produce to the [c]ourt and to the defendants all such co-conspirator statements that it intends to use as evidence at trial" so that the court may perform at least a preliminary analysis of how large a proportion of the government's proof such hearsay is. *See United States v. Bazezew*, 783 F. Supp. 2d 160, 166 (D.D.C. 2011).

Moreover, whenever this Court resolves to make findings on the admissibility of statements under the co-conspirator hearsay exception, it is clear they should happen outside the presence of the jury. *See Tracy*, 12 F.3d at 1200 (explaining findings in jury's presence may unduly influence jury's determination of elements of the offenses charged); *United States v. Paredes*, 176 F. Supp. 2d 183, 188–89 (S.D.N.Y. 2001) ("The Court should make the *Geaney* findings outside the presence of the jury, and the jury should not be told what facts the Court believes have been established.").

C.    **The Large Number of Alleged Co-conspirators and Anticipated Vast Reliance on Hearsay Make a Hearing Outside the Presence of the Jury Necessary to Determine Whether the Government Can Make its Rule 802 Predicate Showings.**

The circumstances of this case pose a significant risk of unfair prejudice to Mr. Isaza Tuzman and militate in favor of an evidentiary hearing regarding the admissibility of alleged out-of-court co-conspirator statements outside the presence of the jury and *before* their admission against Mr. Isaza Tuzman. The government has alleged multiple conspiracies and has failed to disclose which purported co-conspirator participated in which conspiracy. Its recent disclosure that the ninth alleged co-conspirator, Thomas Petru, was involved only in the conspiracy alleged in Count Six evinces its acknowledgement that such clarification is important and appropriate. Moreover, given our review of the evidence to date, we understand the government's proof of conspiracies will rely heavily on the testimony of cooperators who are alleged co-conspirators, and that the government will elicit out-of-court statements of these co-conspirators in an effort to

prove the allegations of the indictment.  For example, there is powerful evidence that Kaleil was

not a co-conspirator of the Amanat brothers at any time, but instead was a victim of their fraud.

Without a predicate finding by this Court of sufficient evidence that Mr. Isaza Tuzman and the

Amanat brothers were co-conspirators, alleged statements by the Amanats to the other co-

conspirators are inadmissible at trial under the co-conspirator hearsay exception.

There is also serious risk of spillover prejudice at trial resulting from the government's

evidence regarding multiple conspiracies.  As noted above, to qualify for the hearsay exception,

each statement must be between co-conspirators of the particular conspiracy at issue, during the

time period of that conspiracy, and in furtherance of that conspiracy.  *See Tracy*, 12 F.3d at 1196;

*see also supra*.  It is the government's burden to make these showings by a preponderance of the

evidence for these statements to be properly be presented to the jury.  *See Bourjaily*, 483 U.S. at

175.  No such showing has even tangentially been made despite the filing of yet more particulars

weeks before trial.

Numerous courts have counseled over the years that, in complex conspiracy cases such as

this one, a court should take affirmative steps to ensure that out-of-court co-conspirator

statements are appropriately received in evidence.  A pretrial evidentiary hearing—as endorsed

by the Fifth Circuit in *James*—is most protective of a defendant and the ideal outcome.

Recognizing that this Circuit does not currently require a *James* hearing, however, the alternative

procedure adopted by Judge Haight in *Saneaux* is instructive.  *See* 365 F. Supp. 2d at 503-04

("[T]he government is directed to elicit and place before the jury all the evidence it will rely

upon to satisfy all prerequisites of admissibility, including the 'in furtherance' requirement, so

that I may hear counsel argue the issue and rule upon the admissibility of the recorded Grullon

declarations before those declarations are placed before the jury.").  Rather than allowing the

government to submit out-of-court co-conspirator statements "subject to connection" later—and holding a *Geaney* hearing after the government rests—a brief hearing outside the presence of the jury should be held just before the statements are to be introduced to test their admissibility. Specifically, should the government seek to elicit such statements from a cooperator such as Stephen Maiden to establish the existence and time period of the conspiracies alleged, the defense requests the opportunity to examine Mr. Maiden (or other alleged co-conspirator) outside the presence of the jury to adequately test the credibility of such testimony.

For the foregoing reasons, Mr. Isaza Tuzman respectfully requests that the Court (i) exercise its discretion to impose preconditions requiring the government to disclose information sufficient to make a determination of the admissibility of the out-of-court co-conspirator statements, and (ii) make such rulings prior to the time such statements are aired before the jury.  Specifically, the defense requests the following relief:

1. That the Court order the government to disclose which particular co-conspirators are alleged to have participated in each of the distinct conspiracies alleged in Counts One, Four, Five, and Six.

2. That the Court order the government to disclose the out-of-court co-conspirator statements the government seeks to offer in evidence.

3. That the Court hold a hearing, outside the presence of the jury, as to the admissibility of any proffered out-of-court co-conspirator statements so that the defense may challenge admissibility before they are presented to the jury.  Should the proffered statements be elicited from government witnesses, the defense respectfully requests the opportunity to examine the witnesses to evaluate the credibility of the statements outside the presence of the jury.

4. That the Court, in any event, adopt a procedure whereby it will rule on the admissibility

of proffered out-of-court co-conspirator statements prior to their presentation to the jury.

**IX.    Mr. Isaza Tuzman Joins In Any Applicable Pretrial Motions In Limine Filed By Co-defendant Omar Amanat.**

Mr. Isaza Tuzman also joins in any applicable pretrial motions *in limine* filed by co-

defendant Omar Amanat.

## <u>CONCLUSION</u>

For the foregoing reasons, and to ensure a fair trial focused on the material issues of

consequence for the jury, the Court should grant Mr. Isaza Tuzman's motions *in limine*.

Respectfully submitted,

Dated:    September 5, 2017          Gibson, Dunn & Crutcher LLP


By: /s/  *Avi Weitzman*
     Avi Weitzman
     Marcellus McRae
     Amer S. Ahmed

200 Park Avenue
New York, NY  10166
Telephone:     (212) 351-4000
Facsimile:     (212) 351-4035

333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

*Attorneys for Defendant Kaleil Isaza Tuzman*