UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA                    :

             -v.-                           :          S8 15 Cr. 536 (PGG)

KALEIL ISAZA TUZMAN and                     :
OMAR AMANAT,
                                            :
                    Defendants.
-------------------------------------------------------x

### GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE
### PORTIONS OF KALEIL ISAZA TUZMAN'S PROPOSED EXPERT TESTIMONY

                              JOON H. KIM
                              Acting United States Attorney
                              Southern District of New York
                              One St. Andrew's Plaza
                              New York, New York 10007

Damian Williams
Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
    *Of Counsel*

# Table of Contents

BACKGROUND ......................................................................................................................... 1

THE COURT SHOULD PRECLUDE PORTIONS OF THE PROPOSED EXPERT
TESTIMONY .......................................................................................................................... 2

    A.      Applicable Law ................................................................................................. 2

       1.  Rule 702 .................................................................................................... 2

       2.  Rule 703 .................................................................................................... 5

       3.  Rule 704(b) ............................................................................................... 5

       4.  Rules 401 through 403 ............................................................................. 6

    B.      Discussion ....................................................................................................... 6

       1.  John T. Young, Jr. ................................................................................... 6

       2.  Charles Bennett ...................................................................................... 12

       3.  Gordon Klein ......................................................................................... 15

       4.  Allen Farrell .......................................................................................... 17

CONCLUSION ...................................................................................................................... 22

**Federal Cases**

*Amorgianos* v. *Romano Enterprises*, 303 F.3d 256 (2d Cir. 2002) ................................................. 3

*Andrews* v. *Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989)........................................ 3

*Bourjaily* v. *United States*, 483 U.S. 171 (1987) ......................................................................... 2

*Cary Oil Co., Inc.* v. *MG Refining & Marketing, Inc.*, 257 F. Supp. 2d 768 (S.D.N.Y. 2003)...... 9

*Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).................................................. 2, 6, 12

*General Elec. Co.* v. *Joiner*, 522 U.S. 136 (1997)................................................................. 2, 3, 12

*Hygh* v. *Jacobs*, 961 F.2d 359 (2d Cir. 1992).............................................................................. 3, 4

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................... 14

*Kumho Tire Company, Inc.* v. *Carmichael*, 526 U.S. 137 (1999) ............................................... 2, 3

*Nimley* v. *City of New York*, 414 F.3d 381 (2d Cir. 2005)............................................................. 2

*SEC* v. *Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1998) ...................................................................... 3

*See United States* v. *Rea*, 958 F.2d 1206 (2d Cir. 1992) ............................................................. 20

*United States* v. *Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .................................................. 4, 11, 13

*United States* v. *DiDomenico*, 985 F.2d 1159 (2d Cir. 1993)................................................... 6, 11

*United States* v. *Duncan*, 42 F.3d 97 (2d Cir. 1994) ........................................................ 11, 16, 20

*United States* v. *Ferguson*, 246 F.R.D. 107 (D. Conn. 2007)....................................................... 9

*United States* v. *Jacques Dessange, Inc.*, No. S2 99 CR. 1182 DLC, 2000 WL 294849
   (S.D.N.Y. Mar. 21, 2000) ......................................................................................... 5, 17

*United States* v. *Khan*, 787 F.2d 28 (2d Cir. 1986) ....................................................................... 8

*United States* v. *Litvak*, 808 F.3d 160 (2d Cir. 2015) ............................................................... 4, 16

*United States* v. *Nersesian*, 824 F.2d 1294 (2d Cir. 1987) .................................................. passim

*United States* v. *Zafar*, 291 F. App'x 425 (2d Cir. 2008) ................................................................. 5

The Government respectfully submits this motion *in limine* to preclude Kaleil Isaza Tuzman ("Isaza Tuzman" or "the defendant") from offering portions of expert testimony from four witnesses that are irrelevant, speculate about the intent of the defendant, misrepresent or incorrectly assume certain facts, speculate and draw misleading conclusions about certain facts, and invade the province of the jury by offering conclusions regarding elements of the charged offenses that should be left solely to the trier of fact. The Government also moves to preclude Isaza Tuzman from offering expert opinions where the defendant has failed to provide the "bases and reasons" for the proffered expert opinions, as required by Fed. R. Crim. P. 16(b)(1)(C).

