UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/19/17

UNITED STATES OF AMERICA,

- against -

KALEIL ISAZA TUZMAN and
OMAR AMANAT,

Defendants.

**MEMORANDUM
OPINION & ORDER**

S8 15 Cr. 536 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendants Kaleil Isaza Tuzman and Omar Amanat are charged with conspiracy

to commit wire fraud, wire fraud, investment advisor fraud, and conspiracy to commit securities

fraud. The Government claims that Tuzman – the former chief executive officer of KIT digital,

Inc. – and Omar Amanat of Enable Invest Ltd., conspired with others, including Stephen

Maiden, to have Maiden's hedge fund purchase and hold KIT digital's stock to artificially inflate

its price and trading volume, and to hide losses Maiden's hedge fund had sustained in Enable.

Tuzman is also charged with making false statements to the public and to auditors about these

transactions and KIT digital's finances. Tuzman has moved for a bill of particulars and an order

dismissing the S8 Indictment as violating the rule against specialty. (Dkt. No. 262) Omar

Amanat has moved to dismiss Count Four as duplicitous and to strike certain language in the S8

Indictment as surplusage. (Dkt. No. 269) Both Defendants have also moved for a severance.

(Dkt. Nos. 262, 269)[1] For the reasons stated below, Defendants' motions will be denied.

---

[1] The Defendants also moved to compel certain pretrial disclosures, but subsequently reached an
agreement with the Government that resolves this issue. (See Tuzman Reply (Dkt. No. 284) at
21)

## I.   THE S8 INDICTMENT'S FACTUAL ALLEGATIONS

Enable was a Dubai-based investment company managed by Irfan Amanat,[2] Omar Amanat's brother. (S8 Indictment (Dkt. No. 198) ¶ 3) Omar Amanat raised funds for Enable. (Id.) In June 2008, Omar Amanat solicited Tuzman to have KIT digital invest in Enable in exchange for Omar Amanat raising funds for a privately-held special purpose investment vehicle controlled by Tuzman that would invest in KIT digital (the "KIT digital SPIV"). (Id. ¶¶ 14, 18, 20, 22) To this end, in June 2008, Omar Amanat induced Stephen Maiden to have his hedge fund, Maiden Capital, invest $1 million in the KIT digital SPIV. (Id. ¶ 19) In the following months, Tuzman obtained approval from KIT digital's Board of Directors to invest $6.5 million – more than half of KIT digital's available cash – in Enable. (Id. ¶¶ 22-23) Tuzman also re-directed Maiden Capital's $1 million investment in the KIT digital SPIV to Enable, without Maiden's authorization. (Id. ¶ 24) Most of KIT digital's investment in Enable was placed in Enable's U.S. trading account. (Id. ¶ 25) By September 2008, that trading account had incurred more than $5.5 million in trading losses, and contained less than $113,000. (Id. ¶¶ 25-26) Both Irfan Amanat – who controlled the account – and Omar Amanat were aware of the losses. (Id. ¶¶ 26-27)

In November 2008, Tuzman made a redemption request for a portion of the KIT digital funds held by Enable. (Id. ¶ 28) In order to satisfy Tuzman's request, Omar Amanat asked Maiden to invest $2 million from Maiden Capital in Enable on a supposedly short-term

---

[2] On August 9, 2017, this Court granted a severance to Irfan Amanat in order to provide his counsel with sufficient time to prepare for trial. (Aug. 9, 2017 Tr. (Dkt. No. 380) at 5)

basis, and Maiden agreed to do so. (Id. ¶¶ 27-28) Omar Amanat then caused Enable to wire nearly $1.5 million to KIT digital. (Id. ¶ 28(a)-(c))

By mid-December 2008, Maiden began requesting the return of at least part of Maiden Capital's $2 million investment. Unbeknownst to Maiden, however, Enable "d[id not have the money] and "'d[id not] have any ability to repay it.'" (Id. ¶¶ 29-31) At the end of December – although Enable had not returned any funds to Maiden Capital – Maiden agreed with Tuzman and Omar Amanat that Maiden Capital would purchase $400,000 of KIT digital stock and hold it for 90 days. (Id. ¶ 58) Maiden also agreed not to redeem Maiden Capital's investment in either the KIT digital SPIV or Enable. (Id.) In return, Omar Amanat assigned a portion of his interest in the KIT digital SPIV to Maiden Capital, and Tuzman agreed to arrange for KIT digital to retain Maiden Capital for various services, and to assign to Maiden Capital a portion of Tuzman's interest in the KIT digital SPIV. (Id.) In a second agreement signed the same day, Omar Amanat and Tuzman agreed that Omar Amanat would facilitate further purchases of KIT digital stock in open market trading. (Id.) Both Omar Amanat and Tuzman were aware at this time that Enable was insolvent. (Id.) In January 2009, Maiden Capital purchased approximately $400,000 in KIT digital stock while Maiden continued to request the return of funds from Enable. (Id. ¶¶ 31, 59, 76(b))

In March 2009, during a telephone call with the Amanat brothers and Tuzman, Maiden learned that Enable was insolvent and that Maiden Capital's multimillion dollar investment in Enable was lost. (Id. ¶ 32) Over the next three years, in order to hide Enable's losses from Maiden Capital's investors and KIT digital's shareholders, Irfan Amanat provided false account statements concerning each entity's investment in Enable. (Id. ¶¶ 35-37, 98, 137) Maiden, in turn, provided false account statements to Maiden Capital's investors, including KIT

digital. (Id. ¶¶ 16, 35, 53, 80) Omar Amanat also wired hundreds of thousands of dollars to Maiden Capital to allow it to honor certain redemption requests. (Id. ¶¶ 38-41, 43-45) Omar Amanat, Tuzman, and Maiden discussed Enable's losses and insolvency in telephone and email communications, and in July 2011, they met to discuss these issues. (Id. ¶¶ 42, 62(e), 76(d))

Between March 2009 and September 2011, Tuzman, with Omar Amanat's knowledge and approval, induced Maiden to purchase more than $2 million worth of KIT digital stock, in part using KIT digital funds provided by Tuzman and Tuzman's own funds, in order to inflate the price and trading volume of KIT digital's stock. (Id. ¶¶ 60-62, 64-69) Tuzman and Omar Amanat represented to Maiden that supporting KIT digital's stock price would facilitate Maiden Capital being repaid, thereby hiding Maiden Capital's Enable losses. (Id. ¶ 60)

In addition to his use of the false account statements provided by Irfan Amanat and Maiden, Tuzman conspired with others to hide KIT digital's true financial condition between 2009 and 2012. Between 2010 and 2012, Tuzman arranged for KIT digital to improperly recognize revenue from sham licenses. (Id. ¶¶ 99-105) When the purported licensee refused to pay, Tuzman had KIT digital loan the licensee money in exchange for the licensee paying KIT digital's invoice. (Id. ¶¶ 106-115) Tuzman also used KIT digital funds in an escrow account to "pay off fabricated or [other] uncollectible receivables" so as to avoid negative accounting treatment, while at the same time claiming that the escrow account was empty. (Id. ¶¶ 116-136)

In March 2012, KIT digital's Board of Directors began questioning certain of the Company's investments, including in Maiden Capital, and Tuzman agreed to resign as chief executive officer. (Id. ¶ 80) In July 2012, Maiden Capital was unable to meet redemption requests and collapsed. (Id. ¶ 46)

## II.    CHARGES

Counts One, Two, and Three of the S8 Indictment charge Omar and Irfan Amanat with conspiracy to commit wire fraud, wire fraud, and aiding and abetting investment advisor fraud by (1) causing Maiden to make material misrepresentations and to omit material facts in communications with Maiden Capital investors about the status of their investments; (2) wiring hundreds of thousands of dollars to Maiden Capital in order to pay certain redemptions and forestall Maiden Capital's collapse; and (3) providing Maiden with false account statements regarding Maiden Capital's investment in Enable, knowing that such false account statements were intended to be presented, and were presented, to Maiden Capital investors. (Id. ¶ 50; see id. ¶¶ 47-48, 52-54)

Count Four charges Omar Amanat and Tuzman with conspiracy to commit securities fraud by inducing Maiden to manipulate the trading volume and price of KIT digital's stock in December 2008 and thereafter while concealing the true relationship between Maiden Capital and KIT digital. (Id. ¶¶ 56-76)

Count Five charges Tuzman with conspiracy to commit wire fraud by, inter alia, having KIT digital invest in Maiden Capital without disclosing the true relationship between KIT digital and Maiden Capital, and by using KIT digital's investments in Maiden Capital to redeem Tuzman's personal investments in Maiden Capital. (Id. ¶¶ 77-82)

Count Six charges Tuzman and Irfan Amanat with conspiracy to commit securities fraud, make false statements in SEC reports, and make false statements to KIT digital's auditors. This charge is premised on these defendants' use of false account statements concerning KIT digital's investments in Enable and Maiden Capital, (id. ¶¶137, 139, 141-143), as well as Tuzman's false statements regarding improper revenue recognition and loans made to delinquent KIT digital customers so that they would pay KIT digital invoices, (id. ¶¶ 97, 143).

