USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/27/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

KALEIL ISAZA TUZMAN and OMAR AMANAT,

Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Cr. 536 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Kaleil Tuzman – the former chief executive officer of KIT digital, Inc. – is charged with conspiracy to commit securities fraud and wire fraud. (S8 Indictment (Dkt. No.198)) A jury has been empaneled, and opening statements and the presentation of evidence began on October 30, 2017.

Robin Smyth is the former chief financial officer of KIT digital. (Id. ¶ 7) The Government claims, inter alia, that Tuzman, Smyth, and others conspired to inflate KIT digital's stock price and to hide its true financial condition from shareholders. Smyth pleaded guilty to conspiracy to commit securities fraud, securities fraud, and three counts of making false statements in KIT digital's SEC filings. (Dkt. No. 47) Smyth entered into a cooperation agreement with the Government. His direct testimony has been taken (see Nov. 17, 2017 Trial Tr. at 2625), and he is presently in the middle of cross-examination. (See Nov. 27, 2017 Trial Tr. at 3227)

In a November 21, 2017 letter – submitted after Defendant Tuzman's cross-examination of Smyth had begun – Tuzman seeks permission to cross-examine Smyth regarding his prior invocations of his Fifth Amendment privilege during a deposition in a state court civil action. (Nov. 21, 2017 Tuzman Ltr.) The Government argues that such questions should not be

permitted because they have "little probative value and [a] great risk of unfair prejudice."[1] (Nov. 24, 2017 Gov't Ltr. at 1) For the reasons stated below, Tuzman will not be permitted to cross-examine Smyth about his invocations of his Fifth Amendment privilege at the civil deposition.

## BACKGROUND

On March 15, 2016, Smyth pled guilty before Magistrate Judge Pitman to conspiracy to commit securities fraud, securities fraud, and three counts of making false statements in KIT digital's SEC filings. (Dkt. No. 47) This Court accepted Smyth's guilty plea on May 4, 2016. (Dkt. No. 52)

Tuzman and Smyth are defendants in Hudson Insurance Company v. Isaza Tuzman and Robin Smyth, Index No. 1555869/2016 (N.Y. Sup. Ct.). In that action, Hudson Insurance Company ("Hudson") sought a declaratory judgment that it was not obligated – under an excess liability policy issued to KIT digital – "to pay defense expenses on behalf of or to indemnify . . . Tuzman or Smyth" in connection with the instant criminal proceeding or a related SEC civil action. Hudson Insurance Company v. Isaza Tuzman and Robin Smyth, Index No. 1555869/2016 (N.Y. Sup. Ct. July 14, 2016) (Complaint ¶¶ 11-12). In its lawsuit, Hudson claimed that it was not liable under the excess liability policy because Tuzman and Smyth had knowledge – at the time that Smyth signed a warranty letter – that they had committed acts "which might give rise to [a] . . . litigation, claim, action, proceeding or investigation." (Id. ¶¶ 33, 34, 46-49)

On July 17, 2017, Irene Jaroslaw – an attorney at Hoguet Newman Regal & Kenney LLP – informed the Government that she represented Tuzman in the Hudson Insurance

---

[1] Although both sides submitted voluminous motions in limine prior to trial – in what has become a pattern – neither side addressed the complicated issue that is the subject of Tuzman's current application, submitted in the midst of the witness's cross-examination.

2

Company case, and that she intended to take Smyth's deposition in that action.[2] (July 17, 2017 Jaroslaw Email (Dkt. No. 350-2)) On July 18, 2017, the Government informed Jaroslaw that it was not a party to the insurance litigation and did not represent Mr. Smyth, and it "urged [Jaroslaw] to contact Mr. Smyth's criminal counsel, Michael Bachner, to coordinate a potential deposition date for Mr. Smyth." (July 19, 2017 Gov't Email (Dkt. No. 356-3)) Once contacted by Jaroslaw, Bachner informed her that Smyth intended to invoke his Fifth Amendment rights and decline to answer questions related to events at KIT digital. (Nov. 24, 2017 Gov't Ltr. at 1) Jaroslaw nonetheless insisted on proceeding with the deposition. (Id.)

