UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>KALEIL ISAZA TUZMAN and<br>OMAR AMANAT,<br><br>Defendants. | S8 15 Cr. 536 (PGG) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
KALEIL ISAZA TUZMAN'S MOTION FOR JUDGMENT OF ACQUITTAL**

GIBSON, DUNN & CRUTCHER LLP

AVI WEITZMAN
AMER S. AHMED
*aweitzman@gibsondunn.com*
*aahmed@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone:   (212) 351-4000
Facsimile:   (212) 351-4035

MARCELLUS ANTONIO McRAE (*pro hac vice*)
*mmcrae@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:   (213) 229-7000
Facsimile:   (213) 229-7520

*Attorneys for Defendant Kaleil Isaza Tuzman*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT .................................................................................................................................. 2

I.  The Statute of Limitations for Count Four is Five Years because Dodd-Frank—which Enacted a Longer Six-Year Limitations Period—does not Apply Retroactively. ................................................................................................................ 4

II. The Government Filed the Indictment Outside of the Statute of Limitations. ................... 7

   A.  Relevant Law ........................................................................................................ 7

   B.  Under the Five-Year Limitations Period, Any Conspiracy Had Concluded Before August 12, 2010, *i.e.*, Five Years Before the Original Indictment. ............ 8

CONCLUSION ............................................................................................................................. 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carpenters & Joiners v. United States*,
   330 U.S. 395 (1947)......................................................................................................2

*In re Enter. Mortg. Acceptance Co., LLC. Sec. Litig.*,
   391 F.3d 401 (2d Cir. 2004)........................................................................................4, 5

*Falter v. United States*,
   23 F.2d 420 (2d Cir. 1928)............................................................................................6

*Grunewald v. United States*,
   353 U.S. 391 (1957)......................................................................................................8

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
   520 U.S. 939 (1997)......................................................................................................4

*Jackson v. Virginia*,
   443 U.S. 307 (1979)......................................................................................................2

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994)......................................................................................................4

*Toussie v. United States*,
   397 U.S. 112 (1970)......................................................................................................4

*United States v. Ben Zvi*,
   242 F.3d 89 (2d Cir. 2001)............................................................................................7

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012)............................................................................................3

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994)..........................................................................................3

*United States v. Fletcher*,
   829 F.2d 495 (2d Cir. 1991)......................................................................................7, 8

*United States v. Gentile*,
   235 F. Supp. 3d 649 (D.N.J. 2017) ..............................................................................6

*United States v. Gigante*,
   436 F. Supp. 2d 647 (S.D.N.Y. 2006)...........................................................................8

*United States v. Gigante*,
   982 F. Supp. 140 (E.D.N.Y. 1997) ................................................................................... 4

*United States v. Grimm*,
   738 F.3d 498 (2d Cir. 2013) ....................................................................................... 7, 9

*United States v. Josephberg*,
   562 F.3d 478 (2d Cir. 2009) ............................................................................................ 3

*United States v. Kapelioujnyj*,
   547 F.3d 149 (2d Cir. 2008) ............................................................................................ 3

*United States v. LaSpina*,
   299 F.3d 165 (2d Cir. 2002) ............................................................................................ 8

*United States v. Lorenzo*,
   534 F.3d 153 (2d Cir. 2008) ............................................................................................ 3

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) ............................................................................................ 4

*United States v. Richardson*,
   512 F.2d 105 (3d Cir. 1975) ............................................................................................ 6

*United States v. Taylor*,
   464 F.2d 240 (2d Cir. 1972) ............................................................................................ 3

*United States v. Valle*,
   301 F.R.D. 53 (S.D.N.Y. 2014) ....................................................................................... 3

*United States v. Valle*,
   807 F.3d 508 (2d Cir. 2015) ....................................................................................... 3, 4

*United States v. Zhou*,
   428 F.3d 361 (2d Cir. 2005) ............................................................................................ 3

*Weingarten v. United States*,
   865 F.3d 48 (2d Cir. 2017) .............................................................................................. 5

**Statutes & Rules**

18 U.S.C. § 371 ................................................................................................................. 5, 7

