

RANDALL W. JACKSON
Tel.:  (212) 303-3650
E-mail:  rjackson@bsfllp.com

December 14, 2017

**BY ECF AND HAND**
Hon. Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:    *United States v. Kaleil Isaza Tuzman, et al.*, 15 Cr. 536(PGG)

Dear Judge Gardephe:

This letter is respectfully submitted in order to move for judgment of acquittal on Counts One through Four of the Indictment. In this case, viewing the evidence in the light most favorable to the Government, no reasonable trier of fact could conclude that the Government has met its burden with regard to Mr. Amanat. There has been no proof whatsoever that Mr. Amanat participated in any scheme with Stephen Maiden to defraud the investors of Maiden Capital. There has similarly been no proof that Mr. Amanat participated in any conspiracy to manipulate the market for KIT Digital stock. For these reasons, as explained in more detail below, the Court should grant Mr. Amanat's motion for judgment of acquittal.

## DISCUSSION

### A.    Applicable Law

Rule 29 provides that:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction.

Fed. R. Crim. Proc. 29. Under Rule 29, "a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). The district court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

575 Lexington Avenue, New York, NY 10022 | (t) 212 446 2300 | (f) 212 446 2350 | www.bsfllp.com



*United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citations omitted) (internal quotations omitted).

  **B.**  **The Government Has Failed to Identify Any Evidence Supporting Any Coherent Theory Under Which Mr. Amanat Had Knowledge of the Maiden Capital Fraud**

  The S8 Indictment suggests two theories from which the Government infers Mr. Amanat's awareness of the Maiden Capital fraud. First, the Indictment alleges that "[t]o facilitate the scheme to defraud Maiden Capital investors, IRFAN AMANAT, the defendant, provided Maiden with fictitious Enable account statements, which Maiden then used, with the knowledge and approval of the Amanat Brothers, to generate fictitious Maiden Capital client account statements that failed to disclose the Enable losses." (Indictment ¶ 16). Second, the Indictment alleges that "[f]or his part, OMAR AMANAT, the defendant, wired hundreds of thousands of dollars to the Maiden Capital Account to support Maiden Capital, including to allow Maiden to repay investors whose redemption requests could not be forestalled and thus to continue to keep secret from Maiden investors the Enable losses." (Indictment ¶ 16). For several reasons, the evidence introduced by the Government is insufficient for any reasonable trier of fact to conclude that Mr. Amanat is culpable under either of these theories.

  First, the point of the Government's second theory appears to have been that, since Omar Amanat provided Maiden cash to pay redemptions, he must have been aware that Maiden was not paying his investors through simple liquidation of the firm's assets and that therefore Mr. Amanat must have been aware of Maiden's fraud. *See* Indictment ¶ 16. For this theory to be cogent, the Government would have to also show that Mr. Amanat believed that Mr. Maiden had committed to refrain from making illiquid investments and would therefore always be able to quickly liquidate his investments and make cash redemptions.  Absent this implicit link, the fact that Mr. Amanat knew Mr. Maiden was borrowing money to pay redemptions *in cash*, as opposed to paying them in kind, proves nothing.  Here, the evidence at trial showed the opposite. As explained below, it showed: (1) Mr. Maiden's investors *knew* he was investing in illiquid securities; (2) Mr. Maiden's investors also knew it was possible that their redemptions could be distributed in kind; (3) as Mr. Maiden, himself, testified there is nothing unusual or improper about a hedge fund taking out a loan to pay redemptions.

  First, Mr. Maiden testified that his agreement with his investors specifically allowed him to invest in illiquid investments. (AX 6013, 6014, 6015, 6016; Tr. 1350-51 ("Inasmuch as there are substantial restrictions on withdrawals and limited partnership interests are not tradeable, an investment in the partnership is a relatively illiquid investment . . . . The interests will not be readily marketable in any event, and no market for them is expected to develop. . . . Thus, the interests are not a suitable investment for investors requiring liquidity."). Maiden also testified that his investors were entirely aware that he was invested in illiquid securities. (Tr. 1128 ("Q. Your investors knew that you were engaged in purchasing of illiquid securities, correct? A. Yes.")). Second, Mr. Maiden also testified that it was entirely permissible for a hedge fund to take a loan out on its assets and pay redemptions from that loan. (Tr. 1224 ("Q.  Well, you do understand that a fund can take out a loan on securities, right?  A.  Sure.  Q.  And it's entitled to pay redemptions to its investors using loan funds if it believes that that is the financially



appropriate way to deal with those redemptions, right? A.  I guess that's right.")). Indeed, the evidence demonstrated that Mr. Maiden specifically advised his fund manager, SS&C, that he was doing just this. (AX 52; Tr. 1483 (Maiden reading from AX 52, email to SS&C employee John Rizzi: "I set up a loan on my illiquid KIT Media position in order to meet redemptions and other expenses as they arise until it becomes liquid.")).

