HBHQTUZ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          15 CR 536 (PGG)
                                        Trial
KALEIL ISAZA TUZMAN AND OMAR
AMANAT,

            Defendants.

------------------------------x

                                        New York, N.Y.
                                        November 17, 2017
                                        9:50 a.m.

Before:

                    HON. PAUL G. GARDEPHE

                                        District Judge
                                        and a Jury

                         APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
DAMIAN WILLIAMS
ANDREA M. GRISWOLD
JOSHUA A. NAFTALIS
     Assistant United States Attorneys

GIBSON, DUNN & CRUTCHER
     Attorneys for Defendant Kaleil Isaza Tuzman
MARCELLUS MCRAE
AVI WEITZMAN

BOIES, SCHILLER & FLEXNER
     Attorneys for Defendant Omar Amanat
RANDALL WADE JACKSON
JOANNA CHRISTINE WRIGHT

HBHQTUZ1

1           (Trial resumed; jury not present)

2           THE COURT:  Is there anything we need to address

3    before we begin with the testimony?

4           MR. WILLIAMS:  Not from the government, your Honor.

5           MR. NAFTALIS:  Your Honor, the only issue is that the

6    defense made a motion to preclude Mr. Ingrassia.

7           THE COURT:  I'm not going to discuss that now.  We'll

8    have to do it at the next break.  The jury is ready.

9           I was given a proposed instruction, is it the party's

10   wish that I read it at the outset of today's proceedings?

11          MR. JACKSON:  Yes, please, your Honor.

12          MS. GRISWOLD:  That's fine.

13          MR. WILLIAMS:  That's fine for the government, your

14   Honor.

15          Just one note on Mr. Ingrassia.  We've whittled down

16   the remainder of the Smyth direct, and so we expect that

17   Mr. Ingrassia will go on before the next break.

18          THE COURT:  All right.  So I guess we'll have to talk

19   about it then.  In the future, if you know that, let me know,

20   OK, because I'm going to assume what you told me is accurate

21   until you tell me it's not accurate, and I came down to court

22   thinking that we had at least an hour of Mr. Smyth's testimony.

23          So let's then, I guess we will have to turn to the

24   Ingrassia issue even though the jury is ready.

25          Let me give you my reaction to what I have read.

HBHQTUZ1

1          I think that much of what the government wants to

2     elicit from Mr. Ingrassia there's really not much argument

3     should be precluded.

4          So what do I mean in saying that?  It seems to me that

5     the cases have uniformly held, as far as I can figure out, that

6     testimony along the lines of -- from analysts, testimony from

7     analysts about how they go about their job, the kinds of things

8     they consider, what information is important to them, what they

9     include in their reports, the degree of reliance they put on

10    that information, whether they believe the information was

11    truthful and the significance of certain information in making

12    their overall evaluation of a stock, I think it's pretty clear

13    that that is admissible.  And for that proposition, I am

14    relying on *United States v. Tomasetta*, 2012 WL 1080293.  Also

15    *United States v. Ferguson*, 2007 WL 4556625.

16         Where I am less clear is it seems apparent that the

17    government wants to ask Mr. Ingrassia some hypothetical

18    questions about if he had known that the revenue of KIT was

19    inflated or if he had known certain other alleged facts, the

20    impact that would have had on his reports, and it is less clear

21    to me that -- first of all, the devil is in the details.  I

22    need to know what the question is, and I need to know what the

23    answer is going to be.

24         In *Tomasetta*, which is a case which the government

25    provides and on which the government in particular relies, the

HBHQTUZ1

1  judge did not permit the government to elicit from the

2  analyst -- or did not permit the government to ask the analyst

3  hypothetical questions about how different disclosures would

4  have affected the analyst's opinion of the stock.  And that was

5  Judge Crotty.

6       The *Regis* case I've looked at, and it has been a

7  frustrating exercise because the transcript is not available

8  for some reason, maybe because of the age of the case, and so I

9  don't know what exactly was elicited by the government at

10  trial.  The excerpt of the transcript from *Regis* that the

11  government provided doesn't reveal to me whether hypothetical

12  questions were asked or not, although the *Regis* case does

13  provide significant support for the other elements that I

14  discussed at the outset it seemed to me should be admitted.

15       The *Ferguson* case provides strong support for the use

16  of hypothetical questions.  The *Ferguson* case is an opinion

17  from Judge Droney when he sat on the district court.  In

18  *Ferguson*, he says that once the government lays an appropriate

19  foundation concerning the importance of loss reserves to

20  understanding AIG's financial conditions at the time, once the

21  government has offered evidence concerning the importance of

22  receiving accurate financial information about AIG, and

23  elicited testimony as to why it's important in terms of giving

24  advice to clients, and also elicited that the analysts rely on

25  AIG financial disclosures in writing reports and in making

HBHQTUZ1

1    recommendations to clients, Judge Droney goes on to say that

2    they would be permitted -- that the analysts in that case would

3    be permitted to testify about how their advice would have been

4    different if they had known the withheld information.

5         So the government also cites *Cuti*. We've talked about

6    *Cuti* before. It is true that the Second Circuit says in *Cuti*

7    that hypothetical questions along the lines of: "If you had

8    known this, would your views have changed?" The Court says

9    that such questions can be "especially useful" in demonstrating

10   the impact of fraud.

11        However, it is also fair to note that in the *Cuti*

12   case, the Second Circuit points out that the hypothetical

13   questions in that case were cabined by the fact that there had

14   been a significant record established concerning, first of all,

15   the factual foundation that was the premise for the

16   hypothetical questions, but also the accounting rules that were

17   at issue in that case. So the Second Circuit said that, and I

18   quote: "Since the applicable accounting rules were explained

19   in detail, the reasoning process that the witnesses employed in

20   answering the hypotheticals was straightforward and transparent

21   to the jurors who could readily discern whether the responses

22   given were reliable." That's from *Cuti*, 720 F. 3d 458.

23        So I don't know what the hypothetical questions are

24   going to be here. We are going to -- I have to have a

25   conversation before the hypothetical question is asked so that

HBHQTUZ1

1    I understand what it is and what the response is going to be so

2    that I can make a determination of whether it is appropriate

3    under the case law

4            MR. NAFTALIS:  Your Honor, I think we can do it in the

5    time.  I think they're going to be pretty basic.

6            "If you had known the revenue had been inflated, would

7    that have been important to you?

8            "If you had known the cash balance were not accurate,

9    would that have been important to you?

10           "If you had known there was fraud, would that have

11   been important to you?"

12           THE COURT:  And you would have laid the foundation for

13   why those things matter, right?

14           MR. NAFTALIS:  Yes.

15           THE COURT:  So I'll listen to the foundation you have

16   laid and when you reach the point where you want to ask the

17   hypotheticals, you can approach, and I'll hear from defense

18   counsel whether they have an objection.

19           MR. WEITZMAN:  Your Honor, can I just raise two issues

20   with respect to that?

21           THE COURT:  Sure.

22           MR. WEITZMAN:  The first is this is going to become a

23   battle of hypotheticals.  For example, on the 12/31/08 Maiden

24   agreement, if they were to ask:  "If you had known about this,

25   would that affect your recommendation?"  Then I get to go

HBHQTUZ1

through all of Maiden's cross-examination and say, "If you had

known that he was going to buy in any event, if you had known a

big proponent" or, you know, do all these other things.  It's

just a battle of hypotheticals and the risk there, here in

particular, is doubly problematic because we haven't had the

opportunity to cross-examine Mr. Smyth about the revenue

inflation scheme that he ran, which means that we can't ask the

contrary hypotheticals because this is the first witness who is

talking about the revenue inflation.  So even under *Cuti*, one

would expect that we have a factual record on which we can

either impeach or diminish the witness' testimony.

        I think that just as a form of trial management, it is

unnecessary for the jury to hear that type of testimony.  The

witness can say revenues were important to him.  The witness

can say cash accounts were important to him.  He doesn't need

to answer the hypotheticals when we're prejudiced because we

haven't had the opportunity to cross-examine Smyth yet and

establish our own factual predicate for our own hypotheticals

        MR. JACKSON:  Your Honor, may I just briefly say, I do

agree with Mr. Weitzman's point, but my real issue is, I think

that of the three examples that Mr. Naftalis gave, one of those

is not like the other.

        "If you had known X," he did two factual conclusions

and then he did one legal conclusion.  I think it's a very

different question to say "if you had known there was fraud."

HBHQTUZ1

1    I don't know if that was just a casual sort of use of language,

2    but if you had known there was fraud basically assumes the

3    legal question that the jury has to make a determination about,

4    so I think that's a different type of question.

5             THE COURT:  So is it your intention to ask these

6    hypothetical questions or to ask hypothetical questions?

7             MR. NAFTALIS:  Yes, along those lines.  The fraud is

8    grounded in the fact that the defendant has certified there is

9    no fraud.  So "if you had known that this certification were

10   false, would that have been important?"

11            Just responding to the *Cuti* issue:  If Mr. Weitzman

12   wants to ask hypotheticals, we have no objection.  If he wants

13   to recall this witness in his case, we have no objection.  If

14   he wants to call other analysts in his case we have no

15   objection.  But he has cited no cases that say this is

16   inappropriate.

17            In fact, the cases we rely on say this is the best way

18   to sort of instruct the jury as to whether these things matter.

19   We're not asking complicated ones or reaching ones.  We're just

20   sort of asking basic high-level questions.

21            "If this were not true, would that have been important

22   to you?  Yes or no.  Why?"

23            We're not going into sort of the details of accounting

24   policies or anything.  We're trying to keep it really short.

25            Again, if they would like to spend time with him

HBHQTUZ1

  1    posing hypotheticals, we believe *Cuti* permits it.  So if they

  2    want to do that, that's fine.  If they want to call a dozen

  3    experts or a dozen analysts on their case and do it, we have no

  4    objection.

  5            MR. WEITZMAN:  Your Honor, I would note that they

  6    haven't proffered any accounting testimony on revenue

  7    recognition yet, so the *Cuti* caveat that you focused on has not

  8    yet been established as a factual predicate in this case.

  9            THE COURT:  It is not a caveat, but it certainly is a

 10    factor that the Second Circuit described in some detail.

 11            MR. WEITZMAN:  Right, your Honor.

 12            THE COURT:  So I think we can infer from that that

 13    they viewed it as important.

 14            MR. NAFTALIS:  On that issue, just to be clear, we've

 15    elicited through Mr. Smyth, I think, and Mr. Mullin that in the

 16    10-K that Mr. Isaza Tuzman signed, the revenue recognition

 17    policy is laid out, and Mr. Smyth has already testified about

 18    application of the revenue recognition policy.  So I think

 19    there is a factual basis for all of this.

 20            THE COURT:  All right.  I'm prepared to rule on the

 21    matter.  If the government is going to ask hypothetical

 22    questions of Mr. Smyth, I'm not going to permit Mr. Ingrassia

 23    to be called out of turn.  The reason for that is that the

 24    premise for the hypothetical questions would be Smyth's

 25    testimony and Smyth's testimony has not been tested by

HBHQTUZ1

1    cross-examination yet.

2            If Ingrassia was just going to testify about the

3    matters that I talked about at the outset, that doesn't

4    implicate Smyth's testimony.  It does no more than say what is

5    important to me as an analyst.  However, if we're going to go

6    beyond that and we're going to get into hypothetical questions

7    that then rely on the accuracy of what Smyth has said and

8    Smyth's testimony has not been tested by cross-examination yet,

9    I find that troubling.

10           So you can tell me what you want to do.  If you want

11   to elicit the hypothetical questions, I'm not going to hear him

12   out of turn.

13           MR. NAFTALIS:  Your Honor, we'll proceed.  I mean, we

14   take what your Honor has said.  We know we are not going to

15   convince you, but we do think the fact that Mr. Smyth has

16   testified to all of this stuff he did lays the factual

17   predicate.  If they want to cross him, it doesn't mean that the

18   factual predicate has gone away.  Let's assume they had a great

19   cross --

20           THE COURT:  I have already --

21           MR. NAFTALIS:  I know we are not going to convince

22   you.

23           THE COURT:  I told you why I think it's unfair.

24   You're not going to change my mind on that.  I would have no

25   problem with Ingrassia testifying if his testimony was not

1    going to get into hypothetical questions that are premised on

2    the accuracy of Mr. Smyth's testimony.

3         If you're going to do that and that testimony hasn't

4    been tested yet, that strikes me as unfair and problematic.

5         So I leave it up to you.  Do you want to call him

6    later after Smyth's examination is over?

7         MR. NAFTALIS:  I mean, he's here sitting outside, so

8    we'd like to call him and reserve the right to recall him if we

9    want to go back to the hypotheticals.

10         I don't know whether we will in the end, but the man

11    flew in and he's out front.

12         THE COURT:  I am sensitive to the inconvenience, but

13    ultimately my primary duty is to ensure the defendants get a

14    fair trial.  And for the reasons I've explained, I'm concerned

15    that hypotheticals premised on a direct that hasn't been tested

16    by cross, troubles me.  I find it troubling and problematic.

17         MR. NAFTALIS:  Can I simply ask "would it have been

18    important to you to know this" and then leave it, as opposed to

19    "how would this have changed your opinion"?

20         THE COURT:  You can elicit from him what is important

21    in making his evaluations of a stock, including income,

22    revenue, I don't know what exactly -- what things you're going

23    to bring out through him, but you certainly can elicit from

24    him--

25         MR. NAFTALIS:  I will do that.

HBHQTUZ1                          Smyth - Direct

1              THE COURT:  -- that matters of this sort are important

2    in reaching evaluation of a stock.

3              But what you would not be permitted to do is then

4    proceed to the hypothetical asking him would his evaluation

5    have been different if he had known X.

6              MR. NAFTALIS:  Understood.

7              THE COURT:  So you want to proceed with him today?

8              MR. WILLIAMS:  Yes.

9              THE COURT:  OK.

10             MR. WEITZMAN:  Thank you, your Honor.

11             THE COURT:  Can we bring in the witness and the jury,

12   please.

13             MR. WILLIAMS:  Yes, your Honor.

14             (Jury present)

15             THE COURT:  Please be seated.

16             Good morning, ladies and gentlemen and gentlemen.

17             THE JURY:  Good morning.

18             THE COURT:  We are going to be continuing with the

19   direct examination of Mr. Smyth.

20             Mr. Smyth, you remain under oath.

21    ROBIN SMYTH, resumed,

22   DIRECT EXAMINATION CONTINUED

23   BY MR. WILLIAMS:

24             THE COURT:  Mr. Williams, please proceed.

25             MR. WILLIAMS:  Thank you, your Honor.

HBHQTUZ1                        Smyth - Direct

1   Q.  Welcome back, Mr. Smyth.

2          MR. WILLIAMS:  Ms. Pyun, can we please pull up

3   Government Exhibit 2781.

4   Q.  Now, Mr. Smyth, when we left off two days ago, you had just

5   testified about this assurance note that you received from

6   Mr. Isaza Tuzman, and I asked you why you had asked Mr. Isaza

7   Tuzman to put an assurance note in an email in order for you to

8   sign the 10-K.  Do you recall that?

9   A.  Yes.

10  Q.  And do you recall that you said that you wanted evidence

11  that Mr. Isaza Tuzman knew what had happened in the company?

12  A.  Yes.

13  Q.  Now, what did you mean when you said you wanted evidence

14  that he knew what had happened in the company?

15  A.  If at any future time there was an investigation either

16  internally or externally with the SEC or prosecutors, I wanted

17  to have that email for evidence.

18  Q.  Mr. Smyth, did there come a time when Mr. Isaza Tuzman kept

19  his promise to get $8 million into KIT digital to fill up the

20  escrow accounts?

21  A.  Yes.

22  Q.  When did he do that?

23  A.  April 2012.

24  Q.  When was the 10-K signed?

25  A.  March 2012.

HBHQTUZ1                         Smyth - Direct

1              MR. WILLIAMS:  I want to show you Government Exhibits

2    2174-A, 2180-A, 2184-A through C.  So let's pull up 2174-A

3    first.

4    Q.  Mr. Smyth, what is this?

5    A.  That is a BBM exchange between myself and Rima Jameel.

6              MR. WILLIAMS:  Let's pull up Government Exhibit

7    2180-A.

8    Q.  What is this?

9    A.  That is BBM exchange between Kaleil, myself and Gavin

10   Campion.

11             MR. WILLIAMS:  Pull up 2184-A.

12   Q.  What is 2184-A?

13   A.  BBM exchange between Kaleil myself and Gavin Campion.

14             MR. WILLIAMS:  Let's look at 2184-B.

15   Q.  What's that?

16   A.  Again, BBM exchange between Kaleil, myself and Gavin

17   Campion.

18             MR. WILLIAMS:  Let's look at 2184-C.

19   Q.  What is that?

20   A.  Again, a BBM exchange between Kaleil, myself and Gavin

21   Campion.

22             MR. WILLIAMS:  We offer Government Exhibits 2174-A,

23   2180-A, 2184-A through C.

24             MR. McRAE:  No objection.

25             MR. JACKSON:  No objection.

HBHQTUZ1                          Smyth - Direct

1          THE COURT:  2174-A, 2180-A, 2184-A through C are

2   received.

3          (Government's Exhibits 2174-A, 2180-A, 2184-A through

4   2184-C received in evidence)

5          MR. WILLIAMS:  Permission to publish, your Honor.

6          THE COURT:  Yes.

7   Q.  Let's pull up Government Exhibit 2180-A.

8          Mr. Smyth, can you please read the first four messages

9   that Mr. Isaza Tuzman sent to you on April 7 of 2012.

10  A.  "First post Sabbath message from my bank relationship

11  manager at Emirates Bank (who is Christian) saying they're off

12  tomorrow for Easter.  While sitting here at airport going to

13  Dubai.  Good news is that they're confirmed to meet me at

14  branch Monday morning and re-confirmed first wire can go out

15  right away if I am there in person.  You guys there?"

16  Q.  Mr. Smyth, in the third message, Mr. Isaza Tuzman

17  references a wire.  What wire did you understand him to be

18  referencing?

19  A.  The first wire he had alluded to in the -- or said in the

20  email message to me, the $3.5 million.

21  Q.  Where did you understand that wire to be going to?

22  A.  To the escrow account held by Rima.

23  Q.  Now, Mr. Smyth, why didn't you ask Mr. Isaza Tuzman to send

24  the $3.5 million directly to KIT digital?

25  A.  Because the amount owed was from -- from that escrow

1    account, and if it had come directly from Kaleil, questions

2    would have been asked as to why Kaleil was sending that amount

3    to them.

4    Q.  OK.  Now at 2:38 p.m. you wrote, "I would like a call

5    between the three of us to discuss where we are now."

6          Do you see that?

7    A.  Yes.

8    Q.  What did you mean by "where we are now"?

9    A.  I wanted to know where the -- what process was for the

10   balance of the $8 million and what we were going to be doing

11   about the back end.

12   Q.  When you say "we," who are you referring to?

13   A.  Kaleil, Gavin and myself.

14   Q.  Now, nine seconds later, Mr. Isaza Tuzman wrote, "You saw

15   my update on Dubai wire above, yes?"

16          And then you responded, "Yes."

17          And then you said, "Hopefully second wire there as

18   well."

19          Do you see that?

20   A.  Yes.

21   Q.  A few lines down, Mr. Isaza Tuzman says, "Second wire:  I

22   don't know.  It wasn't there on Thursday."

23          And then he wrote, "But that was expected as it didn't

24   leave Colombia until Tuesday afternoon".

25          Now, Mr. Smyth, why were you and Mr. Isaza Tuzman

HBHQTUZ1                        Smyth - Direct

1    talking about the timing of wire transactions?

2    A.  The wires needed to be received by the escrow account --

3    Rima in the escrow account as quickly as possible because there

4    was pressure on, and we were running out of time to be able to

5    send the $8 million back to KIT digital.

6    Q.  Mr. Smyth you just said that there was pressure on.

7    Pressure from who?

8    A.  Joe Mullin.

9    Q.  And what do you mean by there was pressure from Joe Mullin?

10   A.  There was pressure that the money that was in the escrow

11   account be returned to KIT digital.

12   Q.  Would you remind the jury just briefly who Joe Mullin was?

13   A.  He was a director of KIT digital as well as chairman of the

14   audit committee.

15   Q.  Now, let's look at what you wrote to Mr. Isaza Tuzman at

16   2:45 p.m.  You wrote, "Are you going to Dubai now anyway I

17   would be happier you down there to do as much as possible to

18   get it moving."

19        What did you mean when you said you would be "happier

20   with you down there to do as much as possible to get it

21   moving"?

22   A.  It's always easier to deal with banks if you want something

23   done if you're there in person rather than communicating when

24   you're not there.

25   Q.  And so who, if anyone, did you want in person at the bank?

1    A.   Kaleil.

2    Q.   Now, can you please read what you then wrote at 2:49:07?

3    A.   "Third wire if that could go direct to Rima would be a

4    bonus as the time delay long and it will be asked for soon."

5    Q.   What did you mean when you said, "It will be asked for

6    soon"?

7    A.   The -- again, the expectation was that it needed to get

8    back into KIT digital, the amount that was in the escrow

9    account.

10   Q.   Mr. Isaza Tuzman then wrote, "I am going to Dubai anyway, I

11   need to be there for Monday morning."

12            Mr. Smyth did you know why Mr. Isaza Tuzman was

13   traveling to Dubai?

14            MR. McRAE:   Objection, your Honor.   Foundation.

15            THE COURT:   Sustained.

16   BY MR. WILLIAMS:

17   Q.   Mr. Smyth, did Mr. Isaza Tuzman and you speak about any

18   meetings that he had in Dubai for Monday morning?

19   A.   No.

20   Q.   And so did you know why he was going to Dubai?

21            MR. McRAE:   Objection.   Lack of foundation.

22            THE COURT:   Overruled.

23   A.   No.

24   Q.   OK.   Now, Mr. Smyth, you testified that the $8 million was

25   traveling from Colombia to Dubai and then to KIT digital.   Did

1   you speak with Rima Jameel about those logistics?

2   A.  Yes.

3          MR. WILLIAMS:  Let's pull up Government Exhibit

4   2174-A.

5   Q.  Now, Mr. Smyth these are BBM messages from you and Rima

6   Jameel also in April of 2012, so this is just days after the

7   last exchange we were looking at.  Can you please read what you

8   wrote to Rima Jameel at 2:42 a.m.

9   A.  "Has money hit now?"

10  Q.  What did you mean by "Has money hit now"?

11  A.  Had the money that Kaleil was sending into the escrow

12  account been received by the bank yet.

13  Q.  Now, in response, she said, "Yes all of it $3 million.

14  Shall we send to New York or Dubai."

15         Do you see that?

16  A.  Yes.

17  Q.  And where did you tell her to send the money to?

18  A.  New York.

19  Q.  When you refer to New York, what are you referring to?

20  A.  The KIT digital account held in New York.

21  Q.  OK.  Now at 3:09 and 22 seconds, you also wrote, "Let me

22  know when the 5 million hits."

23         Do you see that?

24  A.  Yes.

25  Q.  What were you referring to?

HBHQTUZ1                          Smyth - Direct

1   A.   5 million was the balance of the 8 million Kaleil had

2   committed to send to the escrow account.

3   Q.   Then at 3:09 and 49 seconds, Rima Jameel wrote, "Kaleil is

4   sending to me we will lose time on that".

5        Do you see that?

6   A.   Yes.

7   Q.   What were you and Rima Jameel discussing here?

8   A.   The timing of the $5 million being received into the escrow

9   account and then the turnaround to New York.

10  Q.   OK.  Let's jump ahead to 7:18 and 17 seconds.

11       You wrote to Rima Jameel, "Did you het confirm from

12  bank?"  Is there a typo in that message?

13  A.   Yes.

14  Q.   What did you intend to say?

15  A.   "Get."

16  Q.   "Did you get confirm from bank?"

17  A.   Correct.

18  Q.   What did you mean by "get confirm from bank"?

19  A.   I wanted the -- her to let me know if she had the

20  confirmation, the actual receipt from the bank.

21  Q.   Then she responded, "yes funds gone."

22       Now, Mr. Smyth, later on at -- on April 19 at 8:47,

23  you wrote to Rima Jameel, "Has the five hit your account yet?"

24       Do you see that?

25  A.   Yes.

HBHQTUZ1                        Smyth - Direct

1    Q.  What were you referring to when you said, "Has the five hit
2    your account yet"?
3    A.  The same $5 million which was the balance of the
4    $8 million.
5    Q.  And she wrote back, "No, not yet."
6            See that?
7    A.  Yes.
8    Q.  Then a few days later, you wrote to her again and say, "Has
9    five million hit today?"
10           Do you see that?
11   A.  Yes.
12   Q.  What were you referring to when you asked if the "five
13   hit"?
14   A.  The same $5 million which I was expecting to be sent to the
15   escrow account.
16   Q.  Now, Rima Jameel responded, "Yes, it hit.  I have prepared
17   instruction to send to KIT New York based on instruction from
18   Lou but it won't get processed until after New York banks open
19   tomorrow at five which means not till Tuesday."
20           Now, Mr. Smyth, who is Lou?
21   A.  Lou Schwartz was -- I think at that stage he had changed --
22   he used to be in charge of -- he worked for KIT.  He used to be
23   in charge of the American -- America operations, but I think
24   then he was acting as general counsel.
25   Q.  What, if anything, did Lou have to do with the escrow money

HBHQTUZ1                        Smyth - Direct

1    coming back into KIT digital?

2    A.  He was asking Rima for the 5 million to be sent back to

3    KIT.  There was more pressure on now from Lou Schwartz as well

4    for that $5 million to be sent which was the balance of the

5    amounts in escrow accounts in Dubai.

6    Q.  Now, Mr. Smyth, did you speak with Mr. Isaza Tuzman about

7    the $8 million after he started initiating the wires?

8    A.  Yes.

9           MR. WILLIAMS:  Let's look at Government Exhibit

10   2184-A.

11   Q.  Now, these are BBM messages between you, Gavin Campion and

12   Mr. Isaza Tuzman on April 25 and 26.

13          So at 9:32 a.m., he wrote to you, "Would really like

14   to speak.  Sorry to keep bothering."  Then he gives a phone

15   number.  Did you write back or can you read what you wrote back

16   in response?

