HCKTTUZ1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                              15 Cr. 536 (PGG)

KALEIL ISAZA TUZMAN, et al.,

                                  Trial
           Defendants.
------------------------------x
                                  New York, N.Y.
                                  December 20, 2017
                                  9:40 a.m.
Before:

                  HON. PAUL G. GARDEPHE,

                                  District Judge
                                -and a jury-
                      APPEARANCES

JOON H. KIM
     Acting United States Attorney for
     the Southern District of New York
A. DAMIAN WILLIAMS
ANDREA M. GRISWOLD
JOSHUA A. NAFTALIS
     Assistant United States Attorneys

GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Defendant Isaza Tuzman
AVI WEITZMAN
MARCELLUS A. McRAE

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant Amanat
RANDALL W. JACKSON

HCKTTUZ1

1              (In open court, jury not present)

2              THE COURT:  So at some point in the early morning

3    hours I got another letter -- obviously I didn't get the

4    letter, I wasn't here when the letter arrived, but Mr. Jackson

5    did you send something in the early morning about this issue

6    about Government Exhibit 610.

7              MR. JACKSON:  Yes.

8              THE COURT:  What time?

9              MR. JACKSON:  3:00 a.m.  I didn't get the government's

10   letter until after 6:00 p.m. and I was preparing for today's

11   testimony, so I wasn't able to get to it.  I tried to complete

12   it, but I wasn't able to, your Honor.  I'm sorry.

13             THE COURT:  So there's a number of things in

14   Mr. Jackson's letter.  One of the points he makes is that he's

15   not going to stipulate as to the wires that are set forth in

16   Government Exhibit 610.  Just for the record, the letter is

17   docket number 624, footnote 6, Mr. Jackson says he's not going

18   to stipulate as to the wire transfers set forth in Government

19   Exhibit 610.

20             So how does the government intend to deal with that

21   issue?

22             MR. WILLIAMS:  Your Honor, we have attempted to reach

23   out to Bank of America and see if they could have a witness

24   available to be able to authenticate the document and explain

25   what it is.

HCKTTUZ1

1          THE COURT:  All right.  And have you heard anything

2     back?  The proof is going close today.

3          MR. WILLIAMS:  We understand, your Honor.  We

4     understand the urgency.

5          THE COURT:  Now is it true that you marked this

6     exhibit prior to trial?

7          MR. WILLIAMS:  Yes, your Honor, it is.

8          THE COURT:  Given it was marked as a trial exhibit,

9     why didn't you introduce it in your direct case?

10          MR. WILLIAMS:  Your Honor, we have been going over

11     that exact question among the team.  It appears to have been

12     something that we didn't think was necessary, and there is

13     sufficient evidence in the record otherwise of wires and the

14     location of the wires back and forth.  Government Exhibit 610

15     simplifies the matter by putting everything on one page.

16     Obviously it would have been better if we had introduced that

17     one exhibit.

18          THE COURT:  Are you saying that some of the wire

19     transfers you rely on in Government Exhibit 610 are in the

20     record anyway?

21          MR. WILLIAMS:  Yes, but they're in a multitude of

22     documents.  We would have to walk through document by document

23     and weave it all together.  We could do that with evidence

24     already in the record showing wires from Enable to Maiden

25     Capital, between San Francisco and North Carolina, wires from

HCKTTUZ1

Maiden Capital into Manhattan, but it's a laborious exercise,

whereas 610 puts it on one piece of paper.

THE COURT:  There is some support for the argument

that I have discretion to permit the government to reopen, but

it's a difficult situation where the government doesn't really

have any kind of justification for not having introduced this

in its case.

Now in *Leslie*, 103. F.3d 1093, the court says in that

case in the context of the interstate commerce element, it says

that the interstate commerce element, like venue, is a simple

matter, and "the district court may allow the government to

reopen its case to establish this jurisdictional predicate."

Now Mr. Jackson says well, this is a little more

complicated than interstate -- just proving interstate

commerce, it's a little more complicated than just proving

venue because the government has to demonstrate that the wires

were sent in furtherance of the conspiracy, so it's a more

complicated exercise.  So while *Leslie* provides some authority

for the notion that I have discretion to reopen for purposes of

venue or for purposes of satisfying the interstate commerce

element, the argument that Mr. Jackson made, that what's at

issue here is a little more complicated, I believe has some

force to it.

What do you say?

MR. WILLIAMS:  Your Honor, we certainly think that the

HCKTTUZ1

1    cases that we cited make clear that proof of interstate

2    commerce is similar to proof of interstate wire.  After all,

3    the mens rea element isn't applicable to the interstate wire

4    aspect of wire fraud, so we think that they're actually quite

5    similar, and we cited a couple of cases to that point in our

6    letter.

7            THE COURT:  What did you cite for that point?

8            MR. WILLIAMS:  *United States v. Price*, 347 Fed App'x.

9    189, 191 (2d Cir. 2010), page 4 of our letter, your Honor, and

10   also *United States v. Blackman*, which is 839 F.2d 900, 907 (2d

11   Cir. 1988).  We certainly believe that interstate commerce is

12   of apiece with interstate wire, and they're plainly

13   jurisdictional, the circuit made that clear, and we think the

14   Court has discretion, broad discretion to permit the government

15   to reopen its case for that point.  And we're happy to make the

16   record clear that we believe we have sufficient evidence in the

17   record absent 610, but that --

18           THE COURT:  That's kind of a problem, too, you make a

19   representation, I think you said there are hundreds of text

20   messages and emails that you believe satisfy, but you haven't

21   been able to cite -- you haven't been able to give me exhibit

22   numbers that I can go to and immediately say okay, this was in

23   furtherance of the charged conspiracy.  I don't understand why

24   that's been difficult.  If in fact there are hundreds of

25   exhibits that, according to you, satisfy this requirement, why

HCKTTUZ1

1    has it been so hard to tell me –– give me some subset of the

2    hundreds of exhibits so that we can just put that matter to

3    bed?  Why has that been so difficult?

4            MR. WILLIAMS:  Your Honor, it's not difficult.  We

5    identified two documents, one is a text message between Maiden

6    and Amanat and the other was an email communication, which we

7    thought on their face were clearly in furtherance of the

8    conspiracy, and we tied that together with Government

9    Exhibit 2970 which identified Mr. Amanat residing in Manhattan

10   as of December 31, 2008.

11           We thought that was sufficient as an exemplar, but if

12   the Court would like further examples, we're happy to provide

13   as well some of the financial transactions between Maiden and

14   Omar Amanat to show interstate wires, and then of course

15   additional wires from Maiden into New York.  So we think we

16   have enough, your Honor, and again, we're happy to supplement

17   the record.

18           We got Mr. Jackson's letter at 3:00 in the morning

19   like the Court did, or rather when we woke up this morning.  So

20   we see he's not willing to stipulate to the authenticity of the

21   document, we called Bank of America once we saw that footnote,

22   and we're happy to provide any further guidance the Court would

23   like.

24           THE COURT:  We're running out of time.  I read the

25   primary cases you relied on, they do stand for the proposition

HCKTTUZ1

1    that I have discretion with respect to technical matters or

2    what the court refers to as simple matters, such as

3    satisfaction of the interstate commerce element and venue.

4            As I said, I believe that Mr. Jackson's argument that

5    the "in furtherance" requirement makes this slightly more

6    complicated has some force to it.  And given that, there really

7    has been no explanation why Government Exhibit 610, which was

8    marked prior to trial, wasn't introduced.  I'm going to sustain

9    the objection.  I'm not going to allow the exhibit to be put in

10   on the government's rebuttal case.

11           MR. WILLIAMS:  Thank you, your Honor.  We'll certainly

12   argue it to the jury.  We'll take the time to button it up and

13   they'll make the decision.

14           THE COURT:  All right.  As you know, we're coming up

15   on December 21st.  It is my intention to have Mr. Ruocco to

16   communicate to juror number four that we will permit her to

17   depart at 2:00 p.m. on December 21.  Because it is clear to me

18   at that we will not have summations completed by 2 o'clock on

19   December 21, so it is not an option to bring the juror back.  I

20   can't do that.  So given where we are in terms of the trial, it

21   is my intention -- because she's probably worried about this,

22   it is my intention to have Mr. Ruocco communicate to her we

23   will not hold her past 2 o'clock on December 21.

24           Does anyone disagree?

25           MR. JACKSON:  No, your Honor.

HCKTTUZ1

 1                MR. WEITZMAN:  No, your Honor.

 2                MS. GRISWOLD:  No, your Honor.

 3                THE COURT:  I sent you last night in chunks the first

 4      60 pages of the charge.  I just wanted to get it to you, get

 5      most of it to you.  I am still making changes to it.  I was a

 6      little bit on the fence about how to treat venue.  I initially

 7      thought I just may address the venue at the end and say it

 8      applies to all six counts.  I became uncomfortable with that

 9      approach as I worked on the document, and so now I have a

10      reference to venue in each count.  So each count will say,

11      after it goes through the elements, that the government also

12      must meet its burden with respect to venue.  So that's a change

13      from what I sent you.  We are continuing to work on the last

14      few pages of the document, but I expect this will be completed

15      this afternoon, and my expectation is we will have a charge

16      conference this afternoon.

17                Anything anyone wants to say about the charge?

18                MR. WEITZMAN:  Yeah, your Honor, we're still working

19      our way through the charge.  The one thing I did notice is with

20      respect Count Four, your Honor provided the I think traditional

21      and well-accepted securities fraud count.  Count Four is a

22      market manipulation theory, as your Honor is aware.  We

23      attempted as best as possible in our request to charge at pages

24      63 through 65 to define market manipulation.

25                It's a very tricky subject, your Honor, where a

HCKTTUZ1

witness, Mr. Maiden, has acknowledged that he was interested in the stock, he was a bone fide purchaser of the stock before any 12/31/08 agreement.  So the issue of artificial inflation is a very complex issue because, frankly, I don't know how the jury parses between what he genuinely desired to do and what he was doing in an effort to artificially inflate.

But they need some guidance, I think, from your Honor as to what market manipulation is, what the differences between real market activity and market manipulation.  And the example I want to give your Honor is if the CEO gets on Fox News and says hey, everybody buy my stock, and I think my company is great, and they all buy the stock and it inflates the volume and the price of the stock, that's not market manipulation.  So they need some guideposts here, and I think the traditional securities fraud instruction is insufficient because what it really talks about is whether material information was omitted or provided, and that's not really it in this context.

MR. WILLIAMS:  Your Honor, we're happy to look at other recent market manipulation cases, but it strikes us as odd for the Court to be instructing the jury as to what market manipulation looks like.  The example Mr. Weitzman gave certainly wouldn't count.  We think that the traditional securities fraud instruction wouldn't allow the jury to convict the CEO who makes a public statement that my company is great, please buy my stock.  So we'll go back and look specifically at

HCKTTUZ1

1   *United States v. Durante*, which is this office's last market

2   manipulation trial from March of 2017, your Honor.

3          THE COURT:  How do you spell Durante?

4          MR. WILLIAMS:  D-U-R-A-N-T-E, 15 CR 171.  It was Judge

5   Carter.

6          THE COURT:  Okay.

7          MR. WEITZMAN:  And your Honor, the instruction we

8   proposed is not -- does not provide a hypothetical such as the

9   one that I provided.

10          THE COURT:  I know that.

11          MR. WEITZMAN:  It's really an effort to provide a

12   legal definition to market manipulation and artificial

13   inflation.

14          THE COURT:  I understand.

15          Let me talk to my law clerk for a second.

16          (Pause)

17          MR. NAFTALIS:  Your Honor, we're still working our way

18   through the substantive instructions, but with respect to the

19   statutes of limitations instruction, we sent a letter last

20   night at your Honor's request.

21          THE COURT:  He have your date in there, don't I?

22          MR. NAFTALIS:  You do have our date, but I think the

23   issue -- the instruction is confusing because it implies that

24   the jury has to find that each, meaning each --

25          THE COURT:  I'm sorry?

HCKTTUZ1

          MR. NAFTALIS:  The sort of the new second element

within the statute of limitations instruction indicates that

the jury has to find that each Mr. Tuzman and Mr. Amanat have

to continue to participate, and we don't think that's accurate,

we think that --

          THE COURT:  You think it's enough if there's an overt

act within the period, right?

          MR. NAFTALIS:  Exactly.

          THE COURT:  That's probably right.  I will take

another look at that.

          MR. WEITZMAN:  And your Honor, on that issue, I think

that the case law that the government cites in its letter, in

particular *United States v. Martinez*, (2d Cir. 2017) they cite

on page 4 specifically says the limitations period begins only

when the purposes of the conspiracy have been accomplished or

abandoned.

          Our point, your Honor, is that even according to

Mr. Maiden's testimony, the purposes of the alleged conspiracy

were accomplished upon the uplisting to NASDAQ.  So there needs

to be some instruction that the conspiracy ends when its object

is accomplished, and we'll argue, I take it, what that object

was.  I think Mr. Maiden's testimony provides that object.  And

so if he continues to manipulate, as he does in his general

practice, or attempts to after the object is accomplished, the

conspiracy is over, he's just acting on his own.

HCKTTUZ1

1            MR. NAFTALIS:  Your Honor, we just don't think that's

2     accurate.

3            MR. WEITZMAN:  It's their case.

4            MR. NAFTALIS:  We pulled our instruction right from

5     Sand, and it's an affirmative defense that a member of the

6     conspiracy withdraws, but we don't have to prove it keeps

7     going.  And this may be their spin that the object ended, but

8     that is not the crime charged.  So they're welcome to argue to

9     the jury Maiden was freelancing, but there's just no evidence

10    of that, and it shouldn't be in the instruction.  It's the

11    charge that the conspiracy continued into 2012, and all we need

12    to prove is that one member of the conspiracy committed an

13    overt act.

14            THE COURT:  Well, he says that the object of the

15    conspiracy was accomplished, and there is law to the effect

16    that once the object of the conspiracy is accomplished, the

17    conspiracy is over.  There is law that supports is that notion.

18            MR. NAFTALIS:  It's his theory that the object was

19    just to get -- but that's not what Mr. Maiden testified to.

20            THE COURT:  But the question is whether he's entitled

21    to language that says that -- and it may already be in there, I

22    just don't remember off the top of my head, the question is

23    whether he's entitled to language that says once the -- I think

24    the language is already in there, but you don't disagree that

25    he's entitled to language that says once the object of the

HCKTTUZ1

1    conspiracy has been accomplished, the conspiracy is over, you

2    don't object to that, do you?

3         MR. NAFTALIS:  That is correct, but the issue is

4    inserting it into the statute of limitations period and

5    creating -- he basically wants to argue the statute period when

6    this is an uncontroversial point.  He will obviously argue it

7    to the jury.  But the object is to manipulate the stock, not to

8    manipulate the stock to get it on the NASDAQ, and we don't

9    think it should be in the instruction.

10        THE COURT:  Mr. Weitzman, you believe that that

11   concept is not already in the charge?  It is in the charge is

12   my recollection.

13        MR. WEITZMAN:  I don't believe it is, your Honor.

14        THE COURT:  You don't think it is in there at all?

15        MR. WEITZMAN:  I don't think it is, your Honor.

16        THE COURT:  I will go and look at it.

17        MR. WEITZMAN:  The object of the conspiracy under the

18   law is market manipulation, that's the object of the conspiracy

19   technically, but the question is what is the purpose of the

20   conspiracy, and that's what the *Martinez* case on which the

21   government relies specifically says is when the limitations

22   period begins.  When the purpose of the conspiracy has been

23   accomplished then the statute runs.

24        THE COURT:  What do you rely on for that?

25        MR. WEITZMAN:  The *United States v. Martinez* case,

HCKTTUZ1

```
1    which is 862 F.3d 223, jump cite 232.

2              THE COURT:  All right.

3              MR. NAFTALIS:  Your Honor, the purpose is the object.

4    I don't know what Mr. Weitzman is trying to splice it into.

5    The purpose, as alleged, goes to 2012.  The object is to

6    manipulate the stock.  The fact that it moves up to NASDAQ is

7    not what Mr. Maiden says.  This is what they want to argue, and

8    they are welcome to do it, but we don't think it's appropriate

9    to start adding language.  It's an uncontroversial legal

10   principle that when the object is accomplished the conspiracy

11   ends, they're welcome to argue this, but I don't think there

12   should be additional instructions.

13             THE COURT:  We can't spend more time on this.  We'll

14   have to talk it about it more but I'll look at the case.

15             MR. JACKSON:  I have a couple of quick logistical

16   issues, but I want to ask if Special Agent DeCapua could be

17   excused very briefly.

18             THE COURT:  You can step out, sir.

19             MR. JACKSON:  My first issue is with regard to -- I'm

20   just anticipating a little bit of the testimony this morning in

21   relationship to the hearing.  For one, I don't know if the

22   government has AN intention to offer Special Agent DeCapua's

23   résumé, but I don't think it would be appropriate to offer

24   that.

25             MS. GRISWOLD:  We were going to go into it as part of
```

HCKTTUZ1

1    going into the background, similar as Mr. Weitzman did with

2    Professor Ferrell.

3              THE COURT:  Now he's testifying as an expert.

4              MR. JACKSON:  Yes, your Honor, and I'm happy for them

5    to go through his credentials that are on the résumé.  My

6    concern is the résumé includes several internal FBI agent of

7    the year type awards that I think in that sense it's not like a

8    normal résumé, it confers upon the expert I think an improper

9    degree --

10             THE COURT:  Could you hand up a copy of the résumé?

11             MR. NAFTALIS:  Your Honor, just to be clear,

12   Mr. Weitzman went out of his way to make sure --

13             THE COURT:  Could you hand up a copy of the résumé,

14   please?

15             (Pause)

16             THE COURT:  So you're objecting to the lines that say

17   Exceptional Service Award, Federal Bureau of Investigation,

18   2017, and Investigator of the Year Award, Federal Law

19   Enforcement Foundation, 2016, that's what you're objecting to?

20             MR. JACKSON:  That is all, your Honor.

21             THE COURT:  I will overrule the objection.  I don't

22   see it as problematic in any fashion.

23             MR. JACKSON:  Okay, your Honor.

24             The second thing, your Honor, is I just wanted to say

25   I'm not exactly sure how the Court will deal with the

HCKTTUZ1

qualifying of him as an expert, because I know that it seems

most of the judges in this district have a different way of

dealing with it.  Some -- Judge Rakoff says you should just --

there shouldn't be any qualifying, that's for the jury to

determine.

THE COURT:  My philosophy, you have already seen it in

action, the whole "I tender him as an expert," I don't do that,

I don't believe in that.  I will allow the witness to offer an

opinion.

And by the way, in the charge I don't refer to expert

witnesses as expert witnesses because I think that's

prejudicial, and I refer to them as witnesses who are permitted

to offer an opinion.  So that's what I did with Professor

Ferrell.  I didn't announce to the jury Professor Ferrell is an

expert, I just said I will allow Professor Ferrell to offer

opinion testimony.

I will do the same thing with Agent DeCapua.  I will

not make an announcement to the jury that Agent DeCapua is an

expert.  If you wish, you're welcome to say:  Your Honor, may

Agent DeCapua offer opinion testimony in this case?  And I will

say:  Yes, he may.

MS. GRISWOLD:  That's perfect, your Honor.

MR. JACKSON:  That's perfect for us, too, Judge,

especially if it's limited to opinion testimony because I think

we are just a little concerned that the scope of what his

HCKTTUZ1

1    expertise is may be a little bit misconstrued, so if it's

2    offering an opinion -- the language the Court used, that's

3    perfect for us.

4           The last thing, Judge, is during Mr. Maiden's

5    testimony at the hearing when he was asked why he didn't notice

6    this, one of the statements that he made that I think

7    Ms. Griswold appropriately told him on the stand was improper

8    was he said something like I assume Mr. Jackson, law firm of

9    his caliber would be blah, blah, blah, I think any statement

10   like that would be deeply prejudicial.

11          THE COURT:  You're not going to go down that road with

12   Mr. Maiden, are you, that Mr. Jackson is at a big law firm so I

13   assume that anything he shows me is kosher.

14          MS. GRISWOLD:  Your Honor, Mr. Maiden would say -- we

15   would like to elicit that he expected that all documents being

16   shown to him by either party, it didn't cross his mind they

17   were not authentic.  As we saw at the hearing, I said leave

18   Mr. Jackson out of this.  In light of this conversation, I will

19   ask for an opportunity to speak to him briefly before he takes

20   the stand.

21          THE COURT:  Yeah, there shouldn't be any reference to

22   Mr. Jackson or Mr. Jackson's law firm.  I do think it's

23   permissible for him to say that he expected the documents that

24   would be shown to him by either side, he assumed that they were

25   real.

1          MS. GRISWOLD:  Okay.

2          MR. JACKSON:  Thank you, Judge.  Sorry, one last very

3     quick thing, I don't think that we have had this, but this was

4     a question posed during the hearing of one of the witnesses as

5     to -- I think as to Special Agent DeCapua as to whether or not

6     the witness was aware of whether the government had asked

7     Mr. Amanat if they could have full access to his accounts.  We

8     think that's an improper question.  It shifts the burden and

9     implies that Mr. Amanat had a responsibility to give the

10    government voluntarily full access to his accounts.  We did

11    voluntarily provide the data that is the basis of their entire

12    application, so anything beyond at that I think is really

13    improper.

14         MS. GRISWOLD:  Your Honor, I think we would intend to

15    elicit that he did not analyze metadata for the fourth -- he

16    didn't have metadata for the fourth email.  I think that's

17    fine, so long as Mr. Jackson, if he calls an expert or gets

18    into certain things about what they reviewed, we would intend

19    to cross that expert on whether or not that information was

20    also provided to Special Agent DeCapua and the government.

21         MR. JACKSON:  I think that's fair, your Honor.

22         THE COURT:  All right.

23         MS. GRISWOLD:  I have one other issue with respect to

24    Special Agent Amato.  I think there was a pending objection at

25    the end of yesterday's testimony regarding Government

HCKTTUZ1

1    Exhibit 3568, which was the IP log-in records for

2    omar@amanatcapital.com Yahoo account, and I believe the

3    objection was a hearsay objection.

4              I think there's two parts of this.  One is the

5    business records declaration that the records themselves come

6    in, and I don't think that's Mr. Jackson's objection.  I think

7    it's with respect to the question about running the IP address

8    through a database to determine whether or not they're -- a

9    proximate location of the computer logging in could be

10   determined.

11             As we proffered to Mr. Jackson, we believe that that

12   appropriately comes in under 803.17, which is the exception

13   that allows for market reports and similar commercial

14   publication, allows for compilations or databases that are

15   generally relied on by the public or by persons in particular

16   occupations.  Special Agent Amato would testify that she used a

17   database called MaxMind, which is publicly and commercially

18   available but is generally and frequently used by the FBI to

19   look up IP addresses to determine the approximate location of

20   the computer connecting to a particular IP address, so we

21   believe it is proper under that exception, but I believe

22   Mr. Jackson still objects.

23             THE COURT:  What do you say, Mr. Jackson?  I have been

24   looking at 803.17, and just for the record, it provides as an

25   exception to the rule against hearsay, provides an exception

HCKTTUZ1

1    for "market quotations, lists, directories or other

2    compilations that are generally relied on by the public or by

3    persons in particular occupations."

4            MR. JACKSON:  Your Honor, this MaxMind website, it's a

5    private website that's online.  This is not analogous to like

6    the National Crime Institute database or something like that.

7    I worked as a defense attorney and a prosecutor for many years

8    and I never heard of it.  I take the agents at their word, but

9    I don't think this comes in as a market report or a list that

10   is of the type that 803.17 says has inherent indicia.  Implicit

11   in that inherent indicia of authenticity, I don't know who

12   MaxMind is, I never heard MaxMind mentioned until Agent Amato's

13   testimony yesterday, was it, so I don't think it comes in under

14   803.17.

15           I also don't think this area is relevant, the IP

16   log-ins are in, the underlying address doesn't go to any issue

17   in this case.

18           MS. GRISWOLD:  As to the first point, I think Special

19   Agent Amato will be able to lay a foundation to what MaxMind is

20   and the use of it by the FBI.

21           THE COURT:  Just lay -- could you just spell it?

22           MS. GRISWOLD:  One word, M-A-X-M-I-N-D, MaxMind.

23           THE COURT:  Okay.

24           MS. GRISWOLD:  And as to the relevancy point, I want

25   to make clear what we think the relevance is.

HCKTTUZ1

1              THE COURT:  And tell me what she's going to say

2     about -- sorry, MaxMind?

3              MS. GRISWOLD:  MaxMind.

4              THE COURT:  So what's she going to say about MaxMind?

5     Who is it accessible to?  What is she going to say about it?

6              MS. GRISWOLD:  It's publicly available.  You can

7     access it through the internet.  It's a private commercial

8     database.  It is one of I think several, but a primary database

9     that the FBI frequently uses in order to look up -- it's

10    basically geolocation information.  They compile -- MaxMind,

11    what they do is they compile information as to which internet

12    service providers and IP addresses, and they figure out where

13    the approximate location is, and then they provide that service

14    to the public.  And I don't know if they get their revenue

15    through ads or exactly how that works, but she will testify

16    this isn't something that they came up for this case.

17             IP log-in information queries are commonplace in many,

18    many different kinds of investigations that are conducted by

19    the FBI, and that this is a reliable and generally used

20    database that they use to establish that information.

21             I'm happy to move on to address the relevancy if your

22    Honor would like.

23             MR. JACKSON:  I have one thing to insert, I tried to

24    understand what MaxMind is.  There's a Wikipedia page about

25    MaxMind, it literally has three sentences in it, and all it

1    says is:  In an unusual technical glitch, a farmstead about

2    four miles northeast of Potwin, Kansas became the default site

3    of 600 million IP addresses (due to their lack of fine

4    granularity) when the digital mapping company changed the

5    putative geographic center of the contiguous United States

6    leading to law enforcement agents and others visiting the

7    farmstead at all hours of the day and night. A lawsuit against

8    the company by the residents of the farmstead ensued.  There is

9    no other information on Wikipedia page about MaxMind except

10   information about a failure of information that they had in

11   terms of their database that led to a lawsuit.  This is an

12   obscure, private website.  If you want accurate information

13   about an IP address, there is an accepted way to get it, which

14   is to go to the provider and get information, not to go to some

15   random website.

16        MS. GRISWOLD:  Your Honor, you will make your

17   decision, but I don't think the agent will testify that it's a

18   random website.  She will testify that it's used by the FBI and

19   they found it to be reliable in their cases.  They found that

20   the IP address geolocation information that they have gotten

21   from that database has been accurate in the course of her

22   experience.

23        THE COURT:  All right.  I'll have to hear the

24   foundation and then I will rule.

25        And relevance?

HCKTTUZ1

1          MS. GRISWOLD:  Relevance.  The defendant proffered

2     that the emails at issue were authentic originally because they

3     were on his father's Yahoo account, and now he's arguing that

4     they were always on the Omar Amanat account.  And there's no

5     explanation for why he didn't use that account to establish

6     authenticity in the first place.

7          And the log-ins here, which show log-ins into the Omar

8     Amanat account from at least August of 2017 through when the

9     trial began in November 2017, foreclose an argument by the

10     defendant that he only logged into the account after the

11     government levied its fabrication allegations in this case.  I

12     don't know exactly what arguments Mr. Jackson is going to be

13     making, but I think it's relevant as to that point.

14          (Continued on next page)

HckWtuz2

```
 1              MR. JACKSON:  I think the government is, and I
 2    understand what Ms. Griswold is saying, conflating some of the
 3    discussion about what our legal team did with what Mr. Amanat
 4    was doing, and I think there's a lot of confusion about the
 5    timeline.
 6              There is no argument that we're going to be making
 7    about why X or Y wasn't produced to the government at whatever
 8    particular date.  I don't think that that's relevant.  I don't
 9    think that the discussion between parties about how they got
10    the information is something that can be developed
11    appropriately through this case.  There's no testimony from Mr.
12    Amanat; there's never been any representation from Mr. Amanat.
13    There are representations that are in the record as far as the
14    legal proceedings that have to do with what counsel understood
15    and did, and it's a separate question.
16              There's also some confusion, just to put it bluntly,
17    about what exactly was going on.  I don't think this is for the
18    jury, but it's important to note Mr. Amanat has always had
19    these linked Yahoo accounts.  Right?  But the question was, at
20    one point we were notified that for the specific time period in
21    question, there was no relevant information, and that was an
22    impression I think my predecessor as well as I labored under
23    for a while.
24              There was never a belief that Mr. Amanat never had
25    access to these Yahoo accounts, and so the fact that he can log
```

HckWtuz2

1    on to the Yahoo accounts is irrelevant in any question.

2               THE COURT:  Does that change your view in any way?

3               MS. GRISWOLD:  It doesn't, your Honor.  There's a

4    stipulation between the parties.  We're not trying to insert

5    communications between the defendant and his attorney into

6    this, but it is going to be put before the jury that the Sharif

7    Amanat, his father's, Yahoo account was originally the basis

8    for the authenticity of these emails, so I do think it's

9    possible that the jury's going to be confused about what

10   happened here.  And all we want on the record, and maybe they

11   won't draw out or make an argument from it, is something to

12   show that he was accessing the Omar Yahoo account in the time

13   period leading up to the trial.

14              THE COURT:  It does seem to me that that last point is

15   relevant.

16              As to foundation, I'll just have to hear what the

17   agent says.  We need to begin.  The jury's been here for some

18   time.

19              The agent should retake the stand.

20              MS. GRISWOLD:  Yes, your Honor.

21              (Continued on next page)

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.

3          Good morning, ladies and gentlemen.  As I told you

4    yesterday, the case is winding down to a close.  At the next

5    break, I would like you to talk amongst yourselves about

6    whether, once we get into closing arguments and jury

7    deliberations, the jury might be willing to sit until 5:00.

8    The summations are going to be lengthy, as you might expect,

9    given the length of the trial, so that's one reason.  But also,

10   when you've reached the point of deliberations, you may find it

11   helpful to have a longer day than what we have been

12   traditionally utilizing here.

13         Please talk amongst yourselves about that, and when

14   you've reached a consensus, let me know what the jury's views

15   are on that.  OK?

16         For today, we're going to resume the direct

17   examination of Agent Amato.

18         Agent, you remain under oath.

19    JULIE AMATO, resumed.

20         THE COURT:  Ms. Griswold, please proceed.

21         MS. GRISWOLD:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MS. GRISWOLD:

24   Q.  Good morning, Special Agent Amato.

25   A.  Good morning.

HckWtuz2                    Amato - Direct

1    Q.  At the end of yesterday's testimony, we were talking about

2    IP addresses?

3    A.  Yes.

4    Q.  Have you had training at the FBI about IP addresses?

5    A.  Yes.

6    Q.  Can you remind the jury generally what an IP address is?

7    A.  The IP address is basically the unique address that's

8    identified so that people can tell what computer's connected to

9    the Internet.

10   Q.  Special Agent Amato, when we concluded yesterday, you were

11   testifying about Government Exhibit 3568.

12           MS. GRISWOLD:  Can we pull that back up on the screen,

13   Ms. Pyun.

14           Would your Honor like a hard copy, or do you have

15   yours from yesterday?

16           THE COURT:  I have it.  Thank you.

17           MS. GRISWOLD:  Thank you.

18   Q.  Do you recall that these were the IP records for log-ins to

19   the omar@amanatcapital.com account?

20   A.  Yes.

21   Q.  And you identified that between August 16 of 2017 and

22   November 9 of 2017, there was only one IP address used to log

23   in to that account.  Is that correct?

24   A.  That's correct.

25   Q.  And that's the IP address listed in the column on the

1   screen?

2   A.  Yes.

3   Q.  Is there a database used by the FBI to look up IP addresses

4   to determine the approximate location of a computer connecting

5   to a particular IP address?

6   A.  Yes.  We use a couple of them.

7   Q.  Did you use one in this case?

8   A.  Yes, for this I used MaxMind.

9   Q.  Can you explain for the Court what MaxMind is and how it is

10  used by the FBI?

11  A.  Sure.  So, MaxMind is publicly available.  You just go to

12  Google, search MaxMind IP lookup, and it's basically a service

13  that's provided where you could type in an IP address like this

14  one here, and it will show you who the Internet service

15  provider is linked to that address, and it will also show you

16  the approximate geo-location of the IP address.  And so we use

17  it in a lot of our investigations to try and determine the

18  service provider and also the location of the IP address.

19  Q.  And has the FBI found MaxMind to be reliable with respect

20  to the information that it's provided in your investigations

21  for the location of the computer?

22  A.  Yes.  So, based on my training, it is known to be a

23  reliable service throughout the FBI.

24  Q.  And when you ran this IP address through MaxMind, were you

25  able to determine a location?

HckWtuz2                          Amato - Direct

1   A.  Yes.  So, it gives a latitude and longitude, which I don't

2   remember off the top of my head.  But the city is Pine Brook,

3   New Jersey.

4           MS. GRISWOLD:  Can we please pull up Government

5   Exhibit 630.  This is a set of bank records in evidence in this

6   case.  And please highlight the authorized signer information

7   on this account.

8   Q.  Do you see that, Special Agent Amato?

9   A.  I do.

10  Q.  What is the name on the authorized signer information to

11  this account?

12  A.  Omar Amanat.

13  Q.  What is the home address?

14  A.  68 Windsor Drive, Pine Brook, New Jersey 07058.

15          MS. GRISWOLD:  We can take that down.  If we could

16  bring back up Government Exhibit 3583.

17  Q.  This is the chart you were testifying about yesterday

18  regarding four emails that you looked for on Mr. Maiden's

19  computer.  Do you recall this chart?

20  A.  I do.

21  Q.  And this was a chart memorializing your efforts to look for

22  a December 2, 2008, email at 11:07 p.m.?

23  A.  That's right.

24  Q.  Amanat Exhibit 9002?

25  A.  Yes.

HckWtuz2                           Amato - Cross

1    Q.  Were you able to find that on Mr. Maiden's computer?

2    A.  No.

3    Q.  And Amanat Exhibit 908, the 11:33 a.m. email on March 10,

4    2009, were you able to find that on Mr. Maiden's computer?

5    A.  No.

6    Q.  And Amanat Exhibit 9010, the June 2, 2011, 6:13 p.m. email,

7    were you able to find that on Mr. Maiden's computer?

8    A.  No.

9    Q.  And Amanat Exhibit 9013, the 3/26, 2012, 11:34 a.m. email

10   were you able to find that on Mr. Maiden's computer?

11   A.  No.

12   Q.  Were you able to find any of the evidence of these emails

13   on Mr. Maiden's computer, such as an email chain where these

14   emails were responded to?

15   A.  No, I was not.

16           MS. GRISWOLD:  No further questions.

17           THE COURT:  Cross-examination.

18   CROSS-EXAMINATION

19   BY MR. JACKSON:

20   Q.  Good morning, Special Agent Amato.

21   A.  Good morning.

22   Q.  Now, Special Agent Amato, to be clear, what you've been

23   focusing on is just four documents, right, in your testimony

24   now?

25   A.  Right, these four emails.

HckWtuz2                      Amato - Cross

1    Q.  And you're aware that all four of these emails were shown

2    to Mr. Maiden during his testimony, right?

3    A.  I think in -- yeah, in redacted forms.  That's right, yes.

4    Q.  And during his testimony, Mr. Maiden didn't say anything

5    about these emails not being authentic, right?

6    A.  That's correct.

7    Q.  Now, am I correct --

8            MR. JACKSON:  Actually, can we have GX2908.

9    Q.  Am I correct that this is the email that you were looking

10   at on direct examination?  Correct?

11   A.  Yes, that's right.

12   Q.  And this is from June of 2008, right?

13   A.  That's right.

14   Q.  And in this message, Omar Amanat is emailing his brother

15   and talking about deleting some emails from the Yahoo site and

16   downloading them onto the laptop, right?

17   A.  Right.

18   Q.  And Irfan Amanat says, "Set up your Outlook to pull all

19   your email from Yahoo and delete it"?

20   A.  Yup.

21   Q.  "If you need help, I can walk you through it"?

22   A.  That's right.

23   Q.  This email takes place in June of 2008, correct?

24   A.  Yes.

25   Q.  In June of 2008, as far as you know from your role as a

1    case agent here, Omar Amanat had never even met Steve Maiden,

2    right?

3    A.   I'm not a 100 percent sure about that.

4    Q.   You're not sure about that?

5    A.   No.  I'm sorry.

6    Q.   Let me ask you this.  You are aware that the charges in

7    this case don't involve any conduct in June of 2008, right?

8              MS. GRISWOLD:  Objection.

9              THE COURT:  Sustained.

10             MS. GRISWOLD:  Mischaracterizes.

11             THE COURT:  Sustained.

12   BY MR. JACKSON:

13   Q.   Just to be clear, in June of 2008 -- first of all, there's

14   reference here to subpoenaing Yahoo?

15   A.   Yes.

16   Q.   Do you see that?

17   A.   Yes.

18   Q.   You're aware, right, Special Agent, that in civil suits

19   people can issue subpoenas, correct?

20             MS. GRISWOLD:  Objection.  Foundation.

21             THE COURT:  You're going to have to lay a foundation

22   for her knowledge in civil suits.

23             MR. JACKSON:  Sure.

24   Q.   You have some familiarity with civil suits, right?

25   A.   Vaguely with discussion, like, with SEC attorneys.

HckWtuz2                         Amato - Cross

1    Q.  Right.  The SEC is one of the agencies that the FBI works

2    with frequently, right?

3    A.  My squad does, yes.

4    Q.  And you're aware that one of the issues that you have to

5    deal with when there's an SEC investigation and an FBI

6    investigation is that one is civil and one is criminal, right?

7    A.  Yes.

8    Q.  And we don't need to get into details, but there are some

9    legal requirements in terms of how those have to be defined as

10   either separate or joined, right?

11              MS. GRISWOLD:  Objection.  Foundation.

12              THE COURT:  Sustained.

13   BY MR. JACKSON:

14   Q.  Whatever the case may be, you're aware that the SEC issues

15   civil subpoenas, right?

16   A.  Yes.

17   Q.  You've also seen in the course of working as a case

18   agent -- well, you're familiar with the fact that subpoenas can

19   be sent in civil suits; you've seen that before in your work,

20   right?

21   A.  Yes.

22   Q.  And so just in terms of your work as a case agent, you are

23   aware that Omar Amanat participated in civil litigation about

24   various business issues before this ever happened, right?

25              MS. GRISWOLD:  Objection.

HckWtuz2                         Amato - Cross

 1              THE COURT:  Sustained.

 2   Q.  Well, I just want to ask you -- all right.  We'll move on.

 3              One thing you testified about just now --

 4              MR. JACKSON:  You can take this down.

 5   Q.  -- is that you looked through Steve Maiden's computer to

 6   try to find evidence of the four emails that are in question?

 7   A.  Right, if I could see the actual email.

 8   Q.  It's a fact, though, right, as you testified on your

 9   direct, Steve Maiden's computer had at least one large gap in

10   emails on the computer?  Right?

11   A.  Yes.

12   Q.  And during, this is a period when you would have expected

13   hundreds of emails to come to Steve Maiden, right?

14   A.  I don't know.

15   Q.  During the course of your analysis, did you ever try to

16   determine approximately how many emails Mr. Maiden got on a

17   daily basis?

18   A.  On four specific days I did that.

19   Q.  Can you give us a rough estimate of what you saw in terms

20   of the number per day?

21   A.  I think there were usually at least a hundred.

22   Q.  OK.  So at least a hundred, usually, per day, right?

23   A.  Yeah.

24   Q.  And the period that you said there was a gap in

25   Mr. Maiden's, a noticeable gap in Mr. Maiden's email extended

HckWtuz2                    Amato - Cross

1    from the end of January 2009 into March, right?

2    A.  Right.  Emails appeared again on March 10, 2009.

3    Q.  So we're talking about at least 40 days, right?

4    A.  Yes.

5    Q.  Sorry.

6    A.  Maybe a little less.

7    Q.  I'm not sure I can do the math.

8    A.  Yeah.

9    Q.  But by your estimate, that could mean that just for that

10   gap, at least 4,000 emails would appear to be missing from

11   Mr. Maiden's computer, right?

12   A.  It could mean that, yes.

13   Q.  And you have no way of knowing whether there are additional

14   gaps in Mr. Maiden's computer that you weren't able to see,

15   right?

16           MS. GRISWOLD:  Objection.

17           THE COURT:  Sustained.

18   Q.  To be very clear, the reason you're able to notice the gap

19   that you're talking about is because it's so big, right?

20           THE COURT:  You're talking about the January to March

21   period.

22           MR. JACKSON:  Exactly, Judge.

23   A.  Yes.

24   Q.  It might be hard to determine, right, if there was like a

25   two-hour gap when emails were missing?

HckWtuz2                          Amato - Cross

1   A.   Yeah, that's right.

2   Q.   Emails could be gone, and the FBI would have no way of

3   detecting it, right?

4   A.   I don't know what our forensic examiners are able to

5   detect, but I wouldn't be able to detect it.

6   Q.   Sure.

7   A.   Yeah.

8   Q.   And I know you're doing a lot of hard work on this, but

9   you're not a forensic examiners of computers, right?

10  A.   That's certainly true.

11  Q.   That's a relatively specialized area that's handled by the

12  CART team at the FBI, right?

13  A.   That's right.

14  Q.   As far as you know, the FBI didn't do a CART analysis to

15  determine whether there were any fragments on Mr. Maiden's

16  computer that would help you understand whether specific items

17  had been deleted that were not visible in his PSTs?

18          THE COURT:  You used the term "CART analysis"?

19          MR. JACKSON:  Yes, your Honor.

20          THE COURT:  If you're going to use it, you need to

21  elicit from the witness what that means.

22          MR. JACKSON:  Yes, that's very helpful, Judge.

23  Q.   Special Agent Amato, could you explain to the members of

24  the jury what the CART team is?

25  A.   Yeah.  So, the CART team is a team within the FBI that we

HckWtuz2                          Amato - Cross

1    usually use for digital evidence.  They help us download and

2    put it in a useable format, among other things.

3    Q.  OK.  Thank you so much, Agent.  And all I'm asking is, as

4    far as you know, the CART team didn't do any of the type of

5    analysis I was just referring to on Mr. Maiden's computer,

6    right?

7              MS. GRISWOLD:  Objection.  Form.

8              THE COURT:  Sustained.

9    Q.  As far as you know, the CART team didn't do any analysis on

10   Mr. Maiden's computer, right?

11   A.  They were involved.

12   Q.  OK.  Do you know if the CART team came to a determination

13   as to whether or not emails had been deleted from Mr. Maiden's

14   computer?

15   A.  That I don't know.

16   Q.  You also talked a little bit about the emails in the

17   deleted folder on Mr. Maiden's computer?

18   A.  That's right.

19   Q.  And to be clear, there were hundreds of items in the

20   deleted folder -- folders -- on Mr. Maiden's computer, right?

21   A.  Yes, that's right.

22   Q.  Some of those were email drafts, right?

23   A.  Correct.

24   Q.  Some of them were actual emails sent and received?

25   A.  Correct.

HckWtuz2                          Amato - Cross

1   Q.   Some of them were contact information?

2   A.   Correct.

3   Q.   And you understand, right, that when an email is in a

4   deleted folder at the time a computer's imaged, that means it

5   was placed into recycling and had not yet expired, right?

6              MS. GRISWOLD:   Objection.   Foundation.

7              THE COURT:   You need to lay a foundation with her

8   about that.

9              MR. JACKSON:   Judge, can I just ask an open-ended

10  question of the agent.

11  Q.   Do you know what it means for an email to be in a deleted

12  folder at the time that an image expires -- I mean, at the time

13  that the computer is imaged?

14  A.   Other than the fact that when you have -- the deleted-items

15  folder is there, that's about the extent of it.

16  Q.   Right.

17  A.   Yeah.

18  Q.   You're aware from your work as an FBI agent that it's

19  possible to hard delete items on a computer, right?

20             MS. GRISWOLD:   Objection.   Foundation.

21             THE COURT:   Sustained.

22  Q.   Have you ever worked with the hard deletion of emails?

23             MS. GRISWOLD:   Objection.

24             THE COURT:   I think you need to establish that she

25  knows what the term "hard delete" means.

HckWtuz2                    Amato - Cross

1              MR. JACKSON:  Thank you, Judge.

2    Q.  Do you know what I mean when I say hard delete?

3    A.  I don't.

4    Q.  What about permanently delete?

5    A.  As in, like, dragging your trash and emptying your trash?

6    Q.  Exactly.

7    A.  I don't -- I know sometimes things can be recovered still

8    when that happens, so --

9    Q.  And you also know that sometimes they can't be recovered

10   after that happens, right?

11   A.  Yes.

12   Q.  And the FBI has no way of knowing what, if anything,

13   Mr. Maiden deleted and removed from the recycling bin, right?

14              THE COURT:  Sustained.

15   Q.  Are you aware of whether or not, in assessing Mr. Maiden's

16   email traffic, the FBI ever did any analysis of any email

17   accounts of Michael Yavelberg?

18   A.  I'm not aware of any such analysis.

19   Q.  Are you aware of whether or not the FBI did any analysis of

20   the email accounts of Jamie Yavelberg?

21   A.  I'm not aware.

22   Q.  You are aware, in your role as case agent, that after his

23   original testimony Mr. Maiden reached out to Jamie Yavelberg?

24              MS. GRISWOLD:  Objection.

25              THE COURT:  Sustained.

1        MR. JACKSON:  Just one moment, your Honor.

2   Q.   Just to be very clear, it's your belief that Mr. Maiden did

3   actually receive emails that are no longer on his computer

4   during that gap in time that you described, in January to March

5   of 2009?

6   A.   I would expect that he did, yes.

7        MR. JACKSON:  Special Agent Amato, thank you very

8   much.  I don't have any further questions.

9        THE COURT:  Any redirect?

10       MS. GRISWOLD:  Two questions, your Honor.

11  REDIRECT EXAMINATION

12  BY MS. GRISWOLD:

13  Q.   Special Agent Amato in the course of your work as a

14  criminal FBI agent, are you aware of whether or not there are

15  criminal subpoenas that can be issued?

16  A.   Yes.

17  Q.   Are there?

18  A.   Yes.

19  Q.   The gap that you testified about on Mr. Maiden's computer

20  is from January 2009 to early March 2009, is that correct?

21  A.   Yes.  The last emails appeared on January 31, so it's the

22  end of January.

23       MS. GRISWOLD:  If we could put back up for Special

24  Agent Amato the chart that we were looking at, Government

25  Exhibit 3583.

HckWtuz2                        Amato - Redirect

1   Q.  Does the gap on Mr. Maiden's computer cover any of the

2   dates that are listed on Amanat Exhibits 9002, 908, 9010 and

3   913 --9013?

4            THE COURT:  9013, right?

5            MS. GRISWOLD:  9013.  Thank you, your Honor.

6   A.  So, for Amanat Exhibit 908, emails appear began appearing

7   again in Mr. Maiden's account on March 10, 2009.

8   Q.  So there are emails --

9   A.  There are emails for March 10, 2009.

10  Q.  Are there emails for December 2, 2008?

11  A.  Yes.

12  Q.  Are there emails for June 2, 2011?

13  A.  Yes.

14  Q.  Are there emails for March 26, 2012?

15  A.  Yes.

16           MS. GRISWOLD:  No further questions.

17           THE COURT:  Anything else, Mr. Jackson?

18           MR. JACKSON:  No.  Thank you, your Honor.

19           THE COURT:  You can step down, Agent.

20           (Witness excused)

21           THE COURT:  The government will call its next witness.

22           MS. GRISWOLD:  The government calls Special Agent Joel

23  DeCapua.

24           MR. WEITZMAN:  Your Honor, may we approach?

25           THE COURT:  Yes.   (Continued on next page)

HckWtuz2                     Amato - Redirect

1            (At sidebar)

2            MR. WEITZMAN:  I just want to put on the record my

3    client isn't feeling so well today, Judge.  He has an upset

4    stomach, and he'll be in and out of the courtroom at times.  We

5    waive his presence during the times he's out of the courtroom.

6            THE COURT:  Thank you, Mr. Weitzman.

7            MR. WEITZMAN:  You're welcome.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HckWtuz2                         DeCapua - Direct

1              (In open court)

2        JOEL DECAPUA,

3            called as a witness by the Government,

4            having been duly sworn, testified as follows:

5                THE COURT:  Please proceed.

6                MS. GRISWOLD:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MS. GRISWOLD:

9    Q.  Good morning.

10   A.  Good morning.

11   Q.  Where do you work?

12   A.  I work at the Federal Bureau of Investigation.

13   Q.  What is your position there?

14   A.  I'm a special agent.

15   Q.  What squad are you assigned to?

16   A.  I'm assigned to cyber crimes task force on squad CY-2.

17   Q.  How long have you been on the cyber crimes task force?

18   A.  I first joined in 2014.

19   Q.  How long have you been with the FBI in total?

20   A.  Since 2009, so I believe it's nine years.

21   Q.  Between 2009 and 2014, what type of squad were you assigned

22   to?

23   A.  Prior to the cyber crimes squad, I was assigned to a squad

24   focused on securities fraud and public corruption.

25   Q.  Did those cases involve the review of emails?

HckWtuz2                          DeCapua - Direct

1    A.  Yes, they did.

2    Q.  Turning back to the cyber squad, what types of cases does

3    your squad investigate?

4    A.  Generally we investigate any type of hacking case or cyber

5    crime case that has any criminal nexus as opposed to a national

6    security nexus.

7    Q.  Have your cases while on the cyber squad involved the

8    execution of email search warrants?

9    A.  Yes.

10   Q.  Have your cases involved the examination of computers for

11   email content?

12   A.  Yes.

13   Q.  I want to turn to some of the training that you've

14   undertaken at the FBI in the area of electronic or digital

15   evidence.  When new agents join the FBI, is there any training

16   in digital forensics?

17   A.  There is.  At Quantico, we are given new-agents training,

18   which includes training on how to review email headers, how to

19   investigate crimes involving the Internet and generally how to

20   go about gathering digital evidence and then analyzing it for

21   review.

22   Q.  Before we turn to additional training, you just used the

23   term "email headers."  Can you describe for the jury what you

24   mean by that term?

25   A.  Sure.  So, I've learned that emails are -- they're made up

HckWtuz2                    DeCapua - Direct

of two parts.  The first part is the content, which is what you

would see on the screen, the words or the links or whatever is

in the email, and the other part is the header, which is mostly

invisible to someone who sends or receives an email, but if you

know where to look, you can, you can find the header and you

can analyze it, and it's useful to us because it has good

forensic artifacts that we can study.

Q.  Once you became a cyber agent in 2014, did you receive

additional training in the area of digital forensics?

A.  I did.

Q.  Can you describe that training, please?

A.  So, there was on-the-job, sponsored by the FBI, digital

forensics training.  Some of it was self-study.  Some of it

was, I would go on the Internet and go through a course of

study.  Some of it was in person.  Most of it was through a

private company called SANS.  At SANS I took a lot of training

to include a lot about how to analyze email headers and digital

forensics, and I was tested on that training.  I received

certifications on it.

          MS. GRISWOLD:  If we could please pull up for the

witness, counsel and the Court what is marked as Government

Exhibit 3584.

          Would you like another copy, your Honor?

          THE COURT:  I have it.  Thank you.

BY MS. GRISWOLD:

HckWtuz2                         DeCapua - Direct

1   Q.   Do you recognize Government Exhibit 3584, Special Agent

2   DeCapua?

3   A.   I do.

4   Q.   How do you recognize it?

5   A.   It is a résumé I created.

6            MS. GRISWOLD:   The government offers Government

7   Exhibit 3584.

8            THE COURT:   Any objection?

9            MR. JACKSON:   No objection.

10           MR. WEITZMAN:   No objection.

11           THE COURT:   3584 is received.

12           (Government Exhibit 3584 received in evidence)

13           MS. GRISWOLD:   Permission to publish?

14           THE COURT:   Yes.

15   BY MS. GRISWOLD:

16   Q.   Is this a résumé, your résumé?

17   A.   Yes.

18   Q.   And it has three sections: career summary; certifications,

19   training and professional affiliations; and finally, education?

20   A.   That's correct.

21   Q.   I want to focus on the middle section, certifications,

22   training and professional affiliations.   Can you identify which

23   of these certifications -- first of all, what is GIAC that

24   appears in a number of places here?

25   A.   GIAC is an entity that tests and certifies practitioners of

HckWtuz2                    DeCapua - Direct

digital forensics.

Q.  Is GIAC a place that is used by FBI cyber agents to obtain

certifications and training?

A.  Yeah, that's correct.

Q.  Which of these certifications is relevant to the analysis

of emails and email headers?

A.  So, of these certifications, I think the first one that's

relevant is the March 2008 certified fraud examiner.  You learn

some things about digital forensics and analyzing emails, in

that course of certification.  I'm no longer certified; I've

let it lapse.

        The March 2015 certification, the GSEC, is another course

of study I took where we learned about digital forensics, and

there's a part in that course of study that involves the

analysis of emails and email headers.  It culminates in a

five-hour test that I took and passed, and that's why I

received this certification.

        July 2015 certification, certified forensic examiner, is

a -- is another course of study, and then a, a certification

test that I took that involved analysis of digital evidence and

email headers.

        The next one would be October 2016 course, the certified

forensic analyst, which is another course of study that goes

through how to analyze email headers and how to handle digital

evidence, and I took a certification course and I'm certified

HckWtuz2                     DeCapua - Direct

1    in it.

2          The March 2017, the network forensic analyst, is another

3    that handles additional topics in how to analyze email headers.

4    And the March 2017 course, the FBI-sponsored digital extraction

5    technician training, it is another that -- it's a two-week

6    course with, culminating in a test and which I took and passed,

7    which is about the extraction of digital evidence and the

8    analysis and review afterward.

9    Q.  In total, approximately how many email headers have you

10   reviewed in your career?

11   A.  Hundreds.

12          MS. GRISWOLD:  You can take that down, please.

13   Q.  Are you familiar with the term "web mail"?

14   A.  I am.

15   Q.  What is it?

16   A.  Web mail is a service like GMail or HotMail or Yahoo Mail,

17   that allows you to send and receive emails using their email

18   servers.  You log in and you create an account and you can use

19   it to send and receive emails.

20   Q.  Are you familiar with the term "local email client"?

21   A.  I am.

22   Q.  What does that term mean?

23   A.  A local email client is a piece of software that you have

24   on your computer or your phone, even, such as Outlook or Apple

25   Mail or Thunderbird, that allows you, from your personal

HckWtuz2                    DeCapua - Direct

1  computer, to interact with one of the web mail services so you

2  can type up emails on your home computer and click send in

3  Outlook and it will automatically reach out to the, to the web

4  mail service and make sure everything is synced and sent and

5  received properly.

6  Q.  Are you familiar with any protocols that allow local email

7  clients, such as Outlook or Apple Mail, to communicate with a

8  web mail account, such as Yahoo?

9  A.  Yeah, there's several protocols that are used.  The most

10  familiar is the IMAP protocol.

11  Q.  Is that I-M-A-P?

12  A.  Yes.

13  Q.  Can you describe that?

14  A.  So, it stands for the Internet message access protocol, and

15  it's just an agreed upon -- a protocol is an agreed-upon

16  language that two computers or two servers will use to

17  communicate with each other and exchange information.  And

18  specifically IMAP is used for the communications between an

19  email server such as the one that Google would have or

20  something that your employer might have and the local email

21  client, such as Outlook.

22  Q.  Are you familiar with the term "spoofing"?

23  A.  I am.

24  Q.  What is it?

25  A.  Spoofing generally refers to, in the context of emails,

HckWtuz2                      DeCapua - Direct

1   when someone is forging an email.  Either they're making it

2   seem like it's coming from someone who never sent it or they're

3   changing the date or changing the content or changing some

4   other aspect of the email in order to make it fraudulent.

5   Q.  And do you have training at the FBI on spoofing?

6   A.  I do.

7   Q.  Does that involve the review of email headers?

8   A.  It does.

9           MS. GRISWOLD:  Your Honor, may Special Agent DeCapua

10  offer an opinion related to the analysis of electronic

11  evidence, including email headers and email platforms?

12          THE COURT:  Any objection?

13          MR. JACKSON:  No, your Honor.

14          THE COURT:  Yes, he may offer opinion testimony on

15  those subjects.

16          MS. GRISWOLD:  Thank you, your Honor.

17          MR. JACKSON:  Your Honor, just to be clear, as we

18  previously discussed.

19          THE COURT:  Yes.

20          MS. GRISWOLD:  I'd like to show the witness what is in

21  evidence as Government Exhibit 2908, please.

22  Q.  If you could direct your attention to the June 14, 2008,

23  email at 2205.  If you could read that, please, Special Agent

24  DeCapua.  It's an email from Omar Amanat to Irfan Amanat.

25  A.  "Hey Iffi, I also want to delete all of my emails from the

HckWtuz2                        DeCapua - Direct

1    Yahoo site but download them onto my laptop.  How can I do

2    this?  I'm concerned about them subpoenaing Yahoo at some

3    point."

4              MS. GRISWOLD:  If we could please go to Irfan Amanat's

5    response at 2321.

6    Q.  If you could please read the response.

7    A.  "Set up your Outlook to pull all your emails from Yahoo and

8    delete it.  If you need help, I can walk you through it."

9    Q.  Based on your training and experience as an FBI agent and

10   on dealing with email evidence, are you familiar with how to

11   pull emails from a web mail account such as Yahoo, onto a local

12   client account such as Outlook?

13   A.  I am.

14   Q.  Do you need any special FBI or proprietary software to do

15   this?

16   A.  No.

17             MS. GRISWOLD:  At this time, your Honor, we would ask

18   that Special Agent DeCapua be allowed to hook up his laptop so

19   he can provide a brief demonstration to the jury.

20             THE COURT:  Yes.

21   Q.  In preparation for your testimony, did you create a web

22   mail account on Yahoo to use for a demonstration?

23   A.  I -- yes, I did.

24   Q.  Is jamessmith53490@yahoo.com the account you created?

25   A.  It is.

HckWtuz2                    DeCapua - Direct

1    Q.  And to create this account, did you go to yahoo.com?

2    A.  I did.

3    Q.  If you could keep your voice up as well.  Thank you.

4        Let's pull up yahoo.com on your computer.

5        So we're at yahoo.com.  Can you go ahead and log in to the

6    James Smith account that you created?

7    A.  Certainly.  So I logged into it previously so it

8    automatically saved my password and user name, and it just

9    opened up into the web mail access point for the James Smith

10   account.

11   Q.  Did you receive an email from the government in preparation

12   for your demonstration today?

13   A.  I did.

14   Q.  Is that email in your inbox for this account?

15   A.  Yes, it is.

16   Q.  Can you open that up?  Is this the email from Mr. Naftalis

17   on December 18 at 8:58 p.m.?

18   A.  It is.

19   Q.  And the content of that email says, "Hi, Joel"?

20   A.  That's correct.

21   Q.  Can you tell the jury where you find the header information

22   for this email?

23   A.  So, every service is different.  On Yahoo you have to go to

24   "more" and then "view raw message."

25   Q.  What are we looking at now?

HckWtuz2                    DeCapua - Direct

1   A.  So as I testified before, an email is made up of two parts,

2   the content and then the header.  Right here, you see all this

3   seemingly random numbers and dates.  This is all part of the

4   header.  It isn't until you get down to the very bottom that

5   you see the actual content, which is just the words "Hi, Joel."

6   And, of course, however long the content is and whether there's

7   links or anything else, it will be included after the header

8   information.

9           MS. GRISWOLD:  And the Message-ID that's in the

10  middle, can we highlight that.  Scroll down a little.

11  Q.  Do you see that?

12  A.  I do.

13  Q.  Are you familiar with the term "Message-ID"?

14  A.  I am.

15  Q.  What is it?

16  A.  So, as I said before, as a, as a forensicator, there's

17  certain things in a message header that we find has value as

18  digital artifacts, and one of those things in particular is

19  something called a Message-ID.  Now, a Message-ID is completely

20  invisible to you when you send or receive an email unless you

21  go in and view the raw message, but the Message-ID is -- it's a

22  unique number that is assigned to every single email that's

23  sent, and it -- there's certain characteristics of it that we

24  can analyze and we can make certain conclusions about the

25  underlying email.

HckWtuz2                    DeCapua - Direct

1   Q.  You just used the term "forensicator."  What does that term

2   mean?

3   A.  A forensicator is something that is used colloquially

4   within the digital forensics community just to refer to someone

5   who practices digital forensics.

6         THE COURT:  You've also used the term "digital

7   artifact."  Could you tell us what you mean when you say

8   digital artifact.

9         THE WITNESS:  Absolutely.  So an artifact just means

10  something that we find that can give us some insight on what

11  happened in the past.  If you're Indiana Jones, you're looking

12  at sarcophaguses and writings on walls.  For us, we're looking

13  for things like time stamps or any other pieces of data that

14  can tell us what happened in the past.

15        THE COURT:  With respect to an email message.

16        THE WITNESS:  That's correct.  We use the term

17  generally throughout digital forensics, but in respect to an

18  email header and message, there's also forensics -- there's

19  also digital artifacts within a header.

20        THE COURT:  OK.

21  BY MS. GRISWOLD:

22  Q.  Do you have a local email client on your laptop?

23  A.  I do.

24  Q.  What do you have?

25  A.  I have Apple Mail.

HckWtuz2                      DeCapua - Direct

1   Q.  Can you show the jury how you're able to pull this email

2   from the Yahoo account onto your local email client?

3   A.  Absolutely.

4   Q.  And if you could just narrate the steps that you're taking

5   when you're doing it.

6   A.  So the first thing I do, and you may recognize this

7   program, is just open up the mail program, and because I've

8   never set it up before, it's going to ask me for my user name

9   and password.  When I hit create, it's reaching out to Yahoo's

10  server and it's authenticating that my password is correct, and

11  then it's going to prompt me with an option to set up the

12  account, and when I do, the local email client is going to

13  reach out to the server hosted by Yahoo.  They're going to

14  communicate over the IMAP protocol, and they're going to sync.

15  And what that means is the local email client is going to look

16  at Yahoo's server and say, Is there anything here that's not on

17  the local email client?  And it's going to find the email

18  message that Mr. Naftalis sent me and it's going to pull that

19  down onto my local email client, so I push "create."

20  Q.  And the inbox that we're looking at now, is that from your

21  Apple Mail?

22  A.  Yes, it is.  And so here, you see it took a few seconds,

23  but it pulled down the email that was stored on Yahoo's server.

24  Q.  Can you open that email up?

25          Now, can you pull this email onto your laptop and save

HckWtuz2                        DeCapua - Direct

1    it onto your laptop?

2    A.  Yes.

3    Q.  Can you walk the jury through how you do that and narrate

4    as you just did?

5    A.  Sure.  So the easiest way, it is technically on my laptop

6    right now, but in order to save it on my laptop and a place

7    that I know how to quickly get to it, I would just export my

8    mailbox.  And to do that I would go to "mailbox," "export

9    mailbox."  It will ask me where I want to put it.  I'm just

10   going to say on the desktop, and you'll see there's a new file

11   here called inbox.mbox, and that's where the emails are stored.

12   Q.  Can you open up the email you just saved on your desktop?

13   A.  Sure.

14           MR. JACKSON:  Objection, your Honor.

15           THE COURT:  Grounds.

16           MR. JACKSON:  Scope.  Discussion yesterday.

17           THE COURT:  All right.  I'll hear you at sidebar.

18           (Continued on next page)

19

20

21

22

23

24

25

HckWtuz2                         DeCapua - Direct

1           (At sidebar)

2           THE COURT:  All he's done so far is he's brought it

3    down from the Yahoo server.  He's stored it on the desktop of

4    his laptop, and she's asked him whether he can open up the

5    email.  I didn't see that as implicating any of our discussion

6    yesterday.  Are you troubled by anything that's happened so

7    far?

8           MR. JACKSON:  Your Honor, I'm just a little bit

9    concerned about what the next step is.

10          THE COURT:  OK.  So you want to know what's happening

11   next.

12          MR. JACKSON:  I want to know what's happening next

13   because it's not clear to me why we need to take the last step.

14          MS. GRISWOLD:  The steps that we took, our view is

15   that's exactly consistent with what Government Exhibit 2908

16   says.  It says pull from Yahoo onto Outlook and onto my laptop.

17   He's now shown it exists on his laptop.  Now we're just going

18   to delete it from Yahoo.  I'm not going to at this point say,

19   Can you alter it, or anything like that.

20          When we get to the later testimony, he's going to

21   testify about the specific features of the emails that he

22   looked at that were produced by the defendant, but at this

23   point, I'm not intending to do anything else with this, messing

24   with this email.

25          MR. JACKSON:  OK.  Thank you.  I appreciate that.  The

HckWtuz2                    DeCapua - Direct

1    one thing I will say, your Honor, is that going back to Yahoo

2    and deleting the email was not part of what the government's

3    proffer was as to what the demonstration would be yesterday.  I

4    think this is the end of what they proffered to demonstrate,

5    their efforts to go back to the email in Yahoo and delete.

6              Now I understand there's an email where my client

7    discusses it, but I think it's much more speculative testimony

8    in terms of the demonstration.  We're no longer demonstrating a

9    function that is a contested function that they can connect,

10   something that theoretically could have happened.  We're now

11   going into something that's beyond the scope of their proffer,

12   and I don't think it's necessary.  I think you can ask Special

13   Agent DeCapua, Can you delete the email from Yahoo without

14   doing a demonstration of that, and I wouldn't object to that.

15             MS. GRISWOLD:  I disagree.  We've tried to be very

16   careful, but the email says delete the messages from Yahoo.

17             THE COURT:  I agree.

18             (Continued on next page)

19

20

21

22

23

24

25

HckWtuz2                    DeCapua - Direct

1              (In open court)

2    BY MS. GRISWOLD:

3    Q.  Now that you have the email saved on your desktop, can I

4    ask you to close out of that file and go back to Yahoo and show

5    the jury how you can delete the email from both Yahoo and your

6    local email client?

7    A.  So now I'm back to Yahoo.  And there's just the one email,

8    so I just click it and go to delete.  And then I would just

9    empty my trash.  And in doing so, the email no longer exists at

10   Yahoo.  The only place the email exists right now is on my

11   laptop computer.

12   Q.  Did you use any FBI or proprietary software to do the

13   demonstration that you just provided?

14   A.  No.  This is all stuff just out of the box.

15   Q.  What do you mean when you say out of the box?

16   A.  It comes preloaded on the computer.

17   Q.  Based on your experience as an FBI agent and obtaining

18   search warrants, email search warrants, if you were to obtain

19   an email search warrant for all email content in this James

20   Smith account at this moment, what would you expect to receive

21   in response?

22   A.  I would --

23              MR. JACKSON:  Objection.

24              THE COURT:  Do you want to approach on this?

25              MR. JACKSON:  Yes, your Honor.

HckWtuz2                         DeCapua - Direct

1                THE COURT:  OK.

2                (Continued on next page)

HckWtuz2                    DeCapua - Direct

1            (At sidebar)

2            THE COURT:  The point is that the email no longer

3   exists on the email server.

4            Is that your point?

5            MS. GRISWOLD:  Yes.

6            THE COURT:  And you object.

7            MR. JACKSON:  Yes, your Honor.  I don't think the

8   witness has a foundation for that, and I think it's factually

9   incorrect.  In fact, I think it's widely advertised by most of

10  the web mail services that you can delete your account and

11  recover it with some --

12           MS. GRISWOLD:  But at this moment --

13           I'll let you finish your thought.

14           MR. JACKSON:  The question was, What would you expect

15  to recover if you issued a search warrant?  I don't think that

16  this witness could testify that if a warrant was issued to

17  Yahoo it would be able to get the content we just saw.  If it

18  was recoverable, then certainly it's conceivable to me that

19  Yahoo --

20           MS. GRISWOLD:  I don't think that that would be his

21  testimony.  The only place that that email exists now is on his

22  laptop.  Yahoo would only have what's on their servers, and

23  there's nothing on that server right now.

24           MR. JACKSON:  This witness does not have sufficient --

25           THE COURT:  I tend to agree that there is no

HckWtuz2                          DeCapua - Direct

1    foundation at this point for him to testify about what would be

2    produced in response to a search warrant if Yahoo got one now

3    for the James Smith account.

4              MS. GRISWOLD:  OK.  I'll move on.

5              (Continued on next page)

HckWtuz2                      DeCapua - Direct

1                (In open court)

2        BY MS. GRISWOLD:

3        Q.  So the Yahoo account at this point has no emails in it,

4        correct?

5        A.  Correct.

6        Q.  In the James Smith account?

7        A.  Correct.

8                MS. GRISWOLD:  OK.  We can close out of the

9        demonstration.  Thank you.

10       Q.  Now, the process that you just demonstrated, does it work

11       the other way; that is, can you take the email on your laptop

12       and put it back into the Yahoo account using the method that

13       you just demonstrated?

14       A.  Yes, you can.

15       Q.  Based on your experience, the way that a web mail account

16       and the local email client account interact, are you able to

17       offer an opinion on whether the fact that an email exists in a

18       web mail account means the email is authentic?

19               MR. JACKSON:  Objection.  Vague.

20               THE COURT:  All right.  I'll hear you at sidebar.

21               (Continued on next page)

22

23

24

25

HckWtuz2                          DeCapua - Direct

1              (At sidebar)

2              THE COURT:  I thought we covered this yesterday.  I

3     thought you were OK with this question, but it appears that

4     you're not.

5              MR. JACKSON:  No, your Honor.  You're right, I'm OK

6     with this concept.  My problem is the language of the question.

7              THE COURT:  OK.

8              MR. JACKSON:  Does it mean that the email is

9     authentic, I don't know what that means in the context of that

10    question.  When you talk about all the "if there's an email

11    that is in an account, it's an authentic something," OK, so I

12    just think that the question leaves a great degree of

13    ambiguity, and it's very difficult for me to interrogate.

14             MS. GRISWOLD:  Then I can ask him whether or not prior

15    to putting it back up on the Yahoo account it's possible to

16    make changes.  I don't have to link it to the specific emails

17    at issue here, if that's your concern; then that would be the

18    natural question to ask.

19             MR. JACKSON:  I think that we already went over the

20    fact that I don't think this witness has sufficient, I don't

21    think this witness has sufficient basis to offer that specific

22    opinion, but I think the question -- this is just my

23    suggestion.  I think the question that should be asked is, Does

24    the fact that an email is in a Yahoo account mean that the

25    email was necessarily sent when the email purports to have been

HckWtuz2                    DeCapua - Direct

1      sent.

2              THE COURT:  Or you could ask something like, Can you

3      conclude from the presence of an email on the Yahoo web mail

4      service that it accurately reflects content, date sent?

5              MR. JACKSON:  I think the judge's question is the best

6      question.

7              MS. GRISWOLD:  And then I'm going to say why not, and

8      he's going to say because if you have control of the account,

9      you can make alterations to it.  That was the testimony at the

10     hearing as well.  I just want to be clear so we don't come back

11     for another sidebar.  So the clear question that the Court

12     thinks is most appropriate would be to ask whether or not based

13     on the email in the Yahoo account you can tell whether or not

14     the person who is sending, the time, the details in it are, in

15     fact, authentic.

16             MR. JACKSON:  It's the word "authentic."  What the

17     Court said was whether you can tell whether that information --

18             THE COURT:  Maybe we should write it down.

19             MS. GRISWOLD:  I apologize, your Honor.

20             THE COURT:  I'll get a piece of paper.  My question

21     started with, Can you conclude from the presence of an email on

22     a web mail service such as Yahoo that it accurately reflects

23     the date it was sent, the content of the email and the sender

24     and recipient?

25             MR. JACKSON:  Thank you,.  (Continued on next page)

1        (In open court)

2   BY MS. GRISWOLD:

3   Q.   Special Agent DeCapua, can you conclude from the presence

4   of an email in a Yahoo account, on the Yahoo servers, that the

5   email in that account accurately reflects the date it was sent?

6   A.   Absolutely not.

7   Q.   Can you conclude from the presence of the email in a Yahoo

8   account that it accurately reflects the content of the email?

9   A.   You cannot.

10  Q.   Can you conclude from the presence of the email in the

11  Yahoo account that it accurately reflects the sender or

12  recipient?

13  A.   You cannot.

14  Q.   Why not?  And keep your voice up?

15  A.   The reason is an email is not self-authenticating, so if it

16  appears in one place, that doesn't mean anything because it can

17  be spoofed and put there using a technique that is out there

18  that people know how to do, and it involves using the IMAP --

19            MR. JACKSON:  Objection, your Honor.

20            THE COURT:  Sustained.  Sustained.

21            MR. JACKSON:  Move to strike the last answer.

22            THE COURT:  The entire last answer?

23            MR. JACKSON:  No, your Honor.  Just the last part,

24  from "out there."

25            THE COURT:  Yes.  The answer from the point of "out

HckWtuz2                        DeCapua - Direct

1   there that people know," and the remaining part of the answer

2   is struck from the record, and the jury should disregard it.

3   BY MS. GRISWOLD:

4   Q.  Special Agent DeCapua, when an individual has control over

5   their own web mail account, such as the control that you have

6   with the James Smith account, do they have access to the header

7   information of the email?

8   A.  They do.

9   Q.  And are they able to alter the information in that

10  header --

11  A.  Yes, they --

12  Q.  -- if they have control over the account?

13  A.  Yes, they are.

14  Q.  Are they able to alter the content if they have access to

15  the account?

16  A.  Yes, they are.

17  Q.  Now I want to turn to some of the specific emails in

18  evidence in this case.  Let me ask you to define a few terms.

19  You talked about the Message-ID before.  Are you familiar with

20  the term "epoch," E-P-O-C-H?

21  A.  Yes, I am.

22              (Continued on next page)

23

24

25

HCKTTUZ3                    DeCapua - Direct

1   BY MS. GRISWOLD:

2   Q.   What does it mean?

3   A.   So an epoch time stamp is a way of telling time and date.

4   We use the Julian calendar, March 15, 2009.  Computers use

5   something that is easier for them to understand, and the most

6   commonly used way for computers to tell the time and date is

7   something called an epoch timestamp, which all it is is the

8   number of seconds that have a passed since midnight

9   January 1st, 1970 in Greenwich Mean Time, and it's a number in

10  the billions right now, and most forensic timestamps we see are

11  in epoch timestamp format.

12          THE COURT:  You just mentioned Greenwich Mean Time.

13  What is Greenwich Mean Time?

14          THE WITNESS:  Greenwich Mean Time is the time zone

15  that London, England is in.

16  BY MS. GRISWOLD:

17  Q.   How frequently have you come across epoch timestamps in the

18  course of your review of email headers?

19  A.   This would be the first time that I have looked at an epoch

20  timestamp in a email header, but in my review of digit

21  evidence, it's all the time.

22  Q.   And when you say "all the time," can you give us an example

23  of where you have come across an epoch timestamp?

24  A.   You find it in network logs mostly.  When someone tells us

25  they were hacked and we ask for the network logs and we're

HCKTTUZ3                    DeCapua - Direct

1    trying to figure out when dates and times that things happened,

2    most of it will be in an epoch timestamp, and I would have do

3    the conversion from epoch to something that I can understand.

4    Q.  Two more terms before we turn to some emails.  Are you

5    familiar with the format UUID?

6    A.  I am.

7    Q.  What does it stand for and what does it mean?

8    A.  UUID stands for Universal Unique Identifier.  And what it

9    is is something that is very commonly used in computing.  And

10   it's just a number, it's like a serial number, but it has a

11   very specific format that when you look at it, you recognize

12   it.

13   Q.  Have you had training in computer science?

14   A.  I have.

15   Q.  Are you familiar with the term hexadecimal?

16   A.  I am.

17   Q.  Can you spell that for the court reporter?

18   A.  Hexadecimal is spelled H-E-X-I-D-E-C-I-M-A-L.

19   Q.  And what does hexadecimal mean?

20   A.  So our counting system has base ten, we count one through

21   ten.  For computers, because of the way they're built and how

22   they work, it's easier for them to count using a base 16.

23   Hexadecimal is a counting system that uses base 16, and it's

24   just like our counting system, it starts at zero and goes up to

25   nine, but then for ten through 16, it uses letters.  So to

HCKTTUZ3                    DeCapua - Direct

1    count in hexadecimal you go start at zero and go to nine, and

2    the next would be A, B, C, D, E, and F and it stops at F.

3            MS. GRISWOLD:  I would like to pass up to witness what

4    is marked for identification as Government Exhibit 3550, 3551

5    and 3552, and the Court as well.

6            Also passing up what is marked for identification as

7    Government Exhibit 34, which is a stipulation between the

8    parties.  With the Court's permission I would like to read

9    Government Exhibit 34.

10           THE COURT:  Are you offering it?

11           MS. GRISWOLD:  Yes, your Honor.

12           THE COURT:  Is there any objection to Government

13   Exhibit 34?

14           MR. JACKSON:  No objection at all.

15           THE COURT:  Government Exhibit 34 is received.

16           (Government's Exhibit 34 received in evidence).

17           THE COURT:  And you may read it.

18           MS. GRISWOLD:  Thank you.

19           At this point I'm going to read paragraphs four and

20   five of Government Exhibit 34.

21           THE COURT:  Do you want them displayed to the jury?

22           MS. GRISWOLD:  Yes, please, your Honor.

23           Paragraph four.  On November 30, 2017, at the request

24   of the government, Omar Amanat's attorneys logged onto a Yahoo

25   web mail account belonging to Mr. Amanat and produced copies of

1  the underlying emails with header information related to Amanat

2  Exhibits 908, 9010 and 9013 to the government.

3         Paragraph five.  Government Exhibits 3550, 3551, and

4  3552 are copies of the underlying emails with header

5  information related to Amanat Exhibits 908, 9010 and 9013.

6         At this time the government would offer Government

7  Exhibits 3550, 3551 and 3552.

8         MR. JACKSON:  No objection.

9         THE COURT:  3550, 3551 and 3552 are received in

10  evidence.

11         (Government's Exhibits 3550, 3551 and 3552 received in

12  evidence)

13  BY MS. GRISWOLD:

14  Q.  You have those documents in front of you, Special Agent

15  DeCapua?

16  A.  I do.

17  Q.  Let's start with Government Exhibit 3550.

18         MS. GRISWOLD:  Permission to publish that, your Honor?

19         THE COURT:  Yes.

20         MS. GRISWOLD:  And can we please put this up side by

21  side with Amanat Exhibit 908, which is in evidence, in redacted

22  form.

23  Q.  Do both of these emails appear to be emails dated March 10,

24  2009?

25  A.  Yes.

HCKTTUZ3                    DeCapua - Direct

1    Q.   And are they the same subject line?

2    A.   So one of them is the reply.

3    Q.   They both say audit of Enable Invest Ltd?

4    A.   Yes.

5              MR. JACKSON:  Excuse me, your Honor, may I ask the

6    Court to ask the government to briefly read the portion of our

7    stipulation that relates to redactions?

8              THE COURT:  Yes, that might be appropriate,

9    Ms. Griswold.

10             MS. GRISWOLD:  Yes, your Honor.  I believe the portion

11   of the stipulation that Mr. Jackson is referring to is in

12   paragraph one.

13             THE COURT:  Yes, is that what you wish read at this

14   point, Mr. Jackson?

15             MR. JACKSON:  Yes, your Honor, thank you.

16             THE COURT:  All right.

17             MS. GRISWOLD:  On the morning of November 7, 2017,

18   Omar Amanat's attorneys first produced copies of emails that

19   were ultimately admitted into evidence at trial in redacted

20   form as Amanat Exhibits 908, 9002, 9010, and 9013.  These

21   documents were redacted before being offered at the request of

22   the government.

23             MR. JACKSON:  Thank you very much.

24             MS. GRISWOLD:  If we could put back up Government

25   Exhibit 3550 next to Amanat Exhibit 908.

HCKTTUZ3                      DeCapua - Direct

1  BY MS. GRISWOLD:

2  Q.  So the 3550, this has header information for this email?

3  A.  That's correct.

4  Q.  And it includes more email content than is reflected in

5  Amanat Exhibit 908?

6  A.  Yes.

7  Q.  But it does include the email content in the redacted

8  Amanat Exhibit 908, correct?

9  A.  Yes.  Yeah, there's things missing from the content in 908.

10  Q.  So focusing on 3550, which is the email produced by the

11  defendant with the header information, did you take a closer

12  look at the header information for this March 10, 2009

13  document?

14  A.  I did.

15  Q.  I want to direct you in particular to the message ID.

16          MS. GRISWOLD:  If we could highlight that at the top.

17  Q.  Did you take a closer look in particular at the message ID?

18  A.  I did.

19  Q.  What did you look at and what did you find?

20  A.  So I was asked to look at this email and try to determine

21  whether or not it was authentic.  And of course, as I said, an

22  email header could have some very useful things that help make

23  that determination.  And looking at this header there wasn't a

24  lot of information, so I zoomed in on the message ID, because I

25  know that sometimes a message ID can have, for instance, a

HCKTTUZ3                     DeCapua - Direct

1    timestamp.

2          Looking at the message ID, it looks just like a random

3    number, but there's way to make sense of these numbers and try

4    to figure out what they mean.  And so what I did is first I

5    looked, and this message ID is from a Blackberry, so when you

6    send an email from a Blackberry, Blackberry tags this message

7    ID on to the email.  And I looked for more examples of

8    Blackberry message IDs then and they looked just like this.

9    Q.  Are when you said you were looking for examples, were you

10   provided access to a set of emails?

11   A.  I was.  So first I looked online and I saw they were all

12   consistent, and I wanted to make sure they were consistent

13   around this exact time period, March 2009, because I know

14   sometimes you can -- a company can change the format of its

15   message ID.  And I knew that the government had in its

16   possession some emails that were recovered from a guy named

17   Stephen Maiden's computer, and I knew that he was going to have

18   emails from Omar Amanat.

19         So I went to that computer and I sorted the messages

20   by sender, and I exported every single message from Omar

21   Amanat.  And then when I got to to my office I looked all the

22   headers and carved out the ones sent from Omar Amanat with a

23   Blackberry, and I just compared all the message IDs in a line,

24   there were hundreds of them, and I noticed a pattern in those

25   message IDs.

HCKTTUZ3                     DeCapua - Direct

1          MS. GRISWOLD:  I would like to show the witness what

2   is marked for identification as Government Exhibit 3579A, and

3   the Court.

4   Q.  Do you recognize what is marked as Government

5   Exhibit 3779A?

6   A.  I do.

7   Q.  How do you recognize it?

8   A.  This is something I created.

9   Q.  Is it a chart that you created based on your review of

10  message IDs from Omar Amanat Blackberry from Maiden's computer?

11  A.  That's correct.

12  Q.  Is it accurate?

13  A.  Yes.

14          MS. GRISWOLD:  The government offers Government

15  Exhibit 3579A.

16          MR. JACKSON:  No objection, Judge.

17          THE COURT:  3579A is received.

18          (Government's Exhibit 3579A received in evidence)

19          MS. GRISWOLD:  Permission to publish?

20          THE COURT:  Yes.

21  Q.  So this chart is entitled select emails present on Stephen

22  Maiden's computer around March 10, 2009, sent from Omar Amanat

23  with a Blackberry message ID.  Is that an accurate title for

24  the content?

25  A.  It is.

1    Q.  And this chart has less than several hundred emails.  Does

2    this include all of the emails that you reviewed from

3    Mr. Maiden's computer?

4    A.  No, these are just the ones that were right around

5    immediately around the timestamp.

6    Q.  Can you walk the jury through the columns in this chart and

7    what it is that they indicate?

8    A.  So the first column is date and time sent.  Now from the

9    header I just plucked the date, it's very clear cut, I just

10   copied and pasted it into this column for each email.  The

11   sender, same thing, I just took the sender field from the

12   message header.  In this case, every single one is Omar Amanat.

13          Then I took the message ID, again, from the message

14   header I just copied and pasted that field and populated this

15   column.  And then we're jumping a little bit ahead of ourselves

16   here, but then there were two additional columns, one is for a

17   hidden timestamp that I found within the message ID, and the

18   next column is the conversion from epoch time, which is what

19   the hidden timestamp is in, into something that is human

20   readable.

21          MS. GRISWOLD:  Could we highlight the very first row.

22   Q.  And can you make sense of this row?  This is an email that

23   you found on Mr. Maiden's computer?

24   A.  Yes.

25   Q.  And that you understand to be authentic?

HCKTTUZ3                        DeCapua - Direct

A.   Yes.

Q.   And can you walk through the comparison of the first
column, date time sent, with the last column, timestamp
conversion?

A.   Absolutely.  So as I was -- as I mentioned before, when I'm
looking at all the message IDs I noticed that pattern, and the
pattern is the second number in the message ID after the first
hyphen, it was incrementing as dates were going into the
future.  So a really old message would have -- this number
would be lower and a newer message the message would be higher,
and I saw it was just incrementing.

        And I immediately recognized it at this point, this a
timestamp, an epoch hidden timestamp within the message ID.
And because of that, I knew I could use that, it would have
some value as helping me figure out if the email here is
actually authentic.  And so what I did is I started converting
the message IDs from epoch time, which again is just a number
which represents the number of seconds since January 1st, 1970,
into something that I could read and make sense of.  On the far
right-hand side of the spreadsheet you could see the timestamp
and timestamp conversion, which is just me making that
conversion.

        Then I recognized that -- I knew it was a timestamp, I
didn't know what it was a timestamp of.  But once I made this
conversion I started looking at the sent date, and I saw that

HCKTTUZ3                    DeCapua - Direct

1    the timestamp conversion for every single email was within

2    seconds of the sent date.  So therefore I concluded that this

3    hidden timestamp that's in the message ID is a reflection of

4    when the email was sent.

5    Q.  For the hundreds of emails that you reviewed, putting aside

6    the exhibits that are in evidence in this case, did the date

7    time stamp line up when you did the timestamp conversion, did

8    they match?

9    A.  Yes.

10        MS. GRISWOLD:  If we could pull up the highlighted

11   row, please.

12   Q.  Is this the message ID information that was pulled from

13   Government Exhibit 3550 that was provided by the defendant?

14   A.  Yes.

15   Q.  Can you walk us through what you noticed when you analyzed

16   this message ID?

17   A.  So now that after reviewing the emails I found on Stephen

18   Maiden's computer, I knew what to expect, and so I compared it

19   to the emails that I was provided to determine the authenticity

20   of.  And I saw that the message ID, the hidden timestamp within

21   the message ID, when I made the conversion it came to

22   July 23rd, 2009, which is not the date that the email was sent.

23   Q.  Based on your review of this header information and all of

24   the other information on Mr. Maiden's computer that you've

25   testified about, are you able to offer an opinion as to whether

1   or not this email, the Tuesday, March 10, 2009 email, is

2   authentic?

3   A.  Yeah, it's a fake email.

4   Q.  Are you confident in that opinion?

5   A.  I am.

6   Q.  Now besides this one example that's highlighted on the

7   screen, were you able to find any other examples in the

8   hundreds of Blackberry messages from Omar Amanat to Mr. Maiden

9   on his computer where the timestamp conversion did not match up

10  with the date and time sent?

11  A.  No.

12  Q.  Were you able to find any other examples besides this one?

13  A.  Not from the ones on Stephen Maiden's computer.

14          MS. GRISWOLD:  Let's turn to Government Exhibit 3552,

15  please, and if we could put that up side by side with Amanat

16  Exhibit 9002.

17  Q.  From the stipulation that I read, Government Exhibit 3552

18  on the left is the December 2nd, 2008 email with the header

19  information as provided by the defendant?

20  A.  That's correct.

21  Q.  And did you take a closer look at the message ID in this

22  email?

23  A.  I did.

24  Q.  And what did you find?

25  A.  So again, now that I knew there was a hidden timestamp in

HCKTTUZ3                    DeCapua - Direct

1    the message ID, I immediately zoomed in on it.  And the first

2    thing I noticed is the message ID -- the hidden timestamp is

3    absurd, it's actually a date in the future, and I knew it

4    couldn't possibly be real.

5    Q.  If we could go to what is marked for identification as

6    Government Exhibit 3579B.

7         Do you recognize Government Exhibit 3579B as another

8    chart you prepared for your testimony?

9    A.  Yes.

10   Q.  And is it accurate?

11   A.  It is accurate.

12   Q.  Does it relate to December 2nd, 2008 analysis?

13   A.  It does.

14        MS. GRISWOLD:  The government offers Government

15   Exhibit 3579B.

16        MR. JACKSON:  No objection.

17        THE COURT:  Government Exhibit 3579B is received.

18        (Government's Exhibit 3579B received in evidence)

19   BY MS. GRISWOLD:

20   Q.  The title of this chart is select emails present on Stephen

21   Maiden's computer around December 2nd, 2008, sent from Omar

22   Amanat with a Blackberry message ID.

23        What does this chart reflect?

24   A.  It reflects the same thing as -- the same information as

25   the previous chart, it is just comparing the December 2nd, 2008

HCKTTUZ3                    DeCapua - Direct

1   email provided by the defendant to all the other emails I found

2   on the Stephen Maiden computer.

3   Q.  Around that time period?

4   A.  Around that time period.

5   Q.  Putting aside the highlighted ones, for all of the other

6   ones on the chart, did the date and time stamp time sent, the

7   first column, match up when you did the timestamp conversion?

8   A.  Yes, within an approximation.

9   Q.  What about the highlighted row, if we could blow that up,

10  what did you find when you looked at the hidden timestamp for

11  the Tuesday, December 2nd, 2008, header information?

12  A.  As I said before, it indicates a date that's in the future.

13  Q.  October 29, 2087?

14  A.  Yes.

15  Q.  Based on your review of this user ID -- sorry, message ID

16  information from the December 2nd, 2008 email reflected in

17  Amanat Exhibit 9002, are you able to offer an opinion as to

18  whether or not this email is authentic?

19  A.  Yes.

20            MR. JACKSON:  Objection.

21            THE COURT:  Grounds?

22            MR. JACKSON:  Goes beyond the scope of what he's

23  testifying to.

24            THE COURT:  I'll hear you at sidebar.

25            Ladies and gentlemen, we'll take a brief recess.

HCKTTUZ3                    DeCapua - Direct

1     Don't discuss the case, we'll get back to you shortly.

2              (At sidebar)

3              THE COURT:  So I didn't understand how this was

4     different than his previous question.

5              MR. JACKSON:  Your Honor, frankly, I anticipated the

6     first question would come in slightly differently, and I should

7     have objected at that time.  But I do think that this -- I

8     understand that the question was posed at the hearing, and I

9     understand for the purposes of hearing that type of sort of

10    blunt questioning could be potentially useful to the Court.  I

11    didn't think that the government would ask a question that went

12    that far in terms of the conclusion that Special Agent DeCapua

13    is able to offer.  And I think that the conclusion that he's

14    able to offer really is that the message ID on here he does not

15    believe is authentic.  He can't testify that the message in its

16    entirety is inauthentic.  There's no basis for that.

17             MS. GRISWOLD:  I think he can, I think it can be two

18    questions if you want, but I think what he would say is this

19    message ID is fake, and when you have a fake message ID, in his

20    opinion -- and he's set forth his qualifications, his opinion

21    is that that means that the email is fake.

22             MR. JACKSON:  But there's no scientific basis for

23    that, it's entirely possible --

24             THE COURT:  I guess it turns into the question of what

25    do you mean by "fake."  So what we mean by that, I think, is

HCKTTUZ3                    DeCapua - Direct

 1   that the message was not sent at the time and date indicated.

 2   Maybe that's a better way to -- maybe that's more precise.

 3            MR. NAFTALIS:  Your Honor, one of the issues is there

 4   is no evidence it was ever even sent, so I don't want to leave

 5   the misimpression.  The point is it was fabricated, and the

 6   point it is that it was never moved between computers.

 7            MR. JACKSON:  But what the Court just said encompassed

 8   what you said.  The fact that it was not sent at the time and

 9   date it purports to have been sent encompasses --

10            MR. NAFTALIS:  That assumes it was ever sent though.

11            MR. JACKSON:  It does not, it doesn't assume that, and

12   that's really what his opinion goes to scientifically.

13            THE COURT:  I think it's implicit, because according

14   to agent's chart, it was sent in 2087.

15            MR. NAFTALIS:  Maybe I'm being too sensitive to it,

16   but the whole point is that we're -- the jury doesn't know that

17   you can upload -- we haven't completed the whole steps.  We

18   would contest that this email even moved between two computers,

19   so to limit his testimony to it was sent leaves the impression

20   for Mr. Jackson to argue maybe there was computer error when it

21   moving between the computers.  And the point is it was

22   fabricated and never actually moved.  It's an impossibility.

23            MS. GRISWOLD:  The jury heard the term "authenticity"

24   throughout the trial, and I think here, if you don't want me to

25   say is it fake, I think it would be accurate to say based on

HCKTTUZ3                         DeCapua - Direct

1   this message ID, can you offer an opinion to whether or not

2   this email is authentic.

3            MR. JACKSON:  Again, I think it's enormous --

4   authentic does not actually answer the question, it goes

5   beyond -- there's a whole bunch of things that are encompassed

6   in that that goes beyond the scope of what he can actually

7   testify to.

8            MS. GRISWOLD:  It was fabricated.  He would say that

9   message ID was typed in and everything was changed because it's

10  not possible.

11           MR. JACKSON:  He could say -- I think he could offer

12  that testimony and say my opinion is that this message ID was

13  fabricated.  I think that everything beyond that is beyond the

14  scope of his expertise.

15           THE COURT:  The other piece of it would be the email

16  was not sent at the time and date indicated.  He could

17  certainly testify to that.

18           MR. WILLIAMS:  Can she clarify whether or not he could

19  conclude that the email was ever sent to clear up any potential

20  implicit suggestion that the message ID was inaccurate but it

21  may have been sent earlier in time?

22           THE COURT:  Can he testify that the message was never

23  sent?

24           MS. GRISWOLD:  That particular message -- I am happy

25  to confer with him, but I believe, yes, he's saying that

HCKTTUZ3                    DeCapua - Direct

message ID is a message ID that doesn't make sense that tells
him that the email itself was a fabricated email.  When you say
"that message," I think he could testify that that specific
message was never sent.

          THE COURT:  I don't see how he could testify it was
never sent, because theoretically it could have been sent,
right?

          MS. GRISWOLD:  It could have been sent.

          THE COURT:  This particular communication was not
sent.  He couldn't testify that the content of that email was
not sent.

          MS. GRISWOLD:  Was never sent?

          THE COURT:  Yeah, who knows?  That's not a question
that he sought to answer, let's put it that way.

          MR. WILLIAMS:  Which is why I suggested the question:
Can you conclude, based on this message ID, whether or not this
email was ever sent?  And presumably he would say no, I cannot
make that conclusion.

          MS. GRISWOLD:  How about to offer an opinion that the
message ID was fabricated and that this particular email was
not sent on December 2nd, 2008?

          MR. JACKSON:  I'm good with that.  That's acceptable.

          THE COURT:  And I think that's clear.

          MR. JACKSON:  Your Honor, I want to -- related to
that, I would personally like to ask that -- can we clarify the

HCKTTUZ3                    DeCapua - Direct

1    record on his prior answer with regard to saying that it's

2    fake?  I think that that exact same language is what really

3    should be limited in his opinion in regard to both

4    communications.

5              MS. GRISWOLD:  I think you could elicit that on cross.

6    There was no objection and I think there was foundation for it.

7              THE COURT:  I don't think we can go back to that, but

8    you're welcome to cross-examine on that.

9              MR. JACKSON:  Thank you, Judge.

10             THE COURT:  We'll take a brief recess.

11             (Recess taken)

12             THE COURT:  Agent DeCapua can retake the stand.

13

14

15

16

17

18

19

20

21

22

23

24

25

HCKTTUZ3                         DeCapua – Direct

1          (Jury present)

2          THE COURT:  You may proceed.

3          MS. GRISWOLD:  Thank you, your Honor.

4          If we could please put up Government Exhibit 3579B.

5    BY MS. GRISWOLD:

6    Q.  Before the break, Special Agent DeCapua, we were talking

7    about the message ID that you identified for the Tuesday,

8    December 2nd, 2008 email that is in evidence in redacted form

9    as Amanat Exhibit 902.  I want to go back to your testimony

10   about what opinions you're able to offer concerning your

11   analysis.

12          First, let me ask you, are you able to offer an

13   opinion as to whether or not this message ID for this email was

14   fabricated?

15   A.  Yes.

16   Q.  And what is that opinion?

17   A.  It's fake.

18          MS. GRISWOLD:  Let's put up Amanat Exhibit 9002.  If

19   we could highlight the date, please.

20   Q.  Based on your testimony that the message ID is fake, are

21   you able to offer an opinion as to whether or not this email

22   was sent on Tuesday, December 2nd, 2008?

23   A.  Yes.

24   Q.  What's that opinion?

25   A.  It wasn't sent.

HCKTTUZ3                        DeCapua – Direct

1    Q.   And I assume your opinion -- well, let me ask, what's your

2    opinion as to whether or not it was sent in 2087?

3    A.   It definitely was not sent in 2087.

4    Q.   You testified earlier about your training and

5    investigations analyzing email headers in the context of

6    determining if emails were spoofed.  Do you recall that

7    testimony?

8    A.   I do.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HckWtuz4                    DeCapua - Direct

BY MS. GRISWOLD:

Q.  In that analysis, is the Message-ID a focus of your

analysis?

A.  It is.

Q.  Why?

A.  So when you're trying to determine whether an email is

faked or spoofed or fraudulent, as I mentioned before, you look

to the header, and there's certain things in the header that

you focus in on.  And as I mentioned before, you focus in on

the Message-ID, and one of the gold standards for determining,

determining that an email is fake is you find two emails in an

account with the same Message-ID.  Message-IDs are always

unique.  They're always unique.  If you find two with the same

Message-ID, you know one of them is fake.

     When you're spoofing an email or when you're trying to

create a fake email, you go into the header and you change

things in the header, and people know that a Message-ID can't

be the same.

               MR. JACKSON:  Objection.

               THE COURT:  Sustained.

BY MR. JACKSON:

Q.  So a Message-ID is important to your analysis whether or

not an email has been fabricated?

A.  Yes, it's common for a Message-ID to be changed by someone

fabricating an email because they don't want it to match the --

1            MR. JACKSON:  Objection.

2            THE COURT:  Sustained.

3            You can't testify as to what goes on in someone else's

4     mind, so whenever you lapse into topics of what someone else is

5     thinking, there's going to be an objection and it's going to be

6     sustained.

7            THE WITNESS:  I apologize.

8     BY MR. JACKSON:

9     Q.  In the course of your analysis of Message-IDs to determine

10    whether or not emails have been fabricated, have you identified

11    situations where the Message-ID has been changed?

12    A.  Yes.

13    Q.  Let's go to Government Exhibit 3551, the third email that

14    you were asked to analyze.

15            MS. GRISWOLD:  Put it up on the screen, please, and

16    put it side by side with Amanat Exhibit 9013.

17    Q.  On the left-hand side, Government Exhibit 3551, is this the

18    header information that you were provided for this March 26,

19    2012, exhibit?

20    A.  Yes, it is.

21    Q.  And based on the stipulation that we read, this is the

22    header information provided by the defendant for this email?

23    A.  That's correct.

24    Q.  I want to direct your attention to the Message-ID.

25            MS. GRISWOLD:  Could I ask Ms. Pyun to highlight it.

HckWtuz4                          DeCapua - Direct

1   Q.  Did you investigate this Message-ID?

2   A.  I did.

3   Q.  What, if anything, struck you about it?

4   A.  No. 1, it was created most likely with an Apple Mail

5   client, which is on an iPhone; it's on Apple computers.  And I

6   just identified the Message-ID as being the format that Apple

7   Mail uses.

8        The other thing that struck me is you can break this

9   Message-ID into two parts and you can break it up using the

10  "at" symbol that's right before Amanat Capital.  So what's

11  interesting is everything before the "at" symbol.  It looks

12  like a random jumble of numbers and letters, but that format is

13  something very significant in computer science.  This is a

14  UUID, which I defined earlier.  It stands for a universal

15  unique identifier, and they all have the same format.  There's

16  going to be eight characters, a hyphen, four characters, a

17  hyphen, four more characters, a hyphen, four more characters, a

18  hyphen, and then 12 characters.  And this is something found

19  throughout computer science on all different platforms.  It's

20  also known as a GUID, which stands for globally unique

21  identifier, and I know that a GUID or a UUID is in something

22  called hexadecimal, which I defined earlier.

23  Q.  Can you just remind the jury what hexadecimal is?

24  A.  Hexadecimal is the way that computers count, and it allows

25  for the digits zero through 9 and the letters A through F.

HckWtuz4                          DeCapua - Direct

Nothing else.

          THE COURT:  Could you go back and explain how it is
that you were able to determine that this was created on an
Apple Mail client?

          THE WITNESS:  Sure.  So, there's resources that I
looked at where it will say this is a pattern of the Message-ID
for this specific client or this is a pattern for Message-ID
for this specific client, and this specific pattern for a
Message-ID is associated with Apple Mail clients.  And also, I
tested that, and I've looked at emails that I know have been
sent from Apple Mail, including ones I've sent myself, ones
that have been sent from other people's pages in the regular
course of business, and they fit this pattern, every single one
of them.

          THE COURT:  When you say this pattern, could you
identify what you see on this exhibit, Government Exhibit 3551,
where on it is the pattern that you're talking about that
indicates it's Apple?

          THE WITNESS:  The pattern is the UUID, which is
everything before the "at" symbol and then the "at" symbol and
then everything after the "at" symbol, which is a domain name.

          THE COURT:  All right.  Go ahead, Ms. Griswold.
BY MR. JACKSON:
Q.  And you testified that you looked at some other emails to
make sure that you were correct that this was an Apple Mail, is

HckWtuz4                          DeCapua - Direct

1    that correct?

2    A.  I did.

3    Q.  Was that limited to messages from this case, or did you

4    take a broader universe?

5    A.  I took a very broad universe to include emails from -- sent

6    to me in the regular course of business, to emails that I

7    created myself using one of the accounts that I set up and

8    other emails in my possession where I would just quickly run

9    through and confirm that an Apple Mail client always has this

10   type of UUID.

11   Q.  So you testified that the hexadecimal can only have zero

12   through 9 or A through F.  Do I have that right?

13   A.  That's correct.

14   Q.  And in this case, what did you notice about this Message-ID

15   that struck you, based on those parameters?

16   A.  I noticed that in the, in the fifth set of numbers after

17   the fourth hyphen, it does not conform to a standard for UUID,

18   which I would expect it all to be hexadecimal.  There's two

19   characters, they're V's, which there's no reason a V should be

20   there, in a hexadecimal number.

21   Q.  Based on your review of this Message-ID and your

22   familiarity with hexadecimal characters, are you able to offer

23   an opinion as to whether or not this Message-ID was fabricated?

24   A.  Yes.  It's fake.

25           MS. GRISWOLD:  If we could zoom out and show the

HckWtuz4                          DeCapua - Direct

1    entire exhibit, Amanat Exhibit 9013.

2    Q.  Based on your testimony that the user ID is fake, are you

3    able to offer an opinion whether or not --

4            THE COURT:  It's the Message-ID that's fake, right?

5            MS. GRISWOLD:  Yes, your Honor.  If I said something

6    else, I misspoke.

7            THE COURT:  I heard you to say user ID.

8            MS. GRISWOLD:  Oh, I misspoke.

9            THE COURT:  Yes.  Could you reask the question,

10   please.

11           MS. GRISWOLD:  Certainly.

12   Q.  Based on your testimony that the Message-ID for this email

13   was fake, are you able to offer an opinion as to whether or not

14   this email was sent on Monday, March 26, 2012?

15   A.  It was not.

16           MS. GRISWOLD:  If we could put up on the screen Amanat

17   Exhibit 910 -- 9010.  Thank you, Mr. Urbanczyk.

18   Q.  Special Agent DeCapua, were you provided with any header

19   information for this email?

20   A.  No.

21   Q.  So you were unable to do the analysis you did on the other

22   emails?

23   A.  That's right.

24           MR. JACKSON:  And if we could bring up on one screen

25   Amanat Exhibits 908, 9002 and 9013.

HckWtuz4                     DeCapua - Direct

1   Q.  Starting with 908, what is your opinion as to whether or

2   not this email was sent on Tuesday, March 10, 2009?

3   A.  No.

4          MR. JACKSON:  Objection, your Honor.  Asked and

5   answered.

6          THE COURT:  Overruled.

7          This is a wrap-up, I take it.

8          MS. GRISWOLD:  It is, your Honor.

9          THE COURT:  Yes.  It's overruled.

10  BY MR. JACKSON:

11  Q.  What was your answer?

12  A.  It's a fake email.

13         MR. JACKSON:  Objection.

14         THE COURT:  The question was, Agent, whether Amanat

15  Exhibit 908, you could offer an opinion as to whether or not

16  that email was sent on Tuesday, March 10, 2009.  That was the

17  question.

18         THE WITNESS:  It was not sent.

19         MS. GRISWOLD:  If we could zoom up on 9013.

20  Q.  Are you able to offer an opinion as to whether that was

21  sent on Monday, March 26, 2012.

22  A.  It was not sent.

23  Q.  And finally, Amanat Exhibit 9002, are you able to offer an

24  opinion as to whether this email was sent on Tuesday, December

25  2, 2008, at 11:07 p.m.?

HckWtuz4                    DeCapua – Cross

1    A.  It was not sent.

2              MS. GRISWOLD:  No further questions, your Honor.

3              THE COURT:  All right.  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. JACKSON:

6    Q.  Good afternoon, Special Agent DeCapua.

7    A.  Good afternoon.

8    Q.  Special Agent DeCapua, I know you're a very accomplished

9    federal agent.  I want to ask you a few questions about your

10   training specifically related to the issues you've testified

11   about.

12       I'd also like to ask, I'd like to respectfully ask, I'm

13   going to try to phrase all my questions, unless it's necessary

14   otherwise, in the format of yes or no.  So I would ask if you

15   can answer it yes or no, please do so.  If you can't, please

16   let me know if you can't answer yes or no.

17   A.  OK.

18   Q.  Thank you, Agent.

19             Now, I want to just start off by asking you, you

20   attended Indiana University, correct?

21   A.  For my graduate degree, that's correct.

22   Q.  Where did you get your bachelor's degree?

23   A.  It was DePaul University.

24   Q.  OK, so you went to DePaul for undergrad and then you went

25   to Indiana University for graduate school, correct?

HckWtuz4                         DeCapua - Cross

1    A.  That's correct.

2    Q.  In neither of those did you get a degree in computer

3    science, right?

4    A.  I did not get a degree in computer science.

5    Q.  In neither of those did you have a minor in computer

6    science?

7    A.  I did not minor in computer science.

8    Q.  In either your graduate or your undergraduate education,

9    did you take any classes on network engineering?

10   A.  Not on network engineering.

11   Q.  You've never taken classes that qualified you to be a

12   network engineer, correct?

13   A.  Not in college or graduate studies.

14   Q.  OK, well, you're not a network engineer, right?

15   A.  Correct.

16   Q.  And network engineer is a type of technology professional

17   who has a specific technological understanding necessary to

18   construct and analyze the networks that are utilized for email

19   systems, correct?

20   A.  Yes.

21   Q.  Now, just to be clear, have you taken any formal classes on

22   engineering?

23   A.  Yes.

24   Q.  Now, one of the things that you talked about earlier was

25   some of your professional experience, right?

HckWtuz4                        DeCapua - Cross

1    A.  Yes.

2    Q.  You've never worked at Blackberry, correct?

3    A.  Correct.

4    Q.  You've never worked at Apple, correct?

5    A.  That's correct.

6    Q.  You've never worked at Microsoft?

7    A.  Correct.

8    Q.  You've never worked at any of the companies that actually

9    build the computer infrastructure that you've been testifying

10   about today, right?

11   A.  That's correct.

12   Q.  What did you do before you were a federal agent?

13   A.  I was an investigator for the state of Indiana.

14   Q.  Doing what type of investigations?

15   A.  It was primarily securities fraud, financial fraud, money

16   laundering.

17   Q.  OK.  And so after that, you came to the FBI, in 2009,

18   right?

19   A.  That's correct.

20   Q.  And for the first several years that you were at the FBI,

21   you weren't focused on the cyber squad that you're a part of

22   now, right?

23   A.  That's right.

24   Q.  You didn't transfer to that until 2015, right?

25            MS. GRISWOLD:  Objection.

HckWtuz4                         DeCapua - Cross

1            THE COURT:  Sustained.

2    Q.  2014?

3    A.  That's correct.

4    Q.  And so in 2014, you began to focus with particularity on

5    some of the types of cyber issues that have been your recent

6    focus, right?

7    A.  So, I can't answer that in yes or no.

8    Q.  That's fine.  That's fine.  I'll come back to that.  Let me

9    get more information.  The point being 2014 is when you joined

10   the cyber squad?

11   A.  That's right.

12   Q.  You've been doing that work for the past three years?

13   A.  Yes.

14   Q.  And I'm correct that that's when you started taking the

15   classes that we saw on your résumé from GIAC, right?

16   A.  That's correct.

17   Q.  Now, GIAC is not a governmental agency, correct?

18   A.  Correct.

19   Q.  GIAC is a, it's a nonprofit organization, right?

20   A.  I believe so, yes.

21   Q.  And just to be clear, and I have a couple of questions

22   about GIAC, but you've never held an appointment as professor

23   in network engineering or any other type of computer science at

24   any university, have you?

25   A.  No.

HckWtuz4                          DeCapua - Cross

Q.  And you've never been published in any journal related to

computer sciences, right?

A.  No.

Q.  You've never been published in any journal related to

network engineering, correct?

A.  No.

Q.  You've never been published in any journal that relates to

the architecture of email systems, right?

A.  No.

Q.  And just going back to GIAC, GIAC has been the heart of

your formal training on these issues, right?

A.  That's correct.

Q.  The total amount of time that you have spent in formal

training in GIAC is about two weeks, am I correct?

A.  You are incorrect.

Q.  I'm incorrect?

A.  That's right.

Q.  OK.  What is the total amount of time that you've spent in

formal training in GIAC?

          THE COURT:  Could we find out what you mean by formal

training?

          MR. JACKSON:  Yes, your Honor.

          THE COURT:  Do you mean training at GIAC, or do you

mean something else?

          MR. JACKSON:  I mean training at GIAC.

HckWtuz4                    DeCapua - Cross

1   Q.   Let me ask you.  What is the total amount of time that

2   you've spent in courses at GIAC?

3   A.   So, just -- quickly, just to differentiate for the record,

4   GIAC is the certifying body.  They don't put on courses.  The

5   body that puts on courses is something called SANS, and the

6   total amount of time that I sat in a class, probably six weeks.

7   Q.   OK.  So you've sat in classes for SANS for about six weeks

8   for your GIAC certifications?

9   A.   Thereabout.

10  Q.   And you have several different GIAC certifications that we

11  went through?

12  A.   That's correct.

13  Q.   Now, to pass a GIAC course, you only have to take one

14  class, right, one test?

15  A.   Yes.

16  Q.   And you have to get 69 percent or better on that test,

17  right?

18  A.   So, each exam has a different threshold.  I believe the 69

19  percent is for the really difficult -- it's a networking exam,

20  which I passed.  Most of them are closer to like the 70 to 80

21  percent threshold.

22  Q.   OK.  You don't know specifically what the threshold was for

23  each one of the GIAC certifications in your résumé, right?

24  A.   Not right now, no.

25  Q.   OK, but it's your testimony that generally it hovers

HckWtuz4                       DeCapua - Cross

1    somewhere between 69 percent and about 80 percent, is that

2    right?

3    A.   Yes.

4    Q.   And to be clear, there are different levels of GIAC

5    certifications, right?

6    A.   Correct.

7    Q.   There's a beginner level?

8    A.   Yes.

9    Q.   And then there are two intermediate levels.  One is called

10   intermediate and one is called advanced, right?

11   A.   So -- I don't know.  I don't know what you're talking

12   about.

13   Q.   OK.  There's an intermediate level, right, in GIAC?

14   A.   There are intermediate-level courses.  There's one course

15   that is definitely the beginner level, which I actually did not

16   take, and then there are the intermediate level and then the

17   advanced courses.

18   Q.   And then there's a level above the advanced that's called

19   expert courses, right?

20   A.   So, there's not an expert course.  There's an expert

21   certification.  The GFE is what I believe you're referring to.

22   Q.   Have you seen the GIAC road map for certification that is

23   listed on the GIAC website?

24   A.   I have.

25   Q.   And you're aware that it identifies that there's an expert

HckWtuz4                         DeCapua - Cross

1    level, right?

2    A.  Yes.  It's just a test.  It's actually not a class.

3    Q.  Right.  And the certification is called GIAC security

4    expert, right?

5    A.  That's correct.

6    Q.  That's a certification that you don't have?

7    A.  It's a certification I don't have currently.

8    Q.  OK.  Now, the fact of the matter is you were describing in

9    your direct examination some of your work with email headers,

10   correct?

11   A.  That's correct.

12   Q.  And am I correct that, just going back earlier to one of

13   the things that you talked about with the judge --

14        MR. JACKSON:  Can we focus on 3579-B.

15   Q.  And this is one of the documents that you created for this,

16   right?

17   A.  Correct.

18   Q.  For your testimony?

19   A.  Correct.

20   Q.  And there is a time stamp here.  There's a column for the

21   time stamp, correct?

22   A.  That's right.

23   Q.  With the exception of December 2, 2008, email that's

24   highlighted, all of the other emails you got off Mr. Maiden's

25   computer, right?

HckWtuz4                          DeCapua - Cross

1    A.  Yes.

2    Q.  And when you took a look at those, you said you took a look

3    at hundreds of them, right?

4    A.  That's correct.

5    Q.  How many exactly did you take a look at?

6    A.  So, I don't know the exact number.  I had them all in a

7    gigantic test file, and then I automated the process of looking

8    through them all, and I didn't count the exact number.

9    Q.  OK.  Did you take notes as you were doing this process?

10   A.  No.

11   Q.  OK.

12   A.  Other than populating this.

13   Q.  But you put all of those in a gigantic text file, the

14   hundreds you were looking at?

15   A.  Correct.

16            THE COURT:  And these were all Blackberry messages,

17   right?

18            THE WITNESS:  Yes.

19   Q.  What did you do with that text file?

20   A.  So, I ran some scripts on it just to quickly parse out the

21   information I'm interested in, particularly the part that is

22   the hidden time stamp, so then I put that all in another column

23   without having to type them in all by hand.

24   Q.  I guess my question specifically was, did you save that

25   text file?

HckWtuz4                    DeCapua - Cross

A.   I would assume so, but I'm not 100 percent sure if I did.

Q.   OK.  Did you save the scripts that you ran in connection
with the text file?

A.   No.

Q.   OK.  So you ran the scripts; did you write down what you
saw when you ran the scripts?

          THE COURT:  Could you explain what you mean by
scripts?

          THE WITNESS:  So, there's some built-in scripting
programs in Linux, which is the computer I was -- it's a type
of operating system that I was using to do this analysis
because you can quickly parse through large text files, and by
large I mean humongous.  These were, just to open the text
file, it would crash the computer, so I needed a way to
systematically quickly parse through it, and Linux has some
built-in tools that you can use to script.  And by script, I
just mean it's an automated process that takes the manual work
out of things, and so I can write a script that says, Using the
tool built into Linux to ingest every single one of these
Message-IDs and throw out everything other than the hidden time
stamp number that I'm interested in, and then that script will
say take that hidden time stamp number and create a new text
file where all these hidden time stamps are just there, and
then I can take them and copy and paste them into a column.

          THE COURT:  I see.

HckWtuz4                          DeCapua - Cross

1    BY MR. JACKSON:

2    Q.  Now, one of the things you said is that when you ran these

3    scripts, I think your direct testimony was they all came close

4    to the sent time, and I think your words were "within an

5    approximation"?

6    A.  That's correct.

7    Q.  When you say within an approximation, how big was the gap

8    that you saw in the messages that are not on your sheet from

9    the sent time that was listed in the email?

10   A.  So, after -- I didn't look through every single one, but

11   after taking a sampling, I saw that it was consistently a few

12   seconds to maybe like a minute or two, at most, different from

13   the actual sent time of the email.

14   Q.  I'm confused, because you said, I thought, in your direct

15   testimony, that you went through hundreds of these and saw that

16   the sent time consistently matched up with what you described

17   as the time stamp.  Right?

18   A.  Right.  So I would eyeball it.  I would scroll through and

19   say, all right, these all say March 3, and these are March 3,

20   I'm going through, and I'm not looking at each second, you

21   know, time stamp for every single one.

22   Q.  So you didn't actually test out for all these hundreds that

23   you went through, you didn't actually test out whether or not

24   the time in the time stamp that you found matched up with the

25   sent time?

1          MS. GRISWOLD:  Objection to form.  Test out.

2          THE COURT:  Sustained.

3   Q.  You didn't actually make a determination for each one of

4   the specific emails that you looked at whether the time stamp

5   matched up with the sent time?

6          THE COURT:  That's confusing.  You mean the ones on

7   the chart or all the ones he looked at?

8          MR. JACKSON:  I'm talking about all of the emails that

9   he looked at, your Honor.

10  A.  All the emails I looked at, I -- to my satisfaction, I was

11  happy that the time stamp reflected the date the email was

12  sent.

13  Q.  OK.  Let's put aside satisfaction.  My question is, did you

14  actually run the number that you found, what you believe is the

15  hidden time stamp in order to convert it into a time that is

16  human readable for all of these hundreds of messages?

17  A.  Yes.

18  Q.  So you actually ran the conversion?

19  A.  Yes.

20  Q.  Did you preserve that anywhere?

21  A.  I don't think so.  I don't know.

22  Q.  You're not sure?

23  A.  I'm not sure.

24  Q.  OK.  You knew that you were doing this in anticipation of

25  testifying in court, right?

HckWtuz4                      DeCapua - Cross

1    A.  Well, that's why I built this spreadsheet.

2    Q.  I see, but I'm talking about what's not on the spreadsheet.

3    You knew that that was all in anticipation of your testifying

4    in court, correct?

5    A.  Correct.

6    Q.  And so you ran hundreds of bits of analysis, and you're

7    telling me that you didn't take any notes?

8                THE COURT:  Sustained.

9    Q.  OK.  You didn't preserve what you ran in any way?

10               MS. GRISWOLD:  Objection.  May we have a sidebar?

11               MR. JACKSON:  Your Honor, I'm going to move on to

12   another topic.  We can talk about it on a break.

13               THE COURT:  All right.

14   BY MR. JACKSON:

15   Q.  Now, one of the things you also have said --

16               MR. JACKSON:  Can you get, I don't know the exhibit

17   number, the third --

18   Q.  By the way, you first came up with this two nights ago,

19   right?

20   A.  That's correct.

21   Q.  So before two nights ago, you had never come up with this

22   theory before?

23               MS. GRISWOLD:  Objection.  Form.  This theory.

24               THE COURT:  Sustained.

25   Q.  All of the analysis we're talking about, right, you came up

HckWtuz4                         DeCapua - Cross

1   with two nights ago?

2           MS. GRISWOLD:  Objection.

3           THE COURT:  Grounds.

4           MS. GRISWOLD:  Form and as to what he means by this

5   analysis.  It's too vague.

6           THE COURT:  Can you rephrase your question?

7           MR. JACKSON:  Yes, Judge.

8   Q.  During your direct testimony, Special Agent DeCapua, you

9   described your realization that there was a hidden time stamp

10  within certain Blackberry messages, correct?

11  A.  That's correct.

12  Q.  You came to that conclusion two nights ago, right?

13  A.  That's correct.

14  Q.  And before that, you had never done any analysis where you

15  determined that there was a purported hidden time stamp in the

16  Blackberry system, right?

17  A.  That's right.

18  Q.  And to be clear, you've never conferred with anyone at

19  Blackberry to verify your theory, right?

20  A.  That's correct.

21  Q.  And so no one on your cyber squad had ever heard of this

22  theory before, correct?

23          THE COURT:  What theory?

24          MR. JACKSON:  Withdrawn, your Honor.

25  Q.  You're not aware of any literature anywhere that describes

HckWtuz4                        DeCapua - Cross

1    the hidden time stamp that you're talking about that you see in

2    these messages, correct?

3    A.   So, there is literature that describes that time stamps are

4    sometimes embedded in Message-IDs.

5    Q.   But you're not aware of any literature that describes the

6    specific hidden time stamp that you've been talking about,

7    right?

8             THE COURT:  I don't understand the question.

9    Q.   Well, you've been talking about a hidden time stamp that

10   you've been using in these Blackberry messages, right?

11   A.   Correct.

12   Q.   You're not aware of anywhere that it's documented that that

13   hidden time stamp appears in Blackberry messages?

14   A.   Correct.  I found it.

15   Q.   You found it on your own?

16   A.   Yes.

17   Q.   Now, one of the things that you know, and I think you

18   testified on direct, is that companies can alter the way that

19   Message-IDs are created within their computer systems, right?

20   A.   That's correct.

21   Q.   That comes down to a coding decision, correct?

22   A.   Yes.

23   Q.   And there are numerous ways of creating a Message-ID,

24   right?

25   A.   Correct.

HckWtuz4                        DeCapua - Cross

1   Q.  From a computer standpoint, from a coding standpoint?

2        Well, just to be clear, you don't actually -- you're not a

3   person who has ever actually done the coding for the creation

4   of Message-IDs, right?

5   A.  I have not.

6   Q.  But you are aware that the coding connected to Message-IDs

7   can be utilized to create a unique Message-ID in a number of

8   different ways, right?

9            MS. GRISWOLD:  Objection.  Foundation.

10           THE COURT:  Sustained.

11  Q.  Now, the fact of the matter is one of the things that you

12  testified about on your direct examination was this concept of

13  a UUID?

14  A.  That's correct.

15  Q.  And I think your testimony -- first of all, your testimony

16  has been that a Message-ID has to be unique, right?

17  A.  That's correct.

18  Q.  That's not precisely correct, right?

19  A.  I believe, according to the authoritative RFC that

20  addresses Message-IDs, the one thing it says a Message-ID must

21  be is unique.

22  Q.  Right.

23           THE COURT:  And when you say authoritative RFC, what

24  is it you're talking about?  What's the RFC?

25           THE WITNESS:  So when the Internet was developed,

HckWtuz4                         DeCapua - Cross

1    the -- it was a bunch of universities that were just exchanging

2    information, saying how should we make our computers talk to

3    each other, and the convention for sharing information and for

4    publishing it was something called an RFC, which stands for

5    request for comment.

6          Now, over time, the request-for-comments that have

7    been published by -- there's a nonprofit agency, I don't know

8    what the name of it, they have become the authoritative

9    guidebook for what specific protocols must have and what they

10   should have and generally how computers are supposed to talk

11   over a network.  And so when developers are trying to figure

12   out how they should code their software, the most authoritative

13   place where they get the answers as what they must and should

14   have, they go to the RFC where things are published.

15   BY MR. JACKSON:

16   Q.  Thank you.  I'm glad we got to the creation of the

17   Internet, because you're aware of how UUIDs were developed,

18   right?

19          MS. GRISWOLD:  Objection.  Foundation.

20          MR. JACKSON:  I'm asking a question.  He's been

21   talking about his understanding of the history of the Internet.

22          THE COURT:  The objection is overruled.

23          Are you aware how UUIDs were developed?

24          THE WITNESS:  No.

25   BY MR. JACKSON:

HckWtuz4                         DeCapua - Cross

1   Q.   Have you heard of the Apollo company?

2   A.   No.

3   Q.   You're not familiar with that at all?

4   A.   No.

5   Q.   Have you heard of Hewlett-Packard?

6   A.   Yes.

7   Q.   You know that Hewlett-Packard is one of the companies that

8   was involved in the early creation of UUIDs?

9   A.   I have no idea.

10  Q.   You're not familiar with that.  OK.

11       Are you familiar with what is known as the Open Software

12  Foundation?

13  A.   I've heard of it, yes.

14  Q.   You've heard of it, right?  That's the organization that

15  deals with standards for UUIDs, correct?

16  A.   I don't know.

17  Q.   You're not familiar with that?

18  A.   No.

19  Q.   OK.  Have you ever looked into any of the standards

20  associated with UUIDs?

21            MS. GRISWOLD:  Objection.  Form.

22            THE COURT:  Sustained.

23  Q.   What is the source of your training on UUIDs?

24  A.   Mostly it's in Windows Registry Forensics.  A UUID is used

25  very frequently, and I don't -- I never got into the history of

HckWtuz4                          DeCapua - Cross

 1    them or why they look the way they are, but they're one of

 2    those things that when you see them you know them.

 3    Q.  Let's back up from that.  What I'm trying to understand is

 4    how is it that when you see a UUID, you know it?  Where did you

 5    learn that?

 6              THE COURT:  Let's start with, what do you mean by

 7    Windows Registry Forensics?  What is that, and what is the

 8    relationship between that and your ability to identify UUIDs?

 9              THE WITNESS:  So, Windows keeps a database inside

10    their operating system that's called a registry, and inside the

11    registry has different things related to the operating system.

12    For instance, system mate is in the registry.  And as a

13    database it has something called a key, which is a number that

14    represents each field in the database, and something that's

15    commonly used in the Windows registry to act as a key is a

16    UUID.

17    BY MR. JACKSON:

18    Q.  OK.  So I want to know, where did you learn about the

19    UUIDs?

20    A.  From studying digital forensics.

21    Q.  Is it something that you learned in your GIAC classes?

22    A.  Yes, it was something that was discussed in GIAC classes,

23    not the history or formation, but the fact that this is a UUID.

24    Q.  Right.  To be clear, no one ever taught you in GIAC classes

25    that you could look at a UUID and determine definitively that

1   it came from an Apple Mail client, right?

2   A.  Correct.

3   Q.  And in fact, you can't look at a UUID and determine

4   definitively that it came from an Apple Mail computer, can you?

5   A.  You can't.

6   Q.  Right.  It's impossible because there are many different

7   ways a UUID can be created, right?

8   A.  Yes.

9   Q.  A software engineer can create, can design programming that

10  creates a UUID that has the same format as the one you looked

11  at that's not an Apple Mail UUID, right?

12          MS. GRISWOLD:  Objection.  Foundation.

13          THE COURT:  Sustained.

14  Q.  Now, your testimony was that all UUIDs are in hexadecimal,

15  correct?

16  A.  Correct.

17  Q.  And what is the source of your belief?  Can you point us to

18  any authority that says that all UUIDs are hexadecimal?

19          MS. GRISWOLD:  Objection to form.

20          THE COURT:  Overruled.

21  A.  Yes, there's lots --

22          THE COURT:  I guess there are two questions there.

23          MR. JACKSON:  Let me break it up, your Honor.

24  Q.  What is the source of your understanding that all UUIDs are

25  in hexadecimal?

HckWtuz4                    DeCapua - Cross

1   A.  So, first, it's just been through observation, and second,

2   it's been through research.  I believe the Wikipedia posts for

3   hexadecimal says or the Wikipedia post for UUID says "is in

4   hexadecimal."

5   Q.  You're relying on Wikipedia?  That's your testimony?

6           MS. GRISWOLD:  Objection.

7           THE COURT:  His testimony was that he was relying on

8   his own observation and Wikipedia.

9   Q.  OK, so your observations plus Wikipedia, right?

10  A.  Plus other sources that don't come to mind right now, but

11  it's an established standard.

12  Q.  What other sources?  Can you give us any of them?

13  A.  You could probably open up an introductory computer science

14  textbook, and it will describe what a UUID and have

15  information.

16  Q.  Sir, your theory --

17          MS. GRISWOLD:  Objection.

18          THE COURT:  Sustained.

19  Q.  Your testimony that all UUIDs are in hexadecimal is based

20  on the idea -- first of all, you understand, right, that a UUID

21  doesn't have to be in base 16?  Right?

22          MS. GRISWOLD:  Objection.  Foundation.

23          MR. JACKSON:  He's testified about it.  I'm asking the

24  question.

25          THE COURT:  Overruled.

HckWtuz4                    DeCapua - Cross

1              You can answer that question.

2    A.   They do have to be in base 16.

3    Q.   Sir, isn't it a fact that UUIDs can be created in base 32?

4    A.   UUIDs?

5    Q.   Yes, UUIDs.

6    A.   No.

7    Q.   OK.  Sir, isn't it a fact that UUIDs can also be created in

8    base 64?

9    A.   My understanding is all UUIDs are in hexadecimal.

10   Q.   Do you know what base 32 is?

11   A.   I know it as a concept but not in practice.

12   Q.   Educate us on what you know about it as a concept, please.

13   A.   So, as a concept, like I said, we count in base 10.  It's

14   an counting system that goes up to 10.  Computers count in base

15   16, which is a counting system that that goes up to the number

16   16 and incorporates letters up to F in order to represent

17   numbers higher than 10.  Base 32 would be a counting system

18   that counts up to 32.  Base 64 would be a counting system that

19   counts up to 64.

20              THE COURT:  But have you ever seen or do you have

21   experience with either base 32 or base 64?

22              THE WITNESS:  No, and I don't see them in practice in

23   digital forensics.

24   BY MR. JACKSON:

25   Q.   Well, you've done some Google searches in connection with

HckWtuz4                          DeCapua - Cross

1    your testimony today, right?

2    A.  Yes.

3    Q.  Didn't you come across numerous articles online that

4    indicate UUIDs can be created in base 32 and base 64?

5    A.  No.

6    Q.  You've never seen that?

7    A.  I've never seen that.

8    Q.  OK.  I want to show you something that's marked as Amanat

9    Exhibit 97.

10           MR. JACKSON:  Let me show this just to the witness.

11           Your Honor, I'm going to pass a copy to the Court.

12   Q.  Please take a look at that, sir, and then I have some

13   questions.

14   A.  OK.

15   Q.  Is this an article that you've reviewed before?

16   A.  No.

17   Q.  OK, but having looked at this, does this alter your opinion

18   at all about whether or not a UUID can be created in base 32 or

19   base 64?

20           MS. GRISWOLD:  Objection.  Foundation.

21           THE COURT:  Sustained.

22   Q.  Let me show you a different document that I'm going to mark

23   as Amanat Exhibit 98.

24       Do you see this, sir?

25   A.  I do.

HckWtuz4                          DeCapua - Cross

1   Q.  OK.  Is this something that you've ever come across in your

2   Google searching?

3               THE COURT:  In his Google searching?  Is that what you

4   said?

5               MR. JACKSON:  Yes, your Honor.

6               MS. GRISWOLD:  Objection to form.  When he says this,

7   does he mean this particular article?

8               THE COURT:  That's what you mean, right?

9               MR. JACKSON:  Yes, Judge.

10  A.  This particular blog post, no.

11  Q.  OK.  Have you come across blog posts where people are

12  discussing programming that they've done to create UUIDs in

13  base 64?

14  A.  No.

15              MS. GRISWOLD:  Objection.  Foundation.

16              MR. JACKSON:  It's a question.

17              THE COURT:  He's answered it.  He said no.

18              Next question.

19  BY MR. JACKSON:

20  Q.  The fact of the matter is you understand that if a UUID was

21  created in base 64, it would include all the letters in the

22  alphabet?

23              MS. GRISWOLD:  Objection.

24              THE COURT:  Sustained.

25              MR. JACKSON:  Your Honor, he's testified.

1             THE COURT:  Sustained.

2    BY MR. JACKSON:

3    Q.  Putting aside the creation of a UUID, do you know what base

4    64 is?

5    A.  So, yes.

6    Q.  OK.  In base 64, all of the letters of the alphabet are

7    used, correct?

8    A.  Yes, and a couple symbols also.

9    Q.  OK.  And the difference between base 32 and base 64 is that

10   in base 32, you use all capital letters, right?

11            MS. GRISWOLD:  Objection.  Foundation.

12            MR. JACKSON:  He said he knows what it is.

13            MS. GRISWOLD:  32.

14            THE COURT:  Actually, he hasn't testified that he

15   knows what base 32 is, so the objection's sustained.

16            MR. JACKSON:  Thank you, Judge.

17   Q.  Agent DeCapua, do you know what base 32 is?

18   A.  So, it's not something that's used.  Base 64 --

19   Q.  I'm just asking whether or not you know what it is?  Do you

20   know what it is?

21   A.  As a concept, yes.

22   Q.  As a concept.  OK.  Let's just talk conceptually.  In base

23   32, you use the digits zero through 9 as well as all the

24   letters of the alphabet in capitals?

25   A.  I have no idea.

1              MS. GRISWOLD:  Objection.  Foundation.

2              MR. JACKSON:  He said he had no idea.

3              THE COURT:  OK.  The transcript's garbled.  I'm

4    sustaining the objection.

5    BY MR. JACKSON:

6    Q.  Sir, can you -- the Wikipedia page --

7              THE COURT:  I'm sorry?

8              MR. JACKSON:  The Wikipedia page.

9    Q.  It's a fact that nowhere on the Wikipedia page for UUIDs

10   does it say that a UUID has to be in base 16, correct?

11   A.  I don't know for sure, but UUIDs are in base 16.

12   Q.  Sir, if you don't know for sure, that's fine.  That's my

13   question.  Do you know?

14   A.  If it's in the Wikipedia article?

15   Q.  Yes.

16   A.  I don't know.

17   Q.  The fact of the matter also, sir, is that --

18             MR. JACKSON:  If we could take a quick look at

19   Government Exhibit 3551.

20             THE COURT:  Government Exhibit 3951?

21             MR. JACKSON:  3551, your Honor.

22             THE COURT:  3551.

23             MR. JACKSON:  Yes, and if we could zoom in on the top

24   half of that.

25   Q.  To be very clear, you eyeballed this and thought it looked

HckWtuz4                         DeCapua - Cross

1    like a UUID, right?

2              MS. GRISWOLD:  Objection.

3              THE COURT:  Are we putting 3551 up on the screen,

4    because I don't have anything?

5              MR. JACKSON:  It's on the screen, your Honor.  It may

6    be a glitch.

7              THE COURT:  It wasn't on my screen.

8              MR. JACKSON:  Sorry.

9              THE COURT:  Can you ask the question again.

10             MR. JACKSON:  Yes.

11   Q.  You testified that you eyeballed this, right?

12             MS. GRISWOLD:  Objection.  Mischaracterizes the

13   testimony about this Message-ID.

14             THE COURT:  Sustained.

15   BY MR. JACKSON:

16   Q.  The fact of the matter is you can't state definitively that

17   this is a unique UUID, can you?

18   A.  When looking at it --

19   Q.  I'm sorry.  I'm just asking, yes or no, you can't state

20   definitively that this is a UUID?

21   A.  Well, it's not a UUID because it has a V in it.

22   Q.  Right.  And the fact of the matter is it is possible to

23   create a Message-ID that has this format that is not a UUID,

24   right?

25             MS. GRISWOLD:  Objection.  Foundation.

1              THE COURT:  Sustained.

2    Q.  Now, one of the things that programming believes

3    Message-IDs can do is adapt the format related to the

4    Message-ID when network conditions change, right?

5              MS. GRISWOLD:  Objection to form.

6              THE COURT:  Sustained.  You can ask the question, but

7    I don't understand its present format.

8              MR. JACKSON:  OK, Judge.

9    Q.  Sir, you understand network conditions in terms of the

10   amount of traffic are something that can impact the transfer of

11   an email message, right?

12             THE COURT:  That's just too vague.  Do you mean

13   traffic, or do you mean something else?

14             MR. JACKSON:  I mean traffic, your Honor.

15             THE COURT:  OK.  Reask the question and focus on

16   traffic.

17             MR. JACKSON:  OK.

18   Q.  You're familiar --

19             THE COURT:  Actually, it's volume of traffic, right?

20             MR. JACKSON:  Yes, your Honor.

21   Q.  You're familiar with the concept of network traffic, right?

22   A.  Yes.

23   Q.  Network traffic, when it increases, impacts the movement of

24   emails from one server to another, right?

25   A.  It could slow down.

HckWtuz4                          DeCapua - Cross

1   Q.  Right, and one of the things that a programmer can do is

2   alter the information that would appear in Message-ID,

3   depending on network traffic, correct?

4           MS. GRISWOLD:  Objection.  Foundation and form.

5           THE COURT:  Sustained.

6           MR. JACKSON:  Your Honor, could we have a sidebar?

7           THE COURT:  Yes.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Now, you have established that he's not a

3     coder, he's never studied coding, he's never done any coding,

4     and now you're asking him what programmers can do.  Not only is

5     there no foundation, but the limited foundation that is in the

6     record suggests that he doesn't know anything about this.  If

7     you want to get into, and this has been a recurring problem.

8     If you want to get into these area, you've got to lay a

9     foundation that he has an understanding, and then we can get to

10    the specific question, but you're starting with a question

11    without any background as to what he knows and what he doesn't

12    know.

13         MR. JACKSON:  Judge, here's my problem.  I definitely

14    tended to undermine his credentials, because I don't think this

15    witness knows what he's talking about, but he testified on

16    direct extensively about some very problematic conclusions, and

17    I don't feel like a foundational objection on cross-examination

18    of an expert witness who has testified as to these subjects is

19    appropriate.  If he doesn't know the answer, he should just say

20    "I don't know the answer."  I mean, the whole point of my

21    question is to determine whether he knows the answer.  To say

22    lack of foundation, that's more appropriate for direct

23    examination or cross-examination of someone who is a fact

24    witness.

25         THE COURT:  Let me make a couple of points.  First of

1    all, the witness has been completely cooperative with you.

2              MR. JACKSON:  Agreed.

3              THE COURT:  He has not been hostile.

4              MR. JACKSON:  Agreed.

5              THE COURT:  He's not been obstructive.  He's been

6    completely cooperative.

7              MR. JACKSON:  Agreed.

8              THE COURT:  So I have no reason to believe that if you

9    tried on lay a foundation with him that he would try to

10   obstruct your examination in any way.  All the evidence

11   suggests so far is that he relied observation and answered

12   quite candidly whether he knows, for example, about programming

13   or whether he doesn't.

14             MR. JACKSON:  I agree, Judge.

15             THE COURT:  The problem with just sort of dropping

16   these questions in is it's hard to evaluate what his answer is

17   without knowing whether he's got any background in what it is

18   we're talking about, and this particularly concerned me because

19   you brought out coding, he doesn't do coding, and now you're

20   asking him what programmers do.  I just don't know that he has

21   that background.

22             MR. JACKSON:  I agree, Judge, but it's fundamentally

23   unfair for them to make foundation objections.  I have no

24   problem with Special Agent DeCapua's testimony.  In my cross of

25   an expert, for whom I have no discovery, who I never met before

HckWtuz4                    DeCapua - Cross

1    to make foundational questions every time I ask a question, I

2    have no way of knowing what he does and does not know, and I

3    have to be allowed to explore that.

4            THE COURT:  You did have the opportunity to question

5    him on two separate occasions, so it's not entirely accurate to

6    say you don't know anything about this witness.  You've heard

7    him testify twice about the subject matter that we're talking

8    about now, and I say that not to minimize the situation.

9            MR. JACKSON:  No, I understand, Judge.

10           THE COURT:  What we're doing here is quite unusual

11   given that the problem came up in the middle of trial, but I

12   did want to say for the record it's not entirely accurate to

13   say that you haven't had prior exposure to the witness, because

14   he's testified at length twice before.

15           MR. JACKSON:  I agree, Judge.

16           THE COURT:  But I'm sensitive to what you've said.

17           I am going to give him some latitude.  If I think that

18   the background is so lacking in foundation that it will be hard

19   to interpret what his answer is, I'll sustain the objection,

20   and if I don't, I will allow it.  I am going to allow him some

21   latitude, though.

22           MS. GRISWOLD:  I understand, your Honor.  I just would

23   note for the record these appear to be network engineering and

24   coding questions.  I don't think the witness has this

25   background.  I can't follow the questions.  I don't think he

HckWtuz4                    DeCapua - Cross

1    has the foundation for them.

2              THE COURT:  That's another point.  On a number of the

3    questions I've sustained objections to I didn't understand the

4    question, and you've gone out of your way to bring out that he

5    doesn't have credentials in these areas, and now you're asking

6    him very technical questions.  In demonstrating that he's not a

7    network engineer and he doesn't know anything about coding,

8    etc., etc., you've undermined your own ability to ask him these

9    very technical questions, because he's agreed with you.  He's

10   not a network engineer, he hasn't studied computer science, he

11   hasn't done coding.  And so when we get into these kinds of

12   areas, it doesn't give me comfort that he has an adequate

13   background to understand and to answer your questions.

14             MR. JACKSON:  Your Honor, I definitely appreciate

15   that.  I think the Court's ruling is very fair.  I appreciate

16   it.  I just want to point out for an expert witness as opposed

17   to a fact witness, even him saying that he does not know about

18   a particular subject is highly, highly relevant.

19             THE COURT:  I don't disagree.

20             MR. JACKSON:  If he can say "I don't know," if he can

21   say "I'm not familiar with that," it informs the jury's

22   understanding of what the scope of his knowledge is.

23             THE COURT:  I don't disagree.

24             MS. GRISWOLD:  I don't disagree either.  And I think

25   he's said that, he doesn't have knowledge in these areas.

1          MR. JACKSON:  That's fine, I just don't think a

2    foundational objection is appropriate.  I think it's perfectly

3    appropriate for an expert witness to say "I don't know that,"

4    "that's beyond the area of my expertise," "I haven't looked

5    into that," "I'm not familiar with that," and I'll accept his

6    answers.

7          THE COURT:  But you're not asking whether he's

8    familiar with that or not.  That's kind of the problem.  Your

9    refusal to ask foundation questions doesn't allow him, and

10   you've made it very clear you want yes-or-no answers to your

11   questions and so it doesn't give him an opening to say "I'm

12   sorry, I don't know about that field."  Your questioning and

13   your style don't permit him to say that.  If it did, we

14   wouldn't be up here.

15         MR. JACKSON:  OK.  Judge, I'll just note, last, we

16   have a bigger problem, but we'll address that at the break.

17         THE COURT:  While we're up here, can you give us a

18   preview?

19         MR. JACKSON:  Yes, I can.

20         THE COURT:  OK.

21         MR. JACKSON:  There's an enormous 3500 problem in that

22   I've got nothing --

23         MS. GRISWOLD:  I handed you the two pieces -- Special

24   Agent DeCapua sent me an email with essentially the data from

25   the charts that we created at, like, two in the morning, before

HckWtuz4                          DeCapua – Cross

1    we created them, and I handed those to you at the hearing.

2              MR. JACKSON:  I think we should talk about it at the

3    break.

4              (Continued on next page)

HckWtuz4                          DeCapua – Cross

1                    (In open court)

2                    THE COURT:  Please proceed, Mr. Jackson.

3                    MR. JACKSON:  Thank you very much, Judge.

4       Q.  Now, to be clear, Special Agent DeCapua, in the total

5       amount of time that you've spent training on, in training on

6       relevant, that is relevant to electronic evidence and

7       specifically email headers adds up to about two weeks, right?

8                    MS. GRISWOLD:  Objection to form.

9                    THE COURT:  Sustained.

10      Q.  The total amount of time you've spent in formal classes

11      related to email headers adds up to about two weeks, correct?

12      A.  That's correct.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

HCKTTUZ5                         DeCapua - Cross

1    BY MR. JACKSON:

2    Q.   Now just going back to 3511 --

3              THE COURT:   3511?

4              MR. JACKSON:   Sorry, 3551, your Honor.

5              If we could have 3551 again.

6    Q.   Can you point us to any authority that says that a message

7    ID in this format has to come from Apple mail?

8    A.   There are articles online that -- forensic articles

9    published by forensic groups that describe that Apple mail --

10             MR. JACKSON:   Sorry, I'm going to object.

11   Q.   I'm just asking:   Can you identify an authority?

12             THE COURT:   You mean -- what do you mean by identify,

13   the author of the article?

14             MR. JACKSON:   Sure, the author of the article, the

15   name of the website, the name of the article.

16   Q.   Can you identify any article that says this?

17             THE COURT:   Do you want him to talk about websites or

18   talk about authors or what?

19             MR. JACKSON:   Let's take it one by one, Judge.

20   Q.   Can you identify any published book that says that a

21   message ID in this format has to come from Apple mail?

22   A.   Sitting here today, I can't think of any published book.

23   Q.   Okay.   Can you identify a specific article anywhere that

24   says a message ID in the format on Government Exhibit 3551 has

25   to come from Apple mail?

1   A.  I said there are articles, I cannot identify a specific one

2   sitting here today.

3   Q.  Now you knew you were going to be testifying about this

4   particular subject, right?

5   A.  That's correct.

6   Q.  And you were asked some questions about this at a separate

7   proceeding, correct?

8   A.  That's correct.

9   Q.  Did you endeavor to try to find any specific articles that

10  suggest that this message ID format necessarily indicates Apple

11  mail?

12  A.  So now that you bring up the earlier hearing, I think we

13  did give you a copy of an article I found that identifies a

14  GUID an at sign then domain name as belonging to Apple mail.

15  Q.  I don't think that's accurate, but my question is not

16  whether or not Apple mail can create a GUID like this, but

17  whether or not the creation of a GUID with this format

18  necessarily indicates Apple mail?

19          THE COURT:  Could we refer to it as G-U-I-D?  Because

20  I'm not sure how the court reporter is supposed deal with

21  "GUID."

22          MR. JACKSON:  Yes, your Honor, just using the

23  witness's language.

24  Q.  It's probably better to refer to it as a UUID.  Same thing,

25  right?

HCKTTUZ5                    DeCapua - Cross

1   A.  I agree, yes.

2   Q.  GUID and UUID are the same thing, correct?

3   A.  Same thing.

4   Q.  Just to confirm, Special Agent DeCapua, I want to confirm,

5   as you sit here now, you're not aware of any specific authority

6   that you can identify that says that a UUID in this format must

7   come from Apple mail, right?

8   A.  Sitting here today, no.

9   Q.  And you do concede that a message ID can contain these if

10  it's not a base 16 message ID?

11              MS. GRISWOLD:  Objection.

12              THE COURT:  Sustained.

13  Q.  You understand that not all messages IDs are in base 16,

14  right?

15  A.  Yes.

16  Q.  Not all message IDs are hexadecimal, right?

17  A.  Correct.

18  Q.  And if a message ID is not hexadecimal, it could contain a

19  V, right?

20  A.  Yes.

21  Q.  And you can't say that the message ID in 3551 is

22  necessarily supposed to be hexadecimal?

23              THE COURT:  Supposed to be?  Sustained.

24  Q.  Well, you can't say --

25              MR. JACKSON:  Your Honor, it's a little bit --

HCKTTUZ5                         DeCapua - Cross

1    Q.  It's not hexadecimal, right?

2                MS. GRISWOLD:  Objection.

3                THE COURT:  I don't understand the question.

4    Q.  This is not a hexadecimal format for this message ID,

5    right?

6                MS. GRISWOLD:  Objection, asked and answered.

7                THE COURT:  No, I will allow him to and answer.

8                Is this a hexadecimal format?

9                THE WITNESS:  No, because it has a V, but it's

10   supposed to be.

11               MR. JACKSON:  So that gets to my question.  That's

12   where I was headed, Judge.

13   BY MR. JACKSON:

14   Q.  You can't say definitively that this is supposed to be

15   hexadecimal, can you?

16   A.  So I'm bound by common sense here, and when I see this

17   format, 8-4-4-4-12, and everything conforms and looks like hex,

18   and I read articles that say that it's supposed to be hex for

19   Apple mail, and I do experiments myself and every single time I

20   sent something from Apple mail it's in hex, it's UUID and has

21   the domain name.

22   Q.  Do you understand there's a difference between all Apple

23   mail emails being in hex and all hex emails necessarily

24   indicate Apple mail, right?  Those two things are not the same.

25               MS. GRISWOLD:  Objection, form, foundation.

HCKTTUZ5                        DeCapua - Cross

```
 1              THE COURT:  Do you understand the question?

 2              THE WITNESS:  I don't.

 3   Q.  Let me rephrase that then.  Your testimony is that all

 4   Apple mail message IDs are in hex, right?

 5   A.  Just for clarification, this entire thing is the message

 6   ID, so the beginning -- everything before the at sign is in

 7   hex, everything after is just plain letters.

 8   Q.  My only question is your testimony is that all Apple mail

 9   IDs are supposed to be in hex, right?

10   A.  Correct.

11   Q.  You can't say definitively that this is a Apple mail

12   message ID, right?

13              MS. GRISWOLD:  Objection, form.

14              THE COURT:  Overruled.

15   A.  There could be another service that uses the exact similar,

16   and I wouldn't --

17   Q.  So the answer is yes, right?  You can't say definitively.

18   You agree with that?

19   A.  Correct.

20   Q.  And the fact of the matter is there are numerous different

21   email services, right?

22   A.  Correct.

23   Q.  There are lists of email clients available online that run

24   into the hundreds, right?

25   A.  Yes.
```

HCKTTUZ5                     DeCapua - Cross

1   Q.  There are numerous versions even of the specific email

2   clients that are associated with a particular company, right?

3   A.  Could you repeat that question?

4   Q.  For example, Blackberry has had various versions of its

5   email client that it used on the Blackberry, right?

6   A.  So I don't know that for a fact.

7   Q.  Well, you don't believe that they're still using the exact

8   same email operating system today as they were ten years ago,

9   do you?

10  A.  I have no idea.

11         MS. GRISWOLD:  Objection, foundation.

12  Q.  You have no idea.  But the point being you haven't gone out

13  and examined what the message ID format is for every email

14  client out there, have you?

15  A.  No.

16  Q.  So you don't know whether or not there's an email client

17  that creates a message ID that looks like this with a V,

18  correct?

19  A.  So a message ID that looks like it's going to be a UUID but

20  then it changes something --

21  Q.  I'm not asking you whether it looks like a UUID, what I'm

22  saying is you don't know whether there are other email clients

23  that have a message ID that takes this approximate format but

24  contains Vs, correct?

25  A.  I would be shocked to find that out.

1  Q.  You don't know, correct?

2  A.  Correct.

3  Q.  Now the fact of the matter is even with regard to your

4  testimony about the epoch timestamp, epoch timestamps can come

5  in many different formats, right?

6  A.  That's correct.

7  Q.  It's not just the format that you pointed out on your

8  chart, right?

9  A.  The format I pointed out on the chart is overwhelmingly

10  used.  It's the most common one.

11  Q.  But there are other forms of epoch timestamps, right?

12  A.  Yes.

13  Q.  And there are other forms of timestamps in general that are

14  not epoch, right?

15  A.  Yes.

16  Q.  There are timestamps coded to the year 1900, correct?

17  A.  January 1st, 1900.

18  Q.  Bingo.  There are timestamps coded to that, correct?

19  A.  Correct.

20  Q.  There are also message IDs that create randomization by

21  combining a timestamp in one of the formats available with some

22  other information, correct?

23  A.  That's correct.

24  Q.  You haven't -- for the message ID that you looked at for

25  the Blackberry message that you claim was irregular --

1              MS. GRISWOLD:  Objection.

2              THE COURT:  Sustained.

3    Q.  Can we go to 3579, please, 3579B.

4              So you see there's a hidden timestamp here, right?

5    A.  That's correct.

6    Q.  In your prior testimony you said that one of the things

7    that you looked at was you said that this looked like it could

8    potentially correspond with hexadecimal, right?

9    A.  I don't think I said that -- or no, so you're referring to

10   a prior hearing.

11   Q.  Yes, in a prior hearing.

12   A.  Yes, I tried everything.

13   Q.  One of the things that you did is explore whether or not

14   this could be a potentially hexadecimal timestamp, right?

15   A.  Yes.

16   Q.  Because you're aware that there is such a thing as a

17   hexadecimal timestamp that could potentially look like this on

18   the surface, right?

19   A.  Yes.

20   Q.  And your conclusion was if you converted it from the

21   hexadecimal timestamp via the methods that you're aware of, it

22   didn't come out to a time that you thought made sense, right?

23   A.  So the methods that I'm aware of and the methods that I

24   tested are the most commonly used once.

25   Q.  But there are a number of other different types -- there

HCKTTUZ5                    DeCapua - Cross

1    are a number of different methods for converting a hexadecimal

2    timestamp that you didn't explore, right?

3    A.  All the methods of converting a hexadecimal timestamp I

4    tried.  I'm not aware of any other methods.

5    Q.  You can't say definitively, right, that isn't just a

6    randomly generated number on this, right?

7            MS. GRISWOLD:  Objection to form.  Which number are we

8    talking about?

9            MR. JACKSON:  Withdrawn.

10   Q.  On 3579B, with the December 2nd 2008 email, you can't say

11   definitively that the message ID software on Blackberry didn't

12   just generate a random number here, right?

13   A.  So when every other instance --

14   Q.  I'm asking yes or no.

15           THE COURT:  Can you answer it yes or no?

16           THE WITNESS:  Could you repeat the question?

17   Q.  You cannot say definitively that the message ID associated

18   with this message on December 2nd, 2008 was not just a randomly

19   generated number by this software.  You agree with that, right?

20   A.  Could it be?  Sure.

21   Q.  Okay.  And the fact of the matter is you haven't gone back

22   to ask anyone at Blackberry --

23           THE COURT:  You've already asked him about Blackberry

24   over and over and over again.

25           MR. JACKSON:  Judge, I'm very close to my end.

HCKTTUZ5                         DeCapua - Cross

1            We could take that down.

2  Q.  Sir, you're also aware that there have been some very well

3  publicized glitches associated with Blackberries and their

4  timestamps, right?

5  A.  No.

6  Q.  You're aware of well-published glitches associated with

7  epoch timestamps, correct?

8  A.  No.

9  Q.  You never heard of a glitch associated -- that creates a

10  date of 2045 in computers?

11            THE COURT:  I thought we were talking about

12  Blackberries.

13            MR. JACKSON:  I'm talking about epoch timestamps in

14  general.

15  Q.  You heard of an epoch timestamp glitch that accidentally

16  creates a date of 2045, right?

17            MS. GRISWOLD:  Objection to form, to "in computers."

18  Q.  Sir, epoch timestamps are used more broadly than just

19  Blackberries, right?

20  A.  That's correct, but could I reanswer the question that you

21  just asked me?

22  Q.  I don't even know what question we would be talking about.

23  A.  You asked me --

24  Q.  Let me just focus this on this question really quickly then

25  we can address anything.

HCKTTUZ5                          DeCapua - Cross

1         You are aware epoch time is used in many different

2    types of computers, right?

3    A.   That's correct.

4    Q.   And there have been well-publicized glitches associated

5    epoch time, right?

6    A.   I'm familiar with just one.

7    Q.   What's the one you're familiar with?

8    A.   The one I'm familiar with is it's like a Y2K glitch, and

9    it's basically when -- an epoch timestamp is just a big number,

10   and eventually it will get to be such a big number that it will

11   overflow the bounds of the specific piece of memory where the

12   information is stored.  And I think it's going to happen in

13   like 2030 something, I'm not 100 percent sure about that, but

14   there's discussions on what to do before then and whether it's

15   going to cause the end of the world or kind of like Y2K.

16   That's the one about publicized glitch I'm aware of.

17   Q.   2030 something, right?

18   A.   That's what I think.

19   Q.   And you have seen publications online that talk about

20   people -- their epoch timestamps glitching to create an

21   incorrect date on their device of 2030-something, right?

22   A.   No, I have never seen that.

23   Q.   Have you researched that at all?

24   A.   No.

25   Q.   Okay.  Have you heard of the Etisalat virus that infected

HCKTTUZ5                          DeCapua - Cross

1   computers and Blackberries in 2009?

2           THE COURT:  Could you spell that for the court

3   reporter, please?

4           MR. JACKSON:  E-T-I-S-A-L-A-T?

5   A.  I never heard of it.

6           MR. JACKSON:  May I have one moment, your Honor?

7           THE COURT:  Yes.

8           (Pause)

9   Q.  Are you familiar with any viruses that infected

10  Blackberries in 2009 for travelers in Dubai?

11  A.  No.

12  Q.  Now just going towards the end, your analysis on the

13  document that is 3579A starts on March 10, 2009, right?

14  A.  What is --

15  Q.  3579A.

16          Before we get there, just one other question, did you

17  look at the server traffic associated with the messages that

18  you analyzed?

19          MS. GRISWOLD:  Objection, foundation.

20          THE COURT:  Overruled.

21  A.  If I understand you correctly, you mean the server traffic

22  on January 27, 2009, for instance, for this email?

23  Q.  No, I guess what I'm asking is:  Did you look at whether

24  the server routes that were taken by the messages associated

25  here, the messages that are marked as government exhibits, the

HCKTTUZ5                      DeCapua - Cross

1    emails you were focused on, did you look at whether the server

2    routes approximated the server routes that you saw in the other

3    messages?

4              THE COURT:  Do you understand the question?

5    A.  I think you're asking:  Did I look at the headers?

6    Q.  Yes.

7    A.  And look at the IP addresses contained in the headers?

8    Q.  Yes.

9    A.  So I could answer it in two parts.  The first part is for

10   the emails in question there were no server routing information

11   because they were sent emails.  So it's just what was on the

12   defendant's computer that he gave to us.

13   Q.  So you weren't able to analyze that?

14   A.  I wasn't able to analyze it.

15   Q.  Let me ask you this, you're looking here at March 10, 2009,

16   right?

17   A.  That's correct.

18   Q.  Now your comparator messages end January 30, 2009 and pick

19   up again on March 11, 2009, right?

20   A.  That's correct.

21   Q.  So the email that you were focused in on is March 10, 2009

22   from Omar Amanat to Steve Maiden, right?

23   A.  Yes.

24   Q.  Are you aware that there is a gap in Mr. Maiden's emails on

25   his computer that goes exactly to March 10, 2009?

1    A.  No.

2    Q.  You are not aware of that?

3    A.  No.

4    Q.  That's something you never discussed with other FBI agents?

5    A.  I think you asked me that question at a prior hearing and I

6    said no.

7    Q.  After I asked you that, did you explore at all whether

8    there was anything to be gleaned about that?

9    A.  No.

10   Q.  Okay.  When you were looking at the fact that the

11   message -- the comparator message is cut off at the end of

12   January and don't pick up again until the day after March 10,

13   2009, did you attempt to discover whether there was any missing

14   data that would be relevant to your investigation on

15   Mr. Maiden's emails or computer?

16   A.  For the purposes of what I was trying to do here, I was

17   trying to show an example so when I was explaining something

18   complex, people could see what things are supposed to look

19   like.  So didn't explore any of that, no.

20   Q.  And you don't know Steve Maiden, right?

21   A.  I saw him, he was called as a witness at a prior hearing,

22   but other than that, no, I never met him.

23   Q.  You never worked with him?

24   A.  No.

25   Q.  You don't know what he did with the emails that are missing

HCKTTUZ5

1     from January 30 to March 10, right?

2     A.  I have no idea.

3               MR. JACKSON:  No further questions of this witness.

4               MS. GRISWOLD:  One question for redirect, your Honor?

5               THE COURT:  Yes.

6     REDIRECT EXAMINATION

7     BY MS. GRISWOLD:

8     Q.  Special Agent DeCapua, did any of the questions that

9     Mr. Jackson just asked you change any of the opinions that you

10    offered in your direct testimony?

11    A.  No.

12              MS. GRISWOLD:  No further questions.

13              THE COURT:  Anything else, sir?

14              MR. JACKSON:  No, Judge.

15              THE COURT:  You can step down.

16              The government may call its next witness.

17              MS. GRISWOLD:  The government calls Stephen Maiden,

18    but we might need a minute, your Honor, to make sure the

19    marshals bring him up.

20              THE COURT:  All right.  So should we take a brief

21    recess?

22              MS. GRISWOLD:  If we could, your Honor.

23              THE COURT:  Ladies and gentlemen, we'll have a take a

24    brief recess.

25              (Continued on next page)

HCKTTUZ5

1          (Jury not present)

2          THE COURT:  I received another note from the jury,

3    Court Exhibit 18, reads as follows:  I have to take an online

4    class for a job performance for Verizon on December 21st, 2017

5    at 1:30 p.m. in my Bronx office.  It's the last one.  I thought

6    we would be done.  So I put off.  It's a must.  Signed Eric

7    Eleam.

8          Second communication was just orally through

9    Mr. Ruocco, juror number four, Tara Charlton, asked me if it

10   becomes apparent that she will have to be excused that she ask

11   that she be excused today, given that she's got to try to get

12   to JFK Airport tomorrow.  And so --

13         MS. GRISWOLD:  Your Honor, may I speak to Mr. Maiden

14   about the issue that we discussed this morning?

15         THE COURT:  Yes.

16         MR. JACKSON:  Your Honor, she's been an

17   extraordinarily diligent juror, we're very appreciative, but

18   we're happy to have her excused at this point.

19         MR. McRAE:  Agreed, your Honor.

20         MR. WILLIAMS:  Your Honor, I think before the defense

21   had some suggestion to swapping her as an alternate.

22   Mr. Jackson made that proposal.

23         MR. JACKSON:  My suggestion about that was dependent

24   on my hope that we would be able to conclude the case by today,

25   which if we had gotten through summations I think we could have

HCKTTUZ5

1   substituted her as an alternate and not released, but since

2   she's not going to hear the end of the case, I think it would

3   be very difficult to use her.

4              THE COURT:  There's no way we could continue with her.

5   The only way we could have tried to hold onto her in the form

6   of an alternate is if the trial had been completed except for

7   deliberations.  It hasn't, so there's nothing I can do about

8   preserving her role on the jury.  It's just impossible.

9              MR. WILLIAMS:  We understand, we don't object to her

10  being removed.

11             THE COURT:  All right.  So that at the close of the

12  day, Mr. Ruocco, I ask you if you could bring Ms. Charlton out

13  so we could all express our appreciation to her and tell her

14  that she is excused.  So we'll do that at the end of the day.

15             MR. McRAE:  Your Honor, what was the juror number of

16  the first person, the first note you described?

17             THE COURT:  This is a man we heard from recently, Eric

18  Eleam.  He sent out a note about an issue, I think it was last

19  week.  He's alternate number three, Mr. Ruocco informs me.

20             So you want to think about what we should do about

21  Mr. Eleam?

22             MR. WILLIAMS:  Your Honor, we would suggest right now

23  that we get some more information from him potentially

24  including the nature of this training.  Every employer,

25  presumably, certainly the government, have online trainings

HCKTTUZ5

```
1    that you have to do by a certain date.  If this is something
2    that could be pushed off, given the critical day that we have
3    tomorrow, we can't break at 12:00 so he can go up to the Bronx
4    by 1:00.
5              THE COURT:  Mr. Jackson?
6              MR. JACKSON:  I think, Judge, we agree with the
7    government that we should try to inquire first if it's possible
8    we should strike him.
9              THE COURT:  Bring out Mr. Eleam.
10             MR. WILLIAMS:  Your Honor, I'm sorry, we weren't
11   suggesting that we bring him now at the sidebar, but maybe at
12   the close of evidence, given that we have Mr. Maiden ready to
13   go.
14             THE COURT:  All right.  I just told him to bring it
15   out.
16             MR. WILLIAMS:  That's fine, your Honor, it's not going
17   to take that long.
18             (At sidebar, juror present)
19             THE COURT:  We have your note.
20             JUROR:  So you understand, there's a performance thing
21   I have to do for my technician.  I'm a manager with Verizon.  I
22   have to take a performance course that I put off because we
23   have to be here.  The last day I could take it is this day.
24   It's an hour course.  Either I could bring my computer here and
25   we could do a break during that time, but I have to handshake,
```

HCKTTUZ5

1      so I can't let it run.  It pops up on the screen:  Are you

2      there?  Type in that time.

3                  THE COURT:  Absolutely.

4                  JUROR:  Even though I know it, it's to write their

5      appraisals and gets promotions out.

6                  THE COURT:  You have to do it.

7                  JUROR:  I have to do it.

8                  THE COURT:  You could do it here if you brought your

9      computer in?

10                 JUROR:  And I could get to the internet.

11                 THE COURT:  We have that capability.

12                 JUROR:  I could use my phone as a hot spot to get

13     online.  I don't have to plug into your network, I just have to

14     have wi-fi access.  I could uses my phone as a hot spot, but to

15     do their appraisals for January.

16                 THE COURT:  Is there a particular time you got do

17     this?

18                 JUROR:  I have to log in.  There's a class course

19     where it's online structure, so they say:  Are you there?  You

20     have to type in an answer as it's going on.

21                 THE COURT:  What time?

22                 JUROR:  1:30.  I was going to do it in the Bronx, so I

23     need time to go to the Bronx, or start it 1:30 here.  It was at

24     3:30 today, which I wouldn't make it up to the Bronx.

25                 THE COURT:  Okay.  We're going to need to -- I'm going

HCKTTUZ5

1    to need to issue an order so he could bring electronics in.

2                   JUROR:  Or I could --

3                   MR. NAFTALIS:  Your Honor, may I ask a question?

4                   Do you need to be at a specific Verizon computer?

5                   JUROR:  It has to be mine.  My secure token is built

6    into my computer, so I have my password and I have to log in

7    and put my V code.

8                   THE COURT:  Does anybody think there's going to be a

9    problem with this whole hot spot thing?

10                  MS. GRISWOLD:  That's what Special Agent DeCapua used.

11                  MR. JACKSON:  We have all used it.

12                  THE COURT:  We'll plan on breaking a few minutes

13   before 1:30, or you tell us.

14                  JUROR:  Let me call them and let me know that I will

15   bring my laptop here and I will be able to do the course while

16   I'm here, because I was coordinating whether I could make it

17   back uptown to my office in the Bronx to do it.  So there's not

18   a problem.

19                  THE COURT:  Thank you very much.

20                  (Juror not present)

21                  THE COURT:  So we're going to make it work.

22                  MS. GRISWOLD:  Your Honor, did we hear back from the

23   jury as to the 5:00 p.m. day tomorrow, or is this --

24                  THE COURT:  No, we haven't heard.

25                  MS. GRISWOLD:  Was today a 2:30 day?

HCKTTUZ5

1          THE COURT:  I think today is a 2:30 day.

2          DEPUTY CLERK:  2:30.

3          THE COURT:  Have they gotten back to you about sitting

4     to 5:00 once we get into summations?

5          DEPUTY CLERK:  They said no.

6          MS. GRISWOLD:  I thought about talking to the jury now

7     about next week.  I know none of us want to be here, but I

8     don't know if Mr. Jackson has a sense of how long his cross of

9     Mr. Maiden will be.  He has a sense of his testimony from the

10    hearing, but I don't think I have more than half an hour, 45

11    minutes on direct, but if I finish today that would be

12    surprising.

13         I don't know, Mr. Jackson, if --

14         MR. JACKSON:  It's not a super long cross.  I think we

15    know the points we need to make, if we could cut it down, I

16    don't know if we could ask the jury to stay until 3:00 today.

17    If we both agree to do a half hour, I think we could finish it.

18         MR. NAFTALIS:  Your Honor, did Mr. Ruocco say they

19    could not sit until 5:00?

20         THE COURT:  That's what he said.  We have tried this

21    jury's patience, let's be honest.

22         So I am happy to raise with them next week, no idea,

23    of course, what they're going to say.  The question will always

24    be:  How long will this go on for?

25         MS. GRISWOLD:  I think about an hour, I think we can

1  say that to them.

2           DEPUTY CLERK:  They can't stay until 3:00.

3           THE COURT:  All right.

4           DEPUTY CLERK:  Child care issues.

5           MR. JACKSON:  Let's try to complete as much as we can

6  with Mr. Maiden and do a quick cross of him tomorrow and then

7  we'll go to summations.

8           MR. NAFTALIS:  Your Honor, in terms of planning, were

9  you going to explain to them we're moving to summations?

10           THE COURT:  I already did that, sir.

11           MR. NAFTALIS:  What I'm asking is they said they don't

12  want to stay until 3:00.  I don't know if they understand the

13  logistics.

14           THE COURT:  They have child care issues.  Someone has

15  to take care of a child today.

16           MR. NAFTALIS:  I mean 5 o'clock, 5 o'clock on Friday.

17  I know we're imposing on them.  To the extent they realize they

18  may be almost done, potentially.  I know we're all sort of

19  stuck, but I hope that they understand that when we say

20  summations, that means that they may almost get the case, as

21  opposed to what is going on for another week of testimony.

22  They don't necessarily know that.

23           (Continued on next page)

24

25

1           (Jury present)

2           THE COURT:  Government call its next witness.

3           MS. GRISWOLD:  The government calls Stephen Maiden.

4    STEPHEN EWING MAIDEN,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MS. GRISWOLD:

9    Q.  Good afternoon, Mr. Maiden.

10   A.  Good afternoon.

11          MS. GRISWOLD:  If we could put up for Mr. Maiden

12   Amanat Exhibit 9002 in redacted form.

13   Q.  You see that document in front of you, Mr. Maiden?

14   A.  I do.

15   Q.  And I want to focus you in particular on the email at

16   11:07 p.m. that appears to be from Omar Amanat to Stephen

17   Maiden, subject event BESN.  Do you see that?

18   A.  Yes.

19   Q.  Did you receive this 11:07 p.m. email from Omar Amanat on

20   December 2nd, 2008?

21   A.  No.

22   Q.  How sure are you that you did not receive it?

23   A.  I'm positive.

24   Q.  When did you first tell the government you believed you did

25   not receive this email?

HCKTTUZ5                    Maiden – Direct

1   A.  Several weeks ago on a Sunday I was brought in and I was

2   allowed to read the entire email carefully.

3              MR. JACKSON:  Objection, your Honor.  Could we get a

4   precise date?

5              THE COURT:  Do you remember -- you said it was a

6   Sunday, right, Mr. Maiden, do you recall it being a Sunday?

7              THE WITNESS:  I do.

8              THE COURT:  Can you date it for us more precisely?

9   Was it last Sunday?

10             THE WITNESS:  No.

11             THE COURT:  Was it the Sunday before that?

12             THE WITNESS:  No, it was the one before that.

13             THE COURT:  Okay.

14             MS. GRISWOLD:  Your Honor, we're happy to proffer for

15   the record it was December 3rd.

16             MR. JACKSON:  Accepted.

17             THE COURT:  All right.

18   BY MS. GRISWOLD:

19   Q.  How do you know you didn't receive this email?

20   A.  Well, can I reread it?

21   Q.  Yes.

22   A.  I'm not able to see the rest of the email?

23             MS. GRISWOLD:  Could we provide an unredacted version

24   of the email to Mr. Maiden.

25             THE COURT:  What is the exhibit number on the exhibit

HCKTTUZ5                     Maiden – Direct

1    he's now being shown?

2              MS. GRISWOLD:  Government Exhibit 3575UR, just marked

3    for identification.

4              THE COURT:  Okay.

5              MS. GRISWOLD:  If we could pull up for the jury the

6    redacted version, please, Amanat Exhibit 9002, and highlight

7    the portion of the email at the bottom that says:  Therefore,

8    the funds are to remain at Enable as my security deposit.

9              THE WITNESS:  Right.

10   Q.  Mr. Maiden, did you ever agree to leave $2 million at

11   Enable as a security deposit?

12   A.  No.

13   Q.  I want to pull up for you Government Exhibit 2965 in

14   evidence.

15             MS. GRISWOLD:  If we could highlight the bottom email

16   from Omar Amanat to Irfan Amanat on December 19 at 6:48 a.m.

17   Q.  The email that you just looked at that I asked you if you

18   actually received it, that was dated December 2nd, 2008,

19   Mr. Maiden?

20   A.  Yes.

21             MS. GRISWOLD:  Can I ask Ms. Pyun to highlight the

22   bottom section beginning with:  He spoke with Maiden.

23   Q.  Can you read that first sentence, please.

24   A.  Sure.  It says:  He spoke with Maiden where they apparently

25   discussed difficulties getting money out of Enable.  Maiden has

1    tried to reach me and is asking for his $2 million back.

2    Q.  As of December 19, 2008, had you agreed to leave your 2

3    million at Enable as a security deposit?

4    A.  No, no, absolutely not.  And this is just 17 --

5              MR. JACKSON:  Objection.

6              THE COURT:  Sustained.

7              MS. GRISWOLD:  And sustained, is the entire thing

8    struck, or the does the "absolutely" not stand?

9              MR. JACKSON:  I'm only objecting to the non-responsive

10   second portion.

11             THE COURT:  He objecting to "and this is just," that's

12   what he's objecting to.

13             MS. GRISWOLD:  So we'll leave it at "absolutely not."

14             Let's pull up Government Exhibit 3062A in evidence.

15   Q.  Do you have a hard copy of that, Mr. Maiden?

16   A.  I do.

17   Q.  Directing your attention to the email on Thursday,

18   December 18, 2008, from you to Irfan Amanat, do you see that?

19   A.  I do.

20   Q.  Can you read what you wrote to Irfan Amanat on Thursday,

21   December 18?

22   A.  Sure.  I wrote:  Okay, cool.  And on that 2 million I sent

23   last month, am I at least earning interest on that while its

24   sitting there?  Been there longer than I had hoped.

25   Q.  As of December 18, had you agreed to leave 2 million at

HCKTTUZ5                        Maiden - Direct

1    Enable as a security deposit?

2    A.  No.

3    Q.  Mr. Maiden, how many documents were you shown during the

4    course of your trial testimony?

5    A.  I have no idea.  Many.

6    Q.  And during your trial testimony, you were cross-examined by

7    Mr. Jackson for a number of days?

8    A.  I was.

9    Q.  When you were shown documents during your testimony at

10   trial, either by the government or by Mr. Jackson, did the

11   thought cross your mind that any of the documents might not be

12   authentic?

13   A.  No.  No, I am in a federal courtroom --

14            MR. JACKSON:  Objection.

15            THE COURT:  Sustained.

16   Q.  The answer is no?

17   A.  Right, correct.

18   Q.  Were you given an opportunity to give explanatory answers

19   when you were cross-examined by Mr. Jackson?

20            MR. JACKSON:  Objection.

21            THE COURT:  Sustained.  The jury I'm sure remembers

22   the cross-examination.

23            MS. GRISWOLD:  Fair enough.  If we could pull up the

24   transcript from the trial at 1353, please.

25   Q.  Do you recall, Mr. Maiden, that during your

1    cross-examination Mr. Jackson showed you the unredacted

2    version, the longer version of this email at some point?

3    A.  I do remember that he showed me the unredacted version

4    briefly.

5            THE COURT:  When you say the "unredacted version" of

6    this email, could identify for the record what it is you're

7    talking about?

8            MS. GRISWOLD:  Yes, your Honor, it's marked for

9    identification as Government Exhibit 3575UR.

10           THE COURT:  Okay.

11   BY MS. GRISWOLD:

12   Q.  And you see that transcript up on the screen, Mr. Maiden?

13   A.  I do.

14   Q.  And do you see that when Mr. Jackson asked if you

15   remembered the document, you responded:  Vaguely, yes?

16   A.  Yes.

17   Q.  And you have now given the answer that that 11:07 email,

18   you did not receive it.  Can you explain to the jury why you

19   said you vaguely recalled it?

20   A.  Well, couple of reasons.  As I mentioned, sitting in a

21   federal courtroom, I assumed everything that came to me was

22   legitimate.  So my first assumption, having looked at many,

23   many legitimate emails, was that this was.

24           Secondly, what I received was only a redacted version,

25   and I wasn't given a lot of time to look at it.  And so I said:

 1    Vaguely, yes.

 2            MS. GRISWOLD:  And then if we pull up the transcript

 3    at page 1484.  If we could highlight lines 9 through 12.

 4    Q.  If you could read lines 9 through 12 of this transcript,

 5    please.

 6    A.  Sure.  It says:  So your Honor, the full version is in your

 7    binder.  I'm going to place -- your Honor, I can't ask the

 8    witness if he recognizes it because there's context missing,

 9    but I offer 9002.

10    Q.  So at this point Mr. Jackson did not ask you if you

11    recognized Amanat Exhibit 9002?

12    A.  Right, he did not.

13    Q.  Let's turn to March 10, 2009.

14            MS. GRISWOLD:  If we could put on the screen for the

15    jury Amanat Exhibit 908, and if we cold pass up what is marked

16    for identification in unredacted form as Government

17    Exhibit 3578UR.

18    Q.  One last question, Mr. Maiden, on the December 2nd, 2008

19    email we just looked at.  When you met at the U.S. Attorney's

20    Office on or about December 3rd of this year, were you given an

21    opportunity to look at the contents of the computers that you

22    previously turned over to the FBI in 2013?

23    A.  I was, yes, and the context of that I wanted to comment on.

24            THE COURT:  No, there's no question pending.

25            Next question.

1   Q.  And based on your review, was Amanat Exhibit 9002 we just

2   looked at on your computer?

3   A.  No, it wasn't on my computer.

4   Q.  Turning to March 10, 2009, Amanat Exhibit 908, did you

5   review emails on your computer for this day as well when you

6   met at the U.S. Attorney's Office?

7   A.  I did.

8   Q.  In particular, did you look for this 11:33 a.m. email?

9   A.  Yes, I looked for it.

10  Q.  Did you find it on your computer?

11  A.  No, I did not.

12  Q.  Sitting here today, what is your answer to the question of

13  whether or not you received this email from Mr. Amanat on

14  Tuesday, March 10, 2009?

15  A.  No, I never received it.

16  Q.  In this email, if we could highlight the section at the

17  bottom where Mr. Amanat says my personal guarantee will be

18  withdrawn without this assurance, do you see that?

19  A.  I do.

20  Q.  As of March 10, 2009, had Mr. Amanat offered a personal

21  guarantee with respect to the Enable Investment?

22  A.  No, definitely not.

23  Q.  Why do you say that?

24  A.  This is important, the context.  This is two days after

25  March 8.  March 8 was the Sunday I spoke about at testimony

1    quite a bit, which is the first day we had this conference call

2    that I was told that the Enable funds were missing.

3          The next day, March 9, one day before this purported

4    email, that morning I got the call from my investor, I lied to

5    them and told them things were okay.  I called Omar and told

6    him I was lying.  We decided to have a call that night to start

7    pushing down the road of figuring out a settlement.

8          And then this is the next day, so he definitely didn't

9    offer me a personal guarantee.  If I had received that personal

10   guarantee there would have been many emails back and forth

11   about it.  It would have been a conversation topic.  We talked

12   every day that week and really for the next months.  And so

13   absolutely not.  I never received this.

14   Q.  I'm not going to go through each time you were asked about

15   these documents by Mr. Jackson.  Is your answer the same as to

16   why for this one you didn't state that you didn't believe you

17   received it when you were shown it during your trial -- during

18   the trial?

19   A.  Yeah, it's the same, it's -- I assumed what I --

20             MR. JACKSON:  Objection.

21             THE COURT:  Next question.

22   Q.  I want to turn to June 2nd, 2011.

23             MS. GRISWOLD:  Put up Amanat Exhibit 9010 on the

24   screen and show it to the witness and the Court in unredacted

25   form marked Government Exhibit 3576UR.

HCKTTUZ5                          Maiden – Direct

1    Q.  Mr. Maiden, when you met at the U.S. Attorney's Office,

2    were you given time to look at the Thursday, June 2nd, 2011

3    email at 6:13 p.m.?

4    A.  I was, yes.

5    Q.  Did you look for it on your computers?

6    A.  I did look.

7    Q.  Did you find it?

8    A.  No.

9    Q.  Sitting here today, what is your testimony whether you

10   received this email on June 2nd, 2011?

11   A.  I never received it.

12   Q.  Now if we zoom out on this email and go to the bottom,

13   these bottom e-mails that talk about recording calls with your

14   investors, did you receive those emails?

15   A.  I did, yes.

16   Q.  Is your testimony still that you did have conversations

17   with Mr. Amanat in which he encouraged you to record your calls

18   with your investors?

19   A.  We did have conversations like that, yes.

20   Q.  And in those conversations did Mr. Amanat ever suggest the

21   possibility of telling your investors that your investment in

22   Enable was gone?

23   A.  No, absolutely not.

24            MS. GRISWOLD:  Let's go to the next one.  If we could

25   pull up Government Exhibit -- Amanat Exhibit 9013 and show the

1    witness and Court what is marked for identification as

2    Government Exhibit 3577UR.

3    Q.  I want to direct your attention to the email that appears

4    on the screen on Monday, March 26, 2012 at 11:34 a.m.

5            Did you review your computer for this day?

6    A.  I did, yes.

7    Q.  Is this email on your computer?

8    A.  No, it's not.

9    Q.  And sitting here today, what is your testimony as to

10   whether or not you received this email on that day?

11   A.  I did not receive it on that day.

12   Q.  Finally, I want to ask you about your deletion practices

13   with respect to your computer.  You had a desktop and a laptop?

14   A.  Yes.

15   Q.  Are you aware that there's a gap of emails on your computer

16   between January 2009 and March 10 of 2009?

17   A.  Yes, I have been made aware of that.

18   Q.  Do you know why that is the case?

19   A.  I do not.

20   Q.  Can you describe what your practice was with respect to

21   deleting emails in the time period 2008 until the FBI showed up

22   on your doorstep in September of 2012?

23   A.  Sure.  My general practice for emails -- I received a lot

24   of emails, and too many to delete as they came in or cull

25   because I received a lot of information from brokerage houses

HCKTTUZ5                     Maiden - Direct

1    that -- with stock recommendations all day.

2              So I would allow them to come in like a river, then

3    recognized at some point it would hit a barrier and kind of

4    freeze until I deleted some.  So I'm not sure how many times,

5    but I initially would just go down 20 pages or something to the

6    bottom chronologically and delete a chunk of them, and that

7    would take a minute or two to kind of delete.  And then I would

8    empty the trash to create the space, and then that would allow

9    the emails to start coming.

10             But I realized that was not an efficient way to do it

11   because it might delete emails I wanted to keep for any reason.

12   So what I started to do, which I did for the rest of the time,

13   is I would sort the sender -- sort by sender, and then I would

14   try to delete the spam email, essentially.  So especially the

15   research, say Morgan Stanley or Goldman Sachs or Bank of

16   America, they would send me very large files, a lot of memory

17   in each of them and large attachments, so when I deleted them,

18   it would create the most space, and not damage -- leave my

19   other -- delete any other emails that I cared about.

20   Q.  Between 2008 and 2012, was it your practice to delete

21   emails with Omar Amanat?

22   A.  No, absolutely not.

23   Q.  You testified during the trial that Omar Amanat told you he

24   sold his online trading company for quite a bit of money.  Do

25   you recall that?

HCKTTUZ5                        Maiden - Direct

```
1    A.  I do.
2    Q.  In the context of that conversation, did Mr. Amanat tell
3    you what role he had in the trading company?
4              MR. JACKSON:  Objection.
5              THE COURT:  Grounds?
6              MR. JACKSON:  Scope, rebuttal case.
7              MS. GRISWOLD:  I can proffer at sidebar.
8              MR. JACKSON:  Go ahead.  He can answer the question.
9    I withdraw my objection.
10             THE COURT:  All right.
11   A.  Yeah, he told me he had a little bit of programming
12   experience, but he was more of the kind of Steve Jobs type or
13   leader, marketing voice of the company.
14   Q.  You testified during your trial that you spoke to Irfan
15   Amanat prior to investing in Enable, is that correct?
16   A.  That's correct.
17   Q.  And in the course of that conversation, did you discuss the
18   Enable strategy?
19             Let me withdraw that.
20             What, if anything, did Mr. Irfan Amanat tell you about
21   his professional background in that conversation?
22   A.  He told me he was very proficient as programming software,
23   and I know that he had worked -- I believe he told me that he
24   had worked -- and Omar also told me that he worked with Omar at
25   that initial firm that he had sold to E-Trade as well.
```

1  Q.  Mr. Maiden, do you have any idea what other testimony or

2  evidence the government has offered in connection with these

3  four emails I asked you to testify about today?

4  A.  No.

5          MS. GRISWOLD:  No further questions.

6          MR. JACKSON:  Can I try to get two or three minutes

7  in, Judge?

8          THE COURT:  All right.

9  CROSS-EXAMINATION

10 BY MR. JACKSON:

11 Q.  Mr. Maiden, you testified in this case -- your

12 cross-examination in this case was occurring on November 7,

13 right?

14 A.  That sounds right.

15 Q.  And it wasn't until December 3rd that you first said

16 anything to anyone suggesting that the emails that you looked

17 at were not emails that you received, right?

18 A.  Because I hadn't read them.

19 Q.  Sir, it's a yes or no question.  It wasn't until

20 December 3rd, right?

21 A.  Right.

22 Q.  Almost a month passed by, correct?

23 A.  Correct.

24 Q.  And during that time, you didn't reach out to the

25 government, right?

1    A.  How can you do that on something you haven't read?

2    Q.  Sir, during that time you didn't reach out to government,

3    correct?

4    A.  That's correct.

5    Q.  You didn't reach out to anyone else and ask them to contact

6    the FBI, right?

7           That's a yes or no question.

8    A.  Correct.

9    Q.  So the fact of the matter is during the testimony you

10   actually read from portions of the emails that we're talking

11   about, right?

12          That's a yes or no question.

13          MS. GRISWOLD:  Objection.  To what testimony?

14   Q.  During your cross-examination you read from some of the

15   emails that you were just looking at, right?

16   A.  I would say I glanced at them.

17   Q.  But you also read portions aloud to the jury, correct?

18   A.  I did.

19   Q.  And after your testimony ended, you had a conversation, a

20   brief conversation with the prosecutors, right?

21   A.  After -- yes, that's correct.

22   Q.  And they told you you had done a good job, right?

23   A.  Right.

24   Q.  And then you continued to think about your testimony after

25   you got off the witness stand, right?

HCKTTUZ5

1   A.  I'm sure I did, yes.

2   Q.  You actually wrote a letter to Jamie Yavelberg about your

3   testimony, didn't you?

4           MS. GRISWOLD:  Objection.

5           THE COURT:  That's a yes or no.

6   A.  I did, yes.

7   Q.  And when you communicated to her, you did not say you

8   thought that you had been shown some emails that were not

9   authentic, right?

10  A.  That's because I hadn't read them.

11  Q.  You did not say that, did you?

12  A.  No, I did not say that.

13          MR. JACKSON:  Your Honor, this may be -- I don't want

14  to overstay the jurors' time, but I defer to the Court.

15          THE COURT:  Well, how much more do you have,

16  Mr. Jackson?

17          MR. JACKSON:  I think I could complete the cross in

18  approximately ten to fifteen minutes.

19          THE COURT:  I leave it to the jury.  Can you stay ten

20  to fifteen minutes or do people have obligations?

21          JUROR:  I can't.

22          THE COURT:  All right.  Then ladies and gentlemen, we

23  will break for the day.  Don't discuss the case, keep an open

24  mind.  We'll resume at 9:30 tomorrow.  Thank you all very much.

25          (Jury not present)

HCKTTUZ5

1          THE COURT:  I'm going to bring Ms. Charlton to the

2     sidebar now.

3          (At sidebar, juror present)

4          THE COURT:  I have your note about your trip, which

5     you told us about a long time ago --

6          JUROR:  I'm sorry.

7          THE COURT:  -- and we all had it in mind.  But first

8     of all, I wanted to tell you that yes, I will excuse you today,

9     but more importantly I wanted to tell you how much I appreciate

10    your service.  I know it imposed a burden on you.  I know all

11    the lawyers join me in thanking you for your service, the care

12    with which you observed the testimony and the evidence.  We're

13    sorry that because of prescheduled travel you won't be

14    continuing with us.  We are coming to the end --

15         JUROR:  I know.

16         THE COURT:  -- and we all very much wish you could

17    participate, but you told us about this flight when we were in

18    jury selection, and it was the belief of everyone here we would

19    be done by now, and unfortunately that's not the way it turned

20    out.  So I didn't want you to leave without knowing how much we

21    all appreciate your service.

22         JUROR:  Thank you.

23         THE COURT:  And we all wish you well.

24         JUROR:  Okay.  Thank you.  This has been an

25    experience, to say the least.  Happy holidays.

HCKTTUZ5

1                    THE COURT:  Thank you.

2                    (In open court)

3                    THE COURT:  So Mr. Jackson, you have some additional

4      questions for Mr. Maiden, and is there any redirect of Maiden?

5                    MS. GRISWOLD:  Not currently, your Honor.  I tried to

6      keep the direct as short as possible.  I do -- I guess we are a

7      little concerned about how far Mr. Jackson may try to go into

8      the Yavelbergs.  I understand the question that he asked about,

9      but we think anything beyond what has been established is

10     beyond the scope and irrelevant.  But I don't currently

11     anticipate any redirect based on what I heard at the hearing or

12     what I heard so far today.

13                   THE COURT:  Any other questions about Ms. Yavelberg?

14                   MR. JACKSON:  I don't think any others are necessary,

15     Judge.

16                   THE COURT:  Okay.  Does the government have any other

17     evidence or is this going to be it?

18                   MS. GRISWOLD:  It is my intention that this is it.

19                   THE COURT:  Mr. Jackson, anything you want to say?

20                   MR. JACKSON:  Judge, I want to let the Court know I

21     plan on putting on a very short responsive case to what they

22     have done.  I would like to try to reach some stipulation with

23     the government tonight to accelerate that process.  I intend to

24     call Ms. Rosen for very brief testimony to describe some

25     functionality issue at one of the hearings of the Yahoo account

HCKTTUZ5

1    and to introduce some documents that I think are relevant to

2    the analysis here, but that's about it.  If we could agree on

3    those documents, I think that should be extremely brief

4    testimony.  So I will have a discussion with them after Court.

5         I will say, your Honor, I don't know if this is the

6    appropriate time or if the Court had other things, but I did

7    want to lodge my objection to Special Agent DeCapua.

8         THE COURT:  Go ahead.

9         MR. JACKSON:  Your Honor, I think the Special Agent

10   DeCapua is obviously a very diligent agent.  I'm not casting

11   aspersions on him.  I think he performed his duties apparently

12   to best of his ability.

13        I'm deeply troubled that we're hearing the complexity

14   of the calculations that Special Agent DeCapua did regarding

15   what he says are hundreds of additional messages that go to

16   what he testified he observed here, and there may be a text

17   file that represents these calculations and we didn't get it.

18        What we were forwarded in terms of 3500 material for

19   Special Agent DeCapua was very limited.  And I will just note,

20   your Honor, to the extent that the times are not exact with

21   regard to -- to the extent the times are not exact with regard

22   to any of the messages that Special Agent DeCapua is analyzing,

23   there's a Brady issue, Judge, that's Brady material, the times

24   were off by any amount of time.  And what I heard today was the

25   first time I heard Special Agent DeCapua say that he found that

1    the times were the same within a degree of approximation.  That

2    was not his testimony at the hearing the other night.

3              THE COURT:  Well, he indicated -- no, I disagree with

4    you on that.  He indicated at the hearing that the times were

5    not exact, they did not match up exactly.  I think it's fair to

6    say that he indicated that they matched up closely, but he was

7    very clear -- my recollection is at the hearing that there was

8    a lag between the time that was on the date that -- the time

9    that was reflected on the date time column and the time that

10   was reflected in the timestamp conversion column.

11             MR. JACKSON:  Judge, I would concede the Court's

12   memory on all these issues is better than mine, I'm managing a

13   lot of things here, but I hadn't heard him articulate this

14   way -- this idea of within an approximation.  For a minute I

15   thought maybe he was talking about a second off or a couple of

16   seconds off, but if there's anything more than that, minutes or

17   hours, or days, I don't know, I haven't seen any of the

18   calculations, and frankly, he's an incredibly diligent agent,

19   it seems odd to me that he would not keep any --

20             THE COURT:  It may seem odd to you, it didn't strike

21   me as odd.  This all occurred under very, very stressful, rapid

22   circumstances.  As you brought up before the jury, the first

23   time he even did this -- the first time he came up with this

24   particular analysis was, what did he say, two days ago?

25             MR. JACKSON:  That's correct, Judge.

HCKTTUZ5

1          THE COURT:  So I'm sure if it had come up a year ago,

2     there would be a lot more material, but he had a very limited

3     amount of time to do what he had to to.  And in fairness, the

4     government had initially approached this through its

5     determination that it was going to rely on --

6          I will get the date wrong -- May 9?

7          MS. GRISWOLD:  May 8, 2009.

8          THE COURT:  -- May 8, 2009 email that was sort of the

9     centerpiece on this case on the fabrication issue.  And they

10    had a number of arguments about why they thought that email was

11    fabricated, and to some extent their whole line of attack on

12    this point was predicated on this email.  And as you know, I

13    excluded the email that had been the centerpiece of their

14    presentation because of a concern that it would unfairly

15    prejudice Mr. Tuzman.  It was in that context.  And this was,

16    of course, not shared with the jury.

17         So the way it was presented to the jury is that for

18    some unexplained reason Agent DeCapua decided he would have to

19    conduct a completely different type of analysis in the last two

20    days, one could argue that was very unfair, the way that came

21    out, because the reason why he was forced to do that is because

22    of an evidentiary ruling that I made in order to protect a

23    co-defendant.

24         But in any event, while you were surprised he didn't

25    have more written materials, it doesn't surprise me given the

HCKTTUZ5

1    circumstances under which all of this arose.

2              MR. JACKSON:  Your Honor, I appreciate the Court's

3    analysis, and I don't disagree.  That's why I was careful to

4    say at the beginning I don't think Agent DeCapua did anything

5    wrong in terms of way he responded to it.  I don't think my

6    question was unfair because I wasn't trying to create a

7    misimpression.  He had been looking at these emails as well

8    since the beginning, so I wanted to emphasize the recency here

9    in terms of the analysis, and the limited amount of time that

10   this had been examined and all the things he had not looked at.

11             Whether there is a 3500 or Brady issue, your Honor --

12             THE COURT:  Do you have an application?  He said he

13   wasn't sure whether he had maintained any records regarding the

14   message IDs that he had examined with respect to the other

15   Blackberry messages on the point of this time lag between the

16   column marked date time sent and the column marked timestamp

17   conversion.  Do you have an application?

18             MR. JACKSON:  Yes, your Honor, my application is if it

19   exists, it be turned over to us.

20             THE COURT:  What does the government say?

21             MS. GRISWOLD:  We'll find out if it exists.  And I

22   note for the record that the analysis was all done on data on

23   Mr. Maiden's computer that has been turned over as Rule 16

24   discovery, so any scripts or things that were run could be run

25   based on that data.  But of course we will check.

HCKTTUZ5

 1            THE COURT:  The underlying data has been available --

 2    well, was provided to the defense many, many, many months ago.

 3            MR. JACKSON:  I agree with that, Judge.  I don't think

 4    that's responsive, respectfully.  I don't think it's responsive

 5    to the question of whether or not if he has done additional

 6    work on that data, we should have access to it to see it before

 7    he testified.

 8            THE COURT:  And they will inquire if there is any --

 9    and I don't know what the technical term is, but whatever it

10    is, if there is anything that reflects work he did on the time

11    lag issue, they will ask him if that exists and they will

12    provide it to you if it exists.

13            MS. GRISWOLD:  Yes, your Honor.

14            MR. JACKSON:  The last thing I will say about Special

15    Agent DeCapua, when we leave court today I will be mostly

16    focused on my summation.  I will take a little bit of time to

17    consider whether or not we're going to file any motion for

18    relief related to Special Agent DeCapua's testimony, because

19    while I believe that the agent had -- I don't want to suggest

20    anything, I don't believe the agent was intending to say

21    anything inaccurate, I don't think the agent was -- I think the

22    agent was intending to provide accurate testimony.  But I think

23    his testimony was factually incorrect with regard to several

24    very important concepts, and I think it completely undermines

25    the appropriateness of his testimony from a 702 perspective.

HCKTTUZ5

1    I'm going to explore that a bit, and I may put in a filing to

2    the Court on it to explain in more detail what I'm talking

3    about.

4            The witness -- I will give two brief examples.  The

5    witness indicated that a UUID always appears in basic 16, what

6    he described as hexadecimal format.  That is not true.  There

7    is abundant --

8            THE COURT:  Well, without getting into the details of

9    whether it's true or not, he testified to that at the hearing,

10   so you have known for some time that that was his position.

11   And so if you thought it was wrong or incorrect, as you're

12   saying now, then presumably the expert that you retained on

13   this issue could testify that Agent DeCapua is wrong.

14           In other words, my point is it wasn't -- it could not

15   have been a surprise to you that he testified in the fashion he

16   did about UUIDs, because he testified to that before.

17           MR. JACKSON:  Right.  He testified to that.

18           THE COURT:  So to the extent he was wrong on that

19   point, you knew he was wrong, or you had a basis for your

20   belief that he was wrong after he testified at the hearing

21   outside the presence of the jury.

22           MR. JACKSON:  Well, your Honor, just to be clear on

23   the record, I didn't develop the basis for concluding that he

24   was wrong until about 4:00 a.m. last night.  This is an issue

25   that over the last 48 hours I have been researching pretty

HCKTTUZ5

extensively trying to understand it, and while we have been

dealing with a number of other legal issues.  But I believe he

was wrong.  I don't have available to me, I don't believe, an

expert who is capable of addressing that particular issue.  So

it may be this is not something that can be explored in a way

that makes sense, I just want the Court to know that I am

contemplating putting in a filing that tries to explain why I

think the agent was generally wrong on certain of his issues,

and I'm processing it and understanding it, but I'm notifying

the Court.

MS. GRISWOLD:  To complete the record, we note there

was an opportunity provided to Mr. Jackson to come this morning

at 9:00 a.m. if he had any additional cross questions in the

context of whether or not this witness could be qualified under

702, and we were told he didn't have any.  There was no

objection to him being qualified.

MR. JACKSON:  You're right, I didn't ask for an

opportunity for additional questioning on it, but that doesn't

end the questioning.  The questioning is whether or not the

testimony that actually came in during the trial was

appropriate testimony.

I think we need to look at the legal standards

associated with this.  We need to look at what the facts are

that we can actually demonstrate or not demonstrate, and then

we'll make termination.  But I don't -- I'm not trying to

HCKTTUZ5

1    suggest that anyone did anything inappropriately, I think

2    everyone was responding as diligently as they can.  I am just

3    flagging the issue that I want the Court to know that I'm

4    taking a look at tonight and I may put in a submission on.

5            THE COURT:  All right.  So can I assume that whatever

6    additional testimony there will be will be completed in an

7    hour's time or is it going to take longer than that or what?

8            MR. JACKSON:  Yes, your Honor.

9            THE COURT:  Okay.  So in what order are the defense

10   summations going to be?

11           MR. McRAE:  Your Honor, could we have a moment to

12   confer with Mr. Jackson?

13           THE COURT:  Sure.

14           (Pause)

15           MR. McRAE:  Your Honor, thank you for allowing us to

16   confer.  Your Honor, I think that at this point there are a

17   couple of data points that we don't have with respect to

18   tomorrow as far as the defense closings.  Here are a couple of

19   the issues:  We know we're going to take a break at I believe

20   it is 1:30 to accommodate one of the jurors, so that will be

21   1:30 to 2:30.  We also don't know at this point, even though

22   Thursdays on our new schedule typically extend to 3:30, whether

23   we're going to go past that point.  I don't know if the jury

24   has been polled on that question.  I'm not asking the Court

25   that, I'm just noting that it's a factor.

HCKTTUZ5

1          THE COURT:  Well, we asked them to say until 5:00, the

2     answer came back no.

3          MR. McRAE:  So I don't know if there's some

4     intermediate point of 4 o'clock, et cetera.  Again, I'm not

5     asking the Court for an answer on that, I'm pointing it out for

6     this reason:  Working backwards from whenever the testimony of

7     Mr. Maiden, as well as the case, the affirmative case of

8     Mr. Jackson's client ends, it would seem that even if we moved

9     forward with the two-hour chunk of the government's opening

10    closing, that someone's closing is going to be interrupted as

11    much as -- if it's a two-hour time limit that we have, you

12    might get into 20 minutes of it, have a break for an hour, and

13    maybe not even be able to finish it with the time that we have

14    left.

15         And so we want to be responsive to the Court,

16    obviously, we know that the Court needs to know this, but we

17    just want to be completely transparent that some of the things

18    that we're trying to figure out is, based on some of these

19    interminate points, how much interruption is there going to be,

20    and can defense counsel confer amongst themselves once we

21    understand that to see, essentially, if there is going to be an

22    interruption or a break, who is willing to have that or whether

23    there are alternatives where none of us have to have that

24    interruption?

25         So I'm just being as real-time and transparent as I

HCKTTUZ5

can, your Honor.  And the reason why, obviously, it's a

concern, is you can imagine if someone starts a closing, they

get ten minutes into it, 15 minutes into it, understandably we

want to accommodate the jury, that's not the issue, but if you

have to break for an hour and come back in and still not finish

your closing, it's obviously very disruptive, and there's a

concern about dilution of it and carrying over to the next day

and whether people remember it and so on and so forth.  It's

obviously better to be able to get an entire chunk where you

could finish it.  So if that's a reality, then we have to

confer amongst each other as to who is going to have that

happen or whether there's another way to deal with it.

        MR. WILLIAMS:  Your Honor, we have no objection to

them conferring about what order they want to go into, but I

think there should be no question that, given where we find

ourselves, on the Eve of Christmas, pretty much, that we have

to use every second of available jury time that we have left.

        And so we all expect that our summations are going to

get broken up, and that's just the way it's going to be.  So

whether or not the government's summation gets broken up or the

defense summation gets broken up, I want to be clear that the

government would object to anything other than all parties

plowing through using every second of available jury time until

we're done.

        MR. McRAE:  Your Honor, one other quick point.  It is

HCKTTUZ5

1    my recollection, and obviously the record will determine if

2    it's accurate, that we, being counsel of Mr. Isaza Tuzman, went

3    first after the government's opening.  Obviously we would

4    prefer, if we are going to have these interruptions, that we do

5    our closing on behalf of our client the following day, so that

6    would optimize the chance that we don't have any interruption.

7    And obviously I know that's what the Court wants us to confer

8    about, and we will do that, I'm just stating what our

9    preference will be.  But we will, of course, confer with

10   Mr. Jackson as we work these issues out.

11           MR. JACKSON:  Your Honor, I have a great relationship

12   with my co-counsel, co-defendant's counsel here, but the fact

13   of the matter is our preference -- our strong preference also

14   is to go second, which is the order of caption, the order in

15   which we have done most things in this case.  I think it's what

16   make sense.

17           And I also note that I have tomorrow to complete a

18   cross of Mr. Maiden and put on a piece of a direct case, so to

19   whatever extent it makes sense for anyone to have a little bit

20   of additional time, I'm not going to be able to completely

21   focus on the summation tonight, I have to finish the rest of

22   the case.  That's my piece.

23           (Continued on next page)

24

25

HckWtuz6

1          THE COURT:  To state the obvious, I think it's highly

2     likely that one defense lawyer is going to have to give part of

3     their summation tomorrow.  That should be obvious.

4          Understanding that it's been impossible to really

5     predict timing here, and estimates have just been worthless, I

6     guess I come into this thinking that it seems likely that the

7     evidence will be over by 11.  If you assume that the evidence

8     is going to be over by 11, that would seem that the

9     government's summation could go from 11 to 1, and then allowing

10     for slippage and so forth, we're going to get to 1:30.

11          To the extent, Mr. McRae, you expressed a concern

12     about having to go ten minutes, I'm not going to make you do

13     that, but I do want to make clear that at 2:30 we have an hour

14     left in the day, and we will inquire.  As soon as I can find my

15     deputy, I'll find out whether he knows of any flexibility with

16     respect to the 3:30 time.  Unfortunately, I suspect the answer

17     is no, but we will certainly explore that.  And if there's any

18     way we can get in a full defense summation, I'll do that.  But

19     if what it means is that we do one hour on Thursday and one

20     hour on Friday morning, that's just the way it's going to have

21     to be; I can't waste the hour.  That's as much as I can tell

22     you.

23          I do think we need to have a charge conference now.  I

24     actually would like to take a little more time to finish the

25     last few pages so I can give you a complete draft charge.

HckWtuz6

```
 1              I will say in response to your point, Mr. Weitzman,
 2     about additional instructions with respect to market
 3     manipulation, we did obtain the charge that the government made
 4     reference to in the case before Judge Carter.  It was not
 5     illuminating.  We didn't find language anything like the
 6     language that you submitted in Judge Carter's charge.  I'm
 7     happy to look at any other charges that anyone else has
 8     involving market manipulation, but the charge from the Durante
 9     case that the government mentioned was not illuminating on the
10     point.
11              Mr. Ruocco, I had a question for you.
12              Can we resume at 4:00 for the charge conference?
13              MR. WEITZMAN:  Yes, your Honor.
14              MR. JACKSON:  Yes, your Honor.
15              THE COURT:  OK.
16              (Recess)
17              THE COURT:  Please be seated.
18              With respect to the first, I guess, 60 pages, it's not
19     much different than what you already had.  I added venue
20     language in after the elements of each count I discussed.
21              With respect to Count Four, I have added language
22     addressing market manipulation, so that's different than what
23     you've seen before.
24              MR. JACKSON:  Excuse me, your Honor.  It might be
25     helpful, if it's possible, if Mr. Smith, as we're sitting here,
```

HckWtuz6

```
 1   could also send us an electronic copy.

 2              THE COURT:  Sure.  Absolutely.

 3              What I would propose is that we sort of walk through

 4   this and I'll take your comments page by page.  And everybody

 5   can feel free to remain seated.  Pull the microphone up and

 6   just walk through this.

 7              MR. WEITZMAN:  Yes, your Honor.

 8              THE COURT:  Go ahead, Mr. Weitzman.

 9              MR. WEITZMAN:  Page 3, first full paragraph, it

10   states, "It is for you alone to decide whether the government

11   has proven the defendants are guilty."  I think in every other

12   case, for the most part, we say either "the defendant you are

13   considering" or "the respective defendant," something that

14   separates the defendants, because it's not a joint

15   determination.  I would say "either of the defendants guilty"

16   or "the defendant you are considering."

17              THE COURT:  All right.  I'll change it to "the

18   defendant you are considering."

19              What's next?

20              MR. NAFTALIS:  My first comment is a nit on page 20.

21              THE COURT:  Page 20?

22              MR. NAFTALIS:  Through 21.  You just have to close the

23   quote in the second paragraph after "wire fraud."

24              THE COURT:  Yes.  Thank you.

25              What's next?
```

HckWtuz6

1              MR. WEITZMAN:  Yes, your Honor.  I'm sorry.  I have a

2      comment before page 20.  It's page 9, "specific investigative

3      techniques."

4              THE COURT:  Yes.

5              MR. WEITZMAN:  We had a specific request on this that

6      relied on the Supreme Court's decision in Kyles v. Whitley, on

7      page 32 of our request to charge.  The request is that we add:

8              "You are entitled to evaluate the quality and

9      thoroughness of the government's investigation.  For example, a

10     conscientious investigation may enhance in your mind the

11     credibility of the evidence put before you.  In contrast, a

12     sloppy investigation may diminish the credibility of that same

13     evidence.  You may consider these facts in perceptions of the

14     quality of the government's investigation in deciding whether

15     the government has met its burden of proof."  And we cite Kyles

16     and in Kyles --

17             MR. NAFTALIS:  What page are you on of your charge?

18             THE COURT:  He's citing page 32 of his requests to

19     charge.

20             MR. WEITZMAN:  In the majority opinion of Kyles v.

21     Whitley, the Supreme Court said:  "When, for example, the

22     probative force of evidence depends on the circumstances in

23     which it was obtained, and those circumstances raise a

24     possibility of fraud, indication of conscientious police work

25     will enhance probative force and slovenly work will diminish

HckWtuz6

1    it."

2              MR. NAFTALIS:  Your Honor, we object to that.  I'm not

3    familiar with that.  You obviously have more experience than

4    any of us do, but I've never seen that instruction given.

5              MR. WEITZMAN:  There has been a lot of evidence, your

6    Honor, about the quality of the investigation.  I think it's

7    not something that the jury has to categorically ignore.

8              MR. NAFTALIS:  Your Honor, I think it's argument they

9    want to make, but I don't know if it should be in a jury

10   instruction.

11             THE COURT:  Yes.  My problem with it is, I mean, I

12   understand the basic point that if an investigation's sloppy,

13   that may lead to a jury finding that the government hasn't met

14   its burden, but I don't want to communicate to the jury that

15   their function here is as an arbiter of the thoroughness of the

16   government's investigation.  What I've tried to keep them

17   focused on is whether the government has proven the elements of

18   each crime beyond a reasonable doubt, because I believe that's

19   actually what their function is.

20             I believe that the criticisms of the government's

21   investigation are perfectly fair ground for argument, but I

22   don't believe it's something that needs to be in the charge,

23   because it tends to shift the focus from whether the government

24   has met its burden of proving the elements of the crime beyond

25   a reasonable doubt.  It tends to shift the focus from that to

HckWtuz6

1    whether the government did a thorough investigation or should

2    have pursued other avenues, or perhaps shouldn't have relied on

3    the cooperators it relied on.  That to me is all for argument,

4    so I'm not going to add the language that you suggest, Mr.

5    Weitzman.

6             MR. WEITZMAN:  OK.  And this is a semantic issue,

7    perhaps, but on page 11, there's a reference to, in one of the

8    bullets, "the manner of the witness while testifying."

9             THE COURT:  Yes.

10             MR. WEITZMAN:  I found that very confusing, "the

11    manner."  I thought maybe "manner and demeanor."

12             THE COURT:  What paragraph was that in?

13             MR. WEITZMAN:  Actually, it's on page 10 of the new

14    charge, so the second-to-last bullet.

15             THE COURT:  OK.  "The manner and demeanor"?

16             MR. WEITZMAN:  Yes.

17             THE COURT:  All right.

18             MR. WEITZMAN:  Page 13.

19             THE COURT:  Yes.

20             MR. WEITZMAN:  Actually, let me see if it's the same

21    page in the new charge.

22             Yes, at the top of page 13, it says, "You are not to

23    draw any conclusions or inferences of any kind about the guilt

24    of the defendants merely from the fact" -- I think the

25    insertion of the words "the guilt of the defendants" is

HckWtuz6

          1    one-sided, so I would just propose "of any kind about the

          2    defendants merely from the fact."

          3         THE COURT:  I don't have a problem with that.  It will

          4    just say, "You are not to draw any conclusions or inferences of

          5    any kind about the defendants merely from the fact that certain

          6    witnesses at the trial entered into cooperation agreements with

          7    the government or pleaded guilty to crimes," etc.

          8         MR. WEITZMAN:  Page 15.

          9         MR. NAFTALIS:  I'm fine with it, but I actually think

          10   it's better for the defense if you leave "guilt" in because the

          11   idea or thought is that you can't infer that the defendants are

          12   guilty because the cooperators pled guilty.  So I think it's a

          13   better instruction if it's "guilt of," but we don't object.

          14        THE COURT:  I agree with you.  I agree with you

          15   entirely.  I think it's better for the defense if it says

          16   "guilt," but if they want "guilt" out, I'll take it out.

          17        MR. JACKSON:  Sorry, Judge.  I was trying to follow.

          18   Can I just hear exactly what the proposal is more clearly?

          19        THE COURT:  Yes.  As amended by Mr. Weitzman, the

          20   statement would read:  "You are not to draw any conclusions or

          21   inferences of any kind about the defendants merely from the

          22   fact that certain witnesses at this trial entered into

          23   cooperation agreements with the government or pleaded guilty to

          24   crimes that may be similar or related to the crimes with which

          25   the defendants are charged."

HckWtuz6

1      MR. JACKSON:  I think that there might be a middle

2   ground, because we do like the language the Court has, but I

3   appreciate Mr. Weitzman's concern.  Perhaps if it says

4   "inferences of any kind about the guilt or innocence of the

5   defendants merely from the fact that certain witnesses at this

6   trial entered into cooperation agreements."

7      THE COURT:  Are you happy with that?  I don't like it.

8      MR. WEITZMAN:  I actually don't like it.

9      THE COURT:  Yes, because it suggests there's a burden

10   on the defendants.

11      MR. WEITZMAN:  And they may make a finding, and also

12   because we will be arguing that those cooperation agreements

13   actually make them unreliable witnesses.

14      THE COURT:  All right.

15      MR. WEITZMAN:  You know what, if Mr. Jackson prefers

16   the words about the guilt --

17      Is that your preference?

18      MR. JACKSON:  That is my slight preference, just

19   because I'm familiar with that charge.

20      MR. WEITZMAN:  How about "regarding whether or not" --

21   you know, I think it becomes cumbersome, actually, your Honor.

22   I defer to Mr. Jackson.  He's an exceptional lawyer.

23      THE COURT:  Do you want to go back to the way it was

24   originally?

25      MR. WEITZMAN:  Yes, your Honor.

HckWtuz6

<pre>
 1                THE COURT:  OK.  We will do that.

 2                Next.

 3                MR. WEITZMAN:  Yes.  Page 15.  There's a reference in

 4      the middle of the paragraph, "You may also consider the

 5      compensation Professor Ferrell received."

 6                THE COURT:  Yes.

 7                MR. WEITZMAN:  I think that it doesn't have to

 8      identify him specifically, "compensation, if any, a witness

 9      receives," "compensation and benefits" or "benefits, if any, a

10      witness receives."  I mean, Agent DeCapua has his job and he's

11      not getting compensated specifically for his testimony here in

12      addition to his compensation, but it's part of his compensation

13      that he has to come to court.

14                MR. NAFTALIS:  Your Honor, we're fine with it.  We'd

15      actually suggest that that idea go to the bias section so that

16      the idea that any witness is getting compensated, because their

17      travel expert was getting compensated.

18                THE COURT:  Their what?

19                MR. NAFTALIS:  Their travel expert was getting

20      compensated, though he's not an expert, so the idea that "you

21      may consider the fact that a witness is being compensated for

22      his testimony," we don't care that it identifies a particular

23      witness, but on page 12 is the bias charge.

24                MR. WEITZMAN:  I think we are amenable to that as

25      well.
</pre>

HckWtuz6

1          MR. JACKSON:  That's fine for me.  Thank you.

2          THE COURT:  All right.  Where precisely would it go?

3          MR. NAFTALIS:  I think in the first paragraph and four

4     lines down, "You should also take into account evidence of any

5     benefit," and then I think if you just insert a sentence after

6     there that draws on your Honor's expert compensation, but we

7     just de-expertize it.  "You may also consider the compensation

8     a witness received in connection with this case."

9          MR. WEITZMAN:  Can we just simplify and say, "You may

10    also take into account any evidence of any compensation or

11    benefit that a witness may receive"?

12         MR. NAFTALIS:  That's fine.

13         THE COURT:  Now, refresh my memory.  Has Ferrell

14    actually been paid anything yet?

15         MR. WEITZMAN:  I believe he testified he got

16    compensated $60,000.

17         THE COURT:  OK.  I think it would have to say, "You

18    should also take into account any evidence of any benefit or

19    compensation that a witness may or has received."

20         MR. WEITZMAN:  Yes, that's fine by us.

21         MR. NAFTALIS:  That's fine.

22         THE COURT:  OK.  And I'll strike the sentence

23    currently about compensation in the "opinion testimony"

24    section.  OK?  Everybody's fine with that?

25         MR. WEITZMAN:  Yes.

HckWtuz6

1              MR. JACKSON:  Yes, your Honor.

2              THE COURT:  All right.  What's next?

3              MR. WEITZMAN:  Your Honor, we had a specific request

4     regarding our client's high position within the company.  It

5     was request No. 27 on page 40.  We're not at this point

6     pressing the entire request, but we are continuing to press the

7     first two paragraphs of the request.  I'm happy to read it into

8     the record if your Honor would like.

9              THE COURT:  I have it in front of me.  I was just

10    reading it over.

11             This strikes me as an argument to the jury rather than

12    something that I should instruct them as to the law.

13             Basically, for the record, the language that Mr.

14    Weitzman is requesting is that the jury should take into

15    account the fact that Mr. Tuzman was the chief executive

16    officer and chairman of the company in considering whether he

17    had the necessary knowledge and intent.  To me, that's an

18    argument.

19             It's a perfectly valid argument to make to the jury,

20    and it will be made, that Mr. Tuzman was traveling around the

21    world, cutting deals for KITDigital, and he wasn't paying a

22    great deal of attention to what was happening back in the

23    office, but to me, that's a jury argument, not something that I

24    should be instructing the jury on.  So your request is denied.

25             MR. JACKSON:  Your Honor, may we circle back to page

HckWtuz6

1  17?

2          THE COURT:  Sure.

3          MR. JACKSON:  At the bottom of the page, instruction

4  23, I just have a question about this.  I know that this is a

5  relatively standard instruction in criminal cases.  I have a

6  concern that the instruction as written and as applied in this

7  case could create some confusion for the jurors given that we

8  are dealing with a situation where we have multiple counts

9  involving different defendants and very specific time periods

10  that relate to the charged conduct as opposed to uncharged

11  conduct.  I think that there is an appropriate variation in

12  dates charge to be given, but I think that where we are now, I

13  would propose that the second sentence in this be altered.

14          Right now it says, "The indictment in this case refers

15  to various dates."  I would propose striking "it does not

16  matter if the indictment states the specific conduct is alleged

17  to have occurred on or about a certain date and the evidence

18  indicates that, in fact, it was on another date."

19          I think that the third sentence is correct, "The law

20  only requires a substantial similarity between the dates

21  alleged in the indictment and the dates established through

22  evidence at trial."  I would request, your Honor, a sentence in

23  between those that says, "the precise dates that are listed in

24  the" -- "the precise dates in the indictment" -- I'm sorry.

25          I think you should say:  "The evidence need not

HckWtuz6

1   demonstrate that specific conduct occurred on the precise dates

2   identified in the indictment.  However, the alleged dates of

3   the charged conduct should serve as a general indication of the

4   government's allegation."

5        THE COURT:  Why doesn't the third sentence in the

6   current version do what you want?

7        MR. JACKSON:  You know what, Judge, I think you're

8   right.  That's fine.

9        THE COURT:  What you're saying is you want the second

10   sentence struck?

11        MR. JACKSON:  Yes, if we just have the first and the

12   third, that's great.

13        THE COURT:  I have some sympathy with that position,

14   because unlike many cases where dates are often not all that

15   critical, here, the defendants have certain arguments that are

16   predicated on the time periods that are charged in the

17   indictment, and so I'm a little concerned about saying

18   essentially the dates mentioned in the indictment don't matter

19   at all, feel free to ignore them.  I don't think that that's

20   appropriate in this case.

21        I don't think that anything is lost in this case by

22   taking out the second sentence, but what does the government

23   say?

24        MR. NAFTALIS:  Your Honor, I think we'd leave the

25   second sentence because it connects the idea.  We all

HckWtuz6

1    understand what this charge is and what the relationship to the

2    indictment is and what they have to find, but since you're

3    going to be reading the indictment to them, I think it's

4    helpful for them to understand that the indictment says between

5    X and Y; it doesn't matter what the indictment says.  It

6    matters what the evidence shows.  It just has to be a

7    substantial similarity.  It helps to link them.

8              MR. JACKSON:  It does matter what the indictment says.

9              Your Honor, I think my sentence as proposed got a

10   little clumsy, but we might be able to respond to Mr. Naftalis'

11   concern with a shorter sentence which just says, "The

12   government's not required to prove the precise dates; the law

13   only requires a substantial similarity between the dates

14   alleged in the indictment and the dates established through

15   evidence at trial."

16             I think that that protects the government's interests

17   and it also puts a finer point on the fact that what we're

18   really telling the jurors is, Look, if it's March 10 or March

19   9, it doesn't matter, but substantial similarity means we can't

20   be talking about a different year.  I really think it's much

21   less than that in a case like this where there are very

22   specific allegations about when the conspiracy started.

23             THE COURT:  All right.  What do you say to that?  Just

24   so it's clear, paragraph 23 would read as follows:

25             "The indictment in this case refers to various dates.

HckWtuz6

1    The government is not required to prove that conduct took place

2    on the precise dates alleged in the indictment.  The law only

3    requires a substantial similarity between the dates alleged in

4    the indictment and the dates established through evidence at

5    trial."

6            Is that OK with the government?

7            MR. NAFTALIS:  Yes, your Honor.

8            THE COURT:  All right.  I'll strike that second

9    sentence and substitute the sentence I read in its place.

10           Next.

11           MR. WEITZMAN:  Your Honor, my next edit is on page 24,

12   the description of Count Five.

13           MR. NAFTALIS:  We have something on page 22.

14           THE COURT:  OK.  Page 22, did you say?

15           MR. NAFTALIS:  Yes.

16           THE COURT:  OK.

17           MR. NAFTALIS:  This is at the bottom of the top

18   paragraph, where there's the "to wit" clause, and this brings

19   up one of the issues that I think Mr. Jackson raised at some

20   point during the trial.

21           THE COURT:  I'm sorry.  I'm not finding it.  Is this

22   Count Three we're talking about?

23           MR. NAFTALIS:  This is Count Two.

24           THE COURT:  Count Two, OK.

25           MR. JACKSON:  I'm sorry, Mr. Naftalis.  Could you

HckWtuz6

1    remind me what paragraph you're at?

2              MR. NAFTALIS:  The top paragraph, line 2 of the top

3    paragraph, where it says "to wit."

4              THE COURT:  "To wit," yes.  At the top of the page,

5    yes.

6              MR. NAFTALIS:  The issue is -- you'll recall that

7    Mr. Jackson took issue with this "to wit" clause.

8              THE COURT:  Yes.

9              MR. NAFTALIS:  And the issue is that the last clause

10   of this clause refers to the fact that Maiden provided false

11   account statements regarding Maiden Capital's investment in

12   Enable knowing such false account statements were intended to

13   be presented or were presented to Maiden Capital investors.

14   Our theory is that the numbers in the Enable statements were

15   then reflected in the Maiden Capital statements.  We don't want

16   to instruct the jury the wrong way.  We recognize what the

17   indictment says, but paragraph 34 of the indictment, I think

18   your Honor pointed to during one of the conferences, points out

19   that it's really, you can't read the charge in isolation,

20   because it incorporates the prior paragraph by reference.  Our

21   issue is we don't want to leave the misimpression of the

22   theory.

23             THE COURT:  Let me just look.  I recall this coming up

24   before, but I want to go back to the indictment.  What are the

25   applicable paragraphs, Mr. Naftalis?

HckWtuz6

1          MR. NAFTALIS:  I think it's paragraph, so paragraph 34

2     is the -- just to remind you, paragraph 34 is in the middle of

3     the first count.

4          THE COURT:  Yes.

5          MR. NAFTALIS:  And then that's incorporated by

6     reference into Count Two.

7          THE COURT:  All right.  I had in mind a different

8     paragraph that I thought I mentioned at the time this issue

9     came up.

10         MR. NAFTALIS:  I think 54 is where the "to wit" clause

11    is that we're looking at.  No.  Excuse me.  That's Count Three,

12    so it's 50.

13         MR. JACKSON:  It's paragraph 50, and I think that the

14    Court's instruction as written is correct.  That's the actual

15    language in the indictment.

16         MR. NAFTALIS:  The "to wit" clause is not -- it's an

17    exemplar.  It's not really the charging language.

18         MR. JACKSON:  I don't think that that position finds

19    support anywhere in the law.  The "to wit" clause is the key

20    charging language.

21         MR. NAFTALIS:  It puts them on notice, but the

22    charging language, Mr. Williams will address the letter, but --

23         THE COURT:  There's another paragraph that I mentioned

24    at the time this issue came up, which sets forth the theory not

25    that Maiden gave Enable account statements to his clients.

HckWtuz6

```
 1            MR. NAFTALIS:  Right.

 2            THE COURT:  But rather that the information contained

 3   in those statements was given to the clients, and so when this

 4   issue came up, and Mr. Jackson cited probably paragraph 50, I

 5   said, Yes, but there's another paragraph where they make it

 6   clear that it's not actually the Enable statements; it's the

 7   information in the Enable statements.  And now, because the

 8   indictment's so long, I can't find it.

 9            MR. WILLIAMS:  Your Honor, we had thought that was

10   paragraph 34.  Maybe we had it wrong, but we had thought that

11   that was the paragraph that we had pointed to in saying how

12   paragraph 50 should then be read in context.

13            MR. JACKSON:  Your Honor --

14            MR. WILLIAMS:  And if I could just finish.

15            On our objection --

16            THE COURT:  No.  I think the paragraph that I was

17   alluding to is 35, which says, "After the March 2009 telephone

18   call, Maiden, using fictitious account numbers generated by

19   Irfan Amanat, the defendant, and with the knowledge of Omar

20   Amanat, the defendant, began generating fraudulent client

21   statements that failed to disclose the Enable losses and were

22   distributed to Maiden Capital's investors."

23            MR. WILLIAMS:  Your Honor, actually, I don't recall

24   that coming up, but that's actually even more specific,

25   clarifying what the government's theory is.
```

HckWtuz6

1          Our concern is that the charge, which really draws

2     pretty much word for word from paragraph 50, lacks that context

3     from paragraphs 34 and 35, and we're concerned that Mr. Jackson

4     would tell the jury:  Look at the charge.  It says that these

5     statements were provided to Maiden Capital investors from

6     Enable.  You heard no proof of that; therefore, their theory

7     fails, which we don't think would be fair in light of the

8     context that the Court has just cited to.

9          MR. JACKSON:  I think they're entirely entitled to

10    argue the separate theory that this was accomplished through

11    Maiden providing fund -- I'm sorry, through Maiden

12    communicating information that he got allegedly from Irfan and

13    Omar, but I just have never heard of the government arguing

14    that the jury shouldn't be instructed on what is specifically

15    alleged in the "to wit" clause.

16          It's a separate discussion than we were having before,

17    which is whether or not there was some additional relief that I

18    was entitled to in terms of discovery because of the fact that

19    there has not been evidence that supports what I thought is

20    very clearly stated in paragraph 50, and I understand the

21    Court's ruling on that, which I think is entirely appropriate,

22    was that based on the context of the entire indictment, one

23    could reasonably infer that false information was not

24    necessarily provided to the government, and therefore, there

25    was no need for further exploration of what information was

HckWtuz6

1    supplied to the grand jury and whether there was improper

2    information supplied to the grand jury.  I accept and

3    understand that ruling.

4            Now we're in a different place, where the government

5    is saying that the specific language in the "to wit" clause of

6    their own indictment, which they drafted, they should be

7    shielded from having exposure to the jury, and this is the

8    means and methods that they charge and allege.  I don't think

9    that they're entitled to craft a new theory.

10           MR. NAFTALIS:  Your Honor, I think the issue is that

11   there are two ways, at least, I think, we've seen when you

12   summarize the indictment.  It could be Count One charges

13   securities fraud relating to Maiden from X date to Y date that

14   doesn't quote the indictment, and the whole indictment's sent

15   back, which we know is not your practice and we're not pressing

16   that.  But to only tell them the charging language gives an

17   incomplete picture of what the theory is how they're actually

18   indicted.  We don't think Mr. Jackson's right as to what was

19   presented to the grand jury or what our theory is, but we just

20   don't want to leave the jury with a misimpression as to what

21   the charge is.

22           MR. JACKSON:  Then let's just put in some of the

23   language from paragraph 35 and you can make your context

24   argument to the jury.

25           MR. WILLIAMS:  This is the point, and your Honor, we

HckWtuz6

wrote on this in the letter on December 15.  Our proposal was

to just state specifically, "Count Two charges that defendant

Omar Amanat committed wire fraud in connection with an alleged

scheme to defraud Maiden Capital investors by causing Stephen

Maiden to make material misrepresentations and to omit material

facts to Maiden Capital investors about the status of their

investments," full stop, without going into the means and

methods about having to provide additional context from the

indictment.  I think everyone agrees that that's the actual

charge.

         MR. JACKSON:  No, it is not agreed.

         MR. WILLIAMS:  Well, that's language from the

indictment.

         MR. JACKSON:  The language that is quoted at page 22

is word for word the language in the indictment.  I'm actually

quite surprised, because I think the government right now, and

I've never heard something like this, the government right now

is basically teeing up an explicit violation of the Fifth

Amendment.  I mean, you cannot run away from the explicit

language in the "to wit" clause of an indictment.  It's unheard

of.

         MR. WILLIAMS:  We're not asking for that.

         To be clear, I think the issue that we're struggling

with is in light of the fact of what the Court had previously

said, which is paragraph 50 has to be read in context with the

HckWtuz6

earlier paragraphs, we can either put in paragraphs 34, 35, and

the language from 50 for the full context to be there, or we

can truncate the whole thing to have language that doesn't

require further explanation to the jury.

We just don't want to be in a position where

Mr. Jackson is given language in the charge that he can then

tell the jury, Look, the government charged this case in one

way and their evidence doesn't even match up what they

alleged --

MR. JACKSON:  Of course you don't want that.

MR. WILLIAMS:  -- which would be wrong in light of the

earlier statutory, the language in 34 and 35, which is

incorporated by reference into Count Two.

THE COURT:  I think one way this could be resolved is

through adding to the language on 21 and 22 what is pled in

paragraph 35.  I could add something like, "The indictment

further alleges that Stephen Maiden" -- and this is a quote

from the indictment, paragraph 35.  "The indictment further

alleges that Stephen Maiden 'using fictitious account numbers

generated by Irfan Amanat, and with the knowledge of Omar

Amanat, generated fraudulent client statements that failed to

disclose the Enable losses.'"

MR. JACKSON:  I'm happy with that, your Honor.  I

think that that would answer all of our concerns if we include

that language and leave the current language.

HckWtuz6

1           THE COURT:  Is the government OK with that?

2           MR. NAFTALIS:  Your Honor, are you finishing the

3    sentence or stopping at "losses," from 35?  "And were

4    distributed to Maiden Capital investors."

5           THE COURT:  I might need to fix the grammar a little

6    bit, but --

7           MR. NAFTALIS:  In concept, that's fine.

8           THE COURT:  Are you all right with that, Mr. Jackson?

9    Essentially other than correcting the grammar, and I took out

10   the indictment's references to "the defendant," so I won't be

11   using those, but other than that, I'd be putting that portion

12   of paragraph 35 into the discussion of Count Two on page 22.

13          MR. JACKSON:  Yes, your Honor.  That's excellent.

14          THE COURT:  All right.  I will add that.

15          OK.  What's next?

16          MR. WEITZMAN:  Page 24, your Honor, with respect to --

17          MR. JACKSON:  Your Honor, we don't have to address it

18   now; I don't want to cut off Mr. Weitzman, but I do have some

19   significant -- actually, no, your Honor.  We can go to 24.  I'm

20   sorry.

21          THE COURT:  OK.

22          MR. WEITZMAN:  With respect to the description of

23   Count Five.

24          THE COURT:  Yes.

25          MR. WEITZMAN:  We're going to have some significant

HckWtuz6

comments to the wire fraud instruction generally, but in the

first instance, the description of the wire fraud count in the

first paragraph under Count Five, which is taken from the

indictment, is a confusing instruction that lacks legal merit,

which is this.

In the indictment they said, "The government claims

that Mr. Tuzman," skipping ahead, "defrauded shareholders in

KITDigital by failing to disclose that KITDigital's investments

in Maiden Capital were not part of an arm's length

relationship, but were actually part of related-party

transactions."

Related-party transaction, both under the rules and as

Mr. Halkias defined it, has nothing to do with arm's length

relationship.  It's about the lack of any economic substance.

That's the testimony at trial, actually directly from the

accounting standards, and so we cite, in fact, to --

THE COURT:  Is there a way for the Live Note to work

now.

Go ahead, Mr. Weitzman.

MR. WEITZMAN:  Arm's length relationship has not been

defined in the case, and it's not part of the related-party

test.  The related party test that Mr. Halkias testified to,

and it's embodied in the related-party rules, is whether the

transaction lacked or had economic substance.

What we're proposing to then say is, "KITDigital's

HckWtuz6

1    investments in Maiden Capital lacked economic substance and

2    were actually related-party transactions entered into for an

3    improper purpose."

4              MR. NAFTALIS:  Your Honor, we would disagree with

5    that.  I think I noticed that this language changed from the

6    prior draft.

7              THE COURT:  The prior draft really didn't give the

8    jury any sense of what the wire fraud conspiracy was.

9              MR. NAFTALIS:  Right.

10             THE COURT:  It was added to just try to put some meat

11   on the bones about what the crime is that's allegedly been

12   committed.

13             MR. NAFTALIS:  It's really by failing to accurately

14   disclose KITDigital's relationship with Maiden Capital, period.

15   So the arm's length, third party, related party, whatever you

16   want to call it, is one example.  And then if you keep reading,

17   there's another example.  The fact that Maiden Capital wasn't

18   properly disclosed, the $250,000 investment is another example,

19   so it's not just -- we're looking in the indictment, paragraphs

20   78, 79, 80.

21             THE COURT:  What I'm trying to say in this paragraph,

22   Mr. Weitzman, is this is what the government claims is set

23   forth in the indictment.  Now, I understand you say, Well,

24   Judge, that's not actually what the evidence showed.  OK,

25   that's an argument to make to the jury, but I'm not sure it's

HckWtuz6

1    an argument to make to me about what the indictment says,

2    because the indictment does say that.  It's essentially a quote

3    from the indictment.  It is a quote from the indictment, and I

4    probably should have it in quotes.

5        MR. WEITZMAN:  I understand that, and when we get to

6    the wire fraud instruction, I have some very specific requests,

7    because I think that under binding Second Circuit law, failure

8    to disclose a relationship, just any relationship between

9    parties, for example, is not a wire fraud and cannot be a wire

10    fraud unless the omission of material fact concerns an

11    essential element of the bargained-for exchange.  And I'll

12    provide that in greater detail.

13        My concern is that when you're quoting the

14    indictment's language here, the suggestion is that merely

15    because there's a relationship between Maiden and my client

16    that's undisclosed, that constitutes a wire fraud, and I don't

17    think that the law would support that.  And I can walk through

18    why.

19        THE COURT:  Again, you're missing the point.  This

20    isn't a statement of what the law is.  It's a statement of what

21    the government charged.

22        MR. WEITZMAN:  That's fair.  I see that now, your

23    Honor, and we can certainly address my other comments about the

24    law, I guess, in the wire fraud instruction.

25        THE COURT:  All right.

HckWtuz6

1          MR. NAFTALIS:  Your Honor, our issue is that the

2     related party, we understand it's from the indictment, that's

3     just one example of the failure to accurately disclose the

4     nature of the transactions that KITDigital had with Maiden

5     Capital, so 79 and 80 are other examples.

6          THE COURT:  All right.  What do you propose?  It

7     sounds, then, like you want me to add language.  What do you

8     want me to add?

9          MR. NAFTALIS:  Let me just read 79 and see if I can

10    come up with a shorter way to say it.

11         I think the bottom four lines of paragraph 79,

12    "Furthermore, the government alleges that Mr. Tuzman falsely

13    represented to KITDigital's shareholders that the $250,000 --"

14         THE COURT:  But I haven't made any reference yet to

15    the 250.

16         MR. NAFTALIS:  How about, "failed to disclose to

17    KITDigital the $250,000 investment made by KITDigital with

18    Maiden Capital," period.

19         This is the one, your Honor will remember, where

20    Mr. Tuzman wants his money back, his personal money, so he has

21    KITDigital put in 250,000, and then Maiden sends him back

22    280-something.

23         THE COURT:  Right.

24         MR. NAFTALIS:  So he is defrauding the company by

25    basically substituting his money for KITDigital money.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HckWtuz6

1          THE COURT:  I remember the incident.  I'm just asking,

2     you've indicated you want me to add something in this point in

3     the charge to describe the government's theory, and I'm happy

4     to consider that.  I just need you to tell me what it is you

5     want me to add.

6          MR. NAFTALIS:  I think it could be a new sentence.

7     "Furthermore, the government alleges that Mr. Tuzman falsely

8     represented to KITDigital."

9          THE COURT:  All right.  Just give me a second.

10          "That Mr. Tuzman falsely" what?  "Falsely

11     represented," did you say?

12          MR. NAFTALIS:  Yes.

13          THE COURT:  "Represented to KITDigital."  OK.

14          MR. WILLIAMS:  If I can continue to read, your Honor,

15     "that Mr. Tuzman falsely represented to KITDigital that a

16     $250,000 investment was a legitimate investment with Maiden

17     Capital."

18          THE COURT:  A $250,000 investment -- whose investment?

19          MR. WILLIAMS:  "A $250,000 KITDigital investment with

20     Maiden Capital was, in fact, a legitimate investment with

21     Maiden Capital, when, as Tuzman and Maiden had agreed --"

22          THE COURT:  Wait a second.  All right.  "Had agreed."

23          MR. WILLIAMS:  "-- it was instead to be paid to Tuzman

24     for his personal use."

25          THE COURT:  All right.  The whole sentence would read,

HckWtuz6

"The government also alleges that Mr. Tuzman falsely

represented to KITDigital that a $250,000 KITDigital investment

with Maiden Capital was a legitimate investment, whereas

Mr. Tuzman and Maiden had agreed it was instead to be paid to

Mr. Tuzman for his personal use".

      MR. WILLIAMS:  The language is not beautiful, your

Honor, but it comes from the indictment, so that's why we're

suggesting it.

      MR. WEITZMAN:  Your Honor, I understand it comes from

the indictment.  We object.  I think it's fairly encompassed

within the "improper purpose" prong.  I think it just makes it

more cumbersome and details the government's theory in a

one-sided way, but I understand that it does come from the

indictment.

      I think it's redundant of the point, that they have a

preexisting relationship and that investments are being made,

according to the government, for improper purpose.  I don't

think it needs that.  I think this is just a subset of that

theory.

      THE COURT:  Listen, I was concerned that this count

was opaque.  That's why I added the language.  It was totally

opaque.  I think it's still somewhat opaque without the

addition that the government suggests, so my inclination is to

add the language the government has suggested, which is lifted

from the indictment, paragraph 79.

HckWtuz6

1           Anything anyone else wants to say about page 24?

2           MR. JACKSON:  Your Honor, with apologies, can we

3    return to page 22?

4           THE COURT:  Yes.

5           MR. JACKSON:  Just continuing to reflect on this issue

6    we're discussing, I do believe there's a similar opacity

7    problem with the Count Three instruction.  I don't think it

8    requires much modification, but I do think it would be improper

9    for the jury to not have some guidance from the indictment in

10   terms of what is charged in terms of this aiding and abetting.

11   We would request that within the paragraph that says "from in

12   or about March 2009 through in or about June 2012," I think

13   that before that, there is specific language in the indictment

14   that identifies what Omar and Irfan Amanat are alleged to have

15   done in aiding and abetting this investment-adviser fraud in

16   paragraph 53 of the indictment.

17          Specifically it says, "By providing Maiden with

18   capital contributions to meet redemption requests knowing that

19   Maiden Capital investors had been lied to by Maiden about the

20   Enable losses and the status of their investments and providing

21   false account statements regarding Maiden Capital investment in

22   Enable, Omar Amanat and Irfan Amanat assisted Maiden in

23   carrying out his fraudulent scheme and helped Maiden succeed in

24   covering up the losses for over three years."

25          MR. NAFTALIS:  Mr. Jackson, where did you want to

HckWtuz6

1    insert that, just so we can sort of follow it?

2              MR. JACKSON:  I mean, it's a little bit -- I think

3    that it should say, "The indictment charges that," and then

4    include whatever portion of that language the Court thinks is

5    appropriate to give some specificity, and then I think it

6    should include the language that it has here and say something

7    connecting them, like "and by such means," or something like

8    that, "from in or about March 2009 through in or about June

9    2012."

10             THE COURT:  I'd be inclined to put it after.

11             MR. JACKSON:  After works for me as well, Judge.  It's

12   before the indictment; whatever works, though.  I think that

13   both after and before would be appropriate.

14             THE COURT:  Essentially, you want me to include the

15   language that begins "by providing Maiden."

16             MR. JACKSON:  Right.  I would say, "Specifically, the

17   indictment alleges that by providing Maiden with capital

18   contributions."

19             MR. NAFTALIS:  Your Honor, I think if we're going to

20   include this, I think it really should include the majority of

21   paragraph 53, so "rather than disclose the Enable losses,"

22   which begins on the bottom of page 20, through the end of that

23   paragraph.

24             MR. JACKSON:  I don't have any objection to that.

25             THE COURT:  All right.  Just to be clear, at the

HckWtuz6

1     bottom of the paragraph on page 22, I will add the following:

2              "The indictment further alleges that," and it will

3     pick up with a quote, "rather than disclose the Enable losses

4     to investors in the Maiden fund, as he was legally obligated to

5     do," etc., and then I will take it all the way through that

6     paragraph to the end; it's paragraph 53 of the indictment.

7              My inclination is to take out Irfan's name.

8              MR. NAFTALIS:  That's fine, your Honor.

9              THE COURT:  Because Irfan's not on trial and it's not

10    a conspiracy count, so I don't see any point in mentioning

11    Irfan.

12             MR. JACKSON:  I agree, your Honor.

13             MR. WEITZMAN:  And I noted the same thing in several

14    other pages.  For instance, Irfan's name appears in Count Six.

15             THE COURT:  Where it's a conspiracy, it belongs there.

16    Where it's not a conspiracy, it doesn't.  If it's a conspiracy,

17    I have to include it.  In other words, if the indictment

18    charges that Irfan's a coconspirator --

19             MR. WEITZMAN:  But lots of people are charged as

20    coconspirators.  I think it's confusing.

21             THE COURT:  I disagree with you.  That's not true.

22    Lots of people are not charged in this indictment with being

23    coconspirators.  Very few people are named as coconspirators.

24    Where they are, I'm going to be using the name.  If you have an

25    objection to that, you're welcome to raise it as we walk

HckWtuz6

1   through this, but it doesn't belong in this count because it's

2   not a conspiracy count.

3          The jury's entitled to know who the government claims

4   is a coconspirator.  To the extent the indictment names

5   somebody as a coconspirator, I intend to tell the jury that.

6   If you have a problem with that, you'll let me know.

7          OK.  That's what I'm going to do.  I'll pick up with

8   "rather than," and I will quote the rest of the paragraph,

9   omitting Irfan Amanat's name.

10         MR. JACKSON:  Thank you, your Honor.

11         MR. NAFTALIS:  Your Honor, when you're ready, we have

12   an edit on 25.

13         THE COURT:  OK.  Page 25.

14         MR. NAFTALIS:  In the paragraph beginning "Finally,"

15   right under F.

16         THE COURT:  "Finally, in Count Six"?

17         MR. NAFTALIS:  Correct.

18         THE COURT:  OK.

19         MR. NAFTALIS:  It reads right now as if it's a

20   dual-object conspiracy.  Actually, there are three objects, so

21   conspiracy to commit securities fraud is one, conspiracy to

22   make false statements in KITDigital's annual and quarterly

23   reports filed with the SEC is two, and then the third one is

24   making false statements to KITDigital's auditors.  We would

25   suggest inserting perhaps a little (i) or little (a) before "to

HckWtuz6

commit securities fraud," then comma, little (ii) "to make

false statements," etc., and then little (iii) to make false

statements to KITDigital's auditors, just to make clear it's

three different objects.

THE COURT:  OK.  All right.  I will do that.

MR. WEITZMAN:  Your Honor, as you invited me, I'd like

to explain why I think we should be deleting, in the second

paragraph under Count Six, "and Irfan Amanat."

THE COURT:  OK.

(Continued on next page)

1            MR. WEITZMAN:  And the reason is because there's a

2    failure of proof on this issue, and it goes specifically from

3    my review of the court record, it goes to the overt act

4    section, for example, the government abandoned and didn't prove

5    several of the overt acts, and I think it would be improper to

6    charge the jury --

7            THE COURT:  Before we get to the overt acts, could we

8    stick with the page that we're on?  You talk about the overt

9    acts when we get there but let's talk about -- you want to

10   eliminate the reference to Irfan Amanat on page 25 even though

11   that's what the time charges.

12           MR. WEITZMAN:  Yes, your Honor, and that's because --

13   and I know you want to stay at page 24, but the basis for

14   including him as a co-conspirator was the allegation that he

15   sent Enable confirmations to KIT Digital's auditors.  My review

16   of the record does not have any of those confirmations in

17   evidence.  And the government did not bring at that out, to my

18   recollection, before the jury.  And so it's coming out of

19   nowhere with no evidentiary support and is confusing because

20   all they heard is Irfan has been involved in this Maiden

21   Capital fraud.

22           THE COURT:  So what does the government say?

23           MR. WILLIAMS:  We have to go back and look at the

24   record, but I think that we agree that we may not have put in

25   the false audit confirmation reference in the charge.  He is

HCKTTUZ7                     Charge Conference

1    certainly on emails, and the jury has seen evidence of Irfan

2    Amanat, Omar Amanat, and others discussing a balance

3    confirmation into the auditors.  So it's not as if the jury

4    hasn't heard of Irfan being involved in balance confirmations

5    to auditors.  So we rather the overt act coming out, if that's

6    the best solution, but we haven't walked away from the

7    allegation that Irfan was involved in the accounting fraud.

8            MR. WEITZMAN:  So your Honor, I recognize it's part of

9    the indictment and it's a separate trial.  I don't think the

10   government loses anything.  I don't think the jury lacks any

11   clarity by saying Kaleil Isaza Tuzman and others known and

12   unknown.  It's very clear the government is alleging many

13   co-conspirators, Rima Jameel, Petr Stransky, Nigel Regan, Tomas

14   Petru, Robin Smyth, Gavin Campion.  There's not going to be an

15   argument on Count Six that it's a conspiracy of one and there's

16   no conviction.  I just think it confuses the matter to include

17   Irfan when there's a different defendant by the same last name,

18   Omar.

19           MR. NAFTALIS:  Everyone knows they're different people

20   at this point, but I don't think we can take something out of

21   the indictment when there is proof.  We believe the overt act

22   could come out.  We don't want to tee that up for no reason,

23   but there's certainly evidence that Irfan Amanat is involved in

24   this part of the conspiracy, so we don't see a basis to take it

25   out, but we agree it is fair to take out the overt act.

1           MR. WEITZMAN:  There are two overt acts that reference

2    Irfan Amanat sending balance confirmations.

3           THE COURT:  I will leave the reference to Irfan Amanat

4    on page 25.

5           There's also a reference to Irfan Amanat on page 26.

6           MR. WEITZMAN:  Correct.

7           THE COURT:  And Mr. Weitzman, you would make the same

8    argument about that.

9           MR. WEITZMAN:  I would.

10          THE COURT:  And I'm rejecting that argument.

11          But with respect to the overt acts, I do agree if

12   there's no evidence in support of the overt -- a certain overt

13   act, I agree it would be appropriate to take it out, but which

14   ones do you have in mind?

15          MR. WEITZMAN:  So with respect to Irfan Amanat, overt

16   act number one on page 27, and overt act number five on page

17   27, neither of them have been submitted into evidence.

18          Furthermore --

19          THE COURT:  The government agrees?

20          MR. NAFTALIS:  Yes.

21          THE COURT:  So one and five are gone.

22          Go ahead, Mr. Weitzman.

23          MR. WEITZMAN:  I don't believe overt act number two

24   was proven or even alleged, which is a Burns call conference

25   that my client and Robin Smyth participated in.  This is

1    testimony about an earnings call conference in 2011, but

2    there's no testimony or evidence about this one, to my

3    recollection.

4            MR. NAFTALIS:  We're fine with that coming out.

5            THE COURT:  So paragraph little Roman Numeral 2 will

6    come out?

7            MR. NAFTALIS:  Yes.

8            THE COURT:  Overt acts that are problematic?

9            MR. WEITZMAN:  Sorry, I missed one more, overt act

10   number nine, which another false balance confirmation by Irfan

11   Amanat.

12           MR. NAFTALIS:  That's fine.

13           THE COURT:  Number nine will come out.

14           Okay.

15           MR. WEITZMAN:  Those are the only ones I identified,

16   your Honor.

17           THE COURT:  All right.  That brings us to page 29.

18   Changes on page 29?

19           What's the next page?

20           MR. WEITZMAN:  Your Honor, I've been working through

21   this wire fraud instruction, and I think that several of my

22   comments to the wire fraud constructions are specific to my

23   client and may or may not apply to Omar Amanat.  The essence of

24   the -- I'm trying to match up pages, your Honor.

25           So in the first instance, I know this is a typical

1   instruction on page 30, when people undertake to enter into a

2   criminal conspiracy much is often left to the unexpressed

3   understanding.  We would just add this sentence to the effect

4   at the end of the paragraph that says there must be some

5   evidence from which you could conclude that alleged

6   conspirators have manifested their assent.

7              THE COURT:  Well, that's what the next sentence says,

8   it is enough if two or more people, in some way or manner,

9   impliedly or tacitly come to an understanding to violate the

10  law.

11             MR. WEITZMAN:  I see, yes.

12             THE COURT:  What I could do is say if there is

13  evidence that two or more people, blah, blah, blah, is that

14  what you want?

15             MR. WEITZMAN:  Sufficient evidence, yes, your Honor.

16             MR. NAFTALIS:  I don't know what sufficient means

17  there.  We're fine -- it is enough if there was evidence, but

18  sufficient evidence starts to invite --

19             THE COURT:  It is enough if the evidence demonstrates

20  that?

21             MR. WEITZMAN:  Yes, your Honor, that's fine with us.

22             MR. NAFTALIS:  That's fine.

23             THE COURT:  Okay.  What's next?

24             MR. NAFTALIS:  We don't have anything until 43.  I

25  don't know if anyone has anything else before that.

1          MR. WEITZMAN:  In sub A, elements, and then the first

2     element of wire fraud, page 33, 34, I actually don't know where

3     it goes, I'm still trying to figure that out, but there are a

4     couple of edits I'm requesting.  So on page 34 in the paragraph

5     that starts with in order to satisfy this first element.

6          THE COURT:  Yes.

7          MR. WEITZMAN:  The government must also prove the

8     alleged scheme of depriving another of money or property, and

9     that the -- we would propose the following, and I will identify

10    a citation, and that the participants contemplated some actual

11    harm or injury to the intended victims, and it comes from

12    *United States v. Binday*, 804 F.3d 558, jump site 569 (2d Cir.

13    2015).

14         THE COURT:  I think the government submitted a letter

15    on this, didn't you, Mr. Williams?

16         MR. NAFTALIS:  Yes, we did, your Honor.  So we think

17    the instructions -- this is like the standard instruction, and

18    we don't understand what the insertion is supposed to do.

19         THE COURT:  What was the date of that letter?  I read

20    it.

21         MR. NAFTALIS:  We sent it last night.  I could hand

22    you up a copy, your Honor.

23         THE COURT:  Yes, that would be helpful.  I have a lot

24    of paper up here.

25         MR. NAFTALIS:  I thought their citation for the harm

HCKTTUZ7                       Charge Conference

1    issue was an Eleventh Circuit case which the Second Circuit

2    doesn't write -- doesn't support adding additional instruction.

3             THE COURT:  So Mr. Weitzman, is it your position that

4    if I look in *United States v. Binday* I am going to conclude

5    that the language that I have in here is incorrect, is that

6    your position?

7             MR. WEITZMAN:  It is my position that *Binday* supports

8    the requested charge, and I'm turning to it right now.

9             If I could explain to your Honor why I think it's

10   important, what I believe the flaw of the Count Five is, is

11   that under *Binday* and other cases the material omission has to

12   concern an essential element of the bargained for exchange.

13   Not every omission of fact concerns the bargained for exchange

14   where you're subjecting the individual or entity to an

15   unintended to risk of loss.

16            We believe and we submit, your Honor, that there's no

17   evidence sufficient in the record to support that Kaleil knew

18   that Mr. Maiden was running a Ponzi scheme.  We think we

19   debunked that.  So all he's done is he subjected KIT Digital to

20   the same risk of loss that he knew of or that KIT Digital knew

21   of, which is an investment in a hedge fund that was deceiving

22   its investors in claiming good returns.

23            That is not sufficient, in our opinion, to sustain a

24   wire fraud charge.  We believe that you have to lie about, for

25   example, whether Maiden Capital was a legitimate hedge fund or

1   not.  If we are right, and I believe we are, that Kaleil, my

2   client, was deceived about Maiden Capital, the fact that he

3   didn't disclose that he was also an investor but withdrawing

4   money from Maiden Capital does not constitute a wire fraud

5   because he never intended to subject KIT Digital to an

6   undisclosed risk of loss.  They're subjected to a disclosed

7   risk of loss, which is that they are investing in a hedge fund.

8           So I think it's imperative that there be an

9   instruction consistent with *Binday* where the jury is instructed

10  that it has to be -- there has to be a contemplated actual harm

11  or injury.  That's the intent to defraud.

12          THE COURT:  I need a copy of this case.  Do you have a

13  copy of the case?

14          MR. WEITZMAN:  I have my copy of the case that I would

15  be happy to hand up to your Honor.

16          MR. NAFTALIS:  My understanding of the issue they were

17  raising in this 11th Circuit case, I can't remember the facts,

18  but whoever the victim was was going to invest anyway, so they

19  weren't being tricked into doing anything.

20          MR. JACKSON:  Talking about *Binday*?  *Binday* is Second

21  Circuit.

22          MR. NAFTALIS:  This is sort of taking me by surprise,

23  I thought the argument was based on an Eleventh Circuit case.

24  They cited *Binday*, which is sort of the leading wire fraud case

25  in the circuit, as I recall on this issue, but the issue is you

1  would have invested anyway, so therefore you weren't defrauded.

2  I think that's basically what he is arguing.  I don't know how

3  this instruction is wrong if that's their theory, but I don't

4  think the instruction is wrong.  It's an intent argument, it

5  doesn't change the harm argument, he didn't intend to harm in

6  anyone because didn't know -- that doesn't mean the instruction

7  is somehow lacking is.

8            MR. WEITZMAN:  Your Honor, my version has my

9  handwritten notes, I apologize.  I'm happy to pass it up to

10  you.

11            THE COURT:  No, I will have my law clerks print it

12  out.  If I had known that everything was going to go on cases,

13  I would have brought it down with me.

14            MR. WEITZMAN:  804 F.3d 558.

15            MR. NAFTALIS:  Your Honor, I think the paragraph

16  begins in this regard, that is the language, as I understand

17  it, that is the result of *Binday* and that line of cases.  So in

18  order to satisfy this element is sort of --

19            THE COURT:  That's what I thought you wanted,

20  Mr. Weitzman, and I included it, the whole concept of people

21  being able to make informed decisions about what to do with

22  their money.  I thought that's what you were interested in,

23  and --

24            MR. WEITZMAN:  It certainly takes us part of the way,

25  but *Binday* make it very clear that not every deceit about a

1   transaction, even material information, can constitute a wire

2   fraud.  And if you -- I would draw your Honor's attention to

3   key cite four, and in particular also key cite five and

4   footnote ten, for example, they cite to the *Mittelstaedt*

5   opinion, which is another Second Circuit opinion, and I'm happy

6   to quote it, what they say in *United States v. Mittelstaedt*,

7   where a government --

8          THE COURT:  Sir, I'm going to print it out, don't

9   bother reading it.

10          MR. WEITZMAN:  Fair enough.

11          MR. NAFTALIS:  Your Honor, hearing this now, when you

12   read the three paragraphs on this page, that's sort of what a

13   material piece of information is, that has to be material to

14   the decision.

15          MR. WEITZMAN:  But --

16          THE COURT:  Wait until I read the case.

17          (Pause)

18          THE COURT:  So I have the opinion, Mr. Weitzman, or

19   most of it anyway.  What do you want me to -- what pages should

20   I be looking at?

21          MR. WEITZMAN:  Page 570 of the opinion, jump cite.

22          THE COURT:  All right.  Give me a minute.

23          MR. WEITZMAN:  Yes, your Honor.

24          (Pause)

25          THE COURT:  Well, I read page 570.  Is 571 important,

HCKTTUZ7                    Charge Conference

1    too?

2              MR. WEITZMAN:  Yes, your Honor, I think footnote 10.

3    I don't know if that's 570 or 571.

4              THE COURT:  I can't find footnote 10.

5              MR. WEITZMAN:  It may be a printing issue.  It's the

6    paragraph for me that begins:  For example, in *United States v.*

7    *Starr* --

8              THE COURT:  I'm asking you where it is in the text.

9              MR. WEITZMAN:  On my version --

10             THE COURT:  I want to know where it is in the text.

11             MR. WEITZMAN:  On my version I believe it's on page

12   571, your Honor.

13             THE COURT:  Okay.  That can't be right because it's --

14   okay, it's on 570.

15             So the text sentence reads, "We have repeatedly

16   rejected application of the mail and wire fraud statutes where

17   the purported victim received the full economic benefit of its

18   bargain."  And then footnote 10 comes in.  So far I don't see

19   anything that's relevant, so tell me what you want me to look

20   at in paragraph 10.

21             MR. WEITZMAN:  So the description in, for example --

22             THE COURT:  I should have said footnote 10.

23             MR. WEITZMAN:  There are two cases, for example, *Novak*

24   and *Mittelstaedt*.  We'll start with *Novak*.  It says in *Novak* we

25   held where a defendant's counter parties had received all they

bargained for, it was not sufficient to support conviction for

mail fraud that the counter parties might have refused the

bargain had they been aware that defendant would receive a

portion of the money as a personal kickback.

It then continues, in *United States v. Mittelstaedt*

where a government employee concealed his ownership interest in

property that his department agreed to purchase, we held that

it was not sufficient to show that the government, had it known

the truth, would have refused to deal with him on general

principles; rather, to convict, the government has to establish

that the omission caused or was intended to cause actual harm

to purchaser of a pecuniary nature or that the purchaser could

have negotiated a better deal for itself had it not been

deceived.

So it distinguishes -- this case law I think

distinguishes an intent to defraud, meaning intent to deceive.

Not every deception is an intent to defraud, it has to be

intended to subject the recipient of the fraud to some actual

harm or injury that was undisclosed.  Our position is that they

knew they were investing in a hedge fund no different than

Kaleil believed that he was investing in a legitimate hedge

fund that was deceiving everybody.  So there's no undisclosed

risk.  And so just --

THE COURT:  Tell me again what language you want to

add.

1           MR. WEITZMAN:  In the first paragraph -- in the

2   paragraph on page --

3           THE COURT:  I know the paragraph, page 34, in order to

4   satisfy the first element.

5           MR. WEITZMAN:  Yes.

6           THE COURT:  Go ahead.

7           MR. WEITZMAN:  The government must also prove that the

8   alleged scheme contemplated depriving another of money or

9   property and contemplated subjecting the intended --

10          THE COURT:  Now I need you to read more slowly.  And

11  contemplated what?

12          MR. WEITZMAN:  Subjecting the intended or alleged,

13  whichever, victim, to some actual harm or injury, actual

14  pecuniary harm or injury.

15          THE COURT:  I got to tell you, I don't see what that

16  adds.  I really don't understand what it adds.

17          MR. WEITZMAN:  It's an important part of the scienter

18  issue for us, which is Kaleil didn't intend to have KIT Digital

19  subjected to any risks of loss other than the inherent risk of

20  loss of an investment.

21          THE COURT:  But this says that the government must

22  also prove that the alleged scheme contemplated depriving

23  another of money or property.  So that means -- to translate,

24  that means that the government would have to prove that

25  Mr. Tuzman specifically entered into the alleged scheme

HCKTTUZ7                      Charge Conference

1   contemplating that -- we haven't gotten to that charge yet, but

2   contemplating that KIT Digital would be deprived of money and

3   property.

4           MR. WEITZMAN:  But they will argue that the mere

5   transfer of the money to a hedge fund is a deprivation of KIT

6   Digital's money, and I think that that's incorrect under the

7   law.

8           THE COURT:  Are you going to argue that?

9           MR. WILLIAMS:  No, I think we would argue consistent

10  with the language that comes later on the page that --

11          THE COURT:  That they were deprived of information,

12  that's your theory.

13          MR. WILLIAMS:  Right, prevent them from making an

14  informed decision about what to do with their money.

15          THE COURT:  I think you're setting up a straw man that

16  is not their argument.  Their argument is based on that KIT

17  Digital was deprived of the necessary information to make a

18  rational decision about what to do.  That's their theory.

19          MR. WEITZMAN:  And on that issue I have another

20  proposed instruction.  But I do think -- I believe, your Honor,

21  that under the law if Kaleil did not know that Maiden Capital

22  was a fraud, he cannot be guilty of wire fraud.  Because

23  everything that -- whatever KIT Digital knew is what Kaleil

24  knew about the risk of the investment, and so he's not

25  subjecting them to an undisclosed risk of loss.  That would be

HCKTTUZ7                    Charge Conference

1    the intend to defraud.  And I think that the instruction that

2    I'm proposing in that sentence captures what the law requires.

3           MR. NAFTALIS:  Your Honor, I think this is an argument

4    that's not our theory.  Our theory was that everyone knew --

5    they're sending emails about how they're going down the sewer.

6    He didn't put in money and find out a year later he made a bad

7    investment.

8           THE COURT:  I'm not going to add the language on page

9    34 that Mr. Weitzman has asked for.  I don't believe the charge

10   is -- that the language I used on page 34 is inaccurate in any

11   way, and I don't think that the language that Mr. Weitzman just

12   read to me adds anything.  So that is my ruling.

13          MR. WEITZMAN:  I appreciate that, your Honor.

14          THE COURT:  At least on page 34 I'm not adding the

15   language you want.

16          MR. WEITZMAN:  There's another aspect of the *Binday*

17   ruling which I think results an appropriate addition in the

18   next paragraph, second sentence:  Rather a person is also

19   deprived of money or property when that person is provided

20   false or fraudulent information that it believed would prevent

21   him from being able to make informed decisions.

22          I think the language in *Binday* actually says the

23   opposite, which is that not every piece of false information,

24   including false information that is the but for for the

25   investment can constitute a wire fraud.  And the language that

1    they use in *Binday* is that the false information has to be

2    quote, unquote, regarding an essential element of the bargain.

3            THE COURT:  I got to tell you that having looked at

4    the case, and particularly the footnote and having read the

5    text that to which the footnote is added, what they seem to be

6    concerned about in *Binday*, page 570, is whether the purported

7    victim received the full economic benefit of its bargain.

8    That's what they're concerned about, at least on that page,

9    that's what I believe they're talking about in footnote 10.  I

10   don't see that issue being implicated here.

11           And just to finish the thought, the point the court is

12   trying to make is that where the alleged victim received the

13   full economic benefit of its bargain, a fraud has not been

14   committed, at least not one that he could be prosecuted for.

15           MR. WEITZMAN:  I understand that, your Honor.  I think

16   that the emphasis in *Binday* is that it has to be essential to

17   the transaction, essential to the bargained for exchange is

18   exactly --

19           THE COURT:  So what language do you want me to --

20           MR. WEITZMAN:  Where I see it is in paragraph 4 --

21   sorry, key cite four, I don't know if you have Lexus or

22   Westlaw, but the paragraph that says it's not sufficient.

23           THE COURT:  Let me read that paragraph.

24           (Pause)

25           THE COURT:  You're right, the court does say that not

every transaction produced by deceit is actionable, you're

right, but then the court goes on to say rather, the deceit

must deprive the victim of potentially valuable economic

information.  That's exactly what I charged, that's the

language that I'm using in the next paragraph.

In fact, it's almost in haec verba.  I say, "Rather, a

person is also deprived of money and property when that person

was provided false or fraudulent information that it believed

would prevent him from being able to make informed decisions

about what to do with his money and property."  That's the same

concept.  I mean I haven't used the words "potentially valuable

economic information" because I didn't think it fit here, but

that is what I am communicating in that paragraph.

MR. WEITZMAN:  Here's the issue, I think that the

important language is the language towards the end of the

paragraph that I pointed your Honor to, where it says that the

information misrepresentation has to concern an essential

element of the bargain.

And here is the point, your Honor, Kaleil didn't

deceive KIT Digital in our opinion about what Maiden Capital

was.  Kaleil was deceived about what Maiden Capital was.  So

deception about, for example, whether Kaleil was an investor in

Maiden Capital or was pulling out his money in Maiden Capital

doesn't go to the essence of the bargain that KIT Digital made,

which was an investment in Maiden Capital that they were

1      cheated out of.

2              So even if KIT Digital would not have made the

3      investment, because it's not a but for test, it has to concern

4      the essential element of the bargain.  And the bargain here was

5      KIT Digital was going to invest in Maiden Capital and Maiden

6      Capital was going to invest KIT Digital's money.  In reality,

7      neither Kaleil nor KIT Digital knew that Maiden Capital was

8      going to take KIT Digital's money and start paying off

9      redemptions to others.  Maiden Capital acknowledged that.

10     Maiden I think acknowledged that on the witness stand.  So the

11     essence of the bargain is an important component because there

12     was no misrepresentation about that.

13             THE COURT:  What do you say?

14             MR. WILLIAMS:  We have a different view of that.

15     There was substantial testimony, specifically on the $250,000

16     investment that they had a phone where Maiden told him I don't

17     have money, and then Kaleil went back to KIT Digital and said

18     hey, kick in 250, and then Maiden kicked out 288.

19             THE COURT:  Yes, it just -- I remember that testimony,

20     too.  They just have a different theory here.  There's evidence

21     that supports it.  I understand your argument, but they have

22     evidence from which they can make the arguments they want to

23     make.

24             MR. WEITZMAN:  I agree with that, your Honor.  I'm not

25     trying to deprive them of the argument they want to make, which

HCKTTUZ7                    Charge Conference

is if they make that argument, at least that concerns the

essence of the bargain.  But I think that there needs to be an

instruction that differentiates between misrepresentations that

don't go to the essence of the bargain and misrepresentations

that do.  I view that evidence and testimony very differently

than the government.  I think what Mr. Maiden was saying is I'm

not liquid, not I'm bankrupt.

THE COURT:  So far you haven't -- while you have

quoted to me this essence of the bargain repeatedly, you

haven't suggested -- the language you have suggested didn't

include that at all.  I am willing to consider language, but

you have to suggest it to me.

MR. WEITZMAN:  The language I'm suggesting is in that

sentence that starts with "rather," rather a person is also

deprived of money or property when that person is provided

false or fraudulent information regarding an essential element

of the bargained for exchange, or something to that effect.  It

has to say essential element of the transaction.

MR. NAFTALIS:  We don't think that is accurate, and we

think that the definition on the top as to what is material --

the issue in *Binday* and the Eleventh Circuit case, as your

Honor pointed out, is when someone is going to do the deal

anyway, they're not being defrauded.

THE COURT:  I ruled.  I'm not going to include this

language.  Let's move on.

1          MR. JACKSON:  Your Honor, I have some small

2    suggestions on page 35.

3          THE COURT:  Okay.

4          MR. JACKSON:  If the Court is inclined, in the third

5    paragraph that starts with "in order," we would request that

6    the language where it says it is sufficient, that sentence be

7    changed to it is sufficient if you find that a scheme to

8    defraud has been proven, as opposed to existed.

9          THE COURT:  Do you have a problem with that?

10         MR. NAFTALIS:  I'm trying to figure out if it makes

11   sense in English, but in concept, I don't think I do.

12         THE COURT:  Yes, I have no problem with that.

13         MR. JACKSON:  Thank you, Judge.

14         Also on this page, just in the subsequent paragraph,

15   this is just one of these semantic things I'm a little

16   concerned there could be confusion in this first sentence

17   because it says also not required that the defendant

18   participate in or have knowledge of all the operations of the

19   fraud scheme.

20         So I absolutely understand what the Court is

21   indicating is that all of the operations of the fraud scheme

22   applies to participate in and have knowledge of, but I'm

23   concerned that someone could read that and think that there's

24   no requirement that the defendant participate.  It's not

25   required that the government prove that the defendant

1   participated in the fraud scheme, so I think that there's

2   actually -- I think that sentence can be left alone, and if we

3   just add a third sentence to that paragraph, and I think it

4   would also give just a little more balance to the page because

5   it talks a lot about things that are not necessary, and the

6   sentence that we respectfully request, your Honor, is the

7   government must, however, prove beyond a reasonable doubt that

8   the defendant did in fact participate and have the required

9   knowledge in the alleged fraud scheme.

10          MR. NAFTALIS:  Your Honor, that seems clunky to us.

11  The first sentence of this element is that the advised or

12  participated in the fraudulent scheme.  That's what we have to

13  prove.  And this is just explaining that that means.

14          There's a section -- a sentence the next paragraph

15  that defines what it means to participate.  The whole point is

16  your Honor is instructing what it means to participate, and

17  then you're sort of explaining that what -- you don't have to

18  know about everything to participate.  So I don't think it's

19  necessary to sort of -- I think it confuses what your Honor

20  said in the prior paragraphs.

21          THE COURT:  I just don't really see what it adds.  If

22  you look at the sentence above that, Mr. Jackson, the one that

23  begins it is sufficient if you find that a scheme to defraud

24  has been proven.  That's the language you wanted, even if

25  originated by another, and that the defendant, while aware of

1    the scheme's existence, knowingly participated in it.

2              MR. JACKSON:  Your Honor, you raise a good point.

3    Could we cure the potential ambiguity I'm talking about by just

4    saying it is also not required that the defendant participated

5    in all of the operation of the fraud scheme or had knowledge of

6    all the operations of the fraud scheme?

7              MR. NAFTALIS:  That's fine, your Honor.

8              THE COURT:  That's fine.

9              MR. JACKSON:  And my last suggestion on this page,

10   your Honor, in the final full paragraph, it says in the

11   sentence that begins with "even if a defendant," we would

12   request --

13             THE COURT:  Is this on the same page?

14             MR. JACKSON:  Yes, your Honor, it says even if a

15   defendant participated in the scheme in a lesser degree than

16   others, he is nevertheless equally guilty so long as -- we ask

17   and that it say the government has proven that the defendant

18   became a member of the scheme to defraud with knowledge of its

19   general scope and purpose.

20             THE COURT:  Yeah, I don't have a problem.  So it reads

21   so long as the government has proven that that defendant became

22   a member of the scheme or fraud with knowledge of its general

23   scope and scope.

24             MR. JACKSON:  Yes, Judge.

25             THE COURT:  I will add that.

1        We're at the bottom of page 35, what's next?

2        MR. NAFTALIS:  43.

3        THE COURT:  43 is in the substantive wire fraud count.

4        MR. NAFTALIS:  Your Honor, just above that, the edit

5   is -- it's the same issue.

6        THE COURT:  False account statements?

7        MR. NAFTALIS:  Yeah.  It could be knowing the

8   information in the false account statements was intended to be

9   presented to, and then it gets both theories that Mr. Jackson

10  likes and that we like, which is the information that was

11  presented directly -- right now it says on the last sentence

12  and by providing Maiden with false accounts statements

13  regarding Maiden Capital's investment in Enable, knowing that

14  such a false -- that such false account statements were

15  intended to be presented and were represented to Maiden Capital

16  investors knowing that the information contained in the false

17  account statements.

18        MR. JACKSON:  That's not what is charged in the

19  indictment.

20        THE COURT:  Yeah, I think the best I could do on this

21  is to go back to how we resolved this issue in the first place.

22        MR. NAFTALIS:  That's fine, your Honor.

23        THE COURT:  I will have to go back to what we did.  We

24  were talking about the indictment.

25        MR. JACKSON:  I'm fine with that, Judge.  I don't

1   think that we need it twice, but I'm fine with that.

2           THE COURT:  Well, the reason I would need it twice is

3   we're now on page 43, so --

4           MR. JACKSON:  It makes perfect sense.

5           THE COURT:  A lot of water over the dam.

6           MR. JACKSON:  Yeah.

7           THE COURT:  So I will leave the language that's there,

8   Mr. Naftalis, I will add the language from paragraph 35 of the

9   indictment.

10          MR. NAFTALIS:  That's fine, your Honor, thank you.

11          You also need to capitalize "capital."

12          THE COURT:  I did that, thank you.

13          Still on page 43.

14          MR. JACKSON:  I don't have anything else on 43, your

15  Honor.

16          MR. NAFTALIS:  I don't have anything until 48, your

17  Honor.

18          MR. JACKSON:  On 44 -- no, that's all fine, your

19  Honor, I'm sorry.

20          THE COURT:  45, anything on 45?

21          46, 47?

22          MR. JACKSON:  Yes, your Honor.

23          THE COURT:  All right.

24          MR. JACKSON:  I'm not inclined to rehash all of my

25  arguments in my September 20 letter, your Honor, but I do think

1    that the elements as suggested by the government, which I think

2    are what we have here, I don't think that they're really

3    sufficient under the statute for aiding and abetting investment

4    adviser fraud.  I'm happy to discuss it further with the Court

5    if the Court would like, but I don't have anything new to add

6    from what I submitted in my two letters on the issue.

7              THE COURT:  Which letter was that, Mr. Jackson?

8              MR. JACKSON:  Judge, the first letter that I raised

9    this in was a September 20, 2017 letter.  I'm pulling it out.

10   Sorry, September 19, 2017, it appears I wrote it, maybe I filed

11   it late at night, but docket number 448 on the docket.

12             THE COURT:  Maybe we could print it out.

13             (Pause)

14             THE COURT:  So I have your September 19 letter,

15   Mr. Jackson.

16             MR. JACKSON:  Yes, your Honor.  One of our subsequent

17   letters we elaborate on this and sent a bunch of letters, but

18   the point is the same.  Aiding and abetting investment adviser

19   fraud I think the government has conceded doesn't appear to be

20   anything anyone has ever been convicted of at trial.  There are

21   no precedent jury instructions for this.  The instructions that

22   were suggested by the government here come from a series of

23   cases where the principals who were actual investment advisers

24   were charged.

25             Now frankly, I don't think that aiding and abetting

investment adviser fraud is actually a crime, and we -- I don't

think it's a crime that's proveable.  And I think in our Rule

29 motion we argued that the government has not established in

order to prove this, but I think if it is proveable, and we can

assume it is for the purposes of discussing the appropriate

instructions, it can't -- where the Supreme Court and the other

courts have looked at this have put so much emphasis on the

fact that the Investment Advisers Act of 1940 reflects a

congressional recognition of the delicate fiduciary nature of

an investment adviser relationship.  And that's a quote from

*SEC v. Capital Gains Research Bureau*, 375 U.S. 180, which we

cite on the second page of our letter, the whole basis of this

crime comes down to the idea, just to get very blunt about it,

that an investment adviser has this very special relationship

with these investors where he will understand everything that

has been communicated to them and hasn't been communicated to

them.  And so a person who is not actually the investment

adviser by definition is going to be -- it's going to be almost

impossible for them to stand in the shoes of the investment

adviser.  And I think the proof in this case really underscored

that when Mr. Maiden conceded the wide range of information

about what he was doing that Mr. Amanat had no way of knowing,

what he was communicating with his investors what he was not

communicating with his investors.

          So the point is I don't think that we can simply add

1    to the regular elements of investment adviser fraud this fifth

2    element that just says Mr. Amanat willfully and knowingly

3    associated himself in some way with Maiden's commission of

4    investment adviser fraud.

5          THE COURT:  Well, I mean if you look at -- and maybe

6    this is just a failure of translation, but if you look at page

7    51, when I talk about the fifth element, you will see that I

8    include the concept that Mr. Amanat not only must have

9    knowingly associated himself with Maiden's crime, not only

10   wilfully and knowingly did something to help make the crime

11   succeed, but also that he did so with a specific intent to

12   deceive Maiden's clients.

13         MR. JACKSON:  Yes, your Honor, I saw that, and we

14   appreciate that.  We think it is a very good instruction in

15   terms of the fifth element.  But your Honor, we respectfully

16   believe that there's still more that is required.  I think the

17   jury should be instructed in some way that the government has

18   an obligation to prove that Mr. Amanat had sufficient exposure

19   to Mr. Maiden's -- I phrased it in one of our letters, but I

20   think they have to -- they have to demonstrate that Mr. Amanat

21   was somehow in a position to understand what Mr. Maiden was and

22   was not communicating with regard to his status as an

23   investment adviser to his clients in order to establish that he

24   actually had the requisite mens rea to commit this offense.

25         THE COURT:  Isn't there some evidence on this?

1           MR. WILLIAMS:  There is plenty of evidence.  Obviously

2    the day after or the same day that Maiden first lied to his

3    investor about the performance of the fund, the first phone

4    call he made was to Omar Amanat to tell him about it, and there

5    is additional evidence going forward after that first date.

6           THE COURT:  What is the evidence -- so that would be

7    evidence that Mr. Amanat was informed that Maiden was lying to

8    his investors, but what is the evidence that Mr. Amanat did

9    something that helped Maiden perpetrate this fraud on his

10   clients?

11          MR. WILLIAMS:  For instance, causing false Enable

12   account statements to be sent to Maiden.  Omar Amanat was on

13   multiple communications where he is -- where Maiden is telling

14   him and Irfan Amanat I need to report my numbers to my

15   investors, where is my Enable statement.  Obviously there's the

16   $700,000 loan that Mr. Amanat gave Maiden forestall investors

17   learning about the Enable disaster.  So there's plenty of

18   evidence in the record.

19          As to Mr. Jackson's point about the arguments he

20   wanted to make about lack of exposure, we think that the way

21   the Court has instructed the jury and plans to instruct the

22   jury, he can certainly say that he didn't knowingly associate

23   himself with the crime, that he didn't know there was a crime

24   at all.

25          So there's plenty of mens rea.  It's clear that in

1   order to convict Omar Amanat they would have to find that he

2   had sufficient knowledge and he was acting willfully, so he

3   knew what he was doing was wrong, and that he intended to

4   defraud Maiden's clients.  So there's plenty of room for

5   Mr. Jackson to make those arguments.

6           He obviously doesn't have any cases to support the

7   idea that investment advisory fraud is different from other

8   substantive offenses in that aiding and abetting theory can't

9   go hand in hand with it in the same way it would if it were an

10  aiding and abetting wire fraud or something of that nature.  So

11  we don't think the fifth element needs to be instructed any

12  differently than the way the Court has done it.

13          MR. JACKSON:  Your Honor, I just disagree with the

14  last thing Mr. Williams said, I don't have any cases.  I cited

15  Supreme Court analysis of the delicate fiduciary nature of an

16  investment adviser relationship and the fact this whole crime

17  is rooted in that.  There are a number of different cases in

18  the Second Circuit that talk about this.

19          THE COURT:  I would, rather than deal in the abstract,

20  I am open to considering -- what you are really arguing is this

21  isn't a crime at all, and the Second Circuit ultimately will

22  decide whether it's a crime at all.  But you said to me, Judge,

23  I want you to add specific intent to deceive.  I looked at your

24  cases, I decided to adopt the reasoning of some of the cases

25  you cited, I added that language.  If you have other language

1    you want me to consider, I'm happy to consider it, but more

2    than that, I can't really do.  So the time is now, we're

3    looking at the charge, if there's specific language you want me

4    to consider, tell me, and I will consider it.  But beyond that,

5    there's not much I can do.

6              MR. JACKSON:  I would ask your Honor in the fifth

7    element instruction that the Court include a sentence that

8    says:  In order to establish that Mr. Amanat is guilty of

9    aiding and abetting Maiden's commission of the crime, the

10   government must also establish that Omar Amanat was

11   sufficiently situated, that he had -- that he was able to --

12   that he had knowledge of the full scope of Mr. Maiden's duty

13   and disclosures or lack of disclosures with his investment

14   adviser clients.

15             MR. WILLIAMS:  We object to that.  We don't think that

16   there is any legal basis for finding an additional element of

17   knowledge.

18             THE COURT:  I don't think he has to have universal

19   knowledge of every interaction Mr. Maiden had with his client.

20   He has to know that Mr. Maiden is defrauding his clients, and

21   he has to -- given my instruction, he has to have taken some

22   act to help Maiden defraud his clients, and he has to have

23   taken that act with specific intent to deceive Maiden's

24   clients.  That's what I think he has to do.  The Second Circuit

25   will ultimately decide whether that is sufficient or not, but

1    Mr. Jackson, I'm rejecting the language that you just

2    suggested.

3             MR. JACKSON:  Thank you, your Honor, we appreciate

4    that.

5             THE COURT:  Okay.  Anything else on investment

6    adviser -- aiding and abetting investor adviser fraud?

7             MR. NAFTALIS:  Yes.

8             MR. WILLIAMS:  On page --

9             MR. NAFTALIS:  To go back a page to 49, I guess it

10   spills into.

11            THE COURT:  Yes.

12            MR. NAFTALIS:  So on page 36 of our proposed charge

13   there's the charge -- the gist of it is that you don't have to

14   be a registered investment adviser.  We don't know if the

15   defense is going to argue since -- as a hedge fund manager you

16   don't have to be a registered SEC investment adviser, and

17   there's some language in our charge what says to that effect,

18   so we just --

19            THE COURT:  I can't remember now if there's proof in

20   the record to whether Maiden was a registered investment

21   adviser or not.  I just don't remember.

22            MR. NAFTALIS:  He's not.

23            THE COURT:  I know he's not, I don't know if there's

24   evidence of that.

25            MR. WEITZMAN:  I believe there was some.

1          MR. NAFTALIS:  Someone asked him on cross-examination,

2     I think.

3          MR. WEITZMAN:  I think Mr. Melley said he never passed

4     the FINRA exam.  I recall that.  I think someone definitely

5     asked whether he's registered.  I think Maiden was asked that.

6          THE COURT:  I got to confess, it easily could have

7     happened, I just don't remember.  Listen, if it's going to be

8     an issue about whether he was a registered investment adviser,

9     I guess I could introduce that concept.

10          MR. JACKSON:  I plan to take another look at the law

11     tonight to verify that's accurate, but I don't plan to make any

12     argument about his registration status.

13          MR. NAFTALIS:  Is anyone going to challenge investment

14     adviser, quote, unquote, investment adviser?  Because in the

15     page 36 of our proposed charge, keep in mind that whether a

16     person or entity is a, quote, investment adviser is a different

17     issue than whether or not the person or entity is registered as

18     an investment adviser -- capital I, capital A -- you are

19     instructed that registration with the U.S. Securities &

20     Exchange Commission as a lower case investment adviser is not

21     required for you to find that a person is an investment

22     adviser.

23          THE COURT:  I don't see how this issue is going to be

24     presented to the jury, because when I discuss in the first

25     element -- the first element is Maiden's status as an

1    investment adviser, and I instruct the jury -- I don't say

2    anything about whether he was registered or not, I just say

3    that you should think about or you should consider whether

4    Maiden provided advice or was an adviser who issued reports or

5    analysis regarding securities, whether Maiden was in the

6    business of providing such advice, and whether Maiden was

7    provided compensation for such advice.  So that is what the

8    jury is told how they're supposed to resolve the issue.  If

9    someone starts talking about he wasn't a registered investment

10   adviser, there's no instruction that deals with that.

11            MR. NAFTALIS:  That's fair, your Honor.  If they don't

12   argue it, we don't care.

13            THE COURT:  Do you want to look at the law?

14            MR. JACKSON:  I'm saying I'm not going to argue that.

15   I will say I will verify -- I will concede I had planned to

16   argue he was not an investment adviser, but Mr. Naftalis raised

17   a good point, and based on the way he operated, I probably

18   could argue he wasn't really an investment adviser, but I'm not

19   making that argument.

20            THE COURT:  You would rather talk about a switch.

21            MR. JACKSON:  Exactly.

22            MR. NAFTALIS:  Only in North Carolina is $20 million a

23   hedge fund.

24            THE COURT:  Exactly.  So if you have an epiphany

25   overnight that you want to get into the registered investment

1    adviser thing, otherwise --

2              MR. JACKSON:  I have no plan to argue registration.

3              THE COURT:  Anyone else on aiding and abetting

4    investment adviser fraud?

5              MR. NAFTALIS:  No, your Honor.

6              THE COURT:  That brings us to Count Four.

7              MR. WEITZMAN:  Your Honor, on Count Four I can jump to

8    the market manipulation part of the instruction, which is on

9    page 58 and 59.

10             THE COURT:  Does anybody have anything before 59?

11             MR. JACKSON:  No, your Honor.

12             MR. NAFTALIS:  Yes, your Honor.

13             THE COURT:  Okay.

14             MR. NAFTALIS:  I'm trying to -- I think it's before

15   the second element.

16             MR. JACKSON:  Which page?

17             MR. NAFTALIS:  It was 57 of the draft we had last

18   night, so it's -- does the numbering change?  I guess alleged

19   market manipulation comes before knowledge and intent, so right

20   in the paragraph, your Honor, on page 58 of current draft,

21   right after the paragraph where it says nor does it matter.

22             THE COURT:  Sorry, what section are we?

23             MR. NAFTALIS:  Right before you start the alleged

24   market manipulation, we would suggest adding from our proposed

25   charge page 49 to 50 where there are examples of whether a

1    misstatement or omission is -- what makes it material.  So our

2    charge on 49 in the paragraph starts in assessing whether a

3    misstatement or omission is material, both quantitative and

4    qualitative factors should be considered, and it spills over to

5    50.

6           MR. WEITZMAN:  Your Honor, I object to that within the

7    Count Four context.  That really is a Count Six concept.  Count

8    Four is really just market manipulation, so it's not about

9    whether one meets analysts consensus or misstates income or the

10   like, it would be very confusing to include it in the market

11   manipulation count.

12          MR. NAFTALIS:  This is incorporated into the

13   securities fraud construction.

14          THE COURT:  Maybe that's an argument that I need to do

15   something different in Six, Count Six, but I tend to agree with

16   Mr. Weitzman that Count Four is about pumping up the stock and

17   the trading volume.  And so I take your point, Mr. Naftalis,

18   that there may be an issue when I get to Count Six, and

19   that's -- you may be right, that needs to be addressed, but I

20   would be reluctant to drop this into Count Four because Count

21   Four is -- I think everybody agrees what Count Four is, it's

22   relatively straightforward.

23          MR. NAFTALIS:  We agree.

24          THE COURT:  So we might have to fix something when we

25   get to Count Six, but that's the way I prefer to approach it is

```
 1    to fix Count Six, not muck around with Count Four.
 2              MR. WEITZMAN:  Your Honor, I have two essential
 3    points, one I think market manipulation is a very confusing
 4    subject in the context of the facts of this case.  And we went
 5    back to the case law we found, and in addition to case law we
 6    didn't find any very illuminating jury instructions, as your
 7    Honor noted.
 8              We did find an SEC request for a jury instruction, and
 9    I thought it was -- I thought it highlights that there needs to
10    be a robust instruction on market manipulation.  And I'm happy
11    to pass that up to your Honor.  And I think that your Honor is
12    getting -- this is much more robust than earlier drafts, and I
13    very much appreciate that.  This is from the case of *SEC v.*
14    *Whitmore*, 05 CV 869, in the District of Columbia, and if I may
15    pass it up, your Honor.
16              THE COURT:  Yeah, sure.
17              MR. WEITZMAN:  And here's the -- even before your
18    Honor reads it, in the first paragraph there was an emphasis
19    that the sole purpose of the trading has to be manipulative.
20    And it's an important thing that need to be emphasized in the
21    context of our instruction because Maiden, we believe, engaged
22    in bone fide purchases of the stock.  And because it's over the
23    counter, it's inevitable that sometimes a large purchaser will
24    have an affect on the stock price, but that doesn't make it
25    market manipulation.
```

1          And there's no evidence in the record -- in fact, I

2     think it's a real Rule 29 issue but there's no evidence in the

3     record, in my opinion, that Kaleil really knew Mr. Maiden's

4     trading strategies and what he was doing on a day-to-day basis.

5     At a minimum, I think the instruction needs to be amended to

6     reflect this conflict between legitimate economic trading.

7               THE COURT:  I tried to address that.

8               MR. WEITZMAN:  I know you did, your Honor, and I have

9     two small edits that I think would capture what is in the case

10    law.

11              On page 59, in the sentence that starts with

12    "accordingly."

13              THE COURT:  Right.

14              MR. WEITZMAN:  I would propose the following:

15    Accordingly, the government must prove beyond a reasonable

16    doubt that each defendant agreed to engage in conduct with the

17    sole intent of creating a false impression of market activity

18    regarding KIT Digital stock, and with the intent -- with the

19    sole intent to artificially -- I would take "solely" out, with

20    the intent to artificially distort the price of the KIT Digital

21    stock, rather than for legitimate investment or other economic

22    reasons.  And those are -- I'm taking it out of the cases that

23    we cited in our instruction, in particular --

24              THE COURT:  I don't see any cases cited in your

25    instruction.

1           MR. WEITZMAN:  In our request to charge.

2           THE COURT:  Not in what you --

3           MR. WEITZMAN:  I misspoke, your Honor, in the request

4    to charge that we submitted way back when, we cited a number of

5    cases on page 65.  65, for example, *In Re College Bound*

6    *Consolidated Litigation*, which is a Judge Mukasey ruling,

7    specifically said as a preliminary matter, the complaint --

8    this was a 10(b) complaint -- the complaint must state clearly

9    that Work Shafts, which were the defendant, purchased College

10   Bound shares with the quote, unquote, sole intent of raising

11   the price of the stock.

12          And then similarly, in *SEC v. Masri*, the court, which

13   is an SDNY court, it was Judge Holwell, said if a transaction

14   would have been conducted for investment purposes or other

15   economic reasons, and regardless of the manipulative purpose,

16   then it can no longer be said that it is artificially affecting

17   the price of the security or injecting inaccurate information

18   into the market.

19          All of this arises out of the Second Circuit's case in

20   *Mulheren*, which is 938 F.2d 364, and in that case, the Second

21   Circuit expressed quote, unquote, misgivings about the

22   government's view of the law, and then it says, however, that

23   it will assume, without deciding on this appeal, that an

24   investor may lawfully be convicted under Rule 10(b)(5), where

25   the purpose of his transaction is solely to affect the price of

1    the security.

2              So the district courts have latched onto that because

3    there are so many times that people engage in legitimate

4    economic trading that has the effect of increasing or

5    depressing the stock price.  For example, you could engage in a

6    huge short sell and it would depress the stock price, but it's

7    legitimate.  That's why often the market manipulation cases are

8    brought against individuals who put out false information, who

9    engage in pump and dumps, who have fake transactions or wash

10   trades through multiple brokerage accounts.

11             THE COURT:  I don't need to hear this, I can absorb

12   the point.  I think really the only issue is sole intent, and

13   there seems to be substantial support in the case law for that.

14             I mean I intended to get at this point, so I think

15   that really all we're talking about is degree.  The concept is

16   already there, and I agree that the concept -- I agree with you

17   that the concept has to be there.  You want to make it

18   stronger.

19             MR. WEITZMAN:  I do.

20             THE COURT:  I understand that.  You cited some case

21   law to the proposition it should say sole intent, which is

22   certainly stronger than what I said.

23             MR. NAFTALIS:  Your Honor, I think your instruction is

24   clear on page 59, the purchase or sale of stock -- you contrast

25   legitimate economic reasons with the accordingly the government

1    must prove beyond a reasonable doubt that each defendant agreed

2    to engage in conduct that was intended.  So I thought there was

3    supposed to be the contrast.

4             THE COURT:  This is what I'm going to do, if the

5    government wants to challenge "sole," I'm happy to see contrary

6    authority, but I have seen enough authority to believe that the

7    use of "sole" is appropriate.

8             MR. WILLIAMS:  Could we, your Honor, if we could, with

9    the Court's indulgence get the citations for the cases?

10            THE COURT:  They're in his original filing.  I was

11   just looking at them.  Mr. Weitzman, do you want to give the

12   page number again?

13            MR. NAFTALIS:  We have it, your Honor.

14            THE COURT:  It's *Mulheren* and progeny basically.

15            MR. NAFTALIS:  Your Honor, I can't claim I'm familiar

16   with the cases, but I don't think that we have the concept of

17   sole, but sole seems to be very -- I don't know if we like the

18   word "sole," but we understand the concept.

19            MR. WILLIAMS:  To be precise about it as well, if, for

20   instance, if you have an intent to manipulate the price and

21   also to reap some sort of benefit from that manipulation, you

22   have multiple intents.  And so we want to know whether when you

23   say "sole intent," you also have other language to make clear

24   that it doesn't mean that you can't have multiple motives in

25   engaging in market manipulation.

 1          MR. NAFTALIS:  Typically manipulate the price to hope

 2     to make some money at some point.

 3          THE COURT:  Let me read the sentence to you and tell

 4     me if you have a problem.  Accordingly, the government must

 5     prove beyond a reasonable doubt that each defendant agreed to

 6     engage in conduct with the sole intent to, one, create a false

 7     impression of market activity regarding KIT Digital stock, and

 8     two, to artificially distort the price of KIT Digital stock

 9     rather than for legitimate investment purposes.

10          MR. JACKSON:  It's very clear.

11          MR. WEITZMAN:  That's acceptable to us.

12          MR. WILLIAMS:  I think that's fine.  If we have a

13     question with "sole" --

14          THE COURT:  You can come back, yeah.

15          All right.  What's next?

16          MR. JACKSON:  My next issue isn't until 69, your

17     Honor.

18          THE COURT:  Anyone have anything between 59 and 69?

19          MR. NAFTALIS:  Well, that take us into the section

20     about -- I think we have an issue on -- I have not read your

21     statute of limitations, if you changed it, your Honor.

22          THE COURT:  I did change it.

23          MR. WEITZMAN:  Yes, your Honor, I think we already

24     stated our position, but we reiterate our position from this

25     morning on the statutes of limitations.

1                THE COURT:  Let's find that page, it's page 62, and I

2      have changed it from the last draft, and I have keyed it to the

3      need for there to be an overt act after August 12, 2010.

4                What we were talking about this morning, Mr. Weitzman,

5      is your point that where the objective of the conspiracy has

6      been met, the conspiracy is over.  And it's your contention

7      that the objective of the conspiracy was obtained or achieved.

8      What I will say to you is that concept, as I told you this

9      morning, is in the general conspiracy language that I present

10     in connection with Count One.  And it probably won't satisfy

11     you, but I want you to know that it is in there.

12               MR. NAFTALIS:  Your Honor, page 41 of your charge.

13               THE COURT:  Thank you, Mr. Naftalis.

14               And this is just common boilerplate that we're all

15     familiar with, but it says on page 41:  A conspiracy, once

16     formed, is presumed to continue until either its objective is

17     accomplished or there is some affirmative act of termination by

18     its members.

19               So to the extent you wanted to argue to the jury that

20     the objective of the conspiracy has been accomplished, and

21     therefore the conspiracy sort of self-destructed, there's

22     language in the charge to support that.  But I'm open, if you

23     have other ideas, if you have things you want to say and you

24     want me to say in the statute of limitations section about that

25     thought, I'm happy to consider it.

1            MR. WEITZMAN:  Yeah, I think there needs to be some

2     tie to indicate that that is a trigger for the statutes of

3     limitation because right now one doesn't trigger the other.

4     And let me consider what language.

5            THE COURT:  I guess only in the negative, right?

6     Because if you're still committing overt acts, then that would

7     suggest that the objective of the conspiracy has not been

8     realized.

9            MR. WEITZMAN:  Well, I think that's actually a dispute

10    for us, which is we think that, at most, the government's

11    evidence shows that there was a conspiracy -- we dispute it,

12    but a conspiracy until the NASDAQ listing.  What Maiden does

13    afterwards is his own thing.  The guy is a rampant market

14    manipulator.  So the fact that he is still manipulating or

15    attempting to manipulate has nothing to do with the conspiracy,

16    the statute of limitations has to begin when the object -- when

17    the purpose of the conspiracy is accomplished.  That's the

18    issue for us.

19           MR. NAFTALIS:  Your Honor, I think we covered this.

20    Seems like forever ago, maybe this morning, but I think this is

21    their theory of what the conspiracy is, that's not what the

22    evidence is.  We think the instruction as you wrote it is

23    correct and it's consistent with what Sand has.

24           THE COURT:  As I said, we're looking at the page,

25    Mr. Weitzman, is there -- what do you want me to say in

HCKTTUZ7                    Charge Conference

1    addition to what I have said?

2              MR. WEITZMAN:  I would like in addition that says --

3    and I'm spit-balling here, your Honor, a bit -- the statute of

4    limitations begins to run when the purposes of the conspiracy

5    have been accomplished or abandoned.

6              MR. NAFTALIS:  Your Honor, my recollection of

7    researching this last night is that courts have cautioned

8    against explaining legal concepts like when the statute of

9    limitations starts to run.  And the issue really is there just

10   has to be one overt act for purposes of getting over the

11   hurdle.

12             THE COURT:  Actually, as I think about it, I'm not

13   even sure I want the heading statute of limitations here.  I

14   don't want to inject legal concepts such as statute of

15   limitations unnecessarily into the case.  And so I'm not -- as

16   I think about it, I'm not even happy with having the heading

17   statute of limitations.  I need the jury to make a factual

18   finding here, and that's what I want them to focus on, and it's

19   not even important for them to know what the significance of

20   the factual finding is.

21             MR. NAFTALIS:  Maybe your Honor entitle it overt act

22   after August 12, 2010, because we're within the overt act

23   section.  It's not E really, it's really within D.

24             It either could be E and call it the fourth element,

25   or just sort of a further refinement, the third element.

1          MR. WEITZMAN:  I would prefer that it stand on its own

2     as an element that has to be proven beyond a reasonable doubt.

3          THE COURT:  So the new heading will be overt act after

4     August 12, 2010.  Why don't I say requirement.

5          MR. JACKSON:  That's perfect.

6          MR. NAFTALIS:  That's fine.

7          THE COURT:  Requirement of overt act after August 12,

8     2010.

9          MR. WEITZMAN:  And your Honor, I still reserve on the

10    additional language.  I would request -- and I understand your

11    Honor's ruling, I do think it would be appropriate to add in

12    the last line of the charged conspiracy to manipulate the word

13    "charged," so that it's -- so that the jury can't think of --

14         THE COURT:  Sorry, I'm losing you.

15         MR. WEITZMAN:  In the last line of the section before

16    the word "conspiracy" I would add "charged conspiracy."

17         THE COURT:  Sorry, where is that?

18         MR. WEITZMAN:  The statute of limitations section, the

19    last line it says conspiracy to manipulate the market.

20         THE COURT:  Yes.

21         MR. WEITZMAN:  I would add "charged conspiracy."

22         THE COURT:  Okay.

23         MR. NAFTALIS:  That's fine.

24         THE COURT:  Yes.  Okay, I added that.

25         MR. WEITZMAN:  And I do have, as your Honor -- now

1    that your Honor pointed me out to page 41, in the last line of

2    that section, your Honor pointed out regarding withdrawal, I

3    would request that we include language to the effect which

4    comes out of the government's citation of *Borelli*, 336 F.2d

5    376, unless it is shown by some affirmative proof that he

6    withdrew and disassociated himself from it or communicated the

7    abandonment in a manner reasonably calculated to reach

8    co-conspirators.  That is the language that the government

9    included in its letter.  And I think that when a co-defendant

10   tells others I'm no longer part of your conspiracy, for

11   example, and he's withdrawn from it, I would like to put that

12   gloss of it.  It's not just cessation, we believe Kaleil

13   communicated it to Mr. Maiden.

14           THE COURT:  And you said you're citing the

15   government's what?

16           MR. WEITZMAN:  The letter they put in last -- I think

17   it was last night, it's docket 612, and on page 4 in the middle

18   of the paragraph that starts with "Second."

19           THE COURT:  I have a December 19 letter from the

20   government, it's only three pages, so I must not be looking at

21   the right one.

22           MR. WEITZMAN:  I'm happy to pass it up.

23           THE COURT:  Okay.

24           (Pause)

25           THE COURT:  So you want me to add to the end something

1   along the lines of:  Such as a communication of abandonment in

2   a manner reasonably calculated to reach co-conspirators?

3           MR. WEITZMAN:  Yes, your Honor.

4           THE COURT:  Do you have a problem with that?

5           MR. NAFTALIS:  No.

6           THE COURT:  Then I will add it on page 41.

7           So now we're back to I think it's page 62.  Anything

8   else on 62?

9           MR. NAFTALIS:  No.

10          THE COURT:  63?

11          MR. NAFTALIS:  I think, your Honor, the first

12  paragraph on 63, we have the same issue with how the wire fraud

13  is defined.  So it just mirror your Honor's edits, it's just

14  not the arm's length issue.

15          THE COURT:  Could someone refresh my memory what page

16  that was?

17          MR. NAFTALIS:  I believe it was on page 22.  Excuse

18  me --

19          THE COURT:  Yes, I think you're right, sir.

20          MR. NAFTALIS:  24, excuse me.

21          THE COURT:  Yes, page 24.  I added:  The government

22  also alleged that Mr. Tuzman falsely represented KIT Digital

23  that a $250,000 KIT Digital investment to Maiden Capital was a

24  legitimate investment, whereas Mr. Tuzman and Maiden had agreed

25  it was instead to be paid to Tuzman for his personal use.

1                 That's what you want added on page 63, right?

2                 MR. NAFTALIS:  Correct.

3                 MR. WEITZMAN:  Your Honor, I may be misrecollecting, I

4     don't recall Irfan Amanat charged in this count.  Do you guys

5     recall?

6                 MR. NAFTALIS:  Count Five?

7                 MR. WEITZMAN:  Yeah, I think I see his name.  I don't

8     see it in the indictment.

9                 THE COURT:  Sorry, what's the problem with Count Five?

10                MR. WEITZMAN:  I think in the first paragraph on page

11    63 it says Irfan Amanat is charged in Count Five, and I don't

12    believe he is.

13                MR. NAFTALIS:  That's right, he's not.

14                THE COURT:  I was trying to find my copy of the

15    indictment, but of course I can't find it.

16                He's not actually charged in Count Five?

17                MR. JACKSON:  He is not, your Honor.

18                MR. NAFTALIS:  No, he's not.

19                THE COURT:  So I should strike that.  So it's just --

20    it should just say the top of page 63:  Mr. Tuzman and others

21    conspired to commit wire fraud?

22                MR. NAFTALIS:  I think that's right, your Honor.

23                THE COURT:  All right.  I made that change.

24                Anything else on 63?

25                MR. WEITZMAN:  No, your Honor.

1           THE COURT:  64?

2           MR. WEITZMAN:  Your Honor, I just want to preserve the

3   requests I made under Count One and incorporate them here.  I

4   understand your Honor has already ruled.

5           THE COURT:  Could you refresh my memory?

6           MR. WEITZMAN:  Yeah, this was about whether the scheme

7   to defraud intended to deprive the victim.

8           THE COURT:  Oh, yeah.

9           MR. WEITZMAN:  Whether it was an essential element.

10          THE COURT:  Yes, that argument is preserved.

11          MR. NAFTALIS:  Your Honor, our next edit is 66.

12          THE COURT:  All right, on 66.

13          MR. NAFTALIS:  I think in the first object, this would

14  be the part to include more description of what it means to be

15  material.

16          THE COURT:  Yes.

17          MR. NAFTALIS:  I'm trying to find it in our charge.

18          THE COURT:  Tell me what those pages were again?  You

19  said that they were 49 and 50, right?

20          MR. NAFTALIS:  49 to 50, yes.

21          THE COURT:  So I could say something here like I want

22  to expand, however, on my discussion of what is material.

23          MR. NAFTALIS:  That's fine.

24          THE COURT:  Do you have any problem, Mr. Weitzman,

25  with my including examples that are on pages 49 and 50 of the

government's request to charge, document number 391?

            MR. WEITZMAN:  I actually would recommend going
broader.

            THE COURT:  Okay.

            MR. WEITZMAN:  Which is a know is a rare defense
request, but I think the paragraph before the example needs to
be included as well.

            MR. NAFTALIS:  We agree, the qualitative and
quantitative?

            MR. WEITZMAN:  Yes.

            THE COURT:  That paragraph, the next paragraph.
Anything else?

            MR. NAFTALIS:  We suggest to the end, which goes to
the top of 51.

            MR. WEITZMAN:  I would stop after the bullet points.
I don't think there's been any evidence about effects on the
price of stock.  No one has put in expert testimony on that.  I
think it injects an issue that is not really in play here.
There's been no -- I know that Mr. Naftalis believes event
studies are junk science, but there's been no event study to
discuss the issue, so I think it's unnecessary.  I would just
stop at the bullet points.

            MR. WILLIAMS:  I may agree, I'm reading this quickly.

            MR. NAFTALIS:  I would add:  This list is not
exhaustive.

1              MR. WEITZMAN:  That's fine with me.

2              THE COURT:  So it will end with this is not an

3    exhaustive list, period?

4              MR. NAFTALIS:  Right, that first sentence.

5              THE COURT:  Do you want the whole first sentence?

6              MR. NAFTALIS:  It doesn't matter to us.  The fact it's

7    not exhaustive is fine.

8              MR. WEITZMAN:  I would stop at this is not an

9    exhaustive list.

10             THE COURT:  So it would end with this is not an

11   exhaustive list, period.

12             What's next?

13             MR. JACKSON:  My next issue is on 69.  I don't know if

14   anyone has anything before that.

15             THE COURT:  Anyone have anything before 69?

16             MR. WEITZMAN:  At this point I don't think I have

17   anything, but I'm continuing to skim it.

18             MR. NAFTALIS:  On page 68, your Honor, I would just

19   say -- you write I have defined the term material for you in

20   connection with Count Four and this count.

21             THE COURT:  Sorry, where are you?

22             MR. NAFTALIS:  The top of 68.  Now that we have

23   included more materiality definition, just you say I have

24   defined the term "material" for you in connection with Count

25   Four and this count.

HCKTTUZ7                         Charge Conference

1             THE COURT:  I have defined the term "material" for you

2        in connection with Count Four and in connection with this

3        count, period, right?

4             MR. NAFTALIS:  Correct.

5             THE COURT:  Okay.

6             MR. JACKSON:  Your Honor, at 69, in the multiple

7        conspiracies charge --

8             THE COURT:  Yes.

9             MR. JACKSON:  -- the only change, your Honor, we would

10       ask for is in the first sentence after "but instead has offered

11       proof," we would ask for the clause that "even if the

12       government's allegations are accepted, at best," and then the

13       rest of the Court's language shows several separate and

14       independent conspiracies with different members.

15            We just don't want the sentence to read as though we

16       are conceding that they established.

17            (Continued on next page)

18

19

20

21

22

23

24

25

HckWtuz8

1        THE COURT:  All right.  I need to fix that.  I see

2   your point.  I need to fix it.

3        How would you feel about, "With respect to Counts One,

4   Four and Six, Mr. Tuzman and Mr. Amanat contend that the

5   government has not proven the single conspiracy charged in each

6   count, but at best, has offered proof showing several separate

7   and independent conspiracies with different members"?

8        How would you feel about that?

9        MR. JACKSON:  I think that's fine for me, your Honor.

10        MR. WEITZMAN:  That's fine, your Honor.

11        MR. NAFTALIS:  That's fine.

12        THE COURT:  OK.

13        MR. WEITZMAN:  Your Honor, I think it's not in the

14   instructions, I'm sure your Honor considered our request, but

15   so that I can preserve our rights, we requested in request No.

16   47 an instruction on "standards unclear."

17        THE COURT:  Yes.

18        MR. WEITZMAN:  This was on page 88, and I think that

19   the trial record now supports that instruction.

20        THE COURT:  I need to get your charges in front of me.

21   I know they're around here somewhere.  Hold on a second.

22        MR. NAFTALIS:  And your Honor, we responded in a

23   letter I just handed up last night.

24        THE COURT:  Yes.

25        What page should I look at, Mr. Weitzman?

HckWtuz8

1              MR. WEITZMAN:  Page 88 of our requests to charge.

2              THE COURT:  All right.  It's request No. 47 in

3    Tuzman's proposed jury instructions, docket No. 403.

4              And you were saying, Mr. Naftalis, you had addressed

5    this in a letter.  Which letter was it?

6              MR. NAFTALIS:  The one that we handed up that we sent

7    in last night.  I think it's the third point.

8              THE COURT:  Yes.  OK.  Let me just read it.

9              Yes.  I understand you want to preserve the point, Mr.

10   Weitzman, and you have.  I do agree with the sentiments

11   expressed in the government's December 19 letter that the way

12   the case has been tried, the issue is whether Mr. Tuzman was

13   aware that fake revenue was included in KITDigital's SEC

14   submissions as well as the information that was provided to the

15   auditors.

16             I don't think this is a case that turns on the

17   application of accounting rules.  It's a much more

18   straightforward case in which the defendant is arguing that he

19   was not aware of the fraud being perpetrated by Smyth and

20   Campion.

21             MR. WEITZMAN:  It is absolutely correct, your Honor,

22   that that is our defense on the revenue recognition portion of

23   the case.  The problem is that the government has charged a

24   broader case in Count Six.

25             In particular, the government alleges that my client

HckWtuz8

1   deceived auditors, shareholders and others regarding the

2   related-party nature of transactions with Maiden Capital.

3   Mr. Halkias, that outside auditor, specifically testified that

4   "there is no single," and this is a quote, "single best source

5   for a definition of related party," that it's discussed in

6   "numerous places in our professional literature," and both he

7   and Mr. Rocco acknowledged that it's a very complicated

8   question.  That's a direct quote.

9          My client was not a CPA, and unless they're abandoning

10  and there's an instruction that they can't consider the

11  related-party disclosure issues as part of Count Six, I don't

12  think it's appropriate to charge my client with knowledge of

13  this very complex issue.

14         MR. WILLIAMS:  Your Honor, I think he's in the wrong

15  count.  Count Six does not include any discussion of

16  related-party transactions.  Count Five in the indictment

17  concerns the relationship between Maiden Capital and the

18  defendant, and so that's where the language of related party

19  comes in.

20         Count Six is focused on the company's financial

21  performance and revenue recognition and the like, and the Court

22  is correct that the government's proof is largely about fake

23  transactions, so there's no ambiguity there.

24         Count Five does mention related party, and if they

25  want to tell the jury that there's no one, clear definition,

HckWtuz8

1     they can do that.  There's evidence in the record of that, but

2     we don't think that necessitates a separate instruction.

3              MR. WEITZMAN:  Your Honor, I think the instruction is

4     then, appropriate for Count Five.  They're still charging my

5     client with fraud based on unclear accounting standards.

6              MR. WILLIAMS:  We think that argument's available to

7     them based on the record.  That doesn't mean that an

8     instruction is warranted.

9              THE COURT:  I'm sorry?

10             MR. WILLIAMS:  I said they can certainly make the

11    argument based on the evidence in the record, but we don't

12    think that a separate instruction is required.

13             THE COURT:  What do you say to his argument that

14    there's been testimony from the outside auditor that the whole

15    related-party issue is a complicated one?  What's your response

16    to that?

17             MR. WILLIAMS:  The way that we have charged the case,

18    and I think the testimony from the auditor, Mr. Halkias, was

19    that there's no one definition of what it means to be a related

20    party.  However, based on the definition that he was relying

21    on, he was asking the defendant certain questions about his

22    relationship with Stephen Maiden in order to make an

23    assessment, and so Mr. Halkias, I thought, was pretty clear as

24    to what he believed the definition was that he was operating

25    under, and they can certainly argue to the jury that, Look, my

HckWtuz8

```
 1    client didn't know what he actually had to tell Mr. Halkias
 2    because of the ambiguity around what it means to be a related
 3    party, but we don't think that that does all the work that he
 4    thinks it does.
 5            THE COURT:  Let me ask you this.  Is it part of the
 6    government's theory on Count Five that Mr. Tuzman should have
 7    told the auditor that Maiden Capital was a related party?
 8            MR. WILLIAMS:  For Count Five specifically, Michael
 9    Halkias asked Tuzman in August of 2009, Tell me about your
10    relationship with Maiden Capital, and the defendant responded
11    with just a boatload of lies about that.
12            THE COURT:  Right.
13            MR. WILLIAMS:  The whole point was for Halkias to then
14    do an assessment as to whether it was a related party.
15            THE COURT:  I have to say, Mr. Weitzman, I don't think
16    the theory on Count Five involves some arcane interpretation of
17    related-party transactions.  It's going to be premised on, as
18    Mr. Williams just said, the allegation that Mr. Tuzman flat out
19    lied about what his relationship was with Maiden Capital,
20    period.
21            I just don't see Count Five turning on potentially
22    unclear accounting standards about who is a related party and
23    who is not.  I think the proof on that is much more
24    straightforward.  Either the jury believes it or it doesn't.
25    They're welcome to reject it, obviously, but it doesn't turn on
```

HckWtuz8

1    the application of rules regarding related parties, rules that

2    may be unclear.  It turns on the claim that when questioned

3    about his relationship with Maiden Capital, he told numerous

4    lies.

5             MR. WEITZMAN:  I actually don't think that there's an

6    allegation that he told numerous lies.  I think there's one

7    sentence that they focus on, which is whether there was a

8    relationship or suasion regarding buying activity.  Nothing

9    else, to my knowledge, in that email is allegedly false.  That

10   said, your Honor --

11            THE COURT:  Do you want to address that?

12            MR. WILLIAMS:  This is what summation is for.  There's

13   plenty more.

14            THE COURT:  That's my recollection, but go ahead, Mr.

15   Weitzman.

16            MR. WEITZMAN:  I appreciate that.

17            In any event, the context of the email is that

18   Mr. Halkias was trying to make a related-party determination,

19   so I think what Mr. Isaza Tuzman's understanding, if any, of

20   what a related-party transaction is is intertwined with his

21   representations.

22            THE COURT:  But there isn't any evidence.  There's

23   nothing in the record about what his understanding was about

24   related-party transactions one way or the other.

25            MR. WEITZMAN:  I agree with that.  And that's why I

HckWtuz8

1  think that the "standards unclear" instruction is appropriate,

2  because this is a complexity.

3          THE COURT:  But that just proves the inapplicability

4  of it, because if your client doesn't have any idea what the

5  standards are, it really doesn't matter whether they're clear

6  or unclear, and in any event, that's not the government's

7  theory anyway.  The government's theory is when questioned

8  about the relationship -- you say it was one lie, they say it

9  was multiple lies.  There's evidence in the record.  The jury's

10  free to disregard it or decide it's not reliable, but there's

11  evidence in the record that when questioned about his

12  relationship with Maiden, he did not respond truthfully.  I

13  don't see that as implicating related-party rules.  You've

14  preserved the point, but your objection is overruled.

15          MR. WEITZMAN:  Thank you, your Honor.

16          THE COURT:  We're still on multiple conspiracies.

17  Anything else on that?

18          MR. JACKSON:  Nothing from me, your Honor.

19          THE COURT:  OK.  Then we're at background and motive

20  evidence.

21          MR. JACKSON:  I think the Court's charge on this is

22  excellent.

23          THE COURT:  Any other comments?

24          MR. WEITZMAN:  Your Honor, I'm just reading through it

25  now.

HckWtuz8

1            THE COURT:  Yes, go ahead.

2            MR. WEITZMAN:  I guess the only question is whether

3    this is really only applicable to Counts One through Three.  I

4    think the government's theory is that it's applicable to Count

5    Four as well, for example, maybe even Count Five, because it's

6    incorporated.

7            MR. WILLIAMS:  Your Honor, that's actually correct.

8    When the evidence was -- I don't know if you'll recall; it's

9    been so long ago.  When the Court first instructed the jury as

10   to how they would be able to consider this background evidence,

11   Mr. Jackson wanted it only to be as to Counts One through

12   Three.  We said it was admissible as to Four and wanted Four in

13   the instruction as well.  We compromised and left it as One

14   through Three, but technically, the government offered the

15   evidence on this background to all four counts, One through

16   Four.

17           We didn't think that -- frankly, the instruction

18   itself can be broadened to include Count Four, but it would

19   make the instruction a lot more complicated because you'd have

20   to bring up the fact that he's also charged in Count Four along

21   with Mr. Isaza Tuzman, so a lot would have to be changed.

22           MR. JACKSON:  Your Honor, I'm sorry.

23           MR. WEITZMAN:  Can we pause a second?  I'd like to

24   just talk to Mr. Jackson.

25           THE COURT:  Let me make an observation.  I just don't

HckWtuz8

know how much the background evidence has to do with Count

Four.

          MR. JACKSON:  Exactly, Judge.

          MR. WEITZMAN:  I may be in agreement on this one.  I'd

like to talk to Mr. Jackson for a moment.

          MR. JACKSON:  Your Honor, we think that the Court's

last point is the correct point, and this instruction, I think,

as clearly as possible addresses what is a little bit of a

complicated issue and protects everyone's interests and gives

the government the appropriate ability to make the arguments

they need to make about this evidence.

          MR. WILLIAMS:  Your Honor, one of the reasons we

didn't suggest making it abundantly clear that it's applicable

as to Count Four is that we think that the way that the

language is right now, we would be able to rely on the evidence

as background anyway.  It's all one, continuous course of

events.  We think it is relevant to Count Four in particular

because Omar Amanat, knowing that there's an Enable hole,

knowing that the money is gone or "locked up," as Mr. Jackson

would say, is highly incentivized to keep Stephen Maiden in

pocket; not have him redeem his Enable investment; incentivize

him to manipulate the KITDigital stock at a time when that

would be to Maiden's economic benefit and Omar Amanat's

economic benefit, and so on and so forth.  It's kind of of a

piece with the same motive evidence that is applicable to

HckWtuz8

1    Counts One through Three.  That's why we think it's admissible

2    to Count Four or relevant to Count Four.

3           MR. WEITZMAN:  I'm fine with it as is, your Honor.  I

4    have no request.

5           MR. JACKSON:  And I'm not going to object to any

6    motive arguments.

7           MR. WILLIAMS:  And that's fine.  If no one's going to

8    object if we say it, then we don't think the instruction needs

9    to be changed.

10          THE COURT:  Right.  I mean, you're going to make the

11   motive argument, and everybody knows that.  It's not a

12   surprise.  You've been very consistent with your theory.

13          MR. WEITZMAN:  Your Honor, can I ask a question?

14          THE COURT:  Yes.

15          MR. WEITZMAN:  I can't recall, but did your Honor

16   repeat the instruction regarding --

17          THE COURT:  Consciousness of guilt?

18          MR. WEITZMAN:  Yes.

19          THE COURT:  But I did it in the first section, at the

20   end.

21          MR. JACKSON:  Yes, we saw it there.

22          MR. WEITZMAN:  I see it.  Pages 18 and 19.

23          THE COURT:  Yes.

24          MR. WEITZMAN:  Thank you, your Honor.

25          MR. JACKSON:  Your Honor, it seems like we're at the

HckWtuz8

1    end.  I have one other issue, and I know that the Court has

2    already looked at this very closely, but I wasn't sure if we

3    were going to circle back to it.

4         I do believe that for venue in a wire fraud case, the

5    government has to establish that a wire either originated,

6    terminated or passed through the Southern District of New York.

7    I don't know if the Court has already made a determination

8    about that, but I think that that is the law.

9         THE COURT:  Are you requesting that I add language?

10         MR. JACKSON:  Yes, your Honor.

11         THE COURT:  Are you requesting that I add language to

12    the charge?

13         MR. JACKSON:  Yes, your Honor.

14         I think just circling back.  I thought when we were

15    discussing venue before, I thought perhaps there was an

16    additional instruction and I just missed that, but if we could,

17    on 41, just add that with regard to wire fraud, the government

18    is also required to demonstrate that a wire, an interstate wire

19    either passed through, originated or terminated in the Southern

20    District of New York.

21         MR. WILLIAMS:  Your Honor, I thought you covered that

22    on page 44, the top paragraph.

23         THE COURT:  Right.  Do you believe that that's

24    inadequate, Mr. Jackson?

25         MR. JACKSON:  I do, your Honor.  I think that 44 says:

HckWtuz8

1          "The government must prove that an act in furtherance

2     of the alleged unlawful activity occurred within the Southern

3     District of New York.  Such act would include, for example, the

4     placing of a telephone call or an electronic communication to

5     or from the Southern District of New York."

6          I think that that's all accurate, but I think that

7     there is a specific requirement that at least one of the

8     interstate wires go through the Southern District of New York,

9     so I think in the venue instruction on 41, we just need one

10    more sentence that says with regard to wire fraud, the

11    government is also required to prove that an interstate wire

12    either originated, terminated or passed through the Southern

13    District of New York.

14         THE COURT:  Does the government dispute that?

15         MR. WILLIAMS:  No, your Honor, we don't.

16         I think it's a little confusing to have that language

17    on page 41.  It should probably go on 44, which is actually

18    Count Two, the substantive wire fraud.  And Mr. Jackson's

19    suggestion could be inserted in the venue language in that top

20    paragraph.

21         THE COURT:  Do you want it at the top of 44,

22    Mr. Jackson?

23         MR. JACKSON:  That's fine with me, your Honor.

24         THE COURT:  I'm going to strike "an act in furtherance

25    of the alleged activity."  I'm going to strike that and

HckWtuz8

1   substitute the wire language that Mr. Jackson just used.

2              Are you OK with that?

3              MR. WILLIAMS:  That's fine, your Honor.

4              THE COURT:  It will read as follows:

5              "In addition to proving beyond a reasonable doubt all

6   of the elements of wire fraud, as I have explained them to you,

7   the government must prove," and then tell me your language

8   again, Mr. Jackson.  "That a wire communication originated,

9   passed through or terminated in the Southern District of New

10  York"?

11             MR. JACKSON:  Yes, your Honor.  I think it has to be

12  an interstate wire.

13             THE COURT:  I'm sorry?

14             MR. JACKSON:  An interstate wire in furtherance of the

15  alleged unlawful activity.

16             THE COURT:  All right.  Let me start over.  "Must

17  prove that an interstate wire in furtherance of the alleged

18  wire fraud originated, passed through or terminated in the

19  Southern District of New York."

20             MR. JACKSON:  Yes, your Honor.  Thank you.

21             THE COURT:  And then I'm going to strike the next

22  sentence, which reads, "Such an act would include a telephone

23  call," and then it will pick up with, "As I have instructed you

24  as to venue, and venue alone, the government's burden is proof

25  by a preponderance."

HckWtuz8

1          Now, are there modifications necessary in the wire

2     fraud conspiracy instruction?

3               MR. WILLIAMS:  We don't believe so, your Honor.

4               THE COURT:  OK.

5               MR. WILLIAMS:  We do have a question.  I just don't

6     recall whether the Court, at another part of the indictment,

7     defined --

8               THE COURT:  Another point in the charge?

9               MR. WILLIAMS:  I'm sorry.

10          Another point in the charge, defined preponderance of

11    the evidence.

12               THE COURT:  Well, I do it here.  I say more likely

13    than not.  If you look at 44, I say, "As I have instructed you

14    as to venue, and venue alone, the government's burden is proof

15    by a preponderance of the evidence, more likely than not."

16          I think I did define that.  Yes, it's on 42, "a

17    preponderance of the evidence means more likely than not."

18               MR. WILLIAMS:  Thank you, your Honor.

19               MR. NAFTALIS:  Your Honor, we just had a couple more

20    things --

21               THE COURT:  Yes.

22               MR. NAFTALIS:  -- one of which, and I may have missed

23    it, I'm not sure that the instruction the jury shouldn't

24    consider punishment is in there.

25               THE COURT:  It is.

HckWtuz8

1          MR. NAFTALIS:  It is?  OK.

2          THE COURT:  I think it's at the beginning.  Sympathy

3     or bias, "the question of possible punishment must not

4     enter" --

5          MR. NAFTALIS:  There it is.

6          THE COURT:  Page 3.

7          MR. NAFTALIS:  OK.  Understood.

8          And then the last one we had was we had requested a

9     conscious avoidance instruction.

10          THE COURT:  Yes, I rejected that, but I'm happy to

11     hear what you have to say.  I rejected it.  That's why it's not

12     in there.

13          I don't believe that the government's theory is

14     conscious avoidance as to either defendant.  The government, as

15     to Mr. Tuzman, is relying on countless emails, which it argues

16     show knowledge and intent and not a closing of the eyes.

17          As to Mr. Amanat, while I can certainly conceive of a

18     case where the theory could have been conscious avoidance, I

19     don't believe that to be the government's theory as to Mr.

20     Amanat.  The government has introduced communications from

21     which it argues that he was on notice of what Maiden was doing

22     with his investors.  Maiden testified that he discussed with

23     Amanat that he was lying to his investors, and then there's the

24     money that Amanat provided.  I didn't see it as a theory that

25     Amanat closed his eyes as to what was going on.  It seemed to

HckWtuz8

1    me as a case that the government was arguing direct knowledge,

2    and so that's why I eliminated the conscious avoidance

3    language.

4              I'll hear anything more you have to say.

5              MR. WILLIAMS:  Your Honor, I think we certainly

6    believe in our proof, and our proof is that both defendants

7    knew and were told, but I think the reason why we are

8    requesting the instruction, and we understand the Court's

9    ruling, is because in the face of that evidence, they are going

10   to tell the jury, Well, look, yes, Kaleil got all these emails

11   talking about round tripping and whatever, but --

12             THE COURT:  But they're going to be saying that Smyth

13   and Campion lied.

14             MR. WILLIAMS:  Well, no.

15             THE COURT:  They lied and it was their scheme; I know

16   nothing about it.  They're lying, lying, lying.

17             MR. WILLIAMS:  Understood, but there is direct

18   evidence of, for instance, Mr. Isaza Tuzman receiving

19   communications with, for instance, Tomas Petru.

20             THE COURT:  Right.

21             MR. WILLIAMS:  And they're talking about these loan

22   payments and Smyth saying, I'm sending two payments, send them

23   back to us, and Mr. Isaza Tuzman is on those communications.

24   And they're going to argue, they're going to have to say

25   something about those communications, and presumably they're

HckWtuz8

going to say something like, Well, there's no evidence that he

read it, or There's no evidence that he knew what they were

talking about.  And that really does tee up the situation where

on their face the communications are so suspicious and there

are so many red flags that if he doesn't respond saying, Hey,

guys, what are you talking about, then that really does go

toward conscious avoidance, we think.

             THE COURT:  Hold on a second.

             Just give me a moment.  I had asked my law clerk to

retrieve some materials for me on conscious avoidance.  I'd

like to have them in order to continue the conversation.

             MR. NAFTALIS:  Your Honor, we can hand up a letter.

We cited some of the cases.  They're just parentheticals.  I

don't know if it helps you or if you want the full cases.

             MR. JACKSON:  Your Honor, I would just say from our

position, I think the way the Court described it a moment ago

is exactly correct.  This is not a case where the government

has introduced proof under a conscious avoidance theory.  I

mean, there are cases like that, but this is a case where each

one of the cooperating witnesses said explicitly that the

defendants had joined up with them and the defendants are

denying it and are contesting the truth of it.

             A conscious avoidance instruction is only going to add

enormous confusion to the jurors and to, frankly, our jury

addresses in terms of explaining what is and what is not at

HckWtuz8

issue.

MR. WEITZMAN:  Yes, and on our end, Mr. Smyth and Mr. Campion couldn't have been clearer.  Their accusation is that Kaleil effectively forced them, pressured them to commit this fraud, conceived of the fraud, took over the negotiations with Mr. Petru in order to further the fraud.

We obviously deny that, but that's not a conscious avoidance theory.

THE COURT:  It adds a layer of complexity to the instructions.  I'm happy to consider anything you want to say or anything you want to submit on it.  I did think about conscious avoidance.  I took it out because I did not believe it was properly in play in this particular case.  If you want me to revisit that, I'm happy to do it.  I'm happy to think about it more.

MR. WILLIAMS:  I think we will, your Honor, because the cases where a conscious avoidance charge has been given, it is not as if the government doesn't have proof that the defendants knew and people told them about the fraudulent activity; it's that they deny knowledge and that we therefore have to battle between a world in which you're told something but you claim you didn't know about the fraud.  We think that's this case.

For instance, we have evidence of a New York meeting between Smyth, Tuzman and Campion where they discuss that

HckWtuz8

1    spreadsheet, and the defendant doesn't deny that he was at that

2    New York meeting but does deny knowing about the fraud.  Some

3    of the cases discuss when someone is at a meeting where the

4    fraud is discussed and yet they still claim that they lacked

5    knowledge because they didn't read the documents in full or

6    didn't pick up everything that was being said.

7              THE COURT:  But there's utterly no testimony.  There's

8    no support for that in the record.  I mean, there are certainly

9    cases where a defendant takes the stand and says:  "I wasn't

10   paying attention; I didn't read that email; yeah, I was at the

11   meeting, but I wasn't paying attention."  That's not the record

12   here.

13             MR. WILLIAMS:  We agree, your Honor.  What we're

14   saying is --

15             THE COURT:  In order for me to give a conscious

16   avoidance charge, and we're going to get the cases in just a

17   minute, but my understanding is in order for me to give a

18   conscious avoidance charge, there has to be a basis in the

19   record from which a reasonable jury could find that the

20   defendant closed his eyes to what was obvious.  I don't see

21   that as this case.  That's my understanding of the law.  I

22   haven't got the law yet, but that's my understanding of it.

23             MR. WILLIAMS:  We understand, and we're going to go

24   back and look at the record, but we think that through the

25   cross-examination of our cooperating witnesses, specifically

HckWtuz8

Smyth, they questioned whether statements made in emails, for

instance, if you look at them one way, and one example is,

again, going back to that New York meeting, it says 37.6

million and then ELEE, and Smyth said that stood for elephant.

And then Mr. McRae said that stood for, and then he had some

acronym to dispute whether or not that clear on its face that

it stood for elephant, so we do think there's some evidence in

the record.

THE COURT:  That doesn't sound like conscious

avoidance to me.  That sounds like the cooperator is lying.

MR. WILLIAMS:  OK.

THE COURT:  That's what it sounds like to me.

Actually, their theory was that, No, it wasn't that he

didn't notice that it said ELEE.  Their theory is that it

didn't mean elephant at all.

What did you say it meant?  You actually came up with

an acronym for something, as I recall.

MR. WEITZMAN:  Yes.  Expense ledger for excluded

entities.

THE COURT:  Expense ledger for excluded entities.

MR. NAFTALIS:  It's a non-GAAP, obviously, fraud.

MR. WEITZMAN:  Obviously, conscious avoidance is when

you pick up a suitcase that someone gives you at the airport

and you don't ask any questions, and all of a sudden, it's

packed with cocaine.  That's conscious avoidance.

HckWtuz8

1        THE COURT:  And they offer to pay you a lot of money

2   for walking it through customs.

3        MR. WEITZMAN:  Exactly.

4        THE COURT:  That's not this case.  Let's be honest,

5   this case turns on whether they believe the cooperators or not.

6   That's what this case is about.

7        MR. WILLIAMS:  Your Honor, I can tell that we're

8   fighting a losing battle here.  I will just say so that I can

9   feel comfortable that I've exhausted this, for instance,

10   there's one of the assurance notes that Mr. Isaza Tuzman sent

11   to Mr. Smyth saying, I'm going to send $8 million in, and that

12   is inherently suspicious, to be sending $8 million to fill a

13   hole in the company's books, and that by itself should put you

14   on notice that something wrong has happened, and yet they're

15   going to argue that that shows nothing.  That doesn't rely on

16   the credibility of Smyth or Campion or anyone else.

17        Look, maybe what's best is for us to see how they

18   close and what arguments they make to the jury based on the

19   evidence, and then we can reassess from there.

20        THE COURT:  Just give me a minute.

21        I believe that my understanding of the law is correct,

22   which is that a conscious avoidance charge is appropriate when

23   "the evidence would permit a rational juror to conclude beyond

24   a reasonable doubt that the defendant was aware of the high

25   probability of the fact in dispute and consciously avoided

HckWtuz8

1   confirming that fact," citing United States v. Cuti, 720 F.3d

2   453, 463 (2d Cir. 2013).

3          The issue that's in dispute here is a very simple one.

4   It's undisputed that fraud was committed at KITDigital.  The

5   only issue is whether that fraud was done at the direction and

6   with the knowledge of Mr. Tuzman.

7          MR. NAFTALIS:  Your Honor, we'd direct you to Goffer

8   as well.  I don't know if you have that in front of you.

9          THE COURT:  I'm sorry?

10          MR. NAFTALIS:  U.S. v. Goffer.

11          THE COURT:  I don't have that in front of me.

12          MR. NAFTALIS:  Which is 720 F.3d 113, 127 and there

13   the circuit said, "Red flags about the legitimacy of a

14   transaction can be used to show both actual knowledge and

15   conscious avoidance."  And U.S. v. Svoboda.

16          THE COURT:  Yes, I'm familiar with that case.

17          I feel that this case falls in the bucket of what is

18   described in Cuti, and this is what the Second Circuit said in

19   Cuti:

20          "District courts should pay heed, however, to

21   circumstances in which a conscious avoidance charge may be

22   inappropriate."

23          I'm paying heed.

24          "This is so when the only evidence that alerts the

25   defendant to the high probability of the criminal activity is

HckWtuz8

direct evidence of the illegality such that the question for

the jury is whether the defendant had either actual knowledge

or no knowledge at all of the facts in question."

That's from Cuti also, 720 F.3d 463.

I believe that this case is that case.  I believe that

there has been direct evidence of Mr. Tuzman's involvement,

knowledge and intent to commit the fraud.  It's not a case

where certain suspicious things were brought to his attention

or would have come to his attention and he didn't investigate

it or closed his eyes to it.  The record here is that he was an

integral player, according to the government, in the fraud,

that it was done at his direction.  There was testimony about

that from multiple witnesses, and I don't see that a conscious

avoidance charge is appropriate on the evidentiary record.

If you want to cite other cases to me, you're welcome

to do so.  I'm happy to look at them, but I thought about the

issue when I was working on the charge, and I rejected the

notion that a conscious avoidance charge was appropriate.  It

adds a significant layer of complexity to the charge, and there

has to be an evidentiary record to support it, or as the Second

Circuit says, there has to be evidence that would permit a

rational juror to conclude beyond a reasonable doubt that

Mr. Tuzman was aware of a high probability of the fraud and

consciously avoided confirming it.

The only way they could reach that conclusion is by

HckWtuz8

1   flatly rejecting the testimony of the cooperators that he was

2   intimately involved in the fraud, and at that point, I think

3   the government's whole case falls apart.

4        MR. WILLIAMS:  Your Honor, we actually disagree quite

5   strongly.  We think that the documents in the case, we think we

6   can stand up before the jury and say you could disregard the

7   cooperator testimony; there are documents in the case that

8   establish his guilt.  I mean, after all, we charged this case

9   without a single cooperating witness on the accounting-fraud

10  side.  We charged it as a document case, and so we feel quite

11  strongly about our documents and the documents on their face

12  offer circumstantial proof of his knowledge.  But he can argue

13  that the documents are not clear or he didn't read them that

14  way, the same way that the government does.

15       THE COURT:  There isn't any evidence.  Again, there's

16  been no evidence about how he read the documents.  None.  There

17  just isn't any evidence on that.

18       Will there be argument on that?  Yes, but I don't

19  think that converts it.  I can't focus on what arguments the

20  lawyers are going to make.  The Second Circuit tells me to look

21  at the evidence.  The evidence to me is one of direct

22  knowledge.  That's what the evidence is.

23       MR. WILLIAMS:  We'll go back again and look at the

24  law.  I think we have been laboring under the impression that

25  when a defense is raised, so based on the evidence in the

HckWtuz8

record, if the defense is raised that he didn't know because
these things weren't clear, the conscious avoidance charge can
then be used.  But it sounds like, and we'll again go back and
look at the law, that the Court is saying that without evidence
in the record that the defendant wasn't aware of criminality,
despite there being red flags, then no charge is warranted.

          Now that we understand what you're saying, we'll go
back and look at the cases, and if there's anything further we
want to submit on it, we will do that.

          THE COURT:  The example that Cuti cites, and you've
already alluded to it, is that there's evidence that a
defendant attended a meeting, that he wasn't paying attention
to what was going on, or the defendant signed documents but
offered evidence he didn't bother to read the documents.  If we
had that kind of evidence here, I'd be sympathetic to your
position.  I just don't see that evidence.  Without that
evidence, I don't know what the defense lawyers are going to
argue, but it wouldn't surprise me if they argue that the
emails aren't as clear as you're going to argue they are.  It
wouldn't shock me if they made that kind of argument, but I
don't think that our expectations of what they might argue
changes whether there's an evidentiary foundation for it or
not, and I don't see an evidentiary foundation.

          To put it another way, I don't see a basis on which a
rational juror could find that he closed his eyes to the high

HckWtuz8

1    probability of the fact that fraud was going on, that

2    round-tripping fraud was going on at KITDigital.  But if you

3    have other cases you want to show me, I'm happy to look at

4    them, or proof in the record that you think would support this

5    closing his eyes argument, I'm happy to consider it.

6            MR. WILLIAMS:  We'll go back and look.

7            THE COURT:  But it has to be consciously avoiding.

8    It's not just "I was really busy; I was flying around the

9    world; I had a lot going on; I do M&As.

10           It's got to be more than that, consciously avoiding.

11           MR. WILLIAMS:  Right.

12           THE COURT:  It can't be just "I'm busy."

13           MR. WILLIAMS:  Totally.  We agree, and I think that

14   the thing that leaps to mind is the number of questions that

15   Mr. McRae asked witnesses like, This email doesn't say the

16   words "round trip" on it, right?  That, I think, is an example

17   it's not clear.

18           Look, we hear you.  I think you understand what we're

19   saying, and we understand that it's not going to be in the

20   charge as drafted.  If there's anything else that we think

21   would be helpful, we'll submit it.

22           THE COURT:  Thank you.

23           MR. WEITZMAN:  Your Honor, just a few points.  The

24   first is --

25           THE COURT:  Just as a placeholder, because I don't

HckWtuz8

1    want to forget, verdict sheet, but go ahead.

2              MR. WEITZMAN:  On that placeholder, we have no

3    objection to the government's proposed verdict sheet.

4              THE COURT:  You had submitted something which broke

5    down Count Six in a bunch of ways.  You're not interested in

6    that; you just want a general verdict?

7              Do you want something different, Mr. Jackson?

8              MR. JACKSON:  Oh, I want a general verdict sheet.  I

9    thought that Mr. Isaza Tuzman was joining my application

10   yesterday that not guilty precede guilty.

11             THE COURT:  That's right.

12             MR. WEITZMAN:  We are joining that application, but we

13   want a general verdict.

14             MR. NAFTALIS:  Your Honor, the order of guilty versus

15   not guilty doesn't matter to us.

16             THE COURT:  I'm going to have guilty and not guilty.

17   It will be a general verdict sheet.

18             MR. JACKSON:  Sorry, your Honor?

19             THE COURT:  I am rejecting your suggestion.

20             MR. JACKSON:  Thank you, Judge.

21             THE COURT:  It will be guilty and not guilty.

22             MR. WEITZMAN:  Second, does your Honor have a practice

23   with respect to quoting from the jury instructions during

24   summations?

25             THE COURT:  It makes me very nervous, because

HckWtuz8

1    invariably, questions of fairness and completeness come up.  I

2    think it's important lawyers tailor their arguments to the

3    charge, and I have great sympathy for that, but I have to make

4    sure they don't in any way mischaracterize what my instructions

5    are going to be or mislead the jury about what my instructions

6    are going to be.

7              I wouldn't have a problem with "You're going to be

8    asked to determine whether -- blah, blah, blah."

9              MR. WEITZMAN:  Right, or identify as an element of

10   this offense, you'll have to find.

11             THE COURT:  Or, You're going to be asked to determine

12   whether -- pick the element --

13             MR. WEITZMAN:  Right.

14             THE COURT:  -- was proven beyond a reasonable doubt

15   here.

16             MR. WEITZMAN:  OK.

17             MR. WILLIAMS:  To be clear, that doesn't mean they

18   then get to define the element when telling the jury what the

19   element is, that they're going to have to --

20             THE COURT:  See, when you start quoting, it makes me

21   nervous.  This is a complex charge, and if you start quoting

22   from it, you're not going to want to quote all of it, and then

23   we're going to have these issues about whether the jury's been

24   misled about what's really in there.

25             I understand you want to tailor your argument.  Is it

HckWtuz8

1    Mr. McRae that's going to be doing it?

2                MR. WEITZMAN:  Yes, your Honor.

3                THE COURT:  I understand that Mr. McRae is going to

4    want to tailor his argument to what is in the charge, and what

5    I'd ask you to do, if you could, is please try not to quote the

6    charge, but rather, you can direct the jury's attention to

7    issues that are going to come up or things that they're going

8    to have to determine.  That's totally fine, but representations

9    about what I'm going to tell them make me nervous because often

10   there is an issue about completeness.

11               MR. WEITZMAN:  Understood, your Honor.

12               The second thing is we've been trying to figure out,

13   as your Honor's aware, how the case is given to the jury before

14   the close of Friday.

15               THE COURT:  Yes.

16               MR. WEITZMAN:  I wanted to throw out a suggestion.  I

17   don't know if your Honor's ever done it, but your Honor did say

18   today that you will not require Mr. McRae to start his

19   summation, let's say, at 1 p.m. and talk for 20 minutes, but

20   the rules permit reading the instructions at any point in time.

21   What I was noticing is that the general instructions are about

22   20 pages.  It seems to me if the timing works out, it could be

23   that you can start the general instructions right after the

24   prosecution's summation, right before the prosecution's

25   summation, so that they get two hours right up until 1:30, just

HckWtuz8

some way to squeeze more in without wasting the jury's time and
make sure that the instructions are given before the holiday
period.

          THE COURT:  Part of it has to do with whether we're
going to be able to sit at all next week.

          MR. WEITZMAN:  I understand.

          THE COURT:  For example, if the answer comes back we
can't sit next week, I'd be very reluctant to give them legal
instructions and then have nine days go by before they start
deliberating, so that's part of the equation.

          MR. WEITZMAN:  Understood, your Honor.

          MR. JACKSON:  I will say, your Honor, to the extent
that I think we have the potential, and I think everyone's
probably in agreement on this.  To the extent we have the
potential to start any deliberations, I do think it would be
helpful, and I'm certainly going to be focused on using my time
as efficiently as possible in order to hopefully help that
happen, because I do think that even if the jurors get a
limited amount of time, their ability to begin deliberations
when the summations are fresh in their minds and the trial's
fresh in their minds will, regardless of whether or not they
have to come back, I think, will give the jury deliberations
some momentum, so if there's a limited amount of time, I think
we would request the jury be allowed to start for the limited
amount of time to at least begin to process how they're going

HckWtuz8

1          to deal with things.

2                    THE COURT:  Nothing would make me happier, but so far,

3          their unwillingness to stay later is going to be a problem.

4          And of course, I'm just trying to hold this together, and I

5          know everybody wants it held together, but I was hoping for

6          more flexibility on the 5:00 than I got today.  We're still

7          going to explore with them whether even if 5:00 doesn't work,

8          does 4:30 work?  And so I'm still hoping for some movement.

9                    MR. WILLIAMS:  Just so the record's clear, I don't

10         think the government would be -- we wouldn't consent to the

11         jury charge being broken up.

12                   THE COURT:  Yes.  I don't think that's a good idea.

13                   I will say there are judges, and this is, I think,

14         common in other districts, where the charge is given before the

15         summations.  That's actually done.  It's not done here, I don't

16         think, although I think Judge Engelmayer's done it.

17                   MR. JACKSON:  This is actually a pet issue of mine,

18         your Honor.

19                   THE COURT:  I'm sorry?

20                   MR. JACKSON:  This is actually a pet issue of mine.

21         I've submitted a letter on this a few times.  I saw it first,

22         it's common in the District of D.C., and I saw it there and I

23         submitted a letter in the Madoff case explaining some of the

24         rationale and the science behind it.  I do think that there can

25         be cases where it's appropriate and helpful.

HckWtuz8

| 1 | I will say here I have a little bit of a concern that
| 2 | because of the complexity of the evidence, I think it will be
| 3 | more helpful if the jurors have heard the generalized arguments
| 4 | and then are able to inject that into the charge.  But I could
| 5 | see it either way.  Certainly, in the Madoff case,
| 6 | interestingly, Judge Swain agreed to adopt the proposal to give
| 7 | the charge first, but then she decided to give the charge
| 8 | before and after.

THE COURT:  She gave it twice?

MR. JACKSON:  She did.  She ended up giving it twice.
To be fair, it was a very lengthy set of summations that went
on for almost two weeks, but we ended up having two charges,
and so I hope we don't have that here.

THE COURT:  All right.

MR. WEITZMAN:  The final thing is, and I'm not
reopening our case, I neglected to push on this issue, your
Honor, which is the issue of the flash drives.  Your Honor will
recall we made a Touhy request.  We requested a stipulation.
The government put in a letter in response.

In the letter, as they also said orally prior to the
letter, days prior to the letter, they represented that they
would talk to Mr. Smyth to find out if any of the 12 flash
drives were Mr. Tuzman's flash drives.  I've spoken to
Mr. Williams.  He says that he still hasn't spoken to Mr. Smyth
about that issue.  I'm not sure he's inclined to.  I think that

HckWtuz8

1    it's part of their <u>Giglio</u> obligations.  Whether we've rested or

2    not, we should know the answer to that and then we can decide

3    how to proceed.

4              THE COURT:  Yes, I did think you were going to talk to

5    Smyth.  I'm operating on the assumption that none of those

6    flash drives were -- they didn't include the one that he said

7    Tuzman gave him.

8              MR. WILLIAMS:  And that's my understanding as well.

9    That's why I originally communicated that to Mr. Weitzman and

10   the Court.  I think what I had said was that if we were going

11   to enter into a stipulation, the government would have to

12   confirm that the stipulation was accurate, because that's our

13   obligation, and we never did that because no stipulation was

14   entered into.

15             This came up, I went to Mr. Weitzman and said that I

16   wanted Mr. Smyth to return home to Australia, to be home with

17   his family for Christmas, and he said, Well, what about that

18   stipulation?  And frankly, at this point, the case is closed.

19   We're not reopening for the government's Exhibit 610.  We're

20   not inclined to enter into any additional stipulations on

21   Smyth's testimony.  We're done, so we at this point don't feel

22   that we have the need to interview Smyth again for a

23   stipulation that we're not going to enter into.  And we'll

24   leave it at that.

25             MR. WEITZMAN:  I hear Mr. Williams.  I hear what he's

HckWtuz8

1    saying.  I just think that he twice informed us that he was

2    going to get to the bottom of it, and we'd still like to get to

3    the bottom of it, for the record.

4            THE COURT:  All right.  It could have been raised and

5    if it had been raised, I would have addressed it, but I think

6    we're beyond that now.

7            Other issues?

8            MR. JACKSON:  I don't think this is a real issue, your

9    Honor.  I think it's correct that we're all in agreement that

10   the order of summations is going to be Mr. McRae after the

11   government and then me and then rebuttal.

12           THE COURT:  I will make a general comment, which is I

13   think there was concern expressed at some point long ago that

14   the defendants were going to be throwing mud on each other, and

15   that's not what's happened in the case.

16           MR. WEITZMAN:  That's correct, your Honor.  And I

17   don't think that that's really the reason we were discussing

18   today which summation goes first.  It came up because the delay

19   in summations is not at all my client's fault, and we felt at

20   the time that this is a bit prejudicial to our summation as a

21   result of this issue in the rebuttal case, and so fairness

22   would permit us to go second.

23           I think that Mr. Jackson and I have discussed it, and

24   assuming we can get an hour in tomorrow, an hour-fifteen in

25   tomorrow, I think we're comfortable proceeding first, your

HckWtuz8

Honor.

        THE COURT:  All right.  I'm going to do everything I can to make sure that that happens.

        MR. WEITZMAN:  Thank you, your Honor.

        THE COURT:  Anything else?

        MR. WILLIAMS:  If we're all done, I have one personal matter that I'd like to bring up off the record.

        THE COURT:  Sure.

        (Discussion off the record)

        MR. JACKSON:  Thank you very much, your Honor.

        MR. WILLIAMS:  Thank you, your Honor.

        MR. WEITZMAN:  Thank you, your Honor.

        THE COURT:  Thank you, all.

        (Adjourned to December 21, 2017, at 9:30 a.m.)

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   JULIE AMATO

 4   Direct By Ms. Griswold . . . . . . . . . . .6522

 5   Cross By Mr. Jackson . . . . . . . . . . . .6526

 6   Redirect By Ms. Griswold . . . . . . . . . .6536

 7   JOEL DECAPUA

 8   Direct By Ms. Griswold . . . . . . . . . . .6539

 9   Cross By Mr. Jackson . . . . . . . . . . . .6592

10   Redirect By Ms. Griswold . . . . . . . . . .6642

11   STEPHEN EWING MAIDEN

12   Direct By Ms. Griswold . . . . . . . . . . .6650

13   Cross By Mr. Jackson . . . . . . . . . . . .6663

14                        GOVERNMENT EXHIBITS

15   Exhibit No.                           Received

16    3584    . . . . . . . . . . . . . . . . . .6542

17    34     . . . . . . . . . . . . . . . . . .6566

18    3550, 3551 and 3552   . . . . . . . . . . .6567

19    3579A   . . . . . . . . . . . . . . . . . .6571

20    3579B   . . . . . . . . . . . . . . . . . .6576

21

22

23

24

25
```