## BACKGROUND

On September 11 and 18, 2017, the defendant identified four proposed expert witnesses: Professor John T. Young, Jr. ("Young"), Charles Bennett ("Bennett"), Allen Ferrell ("Ferrell"), and Gordon Klein ("Klein").[1] (Exs. A-D hereto). According to the defendant's disclosures, Young is expected to testify about, among other things, the restructuring, marketing, and sale process of KIT Digital in the years *following* the charged accounting fraud scheme; a process which, Young will opine, demonstrates that the defendant was not engaged in a fraud in the *preceding* years. Bennett is expected to testify about, among other things, the indicia of market manipulation schemes generally, that no such indicia are present in this case, and that certain written stock purchase agreements were entered into for a legitimate reason, not to manipulate the market in KIT Digital shares. Ferrell is expected to testify about, among other things, Maiden Capital's trading patterns and opine that these patterns do not reflect a market manipulation scheme. Finally, Klein is expected to testify about, among other things, KIT

---

[1]    The defendant also provided notice of a summary witness, Andrew Rosini, whose proffered testimony the Government does not move to preclude at this time.

Digital's accounting practices and why such practices were consistent with various accounting rules and industry guidance, rather than fraudulent.

**THE COURT SHOULD PRECLUDE PORTIONS OF
THE PROPOSED EXPERT TESTIMONY**

As set forth below, the Court should preclude certain portions of the proffered testimony of the defendant's experts because they are improper.

**A.     Applicable Law**

**1.     Rule 702**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible. *See Bourjaily* v. *United States*, 483 U.S. 171, 172-73 (1987). The District Court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See General Elec. Co.* v. *Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is whether the witness "is qualified as an expert" to render the proposed opinion. *See Nimley* v. *City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable. *Daubert* v. *Merrell Dow Pharm.*, 509 U.S. 579, 589-90 (1993); *see Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

In *Joiner*, the Supreme Court explained that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  522 U.S. at 146.  For example, in *Kumho Tire*, the Court upheld the exclusion of an expert's testimony that a defect caused a tire's tread to separate from the rest of the tire, because the expert's theories could not reliably determine the cause of the separation in the tire at issue.  *Kumho Tire*, 526 U.S. at 154-55; *see also Amorgianos* v. *Romano Enters.*, 303 F.3d 256, 267 (2d Cir. 2002) (district court should undertake rigorous examination of facts on which expert relies, expert's methodology, and application of that methodology to facts).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning and methodology was applied reliably to the facts, so as to be relevant and helpful to the jury.  *See Kumho Tire*, 526 U.S. at 137.  The fact that an expert may generally possess "specialized knowledge" does not automatically render his opinions in a case reliable.  *See SEC* v. *Lipson*, 46 F. Supp. 2d 758, 761 (N.D. Ill. 1998) (fact that witness is a certified public accountant, generally possessing the "specialized knowledge" to qualify as an expert witness, does not automatically render his opinions reliable).

Expert testimony is inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help."  *Andrews* v. *Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989).  In addition, expert testimony that "expresses a legal conclusion" should be excluded.  *Hygh* v. *Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).  As the Second Circuit explained, "[e]ven if a jury were not misled into adopting a legal conclusion

proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard — explicit or implicit — to the jury." *Id*. at 364. An expert "is not qualified to compete with the judge in the function of instructing the jury." *Id*.

In *United States* v. *Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987), the Second Circuit expressed discomfort with the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence." The Court stated that the district court must be vigilant to prevent an expert from coming "dangerously close to usurping the jury's function." *Id*.; *see United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (holding that expert testimony in securities fraud cases "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it"). In addition, testimony about industry practice — while itself otherwise permissible — may not be used to circumvent the prohibition on testimony on a legal conclusion. *Id*. at 1295.

The question whether facts are material is "well suited for jury determination." *Id*. at 1298; *see also United States* v. *Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) ("Determination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" (quoting *Bilzerian*, 926 F.2d at 1298)); *Litvak*, 808 F.3d at 182-83 (concluding that the district court erred by excluding materiality experts on relevance grounds instead of allowing some portions of expert testimony while limiting improper portions of expert testimony on the "ultimate question" of materiality); *United States* v. *Jacques Dessange, Inc.*, No. S2 99 CR. 1182 DLC, 2000 WL 294849, at *3

(S.D.N.Y. Mar. 21, 2000) (excluding proposed expert opinion on materiality relating to a visa application because "[t]he issue of materiality is for the jury to decide.").

### 2. Rule 703

Rule 703 of the Federal Rules of Evidence precludes an expert from disclosing to the jury "[f]acts or data that are otherwise inadmissible" unless the court determines that their probative value substantially outweighs their prejudicial effect, and the facts or data must be "of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject." Experts cannot be used as a substitute to calling witnesses to the events or facts at issue. For example, in *United States* v. *Zafar*, 291 F. App'x 425, 427 (2d Cir. 2008), the Second Circuit affirmed the district court's exclusion of the defendant's proposed expert testimony about the use of stock-selection software found on the defendant's computer in a securities fraud case. There was no evidence that the defendant actually used that software for stock trading at the time of the charged offenses. *Id.* The Court affirmed the district court's decision, because the defense expert was not trying "to show the jury how the software worked but to insinuate what had happened with respect to the relevant stock trades." *Id.*