5

## DISCUSSION

## I.    DEFENDANTS' SEVERANCE MOTIONS

Tuzman and Omar Amanat have moved for a severance. Omar Amanat contends that Counts One, Two, and Three – in which he is charged along with Irfan Amanat – are misjoined with Counts Five and Six, which name Tuzman and Irfan Amanat. (Omar Amanat Br. (Dkt. No. 270) at 22-26[3]) Both Omar Amanat and Tuzman contend that a severance is necessary due to irreconcilable defenses and spillover prejudice. (Id. at 26-33; Tuzman Br. (Dkt. No. 263) at 24-33)

### A.    Legal Standards for Joinder and Severance

Federal Rule of Criminal Procedure 8(b) provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Joinder of defendants in multiple-count indictments is proper where the charged conduct is "'unified by some substantial identity of facts or participants' or 'arise[s] out of a common plan or scheme.'" United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (quoting United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987)) (citing United States v. Green, 561 F.2d 423, 426 (2d Cir. 1977)); accord United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008). Joinder may be appropriate even where a defendant is not charged in a conspiracy count naming another defendant. Rittweger, 524 F.3d at 177-78 (citing United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003)).

---

[3] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

6

The Second Circuit has stated that joinder is proper when "common factual elements" of different charges are readily apparent. United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988). Thus, "counts might be 'connected' if one of the offenses 'depend[s] upon []or necessarily l[eads] to the commission of the other,' or if proof of one act 'constitute[s] []or depend[s] upon proof of the other." United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2006) (quoting United States v. Halper, 590 F.2d 422, 429 (2d Cir. 1978)) (alterations in Shellef). Similarly, where one offense stems from the other, that link "provides a sound basis for joinder under Rule 8(b)." Turoff, 853 F.2d at 1044. Finally, where two charged conspiracies are "intertwined" with each other, they are sufficiently related to justify joinder. Attanasio, 870 F.2d at 815.

Federal Rule of Criminal Procedure 14 provides that even where joinder is proper under Rule 8(b), a court may nonetheless grant a severance "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government. . . ." Fed. R. Crim. P. 14. In order to prevail on a severance motion under Rule 14, however, a "defendant must show not simply some prejudice but substantial prejudice." United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004) (quoting United States v. Werner, 620 F.2d 920, 928 (2d Cir. 1980)) (emphasis in Sampson). A defendant has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks and citation omitted). It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." Zafiro v. United States, 506 U.S. 534, 540 (1993). Instead, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or

innocence." Id. at 539. Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

The Second Circuit has noted that "the principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).

## B. Analysis

### 1. Omar Amanat's Argument that Counts One, Two and Three Are Misjoined with Counts Five and Six

Omar Amanat contends that Counts One, Two, and Three are misjoined with Counts Five and Six, because the first set of charges address fraud at Maiden Capital while the latter charges address fraud at KIT digital. (Omar Amanat Br. (Dkt. No. 270) at 21-22) According to Omar Amanat, these alleged fraudulent schemes "are distinct in their objectives, their victims, their methods, and their participants," and the KIT digital fraud scheme was "far more complex," involved multiple participants, and was undertaken without Omar Amanat's knowledge. (Id. at 22-24) Omar Amanat further contends that "proof of one scheme is not dependent on proof of the other." (Id. at 25) The Government argues, however, that the two sets of charges are "unified by a common scheme or plan . . . [by Defendants] to conceal the Enable losses." (Gov't Opp. (Dkt. No. 282) at 42-43)

"Rule 8(b) allows joinder of two or more defendants 'if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses.'" Rittweger, 524 F.3d at 177 (quoting Fed. R. Crim. P. 8(b)). The Second Circuit "ha[s] interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that 'joinder is proper where two or more persons' criminal acts are "unified by

8

some substantial identity of facts or participants," or "arise out of a common plan or scheme.""" Id. (emphasis added) (quoting United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990)). So long as this standard is met, "members of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy." Id. (citing Attanasio, 870 F.2d at 815).

For example, "[c]ourts have upheld joinder in situations where the criminal acts of one offense helped to finance the criminal acts of another offense." United States v. Ohle, 678 F. Supp. 2d 215, 225 (S.D.N.Y. 2010) (citing Turoff, 853 F.2d at 1045; United States v. Catapano, 05 Cr. 229, 2008 WL 3992303 (E.D.N.Y. Aug. 28, 2008)). Moreover, even where multiple conspiracies are charged, "[k]nowledge of the other conspiracy is not required," although proof of such knowledge "is an indicator of whether or not there is a common scheme or purpose." Id. at 225-26 (citing United States v. Menashe, 741 F. Supp. 1135, 1139 (S.D.N.Y. 1990)).

The Second Circuit has assumed without deciding that "[u]nder the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment.'" Rittweger, 524 F.3d at 178 (quoting Fed. R. Crim. P. 8(b)).

Here, the S8 Indictment charges a complex web of interrelated and overlapping fraud. Counts One, Two, and Three allege that the Amanat brothers and Maiden defrauded Maiden Capital's investors by hiding the Enable losses, in part through the use of false Enable account statements. (See S8 Indictment (Dkt. No. 198) ¶¶ 35-37) Count Six alleges that at this same time, Irfan Amanat worked with Tuzman and KIT digital's Chief Financial Officer Robin Smyth to provide similarly false Enable account statements to KIT digital. (Id. ¶ 137) While Omar Amanat is not charged with accounting fraud related to KIT digital, the Government has

alleged that Omar Amanat knew that (1) KIT digital had invested in Enable; (2) his brother was generating and providing false Enable account statements to Maiden; and (3) KIT digital had not disclosed the huge losses it had sustained in Enable. (See id. ¶¶ 20, 33-34, 42) Indeed, the Government alleges that Omar Amanat urged Maiden to force Tuzman to contribute more to support Maiden Capital because the collapse of Maiden Capital would reveal, inter alia, KIT digital's huge losses in its Enable investment and its related fraud. (See id. ¶ 42) In sum, although Omar Amanat is not charged with KIT digital's accounting fraud, the S8 Indictment includes allegations demonstrating that he was well aware that the fraud at Enable, Maiden Capital, and KIT digital was closely interrelated. Indeed, as the S8 Indictment alleges, Omar Amanat warned at the time that if Maiden Capital failed, a trustee would be appointed, and

> "he will quickly realize all money was lost in KIT Digital and everyone here will be sued. Securities laws violations have occurred. Criminal behavior jail time. Bottom line: [Maiden Capital] needs to be made whole or ship will sink."

(Id.) While Omar Amanat's "[k]nowledge of the [KIT digital accounting fraud] is not required," Ohle, 678 F. Supp. 2d at 225, the S8 Indictment alleges facts demonstrating that he well understood that the collapse of Maiden Capital would likely lead to criminal charges against the principals of Maiden Capital, Enable, and KIT digital.

The cases cited by Omar Amanat do not support his request for a severance. While a severance was granted in those cases, the only links between the various crimes charged were certain overlapping defendants and the type of crime. In United States v. Yaron, No. S2-10-CR-363 GBD, 2011 WL 3279054, at *1-*2 (S.D.N.Y. July 28, 2011), for example, the courts severed two conspiracy counts alleging fraud in contracting, because the only common elements were the defendants who had awarded the contracts and their desire for kickbacks. Similarly, in United States v. Greenfield, No. 01 CR 401 (AGS), 2001 WL 1230538, at *3 (S.D.N.Y. Oct. 16, 2001), the court granted a severance where the indictment charged the defendants with multiple

10

counts of insurance fraud, but the only connection between the crimes was a common desire to obtain insurance proceeds through fraud. And in United States v. Kouzmine, 921 F. Supp. 1131, 1132-33 (S.D.N.Y. 1996), the court severed counts charging a "separate and distinct immigration fraud conspiracy and related substantive counts that allegedly took place after [the two defendants moving for a severance], who initially were involved with [a third defendant], had a falling out with [the third defendant] and went into business for themselves at another location." Because of the "falling out between [the defendants], there [was] no colorable argument . . . that both conspiracies alleged here were part of a single overarching scheme." Id. at 1133.