At Smyth's July 27, 2017 deposition, Jaroslaw questioned him for approximately seven hours. (Nov. 24, 2017 Gov't Ltr., Ex. A (Dep. Tr.)) Most of Jaroslaw's questions at the deposition concerned Smyth's conduct at KIT digital, and her questions appear to be a "dry run" for the questions posed to Smyth on cross-examination in the instant criminal case.
For example, Smyth was questioned at his deposition – and has been questioned at trial – about his contacts with the U.S. Attorney's Office, disclosures to the U.S. Attorney's Office, contacts with potential witnesses, properties and bank accounts owned by himself or his wife, potential fraud committed at ROO Group regarding video-streaming numbers, contacts with Tuzman and Tuzman's responsibilities at KIT digital, Smyth's relationship with KIT digital's president Gavin Campion – another Government cooperating witness – and whether Smyth and Campion agreed to falsely implicate Tuzman. (Compare id. at 19-25, 33-38, 47-50, 67-68, 72-77, 78-81, 85-88, 98-107, 108-12, 117-19, with Nov. 17, 2017 Trial Tr. at 2768-2778, and Nov. 27, 2017 Trial Tr. at 3059-74, 3095-3100, 3108-3116, 3130-3146)

---

[2] Gibson, Dunn & Crutcher lawyers have handled Tuzman's representation at trial, but Jaroslaw is also listed as counsel of record for Tuzman in the instant criminal case. (Dkt. No. 339)

Jaroslaw also asked Smyth numerous questions about deceiving Tuzman, plans to give false testimony about Tuzman, coordinating with others to present false testimony about Tuzman, and what Smyth's testimony would be at the criminal trial. (See, e.g. Nov. 24, 2017 Gov't Ltr., Ex. A (Dep. Tr.) at 104 ("And it's a fact, isn't it, that you and Mr. Campion agreed to falsely implicate Mr. Isaza Tuzman in your criminal wrongdoing?"); id. at 165 ("Mr. Smyth, isn't it true that you intend to lie about Mr. Isaza Tuzman's participation in a conspiracy to deceive KIT digital's auditors and the public about the monies at Enable Invest?"); id. at 168 ("Isn't it a fact that it would be false to say that Mr. Isaza Tuzman misled KIT Digitial's auditors about the true reason for KIT Digital's investment in Maiden Capital?"); id. at 169 ("And isn't it a fact that you would be committing perjury if you were to testify under oath that Mr. Isaza Tuzman knew you and Rima Jameel had created Jourdian Invest?"); id. at 172 ("You intend to provide testimony against Mr. Isaza Tuzman that relates to TCN, correct? . . . Will it be your testimony that KIT digital did not deliver product to TCN?); id. at 174-75 ("And it's a fact, is it not, that you lied to Mr. Isaza Tuzman and never told him you were fabricating license agreements in order to artificially inflate KIT digital's revenues?"); id. at 186 ("Have you ever falsified evidence? . . . . Have you ever lied to the government?"); id. ("Do you plan to provide any testimony against Mr. Isaza Tuzman that relates in any way to these handwritten notes?"); id. at 218 ("Have you ever made an untrue statement regarding Mr. Isaza Tuzman?").

Similar questions have already been posed to Smyth during cross-examination in the criminal case. (See, e.g., Nov. 27, 2017 Trial Tr. at 3059 ("Sir, sometime between 2012 and 2015 when you were in Australia, you and a Mr. Gavin Campion agreed that you would each provide false testimony against Kaleil, correct?"); id. at 3073-74 ("Sir, on at least one occasion you even lied to Mr. Campion during your meetings between 2012 and 2015 in an effort to

4

convince him to join you in falsely blaming Kaleil for your frauds, right?"); id. at 3147 ("[Y]ou told the government that there wasn't any fraud at ROO Group before Kaleil arrived, right? . . . [W]hen you said that you didn't engage in anything improper at ROO Group before Kaleil arrived, that was a false statement, correct?"))