18 U.S.C. § 3282 ............................................................................................................... 1, 5

18 U.S.C. § 3301 ........................................................................................................... 1, 5, 6

Dodd-Frank Act, Pub. L. 111-230. ........................................................................................ 5

Fed. R. Cr. P. 29 ............................................................................................................................3

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Defendant Kaleil Isaza Tuzman, through undersigned counsel, respectfully moves for a judgment of acquittal on Counts Four, Five, and Six of the S8 Indictment on the ground that the government has failed to present sufficient proof on each and every element of Counts Four, Five, and Six from which a rational juror could conclude beyond a reasonable doubt that Mr. Isaza Tuzman is guilty of the charged crimes.

In addition to this general motion for judgment of acquittal in regard to all counts of the S8 Indictment as to which Mr. Isaza Tuzman is charged as a named defendant, Mr. Isaza Tuzman further moves for judgment of acquittal on Count Four on the ground that the government filed the original indictment in this action after the statute of limitations had expired.

## PRELIMINARY STATEMENT

Count Four of the S8 Indictment charges Mr. Isaza Tuzman with conspiring with Stephen Maiden and Omar Amanat to manipulate the market in KIT Digital's stock by inflating its value. There was a total failure of proof at trial on that theory of criminal liability. To the contrary, the evidence adduced at trial demonstrated that by August 2009, any such alleged market-manipulation conspiracy—if it ever existed (and it did not)—had ended. Instead, in and after August 2009, Mr. Isaza Tuzman repeatedly solicited Maiden *to sell* Maiden's KIT Digital stock to interested third parties, which sales would have put pressure on the stock *to reduce, rather than inflate, in price*. That proof is fatal to Count Four because it means the original indictment containing that count was filed outside of the applicable five-year statute of limitations.

First, the relevant statute of limitations for Count Four is the standard five-year limitations period under 18 U.S.C. § 3282(a). The six-year period called for in 18 U.S.C. § 3301 was added by the Dodd-Frank Act of 2010 and took effect in July 2010—long after the alleged conspiracy between Maiden and Mr. Isaza Tuzman had run its course. As a result, the

presumption against retroactive application of federal legislation to pre-enactment conduct should preclude application of the amended, longer limitations period to Count Four.

Second, the government has not proven that any of the Count Four co-conspirators committed an overt act in furtherance of the alleged Count Four conspiracy after August 12, 2010—five years before the government filed its original indictment under seal.  While we dispute the existence of a conspiracy at any point in time, the evidence establishes at a minimum that, after August 2009, Mr. Isaza Tuzman made clear that he did not care whether Maiden bought or sold KIT Digital stock.  Any purchases of KIT Digital shares by Maiden after August 2009 are consistent with his admitted enthusiasm for the company's shares based on his belief that it was undervalued, and also with Maiden's admissions that he had been manipulating KIT Digital stock long before the government alleges that Maiden and Mr. Isaza Tuzman entered into a conspiratorial agreement.

Given the evidence adduced at trial, there is no reasonable basis on which to permit Count Four to be submitted to the jury.  When competing inferences stand in equipoise, as a matter of law the prosecution has not met its burden of proof beyond a reasonable doubt.  The Court should acquit Mr. Isaza Tuzman on Count Four because the government filed its original indictment after the statute of limitations had expired.

## ARGUMENT

"[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979).  The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have found each element of the charged offense to have been proven beyond a reasonable doubt.  *Id.* at 319.  Although the jury is "permitted to enter an . . . unreasonable

verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." *Id.* at 317 n.10 (citing *Carpenters & Joiners v. United States*, 330 U.S. 395, 408 (1947)).

To safeguard that bedrock constitutional guarantee, Rule 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Cr. P. 29(a). While the Court must draw all reasonable inferences in the government's favor, *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009), the Court is nonetheless "obligated to 'consider the evidence presented at trial in its totality, not in isolation.'" *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou*, 428 F.3d 361, 369-70 (2d Cir. 2005)). "If the evidence is such that reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). If the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012).