Mr. Maiden also testified that he was permitted to distribute redemptions in kind to his investors, meaning that, "in lieu of sending just cash as a redemption, he could simply "send the stock directly to the investor who wants their money back." Tr. 1200-01.  (*Id.* Q. Now, one of the other components of this agreement that you've talked about that you had with your investors was you were allowed to, if you so chose, to distribute what you had in your portfolio to your investors in kind, correct? A. I think that was an option, yes.").  The Maiden Capital fund documents were explicit on this point.  Tr. 1200-02.  Thus absent any additional linkage—which the Government has failed to offer into evidence—the fact that Mr. Amanat knew Mr. Maiden was using the proceeds of his loan to pay his investors redemptions proves nothing and it certainly does not prove that Mr. Amanat had knowledge of Mr. Maiden's fraud or that providing cash redemptions somehow hid this fraud.

All of this evidence demonstrates that there is simply no validity to the Government's theory as to the loan Mr. Amanat provided as being evidence of his knowledge of fraud. The Government appears to have sought an Indictment from the Grand Jury under a theory that Maiden purported to be invested only in highly liquid securities and that his investors were operating under such a belief. The evidence has demonstrated the opposite. Maiden's investors were not only aware that Maiden was invested in illiquid securities, this was a critical part of Maiden's "small cap" strategy that was the basis for their investment. If the investors of Maiden Capital had no basis for believing that any redemption paid to them was a straight line liquidation of securities, it is impossible for the Government to argue that Mr. Amanat would have known Mr. Maiden was engaged in fraud simply on the basis of providing a loan to Maiden's investors. Indeed, the evidence demonstrates that Mr. Amanat was in the very same position knowledge-wise on this point as SS&C, however Mr. Amanat had even less knowledge of the implications of a loan because he was not engaged in the regular process of assisting Maiden in assessing the overall value of his fund.

Second, the Government has failed to introduce any evidence supporting its theory that: "[t]o facilitate the scheme to defraud Maiden Capital investors, IRFAN AMANAT, the defendant, provided Maiden with fictitious Enable account statements, which Maiden then used, with the knowledge and approval of the Amanat Brothers, to generate fictitious Maiden Capital client account statements that failed to disclose the Enable losses." (Indictment ¶ 16).  Mr. Maiden himself testified that the Enable investment did have value, undermining the Government's theory entirely.  Mr. Maiden explained that the Enable investment had been converted into a promissory note that provided monthly interest to Maiden Capital and that was therefore valuable as a classic debt instrument.  Maiden testified that the Enable "investment" had been "converted" by Maiden into a different financial arrangement, one where Maiden Capital received "a guaranteed return." (Tr. 1176). Maiden admitted, critically, that when Maiden capital "converted [its investment] into a guaranteed return" Maiden understood that "essentially a promissory note had been created."  (Tr. 1176).  There was therefore *nothing* false



about the Enable statements in the first place.  As explained below, the evidence admitted by the Government shows that these statements reflected the value of the debt instruments and its guaranteed interest if the loan had been called.  Thus the Enable statements cannot serve as the predicate for Mr. Amanat's alleged knowledge of any fraud.

Maiden's understanding, of course, was consistent with the agreement into which Maiden entered. Maiden explained as follows:

> Q.  Now, one of the things that you looked at during your direct examination where you looked at these statements, these Irfan Amanat statements, there was a part that talked about the guaranteed return.  Do you remember that?
> A.  Yes.
> Q.  And that was on each one of those statements, right, guaranteed return, right?
> A.  Right.
> Q.  Right?
> A.  Right.
> Q.  And the reason that was there is because you had entered into an agreement whereby you got a guaranteed return, correct?
> A.  I believe that's right.

(Tr. 1175). Maiden acknowledged that he had executed the agreement in question, which converted the Maiden Capital interest into a Promissory Note, and the agreement was entered in evidence. (AX 315 ("The Recipient will pay the Investor the rate of one month Libor + 300 basis points annually on the Capital some (the "Guaranteed Return")"). A promissory note, of course, is a debt instrument. *See, e.g.* "Promissory Note," Wikipedia, available at Wikipedia.com ("A promissory note, sometimes referred to as a note payable, is a legal instrument (more particularly, a financial instrument and a **debt instrument**), in which one party (the maker or issuer), promises in writing to pay a determinate sum of money to the other (the payee), either at a fixed or determinable future time or on demand of the payee, under specific terms.") (emphasis added); Tr. 3804 (Smyth testimony: "Q. Right. And a promissory note doesn't have to be secured by anything, does it? A. Correct. Q. But it can be sometimes, right? A. Right."). Maiden further testified that he understood that his hedge fund was entitled to "own debt" (Tr. 1205) and that any hedge fund, like Maiden Capital, could distribute debt "in kind" if it so desired. (Tr. 1205 ("Q. It can also own debt, right? A. Right. Q. All three of these things can be distributed in kind if you want to, right? A. Right. Q. There's a way to do it? A. There is."). Importantly, the Guaranteed Return as explained in AX 315 is precisely the Guaranteed Return in the so-called "fictional" Enable returns that Irfan Amanat sent to Omar Amanat. (Tr. 796 ("Q. I want to highlight at the top. It says, 'Current one month LIBOR plus 300 basis points.' Do you see that? A. Yes. Q. Next to that, it says 'guaranteed return'? A. Right.")).