17   A.  "I keep getting dragged onto calls."

18   Q.  Then he wrote, "OK.  Am meeting Petr and Gavin tonight and

19   want to strategize."

20          Who is Petr in that message?

21   A.  Petr Stransky.

22   Q.  Mr. Smyth, had you previously spoken with Mr. Isaza Tuzman

23   about why he was meeting with Petr Stransky?

24   A.  Yes.

25   Q.  What did he say about why he was meeting Petr Stransky?

1   A.  They were meeting on the content services sale from KIT

2   digital.

3   Q.  Just very, very briefly, can you tell the jury what content

4   services was and what the sale was?

5   A.  Petr Stransky ran the operation of content services, and we

6   were preparing to sell content services to Petr Stransky out of

7   KIT similar to the sale of Visual which would have included all

8   the uncollectible revenue under the fake perpetual licenses.

9   Q.  Did that sale ultimately happen, Mr. Smyth?

10  A.  It did.

11  Q.  When?

12  A.  June 2012.

13          MR. WILLIAMS:  You can jump to the next page, Ms.

14  Pyun.

15  Q.  Now, at 9:47 a.m., Mr. Isaza Tuzman wrote, "Did 5 million

16  get received by KIT?"

17          Then he goes on to write, "Also, do you know what's

18  happening with my transition agreement?  Had counted on this.

19  Even in loaning Tomas money."

20          Do you see that?

21  A.  Yes.

22  Q.  What was the 5 million or what was your understanding of

23  what Mr. Isaza Tuzman meant by "5 million get received by KIT"?

24  A.  He wanted to know whether the 5 million that he sent to the

25  escrow account had been sent to KIT and been received by KIT

HBHQTUZ1                          Smyth - Direct

1    digital, New York.

2    Q.  Please read the next two messages that you wrote.

3    A.  "Yes $5 million landed.  No, I have no visibility on your

4    transition agreement."

5    Q.  Now, Mr. Isaza Tuzman then wrote, "Good on 5 million.  That

6    8 million has me fending for my life."

7          What did you understand Mr. Isaza Tuzman to mean when

8    he said "the $8 million has me fending for my life"?

9          MR. McRAE:  Objection.  Speculation.

10         THE COURT:  Sustained.

11   Q.  Mr. Smyth, did you speak with Mr. Isaza Tuzman about where

12   he had received -- obtained the $8 million?

13   A.  Yes.

14   Q.  What did he tell you?

15   A.  He had borrowed it from people in Colombia.

16   Q.  And what, if anything, did he say about whether or not that

17   borrowing $8 million from people in Colombia had any impact on

18   him?

19         MR. McRAE:  Objection.  Leading, your Honor.

20         THE COURT:  Overruled.

21   A.  He said that he really needed to pay back the money to

22   those people in Colombia.

23   Q.  And did he explain why?

24   A.  I just -- not in a lot of words, but --

25         MR. McRAE:  Objection.

HBHQTUZ1                         Smyth - Direct

1          THE COURT:  Sustained.

2          MR. McRAE:  Thank you.

3          THE COURT:  The question was did he explain why.

4          THE WITNESS:  Not really.

5  Q.  Now, Mr. Smyth, after Mr. Isaza Tuzman wired $8 million

6  from Colombia, did you tell your auditors that there was an

7  $8 million hole in the escrow accounts?

8  A.  No.

9  Q.  After he wired that $8 million in from Colombia, did you

10 tell your board of directors that there was a $8 million hole

11 in your accounts?

12 A.  No.

13 Q.  After he wired that money from Colombia, did you tell Joe

14 Mullin that there was a $8 million hole in your accounts?

15 A.  No.

16 Q.  And after he wired that money from Colombia, did you tell

17 your investors that there was a $8 million hole in your

18 accounts?

19 A.  No.

20 Q.  Why didn't you tell those people the truth?

21 A.  Because Kaleil had filled the hole with the $8 million.

22         MR. WILLIAMS:  No further questions.

23         THE COURT:  All right.

24         MR. JACKSON:  Excuse me, your Honor.

25         THE COURT:  Yes.

HBHQTUZ1                           Smyth - Direct

1           MR. JACKSON:  May we request at this time that the

2    Court provide the limiting instruction we discussed?

3           THE COURT:  Yes.

4           Ladies and gentlemen, I'm going to read an instruction

5    to you about some of the evidence that you've heard recently.

6    The instruction is as follows:

7           You have heard evidence related to alleged accounting

8    fraud at KIT digital.  Some of this evidence has referenced

9    Enable, a company about which you have heard evidence.  You

10   should be aware that Omar Amanat is not charged in Counts Five

11   and Six of the indictment which relate to alleged improper

12   transactions in accounting at KIT digital.  I will give you

13   further instructions on all of the counts of course at the

14   conclusion of the case.

15          Now, is it the lawyers wish at this point --

16          Mr. McRae, something you wanted to say?

17          MR. McRAE:  Yes, your Honor.  I was going to ask if we

18   could very briefly approach.  It will just take a second.

19          THE COURT:  OK.

20          (Continued on next page)

21

22

23

24

25

HBHQTUZ1                        Smyth - Direct

1          (At the side bar)

2          MR. McRAE:  I just wanted to confirm that now that

3   Mr. Smyth has been tendered, the government will respect the

4   admonition that they not communicate with him nor have his

5   counsel communicate with him either directly or indirectly.

6          I understand we are going to have a witness taken out

7   of order, but I wanted to make sure that that expectation and

8   admonition were in play, and I didn't want to do it in front of

9   the jury.

10          MR. WILLIAMS:  That's fine, your Honor.  I think

11   Mr. McRae misspoke.  He said nor have his lawyer communicate

12   with him or Mr. Smyth communicate with his lawyer, but the

13   government is not going to communicate with Mr. Smyth's lawyer.

14          MR. McRAE:  That's what I meant, either direct or

15   indirect.

16          THE COURT:  OK.

17          MR. McRAE:  Thank you, your Honor.

18          (Continued on next page)

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Ladies and gentlemen, we're going to break

3    into Mr. Smyth's testimony at this point to take testimony from

4    a witness who has traveled a distance to get here and who has

5    been waiting to testify for some time.

6           So, Mr. Smyth, you can step down, sir.  And the

7    government will call that witness, please.

8           MR. NAFTALIS:  Yes, your Honor.  The government calls

9    Richard Ingrassia.

10    RICHARD ALAN INGRASSIA,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13           MR. NAFTALIS:  Your Honor, may I inquire?

14           THE COURT:  Yes, please.

15    DIRECT EXAMINATION

16    BY MR. NAFTALIS:

17    Q.  Mr. Ingrassia, where do you live?

18    A.  I live in Lake Forest, California.

19    Q.  How far did you go in school?

20    A.  I was undergraduate, University of Notre Dame and then

21    graduate School of Journalism at Northwestern University.

22    Q.  Are you familiar with a company called ROTH Capital?

23    A.  Yes.

24    Q.  How?

25    A.  I was equity research analyst there from 2002 to 2013.

HBH9TUZ2                          Ingrassia - direct

1   Q.  And can you tell the jury what type of a firm ROTH Capital

2   is?

3   A.  ROTH Capital is an investment bank.

4   Q.  What is an investment bank generally?

5   A.  An investment bank helps companies raise money and

6   publishes research reports to help investors make better

7   decisions on stocks.

8   Q.  Pull the microphone a little closer.  It's a little hard to

9   hear in this courtroom.

10              Where is Roth based?

11  A.  In Newport Beach, California.

12  Q.  Now, you said you were an equity research analyst at Roth

13  during your time there?

14  A.  Yes.

15  Q.  Can you explain to the jury in general terms what an equity

16  research analyst is?

17  A.  An equity research analyst studies companies, reads their

18  filings, talks to management, customers, suppliers,

19  competition, and then publishes reports on those companies to

20  help investors make better decisions.  And most of those

21  reports center around establishing a valuation for that company

22  and a recommendation of either a buy, a sell, or a hold.

23  Q.  Just to go through some of what you said.  What type of

24  companies did you cover at Roth?

25  A.  At ROTH Capital's specialty was in small cap and micro cap

HBH9TUZ2                        Ingrassia - direct

1    companies, meaning companies generally under five hundred

2    million in valuation.

3    Q.  Were these public or private companies?

4    A.  Public.

5    Q.  And you said you would give recommendations about whether

6    to buy, sell, or hold.  Can you explain what those concepts

7    mean?

8    A.  Sure.  So a buy would mean that when I estimated the value

9    of that company it was in my opinion greater than where it was

10   trading in the market at the time.  And obviously vice versa on

11   a sell rating.  I would value it.  If I thought it was

12   overvalued, then that would qualify to be a sale rating.

13   Q.  Did you focus on any particular types of companies?

14   A.  Yes.  Almost all in media, media-related technologies, and

15   internet technologies.

16   Q.  And how many companies -- in your business as an equity

17   research analyst are you familiar with the word cover?

18   A.  Yes.

19   Q.  What does cover mean in this field?

20   A.  Cover means doing what I just described, which is writing

21   research and studying companies.

22   Q.  How many covers -- excuse me.  How many companies did you

23   cover at any one time?

24   A.  It varied but typically not more than fifteen.  I'd say

25   twelve to fifteen on average.

HBH9TUZ2                          Ingrassia - direct

1    Q.  And how closely did you follow the companies that you were
2    covering?
3    A.  As closely as I possibly could.
4    Q.  Mr. Ingrassia, are you familiar with a company called KIT
5    digital?
6    A.  Yes.
7    Q.  How?
8    A.  I covered the company while I was at Roth roughly I think
9    2009 to 2013.
10   Q.  And who was the CEO of KIT when you covered the company?
11   A.  Kaleil Isaza Tuzman.
12   Q.  Did you ever meet Mr. Tuzman?
13   A.  Yes.
14   Q.  Now, in covering KIT digital and other companies what types
15   of information did you consider in doing your research?
16   A.  Well, it would be a lot of different information.
17   Primarily it would be their publicly filed financial
18   statements.  Obviously anything on their website.  Again, like
19   I said, I would interview customers and suppliers and others
20   outside but analysts are generally restricted only to the
21   information that's publicly available.  So that's what I had to
22   rely on.
23   Q.  When you said publicly filed financial statements, do you
24   mean the company's SEC filings?
25   A.  Yes.  So 10-Ks or annual reports, quarterly reports, the

HBH9TUZ2                        Ingrassia - direct

1    10-Qs and then 8-Ks and other filings, various events during

2    the company's history.

3    Q.  Now between -- you said you covered KIT between 2009 and

4    2013 approximately?

5    A.  Yeah, I think that's right.

6    Q.  Did you review KIT's 10-Ks, 10-Qs and 8-Ks at that time, at

7    the time they were released?

8    A.  Yes.

9    Q.  In reviewing these SEC filings, did you focus on any

10   particular parts of them in doing your research on KIT digital?

11   A.  Primarily it would be the statements themselves, the income

12   statement, the balance sheet, the cash list statement also the

13   management's discussion and analysis.  I would read them all

14   but those were the areas that were most important.

15   Q.  Whether you said the balance sheet, the income statement,

16   cash list statement, are those the financial statements of the

17   company?

18   A.  Yes.

19   Q.  And why did you focus on the financial statements of the

20   company?

21   A.  Well, the type of analyst I was, I valued a company based

22   on their discounted cash flow projections.  And so

23   understanding the financials was most important to me actually

24   setting what I thought was a fair value on the company.

25   Q.  We don't need to get into the detail but when you say

HBH9TUZ2                       Ingrassia - direct

1    discounted cash flow, just in very general terms what does that

2    mean?

3    A.   So it's -- it's the cash flow of a company over a period of

4    time.  I typically looked at five years.

5    Q.   Is that just basically a type of analysis you did?

6    A.   Sorry.  It's a methodology for valuing stocks.

7    Q.   Did you rely on KIT digital and other companies' financial

8    statements being accurate in your work?

9    A.   Absolutely.

10   Q.   Can you explain to the jury why.

11   A.   Like I said, as an analyst I'm really only privy to the

12   information that's filed publicly.  So there is no other

13   information I can go on to set my valuation and create my

14   models.

15   Q.   Focusing on KIT digital, were any particular financial

16   metrics important to you in doing your research?

17   A.   Yeah.  I would say -- I mean the big ones are revenue,

18   operating income, net income to some extent.  I would say in

19   KIT digital's case in particular revenue was probably most

20   important because they were -- they were making a lot of

21   acquisitions in a rapid -- in a short period of time.  And

22   understanding the difference between what was acquired revenue

23   and what was organic revenue was important to me.

24   Q.   Can you explain to the jury the difference between organic

25   revenue and acquired revenue.

1   A.   So organic revenue is revenue or sales generating --

2   generated by the company that existed before an acquisition.

3   So essentially just apples to apples comparison from one period

4   to another.

5        Nonorganic would be anything that was added during

6   that period that might throw off the total.

7        MR. NAFTALIS:  Ms. Pyun, can you please bring up

8   Government Exhibit 218 in evidence.

9   Q.   And Mr. Ingrassia, it's going to come up on a screen in

10  front of you.

11       MR. NAFTALIS:  Ms. Pyun if you can show the top so we

12  can see the date of this.

13  Q.   Do you see that this document says form 10-K for the period

14  ending December 31, 2011 for KIT digital?

15  A.   Yes.

16  Q.   Do you recognize this document?

17  A.   Yes.

18  Q.   Did you review it at the time it was released by KIT

19  digital?

20  A.   I mean it's hard to say -- I mean I'm sure I did.

21  Q.   Did you review the 10-K?

22  A.   I always reviewed the 10-Ks.

23       MR. NAFTALIS:  Ms. Pyun, let's go to page F4 of the

24  10-K.

25  Q.   And looking at the top do you see it says, "Consolidated

1   Statements of Operations and Comprehensive Loss"?

2   A.  Yes.

3   Q.  Can you explain to the jury what we are looking at here.

4   A.  So this is the income statement that I mentioned.  So this

5   is the high level summary of the company's sales, all their

6   expenses, and then ultimately the earnings that they generated

7   per share in those periods.

8   Q.  So this is part of the financial statements that KIT

9   digital released?

10  A.  Right.

11  Q.  And what is the very top line in the -- in this statement?

12  A.  Revenue.

13  Q.  And just explain to the jury, it says revenue, and then

14  there are certain years 2011, 2010, 2009.  What is listed for

15  each of those?

16  A.  So revenue for 2011 was reported at 214,932,000.

17          In 2010 it was 106,597,000.

18          And in 2009 47,284,000.

19  Q.  So it's going up over time?

20  A.  Yes.

21  Q.  For each of those numbers did you rely on what KIT digital

22  said its revenue was to be accurate?

23  A.  Of course.  Yes.

24  Q.  And, again, why?

25  A.  I don't really have access to anything else that would tell

HBH9TUZ2                        Ingrassia - direct

1   me otherwise -- I don't have anything else to go on and I build

2   my models based on this and my valuation.

3           MR. NAFTALIS:  Ms. Pyun, can we go back a page to page

4   F3.

5   Q.  Let's look at the very top of the page.  It says

6   consolidated balance sheets.  Do you see that, Mr. Ingrassia?

7   A.  Yes.

8   Q.  So what are we looking at here?

9   A.  So these are asset and liability accounts totals for the

10  end of this period; assets being items like cash and

11  investments and liabilities meaning mostly debts.

12  Q.  Is this another piece of KIT digital's financial

13  statements?

14  A.  Yes.

15  Q.  And it says assets on top and then it says current assets.

16  What's the first current asset listed?

17  A.  Cash and cash equivalents.

18  Q.  Can you just explain to the jury what cash and cash

19  equivalents are.

20  A.  It's pretty much the way it sounds.  It's how much money is

21  in the bank liquid, you know, cash available for withdraw.

22  Q.  For the period ending December 31, 2011 KIT digital says

23  that there is 45,660,000; is that right?

24  A.  Yes.  That's what it says.

25  Q.  Then for the prior year it was 141,233,000?

HBH9TUZ2                         Ingrassia - direct

1    A.  Yes.  Correct.

2    Q.  Did you rely on what KIT digital said its cash and cash

3    equivalents were to be accurate?

4    A.  Yes.  Obviously the amount of cash would be added directly

5    to my valuation of the company's cash flows.

6    Q.  And you've used the word "valuation" a few times.  What do

7    you mean by valuation?

8    A.  So that's my estimate of what -- of the fair value of the

9    company.  I'm not sure how to explain it real clearly.  It's

10   what I think the company is worth.  Not necessarily what the

11   company is trading for on the stock market.

12   Q.  So as an example let's say GE for example.  If GE is

13   trading at, I don't even know, ten dollars today.  On the stock

14   market, when you say what the valuation of GE is, can you just

15   explain in context what you mean by that?

16   A.  Sure.  If I say look at General Electric's financial

17   statements and create a model and run my estimates, I might,

18   for example, establish that I think the fair value based on my

19   projections is $20 a share and in that case with the stock just

20   at 10 that would qualify as a company that I would say is a

21   buy.

22   Q.  Because you think there is upside?

23   A.  Right.

24        MR. NAFTALIS:  Ms. Pyun, could we go forward to page

25   F12.

Q.  At the very top of the page it says "Notes to Consolidated
Financial Statements," and then below that it says "Summary of
Significant Accounting Policies."

          Can you explain to the jury where we are in KIT
digital's 10-K?

A.  So these would be the footnotes to the financial
statements.

Q.  And what are footnotes to financial statements?

A.  Just details that explain how some of the numbers were
arrived on the -- either the income statement or the balance
sheet.

Q.  And in particular where it says, Summary of Significant
Accounting Policies," what do you understand to be in this
section of the footnotes?

A.  The way it sounds.  There are different ways to, for
example, recognize revenue.  And this is the company explaining
to shareholders or any other interested party exactly how they
do that.

Q.  You noted it says revenue recognition, and we're not going
to read the whole paragraph there, but during your work between
2009 and '13 did you review how KIT digital represented it was
recognizing revenue to its shareholders?

A.  You know, I did and -- but probably did the most of that,
most of that kind of analysis early on when I initiated
coverage on the company.  Later I would just really look for

HBH9TUZ2                          Ingrassia - direct

1    any changes in the revenue recognition policy as time went on.

2    Q.   When you say "initiate coverage," what do you mean?

3    A.   That would be the first report that I wrote on the company

4    where I established my first opinion on the fair value and

5    whether I thought it was a buy, a hold, or a sell.

6    Q.   Just unpack that for the jury.  When you first start

7    coverage, you were looking at how the company disclosed its

8    recognizing revenue?

9    A.   Right.

10   Q.   And then going forward what do you do with respect to these

11   disclosures and subsequent filings?

12   A.   So what I like to -- I mean what's important to me is how

13   conservative or aggressive a company is and how they report

14   their revenues.  And I just personally like to see a more

15   conservative approach to doing that.  So I would look to see if

16   that had been changed in any way to a more aggressive policy

17   because that can sometimes distort the comparison of financial

18   statements from one period to another.

19   Q.   Did you rely on how KIT digital represented it was

20   recognizing revenue to be true?

21   A.   Yes.

22   Q.   Again, why?

23   A.   Like I relied on most things in the financial statements.

24   If it's not true here, then everything that I based my

25   estimates on and my valuation could possibly be wrong or

1   misconstrued.

2           MR. NAFTALIS:  Ms. Pyun, let's go to the -- I think

3   it's the third to last page which is Exhibit 31.1 to the 10-K.

4   Q.  This on top, Mr. Ingrassia, says, "Certification of CEO

5   Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002."

6           Do you see that?

7   A.  Yes.

8   Q.  Generally what are we looking at here?

9   A.  This is a statement that the CEO has to sign to verify that

10  the -- that everything in this document is accurate.

11  Q.  And who is it signed by in this case?

12  A.  Kaleil Isaza Tuzman.

13  Q.  And in particular you said you rely on everything being

14  accurate.  That includes the numbers in the financial

15  statements?

16  A.  I would say that's mostly the numbers.

17  Q.  And looking at paragraph five, it says, "The registrant's

18  other certifying officers and I have disclosed, based on our

19  most recent evaluation of internal control over financial

20  reporting, to the registrant's auditors and audit committee of

21  the registrant's board of directors (or persons performing the

22  equivalent functions):"

23          I'm looking at "(b) any fraud, whether or not

24  material, that involves management or other employees who have

25  a significant role in the registrant's internal control over

HBH9TUZ2                         Ingrassia - direct

1    financial reporting."

2            Do you see that?

3    A.  Yes.

4    Q.  Was this representation about there being no -- about fraud

5    important to you?

6    A.  Yes.  Obviously.  You take this for granted actually.

7    Q.  And it also says that fraud, whether material or

8    immaterial.  It doesn't matter how big the fraud is, right?

9    A.  Right.

10   Q.  And let's just flip to the last page of the

11   certification -- excuse me.  The last page of the 10-K.  We're

12   looking at Exhibit 32.1.

13           In substance what is this page?

14   A.  This is the final sign-off on the Sarbanes-Oxley compliance

15   signed by Mr. Tuzman.

16   Q.  And what is Mr. Tuzman representing in this page?

17   A.  That the, as it says in point two, that it fairly

18   represents in all material respects the condition and

19   operations of the company.

20   Q.  And before that?

21   A.  That it complies with section 13(a) and 15(d) of the SEC

22   Act of 1934.

23   Q.  What are Section 13(a) and 15(d) of the Securities Exchange

24   Act?  Are those the federal securities laws?  Part of the

25   federal securities laws?

HBH9TUZ2                          Ingrassia - direct

```
 1    A.   Yes.

 2    Q.   Was this certification important to you?

 3    A.   Yes.

 4    Q.   Why?

 5    A.   It tells me that I can rely on everything that I just read.

 6    Q.   Mr. Ingrassia, are you familiar with the -- something

 7    called quarterly guidance?

 8    A.   Yes.

 9    Q.   Can you explain to the jury what quarterly guidance is?

10    A.   So guidance in general is management's communication to

11    Wall Street analysts like myself on what they think they can

12    do, what they estimate their financial performance will be.  In

13    a quarterly case it would be for the quarters to come.  And

14    most companies would give annual guidance as well.

15    Q.   Just as an example, let's assume it's the middle of the

16    first quarter of this year.  The company is doing what with

17    respect to the first quarter?

18    A.   (No response).

19    Q.   Just explain when in time it comes out.

20    A.   So typically a company will give guidance when it reports

21    the prior -- the prior quarter's results.  So if they were

22    reporting the first quarter, a company that's giving guidance

23    might give second quarter guidance and then guidance for the

24    entire year.

25    Q.   So it's basically an opinion of how they might do in the
```

HBH9TUZ2                        Ingrassia - direct

1   future?

2   A.   Right.   And analysts generally assume that that's based on

3   some fairly rigorous controls in the company that allows them

4   to estimate sales accurately.

5   Q.   Now, throughout your testimony you've referenced the model.

6   Just in very broad strokes what do you mean by a model?

7   A.   So that's an Excel spreadsheet of my creation where I enter

8   the actual results from a number of prior years and then use

9   the pattern established by those prior years and what I've

10  gathered by my own independent research to make my own

11  projections independent of the guidance of the company for what

12  they might do in the coming periods.

13  Q.   And you said that you gather information from -- is certain

14  of that information drawn from a company's SEC filings?

15  A.   Yeah.   I mean it's mostly that.   It's difficult to get

16  anything really out of -- I mentioned that I would call their

17  customers and their suppliers and competitors but it's -- those

18  folks don't usually give you actual numbers.   You just have to

19  go with anecdotal evidence.

20  Q.   Did you build a model in connection with your research of

21  KIT digital?

22  A.   Yes.

23  Q.   Were any particular inputs from KIT digital's financial

24  statements used in your modeling?

25  A.   I mean all of them really.

HBH9TUZ2                          Ingrassia - direct

1    Q.   Was revenue included?

2    A.   Yes, of course.

3    Q.   Now in front of you there's a folder.  Do you see that?

4    And do you see Government Exhibits 3304A, 3301A and 3301B for

5    identification?  Do you see those three documents?

6    A.   Yes.  I have them now.

7    Q.   Do you recognize those three exhibits?

8    A.   These are three of my research reports on KIT digital.

9              MR. NAFTALIS:  Your Honor, we offer these not for the

10   truth.  We offer them as opinions and for the witness's state

11   of mind.

12             MR. WEITZMAN:  No objection.

13             MR. JACKSON:  No objection, your Honor.

14             THE COURT:  Ladies and gentlemen, these three

15   exhibits, 3304A, 3301A and 3301B are, as Mr. Naftalis said, not

16   offered for the truth of any of the statements that are

17   contained in the documents but rather as reflecting the

18   witness's opinion at the time of, in this case, KIT digital

19   stock and to the extent it sheds light on his state of mind at

20   the time that he wrote these reports.  So these three exhibits,

21   3301A, 3304A, and 3301B are received.

22             (Government's Exhibits 3301A, 3304A, and 3301B

23   received in evidence)

24             MR. NAFTALIS:  Permission to publish 3304, your Honor.

25             THE COURT:  Yes.

HBH9TUZ2                         Ingrassia – direct

1    Q.   Just generally what are we looking at here?

2    A.   So this is the front page of my research report.  It has a

3    lot of information on it.  52 week high and low, for example.

4    My price target.  And then a summary of the research opinion

5    that I give inside the note.

6    Q.   Okay.  We'll walk through it in a second.  So this is one

7    of your research reports from KIT digital at the time?

8    A.   Yes.  It looks like my report after they reported first

9    quarter results in 2010.

10   Q.   Just stepping back from this exhibit for a second.

11   Approximately, between 2009 and 2013, how many research reports

12   about KIT did you publish, just approximately?

13   A.   Wow.  Well, let's see.  It would be at least one per

14   quarter.  There was a fair number of acquisitions and I covered

15   it for -- I mean it had to be maybe around 30, maybe more.

16   Q.   And in each of those did you rely on KIT digital's SEC

17   filings in preparing those reports?

18   A.   Probably not all of them but most of them.

19   Q.   And you relied on those SEC filings being accurate?

20   A.   Yes.

21   Q.   Now let's look specifically at this report just to orient

22   the jury.  On the top there is your name, Richard Ingrassia; is

23   that right?

24   A.   That's right.

25   Q.   The date of this one is May 18, 2010?

HBH9TUZ2                          Ingrassia - direct

1    A.  Yes.

2    Q.  That's the date that you published it?

3    A.  Correct.

4    Q.  And then we see it says KIT digital.  That's the company,

5    obviously?