### 3. Rule 704(b)

Rule 704(b) of the Federal Rules of Evidence expressly prohibits an expert from expressing "an opinion or inference as to whether the defendant did or did not have the mental state . . . constituting an element of the crime charged. . . ." The rule excludes such expert testimony because "[t]hose matters are for the trier of fact alone." Although "Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state," the expert is not permitted to "expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw." *United States* v. *DiDomenico*, 985 F.2d 1159, 1165 (2d

Cir. 1993) (citations omitted).  Courts must guard against expert witnesses using "semantic camouflage" to "stat[e] the bottom-line inference, and leaving it to the jury merely to murmur, 'Amen.'"  *Id.*

       **4.**        **Rules 401 through 403**

Rules 401 through 403 of the Federal Rules of Evidence provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury.  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595 (quoting authority omitted).

**B.**      **Discussion**

For the reasons set forth below, certain of Isaza Tuzman's proposed experts' proffered opinions are inadmissible and should be excluded.

       **1.**        **John T. Young, Jr.**

The defendant proposes to call Young to provide expert testimony about, among other things, "chapter 11 restructuring, the best practices for maximizing value in a sale transaction involving a public company, and the marketing and sale of public companies to private equity firms."  (Ex. A, at 1).[2]  The defendant seeks to have Young opine that this process, and certain steps the defendant supposedly took as part of it, demonstrate that he lacked the requisite *mens*

---

[2] Isaza Tuzman was removed as CEO in March 2012 and resigned from the KIT Digital board in April 2012. The company filed for bankruptcy on April 25, 2013.

*rea* to break the law during the time of the charged fraudulent schemes.  This testimony should be precluded because it is (1) lay hearsay testimony, not expert testimony, (2) irrelevant, (3) certain to create jury confusion and waste time, and (4) will usurp the role of jury on the central issue in the trial – the defendant's state of mind.

Among other things, the defendant intends to have Young offer the following inadmissible expert testimony:

- KIT Digital's November 2012 Form 8-K "contributed to the precipitous decline in the price of KIT Digital stock" because it "lacked key information and created uncertainty in the market."  (Ex. A, at 4, 6-7).

- KIT Digital's "failure to restate the Company's financial statements rendered any pre-bankruptcy sale process or attempt to attain rescue financings . . . impracticable. . . . Failure to restate KIT Digital's historical financials reveals that the Company and its advisors were not engaging in a good-faith and fulsome marketing process intended to maximize shareholder value." (Ex. A, at 4, 7).

- "The subsequent bankruptcy process of KIT Digital suffered from substantial deficiencies." (Ex. A, at 4).

- JEC Capital Partners, LLC was a "vulture fund" that "acquired a significant proportion of the shares of KIT Digital [and through] substantial agitation, threats, and demands . . . secured two of the five seats on the Company's Board and JEC Capital's principal, Peter Heiland, became interim CEO. . . . The course of events . . . wherein an activist investor intentionally drives the value of a company down in order to force a bankruptcy process . . . is a well-known strategy of activist investors such as JEC Capital. . . . The course of events . . . wherein an activist investor intentionally drives the value of a company down in order to force a bankruptcy process . . . is a well-known strategy of activist investors such as JEC Capital. . . . By employing this strategy against KIT Digital, JEC Capital acquired KIT Digital for a fraction of its value." (Ex. A, at 4-5).

- Because the CEO of KIT Digital was Mr. Heiland, the founder of JEC, "KIT Digital's Management was inherently conflicted and was biased in favor of JEC Capital. . . . JEC Capital manipulated the bankruptcy sales process to the disadvantage of third party bidders and in effect to bias the bankruptcy process in favor of JEC. . . . JEC Capital purchased KIT Digital at price below its value. . . . Unlike JEC Capital, Mr. Isaza Tuzman endeavored to capture value for KIT Digital shareholders." (Ex. A, at 8-11).

As a threshold matter, Young's testimony about who did what, and why, in connection with KIT Digital's bankruptcy process is plainly not the subject of permissible expert testimony. That is fact testimony, which the defendant can adduce by calling fact witnesses or testifying himself (subject to obvious concerns about the relevance of such testimony). Young is not a percipient witness and does not know what happened or the motive for such actions. *See* Fed. R. Evid. 702. To the extent Isaza Tuzman would claim that Young was able to opine on the motives of participants in the bankruptcy proceeding because Young had spoken to them – including, presumably, Isaza Tuzman himself – this would be a naked effort to put self-serving hearsay testimony before the jury while insulating it from effective cross-examination. Such an approach is inconsistent with Rule 703, as the limited value of such "facts" cannot possibly "substantially outweigh" the prejudice to the Government of spiriting hearsay statements in through the backdoor.