Acknowledging that Omar Amanat and Tuzman may have had a less than amicable relationship, they – together with Maiden – agreed to conceal the Enable losses and worked together toward that end. As discussed above, because the disclosure of the disastrous losses at Enable would lead to the collapse of Enable, Maiden Capital, and KIT digital, and discovery of the alleged fraud taking place at all three entities, Omar Amanat, Tuzman, and Maiden shared a common interest and purpose in concealing the Enable losses. According to the Government's theory as outlined in the S8 Indictment, the alleged fraud schemes at all three entities were mutually interdependent. Disclosure of the losses and financial improprieties at any one of these three entities would likely lead to the collapse of the other two entities and the disclosure of fraud taking place at those entities. Although Omar Amanat argues that "[t]he government provides no authority for its position that the simple allegation that Enable losses were concealed, notwithstanding the dissimilar characteristics and circumstances of that concealment in each of the schemes, somehow satisfies Rule 8(b)'s standards for joinder" (Omar Amanat Reply (Dkt. No. 285) at 7), Rule 8(b) is satisfied by either "substantial identity of facts or participants" or "a common plan or scheme"; it does not require both. Rittweger, 524 F.3d at

177. Because the charges against Omar Amanat and Tuzman are premised on a common scheme or plan to hide the Enable losses, these counts are properly joined under Rule 8(b).[4]

## 2.    Irreconcilable Defenses

Both Omar Amanat and Tuzman argue that a severance is necessary because they have irreconcilable defenses: Omar Amanat intends to argue that Enable was not insolvent but merely illiquid, while Tuzman will argue that he was a victim of the Amanats' allegedly disastrous trading and fraud at Enable. (Tuzman Br. (Dkt. No. 263) at 30-31; Omar Amanat Br. (Dkt. No. 270) at 28-29) Both defendants also argue that their relationship is deeply antagonistic, such that each will act as a "'second prosecutor'" against the other.[5] (Id. at 30-33 (citation omitted); Omar Amanat Reply (Dkt. No. 285) at 12-14; Tuzman Reply (Dkt. No. 284) at 17-18 (quoting United States v. Shkreli, No. 15 Cr. 637(KAM) (E.D.N.Y. Apr. 19, 2017))) The Government argues that "[r]egardless of how Enable became unable to repay investors, [the defendants] united in a common scheme to hide Enable's insolvency from investors." (Gov't Opp. (Dkt. No. 282) at 49-50)

---

[4]  Although Omar Amanat argues that joinder is not justified by proof that one fraud scheme is dependent on another, (see Omar Amanat Br. (Dkt. No. 270) at 25), the Government's theory here is that there was a common scheme or plan to hide the Enable losses – not merely that the alleged KIT digital fraud scheme was dependent on the fraud schemes at Maiden Capital and Enable.

[5]  Assuming arguendo that Tuzman and Omar Amanat dislike each other, and that some evidence of this antagonism will emerge at trial, that circumstance alone does not require a severance. United States v. Cardascia, 951 F.2d 474, 485 (2d Cir. 1991) ("[A]n adversarial stance by a codefendant clearly does not, alone, require trials to be severed.") The mere fact that co-defendants dislike each other, or blame each other for their current predicament, does not demonstrate that the jury must necessarily convict one if it believes the other. Moreover, while there is evidence of antagonistic communications between Omar Amanat and Tuzman, it is not clear at this stage that these communications will be relevant or admissible at trial.

12

"Defenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'" United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003) (quoting United States v. Cardascia, 951 F.2d 474, 484 (2d Cir. 1991)) (citing Zafiro, 506 U.S. at 542 (Stevens, J., concurring)). But "'[m]utually antagonistic defenses are not prejudicial per se.'" United States v. Haynes, 16 F.3d 29, 32 (2d Cir. 1994) (quoting Zafiro, 506 U.S. at 538). Instead, a defendant must show that antagonistic defenses will result in prejudice such that "there is a serious risk that a joint trial would compromise a specific trial right." Zafiro, 506 U.S. at 539. Moreover, "'Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.'" Yousef, 327 F.3d at 151 (quoting Zafiro, 506 U.S. at 538-39).

Here, Tuzman and Omar Amanat have not set forth mutually antagonistic defenses, nor have they demonstrated that they will suffer prejudice to a specific trial right if a severance is not granted. Although the Defendants make much of the factual issue of whether Enable was insolvent or merely illiquid in late 2008 and beyond, the trial will not turn on whether Enable's trading losses rendered it insolvent or illiquid, but rather whether Amanat and Tuzman took steps to hide those trading losses from investors. In other words, a jury could accept Tuzman's argument that Enable was insolvent because of its trading losses, and still conclude that Omar Amanat did not conspire to hide these losses from investors. Similarly, a jury could reject Tuzman's claims that Enable was insolvent – and find that Enable was merely illiquid – but nonetheless acquit Tuzman. Accordingly, this case is not like those in which defendants have affirmatively argued that the other committed the charged offense. See e.g., United States v. Basciano, No. 05-CR-060 (NGG), 2007 WL 3124622, at *8 (E.D.N.Y. Oct. 23, 2007) (severing trial because "to the extent that the jury believes [one defendant's] defense that

he rescinded the hit on Pizzolo and [the other defendant] reordered it, the defenses are more than merely inconsistent; they are in direct conflict"); United States v. Copeland, 336 F. Supp. 2d 223, 224 (E.D.N.Y. 2004) (severing defendants where one defendant argued that "he was not involved in the bank robbery," while the other planned to introduce independent evidence that it was the first defendant who "entered the bank to commit the robbery").[6] Criminal liability here will turn on what, if anything, each Defendant conspired to hide from investors. While Defendants may present different theories to the jury and may disagree about one or more of the underlying facts, each defendant could be acquitted (or convicted) under either side's presentation of the facts.

Nor is this case comparable to United States v. Shkreli, No. 15-CR-637 (KAM), 2017 WL 4019387 (E.D.N.Y. Apr. 19, 2017), which Defendants also cite. (Tuzman Reply (Dkt. No. 284) at 6; Omar Amanat Reply (Dkt. No. 285) at 12-13) In Shkreli, the defendants – a hedge fund manager and his corporate attorney – were charged with defrauding investors. Id. at *1-*3. Each defendant planned to blame the other at trial: the hedge fund manager claimed that he relied on advice of counsel, while the attorney contended that he was a victim of the manager's fraud. Id. at *4. The court found that the defendants' defenses were not mutually antagonistic, because the jury was not required to convict one if it believed the other, because each could have misunderstood the other. Id. at *5. The court nevertheless granted a severance,

---

[6] United States v. Tootick, 952 F.2d 1078 (9th Cir. 1991) and United States v. Serpoosh, 919 F.2d 835 (2d Cir. 1990), cited by Defendants, (Omar Amanat Br. (Dkt. No. 270) at 33; Tuzman Br. (Dkt. No. 263) at 30), are likewise not on point. In Tootick, 952 F.2d at 1081, one defendant accused the other of having committed the charged assault. Similarly, in Serpoosh, 919 F.2d at 838 (2d Cir. 1990), "[b]oth defendants gave detailed and mutually exclusive explanations of their conduct on the day of the arrest. . . ."). There has been no such showing here. In any event, "mere finger pointing among codefendants is not sufficient to warrant severance." Copeland, 336 F. Supp. 2d at 224 (citing Haynes, 16 F.3d at 31-32 (noting that Serpoosh and similar authorities were overruled by the Supreme Court's decision in Zafiro")).

14

because of "extraordinary and unique facts": the attorney defendant intended to argue that the hedge fund manager was in fact guilty of the charged fraud. Id. at *6. There is no such record here.

While, in their motion papers, Tuzman states that he is a victim of the Amanats' disastrous trading at Enable (Tuzman Br. (Dkt. No. 263) at 24), and Omar Amanat references threats that Tuzman made to him at the time (Omar Amanat Br. (Dkt. No. 270) at 30-32), neither Tuzman nor Omar Amanat actually states that he intends to introduce evidence and arguments concerning these matters at trial. In any event, Amanat is not charged with having defrauded Tuzman, and Tuzman is not charged with having threatened Amanat. Instead, both men are charged with having defrauded investors.

The Court concludes that Defendants' claims of antagonistic defenses do not justify a severance.