During the seven-hour deposition, Smyth invoked – at the direction of his counsel – his Fifth Amendment right to remain silent more than 350 times. (See, e.g., Nov. 24, 2017 Gov't Ltr., Ex. A (Dep. Tr.) at 16, 122-23, 126, 128) Tuzman's counsel repeatedly criticized Smyth's invocation of the privilege. (See, e.g., id. at 24 ("And if you did discuss these communications with the U.S. Attorney's office, then you have no privilege to assert. Do you understand that?"); id. at 166 ("You can't take the Fifth as to whether you've had discussions with the U.S. Attorney's office about this topic. That he is in conversations with the U.S. Attorney's office in no way can possibly incriminate him."); id. at 241-42 ("How can you take the Fifth Amendment? You've already discussed meeting with them. . . ."); id. at 248-49 ("[Y]ou do not understand the Fifth Amendment."))[3]

---

[3] Tuzman's counsel's deposition of Smyth can only be viewed as an attempt to evade the limitations on criminal discovery set forth in the Federal Rules of Criminal Procedure and related case law. Smyth was asked numerous questions that have no apparent relevance to the insurance dispute, including numerous questions about trial preparation with staff of the U.S. Attorney's office and what Tuzman's trial testimony would be on certain subjects. (See, e.g., Nov. 24, 2017 Gov't Ltr., Ex. A (Dep. Tr.) at 16 ("And did you review documents this week with the U.S. Attorney's office?"); id. at 114-16 ("Previously you testified that you met with the U.S. Attorney's office . . . who was present in the room besides yourself and, for a short time, your attorney? . . . [AUSA] Damian Williams was taking occasional notes on what you were saying; is that correct?"); id. at 166 ("Have you prepared with the U.S. Attorney's office to provide testimony regarding the Enable allegations?"); id. at 167 ("Do you intend to provide testimony that Mr. Isaza Tuzman conspired with Omar Amanat and Stephen Maiden to hide – [E]nable losses from both investors in Maiden Capital and KIT digital shareholders?"))

The fact that Tuzman's counsel continued to question Smyth as he invoked the privilege more than 350 times also indicates that the deposition was not intended to obtain information relevant

5

Tuzman now seeks permission to cross-examine Smyth regarding his invocations of the Fifth Amendment at the civil deposition. Tuzman wishes to introduce evidence that Smyth asserted his Fifth Amendment rights in response to the following questions:

- Did ROO Group have as many video streams as it reported publicly?

- And in fact it would be a lie to state that Mr. Isaza Tuzman had knowledge of your use of KIT digital's funds to finance the loan from Jourdian Invest to TCN, correct?

- And, in fact, any testimony that Mr. Isaza Tuzman was involved in fabricated contracts for the purpose of boosting KIT digital's revenue, that would be a lie, correct?

- And in fact you deceived Mr. Isaza Tuzman by fabricating the license agreements yourself, correct?

- And it's a fact, is it not, that you lied to Mr. Isaza Tuzman and never told him you were fabricating license agreements in order to artificially inflate KIT digital's revenues?

- And isn't it a fact that you deceived Mr. Isaza Tuzman by informing him that the Jourdian Invest loan was an arm's-length loan?

- Have you ever falsified evidence?

- So you're refusing to answer where you're staying now . . . because it will incriminate you? . . . And will it incriminate you because you and Mr. Petty are conspiring to frame Mr. Isaza Tuzman?

- Isn't it a fact that you and Mr. [Robert] Petty have discussed presenting false testimony to implicate Mr. Isaza Tuzman in your crimes?

(Nov. 26, 2017 Tuzman Ltr. at 3 (internal citations omitted))

Tuzman argues that

if Smyth <u>denies</u> on cross-examination that he deceived Mr. Isaza Tuzman, provided false testimony and evidence about Mr. Isaza Tuzman, or coordinated with others to present false testimony in this action, Mr. Isaza Tuzman is entitled to introduce testimony in which Smyth <u>previously remained silent in response to the very same allegations</u>, rather than denying them as false. Simply put, Smyth's

---

to the insurance coverage dispute, but rather was intended to provide a source of material that could be used at the criminal trial.

6

decision to remain silent is evidentiary and proper fodder for cross examination at trial.

(Id. at 4 (emphasis in original))

According to Tuzman, "unless constitutional questions are raised by the danger that a jury might equate use of the Fifth Amendment with guilt, the decision whether to allow questioning regarding prior invocations of the right to silence to impeach present testimony is left to the sound discretion of the trial court." (Nov. 21, 2017 Tuzman Ltr. at 3 (citing Grunewald v. United States, 353 U.S. 391 (1957)) Tuzman posits that "[a] defendant should [] be free to cross-examine government witnesses with prior invocations of the Fifth Amendment" – so long as invocation is inconsistent with the witness's testimony at trial – because there is no danger it might prejudice the defendant's assertion of his Fifth Amendment rights. (Id.)