Accordingly, where the evidence is "in equipoise," a judgment of acquittal is required. *Id.* This requirement is designed to ensure that the jury does not convict merely because it determines that "'the defendant is ***probably*** guilty.'" *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)) (emphasis in original). In other words, "where the evidence viewed in the light most favorable to the government is 'at least as consistent with innocence as with guilt,' the government has not met its burden" of proving the charged crime beyond a reasonable doubt. *United States v. Valle*, 301

3

F.R.D. 53, 97 (S.D.N.Y. 2014) (quoting *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994)), *aff'd in part, rev'd in part on other grounds*, 807 F.3d 508 (2d Cir. 2015) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

I.  **The Statute of Limitations for Count Four is Five Years because Dodd-Frank—which Enacted a Longer Six-Year Limitations Period—does not Apply Retroactively.**

The "presumption against retroactive legislation is deeply rooted in our jurisprudence." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Accordingly, courts should apply "this time-honored presumption unless Congress has clearly manifested its intent to the contrary." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997). This rule against retroactivity applies with equal force to statutes of limitations, *In re Enter. Mortg. Acceptance Co., LLC. Sec. Litig.*, 391 F.3d 401, 405-06 (2d Cir. 2004), which "are to be liberally interpreted in favor of repose," *Toussie v. United States*, 397 U.S. 112, 115 (1970) (citation omitted). The core rationale animating statutes of limitations is that "[i]t is unjust to force defendants to answer 'charges when the basic facts may have become obscured by the passage of time.'" *United States v. Gigante*, 982 F. Supp. 140, 154 (E.D.N.Y. 1997) (quoting *Toussie*, 397 U.S. at 114-15).

To implement this rule against retroactivity, the Supreme Court has articulated the two-step analysis that courts should apply:

> At the first stage, a court must "determine whether Congress has expressly prescribed the statute's proper reach." If Congress has done so, the inquiry ends, and the court enforces the statute as it is written. If the statute is ambiguous or contains no express command, the court proceeds to the second stage of the *Landgraf* test and "determine[s] whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." If the statute, as applied, would have such an effect, it will not be applied retroactively "absent clear congressional intent" to the contrary.

*In re Enter. Mortg.*, 391 F.3d at 405-06 (quoting *Landgraf*, 511 U.S. at 280).

Here, the conspiratorial agreement at the heart of Count Four is alleged to have begun on December 31, 2008. At that time, the statute of limitations for securities fraud charges under 18 U.S.C. § 371 was undeniably five years. 18 U.S.C. § 3282(a) (2008). Presumably, the government will argue that the limitations period is actually six years by virtue of the Dodd-Frank Act, which enacted a longer limitations period for specifically enumerated substantive and conspiratorial types of securities-fraud offenses. *See* 18 U.S.C. § 3301. That new statute of limitations provision was enacted on July 21, 2010, and took effect the next day. Dodd-Frank Act, Pub. L. 111-230 § 4, 124 Stat. at 1390 ("Except as otherwise specifically provided in this Act or the Amendments made by this Act, this Act and such amendments shall take effect 1 day after the date of enactment of this Act.").

The *Landgraf* analysis shows that Dodd-Frank's extended limitations period cannot apply to the conduct charged in Count Four. At step one, Dodd-Frank does not contain any statement indicating that the new six-year limitations period announced by that Act should apply retroactively. At step two, the Second Circuit has explained that "[e]xtending the statute of limitations retroactively increases a defendant's liability for past conduct by increasing the period of time during which a defendant can be sued." *In re Enter. Mortg. Acceptance Co.*, 391 F.3d at 406 (citation omitted). Thus, because the alleged Count Four conspiracy began prior to Dodd-Frank's enactment and the imposition of a six-year limitations period, the § 3282 five-year period applies.