Putting aside for the moment the other problems with the Government's theory, if Maiden understood that the Enable balance was a debt obligation, and he clearly did, there was nothing "fictional" about the statements. A debt obligation in this context cannot be "fictional." It need not be backed by assets. (Tr. 3801, 3804 (Robin Smyth testimony acknowledging that a



"promissory note is a type of debt . . . . [and] a promissory note doesn't have to be secured by anything.")). A promissory note certainly need not be supported by trading. That is to say: all of the testimony that the Government elicited regarding whether there was trading going on at Enable is irrelevant. If, as both Mr. Maiden and Mr. Amanat understood, the Enable obligation had been converted to debt, to a promissory note, there was no need for trading to support the note. And of course there was no fraud.

Separately, the independent parts of the Government's theory were also fatally undermined by the evidence. For example, there is no evidence that the Enable statements were "fictitious" or more importantly Omar Amanat was aware of any fictitious nature of these statements. The only testimony in the record supporting the notion that the Enable statements were "fictitious" is Maiden's testimony that both Omar and Irfan Amanat told him that the money invested in Enable was "frozen … unable to be accessed . . . . a broker or bank that Enable was doing business with had frozen their assets or gone out of business, and I couldn't access any of my Maiden Capital funds.  That's the story I was told by Omar, by Irfan, and then later confirmed by Omar in a conversation right after that call." (Tr. 802). After a foundational objection, Maiden went on to testify that Irfan Amanat had told Maiden, on a call in which Omar Amanat allegedly participated, that "there was no money to be traded, so there was no trading strategy after March of 2009." (Tr. 803). Maiden further testified that Omar Amanat had subsequently "stuck with [his] story" that Enable's assets had been frozen after a problem with one of its brokers, "but confirmed that there was no trading going on in Enable." (Tr. 803). This is the only testimony supporting the notion that the Enable statements Maiden received were "fictitious." Maiden's own testimony, however, undermines any reasonable inference that could be drawn from this testimony that the statements in question were "fictitious" as opposed to simply representing Enable's understanding of its outstanding debt obligation to Maiden Capital.

Thus both of the Government's theories of Mr. Amanat's participation in the supposed fraud are fatally undermined by the evidence and particularly by the uncontroverted testimony of the Government's own witnesses. This is to say nothing of the fact that the "fictional" Enable statements in question were not even sent by Omar Amanat. They were all sent by Irfan Amanat. Even if this evidence did not suffer from the problems described above, the only evidence the Government has offered to suggest that Omar Amanat might have had any awareness of any alleged falsity is the document showing that Omar Amanat asked if Irfan Amanat could reduce the fees associated with the Enable balance to improve Mr. Maiden's returns. (GX 2968). Maiden, however, admitted that after this point, the amount of the balance was only changed by about $60,000, and that this was well within expectations for the type of reduction of fees that was typical in the industry. (Tr. 1500-01). This is not evidence of scienter. This is not evidence of anything. The two theories of Mr. Amanat's culpability set out in the Indictment are both bankrupt.



**C.      The Government Has Failed to Introduce Any Evidence that Any Allegedly
False Information Involving Enable Was Transmitted to the Maiden
Investors or that Omar Amanat Had Any Reason to Believe It Would Be**

In order to demonstrate that the scheme existed which is the basis of Counts One through
Three, the Government was required to introduce evidence that it was a contemplated part of the
scheme that some false information would be transmitted to the purported victims of the fraud,
the Maiden Capital investors. Indeed, the Indictment alleges that Omar Amanat committed
various acts "to keep secret from Maiden investors the Enable losses." Indictment ¶ 38. The
Indictment also alleges, falsely, that the supposedly "false client statements" that were created by
Irfan Amanat "were intended to be presented, **and were presented, to Maiden Capital's
investors.**" Indictment ¶ 50 (emphasis added); *but see* Tr. 1191-92 ("Q.  Now, as I think you told
Ms. Griswold, nothing in the statement that actually went to the investors specified the amount in
Enable, right? A.  Right.  Q.  And so as far as you know, the investors had no idea what the
actual -- how you were valuing the Enable investment, correct? A.  That's true."). Indeed, the
Court's questioning of Maiden set out the problem most clearly:

> THE COURT: Before we go further, the statements that were sent
> to your investors, did they show a balance -- an Enable balance,
> those statements?
>
> THE WITNESS: No, they did not. They had some dollar amount
> which was the sum of all stocks and other assets that I had
> communicated to my administrator. So it wasn't broken out like
> this.
>
> THE COURT: So no Maiden Capital investor received a account
> statement showing that Maiden Capital had an Enable balance of
> 2.5 million?
>
> THE WITNESS: That's right. I didn't communicate to them that I
> had made any investment in Enable.