6    A.  Yes.

7    Q.  In this case it says KITD 12.75 NASDAQ buy.  Can you just

8    explain what that means?

9    A.  So 12.75 was the closing price of the stock the day before

10   the note was published and then buy is my recommendation on the

11   stock.

12   Q.  Here, below that, you say estimates changed, target price

13   changed.  What does that mean?

14   A.  That means that as a result of what I read in the filings

15   and any subsequent research that I did I changed my estimates

16   in one way or another and changed my target price.  I don't

17   know whether it was lowering or raising those numbers just

18   offhand.

19   Q.  If we just look at the fourth bullet on the first page.

20   This may refresh you.  What do you write in the fourth bullet?

21   A.  Okay.  I raised the estimates and I raised the target price

22   to $20, just slightly from $19.50 before that.

23   Q.  The stock was trading at 12.75 and you were saying that you

24   had a target price that it could go up to 20?

25   A.  Right.  $20 was my opinion of what I thought the fair value

1    of the stock was at the time.

2    Q.  And that was based in part on KIT digital's SEC filings?

3    A.  Yes.

4    Q.  Let's look on the left there are two big blue boxes.  One

5    of them says EPS dollar sign and one of them says revenue,

6    dollars in millions.

7            What are in each of these boxes?

8    A.  So EPS would be at the very bottom of the income statement.

9    That's the total earnings per share for the company.

10           And then revenue is, as I described before, it's the

11   total sales of the company in those periods.

12   Q.  And then looking at the -- in the revenue section, certain

13   of the numbers have As after them and certain of the numbers

14   have Es.  Can you explain to the jury what the difference is

15   and how to read this?

16   A.  So the As would be actual results as published in their SEC

17   filings.  And then the Es are my estimates from my model.

18   Q.  So is this was May of 2010, which is in the second quarter;

19   is that right?

20   A.  That is in the second quarter.  But this is the first

21   quarter earnings report.

22   Q.  So if we look where it says 21.9E, that's an estimate for

23   how you think what?

24   A.  21.9 was what I estimated for revenues in the second

25   quarter which we were about halfway through.

HBH9TUZ2                        Ingrassia - direct

1   Q.  And that's in millions?

2   A.  Yes.

3   Q.  Are the estimates sometimes called analyst estimates?

4   A.  Yes.

5   Q.  Let's jump to page five of this exhibit.

6           What are we looking at here?

7   A.  That's my model.

8   Q.  So we're definitely not going to go through it all.

9   A.  Good.

10  Q.  But what's the top line of the model?

11  A.  The very top line are the -- okay, revenue.

12  Q.  Now, you said that -- that your analyst reports were

13  published?

14  A.  Correct.

15  Q.  And how were they published?

16  A.  So we used a system called BlueMatrix that made the reports

17  available to our investment banking clients, clients of the

18  firm, and the companies also had access to those numbers.

19  Q.  What about your estimates for revenue?  How were those

20  published?

21  A.  So they'd be published in the report in this way, as you

22  were just highlighting there, in the blue boxes.  But they'd

23  also be picked up by Thomson and like other publicly -- other

24  data services that would post them publicly online.  So really

25  the estimates themselves were available to everyone.  It was

HBH9TUZ2                          Ingrassia - direct

1    just my written reports that were only available to our

2    clients.

3    Q.  Now as an analyst did you talk to investors?

4    A.  Yes.

5    Q.  Did you talk to KIT digital investors?

6    A.  Yes.

7    Q.  Based on your conversations with investors did you

8    understand that they used your research in making investment

9    decisions?

10   A.  Yes.

11           MR. WEITZMAN:  Objection.  Hearsay.  Offered for the

12   truth.

13           THE COURT:  Overruled.

14   Q.  As a research analyst did you talk to corporate executives

15   of companies you covered?

16   A.  Yes.

17   Q.  Based on your conversations with corporate executives, did

18   you understand that executives read your research?

19   A.  Not all of them but some were more interesting than others,

20   I guess.

21           No.  I assumed that they read them.  That's the way I

22   operated.

23           MR. NAFTALIS:  We can take this one down, Ms. Pyun.

24           Let's look at Government Exhibit 3301B in evidence.

25   Q.  What's the date on this one?

HBH9TUZ2                           Ingrassia - direct

1    A.   April 2, 2012.

2              MR. NAFTALIS:   Let's look at the second page, please.

3    Zoom in on where it says cash investment.

4    Q.   Now when we were looking at KIT digital's 10-K you said

5    that you paid attention to the cash on the balance sheet; is

6    that right?

7    A.   Yes.

8    Q.   And cash was important to you?

9    A.   Yes.

10   Q.   Can you read what you wrote here after "cash investment

11   writedown"?

12   A.   "The company may not be able to retrieve a 2.1 million cash

13   investment in an EMEA entity of undisclosed name and therefore

14   the asset was removed from the books."

15   Q.   Was the fact that KIT had disclosed it might not have been

16   able to retrieve $2.1 million in cash important to you?

17   A.   Yes.

18   Q.   Why?

19   A.   I mean $2.1 million is a lot of money still and it was -- I

20   had never seen a cash writedown in any of the companies before,

21   in the companies that I had covered.

22   Q.   When you say "writedown," what do you mean?

23   A.   It means it's taken off the asset.  So, we were talking

24   about that first line in the balance sheet, where it says cash

25   and cash equivalents, writedown means for whatever reason that

HBH9TUZ2                        Ingrassia - direct

1    money was no longer there or they were looking to retrieve it

2    and weren't able to do that.

3              MR. NAFTALIS:  Let's look at Government Exhibit 3301A

4    in evidence.

5    Q.  What's the date on this one, Mr. Ingrassia?

6    A.  January 12, 2012.

7    Q.  Just looking at the headline on the first page of this one,

8    see it says "Adding Sezmi to Estimates"?

9    A.  Yes.

10   Q.  Let's look at the second page of this exhibit.  You see

11   where it says, "Sezmi Acquisition," see it references that?

12   A.  Yes.

13   Q.  You write, "As a reminder on Friday, January 6 KIT

14   announced the acquisition of a Silicon Valley based Sezmi for 8

15   million cash, 8 million in debt assumption, and approximately

16   11 million stock."  And then you go on.

17             What was your understanding of the total consideration

18   that KIT paid for Sezmi?

19   A.  So I would look at this as a total acquisition valued at

20   $27 million.

21   Q.  And what was your understanding of who was receiving the

22   $27 million?

23             MR. WEITZMAN:  Objection.  Foundation.

24             THE COURT:  Sustained.

25   Q.  Did you review KIT digital's 8-K -- 8-Ks when it announced

HBH9TUZ2                          Ingrassia - direct

1   acquisitions?

2   A.  If this was in an 8-K I'm sure I did.

3   Q.  It says here, "On Friday January 6 KIT announced the

4   acquisition," do you see that?

5   A.  Yes.

6   Q.  Do you recall the source of this information?

7   A.  I don't recall specifically but if I said "KIT announced"

8   that was most likely in a press release.

9   Q.  What was your understanding of the total -- of who was

10  receiving the $27 million?

11              MR. WEITZMAN:  Objection.  Foundation.

12              MR. NAFTALIS:  We'll do it the long way, your Honor.

13              THE COURT:  Okay.

14              MR. NAFTALIS:  Can we go back to Government Exhibit

15  218 in evidence.  Go to page 15.

16  Q.  This is the 10-K issued to all shareholders, right?

17  A.  Yes.

18  Q.  Where KIT digital says what it did, right?

19  A.  Yes.

20  Q.  And this was signed by Mr. Isaza Tuzman, correct?

21  A.  Yes.

22  Q.  And he certified that everything in here was true?

23  A.  Yes.

24  Q.  He certified there was no fraud?

25  A.  Yes.

HBH9TUZ2                          Ingrassia - direct

1    Q.  He certified he had reviewed all the pages in it?

2    A.  Yes.

3    Q.  And Mr. Isaza Tuzman, he certified with respect to Sezmi

4    here, total consideration was 7.85 million in cash, the

5    assumption of 16.526 million in liabilities, 2.625 million owed

6    to the shareholders of Sezmi which will be issued in shares and

7    held in escrow for a period of up to 12 months following the

8    closing date and contingent consideration based upon revenue

9    and other targets totaling 25 million."

10        Do you see that?

11   A.  Yes.

12   Q.  And we could go back to the 8-K if we wanted to, right?

13   A.  Yes.

14   Q.  Based -- how long -- were you a research analyst for?

15   A.  I was at Roth a little more -- eleven-and-a-half years.

16   Q.  Based on your experience and your review of this, what was

17   your understanding of who the $27 million in consideration was

18   going to?

19        MR. WEITZMAN:  Objection.  Can we have a sidebar, your

20   Honor.

21        THE COURT:  Yes.

22        (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. WEITZMAN:  Your Honor this raises the issue that

3   Mr. McRae raised in Mr. Smyth's direct.  All he knows is what

4   the document says.  He can't identify -- he's not a legal

5   expert.  He didn't review the contracts.  He can't discuss what

6   his interpretation is of what the consideration meant.  Just

7   say what the document says and that's it.  It's for them to

8   argue that that meant something else, but he's not the legal

9   expert.

10          MR. NAFTALIS:  I'm asking for what a professional

11   understands an SEC filing to say.

12          THE COURT:  And the point is that it's a fair

13   inference that $27 million was paid to the owners of Sezmi,

14   right?

15          MR. NAFTALIS:  You can cross him on this and I expect

16   you will, but it's --

17          MR. WEITZMAN:  Your Honor, the second thing.

18          THE COURT:  I'm sorry?

19          MR. WEITZMAN:  The second thing unrelated to this

20   question in particular I think government counsel should not be

21   injecting invective such as I'll do it the long way which

22   suggests to the jury that my objections are improper even if

23   sustained.

24          THE COURT:  Try not to do that.

25          MR. NAFTALIS:  I will.

HBH9TUZ2                         Ingrassia - direct

 1              (In open court)

 2              MR. NAFTALIS:  We can bring that back up, please.

 3   Q.  So I'll ask again.  You said it was 27 million

 4   approximately in total consideration?

 5   A.  Yes.

 6   Q.  You're basically adding 7.8 plus 16 plus -- 16.5 plus 2.6

 7   to get to that number?

 8   A.  Correct.

 9   Q.  And in your report you were rounding the numbers.  Is that

10   accurate?

11   A.  Yes.  It said 27 in the report.  I can't off the top of my

12   head understand or explain the -- this says 25 million in this

13   paragraph.

14   Q.  Okay.  Either way, what was your understanding of who was

15   receiving the 25 million or the 27 million in consideration?

16   A.  Well, I would assume the cash, and here it says 7,850,000,

17   I would assume that cash would go to Sezmi shareholders.  The

18   debt would be assumed.  So not necessarily any cash exchange

19   there.  And then 2.625 million in stock held in escrow also for

20   Sezmi shareholders.

21   Q.  Focusing on the cash.  When you see the 7.85 million in

22   cash, your understanding is that consideration goes to who?

23   A.  Sezmi shareholders.

24   Q.  Do you see any disclosure in here that that cash is going

25   to anybody else?

HBH9TUZ2                          Ingrassia - direct

 1   A.  Not here, no.

 2   Q.  Was it important to you that this disclosure be accurate?

 3   A.  Yes.

 4   Q.  Was it important to you that the company disclose to you

 5   who was getting the cash?

 6   A.  Yes.

 7   Q.  Why?

 8   A.  I would just assume -- I mean that's -- if it was going

 9   somewhere else then -- I don't -- I wouldn't know what to do or

10   how to analyze it.

11   Q.  Now, you said you reviewed KIT digital's financial

12   statements for 2009 to '13?

13   A.  Yes.

14   Q.  Would you say you're familiar with them?

15   A.  Yes.

16   Q.  In your review of their financial statements, did you ever

17   see any disclosure that money that was earmarked for

18   integration or restructuring was being used to pay down

19   outstanding accounts receivable?

20   A.  I don't recall anything like that.

21   Q.  Would that have been important to you?

22   A.  Yes.

23   Q.  Why?

24   A.  Because money spent on integration was money being spent on

25   the operations of the business, important operations of the

HBH9TUZ2                         Ingrassia – direct

1    business, especially here, where companies were being acquired

2    and integrated into the existing company.

3    Q.   In your review of KIT's SEC filings did you see any

4    disclosure about side letters with respect to transactions and

5    where consideration was going to go?

6    A.   I can't recall anything like that.

7    Q.   Would that have been important to you?

8              MR. WEITZMAN:  Objection.  Cuti.

9              THE COURT:  I'm sorry?

10             MR. WEITZMAN:  Cuti.  Objection.

11             MR. NAFTALIS:  Why was that important to you.

12             THE COURT:  You can modify the question.

13             THE WITNESS:  Can you ask the question again.

14   Q.   You didn't see any disclosure of that?

15   A.   Not that I remember, no.

16   Q.   Why was that important to you?

17             MR. WEITZMAN:  Objection.

18             MR. NAFTALIS:  I'll move on.  It's fine.

19             Now can we bring up Government Exhibit 2970 in

20   evidence, please.

21   Q.   Do you see this document, Mr. Ingrassia?

22   A.   Yes.

23   Q.   What was the first time you saw it?

24   A.   In your office the other day.

25   Q.   Roughly when was that?

HBH9TUZ2                          Ingrassia - direct

1    A.  Wednesday.

2    Q.  And you said you reviewed KIT digital's SEC filings between

3    2009 and '13?

4    A.  Yes.

5    Q.  Did you ever see any disclosure of a December 31, 2008

6    agreement between Omar Amanat, Stephen Maiden and Kaleil Isaza

7    Tuzman?

8    A.  No.  I don't remember anything like that.

9    Q.  And how long have you worked in finance?

10   A.  Since 1997.

11   Q.  In your career have you ever heard of a CEO of a public

12   company paying a shareholder to buy its stock?

13              MR. WEITZMAN:  Objection, foundation.

14              THE COURT:  Overruled.

15              THE WITNESS:  I can't recall any -- seeing anything

16   like this before.

17   Q.  And you -- with respect to KIT digital did you speak to any

18   of their corporate officers at the time you were covering the

19   company?

20   A.  Yes.

21   Q.  Do you remember who?

22   A.  Well it would be Mr. Tuzman mostly; the CFO, Robin Smyth;

23   and on occasion Gavin Campion.

24   Q.  Did any of them ever mention something called the elephant

25   to you?

HBH9TUZ2                        Ingrassia - cross

1    A.  No.

2              MR. WEITZMAN:  Objection.

3              THE COURT:  Grounds.

4              MR. WEITZMAN:  Vague.

5              THE COURT:  Overruled.

6              MR. NAFTALIS:  No further questions, your Honor.

7              THE COURT:  All right.

8              Cross-examination.

9              MR. WEITZMAN:  Yes, your Honor.  We have some binders

10   for the Court.

11             THE COURT:  Thank you.

12   CROSS-EXAMINATION

13   BY MR. WEITZMAN:

14   Q.  Good morning, Mr. Ingrassia.

15   A.  Good morning.

16             MR. WEITZMAN:  I'm sorry.  I forgot something.

17   Q.  Mr. Ingrassia, you have extensive experience analyzing

18   media and entertainment companies, correct, technology

19   companies?

20   A.  Yes.

21   Q.  Over 20 years experience, correct?

22   A.  Yes.

23   Q.  You have a bachelor's degree in economics and statistics,

24   right?

25   A.  Yes.

HBH9TUZ2                        Ingrassia - cross

1   Q.  You were a research analyst starting in the mid 1990s,

2   right?

3   A.  I wasn't an actual equity research analyst in the '90s.  I

4   was more of an industry research analyst at the time.

5   Q.  As an industry research analyst you gained exposure to

6   analysis of financial statements, correct?

7   A.  Correct.

8   Q.  And analysis of the health and well-being of companies?

9   A.  Yes.

10  Q.  So over -- since the mid 1990s this is basically what

11  you've been doing, analyzing companies, their balance sheets,

12  their financial statements and the like, right?

13  A.  Yes.

14  Q.  And for that period of time you've spoken probably to

15  dozens, hundreds of CEOs and CFOs; is that right?

16  A.  Maybe not hundreds but a lot.

17  Q.  A lot.

18          In fact, you're sought after as a commentator about

19  companies, correct?

20  A.  I suppose you could say that.

21  Q.  You've published hundreds of research notes and

22  newsletters?

23  A.  It's probably in the hundreds, yes.

24  Q.  You've appeared on TV, correct?

25  A.  It's been a while, but yes.

HBH9TUZ2                         Ingrassia - cross

1   Q.   CNBC, Bloomberg, right?

2   A.   Yes.

3   Q.   You've been quoted in leading newspapers, correct?

4   A.   Yes.

5   Q.   The Wall Street Journal, Investors Business Daily, USA

6   Today, Forbes.  Do you recall being quoted in each of those?

7   A.   Yes.  I'm not sure specifically what about.

8   Q.   And one of the reasons you're quoted and sought after for

9   TV every now and then is because you're considered an expert in

10  your field, research analysis, right?

11            MR. NAFTALIS:  Objection, your Honor.  To the extent

12  that we're opening some --

13            MR. WEITZMAN:  No, we're not, your Honor.

14            THE COURT:  Then I'll allow you to answer that

15  question.

16            THE WITNESS:  Yes.

17  Q.   You are what we call a professional analyst, right?

18  A.   Yes.

19  Q.   And so as a professional analyst you have to read

20  everything about the company, right, that you're covering?

21  A.   I try to.

22  Q.   And you talk to management?

23  A.   Yes.

24  Q.   Up and down the chain, right, if you can?

25  A.   Yes, if I can.

HBH9TUZ2                    Ingrassia - cross

1    Q.  And your job is to make predictions about where companies

2    are going to go, right?

3              Among other things?

4    A.  Among other things, yes.

5    Q.  And then you rate them as a buy or a sell, right?

6    A.  Or a hold.

7    Q.  Or a hold.  Thank you.

8              And is it fair to say that given your depth of

9    experience and expertise you're not the average investor or

10   analyst, correct?

11             MR. NAFTALIS:  Objection.  Form.  Vague.

12             THE COURT:  Sustained.

13   Q.  Sir, as a function of your expertise you really drill down

14   into companies' numbers, correct?

15   A.  Yes.

16   Q.  And so there are details of financial statements that are

17   important to you, correct?

18             Even minor details might be important to you, correct?

19   A.  Yes.

20   Q.  And fair to say that you're looking at companies much more

21   intensively than the average investor?

22             MR. NAFTALIS:  Objection.

23             THE COURT:  Sustained.

24   Q.  So we talked about some of your equity research notes.

25   Would it surprise you to learn that you wrote 42 of them about

HBH9TUZ2                      Ingrassia - cross

1    KIT digital?

2    A.   No.

3    Q.   I'd like to put up KIT Exhibit 3512.

4         Do you recognize this document?

5    A.   This looks like my initiation report, the first note I

6    wrote, first research report on the company.

7              MR. WEITZMAN:  We offer KIT Exhibit 3512.

8              MR. NAFTALIS:  Your Honor, no objection to the extent

9    it's offered not for the truth and it's his opinion.

10             MR. JACKSON:  No objection, your Honor.

11             THE COURT:  All right.  Ladies and gentlemen, as was

12   true with the other research reports this report is also being

13   received not for its truth but rather for the state of mind of

14   the witness.

15             All right 3512 is received.

16             (Defendant Exhibit KIT 3512 received in evidence)

17             MR. WEITZMAN:  If we may publish that.

18             THE COURT:  Yes.

19   Q.   This is what you called your initiation equity research

20   report, correct?

21   A.   Correct.

22   Q.   You initiated coverage on November 24, 2009?

23   A.   Yes.

24   Q.   And in initiating coverage you had to really study the

25   company, correct?

HBH9TUZ2                        Ingrassia - cross

1    A.  Yes.

2    Q.  And study the market, right?

3    A.  I'm not sure what you mean by "the market."

4    Q.  Let's change it.  Study the industry in which the company

5    is competing, right?

6    A.  Yes.

7    Q.  And you rated in your very first equity research report

8    that KIT digital was a buy, correct?

9    A.  Yes.

10   Q.  That's because that's what you genuinely believed, that KIT

11   digital was going places, right?

12   A.  Well, it's a little more -- it's not a science, but it's a

13   little more scientific than that.  My twelve-month price

14   target, as I estimated, was 16, $16 a share, and the stock was

15   currently at $10.80 a share.  So that by our definitions at

16   Roth was a buy.

17   Q.  I'm just trying to make it more colloquial.  What you're

18   suggesting is that the stock price was -- you thought it could

19   increase, should increase?

20   A.  Yeah.  I would hesitate to say "should," but I would just

21   say that I thought it was worth more than where it was

22   currently trading.

23   Q.  And one of the reasons you thought it was worth more than

24   where it was currently trading is based on your financial model

25   of the company, right?

HBH9TUZ2                          Ingrassia - cross

1   A.  Correct.

2   Q.  Now, that financial model includes certain assumptions,

3   right?

4   A.  Yes.

5   Q.  It's not just information the company provides, but it's

6   assumptions you're making within your financial model, right?

7   A.  With -- yes.  But it's based on -- I used the historical

8   results as a basis for a lot of what I assumed going forward.

9   Q.  Right.  Fair enough.  And one of the assumptions you're

10  making is as to the growth in, for instance, the demand for

11  video IP, right?

12  A.  Right.  That would be just a sector, a trend that supports

13  the growth of any company.

14  Q.  That's not information you're relying on from KIT digital

15  but just market information, right?

16  A.  Yes and no.  Both.  I would say.

17  Q.  And one of the other things that plays into your

18  assumptions is what's called the multiple at which other

19  companies are trading at, right?

20  A.  Not really, no.  In my analysis I focused primarily on the

21  net present value of the cash flows as the basis for my

22  valuation, not what other companies were trading for

23  necessarily.

24  Q.  Okay.  But are you ascribing a multiple to KIT digital, KIT

25  digital's revenues?

HBH9TUZ2                          Ingrassia - cross

1    A.   No.

2    Q.   One of the other things you're doing in building out your

3    financial model is you're relying on comps, right?

4    A.   Again, I looked at companies -- all the companies that I

5    covered, not necessarily in comparison to other valuations in

6    this space, but just purely on the valuation of their

7    discounted cash flows as I estimated them.

8    Q.   You recall that in some of your equity research reports

9    you're discussing comparable companies?

10   A.   Yes.

11   Q.   And one of the reasons you're discussing comparable

12   companies is because you're trying to determine for yourself

13   and for your clients the extent to which KIT digital is trading

14   in similar fashion to comparables or not, right?

15   A.   Well for me it was really more just of a gut check on my

16   price target.

17   Q.   Okay.  And one of the other things you're doing is you're

18   doing what's called channel checks, right?

19   A.   Yes.

20   Q.   And a channel check is when you call up KIT digital's

21   customers and actually talk to them about what their views are

22   of KIT digital's products and services, right?

23   A.   Yeah, their views of the product would be probably part of

24   the discussion.

25   Q.   And those channel checks were important in your analysis of

1    the company, right?

2    A.   Yes and no.  They were important anecdotally for me to

3    understand:  A, that they actually were customers first; and B,

4    that they were happy customers.  But, as I said before, those

5    customers are mostly private companies or, in any case, would

6    not share numbers with me specifically.

7    Q.   Right.

8    A.   In most cases.

9    Q.   But if the channel checks had come out negative, that would

10   influence your views of the company, right?

11              MR. NAFTALIS:  Objection, your Honor.

12              THE COURT:  Grounds.

13              MR. NAFTALIS:  I think this is sort of the -- the time

14   period and the reverse Cuti issue again.

15              THE COURT:  All right.  I'll see the lawyers at

16   sidebar.

17              (Continued on next page)

18

19

20

21

22

23

24

25

HBH9TUZ2                         Ingrassia - cross

1            (At the sidebar)

2            THE COURT:  Where are we going exactly?

3            MR. WEITZMAN:  I'm just trying to lay the foundation

4    that he's relying on a lot of different factors to come up with

5    his rating system and his recommendations, and one of them is

6    channel checks.  He's saying not so much, but I'm trying to

7    establish that he actually listened to the channel checks.  If

8    they would have come out negative, he would have incorporated

9    that into his analysis.  That's it.

10            THE COURT:  Do you have a problem with that?

11            MR. WILLIAMS:  Apparently the channel checks are meant

12   to determine whether the customers are, in fact, customers.

13   And it seems like you were trying to establish that he did

14   channel checks and no one -- none of them came up negative and

15   that if it had come up negative it would have impacted his

16   recommendation, right, which is the objection to reverse Cuti.

17            MR. WEITZMAN:  I'm not sure it is.  I'm not asking him

18   for a hypothetical to establish materiality of anything.  I'm

19   just asking him the importance of channel checks in his

20   analysis.

21            MR. WILLIAMS:  Are you planning on asking him whether

22   or not any of the channel checks came up negative?

23            MR. WEITZMAN:  That's a fact he can decide.

24            MR. NAFTALIS:  -- if this had happened would that have

25   been important, which I steered clear of.

HBH9TUZ2                      Ingrassia - cross

1           I don't think this is going to be controversial.  I'm

2      just trying to point out that you restricted my direct

3      examination.  Now you're trying to pose hypotheticals to a

4      witness because you like them.  I don't care.  I think all this

5      is fair game.  But I don't think you can have it both ways.  I

6      don't think there's anything terribly controversial that KIT

7      digital is a real company.  So, you know, if he wants to spend

8      time on this it's fine.  But I just don't think the questions

9      are relevant or appropriate given what we were not allowed to

10     do.

11          MR. WEITZMAN:  There is totally different purpose for

12     the question.  All I'm trying to establish -- I can take out

13     the word "if" if that helps the government counsel.

14          THE COURT:  I think the reason why we're where we're

15     at is that the witness didn't give you the answer that you

16     wanted on whether channel checks were important.  He gave you

17     an answer.  It wasn't the one you wanted, and so now you're

18     probing him on it.

19          MR. WEITZMAN:  Exactly.

20          THE COURT:  I don't think it's a hypothetical yet.  So

21     I am going to overrule the objection.

22          MR. WILLIAMS:  There was one other objection.

23     Mr. Weitzman has not put a time period to any of his prior ten

24     or so questions.  And so now that we're getting into this area

25     of channel checks he should be specific about the time period

HBH9TUZ2                          Ingrassia - cross

1    he's referring to.