Furthermore, Young's proffered opinions about KIT Digital's bankruptcy, JEC Capital's role in that bankruptcy process, and the defendant's actions after leaving KIT Digital – including his efforts to "capture value for KIT Digital shareholders" – are irrelevant. *See United States* v. *Khan*, 787 F.2d 28, 34 (2d Cir. 1986) ("Expert evidence is not immune from the relevance requirement and must be excluded if irrelevant." (alterations omitted)). The central issue in this case is whether the defendant, between 2008 and 2012 when he was Chairman and CEO of KIT Digital, engaged in a fraud. The events described in the Young notice that followed the discovery of the alleged accounting fraud scheme – including the complicated post-fraud

bankruptcy proceedings – shed no light on the defendant's actions while at KIT Digital. For this reason, all of these opinions should also be excluded under Rule 401.[3]

Even if the Court were to find that Young's proffered testimony has some relevance, any probative value would be far outweighed by the jury confusion and distraction or waste of time that would result from allowing the jury to consider this testimony. First, the likelihood of Young's testimony confusing or distracting the jury is great because the jury will think that they have to unpack the cause of KIT Digital's bankruptcy — all of which post-dates the fraud allegations in this case — in order to determine the defendant's guilt. *See Cary Oil Co.* v. *MG Refining & Mkt., Inc.*, 257 F. Supp. 2d 768, 773 (S.D.N.Y. 2003) (excluding evidence that "would be distracting to the jury, focusing them on [] irrelevant issue[s]"). This is not the jury's task. But by inundating the jury with irrelevant post-hoc facts surrounding the bankruptcy proceedings,[4] the jury will no doubt assume the opposite. Second, and relatedly, Young's testimony would be a significant waste of time, resulting in a trial within a trial on bankruptcy principles, restructuring law, and the actions of JEC Capital. *See United States* v. *Ferguson*, 246 F.R.D. 107, 116 (D. Conn. 2007) (limiting the use of certain evidence, the introduction of which could have diverted the jury's attention to collateral questions and which risked "creating a trial within a trial") (citation omitted). The presentation of relevant evidence will consume enough of the jury's time; the defendant's attempt to attach a bankruptcy trial to this case should be rejected.

---

[3] At best, Young's testimony about the bankruptcy and JEC Capital's actions might be relevant at sentencing when determining an appropriate loss amount. However, it is not relevant at trial.
[4] The S8 Indictment mentions the bankruptcy process in a single sentence in the background section. (*See* Ind. ¶ 90 (noting the issuance of the November 2012 8-K and then stating that "In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.")

Young's proffered testimony should also be precluded because it usurps the jury's fact-finding role and, at bottom, seeks to "state an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged." Fed. R. Evid. 704(b). "Those matters are for the trier of fact alone." *Id.* A central issue in this case is whether the defendant had the requisite intent to engage in a fraud. Rule 704(b) expressly forbids calling an expert to testify about the defendant's subjective state of mind in a criminal case. Young contemplates doing exactly that. For instance:

- Young will "directly dispute" the Government's contention that "Mr. Isaza Tuzman was *motivated to engage in the charged accounting fraud scheme* in order to cause a sale of KIT Digital from which he would profit." (Ex. A, at 3) (emphasis added).

- The defendant "invited both searching and exacting due diligence in of [KIT Digital's] financials by [private equity buyers], as is done in virtually all private equity purchases of large companies like KIT Digital, and restricted his ability to sell his stock. A private equity firm would have substantial recourse, including against a company's officers and directors, upon discovery of misrepresentations or fraud, even if the sale transaction had been closed and consummated. It would be *against a CEO's interests to invite due diligence if he knew or suspected there was fraud underlying a company's financials*." (Ex. A., at 3, 5-6) (emphasis added).

- The defendant "undertook substantial efforts, at considerable personal expense, to purchase KIT Digital at a price per share above the then-current trading price." KIT Digital's Board "did not meaningfully engage" with the defendant on a potential sale of KIT Digital, even though the defendant's "efforts to purchase KIT Digital would have resulted in a better return to KIT Digital shareholders than the bankruptcy process ultimately yielded. It would have *been against Isaza Tuzman's financial interests* to purchase KIT Digital unless he believed the market was undervaluing KIT Digital, a belief which would have been inconsistent with knowledge of accounting fraud or other misrepresentations." The defendant's offer to buy KIT Digital in 2012 "at a price per share that was higher than the then-trading price are *indicia that Mr. Isaza Tuzman believed there was no underlying fraud or meaningful defects* in the Company, and its acquisition represented a valuable investment opportunity." (Ex. A, at 3-4, 8) (emphasis added).

This testimony is plainly impermissible, as it attempts to tell the jury – either explicitly or implicitly through "semantic camouflage," *DiDomenico*, 985 F.2d at 1165 – that the defendant's actions demonstrate that he lacked a guilty *mens rea*.