### 3. Spillover Prejudice

Tuzman and Omar Amanat argue that a severance is justified based on the risk of spillover prejudice. Tuzman argues that he will suffer unfair prejudice as a result of evidence entered against Omar Amanat as to the Maiden Capital fraud charged in Counts One, Two, and Three.[7] (Tuzman Br. (Dkt. No. 263) at 24-30) Omar Amanat claims that he will suffer unfair prejudice as a result of the evidence that will be introduced against Tuzman in connection with the KIT digital accounting fraud. (Omar Amanat Br. (Dkt. No. 270) at 26-28) Omar Amanat also suggests there judicial economy will not be served by a joint trial, because the Maiden

---

[7] Tuzman also argues that he would be prejudiced by the introduction of Rule 404(b) evidence against Omar Amanat. (Tuzman Br. (Dkt. No. 263) at 24-30) The Government has stated, however, that it "does not presently intend to offer any 404(b) evidence." (Gov't MIL Opp. (Dkt. No. 443) at 19-20); see also Tuzman MIL (Dkt. No. 405) at 38-39 ("[T]he government did not provide notice of any Rule 404(b) evidence by the deadline of August 18, 2017. . . ."))

15

Capital fraud would not be relevant at a separate trial of the KIT digital fraud. (Id. at 27-28; Omar Amanat Reply (Dkt. No. 285) at 9-10)

"[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540 (citations omitted). Indeed, "[Fed. R. Crim P.] 8(b) and 14 are designed 'to promote efficiency and to avoid a multiplicity of trials [so long as] these objectives can be achieved without substantial prejudice to the right of the defendant to a fair trial.'" Id. (quoting Bruton v. United States, 391 U.S. 123, 131 n.6 (1968)) (alteration in Zafiro). Thus, in order to prevail on a motion for a severance, the defendant carries the "'heavy burden'" of showing "'not simply some prejudice but substantial prejudice [flowing from a joint trial].'" Sampson, 385 F.3d at 190 (emphasis in original) (citations omitted). Substantial prejudice might exist where evidence admissible at a joint trial "in some way affect[s] the jury's ability fairly and rationally to evaluate the evidence of . . . guilt [of each defendant]." United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996).

For example, a severance might be appropriate where some defendants are charged with serious violent crimes that will take months to trial, while other defendants are charged with less serious, non-violent offenses that could be quickly tried separately. In United States v. DiNome, 954 F.2d 839, 844 (2d Cir. 1992), the Second Circuit reversed two defendants' wire and mail fraud convictions due to spillover prejudice where they were tried in a 16-month organized crime trial with co-defendants facing RICO charges for "vicious murders, loansharking, auto theft, pornography, and firearms trafficking." Similarly, in United States v. Bellomo, 954 F. Supp. 630, 649-50 (S.D.N.Y. 1997), the court granted a severance to defendants

16

who were charged with illegal gambling, where their co-defendants faced much more serious RICO charges that would involve a "lengthy" trial.

Where "there exists [merely] some greater quantum of proof implicating one defendant compared to another, [however,] this fact alone does not justify severance, for 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.'" United States v. Kahale, 789 F. Supp. 2d 359, 393 (E.D.N.Y. 2009) (quoting United States v. Scarpa, 913 F.2d 993, 1015 (2d Cir. 1990)), aff'd sub nom. United States v. Graham, 477 F. App'x 818 (2d Cir. 2012); see also United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.").

Moreover, "the fact that [certain] evidence may be admissible against one defendant but not another does not require a severance." United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983) (citations omitted). A limiting instruction is sufficient to cure any potential for spillover prejudice. See United State v. DeVillio, 983 F.2d 1185, 1192-93 (2d Cir. 1993) (court's "explicit limiting instruction to the jurors that [testimony concerning an attempted murder by co-defendants] could not be used as evidence against [defendants who did not participate in the attempted murder]" was sufficient to protect against potential prejudice flowing from a joint trial); United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir. 1988) (despite defendants' claim that the "overwhelming majority of evidence introduced at trial was not admissible against them," a jury instruction was sufficient to ensure that the defendants did not suffer unfair prejudice).

Here, the combined trial of Tuzman and Omar Amanat is expected to last about six weeks. Only non-violent, allegedly fraudulent conduct is at issue.[8] Moreover, as discussed above, given the interconnectedness of the alleged fraud taking place at KIT digital, Enable, and Maiden Capital – all premised on a common desire to hide the trading losses at Enable – it is by no means clear that the evidence at separate trials would be significantly different. Finally, this is not a case where the evidence is so inflammatory that there is reason to be concerned that a jury may have difficulty in considering the evidence against each man separately, nor does there appear to be a significant risk of jury confusion. Cf. United States v. Gilbert, 504 F. Supp. 565, 571 (S.D.N.Y. 1980) (severing securities fraud defendant who was charged in only three of 36 counts because of disparity of proof and risk that jury might have difficulty distinguishing severed defendant from co-defendants).

The S8 Indictment contains only six counts, and the jury is not likely to confuse Tuzman's role at KIT digital with Omar Amanat's role at Enable. The concern seen in other cases about disparity of proof is absent here. Moreover, as discussed above, proof of the Enable trading losses is relevant to both the Maiden Capital and KIT digital fraud schemes. To the extent that other evidence is only admissible against one defendant, that issue can be adequately addressed through the use of a limiting instruction.[9]

---

[8] Tuzman's reliance on Basciano, 2007 WL 3124622, and James, 2007 WL 1579978, is entirely misplaced, given that those cases involve murders committed by a co-defendant.

[9] In arguing that a limiting instruction will be insufficient, Tuzman relies on United States v. McDermott, 245 F.3d 133 (2d Cir. 2001). (Tuzman Br. (Dkt. No. 263) at 32) That case is not on point. In McDermott, defendant A improperly leaked material non-public information to a prostitute, who in turn shared it with defendant B. McDermott, 245 F.3d at 139. The court found that a limiting instruction was not sufficient to prevent spillover prejudice, because a guilty verdict as to defendant B would require that defendant A be found guilty as well. Id. Here, by contrast, a jury finding Omar Amanat guilty would not be required to find Tuzman guilty, and a jury finding Tuzman guilty would not be required to find Omar Amanat guilty.

18

Defendants' motion for a severance will be denied.

## II.   OMAR AMANAT'S CLAIM THAT COUNT FOUR IS DUPLICITOUS

Omar Amanat argues that Count Four is duplicitous because it charges two

separate conspiracies, which Amanat refers to as "phase one" and "phase two." (Omar Amanat

Br. (Dkt. No. 270) at 33-34) According to Amanat, the "phase one conspiracy is premised on

> a written December 2008 Agreement among [Omar] Amanat, Tuzman, and
> Maiden for Maiden to make purchases of KIT Digital stock, in which each party
> provided consideration for the benefits allegedly sought by entering into that
> agreement.

(Id.) The "phase two" conspiracy is premised on

> an agreement in which only Tuzman and Maiden participated for Maiden to
> continue to make purchases of KIT Digital stock, and in which only Tuzman and
> Maiden provided consideration for the benefits sought.

(Id.) Omar Amanat argues that this Court "should either dismiss Count Four or require the

government to elect which of the two conspiracies it will seek to prove at trial." (Id. at 41)

The Government contends, however, that Count Four charges a single conspiracy

premised on a common scheme and plan to manipulate KIT digital stock. (Gov't Opp. (Dkt.

No. 282) at 38-41)

### A.   Legal Standard

"An indictment is impermissibly duplicitous where: 1) it combines two or more

distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there

be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." United States

v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (quoting Fed. R. Crim. P 8(a) (2001); United States

v. Murray, 618 F.2d 892, 896 (2d Cir. 1980)) (citing United States v. Margiotta, 646 F.2d 729,

733 (2d Cir. 1981)). "A duplicitous indictment, which alleges several offenses in the same

count, must be distinguished from 'the allegation in a single count of the commission of a crime

19

by several means.'" United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) (quoting

Murray, 618 F.2d at 896). In determining whether an indictment is duplicitous, a court should

consider

> "whether a general verdict of guilty [might] conceal[] a finding of guilty as to
> one crime and a finding of not guilty as to another, [whether there is a] risk
> that the jurors may not [be] unanimous as to any one of the crimes charged,
> assuring the defendant adequate notice, providing the basis for appropriate
> sentencing, and protecting against double jeopardy in subsequent
> prosecutions."

Sturdivant, 244 F.3d at 75 (quoting Margiotta, 646 F.2d at 733) (citing Murray, 618 F.2d at 896).