The Government argues, however, that analysis of the factors set forth in Grunewald and its progeny "favor precluding Isaza Tuzman from using Smyth's silence to impeach his trial testimony." (Nov. 24, 2017 Gov't Ltr. at 4) In seeking to preclude such questioning, the Government also argues that "Smyth's repeated invocations . . . have vanishingly little probative value and [a] great risk of unfair prejudice." (Id. at 1)

## DISCUSSION

### I. LEGAL STANDARD

The Court concludes, and the parties agree (see Nov. 24, 2017 Gov't Ltr. at 4; Nov. 21, 2017 Tuzman Ltr. at 3-4), that the applicable analytical framework is set forth in Grunewald, 353 U.S. 391, and United States v. Hale, 422 U.S. 171 (1975).

Grunewald and Hale teach that a party may cross-examine a witness regarding his prior invocation of the Fifth Amendment only if that party "establish[es] a threshold inconsistency" between the witness's invocation of the privilege and his testimony at trial. Hale,

7

422 U.S. at 176; see also Grunewald, 353 U.S. at 419 ("[T]he threshold question here is simply whether, in the circumstances of this case, the trial court erred in holding that [the defendant]'s plea of the Fifth Amendment privilege . . . involved such inconsistency with any of his trial testimony as to permit its use against him for impeachment purposes.").

> In Grunewald, the Court identified three factors relevant to determining whether silence was inconsistent with later exculpatory testimony: (1) repeated assertions of innocence before the [tribunal]; (2) the secretive nature of the tribunal in which the initial questioning occurred; and (3) the focus on petitioner as potential defendant at the time . . . , making it "natural for him to fear that he was being asked questions for the very purpose of providing evidence against himself."

Hale, 422 U.S. at 178-79 (quoting Grunewald, 353 U.S. at 423)).

This Court's analysis of this issue is also guided by Second Circuit authority instructing that "the good faith assertion by a witness of his Fifth Amendment rights would ordinarily preclude an inference of inconsistency." United States v. Carr, 584 F.2d 612, 618 (2d Cir. 1978).

Finally, this Court's analysis is informed by precedent holding that evidence regarding an invocation of the right to remain silent generally has little or no probative value, while evidence of invocation carries a significant risk of unfair prejudice. In United States v. Zaccaria, 240 F.3d 75, 79 (1st Cir. 2001), the court – in concluding that the district court properly precluded the cross-examination of a Government witness about his prior invocation of the Fifth Amendment privilege – applied the Grunewald/Hale analysis and principles as follows:

> The Hale Court noted that the admissibility of this sort of disputed evidence necessarily hinges on the validity of the premise that silence in the face of questioning is inconsistent with – and thus impeaches – a later claim of innocence. [Hale, 422 U.S.] at 176, 95 S.Ct. 2133. The Court remarked [on] the dubiousness of that premise, stating that "[i]n most circumstances silence is so ambiguous that it is of little probative force." Id. The Court proceeded to mine the record in search of special circumstances that might have rendered Hale's silence inconsistent with a subsequent claim of innocence, and found none. Id. at 177-80, 95 S.Ct. 2133. As a result, the Court concluded that Hale's invocation of the

8

right to remain silent had virtually no probative value as an inconsistent statement. Id. at 180, 95 S.Ct. 2133.

The Hale Court then turned to the other pan of the scales. Balancing against the lack of probativeness, the Court found a substantial likelihood of unfair prejudice should the showing of silence be allowed. "The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted." Id. The resulting combination – scant probative value and a significant risk of unfair prejudice – proved deadly: the Court concluded that information about Hale's invocation of his right to remain silent should not have been allowed into evidence as a means of impeachment. Id. at 180–81, 95 S.Ct. 2133.