Concededly, the Second Circuit has not yet ruled in the precise circumstances presented here—how the *Landgraf* presumption against retroactivity applies where the original statute of limitations applicable to the charged conduct had not yet expired at the time of the relevant

5

change in law. *Weingarten v. United States*, 865 F.3d 48, 56–58 (2d Cir. 2017) (addressing the issue in § 2255 context and showing "the lack of controlling authority on this difficult issue").[1] After a diligent search, undersigned counsel has not found a single case where a court in this Circuit has resolved whether Section 3301 may be applied retroactively. The only decision we have found that addresses—***and rejects***—the proposition that Section 3301 applies retroactively comes out of the Third Circuit, where, in *United States v. Gentile*, the district court refused to apply Section 3301's six-year limitations period to a crime that allegedly took place in 2008 because "at the time Defendant committed his criminal acts, he had a statutory right which protected him from criminal prosecution five years from the date he committed said acts." 235 F. Supp. 3d 649, 654 (D.N.J. 2017).

The holding of *Gentile* should apply here. The facts adduced at trial clearly demonstrate that the charged Count Four conspiracy—putting aside whether any such market-manipulation conspiracy existed in the first place—concluded well before July 22, 2010. As explained *infra*, the evidence shows that Mr. Isaza Tuzman repeatedly told Maiden after August 2009 that he did not care about Maiden's trading in KIT Digital. Moreover, Maiden's testimony alone demonstrates the danger of permitting limitations periods to be retroactively extended absent express congressional approval: In preparing for his testimony, Maiden met with the government "approximately 22" times, Tr. 990:23-25, with the purpose of those 22 meetings

---

[1] The Second Circuit has held that extended statutes of limitations do not violate the Constitution's Ex Post Facto Clause where the original statute of limitations had not run on the date of enactment. *See Falter v. United States*, 23 F.2d 420, 425 (2d Cir. 1928). But *Weingarten*'s holding strongly suggests that the Ex Post Facto analysis is distinct from the *Landgraf* retroactivity test; if it were otherwise, the Second Circuit would not have had occasion to describe the statutory-retroactivity issues presented in *Weingarten* as "difficult." *See also United States v. Richardson*, 512 F.2d 105, 106 (3d Cir. 1975) (recognizing *Falter*'s rule, but holding that Congress's intent to extend a limitations period retroactively is distinct from whether it could constitutionally do so consistent with the Ex. Post Facto Clause).

being to "go through all of the emails and *reacquaint [him]self with events that occurred over the years*." Tr. 992:7-12 (emphasis added).  Even then, due to the passage of time, Maiden could not "remember the precise words of many of the conversations at issue in this case," despite agreeing "that with regard to some of these conversations the *precise words* that were said *make a difference*." Tr. 994:6-15 (emphases added).  Indeed, Maiden's memory lapses were thrown into stark relief during recent hearings over the authenticity of certain emails—with Maiden flip-flopping mid-trial (notably, after his cooperator testimony had concluded) regarding whether he genuinely remembered receiving a particular email in 2009.  *See* Tr. 4286:15-4287:9.  This sort of faded memory—all too susceptible to suggestion—is precisely the evil that statutes of limitations are designed to protect against, and the Court should not allow the government to benefit from a longer limitations period enacted prospectively only after the alleged facts underlying Count Four had concluded.

**II.     The Government Filed the Indictment Outside of the Statute of Limitations.**

    **A.     Relevant Law**

Where a conspiracy statute requires proof of an overt act—like § 371 does—(1) the "conspiracy must still have been ongoing within the [limitations] period preceding the indictment, and (2) at least one overt act in furtherance of the conspiratorial agreement must have been performed within that period." *United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001) (alterations and citations omitted).  "The crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *United States v. Grimm*, 738 F.3d 498, 502 (2d Cir. 2013) (citations omitted).  After the "main goals" of the conspiracy have been accomplished, the conspiracy has ended and the statute of limitations begins to run. *United States v. Fletcher*,

7

829 F.2d 495, 499 (2d Cir. 1991) (the "limitations period begins to run after the last overt act in furtherance of the main goals of the conspiracy"). Where those goals involve economic motivations, the conspiracy ends when the conspirators realize the economic benefit of the conspiracy. *United States v. LaSpina*, 299 F.3d 165, 176 (2d Cir. 2002).