(Tr. 880). Thus, the only witness who could speak to this issue testified that the key assertion in
the Indictment on Counts One Through Three was **entirely false**. *See* Indictment ¶ 50. This is a
major problem for Counts One Through Three on multiple fronts.

First, if the allegation in the Indictment that the Enable statements were sent to Maiden
Capital Investors is false, and it clearly is, the Government has failed to introduce any evidence
of any relevant false information about which Mr. Amanat could have possibly been aware that
was actually communicated to Maiden Capital investors. "[I]t is axiomatic that fraud involves
'[a] knowing misrepresentation or knowing concealment of a material fact made to induce
another to act to his or her detriment.'" *See Carlson v. DynCorp Int'l*, 657 Fed.Appx. 168, 174
(4th Cir. 2016) (quoting Fraud, **Black's Law Dictionary** (10th ed. 2014)). Indeed, as described
earlier, the Indictment made explicit that the theory of the scheme alleged in Counts One and
Two involved execution by only two specified methods: "**[1]** by wiring hundreds of thousands of



dollars to Maiden Capital in order to pay certain redemptions and forestall Maiden Capital's collapse, and **[2]** by providing Maiden with false account statements regarding Maiden Capital's investment in Enable, knowing that such false account statements were intended to be presented, and were presented, to Maiden Capital investors." Indictment ¶ 50.[1]

The evidence has made clear that the Government's theory that Mr. Amanat knowingly aided Mr. Maiden's representations to his investors by providing him with a loan, the "hundreds of thousands of dollars" referenced in Indictment ¶ 50, is factually and legally bankrupt. There has been no testimony that would allow a reasonable factfinder to conclude that Mr. Amanat believed that providing these funds somehow aided Mr. Maiden in deceiving his investors. It is conceded that Mr. Maiden openly disclosed to his fund administrator, SS&C, that he was borrowing funds in order to pay investors redemptions. (AX 52 (email from Maiden to SS&C employee John Rizzi regarding loan on assets to pay redemptions); Tr. 1483 ("Q. And what did you say to him in the first sentence here? A. 'Jim Bradshaw put in 6K into his IRA for investment June 1. I took out 6K into general partner account. I set up a loan on my illiquid KIT Media position in order to meet redemptions and other expenses as they arise until it becomes liquid. Highly likely in next few months. Thus, in the month I borrowed 320,000 to 300,000 -- 300,000 was used to redeem Alpine Capital as discussed prior.'")). It is equally clear that Mr. Maiden disclosed to the relevant investors that he was taking out a loan on his assets to pay redemptions (GX 1725 (email from Jess Ellington to Maiden)); Tr. 3536 (reading email stating: "'I sent you a redemption request on August 15. According to our side letter agreement, you are contractually bound to return requested funds within 14 days. You are now 45 days late.' No. 2, 'You indicated in your email dated August 24, that you were working with your lender and selling securities and could probably free up 100K in early September.'").

The evidence is also clear that in the only conversation Mr. Amanat ever had with a Maiden Capital investor about this loan or any other aspect of his dealings with Maiden Capital, Mr. Amanat openly disclosed that he was making a loan to Mr. Maiden in order to pay redemptions and that he was doing so because he believed in the value of Maiden Capital's KIT investment. (*e.g.* AX 39; Tr. 1265-66 ("Q. And so then you're talking about this phonecall that you just had with Jess Ellington, the investor, right? A. Right. Q. And you say, "Still can't believe you told Jess you are first priority lender. He is probably freaking out," right? A. Right. Q. And what you're saying is you still can't believe that Omar Amanat told the investor the truth, right? A. The truth about that."); Tr. 3542 (Ellington testimony that the call was limited to "I think he was just describing -- as I recall, he was describing the merits of his KITMedia investment" and that Ellington couldn't remember the details of the call, including "What, if anything, did Mr. Maiden or Mr. Amanat say on that call about whether Mr. Amanat was invested in Maiden Capital? A. I -- I don't recall there, that was mentioned whether he was directly invested in Maiden.").