2              THE COURT:  Yes.

3              MR. JACKSON:  I'm fine for the moment.  I just -- I

4    had too much coffee.  I'm just wondering approximately what

5    time does the Court expect to --

6              THE COURT:  I was going do break at 11:30 which is in

7    just a few minutes.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. WEITZMAN:  Sorry.  Is there an objection pending,

3    your Honor?

4          THE COURT:  No.

5    Q.  We were talking about channel checks, Mr. Ingrassia?

6    A.  I wasn't.  You were asking me about them.

7    Q.  Exactly.  And as part of your research into a company you

8    call a company's clients to determine how things are going with

9    the products and services they're receiving, right?

10   A.  I would try to but I wasn't always --

11         THE COURT:  Please don't cut the witness off.

12         Go ahead, sir.

13   A.  I wasn't always successful getting through.

14         MR. WEITZMAN:  Can we put up KIT Exhibit 3514.

15   Q.  Do you recognize this, sir?

16   A.  Yes.  That's my report from March 15, 2010.

17         MR. WEITZMAN:  We offer KIT Exhibit 3514.

18         MR. NAFTALIS:  No objection subject to the same

19   limitations.

20         MR. JACKSON:  No objection, your Honor.

21         THE COURT:  So, ladies and gentlemen, it seems like

22   we're going to see a number of research reports.  The same

23   instruction as to all of them.  None of them are being offered

24   for the truth of the statements in the reports.  Rather, they

25   are all being offered to the extent they shed light on the

HBH9TUZ2                          Ingrassia - cross

1    witness's state of mind.

2                  3514 is received.

3                  (Defendant Exhibit KIT 3514 received in evidence)

4                  MR. WEITZMAN:  If we may publish that.

5    Q.  You issued an equity research report on March 15, 2010

6    correct?

7    A.  Yes.

8    Q.  And the title of the report was, "Channel Checks Reveal

9    Strong Client Macros Upside to 2010 Growth; Reiterate Buy."

10                 Do you see that?

11   A.  Yes.

12   Q.  You're talking about KIT digital at this point?

13   A.  Yes.

14                 MR. WEITZMAN:  If we can turn to page two.

15                 And if you can highlight the paragraph that says "Our

16   confidence."

17   Q.  What you said is, "Our confidence in KIT digital is founded

18   not only on the historical pattern, however, but on the results

19   of several very positive channel checks with key clients

20   acquired by KIT digital in the FeedRoom and Nunet transactions

21   of October 2009.  These clients are among the fortune global

22   200 and asked to remain anonymous, but we offer the following

23   general observations:"

24                 Then you have, if you can expand that, I won't read

25   all the observations, just the titles of them.

HBH9TUZ2                    Ingrassia - cross

1          "Potential to Consolidate Third Parties with VX-One

2     package, international expansion, high switching costs, and

3     usage-based contracts," right?

4     A.  Yes.  Can I read the paragraph before the "our confidence"

5     paragraph.

6                MR. WEITZMAN:  Of course.  If we can go up.

7                THE WITNESS:  Okay.

8     Q.  So I just want to establish these channel checks were

9     important at times, for example, in connection with this

10    March 15, 2010 report to your recommendations and conclusions,

11    right?

12    A.  Yes.  I mean the reason why I wanted to read the paragraph

13    before was because I'm not sure if I'm talking -- I can't

14    recall if I was talking about the historical pattern of actual

15    results or the historical pattern of those clients that I

16    checked.

17    Q.  Okay.  In any event, my question is a different one.  My

18    question is those channel checks were relevant to your

19    analysis, right?

20    A.  They were supplemental, yeah.  They were relevant, yes.

21                MR. WEITZMAN:  Your Honor, this would be a good time

22    for a break.

23                THE COURT:  Ladies and gentlemen, we'll take our mid

24    morning recess.  Don't discuss the case.  Keep an open mind.

25    There's more evidence.  We'll be back to you shortly.

HBH9TUZ2                        Ingrassia – cross

1              (Jury not present)

2              THE COURT:  You can step down, sir.

3              (Witness excused)

4              THE COURT:  Please be seated.  Anything we need to

5    discuss?

6              MR. NAFTALIS:  No, your Honor.

7              (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HBHQTUZ3

```
 1              (Jury not present)
 2              THE COURT:  Are we prepared to proceed?
 3              MR. WILLIAMS:  Yes, your Honor.
 4              THE COURT:  The witness should take the stand.
 5         Mr. Weitzman, have you provided me whatever certain
 6    materials were provided to the government concerning Mr. Lyter.
 7              MR. WEITZMAN:  Your Honor, we either have it here -- I
 8    have to check with my paralegals -- or we will have it by the
 9    end of the day.  There have been additional materials provided
10    even as late as last night, and I'm happy to reference those,
11    but we do intend to provide it to your Honor.
12              THE COURT:  Today.
13              MR. WEITZMAN:  Yes.
14              THE COURT:  OK.  Please bring in the jury.
15              (Continued on next page)
16
17
18
19
20
21
22
23
24
25
```

1              (Jury present)

2    CROSS-EXAMINATION

3    BY MR. WEITZMAN:

4              THE COURT:  Please proceed with questioning.

5              MR. WEITZMAN:  Yes.  Thank you, your Honor.

6    Q.  Mr. Ingrassia, the ROTH research reports that you

7    published, they were available to ROTH clients, correct?

8    A.  Yes.

9    Q.  And is that investment banking clients?

10   A.  Not necessarily clients of investment banking but any of

11   our clients.

12   Q.  Are most of your clients companies?

13   A.  I don't understand.  They're mutual funds and hedge funds,

14   clients of ROTH.

15   Q.  So most of your clients are companies, large companies or

16   medium-size companies in the financial sector, right?

17   A.  Yes.

18   Q.  You'd call most of your clients sophisticated market

19   participants?

20   A.  I don't know if I'd say most of them, but many of them are.

21   Q.  I take it individual investors weren't your clients; the

22   mutual funds and hedge funds that had or invested their money

23   were your clients, right?

24             MR. NAFTALIS:  Objection to form.

25             THE COURT:  Sustained.  It's compound.

HBHQTUZ3                         Ingrassia - Cross

Q.  Sir, the individual investors who invested with mutual

funds and hedge funds, they weren't your clients, correct?

        MR. NAFTALIS:  Same objection.

        THE COURT:  Sustained.

Q.  Sir, as an equity research analyst, you often communicated

with chief financial officers of publicly traded companies,

right?

A.  Yes.

Q.  And, in fact, you spoke to many CFOs at many companies,

right?

A.  Yes.

Q.  Many of the CFOs at those companies would on occasion reach

out to you, right?

A.  I don't recall -- well, I suppose --

Q.  Sometimes CFOs were interested in learning how you reached

the numbers you reached in your forecasts, right?

A.  They're interested but generally they didn't reach out to

me directly.

Q.  OK.  But you had conversations with CFOs about the

assumptions in your models, right?

A.  To some extent, yes.

Q.  You had conversations with CFOs about your analyst

expectations?

        MR. NAFTALIS:  Your Honor, this is very broad.  We

object to the form.

1           THE COURT:  I'll allow it.

2    A.  Can you repeat it again.

3    Q.  So, you would issue expectations for companies, like

4    earnings expectations.  Is that what you'd call it?

5    A.  I would publish earnings estimates, yes.

6    Q.  Earnings estimates, not expectations.  Thank you.

7           And as part of those estimates, did you sometimes have

8    conversations with CFOs of publicly traded companies about how

9    you reached those estimates?

10   A.  Usually not specifically about how I -- what assumptions I

11   made, no, and certainly not before I published them.

12   Q.  I mean after you published them.  CFOs ever call you and

13   say, "Hey, I'm not seeing how you reached that estimate" or

14   "It's too low" or "It's too high"?

15   A.  They really can't do that, but they would ask me for my --

16   a little more detail occasionally.

17   Q.  OK.  Would it surprise you if there was a CFO who had no

18   interest in your research?

19   A.  Yes, it would surprise me.

20   Q.  Because part of their job is to understand the analyst's

21   expectations of the company, right?

22   A.  That's right.

23   Q.  Part of their job is to manage the company's budgeting, for

24   example, right?

25   A.  Not necessarily the CFO.  Might have a chief accounting

HBHQTUZ3                         Ingrassia - Cross

1   officer, someone below the CFO that would do that.

2          THE COURT:  We're getting far afield here.

3   Q.  You communicated with Mr. Smyth some, right?

4   A.  Yes.

5   Q.  You communicated with him regarding assumptions for your

6   model, correct?

7          MR. NAFTALIS:  Objection.  The word "assumption" is

8   very broad, your Honor.

9          THE COURT:  Sustained.

10  Q.  Sir, when you -- withdrawn.

11         Did you communicate with him regarding financial

12  performance metrics?

13         MR. NAFTALIS:  Your Honor, a time period would be

14  helpful.

15         THE COURT:  Yes, a time period is necessary.

16  Q.  In 2010, May 2010, did you communicate with Mr. Smyth

17  regarding financial assumptions or performance metrics?

18  A.  Can you be more specific about the metrics?

19  Q.  In May 2010, do you recall asking to speak to Kaleil Isaza

20  Tuzman or Robin Smyth regarding certain assumptions in your

21  model?

22  A.  I don't recall that date specifically.

23         MR. WEITZMAN:  Put up KIT Exhibit 3424 -- 3524, excuse

24  me.  If we can go to page 2 and page 3.  If you can

25  highlight --

1    Q.  Mr. Ingrassia, do you see this email?  I'm going to ask you

2    to focus on the bottom part of this email.  Does this refresh

3    your recollection that in May 2010 you asked to speak to either

4    Kaleil Isaza Tuzman or Robin Smyth regarding assumptions to

5    revise your model?

6    A.  That looks like an email of mine.

7    Q.  I'm sorry, I'm asking specifically does this refresh your

8    recollection of that?

9    A.  Not the specific conversation, no.

10   Q.  But -- I'm not asking about a conversation again.  I

11   apologize.

12          I'm asking whether this refreshes your recollection

13   that in May 2010 you asked to speak to Kaleil Isaza Tuzman or

14   Robin Smyth regarding assumptions for your KIT digital model?

15   A.  Yeah, I suppose.

16   Q.  In fact, you did speak to Robin Smyth regarding assumptions

17   and financial performance metrics, correct?

18   A.  I honestly don't remember if it was on that date or if that

19   conversation happened.

20   Q.  OK.  At any point in 2010, did you speak to Robin Smyth?

21   A.  To be perfectly honest, I don't remember a lot of

22   conversations with Robin Smyth.  I may have, but I couldn't

23   tell you when or how many times.

24   Q.  Now, as we established -- as we talked about earlier, you

25   initiated coverage on KIT digital in November 2009, correct?

HBHQTUZ3                          Ingrassia - Cross

1   A.  Correct.

2   Q.  And you rated KIT digital buy, correct?

3   A.  Correct.

4   Q.  And you understood at that time what KIT digital's business

5   was about, right?

6   A.  I believe so, yes.

7   Q.  You understood that they were selling software and services

8   to help companies manage and distribute video over IP, over the

9   internet, right?

10  A.  Correct.

11  Q.  And part of your thesis was based on the expectation that

12  the IP video industry was going to grow substantially, correct?

13          THE COURT:  I don't -- could you establish what his

14  thesis was.

15          MR. WEITZMAN:  The thesis that it was a buy, sorry?

16          THE COURT:  Oh, yes, OK.

17  Q.  Part of the thesis supporting your buy rating was that you

18  expected the IP video industry to grow substantially, correct?

19  A.  Well, part of my thesis -- the thesis was on the industry

20  altogether.  The buy rating was specifically related to my --

21  my projection of value for KIT digital.

22  Q.  OK.  So --

23  A.  There are plenty of companies in the space that I didn't

24  think that highly of, based on their numbers.

25  Q.  Fair enough.  In 2009, you thought very highly of KIT

HBHQTUZ3                        Ingrassia - Cross

1    digital?

2    A.  I thought they were undervalued, yes.

3    Q.  And part of your thesis was that there be consolidation in

4    the industry, right?

5    A.  Yes.

6    Q.  And you thought that KIT digital's strategy of buying up

7    companies around the world would establish it as a leader in

8    the industry, right?

9    A.  I mean, I didn't know if they would end up as a leader, but

10   I did think that by buying similar assets, it would be

11   important for the company's growth.

12   Q.  Right.  And you were a proponent of KIT digital's global

13   reach, right, expansion?

14   A.  Generally, yes.

15   Q.  It didn't surprise you in any respect that KIT digital

16   moved its headquarters from New York to Prague, right?

17   A.  I don't know if I could say that it surprised me or not.

18   Q.  You understood at the time, sir, that Prague was a hub in

19   this industry and other technology industries, correct, for

20   corporate headquarters, right?

21           MR. NAFTALIS:  Your Honor, could we get a time frame?

22   I think Mr. Weitzman may have misspoke in terms of --

23           THE COURT:  Yes.  Yes.

24           MR. WEITZMAN:  Fair enough.

25   Q.  In 2009, do you recall that Prague was a location where a

HBHQTUZ3                      Ingrassia - Cross

1    lot of technology companies were either moving to or

2    establishing a presence in?

3    A.  Yeah, I don't know where I would have ranked it at the

4    time, but it was becoming known for that.

5    Q.  Because they have high education, good technology

6    professionals --

7              THE COURT:  Sustained.

8    Q.  You understood, sir, that Prague was a cheaper location

9    to --

10             THE COURT:  Sustained.

11   Q.  Sir, as part of your analysis of the industry, did you have

12   to understand the various benefits of operations in certain

13   cities as opposed to others?

14             MR. NAFTALIS:  Relevance.

15             THE COURT:  Yes, sustained.

16   Q.  Sir, as part of the -- one of the things that you liked

17   about KIT digital is the fact that it was focusing on

18   enterprise clients, correct?  We'll define that in a moment.

19   A.  That was part of it.

20   Q.  And an enterprise client is a large multinational company

21   that could apply KIT digital's technology across the company in

22   various ways, right?

23   A.  Not necessarily a large multinational, but corporate

24   clients versus individual clients.

25   Q.  OK.  And in particular, the larger corporations were the

HBHQTUZ3                    Ingrassia - Cross

1    ones that were impressing you as far as KIT digital's client

2    base, right?

3    A.   Yes, I'd say it was important to have some big name

4    clients.

5           MR. WEITZMAN:   Can we put up KIT Exhibit 3512, page 5.

6    Highlight the top.

7    Q.   In your initial coverage report, you highlighted some of

8    the companies major client works and capabilities, correct?

9    A.   Yes.

10   Q.   And these were some of the largest clients that KIT digital

11   had, right?

12   A.   That's the way it was communicated to me, yes.

13   Q.   You weren't focusing on small clients.  You were focusing

14   in your report on the larger clients?

15   A.   Not necessarily.  I was interested in any client I could

16   speak to about the company.

17   Q.   At any point in your relationship or coverage of KIT

18   digital, did Kaleil ever mention to you a company called

19   Crosshaven?

20   A.   Doesn't ring a bell.

21   Q.   Did he ever mention to you a company called Wolfgang

22   Holdings?

23   A.   I don't recall that.

24   Q.   Did he ever mention to you a company called Bimini Trading?

25   A.   No.

1    Q.  But you recall that he was talking to you about the large

2    enterprise clients like these, right?

3    A.  I don't know if it was a conversation between Mr. Tuzman

4    and I, but this -- this obviously came from the company.

5    Q.  And you'd agree with me, sir, that you thought that KIT

6    digital was well positioned in the global marketplace by

7    focusing on these larger clients, right?

8          THE COURT:  Can we have a point in time?

9    Q.  In 2009.

10   A.  I would say generally yes, but the thing about big clients

11   is they're really -- they do more to impress shareholders --

12   big clients like this typically have several vendors like KIT

13   digital, so I thought it was important that they had these big

14   name clients, but I -- a lot of companies in this space had

15   these big name clients.

16   Q.  OK.  Fair enough.

17         You'd agree with me that as part of your buy rating in

18   2009, you cared or you believed that KIT digital might be an

19   acquisition target, right?

20   A.  I felt that any company of their size in the space could

21   possibly be an acquisition target.

22   Q.  In fact, in 2009, you believed that Kaleil was a key person

23   within the company, right?

24   A.  Yes, as CEO, sure.

25   Q.  And one of the risk factors you identified in your report

HBHQTUZ3                        Ingrassia - Cross

1   was should Kaleil leave as CEO of the company, right?

2   A.   That's a pretty typical risk to point out in any company,

3   yes, of the CEO.

4   Q.   In fact, you included that in each of your reports,

5   correct, until Kaleil left?

6   A.   Again, that's a typical disclosure, and it was in every

7   company that I covered, yeah, key people.

8   Q.   I understand that, sir.  You included that in each of your

9   reports.  Yes or no.

10  A.   I believe so, yes.

11  Q.   In February 2010, you called KIT digital a top pick in your

12  eyes, correct?

13  A.   Correct.

14  Q.   And in March 2010, do you recall that you re-confirmed your

15  buy rating for KIT digital?

16  A.   I probably did because I had a buy rating on it the whole

17  time that I covered the stock.

18  Q.   Right.  And one of the things that I think we saw this

19  earlier, one of the -- withdrawn.

20       You recall that you analyzed KIT digital's

21  acquisitions in 2010 and concluded that they would be

22  accretive?

23  A.   Based on information from the company, yes; while I can't

24  say all of them were accretive, no.

25  Q.   But many of them you thought were accretive to the

HBHQTUZ3                          Ingrassia - Cross

1   company's growth, right?  Yes or no.

2   A.  Yes.

3   Q.  And in March 2010, you specifically were impressed by the

4   growing number of enterprise customers that KIT digital had,

5   right?

6   A.  Is that a quote from my report?

7          THE COURT:  No, he's just asking you if you recall

8   that in 2010 you felt that way.

9          THE WITNESS:  OK, I did.

10  Q.  I'm sorry, I couldn't hear your answer.

11  A.  Yes.

12  Q.  OK.  And, by the way, you spoke briefly about Sezmi, that

13  acquisition.  Do you recall that?

14  A.  I don't recall the details of the acquisition really or the

15  company, but, yes.

16  Q.  That wasn't my question.  Apologies if it was poorly

17  worded.  You recall testifying on direct about the Sezmi

18  acquisition?

19  A.  Yes.

20  Q.  And do you recall that one of the reasons that you

21  discussed the Sezmi acquisition in your research note was

22  because you said that the Sezmi acquisition was perhaps more

23  important to the patent portfolio than the company's profits

24  and loss.  Do you recall that?

25  A.  I do, yeah, perhaps.

HBHQTUZ3                           Ingrassia - Cross

1    Q.  And that's what you believed at the time, right?

2    A.  Yes.

3    Q.  Now, to be clear, you never reviewed the actual contract

4    involving the Sezmi sale, right?

5    A.  No, that was the sort of thing that analysts don't get

6    exposure to.

7    Q.  And you don't know what the terms of the contract were

8    other than what was in the 8-K you reviewed, right?

9    A.  And in the press release or what was communicated to me by

10   the company.

11   Q.  Right.  You didn't know whether the -- withdrawn.

12        You also testified about a December 31, 2008 agreement

13   that involved Mr. Maiden and Mr. Isaza Tuzman as the managing

14   director of KIT digital.  Do you recall that?

15   A.  Yes.

16   Q.  And you testified that you had not seen such an agreement

17   before?

18   A.  Correct.

19   Q.  You don't hold yourself out as a lawyer reviewing

20   agreements, buy and hold agreements, right?

21   A.  No.

22   Q.  And you don't have any knowledge one way or the other

23   whether the agreement was ever implemented, right?

24   A.  No, I don't.

25   Q.  You don't have any knowledge one way or another as to

HBHQTUZ3                     Ingrassia - Cross

1    whether it was ever an effective agreement, right?

2    A.  No.

3    Q.  And you don't have any knowledge one way or the other as to

4    whether Mr. Maiden was planning to purchase the stock

5    referenced in that agreement in any event, right?

6    A.  Right.

7    Q.  You do know Mr. Maiden though, right?

8    A.  I can't say that I know him personally.

9    Q.  OK.  You know Mr. Maiden because you communicated with him

10   though, right?

11   A.  You know, I honestly don't remember communicating with

12   Mr. Maiden directly.  I may have spoken to some of his

13   associates.

14          MR. WEITZMAN:  Can we put up KIT Exhibit 3546.  Can

15   you blow up the bottom two emails, all the way to the bottom.

16   Q.  If you can review that to yourself.

17   A.  OK.

18   Q.  Does this refresh your recollection that you communicated

19   with a man named Stephen E. Maiden?

20   A.  Yes, this looks like emails between me and -- I recollect

21   it now.

22          MR. WEITZMAN:  OK.  We can take that down.

23   Q.  Did that refresh your recollection that Mr. Maiden and you

24   would communicate about KIT digital?

25   A.  I can't say if it was more frequent than that or -- I

HBHQTUZ3                          Ingrassia - Cross

1   didn't really get a chance to read the whole context there

2   either, but obviously I had a -- at least that conversation

3   with him by email.

4   Q.  We'll come back to Mr. Maiden in a moment.

5            Now, you did discuss KIT digital with my client,

6   Kaleil, correct?

7   A.  Yes.

8   Q.  And, in fact, sometimes you invited Kaleil to speak to your

9   clients and investors, correct?

10  A.  Yes, we'd do that for all of our CEOs and investors.

11  Q.  What do you mean you do that for all your CEOs?

12  A.  Well, all the companies that I covered, we would as --

13  would give -- if we could, we would try to arrange access

14  between investors and the CEOs, publicly, obviously.

15  Q.  So you invited Kaleil to speak to your investors, right,

16  your customers?

17  A.  Yes, and he also attended our conferences where --

18  Q.  And you invited him to attend your conferences?

19  A.  Yes.

20  Q.  Did you ever invite him to speak at one of your conference

21  panels?

22  A.  Testing my memory.  I -- maybe.

23  Q.  OK.  You respected Kaleil at the time between 2009 and

24  2012?

25  A.  He seemed at the time like a capable CEO.

HBHQTUZ3                    Ingrassia - Cross

1    Q.  At the time you were impressed by what he was doing with

2    KIT digital, correct?

3    A.  Yeah, that's safe to say.

4    Q.  You don't have any personal knowledge of his jobs and

5    responsibilities, what he was doing at the company, right?

6    A.  No.  I know he traveled a lot.

7    Q.  You don't have any personal knowledge of how he divided or

8    how division of responsibilities was handled between him,

9    Mr. Smyth and Mr. Campion, right?

10   A.  Not specifically, no.

11   Q.  Would it be fair for you -- withdrawn.

12        Would it be fair to say that Mr. Isaza Tuzman was an

13   ambassador for the KIT digital brand?

14        MR. NAFTALIS:  Objection.

15        THE COURT:  Sustained.  Sustained.

16   Q.  You communicated with Kaleil not infrequently about stock

17   performance, correct?

18   A.  I'm sorry, about what?

19   Q.  Stock performance of KIT digital.

20   A.  I don't know that I would say I frequently talked to him

21   about the stock, but I certainly talked to him on a number of

22   occasions about the company and his strategy.

23   Q.  Sometimes he reached out to you to find out what you were

24   hearing in the marketplace?

25        MR. NAFTALIS:  Objection.  Time period.

HBHQTUZ3                    Ingrassia - Cross

1          THE COURT:  Sustained.

2     Q.  In 2011, do you recall that Mr. Isaza Tuzman reached out to

3     you to get insight about what investors are saying in the

4     marketplace?

5          THE COURT:  Sustained.

6     Q.  Sir, in April of 2011, do you recall having conversation or

7     communication with Kaleil about stock movements of KIT digital

8     stock?

9     A.  I don't recall a specific conversation, but it's not

10    unusual for a CEO to call an analyst and see if they're hearing

11    anything that didn't come back -- hasn't been communicated to

12    the company yet.

13    Q.  That's not an unusual thing to do, right?

14    A.  No.

15    Q.  Do you know the term DSOs?

16    A.  Yes.

17    Q.  That term refers to days sales outstanding, correct?

18    A.  Correct.

19    Q.  That's a measure of how long it takes the company to

20    collect on its bills, right?

21    A.  Generally, yes.

22    Q.  And you recall that there came a time in 2010 when

23    investors in the market were raising concerns about KIT

24    digital's DSOs?

25    A.  Yes, I remember as a result of some acquisitions that DSOs

HBHQTUZ3                    Ingrassia - Cross

1   spiked.

2   Q.  Do you recall that in 2010, you believed that the DSO issue

3   was a short-term distraction?

4   A.  That sounds like something I might have said.  Yeah,

5   typically that's the kind of fixable issue that you see in a --

6   or at least it corrects itself over time if all goes well.

7             MR. WEITZMAN:  Can we put up Government Exhibit

8   3304-A.

9   Q.  Do you see the second bullet point "DSO and euro volatility

10  are short-term distractions"?

11  A.  Yes.

12  Q.  In fact, you thought that investors shouldn't care about

13  issues such as DSOs, correct?

14  A.  No, I wouldn't say that.

15            MR. WEITZMAN:  Can we put up KIT Exhibit 3524.  Can we

16  turn to page 2.  Bottom email.  If we can highlight the first

17  two sentences.

18  Q.  Does this refresh your recollection that in May 2010, you

19  wrote to Kaleil that "investors should care about organic

20  revenue growth and margin expansion in a company like KIT not

21  EPS, DSOs and currency fluctuation"?

22            MR. NAFTALIS:  Objection.  The witness didn't say he

23  didn't remember anything, so I don't think this is proper

24  refreshing.

25            THE COURT:  Sustained.

HBHQTUZ3                    Ingrassia - Cross

1   Q.  Is this a communication between you and Kaleil dated

2   May 17, 2010, sir?

3   A.  Yes.

4            MR. WEITZMAN:  We offer KIT exhibit 2534.

5   A.  Can I make a comment on this?

6            THE COURT:  No.  What's the government's position?

7            MR. NAFTALIS:  I'm not sure what the relevance of this

8   is.