In addition to being forbidden by Rule 704(b), expert testimony that purports to tell the jury why the defendant took certain actions, whether those actions are consistent with committing fraud, does not "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, but instead usurps the jury's function by dictating a particular outcome, *United States* v. *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making the decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)). To this end, Rule 704 does not permit "opinions which would merely tell the jury what result to reach." Fed. R. Evid. 704 advisory committee's note; *see, e.g.*, *Bilzerian*, 926 F.2d at 1294 (expert testimony "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it"). Similarly, the district court must be vigilant to prevent an expert from coming "dangerously close to usurping the jury's function." *United States* v. *Nersesian*, 824 F.2d at 1308. Because Young's proffered testimony about the defendant's state of mind violates these principles, it should be precluded.[5]

_____

[5] In addition to precluding Young's opinions for the reasons set forth above, certain of the proffered opinions should be precluded because the defendant has not demonstrated that the opinions are the "product of reliable principles and methods." Fed. R. Evid. 702(c). For instance, Young seeks to testify that: (1) In or about late 2011, Isaza Tuzman invited both searching and exacting due diligence of the Company's financials;" and (2) "Private equity first seeking to buy KIT Digital . . . requested, reviewed, and/or analyzed due diligence materials . . . [and] offers to purchase KIT Digital were contingent on additional due diligence and access [to]

### 2.     Charles Bennett

The defendant proposes to call Bennett to provide expert testimony about market manipulation.  (Ex. B at 1.)   This testimony should be precluded because it is irrelevant and seeks to usurp the province of the jury by going to the ultimate issue of the defendant's guilt or innocence.

The Indictment alleges that the defendant agreed with others, including his co-defendant Omar Amanat and Stephen Maiden, to manipulate the market in KIT Digital shares by artificially inflating the stock's share price and trading volume.  (S8 Indictment ¶¶ 55-69).   As evidence of this manipulation, the Indictment points to, among other things, the 2008 Purchase Agreement involving Isaza Tuzman, Omar Amanat, and Steven Maiden (S8 Indictment ¶¶ 58-59), Maiden's pattern of matched trades of KIT Digital stock, (S8 Indictment ¶ 61), and Isaza Tuzman's withholding from KIT Digital's auditors information on the reasons for KIT Digital's investment in Maiden Capital (S8 Indictment ¶¶ 71-73).

The defendant seeks to elicit from Bennet expert testimony regarding the following:

- Bennett will testify about nine "*potential indictors or indicia of market manipulation schemes*," including "spread of false information or misleading information,"

corporate records and management."  (Ex. A at 3-5.)  The basis for Young's opinions regarding the due diligence that the defendant allegedly invited into KIT Digital or the due diligence that private equity firms actually performed of KIT Digital's financials is unclear.  Isaza Tuzman only proffers Young's "professional experience" in certain fields and review of "certain documents."  But such generalized "bases and reasons" do nothing to show how the opinions drawn from these sources meet *Daubert*'s reliability requirement or how such opinions are "connected to existing data" by anything other than "the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146. Because the defendant has not provided a sufficient foundation by which this Court can assess the reliability of these proffered opinions, these expert opinions should be precluded. At a minimum, if the Court were to entertain admitting this testimony a *Daubert* hearing would be necessary in order for the Court to properly assess the bases and reliability of the proffered opinions.

"spoofing," "use of high pressure or dishonest sales techniques," "collapse of the market for a security after the manipulative behavior has ceased," "domination and control of the market," "a pattern of matched trades and washed sales," "false restriction on the 'float,'" "concerted short selling," and "interference with the functioning of market information." (Ex. B, at 2-3) (emphasis added).

- "[B]ased on his review of the allegations in the Indictment and Maiden Capital's and Mr. Isaza Tuzman's trading in KIT digital during the alleged manipulative period, "these [nine] indicia of market manipulation are *absent* in connection with Mr. Isaza Tuzman's dealing with Stephen Maiden and trading of KIT digital stock." (Ex. B, at 2-3) (emphasis added).

- The December 30, 2008 agreement "*does not bear the traditional indicia of market manipulation*" and was "*consistent* with Maiden Capital's substantial, long-term position in KIT digital as an active investor." (Ex. B, at 2-3) (emphasis added).

- The related December 31, 2008 Facilitation Agreement "*does not bear the traditional indicia of market manipulation*." (Ex. B, at 2-3) (emphasis added).

- The communications between Maiden and the defendant "appear to be *consistent* with the types of communications that Mr. Isaza Tuzman had with other investors other than Stephen Maiden." (Ex. B, at 5-6) (emphasis added).