"'A conspiracy involves an agreement by at least two parties to achieve a

particular illegal end.'" United States v. Rigas, 281 F. Supp. 2d 660, 664 (S.D.N.Y. 2003)

(quoting United States v. LaSpina, 299 F.3d 165, 174 (2d Cir. 2002)). The Second Circuit has

"frequently noted that the 'essence of conspiracy is the agreement and not the commission of the

substantive offense.'" McDermott, 245 F.3d at 137 (quoting United States v. Gore, 154 F.3d 34,

40 (2d Cir. 1998)) (citing United States v. Walker, 142 F.3d 103, 112 (1998)). "'In order to

prove a single conspiracy, the government must show that each alleged member agreed to

participate in what he knew to be a collective venture directed toward a common goal. The co-

conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the

essential nature of the plan.'" Rigas, 281 F. Supp. 2d at 664-65 (quoting McDermott, 245 F.3d

137).

"[I]t is well established that '[t]he allegation in a single count of a conspiracy to

commit several crimes is not duplicitous, for "[t]he conspiracy is the crime and that is one,

however diverse its objects."'" Murray, 618 F.2d at 896 (quoting Braverman v. United States,

317 U.S. 49, 54 (1942)). "[A]cts that could be charged as separate counts of an indictment may

instead be charged in a single count if those acts could be characterized as part of a single

continuing scheme." United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989) (citing

Margiotta, 646 F.2d 733).

Thus, "[a] single conspiracy may be found where there is mutual dependence and

assistance among the [participants], a common aim or purpose . . . or a permissible inference,

from the nature and scope of the operation, that each actor was aware of his part in a larger

organization where others performed similar roles equally important to the success of the

venture." United States v. Vanwort, 887 F.2d 375, 383 (2d Cir. 1989) (quoting United States v.

Bertolotti, 529 F.2d 149, 154 (2d Cir. 1975)) (internal quotation marks omitted).

> All that needs to be proved is that it reasonably could be inferred that [the
> defendants] participated in the alleged enterprise with a consciousness of its
> general nature and extent. The members of the conspiracy do not have to
> conspire directly with every other member of it, or be aware of all acts committed
> in furtherance of the conspiracy, or even know every other member. There is no
> requirement that the same people be involved throughout the duration of the
> conspiracy.

Id. (quoting United States v. Rooney, 866 F.2d 28, 32 (2d Cir. 1989)) (internal quotation marks

omitted).

"Furthermore, 'a single conspiracy is not transposed into a multiple one simply by

lapse of time, change in membership, or a shifting emphasis in its locale of operations.'" Id. at

32 (quoting United States v. Cambindo Valencia, 609 F.2d 603, 625 (2d Cir. 1979), modified on

reh'g, 609 F.2d 603, 641 (2d Cir. 1980)); see also United States v. Martino, 664 F.2d 860, 876

(2d Cir. 1981) (a single conspiracy does not "become multiple merely because a long period of

time is spanned" (citing Murray, 618 F.2d at 902 (six years); United States v. Armedo-

Sarmiento, 545 F.2d 785, 789-90 (2d Cir. 1976) (four years))).

## B. Analysis

The S8 Indictment alleges that "[b]etween . . . December 2008 and . . . September

2011, [Tuzman][,] . . . .[Omar Amanat], . . . Maiden[,] and others engaged in efforts to artificially

21

inflate the share price and trading volume of [KIT digital] shares." (S8 Indictment (Dkt.

No. 198) ¶ 56) The S8 Indictment then describes various purchases of KIT digital stock by

Maiden Capital at the instigation of Tuzman and Omar Amanat, beginning with Maiden's

agreement in December 2008 to purchase $400,000 worth of KIT digital stock and to hold it for

90 days. (Id. ¶¶ 58-63) Over the next two and a half years, Tuzman and KIT digital wired

Maiden additional funds to purchase KIT digital shares, "with the knowledge and approval of . . .

Omar Amanat." (Id. ¶¶ 61, 64-69) Although Omar Amanat contends that Count Four is

duplicitous, he concedes that the allegations in Count Four all address the same objective of

"manipulat[ing] the price of KIT Digital stock." (Omar Amanat Br. (Dkt. No. 270) at 35)

Omar Amanat argues that Count Four alleges two separate conspiracies, however,

because the S8 Indictment does not "specific[ally] alleg[e] that [Omar] Amanat actually

participated in, benefitted from, or did anything whatsoever to further Maiden's continuing

purchases of KIT Digital stock in the open market" after Maiden fulfilled the terms of the

December 2008 written agreement, or that Omar Amanat "knew anything about the[] [later

purchases of Kit digital stock]." (Id. at 36) But the S8 Indictment specifically alleges that

"between March 2009 and September 2011, with the knowledge and approval of TUZMAN and

OMAR AMANAT, the defendant, Maiden continued to manipulate [KIT digital's] stock price,

purchasing in excess of $2 million of [KIT digital] shares through Maiden Capital." (S8

Indictment (Dkt. No. 198) ¶ 61 (emphasis in original)). The S8 Indictment then proceeds to

discuss, in detail, several of the allegedly manipulative KIT digital stock transaction Maiden

engaged in. (Id. ¶¶ 61-63)

Even if the S8 Indictment had not alleged Amanat's "knowledge and approval" of

these later transactions, there is no requirement that "[t]he members of the conspiracy . . . be

22

aware of all acts committed in furtherance of the conspiracy." Vanwort, 887 F.2d at 383

(internal quotation marks omitted) (citation omitted). Moreover, Omar Amanat "need not have

agreed on the [later] details of the conspiracy" with Tuzman and Maiden "so long as they agreed

on the essential nature of the plan'" to manipulate KIT digital's stock. Rigas, 281 F. Supp. 2d at

665 (quoting McDermott, 245 F.3d at 137)).

        The cases cited by Omar Amanat (see Omar Amanat Br. (Dkt. No. 270) at 37-38;

Omar Amanat Reply (Dkt. No. 285) at 14-15, 17) are not to the contrary. In United States v.

Gabriel, 920 F. Supp. 498, 503 (S.D.N.Y. 1996), aff'd, 125 F.3d 89 (2d Cir. 1997), the

defendants were charged with conspiring to defraud customers by misrepresenting the materials

used to repair airplane components, making false entries to prevent discovery of these

misrepresentations, and covering up the scope of the misrepresentations. Despite the "broad,

conclusory language of the 'boilerplate' paragraphs" alleging these goals as a common plan,

Judge Rakoff concluded that the indictment's allegations described two separate conspiracies:

one conspiracy to deceive customers, and a second to cover-up the deception. Gabriel, 920 F.

Supp. at 503. The court pointed out that because one defendant, Vitti, did not join the

defendants' company until after customers discovered the problem, "[i]n essence, th[ere] is a

clear allegation of a new and separate conspiracy – different in impetus, duration, personnel and

purpose from the original conspiracy and founded on a desire to minimize the company's

potential liabilities by concealing the full extent of the original conspiracy in which Vitti played

no part." Id.[10]

---

[10] Even then, Judge Rakoff did not dismiss the charge as duplicitous, because "the Court of
Appeals has repeatedly cautioned that the determination of whether a conspiracy is single or
multiple is an issue of fact 'singularly' well suited to determination by a jury," and he "[could
not] conclude on the basis of the pleadings alone that there is no set of facts falling within the

In United States v. Munoz-Franco, 986 F. Supp. 70, 71 (D.P.R. 1997), the

defendants, who included two bank officers, were charged with conspiracy to defraud a bank.

The court noted that the indictment's "description of the overt acts is neatly divided between two

distinct sets of co-conspirators," and that each set of allegations does not mention the co-

conspirators from the other. Id. Given these circumstances, the court concluded that the

conspiracy charge was duplicitous. Id. at 72.

Here, Tuzman, Omar Amanat, and Maiden all allegedly agreed with each other at

the outset of the conspiracy that Maiden would make purchases of KIT digital stock in order to

manipulate KIT digital's stock price. Unlike in Munoz-Franco – where certain defendants did

not know the other alleged co-conspirators and did not agree to or stand to benefit from the

others' fraud – the acts of Tuzman and Maiden were "approv[ed] [by]" and continued to benefit

Omar Amanat, because these acts tended to conceal the Enable trading losses. (See S8

Indictment (Dkt. No. 198) ¶ 61) Nor was there a shift in the conspiracy's goal of manipulating

the price of KIT digital's stock when Maiden began receiving funds from Tuzman and KIT

digital for the purpose of purchasing KIT digital stock.

In sum, the S8 Indictment sufficiently alleges that there was "a common aim or

purpose" to manipulate KIT digital's stock price and that each conspirator, including Omar

Amanat, was "conscious[] of [the alleged conspiracy's] general nature and extent." Vanwort,

887 F.2d at 383 (internal quotation marks omitted) (citations omitted). Accordingly, Count Four

charges a single conspiracy and is not duplicitous.