The same analytic framework pertains here. The admissibility vel non of evidence [about the government witness's] silence depends on constructing a balance involving the probative worth of the evidence and its unfairly prejudicial effect. See Fed. R. Evid. 403. Hale teaches that the trial court must start this task from a binary premise: (1) that silence per se generally has little or no probative value for impeachment purposes, [Hale,] 422 U.S. at 176, 95 S.Ct. 2133; and (2) that evidence of the invocation of the right to remain silent is inherently prejudicial, id. at 180, 95 S.Ct. 2133. Thus, a proffer of such evidence should be rejected unless special circumstances exist in a given case that materially shift the balance in favor of admissibility.

Zaccaria, 240 F.3d at 79 (footnote omitted).

## II. ANALYSIS

### A. Application of the *Grunewald/Hale* Factors

Applying the Grunewald/Hale factors here, Tuzman has not established the "threshold inconsistency" between Smyth's invocation of his right to remain silent at the civil deposition and his testimony or anticipated testimony at trial. Hale, 422 U.S. at 176. With respect to the first factor, Tuzman claims that "Smyth did not assert his innocence [as to fabricating evidence against Tuzman] during the July 2017 deposition." (Nov. 21, 2017 Tuzman Ltr. at 4) This assertion is false. In response to the accusation by Tuzman's counsel that Smyth had lied about Tuzman's awareness of illusory contracts at KIT digital, Smyth testified both that certain contracts were illusory and that "[Tuzman] was aware [of this fact]." (Nov. 24, 2017 Gov't Ltr., Ex. A (Dep. Tr.) at 207) Moreover, when Tuzman's counsel asked Smyth if he

9

"intend[ed] to lie about Mr. Isaza Tuzman's participation in a conspiracy to deceive KIT digital's auditors and the public about the monies at Enable Invest," Smyth testified, "No." (Id. at 165) Smyth also answered "No" to counsel's accusation that, "to the extent there was any fraud in declaring KIT digital's investments [i]n Enable Invest Ltd. a cash equivalent, [Smyth] committed this fraud without Mr. Isaza Tuzman's involvement." (Id.)

In connection with the first factor, the Grunewald Court also directs lower courts to consider whether the witness had "pleaded his Fifth Amendment privilege solely on the advice of counsel." Grunewald, 353 U.S. at 422. The deposition transcript here makes clear that Smyth asserted his Fifth Amendment privilege "on the advice of counsel," id., and Tuzman has not shown that Smyth invoked the privilege in bad faith. As noted above, the Second Circuit has stated that "the good faith assertion by a witness of his Fifth Amendment rights would ordinarily preclude an inference of inconsistency." Carr, 584 F.2d at 618.

Tuzman argues, however, that Smyth had "already incriminated himself" because he had pled guilty to securities fraud in this case. (See Nov. 21, 2017 Tuzman Ltr. at 3-4.) The questions posed by Tuzman's counsel at the deposition implicated much more than the crimes Smyth had pleaded guilty to, however. Many of those questions addressed whether Smyth had fabricated evidence, lied to federal officers, or conspired to commit perjury. Neither Smyth's guilty plea nor his cooperation agreement protect him from charges of perjury, false statement, or fabrication of evidence. Accordingly, it is clear both that Smyth had a sound basis to assert his Fifth Amendment right at the civil deposition, and that he relied on advice of counsel in asserting his Fifth Amendment privilege. Analysis of the first factor in the Grunewald/Hale test weighs in favor of preclusion.

The second factor – "the secretive nature of the tribunal in which the initial questioning occurred" – on its face does not cut strongly in either direction. Although Smyth's deposition was not held in secret and Smyth was represented by counsel, the deposition was not an "open court proceeding[], where cross-examination and judicially supervised procedure provide[d] safeguards for the establishing of the whole, as against the possibility of merely partial, truth." Grunewald, 353 U.S. at 423. During the seven-hour deposition, Tuzman's counsel badgered Smyth regarding his invocation of the Fifth Amendment and repeatedly prodded Smyth to admit that he was lying about Tuzman's involvement in the charged accounting fraud scheme. Hale teaches that, with respect to the second factor, courts should consider whether the witness may "have been intimidated by the setting, or at the very least, [] may have preferred to make any statements in more hospitable surroundings, in the presence of an attorney, or in open court." Hale, 422 U.S. at 179. Given the extremely hostile circumstances in which the deposition was taken, Smyth was likely "intimidated by the setting, or at the very least, [] may have preferred to make any statements in more hospitable surroundings." Id. Accordingly, the second factor also favors preclusion.