The mere fact that co-conspirators continued to talk and act in concert—even if such conversations were to conceal the completed object of the criminal conspiracy—does not suffice to extend the statute of limitations. *Fletcher*, 928 F.2d at 498 ("[T]he life of a conspiracy cannot be extended for statute of limitations purpose by acts of concealment after the conspiracies' objectives have been fully accomplished even if those acts are 'done in the context of a mutually understood need for secrecy.'") (quoting *Grunewald v. United States*, 353 U.S. 391, 402 (1957)). Otherwise, conspiracy would become "an indefinitely continuing offense with an indeterminate statute of limitations." *LaSpina*, 299 F.3d at 175 (citation omitted). This strict limitation is consistent with the Supreme Court's "warn[ing] that it views with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Id.* at 174 (citing *Grunewald*, 353 U.S. at 404).

### B. Under the Five-Year Limitations Period, Any Conspiracy Had Concluded Before August 12, 2010, *i.e.*, Five Years Before the Original Indictment.

Applying § 3282's five-year limitations period, there is no fair argument that Count Four is timely. Because the government filed its original indictment on August 12, 2015, the government must prove beyond a reasonable doubt that an overt act took place in furtherance of the Count Four market-manipulation conspiracy after August 12, 2010.[2] But Maiden's testimony

---

[2] The original indictment was filed under seal on August 12, 2015, Dkt. 6, 8, and was unsealed on September 8, 2015, Dkt. 5. Indictments filed under seal are considered for statute of limitations purposes to have been filed on the date of their unsealing if the government sought the under-seal filing for an improper purpose. *United States v. Gigante*, 436 F. Supp.

8

makes clear that any market-manipulation conspiracy—to the extent there was one—had long since finished by August 2010.  *See Grimm*, 738 F.3d at 502.

The testimony shows that any conspiracy to inflate the price or volume of KIT Digital's stock had concluded by at least August 2009.  As the government argued to the jury in its opening statement, the government's theory is that Maiden, Omar Amanat, and Mr. Isaza Tuzman "***agreed to pump*** [KIT Digital's stock], to make it look like it was in demand, to make the stock look popular, to make it look like it was red hot."  Tr. 122:20-22 (emphasis added).  But Maiden testified that—starting as early as August 13, 2009—Mr. Isaza Tuzman began offering Maiden numerous avenues ***to sell*** his holdings of KIT Digital stock (without any indication of concern that such volumes of share sales might drive the price of the stock down).  For example, on August 13, 2009, Mr. Isaza Tuzman asked Maiden whether Mr. Isaza Tuzman should "find a block buyer for some of [his] shares."  Tr. 1661:13-17.  This solicitation to sell KIT Digital shares was repeated on August 18, 2009, August 28, 2009, September 1, 2009, and October 27, 2009—when Maiden was approached to sell KIT Digital shares either by Mr. Isaza Tuzman directly (who had located a buyer), or by investors who had been referred to Maiden by Mr. Isaza Tuzman.  Tr. 1663:2-9; 1664:14-24; 1666:3-12; 1667:16-20.  On the undisputed record, Mr. Isaza Tuzman did not believe at this time that he was part of any conspiracy to pump up the price of KIT Digital stock via share purchases by Stephen Maiden.

Moreover, Maiden rebuffed these offers—despite his regular practice of market manipulation with regard to the shares his hedge funds held—because he was a true believer in

---

2d 647, 654 (S.D.N.Y. 2006).  This motion assumes that the relevant filing date is August 12, 2015, the date of the filed sealing; in doing so, Mr. Isaza Tuzman does not concede that the government filed the Indictment under seal for a proper purpose, and reserves all his rights in that regard.

the value of KIT Digital's stock, ***not*** because of any urging on the part of Mr. Isaza Tuzman. In rebuffing Mr. Isaza Tuzman's August 18, 2009 offer to find a buyer for Maiden's stock, Maiden explained that he believed that KIT Digital "has too much momentum and [was] still undiscovered" and that, in his view, the company was "worth double current prices." Tr. 1665:2-14. Indeed, this is the same advice that Maiden gave his own father. Tr. 1650:3-8 ("Q. And then in the last line [Maiden's father] wrote, 'Would you still hold any of these KIT digital or others might be better?' And you responded on August 18, 2009, 'I would sell them all and buy KIT digital today ahead of a call tomorrow.' Do you see that? A. Yes."). Maiden eventually sold a block of KIT Digital stock in November 2009 at $10.86 per share, and when Maiden informed Mr. Isaza Tuzman of that sale, Mr. Isaza Tuzman congratulated Maiden for the profitable trade while acknowledging that Maiden's block sale had depressed the stock price. Tr. 1678:5-20. In other words, far from propping up the stock, Maiden admitted that he took action in November 2009 that "put downward pressure on the price of KIT Digital stock." Tr. 1678:18-20.