---

[1] The Indictment also suggests, more generally, that the unspecified conspirators effected the scheme "by causing Maiden to make material misrepresentations and to omit material facts to Maiden Capital investors about the status of their investments," (Indictment ¶ 50), however there was no testimony whatsoever on the topic of any omissions or misrepresentations that Mr. Amanat caused. The only information that could even arguably fall into this category is the testimony regarding Maiden's calculation of the value of the fund, which is discussed below in Part D.



If the evidence is clear that Mr. Maiden disclosed to both SS&C and Mr. Ellington that he was taking out a loan to pay the redemptions, and the evidence also demonstrates that Mr. Amanat disclosed this fact to the only Maiden Capital investor the Government chose to call, it is unclear how the Government can argue or establish that the payment of the loan was some sort of deceptive act that either evinces Mr. Amanat's comprehension of Mr. Maiden's fraud or demonstrates that Mr. Amanat was affirmatively attempting to further the fraud. There is simply no information in the record that Mr. Amanat either transmitted any false information to a Maiden Capital investor or was aware of any false or misleading information submitted to a Maiden Capital investor.

Indeed, the defense openly asked Mr. Maiden what the false information was of which Mr. Amanat was aware and the most coherent response that Mr. Maiden could muster was "that Enable had any value whatsoever." (Tr. 1183 ("Q. What is the specific false information that you received that you agreed with Omar Amanat to convey to the investors? A. That Enable had any value whatsoever.")). When the defense asked "Q. Is there anything else?" Mr. Maiden's response was "I think that's more than enough." (Tr. 1183). When we pressed further, Mr. Maiden referenced his phone call with Jess Ellington, stating "Well, there was also the call with Jess Ellington when Omar told the investor, Jess, that everything was going to work out." (Tr. 1184). Earlier in his testimony, Mr. Maiden referenced the idea that Mr. Amanat was aware that Mr. Maiden had told an investor he was having "an okay month." (Tr. 998). Mr. Maiden admitted that the term "okay" is ambiguous. (Tr. 999) ("Q. That's not my question. My question is: The term "okay" is not clearly defined, is it? A. No, it's not. Mr. Maiden also admitted that he could not even remember the actual words that he had communicated to Mr. Amanat on this vague point. (Tr. 1000 ("Q. You don't remember specifically saying the words, "I just lied to my investor," do you? A. I don't remember the specific words I used. That's correct.")).

As discussed earlier in this submission, there is no information in the record whatsoever supporting the notion that Mr. Amanat was aware of any false information being transmitted above the value of the investment. The evidence is that Mr. Maiden never mentioned Enable at all to his investors. (Tr. 880 ("THE COURT: So no Maiden Capital investor received a account statement showing that Maiden Capital had an Enable balance of 2.5 million? THE WITNESS: That's right. I didn't communicate to them that I had made any investment in Enable."). If the Enable investment was never even discussed with any Maiden Capital investor, it is impossible for any reasonable factfinder to conclude that Omar Amanat is somehow culpable for any omission of information about Enable.

The evidence also demonstrates that Mr. Maiden acknowledged that the Enable investment had been converted to a debt interest throughout the entire period of the charged conspiracies, and that the amounts transmitted to SS&C matched the amounts of that debt interest. (Tr. 1176, AX 315; Tr. 797, 1472-73 (Maiden reading from AX 315: "A. 'The recipient will pay the investor the rate of one month  LIBOR plus 300 basis points annually on the capital sum (the guaranteed return) throughout the duration for which the investor has the capital sum invested."). There is no evidence that Mr. Amanat had information to help him understand how Mr. Maiden was valuing or marking his fund, and there is no evidence that Mr. Amanat learned what numbers Mr. Maiden was actually communicating to his investor, so the vague idea that because Maiden thought there was little value in Enable that Mr. Amanat must have been aiding



a fraud is bankrupt. (Tr. 1184 ("Q. OK. Great. You do agree with me, right, that in terms of your calculation of the overarching value of your fund, Mr. Amanat had no way of knowing how you were supposed to calculate a number of different positions in your fund, correct? A. That's fair, yes.")). No reasonable juror could conclude from this lack of evidence that Mr. Amanat was made aware of sufficient information to make him culpable for Mr. Maiden's fraud.

> **D.      The Government Has Failed to Introduce Any Evidence That Would Allow a Reasonable Factfinder to Conclude that Omar Amanat Believed Maiden Was Misrepresenting the Value of His Fund to His Investors**

While in the immediately preceding section, we generally addressed the insufficient nature of the proof on this point, it is worth emphasizing that, even beyond the aforementioned concessions of Maiden,[2] the proof simply would not allow any reasonable factfinder to conclude that Omar Amanat had sufficient information to conclude that Maiden was misrepresenting the value of his fund to his investors. At the risk of restating the obvious, the Government was required to introduce some evidence that would allow a reasonable factfinder to conclude that Omar Amanat could have understood that Stephen Maiden was materially understating the value of the Maiden Capital Fund to the Maiden Capital investors. There is, however, no such evidence in the record. Indeed, the evidence is directly to the contrary.