9            THE COURT:  What's the relevance?

10           MR. WEITZMAN:  I can proffer it at sidebar, your

11   Honor.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

HBHQTUZ3                          Ingrassia - Cross

1              (At the side bar)

2              MR. WEITZMAN:  Your Honor, this goes to the

3    materiality issues that they are raising, which is DSOs is a

4    direct correlate to the collectability of revenues.  So he's

5    telling Kaleil that he doesn't think DSOs are all that relevant

6    to investors.  It's exactly on point to the theory of the case.

7              MR. NAFTALIS:  You can ask that.  I don't have

8    objection to asking questions, but he already said he didn't

9    agree with you on that.

10             MR. WEITZMAN:  He said the opposite now in this email.

11             THE COURT:  I don't think that's exactly true,

12   Mr. Weitzman, but there's no objection.  Let's just get moving,

13   OK?

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

HBHQTUZ3                        Ingrassia - Cross

```
 1              (In open court)
 2              THE COURT:  There's no objection to 3524?
 3              MR. NAFTALIS:  Correct.
 4              THE COURT:  KIT 3524 is received.
 5              (Defendant's Exhibit KIT 3524 received in evidence)
 6    Q.  Mr. Ingrassia, on May 17, 2010, you wrote to Kaleil, "I'll
 7    tell you what I told sales investors should care about organic
 8    revenue growth and margin expansion in a company like KIT, not
 9    EPS, DSOs and currency fluctuation."
10              Do you see that?
11    A.  Yes.
12              MR. WEITZMAN:  You can take that down.
13    Q.  Sir, isn't it a fact that from time to time you would
14    suggest to Kaleil particular things he should say on conference
15    calls with investors?
16    A.  I might make suggestions based on what I was hearing from
17    investors and our sales team about what issues they might have
18    had with the stock at the time.
19    Q.  Nothing improper about that, right?
20    A.  No.
21    Q.  And what about the converse, were there times when Kaleil
22    asked you to ask particular calls on investor calls?
23              THE COURT:  I'm sorry?
24              MR. WEITZMAN:  Sorry, I mangled that question, your
25    Honor.
```

HBHQTUZ3                         Ingrassia - Cross

1   Q.  What about the converse, were there times when Kaleil asked
2   you to ask particular questions on investor calls?
3   A.  I don't recall that specifically, but that also wouldn't
4   have been out of line.
5   Q.  OK.  Nothing improper about that either, right?
6   A.  It depends on what question it was.
7            MR. WEITZMAN:  OK.  Can we put up KIT Exhibit 3548.
8   Q.  This is a January 31, 2011 communication between you and
9   Kaleil with a cc. to Robin Smyth, correct?
10  A.  Yes.
11           MR. WEITZMAN:  We offer KIT Exhibit 3548.
12           MR. NAFTALIS:  No objection.
13           THE COURT:  KIT Exhibit 3548 is received.
14           (Defendant's Exhibit KIT 3548 received in evidence)
15  Q.  Sir, in this communication from you, you write "K."  That
16  stands for Kaleil?
17  A.  Yes, it must.
18  Q.  You write, "Might be helpful to say something, if you can,
19  about cash flows in Q-4 and up to/including the deal."
20           Do you see that?
21  A.  Yes.
22  Q.  And then at the bottom of that paragraph you say, "Let me
23  know and I'll ask the question," correct?
24  A.  Yes.
25  Q.  And by that you meant that you would ask a question about

HBHQTUZ3                      Ingrassia - Cross

1   the cash flows in Q-4 up to/including the deal, correct?

2   A.  Right, the sales force had questions about where the cash

3   was going, and I thought it was important for him to point that

4   out.

5   Q.  And there's nothing improper in your discussing with the

6   CEO potential questions you might ask on an investor call,

7   correct?

8   A.  No.

9   Q.  OK.  Sir, we previously mentioned Steve Maiden.  Do you

10  recall that?

11  A.  Yes.

12  Q.  And you couldn't recall whether you spoke to him at first,

13  communicated with him?

14  A.  Not directly with him, no.

15       MR. WEITZMAN:  OK.  And can we put up KIT Exhibit

16  3539.

17  Q.  Sir, does this refresh your recollection that you had

18  direct communications with Mr. Maiden regarding KIT digital?

19  A.  Yes, this is an email --

20       THE COURT:  No, don't say what it is.  Just does it

21  refresh your recollection.

22       THE WITNESS:  Yes.

23       THE COURT:  It's a yes-or-no question.

24       THE WITNESS:  OK.

25  Q.  In fact, sir, it wasn't an infrequent thing for you to

HBHQTUZ3                         Ingrassia - Cross

1    communicate with Mr. Maiden about KIT digital, right?

2              MR. NAFTALIS:  Objection to form and time period.

3              THE COURT:  Grounds?

4              MR. NAFTALIS:  Time period.

5              THE COURT:  Sustained.  Sustained.

6    Q.  Sir, in 2010, you were communicating with Mr. Maiden quite

7    frequently, weren't you?

8    A.  I don't recall how often it was.

9    Q.  Do you recall communicating with him in April of 2012?

10             MR. NAFTALIS:  '10 or '12, I'm not sure --

11             MR. WEITZMAN:  12.

12             MR. NAFTALIS:  I thought we were just in '10.  I

13   wanted to be sure we were being clear.

14   A.  Like I said --

15             THE COURT:  Do you remember whether you communicated

16   with him in April 2012?

17             THE WITNESS:  I don't remember whether it was April.

18        (Continued on next page)

19

20

21

22

23

24

25

1           MR. WEITZMAN:  Can we put up KIT Exhibit 3545.

2    Q.  Sir, does this refresh your recollection that in April 2012

3    you were communicating directly with Stephen Maiden about KIT

4    digital?

5    A.  Yes.

6    Q.  And it wasn't just once in April 2012, was it, that you

7    communicated with Mr. Maiden about KIT digital, right?

8    A.  I don't know how many times it was.

9           MR. WEITZMAN:  Can we put up KIT Exhibit 3541.

10   Q.  Sir, does this refresh your recollection that you

11   communicated with Mr. Maiden multiple times in April 2011

12   regarding KIT digital?

13   A.  At least two or three.

14   Q.  Now you recall that Kaleil left the company, resigned, in

15   or about March 2012?

16   A.  That sounds about right.

17   Q.  You recall that the stock of KIT digital took a sharp dive

18   after he left?

19   A.  It usually does when a CEO resigns.

20   Q.  Dropped about 22 percent that day, right?

21   A.  I don't recall.

22   Q.  But after Kaleil left you continued to give KIT digital a

23   buy rating, right?

24   A.  I believe I did, yeah.  I don't think I ever went from a

25   buy rating.

HBH9TUZ4                    Ingrassia - cross

1   Q.  You continued to rate KIT digital at buy even after its

2   financial statements were delayed in release, right?

3   A.  Yes.

4   Q.  You continued to rate KIT digital a buy even after the

5   company disclosed a weakness in financial controls, correct?

6   A.  Yes.

7   Q.  You continued to give KIT digital a buy even after the

8   company revised certain financials by management in March 2012,

9   right?

10  A.  It's possible.  Like I said, I had a buy rating on it the

11  whole time I covered it.

12          MR. WEITZMAN:  Let's got to Government Exhibit 3301B.

13  Q.  You recall this note that you were shown in your direct

14  examination.  This is the April 2, 2012 note.

15  A.  Yes.

16  Q.  Correct.  And in the April 2, 2012 note on page two you

17  were shown this part about cash investment writedown, correct?

18  A.  Yes.

19  Q.  Now, in fact, you considered this writedown to be a small

20  writedown, correct?

21  A.  I don't think -- well --

22          MR. WEITZMAN:  Can we go to page one.

23          Can you highlight the second bullet point "small cash

24  investment writedown."

25  Q.  You considered it to be a small cash investment writedown?

HBH9TUZ4                          Ingrassia - cross

1    A.  Well, that's what I said but any writedown of cash --

2    Q.  Sorry.  I couldn't hear that.

3    A.  That's what's in the bullet point, but any writedown of

4    cash to me is, I wouldn't say big, but it's something to be of

5    concern.

6    Q.  In your direct examination you've stated that you've never

7    seen companies write down cash.

8            Do you recall that?

9    A.  I don't think I said "never."  I don't remember ever seeing

10   it before.

11   Q.  Isn't it -- you recall that there was a great recession in

12   2007, 2008?

13   A.  Yeah.

14   Q.  Do you recall that companies were writing down their

15   investments left and right?

16           THE COURT:  He's talking about cash.

17           MR. WEITZMAN:  I understand.  I'm getting there, your

18   Honor.

19           THE COURT:  Okay.

20   Q.  Do you recall that?  They were writing down their

21   investments?

22   A.  Yes.

23   Q.  And do you recall that there was a lot of counterparty risk

24   in 2008?

25   A.  I suppose so.

HBH9TUZ4                          Ingrassia - cross

1    Q.  And counterparty risk is when, for instance, financial

2    institutions that are holding your money are defaulting or

3    collapsing, correct?

4    A.  Right.

5    Q.  Companies like banks, correct, were collapsing in 2008,

6    right?

7    A.  Yes.

8    Q.  Insurance companies were collapsing in 2008?  Do you recall

9    that?

10   A.  Yes.

11   Q.  And do you recall that those collapses caused cash to be

12   written down by many companies in 2008?

13   A.  I didn't cover banks and financial institutions so I really

14   couldn't say specifically.

15   Q.  Fair enough.

16          So your knowledge is limited to the ten or twelve

17   companies you were covering at the time?

18   A.  Most of my knowledge.  Yeah.

19   Q.  And you weren't covering any of the companies that were

20   writing down cash during the financial crisis?

21   A.  I can't say that specifically.

22          MR. NAFTALIS:  Objection.  Foundation.

23          THE COURT:  Sustained.

24   Q.  Covering a company like KIT digital, was it important to

25   you to see what other equity analysts were saying about KIT

1    digital?

2    A.  Not necessarily.

3    Q.  Did you, in fact, review other equity analysts' reports

4    about KIT digital?

5    A.  Typically that was not my -- not my policy.

6    Q.  Do you recall whether you reviewed equity analyst reports

7    issued by KIT digital from a company called JMP Securities?

8    A.  I don't recall that specifically.

9    Q.  Do you know an individual named Mark Harding?

10   A.  Possibly.  I don't recall.

11   Q.  Or an individual named Jeffrey Spurr?

12   A.  No.  That doesn't sound familiar.

13   Q.  Do you recall reading any other equity analyst reports in

14   or about April 2012 where they said that --

15              THE COURT:  No.  Just ask the question.  Do you recall

16   reading any -- any other analysts' reports in or about

17   April 2012 about KIT digital?

18              THE WITNESS:  I don't recall specifically but I may

19   have, yes.

20              MR. WEITZMAN:  Can we put up KIT Exhibit 3519.

21              MR. NAFTALIS:  Your Honor, can we have a sidebar

22   briefly.

23              THE COURT:  If we must.

24              (Continued on next page)

25

```
 1              (At the sidebar)
 2              MR. NAFTALIS:  I apologize for doing this but I just
 3    don't want there to be a question where he's reading from a
 4    document.
 5              THE COURT:  That's why I broke into the question.
 6              MR. NAFTALIS:  I think all of us agree that these
 7    documents are hearsay so that you can't -- they are only
 8    offered for state of mind.
 9              THE COURT:  So what's your intention?  Are you going
10    to show him the document?
11              MR. WEITZMAN:  First of all, I'm going to ask him if
12    he read it.
13              THE COURT:  It seems likely that the answer is going
14    to be no.
15              What's the next question?
16              MR. WEITZMAN:  In any event, I would offer the
17    document only for state of mind.
18              THE COURT:  How are you going to offer the document?
19              MR. WEITZMAN:  This it was actually on the
20    government's exhibit list.
21              THE COURT:  That's fine but that doesn't mean it's
22    admissible.
23              MR. WEITZMAN:  There is no dispute as to authenticity.
24    So I'm going to offer it for the purpose of the state of mind
25    of the writer.
```

1        MR. NAFTALIS:  That he never read it?

2        THE COURT:  We're wasting time.

3        MR. WEITZMAN:  Okay.

4        (Continued on next page)

```
 1                    (In open court)
 2   Q.  Sir, do you recall whether you read this equity analyst's
 3   report in April 2012?
 4   A.  I don't recall.
 5   Q.  And nothing about the report refreshes your recollection
 6   about that?
 7   A.  Not really, no.  It's five-and-a-half years ago.
 8   Q.  Now you've spoken to the prosecutors here how many times
 9   before your testimony today?
10   A.  Just once on the phone from home and then Wednesday this
11   week.
12   Q.  So two conversations with Mr. Naftalis and others?
13   A.  Yes.
14   Q.  And was this the first time that you ever spoke to
15   prosecutors?
16   A.  Yes.
17   Q.  And was the SEC on those calls?
18            THE COURT:  I thought he talked about one call and a
19   meeting.
20            MR. WEITZMAN:  Yes, your Honor.  You're correct, your
21   Honor.
22   Q.  Was the SEC on the call or present at the meeting?
23   A.  Was a representative of the SEC on my call with
24   Mr. Naftalis?
25   Q.  Yes.
```

1    A.   No.

2    Q.   Was a representative of the FBI or the U.S. Postal

3    Inspection Service on the call?

4    A.   Yes.

5    Q.   And you understand that the prosecutors and the postal

6    inspection service and the FBI, that part of their charge is to

7    enforce the securities laws, correct?

8    A.   I don't know that specific call but, okay, yeah.

9    Q.   And one of the securities laws that are enforced is a law

10   called Reg AC, correct?

11          MR. NAFTALIS:   Objection, your Honor.   I'm not sure

12   where we're going here.   Foundation as well.

13          THE COURT:   Yes.   Sustained.

14   Q.   Are you familiar with Reg AC, sir?

15          THE COURT:   Yes or no.

16          THE WITNESS:   No.

17          THE COURT:   Next question.

18   Q.   Sir, have you heard of Regulation Analyst Certification?

19   A.   Analyst certification I'm familiar with.

20   Q.   And analyst certification is something that you did as a

21   analyst in connection with each of your equity research analyst

22   reports, correct?

23   A.   Yes.   That was standard procedure.

24   Q.   And what that analyst certification is, is that you believe

25   in the content of your report, correct?

1    A.  Yes.

2    Q.  And you understand that that's a SEC requirement that you

3    believe in your certification, correct?

4    A.  Yes.

5              MR. WEITZMAN:  In fact, let's put up KIT Exhibit 3514.

6              Turn to -- actually take that down.  That's okay.

7    Q.  You understand that if you were to issue an analyst report

8    that you did not believe in, that would be a violation of the

9    securities laws, correct?

10   A.  Yes.

11   Q.  And that that could get you in trouble with the SEC,

12   correct?

13   A.  Yes.

14   Q.  And it can get you in trouble with prosecutors as well,

15   right?

16   A.  Yes.

17   Q.  Do you recall that there came a time in May 2012 where KIT

18   digital entered into an agreement for the sale of $29 million

19   in equity?

20   A.  That sounds familiar.

21             MR. NAFTALIS:  Objection.  Relevance.

22             MR. WEITZMAN:  I'll connect it, your Honor.

23             THE COURT:  All right.  I'll see where it goes.

24   Q.  And the agreement that KIT digital entered into in May 2012

25   that was after Kaleil left the company, correct?

```
 1    A.  Is that the fact --

 2              THE COURT:  No, don't -- he's asking you if you know

 3    this.  You can't rely on the question.  Okay.

 4              THE WITNESS:  Okay.

 5              THE COURT:  So repeat the question, Mr. Weitzman.

 6              MR. WEITZMAN:  I'll break it down.

 7    Q.  You recall that you testified earlier that Kaleil left the

 8    company in March 2012?

 9    A.  Yes.

10    Q.  And so the equity sale of $29 million in May 2012 was after

11    Kaleil left the company, correct?

12    A.  Yes.

13    Q.  That was by new management within the company, correct?

14    A.  Yes.

15    Q.  And you recall that you thought the terms of this financing

16    were really onerous?

17    A.  I don't recall.

18    Q.  Do you recall that the terms of the financing is what's

19    called in the industry a debt spiral?

20              MR. NAFTALIS:  Objection, your Honor.  Relevance.

21              THE COURT:  Yes.  We'll have to discuss it.

22              (Continued on next page)

23

24

25
```

```
 1              (At the sidebar)

 2              MR. WEITZMAN:  Yes, your Honor.  I have documents that

 3    show that this individual understood that there was a financing

 4    of the company that would result in a debt spiral to the

 5    company; that notwithstanding that he continued to issue a buy

 6    rating and part of the reason he did that was because the

 7    chairman of his company told him that they can't -- they can't

 8    downgrade or they can't -- they can't issue a negative release

 9    about KIT digital because they were investors in KIT digital.

10    And this is necessary to prove bias and motivation to curry

11    favor with the prosecutors.

12              MR. NAFTALIS:  Oh, please, because he has to comply

13    with the rules of the company that they can't change a rating

14    when they are underwriting security you're saying that's bias

15    to us?

16              MR. WEITZMAN:  Yes because --

17              MR. NAFTALIS:  At the time in 2012 it's bias to us?

18              MR. WEITZMAN:  That's not the issue, Mr. Naftalis.

19              He's an individual who did not -- who violated Reg AC.

20    He did not report his true beliefs based on the e-mails I have

21    and because of that he has to curry favor with the prosecutors

22    today, not back in 2012.

23              THE COURT:  Well I mean you can explore that with him.

24    You'll be bound by his answers.

25              MR. WEITZMAN:  Of course.
```

```
 1              MR. WILLIAMS:  Can we have a proffer.

 2              MR. NAFTALIS:  What you're going into because I don't

 3   understand it.  I don't want to make a misimpression with the

 4   jury that there's actually anything here based on the

 5   questions.  I don't really understand what --

 6              THE COURT:  He's already made a proffer of what he

 7   intends to ask.

 8              MR. NAFTALIS:  That he was currying favor?

 9              THE COURT:  No.  That he's got a motive now to curry

10   favor with you based on what happened in 2012.

11              MR. WILLIAMS:  That's fine.  How much longer do you

12   have?

13              MR. WEITZMAN:  It depends on his answers.  It's not

14   going to be very long.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25
```

```
1              (In open court)
2    Q.  Mr. Ingrassia, are you familiar with the term debt spiral
3    financing?
4    A.  Yes.
5    Q.  That is a type of financing that occurs when an issuer like
6    KIT digital issues -- issues stock with really onerous terms,
7    right?
8    A.  Yes.
9    Q.  And one of the onerous terms is that if the stock reduces
10   in price below a particular level the company issues more stock
11   to the buyer of the stock, right?
12   A.  Correct.
13   Q.  And even if it continues to spiral downward, the stock
14   price, the company has to give cash to the buyer of the stock,
15   right?
16   A.  I don't know if that's the case in every financing of that
17   kind.
18   Q.  But the term debt spiral financing is a term that you
19   understood what that meant, right, in 2012?
20   A.  Yes.
21   Q.  And, sir, in May of 2012 the company issued financing, $29
22   million of stock in what's called debt spiral financing; isn't
23   that correct?
24   A.  It's not specifically called that but it may have been
25   referred to that -- referred as that.
```

1    Q.  You believed the financing terms were a debt spiral for the

2    company in May 2012, right?

3    A.  I don't recall.

4    Q.  Sir, do you recall having a conversation in May 2012 with

5    Stephen Maiden about the debt spiral financing that KIT digital

6    issued in May 2012?

7    A.  I don't recall it specifically, but I may have.

8            MR. WEITZMAN:  Can we put up KIT Exhibit 3546.

9            Can we highlight the two e-mails in the middle.

10   Q.  These are communications between yourself and Mr. Maiden,

11   correct?

12   A.  Yes.

13           MR. WEITZMAN:  We offer KIT Exhibit 3546.

14           MR. JACKSON:  No objection.

15           MR. NAFTALIS:  Your Honor I think we're refreshing

16   recollection here, if the question was to refresh recollection.

17           MR. WEITZMAN:  This goes to state of mind.

18           THE COURT:  I don't understand.  I think he's offering

19   it -- you're offering it, right?

20           MR. WEITZMAN:  I am.

21           THE COURT:  So he's not using it to refresh

22   recollection.  He's seeking to offer it.

23           MR. NAFTALIS:  No objection.

24           THE COURT:  3546 is received.

25           (Defendant Exhibit KIT 3546 received in evidence)

1    Q.  Sir, on May 17, 2012 Steve Maiden e-mailed you and he said,

2    "So this looks like a debt spiral deal.  Are there limits to

3    this?  Does this force the company to sell?  Crazy bad

4    offering."

5            Do you see that?

6    A.  Yes.

7    Q.  And at 10:51 a.m. you wrote, "Exactly the point I'm hung up

8    on and why I'm not published yet.  I'm writing this up for as

9    bad as it is and I need to have it right."

10           Do you see that?

11   A.  Yes.

12   Q.  In May 2012, sir, you agreed with Mr. Maiden that this was

13   a debt spiral financing, correct?

14   A.  It looked pretty bad, yeah.

15   Q.  You didn't think this was a good move for the company,

16   right?

17   A.  Not in this respect, no.  In financing.

18   Q.  You issued a note the next day, correct?

19   A.  Probably.

20           MR. WEITZMAN:  Can we put up KIT Exhibit 3521.

21           Can we put up -- this is the note that you issued on

22   May 18, 2012?

23           THE WITNESS:  Yes.

24           MR. WEITZMAN:  We offer KIT Exhibit 3521.

25           MR. NAFTALIS:  With the same limitation, no objection.

1              MR. JACKSON:  No objection, your Honor.

2              THE COURT:  This would be received, ladies and

3    gentlemen, for state of mind just as the other analyst reports

4    were received.  So with that limitation 3521 is received.

5              (Defendant Exhibit KIT 3521 received in evidence)

6              MR. WEITZMAN:  If you would highlight the first

7    paragraph under 2012 revisions.

8    Q.  You wrote, "Much remains to be done before shares are

9    recognized for the value of the underlying business, and the

10   structure of the recent equity raise creates yet another

11   overhang on the stock," correct?

12   A.  Yes.

13   Q.  Nothing in this report referred to debt spiral financing,

14   using those terms, correct?

15             THE COURT:  Do you remember?

16             THE WITNESS:  I don't remember.  But that's obviously

17   slang.

18   Q.  You continued to issue a buy rating for the company at this

19   time, correct?

20   A.  Yeah, because my values --

21   Q.  Hold on a second.  I just wanted a yes or no.  You

22   continued to issue a buy rating --

23   A.  Yes.  As I said, I had a buy rating on it.

24   Q.  And you continued to issue the buy rating even though you

25   believed that the terms of the financing offered days prior

1    could result in a debt spiral for the company, correct?

2    A.  Yes, because a financing doesn't necessarily have relevance

3    to the value of the stock.

4    Q.  You understood, sir, that the debt spiral financing that

5    you knew about could result in a bankruptcy for the company,

6    correct?

7    A.  I don't know that I thought it would be a bankruptcy but it

8    could certainly harm the shareholders.

9    Q.  And you didn't mention -- withdrawn.

10          Sir, your company ROTH Capital owned a substantial

11   position in KIT digital in May 2012; isn't that correct?

12   A.  I don't know if we owned a portion of the company.

13   Q.  You at some point between 2010 and 2012 you are aware ROTH

14   Capital was an investor in KIT digital, right?

15   A.  Again, I don't know that they were an investor.  We -- KIT

16   digital was an investment banking client.  So we helped them

17   raise money on several occasions.

18          MR. WEITZMAN:  Could we go to page -- the final -- the

19   second to last page of this document.  And can we highlight the

20   first disclosure.

21   Q.  This is the May 18, 2012 equity issue -- equity report you

22   issued.  And it says, "Disclosures Roth and/or its employees,

23   officers, directors and owners own options, rights or warrants

24   to purchase shares of KIT digital, Inc. stock.  Roth makes a

25   market in shares of KIT digital, Inc. and as such buys and

1  sells from customers on a principal basis."

2          Do you see that?

3  A.  Yes.

4  Q.  And in addition to that, Roth also was one of the

5  investment bankers to KIT digital, right?

6  A.  Correct.

7  Q.  Roth generated substantial fees as a result of that

8  relationship, right?

9  A.  Yes.

10  Q.  And as a result of the relationship with KIT digital you

11  had an incentive not to downgrade KIT digital, after my client

12  left the company, to a sell, correct?

13  A.  No.  My research was always independent of anything on the

14  banking side.

15  Q.  Okay.  Who was the chairman of your company at Roth?

16  A.  Byron Roth.

17  Q.  Isn't it a fact, sir, that Byron Roth told you that you

18  can't issue negative commentary on KIT digital?

19  A.  I don't recall that at all.

20  Q.  Isn't it a fact, sir, that Byron Roth told you that issuing

21  negative commentary on KIT digital would be like shooting

22  yourselves in the foot since you guys are owners of KIT digital

23  stock?

24  A.  No.

25          MR. WEITZMAN:  Putting up KIT Exhibit 3527.  Can we

1    put up page one and page two.

2    Q.  Is this is an e-mail exchange on which you are a recipient,

3    correct, Mr. Ingrassia?

4    A.  Yes.

5    Q.  And it involves Kaleil and your chairman, Byron Roth,

6    correct?