Bennett's testimony is both irrelevant and goes to the ultimate issue for the jury —

whether the defendant agreed to engage in market manipulation. Allowing an "expert" to testify

that the jury should consider certain "indicators or indicia of market manipulation schemes";[6]

that, in the case of the defendant, "these indicia of market manipulation schemes are absent"; and

that the various 2008 manipulative agreements do "not bear the traditional indicia of market

manipulation" is an improper effort to usurp the jury's function. *See Nersesian*, 824 F.2d at

1308 (district court must be vigilant to prevent an expert from coming "dangerously close to

---

[6]   Many of the indicia identified by Bennett are not even alleged in the Indictment. Bennett's opinions should also be precluded as irrelevant because their "absence" from the case sheds no light on whether or not the market was manipulated. The Government is not required to prove every possible indicia of a market manipulation scheme in order to establish the market was manipulated. To the contrary, the Government has alleged certain indicia of the scheme, and the issue for the jury is whether or not those indicia are present.

usurping the jury's function"); *Bilzerian*, 926 F.2d at 1294 (holding that expert testimony in securities cases "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it").

An evidentiary analogy makes the point clear. The Federal Bureau of Investigation and the United States Postal Inspection Service have dozens of highly-trained agents and inspectors who have devoted decades of their lives to investigating market manipulation and other types of securities fraud. Yet it would be wholly improper for the Government to call such an agent or inspector – no matter how seasoned and accomplished – as an expert witness to say that he or she had reviewed the evidence in the case and concluded that the defendant *did* commit the crime. Nor would such plainly impressible testimony be saved by employing the defendant's analogous rhetorical device of the agent instead testifying that the defendant's actions were "consistent with" the defendant committing fraud. The defendant cannot be allowed to attempt the reverse through Bennett's testimony, lest a criminal trial turn into a swearing contest by "expert" witnesses on both sides of the aisle.

Moreover, it would be improper for Bennett to assume counsel's responsibility to make arguments and suggest that the jury draw certain inferences from the evidence. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("[E]xperts should not be permitted to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." (internal quotation marks omitted)). For example, Bennett should not be permitted to opine that the communications between Maiden and the defendant "appear consistent with the types of communications that are typical between executives and investors" and were consistent with communications that the defendant had with other investors.

14

Essentially, the defendant offers Bennett as an expert in reading emails and determining whether they are fraudulent. Such testimony is nothing more than lawyer's argument dressed up in expert testimony. *See Nersesian*, 824 F.2d at 1308 (expressing discomfort with the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence").

Accordingly, these opinions should also be excluded.

### 3.    Gordon Klein

The defendant proposes to call Klein to provide rebuttal testimony to the Government's expert witness, Adoria Lim ("Lim"). (Ex. D, at 1). Lim will offer limited testify about certain principles of what is required under Generally Accepted Accounting Principles ("GAAP"); she will not testify about the defendant's conduct or offer an opinion about the facts of the case. Klein's testimony is not so circumscribed. Instead the defendant seeks to call him to offer opinions that will usurp the role of the jury.

For instance, Klein intends to testify that:

- Under GAAP, "KIT Digital's recording of its investment with Enable Invest Ltd. . . . as a 'cash equivalent' on its balance sheet was *not improper*. On the contrary, the Enable investment was *not unreasonable*." (Ex. D, at 2-3) (emphasis added).

- The "$2 million Enable investment does *not* appear to have been *material* to investors." (Ex. D, at 3) (emphasis added).

- Under GAAP, "KIT Digital's recording of its investment totaling approximately $1.15 million with Maiden [ ] as an 'investment' and not a 'related party transaction' was *not improper*." (Ex. D, at 3) (emphasis added).

- Under GAAP, "KIT Digital's recognition of revenue in connection with KIT Digital's software sales to TCN was *not improper*. . . . A later-arising dispute between contracting parties regarding the particular functionality that was agreed upon and/or whether the software was fully delivered *does not alter the reasonableness of the original revenue recognition*." (Ex. D, at 4) (emphasis added).

- Under GAAP, "[i]t is *not improper* for KIT Digital to coordinate a loan from a third party lender to TCN that would provide TCN with funds for satisfying its receivable to KIT Digital." (Ex. D, at 4-5) (emphasis added).

- Under GAAP, KIT Digital's overstatement in recording goodwill with respect to its acquisition of Sezmi was "error [that] only impacted aspects of the financials statements of the Company that *are not commonly regarded by investors as important*." (Ex. D, at 5) (emphasis added).

As with the defendant's other experts, Klein's proffered opinions should be precluded because they improperly usurp the jury's fact-finding role. Here, a key question for the jury will be whether KIT Digital's financial statements contained false statements and, if so, whether the defendant participated in a fraud that caused those false statements. Klein's intention to instruct the jury on what actions were "improper" and which actions were not does not help the trier of fact. Instead, it seeks to usurp the jury's role as primary arbiter of the evidence. "When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making the decision, but rather attempts to substitute the expert's judgement for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to makes its own informed determination." *Duncan*, 42 F.2d at 101.