---

scope of [the conspiracy charge] that could warrant a reasonable jury in finding a single
conspiracy." Id. at 504-05 (citations omitted).

## III.    TUZMAN'S MOTION FOR A BILL OF PARTICULARS

Tuzman moves for a bill of particulars "identify[ing] the specific purchases and sales of securities, other than those specifically identified in the indictment, that the alleged conspirators executed in connection with the charged conspiracy in Count Four." (Serpe Decl. (Dkt. No. 264) ¶ 5) Noting that the S8 Indictment alleges that Maiden purchased more than $2 million of KIT digital stock as part of the market manipulation conspiracy charged in Count Four, Tuzman argues that he cannot prepare for trial without knowing "[h]ow . . . the government arrive[d] at [that] figure," the size and number of those trades, the "types of trades" that are "improper," and how those improper trades differ from legitimate trades. (Tuzman Br. (Dkt. No. 263) at 35) Tuzman further complains that because the Government will not confirm that every trade was fraudulent, without more particularized information, he will be forced to explain the events surrounding legitimate transactions. (Id. at 35, 38) The Government responds that, given the detail set forth in the S8 Indictment and subsequent discovery and guidance, it has disclosed sufficient information for Tuzman's defense. (Gov't Opp. (Dkt. No. 282) at 32-37) The Government further states that it "consider[s] all trading after December 31, 2008 to be in furtherance of the conspiracy . . . [but] [cannot] rule out the possibility that Maiden executed isolated trades for legitimate purposes." (Id. at 34)

### A.    Legal Standard

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars where necessary to """prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.""" United States v. D'Amico, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (quoting United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting United States v. Bortnovsky, 820 F.2d

572, 574 (2d Cir. 1987) (per curiam))). The decision to grant or deny a bill of particulars "rests within the sound discretion of the district court." Bortnovsky, 820 F.2d at 574.

"A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." United States v. Gibson, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) (citing United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995)). "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." United States v. Gotti, No. 02 Crim. 743 (RCC), 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004) (citing Bortnovsky, 820 F.2d at 574); accord United States v. Mandell, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) ("The standard for determining whether a bill of particulars is appropriate is based on necessity . . . .").

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." Bortnovsky, 820 F.2d at 574 (citations omitted); see also United States v. Walsh, 194 F.3d 37, 47 (2d Cir.1999) ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." (citing United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990))). However, "[t]he Government d[oes] not fulfill its obligation merely by providing mountains of documents to defense counsel[,] who [a]re left unguided as to which documents [the Government will use at trial]." Bortnovsky, 820 F.2d at 575. But "the [G]overnment need not provide particulars where it has none." United States v. Rajaratnam, No. 09 Cr. 1184(RJH), 2010 WL 2788168, at *9 (S.D.N.Y. July 13, 2010).

"[T]he proper inquiry is not whether the requested information would be helpful to the defense, but rather whether the information is necessary to the defense." United States v.

Dupree, No. 10-CR-627 KAM, 2011 WL 5976006, at \*6 (E.D.N.Y. Nov. 29, 2011) (emphasis in original) (citing Torres, 901 F.2d at 234; United States v. Feola, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989)). "It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts." Feola, 651 F. Supp. at 1132. "'[W]heres, whens, and with whoms'" of the conspiracy are "'beyond the scope of a bill of particulars.'" United States v. Barret, 824 F. Supp. 2d 419, 439-40 (E.D.N.Y. 2011) (quoting United States v. Mitlof, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)) (citing United States v. Matos–Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988)).

   In applying these principles, courts have differentiated between cases in which only isolated illegal activity is alleged, and cases in which most or all activity is alleged to have been illegal. In Bortnovsky, for example, the Second Circuit reversed convictions for mail fraud, conspiracy to defraud the United States, and Racketeer Influenced and Corrupt Organizations Act ("RICO") violations arising from a scheme to submit false and inflated insurance claims for burglaries and fire damage that never occurred. Bortnovsky, 820 F.2d at 573. Because the Government introduced evidence of twelve burglaries and provided defense counsel with four thousand documents, but only contended that four burglaries were fake and three documents were fraudulent, the court found that it was error to deny a bill of particulars identifying which burglaries were fake and which documents were fraudulent. Id. at 574-75. Similarly, in United States v. Nachamie, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the Government produced discovery concerning two thousand Medicare claims, and stated that it would specify which were alleged to be false forty-five days before trial. Judge Scheindlin required the Government to provide a bill of particulars identifying which claims it planned to prove at trial were false and

27

how they were false. Nachamie, 91 F. Supp. 2d at 574. "[B]oth Bortnovsky and Nachamie presented the quintessential 'needle in a haystack' problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent." Kahale, 789 F. Supp. 2d at 376.

By contrast, in United States v. Dupree, the court found no need for a bill of particulars. In that case, defendants were charged with "with various counts of Bank Fraud, Making a False Statement, and Conspiracy to Commit Bank, Mail, and Wire Fraud . . . aris[ing] out of an alleged scheme to defraud Amalgamated Bank ('Amalgamated'), a financial institution, and C3 Capital, LLC, a private equity investment firm, by obtaining, and attempting to obtain, loans for GDC [defendants' company] and its subsidiaries on the basis of false financial statements and other material misrepresentations." Dupree, 2011 WL 5976006, at *1. "[T]he government ha[d] previously stated that it believe[d] all of the accounts receivable figures on all financial statements, BBCs, and aging reports submitted to Amalgamated and C3 Capital during the charged period of the conspiracy [were] false." Id. at *7. Relying on Bortnovsky, the defendants "requested[] . . . that the government specify . . . (1) the consolidated financial statements and BBCs [Borrowing Base Certificates] alleged to be false, (2) the entries alleged to be false, and (3) the alleged 'fictitious,' 'prematurely recognized,' and 're-aged' sales and 'improperly booked' cash by date, amount, customer, invoice number, and line item." Id. at *6 (citation omitted). The court rejected defendants' request, because "defendants . . . [were] not searching for only a few allegedly false documents among the thousands produced like in Bortnovsky; rather, the government alleges that defendants committed a 'large, multi-year fraud that permeated and sustained their entire business.'" Id. (citation omitted); see also United States v. Drivas, No. 10-CR-771 NG, 2012 WL 3011023, at *4 (E.D.N.Y. July 19, 2012)

.

28

(Government's representation "that 'all the transactions billed to Medicare by Bay Medical [were] fraudulent, as [that] clinic existed primarily to commit fraud' . . . [was] sufficient to vitiate defendants' demand for particulars 'identify[ing] specific documents and transactions the Government contend[ed] [we]re fraudulent.'" (citations omitted)).

Similarly, in United States v. Shteyman, defendants were charged with conspiracy to defraud the United States through false Medicare claims. Shteyman, No. 10 CR 347 SJ, 2011 WL 2006291, at *1(E.D.N.Y. May 23, 2011). While the indictment alleged a total loss of $3.5 million, it only listed a sample of the allegedly fraudulent claims. Id. at *4. The court noted, however, that "the Government has stated that it is its position that [the clinic's] only business was to bilk the Medicare Program," because a representative study had "conclude[d] that approximately 98% percent of the sample claims were inappropriate." Id. at *4 & n.7. As a result, the court denied the request for a bill of particulars identifying the remaining fraudulent claims, because "'the prosecution is . . . arguing that every last penny collected or billed by [the defendants' clinic] are criminal proceeds.'" Id. (citation omitted).

## B. Analysis

The Court concludes that the Government has provided Tuzman with the "necessary" information to defend himself against the charge set forth in Count Four. The Government has identified in the various charging instruments, discovery materials, and other communications – including its opposition here – the identity of Tuzman's co-conspirators, the duration of the conspiracy, and the details of the formation of the illegal agreement. (See, e.g., S8 Indictment (Dkt. No. 198) ¶¶ 56, 58) In addition, the Government has disclosed multiple overt acts in the S8 Indictment that reveal the alleged means by which Tuzman and his co-conspirators meant to carry out the scheme. (Id. ¶ 76) The Government has also provided a wealth of information in discovery, including a spreadsheet that "detail[s] thousands of

29

purchases and sales of [KIT digital] securities by Maiden Capital." (Def. Br. (Dkt. No. 263) at 35) The Government has also stated that it is operating under the presumption that all of Maiden Capital's trading in KIT digital stock during the relevant time period was manipulative. (Gov't Opp. (Dkt. No. 282) at 34) Tuzman has had more than a year to review this information and has known for nearly two months what exhibits the Government plans to introduce at trial. What has already been provided to Tuzman is sufficient to allow him to adequately prepare for trial.