In connection with the third Grunewald/Hale factor, this Court must consider whether it was "'natural for [Smyth] to fear that he was being asked questions for the very purpose of providing evidence against himself.'" Hale, 422 U.S. at 178-79 (quoting Grunewald, 353 U.S. at 423)). Having reviewed the deposition in its entirety, it is evident to this Court that Smyth had ample reason to fear that Tuzman's counsel was attempting to demonstrate that Smyth had made false statements to federal agents, fabricated evidence, and was planning to commit perjury at trial. Although Smyth had pleaded guilty to the accounting fraud scheme charged in this case, Tuzman's counsel was attempting to pressure Smyth into admitting crimes

to which he had not pled guilty, and for which his guilty plea and cooperation agreement provided no protection, such as perjury and making false statements. Under these circumstances, it was "natural for [Smyth] to fear that he was being asked questions for the very purpose of providing evidence against himself." Grunewald, 353 U.S. at 424. Accordingly, the third Grunewald/Hale factor also favors preclusion.

Having considered the three Grunewald/Hale factors, this Court concludes that Tuzman has not demonstrated that Smyth's invocation of his right to remain silent at his deposition is inconsistent with any exculpatory testimony he might offer at trial concerning fabrication of evidence against Tuzman or deceiving Tuzman. Tuzman has also not shown "special circumstances . . . that materially shift the balance in favor of admissibility." Zaccaria, 240 F.3d at 79. Accordingly, Grunewald, Hale, and their progeny counsel that Tuzman's application should be denied.

B. **The Remaining Cases Cited By Tuzman Are Not On Point**

As noted above, Tuzman agrees that the analytical framework provided by Grunewald and Hale is applicable here. (See Nov. 21, 2017 Tuzman Ltr. at 3-4) Tuzman nonetheless cites a myriad of other cases to this Court in an effort to demonstrate that his proposed cross-examination of Smyth is appropriate. None of the cases cited by Tuzman demonstrates that cross-examination of Smyth concerning his invocation of the Fifth Amendment would be proper, however.

Several of the cases Tuzman cites (see id. at 5), relate to whether certain types of evidence or argument violate the Constitution. See, e.g., Fletcher v. Weir, 455 U.S. 603, 607 (1982) ("In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to

postarrest silence when a defendant chooses to take the stand."); Jenkins v. Anderson, 447 U.S. 231, 240-41 (1980) ("Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative th[a]n prejudicial. We merely conclude that the use of prearrest silence to impeach a defendant's credibility does not violate the Constitution."); United States v. Robinson, 523 F. Supp. 1006, 1007 (E.D.N.Y. 1981) (considering whether the prosecution's "comment upon evidence of pre-arrest silence where no defense case is presented" was "consistent with a defendant's Fifth Amendment privilege against self-incrimination"). The issue here is of an "evidentiary" and not of a "constitutional dimension," however. See Zaccaria, 240 F.3d at 79.

Other cases cited by Tuzman (see Nov. 26, 2017 Tuzman Ltr. at 4-5), merely recite boilerplate language about the Confrontation Clause and are not instructive as to whether Smyth's prior invocations of the Fifth Amendment privilege are probative here. See, e.g., United States v. Treacy, 639 F.3d 32, 44 (2d Cir. 2011) ("The Confrontation Clause guarantees a criminal defendant the right to delve into the witness' story to test the witness' perceptions and memory and to impeach, i.e., discredit, the witness. Although the scope of cross-examination is generally within the sound discretion of the trial court, the trial judge's discretion cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.") (internal quotation marks and citations omitted); Dunbar v. Harris, 612 F.2d 690, 693 (2d Cir. 1979) (the Confrontation Clause entitles defendants to ask questions where the "answers solicited might [] establish[] untruthfulness with respect to specific events of the crime charged") (internal quotation marks and citation omitted).

Still other cases relied on by Tuzman (see Nov. 21, 2017 Tuzman Ltr. at 3; Nov. 26, 2017 Tuzman Ltr. at 4) address evidentiary questions not at issue here. See United States v.