In these exchanges in and after August 2009, Mr. Isaza Tuzman made clear to Maiden that ***he did not care*** about the day-to-day pricing of KIT Digital's stock. For example, in response to a September 14, 2009 email from Maiden regarding a drop in the price of KIT Digital stock, Mr. Isaza Tuzman wrote: "Steve, I know you hate to hear this: I can't watch the stock every day. I need to focus on the business. No idea why we're down." Tr. 1696:6-18. In a January 15, 2010 email, after Maiden wrote to Mr. Isaza Tuzman regarding another fall in the price of KIT Digital's stock, Mr. Isaza Tuzman wrote: "Not sure what you want me to do with all these notes, bro? … I can't control the markets." Tr. 1697:22-23. On that same email chain, Mr. Isaza Tuzman explained to Maiden: "I care deeply [about the stock price] but I have no

10

power to affect it." Tr. 1698:25-1699:2.  These statements cannot fairly be described as the statements of co-conspirators still in the throes of an agreement to manipulate the price of a publicly traded security to drive up its value.  And the government should not be permitted to argue as much to the jury in closing because, on this trial record, that would encourage jurors to err on the side of "probably guilty" rather than "guilty beyond a reasonable doubt."

To the extent the government points to any post-August 12, 2010 trading on Maiden's behalf, these trades merely reflect Maiden's admittedly independent incentive to manipulate the price of KIT Digital stock to inflate the value of his own portfolio.  According to Maiden's testimony, Maiden had been manipulating many, many stocks in his investment portfolio *long before* the beginning of the alleged conspiracy between him and Mr. Isaza Tuzman.  For example, Maiden testified that he manipulated the price of a stock called Blue Earth, in which his fund had a substantial position.  At the end of the month, Maiden would buy Blue Earth stock in order to inflate the monthly closing stock price; this inflated value would, in turn, increase the total value of Maiden's fund.  Tr. 1684:22-1685:9.  He also would periodically make mid-month purchases to artificially increase the price of Blue Earth stock at the end of a particular day in order to bolster the attractiveness of Blue Earth stock to his investors.  Tr. 1685:15-19.

Maiden also admitted to similar manipulation of KIT Digital's stock beginning in September 2008, before any alleged conspiracy with Mr. Isaza Tuzman ever began.  Over time, Maiden acquired a substantial position in KIT Digital's stock (without Mr. Isaza Tuzman's involvement) and, just as with his other holdings, Maiden began making trades intended to manipulate the price of KIT Digital's stock.  Like he did with Blue Earth, Maiden testified that he would purchase shares at the end of the month and mid-month to prop up KIT Digital's stock price.  Tr. 1686:14-1688:21.  According to Maiden's testimony, he did this in September,

11

October, and December 2008. Tr. 1689:18-1698:24 (September and October 2008); Tr. 1883:19-1884:5 (December 2008). Furthermore, Maiden admitted that, on December 1, 2008, he engaged in wash trades in which Maiden Capital sold shares that were purchased by a fund called Saxon, which was also controlled by Maiden. Tr. 1883:4-25. Maiden admitted that Mr. Isaza Tuzman had nothing to do with these trades. Tr. 1884:3-5.[3] By Spring 2009, KIT Digital's importance to the total value of Maiden's fund portfolio grew when the Blue Earth company "tanked," leaving Maiden's fortunes inextricably tied to the rise and fall of KIT Digital's share price. 1692:12-1693:15. His personal motive for keeping the KIT Digital share price high is plain.

Maiden's own testimony (and there was no other percipient witness testimony on Count Four) thus establishes that—even if a market-manipulation conspiracy had ever existed—it had ended long before August 12, 2010.