For example, Mr. Maiden admitted, relatively early in his cross-examination, before being confronted with any documents, that Omar Amanat told him that he thought it was "very important" that Maiden disclose everything to his investors. (Tr. 1189-90 ("Q. You engaged in discussions with Omar Amanat where he stressed to you that he believed it was very important for you to disclose everything that was happening in terms of the machinations around KIT Media and KIT digital investment, right? A. He brought it up a few times. Q. Right. In fact, you pushed back on certain occasions and said, I can't disclose X, right? A. Right.")).

Mr. Maiden also admitted that the calculation of Maiden Capital's interest in KIT was a very complicated matter and that Mr. Amanat lacked sufficient information to understand how precisely Mr. Maiden was calculating the total value of his fund. (Tr. 1184 ("16 Q. OK. Great. You do agree with me, right, that in terms of your calculation of the overarching value of your fund, Mr. Amanat had no way of knowing how you were supposed to calculate a number of different positions in your fund, correct? A. That's fair, yes.")); Tr. 1184-85 ("Q. And you also agree that with regard to the KIT digital investment that was made through KIT Media, there was a lot of complication in terms of the appropriate valuation of that investment over the course of the years between 2008 and 2012, right? A. Right."). Maiden also admitted that Mr. Amanat had told Maiden that he should appropriately mark down the value of Maiden Capital. (Tr. 1203-04 ("In the same vein he told me . . . to mark the fund down")).

Indeed, the evidence shows that if Mr. Amanat believed anything about how Mr. Maiden marked his fund, he believed that it was undermarked because Mr. Maiden did not include the value of the sales fee for the Maiden Capital investment in KIT Digital.  Maiden stated that,

---

[2] *e.g.,* Tr. 1184 ("Q.  … You do agree with me, right, that in terms of your calculation of the overarching value of your fund, Mr. Amanat had no way of knowing how you were supposed to calculate a number of different positions in your fund, correct?  A. That's fair, yes.").



during the time period of the conspiracy, he thought his KIT Digital interests alone could have been worth approximately $13 million to $15 million. (Tr. 1186). This did not include any valuation of the "sale fee" for KIT Digital that Mr. Maiden testified he and Mr. Amanat believed Maiden Capital would receive if the settlement was enforced. (Tr. 1187 ("It's a fact, isn't it, sir, that you when you valued the KIT investment repeatedly left out the 2.5 percent sales fee that you thought A. That's true."). Maiden admitted that the sales fee alone could have been worth as much as $19 million. ("Q. If the company had been sold for $750 million, what would the 2.5 percent sales fee have been worth to you? A. That would have been worth maybe $19 million."); Tr. 1185 ("Q. And you understood that Mr. Amanat actually believed that KIT Media, the KIT Media investment had a lot of value, right? …. Q. Right. It was your understanding in your interactions with him that he actually believed that, right? A. Yes, that is true."). Maiden admitted that the calculations in the statements that were sent to the Maiden Capital investors did not include the sales fee valuation. (Tr. 1196 ("Q. So all I'm asking you is when you did this calculation, okay, that ends up in Solaris Capital, you telling them that they have $253,852, you hadn't included the sales fee that you were potentially entitled to, had you? ….A. No. I hadn't included that.")). So the only conclusion from this that any reasonable factfinder could draw is that Mr. Amanat actually understood that Mr. Maiden, if anything, was undermarking his fund.

Maiden further admitted that Mr. Amanat had told him repeatedly that Maiden should shut down the fund and distribute all of its assets in kind (Tr. 1204 ("Q. . . . You said in the same vein that he told you to mark the fund down, he may have told you also that you should shut the fund down, distribute in kind, right? A. These are idiotic suggestions when he stole-- Q. I'm not asking you for your judgment of the assessment, sir. I'm just asking you that's what he told you to do, right? A. He mentioned these types of foolish ideas. Q. At various points he told you shut the gates, right? A. Right."); Tr. 1204-05 ("Q. When you were complaining that people were asking for redemptions, Omar Amanat said to you: Bro, it's time to shut the gates and distribute everything in the fund in kind . . . . THE WITNESS: Okay, yes.").

### E.   The Government Has Failed to Identify Any Interstate Wire Contemplated Or Sent in Furtherance of Counts One and Two

"The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires. To establish the first element, the government must prove (i) the existence of a scheme to defraud (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). The Government has failed to identify any use of *interstate* wires that *furthered* the specific scheme charged in the Indictment – the alleged scheme between Omar Amanat, Stephen Maiden, and Irfan Amanat to defraud Maiden Capital investors through the means described in the Indictment. Indeed, there was almost no relevant discussion of interstate wires in the Government's case at all.