7    A.  Yes.

8            MR. WEITZMAN:  We offer KIT Exhibit 3527.

9            MR. NAFTALIS:  Objection, your Honor.

10           THE COURT:  You object?

11           MR. NAFTALIS:  We can let --

12           THE COURT:  Do you want to approach?

13           MR. NAFTALIS:  What is the offering for?

14           THE COURT:  Do you want to approach?

15           MR. NAFTALIS:  Yes.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1                (At the sidebar)
 2                MR. NAFTALIS:  This is from 2010.  They are trying to
 3      impeach him for something that happened in 2012.
 4                MR. WEITZMAN:  Yes.  There's a directive here in this
 5      e-mail and I'm entitled to elicit and get the fair inferences
 6      resulting from it that the chairman of his company tells him --
 7                THE COURT:  Where is that?
 8                MR. WEITZMAN:  Bottom e-mail.  Sorry.  Kaleil says,
 9      "Gents, I just heard from two of our shareholders that Roth was
10      out with negative commentary..."
11                THE COURT:  I'm sorry.  I can't see what you're
12      reading.
13                MR. WEITZMAN:  I apologize, your Honor.  If I can take
14      your binder, I'll highlight it for you.
15                This part is Kaleil's e-mail.  And on June 2010 he
16      says, "Gents I just heard from two of our shareholders that
17      Roth was out with negative commentary on KIT digital," from the
18      chairman of his firm on an e-mail that he's cc'd on says, "We
19      own shares, shares we bought in market and not just warrants
20      and would be literally shooting ourselves in the foot.  Let us
21      know if you hear anything specific and we'll address it right
22      away.  It is brutal out there."
23                MR. WILLIAMS:  Is that a directive?
24                THE COURT:  It doesn't seem like a directive to me.
25                MR. WEITZMAN:  It's a fair inference for me to ask him
```

1    whether he took it as the chairman of his firm saying he

2    shouldn't --

3              THE COURT:  I don't know.  So let me tell you what I

4    think a fair inference is.  Mr. Tuzman is saying that he heard

5    that Roth was putting in a negative commentary and what I

6    understand Byron Roth to say in response is:  No, we're not

7    doing that and if we were to do that it would be like shooting

8    ourselves in the foot.

9              MR. WEITZMAN:  Exactly.  I agree with that, your

10   Honor.  And I think that's the impeachment I'm seeking.

11             THE COURT:  I don't think it's impeachment, but you

12   can ask him -- you can ask them if he viewed that as a

13   directive from Byron Roth not to say anything mean about KIT

14   digital.

15             MR. WEITZMAN:  Right.  Thank you, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)
 2                    MR. WEITZMAN:  Your Honor, we offer KIT Exhibit 3527.
 3                    THE COURT:  Anything else you want to say,
 4       Mr. Naftalis?
 5                    MR. NAFTALIS:  No.
 6                    THE COURT:  Are you objecting to 3527?
 7                    MR. NAFTALIS:  No.
 8                    THE COURT:  3527 is received.
 9                    (Defendant Exhibit KIT 3527 received in evidence)
10                    MR. WEITZMAN:  Can we highlight page two, the top
11       e-mail from Kaleil.
12       Q.  Sir, there is an e-mail from Kaleil to yourself, several
13       other people at your company, correct, and Byron Roth?
14       A.  Yes.
15       Q.  And it's dated June 8, 2010, correct?
16       A.  Yes.
17       Q.  And its subject is "Roth commentary on KIT digital," right?
18       A.  Yes.
19       Q.  And Kaleil says, "Gents I just heard from two of our
20       shareholders that Roth was out with negative commentary on KIT
21       digital?  Anything of which I should be aware?"
22                    Do you see that?
23       A.  Yes.
24       Q.  And turn to Mr. Roth's response.  Page one bottom e-mail.
25                    Byron Roth, sir, is the chairman of your firm that you
```

1   worked at at the time?

2   A.  Yes.

3   Q.  And on June 8, 2010 he e-mails Kaleil back on an e-mail

4   that you are a recipient, correct?

5   A.  Yes.

6   Q.  And he says, "We own shares (shares we bought in market not

7   just warrants) and would be literally shooting ourselves in the

8   foot.  Let us know if you hear anything specific and we will

9   address it right away.  It is brutal out there."

10          Do you see that?

11  A.  Yes.

12  Q.  Sir you, understood that if you were to issue negative

13  commentary about KIT digital after Kaleil departed as the CEO

14  you would be hurting Roth's equity interest in KIT digital?

15  Did you understand that, yes or no?

16  A.  No.

17          MR. NAFTALIS:  Objection, this is confusing.

18          THE COURT:  All right.  The answer is no.

19          MR. WEITZMAN:  No further questions.

20          THE COURT:  All right.

21          Mr. Jackson, sir.

22          MR. JACKSON:  Your Honor, I have less than three

23  minutes of questions.

24          THE COURT:  Okay.

25          (Continued on next page)

HBH9TUZ4                          Ingrassia - cross

1    CROSS-EXAMINATION

2    BY MR. JACKSON:

3    Q.  Good morning, sir -- good afternoon.

4    A.  Good afternoon.

5    Q.  Now, sir, my -- can we call up Government Exhibit 218.

6    Now, sir, this is one of the documents that you looked at with

7    the government on your direct examination, right?

8    A.  Yes.

9              MR. JACKSON:  Can we go to page 100 of this document.

10             If you can blow up the top half of this.

11   Q.  You see here sir that this entire section of this 10-K is

12   talking about KIT Media, right?

13   A.  The first paragraph is -- refers to KIT Capital.

14   Q.  Right.  Part of it refers to KIT Capital and then another

15   part refers to KIT Media, correct?

16   A.  Yes.  And then the last one refers to KIT Capital.

17   Q.  Right.  And as an analyst you were familiar with the fact

18   that through KIT Capital and KIT Media investments were made in

19   KIT digital, right?

20   A.  From these filings, yes.

21   Q.  This was something that was publicly disclosed in the SEC

22   filings, right?

23   A.  Yes.

24   Q.  And there's nothing wrong from your perspective, there was

25   nothing wrong with the use of a vehicle like KIT Media, right?

HBH9TUZ4                    Ingrassia – cross

1    A.  I can't say that I analyzed it very closely.

2    Q.  Sure.  But you are aware of the 10-Ks, right?

3    A.  Yes.

4    Q.  And you're aware that everything that's in the 10-K was

5    part of a public filing about the company, right?

6    A.  Right.

7    Q.  Now, as an analyst you rely on experts sometimes, don't

8    you, to help you understand transactions?

9    A.  What do you mean by experts?

10   Q.  Well do you ever consult with experts to get a deeper

11   understanding of something that you're looking at?

12   A.  I might ask others in our firm.

13   Q.  Did you ever ask others outside your firm?

14   A.  Not that I recall.

15   Q.  But sometimes you would ask other people at your firm who

16   might have more expertise in an area than you did, right?

17   A.  Right.  I wasn't a banker.  I was an analyst.

18   Q.  So even though you were one of the people who was

19   specifically paid to analyze this company, there were

20   transactions that you wouldn't necessarily understand, right?

21   A.  It's possible, but I would try.

22   Q.  And then you would sometimes talk to bankers, people who

23   were bankers who had more sophistication about areas that you

24   didn't understand, correct?

25   A.  Maybe just to understand the terms after the fact.

1   Q.  Right.  To understand the terms and perhaps to also

2   understand the nature of what you were looking at, correct?

3   A.  Yes.

4   Q.  Now, remind me, again, what's your education?

5   A.  University of Notre Dame and Northwestern.

6   Q.  What degrees do you have?

7   A.  Economics at Notre Dame and journalism at Northwestern.

8   Q.  And do you have any kind of certifications from FINRA or

9   anything?

10  A.  No.  I'm a licensed rep.

11  Q.  Great.  You mentioned a system you used called BlueMatrix?

12  A.  Yes.

13  Q.  And just in very, very brief summary, in like one sentence,

14  what is BlueMatrix?

15  A.  It's a online publishing platform for research.

16  Q.  Now, one of the things that you talked about during your

17  testimony, do you remember, was this idea that you had never

18  heard of a CEO paying a person to buy stock.  Do you remember

19  that?

20  A.  Yes.

21  Q.  And you remember Mr. Naftalis showed you a document that

22  you talked about, this December 2008 agreement that you looked

23  at?

24  A.  Right.

25  Q.  And Mr. Weitzman asked you:  You're not an expert in

HBH9TUZ4                         Ingrassia - cross

1   analyzing those kinds of agreements, right?

2   A.  Correct.

3   Q.  But it is a fact, isn't it, that you are familiar with CEOs

4   incentivizing people to purchase stock, correct?

5           MR. NAFTALIS:  Objection to form.  It's vague.

6           THE COURT:  Sustained.

7   Q.  Let me ask you a more specific question.  You are -- you

8   generally -- you were an analyst during 2008, right?

9   A.  Yes.

10  Q.  So even though you were covering specific companies you

11  were aware of the global market crisis going on at the time,

12  right?

13  A.  Yes.

14  Q.  You were reading the Wall Street Journal everyday, right?

15  A.  Maybe not everyday but, yes.

16  Q.  You were following the news about it?

17  A.  Yes.

18  Q.  You were aware of the general market forces going on,

19  right?

20  A.  Generally.

21  Q.  You were aware of Warren Buffett's investment in Goldman

22  Sachs in 2008, correct?

23  A.  No.  I can't say that specifically.

24  Q.  You don't remember at all the transactions where Warren

25  Buffett invested a tremendous amount in Goldman Sachs?  You had

1    no familiarity with that?

2    A.  It sounds familiar but I don't know specifics.

3    Q.  I'm not asking you about the specifics, but you're

4    generally aware of it, right?

5    A.  Yes.

6    Q.  You don't remember the specifics?

7    A.  No.

8    Q.  But you do remember that when Warren Buffett did that

9    Goldman Sachs incentivized him by providing him with an

10   outsized dividend, right?

11   A.  Like I said, I don't know the specifics.

12   Q.  I just want to show you something and I want to ask you if

13   it refreshes your recollection.  This is a document marked as

14   Amanat Exhibit 406.

15           I just want you to take a look at that for a moment.

16   A.  Okay.

17   Q.  Having looked at that, does that refresh your recollection

18   that Warren Buffett got certain incentives in connection with

19   his purchase of stock in Goldman Sachs?

20           MR. NAFTALIS:  Objection to form.

21   Q.  That Warren Buffett or Berkshire Hathaway, through

22   Berkshire Hathaway got certain incentives in connection with

23   the purchase of stock?

24   A.  That's the way the Wall Street Journal saw it.

25           THE COURT:  Again, we're not interested really in what

1   the Wall Street Journal thinks about it.  The question is

2   whether it refreshes your recollection that Warren Buffett

3   received a larger dividend in exchange for his agreement to buy

4   the stock.  Does that document refresh your recollection on

5   that?

6               THE WITNESS:  No.

7   Q.  Putting that aside, you are aware that sometimes investors

8   get incentives for making investments, right?

9               THE COURT:  That's too broad.

10              MR. JACKSON:  That's too broad, your Honor.

11  Q.  You are aware that sometimes in the connection with the

12  purchase of stock, a company will provide for specifically --

13  specific terms that incentivize that particular investment in

14  stock, correct?

15  A.  No.  As an analyst we live in a different world.  I keep my

16  head down on the company.

17  Q.  So your testimony is you -- that's not -- that whole area

18  is not really something that you even cover as an analyst?

19  A.  It's not my expertise.

20  Q.  It's not your expertise.

21              So to the extent that you were being asked about that

22  on direct, that's really outside of the scope of what you know

23  about?

24              THE COURT:  Sustained.

25  Q.  Just to end up.  It's a fact, isn't it, sir, that during

HBH9TUZ4                          Ingrassia - redirect

1    the course of all your coverage of KIT digital you never had

2    any dealings with Omar Amanat, correct?

3    A.  I don't recall any dealings with him, no.

4              MR. JACKSON:  Okay.  Thank you, sir.  No further

5    questions for you.

6              THE COURT:  Any redirect.

7              MR. NAFTALIS:  Yes.  Very brief, your Honor.

8    REDIRECT EXAMINATION

9    BY MR. NAFTALIS:

10   Q.  Mr. Ingrassia, let's pick up where Mr. Jackson left off.

11   He asked you some questions about Warren Buffett and Goldman

12   Sachs.  And the gist was that whether Warren Buffett was

13   getting certain incentives or his firm was getting certain

14   incentives when it invested in Goldman Sachs?

15   A.  Yes.

16   Q.  Is your knowledge of that based on things you read in the

17   paper?

18   A.  Yes.

19   Q.  Things that were publicly disclosed?

20   A.  Things that I read just now.

21   Q.  Did you ever -- you saw that December 2009 agreement, 2008

22   agreement between --

23   A.  Was that the one between Maiden and --

24   Q.  Yes between Maiden, Mr. Amanat, Mr. Tuzman.  Do you

25   remember that document?

1  A.  Yes.

2  Q.  Did you ever see any reporting about that in the paper?

3  A.  No.

4  Q.  Did you ever seeing anything about that in the financial

5  statements?

6  A.  No.  I don't recall.

7  Q.  You were asked some questions by Mr. Weitzman about your

8  buy rating on KIT digital, correct?

9  A.  Yes.

10 Q.  And fair to say you rated KIT a buy for basically the

11 entire time you covered the stock, right?

12 A.  Yes.

13 Q.  And that was based in part on your review of KIT's

14 financial statements, right?

15 A.  It was based almost entirely on my review of their

16 financial statements.

17 Q.  And you assumed those statements were true and accurate?

18 A.  Yes.

19 Q.  You relied on that?

20 A.  Yes.

21 Q.  And Mr. Tuzman signed the 10-Qs and 10-Ks saying these are

22 real, these are accurate, there is no fraud?

23 A.  Yes.

24 Q.  And you relied on that?

25 A.  Yes.

HBH9TUZ4                          Ingrassia - redirect

1    Q.  Now you were asked some questions about who Roth's

2    customers are, meaning trading customers?

3    A.  Yes.

4    Q.  Some of the customers are hedge funds?

5    A.  Yes.

6    Q.  Some are mutual funds?

7    A.  Yes.

8    Q.  Some are what are called retail investors?

9    A.  Yes.

10   Q.  Regular people?

11   A.  No.  High net worth.

12   Q.  High net worth people?

13   A.  Yes.

14   Q.  They have access to your research?

15   A.  Yes.

16   Q.  Mr. Weitzman asked you some questions, and he pointed you

17   to something in a report where, about the concept of DSOs, days

18   sales outstanding?

19   A.  Yes.

20   Q.  Are those important to you days sales outstanding?

21   A.  Yes, to a degree.

22   Q.  Can you explain to the jury what that concept is and why

23   it's important to you.

24   A.  It's a measure of how long it's taking a company to collect

25   revenues on product or services that they have sold and

1   generally expect that to be -- well it depends on the industry

2   but 60 to 90 days.

3   Q.  And when you were looking at the days sales outstanding did

4   you have an understanding one way or another whether the

5   customers who owed KIT digital money were real?

6   A.  I'm sorry.  Ask the question again.

7   Q.  When you were considering whether the days sales

8   outstanding, the number, did you assume that the sales were

9   real, meaning real customers owed KIT digital real money?

10  A.  Of course.

11  Q.  Mr. Weitzman also asked you some questions about your

12  communications with Stephen Maiden?

13  A.  Right.

14  Q.  Stephen Maiden, to your recollection did you ever actually

15  reach out yourself to Stephen Maiden?

16  A.  Not to my recollection.  And I will say that I spoke to

17  hundreds of portfolio managers over my career at Roth.

18  Obviously I should have remembered that I spoke to Stephen or

19  at least traded e-mails with him but I don't remember speaking

20  to him.

21  Q.  To be clear, investors reach out to you, right?

22  A.  Yes.

23  Q.  And investors who hold a particular stock reach out to you

24  about stocks you cover, right?

25  A.  Yes.

HBH9TUZ4                        Ingrassia - redirect

1    Q.  You were one of the leading analysts that covered Roth,

2    correct?

3    A.  That covered KIT digital.

4              THE COURT:  That covered Roth?

5    Q.  Covered KIT digital?

6    A.  Yes.

7    Q.  To your recollection, did you ever yourself reach out to

8    Stephen Maiden?

9              MR. WEITZMAN:  Objection.  Asked and answered.

10             THE COURT:  I think it was but what do you recall.

11             THE WITNESS:  I don't recall reaching out to him,

12   prompting a conversation, no.

13   Q.  Anything different about the reach outs from Mr. Maiden to

14   you from other hedge fund analysts?

15   A.  No.  It was pretty typical.  It may not be by e-mail, by

16   phone.

17   Q.  You were also asked some questions by Mr. Weitzman about

18   that $2 million that was written off from KIT's balance sheet

19   in 2012?

20   A.  Right.

21   Q.  And then he jumped back to 2007 and '8 to the financial

22   crisis.  Do you remember that?

23   A.  Yes.

24   Q.  And he said investments were written off?

25   A.  Yes.

HBH9TUZ4                          Ingrassia - redirect

1    Q.  Was there a financial crisis in 2012?

2                MR. WEITZMAN:  Objection.  Relevance.

3                THE COURT:  Overruled.

4    A.  Not that I'm aware of.

5                MR. NAFTALIS:  Let's also put up Government Exhibit --

6    I think it's Amanat -- Tuzman Exhibit 3527.

7                If Mr. Tuzman's counsel can put that up.  We don't

8    have that.  We just got it.

9    Q.  Now, again, do you remember, just like with the cash

10   questions you were talking about 2012 and then there were

11   questions that jumped back in time.  Do you remember that?

12   There were questions about Mr. Roth?

13   A.  Yes.

14   Q.  There was a capital raise that KIT digital did after Tuzman

15   left the company in May of '12?

16   A.  Yes.

17   Q.  And then he asked you questions about what you did or

18   didn't do with respect to communications with Byron Roth?

19   A.  Yes.

20   Q.  So just to be clear the capital raise was 2012, correct?

21   A.  The one in question, yes.

22   Q.  And this e-mail is from when?

23   A.  June 2010.

24   Q.  Any connection between this e-mail and the capital raise in

25   2012?

1   A.  No.

2              MR. WEITZMAN:  Objection.  Vague.

3              THE COURT:  Overruled.

4   Q.  I don't know if we got the answer.

5              Any connection between this e-mail in 2010 and --

6   A.  No.  There couldn't have been.

7   Q.  And, finally, your recommendation says to buy or sell.  Did

8   you believe in all those recommendations.

9   A.  Yes.

10             MR. NAFTALIS:  No further questions.

11             THE COURT:  Anything else?

12             MR. JACKSON:  Nothing from us.  Thank you, your Honor.

13             MR. WEITZMAN:  Nothing, your Honor.

14             THE COURT:  You may step down, sir.

15             Ladies and gentlemen we're going to take our afternoon

16  break.  So be back to you shortly.  Keep an open mind.  There

17  is more evidence to hear.  Don't discuss the case.  Be back to

18  you shortly.

19             (Jury not present)

20             THE COURT:  You can step down Mr. Ingrassia.

21             (Witness excused)

22             THE COURT:  All right.  We'll resume -- do you have

23  something you want to take up?

24             MR. McRAE:  Just wanted to give you your binders now.

25             THE COURT:  That would be great.

HBH9TUZ4                          Ingrassia - redirect

1              We'll resume shortly with the cross-examination of

2    Mr. Smyth.

3              (Recess)

1              (Jury present)

2              THE COURT:  Ladies and gentlemen, we will now hear the

3    cross-examination of Mr. Smyth.

4              Mr. McRae.

5              MR. McRAE:  May I inquire, your Honor?

6              THE COURT:  Please.

7     ROBIN SMYTH, resumed.

8    CROSS-EXAMINATION

9    BY MR. McRAE:

10   Q.  Good afternoon, Mr. Smyth.

11   A.  Good afternoon.

12   Q.  Sir, from 2010 to 2012, you told many lies to many people

13   about KIT digital's financial condition, correct?

14   A.  Correct.

15   Q.  Sir, from 2010 to 2012, when you made false statements

16   about KIT digital's financial condition, your goal was to

17   mislead people, correct?

18   A.  Yes.

19   Q.  Between 2010 and 2012, you used false and deceptive means

20   to misrepresent KIT digital's true financial health to

21   shareholders, right?

22   A.  Yes.

23   Q.  The investing public, right?

24   A.  Yes.

25   Q.  Independent auditors, right?

HBHQTUZ5                        Smyth - Cross

1   A.  Yes.

2   Q.  And the Securities and Exchange Commission, correct?

3   A.  Yes.

4   Q.  So lying to people without being detected is something you

5   have experience with, right?

6   A.  In these cases, yes.

7   Q.  I'm sorry, sir, could you say that again?

8   A.  In these cases, yes.

9   Q.  And from 2010 to 2012, you also schemed to recognize

10  revenue for perpetual license contractors for KIT digital

11  software knowing that KIT digital had not delivered a finished

12  product to the customer, right?

13  A.  Yes.

14  Q.  So you lied about KIT digital's revenues also, correct?

15  A.  Yes.

16  Q.  And, sir, at times you even created illusory contracts,

17  correct?

18  A.  Yes.

19  Q.  Sham contracts, right?

20  A.  Yes.

21  Q.  And during your direct examination, you talked about many

22  documents you created and helped create that were also fake.

23  Is that right?

24  A.  Yes.

25  Q.  Yes.  We just mentioned one of the them a second ago, sham

HBHQTUZ5                          Smyth - Cross

1    licenses?

2    A.  Yes.

3    Q.  You also created false auditor licenses, right?

4    A.  Yes.

5    Q.  Fake clients, right?

6    A.  Yes.  I didn't create them, but yes, there were false

7    clients.

8    Q.  As well as false bank account information that you

9    provided, right?

10   A.  Yeah, I organized that.  Yes.

11   Q.  So part of your frauds and lies from 2010 to 2012 involved

12   creating false records that you would then use to support false

13   stories that you wanted people to believe, right?

14   A.  Yes.

15   Q.  So using fake documents to support lies is also something

16   you have experience with, right?

17   A.  Yes.

18   Q.  And to avoid detection of the frauds you committed at KIT

19   digital, you concealed your frauds from 2010 to 2012, didn't

20   you?

21   A.  Yes.

22   Q.  For example, you concealed your improper revenue

23   recognition scheme from the public and independent auditors

24   intending for them to be misled by your statements, right?

25   A.  Could you repeat that question?

HBHQTUZ5                          Smyth - Cross

Q.   Certainly.  You concealed your improper revenue recognition

scheme from the public and independent auditors intending for

them to be misled by your statements, correct?

A.   Yes.

Q.   So concealing the truth from people is yet another thing

with which you have considerable experience, correct?

A.   Yes.

Q.   So you even deceived people who worked with you every day

at KIT digital for years by concealing your fraudulent activity

from them, right?

A.   Some of the people worked with me, yes.

Q.   You understood that being the chief financial officer at

KIT digital was a position of trust, right?

A.   Yes.

Q.   You abused that trust?

A.   I did.

Q.   You abused that trust repeatedly, correct?

A.   Yes.

Q.   And, sir, you would agree that in order to conduct all the

fraudulent transactions while concealing your wrongdoing, it

required a certain level of skill in convincing people that you

were telling the truth when in fact you were lying, right?

A.   Yes.

Q.   That's a skill that you possess, right?

A.   I -- I suppose so, yes.

1  Q.  Now, you'd also agree that in the case of each person that

2  you lied to and deceived, sir, you conned those people into

3  believing the lies that you told were the truth, right?

4  A.  Yes.

5  Q.  And by conning, you would agree that what you did with

6  people that you deceived was to use words and to use documents

7  to create the illusion of truth while not telling them the

8  whole story, right?

9  A.  Yes.

10  Q.  And when you were conning people from 2010 to 2012, you

11  didn't try to act in a way that would tip off to those people

12  that you were lying, right?

13  A.  Correct.

14  Q.  I mean, you tried to act sincere, right?

15  A.  Yes.

16  Q.  You tried to act earnest, right?

17  A.  Yes.

18  Q.  You tried to act like you could be trusted, right?

19  A.  Yes.

20  Q.  In other words, when you were lying to people from 2010 to

21  2012, you tried to behave just like you've been behaving here

22  in court the past few days, right?

23          MR. WILLIAMS:  Objection.

24          THE COURT:  Sustained.

25  Q.  Sir, you deceived a lot of intelligent professionals who

HBHQTUZ5                         Smyth - Cross

1   asked for KIT digital's true financial health during this

2   period 2010 to 2012, right?

3   A.   Yes.

4   Q.   You deceived KIT digital's accountants and auditors about

5   KIT digital's true financial health during this period,

6   correct?

7   A.   Yes.

8   Q.   And, sir, you believed that -- when you were on direct

9   examination, do you recall testifying that you lied for the

10  whole time between 2010 and 2012 to KIT digital's auditors?

11  A.   Yes.

12  Q.   Some of KIT digital's auditors who were deceived were Grant

13  Thornton, right?

14  A.   Yes.

15  Q.   And you would agree that Grant Thornton is one of the most

16  respected auditing firms at least in the United States, right?

17  A.   Yes.

18  Q.   And you had extensive communication with the auditors from

19  Grant Thornton in that 2010 to 2012 time period, right?

20  A.   Yes.

21  Q.   You had phone calls with these Grant Thornton auditors

22  during that period, right?

23  A.   Yes.

24  Q.   You had email exchange communications with those auditors

25  from Grant Thornton in that time period, right?

1   A.  Yes.

2   Q.  You had face-to-face meetings with auditors from Grant

3   Thornton during that same time period?

4   A.  Yes.

5   Q.  In fact, you even socialized by going out to dinner with

6   some of those auditors during that time period, right?

7   A.  Yes.

8   Q.  You acted, sir, to gain their trust, right?

9   A.  Yes.

10  Q.  And with all the contact and experience that these Grant

11  Thornton auditors had, none of them ever told you that they

12  were aware of your frauds, right?

13  A.  Correct.

14  Q.  Grant Thornton, while they were auditing KIT digital, had

15  access to KIT digital's books, right?

16  A.  Yes.

17  Q.  In fact, Grant Thornton also had access to KIT digital's

18  customers.  Isn't that right?

19  A.  Could you explain that question?

20  Q.  Sure.  Grant Thornton could send out letters episodically

21  to KIT digital's customers to confirm some of the

22  representations that you were making to Grant Thornton, right?

23  A.  Yes.

24  Q.  Grant Thornton's job was to confirm the accuracy of KIT

25  digital's financial statements, right?

HBHQTUZ5                              Smyth – Cross

1    A.  Correct.

2    Q.  And even when Grant Thornton had questions about what you

3    were doing at KIT digital and about KIT digital's financials,

4    you were able to throw them off the trail, right?

5    A.  Yes.

6    Q.  So your deception was so extensive that even though Grant

7    Thornton worked to verify your financial representations, they

8    weren't able to catch you lying, correct?

9              MR. WILLIAMS:  Objection to the characterization.

10             THE COURT:  Sustained.

11   Q.  Sir, in 2011, you also deceived KIT digital's lawyers about

12   the reasons you included restructuring fees in some of KIT

13   digital's acquisitions, correct?

14   A.  Can you tell me which lawyers?  I'm a bit confused.

15   Q.  OK.  For example, you remember someone named Scott Ordt who

16   was a lawyer for WWB?

17   A.  Yes.

18   Q.  You deceived Scott Ordt about the reasons you were

19   including restructuring fees in the acquisition of WWB by KIT

20   digital, right?