Klein's proffered opinions as whether KIT Digital's accounting treatment of certain items was "material" to investors or had an impact on the financial statements is similarly improper. Materiality is a question for the jury, and expert testimony in which the expert expresses a conclusion on the ultimate issue on materiality is not admissible because it would do nothing more than tell the jury what result to reach.[7] *See Duncan*, 42 F.3d 97 at 101 ("When an expert

---

[7] *United States* v. *Litvak* is not to the contrary. There, the Court of Appeals held that the trial court erred by excluding a defense materiality expert on *relevance* grounds. *Litvak* made clear that expert testimony on general processes in the investment community – which bear on materiality – were "highly probative of materiality" and should have been admitted. 808 F.3d at

undertakes to tell the jury what result to reach, this does not *aid* the jury in making the decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)); *Jacques Dessange, Inc.*, 2000 WL 294849, at *3 (precluding expert from testifying on the issue of materiality because "the issue of materiality is for the jury to decide").

Accordingly, these opinions should also be excluded.[8]

### 4. Allen Farrell

The defendant proposes to call Ferrell to provide expert testimony about "economics and econometric analysis" (Ex. C at 1). Notwithstanding this vague description, the improper purpose of his proffered testimony is clear. Isaza Tuzman hopes to add Ferrell to his growing army of purported experts seeking to "opine" on the defendant's innocence. This testimony should be precluded because it is irrelevant and seeks to usurp the province of the jury by going to the ultimate issue of the defendant's guilt.

Ferrell's proposed testimony includes the following:

---

182. At the same time, the court explained that portions of the proffered expert testimony, in which the defense expert sought to opine on the ultimate issue of materiality "could have been properly limited by the District Court." *Id.* at 183. The Government seeks a similar limitation on the defendant's attempt to elicit improper ultimate issue testimony.

[8] In addition to precluding Klein's opinions for the reasons set forth above, certain of Klein's proffered opinions should be precluded because Isaza Tuzman has not demonstrated that the opinions are the "product of reliable principles and methods." Fed. R. Evid. 702(c). For instance, Klein intends to testify that KITD's overstatement of its "recorded goodwill . . . had no impact on KIT digital's total reported assets, reported owner's equity, reported sales, gross profit or net income as of December 31, 2011." (Ex. D at 5). Isaza Tuzman's expert notice indicates that Klein will testify that even if KIT Digital committed an accounting error, that error "had no impact" on company financials. But the defendant fails to identify which documents Klein relied on in reaching this far-reaching (and improper) opinion and what metric or methods Klein used to determine whether any such "impact" was present. For this reason, this opinion should be precluded as unreliable. At a minimum, if the Court were to consider allowing Klein to testify as described herein, this topic should be explored at a *Daubert* hearing.

- Testimony about whether Stephen Maiden's trading was consistent with or evidence of the charged market manipulation schemes:

  - "Maiden Capital's and Saxon's investment and trading in KIT digital stock was *consistent* with its stated investment strategy";

  - "Certain aspects of Maiden Capital's trading in KIT digital . . . are *inconsistent* with allegations of a coordinated scheme between these individuals to manipulate the price and volume of trading in KIT digital stock";

  - "Maiden Capital's (and Saxon's) trading in KIT digital after the investment by KIT digital and KIT Capital into Maiden Capital in 2009 and 2010 do *not suggest the existence of a coordinated scheme* between Stephen Maiden and Mr. Isaza Tuzman to facilitate Maiden Capital's trading in KIT digital";

  - "Because the Government's theory of a manipulative scheme between Stephen Maiden and Mr. Isaza Tuzman does not explain an economic motive or purpose for artificially increasing the stock price or trading volume of KIT digital stock . . . *it is implausible*";

  - "A limited number of statistically significant stock price movements is *consistent* with what one would expect based on random chance, and therefore does not support a view that the trading artificially increased KIT digital's stock price";

  - "There are possible *alternative explanations* . . . for Maiden Capital's and Saxon's buying and selling of KIT digital stock in the same or similar quantities on the same day and for the same or similar price";

  - "The alleged manipulative trade on March 9, 2009 is a trade between Maiden Capital and Saxon and therefore would be *consistent with a legitimate desire*

to increase the position in KIT digital stock in one fund (Maiden Capital) and decrease the position in KIT digital stock in the other (Saxon)"; and

- o "The trading between March 30, 2011 and April 29, 2011 by Saxon . . . is *inconsistent* with a claim that trading was done to artificially increase the price of KIT digital stock." (Ex. C, at 2-6) (emphasis added).