Tuzman's claim that particularized trade information is necessary is belied by the very questions he claims he needs answered. The fact that Government has disclosed "thousands" of trades, combined with its belief that most, if not all, were manipulative, shows that it does not contend there were merely "a handful of large [improper trades]." (Tuzman Br. (Dkt. No. 263) at 35) The S8 Indictment also explains that the difference between Maiden's trading in KITD stock before and after the conspiracy was entered into – to the extent any trading in the period before the conspiracy is even relevant – is that "one of the big incentives for [Maiden] to buy stock – give up economics etc was for [Tuzman] to put a couple million into [Maiden's] fund." (S8 Indictment (Dkt. No. 98) ¶ 67) And while "defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy," Feola, 651 F. Supp. at 1132, the S8 Indictment alleges that the "types of trades . . . the government consider[s] improper" are those in which the alleged conspirators provided Maiden Capital with funds to conduct the trades to inflate KIT digital's stock price, (see, e.g., S8 Indictment (Dkt. No. 98) ¶ 61), and engaged in "wash" trading that inflated its trading volume. (See, e.g., id. ¶ 61(a)-(c)).

Tuzman cites no market manipulation case in which a court has required that particularized trade information be disclosed. As he acknowledges, in United States v.

30

Rajaratnam, 2010 WL 2788168, at \*4-\*9, the court required disclosure of the dates inside information was provided and the substance of that information, but ruled that "the defendants are not entitled to an itemization of the trades at issue in the conspiracy counts" because of disclosures of trading activity made in relation to substantive insider trading counts. Id. at \*4-\*9; see also United States v. Contorinis, No. 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739, at \*1-\*2 (S.D.N.Y. May 5, 2010) (requiring only that "the government . . . submit a bill of particulars with respect to the material, non-public information allegedly disclosed"). Similarly, this Court ruled in United States v. Martoma, No. 12 CR 973 PGG, 2013 WL 2435082, at \*6 (S.D.N.Y. June 5, 2013), that disclosure of trading information in relation to substantive insider trading counts sufficed as to the conspiracy charge. In these cases, disclosure of some allegedly illegal trading activity was found sufficient. Here, an earlier charging instrument provided Tuzman with trading detail supporting a substantive securities fraud count. (See Indictment (Dkt. No. 4) ¶¶ 1-29) His "requests seek[ing] disclosures detailing on an individualized basis those trades and other acts that the Government claims manipulated the price of [KIT digital] stock . . . aim to 'compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars.'" United States v. Wey, No. 15-CR-611 (AJN), 2017 WL 237651, at \*19 (S.D.N.Y. Jan. 18, 2017) (quoting United States v. Levy, 11-cr-62, 2013 WL 664712, at \*13 (S.D.N.Y. Feb. 25, 2013)).

Nor are the non-securities fraud cases cited by Tuzman – which rely on Bortnovksy and Nachnamie – persuasive here. This case does not "present the quintessential 'needle in a haystack' problem [in which a] defendant[] [is] faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government [seeks] to prove were fraudulent." Kahale, 789 F. Supp. 2d at 376.

Tuzman's request for a bill of particulars will be denied.

## IV.   OMAR AMANAT'S MOTION TO STRIKE

Omar Amanat has moved to strike certain allegations from the S8 Indictment as "highly prejudicial, misleading, and extraneous to the charges," arguing that they could mislead the jury. (Omar Amanat Br. (Dkt. No. 270) at 41, 43)

"While Federal Rule of Criminal Procedure 7(d) permits a court to 'strike surplusage from the indictment,' 'it has long been the policy of courts within the Southern District to refrain from tampering with indictments.'" United States v. Daugerdas, No. S3 09 CR 581 (WHP), 2010 WL 4967878, at *1 (S.D.N.Y. Nov. 22, 2010) (quoting United States v. Bin Laden, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000)). Moreover, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike." United States v. Mostafa, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013) (citations omitted). "[I]f it should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial." United States v. Butler, 351 F. Supp. 2d 121, 124 (S.D.N.Y. 2004).

Here, it is not this Court's practice to give "speaking" indictments such as the S8 Indictment to the jury. In the event that the Court decides to provide the jury with the S8 Indictment either in whole or in part, Amanat may renew his motion to strike. For the present, Amanat's motion is denied without prejudice.

## V.   TUZMAN'S RULE OF SPECIALTY CHALLENGE

### A.   Tuzman's Arrest and Extradition from Colombia

On August 12, 2015, a grand jury in this District issued the S1 Indictment, which charged Tuzman with (1) conspiracy to commit securities fraud, (2) securities fraud in

32

connection with Maiden's purchases of KIT digital stock, (3) conspiracy to commit wire fraud, (4) wire fraud in connection with Tuzman's failure to disclose the relationship between KIT digital and Maiden's fund, (5) conspiracy to commit securities fraud, and (6) securities fraud in connection with false statements Tuzman made in SEC filings and to KIT digital auditors, and (7) two counts of making false statements in SEC filings. (Dkt. No. 7)

A warrant for Tuzman's arrest was issued that same day. (Nov. 18, 2015 Govt. Ltr. (Dkt. No. 21) at 5) Tuzman – who holds dual United States-Colombian citizenship – was in Colombia at that time, and the Government requested that Colombian authorities arrest Tuzman and extradite him to the United States. (Id. at 3) Tuzman was arrested in Bogota on September 7, 2015, pursuant to the charges pending against him in the United States. (Id. at 2-3; Nov. 10, 2015 Def. Ltr. (Dkt. No. 15) at 2)

On October 13, 2015, the Government prepared a formal extradition package based on the S1 Indictment, (Serpe Decl. (Dkt. No. 264-6), Ex. 6 at 33 (Extradition Package Ex. B)), and submitted it to the Colombia Ministry of Foreign Affairs on October 21, 2015. (Nov. 18, 2015 Gov. Ltr. (Dkt. No. 21) at 3) On March 16, 2016, the Colombia Supreme Court approved Tuzman's extradition on Counts One, Three, and Five of the S1 Indictment – the conspiracy counts – but denied extradition as to the remaining substantive counts. (Serpe Decl. (Dkt. No. 264-5), Ex. 5 at 1, 97) The Colombia Supreme Court also set forth several conditions for Tuzman's extradition, including that Tuzman "cannot, under any circumstance, be tried for prior or different acts than those which are [the] reason and authorization for his extradition." (Id. at 94) On June 23, 2016, the United States sent Colombia Diplomatic Note No. 1044, stating that Tuzman would not be subject to inhumane treatment, the death penalty, or life

imprisonment. (Dkt. No. 482-1) Tuzman was extradited to the United States on July 14, 2016. (See Dkt. No. 69)

## B. Tuzman Lacks Standing to Challenge the S8 Indictment on Specialty Grounds

Tuzman argues that the S8 Indictment violates the principle or rule of specialty "by alleging facts . . . that were not present in the S1 Indictment." (Tuzman Br. (Dkt. No. 263) at 18-19) Citing a recent line of Second Circuit cases, the Government contends that Tuzman lacks standing to raise such a challenge, and that – in any event – the Government is permitted to allege a broader set of facts in a superseding instrument. (Gov't Opp. (Dkt. No. 282) at 25-26) Tuzman responds that the decisions cited by the Government are limited to sentencing and other contexts not applicable here, and that earlier Supreme Court precedent is to the contrary. (Tuzman Reply (Dkt. No. 284) at 7-11)

"Under an extradition treaty, the principle of specialty means that an extradited defendant 'can only be tried for one of the offences described in th[e] treaty [under which he is extradited], and for the offence with which he is charged in the proceedings for his extradition.'" United States v. Barinas, 865 F.3d 99, 104 (2d Cir. 2017) (quoting United States v. Rauscher, 119 U.S. 407, 430 (1886)) (citations omitted). "[E]xtradition documents such as Diplomatic Notes implicate the same international legal rights as treaties[,] because 'a violation of [an] extradition agreement may be an affront to the surrendering sovereign.'" United States v. Suarez, 791 F.3d 363, 367 (2d Cir. 2015) (quoting United States v. Baez, 349 F.3d 90, 92 (2d Cir. 2003) (citing Fiocconi v. Attorney General of the United States, 462 F.2d 475, 479-80 (2d Cir. 1972)).

The Supreme Court recognized the principle of specialty in the 1886 case of United States v. Rauscher, 119 U.S. 407. In Rauscher, the defendant – the second mate of a ship

on the high seas – appealed his conviction for "unlawfully inflict[ing] . . . cruel and unusual punishment" on one of the crew. Rauscher, 119 U.S. at 409. The defendant had been extradited from Great Britain on the charge of murder pursuant to an extradition treaty between the United States and Great Britain which provided for extradition for certain offenses, including murder, but not including unlawfully inflicting "cruel and usual punishment." Id. at 409, 411.