Deutsch, 987 F.2d 878, 883 (2d Cir. 1993) ("The district court has the discretion to prevent a party from calling a witness solely to have him or her invoke the privilege against self-incrimination in front of the jury."); Harris v. City of Chicago, 266 F.3d 750, 755-56 (7th Cir. 2001) (civil case applying the "well-settled principle that 'the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them'") (quoting Baxter v. Parmigiano, 425 U.S. 308, 318 (1976)).

United States v. Sing Kee, 250 F.2d 236 (2d Cir. 1957), is also inapposite. There, "[d]efense counsel questioned [a witness] on direct examination about his appearance before the grand jury," and the "answers given by the witness were factually accurate" but "capable of much broader interpretation." Id. at 240. Under those circumstances, the Second Circuit held that the "trial judge did not abuse his discretion by permitting the cross-examination" of that witness regarding his prior claim of privilege before the grand jury. Id. The court explained:

> Having brought the conduct of the witness before the grand jury into issue, the defendant cannot now complain that the government was permitted to develop all that happened so as to rebut an inference which was contrary to fact. The rule enunciated in Grunewald . . . was not intended to permit a defendant to draw out part of the facts from a witness while foreclosing the government on cross-examination from developing all the facts so that the partial account is not misleading.

Id. Here, however, the Government has not placed Smyth's conduct at the deposition at issue.

In sum, none of the cases cited by Tuzman demonstrate that the proposed cross-examination of Smyth would be appropriate.

C.     **Federal Rule of Evidence 403**

Even if Grunewald, Hale, and their progeny did not indicate that Tuzman's proposed questioning is inadmissible, the Court would preclude such questioning under Fed. R.

14

Evid. 403. Rule 403 provides: "The court may exclude evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Here, as already discussed, Smyth's invocation of the Fifth Amendment privilege upon the advice of counsel has little to no probative value. "'In most circumstances silence is so ambiguous that it is of little probative force.'" Victory v. Bombard, 570 F.2d 66, 70 (2d Cir. 1978) (quoting Hale, 422 U.S. at 176); see also State Farm Life Ins. Co. v. Gutterman, 896 F.2d 116, 119 (5th Cir. 1990) ("'The assertion of the [Fifth Amendment] privilege, particularly on the advice of counsel, is an ambiguous response.'") (quoting Farace v. Independent Fire Ins. Co., 699 F.2d 204, 210-11 (5th Cir. 1983)); United States v. Tomaiolo, 249 F.2d 683, 691 (2d Cir. 1957) ("Insofar as guilt or innocence is concerned, it is clear that claiming the privilege does not imply guilt which would be at all inconsistent with later protestations or indications of innocence."); U.S. ex rel. Carbone v. Manson, 447 F. Supp. 611, 622 (D. Conn. 1978) ("[I]t is not at all clear that any inference can be reasonably drawn from the invocation of the Fifth Amendment on the advice of counsel.").

Moreover, as the Zaccaria court recognized, "evidence of the invocation of the right to remain silent is inherently prejudicial." Zaccaria, 240 F.3d at 79. If Tuzman were permitted to elicit Smyth's prior invocation of the Fifth Amendment, there is a significant risk that the jury would give this evidence undue weight. See United States v. Morris, 988 F.2d 1335, 1339 (4th Cir. 1993) (noting the "ever present danger that a jury might misunderstand the context in which [] fifth amendment questioning occurs") (quoting Nezowy v. United States, 723 F.2d 1120, 1124 (3d Cir. 1983)); United States v. Barber, 668 F.2d 778, 785 (4th Cir. 1982) ("It

15

needs no extensive discussion to establish that, without a good reason, one should not be asked about the invocation of the Fifth Amendment Privilege."); Ross v. Am. Exp. Co., 35 F. Supp. 3d 407, 450 (S.D.N.Y. 2014) ("In many contexts, inferences from silence are perilous, and silence is often so ambiguous that it is of little probative force, inviting a fact finder to speculate as to its meaning.") (internal quotation marks and citation omitted).

Accordingly, even if Tuzman had satisfied the Grunewald/Hale test, this Court would preclude the proposed cross-examination of Smyth under Rule 403.

## **CONCLUSION**

For the reasons stated above, Tuzman's application to cross-examine Smyth regarding his invocation of his Fifth Amendment right at a civil deposition is denied.

Dated: New York, New York
November 27, 2017

SO ORDERED.

_Paul R. Gardephe_
Paul G. Gardephe
United States District Judge