The government is likely to point to several events that took place after August 12, 2010, but Maiden's testimony makes clear that these actions were not taken in furtherance of any market-manipulation conspiracy.

*First*, Maiden testified regarding a March 2011 redemption of Mr. Isaza Tuzman's personal investment in Maiden Capital and a contemporaneous investment by KIT Digital in Maiden Capital. *See* Tr. 824:12-830:11. But Maiden did not explain how this transaction advanced market manipulation. Indeed, because the redemption/investment occurred

---

[3] On cross-examination, Maiden acknowledged his manipulative trading in additional stocks. He recalled manipulating the stock of A-Power. Tr. 1849:13-19. He recalled manipulating the stock of Broad Wind Energy. Tr. 1849:20-22. He recalled manipulating the stock of Nascent Wine Company. Tr. 1850:1-3. He recalled manipulating the stock of Northern Oil and Gas. Tr. 1850:4-6. He recalled manipulating the stock of Triton Distribution Systems. Tr. 1850:13-14. He manipulated these, and other, stocks by engaging in wash trading. Tr. 1851:19-22. He did this without any involvement by Mr. Isaza Tuzman. Tr. 1850: 23-25.

simultaneously, it could not have increased Maiden's ability to invest in KIT Digital as a practical matter (or in any other stock) because KIT Digital invested $38,000 *less* than Mr. Isaza Tuzman redeemed.  Tr. 824:12-831:10, 1787:24-1789:21.

*Second*, the government points to a July 2011 meeting at KIT Digital's headquarters in New York as an overt act in furtherance of Count Four.  *See* S8 Indictment ¶ 76(d).  But the undisputed testimony is that the July 2011 meeting had nothing to do with any market manipulation conspiracy relating to KIT Digital stock.  Instead, Maiden testified that the purpose of the meeting was "to rescue Maiden Capital."  Tr. 886:23-24.  During that meeting, Mr. Isaza Tuzman proposed "a straight 'rescue plan'" for Maiden Capital even though it would result in "no additional upside" for Mr. Isaza Tuzman and the others involved in the rescue plan.  Tr. 899:14-15.  None of these topics were at all related to earlier alleged efforts to manipulate KIT Digital's stock.  Indeed, the meeting was attended not only by the alleged co-conspirators— Omar Amanat and Maiden—but *also* by two sophisticated investors who had no connection whatsoever to the alleged market-manipulation scheme:  Jason Karp and Jonathan Jackson.  Tr. 1814:3-13.  Neither of those additional attendees at the July 2011 meeting offered testimony (or even appeared) at trial to corroborate the government's theory that the July 2011 meeting to "rescue Maiden Capital" was an overt act in support of the market-manipulation conspiracy to pump up the price of KIT Digital stock.

The evidence presented at trial was not sufficient to show that any conspiracy to manipulate the market in KIT Digital securities continued after August 12, 2010.

## CONCLUSION

For the foregoing reasons, the Court should acquit Mr. Isaza Tuzman on Count Four of the S8 Indictment because this count was brought outside of the statute of limitations, and also acquit Mr. Isaza Tuzman on Counts Four, Five, and Six of the S8 Indictment because the

government has failed to present sufficient proof on each and every element of Counts Four, Five, and Six from which a rational juror could conclude beyond a reasonable doubt that Mr. Isaza Tuzman is guilty of the charged crimes.

Date:   December 14, 2017
        New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ Avi Weitzman*

    Avi Weitzman
    (aweitzman@gibsondunn.com)
    Marcellus McRae
    (mmcrae@gibsondunn.com)
    Amer S. Ahmed
    (aahmed@gibsondunn.com)

200 Park Avenue
New York, NY 10166
Telephone:   (212) 351-4000
Facsimile:   (212) 351-4035

333 South Grand Avenue
Los Angeles, CA 90071
Telephone:   (213) 229-7000
Facsimile:   (213) 229-7520

*Attorneys for Defendant Kaleil Isaza Tuzman*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2017, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

                                                  */s/ Avi Weitzman*
                                                  Avi Weitzman