Mr. Maiden testified about certain funds that were transferred from Maiden Capital to Enable in November or December of 2008, but all of this predated the time periods of Counts One and Two, which begin in March of 2009. *See, e.g.,* Tr. 635 ("Q. Mr. Maiden, did you ultimately wire the full $2 million to Enable? A. I did, yes. Q. When did you do that? A. I **did it in three separate wires in November**, around that time period.'"). There are only a few other



potentially relevant wires, but the evidence with regard to each is insufficient either because there is no evidence it was an interstate wire or there is no evidence that would allow a reasonable factfinder to conclude that it is in furtherance of the conspiracy.

The $700,000 that Mr. Amanat sent to Mr. Maiden in 2011 is charged in the Indictment, but the actual evidence, as described above, demonstrates that there was nothing in furtherance of any conspiracy about this transmission – it was openly disclosed that Mr. Amanat was making a loan to Mr. Maiden in order to help him pay redemptions. Perhaps even more importantly, there is also no information in the record showing that this was an interstate wire. There is information in the record that certain of the investors wired money to Maiden Capital, *e.g.* Tr. 868 ("And here I see a wire from an investor, a new investor."), but there is no information in the record demonstrating that these are interstate wires, or that these wires furthered the scheme charged in the Indictment, as opposed to Mr. Maiden's general criminal activity. Mr. Maiden's testimony also made clear that much of his request for funds from Mr. Amanat in 2011 and 2012 that led to wires was for his personal survival and not in furtherance of any conspiracy. (e.g. Tr. 926 ("Q. In this text message exchange, Mr. Maiden, you say to Mr. Amanat at 10:07 a.m., 'Omar the wire. What's going on? My kids have to eat bro. Please send wire bro. This is absurd.'")).

There is also no location information about these wires. There is no location information in the record about any potentially relevant wire that would allow a juror to reasonably conclude, without pure speculation, that the wire in question was in fact an interstate wire sent in furtherance of the charged schemes. And of course there is no testimony that any of the alleged conspirators contemplated that interstate wires would be used in furtherance of the conspiracy. In sum, the Government's proof on Counts One and Two fails as a matter of law.

F.     **The Government Has Not Come Close to Making the Necessary Showing In Order to Hold Mr. Amanat Liable for Aiding and Abetting an Investment Advisor Fraud**

The Supreme Court has observed that "[t]he Investment Advisers Act of 1940 . . . reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship.'" *See Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191 (1963). The Government has offered no proof whatsoever to support the conclusion that Mr. Amanat had the requisite knowledge to be guilty as an aider and abettor on this Count. As we detailed in our September 20, 2017 letter to the Court on the Government's proposed jury instructions, it appears from our review of the cases that no individual has ever before been criminally convicted at trial of aiding and abetting Investment Advisor Fraud. It seems likely that that the reason for the paucity of cases is that what the Government seemingly must demonstrate is daunting: (1) the defendant had knowledge of the investment advisor's fiduciary duty to his clients; (2) the defendant had knowledge of the full scope of disclosures and omissions relevant to the investment advisor's fraud against his clients; (3) the defendant had the specific intent to aid in that criminal violation of the investment advisor's fiduciary duty to his clients, and not simply aid in some other generalized crime. *See Tagliaferri*, 820 F.3d at 575 (noting that the intent requirements of investment advisor fraud are rooted in "the special context of a fiduciary relationship"); *see also United States v. Lucarelli*, 476 F.Supp.2d 163, 168 (D.



Conn. 2007) (granting motion for judgment of acquittal where court provided insufficient aiding and abetting instruction in securities fraud case, noting "the Court's charge to the jury on aiding and abetting did not explicitly instruct that in order to be guilty of aiding and abetting securities or mail fraud, Mr. Lucarelli must have had a specific intent to defraud the NHSB and/or its depositors").

As discussed in our earlier letter, in *Lucarelli*, the court provided an instructive discussion of aiding and abetting liability in the context of a specific intent crime like securities fraud, which is significantly less complex in terms of the duty involved and thus the specific intent that the Government must demonstrate than the crime charged in Count Three. The court instructed:

> [B]oth sides now appear to be in at least marginal agreement that a finding of specific intent to defraud the NHSB and/or the depositors was required for a fraud conviction, even on an aiding and abetting theory: defense counsel made this contention after the charge was given and the case submitted to the jury, in summarizing his objections to the Court's charge; the Government at oral argument on defendant's post-trial motions agreed that the required intent of a principal and an aider and abettor is "essentially," if not "precisely," the same, and admitted that any distinction between the two may be one "without a difference." And, with the 20/20 vision of hindsight, the Court agrees that the defendant's position with respect to the aiding and abetting charge is correct and that the jury's special interrogatory answers illustrate that the charge was insufficiently tailored to the novel circumstances of this prosecution. **The comment to the proposed model jury charge for aiding and abetting in Sand, Modern Federal Jury Instructions Criminal (2006) ("Sand"), states that "[i]n order to associate oneself with the underlying crime, the defendant must have shared the principal's criminal intent."** Sand, Instruction 11-2, cmt. at 11-11 (citing, inter alia, *United States v. Evans-Garcia*, 322 F.3d 110, 114-15 (1st Cir.2003); *United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir.1997) (elements of conviction under an aiding and abetting theory include "that the accused had the specific intent to facilitate the commission of a crime by another" and "that the accused had the requisite intent of the underlying substantive offense")). This position is also supported by Second Circuit authority. . . . . These cases show that the nuanced distinction the Government attempted to draw at oral argument by referring to the more general language of cases such as *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir.2006), *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir.2001), and *United States v. DeFiore*, 720 F.2d 757, 763-64 (2d Cir.1983), for the proposition that an aider and abettor must only act "with the specific purpose of bringing about the underlying crime," *Samaria*, 239 F.3d at 235, particularly in the context of a specific intent crime such as fraud (conviction of which as a principal requires specific intent to defraud another of money and/or property), is one without a difference. While the language of the cases cited by the Government parallels the essence of the Court's charge, it does not alter the intent proof required and it fails to articulate the required shared intent between aider and abettor and principal. Accordingly, the language of the Court's charge, while



technically correct, did not suffice for purposes of adequately guiding the jury in a
case such as this one.

*Id.* at 168-69 (emphasis added). In this case there has been no proof that would allow the jury to
assume that Mr. Amanat could stand in the shoes of Mr. Maiden from the standpoint of *mens rea*.
Mr. Amanat was not present for any of the relevant conversations with Mr. Maiden's investors,
and the extraordinarily limited information he received about these conversations was vague to
the point of being meaningless. (Tr. 677 ("I told him that I had just lied to my investor"); 1109
("Sir, I'm asking you: You didn't give details about what the lie was, did you. A. Okay.
Correct."). Regardless, even fulsome information about a handful of conversations would not be
sufficient to bring a third party into the scope of liability for this crime. The evidence is
insufficient as a matter of law.

G.     **The Government Has Failed to Offer Any Evidence Demonstrating that
       Omar Amanat Had Any Intent to Manipulate the Market of KIT Digitial
       Stock**

       The Government has introduced no evidence to support the conclusion that Omar Amanat
had an intent to manipulate the market of KIT Digital stock. All that has been offered, with
regard to Mr. Amanat is an opaque agreement signed in December of 2008 that says nothing on
its face about market manipulation. (GX 2970).  There was testimony that Mr. Amanat
supposedly proposed the agreement, but no detail as to the substance of those conversations. (Tr.
640). At one point the Court pressed Mr. Maiden to answer specifically the question as to what
was said about the agreement:

              THE COURT: You need to focus. The question is what was said.
              Not your understanding. Not what you inferred. What was said.
              What was said. And in this case specifically Mr. Amanat say?

              THE WITNESS: He said -- he told me in several conversations
              that there was an aggressive seller that could really hurt the stock
              called RAM Capital. And KIT digital was looking to raise money
              short term, the next month or two. And that that was Vision Capital.
              So they were looking at the stock closely.

Tr. 645. This is the totality of the substantive proof against Mr. Amanat on the market
manipulation count. No reasonable factfinder could conclude on that record that Mr. Amanat
joined a conspiracy to manipulate KIT Digital stock. Mr. Amanat is not a participant in any of
the conversations about supposed market manipulation that the Government alleges occurred
after the signing of the agreement. And it is not illegal to attempt to incentivize an investor to
purchase stock in the open market. The Government has not met its burden.

H.     **To the Extent that the Government Has Introduced Any Evidence of Any
       Count Four Conspiracy, the Evidence Has Demonstrated That There Were
       Two Separate Conspiracies, At Least One of Which Is Time-Barred**



Without rehashing his arguments, we fully join all of the arguments in Mr. Isaza Tuzman's Rule 29 motion on the statute of limitations – the Count Four conspiracy is time barred. We also note that the evidence makes clear that Mr. Amanat is not a participant in any of conversations surrounding supposed market manipulation after the end of 2008. The only reasonable interpretation of the evidence is that Mr. Amanat was not a participant in any subsequent market manipulation conspiracy, which the Government has not even proven. If Mr. Amanat had any agreement with Mr. Maiden, it was clearly a separate conspiracy and it was not charged within the time period of the statute of limitations.

We appreciate the Court's consideration.

Respectfully submitted,

 /s/  Randall W. Jackson
Randall W. Jackson

CC: All parties