21   A.  Yes.

22   Q.  He wasn't the only lawyer that you deceived in 2011 about

23   the reasons you were including restructuring reserves in side

24   letters for acquisitions, right?

25   A.  Correct.

1   Q.  You also deceived KIT digital's board of directors about

2   KIT digital's true financial health from 2010 to 2012, right?

3   A.  Correct.

4   Q.  And you would agree, sir, that at least during that time

5   period, KIT digital's board of directors included several

6   independent people that you actually considered to be

7   financially educated, right?

8   A.  Yes.

9   Q.  For example, you remember Joe Mullin, right?

10  A.  Yes.

11  Q.  Joe Mullin was previously a portfolio manager for a

12  privately owned investment management firm, right?

13  A.  Yes.

14  Q.  And you also remember somebody named Santo Politi?

15  A.  Yes.

16  Q.  Santo Politi was a board member of KIT digital during this

17  2010-2012 time frame, right?

18  A.  Yes.

19  Q.  And Santo Politi is another individual on the board at KIT

20  digital that you deceived, right?

21  A.  Yes.

22  Q.  And you recall that Santo Politi was the founder of a media

23  entertainment and technology focused venture fund, right?

24  A.  Yes.

25  Q.  And, sir, the other individual we can use as an example is

1   Mr. Wayne Walker.  You recall him, right?

2   A.  Yes.

3   Q.  Wayne Walker was a board member at KIT digital, right?

4   A.  Yes.

5   Q.  Wayne Walker was also a lawyer, right?

6   A.  Yes.

7   Q.  He was actually a named partner in his own firm, the law

8   firm of Walker Nell Partners.  Do you remember that?

9   A.  Yes.

10   Q.  And you also recall that Mr. Walker was previously chairman

11   for Habitat for Humanity?

12   A.  Yes.

13   Q.  And you deceived him as well?

14   A.  Yes.

15   Q.  And you also deceived KIT's audit committee about the true

16   financial condition of KIT digital from 2010 to 2012, right?

17   A.  Yes.

18   Q.  So let's delve into this a bit further.  You actually

19   deceived people who relied on you to do your job ethically and

20   legally, right?

21   A.  Yes.

22   Q.  Now, you know my client, Kaleil, right?

23   A.  Yes.

24   Q.  You know he's not an accountant, right?

25   A.  I know he's not a qualified accountant, yes.

HBHQTUZ5                         Smyth - Cross

1    Q.  Not any type of accountant, qualified or unqualified?

2    A.  Right.  Yes.

3    Q.  You, on the other hand, are an accountant, right?

4    A.  Yes.

5    Q.  And in addition to you being an accountant, you actually

6    deceived people who worked directly under you in the finance

7    department at KIT digital, didn't you?

8    A.  Yes.

9    Q.  Those people were accountants, some of them, right?

10   A.  Yes.

11   Q.  People like John Clark?

12   A.  Yes.

13   Q.  Right?

14         People like Rich Faur?

15   A.  Yes.

16   Q.  Now, sir, you communicated with Mr. Clark and Mr. Faur

17   fairly frequently when you were KIT digital's chief financial

18   officer in the 2010 to 2012 time period, right?

19   A.  Yes.

20   Q.  And would you also agree that Mr. Faur and Mr. Clark had

21   some level of a skill and experience in reviewing financial

22   books and records?

23   A.  Yes.

24   Q.  And yet even though Mr. Clark and Mr. Faur were accountants

25   who worked directly under you, you were able to conceal your

HBHQTUZ5                          Smyth - Cross

1    accounting frauds from accountants, right?

2    A.  Yes.

3    Q.  Sir, you took an oath to tell the truth here in court.  Do

4    you recall that?

5    A.  Yes.

6    Q.  You also recall testifying on your direct examination that

7    you signed certifications in connection with KIT digital's

8    annual financial reports, the 10-Ks.  Do you recall that?

9    A.  Yes.

10   Q.  Those certifications contain statements by you where you

11   say that you essentially are swearing that the representations

12   that you're making are truthful.  You recall that too, right?

13   A.  Yes.

14   Q.  And you lied in those certifications, didn't you?

15   A.  Yes.

16   Q.  So, you also have experience in lying even when you've

17   sworn to tell the truth, right?

18   A.  Yes.

19   Q.  Sir, even before you were arrested, you were concerned

20   about getting caught for the crimes that you've pled guilty to,

21   right?

22   A.  Yes.

23   Q.  To say that you were fearful about being caught for the

24   crimes that you committed would also be accurate, right?

25   A.  Yes.

HBHQTUZ5                          Smyth - Cross

1   Q.  You were fearful about being caught because you knew the

2   consequences would be severe, right?

3   A.  Yes.

4   Q.  And in September 2015, your fear became a reality because

5   that's when you were apprehended by authorities of the United

6   States while you were in Australia, right?

7   A.  Correct.

8   Q.  And you were arrested in Australia because you had been

9   indicted here in the United States, right?

10  A.  Correct.

11  Q.  And the U.S. Government sought what's called extradition;

12  in other words, to have you brought back from Australia to the

13  United States so you could be processed here.  Do you recall

14  that?

15  A.  Yes.

16  Q.  And when you were in Australia, it wasn't an instant

17  turnaround where you got to come immediately to Australia

18  (sic).  You actually stayed at some prisons when you were in

19  Australia.  Isn't that right?

20  A.  Correct.

21  Q.  In fact, you stayed at multiple prisons when you were in

22  Australia, didn't you?

23  A.  Yes.

24  Q.  You stayed in three prisons in Australia, right?

25  A.  Correct.

HBHQTUZ5                        Smyth - Cross

1    Q.  Three prisons around Melbourne, in that area, right?

2    A.  Correct.

3    Q.  All right.  And, in fact, you were incarcerated in

4    Australia for about two months.  Do you recall that?

5    A.  Yes.

6    Q.  Then, finally, you were extradited to the United States

7    late in 2015, right?

8    A.  Yes, the 5th of November.

9    Q.  OK.  Now, Australian prison, that was unpleasant, wasn't

10   it?

11   A.  Yes.

12   Q.  It's the first time you had ever been arrested, right?

13   A.  Correct.

14   Q.  You'd never been locked up before, right?

15   A.  Correct.

16   Q.  It was pretty scary for you, wasn't it?

17   A.  It was.

18   Q.  But then you got extradited to the United States, right?

19   A.  Yes.

20   Q.  When you first arrived in the United States, you were

21   booked in the Metropolitan Correctional Center, right?

22   A.  Correct.

23   Q.  You felt out of place?

24   A.  Yes.

25   Q.  Again, you were terrified?

HBHQTUZ5                        Smyth - Cross

1   A.  You could say that, yeah.

2   Q.  And you felt like you didn't belong there for the crimes

3   that you had committed, right?

4   A.  No, I don't think that's true.

5   Q.  Oh, so you felt at that point when you were locked up in

6   the United States that you deserved to be there?

7   A.  I'd done things wrong, yes.

8   Q.  Oh, OK, but you did ask to get released though?

9   A.  Yes.

10  Q.  OK.  So you felt that the conditions at the Metropolitan

11  Correctional Center were actually worse than the conditions of

12  confinement you had in Australia, right?

13  A.  Yes.

14  Q.  You were incarcerated at the MCC in New York for six

15  months.  Isn't that right?

16  A.  Correct.

17  Q.  And you desperately wanted to see your family again, right?

18  A.  Yes.

19  Q.  You desperately wanted to get back to Australia, right?

20  A.  I wanted to get back to Australia, yes.

21  Q.  Desperately?

22  A.  Well, yes.

23  Q.  And the government offered you the opportunity to reduce

24  your prison exposure if you would agree to cooperate in this

25  case, right?

HBHQTUZ5                        Smyth - Cross

1              MR. WILLIAMS:  Objection, your Honor.

2              THE COURT:  Grounds.

3              MR. WILLIAMS:  Foundation.

4              THE COURT:  Overruled.

5   A.   The government made no representation of an offer to me.

6   Q.   Sir, there was never a time at any point when you were

7   incarcerated where or after you were released from

8   incarceration --

9              THE COURT:  Well, which is it?

10             MR. McRAE:  We'll go with the latter, OK?

11  Q.   After your release, was there ever a point -- actually,

12  let's go back.  That's a good place.  Let's start at the

13  beginning.

14             While you were incarcerated, you had no communications

15  with the government about entering into a cooperating plea

16  agreement?

17  A.   Yes, I did.  Yes, I entered a cooperating plea agreement.

18  Yes.

19  Q.   And you understood that the cooperation part meant

20  cooperation in the prosecution of this case, right?

21  A.   I did.

22  Q.   You also understood that when you were arrested in

23  September of 2015, you were shown a copy of the indictment in

24  the case, weren't you?

25  A.   Yes.

HBHQTUZ5                          Smyth - Cross

1    Q.  Sir, the indictment at that point only charged two

2    defendants, right, you and Kaleil?

3    A.  Correct.

4    Q.  So using deductive reasoning, right, at that point you

5    understood since there were only two names on the indictment

6    that in order for you to cooperate, you would have to cooperate

7    against Kaleil because you couldn't cooperate against yourself,

8    right?

9              THE COURT:  Sustained.  It's a complicated question.

10   Q.  You understood at that point that in order for you to

11   cooperate, you would have to cooperate against Kaleil, correct?

12             MR. WILLIAMS:  Objection.  Lay a foundation.

13             THE COURT:  Sustained.

14   Q.  Sir, when you saw the indictment had only two names, let's

15   start with that.  You were just testifying momentarily that you

16   saw the indictment had two names on it, yours and Kaleil's?

17   A.  Yes.

18   Q.  You knew at that point that if you were going to cooperate

19   in the case, you'd have to cooperate against Kaleil, right?

20   A.  Yes.

21   Q.  OK.  Now, in May -- excuse me -- in March of 2016, you pled

22   guilty to all five counts charged against you in the

23   indictment, right?

24   A.  Yes.

25   Q.  On direct examination, you were asked about the crimes that

1   you committed.  Do you remember that?

2   A.  Yes.

3   Q.  But you responded by telling us what you were charged with.

4   Do you remember how you said that?  That you were charged with

5   conspiracy to commit security fraud and accounting fraud.  Do

6   you remember that?

7   A.  I don't really remember, no.

8   Q.  Let's parse that distinction.  You understand the

9   difference between saying that you're charged with and what you

10  did, right?

11  A.  Yes.

12  Q.  Because when you say what you're charged with, that's a way

13  of talking about what you are accused of without actually

14  admitting it, right?

15  A.  Yes.

16  Q.  But just to clarify, you weren't just charged with the

17  crimes that you described; you committed the crimes that you

18  described, right?

19  A.  I did.

20  Q.  OK.  Now, sir, you have not been sentenced for your crimes

21  yet, have you?

22  A.  No, I haven't.

23  Q.  And prior to being arrested in September 2015, you were

24  hoping that if you were arrested, that you would just be happy

25  to serve two years in prison.  Do you remember that?

HBHQTUZ5                          Smyth - Cross

1   A.  I don't remember that, no, sorry.

2   Q.  You know Gavin Campion, right?

3   A.  I do know Gavin Campion.

4   Q.  Gavin Campion has been to your house in Australia, hasn't

5   he?

6   A.  He has.

7   Q.  I should be specific.  He's been to one of your houses in

8   Australia.  Isn't that right?

9   A.  Yes.

10  Q.  Now, between 2015 -- 2012 after you left KIT digital and

11  2015 when you were arrested, you had a number of conversations

12  with Gavin Campion in Melbourne Australia.  Isn't that right?

13  A.  Yes.

14  Q.  One of the conversations that you had actually took place

15  at your house.  Isn't that right?

16  A.  I had conversations with Gavin at my house, yes.

17  Q.  Right.  And didn't you tell prosecutors in one of the

18  meetings that you had, which we'll get to, on June 3, 2016 --

19  excuse me, actually, didn't you tell Gavin Campion that if

20  essentially you got caught that you would be happy to serve two

21  years in prison?

22  A.  I don't remember that.  Sorry.

23          MR. McRAE:  Let me show you a document, not to publish

24  it, just for the witness to see it, for counsel and for the

25  Court and it's KIT Exhibit 4089.

HBHQTUZ5                          Smyth - Cross

Q.  Sir, I'm going to ask you to take a look at the second and
third page.  If you look in the -- it's not a full paragraph
but it's the top paragraph on the third page.  I just want you
to read that to yourself, and I just want you to tell me
whether this refreshes your recollection as to whether you ever
told Gavin Campion in that time period that I gave you that you
would settle for two years in jail?

A.  Yes.

Q.  OK.  Very well.  So you recall that now?

A.  I don't recall it, but --

        THE COURT:  So the answer is no.  He's going to ask
you questions.  He's going to show you documents and ask you
whether it refreshes your recollection or not.  So that's a
yes-or-no question.

        If it does refresh your recollection, you'll say,
"Yes, It refreshes my recollection."  If it doesn't refresh
your recollection, then you need to say no.

        So what's your answer?

        THE WITNESS:  No.

Q.  Great.  OK.  Thank you, sir.

        Sir, you did understand though that at the time that
you pled guilty in this case that as a result of the crimes
that you committed, you faced a maximum sentence of 85 years in
prison?

A.  Yes.

HBHQTUZ5                              Smyth - Cross

1   Q.  85 years in prison must have been a shocker for you, right?

2   A.  It was.

3   Q.  Now, in addition to this 85 years in prison time as a

4   maximum that you were facing, you also faced the threat of a

5   considerable fine.  Isn't that right?

6   A.  Correct.

7   Q.  In fact, you faced more than a $5 million fine as a result

8   of the crimes to which you pled guilty, right?

9   A.  Yes.

10  Q.  Now, sir, do you recall testifying on direct examination

11  that when you were lying and making false records about KIT

12  digital, you felt pressure?

13  A.  Yes.

14  Q.  So pressure made you lie from 2010 to 2012?

15  A.  The pressure didn't make me lie.

16  Q.  But pressure was part of what you were experiencing in 2010

17  to 2012 when you lied about KIT digital, right?

18  A.  I think the pressure was -- I was -- from memory, from my

19  evidence the pressure was near the end when in 2012 I said I

20  was under extreme pressure, yes.

21  Q.  Sir, didn't you say that you were working 18 hour days?

22  A.  Yes, but --

23  Q.  No, just a yes or no.

24  A.  Sorry.  Yes.

25  Q.  Is it your -- and it's your testimony that working an

HBHQTUZ5                         Smyth - Cross

1    18-hour day didn't impose any pressure on you at all?

2              THE COURT:  No.  No.  Sustained.  Sustained.  That

3    wasn't his testimony.

4              MR. McRAE:  That's why I'm asking I want to clarify.

5    That's precisely my point.

6    Q.  Working 18 hours a day did cause you to experience

7    pressure, didn't it?

8    A.  Not pressure, no.  I was -- I was not -- I was tired and it

9    was -- not pressure what I would say.

10   Q.  No pressure, OK.  So you would have to agree though, sir,

11   that from the moment that you found out about the prospect of

12   serving 85 years in prison, you felt pressure then though,

13   didn't you?

14   A.  I felt -- pressure is not the word I would use, no.

15   Q.  I want to understand this.  So the times that you were

16   sitting in prison in Australia and in New York, you certainly

17   felt pressure then, didn't you, sir?

18   A.  I -- I can't -- I don't know what pressure relates to that.

19   I didn't feel good about myself, and I didn't feel I was in a

20   good situation, yes.

21   Q.  You testified within the last 15 minutes that when you were

22   locked up in Australia for months, you had never been locked up

23   before, right?

24   A.  No.

25   Q.  And your testimony is that you spent two months in prison

HBHQTUZ5                          Smyth - Cross

1   where you had never been before, and you didn't feel pressure?

2   A.   I felt scared.

3   Q.   But no pressure?

4   A.   Well, I -- I'm struggling to find out what the pressure --

5   yeah, well, you could call it pressure, but -- yes.

6   Q.   Is trying to maintain survival pressure?

7   A.   Yeah, there it -- yes, OK.  If you put it that way, yes,

8   OK.

9   Q.   And, sir, you testified on direct examination that you also

10  spent time in prison in New York, right?

11  A.   Yes.

12  Q.   And you said just a few moments ago that the conditions at

13  the MCC in New York were worse than the conditions in

14  Australia, right?

15  A.   Yes.

16  Q.   And you spent twice as long in the New York prisons as you

17  did in the prisons in Australia, right?

18  A.   Yes.

19  Q.   And you felt pressure then too, didn't you, sir?

20  A.   Yes.

21  Q.   Yeah.  Every second that you contemplate the 85 years in

22  prison that you could be facing is an instance of pressure that

23  you feel.  True or false?

24  A.   True.

25  Q.   Now, sir, you also said that during your direct examination

1   that part of the reason you committed fraud at KIT digital was

2   to make money.  Do you remember that?

3   A.  Yes.

4   Q.  So while you were committing frauds from 2010 to 2012,

5   making money was a goal that you had, right?

6   A.  I wanted to make money, yes.

7   Q.  So from 2010 to 2012, you were willing to lie in order to

8   achieve something that was more important to you than telling

9   the truth, right?

10  A.  Yes.

11  Q.  And as you sit here, your desire to avoid jail is greater

12  than any desire that you ever had to make money, right?

13  A.  No, I wouldn't say that.

14  Q.  Really?

15  A.  Yeah.

16  Q.  So for all the money that you got from frauds when you were

17  committing them, your testimony is that you wouldn't trade

18  every cent of that right now if you didn't have to spend

19  another second in prison?

20  A.  I'd trade that money, yes.

21  Q.  Now, sir, when the prosecutors conditioned your plea

22  agreement on your willingness to cooperate, they also required

23  that you be truthful, right?

24  A.  Correct.

25  Q.  Right.  But by your own admission, being truthful is

1  something that you've struggled with for years prior to your

2  arrest, right?

3  A.  I had issues telling the truth at KIT digital, yes.

4  Q.  I'll adopt your parlance.  Issues.  OK.

5          Now, sir, you also recall on direct examination that

6  it was elicited from you that you had an understanding of what

7  would happen to you as far as your plea agreement if you lied,

8  right?

9  A.  Correct.

10  Q.  And do you recall testifying that it was your understanding

11  that if you lied in connection with your cooperation in this

12  case, that that would relieve the government of its

13  obligations?

14  A.  Yes.

15  Q.  But, sir -- and in saying that, that it would relieve the

16  government of its obligations, just to put that in the simplest

17  terms, if you lied in connection with your cooperation in the

18  case, the government would have no obligation to recommend a

19  sentence be in light of or commensurate with whatever

20  cooperation you gave.  You understand that, right?

21  A.  Yes.

22  Q.  But, sir, in your case at least, knowledge that you could

23  go to jail for lying, that doesn't prevent you from lying, does

24  it?

25          THE COURT:  Do you understand the question?

1           THE WITNESS:  No, I don't understand.

2     Q.  OK.  Let me put a finer point on it.  OK?

3           All the years that you were committing fraud when you

4     were at KIT digital before you were arrested, you knew that you

5     could go to jail for committing those crimes, right?

6     A.  Yes.

7     Q.  You didn't need a federal prosecutor to tell you if you

8     commit those crimes between 2010 and 2012, you could go to

9     jail.  You knew that, right?

10    A.  Yes.

11    Q.  You didn't need an FBI agent to tell you that either?

12    A.  No.

13    Q.  No one had to write down 85 years maximum sentence on a

14    sheet of paper for you to know something that you probably knew

15    while you were in high school, which is hopefully that if you

16    committed a crime, you could go to jail, right?

17    A.  Yes.

18          THE COURT:  Sustained.

19    Q.  Now, sir, even though you knew you could go to jail for

20    lying while you were committing those crimes at KIT digital,

21    that didn't stop you from lying about KIT digital's true

22    financial picture, right?

23    A.  Correct.

24    Q.  So, sir, is it fair to say then that from 2010 to 2012,

25    your desire to commit fraud was greater than your fear of going

1    to jail?

2    A.  Yes.

3    Q.  And from 2010 to 2012, your belief that you were a good

4    liar was stronger than your fear that you might go to jail,

5    right?

6    A.  You could say that, yes.

7    Q.  And, sir, your belief that you're a good liar after years

8    of conning people is still stronger than your fear that you

9    might go to jail now, isn't it?

10   A.  No.

11   Q.  OK.  Now, in exchange for your testimony against Kaleil in

12   this criminal case, the government provided you with a plea

13   agreement, right?

14   A.  Yes.

15   Q.  And in that plea agreement, it's your understanding that if

16   certain conditions are met by you, that the prosecutors will

17   offer to recommend a reduced sentence, right?

18   A.  I believe they're going to give the letter to Judge

19   Gardephe on the details of my cooperation, and it's up to the

20   Judge what he would do.

21   Q.  But when you say "the letter," sir, the letter that you're

22   talking about is a recommendation of a reduced sentence if it's

23   deemed that you have substantially assisted the prosecution in

24   this case?

25            THE COURT:  It's too complicated.  You've got to break

1    it down.

2            MR. McRAE:  Certainly.

3    Q.  Sir, are you familiar with what's known as a 5K letter?

4    A.  I've heard of the letter, yes.

5    Q.  And you know that in order to get -- let's to make sure

6    that we are communicating about the same thing.

7            The 5K letter is the letter referred to in your plea

8    agreement as the potential, let's say, recommendation of a

9    reduced sentence reflecting your cooperation, correct?

10   A.  I believe it's a letter that -- my understanding is that it

11   is a letter that details the extent of my cooperation which

12   will be addressed to Judge Gardephe.

13   Q.  You know that in order to get the prosecutor's 5K letter,

14   it may not be enough for you to just tell everything that you

15   know in this case, right?

16   A.  Can you clarify?

17   Q.  Sure.  You understand that you will not receive a 5K letter

18   unless the prosecutors have concluded that you provided them

19   with substantial assistance in their prosecution against

20   Kaleil, correct?

21   A.  I don't know that that sort of -- I'm aware that I need to

22   give all -- speak truthfully, give all the evidence I have and

23   help them in telling them about the crimes I've committed with

24   other people.

25   Q.  And you also understand that it means that if your

1    information is not substantially useful in their eyes, you will

2    not get that 5K letter, right?

3    A.   I -- I would have thought it would have -- to get the

4    cooperation agreement I -- I spoke -- we spoke to the

5    government, so I mentioned that they base the cooperation

6    agreement on information I was supplying.

7    Q.   Yeah, I want to -- let me ask you a specific question here,

8    sir.  Do you understand the words "substantial assistance"

9    being part of the language in your plea agreement?

10   A.   I don't know -- I can't remember substantial was in the

11   plea agreement, but I assume that you're right.

12           MR. McRAE:  Let me show you Government Exhibit 3516-18

13   which has been admitted.

14           Sir, why don't we turn to page 3.  Why don't we go to

15   the third full paragraph.  Actually, let's go to the second

16   full paragraph, my apologies, starting with the sentence that

17   begins "in addition."  It is in the middle of the paragraph and

18   you can go over to the right and it starts off "in addition."

19   Thank you.

20   Q.   Sir, I just want to read this out loud.

21           "In addition, if this Office determines that the

22   defendant has provided substantial assistance in an

23   investigation or prosecution, and if he has fully complied with

24   the understandings specified in this agreement, this office

25   will file a motion, pursuant to Section 5K1.1 of the U.S.

HBHQTUZ5                        Smyth - Cross

 1  Sentencing Guidelines, requesting the Court to sentence the

 2  defendant in light of the factors set forth in Section

 3  5K1.1(a)(1)-(5).

 4           Sir, my question to you is, you've read this language

 5  before?

 6  A.  Yes.

 7  Q.  And you do understand that the prosecutors, and the

 8  prosecutors alone, decide whether you've given substantial

 9  assistance, right?

10  A.  Yes.

11  Q.  And, sir, you're hoping that as a result of your testifying

12  against Kaleil, that you don't have to spend another moment in

13  jail, right?

14  A.  I'm hoping with everything I've done in giving them

15  evidence, yes, I'd like not to spend time in jail, yes.

16  Q.  And you're highly motivated to show the prosecutors your

17  willingness to provide substantial assistance by testifying

18  against Kaleil, correct?

19  A.  I'm going to do everything I can to tell the truth and give

20  them all the evidence I can, yes.

21  Q.  You're going to do everything humanly possible.  Isn't that

22  right?

23  A.  No.

24  Q.  Sir, you didn't have to guess at the information the

25  government wanted from you, right?

HBHQTUZ5                          Smyth – Cross

1   A.  No.

2   Q.  In numerous meetings before you testified in this case, the

3   prosecutors told you all the areas that they wanted you to

4   address in your testimony, right?

5   A.  Could you repeat that question?

6   Q.  Certainly.  In the numerous meetings that you had with

7   prosecutors before you came in and testified on direct

8   examination, the prosecutors told you all the areas that they

9   wanted you to address in your testimony, correct?

10  A.  They asked me questions about my –– what was my evidence,

11  yes.

12  Q.  And you did meet with the prosecutors and other law

13  enforcement at least 29 times since you were arrested

14  September 2015, right?

15  A.  I believe that's correct, yes.

16  Q.  And the 29 meetings that you talked about on direct

17  examination didn't include discussions that you had with

18  Mr. Williams or other prosecutors during breaks on your direct

19  examination, right?

20          MR. WILLIAMS:  Objection.  Confusing.

21          THE COURT:  Sustained.  Sustained.

22  Q.  So, sir, even after all of these meetings –– let's talk

23  about who attended the meetings.  Let's talk about the

24  prosecutors first.

25          Mr. Williams was one of the prosecutors at those 29

HBHQTUZ5                        Smyth - Cross

1    meetings or so, correct?

2    A.  Yes.

3    Q.  AUSA Andrea Griswold was also at those meetings, some of

4    them at least?

5    A.  Some of the meetings, yes.

6    Q.  I used an acronym.  I said AUSA.  It's Assistant United

7    States Attorney.  Assistant United States Attorney Joshua

8    Naftalis was also at some of the meetings you had with the

9    prosecutors, correct?

10   A.  Yes.

11   Q.  You also had meetings attended by some prosecutors who are

12   not even present in the courtroom, like Ed Kim, correct?

13   A.  I can't remember that name.

14   Q.  You also met with FBI agents in a number of these meetings

15   that you recalled with the prosecutors, correct?