• Testimony about whether certain communication patterns and trading was consistent with or evidence of the charged market manipulation schemes:

- o "There is no discernable systematic *pattern* in Maiden Capital's or Saxon's trading vis-à-vis the *communications* with Mr. Isaza Tuzman";

- o "The Government fails to address the dates where there are *similar communications* during which Maiden Capital and/or Saxon either did not trade at all, or sold KIT digital shares"; and

- o "Maiden Capital (and Saxon) held and traded numerous stocks aside from KIT digital, and KIT Capital and KIT Digital were only two of many investors in Maiden Capital." (Ex. C, at 4-6) (emphasis added).

• Testimony about the statistical significance of stock price movements:

- o "KIT digital's stock price did not increase a statistically significant amount over the 30-day purchase period;"

- o "On none of [the Government's identified dates] did the stock price increase a statistically significant amount;"

- o "There were only a limited number of days when . . . the stock price increased by a statistically significant amount;" and

- o "A limited number of statistically significant stock price movements is consistent with what one would expect based on random chance, and therefore does not support a view that the trading artificially increased KIT digital's stock price." (Ex. C, at 3-5).

As before, Ferrell's proffered opinions should be precluded because they improperly

usurp the jury's fact-finding role. Here, the issue of whether Isaza Tuzman agreed to manipulate

the market in KIT Digital shares is a question for the jury to decide. It is improper for an expert

such as Ferrell "to tell the jury what result to reach" — that certain trading strategies evince

intentional manipulation or do not. *See Duncan*, 42 F.2d at 101. The investment strategies of

Maiden Capital and Saxon are not areas of expertise but are instead questions for fact witnesses

with knowledge of these investment strategies (such as Maiden) as supplemented by

contemporaneous documents relating to Maiden's considerations at the relevant time. The

defendant may not use proposed experts to introduce purely lay assertions. *See United States* v.

*Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) (lay opinion testimony is unhelpful where the jury is in

as good a position to assess the facts as the testifying witness). Of course, the defendant is free to

cross-examine Government witnesses in order to demonstrate possible alternative explanations

for the evidence of coordinated trading that the Government intends to introduce at trial.

Similarly, Ferrell's testimony that Maiden Capital and Saxon "held and traded numerous

stocks aside from KIT digital" and "KIT Capital and KIT Digital were only two of many

investors in Maiden Capital" is not expert testimony. They are basic facts about which Ferrell

has no specialized knowledge. What is more, the makeup of Maiden Capital's and Saxon's

trading portfolio has no bearing on whether or not Maiden Capital's and Saxon's trading was

part of a scheme to manipulate the market. The same is true for Ferrell's testimony that

companies *other than* KIT Capital and KIT Digital invested in Maiden Capital. What is relevant

in this case is KIT Capital's and KIT Digital's investments in Maiden Capital — investments

which show that Tuzman was responsible for a market manipulation scheme.

Nor should Ferrell be permitted to offer testimony that the lack of movement in KIT

Digital's stock price demonstrates that there was no scheme to artificially increase the

company's stock price. The facts surrounding Maiden's trading and the reason for it are factual

issues for the jury determine. Thus, while a summary witness could potentially graphically

represent certain trading in KIT Digital shares to show the facts with respect to Maiden's

positions in KIT Digital securities at relevant times, including the impact of that trading on the volume and share price (and, in the defendant's view, an absence of movement in price), it is for counsel to argue the significance of such data and for the jury to determine its weight. Additionally, it is axiomatic in criminal securities cases that the success of the scheme is not an element of the offense. Whether the defendants and their cohorts were successful in manipulating the stock to the extent that they wanted is not determinative of their guilt or innocence.

In addition, Ferrell's proffered opinions regarding the connections (or lack thereof) between Maiden Capital's or Saxon's trading and any communications with the defendant are irrelevant and should be precluded under Rule 401, and because they seek to usurp the role of jury. Ferrell has no specialized knowledge about these connections. He is simply being called to usurp the jury's function and offer argument under the guise of expert testimony. *See Nersesian*, 824 F.2d at 1308 (expressing discomfort with the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence").

Finally, the defendant's expert disclosure regarding Ferrell is also insufficient under Rule 16(b)(1)(C). As noted above, certain of Ferrell's opinions are that movements of KIT Digital's stock price were or were not "statistically significant." However, Ferrell offers no analysis, econometric or otherwise, underlying these opinions, and has thus failed to supply his "bases and reasons." In particular, Ferrell does not define what it means to be "statistically significant," and thus the Government is left guessing as to what Ferrell means and how he reached his conclusion.

For these reasons, these opinions should be precluded.

## CONCLUSION

For the reasons stated above, the Court should preclude certain proffered opinions of the

defendant's experts.

Dated: New York, New York
      October 2, 2017

                    Respectfully submitted,

                    JOON H. KIM
                    Acting United States Attorney for the
                    Southern District of New York

By:   /s/                    
                    Damian Williams
                    Andrea M. Griswold
                    Joshua A. Naftalis
                    Assistant United States Attorneys
                    Tel.: 212-637-2298 / 1205/ 2310