> The Supreme Court considered whether a defendant,

> once being within the jurisdiction of [the prosecuting] country, no matter by what contrivance or fraud, or by what pretense of establishing a charge provided for by the extradition treaty, he may have been brought within the jurisdiction, he is, when here, liable to be tried for any offense against the laws, as though arrested here originally.

Id. at 422.

> The Court rejected that view, holding that

> "[t]he treaty . . . requires . . . that there shall be given up, upon requisitions respectively made by the two governments, all persons charged with any of the seven crimes enumerated; and . . . before he shall be delivered up on this demand, it must be shown that the offense for which he is demanded is one of those enumerated . . . . [T]he fair purpose of the treaty is that the person shall be delivered up to be tried for that offense, and for no other.

Id. at 422-23.

> The Court then stated the general principle that

> a person who has been brought within the jurisdiction of the court, by virtue of proceedings under an extradition treaty, can only be tried for one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition.

Id. at 430.

> Rauscher does not address standing, nor does it disclose whether Great Britain

had objected to Rauscher's prosecution. In several recent decisions, however, the Second Circuit has held that "'[a]s a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right

accruing to the accused.'" Barinas, 865 F.3d at 105 (quoting Shapiro v. Ferrandina, 478 F.2d 894, 906 (2d Cir. 1973)). As a result, "[a]n extraditee lacks standing to complain of noncompliance with an extradition treaty unless the 'treaty [contains] language indicating "that the intent of the treaty drafters" was that such benefits "could be vindicated" through private enforcement.'" Id. (quoting United States v. Garavito-Garcia, 827 F.3d 242, 247 (2d Cir. 2016)); see also Suarez, 791 F.3d at 367 ("'[A]bsent protest or objection by the offended sovereign, [a defendant] has no standing to raise the violation of international law as an issue.'" (quoting United States v. Reed, 639 F.2d 896, 902 (2d Cir. 1981)).

In United States v. Suarez, the defendant was extradited from Colombia on the condition – agreed to by the United States in a diplomatic note – that if convicted he not be subjected to cruel and unusual punishment, torture, or life imprisonment. Suarez, 791 F. 3d at 365. After Suarez was sentenced to 648 months' imprisonment – a term which the district court acknowledged was "'effectively a life sentence'" – he appealed his sentence on the ground that it violated the rule of specialty. Id. The Second Circuit held that "Suarez would only have prudential standing to raise the claim that his sentence violated the terms of his extradition if the Government of Colombia first ma[de] an official protest." Id. at 367 (citations omitted).

In United States v. Garavito-Garcia, defendant appealed the denial of his motion to dismiss the indictment on the grounds that his extradition violated the U.S.-Colombia extradition treaty. Garovito-Garcia, 827 F.3d at 246. Defendant argued that Colombian criminal procedure – incorporated into the extradition treaty by reference – required extradition within a certain time period, which had not been adhered to. Id. at 245-46. The Colombian Attorney General had rejected this argument in ordering the defendant's extradition, finding that the time period had been tolled for medical reasons. Id. The Second Circuit rejected defendant's claim

on two grounds: first, for reasons of comity, since Colombia had already rejected the defendant's proposed interpretation; and second, because Colombia had not objected to the defendant's extradition. Id. at 246-47. The court repeated Suarez's holding that "absent protest or objection by the offended sovereign, a defendant has no standing to raise the violation of international law as an issue," and held that Garavito-Garcia "lack[ed] standing to invoke the extradition treaty as a basis for the dismissal of the indictment." Id. (quoting Suarez, 791 F.3d at 367) (citing United States v. Bout, 731 F.3d 233, 240 n.6 (2d Cir. 2013)).

Here, Tuzman does not contend that the Colombian government has objected to his prosecution under the S8 Indictment. Nor does he argue that the extradition treaty between Colombia and the United States provides for a private right of action. As a result, Tuzman lacks standing to raise a challenge under the rule of specialty.

Tuzman's argument that Suarez applies only in the sentencing context is belied by the broad language used in that decision as well as subsequent Second Circuit decisions. While Suarez addresses a sentencing restriction contained in a diplomatic note, no part of the Second Circuit's analysis turns on the fact that Suarez is raising a sentencing issue. To the contrary, the court speaks in broad and general terms: "Generally speaking, 'absent protest or objection by the offended sovereign, [a defendant] has no standing to raise the violation of international law as an issue'. . . . Any individual right that Suarez may have under the terms of his extradition is 'only derivative through the state.'" Suarez, 791 F.3d at 367 (citations omitted)). While Tuzman argues that this language is "not central to [the decision's] core holding," (Tuzman Br. (Dkt. No. 263) at 22), Gravito-Garcia confirmed the breadth of the decision by applying Suarez outside

37

the sentencing context to a request to dismiss an indictment – the same request Tuzman makes here.[11] (Id. at 10).

Nor do the Second Circuit's recent decisions conflict with Rauscher. Tuzman points to Rauscher's quotation from an earlier decision stating that

> "a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, . . . which are capable of enforcement as between private parties in the courts of the country. . . . A treaty, then, is a law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined."

Id. (quoting Head-money Cases, 112 U. S. 580 (1884)) (citation omitted)). But Suarez and its progeny do not hold that a treaty can never confer rights enforceable by private parties; to the contrary, the Second Circuit has acknowledged this possibility, but only where "the 'treaty [contains] language indicating "that the intent of the treaty drafters" was that such benefits

---

[11] While Tuzman contends that Gravito-Garcia is distinguishable because it only addresses a procedural requirement, (Tuzman Br. (Dkt. No. 263) at 22 n.4; Tuzman Reply (Dkt. No. 584) at 10-11), standing is a threshold question. See Gravito-Garciau, 827 F.3d at 426-47; Suarez, 791 F.3d at 366-67 (noting that prudential standing, like Article III standing, is a "'threshold question'" (quoting Hillside Metro Assoc., LLC v. JPMorgan Chase Bank, Nat. Ass'n, 747 F.3d 44, 48 (2d Cir. 2014)). Moreover, the Second Circuit recently adhered to Suarez's broad holding in the context of a violation of supervised release proceeding, which followed the defendant's extradition for the crime underlying the supervised release violation. In United States v. Barinas, the Court summarized the state of the law as follows:

> [W]hile "[t]he 'principle of specialty' reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government," Fiocconi, 462 F.2d at 481, that principle can afford "the extraditee" himself a "remedy only if the surrendering government would object, since the underlying substantive wrong, which grows out of international law, is only to the latter," id. at 479-80 n.8. An extraditee lacks standing to complain of noncompliance with an extradition treaty unless the "treaty [contains] language indicating 'that the intent of the treaty drafters' was that such benefits 'could be vindicated' through private enforcement." Garavito, 827 F.3d at 247 (quoting Suarez, 791 F.3d at 367).

Barinas, 865 F.3d at 105.

"could be vindicated" through private enforcement.'" Barinas, 865 F.3d at 105 (quoting

Garavito-Garcia, 827 F.3d at 247 (contrasting "two distinct concepts: treaty language 'directly

benefiting private persons,' which international agreements regularly feature; and treaty

language indicating 'that the intent of the treaty drafters' was that such benefits 'could be

vindicated' through private enforcement, which is far less common" (footnotes omitted))).

        The general discussion in Rauscher and the Head-money Cases of what a treaty

may do provides no insight into what, if any, private rights of action the U.S.-Colombia treaty

and diplomatic note offer here. Indeed, the defendant in Barinas raised the same argument

Tuzman asserts here (see Reply Brief for Defendant-Appellant Eduardo Barinas, Barinas, 865

F.3d 99 (No. 16-2218), 2017 WL 564585, at *1-*6 (arguing that Suarez and Garavito-Garcia do

not apply to specialty challenges and that to the extent they are read broadly to preclude

international obligation challenges sounding in specialty, they do not comport with Rauscher)),

and the Second Circuit was not persuaded. See Barinas, 865 F.3d at 104 (quoting Rauscher, 119

U.S. at 430).

        Because Colombia has not objected to Tuzman's prosecution on the S8

Indictment, and because the U.S.-Colombia extradition treaty and diplomatic note do not provide

for a private right of action, Tuzman's specialty challenge will be denied for lack of standing.

## CONCLUSION

        For the reasons stated above, Defendants' pretrial motions are denied.

Dated: New York, New York
      October 19, 2017

                    SO ORDERED:

                    Paul G. Gardephe
                    United States District Judge