16   A.  Yes.

17   Q.  As well as agents of the United States Postal Service

18   Inspection, correct?

19   A.  Yes.

20   Q.  You recall meeting with a Postal Inspector Melissa Atkin?

21   A.  Yes.

22   Q.  In your meetings with prosecutors, there were also times

23   when attorneys from the Securities and Exchange Commission were

24   present, right?

25   A.  Correct.

1  Q.  Now, sir, just last month you met with the prosecutors

2  three times a week, right?

3  A.  I don't know the exact dates, but, yes, I met regularly.

4  Q.  Do you recall testifying on direct examination in response

5  to a question about how many times you'd met with the

6  government in the last month or so, it being three times a

7  week?

8          MR. WILLIAMS:  Objection.  I didn't ask the question

9  like that.

10  A.  No, I don't remember that.

11          MR. McRAE:  I'll move on, your Honor.

12  Q.  Sir, each of the 29 times that you met with the government

13  approximated that those meetings were three to four hours each.

14  Do you recall that?

15  A.  Yes.

16  Q.  So help me out here, Mr. Smyth.  If you had 29 meetings

17  that were three hours each, how many hours would that be?

18  A.  Approximately 90.

19  Q.  Right.  And if you had 29 meetings at four hours each, that

20  would be how many?

21  A.  Approximately 120 hours.

22  Q.  About 136, actually, right?

23  A.  Sorry?

24  Q.  Do you remember?

25  A.  Or it's 120.

HBHQTUZ5                         Smyth - Cross

```
 1   Q.  I'm sorry.  What did you say?
 2   A.  Four hours.  You said four hours meeting by 29 meetings,
 3   that's 120.
 4   Q.  Right.  Right, if you do 29 times four, what do you have
 5   there?
 6   A.  126, yeah.
 7   Q.  Thank you.  I misspoke.  I meant 126; I said 136.
 8          In prior meetings that you had with the prosecutors
 9   then, we're talking about a range of 87 hours to approximately
10   126 hours of meetings, right?
11   A.  Yes.
12   Q.  There were questions that the prosecutors repeated to you
13   again and again in various meetings that you had with them,
14   right?
15   A.  Yes.
16   Q.  And after the prosecutors posed questions, you would give
17   answers, right?
18   A.  Yes.
19   Q.  And the prosecutors would sometimes comment on your
20   answers, right?
21   A.  Yes.
22   Q.  They gave feedback on your answers, right?
23   A.  Yes.
24   Q.  You would discuss your answers with the prosecutors in
25   meetings, right?
```

1    A.  Yes.

2    Q.  And also there were times that when you would provide

3    answers, that the prosecutors would tell you when they thought

4    you were wrong, right?

5    A.  Could you repeat that?  Sorry.

6    Q.  There were also times when you were discussing topics with

7    the prosecutors where they told you that they thought that some

8    of your responses were wrong, right?

9    A.  I don't remember that, no.

10   Q.  So it's your understanding that in approximately 87 to 126

11   hours of meeting, there wasn't a single instance where you gave

12   a response to a question where the prosecutor may have said to

13   you that they thought your answer was incorrect?

14   A.  It's possible.  I don't remember any direct instance.

15   Q.  Now, sir, isn't it a fact that the testimony that you gave

16   on direct examination was rehearsed testimony?

17   A.  I was aware of the questions that -- a lot of the questions

18   I would be asked, yes.

19   Q.  Would you agree that there's a difference between being

20   aware of a question and an answer and rehearsing it repeatedly

21   through meetings so that your testimony is rehearsed?

22   A.  Yes, OK.

23   Q.  Now, let's just go over a couple of examples, sir.  You

24   testified over two days that Kaleil conspired with you.  Do you

25   recall that?

1    A.  Yes.

2    Q.  You also testified on direct examination that you lied to

3    investors all the time during the two and a half years that you

4    were committing fraud, right?

5    A.  Yes.

6    Q.  And yet, sir, you also testified that Kaleil was one of the

7    largest investors in KIT digital during the same period, right?

8    A.  Yes.

9    Q.  So your testimony about lying to investors all the time, so

10   that was just rehearsed testimony you gave because you thought

11   it would please the prosecutors, right?

12           MR. WILLIAMS:  Objection to all the characterizations.

13           THE COURT:  Sustained.

14   Q.  Sir, you actually learned some of your answers by heart in

15   these preparation sessions.  Isn't that right?

16   A.  I remembered some answers, yes.

17   Q.  Sir, do you remember that you were shown three photographs

18   during your direct examination of three different individuals?

19   A.  Yes.

20   Q.  Do you remember that you were asked to identify each one of

21   those individuals?

22   A.  Yes.

23   Q.  Do you recall being asked:  How do you recognize the

24   individual in the photograph?

25   A.  Yes.

1    Q.  Do you recall that you gave the same answer three times,

2    which was "I've met the person many times and that's a

3    photograph of that person"?

4    A.  Yes.

5    Q.  The reason that you gave the identical answers in response

6    to those questions is because that was rehearsed testimony.

7    True or false.

8    A.  No, it's because there were photographs and it was the same

9    answer.

10   Q.  Sir, your rehearsals with the prosecutors is also the --

11            THE COURT:  Sustained.

12            MR. WILLIAMS:   Objection.

13   Q.  Your preparation sessions with the prosecutors is also the

14   reason you keep saying "we" so many times in response to

15   questions about what you did, right?

16            THE COURT:  Sustained.

17   Q.  Sir, in some of your meetings, the prosecutor showed you

18   documents, right?

19   A.  Yes.

20   Q.  And you recall that you were asked whether you had seen all

21   the evidence in the case, right?

22   A.  Yes.

23   Q.  And you said no, right?

24   A.  Correct.

25   Q.  Now, it's your understanding that at a minimum, there are

1    other witnesses testifying in this case other than you, right?

2    A.  Correct.

3    Q.  So it wouldn't surprise you that you haven't seen evidence

4    that has nothing to do with you, right?

5    A.  Correct.

6    Q.  Before you testified in court on direct examination, it was

7    your understanding that the prosecutors did show you all the

8    evidence in this case that they wanted you to see.  Correct?

9              MR. WILLIAMS:  Objection.

10             THE COURT:  Sustained.

11   Q.  Sir, the prosecution during your direct examination -- let

12   me rephrase the question.

13             There wasn't a single document that you were shown

14   during your direct examination that you had not previously seen

15   in preparation sessions with the prosecutors, correct?

16   A.  Correct.

17   Q.  And in your dozens of meetings with the prosecutors, they

18   also tried to refresh your memory of events with documents?

19   A.  I would -- yes.  I looked at documents, yes.

20   Q.  And even after anywhere from 87 to 126 hours of meeting,

21   there were still instances that you couldn't --

22             THE COURT:  I'm sorry, I'm confused about the 126.  Is

23   that 29 times four?

24             MR. WEITZMAN:  116.

25             MR. McRAE:  I got three different numbers here.  I'm

HBHQTUZ5                          Smyth - Cross

 1    sorry, 116.

 2              THE COURT:  There's a reason why we went to law

 3    school.

 4              MR. McRAE:  Amen to that.

 5              THE COURT:  Go ahead, sir.

 6              MR. McRAE:  Thank you.

 7    Q.  I don't want to over -- I don't want to inflate it.  It was

 8    116.  OK, I will just say over a hundred.

 9              Sir, in the 87 to over a hundred hours that you met

10    with the prosecutors, notwithstanding all of those meetings,

11    there were still times that you couldn't recall the specific

12    dates of meetings within even a year, like the best that you

13    could do was like 2011 in some instances, right?

14              MR. WILLIAMS:  Objection.  Break that down.

15              THE COURT:  Sustained.

16    Q.  Sir, weren't there instances where the best that you could

17    do to recall when a communication occurred is to say the year

18    that it occurred without knowing the day or the month?

19              MR. WILLIAMS:  Objection.  Unclear if he is asking him

20    about his testimony on direct or in preparation sessions with

21    the government.

22    Q.  I'm asking about your testimony on direct.

23              THE COURT:  You're asking him about his testimony on

24    direct whether there were times that he was only able to date

25    it by year?

1              MR. McRAE:  Correct.

2              THE COURT:  You can answer that.

3   A.  Is there a specific -- I can't remember the specific

4   examples.  I may have said 2011, but I may have -- maybe, yes.

5   I don't know.

6   Q.  And, sir, isn't it also true that in your preparation

7   sessions with the prosecutors, you were shown documents that

8   you had no knowledge about?

9   A.  Yes.

10  Q.  In addition to attempting to prepare you by meeting with

11  you upwards to more than a hundred hours, there were instances

12  where the prosecutors were actually giving you new information,

13  right?

14             MR. WILLIAMS:  Objection.  Specificity, please.

15             MR. McRAE:  I think the witness knows what he didn't

16  know before and what was supplied to him.

17             THE COURT:  I'll sustain the objection.  New

18  information is incredibly broad.

19  Q.  Let's telescope it.

20             Isn't it true, sir, that in these numerous meetings

21  that you had with prosecutors there were instances when they

22  supplied you with new information; in other words, information

23  that you didn't possess prior to those meetings about

24  allegations at KIT digital?

25  A.  I --

1              MR. WILLIAMS:  Objection.

2              THE COURT:  I'm sorry?

3              MR. WILLIAMS:  Same objection, your Honor.

4              THE COURT:  About allegations at KIT digital?  I don't

5       understand what that means.

6              MR. McRAE:  Well, the allegations being in the

7       charging instrument.

8              THE COURT:  Could you rephrase the question, please?

9              MR. McRAE:  Yes.

10      BY MR. McRAE:

11      Q.  Sir, isn't it true that the prosecutors supplied you in

12      some instances with information that you did not have before

13      you met with them?

14      A.  I can't recall what that would mean.

15      Q.  Do you recall just a couple of days ago the prosecutors

16      showing you a December 31, 2008 agreement that involved Maiden

17      Capital?

18      A.  Yes.

19      Q.  You testified that before the prosecutors showed you that

20      document relatively recently.  You had never seen it before,

21      right?

22      A.  Correct.

23      Q.  That would be an example, sir, wouldn't it, of the

24      prosecutors giving you new information that you didn't have

25      before, right?

HBHQTUZ5                        Smyth - Cross

1    A.  I hadn't seen that document, no.

2    Q.  Now, sir, you don't know yet whether you're going to get

3    the 5K1 letter, right?

4    A.  Correct.

5    Q.  Now, you do know that you have already received numerous

6    benefits in exchange for your agreement to cooperate even

7    before you testified on direct examination, right?

8    A.  Can you be specific?

9    Q.  Let's start with the first one.  On May 4, 2016, you were

10   released from jail, right?

11   A.  I was.

12   Q.  Oh, yeah.

13            MR. McRAE:  Let's take a look at KIT Exhibit 4026.

14   Just for the witness, not to be published.

15   Q.  Sir, I just want you to take a look at this document.  In

16   particular, I want you to take a look at the body of it.  It's

17   brief.  When you're done, you can take a look at the date in

18   the lower left-hand corner.

19   A.  Yep.

20            MR. McRAE:  Your Honor, I'd like to admit KIT Exhibit

21   4026.

22            MR. WILLIAMS:  Object to relevance.

23            MR. McRAE:  Your Honor, it's directly relevant.

24            THE COURT:  Well, you can examine him about it and

25   we'll see where it goes.

1              MR. McRAE:  Thank you, your Honor.

2    BY MR. McRAE:

3    Q.  Mr. Smyth, you were released from prison on May 4, 2016,

4    correct?

5    A.  Yes.

6    Q.  You were released from prison after you agreed to cooperate

7    against Kaleil, right?

8    A.  After I had a cooperation agreement, yes.

9    Q.  Right.  And, sir, you would agree that being released from

10   jail, that that was a benefit to you, wasn't it?

11   A.  Yes.

12   Q.  Now, sir, that release from jail is not disclosed in your

13   plea agreement, is it?

14   A.  Sorry.  Can you explain the plea agreement?

15   Q.  In other words, sir, your release from jail is a benefit

16   that you received before you even testified on direct

17   examination that is not disclosed in your plea agreement?

18   A.  Right.

19             MR. WILLIAMS:  Objection, your Honor, the plea

20   agreement --

21             THE COURT:  Sustained.  It's a compound question.

22   Q.  Sir, your release from jail is not disclosed in your plea

23   agreement, is it?

24   A.  No.

25   Q.  Thank you.

HBHQTUZ5                          Smyth - Cross

1          MR. McRAE:  Your Honor, I note that it is, at least by

2    my watch, perhaps 2:30.

3          THE COURT:  Ladies and gentlemen, we will adjourn for

4    the day.  As you know, we are not sitting next week.  So Happy

5    Thanksgiving.

6          Don't discuss the case with anybody.  Keep an open

7    mind.  There's more evidence.

8          We will resume on the following Monday at 9:30.  Have

9    a pleasant holiday.  Thank you all very much.

10          (Jury excused)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HBH9TUZ6

1          (Jury not present)

2          THE COURT:  You may step down, Mr. Smyth.

3          (Witness excused)

4          MR. McRAE:  Your Honor, I don't know we never

5     discussed rules about walking in the well without permission.

6          THE COURT:  I don't like lawyers to walk around

7     because I think it's a distraction.

8          MR. McRAE:  Yes.

9          THE COURT:  So if you wouldn't mind I would ask you to

10    stay at the podium.

11         MR. McRAE:  Right.

12         THE COURT:  When you're questioning the witness.

13         MR. McRAE:  Perfectly.  But it's okay, it's less

14    circuitous for me to go this way to get back when the jury is

15    out.

16         THE COURT:  Oh, no.  Of course.  Absolutely.

17         Please be seated.

18         So, we have the Lyter Daubert hearing on Monday.

19         MR. WEITZMAN:  Yes, your Honor.  And I have materials

20    for your Honor and the government.

21         THE COURT:  And I think I told you we would start at

22    9:30.  I think my preference would actually be 10.

23         MR. WEITZMAN:  That's acceptable.

24         THE COURT:  So we will proceed at 10 a.m. on Monday

25    with a Daubert hearing concerning Mr. Lyter.

HBH9TUZ6

1          And Mr. Weitzman are you going to give me now what

2     you've provided to the government.

3          MR. WEITZMAN:  I have a copy for you and for the

4     government, your Honor, if I can just explain one thing.

5          There were many exchanges we had with the government

6     where, as you know, they've said that they can't understand

7     anything we've provided.  It's been our position, as you also

8     know, your Honor, that we don't believe we're obligated to

9     produce a report under the rules; that we produced the summary

10    of his testimony, anticipated testimony and the data.

11         As a result of the government's continued statements

12    that they do not understand what he's done, we produced last

13    night -- we asked Dr. Lyter to finalize a report.  And we

14    produced it to the government last night.  And it's within that

15    binder.  It was signed just yesterday, your Honor.  So we

16    produced it as soon as it was signed.  It's what's marked as

17    KIT Exhibit 10,004.  That will contain not just the report,

18    which was a summary of his anticipated testimony, but all of

19    the data that we previously provided to the government.  There

20    is nothing new in the report that had not previously been

21    disclosed to the government.  I want to be clear about that.

22    But we have provided it basically like a report that one would

23    see in a civil case for the government's benefit as a result of

24    their statements.

25         THE COURT:  Now, I know there was an issue at some

HBH9TUZ6

1    point about whether the defense was going to provide merely the

2    tests that Dr. Lyter was going to be testifying about but not

3    related tests that he performed.  Has that issue been resolved?

4         MR. WEITZMAN:  It has.  In light of your Honor's

5    ruling, of course, we've produced all of the data that has been

6    generated.  In addition to that, the government asked for

7    additional data that Dr. Lyter had to go to his lab in North

8    Carolina to generate specific to the government's request.  So

9    it's not even data that we ever intended to rely on or that we

10   thought -- or that ever was created as part of his analysis.

11   But we've been trying to give the government all the data that

12   they're requesting irrespective of the federal rules.

13        And in addition I would say the government also

14   requested that we produce all of Dr. Lyter's prior expert

15   reports and expert testimony on this very same testing.  You'll

16   recall, your Honor, that, as part of the briefing, they alleged

17   that Dr. Lyter has no experience or isn't known to have

18   experience doing this type of testing.  We've rebutted that

19   with I think four or five cases where he's testified on this

20   very issue.  The government insisted that we produce a copy of

21   his testimony.  I don't think the criminal rules or, frankly,

22   the civil rules require us to produce that, but we did produce

23   that this week to the government, once we got permission from

24   Dr. Lyter, and Dr. Lyter obtained permission from his other

25   clients to release those prior reports.

HBH9TUZ6

1          THE COURT:  All right.  Other things we should

2    discuss?

3          MR. NAFTALIS:  No, your Honor.  I don't want to

4    belabor but the point is that it's been months.  We were asking

5    for things that should have been disclosed.  And now we get

6    them.  So we think this just reveals that everything was held

7    back.  We don't want to belabor it, but this was sort of the

8    whole point that we were looking for the bases and reasons.  We

9    were asking for tests that our expert says if you do this right

10   there should be all these test results.  They weren't there.

11   So we were forced to go through an interrogatory process where

12   we were literally making them do their work.  I don't think

13   this means they've satisfied their burden.  I think this means

14   they finally did their job on November 17.

15          Also for Monday, we're just wondering how long should

16   we budget.  We're looking obviously to Mr. Weitzman.

17          THE COURT:  Mr. Weitzman, how long do you think your

18   direct will be?

19          MR. WEITZMAN:  To be safe, two hours.

20          THE COURT:  Two hours?

21          MR. WEITZMAN:  Yes.  Your Honor, do you mind?  I

22   apologize.  I just want the record to be clear.

23          Nothing we produced yesterday was new data.  It was

24   data they have long been provided.  So it's just not accurate

25   to say that we've held anything back.  The report was not --

HBH9TUZ6

was not created, it was not signed.  It was not obligated to be

produced.  Once we got a report, we produced it.  I just want

the record to be perfectly clear on this because I think it's

not accurate.

MR. NAFTALIS:  Your Honor, I don't want to belabor

this.  I know all of us can't stand the ink expert, it's too

much at this point.  The point is we were asking for the bases

and reasons since August and the answer we got consistently,

including on Wednesday, is we don't owe you anything.  They

even said that after your Honor issued an opinion inviting them

to offer bases and reasons and now we get it.  I really don't

want to belabor it.  The record speaks for itself.  They

refused to turn anything over until mid trial.  There are new

things in this document.  So this is not --

THE COURT:  You mean in the report.

MR. NAFTALIS:  In the report which they claim they

don't have to give us, there's new stuff in it.  So rolling

expert productions about things that were incomplete is not how

your Honor's ruling from August was meant to be, which is the

government has to keep shaking the tree.  It's supposed to come

out in good faith so that we can interpret it.  We had to hire

someone to figure it out and teach their expert what they

should have done so we could figure out what they did.

And to be clear, as a result of our shaking the tree,

Dr. Lyter has now withdrawn one of his opinions.  So now we're

down to allegedly eight documents are fake as opposed to 21 or

whatever -- as opposed to the nine initially.

        And we also wanted to just clarify:  Are they going to

argue that based on the eight down from nine all the books are

fake?  Because we're sort of trying to figure out what the

relevance of his testimony is to the case because we think

that's a real bootstrap to say I tested a couple of pages and

now I'm going to argue -- let's assume it's even admissible,

but if that's the position they're taking.

        THE COURT:  Just so I'm clear, so you want to know

from the defense whether they're arguing that the notebooks in

their entirety or phony or just the eight pages?

        MR. NAFTALIS:  Dr. Lyter has not said in his report

that all the notebooks are fake.  They sort of picked out 21.

He could only reach conclusions apparently that less than --

about a third of them were purportedly like manufactured.

We're obviously going to talk about I guess the third of them

based on whatever he did.

        But the question is:  Assuming it comes in, which we

don't think it's honestly admissible, are they trying to say

eight of five hundred pages equals everything is fake?

        We just don't know what the relevance of this is, or

are they challenging specific pages?

        THE COURT:  Mr. Weitzman, are you going to be

contending that the notebooks in their entirety are fake,

HBH9TUZ6

1    whatever that means?

2         MR. WEITZMAN:  We've never suggested that so I'm not

3    sure.

4         THE COURT:  So you're contending that there's certain

5    pages, and Mr. Naftalis referred to eight documents.  I don't

6    know whether that's eight pages, or is that what you mean when

7    you say eight documents?

8         MR. NAFTALIS:  They've identified pages but they

9    haven't told us what on the page is fake.  So, again, we're

10   dancing around here.  We've identified -- they give you a Bates

11   number and say this document or this page is inconsistent with

12   creation date to a certain date.

13        So I don't know if they're saying everything on the

14   page is manufactured or the doodle in the corner.

15        I mean they're going to say that there are a bunch of

16   holes punched in the document, go look at the holes punched.

17   But we don't know which ones -- what they're really saying.

18        MR. WEITZMAN:  Your Honor, I'm sorry.  I find some of

19   these.

20        THE COURT:  Don't tell me what you think of it.  Just

21   tell me whether you're going to be arguing that whole pages are

22   manufactured or whether your theory is that little additions

23   were made.

24        MR. WEITZMAN:  What we're going to say is that the ink

25   that was tested on those pages was placed within the two years

HBH9TUZ6

1    prior to the ink testing date.  We're not in a position to say

2    whether entire pages are fabricated.  The point being that

3    the --

4          THE COURT:  So you picked and -- I guess did you -- so

5    the defense picked and chose what ink to -- what ink excerpts

6    to test?  Is that what happened?

7          MR. WEITZMAN:  So I think in some instances, in most

8    instances, he reviewed the books and chose what to test and he

9    was trying to do almost like a random sample of pages so that

10   he can get a sampling of them.

11         There are some pages that we had deep concerns about

12   because we didn't think it was -- some of the entries were

13   logical that someone who is a coconspirator would write some of

14   the things he wrote.  So there were some pages that he was

15   directed to.  But the point being if the guy on even one

16   occasion wrote in his notebook in an effort to obtain a

17   cooperation agreement, a false entry that is not

18   contemporaneous when he's testified, will testify, that it's

19   all contemporaneous, the jury is entitled to infer that he's

20   trying to fabricate evidence against our client.  We don't have

21   to suggest --

22         THE COURT:  I don't want to hear anymore.

23         Are any of the pages at issue, have they been

24   introduced?  Because there were very few pages of the notebooks

25   that were actually introduced.

HBH9TUZ6

1              Did Dr. Lyter test any of those page that were

2       actually introduced into evidence?

3              MR. WEITZMAN:  The answer is yes.  We didn't know

4       which pages they were going to introduce when the testing was

5       done because the testing had to be done back in 2016.

6              THE COURT:  Just asking -- as you would say, it's a

7       yes-or-no question.

8              MR. WEITZMAN:  It is a yes or no.

9              THE COURT:  But you can't answer it yes or no?

10             MR. WEITZMAN:  I said yes.  I said yes.  The page with

11      the chart, the round-tripping chart where he says Kaleil said

12      that's a great idea.

13             THE COURT:  But that wasn't introduced, sir.

14             MR. WEITZMAN:  The page was.

15             THE COURT:  But that entry was not introduced.

16             MR. WEITZMAN:  But the page -- the page with the

17      round-tripping chart was the one -- the round-tripping chart

18      ink.

19             THE COURT:  The chart was introduced.

20             MR. WEITZMAN:  And that was tested.  And it came back

21      as having been created in the two years prior to having been

22      turned over to the government.  So our position is that's

23      highly relevant, obviously, to a piece of evidence that's

24      admitted by the government.

25             THE COURT:  Now does the government have an expert?

HBH9TUZ6

1    And if so, are we going to hear from that person on Monday?

2           MR. NAFTALIS:  We have Mr. LaPorte who also works for

3    the Department of Justice.  He will be here.  We haven't

4    decided.

5           THE COURT:  You haven't decided whether to call him or

6    not?

7           MR. NAFTALIS:  We just got this in the middle of the

8    night.

9           THE COURT:  I understand.

10          MR. NAFTALIS:  I would say for time planning there's a

11   good likelihood we'll have him explain why this is wrong, but I

12   haven't spoken to him about what's in here yet.

13         THE COURT:  So for my planning purpose should I be

14   thinking of something in the vicinity of four hours or more?

15         MR. NAFTALIS:  I hope -- yes, and I hope we can keep

16   it short.  But I think for cross and for a so-called other

17   expert, yes.

18         THE COURT:  Okay.

19         Other matters we should talk about?

20         MR. JACKSON:  No.  Have a happy Thanksgiving, your

21   Honor.

22         THE COURT:  Same to you.

23         Mr. Weitzman, anything else?

24         MR. WEITZMAN:  No, your Honor.  Thank you very much.

25         THE COURT:  Anything else from the government?

HBH9TUZ6

1               MR. WILLIAMS:  No, your Honor.  Happy Thanksgiving.

2               THE COURT:  Unfortunately we'll be spending more time

3       together before Thanksgiving, but I'll see you on Monday.  Have

4       a pleasant weekend.

5               (Adjourned to November 20, 2017 at 10 a.m.)

```
 1                     INDEX OF EXAMINATION

 2    Examination of:                        Page

 3     ROBIN SMYTH

 4    Direct By Mr. Williams . . . . 2614

 5     RICHARD ALAN INGRASSIA

 6    Direct By Mr. Naftalis . . . . 2630

 7    Cross By Mr. Weitzman  . . . . 2661

 8    Cross By Mr. Weitzman  . . . . 2678

 9    Cross By Mr. Jackson . . . . . 2726

10    Redirect By Mr. Naftalis . . . 2732

11     ROBIN SMYTH

12    Cross By Mr. McRae . . . . . . 2740

13                    GOVERNMENT EXHIBITS

14    Exhibit No.                        Received

15     2174-A, 2180-A, 2184-A through 2184-C  . . .2617

16     3301A, 3304A, and 3301B  . . . . . . . . .2646

17                    DEFENDANT EXHIBITS

18    Exhibit No.                        Received

19     KIT 3512   . . . . . . . . . . . . . . .2665

20     KIT 3514   . . . . . . . . . . . . . . .2674

21     KIT 3521   . . . . . . . . . . . . . . .2718

22     KIT 3524   . . . . . . . . . . . . . . .2698

23     KIT 3527   . . . . . . . . . . . . . . .2724

24     KIT 3546   . . . . . . . . . . . . . . .2716

25     KIT 3548   . . . . . . . . . . . . . . .2699
```