HcmWtuz1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

       v.                         15 Cr. 536 (PGG)

KALEIL ISAZA TUZMAN, et al.,

                                  Trial
           Defendants.
------------------------------x
                                  New York, N.Y.
                                  December 22, 2017
                                  9:10 a.m.
Before:

                 HON. PAUL G. GARDEPHE,

                                  District Judge
                                -and a jury-
                      APPEARANCES

JOON H. KIM
     Acting United States Attorney for
     the Southern District of New York
A. DAMIAN WILLIAMS
ANDREA M. GRISWOLD
JOSHUA A. NAFTALIS
     Assistant United States Attorneys

GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Defendant Isaza Tuzman
AVI WEITZMAN
MARCELLUS A. McRAE

BOIES, SCHILLER & FLEXNER LLP
     Attorneys for Defendant Amanat
RANDALL W. JACKSON

HcmWtuz1

```
 1              (Trial resumed)

 2              THE COURT:  Please be seated.

 3              I received a letter, I guess last night, from

 4     Mr. Tuzman's counsel, objecting to the government's suggestion

 5     of, I guess, putting a computer into the jury room.  As I

 6     previously indicated, I have no intention of sending any sort

 7     of computer into the jury room, I'm happy to hear anything

 8     anyone wants to say on the subject, but I'd previously

 9     indicated to the lawyers that I had significant concerns about

10     sending computers into the jury room.

11              MS. GRISWOLD:  We understood that, your Honor.  I

12     think that there is a small subset of documents that can't

13     really be feasibly printed, such as the trading records for

14     Mr. Maiden; there are thousands of pages, so we need some sort

15     of plan.  The government would propose that we have a computer

16     that's wiped that has that subset of documents on it and

17     available so that the jury, if they want to look at trading

18     records, can do that, because we can't send, or we propose not

19     to send thousands of pages of trading records back in paper

20     format.

21              THE COURT:  As I said, I'm not going to send any sort

22     of computer equipment back into the jury room.  I'm happy to

23     include in the charge some statement that certain documents,

24     such as trading records, are too voluminous to send into the

25     jury room and if they want to see them or some portion of them,
```

HcmWtuz1

 1    they can request that, but I'm not going to send --

 2              MS. GRISWOLD:  That makes sense, your Honor.

 3              THE COURT:  As you recall, in the charge I say, "All

 4    of the documentary exhibits that have been received in evidence

 5    will be sent into the jury room."  What I had contemplated

 6    adding, subject to what the lawyers thought, was, "You may also

 7    request nondocumentary evidence, and that will be shown to you

 8    here in the courtroom," and maybe an appropriate -- I'm open to

 9    suggestions.

10              MS. GRISWOLD:  From the government's perspective, I

11    think that makes sense, because there are a couple things that

12    fall into that category, such as the NASDAQ video clips or

13    perhaps Mr. Steward's testimony.  I would request that that be

14    maintained in the charge and that an additional sentence be

15    added that certain records, such as trading records that are

16    voluminous, and spreadsheets, will not be sent back but will be

17    available to you if you request them and can be shown to you in

18    the courtroom.

19              THE COURT:  Is there an index of materials that were

20    received in evidence?

21              MS. GRISWOLD:  Yes, your Honor.  We have that

22    prepared.

23              THE COURT:  OK.  Do the defense lawyers have any

24    objection to the language proposed by Ms. Griswold?

25              MR. JACKSON:  No, your Honor.

HcmWtuz1

1          MR. WEITZMAN:  No, your Honor.

2          MR. JACKSON:  I would just note I don't think the

3     parties conferred on the indexes, so we'll need to discuss

4     whatever it is.

5          THE COURT:  OK.  I do want the documentary evidence to

6     be prepared such that it can be sent back into the jury room as

7     soon as deliberations begin, so I would like the lawyers to

8     consult on that and make sure everybody's comfortable with what

9     we're sending back into the jury room.

10          Ms. Griswold, could you give me that sentence again,

11     please.

12          MS. GRISWOLD:  Yes, your Honor.

13          Certain exhibits that are too voluminous to be sent

14     back in paper format will be available.

15          THE COURT:  OK.  Just give me a moment.

16          Should I say too voluminous for copying?  Should I say

17     that?

18          MS. GRISWOLD:  For printing, I would suggest.

19          THE COURT:  OK, for printing.  And should I say "such

20     as trading records"?

21          MS. GRISWOLD:  Such as trading records and Excel

22     spreadsheets, would be our request to cover the documents that

23     fall into that category.  For example, there are Chips wire

24     transfer records that fall into this category.

25          THE COURT:  All right.  To be clear, I'm going to add

HcmWtuz1

1   on page 73, in the paragraph addressing their right to see

2   exhibits, I'll just read the whole paragraph:

3           "All the documentary exhibits that have been received

4   in evidence will be sent into the jury room.  You may also

5   request nondocumentary evidence and that will be shown to you

6   here in the courtroom.  Certain exhibits that are too

7   voluminous for printing, such as trading records and Excel

8   spreadsheets, will be made available to you here in the

9   courtroom upon your request.  An index reflecting materials

10  received in evidence will be provided to you."

11          MS. GRISWOLD:  That works for the government.  Thank

12  you.

13          MR. WEITZMAN:  Yes.  That's agreeable.

14          THE COURT:  Mr. Jackson.

15          MR. JACKSON:  Yes.  That's excellent, Judge.

16          THE COURT:  OK.  Have you talked amongst yourselves

17  about what you want to do with respect to the jurors that have

18  articulated issues with sitting next week?

19          MR. JACKSON:  The defendants have discussed it, your

20  Honor.  Our preference is I think for one, I think for all of

21  them, it only makes sense to, I think, release Mr. Morgan and

22  to make the other two jurors who had issues alternates, and

23  proceed with the jurors who can actually deliberate into next

24  week, because otherwise, we run the risk of any number of

25  problems, among them including the possibility of having to

HcmWtuz1

1    restart deliberations, perhaps even multiple times.  We think

2    it makes sense to go with the jurors that are able to sit.

3             THE COURT:  Just so I understand, you're proposing

4    that I excuse Mr. Morgan at the close of everything, at the

5    close of summations and jury instructions today; you're

6    suggesting I excuse him.  Right?

7             MR. JACKSON:  Yes, your Honor.  I think based on what

8    your Honor explained to us was his proffer, it does not sound

9    like he's going to be in any position, I think it would be an

10   undue burden on him to have the possibility of returning while

11   he's addressing what we discussed.  We think it makes sense to

12   release him and then appoint the other two jurors who have

13   issues as alternates.

14            THE COURT:  One is already an alternate, so no issue

15   there.

16            MR. JACKSON:  Right.

17            THE COURT:  That is Ms. Mueller.

18            Just to be clear, you're suggesting that with

19   Mr. Sabogal I should tell him that he's subject to recall.

20            MR. JACKSON:  Yes, your Honor.

21            THE COURT:  OK.  What does the government say?

22            MR. NAFTALIS:  Your Honor, we largely agree, but in an

23   excess of caution, we would suggest not releasing Mr. Morgan.

24   Let him go back to work on the very off chance that we actually

25   need an alternate, I think it would be prudent to just have him

HcmWtuz1

available.  I don't think anyone wants to impose on him.  We
know he can't really sit anymore, it's gotten to be too much
for him, but it would be nice to just have an alternate if we
ever need one.  But I think we all agree that the folks who are
available to start deliberating, we should just make them the
seated jury and make the others the alternates.

            THE COURT:  Does anyone object to my telling all three
jurors that they're subject to recall?

            MR. JACKSON:  Your Honor, we defer to the wisdom of
the Court.  It just seems -- we defer the wisdom of the Court.
We've already stated our view.

            THE COURT:  As I told you yesterday, another thing you
should be thinking about is Mr. Morgan, as I told you, was, as
I understand it, the sole juror who was objecting to sitting
until five today, so you might want to factor that into your
calculations about whether you want me to excuse him or whether
you want me to tell him he's subject to recall.

            MR. JACKSON:  I think that's a major issue, your
Honor, and it's a continuing issue, because next week is going
to be a high-stress week, too, in terms of timing.

            THE COURT:  Right.

            MR. JACKSON:  I think it makes sense to excuse
Mr. Morgan.

            MS. GRISWOLD:  I think, your Honor, if that's the
case, the rest of the jurors could stay until five and he's the

HcmWtuz1

1    only one, we would agree.  If that is the state of the facts,

2    then we agree.

3          THE COURT:  Yes, that is the state of the facts.

4    Mr. Ruocco's repeatedly told me that.  And by the way, I think

5    that's been true for some time.  Just so you know, there was

6    great willingness on the part of the juror to stay longer, but

7    Mr. Morgan was the dissenter on that.

8          With the approval of the lawyers, I will excuse

9    Mr. Morgan at the close of the jury instructions, and I will

10   tell Mr. Sabogal and Ms. Mueller that they are subject to

11   recall and will be functioning as alternates and that they will

12   be subject to all the rules of conduct that I told them at the

13   start of the trial.

14         MR. WEITZMAN:  Thank you, your Honor.

15         MR. JACKSON:  Thank you, your Honor.

16         THE COURT:  Mr. Weitzman, was there something else you

17   wanted to say?

18         MR. WEITZMAN:  Yes.  I wanted to raise two issues.

19         The first is one that I raised yesterday.  I've gone

20   back to the transcript and we are requesting a curative

21   instruction on two statements that were made in the

22   government's summation.  The first concerns Professor Ferrell's

23   testimony.  At page 6876, the government stated as follows:

24         "Even the defendants' expert, the Harvard—MIT

25   professor, he spent a day testifying about how he did not

HcmWtuz1

believe Maiden had a big impact on price each day.  Even he

testified that there were a number of days where Maiden did

impact the price."

          Frankly, I think both statements are wrong.  He did

not testify at all about whether Maiden had a big impact or

not, and he certainly did not testify that there were a number

of days where Maiden did impact the price.  I think the

government crossed its own red line on this one.

          THE COURT:  Let's stick with that.

          What's the government's position on that?

          MR. WILLIAMS:  Your Honor, they raised this after the

government's submission, and I think the Court and the

government both said that they're free to respond in their

defense summation to that point.  They specifically declined to

do that and are now seeking an instruction.  We certainly think

if there was a misstatement, they could have pointed it out to

the jury, and that's fair argument that they would be able to

make, but they didn't do that.  For them to make that strategic

decision to not comment so now they can seek an instruction

from the Court, we think that that's not warranted.

          THE COURT:  Why should this be treated any differently

than other objections that have been made where I told the jury

that their recollection of the evidence controls?  Why should

this be treated differently?

          MR. WEITZMAN:  Your Honor, I think that this is

HcmWtuz1

1    actually rather egregious for two reasons.

2              THE COURT:  First of all, maybe I'm wrong, but I

3    thought he did concede or his charts indicate that there was an

4    effect on 12/31.  Am I wrong about that?

5              MR. WEITZMAN:  He conceded that there was a

6    statistically significant movement in the price of KITDigital's

7    stock.  He specifically testified that he can't testify as to

8    the reasons for that statistically significant movement.

9    That's the point.

10             Part of our defense, your Honor, is given the absence

11   of any proof that Maiden actually moved the stock, and this is

12   the entire point about Professor Ferrell.  Given the absence of

13   that evidence, there are fair inferences that can be drawn that

14   there was no agreement to manipulate the stock.  This is

15   literally the only statement and only piece of evidence they

16   are now pointing to to suggest there was actual market

17   manipulation, and it's based on a misstatement of the record.

18             Now, when I raised it, the government said, We'd like

19   to look at the transcript, we're not sure what was said.  And

20   we didn't have the benefit of the transcript either during our

21   summation, but I think that when it's such a critical piece to

22   our defense --

23             THE COURT:  Why didn't you address it, then, in your

24   summation if it was so critical?

25             MR. WEITZMAN:  I think we did address that Professor

HcmWtuz1

1     Ferrell said there was no statistical movement.

2               THE COURT:  OK.  Why isn't that adequate?  The

3     government actually says you didn't, but I'll accept your

4     representation that Mr. McRae did.  If Mr. McRae did address

5     it, again, I come back to my original question.  What you're

6     saying basically is that the government misrepresented the

7     evidence.  The parties have been trading allegations of that

8     sort throughout the summations.

9               I have an instruction to the jury I've already given,

10    I'm going to give it again in the charge, that it's their

11    recollection of the evidence that controls and to the extent

12    the lawyers have said something that's wrong about the

13    evidence, it's their recollection that controls, so I'm

14    struggling with why that is not adequate.

15              MR. WEITZMAN:  I appreciate that, your Honor.

16              THE COURT:  Because at bottom, what you're saying is

17    that the government misrepresented what the evidence was, and

18    as I said, the parties have been trading those accusations, but

19    ultimately, I told the jury when someone objected, It's your

20    recollection of the evidence that controls, not what the lawyer

21    says, and I'm going to repeat that in my charge, as you know.

22              MR. WEITZMAN:  Yes.

23              THE COURT:  The question is, why isn't that good

24    enough?

25              MR. WEITZMAN:  I want to preserve my objection.  I

HcmWtuz1

```
 1    want to make the record clear.  I think it's a bit different

 2    when you're arguing, I think that instruction is a very

 3    appropriate instruction.  I also think the jury understands

 4    that it's about the inferences drawn from the evidence.  This

 5    is just a misstatement, total factual misstatement, but I

 6    understand your Honor's position.  I will move on.

 7            But I do want to make the record clear that in two

 8    other instances, the government stated that my client received

 9    money from Enable.  I've gone back to the transcript, and the

10    government said, at page 6868:

11            "He went to Steve Maiden, he went to Steve Maiden,"

12    this is referring to Mr. Amanat, "to steal money from Maiden so

13    he could give it back to Isaza Tuzman."

14            That was an incorrect statement of the record, and

15    then at page --

16            THE COURT:  Oh, because it went back to KIT?  Is that

17    your point?

18            MR. WEITZMAN:  Yes, it is, your Honor.

19            THE COURT:  What's the government's position on that?

20            MR. WILLIAMS:  Your Honor, this is obviously one of

21    those cases where he, as the CEO of the company that he's named

22    after himself, is negotiating directly on behalf of KITDigital

23    to get the money back, saying that Enable sent it back to him

24    is pretty much the same thing.  The jury can certainly

25    understand that the money is for the corporate entity as
```

HcmWtuz1

1    opposed to him personally.

2           Again, if they thought this was such a critical point,

3    they could have pointed that out to the jury.  In fact, I think

4    Mr. McRae said the corporate form matters, KITCapital versus

5    KITDigital versus Kaleil personally.  We don't think this is an

6    issue.

7           THE COURT:  Is this a matter you intend to touch on in

8    your rebuttal?

9           MR. WILLIAMS:  Not that wire, your Honor.

10          THE COURT:  OK.

11          MR. WEITZMAN:  Just for the record, there's a second

12   reference, on page 6869, which says:

13          "So two days later Maiden wires the first million to

14   Enable, and what does Omar do with that money?  The very same

15   day, and you saw these bank records, the majority of that money

16   that came into Enable from Maiden went out the door to Isaza

17   Tuzman."

18          That's just incorrect.  I think the government has to

19   concede that.  I'm not asking for anything further.  If your

20   Honor were willing to give a curative instruction, I would

21   request it, but I understand your Honor's point.

22          There's a the second point, your Honor, which is the

23   issue of the government's summation on the whole and what it

24   may intend to do in its rebuttal.  The law is clear that a

25   summation is where the government's supposed to marshal the

HcmWtuz1

1    evidence.

2              THE COURT:  I want to say the jury is present so I

3    need you to please make this point as quickly as you can.  I

4    asked the jury to be on time.  They were on time.  It's almost

5    9:40.  I know you want to make a record, but please make it as

6    quickly as you can.  OK?

7              MR. WEITZMAN:  Yes, your Honor.  30 seconds.

8              A summation is where the government marshals its

9    evidence; it's not in rebuttal.  The government in its

10   summation did not mention the following even once:  Sezmi,

11   Peerset, WWB, Tomas Petru, Visual Connection, Morse Chen.

12             My strong suspicion is that the government held back

13   those allegations and those documents so that it can spring it

14   on rebuttal.  I think if that happens, your Honor, the

15   defendants may be entitled to a surrebuttal, and I think

16   there's a lot of support.

17             We can proceed and see what they do on rebuttal, but I

18   wanted to put that out there.

19             THE COURT:  Mr. Jackson, are you prepared to proceed?

20             MR. JACKSON:  I am, your Honor.

21             (Jury present)

22             THE COURT:  Please be seated.

23             Good morning, ladies and gentlemen.  We will now hear

24   the rest of Mr. Jackson's closing on behalf of Mr. Amanat.

25             Mr. Jackson, please proceed.

1              MR. JACKSON:  Thank you, your Honor.

2              Good morning again, ladies and gentlemen, and I want

3      to say thank you.  I didn't get a chance yesterday to say thank

4      you, but I hope you know that all the parties deeply appreciate

5      your jury service.  We know that this has been a very long

6      trial, and we deeply appreciate the sacrifice that you've all

7      made.

8              I want to start off by talking a little bit about the

9      concept of common sense, which is something that the government

10     has brought up.  It's something that's been discussed in this

11     trial, and I'm going to try to move as quickly as possible

12     today in the very limited time I have through a lot of points

13     of evidence, so I apologize if I move too fast.  I'm going to

14     try to address everything, but there's a lot.  And the thing

15     that I want to ask you to do is, as you examine the evidence,

16     don't give up real common sense.  And I submit to you the term

17     gets tossed around, but what it really means is stepping back,

18     looking at the big picture, using your own powers of deduction,

19     what you know about your own everyday lives, and asking

20     yourselves, does that make sense?

21             Now, in that context, the first thing I want to

22     address is the government's rebuttal case.  You heard a few

23     witnesses testify in the rebuttal case having to do with some

24     allegations relating to four documents in this case.  I'm going

25     to address them very quickly.  That's not because we don't take

HcmWtuz1                    Summation - Mr. Jackson

1    them seriously.  We take those kind of allegations extremely

2    seriously.  We have enormous respect for this jury, and it's

3    incredibly important that those are appropriately addressed,

4    but the reason I'm moving through them quickly is because it's

5    important for you to understand, you need to listen to the

6    judge's instructions closely.  This is not evidence that Mr.

7    Amanat participated in any of the crimes, and it can't be

8    substituted as evidence that he participated in any of the

9    crimes charged.  It's offered for a much more limited purpose,

10   but even for that limited purpose you can't accept it, and I

11   want to talk to you briefly about why.  It's not proof.

12          One of the things that you heard early in the case was

13   from Mr. Maiden -- sorry, late in the case, when Mr. Maiden was

14   talking about some of the, we talked a little bit about this,

15   he was talking about some of the bluffing that was going on

16   between Mr. Isaza Tuzman, bluffing going on between Omar Amanat

17   and Mr. Maiden, and this is important, right, because what

18   Mr. Maiden talked about on the witness stand, the reason I want

19   you to keep this in mind, Mr. Maiden was emphasizing, when he

20   was recalled to recant his earlier testimony that he had

21   actually received all these documents, he acknowledged that

22   every component of what was in those documents that's important

23   was something that was actually discussed in real life,

24   including this bluffing that the government focused in on.

25          Another thing that's important, right, Special Agent

HcmWtuz1                    Summation - Mr. Jackson

Amato, very good special agent, she talked to you about this.
She talked to you about the fact that on Mr. Maiden's computer,
which is the centerpiece of what the government is trying to
argue is evidence that there were some missing emails,
Mr. Maiden's computer had a multi-month gap.  It had a gap that
stretched from the end of January into March, where there were
thousands of emails that the FBI presumed were missing, and
they had absolutely no explanation for it.  And ladies and
gentlemen, I submit to you that when you actually hear the
charge and you understand precisely when the conspiracy is
alleged to start in this case, you're going to see that one of
the biggest coincidences, which no one can explain, is that
Mr. Maiden's computer is missing all of the emails right up
until the start of the alleged conspiracy period and scheme
period that relates to Counts One through Three.  That's
bizarre and it's unexplained.

        What else?  Another part of the evidence in its
rebuttal case was the Yahoo stipulation that you saw that had
to do with the idea that there were some emails, that there was
a search warrant for them and they looked for these emails.  If
you actually look at the stipulation -- and this was agreed
between the parties; it was a mutually stipulated agreement --
the stipulation makes clear that the Yahoo employee that
they're talking about here did not, was not a coder, didn't
understand how linked accounts were stored within Yahoo's

HcmWtuz1                    Summation - Mr. Jackson

1    system, and what you know the evidence is, is that Mr. Amanat

2    had two different Yahoo addresses which were linked.  It's

3    impossible for us to know, because the government didn't put on

4    any proof of it, and this Yahoo witness made clear that it's

5    impossible for us to know how that's stored within the Yahoo

6    system.  What we do know is that when we logged on to it, when

7    we looked at it, there were thousands of emails in these linked

8    accounts.

9          You saw that when Ms. Rosen showed you some of the

10   accounts that showed you the raw data that was completely

11   turned over to the government.  You also saw that here, in the

12   government's discovery, there were portions, the important

13   portions of certain of the chains that were at issue here, and

14   this is the one about recording.  There is no question, there

15   is no question that Omar Amanat was telling Mr. Maiden it was

16   important for him to record the call, and he even said to him

17   after Mr. Maiden told him that he didn't know how to record a

18   call, Please wait.  And then Mr. Maiden conceded that Omar

19   Amanat was upset and that he was not happy that Mr. Maiden had

20   gone forward with the call.

21         Well, this is the email that demonstrates that he was

22   upset.  It fits in logically.  It fits in with your common

23   sense.  This is just the email that Mr. Amanat got about the

24   catchall mailbox, it's continued at 2017, which helps to

25   explain why there's any confusion on the part of the government

HcmWtuz1                    Summation - Mr. Jackson

1    in terms of the search warrant.  If you look at the actual

2    stipulation, you can see that it doesn't say what they claim

3    that it said.

4           Again, going back, this is Mr. Isaza Tuzman talking

5    about the fact that bluffing was a key part of what they were

6    doing at the time.

7           What else?  Mr. Maiden suggested in his testimony that

8    he didn't believe that he would have been talking about sending

9    $2 million, right, and some of the stuff with Jim Cohen in the

10   email.  When you saw the agreement that came into evidence that

11   Mr. Maiden acknowledged that he had received, and it says,

12   "investor agrees to transfer to recipient a further $2 million

13   in proceeds it receives from the current offering and if

14   investor fails to do so within 30 trading days, then Jim Cohen

15   or Stephen E. Maiden will do so in its instead."

16          Special Agent DeCapua, I just want to talk about

17   briefly.  Again, we have no issues with Special Agent DeCapua

18   or his work as a special agent.  He's a good special agent.

19   What he's not is an expert in computing.  That was made

20   painfully obvious when you heard him testifying on the stand.

21   He acknowledged he had no degree in computer science.  He

22   acknowledged that he had only had about two weeks of classroom

23   training on the issues he was talking about and testifying on.

24          When we tried to ask him about this degree of

25   approximation that he was talking about, the fact that with a

1   bunch of the records that we did not see, it was not the case

2   that the time stamp actually matched up with the purported sent

3   time.  And we asked him, Where are those records?  He said, I'm

4   not sure if I have them or not.  He didn't introduce them; we

5   only saw a very limited subset of what he had done.  And when

6   we asked him about this, Did you actually confirm that when you

7   looked at these records there was some sort of discrepancy, and

8   he said "I would eyeball it."  Ladies and gentlemen, that's not

9   proof that you can accept in a case like this from a person

10  purporting to have a technical opinion that you're supposed to

11  rely on.

12          Do you remember when Mr. Naftalis cross-examined

13  Professor Ferrell?  Mr. Naftalis was doing what he was supposed

14  to do, because when a person comes into the courtroom and

15  offers opinion testimony that's supposed to be based on their

16  knowledge in the field, they're supposed to be tested and

17  they're supposed to have sufficient information that they can

18  actually give you credible, reasoned opinions that are based on

19  science, based on actual knowledge.

20          Professor Ferrell was being cross-examined on the

21  details of his lifetime of work, numerous scholarly journals in

22  terms of what he was doing, and as a person who's been a

23  Harvard professor for a number of years.  And with regard to

24  Special Agent DeCapua, we just didn't have that.  I mean, we

25  asked him, Did you even ask anyone at Blackberry about whether

HcmWtuz1                    Summation – Mr. Jackson

1    or not any aspects of what you're doing are accurate, and he

2    said he never talked to anyone at Blackberry.  We don't know

3    what the Blackberry system does in terms of when we talked to

4    him about traffic, how the Blackberry system creates different

5    Message-IDs.  We don't know that.  What he conceded is that the

6    Message-ID program can be set up by any programmer to create

7    any number of random numbers to try to create a unique

8    identifier.  Each one of the numbers that Special Agent DeCapua

9    was looking at could have been a hex number, it could have been

10   a base 32 number, it could have been a base 64.  He just

11   doesn't know and he didn't have familiarity with the concepts

12   enough for you to rely on that testimony.

13          Special Agent DeCapua conceded:

14   "Q.  You can't look at a UUID and determine definitively that

15   it came from an Apple Mail computer?"

16          And he said:

17   "A.  No, you can't."

18          And we said:

19   "Q.  Right, it's impossible because there are many different

20   ways a UUID can be created, right?

21   "A.  Yes.

22   "Q.  Now, your testimony was that all UUIDs are in hexadecimal,

23   correct?"

24          He said:

25   "A.  Correct.

1          Ladies and gentlemen, that was flat out wrong.  OK?

2     When we asked him about it on the stand, he didn't really

3     understand UUIDs.  He didn't know the history of UUIDs.  He

4     wasn't familiar with who was responsible for the standards in

5     that area of computer science.

6          We asked him:

7     "Q.  What's the source of your belief?  Can you point us to any

8     authority that says all UUIDs are hexadecimal?"

9          He says:

10    "A.  So, first, it's just through observation," and then he

11    mentioned the Wikipedia posts for UUIDs.

12         Ladies and gentlemen, that is not appropriate expert

13    testimony.  It's not appropriate opinion testimony; you can't

14    rely on it.  What you should rely on, right, and we asked him:

15    "Q.  Didn't you come across numerous articles online that

16    indicate UUIDs can be created in base 32 and base 64, which

17    would mean that they could contain a V?  By Agent DeCapua's own

18    testimony, he said he hadn't seen that.

19         Then, Ms. Rosen testified that she did a simple lookup

20    for these articles and there were numerous articles online

21    available that show base 32 and base 64 UUIDs, which Special

22    Agent DeCapua explained would contain a V, but he didn't know

23    about that, because he's not an expert in this area.  He's a

24    good agent, but he's not an expert in this area.

25         What else?  This was a portion of Mr. Maiden's

HcmWtuz1                    Summation - Mr. Jackson

1    testimony on this issue, where he was calling into question

2    whether or not he would have received this email during the

3    time period.  Again, look at the actual agreements Mr. Maiden

4    entered.  OK?  The actual agreements Mr. Maiden entered say

5    exactly that, that he was required to transfer funds in a way

6    that's talked about in the emails.  Right?  And then, this is,

7    I think, in terms of the commonsense analysis, and I'm only

8    making two more points about this, in terms of the commonsense

9    analysis, some of the most clear evidence on this, Steven is

10   acknowledging that there were real-life conversations about

11   precisely these points.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. JACKSON:  This was the email, it says:  It's been

2    three months and Cohen still hasn't lived up his word to send

3    us two million.  I don't know why you seem unable to cut your

4    losses on this thing.  You heard him say it.  This was during

5    the time period when Blue Earth Solutions was tanking, Omar

6    Amanat was in real life expressing his concerns about Jim Cohen

7    at that precise time in real life.  Yes.

8              He was saying to you that he had deep concerns about

9    what was going on with Jim Cohen and Blue Earth Solutions in

10   real life.  Answer:  Yes.

11             Similarly, this one talked about the 3D effect, the

12   email where Mr. Amanat was saying disclose, disclose, disclose

13   to every investor everything in this case, everything we know

14   about the Enable liquidity issues and lock up restrictions.

15             When we asked Mr. Maiden:  In it Mr. Amanat says to

16   you it's the 3D effect, no special effects, disclose, disclose,

17   disclose, right?  That's what it reads, yes.

18             In fact, disclose, disclose, disclose is something

19   that Mr. Amanat said to you in real life, right?

20             And Mr. Maiden says:  I think he did use those words.

21             Then this email:  Every trader on Wall Street records

22   their phone calls.  This is standard protocol.  How do you not

23   have a basic trading turret?  When we asked Mr. Maiden about

24   this, we asked Mr. Maiden about this, we said:  Are you trying

25   to say that Mr. Amanat was never saying to you that he had

HCMTTUZ2                    Summation - Mr. Jackson

1    frustration about you not recording it?  And he said:  No,

2    you're right, he did.  I think he was frustrated that I didn't

3    record the call.

4         We said:  By the way, he also mentioned to you in real

5    life that you should use what is called a trading turret,

6    right?  And a trading turret is exactly what is referenced in

7    this email, correct?  Right, right.

8         Why is this important?  It makes no sense that someone

9    would go through all of the complex whatever would be necessary

10   to create fake emails only to replicate conversations that it's

11   uncontested were being had in real life.  There is no component

12   of these that matters that Mr. Maiden didn't completely

13   acknowledge or hasn't acknowledged in his conversations with

14   the government was a real component of the conversations.

15   That's an attempt to distract you from the real evidence in

16   this case.

17        And so, ladies and gentlemen, let's do one more, this

18   is the one where it says in an email:  Therefore, my sincere

19   advice to you, which you never listen to, is that he is

20   bluffing -- referring to Kaleil Isaza Tuzman -- that the Enable

21   issue has any impact on the company.  He's just trying to

22   sucker us into wire funds and I think to deflect blame from

23   what I heard is an internal coup d'etat by management.

24        And when we asked Mr. Maiden:  Do you recall that at

25   some point Mr. Amanat told you that he thought Kaleil was

1    bluffing, right?  At some point, yes, we all thought everybody

2    was bluffing each other.

3            That was actually a subject of discussion between you

4    Mr. Amanat in real life, right?  Yes.

5            And Mr. Amanat repeated, you see it here where it

6    says:  Mr. Amanat repeatedly encouraged you to take a more

7    aggressive posture with Kaleil, right?  Yes, that's true.

8            You see where it says in the paragraph number one that

9    we have a valid binding settlement agreement.  This is another

10   one of the emails.  Do you see it?  I do.

11           In real life Mr. Amanat expressed to you that he

12   thought there was a valid binding settlement agreement worth 19

13   or 20 million from Mr. Maiden.  Answer:  He expressed that in

14   real life.

15           And in real life, he told you:  Heck, the sale fee

16   alone is worth 20 million, right?  Answer:  He did.

17           Mr. Maiden is acknowledging every component that is

18   important in these emails is an undisputed subject of

19   conversation between him and Mr. Amanat in real life.  It makes

20   no sense that someone would go to the trouble of trying to hack

21   Yahoo and create fake emails to replicate what is undisputed.

22           What about this part:  We have a valid binding

23   settlement agreement.  Mr. Amanat first quarter telling you

24   that he still thought the original settlement agreement was

25   valid.  In the first quarter, yes, that's true.

1           And he was telling you he thought the sale fee alone

2      was 20 million in real life, right?  Yes, I think that's right.

3           This is another one.  This is the sitting on a

4      mountain of cash.  We're going through every component of these

5      emails.  This was something that was actually -- that you and

6      Mr. Amanat discussed, right?  Right.

7           Okay.  And in fact, Mr. Amanat expressed to you that

8      he believed the company was worth 500 to 750 million.  And he's

9      like:  Right.

10          Again, the coincidence in this case -- the government

11     will try to say what a coincidence, there's no V.  The

12     coincidence is that there are -- the government is building

13     their rebuttal case on Mr. Madden's computer.  It's missing at

14     least thousands of emails, and there's no explanation, no

15     explanation from Mr. Maiden, no explanation from the FBI.  The

16     FBI testified that they didn't even do a forensic examination

17     on Mr. Maiden's computer to try to determine the reason for

18     that.  Why?  Because that is called stepping away from the

19     pursuit of truth and focusing on trying to secure a conviction.

20     That's not appropriate.  You should reject that.  That's all I

21     have to say about that.

22          Now I talked to you yesterday about some of the

23     gambles the prosecution took.  I'm going to move through these

24     quickly, but I just want to point out, it's really one gamble,

25     and it's the gamble that you are going to put aside your common

sense and not consider the evidence and the judge's

instructions as it applies to the evidence in terms of whether

or not the government has actually proven their case beyond a

reasonable doubt.

So I just want to run through -- it's the same

concepts, but I want to run through just in terms of what they

flat are out, they are explicit reasonable doubts.

The second one is the government's only substantive

witness against Mr. Amanat is a proven liar.  That alone is

enough for you to find Omar Amanat not guilty.

Now we have already talked about Mr. Maiden a lot.

I'm not going to talk about him too much today because you

heard his testimony.  You know that the man can't be relied

upon.  But there are a few points, if you bear with me, I have

to get through in terms of Mr. Maiden.

Again, Mr. Maiden acknowledged that before he ever met

Omar Amanat, ever met Kaleil Isaza Tuzman, he was engaged in

serious criminal activity.  He was independently engaged in the

Blue Earth Solutions stock manipulation scheme.  So this one

was fascinating, because we asked him about I particular email

that he sent to one of his earlier co-conspirators, a man who

he knew as the ice man.

And we showed him that email during his testimony, and

he is using code language in his conversation with the ice man

where he says please stop leaning on BESN, Blue Earth

1    Solutions, let it breathe.  This wasn't something that he had

2    discussed extensively with the government, but when we asked

3    him about this, we said this was the period you told

4    Ms. Griswold you were attempting to manipulate Blue Earth stock

5    right and you're telling the ice man to let it breathe.

6          And there were so many inconsistencies with this.

7    When we asked him about it initially we said:  So you had a

8    communication with the ice man where you're telling him you're

9    coordinating with him about manipulating the stock of Blue

10   Earth Solutions.  First he said:  I don't recall it.

11         Then after I showed it to him, says:  Were you having

12   conversations with the ice man about the manipulation of Blue

13   Earth stock?  His answer:  I would say yes.

14         This was a portion of Mr. Maiden's testimony where we

15   asked him:  When you discussed with the government your first

16   meeting in June 2008, you were talking about a phone call.

17   Yeah.

18         And this was an amazing point in the testimony because

19   I think you guys remember this is was Mr. Maiden was recounting

20   his first conversation supposedly with Mr. Amanat, and he was

21   claiming that Mr. Amanat was telling him about the Twilight

22   money that he was making, and then when we asked him, we said:

23   Sir, it's a fact, isn't it, that in June 2008 the trial

24   Twilight films hadn't even come out.  And we showed him

25   something that refreshed his recollection, and he acknowledged:

1    That's right, they didn't come out until November 2008.

2              The man is spinning a tale in order to fit in with the

3    government narrative that he believes the government wants you

4    to hear.

5              This is probably one of the most important points.

6    You will recall that throughout the testimony with Mr. Maiden

7    he was fighting on the concept of whether or not he believed

8    that a settlement was possible.  And you may have been

9    wondering -- you probably figured it out by now because you

10   heard the whole case, but may have been wondering at that time

11   why is Mr. Maiden fighting so hard to say that he didn't

12   believe a settlement was possible?  What is this issue?

13             Well, this goes back to what I was talking about

14   yesterday.  Mr. Maiden knows that if he believed that the

15   settlement was valid, that means there was no conspiracy.  Why?

16   Because if Mr. Maiden believed that they could have gotten a

17   value out of the settlement, if he really believed that you

18   could try to get the value out of the settlement, then the

19   value of his fund was actually under marked at the time.

20             And let me just unpack that.  What that means is he

21   was valuing his investors' investments at less than the actual

22   amount that they were worth at that time based on his belief.

23   And remember, the government has to establish that the

24   conspirators had a meeting of the minds with regard to the

25   alleged fraud.

1           And so at this point, Mr. Maiden, when we asked him,

2     "You actually believed there was an opportunity for Maiden

3     Capital to collect on that original value you thought you were

4     getting out of the settlement," his answer was, "I don't know

5     what I believed."  I don't know what I believed.  After he had

6     been prepping on this issue numerous times with the government.

7           And we asked him -- we showed him a communication with

8     his lawyer that we got access to, and in the communication with

9     his lawyer his statement couldn't be more clear.  He says:  My

10    thought was always and in persisting that KIT Digital was a

11    good company and would be sold for a lot, and the value of the

12    settlement, particularly including the sale fee of 2.5 percent,

13    which I never marked in my fund but always knew, when honored,

14    meant my fund was marked at a significant discount, was worth

15    more than the fund was marked.  And upon liquidation, the fund

16    would be liquid and profitable for all investors.

17          Why is that important?  This is a completely different

18    statement of what he believed at the time versus what he's

19    claiming he didn't know, he wasn't sure about what the

20    settlement was.

21          When we went back after that he said:  So at one

22    point, you believed the settlement was valid?  And he said:  I

23    did.

24          Again, we continued to ask him about.  He continued

25    fighting on his belief that the 2.5 percent sale fee alone was

1    worth more than your entire fund.  He's like:  It could have

2    been at certain prices.

3            But this is a communication between him, Mr. Maiden,

4    and Mr. Isaza Tuzman and Kamal El Tayara in 2012 where

5    Mr. Maiden said:  My lawyer has been studying the first

6    settlement and strongly believes, as I do, that it is

7    enforceable.

8            Now why is Mr. Maiden doing this?  It's because of

9    something that the government didn't talk about a lot during

10   the course of this case, it came up in cross-examination.  This

11   is the cooperation agreement between Maiden and the government.

12   And the important key point that's not addressed, it says:

13   Upon a determination that the defendant has rendered

14   substantial assistance.

15           What that means is Mr. Maiden knows he has to secure

16   something against someone.  He can't -- it's not enough that he

17   just tell his story, it has to implicate another person.  And

18   that's what he's attempting to do here, he's attempting to

19   demonstrate that he can provide substantial assistance.  And

20   it's a term that miraculously wasn't even explored during

21   Mr. Maiden's direct examination, even though it is the heart of

22   his cooperation agreement with the government.

23           Again, when we first asked Mr. Maiden about Mr. Amanat

24   specifically telling him that he wanted him to record his phone

25   calls with the investors, his claim was that he didn't remember

1     it.  Then you saw -- this is the uncontested authentic email

2     that came from Mr. Maiden's computer where Mr. Amanat said:  Do

3     the call on a recorded line.

4           Now I'm not going to talk a lot about Mr. Maiden's

5     cocaine use because, frankly, you heard it.  The point that I

6     want to make about his slitch use is not that Mr. Maiden is a

7     drug addict.  He is a drug addict, it's pretty clear, but

8     that's not really the point.

9           The point is he told what the government should have

10    realized were multiple clear lies about him.  When a witness

11    telling you about something as obvious as that, multiple clear

12    lies about it, it's a real problem that's not actually

13    addressed by the government.

14          These are the notes of the meeting -- this is a

15    stipulation between the parties.  Government agrees that in the

16    2014 meeting that Mr. Maiden had with the government, the

17    report indicated that Maiden stated Maiden said that about ten

18    years ago his drug use stopped.  This is his version one of his

19    drug use.  So he's saying no drug use after 2004.

20          Then after this issue arose and he had some more

21    discussions with the prosecutors just before trial, he said:

22    It's been asked several times and brought up consistently, I

23    would say it's been generally consistent.

24          I said:  Well, isn't it a fact, sir, when you

25    originally were asked about the two meetings you told the

1    prosecutors that you stopped using cocaine about ten years

2    before the conversation?  And he said:  Yeah, I recall saying

3    that I had basically stopped ten years before.

4            Not that you basically stopped, you told them that you

5    had stopped.  He said:  No, I recall saying that I basically

6    stopped.

7            Ladies and gentlemen, I submit to your own common

8    sense, do you really believe that federal agents interviewing a

9    cooperating witness would hear him say I basically stopped

10   using cocaine and they would just write down that he said that

11   he had stopped?  That doesn't make any sense.

12           Then we got to the third version of this.  What you

13   specifically told them after that was raised again was that

14   what you specifically told them was that it was no more than

15   two times a year in the last ten years, correct?  Right.

16           But that was a lie, right?  No, no.

17           Right, you're always -- then we broke out the slitch

18   text that he didn't know that we had, he didn't know that you

19   identified that in the text messages.  And we started going

20   through it, and it was painfully obvious that this two times a

21   year in the last ten years thing, which was the version three

22   of his cocaine use, was just a lie.

23           There were all these communications involving whiff,

24   slitch, splash.  There was a communication where someone on the

25   other side was saying white is simply white, and he's like the

HCMTTUZ2                    Summation - Mr. Jackson

1     last seven minutes may require slitch.  And he said:  I don't

2     recall that message.

3          Having looked you through that, does it refresh your

4     recollection?  He said:  I believe I likely did have this text

5     message on that date, yes.

6          There were so many of them:  Slitch was always the go

7     to.  Only thing on my mind is whiff.  Not even my kids compare

8     to a tight slitch buzz.

9          Again, the only reason that we're pointing this out to

10    you is because it's so blatantly obvious that Mr. Maiden just

11    told an enormous lie about this.  No one jokes -- your common

12    sense tells you no one jokes, who is an actual cocaine user,

13    that much constantly about using cocaine when they actually do

14    use cocaine.

15         In fact, this one was one where he gave on two

16    separate days explicitly conflicting testimony.  We said:  In

17    the long ago past you did get cocaine from Mr. Yavelberg,

18    right?  He said:  Yes.

19         Then after a few days to think about the fact that he

20    didn't want to implicate Mr. Yavelberg, he said -- the question

21    I'm asking you is, yes or no, you sometimes got cocaine from

22    Mr. Yavelberg.  Answer:  No.

23       What else?  You heard about this phone call that Mr. Maiden

24    claims he said all these things to Mr. Amanat.  These are the

25    actual -- this is the actual language from the notes that were

HCMTTUZ2                    Summation - Mr. Jackson

taken, the report that was taken by the federal agents involved

for the March 9 phone call.  And he says Maiden stated it was

the morning after the call about Enable being defunct that he

first lied to his investors.  Maiden said that an investor

asked how the month was going, and Maiden said it was fine.

Maiden advised it was after this investor phone call that

Maiden called Omar and said they had to fix the situation, and

that is when they tried to negotiate a settlement.  Maiden said

that this added to the stress of the entire situation.

Now in this, this is a completely different description of

what happened in that original phone call than what Mr. Maiden

was trying to sell you on the witness stand.  This is a phone

call that anyone could have.  Maiden advised that after this he

called Omar and said they needed to fix the situation.  That's

not a conversation that gives Mr. Amanat any sort of criminal

connection to Mr. Maiden.

We talked about the fact Maiden defrauded Mr. Amanat.  He

has to be required to be punished for that.

Ladies and gentlemen, you heard the testimony, you saw

it.  Mr. Maiden is a liar.

What else?  The central prosecution arguments do not make

sense.  And I want to emphasize, they have only focused on a

handful of documents in this case.  Those documents do not

indicate that Mr. Amanat was a participant in any of the crimes

that we're talking about in this case.  I want to talk about

1  these, but when you look at that, the fact that their arguments

2  about these documents don't make sense is enough for you to

3  find Mr. Amanat not guilty.

4      What's one of the first ones they talk about?  It's this

5  email, Government Exhibit 2908, where Mr. Amanat says to his

6  brother:  Hey, Iffy, I also want to delete all my emails from

7  the Yahoo site but download them onto my laptop.  How can I do

8  this?  And Irfan Amanat says:  Set up your Outlook to pull all

9  your email and delete it.  If you need help, I could walk you

10  through it.  And Mr. Amanat said:  I'm concerned about them

11  subpoenaing Yahoo at some point.

12      This is important, because this email underscores how far

13  off from the actual proof of an actual conspiracy starting in

14  March 2009 we are in this case.  Mr. Amanat -- this is months

15  before -- this is almost a year before the alleged time of the

16  supposed conspiracy.  You heard that he had had other

17  businesses in the past, you know that there are civil

18  subpoenas, all he says here is that he wants to take his emails

19  off of Yahoo because he doesn't want people to have access to

20  them necessarily.  That's not illegal.  A lot of people delete

21  their email accounts.

22      What about this one?  I had a call with Kaleil, we need to

23  discuss this.  This is the call -- this is the document that

24  Ms. Griswold put up numerous times during the course of her

25  summation.  I think it came up three or four times.  And it's

the document where Mr. Amanat is talking about the fact that

after a call with Kaleil there's all this concern in December

of 2008 about what is going on with Enable.

          First of all, again, this document is not proof of any

of the actual charges here, it's background.  But what's

important here is there's a lot that's left out.  Look at

what -- these are actual communications between Mr. Amanat and

his brother.

          Look at what Mr. Amanat says.  He said you described

him -- describing the loss occurred do not jive with the

statements doc he saw from you and Mahmood.  Sees no evidence

of big gains in the GTL -- at GTL in the Enable account.  As I

suspected, he's perplexed how Enable only had a few hundred

thousand with GTL that do not show a major gain.  Doesn't know

anything about Riverbank or other accounts.  Seems he doesn't

understand your attempts to explain this.

     Mr. Amanat isn't saying to his brother:  We have been

caught, we have no trading.  He's saying:  You need to explain

what was going on in the trading better.  What he's saying is

there's the GTL account where they had some gains -- and this

is the account that you will recall they freely explained to

both Mr. Isaza Tuzman and to Mr. Maiden, for whatever reason at

the end of 2008, that broker got locked up.  They couldn't --

          MR. WILLIAMS:  Objection, your Honor.

          THE COURT:  Sustained.

1              MR. JACKSON:  So you see here -- and we'll go to an

2     email that addresses that, but it says he spoke with Mr. Maiden

3     where they apparently discussed difficulties getting money out

4     of Enable.  Maiden tried to reach me and is asking for his two

5     million back.  In a world where everyone is suspicious, this is

6     a major problem and red flag for me.  As you know, I don't have

7     the ability to pay it -- repay it.  I only made the loan

8     because Mahmood was promising to repay in a few weeks.  Any

9     monies out from Mahmood need to first come to pay this down.

10             So in that, you see Mr. Amanat is saying that if they

11    get any money out of the broker, it needs to come to pay down

12    whatever debts they have.

13             And he says this is a major disaster.  If Maiden

14    suspects fraud of some sort and notifies the authorities, I'm

15    cooked.  That, ladies and gentlemen, I submit to you on the

16    surface sounds problematic, but it's a completely logical

17    statement, because what Mr. Amanat is saying is that we have a

18    real problem, and we can't get funds out of this broker.  If

19    someone thinks that that's fraud, I'm going to be dealing with

20    a real problem.

21             And ladies and gentlemen, it's exactly what we talked

22    to you about in opening statement.  When you are accused of

23    fraud, even if you didn't do it, it's a real problem, you're

24    going to be dealing with serious problems.

25             And what does Irfan Amanat respond to his brother?

1   This isn't posturing.  He doesn't say that there is no -- that

2   there's nothing behind this.  He says okay, he doesn't know how

3   to read the statements, which is creating the problem when I

4   show it to him, and he says regarding Maiden discussed Mahmood

5   can't deliver the two million.

6            MR. WILLIAMS:  Your Honor, we object and ask for an

7   instruction on this point on this email.

8            THE COURT:  He's just reading the email.  I will hear

9   you after.  I will hear your point after.

10           MR. WILLIAMS:  Thank you, your Honor.

11           THE COURT:  At this point he just read the email.  The

12  email is in evidence.  He can read the email.

13           MR. JACKSON:  Thank you, your Honor.

14           Now these are some other -- this is another one of the

15  emails that the prosecution focused in on.  And I just want to

16  focus on this one briefly, because this is a discussion in

17  February 2009.  Again, more background before the start of the

18  Counts One through Three supposed schemes.

19           But what he says is -- what's important here is look

20  at what Mr. Amanat says in February 2009.  He says -- after

21  Irfan Amanat says -- after Maiden sends this message and Irfan

22  says can we do anything, he said:  Yeah, send him back 500

23  ASAP.  Oh, I forgot, we don't have it, with eight exclamation

24  points.

25           Why is that important?  These are the communications

1    in real-time between my client and his brother.  Does that

2    sound to you like -- what does that read to you as?  Use your

3    own common sense.  Mr. Amanat is expressing frustration with

4    his brother for failing in terms of trading in what the

5    situation has created for him.  That came through in a bunch of

6    the emails that are discussed here.  And there's real concern

7    about it, but he's not discussing any sort of fraudulent

8    intent, he's talking about the fact that because of the

9    problems with the trading, they're not able to give the money

10   back.

11          And it's actually explicitly discussed in another one

12   of the communications that the government offered in evidence.

13   This is a communication where Mr. Amanat says -- and it's the

14   third sentence in April 20, 2009 email:  The realty is we lost

15   a public company's cash through poor risk management, so we are

16   really in no position to be anything but humble and apologetic.

17          This is a communication between Mr. Amanat and his

18   brother in 2009 where he is acknowledging that it was through

19   poor risk management, poor -- a poor job in terms of the way

20   that they managed the GTL broker.  And what Irfan Amanat

21   responds is please, again, before we take more blame, remember

22   we did the due diligence on GTL, their auditors said it had a

23   strong balance sheet.  We had good risk management in trading

24   but poor risk management in trusting auditors.  How ironic.

25          This isn't posturing.  This is just two communications

HCMTTUZ2                    Summation - Mr. Jackson

1  between the brothers.  And they're not talking about fraud,

2  they're talking about the fact that they tried and they failed.

3  They tried to execute good trading in terms of GTL and they

4  just failed.

5          What else?  There's a message that Ms. Griswold put up

6  several times during her summation, and it's this message --

7  it's everything that starts after the red part of this message.

8  She started off with trustee is appointed, he will quickly

9  realize all money was lost in KIT Digital and everyone here

10  will be sued.

11         What is being left out?  The first part of the text

12  message was left out each time Ms. Griswold cited it.  He said:

13  Be aggressive today.  Say it doesn't matter who did what.

14  Paint a stark nightmare scenario.

15         Why is that important?  Because when we asked

16  Mr. Maiden about it, we said Mr. Maiden -- sorry, they asked

17  Mr. Maiden who did you understand Mr. Amanat to be telling you

18  to be aggressive towards, towards Kaleil Isaza Tuzman.

19         And this goes back to what we talked about earlier,

20  there was a mutual interest in the parties bluffing one another

21  in these negotiations.  This was not an acknowledgment that

22  there was a crime, that there was actually a crime, it was

23  aggressive deal making.  This was an aggressive attempt to try

24  to push the situation in terms of the stakes there.

25         And this is something that you saw even in Mr. Isaza

1    Tuzman's communications.  He talked about, in another one in

2    2011 when he was communicating with Robin Smyth, you have to be

3    able to believe the bluff to carry it out.

4         This is how aggressive negotiations and business

5    discussions sometimes go by.  And frankly, ladies and

6    gentlemen, that's what this was.  This was a series business

7    dispute, but there's no evidence of an actual criminal

8    conspiracy.

9         What else?  Fourth reasonable doubt.  Omar Amanat

10   cannot be guilty of defrauding people whom he communicated no

11   fraudulent information to directly or indirectly.

12        This is perhaps the most important point.  Steve

13   Maiden, when asked about early 2008 said hadn't met Mr. Amanat,

14   he hadn't met Mr. Tuzman, and you were already hemorrhaging

15   money from your fund, correct?  He said:  I was down, yes.

16        Said one of the additional things that you said is you

17   were describing your own trading as impressively bad trading.

18   Answer:  Yeah.

19        And you remember when he was talking about his book he

20   was flaming money into the fire.  This is going on long before

21   any of his dealings with Omar Amanat.  The man had basically

22   destroyed his own fund.

23        And we asked him explicitly:  You were already engaged

24   in massive gambling with your client's money, correct?

25        Yes, I was.

1          Now again, this is from Mr. Maiden's testimony, Omar

2     and Irfan openly disclosed to Maiden that because of the GTL

3     problem, the Enable cash was frozen.  Mr. Maiden says they told

4     him it was unable to be accessed, there was a market, you know,

5     the substance of it was that, as I testified yesterday, a

6     broker or bank that Enable apparently was doing business with

7     had frozen their assets and gone out of business and I couldn't

8     get access to any of my Maiden capital funds.

9          So in terms of what they were supposed to do, they

10    communicated to Maiden what the situation was.  And this is so

11    important, because they're not charged --

12          MR. WILLIAMS:  Objection, your Honor.

13          THE COURT:  I'm going to sustain the objection.

14          MR. JACKSON:  Okay, Judge I'm moving on.

15          THE COURT:  Ladies and gentlemen, the reason why I'm

16    sustaining the objection is the evidence that Mr. Jackson has

17    referred to is offered on state of mind, you may recall, state

18    of mind of Maiden.  It wasn't offered for its truth.  So it's

19    important that you understand the purpose or are reminded of

20    the purpose of what that evidence was admitted for.  It was

21    admitted to the extent it casts light on Mr. Maiden's state of

22    mind.  It wasn't offered for the truth.

23          Go ahead, Mr. Jackson.

24          MR. JACKSON:  Completely agreed.  And that's what you

25    should focus on, Mr. Maiden's state of mind.  You should also

HCMTTUZ2                          Summation - Mr. Jackson

1     focus on what Mr. Maiden said were the actual communications

2     between the alleged co-conspirators at the time and what the

3     evidence is of that.

4            What else?  The Enable statements that the government

5     alleges were the heart of the conspiracy here, there were these

6     statements that Irfan Amanat made, they didn't actually go --

7     first of all, Omar didn't send the statements to Maiden, he got

8     them from Irfan Amanat, who Mr. Maiden testified he understood

9     he was the person doing the trading, et cetera.

10           Again, Mr. Maiden said they told you they had a

11    problem with the company called GTL, right, we asked him,

12    right, GTL was one of the brokers, you understood?

13           I heard the name, yeah.

14           And they expressed to you they were illiquid because

15    of the problem that he had with GTL, right?  Right.

16           And he told you that GTL got locked up because of

17    whatever problems they were having with the liquidity they had

18    was locked up, right?  Right.

19           Now this is critically important to this point.  We

20    asked Mr. Maiden one of the things that you looked at during

21    your direct examination when you looked at these statements,

22    these Irfan Amanat statements, there was a part that talked

23    about the guaranteed return.  Do you remember that?

24           And his answer was:  Yes.

25           And that was on each one of those statements, right,

HCMTTUZ2                      Summation – Mr. Jackson

1    guaranteed return, right?

2            Right.

3            And the reason that was there is because you had

4    entered into an agreement where you got a guaranteed return,

5    correct?

6            And Mr. Maiden's answer was:  I believe that's right.

7            Why is that important?  Because you saw the agreement.

8    The money that was at Enable from Maiden Capital, Mr. Maiden

9    acknowledged that by the time period that this alleged fraud

10   begins to occur, the time period of this alleged conspiracy,

11   Mr. Maiden entered into an agreement to convert his investment

12   at Enable into a promissory note.  This is the signed

13   agreement.

14           We asked him:  Sir, yes or no, you had converted what

15   was going on in Enable, your investment there, into a situation

16   where you got a guaranteed return?

17           Answer:  Yes.

18           What you understood is that where you converted that

19   into a guaranteed return, essentially a promissory note had

20   been created, correct?

21           And Mr. Maiden agreed.

22           Why is that important?  Because at the point that a

23   promissory note was created, this was an acknowledgment between

24   them that they were converting it to debt.  This was no longer

25   a trading account, it was a conversion into debt where they

HCMTTUZ2                        Summation - Mr. Jackson

1    were promising them that what they could do, they would give

2    him the money they could, they owed him this debt.  And they

3    openly stated it.

4            We asked Robin Smyth:  Could you tell us what a

5    promissory note is?  He's a person who is a Certified Public

6    Accountant.  He said a promissory note is a commitment to pay

7    money on certain times.

8            A promissory note is a type of debt, right?

9            Yes, it acknowledges an amount due.

10           And a promissory note doesn't have to be secured by

11   anything, does it?

12           Answer:  Correct.

13           Because they didn't have the cash, as Mr. Maiden

14   explained, they converted it to a promissory note.  It was a

15   promise that they owed a particular debt.

16           And when we talked with Mr. Maiden about it, we asked

17   him:  Fact of the matter is a hedge fund can own securities,

18   right?

19           Right.

20           It can also own real estate, right?

21           It can also own debt, right?

22           All three of those things can be distributed in kind

23   if you want to, right?  Right.

24           There's a way to do it, right?

25           There is.

HCMTTUZ2                      Summation - Mr. Jackson

1              So the debt interest that they had is something that

2      you saw Mr. Maiden freely enter into.  And when they were

3      giving him statements after that point, all that the statements

4      had to reflect was what the accumulated interest was on the

5      promissory note.  That's all it was.

6              If you look at it, it says -- it talks about the

7      guaranteed return, right, and when you looked at the

8      statements -- I said I want to highlight the top, current one

9      month Libor plus 30 basis points.  Do you see that?

10             Yes.

11             Next to that it says guaranteed return.

12             Right.

13             If anyone looked at the supposedly fictitious Enable

14     statements, they would have seen they're reflecting exactly

15     what is supposed to be reflected when you have a promissory

16     note and when you have a debt interest that's accumulating

17     interest.  It's not fictional, it's just a debt that they're

18     acknowledging.

19             What else?  This was -- we asked Mr. Maiden:  Now as I

20     think you told Ms. Griswold, nothing in the statement that

21     actually went to the investor specified the amount in Enable,

22     right?

23             Answer:  Right.

24             So as far as you know, the investors had no idea what

25     the actual -- how you were actually -- how you were evaluating

HCMTTUZ2                    Summation - Mr. Jackson

1    the Enable investment, correct?

2              That's true.

3              So Mr. Amanat is being charged with defrauding the

4    Maiden Capital investors even though they had no idea about

5    what his negotiations were with Mr. -- about what Enable's

6    negotiations were with Mr. Maiden, and they had no -- the

7    Maiden Capital investors had no exposure, no suggestion in the

8    communications that Mr. Maiden gave the investors that that

9    number somehow reflected Enable.  It wasn't even part of the

10   discussion.

11             The Court asked the question very explicitly:  Before

12   we go further, the statements that were sent to your investors,

13   did they show a balance, an Enable balance, those statements?

14             And Mr. Maiden said:  No, they did not.  They had some

15   dollar amount, which was the sum of all the stocks and all the

16   other assets I communicated, but it wasn't broken out like

17   that.

18             And the Court said:  So no Maiden Capital investor

19   received an account statement showing that Maiden Capital had

20   an Enable balance of 2.5 million.

21             The witness:  That's right.  I didn't communicate to

22   them that I had made any investment in Enable.

23             It is impossible for Mr. Amanat to be guilty of

24   defrauding the Maiden Capital investors based on Enable

25   statements when they had no information about Enable.  There

HCMTTUZ2                    Summation - Mr. Jackson

1    was nothing to be omitted from a discussion because the

2    discussion never happened.

3           What else do we know?  In the communications that

4    Mr. Maiden was having with SS&C, he's telling them exactly what

5    the Enable balance is, and he also is disclosing to them that

6    he is setting up a loan on his illiquid KIT Media position in

7    order to meet redemptions.

8           So he was describing to SS&C, his fund manager,

9    exactly what was going on in terms of Mr. Amanat, that there

10   was a balance that they had there, which was a debt interest,

11   and it was being communicated by SS&C.  Mr. Amanat had no

12   involvement in the SS&C process, he had no insight into all the

13   other ways that Mr. Maiden was valuing its fund, he had no

14   communication with the investors that was fraudulent in any

15   way.

16          This is fascinating.  This is a part where we saw a

17   communication from the investor Mr. Ellington to Steve Maiden

18   where he's talking about wanting a redemption.  And you heard

19   there was a conversation between -- a phone call between Omar

20   Amanat, Jesse Ellington and Steve Maiden.  And after the phone

21   call, Mr. Maiden sends Omar Amanat a text message where he

22   says -- we asked him about this:  Then you're talking about

23   this phone call you just had with Jess Ellington, the investor,

24   right?

25          Right.

1            Still can't believe you told Jesse you are first

2     priority lender.  He is probably freaking out, right?

3            Answer:  Right.

4            And what you're saying is you still can't believe that

5     Omar Amanat told the investor the truth, right?

6            The truth about that.

7            The only thing that happened on that phone call was

8     that Omar Amanat said I'm loaning Maiden money in order to pay

9     redemptions.  That was the only conversation of any substance

10    that he ever had with an investor, and Mr. Maiden acknowledged

11    that was the truth, and he is sending Omar an email saying I

12    can't believe you told him the truth.

13            What else?  Mr. Ellington didn't even remember what

14    the call was about, but he definitely did not say that Omar

15    gave him any false information.  All he talked about was he

16    said -- he described the merits of his KIT Media investment,

17    and you remember that Mr. Maiden said that he believed that

18    Omar really believed that the KIT Media investment had a lot of

19    value.  There was nothing false said on that phone call.

20            We tried to ask him about what the specific

21    information was that he received that he agreed with Omar to

22    convey to investors, and he says that Enable had any value

23    whatsoever.  We already talked about that, right?  Because it

24    was made clear in the agreement that Mr. Maiden had that with

25    Enable that had been converted to a debt interest.  There's

1    nothing that Mr. Amanat knew about that there's been any

2    evidence about in terms of false information and about that

3    being communicated to investors.

4            So we asked him:  What else?  He said the call with

5    Jesse Ellington when he said that everything would work out.

6            Well, everything is going to work out is an ambiguous

7    concept.  It's a statement of optimism, ladies and gentlemen,

8    it's not a fraud.  He told them that -- the testimony was on

9    the phone call Mr. Amanat made clear they were dealing with an

10   illiquid investment that Maiden Capital had, and Omar was

11   willing to make a loan on the basis of it, and he was willing

12   to because he thought that the KIT Media value that Maiden

13   Capital had was worth a lot of money.

14           And he acknowledged that the term "having an okay

15   month" was not clearly defined.  These are vague, vague

16   concepts.  They're not proof of Mr. Amanat attempting to

17   defraud anyone.

18           We asked Mr. Maiden:  You do agree with me, right,

19   that in terms of your calculation of the overarching value of

20   your fund, Mr. Amanat had no way of knowing how you were

21   supposed to calculate a number of different positions in your

22   find, right?

23           And he said:  That's fair, yes.

24           So the only number that the government is focused on

25   is the value of the fund that gets broken into pieces into

HCMTTUZ2                    Summation - Mr. Jackson

these statements that go to Maiden investors.  And here

Mr. Maiden is acknowledging Omar had no way of knowing whether

the number that Mr. Maiden was calculating was correct.

          But what do we know?  Omar was repeatedly trying to

get Maiden to give as accurate a number as he could.

          Stephen Maiden:  You engaged in discussions with Omar

Amanat where he stressed to you that he believed it was very

important for you to disclose everything that was happening in

terms of the machinations around KIT Media and KIT Digital

investments, right?

          Answer:  He brought it up a few times.

          Right.  In fact, you pushed back on certain occasions

and said I can't disclose X, right?

          Right.

          You're not guilty of participating in a conspiracy

with someone to hide something when you don't know the

investors.  Mr. Amanat wasn't the person who was friends and

family with the Maiden Capital investors.  He was another

outside party who had a business relationship with them, and he

was saying to Mr. Maiden you need to make sure that you

disclose everything that is going on with that.  That's

acknowledged in Mr. Maiden's testimony.  That alone is

sufficient for to you acquit Omar Amanat.

          The government cannot establish proof beyond a

reasonable doubt when Mr. Maiden, the only substantive witness

1    in this case, acknowledges that Mr. Amanat was telling him,

2    stressing to him that he believed it was very important for him

3    to disclose everything.  That's Mr. Maiden's testimony.  That's

4    not proof beyond a reasonable doubt.

5            He also -- Maiden also admitted that Mr. Amanat had

6    told Maiden that he needed to appropriately mark down the value

7    of the fund to whatever extent any of these investments were

8    overvalued with regard to anything, including Enable.  And said

9    in the same vein he told you to mark down -- mark the fund

10   down, and he says:  Yeah, he may have said that.

11           What do you mean he may have said that?  That is

12   central to the questions in this case, and Mr. Maiden is being

13   casual about that.

14           Again, lots of complication in terms of how it was

15   calculated, the value of KIT Media, but one thing that was --

16   of the KIT Media investment and the KIT Digital investment.

17   The one thing that was clear is that Mr. Maiden acknowledged

18   that just the 2.5 percent sales fee that was he was going to

19   get was worth more than the value of the entire fund, worth

20   more than 19 million.  So Mr. Amanat knew that he had that

21   2.5 percent sale fee and this interest in this company that was

22   going to be sold for as much as $700 million, he had no reason

23   to believe that the number that Mr. Maiden was providing to his

24   investors in terms of what the overarching value of his fund

25   was wrong.

1            And we asked him:  You actually -- you understood that

2       Mr. Amanat actually believed that KIT Media, the KIT Media

3       investment had a lot of value, right?

4            He says:  To my understanding, Omar Amanat thought KIT

5       Media had a lot of value?

6            Right.

7            I think we all hoped and believed it did.

8            Also, Mr. Maiden was not including the sales fee in

9       the calculation of this fund that went to investors, which

10      means that at the time, as Mr. Maiden said to his attorney in

11      his confidential communication with the attorney, he was

12      actually, in his own mind, undervaluing the fund.

13           What about here?  We asked him:  This is in the same

14      vein, he told you to mark the fund down and may have also told

15      you you should shut the fund down and distribute all the assets

16      in kind.

17           Why is that important?  I know we stressed this "in

18      kind" to you a bunch of times, and it may not be clear to you

19      why that's important.  Because if you distribute in kind, you

20      have to open up the books of the firm, you have to give all of

21      the assets in equal parts or appropriately equal parts to each

22      of the investors.  It's a full disclosure thing.  He would have

23      had to give them the pieces of the Enable debt.

24           And this is why Mr. Maiden didn't want to do it.  This

25      is why Mr. Maiden kept saying these are idiotic suggestions.

HCMTTUZ2                    Summation – Mr. Jackson

1    I'm not asking you whether it was idiotic, I'm asking you

2    that's what he told you to do, right?

3             And he said he mentioned these types of foolish ideas.

4             The foolish idea that he's talking about that Omar

5    mentioned to him would have been full disclosure to the Maiden

6    Capital investors.  It was shutting the fund down and

7    distributing all of its assets in kind.  That would include the

8    Enable debt interest that they had that it be converted to a

9    promissory note.  Mr. Amanat does not have any fraudulent

10   intent.  There's no proof of that.

11            Okay.  Fifth, and I'm racing through these, Maiden's

12   investor understand completely that he was invested in illiquid

13   assets.  This is an important point because you saw in the

14   agreement it says very explicitly they're allowed to invest in

15   illiquid investments.

16            Why is that important?  Because the government tried

17   to suggest that because Mr. Amanat provided Mr. Maiden with a

18   loan that he must have known that the investors were being

19   deceived, because otherwise Maiden would have just been able to

20   liquidate his assets and provide the cash.

21            Well, that's not the case.  Mr. Amanat had no reason

22   to believe that providing a loan to Mr. Maiden would work as a

23   deception to the investors, because the investors knew that the

24   fund was largely illiquid.  Illiquid means you can't sell all

25   the assets.  It means they can't be readily disposed of.  Which

1    means if someone wants a cash redemption, you have to get the

2    money from somewhere else.

3            And we asked him:  Your investors knew that you were

4    engaged in the purchasing of illiquid securities, correct?

5            Yes.

6            And when we asked Jesse Ellington, he said you were

7    aware of the provision that said Maiden Capital was allowed to

8    make a distribution to your or redemption to you in kind.

9            And he said:  It's right there in the agreement, it's

10   in the contract.

11           We asked Mr. Maiden that he understood that a fund is

12   allowed to take out a loan on its securities and it's entitled

13   to pay redemptions to its investors using loan funds if it

14   believes that's a financially appropriate way to deal with

15   those redemptions.  Of course he believed that was appropriate.

16   That's why he told SS&C, his fund manager, very explicitly what

17   he was doing.  If he thought that it was somehow illegal for

18   Omar Amanat to loan him money to pay a redemption, there's no

19   way he would have said explicitly in the email that you saw to

20   John Rizzi:  I'm taking a loan out on my illiquid KIT position

21   in order to pay a redemption to my investors.  And that's what

22   he did.  He said I set up a loan to meet redemptions.

23           What else?  This is the point more explicitly about

24   the liquidity:  Loaning money does not demonstrate any guilty

25   knowledge.  This is him again talking with SS&C about this.

1          What else?  The text messages underscore the extent to

2     which this whole idea that when Omar Amanat loaned him money

3     that this shows that he was part of a conspiracy is ridiculous.

4     If you look at the actual text messages, so many of them have

5     nothing to do with what Mr. Maiden's business interests were.

6     Is Mr. Maiden begging for money to live?  Look at this, he said

7     I have no money to live.  I can't buy peanut butter and jelly.

8          What else?  The government -- the people that the

9     government claims were co-conspirators hated each other, were

10    playing each other, and there's no evidence of actual agreement

11    on any illegal objective.

12         Look here.  This part was amazing because we're asking

13    Mr. Maiden about this conversation he was having with Kaleil

14    Isaza Tuzman where he's trashing Omar Amanat, and he said skull

15    is kind, in reference to Mr. Amanat.  This is in the spring of

16    '09, this is at the start of when the supposed conspiracy or

17    scheme related to Counts One, Two and Three was going on.

18         And Mr. Maiden acknowledged:  You were kind of playing

19    both sides throughout the period between 2008 and 2012.  And he

20    said whatever it took to get the money back, yes.

21         In some communications with Mr. Amanat you say

22    unfavorable things about Mr. Isaza Tuzman, right?

23         Right.

24         In communications with Isaza Tuzman you would say

25    unfavorable things about Mr. Amanat, right?

1            Right.

2            These are business men engaged in an attempt to

3   manipulate each other in a very aggressive deal-making

4   situation.  This is not agreement.  There's no evidence of

5   meeting of the minds.

6            You saw in this email communication Omar Amanat again

7   was everyone encouraging Maiden to take an aggressive posture

8   in the negotiations with Mr. Isaza Tuzman.  He said you're not

9   being aggressive, total passive meek duck.  This was an

10  aggressive negotiation situation.

11           What else?  Government has not produced logical

12  evidence of motive.  We talked about that a little bit

13  yesterday.  I'm not going to get further into it, but that

14  alone is sufficient for you to find Omar Amanat not guilty.

15           I mean the only point I want to make in addition to

16  what I said yesterday about this is that "motive" has the same

17  root as the word "motivated," and if you just look at the text

18  messages, they underscore the extent to which Omar Amanat was

19  not motivated to engage with Stephen Maiden.  These are the

20  messages that the government put in.  It's just Stephen Maiden

21  texting Omar Amanat over and over and over and over and over

22  and over again:  Please call me.  Dude, when are we talking?

23  Respond.  Question marks.  Over and over again.

24           Mr. Amanat responds once after -- in this series of

25  messages after Maiden hit him numerous times:  Call me ASAP.

HCMTTUZ2                    Summation - Mr. Jackson

1    Please, Bro, please call me.  When are we talking?  I'm very

2    disappointed.  It's rude.  Answer the phone.  What the fuck?

3    Show me the respect to tell me when to talk.

4            Mr. Amanat is like:  Please, I'm just up.  A had a

5    late night.

6            All right.  Okay.  I really need your focus.  And he

7    keeps texting him over and over again.

8            Mr. Amanat is not motivated to engage in activity with

9    Mr. Maiden, it's Mr. Maiden who is just constantly hitting up

10   Mr. Amanat.  You see that over and over again.

11           What else, what's the ninth one?  The government has

12   offered no proof that Omar understood anything that was being

13   done to constitute market manipulation, and they failed to show

14   that he did.  And they somehow failed to introduce any evidence

15   that he did anything in furtherance of the supposed market

16   manipulation agreement in all those years after it was signed

17   in 2009.

18           Now you're going to see an instruction from the judge

19   about the time period that relates to Count Four, the supposed

20   market manipulation agreement.  I want you to take a look at

21   that very closely and focus in on that.  Because with regard

22   to -- it's very clear, the government does not have evidence

23   showing that Omar was engaged in this.  The only thing that

24   they have repeatedly focused on is the text message where

25   Mr. Amanat says that he raised -- that without Omar he says to

1   Mr. Isaza Tuzman:  You want have Mr. Maiden's open market

2   purchases.  That's called fund raising.  That's completely

3   legal.  In fact, half of the businesses in the city you know

4   from your own common sense, that's what investment banking is,

5   is raising funds for stock purchases in the open market.

6   That's not illegal.  And there's nothing in the agreement that

7   indicates illegality.

8          And also this is a point that Mr. McRae touched on,

9   but you don't sign legal agreements if you think that the legal

10  agreement equals a criminal conspiracy.  It doesn't make any

11  sense.  Why would you do that?  What would be the point of

12  going through that?  What would be the point of involving

13  attorneys?  It wouldn't be enforceable.  You would be

14  terrified.

15         Also, they introduced evidence that Omar was a person

16  who called to suggest the agreement, which I suggest to you

17  suggests he's innocent, the fact that he wanted to draw up an

18  agreement to set out exactly what they were agreeing about

19  incentivizing Mr. Maiden to purchase some stock, but he

20  couldn't remember any details about it.

21         He said -- when we asked him about it, all he could

22  say is that, we said -- the Court said:  You need to focus.

23  The question is what was said, not your understanding, not what

24  was said.

25         And he said:  He told me in several conversations that

HCMTTUZ2                    Summation - Mr. Jackson

1    there was an aggressive seller that could really hurt the stock

2    called Ram Capital, and KIT Digital was looking to raise money

3    short term in the next month or so, and that was Vision

4    Capital, so they were looking at the stock closely.

5              That's not saying:  Manipulate the stock, Steve.

6    That's saying:  Yeah, there's people selling, we want to

7    raise -- they want to raise some money.  It would be good if

8    you want to buy some more of the stock if you think it's this

9    great investment.

10             What about Mr. Carpi?  Mr. Carpi acknowledged that

11   there are sometimes deals where a company will give a certain

12   investor preferred stock and warrants in connection with the

13   purchase of the stock.  Yeah, that could be the case.

14             And he said:  Sometimes a decision to do that is part

15   of a company's decision to try to incentivize that investor to

16   make the investment.

17             And he said:  Yeah, that could be.

18             And that's not something that's necessarily illegal,

19   correct?

20             And he said:  Correct.

21             Because, ladies and gentlemen, you know from your own

22   common sense and life experience that companies do fund raising

23   all the time.  People incentivize investors.  The agreement

24   itself is not illegal, and there's no proof, there's no

25   conversation involving Omar Amanat saying that he wants

1    Mr. Maiden to manipulate the stock.  There's nothing.

2              What's tenth?  The tenth reasonable doubt is all the

3    memory problems that the witness in this case had and the

4    fundamental unfairness of that fact.

5              Now this is a case, ladies and gentlemen, where I

6    submit to you words matter.  What was actually said in the

7    conversations that are at issue matters, and it matters in a

8    big way, because the government is trying to suggest that in

9    some of the conversations between Mr. Maiden and Mr. Amanat

10   there was this expressed -- something that you can infer was

11   criminal knowledge.

12             But we don't know what was said because not even

13   Mr. Maiden could say that he remembered the details of things.

14   When we asked him -- and this is in the second column, I say:

15   You don't actually remember the exact words you used in the

16   conversation that you had with Omar Amanat about encouraging

17   you to disclose what was happening in these transactions, do

18   you?

19             And he says:  The exact words I don't remember, I

20   remember the substance.

21             Right.  You don't remember the words though, right?

22             I guess not, not exact, no.

23             That's so important because this is the

24   conversation -- this is one of the conversations where

25   Mr. Amanat is telling Mr. Maiden to disclose things to the

1    investors, and Mr. Maiden is saying that he kind of blew that

2    off, but he can't even remember what he said to blow it off.

3          That's not proof beyond a reasonable doubt.  You can't

4    find a man guilty when the only substantive witness who came

5    into the courtroom testified that he was told about the

6    supposed fraudulent misrepresentations you need to disclose to

7    the investors, and he said:  Oh, but I told them these are

8    ridiculous ideas.

9          I'm like:  What did you actually say?

10          And he can't tell us what he said after he's been

11    prepping with the government for years?  That's not proof

12    beyond a reasonable doubt.

13          Mr. Ellington, the only Maiden Capital victim who came

14    into this case, the only one, he couldn't even remember what

15    Mr. Maiden told us about the conversation.  Mr. Maiden made

16    clear in his testimony it was about the fact that Omar was

17    loaning money, which was the truth.  And Mr. Ellington didn't

18    even remember that fact.

19          There was a point in your direct testimony where you

20    described the second contact you had with Mr. Amanat, the brief

21    call you had?

22          Yes.

23          That was a long time ago, right?

24          Yes.  He said it would have been in 2012.  So I

25    remember the call, the date I'm a little more fuzzy on.

HCMTTUZ2                    Summation – Mr. Jackson

1           And I think when you were being asked about it on

2    direct you were struggling to remember certain details of the

3    call, right?

4           Yes.

5           In fact, even as you sit here right now, you don't

6    remember the precise words that were said during the call, do

7    you?

8           And he said:  No, I don't.

9           We said:  Sir, isn't it a fact that the actual reason

10   for the call was that you had requested to speak with the

11   person who was lending money to Mr. Maiden?

12          And I said:  Sorry, sir, please tell me.

13          And he said that I can't answer yes or no because I

14   can't remember whether it was specifically to speak to the

15   lender.

16          Mr. Maiden told you that that was the only purpose of

17   the call.  The documents told you that that was the only

18   purpose of the call.

19          This is the communication between Mr. Ellington and

20   Mr. Maiden.  He says, "I'm available to talk with Omar any

21   time," after Mr. Maiden says, "Still trying to get lender calls

22   set up."

23          So it was made explicit to Mr. Ellington back in 2012

24   Omar Amanat is lending money to Steve Maiden in order to pay

25   the redemption.  Mr. Ellington didn't even remember that.

HCMTTUZ2                    Summation - Mr. Jackson

1            It's a real problem when the government is asking you

2    to find a man guilty when they are held to the standard, the

3    highest standard in the law, proof beyond a reasonable doubt,

4    and they only brought in one Maiden Capital investor and he

5    can't remember what his conversation was with Omar Amanat.

6    That alone is reason to find Mr. Amanat not guilty.

7            The government, he acknowledged, didn't even discuss

8    the key email that he looked at during cross-examination with

9    Mr. Amanat.

10           What's the eleventh reasonable doubt?  It's the

11   improper nature of Steve Maiden having secret assess to a high

12   ranking Justice Department official and getting a sweetheart

13   deal on cooperation, uncharged crimes and forfeiture.

14           Now I'm not going to go that deep into this because it

15   speaks for itself.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1          MR. JACKSON:  But, ladies and gentlemen, I think it's

2     stunning that Mr. Maiden acknowledged that when we asked him

3     about this, he was speaking with a high-ranking Justice

4     Department official, and she told him, You need to stay off the

5     phone, be careful what you say.  Right?  And he acknowledged

6     she may have said that, but he said I can't really recall the

7     conversation.

8          And then you saw the conversation with Mr. Yavelberg

9     where he's saying:  Use Jamie's guys, the guys who visited from

10     the FBI work for her.  We will write the shit.

11          These are the text messages between Mr. Yavelberg and

12     Mr. Maiden where Mr. Maiden says, after Mr. Yavelberg says,

13     just so you can comprehend, he says, "Believe me, I do.  Just

14     do your part."  And the government never even asks Mr. Maiden

15     what he was talking about when he said, Just do your part.  I

16     mean, that's stunning.  You know, Mr. Maiden says in these

17     communications:  "I will try.  Just keep your lips sealed shut

18     on it."  The government asked him no questions about that.

19          Look at this.  This is amazing.  Mr. Yavelberg says,

20     "Don't fuck this up.  She and I have said no emails or phone

21     calls, none except about sports or weather.  Stick to that."

22     He says, Thanks.

23          "Don't thank me, please.  Just stick to the fucking

24     plan."

25          What was the plan?  I mean, the government never

HcmWtuz3                    Summation - Mr. Jackson

1    elicited from the main cooperating witness, the only

2    substantive witness, what was the plan that he had with

3    Mr. Yavelberg.  Just the absence of information alone is

4    reasonable doubt.  It is wildly improper and unfair.

5         What's the 12th reasonable doubt?  It's the

6    government's failure to introduce evidence of even the most

7    basic aspects of the supposed crimes here.  I talked about this

8    briefly yesterday, but I want to put a finer point on this.

9         The government has failed to identify any interstate

10   wire that was contemplated or sent in furtherance of Counts One

11   and Two, the wire fraud counts.  OK?  They have failed to show

12   any interstate wire to the Southern District of New York, which

13   is a requirement you will hear about when the judge gives you

14   instructions.  OK?  And this is not an area in which the

15   government can ask you to speculate.

16        I expect when Mr. Williams gets up, he will say, Oh,

17   there were a bunch of conversations, one of them must have been

18   a communication over interstate wires.  That's not acceptable.

19   You have to listen very closely to the judge's instructions.

20   The instructions are going to tell you they have to prove

21   beyond a reasonable doubt.  This isn't a technical matter.

22   This is a wire fraud scheme that's charged.  They have to prove

23   that there was a specific wire sent in furtherance of the

24   conspiracy that crossed state lines.  They've introduced no

25   location information whatsoever about any of the communications

1    in this case.  All they can ask you to do is speculate.

2         And what do you know?  Mr. Amanat was in various

3    places at different times, as was Mr. Maiden.  They both talked

4    about traveling.  Mr. Amanat and Mr. Campion talked about

5    running into Mr. Amanat in Prague.  There were communications

6    where Mr. Amanat talked about being in L.A. sometimes, being in

7    San Francisco sometimes.  Mr. Maiden talked about traveling to

8    New York multiple times.  Some of the key text messages that

9    they introduced, Mr. Maiden and Mr. Amanat were actually

10   sitting across the table from one another.  They cannot ask you

11   to speculate about the wire, and there is no proof.  It is an

12   automatic indication that they have failed to meet their

13   burden.

14        What else?  They focus in on the fact that Mr. Amanat,

15   related to this point, Mr. Amanat wrote a registered address in

16   Manhattan on one document before the time period of Counts One

17   and Two.  Right?  This is in December 2008, somebody said,

18   Write your registered address, and it was an address in New

19   York.  OK?  That doesn't give you an indication that he was

20   actually in New York at the time of any particular

21   communication.

22        And what else?  Special Agent Amato told you that when

23   she looked up the home address of Mr. Amanat, it was actually

24   in New Jersey.  OK?  So we don't know.  The government has not

25   introduced any real evidence that Mr. Amanat was living in New

HcmWtuz3                    Summation - Mr. Jackson

1    York.  OK?  People put a registered address, people have many

2    registered addresses.  You can have a business address.  You

3    can have an address where you receive mail.  You can have an

4    additional apartment.  But even so, even if they had

5    established that, that would be insufficient for you to

6    conclude that any particular wire was sent.  And ladies and

7    gentlemen, this is the government's burden, and it's serious.

8              THE COURT:  Five more minutes, Mr. Jackson.

9              MR. JACKSON:  Yes.  Thank you, Judge.

10             I just want to make three points about what I expect

11   is going to happen soon, which is the government is going to

12   stand up and give a rebuttal summation.  Mr. Williams is a very

13   good attorney.  I expect he'll make a lot of points.  We

14   probably won't get an opportunity to respond to them, but I

15   want to ask you, please -- it's your final duty before you

16   begin deliberations -- to continue to interrogate what the

17   government is saying, at least contemplate what might

18   Mr. Jackson or Mr. McRae say in response to that if they had an

19   opportunity?  Because the arguments that are going to be made

20   are not the evidence.  The evidence is what you actually saw

21   and the lack of evidence is what you actually saw during the

22   course of the trial.  And I'm just asking you to please

23   continue scrutinizing it.

24             The government argues that they didn't pick their

25   witnesses.  That's not true.  They did pick their witnesses.

1  They selected the people they wanted to give cooperation

2  agreements to, and they tried to do it in front of you in this

3  courtroom, and you heard they repeatedly lied.  They repeatedly

4  withheld important information, and they repeatedly engaged in

5  testimony that is not credible.  It doesn't hold up.  They may

6  argue that there's no honor amongst thieves or something like

7  that.  Well, the only proven thieves in this case are Maiden,

8  Smyth and Campion.  OK?  So that's an argument which you should

9  reject.  The fact that these men were engaged in serial

10 deception of one another, that they did not like each other,

11 that they were engaged in aggressive negotiations, shows that

12 there was no conspiracy, and the government hasn't proven that.

13         Any man who is standing next to Mr. Maiden, this is a

14 man who has mysteriously all the emails missing right up to the

15 point, the starting point of the supposed schemes in this case.

16 OK?  This is a man who has no explanation for that and a number

17 of other details.  It doesn't make sense.

18         I'm wrapping up, and I just want to say at the

19 beginning of the case I told you a little bit about a situation

20 that happened in my elementary school when I was a kid.  This

21 is actually a picture of my elementary school, and the reason I

22 bring it up is in that story, you heard about basically our Boy

23 Scouts situation didn't work out.  There was a lot of finger

24 pointing between the teachers and the principal of my school,

25 and the fact of the matter is that none of those people had

1    done anything.  OK?  That's what came out of that.

2          The reason I told that story is because I hope you

3    understand you can have a lot of proximity to people who are

4    engaged in wrongdoing and not actually be engaged in wrongdoing

5    yourself.  Mr. Maiden had so much interaction with so many

6    people.  OK?  He's interacting with SS&C.  They had more

7    details about what was happening than Mr. Amanat ever could

8    hope to have.  He's interacting with those people, and Mr.

9    Amanat never had exposure to the knowledge that would have

10   allowed him to have the fraudulent intent to defraud the Maiden

11   Capital investors.

12          I think it's quite likely that back then, when I was a

13   kid, if email existed, when my principal figured out that the

14   money had been missing, there probably would have been frantic

15   emails between him and the teachers saying, This is a disaster,

16   people are going to blame us, and those could have been

17   interpreted out of context.  Please don't interpret them out of

18   context.  Please hold the government to its extraordinarily

19   high burden and focus in on what's actually charged, not

20   distractions, not background, not things that don't actually go

21   to the charges, but what is the actual evidence that

22   establishes that Mr. Amanat intended to defraud Maiden Capital

23   investors.

24          There is no evidence like that.  The evidence

25   demonstrates that Mr. Amanat is innocent.  The evidence

HcmWtuz3                    Rebuttal - Mr. Williams

1   overwhelmingly shows that, and so when you go back to

2   deliberate, I'm going to ask you to return a verdict of not

3   guilty.

4           I deeply, deeply appreciate your time.  Thank you.

5           THE COURT:  Ladies and gentlemen, we'll take a recess

6   before we hear the government's rebuttal.

7           (Jury not present)

8           THE COURT:  Please be seated.

9           We'll resume in about ten minutes.

10          MR. WILLIAMS:  Thank you, your Honor.

11          (Recess)

12          THE COURT:  Mr. Williams, are you prepared to proceed?

13          MR. WILLIAMS:  Yes, I am, your Honor.

14          THE COURT:  All right.  Please bring in the jury.

15          MR. JACKSON:  Your Honor, I'm very sorry, but my

16  client is not here.  We're getting him from the bathroom.  I'm

17  going to need another 20 seconds to retrieve him from the

18  bathroom.

19          THE COURT:  All right.

20          Are we all set, Mr. Jackson?

21          MR. JACKSON:  Yes, your Honor.

22          THE COURT:  OK.

23          (Jury present)

24          THE COURT:  Please be seated.

25          Ladies and gentlemen, we will now hear the

1    government's rebuttal summation.

2              Mr. Williams.

3              MR. WILLIAMS:  Thank you, your Honor.

4              Good morning, ladies and gentlemen.

5              I tried to listen very carefully to the arguments that

6    the defense lawyers have made over the past couple of days.  I

7    tried to focus really carefully on what they were actually

8    trying to tell you about why their very guilty clients are

9    actually really innocent.  I tried to focus really hard on the

10   things they were focusing on and the things that they had no

11   response to, things they didn't even show you, things they

12   couldn't talk about.

13             One thing that actually came out really clearly is

14   that each defendant has now conceded -- conceded -- that there

15   was a fraud going on at KITDigital and at Maiden Capital.

16   Right?  No doubt about that.  No doubt about it; they've

17   admitted that.  But they've tried their absolute best to

18   convince you that they had nothing to do with it, despite the

19   fact that three witnesses have come into this courtroom, who

20   have pled guilty to committing fraud at KITDigital and Maiden

21   Capital and pled guilty to committing those frauds with these

22   men.  They tried to say they didn't know about it.

23             Now, these so-called visionaries, right, these

24   business visionaries, I mean, Kaleil Isaza Tuzman, they told

25   you, was able to predict the iPhone.  Omar Amanat saw that

HcmWtuz3                    Rebuttal - Mr. Williams

1   there was some teenage vampire movie that was going to make a

2   lot of money.  These men can see around corners, they're

3   visionaries, but now somehow these business visionaries are

4   blind -- blind -- to the things that are going on all around

5   them.  They're living in a den of thieves, and they've got no

6   idea.  They want to tell you that they're blind visionaries.

7   That's the basic point, right?  That's what you have to buy.

8           As I sat here listening to those arguments, I kept

9   being reminded of an ancient proverb.  Some people think it

10  traces back to ancient China.  Some people think it goes back

11  to ancient Greece.  It doesn't matter.  The universal principle

12  that stands behind it is this: the fish rots from the head

13  down.  That's a proverb about accountability and corruption.

14  When an organization gets taken over with rot and fraud, look

15  to the top.  Look at the head.  See what's happening there.

16          Kaleil Isaza Tuzman was KITDigital.  Right?  When he

17  took over KITDigital, he looked in the mirror and he decided of

18  all the names in the world I could possibly give this company,

19  I'm going to name it after me.  I'm going to name it after me.

20  And then when he got there, he handpicked Robin Smyth, he

21  handpicked Gavin Campion, he handpicked Rima Jameel.  These are

22  his people that he put in charge, he put in place, and when he

23  got his hands on that company, it started to stink with fraud:

24  K3.

25          And now that he's been caught, what is he trying to

HcmWtuz3                    Rebuttal - Mr. Williams

1  convince you?  He's trying to blame Smyth, blame Campion, blame

2  Rima Jameel.  "I didn't know."

3        Same thing with Omar Amanat.  He's the one who

4  precipitated this whole disaster at Maiden Capital because of

5  that Enable thing, whatever that is.  He blew a multimillion

6  dollar hole in Maiden Capital.

7        Steve Maiden, once he learned about that Enable hole,

8  the first person he called was Omar Amanat.  The whole thing

9  got kicked off because of this.  Now, Maiden is sitting in

10  prison.  Right?  You saw him.  He's in a jumpsuit.  That's some

11  sweetheart deal he got, right?  A seven-year prison sentence,

12  testifying in a jumpsuit.  Right?  Maiden is in prison, why,

13  because he was lying to his investors, because of the same

14  "criminal behavior" and "jail time" Omar Amanat was talking

15  about in that text message, which we're going to come back to

16  in a moment.  So now that Omar Amanat's been caught, what does

17  he say?  I didn't know about it.  "Criminal behavior, jail

18  time" actually meant noncriminal behavior and no jail time.  It

19  doesn't make any sense.

20        Now, I'm not going to have enough time to go through

21  all the defense arguments in this rebuttal.  They made a whole

22  lot of arguments, and a lot of them are ridiculous, but I want

23  to just be clear about a couple of things.  We don't have to

24  respond to everything because the evidence speaks for itself.

25  The evidence speaks for itself, and there was a lot said

HcmWtuz3                          Rebuttal - Mr. Williams

yesterday, particularly by Mr. McRae, a lot of deeply personal
attacks on the government and our motivation and what we're
doing here.

          I want to make one thing very clear.  It is an honor
and a privilege to represent the government in this trial, to
sit at this table, take on that burden, and we expect to take
any blow, whether it's high or it's low.  It does not matter.
We will turn the other cheek.  It is not about us.  It is not
about us.  It's about these two men and what they did.  It's
not even about the defense lawyers.  Mr. Jackson can come in
here with all his movie analogies and talk about Santa.
Mr. McRae can come up here and tell you about things and give
you rhymes.  Right?  Just because it rhymes doesn't mean it's
actually important.  Right?  It's about what their clients did.
That's what we're going to focus on.  Our duty, this table's
duty is to look at the facts and take them where they lead.
And where did they lead?  To a corrupt CEO and his
smooth-talking investor friend -- that's it -- to the head of
the rotten fish.  That's why we're here.

          Now let's talk about a couple deeply misleading
defense arguments that we just have to respond to before we dig
in to the actual counts.

          Now, one of these arguments is that all the
cooperating witnesses are liars.  Right?  That was the main
thing they tried to argue to you:  Maiden's a liar, Smyth's a

HcmWtuz3                          Rebuttal - Mr. Williams

liar, Campion's a liar.  They spent a lot of time focusing on
this argument, and the reason they had to do it is because if
you believe the cooperating witnesses, if you believe that
they're telling you the truth, then their clients are guilty.
They have to tell you that all these men are lying because it's
an act of desperation.

        The alternative is unacceptable.  It would mean their
clients are guilty.  And you have to think about the kind of
conspiracy theory, right?  You would have to really engage in a
big, dark conspiracy theory where these three men, separately,
all come into this courtroom having admitted to being
criminals, having told the government what they did, and
sitting with these cooperation agreements that would subject
them to a perjury prosecution if they lied to you.  All of
these men would have to independently come in here and take the
bet that they're going to just lie.  Right?  Face a ton of time
in prison.  It makes no sense.  But they have to convince you
that not one, not two, all three of these men are independently
lying to you.  It doesn't make any sense.

        MR. McRAE:  Objection, your Honor.  Improper burden
shifting.

        THE COURT:  Sustained.

        Just to remind you, ladies and gentlemen, the defense
doesn't have any burden to do anything here.  They don't have
the burden to offer evidence.  They don't have the burden of

1   making any particular arguments.  The burden on all these

2   matters is always on the government.

3           Go ahead.

4           MR. WILLIAMS:  And we embrace that burden.  That's a

5   burden that we wear proudly.  It's the same burden that's

6   applied to every single criminal case in this country since

7   this nation was founded.

8           Now, look, there's an obvious reason why they also

9   argue that somehow the cooperators colluded in this case,

10  right?  They coordinated their testimony, tried to say that

11  Smyth and Campion got together and tried to sort it all out.

12  It doesn't make any sense.  If that were true, then the stories

13  would be 100 percent the same, and you're coordinating all the

14  details to match up just perfectly.  Different witnesses

15  remember different things because that's how human memory

16  works.

17          All of you who have been sitting in this trial for two

18  months, hearing the same evidence, when you go back to the jury

19  room, you're going to remember different things, right?  Does

20  that make you a liar?  No.  But under the defense theory, it

21  would make you inherently suspect, untrustworthy.  Juror number

22  whatever, you can't rely on that person's memory because it's

23  different from someone else's.  That's not how memory works.

24          Now, I just want to respond to one thing that

25  Mr. McRae said yesterday about Gavin Campion.  He actually

HcmWtuz3                    Rebuttal - Mr. Williams

 1  ridiculed him for remembering vivid details from one particular

 2  event.  It was a day in Prague where he tried to blow the

 3  whistle on the accounting fraud.  He went to the board of

 4  directors.  He was sitting in a car.  He tried to tell this guy

 5  Wayne Walker about the fraud, and Wayne Walker as opposed to

 6  listening to him jumped out of the car, grabbed his umbrella

 7  and took his bag.  Gavin Campion stayed in that car and was

 8  weeping -- weeping -- because he could not be heard.

 9          Mr. McRae took that story, and what did he do?  He

10  ridiculed Gavin Campion for calling a bag a satchel -- a

11  satchel.  Gavin Campion is British; he lives in Australia.  So

12  what he uses a different word for a bag.  What does that

13  matter?  The point of the story was that Gavin Campion was

14  trying to do the right thing.  There's nothing to joke about

15  that.  What are we doing here if we're calling a man a liar

16  just because he remembers a vivid detail from a key moment in

17  his life when he was trying to do the right thing and stop a

18  fraud.

19          The last thing I want to respond to you about, before

20  I get into the counts, is this false notion that just because

21  the government didn't call more witnesses, somehow there's a

22  problem with our case.  We believe in a concept of mercy.  Do

23  you want to be here in 2020?  No.  We all want to go home, and

24  frankly, if there are any witnesses that they thought would

25  help them -- obviously they have no burden to call anyone --

but you saw what they did.  When they thought that Andy Steward

would help them, they flew all the way to England to hear from

Andy Steward.

         MR. McRAE:  Objection, your Honor.  Notwithstanding

that qualification, it is improper burden shifting to think of

qualitative comparison.

         THE COURT:  As I said before, ladies and gentlemen,

the defendants have no obligation to offer any evidence at all,

so keep that in mind as you listen to these arguments.

         Go ahead, Mr. Williams.

         MR. WILLIAMS:  When you hear arguments from the

defendants and you hear their witnesses, you can scrutinize

that.

         What did Andy Steward tell you?  What did their first

witness tell you?  That businessmen do not belong in prison.

That's who they called.  Anyone else out there in the world may

have said something similar.  We don't know.  They didn't call

anyone else, they have no burden to, but the point is the

government gave you sufficient evidence you could rely on: the

people that actually committed the crimes with these

defendants.

         Let's get into Count Six.  I want to talk about the

accounting fraud.  I'm going to work my way backwards, because

Count Six is the accounting fraud and Tuzman only, and then

we're going to get to Omar Amanat.

HcmWtuz3                     Rebuttal - Mr. Williams

1          On the accounting fraud, they've already conceded that

2     the accounting fraud happened, right?  The only question is

3     whether Tuzman knew.  I'm going to give you five reasons why

4     you can conclude that Tuzman knew.

5          The first reason, he knew it so well, the man gave it

6     a nickname.  I'm going to repeat that.  He knew it so well, he

7     gave it a nickname.  You've got to think about your own

8     personal life.  How many people in your personal life have you

9     given nicknames to?  Maybe your spouse has a nickname.  Maybe

10    your best friend has a nickname.  Maybe when you were a kid,

11    you had a blanket or some toy you gave a nickname to.  You only

12    give nicknames to things that you know really well.  You don't

13    give nicknames to strangers, right?  Things you have no idea

14    about?

15         These men are talking about the elephant and elephant

16    hunting, slaying elephants with their bare hands.  They weren't

17    talking about multiton mammals in sub-Saharan Africa and Asia.

18    They were talking about fraud.  It doesn't make any sense.

19         Mr. McRae spent a lot of time saying Oh, well, you

20    know, on the spreadsheet Robin Smyth showed to his client it

21    said ELEE on it.  He said, Mr. Smyth, how many E's are in the

22    word "elephant"?  That was the key question.  Mr. Smyth said,

23    Well, there are two, but that word "ELEE" meant elephant to me,

24    and Mr. McRae said, Doesn't it mean "expense ledger for

25    excluded entity"?  Robin Smyth actually laughed when he was

HcmWtuz3                    Rebuttal - Mr. Williams

1   asked that question, and so did some of you.  The whole thing

2   was preposterous.

3          Now, look, the second reason is that fraud was

4   literally on the agenda when Robin Smyth and Tuzman met.

5   Literally on the agenda.  Remember, Smyth kept all these

6   notebooks when he was at KITDigital, and you saw some of the

7   notes from the notebooks.  And remember, you didn't hear

8   anything in Mr. McRae's closing about these exhibits.  This is

9   2190-B.

10          MR. McRAE:  Objection.

11          MR. WILLIAMS:  Fraud is literally No. 4 on the agenda.

12          MR. McRAE:  Objection.  Improper rebuttal.

13          THE COURT:  Overruled.

14          MR. WILLIAMS:  Fraud is literally on the agenda.  It's

15   No. 4.  Look at that.  We asked Smyth about it:

16   "Q.  Mr. Smyth, we'll go one by one, did you discuss fraud with

17   Mr. Isaza Tuzman?

18   "A.  Yes."  He goes on:  "This was a list to meet with him,

19   yes.  When I would have met with him I would have discussed the

20   back end, the fraud."  So fraud was literally on the agenda

21   when Smyth was meeting with Tuzman.

22          Let's see what else he says.  No. 19, "We are freaking

23   out people"; they're freaking out people.

24          Look at what else he says:  "We are bringing now too

25   many people into it."  We, not I.  We.  You've got to imagine a

HcmWtuz3                    Rebuttal - Mr. Williams

1   world in which Tuzman actually doesn't know about the fraud.

2   Imagine a world in which he doesn't know about the fraud and

3   he's meeting with Smyth. All right, Kaleil, let's get to item

4   No. 4, the back end, fraud.  His response would be, What are

5   you talking about, the back end?  What are you talking about?

6   Then he gets to "we're freaking out people."  We're freaking

7   out who?  What are you talking about?  By the time he gets to

8   No. 21, "we're now bringing too many people into it," bringing

9   too many people into what?  You can conclude that Tuzman knew

10  about this fraud because it's literally on the agenda.

11          Let's talk about the third reason.  Everyone who

12  worked for Tuzman could not have possibly deceived him.

13          Let's talk about Rima Jameel for a second.  Rima

14  Jameel is his personal lawyer.  Right?  He brought her into the

15  company.  Not Smyth, not Campion.  Kaleil Isaza Tuzman, that's

16  his lawyer.  So in order for you to agree with the defense that

17  Kaleil Isaza Tuzman didn't know about the fraud, you'd have to

18  believe that Rima Jameel hid it from him.  But as you know,

19  Rima Jameel and the defendant were not just lawyer and client.

20  They were personally close.  Look at how they talked to each

21  other in the middle of the fraud:

22          "Hi, babe.  I miss seeing you.

23          "I miss seeing you too.  You should take a weekend and

24  come hang out with me.  We can go to the beach, charter a boat

25  for the day.  What do you think about buying a boat?

 1                "I would love to do that.  You are the only person I

 2     trust to do that.  Yes, we should.  Can't wait to see you.

 3                Right?  So imagine a world in which Rima Jameel and

 4     Kaleil Isaza Tuzman are on a boat in the middle of the fraud

 5     right off the beach talking about "I miss you."

 6                MR. McRAE:  Objection, your Honor.  There's no

 7     evidence that this ever happened.

 8                THE COURT:  Overruled.

 9                MR. WILLIAMS:  You'd have to conclude that somehow she

10     didn't tell the person who she says "you're the only person I

11     trust to do that," she didn't tell him, Oh, by the way, by the

12     way, babe, I'm committing a fraud in your company, that's named

13     after you.  Right?  It makes no sense.

14                Let's talk about Robin Smyth.  Now, obviously Robin

15     Smyth is the CFO.  You'd have to believe that Robin Smyth also

16     hid the fraud from the defendant.  That's a ridiculous

17     proposition.  Why is that?  Because Robin Smyth was the bird

18     dog in the relationship.  That's the relationship between

19     Tuzman and Smyth.  Tuzman's the hunter.  He's going out and

20     hunting all these acquisitions.  Robin Smyth was his bird dog.

21                Let's look at something about that.  This is an email

22     from January 2012, right after the Sezmi transaction.  They got

23     7.85 million and working its way around the world, and Tuzman

24     gets an email from Smyth.  He sends it to Tomas Petru and to

25     Tuzman, saying:  "I'm sending $1 million.  Send me an invoice

HcmWtuz3                    Rebuttal - Mr. Williams

1    for post-Sezmi acquisition integration and support services."

2            Petru responds, "Nothing received yet."  Right?  He's

3    telling Tuzman, I didn't get the money yet.  This is $1 million

4    in the 7.85 million in cash.

5            Tuzman's response:  "Robin, can you bird dog this?"

6    Remember, I asked Smyth?  I said:  What's a bird dog?

7            He said, "A bird dog is a dog that goes hunting, and

8    maybe if a bird is shot, he chases down the bird."

9            Look, this makes sense, right?  If a hunter is

10   shooting birds, but the hunter doesn't want to go in the

11   bushes, dig into the bushes and try to grab the bird, you might

12   get your arms all cut up, maybe get poison ivy or a tick.  He

13   doesn't want that.  That's why a hunter has a bird dog, a dog

14   you can send into the bushes to get that bird so your hands

15   don't get mud and blood on them, right?  Robin Smyth was his

16   bird dog.

17           Do you think Smyth, he didn't tell you you were going

18   to chase money all around the world?  No.  That's why you have

19   a bird dog to do it for you, so when the time comes and the

20   questions come up, Well, did you know about the fraud, he can

21   say, No, I know my hands are clean, but look at that bird dog,

22   his hands are all dirty.  That's exactly the role that Smyth

23   played.  Don't be fooled.

24           And by the way, they made a big point of saying

25   there's no evidence that their client ever saw anything about

HcmWtuz3                    Rebuttal - Mr. Williams

1    the 7.85 million means he's round tripping.  He literally got

2    this invoice, this fake invoice, from Tomas Petru.  They didn't

3    talk about this document at all.  He said nothing like this

4    existed.

5             MR. McRAE:  Objection, your Honor.

6             THE COURT:  Overruled.

7             MR. McRAE:  That mischaracterizes the evidence.

8             THE COURT:  Overruled.

9             MR. WILLIAMS:  This is just damning evidence.  He

10   stood right here and said there was no evidence like this.

11            Look, you would also have to conclude that a man like

12   Kaleil Isaza Tuzman, who made it his job as CEO to dig into the

13   little expenses -- right -- these are taxi receipts, and

14   they're not even in English.  He sends his assistant this

15   email:  "Please have printed and brought to my hotel room

16   during the day so I can review."  He's literally sitting in his

17   hotel room poring over faded taxi receipts like pocket trash

18   trying to make sense whether a hundred bucks of company money

19   is being spent properly.  You don't think he saw $1 million

20   going out the door with a fake invoice?  Come on.

21            I want to jump forward to some of the chronologies,

22   the emails and text messages and Smyth's notebooks, the

23   chronology of events that shows you that Tuzman knew.

24            First of all, in 2011, September, Smyth and Campion

25   present this spreadsheet to Tuzman to show him the true state

HcmWtuz3                          Rebuttal - Mr. Williams

1  of the elephant.  Right?  $37 million, September 2011, tried to

2  get him to stop the fraud.

3          Right after that, in February 2012, there was an

4  argument between Smyth and Tuzman in Dubai.  Smyth said:

5  "A.  I remember I raised my voice during that conversation.

6  And I remember standing at the door of his apartment as I left,

7  and we stood there and I said, Look, I just don't know what I'm

8  going to do.  I just need to think about it."

9          Smyth was threatening not to sign the 10-K, which

10  would have been a huge deal.  It would've blown the whistle and

11  whole thing would have come crashing down.

12          Smyth also said:

13  "A.  I remember I was emotional at the time and I said I'm

14  breaking every principle I ever stood for."

15          These are text messages between Tuzman and Smyth.

16  Right?  Tuzman's talking about, right after the argument, "Hey,

17  maybe a new CEO can come in."  And Smyth is telling Tuzman, "I

18  don't feel comfortable with that at all."  Right?  They're

19  talking about whether the new CEO can be controlled, someone

20  who didn't know the real position of the company.  Now,

21  yesterday Mr. McRae said if the government's theory is true,

22  they'd've shown you text messages of Kaleil knowing what was

23  really going on.  This is literally a text message of Kaleil

24  literally knowing what's going on.

25          Then it goes on.  Smyth, in one of his notebooks,

1    wrote down what was in his head, right?  What he was thinking

2    at the time about Kaleil leaving the company and what was

3    happening with the fraud, and look at what he wrote:  "If

4    Kaleil leaves as CEO, that is day I leave as CFO.  I am not

5    signing as only person who knows of BE."  Back end, the fraud.

6    I don't want to be the only one who signs the 10-K, who knows

7    about the fraud.  That's what's going on in his head.

8           "One alternative is to tell everyone we have been

9    BE'ing, which we have, run out of options."  One option is to

10   tell the world about the fraud.  That's what's going through

11   his head.

12          Smyth is scared, and he tells you exactly what he did

13   after that.  Right?  He got a burner phone, called up a lawyer,

14   trying to see whether he was going to blow the whistle, and

15   instead, what did he do, he decided to go to Tuzman and say,

16   Why don't you put $8 million of your own money into the company

17   to cover up the fraud?  And he agreed.  If you don't know about

18   the fraud, why would you dig into your pocket and pull out $8

19   million to cover something up?  It doesn't make any sense.  It

20   doesn't make any sense.

21          And look, he said:  "I decided in my mind the biggest

22   problem and the most pressing problem was the hole we had in

23   the escrow accounts -- this is Smyth -- and I thought the best

24   course of action at that stage was to tell Kaleil that I wanted

25   him to replace the money in the escrow account."

HcmWtuz3                    Rebuttal - Mr. Williams

1          Now, look, Smyth also went one step further.  He told

2     you that he also demanded that Tuzman give him something in

3     writing -- in writing, on paper -- to show that Tuzman knew

4     about the fraud.  And why did Smyth do that?  He told you

5     specifically.  I asked him:

6     "Q.  What did you mean when you said you wanted evidence that

7     he knew what happened in the company?

8     "A.  If at any future time there was an investigation, either

9     internally or externally, with the SEC or the prosecutors, I

10     wanted to have that email for evidence."

11          That's a smart bird dog.  He wanted to show you that.

12     He knew he was going to be blamed.

13          Let's look at the assurance note.  He makes very clear

14     that he was putting $8 million into the company to cover up the

15     hole in the escrow accounts.  This is the same day the 10-K is

16     filed, same day that Kaleil said 10-K's accurate, cash is

17     accurate, everything's good.  Right?  Same day.

18          Let's look at the $8 million.  There's something

19     really, really suspicious about this too, in addition to the

20     fact that he's putting it into the company.  It was actually a

21     round-trip transaction.  He sends $3 million first to Rima

22     Jameel and then Rima Jameel sends it back to KITDigital.  Then

23     he sends $5 million, same thing.  Let's look at how that money

24     traveled.  It traveled in one big circle.  He sends money from

25     KITCapital in New York all the way to Dubai, right?  6,800

HcmWtuz3                    Rebuttal - Mr. Williams

1    miles and then 6,800 miles back, Rima Jameel sends it right

2    back to New York.  You might be asking yourself, Self, how far

3    is it between the KITCapital account in New York and the

4    KITDigital account in New York?  It's 12 blocks.  The man could

5    have walked 12 blocks.  Why send money 13,000 miles around the

6    world when you could have walked 12 blocks to take it from one

7    account to another account?  You've got to ask yourself, Who

8    does that?  Obviously someone who is committing a fraud.  12

9    short blocks, to be clear.

10         And remember, Joe Mullin, the head of the audit

11   committee, was out there hunting for this cash.  Remember, he

12   went all the way to Dubai to meet with Rima Jameel and Tuzman

13   to tell them, I want the escrow account money back in the U.S.,

14   and Tuzman at the same time he's wiring this money all around

15   the world, told Joe Mullin:  Joe, it's all good.  The money is

16   there.  There are no issues.

17         The man is simultaneously lying to Joe Mullin and

18   sending money in one big circle.  It doesn't make any sense.

19   And by the way, he's telling Robin Smyth, "That 8 million has

20   me fending for my life."  Those are serious words, fending for

21   your life.  How many things would have you fending for your

22   life?  Right?  And how many things that you don't even know

23   about would have you fending for your life?  It doesn't make

24   any sense.

25         When you go back to the jury room, you can start with

HcmWtuz3                    Rebuttal - Mr. Williams

1    Count Six, check guilty and move on.

2           Let's talk about Count Five.  This is the conspiracy

3    with Maiden, the wire fraud conspiracy.  Now, there are only a

4    couple of key questions you have to answer about this.  This is

5    the count where Kaleil is causing KITDigital to send money to

6    Maiden Capital without actually telling KITDigital and the

7    shareholders the truth about what's going on.

8           Mr. McRae told you that there's nothing wrong with

9    this money going from KITDigital to Maiden Capital, that

10   everyone knew the truth.  The evidence actually disagrees with

11   that, so let's look at the first transaction:  March 10, 2009,

12   $200,000.  The timing of this is critical because March 10 is

13   only a couple days after Maiden learns that he's got a big hole

14   in the company because there's nothing there in Enable, and

15   Kaleil agrees to send $200,000 of KITDigital money into Maiden

16   Capital because Maiden was desperate for cash.  Right?

17   Desperate for cash, on life support.

18          Now, you have a CEO of a public company, knowing that

19   Maiden is desperate for cash and in trouble and he decides to

20   send his shareholders' money into Maiden Capital, into that

21   fire.  Who would do that?  Someone who desperately needs Maiden

22   Capital to survive.  Remember, they had just signed the market

23   manipulation agreement a few months before.  Maiden couldn't go

24   under, that would be a problem, so he puts his investors' money

25   at risk to help himself.

HcmWtuz3                    Rebuttal - Mr. Williams

1            Remember, Michael Halkias, the auditor, started asking

2       questions:  Who is Maiden?  Why are you sending $200,000 to

3       him?  Do you have any secret relationships or agreements with

4       him we should know about?  Is there a quid pro quo going on

5       here?

6            Now, you all know why Halkias was concerned.  He told

7       you.  He said:

8       "A.  My concern was that there was a possibility that the

9       investment was made in Maiden with the explicit understanding

10      that Maiden would in return invest in KIT."  He had an

11      obligation at that point, the defendant did, to tell the truth

12      to Halkias.  He had an obligation, right?  He could have said:

13      Halkias, it's OK; if you're concerned, let me show you my

14      market manipulation agreement that I just signed with Maiden;

15      take a look at it; ask me any questions about it.

16           He could have said:  Oh, by the way, Maiden also just

17      suffered this big issue with Enable; he's got a big hole in his

18      company because of this thing Enable with Omar Amanat.  He

19      could have said that.  He could have told the truth.  He had to

20      tell the truth.  That was his obligation.

21           What did he do instead?  He lied, and by the way, not

22      only did he lie, he didn't tell Halkias that on the very same

23      day that Halkias is asking questions, he was sending more of

24      his own personal money into Maiden Capital.  Right?  If Halkias

25      is concerned about a relationship between the CEO and Maiden,

HcmWtuz3                    Rebuttal - Mr. Williams

1   you would have thought that on the very same day that Halkias

2   is asking these questions, he would have told him about that.

3   Right?  You can't forget something like that.

4         Now, look, Mr. McRae focused on this exhibit in his

5   closing, and he said, Well, you know he told the truth because

6   he told Halkias it's KITDigital.  KITDigital has never had any

7   understandings or agreements with Maiden or Maiden Capital.

8   Mr. McRae says, If you look at the market manipulation

9   agreement, it actually says KITCapital, not KITDigital.  It

10  says KITCapital.  Right?  Come on.  He is KITCapital, he is

11  KITDigital.  You know that.  You know that.

12        Then look at the next sentence -- actually, two

13  sentences later; it's still a lie:  "No one at KITDigital or

14  anyone associated with KITDigital has any suasion of any kind

15  over Maiden Capital's investments."  Last time I checked, he's

16  still the CEO of KITDigital, he's got this agreement with

17  Maiden that's secret.  That's still a lie.  You can convict him

18  based on the fact that he knows that he can't tell the truth to

19  Halkias.  That's his consciousness of guilt.

20        Now let's talk about another investment, the last

21  investment KITDigital made with Maiden.  Remember, Kaleil

22  Tuzman wanted his $250,000 personal money out of Maiden

23  Capital, but Maiden didn't have it.  He was broke.  He couldn't

24  pay him back.  So what did he do?  He kicked in KITDigital's

25  own shareholder money so he could have his money kicked out.

HcmWtuz3                    Rebuttal - Mr. Williams

1    Maiden testified about this.

2              You have to think about it in your own personal life.

3    Imagine you went to the bank, your own bank.  You put your ATM

4    card in and ask for a hundred bucks.  The ATM says, We don't

5    have any money today.  Sorry.  We ran out of cash.

6              Damn, that's terrible.  Then you go to your best

7    friend, and you say:  Hey, I got a bank that's really safe.

8    Why don't you open up an account with the bank, put in a

9    hundred bucks.  Right, that's a good start.  Your friend does

10   it, believing you, right?  And you go back to the ATM, pop in

11   your card, you get your hundred bucks out, that's basically

12   like you getting your friend's money and putting it into your

13   own pocket, and that's exactly what Kaleil did.  Mr. McRae told

14   you that's responsible behavior.  It's not, it's offensive.

15             Look what Kaleil told Robin Smyth, "Made $250,000

16   investment," and then he goes on to say, "Maiden Capital is

17   performing well also."  That's a lie.  That's what half this

18   trial's been about.  Come on.

19             Now, look, you can focus on the way that he described

20   the issues at Maiden Capital once he was kicked out of the

21   company.  This is June of 2012.  KITDigital's asking Maiden for

22   its money back, all that money that they thought was safe.

23   Maiden didn't have it, right?  Look what Tuzman wrote,

24   including to Wayne Walker and Joe Mullin:  "I think this is a

25   solvable situation, but it requires knowing the full context

HcmWtuz3                    Rebuttal - Mr. Williams

```
1   and understanding the 'bullets' that a guy like Maiden feels if

2   cornered."  Bullets.  Who talks like that?  You know exactly

3   what bullets he was referring to.  That's all the testimony

4   Maiden was telling you about, all the fraud they were doing.

5           All right.  Let's move on to the market manipulation

6   conspiracy.  I'm going to have to move pretty quickly through

7   this one.  It's actually not that difficult because they

8   actually signed an agreement.  They've been charged with

9   conspiracy and they literally signed a agreement, so you only

10  need to decide whether Stephen Maiden actually tried to

11  manipulate the KITDigital stock, and most of the defense

12  arguments on this have been, Oh, well, maybe he was

13  manipulating a whole bunch of other stocks.  That's irrelevant.

14          Actually, if anything, it goes to show why they're

15  guilty.  If you're a bank robber and you want to team up with

16  some bank robbers to do a robbery, who do you go to?  You go to

17  a bank robber, right?  That's who you team up with.  If you're

18  trying to manipulate a stock, who do you team up with?  You

19  team up with a stock manipulator.  It makes sense.  You think

20  it's an accident that these two men joined up with Stephen

21  Maiden?  No.  It makes perfect sense.  That's exactly who you

22  go to if you want to commit this kind of crime.

23          And remember, not a single witness told you that they

24  have ever seen a CEO of a public company pay an investor to buy

25  the stock.  You'd better know someone, if you want to do that,
```

HcmWtuz3                    Rebuttal - Mr. Williams

1   who's going to go along with it -- right -- as opposed to

2   blowing the whistle.  You'd better make sure that the person is

3   the exact kind of person who would commit that kind of crime

4   with you.  They went to Steve Maiden because it made sense.

5         Now, they also made these arguments that somehow the

6   stock wasn't manipulated because it didn't shoot up like a

7   rocket ship.  They called Professor Ferrell to talk about how

8   the stock didn't shoot up.  That is not what this case has been

9   about.  Maiden told you it was about supporting the stock,

10  keeping it up.

11        This is Omar Amanat:  "Singlehandedly kept the stock

12  up."  He's talking about Maiden, keeping it up as opposed to

13  dropping.  Maiden told you the stock was heavy; it was heavy

14  without being supported.  Look at how Maiden describes it.

15  Tuzman has written to him:  "Where is my stock trading?

16  Getting nervous notes."  Maiden says, "It's dropping because I

17  was on a plane on way to Vegas.  This thing is heavy every day

18  unless I support it.  Sucks."  It's heavy unless I support it.

19  He gets on a plane, folks, he steps away from his desk and the

20  thing starts to fall.

21        Maiden's talking about the KIT stock, he calls it the

22  Hindenburg, the famous German blimp that catches fire and falls

23  out of the sky.  He didn't talk about a rocket ship, he talked

24  about a burning blimp.

25        Finally, the defense made arguments about how the

HcmWtuz3                    Rebuttal - Mr. Williams

1   conspiracy ended because Maiden somehow, the conspiracy ended

2   because they dropped out of the conspiracy and Maiden was doing

3   this on his own.  Not a single person dropped out of this

4   conspiracy.  They met in New York in 2011 to save Maiden

5   Capital.  Omar Amanat was still sending text messages to Maiden

6   talking about "remind Kaleil that you supported his stock."

7   Maiden is still doing wash trades and all sorts of things that

8   don't make any sense with the stock unless you're trying to

9   manipulate it.  Reject that argument.

10          I want to turn to Counts One through Three.  This is

11  the Maiden Capital fraud.  Look, Mr. Jackson spent a lot of

12  time focusing on all the things that are complicated in this

13  case.  I want to simplify it for you.  There's a simple

14  principle.  If you're an investor, you have the right to know

15  the truth.  Period, full stop.  Nothing complicated about that.

16  If part of your investment has been lost because of the Enable

17  hole, you have the right to know the truth.  There were only a

18  handful of people in the entire world who knew the truth about

19  the health of Maiden Capital.  One of them was Omar Amanat.

20  One of them was Steve Maiden.  None of them were Maiden Capital

21  investors, the people who had the right to know what was really

22  going on.

23          Mr. Jackson said, Oh, it's so complicated, ignoring

24  again the text messages where his client is not talking about

25  complicated, "criminal behavior," "jail time," "fund needs to

HcmWtuz3                    Rebuttal - Mr. Williams

1   be made whole or ship will sink."  Look, he also talked about

2   how believing that the Enable hole had some sort of value

3   somehow made it OK.  Right?  Made Maiden Capital actually not

4   problematic.

5          Hopes and beliefs, if those things had value, if that

6   was worth money, then we'd all be rich.  We'd all be rich and

7   you could trade your hopes and dreams for someone's money.  If

8   you go to the bank and you want to get your money out, but they

9   say:  We don't have it today, but we hope and believe and dream

10  that one day it's all going to come back; here's a promissory

11  note.

12         I don't want a promissory note.  I want cash.  The

13  promissory note idea doesn't make any sense.  At the end of the

14  day, Omar Amanat knew exactly what they were doing, and

15  Mr. Jackson spent a lot of time addressing a lot of arguments,

16  but one thing we have proven to you is that Omar Amanat

17  actually took over Maiden Capital.  Remember, he installed his

18  wife as the head of Maiden Capital.  If Omar Amanat is some

19  disinterested dude who didn't know what was going on, he

20  literally owned Maiden Capital.  If he wanted to disclose

21  something to the investors, he could tell them, Oh, hey,

22  there's this Enable thing you should be aware of -- he was the

23  owner -- he could have done it.  There's no evidence in the

24  case that he told anyone the truth.  You think Omar Amanat

25  couldn't just pick up the phone and say something to the

HcmWtuz3                          Rebuttal - Mr. Williams

1   investors?  Right?

2          Listen carefully to the instructions.  There is

3   nothing that would make it OK for Maiden to keep this secret

4   from his investors.  Investors have to know the truth.

5          Also, Mr. Jackson spent a lot of time telling you that

6   Enable had money, Enable was valuable, promissory notes, and

7   that Maiden was the only substantive witness you heard from.

8          You also heard from Robin Smyth.  Actually, before we

9   get there, he made this argument about no evidence of

10  interstate wires.  Look, all these wires from Omar Amanat and

11  Enable over to Maiden Capital, California to North Carolina.

12  Last time I checked, California and North Carolina are not the

13  same state.

14         This is all in the record.  Mr. Jackson made a big

15  deal about this.  He also said no wires coming into New York.

16  Look, wires to Maiden Capital, KITDigital to Maiden Capital and

17  Maiden Capital into KITCapital, New York, New York.  Last time

18  I checked, that's right here.  It's a ridiculous argument.  But

19  he also said that there was only one substantive witness who

20  testified against his client.  Remember, Robin Smyth pled

21  guilty to misrepresenting that Enable had money.  Right?  And

22  this is a note from his notebook.  He told you he considered

23  round tripping KITDigital money to Enable to pay off the money

24  that Enable supposedly had for KITDigital.  You know if Robin

25  Smyth wrote it down in his notebook as something to round trip,

HcmWtuz3                    Rebuttal - Mr. Williams

1    it's probably fake.  You can reject the argument that somehow

2    Enable had value.  It's ridiculous.

3         I want to touch a little bit on the fake evidence that

4    Omar Amanat put in this trial.  Let's just talk about that for

5    a minute.  It's a window into his guilty mind, that in order to

6    get out of this mess, he actually decided to put fake evidence

7    right in front of you.  And Mr. Jackson started his opening

8    statement in this case with his story about the big bronze

9    statue across the street.  The scales of justice, right,

10   wearing a blindfold.  He said there are no roulette tables

11   there, and he's right.  You don't take gambles here, and he's

12   right.  But Omar Amanat decided to come into this courtroom and

13   take a massive bet.  Right?  To put a whole bag of fake

14   evidence on the scales of justice to tip it in his favor so

15   that you could take it back into the jury room and look at it

16   and acquit someone who should be convicted.  He took that

17   gamble and he lost.  He gambled that just because justice wears

18   a blindfold, justice is blind to the truth, that all of us are

19   blind to the truth.  It's ridiculous, he got caught in the

20   middle of this trial.

21        Mr. Jackson said, Oh, there are all these reasons why

22   it reflects reality and whatnot.  Omar Amanat created emails

23   that would look like they were real.  That's the whole point,

24   right?  That's the whole point.  He even talked about there's

25   evidence in the record.  Mr. Jackson talked about Irfan Amanat

HcmWtuz3                    Rebuttal - Mr. Williams

1   in his opening statement.  He said that Irfan Amanat, the

2   defendant's brother, was a technical genius.  Remember, this is

3   the same Irfan Amanat who Omar was talking to about deleting

4   all the emails from Yahoo, right?  Pulling them down on to his

5   computer.  That was the whole thing.

6         This is Tuzman:  "My understanding is that Irfan

7   fabricated and forged documents."  Come on.  Omar Amanat

8   introduced fake evidence into this record.  It's offensive.

9   It's offensive.  Mr. Jackson's main point was that Agent

10   DeCapua couldn't really tell you everything you needed to do.

11   He was an expert.  He was agent of the year at the FBI, and he

12   told you what your common sense already knows.  You can't send

13   emails from the future.  Email from 2087?  Literally an email

14   from 2087, and he's saying it's real.  It doesn't make any

15   sense.  And there wasn't just one, there wasn't just two, there

16   wasn't just three.  There were four fake emails.  The whole

17   thing is ridiculous, and he's trying to say, Oh, there was a

18   gap in Maiden's computer.  There was a gap in Maiden's computer

19   of three months.  You all know what happened: that gap did not

20   contain those four emails.  The time period of that gap is

21   before those four emails.  It's a ridiculous proposition.

22         Emails like this just don't magically appear out of

23   nowhere in the middle of a trial.  Gifts don't come like that.

24   You think with all these documents that you've seen that no one

25   would have seen these until Maiden had finished his

1   cross-examination and then they, *voila*, magically appear?  Four

2   of them?

3          You don't need to call Blackberry and ask them whether

4   it's possible to send emails from the future.  Can you imagine

5   that phone call?

6          This is Agent DeCapua from the FBI.  I just want to

7   ask you a couple questions.  Ma'am, is it possible to send an

8   email from 2087?

9          Is it possible?  What?  Are you from the FBI?  What is

10  happening with our country's law enforcement, asking these dumb

11  questions?

12         2087, folks, and yet he's trying to tell you that

13  these emails are real.  You don't have to call anyone.  That's

14  an embarrassing phone call.  You don't pick up the phone to say

15  foolishness like that.

16         And remember, Mr. Jackson said, Well, Maiden looked at

17  these emails.  When he cross-examined him, he said, You

18  recognize them, right?  You remember when Mr. Jackson started

19  his cross-examination.  What were some of his first questions?

20  Mr. Maiden, Mr. Maiden, I'm a ferocious cross-examiner.  Who

21  played me in your press, right?  Ferocious.  He had him on a

22  choke collar, right?  Every time Maiden departed, pulled him

23  back.  You think that Maiden was going to be able to say, Oh,

24  actually, Mr. Jackson, let's have a discussion about potential

25  fabrication of documents in this case.  No, no.  Come on.

1          Now, look, I want to address a couple of other things

2     about what Mr. Jackson said.  If he actually believed, if his

3     client truly believed that Maiden Capital had value, then why

4     was he sending $700,000 of money into Maiden Capital.  If you

5     think that the place is fine, why are you dumping your own

6     money into it?  It doesn't make any sense.  700 grand is a lot

7     of money.  Right?  You don't send that in for free.  You send

8     that in for free.  You send it in because Steve Maiden is

9     telling you:  Dude, we have to cover this up; if people find

10    out it's true, we're going to end up caught; we're going to end

11    up right here; I'm going to be in a jumpsuit.

12         And Omar Amanat ultimately agrees.  That "criminal

13    behavior" "jail time" text message was after all the things

14    that Mr. Jackson was talking about, the promissory note and

15    this and that.  Those were earlier.  "Criminal behavior" "jail

16    time" is later.  Omar Amanat agreed:  I don't want to go to

17    jail; be aggressive today; let's work this out.

18         And remember, they show up at that New York meeting,

19    by the way, you didn't hear anything about this in the

20    arguments you heard yesterday and today.  Remember, we

21    presented evidence on this, they show up at the meeting in New

22    York to save Maiden Capital, and what did they do?  The first

23    thing that happens -- well, actually, the second thing that

24    happens after Omar sends the text message about "criminal

25    behavior" "jail time" is that they all get patted down.

1           Mr. Jackson says business dispute.  You've all been in

2     meetings.  How many meetings have you walked into and the first

3     thing that happens is someone pats you down?  Right?  Recording

4     devices, and they confiscate your phones.  If you don't know

5     there's something wrong's going on:  Dude, why are you patting

6     me down?  Why are you touching me?  Why are you taking my

7     phone?  Why are you worrying about recording devices?  Why am I

8     getting this "criminal behavior" "jail time" text message?  I

9     got to go.  I got to go.

10          Omar Amanat stayed.  That tells you everything you

11    need to know about whether he knew that this whole thing was a

12    fraud.  It just doesn't make any sense.  Doesn't make any

13    sense.

14          Look, at the end of the day, when you consider all the

15    evidence that we presented to you, we could spend hours and

16    hours and hours reminding you of everything you've seen.  We

17    don't need to do that.  The government proved its case.  Common

18    sense tells you that when someone says "criminal behavior"

19    "jail time," they mean criminal behavior and jail time.  The

20    opposite would be the Upside Down, as Mr. Jackson liked to say.

21    The opposite would be the Upside Down.

22          Mr. McRae said, When someone reveals themselves you

23    believe them the first time.  I'm butchering the Maya Angelou

24    quote, but that's what it is.  When someone tells you what

25    they're thinking at the time, believe them.  Don't complicate

HcmWtuz3                    Rebuttal - Mr. Williams

1    it.  It's very simple.  When you're thinking about the

2    accounting fraud, does money move from point A to point B?

3    Yes, that's how money moves.  Does it go in a circle?  No.

4    It's not complicated.

5           These lawyers are excellent at their work.  They're

6    excellent at their craft.  They are good.  I respect them.

7    They're doing their jobs, to test the government's case, but we

8    have done our jobs too.  We have presented you with evidence

9    beyond a reasonable doubt that both these defendants are

10   guilty, guilty, guilty as charged.  You don't have to

11   complicate it.  We don't have to think about things that could

12   speculatively happen some way in 2087.  What if the email

13   actually came in from 2087?  Don't go there.  It makes your

14   head hurt.

15          The evidence in this case is straightforward and

16   simple and it's overwhelming.  Kaleil Isaza Tuzman and Omar

17   Amanat are guilty as charged.  Period.

18          Thank you.

19          THE COURT:  Ladies and gentlemen, the jury

20   instructions are going to take about an hour and a half for me

21   to read to you.  Does anyone need a break before we get

22   started?  If you do need a break, we'll take one.

23          I see some of you nodding.  We'll take a brief recess

24   and then you'll come back and I'll give you the instructions.

25          (Jury not present)

HcmWtuz3

1          THE COURT:  Please be seated.

2          MR. JACKSON:  Your Honor, I just want to note a couple

3   of objections.

4          THE COURT:  Yes, go ahead.

5          MR. JACKSON:  There was a portion during Mr. Williams'

6   rebuttal summation where he cited Agent DeCapua's status as

7   agent of the year, etc.

8          THE COURT:  Yes.

9          MR. JACKSON:  We think that was improper bolstering.

10         THE COURT:  It's on his résumé, sir.  It's in

11   evidence.

12         MR. JACKSON:  OK, your Honor.  Just noting the

13   objection.

14         There was also some argument at the end of

15   Mr. Williams' rebuttal summation where he's talking about

16   meetings in 2011 and he argued that on the basis of being in

17   two places, New York, Omar Amanat knew this whole thing is a

18   fraud.  Your Honor, we submit that the way that that was argued

19   conflated the counts in terms of what's going on, and suggested

20   that Mr. Amanat was potentially a participant in some of the

21   activity with which he's not charged, so we're just noting the

22   objection.

23         (Continued on next page)

24

25

HCMTTUZ4

```
 1              THE COURT:  Anything you want to say about that,
 2   Mr. Williams?
 3              MR. WILLIAMS:  No, your Honor.
 4              THE COURT:  Everyone ready?
 5              Mr. Weitzman?
 6              MR. WEITZMAN:  I also had something to note.  As I
 7   noted before the rebuttal, I thought it would be improper for
 8   the government to get into new areas on rebuttal.  I think they
 9   did do that in one at least one very significant respect, which
10   was the Smyth notebooks.  They did not mention the Smyth
11   notebooks, not one word in their summation.  We did not
12   respond.  We did not mention the Smyth notebooks in our
13   defense.
14              THE COURT:  You attacked sometime's credibility.
15              MR. WEITZMAN:  I agree, your Honor.
16              THE COURT:  And they are entitled to respond to the
17   attacks that Mr. McRae made on Smyth's credibility by saying
18   among other things, there were these entries in his notebooks.
19              MR. WEITZMAN:  I understand the point, your Honor, I
20   would like to preserve the objection.  I would like to point
21   out one of the things Mr. Williams said is they didn't mention
22   the notebooks in their defense summation.  We didn't have --
23   first, we didn't have an obligation to; second, because they
24   didn't elicit, they didn't make any argument about the
25   notebooks, it was proper for us not to mention them.  This is
```

HCMTTUZ4                    Charge

1    the issue --

2              THE COURT:  Sorry, because they didn't say anything

3    about the notebooks it would have been improper for you to

4    mention them?

5              MR. WEITZMAN:  No, it was fine for us not to mention

6    them because they didn't marshal that evidence in their

7    summation is my point.  They left it for the rebuttal so we

8    wouldn't have an opportunity to respond to it.

9              THE COURT:  It was completely foreseeable that they

10   would say something about the notebook entries, so your

11   objection is overruled.

12             Anything else before I bring in the jury?

13             MR. WEITZMAN:  Could we take a two-minute break, your

14   Honor?

15             THE COURT:  Yes, we'll take a two-minute recess.

16             (Recess taken)

17             (Jury present)

18             THE COURT:  Ladies and gentlemen, I will now instruct

19   you as to the law that governs this case.

20             I asked Mr. Ruocco to place a copy of the instructions

21   on each of your chairs.  You should feel free to read along

22   with me or you can just listen to me, whichever you prefer.  I

23   do want you to know that you will be able to take your copy of

24   the instructions into the jury room, and you will be able to

25   consult with the instructions during your deliberations.

HCMTTUZ4                    Charge

1            There are three parts to the instructions.  First, I

2    will give you general instructions about your role and how you

3    are to decide the facts of the case, that is, what happened;

4    second, I will give you instructions as to the specific charges

5    in this case; third, I will give you some final instructions

6    about procedure.

7            It is important that you listen carefully.  I am

8    reading these instructions from a prepared text because the law

9    is made up of words that are very carefully chosen.  This is

10   not a time to ad lib.  When I tell you what the law is, it's

11   critical that I use exactly the right words.

12           My duty at this point is to instruct you as to the

13   law.  It is your duty to accept these instructions of the law

14   and apply them to facts as you determine them.  With respect to

15   legal matters, you must take the law as I give it to you.  If

16   any lawyer has stated a legal principle different from any that

17   I state to you in my instructions, it is my instructions that

18   you must follow.

19           You are to consider these instructions together as a

20   whole; in other words, you're not to isolate or give undue

21   weight to any particular instruction.  You must not substitute

22   your own notions or opinions of what the law is or what it

23   ought to be.

24           As members of the jury, you are the sole and exclusive

25   judges of the facts.  You decide what happened.  It is your

sworn duty to determine the facts based solely on the evidence received in the trial.  Any opinion I might have regarding the facts is of absolutely no consequence.

The personalities and the conduct of counsel in the courtroom are not in any way at issue.  If you formed an opinion of any kind as to any of the lawyers in the case, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, that should not enter into your deliberations at all.

The lawyers and I have had sidebar conferences and other conferences out of your hearing.  These conferences involved procedural and evidentiary matters and should not enter into your deliberations at all.

A lawyer has a duty to object when the other side offers testimony or other evidence that the lawyer believes is not admissible.  It is my job to rule on those objections.  Why an objection was made or how I ruled on it is not your concern. You should not draw any inference simply from the fact that a lawyer objects to a question or that I sustained or overruled an objection.

You must evaluate the evidence calmly and objectively, without prejudice or sympathy.  You must be completely fair and impartial.  Your verdict must be based solely on the evidence developed at this trial, or the lack of evidence.  Our system of justice cannot work unless you reach your verdict through a

1    fair and impartial consideration of the evidence.  Under your

2    oath as jurors, you're not to be swayed by sympathy or

3    prejudice.  You are to be guided solely by the evidence in this

4    case.  And the crucial bottom line question that you must ask

5    yourselves as you sift through the evidence is:  Has the

6    government proven each element of the charges beyond a

7    reasonable doubt?

8           It is for you alone to decide whether the government

9    has proven that the defendant you are considering is guilty of

10   the crimes charged, and you are to do so solely on the basis of

11   the evidence and subject to the law as I explain it to you.  If

12   you let fear or prejudice or bias or sympathy interfere with

13   your thinking, there is a risk that you will not arrive at a

14   true and just verdict.

15          If you have a reasonable doubt as to a defendant's

16   guilt, you should not hesitate for any reason to reach a

17   verdict of not guilty.  But on the other hand, if you should

18   find that the government has met its burden of proving beyond a

19   reasonable doubt that a defendant is guilty, you should not

20   hesitate because of sympathy or any other reason to reach a

21   verdict of guilty.

22          The question of possible punishment must not enter

23   into or influence your deliberations in any way.  The duty of

24   imposing a sentence rests exclusively upon me.  Your function

25   is to weigh the evidence in the case and to determine whether

1   or not a defendant has been proven guilty beyond a reasonable

2   doubt solely on the basis of such evidence or lack of evidence.

3       Under your oath as jurors, you cannot allow a

4   consideration of the punishment that may be imposed on a

5   defendant, in the event of a finding of guilt, to influence

6   your verdict in any way or in any sense to enter into your

7   deliberations.  Similarly, you cannot permit any feelings you

8   might have about the nature of the crimes charged to interfere

9   with your decision-making process.  Your verdict must be based

10  exclusively upon the evidence or the lack of evidence in this

11  case.

12      In reaching your verdict, you must remember that all

13  parties stand equal before a jury in the courts of the United

14  States.  The fact that the government is a party and that the

15  prosecution is brought in the name of the United States does

16  not entitle the government or its witnesses to any greater

17  consideration than that accorded to any other party.  By the

18  same token, you must give it no less consideration.

19      In reaching your decision as to whether the government

20  sustained its burden of proof, you may not consider any

21  personal feelings you may have about either defendant's race,

22  religion, ethnicity, national origin, sex or age.  All persons

23  are entitled to the same presumption of innocence.

24      Mr. Tuzman and Mr. Amanat have each pleaded not

25  guilty.  In doing so, each defendant has denied the charges in

HCMTTUZ4                        Charge

1      the indictment.  As a result, the government has the burden of

2      proving the charges against them beyond a reasonable doubt.

3      This burden of proof never shifts to a defendant for the simple

4      reason that the law never imposes upon a defendant in a

5      criminal case the burden or duty of testifying, of calling any

6      witness, or of locating or producing any evidence.

7            A defendant does not have to prove his innocence.  To

8      the contrary, a defendant is presumed innocent until such time,

9      if ever, that you as a jury are satisfied that the government

10     has proven him guilty beyond a reasonable doubt.

11           Mr. Tuzman and Mr. Amanat began the trial here with a

12     clean slate.  This presumption of innocence alone is sufficient

13     to acquit a defendant unless you as jurors are unanimously

14     convinced beyond a reasonable doubt of his guilt after a

15     careful and impartial consideration of all the evidence.  If

16     the government fails to sustain its burden as to a particular

17     defendant, you must find that defendant not guilty.

18           I will now address reasonable doubt.  What is

19     reasonable doubt?  It is a doubt founded in reason, as opposed

20     to a doubt based on speculation, emotion, sympathy, or

21     prejudice.  It is a doubt that arises out of the evidence in

22     the case or the lack of evidence.  It is a doubt that a

23     reasonable person has after carefully weighing all the

24     evidence.  Reasonable doubt is a doubt that arises from your

25     own judgment, life experience, and common sense when applied to

the evidence.

If, after a fair and impartial consideration of all the evidence, you are not satisfied of the guilt of a particular defendant, that is, if you do not have an abiding conviction of his guilt, you must find him not guilty.  In other words, if you have such a doubt as would cause you, as a prudent person, to hesitate before acting in matters of importance to yourself, then you have a reasonable doubt, and it is your duty to find that defendant not guilty.

On the other hand, if, after a fair and impartial consideration of all the evidence you do have an abiding conviction of a defendant's guilt, in other words, a conviction you would be willing to act upon without hesitation in important matters in your own life, then you have no reasonable doubt, and it is your duty to convict that defendant.

Reasonable doubt is not whim or speculation.  It is not an excuse to avoid the performance of an unpleasant duty. Reasonable doubt also does not mean beyond all possible doubt. It is practically impossible for a person to be absolutely and completely convinced of any disputed fact that by its nature is not susceptible to mathematical certainty.  As a result, the law in a criminal case is that it is sufficient for the government to establish the guilt of a defendant beyond a reasonable doubt, not all possible doubt.

In determining the facts you must rely on your own

1    recollection of the evidence.  The evidence in this case is the

2    testimony of the witnesses, the exhibits received in evidence,

3    and the stipulations or agreements as to certain facts entered

4    into by the parties.  When I sustained an objection to a

5    question, the answer that the witness may have given in

6    response to that question is not part of the record in this

7    case and may not be considered by you.  You are likewise not to

8    consider a lawyer's questions as evidence.  It is the witness's

9    answers that are evidence, not the questions.

10          When I ordered that testimony be stricken from the

11   record, you may not consider that testimony during your

12   deliberations.

13          From time to time I received certain evidence for a

14   limited purpose, for example, as proof of a defendant's stated

15   of mind.  Where evidence was admitted for a limited purpose,

16   you must follow the limiting instructions I have given and use

17   the evidence only for the purpose I indicated.

18          The only exhibits that are evidence in this case are

19   those that were received in evidence.  Exhibits marked for

20   identification but not admitted are not evidence, nor are

21   materials that were used only to refresh a witness's

22   recollection.

23          Witnesses sometimes have a failure of recollection

24   when testifying.  In such circumstances, it is proper for the

25   lawyer questioning the witness to attempt to refresh his or her

HCMTTUZ4                    Charge

recollection.  Anything can be used to refresh a witness's
recollection.  Where a document is used, that document does not
have to have been prepared by the witness, made
contemporaneously with the events described in it, or be
admissible.  Where a witness states that a writing has
refreshed the witness's memory, then the witness may proceed to
testify as to the matters on which his or her memory was
refreshed.  That testimony is evidence.  However, where a
witness states that his recollection is not refreshed, any
statements a lawyer may have made about the document used in
the attempt to refresh the witness's recollection are not
evidence.

        As I told you at the outset of the case, arguments by
lawyers are likewise not evidence, because the lawyers are not
witnesses.  What they have said to you in their opening
statements and in their closing arguments is intended to help
you understand the evidence to reach your verdict.  However,
where your recollection of the evidence differs from what a
lawyer has argued, it is your recollection of the evidence that
controls.  You must determine the facts based solely on the
evidence received at this trial.  In determining the facts, you
must rely upon your own recollection of the evidence.  What the
lawyers said in opening statements, in closing arguments, in
objections or in questions is not evidence.

        I remind you also that nothing I have said during the

1   trial or will say during these instructions is evidence.

2   Similarly, the rulings I have made during the trial are not any

3   indication of my views of what your decision should be.

4        It is for you alone to decide the weight, if any, to

5   be given to the testimony you have heard and the exhibits you

6   have seen.

7        Generally, there are two types of evidence that you

8   may consider in reaching your verdict, direct evidence and

9   circumstantial evidence.

10       Direct evidence is testimony by a witness about

11  something he or she knows by virtue of his or her own senses,

12  something seen, felt, touched or heard.  For example, if a

13  witness testified when he left his house this morning it was

14  raining, that would be direct evidence about the weather.

15  Direct evidence may also be in the form of an exhibit.

16       Circumstantial evidence is evidence from which you may

17  infer the existence of certain facts.  For example, assume that

18  when you came into the courthouse this morning the sun was

19  shining and it was a nice day.  Assume that the courtroom

20  blinds were drawn and you could not look outside.  As you were

21  sitting here, someone walks in with an umbrella which is

22  dripping wet.  A few minutes later, another person enters with

23  a wet raincoat.  Now you can't look outside the courtroom and

24  you can't see whether or not it's raining, you have to no

25  direct evidence of that fact.  But, on the combination of facts

HCMTTUZ4                    Charge

that I have asked you to assume, you could conclude that it had

been raining.  That's all there is to circumstantial evidence.

On the basis of reason, life is experience and common sense,

you infer from one established fact the existence or

non-existence of some other fact.

        The matter of drawing inferences from facts in

evidence is not a matter of guesswork or speculation.  An

inference is a logical, factual conclusion that you might

reasonably draw from other facts that have been proven.  Many

material facts, such as what a person was thinking or

intending, are rarely easily proven by direct evidence.  Often

such facts are established by circumstantial evidence.

        Circumstantial evidence may be given as much weight as

direct evidence.  The law makes no distinction between direct

and circumstantial evidence, but simply requires before

convicting a defendant the jury must be satisfied of the

defendant's guilt beyond a reasonable doubt based on all the

evidence in the case, circumstantial and direct.

        There are times when different inferences may be drawn

from the evidence.  The government may ask you to draw one set

of inferences while the defendant asks to you draw another.  It

is for you, and for you alone, to decide what inferences you

will draw.

        What is important here is the quality and the

persuasiveness of the evidence relied on by a party and not the

number of witnesses, the number or variety of the exhibits that

party introduced, or the length of time that party spent on a

particular subject.

As I stated, you should draw no inference or

conclusion for or against either side based on a lawyer's

objection or my ruling on the objection.  A lawyer has an

obligation to object when he or she believes that evidence is

not properly admitted under the rules of evidence.  You should

likewise draw no inference or conclusion of any kind, whether

favorable or unfavorable, with respect to any witness or party

in the case by reason of any question I posed to a witness.

There is no legal requirement that the government

prove its case through any particular means.  You are not to

speculate as to why the government used the techniques it did

or why it did not use other techniques.  Law enforcement

techniques are not your concern.  Your concern is to determine

whether or not, based on the evidence or lack of evidence, a

defendant's guilt has been proven beyond a reasonable doubt.

You should evaluate the credibility, believability,

and reliability of the witnesses by using your common sense.

Common sense is your greatest asset as a juror.  Ask yourself

whether the witness appeared honest, open, candid, and

reliable.  Did the witness appear evasive or as though he or

she was trying to hide something?  How responsive was the

witness to the questions asked on direct examination in

 1  comparison to the questions posed on cross-examination?  You

 2  should also consider the witness' ability to recollect past

 3  events.

 4          If you find that any witness has lied under oath at

 5  this trial, you should view the testimony of that witness

 6  cautiously and weigh it with great care.  It is, however, for

 7  you to decide how much of the witness's testimony, if any, you

 8  wish to believe.  Few people recall every detail of every event

 9  precisely the same way.  A witness may be inaccurate,

10  contradictory, or even untruthful in some respects and yet

11  entirely believable and truthful in other respects.  It is for

12  you to determine whether such inconsistencies are significant

13  or inconsequential and whether to accept or reject all or to

14  accept some and reject the balance of that witness's testimony.

15          In sum, it is up to you to decide whether the

16  testimony of a witness is truthful and accurate, in part, in

17  whole, or not at all, as well as what weight, if any, to give

18  to that witness's testimony.

19          In evaluating the testimony of any witness, you may

20  consider, among other things, the witness's intelligence, the

21  ability and opportunity the witness had to see, hear or know

22  the things that the witness testified about, the witness's

23  memory, any interest, bias or prejudice the witness may have,

24  the manner and demeanor of the witness while testifying, and

25  the reasonableness of the witness's testimony in light of all

HCMTTUZ4                          Charge

1    the evidence in the case.

2              The government is not required to prove the essential

3    elements of the offense by any particular number of witnesses.

4    The testimony of a single witness may be sufficient to convince

5    you beyond a reasonable doubt of the existence of the essential

6    elements of the offense you are considering if you believe that

7    the witness has truthfully and accurately related what he or

8    she has told you.

9              You have heard argument that, at some earlier time,

10   witnesses said or did something that is inconsistent with their

11   trial testimony.

12             Evidence of prior inconsistent statements was

13   introduced for the purpose of helping you decide whether to

14   believe a witness's testimony.  If you find that a witness made

15   an earlier statement that conflicts with the witness's trial

16   testimony, you may consider that fact in deciding how much of

17   the witness's trial testimony, if any, to believe.

18             In making this determination, you may consider whether

19   the witness intentionally made a false statement or whether it

20   was an innocent mistake, whether the inconsistency concerns an

21   important fact, or whether it had to do with an insignificant

22   detail, whether the witness had an explanation for the

23   inconsistency and whether that explanation accords with your

24   common sense.

25             It is exclusively your duty, based upon all the

1   evidence and your own good judgment, to determine whether the

2   prior statement was inconsistent, and if so, how much, if any,

3   weight to give to the inconsistent statement in determining

4   whether to believe all, part of, or none of the witness's

5   testimony.

6           In deciding whether to believe a witness, you should

7   consider whether there is any evidence that the witness is

8   biased in favor or against the government or one or more of the

9   defendants.  Likewise, you should consider evidence of any

10  other interest or motive that the witness may have in

11  cooperating with a particular party.  You should also take into

12  account evidence of any benefit or compensation that a witness

13  may or has received or hopes to receive from testifying in this

14  case or as a result of the outcome of this case.  It is your

15  duty to consider whether any witness has permitted bias or

16  interest to color his or her testimony.  If you find that a

17  witness is biased, you should view his or her testimony with

18  caution, weigh it with great care, and subject it to close and

19  searching scrutiny.

20          The mere fact that a witness has an interest in the

21  outcome of this case does not mean, of course, that he or she

22  has not told the truth.  It is for you to decide from your own

23  observations, and applying your common sense, life experience

24  and all the other considerations I have mentioned, whether the

25  possible interest of a witness has, intentionally or otherwise,

1    colored or distorted his or her testimony.  You're not required

2    to disbelieve an interested witness.  You may accept as much of

3    his or her testimony as you deem reliable and reject as much as

4    you deem unworthy of acceptance.

5          You have heard testimony from witnesses who have

6    pleaded guilty and entered into cooperation agreements with the

7    government.  Several of these witnesses hope that, as a result

8    of their cooperation with the government, including testifying

9    at this trial, they will receive a lesser sentence.

10          You are not to draw any conclusions or inferences of

11   any kind about the guilt of the defendants merely from the fact

12   that certain witnesses at this trial entered into cooperation

13   agreements with the government or pleaded guilty to crimes that

14   may be similar or related to the crimes with which the

15   defendants are charged.  Each of the witnesses who decided to

16   plead guilty and cooperate with the government did so based on

17   their evaluation of what was in their best interest.  Their

18   decision to plead guilty and to cooperate with the government

19   is not evidence that either defendant committed a crime.  A

20   defendant may not be found guilty simply based on his

21   association with individuals who decided to plead guilty and

22   enter into cooperation agreements with the government.

23          You should be aware that it is not unusual for the

24   government to rely on the testimony of witnesses who admit to

25   participating in a criminal activity.  The government must take

HCMTTUZ4                    Charge

its witnesses as it finds them, and frankly the government must

use such testimony in criminal prosecutions because otherwise

it would be difficult or impossible to detect and prosecute

wrongdoers.  For this reason, the law allows the use of

cooperating witness testimony, and you may consider the

testimony of all of these witnesses in determining whether the

government has met its burden of proving the defendants' guilt

beyond a reasonable doubt.

          The testimony of cooperating witnesses must, however,

be scrutinized with special care and caution.  The fact that a

witness has pleaded guilty to crimes and has entered into a

cooperation agreement with the government may be considered by

you as bearing on the witness's credibility.  It does not

follow, of course, that simply because a person has admitted to

committing crimes and has entered into a cooperation agreement

with the government that he is incapable of giving a truthful

account of what happened.  Moreover, it is no concern of yours

why the government made an agreement with a witness.  Your sole

concern is whether a witness has given truthful testimony.

          The testimony of cooperating witnesses should be given

such weight as it deserves in light of all the facts and

circumstances before you, taking into account the witness's

candor, the strength and accuracy of his recollection, his

background, his demeanor, and the extent to which his testimony

is or is not corroborated by other evidence in the case.  As

1    with other witnesses, you may consider whether a cooperating

2    witness has an interest in the outcome of this case, and if so,

3    whether that interest has affected his testimony.

4            In this regard, you should bear in mind that a witness

5    who has pleaded guilty and entered into a cooperation agreement

6    with the government has an interest and motives different from

7    those of any other witness in this case.  In evaluating the

8    testimony of such a witness, you should ask yourself whether

9    the witness would benefit more by lying or by telling the

10   truth.  Was the witness's testimony influenced in any way by a

11   belief or hope that he would receive favorable treatment by

12   testifying falsely, or did he believe that his interests would

13   be best served by testifying truthfully?  If you believe that a

14   witness was motivated by hopes of avoiding a term of

15   imprisonment, was the motivation one that would cause him to

16   lie, or was it one that would cause him to tell the truth?

17           In sum, you should consider all of the evidence in

18   deciding what weight, if any, to give to the testimony of a

19   cooperating witness.  If you find that the testimony of a

20   cooperating witness was false, you should reject it.  However,

21   if, after a cautious and careful examination of the cooperating

22   witness's testimony, in light of all the evidence, you conclude

23   that the cooperating witness told the truth, you should accept

24   the testimony as credible and act upon it accordingly.

25           As with any witness, let me emphasize the issue of

1    credibility need not be decided on an all-or-nothing basis.

2    Even if you find that a witness testified falsely in one part,

3    you may still accept his testimony in other parts, or you may

4    disregard all of that witness' testimony.  That is a

5    determination entirely for you, the jury, to make.

6           You have heard testimony from witnesses employed by a

7    law enforcement agency.  The fact that a witness is employed by

8    a law enforcement agency does not mean that his or her

9    testimony deserves more or less consideration, or greater or

10   lesser weight, than that of any other witness.  It is up to you

11   to decide, after reviewing all the evidence, what weight to

12   give the testimony of law enforcement witnesses.

13          I permitted Professor Allen Ferrell and Agent Joel

14   DeCapua to express opinions about certain matters that are at

15   issue in this case.  Those witnesses were permitted to give

16   opinion testimony because they possess specialized knowledge as

17   a result of their education, training, and work experience.

18          In weighing the testimony of those witnesses, you may

19   consider their qualifications, the reasons they gave for their

20   opinions, and the reliability of the information supporting

21   those opinions, as well as all the factors I have previously

22   mentioned for evaluating witness testimony.  To the extent you

23   find the opinion testimony of these witnesses credible and

24   reliable, you may rely on it.  To the extent that you do not,

25   you need not rely on their testimony.  Opinion testimony should

HCMTTUZ4                      Charge

1    receive whatever weight and credit, if any, you think

2    appropriate, given all the other evidence in the case.

3           Your verdict must be based solely on the evidence

4    developed at trial or the lack of evidence.  It would be

5    improper for to you consider, in reaching your decision as to

6    whether the government has sustained its burden of proof, any

7    personal feelings that you may have about the defendant's race,

8    religion, national origin, sex or age.  Similarly, it would be

9    improper for you to consider any personal feelings that you may

10   have about the race, religion, national origin, sex or age of

11   any witness or anyone else involved in this case.  The

12   government and the defendants are entitled to a trial free of

13   prejudice, and our judicial system cannot work unless you reach

14   your verdict through a fair and impartial consideration of the

15   evidence.

16          You may not draw any inference, whether favorable or

17   unfavorable as to either side, from the fact that no person

18   other than Mr. Tuzman and Mr. Amanat is on trial here.  You may

19   not speculate as to the reasons why other persons are not on

20   trial.  Those matters are wholly outside your concern and have

21   no bearing on your function as jurors.

22          There are persons who names you heard during the trial

23   but who did not appear to testify.  You should not draw any

24   inference or reach any conclusions as to what they would have

25   testified to had they been called.  Their absence should not

HCMTTUZ4                    Charge

affect your judgment in any way.  You should keep in mind my

instruction, however, that the law does not impose on a

defendant the burden or duty of calling any witnesses or

producing any evidence.  It is the government's burden to prove

beyond a reasonable doubt each element of the crimes charged in

the indictment.

    Mr. Tuzman and Mr. Amanat did not testify in this

case.  Under our Constitution, a defendant has no obligation to

testify or present any evidence, because it is the government's

burden to prove the defendant's guilt beyond a reasonable

doubt.  That burden remains with the government throughout the

trial and never shifts to a defendant.  A defendant is never

required to prove that he is innocent.

    You may not attach any significance to the fact that

Mr. Tuzman and Mr. Amanat did not testify.  You may not draw

any inference against either defendant because he did not take

the witness stand.  You may not speculate as to why he did not

testify, and you may not consider this against him in any way

in your deliberations.

    You heard evidence that certain witnesses discussed

the facts of the case and their testimony with lawyers before

the witness appeared in court.

    Although you may consider that fact when you are

evaluating a witness's credibility, you should be aware that

there is nothing unusual or improper about a witness meeting

1    with lawyers before testifying.  Indeed, it would be unusual

2    for a lawyer to call a witness to testify without such

3    preparation.

4            The weight you give to the fact or nature of the

5    witness's preparation for his or her testimony and what

6    inferences you draw from such preparation are matters

7    completely within your discretion.

8            The indictment in this case refers to various dates.

9    The government is not required to prove that the conduct took

10   place on the precise dates alleged in the indictment.  The law

11   only requires a substantial similarity between the dates

12   alleged in the indictment and the dates established through

13   evidence at trial.

14           You heard evidence in the form of stipulations or

15   agreements between the parties.  Some of the stipulations have

16   been as to facts, while others are testimonial stipulations,

17   agreements between the parties that a witness would testify as

18   to certain facts if called at trial.  Where the parties have

19   entered into agreement as to certain facts, you must regard the

20   agreed upon facts as true.  Similarly, where the parties have

21   entered into a testimonial stipulation, you must accept for

22   purposes of your deliberations that if that witness had been

23   called to testify, he or she would have testified as set forth

24   in the stipulation.

25           Certain summary charts were admitted into evidence.

1    These charts were introduced to assist you in considering the

2    evidence that they summarize.  These charts are only as

3    persuasive as the testimony and documents on which they are

4    based, however, and they are not themselves independent

5    evidence.  Therefore, you are to give no greater consideration

6    to those summary charts than you would give to the evidence

7    upon which they are based.

8         The government offered evidence that at this trial

9    defendant Omar Amanat introduced emails into evidence that had

10   been fabricated.  Mr. Amanat denies that any of the emails

11   introduced were fabricated.

12        As I have instructed you previously, the government's

13   evidence concerning allegedly fabricated emails has no

14   application whatsoever to Mr. Tuzman.  It was offered solely as

15   against Mr. Amanat.  The government does not contend that

16   Mr. Tuzman was involved in any fashion in the fabrication of

17   email, and you may not consider this evidence for any purposes

18   as to Mr. Tuzman.

19        As I have also instructed you previously, although the

20   evidence concerning allegedly fabricated emails was admitted

21   against Mr. Amanat, it was admitted only for a limited purpose.

22   That limited purpose is on the issue of whether it demonstrates

23   Mr. Amanat's consciousness of guilt.  If you find that

24   Mr. Amanat introduced fabricated emails into evidence, you may,

25   but need not, infer that he believed that he was guilty of the

HCMTTUZ4                    Charge

1   charged crimes.  You may not, however, infer on the basis of

2   this evidence alone that Mr. Amanat is in fact guilty of the

3   crimes with which he is charged.

4        To repeat, the evidence you heard regarding allegedly

5   fabricated emails may only be considered as to Mr. Amanat, and

6   only on the issue of whether it demonstrates Mr. Amanat's

7   consciousness of guilt.  You may not infer on the basis of this

8   evidence alone that Mr. Amanat is guilty of the charged crimes.

9        As with all factual questions, it is the jury's

10  responsibility to determine whether this evidence does or does

11  not show consciousness of guilt on the part of Mr. Amanat.

12  Whether evidence that Mr. Amanat introduced fabricated emails

13  into evidence shows that he and believed that he was guilty of

14  the charged crimes and the significance, if any, to be given

15  such evidence are matters for you, the jury, to decide.

16       Mr. Tuzman and Mr. Amanat are charged with multiple

17  offenses.  In a moment I will explain to you in great detail

18  what crimes each defendant is charged with and the elements of

19  those crimes.  You should be aware, however, that the number of

20  offenses each defendant is charged with is not evidence of

21  guilt, and the mere number of counts charged in this case

22  should not influence your decision in any way.

23       Moreover, in our system of justice, guilt is personal

24  and individual.  Accordingly, you must separately consider the

25  evidence against each defendant on each offense charged, even

 1    where the government has charged both defendants in a single

 2    count.  For each defendant and each offense, you must decide

 3    whether the government has proved beyond a reasonable doubt

 4    that a particular defendant is guilty of a particular offense.

 5    You will be asked to return a separate verdict for each

 6    defendant as to each offense with which that defendant has been

 7    charged.

 8             We'll take a one-minute stretch break now.

 9             (Pause)

10             THE COURT:  I will now turn to the law applicable to

11    the specific charges in this case.

12             The charges against the defendants are contained in an

13    indictment.  As I told you at the outset of the case, an

14    indictment is not evidence, it's merely an accusation, a

15    statement of charges made against a defendant.  It gives a

16    defendant notice of the charges against him, and informs the

17    court and the public of the nature of the accusation.

18             Given that the indictment is proof of nothing, a

19    defendant begins trial with an absolutely clean slate and

20    without any evidence against him.

21             The indictment in this case contains six charges or

22    counts.  Mr. Amanat is charged in Counts One, Two, Three and

23    Four.  Mr. Tuzman is charged in Counts Four, Five and Six.

24             Count One of the indictment charges Omar Amanat with

25    conspiracy to commit wire fraud.  The government claims that

1   Omar Amanat and his brother, Irfan Amanat, participated in a

2   scheme to defraud investors in Maiden Capital.

3           The indictment charges from in or about March 2009

4   through in or about June 2012, in the Southern District of New

5   York and elsewhere, Omar Amanat and Irfan Amanat, and others

6   known and unknown, willfully and knowingly combined, conspired,

7   confederated and agreed together and with each other to commit

8   wire fraud.

9           The indictment further charges that it was a part and

10  an object of the conspiracy that Omar Amanat and Irfan Amanat

11  and others, known and unknown, willfully and knowingly, having

12  devised and intending to devise a scheme and artifice to

13  defraud, and for obtaining money and property by means of false

14  and fraudulent pretenses, representations and promises, would

15  and did transmit and cause to be transmitted by means of wire,

16  radio, and television communication in interstate and foreign

17  commerce writings, signs, signals, pictures and sounds for the

18  purpose of executing such scheme and artifice.

19          Count Two of the indictment charges that Mr. Amanat

20  actually committed wire fraud by engaging in a scheme to

21  defraud investors in Maiden Capital.

22          The indictment states that from in or about March 2009

23  through in or about June 2012, in the Southern District of New

24  York and elsewhere, Omar Amanat willfully and knowingly, having

25  devised and intending to devise a scheme and artifice to

1    defraud, and for obtaining money and property by means of false

2    and fraudulent pretenses, representations and promises,

3    transmitted and caused to be transmitted by means of wire,

4    radio, television communication and interstate and foreign

5    commerce, writing, signs, signals, pictures and sounds for the

6    purpose of executing such scheme and artifice, to wit, Omar

7    Amanat, Irfan Amanat and others schemed to defraud Maiden

8    Capital investors by causing Maiden to make material

9    misrepresentations and to omit material facts to Maiden Capital

10   investors about the status of their investments by wiring

11   hundreds of thousands of dollars to Maiden Capital in order to

12   pay certain redemptions and forestall Maiden Capital's

13   collapse, and by providing Maiden with false account statements

14   regarding Maiden Capital's investment in Enable, knowing that

15   such false account statements were intended to be presented and

16   were presented to Maiden Capital investors.

17           The indictment further alleges that Stephen Maiden,

18   using fictitious account numbers generated by Irfan Amanat, and

19   with the knowledge of Omar Amanat, generated fraudulent client

20   statements that failed to disclose the Enable losses and were

21   distributed to Maiden Capital's investors.

22           In Count Three, the government claims that Stephen

23   Maiden was an investment adviser and that Omar Amanat aided and

24   abetted Stephen Maiden's frauds on Maiden Capital's investors.

25           The indictment charges that from in or about

HCMTTUZ4                    Charge

March 2009 through in or about June 2012, in the Southern

District of New York and elsewhere, Omar Amanat willfully and

knowingly aided and abetted an investment adviser who used the

mails and other means and instrumentalities of interstate

commerce, directly and indirectly, A, to employ a device,

scheme and artifice to defraud clients and prospective clients,

B, to engage in a transaction, practice, and course of business

which operated as a fraud and deceit upon clients and

prospective clients, and C, to engage in an act, practice, and

course of business which was fraudulent, deceptive, and

manipulative, to wit, Omar Amanat aided and abetted fraud by

Maiden, an investment adviser, in which Maiden made false and

materially omissive statements to investors about the status of

their investments in Enable and the payment of redemptions.

     The indictment further alleges that rather than disclose

the Enable losses to investors in the Maiden fund, as he was

legally obligated to do, Maiden concealed the Enable losses,

thereby acting in his own self interest and the interests of

Omar Amanat, his close associate, who did not want the Enable

losses to be exposed.  By providing Maiden with capital

contributions to meet redemption requests knowing that Maiden

Capital's investors had been lied to by Maiden about the Enable

losses and the status of their investments, and by providing

false account statements regarding Maiden Capital's investment

in Enable, Omar Amanat assisted Maiden in carrying out his

HCMTTUZ4                         Charge

fraudulent scheme and helped Maiden to succeed in covering up

the losses for over three years.

In Count Four, the indictment charges that Mr. Tuzman and

Mr. Amanat engaged in conspiracy to commit securities fraud

through manipulating the market for KIT Digital stock.

The indictment alleges that from in or about December 2008

through in or about September 2011, in the Southern District of

New York and elsewhere, Kaleil Isaza Tuzman and Omar Amanat and

others, known and unknown, willfully and knowingly combined,

conspired, confederated and agreed together and with each other

to commit an offense against the United States, namely, fraud

in connection with the purchase and sale of securities issued

by KIT Digital.

The indictment further charges that it was a part and

object of the conspiracy that Kaleil Isaza Tuzman and Omar

Amanat and others, known and unknown, willfully and knowingly,

directly and indirectly, by the use of means and

instrumentalities of interstate commerce and of the mails and

of the facilities of national securities exchanges, would and

did use and employ, in connection with the purchase and sale of

securities, manipulative and deceptive devices and contrivances

by, A, employing device, schemes and artifices to defraud, B,

making untrue statements of material fact and omitting to state

material facts necessary in order to make the statements made,

in the light of the circumstances under which think were made,

1   not misleading, and C, engaging in acts, practices and courses

2   of business which operated and would operate as a fraud and

3   deceit upon any person.

4       The indictment further alleges that in furtherance of the

5   conspiracy and to effect its illegal object, Kaleil Isaza

6   Tuzman and Omar Amanat and their co-conspirators, committed the

7   following overt acts, among others, in the Southern District of

8   New York and elsewhere:

9       1.  On or about December 31, 2008, Tuzman, Omar Amanat, and

10  Stephen Maiden executed an agreement pursuant to which Maiden

11  agreed that Maiden Capital would buy at least $400,000 of KIT

12  Digital common stock in the open market.

13      2.  Between in or about January 2009 and in or about

14  February 2009, Maiden purchased over $400,000 of KIT Digital

15  common stock through Maiden Capital.

16      3.  In or about March 2011, Maiden bought and sold KIT

17  Digital shares in an effort to artificially inflate the price

18  of KIT Digital shares.

19      4.  In or about July 2011, Omar Amanat and Tuzman met with

20  Maiden and others in Manhattan in part to discuss the losses

21  sustained in Enable.

22      Count Five.  In Count Five, the indictment charges

23  Mr. Tuzman with conspiracy to commit wire fraud.  The

24  government claims that Mr. Tuzman and others participated in a

25  scheme to defraud shareholders in KIT Digital by failing to

 1    disclose that KIT Digital's investments in Maiden Capital were

 2    not part of an arm's length relationship but were actually

 3    related party transactions entered into for an improper

 4    purpose.  The government also alleges that Mr. Tuzman falsely

 5    represented to KIT Digital that a $250,000 KIT Digital

 6    investment with Maiden Capital was a legitimate investment,

 7    whereas Mr. Tuzman and Maiden had agreed it was instead to be

 8    paid to Mr. Tuzman for his personal use.

 9         The indictment states that from at least in or about

10    March 2009 up to in or about March 2011, in the Southern

11    District of New York and elsewhere, Kaleil Isaza Tuzman and

12    others, known and unknown, willfully and knowing combined,

13    conspired, confederated and agreed together and with each other

14    to commit wire fraud.

15         The indictment further charges that it was part and object

16    of the conspiracy that Kaleil Isaza Tuzman and others, known

17    and unknown, willfully and knowingly, having devised and

18    intending to devise a scheme and artifice to defraud, and for

19    obtaining money and property by means of false and fraudulent

20    pretenses, representations and promises, would and did transmit

21    and cause to be transmitted by means of wire, radio, and

22    television communication in interstate and foreign commerce,

23    writings, signs, signals, pictures and sounds for purposes of

24    executing such scheme and artifice.

25         Finally in Count Six the indictment alleges that Mr. Tuzman

HCMTTUZ4                        Charge

and others participated in a conspiracy to:  One, commit

securities fraud; two, make false statements in KIT Digital's

annual and quarterly report filed with the Securities &

Exchange Commission, the SEC; and three, make false statements

to KIT Digital's auditors.

The indictment charges that from in or about 2009 through

in or about April 2012, in the Southern District of New York

and elsewhere, Kaleil Isaza Tuzman and Irfan Amanat and others,

known and unknown, willfully and knowingly combined, conspired,

confederated and agreed together and with each other to commit

offenses against the United States, namely:  A, to commit fraud

in connection with the purchase and sale of securities issued

by KIT Digital; and B, to make and cause to be made false and

misleading statements of material fact in applications, reports

and documents required to be filed with the SEC under the

Securities Exchange Act of 1934 and the rules and regulations

thereunder; and C, to make and cause to be made false and

misleading statements and omissions to KIT Digital's auditors.

Count Six further charges that it was a part and object of

the conspiracy that Kaleil Isaza Tuzman and others, known and

known, willfully and knowingly, directly and indirectly, by the

use of the means and instrumentalities of interstate commerce

and of the mails and of the facilities of national securities

exchanges, would and did use and employ, in connection with the

purchase and sale of securities issued by KIT Digital,

HCMTTUZ4                    Charge

manipulative and deceptive devices and contrivances by:  A,

employing devices, schemes and artifices to defraud; B, making

and causing KIT Digital to make untrue statements of material

fact and omitting to state material facts necessary in order to

make the statements made, in light of the circumstances under

which they were made, not misleading; and C, engaging in acts,

practices, and courses of business which operated and would

operate as a fraud and deceit upon any person.

     Count Six goes on to allege that it was further a part and

object of the conspiracy that Kaleil Isaza Tuzman and Irfan

Amanat and others known and unknown, willfully and knowingly,

in applications, reports and documents required to be filed

with the SEC under the Securities Exchange Act of 1934, and the

rules and regulations thereunder, would and did make and cause

KIT Digital to make statements that were false and misleading

with respect to material facts.

     Count Six also claims that it was further a part and object

of the conspiracy that Kaleil Isaza Tuzman, being an officer of

KIT Digital, an issuer with a class of securities registered

pursuant to Section 12 of the Securities Exchange Act of 1934,

Irfan Amanat and others, known and unknown, willfully and

knowingly would and did, directly and indirectly:  A, makes and

cause to be made materially false and misleading statements;

and B, omit to state and cause other persons to omit to state

material facts necessary in order to make the statements made,

HCMTTUZ4                    Charge

in the light of the circumstances under which such statements were made, not misleading to accountants in connection with, (1), audits and examinations of the financial statements of KIT Digital required to be filed with the SEC pursuant to rules and regulations enacted by the SEC, and (2), the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations enacted by the SEC.

Count Six further charges that in furtherance of the conspiracy and to effect its illegal objects, Kaleil Isaza Tuzman and Irfan Amanat and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

On or about August 16, 2010, Tuzman and Smyth signed KIT Digital's form 10Q for the fiscal quarter ending June 30, 2010, which was transmitted electronically to the SEC from New York, New York.

On or about December 10, 2010, Rima Jameel and Smyth executed an escrow agreement establishing the UAE escrow account and agreed to place $7.5 million of KIT Digital funds in the UAE escrow account.

On or about March 16, 2011, Tuzman and Smyth signed KIT Digital's form 10K for the fiscal year ending December 31, 2010, which was transmitted electronically to the SEC from New York, New York.

On or about January 6, 2012, Tuzman signed KIT Digital's

HCMTTUZ4                    Charge

form 8K, which was transmitted electronically to the SEC from
New York, New York.

On or about March 13, 2012, Rima Jameel emailed a balance
confirmation to KIT Digital's independent auditors in which she
falsely claimed that the UAE escrow account contained
approximately $6.1 million.

On or about March 30, 2012, Tuzman and Smyth signed KIT
Digital's form 10K for the fiscal year ending December 31,
2011, which was transmitted electronically to the SEC from New
York, New York.

On or about April 13, 2012, Tuzman caused KIT Capital to
wire $3 million to JB Legal Consulting to replenish the UAE
escrow account.

On or about April 19, 2012, Rima Jameel caused JB Legal
Consulting to wire $2,999,918 to KIT Digital as a purported
release of escrowed funds from the UAE escrow account.

On or about April 20, 2012, Tuzman caused KIT Capital to
wire $5 million to JB Legal Consulting to further replenish the
UAE escrow account.

On or about April 26, 2012, Rima Jameel caused JB Legal
Consulting to wire $4,999,949 to KIT Digital as a purported
release of escrowed funds from the UAE escrow account.

The defendants deny all of the charges in the indictment
and contend that the government has not proven any of these
charges beyond a reasonable doubt.  As I have said, the

HCMTTUZ4                    Charge

1   indictment does not constitute evidence that either defendant

2   committed any of the crimes charged in the indictment.

3       In a moment I will instruct you on each of the charges in

4   detail.  As I have said, you will be asked to render a verdict

5   as to each defendant and as to each count.  Accordingly, you

6   must consider as to each defendant and as to each count whether

7   the government has proven all of the elements of each offense

8   beyond a reasonable doubt.

9       Count One, conspiracy to commit wire fraud Maiden Capital

10  investors.

11      In Count One of the indictment, Omar Amanat is charged with

12  violating Title 18, United States Code, Section 1349, which

13  states:  Any person who conspires to commit any offense under

14  this chapter, including wire fraud, shall be guilty of a crime.

15      The government claims that Mr. Amanat conspired with

16  Stephen Maiden and others in connection with an alleged scheme

17  to defraud investors in Maiden Capital.

18      A conspiracy is a kind of criminal partnership, an

19  agreement between two or more people to join together to

20  accomplish some unlawful purpose.

21      The crime of conspiracy to commit wire fraud is a separate

22  and distinct offense from the actual commission of wire fraud.

23  Indeed, a defendant may be found guilty of conspiracy to commit

24  wire fraud even if the conspiracy was not successful and no

25  wire fraud was ever actually committed.  That is because

HCMTTUZ4                    Charge

1   conspiracy to commit wire fraud is a stand-alone separate crime

2   premised on an illegal agreement.

3        With respect to wire fraud conspiracy charged in Count One,

4   the government must prove each of the following elements beyond

5   a reasonable doubt:

6        First, that the conspiracy charged in Count One existed,

7   that is, that from or about March 2009 through in or about

8   June 2012 an agreement or understanding between two or more

9   people existed to commit wire fraud; and

10       Second, that Omar Amanat willfully and knowingly joined and

11  participated in that conspiracy during the time period charged

12  in Count One.

13       The first element of the crime of conspiracy has is two

14  parts, an unlawful agreement, and an object of the conspiracy.

15       To establish a conspiracy, the government is not required

16  to show that two or more people sat down around a table and

17  entered into a solemn pact, orally or in writing, stating that

18  they had they had formed a conspiracy to violate the law and

19  spelling out all the details of the plans and the means by

20  which the unlawful project is to be carried out, or the part

21  that each of the persons who was a party to the conspiracy was

22  going to play.

23       When people undertake to enter into a criminal conspiracy,

24  much is often left to the unexpressed understanding.

25  Conspirators do not usually reduce their agreements to a formal

writing.  They don't typically publicly broadcast their plans.
From its very nature, a conspiracy is almost always secret in
its origin and execution.

         It is enough if the evidence demonstrates two or more
people, in some way or manner, impliedly or tacitly, come to an
understanding to violate the law.  Express language or specific
words are not required to indicate assent or agreement to
conspiracy.  You need only find that two or more people entered
into the unlawful agreement alleged in Count One to find that a
conspiracy existed.  What the government must prove is that
there was a mutual understanding, either spoken or unspoken,
between two or more people to cooperate with each other to
violate the law and to accomplish an unlawful act.

         In determining whether the government has proven the
unlawful agreement alleged in Count One, you should consider
the proven acts and conduct of the alleged co-conspirators
undertaken to carry out the apparent criminal purpose.  The
adage, "Actions speak louder than words" is applicable here.
Often the only evidence that is available is that of
disconnected acts that, when considered in connection with one
another, show a conspiracy or an agreement to secure a
particular result just as satisfactorily and conclusively as
more direct proof.  As I have said, it is not necessary that
the conspiracy actually succeed for to you conclude that it
existed.

HCMTTUZ4                         Charge

        1        In deciding whether the conspiracy charged in Count

        2   One existed, you may consider all the evidence of the acts,

        3   conduct, and statements of those you determine the government

        4   has proven were co-conspirators, and the reasonable inferences

        5   to be drawn from that evidence.

        6        When people enter into a conspiracy to accomplish an

        7   unlawful end, they become agents or partners of one another in

        8   carrying out the conspiracy.  In determining the factual issues

        9   before you, you may take into account against Mr. Amanat any

       10   acts or statements made by any of the alleged co-conspirators

       11   during the course of the conspiracy, even though such acts or

       12   statements were not made in Mr. Amanat's presence or made

       13   without his knowledge.

       14        It is sufficient to establish the existence of the

       15   conspiracy if you find beyond a reasonable doubt that the minds

       16   of at least two alleged conspirators met in an understanding

       17   way and that they agreed, as I have explained, to work together

       18   to accomplish the objective of the conspiracy charged in Count

       19   One.

       20        The second part of the conspiracy element relates to

       21   the object or objective of the conspiracy.  According to the

       22   indictment, the objective of the conspiracy charged in Count

       23   One was to commit wire fraud.  In order for you to determine

       24   whether Mr. Amanat conspired to commit wire fraud, you must

       25   understand the elements of that offense.  Accordingly, I will

1    instruct you now on the elements of wire fraud.  You will apply

2    these same instructions concerning the elements of wire fraud

3    when you consider Count Two, which charges Mr. Amanat with the

4    actual commission of wire fraud.

5            In order to prove that a defendant committed wire

6    fraud, the government must establish beyond a reasonable doubt

7    the following three elements:  First, that in or about the time

8    period alleged in the indictment there was a scheme or artifice

9    to defraud others of money or property by means of false or

10   fraudulent pretenses, representations or promises.

11           Second, that the defendant knowingly and willfully

12   devised or participated in the scheme or artifice to defraud,

13   with knowledge of its fraudulent nature and with the specific

14   intent to defraud.

15           And third, that in the execution of that scheme, the

16   defendant used or caused the use by others of interstate or

17   international wires.

18           The first element of wire fraud requires the

19   government to prove beyond a reasonable doubt the existence of

20   a scheme or artifice to defraud others of money or property by

21   means of false or fraudulent pretenses, representations or

22   promises.

23           A scheme or artifice is simply a plan for the

24   accomplishment of an object.

25           Fraud includes all the possible means by which a

1    person seeks to gain some unfair advantage over another person

2    by false representations, false suggestion, false pretenses, or

3    concealment of the truth.  The unfair advantage sought can

4    involve property, money, or any other thing of value.

5         Thus, a scheme to defraud is any plan, device, or

6    course of action to deprive another of money or property by

7    means of false or fraudulent pretenses, representations or

8    promises.  It is a plan to deprive another of money or property

9    by trick, deceit, deception, swindle or overreaching.

10        Even where statements allegedly made in furtherance of

11   a scheme to defraud were literally true, you can still find

12   that the first element of the wire fraud statute has been

13   satisfied if the statements and/or conduct of the defendant

14   were deceptive.  You may also find the existence of such a

15   scheme if you find that the defendant conducted himself in a

16   manner that departed from traditional notions of fundamental

17   honesty and fair play in the general business life of society,

18   and that this conduct was deceptive.

19        A scheme to defraud need not be shown by direct

20   evidence but may be established by all the circumstances and

21   facts of the case.

22        A pretense, representation, or a statement is

23   fraudulent if it was made falsely and with intent to deceive.

24   A statement may also be fraudulent if it contains half truths

25   or if it conceals material facts in a manner that makes what is

1    said or represented deliberately misleading or deceptive.

2            The alleged false or fraudulent representation or

3    concealment must, however, relate to a material fact or matter.

4    A material fact is one that would reasonably be expected to be

5    of concern to a reasonable and prudent person in relying upon

6    the representation or statement in making a decision.  This

7    means that if you find that a particular statement or

8    representation false, you must determine whether the statement

9    or representation was one that a reasonable person might have

10   considered important in making his or her decision.  The same

11   principle applies to fraudulent half truths or omissions, that

12   is, failures to disclose facts.

13           In order to satisfy this first element, the government

14   must also prove that the alleged scheme contemplated depriving

15   another of money or property.  It is not necessary for the

16   government to establish that a defendant actually realized any

17   gain from the scheme, or that any particular person actually

18   suffered damages as a consequence of the fraudulent scheme.

19   The key point is whether there was a scheme that contemplated

20   depriving another of money or property, not the consequences of

21   such a scheme.

22           In this regard, a person is not deprived of money or

23   property only when someone directly takes his money or property

24   from him.  Rather, a person is also deprived of money or

25   property when that person is provided false or fraudulent

1   information that, if believed, would prevent him from being

2   able to make informed decisions about what to do with his money

3   or property.

4           In other words, a person is deprived of money or

5   property when he is deprived of the right to control that money

6   or property, and he is deprived of the right to control that

7   money or property when he is provided with false or fraudulent

8   information that affects his ability to make discretionary

9   economic decisions about what to do with that money or

10  property.

11          If you find that the government has sustained its

12  burden of proof that the scheme to defraud charged in Count One

13  existed, you next should consider the second element.

14          The second element of wire fraud is that the defendant

15  devised or participated in the fraudulent scheme knowingly,

16  willfully and with a specific intent to defraud.

17          To devise a scheme to defraud is to concoct or plan

18  it.

19          To participate in a scheme to defraud means to

20  associate oneself with it with a view and intent toward making

21  it succeed.  While a mere onlooker is not a participant in a

22  scheme to defraud, it is not necessary that a participant be

23  someone who personally and visibly executes the scheme to

24  defraud.

25          In order to satisfy this element, it is not necessary

for the government to establish that the defendant originated
the scheme to defraud.  It is sufficient if you find that a
scheme to defraud has been proven, even if originated by
another, and that the defendant, while aware of the scheme's
existence, knowingly participated in it.

It is also not required that the defendant participate
in all of the operations of the fraud scheme or that he had
knowledge of all of the operations of the fraud scheme.  The
guilt of a defendant does not turn on the extent of his
participation.

It also is not necessary that the defendant
participated in the alleged scheme from the beginning.  A
person who comes in at a later point with knowledge of the
scheme's general operation, although not necessarily all its
details, and intentionally acts in a way to further the
unlawful goals, becomes a member of the scheme and is legally
responsible for all that may have been done in the past in
furtherance of the criminal objective and all is that is done
thereafter.  Even if a defendant participated in the scheme to
a lesser degree than others, he is nevertheless equally guilty,
so long as the government has proven that that defendant
participated in the scheme to defraud with knowledge of its
general scope and purpose.

Before a defendant may be convicted of wire fraud, the
government must prove that he acted knowingly and willfully and

1    with a specific intent to defraud.  I will now define the terms

2    knowingly, willfully, and intent to defraud.

3           A person acts knowingly if he acts intentionally,

4    deliberately and voluntarily, and not because of ignorance,

5    mistake, accident or carelessness.

6           A person acts willfully if he acts deliberately and

7    with the intent to do something that the law forbids, that is,

8    with a bad purpose to disobey or disregard the law.

9           In the wire fraud context, a defendant acts with

10   specific intent to defraud if he engages or participates in the

11   fraudulent scheme with knowledge of its fraudulent or deceptive

12   character and with an intention to be involved in the scheme to

13   defraud and to help it succeed, all with a purpose of causing

14   harm to the alleged victims, that is, to deprive the victims of

15   money or property.  The government need not prove that the

16   intended victims were actually harmed, only that such harm was

17   contemplated.  A defendant is presumed to intend the natural

18   and probable consequences of his actions.  So when the

19   necessary result of a defendant's scheme is to injure others,

20   fraudulent intent may be inferred from the scheme itself.

21          The question of whether a person acted knowingly,

22   willfully, and with specific intent to defraud is a question of

23   fact for you to determine, like any other fact question.  This

24   issue obviously involves the defendant's state of mind.  Direct

25   proof of knowledge and fraudulent intent is often not

HCMTTUZ4                    Charge

1  available.  It would be a rare case where it could be shown

2  that a person wrote or stated that as of a given time in the

3  past he committed an act with fraudulent intent.  Such direct

4  proof is not required.  The existence of knowledge,

5  willfulness, and criminal intent, though subjective, may be

6  established by circumstantial evidence based upon a person's

7  outward manifestations, his words, his conduct, his acts and

8  all the surrounding circumstances disclosed by the evidence and

9  the rational or logical inferences that may be drawn therefrom.

10         Because an essential element of wire fraud is intent

11  to defraud, a defendant's good faith, as I will define that

12  term, is a complete defense to a charge of wire fraud.  A

13  defendant has no burden to establish a defense of good faith.

14  The burden is on the government to prove fraudulent intent and

15  consequent lack of good faith beyond a reasonable doubt, even

16  false representations or statements or omissions of material

17  facts do not amount to a fraud unless done with fraudulent

18  intent.  However misleading or deceptive a plan may be, it is

19  not fraudulent if it was carried out in good faith.  A

20  defendant's honest belief in the truth of the representations

21  made is a complete defense, however inaccurate the statements

22  may turn out to be.

23         In considering whether a defendant acted in good

24  faith, however, you should be aware that a defendant's belief

25  that ultimately everything would work out so that no investor

1    would lose any money, or that particular investments would

2    ultimately be financially advantageous for clients, does not

3    necessarily constitute good faith.  No amount of honest belief

4    on the part of a defendant that a scheme will ultimately make a

5    profit for the investors will excuse fraudulent actions or

6    false representations by him to deprive others of money or

7    property.

8            The third and final element of wire fraud that the

9    government must establish beyond a reasonable doubt is that

10   interstate or foreign wire facilities were used in furtherance

11   of the scheme to defraud.

12           The interstate or foreign requirement means that the

13   wire communication must pass between two or more states, as for

14   example, a transmission of computer signals between New York

15   and another state, such as New Jersey, California or a

16   territory such as the U.S. Virgin Islands, or between the

17   United States and another country.

18           It is not necessary for a defendant to be directly or

19   personally involved in any wire communication, so long as the

20   communication is reasonably foreseeable in the execution of the

21   alleged scheme to defraud in which the defendant is accused of

22   participating.  In this regard, it would be sufficient to

23   establish this element of the crime if the evidence justifies a

24   finding that a defendant caused the wires to be used by others.

25   This does not mean that the defendant himself must have

 1  specifically authorized others to execute a wire communication.

 2  When one commits an act with knowledge that the use of a wire

 3  will follow in the ordinary course of business, or where such

 4  use of the wires can reasonably be foreseen, even though not

 5  actually intended, then he causes the wires to be used.  The

 6  wire communication requirement may be satisfied even if the

 7  wire communication was done by a person with no knowledge of

 8  the fraudulent scheme, including the victim of the alleged

 9  fraud.

10       The use of the wire need not itself be fraudulent.

11  Stated another way, the wire communication need not contain any

12  fraudulent representation or even any request for money.  It is

13  sufficient if the wires were used to further or assist in

14  carrying out the scheme to defraud.

15       The government must establish beyond a reasonable

16  doubt the particular use of the wires charged in the

17  indictment.  However, the government does not have to prove

18  that an interstate wire was used on any precise dates alleged

19  in the indictment.  It is sufficient if the evidence

20  establishes beyond a reasonable doubt that a wire was used on a

21  date reasonably near the time period alleged in the indictment.

22       You should also be aware that only the wire

23  communication must be reasonably foreseeable to the defendant,

24  not its interstate or foreign component.  Thus, if you find

25  that the wire communication was reasonably foreseeable, and the

HCMTTUZ4                          Charge

1    interstate or foreign wire communications actually took place,

2    then this element is satisfied even if it was not foreseeable

3    that the wire communication would cross state or national

4    lines.

5           If you conclude that the government has proven beyond

6    a reasonable doubt that the conspiracy charged in Count One

7    existed, and that the conspiracy had as its object the illegal

8    purpose charged in the indictment, then you must next determine

9    whether Mr. Amanat participated in the conspiracy with

10   knowledge of its unlawful purpose and in furtherance of its

11   unlawful objective.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:   The government must prove beyond a

2    reasonable doubt that Mr. Amanat willfully and knowingly

3    entered into the conspiracy charged in Count One with criminal

4    intent -- that is, with a purpose to violate the law -- and

5    that he agreed to take part in the conspiracy to promote and

6    cooperate in its unlawful objective.   "Knowingly" and

7    "willfully" have the same meaning that I provided to you

8    earlier.   The terms "knowingly" and "willfully" are intended to

9    ensure that if you find that Mr. Amanat joined the charged

10   conspiracy, you also conclude beyond a reasonable doubt that in

11   doing so, he knew what he was doing; in other words, that he

12   took the actions in question deliberately and voluntarily.

13             The key question is whether Mr. Amanat entered into

14   the unlawful agreement charged in Count One with an awareness

15   of at least some of the basic aims and purposes of the alleged

16   unlawful agreement.   Mr. Amanat's participation in the

17   conspiracy may be established by evidence of his own acts or

18   statements, as well as those of any alleged coconspirator, and

19   the reasonable inferences which may be drawn from the acts and

20   statements.

21             It is not necessary for the government to show that

22   Mr. Amanat was fully informed as to all the details of the

23   conspiracy in order for you to infer knowledge on his part.   To

24   have guilty knowledge, a defendant need not know the full

25   extent of the conspiracy, or of all of the activities of all of

HcmWtuz5                    Charge

its participants.  It is not even necessary for the defendant

to know every other member of the conspiracy.  In fact, a

defendant may know only one member of the conspiracy and still

be a coconspirator.  Nor is it necessary for a defendant to

receive any monetary benefit from his participation in the

conspiracy, or that he have any financial stake in the outcome.

It is enough if he participated in the conspiracy willfully and

knowingly, as I have defined those terms.

        The duration and extent of a defendant's participation

has no bearing on his guilt.  A defendant need not have joined

the conspiracy at the outset.  If a defendant joined the

conspiracy at any time in its progress, he will be held

responsible for all that was done before he joined and all that

was done during the conspiracy's existence while he was a

member.  Moreover, each member of the conspiracy may perform

separate and distinct acts.  Some conspirators play major

roles, while others play minor roles in the scheme.  An equal

role is not what the law requires.  In fact, even a single act

may be sufficient to draw a defendant within the scope of a

conspiracy.

        I want to caution you, however, that a person's mere

association with a member of the conspiracy does not make that

person a member of the conspiracy, even when that association

is coupled with knowledge that a conspiracy is taking place.

In other words, knowledge without agreement and participation

HcmWtuz5                    Charge

is not sufficient.  You may not find that Mr. Amanat is a

member of the conspiracy charged in Count One merely because of

a family or business relationship with an alleged

coconspirator.  Similarly, mere discussion of common aims and

interests does not necessarily establish membership in a

conspiracy.  What is necessary is that Mr. Amanat joined in the

conspiracy charged in Count One with knowledge of its unlawful

purpose, and with an intent to aid in the accomplishment of its

unlawful objective.

           In sum, a defendant, with an understanding of the

unlawful character of the conspiracy, must have intentionally

engaged, advised, or assisted in it for the purpose of

furthering an illegal undertaking.  A defendant thereby becomes

a knowing and willing participant in the unlawful agreement --

that is to say, a conspirator.

           A conspiracy, once formed, is presumed to continue

until either its objective is accomplished or there is some

affirmative act of termination by its members.  So, too, once a

person is found to be a member of a conspiracy, he is presumed

to continue his membership in the venture until its

termination, unless it is shown by some affirmative proof that

he withdrew and disassociated himself from it, such as a

communication of abandonment in a manner reasonably calculated

to reach coconspirators.

           Count One of the indictment charges that from in or

HcmWtuz5                       Charge

about March 2009 through in or about June 2012, Omar Amanat

conspired to commit Wire fraud in connection with a scheme to

defraud investors in Maiden Capital.  The government is not

required to prove that the conspiracy charged in Count One

started and ended on any specific date.  It is sufficient if

you find that the conspiracy was formed and that it existed at

some time within or around the dates set forth in the

indictment.

          In addition to the elements of conspiracy that I have

discussed, you must also consider the issue of venue, whether

an overt act in furtherance of the conspiracy occurred within

the Southern District of New York.  I instruct you that the

Southern District of New York includes Manhattan.

          As to the conspiracy charged in Count One, it is

sufficient to find venue in the Southern District of New York

if you find that Mr. Amanat or a coconspirator committed any

act in furtherance of the conspiracy in this district during

the existence of the conspiracy.

          As to venue, and venue alone, the government's burden

of proof is not proof beyond a reasonable doubt.  Instead,

venue may be established by a preponderance of the evidence.  A

preponderance of the evidence means more likely than not.

Thus, the government has satisfied its burden under the venue

element if you conclude that it is more likely than not that

Mr. Amanat or a coconspirator committed an act in furtherance

HcmWtuz5                     Charge

of the Count One conspiracy within the Southern District of New

York.  If, on the other hand, you find that the government has

failed to prove venue by a preponderance of the evidence, then

you must find Mr. Amanat not guilty.

          One more stretch break, ladies and gentlemen.  Groans

are permitted.

          All right.  Let's continue, ladies and gentlemen.

          Count Two:  Wire fraud -- Maiden Capital Investors.

          Count Two of the indictment charges Mr. Amanat with

actually committing wire fraud between in or about March 2009

and in or about June 2012.  This is the same wire fraud that is

the object of the conspiracy charged in Count One.

          The wire fraud statute provides that whoever, having

devised or intending to devise any scheme or artifice to

defraud, or for obtaining money or property by means of false

or fraudulent pretenses, representations, or promises,

transmits or causes to be transmitted by means of wire, radio,

or television communication in interstate or foreign commerce,

any writings, signs, signals, pictures, or sounds for the

purpose of executing such scheme or artifice, shall be guilty

of a federal crime.

          Count Two charges that Mr. Amanat committed wire fraud

in connection with an alleged scheme to defraud Maiden Capital

investors by causing Stephen Maiden to make material

misrepresentations and to omit material facts in communications

HcmWtuz5                    Charge

to Maiden Capital investors about the status of their

investments; by wiring hundreds of thousands of dollars to

Maiden Capital in order to pay certain redemptions and

forestall Maiden Capital's collapse; and by providing Maiden

with false account statements regarding Maiden Capital's

investment in Enable, knowing that such false account

statements were intended to be presented, and were presented,

to Maiden Capital investors.  According to the government,

Maiden -- using fictitious account numbers generated by Irfan

Amanat, and with the knowledge of Omar Amanat -- generated

fraudulent client statements that failed to disclose the Enable

losses and were distributed to Maiden Capital's investors.

          As I instructed you in connection with the wire fraud

conspiracy charged in Count One, in order to prove the

defendant guilty of actually committing wire fraud, the

government must prove beyond a reasonable doubt each of the

following three elements:

          First, that in or about the times alleged in the

indictment, there was a scheme or artifice to defraud others of

money or property by false or fraudulent pretenses,

representations, or promises;

          Second, that Mr. Amanat knowingly and willfully

devised or participated in the scheme or artifice to defraud,

with knowledge of its fraudulent nature and with the specific

intent to defraud; and

1          Third, that in the execution of that scheme, Mr.

2   Amanat used, or caused the use by others of, interstate or

3   foreign wires.

4          I have already defined each of these elements in my

5   instructions concerning Count One.

6          All of those instructions apply with equal force to

7   the actual commission of wire fraud charged in Count Two, and

8   you must rely on those instructions in determining whether the

9   government has met its burden of proof on Count Two.

10          In addition to proving beyond a reasonable doubt all

11   of the elements of wire fraud as I have explained them to you,

12   the government must prove that an interstate wire in

13   furtherance of the alleged wire fraud originated, passed

14   through, or terminated in the Southern District of New York.

15   As I have instructed you, as to venue and venue alone, the

16   government's burden of proof is proof by preponderance of the

17   evidence -- more likely than not.  If you find that the

18   government has not proven venue by a preponderance, then you

19   must find Mr. Amanat not guilty on Count Two.

20          Count Two also charges Mr. Amanat with "aiding and

21   abetting" wire fraud.  This is an alternative theory of

22   criminal liability.  A defendant may be guilty of wire fraud if

23   he acted as the principal who committed the crime, but a

24   defendant may also be guilty of wire fraud if he aided or

25   abetted someone else who actually committed that crime.

1          The "aiding and abetting" statute provides that

2   whoever commits an offense against the United States or aids

3   and abets or counsels, commands or induces, or procures its

4   commission, is punishable as a principal.

5          Under the aiding and abetting statute, it is not

6   necessary for the government to show that the defendant himself

7   actually committed the crime with which he is charged in order

8   for you to find the defendant guilty.  Even where the evidence

9   does not demonstrate that a defendant himself committed the

10   crime charged, you may, under certain circumstances, still find

11   that defendant guilty of that crime as an aider or abettor.

12          A person who aids or abets another to commit an

13   offense is just as guilty of that offense as if he committed it

14   himself.  Accordingly, you may find Mr. Amanat guilty of wire

15   fraud if you find beyond a reasonable doubt that the government

16   has proven that another person actually committed the charged

17   wire fraud, and that Mr. Amanat aided and abetted that person

18   in committing that offense.

19          The first requirement for finding aiding and abetting

20   liability is that another person actually committed the charged

21   wire fraud.  No one can be convicted of aiding and abetting the

22   criminal acts of another if no crime was committed by the other

23   person in the first place.  Here, if you find that another

24   person committed the charged wire fraud, you must then consider

25   whether Mr. Amanat aided or abetted that person in committing

HcmWtuz5                    Charge

wire fraud.

In order to aid or abet another in committing a crime, a defendant must have willfully and knowingly associated himself in some way with the crime, and willfully and knowingly sought by some act to help make the crime succeed. Participation in the crime is willful if action is taken voluntarily and intentionally, or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose either to disobey or to disregard the law.

The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider or abettor must have some interest in the criminal venture.

In determining whether Mr. Amanat aided or abetted the commission of the wire fraud charged in Count Two, ask yourself these questions:

Did he participate in the crime charged in Count Two as something he wished to bring about?

Did he knowingly and willfully associate himself with the criminal venture charged in Count Two?

Did he seek by his actions to make the criminal

HcmWtuz5                    Charge

venture charged in Count Two succeed?

          If Mr. Amanat did these things, then he aided and
abetted in the wire fraud charged in Count Two, and is guilty
of that offense.  If, on the other hand, your answer to any of
these questions is "no," then Mr. Amanat is not an aider and
abettor, and is not guilty as an aider and abettor of that
offense.

          A defendant may also be guilty as an aider or abettor
where he willfully causes a crime.  The aiding and abetting
statute provides that whoever willfully causes an act to be
done which if directly performed by him or another would be an
offense against the United States shall be guilty of a federal
crime.

          What does the term "willfully caused" mean?  It does
not mean that Mr. Amanat himself committed wire fraud or that
he supervised or participated in the wire fraud charged in
Count Two.

          In determining whether Mr. Amanat "willfully caused"
the wire fraud charged in Count Two, you should ask yourself
the following questions:

          Did Mr. Amanat take some action without which the
crime would not have occurred?

          Did Mr. Amanat intend that the crime would be actually
committed by others?

          If you are persuaded beyond a reasonable doubt that

1    the answer to both of these questions is "yes," then Mr. Amanat

2    is as guilty of the crime charged in Count Two as if he had

3    actually committed the wire fraud charged in Count Two.

4           Count Three:  Aiding and Abetting Investment Adviser

5    Fraud.

6           Count Three of the indictment charges that, from in or

7    about March 2009 through in or about June 2012, Mr. Amanat

8    aided and abetted Stephen Maiden -- an investment adviser as a

9    result of his position at Maiden Capital -- in committing

10   investment adviser fraud.

11          Federal law provides that it shall be unlawful for any

12   investment adviser by use of the mails or any means or

13   instrumentality of interstate commerce, directly or indirectly

14   (a) to employ any device, scheme, or artifice to defraud any

15   client or prospective client; (B) to engage in any transaction,

16   practice, or course of business which operates as a fraud or

17   deceit upon any client or prospective client; or (c) to engage

18   in any act, practice, or course of business that was

19   fraudulent, deceptive or manipulative.

20          You should be aware that an investment adviser has an

21   affirmative duty of utmost good faith, and full and fair

22   disclosure of all material facts, as well as an affirmative

23   obligation to employ reasonable care to avoid misleading his

24   clients.  An investment adviser's concealment of material

25   information which he or she is under a duty to disclose to

HcmWtuz5                    Charge

1    another, under circumstances where the disclosure can or does

2    result in harm to an investor, can constitute fraud.

3         I understand a juror needs to use the bathroom, so

4    we'll take a very brief recess for that purpose.

5         (Jury not present)

6         THE COURT:  Please be seated.

7         MR. NAFTALIS:  Your Honor, we have one minor issue to

8    raise.  I think that the verdict sheet should say "investment

9    adviser" under Count Three, not investor adviser.

10         THE COURT:  I'm sorry?

11         MR. NAFTALIS:  The verdict sheet refers to, Count

12    Three, investor adviser, not investment adviser.

13         THE COURT:  That's a typo.  We'll fix that.

14         MR. WEITZMAN:  Your Honor, Mr. McRae and I are both

15    running to the facilities.

16         MR. JACKSON:  Your Honor, I have a brief issue I have

17    to raise.  I apologize, but I have to raise it.

18         During the government's rebuttal summation, there was

19    reference to California to North Carolina wires.

20         THE COURT:  I'm sorry?

21         MR. JACKSON:  There was reference to California to

22    North Carolina wires, and there was also reference to

23    KITDigital wires that the government referred to, I believe, as

24    answering the questions that I raised about whether or not the

25    government had established that a wire in furtherance of the

HcmWtuz5                    Charge

1   conspiracies charged in Counts One and Two had been

2   established.

3          Two issues.  One, the government did not state on the

4   record what exhibits it was referring to, so it's difficult to

5   understand what the government is talking about.  That's not on

6   the record.

7          Second, I'm not aware of testimony that specified a

8   California to North Carolina wire that was sent in furtherance

9   of the conspiracy.  I'm just not aware of it, so I'd ask the

10  government to identify it.

11         And third, I don't think that any KITDigital wire can

12  be appropriately connected to the fraud schemes that are

13  charged in Counts One and Two.

14         I think those are issues that may require additional

15  discussion.

16         MR. WILLIAMS:  Your Honor, we strongly disagree.  All

17  the records that we pointed the jury to are in evidence, No. 1.

18         With regard to the KITDigital wire into Maiden

19  Capital, KITDigital was an investor in Maiden Capital, and they

20  wired money into Maiden Capital as part of the scheme.  Maiden

21  caused them to wire him money knowing that he was broke, and so

22  we certainly think that that is a wire that the jury can

23  consider, and it was backed up by the evidence.

24         Mr. Jackson had made many arguments in advance of the

25  summation that the government didn't have sufficient evidence

1     of venue and interstate wires, but the bank records are in

2     evidence.  We had told Mr. Jackson that there are other

3     exhibits that we could point to that are clear on their face,

4     but obviously he objected to us reopening our case for that

5     purpose, so we just did the work of putting together the

6     various bank statements.

7              We don't exactly know what the issue is, but we're

8     arguing from what's in evidence.

9              THE COURT:  What's the California to North Carolina

10    wire?

11             MR. WILLIAMS:  We had Government Exhibit 3800-AA,

12    which is a summary chart listing all the wires that were sent

13    from Enable to Maiden Capital.  Now, those were based on a few

14    other exhibits including -- this is off memory, your Honor --

15    Government Exhibit 634, for instance, which is the First

16    Republic wires.  That's the Enable account.  That account was

17    based in San Francisco, California, and the Maiden Capital

18    account is the Bank of America account.  The various bank

19    records include location information.  They say SF for the

20    Enable account, NC for the North Carolina Bank of America

21    account, and we were simply pulling from the documents that are

22    in evidence showing where the various bank accounts are

23    located.

24             We don't think that's controversial.

25             THE COURT:  Anything you want to say, Mr. Jackson?

1          MR. JACKSON:  Yes, your Honor.  There are two things I

2    want to say.

3          One, this implicates precisely the notice concerns

4    that I raised as well as the concerns about whether or not it

5    would implicate the charge in terms of potential constructive

6    amendment of the indictment.  It is very difficult to

7    understand how the jury could make a determination based on

8    that as to whether or not the KITDigital wire that was

9    referenced was actually a KITDigital wire that's connected to

10   Counts One and Two as opposed to some wires connected to Counts

11   Five and Six.  I didn't even understand it.

12         Secondly, your Honor, I think what Mr. Williams is

13   saying is that because the address of whoever is, you know, the

14   registered address of whoever has this bank account is in a

15   particular state that the jury could infer that any particular

16   wire that was sent from that account is a wire transmission

17   that went from California to North Carolina.  I don't think

18   that that would be a fair inference, your Honor, and I think it

19   implicates also, and this is the last thing I'll say, what the

20   Court said at the very beginning of the case, which is that we

21   were not going to have argument about documents and portions of

22   documents that were not exposed to the jury during the course

23   of trial.

24         I have no idea what Mr. Williams is talking about, and

25   if it's buried in some document that there is a California to

HcmWtuz5                    Charge

1    North Carolina wire, I'm just saying I had no opportunity to

2    understand what that was, and after he said it, I moved as

3    diligently as possible to try to understand and see if that was

4    in the record, and I don't see it.

5            MR. WILLIAMS:  Your Honor, there was summary witness

6    testimony about these bank wires.  The exhibits that the

7    summary testimony was based on were specified as well.  If you

8    look at the underlying documents, it's in the record.

9            THE COURT:  All right.  Do you have any application,

10   Mr. Jackson, at this point?

11           MR. JACKSON:  My application, your Honor, is that the

12   jury be instructed to disregard that argument.

13           THE COURT:  All right.  That application is denied.

14           Just take a brief recess and then we'll resume with

15   the charge.

16           (Recess)

17           (Jury present)

18           THE COURT:  Please be seated.

19           Ladies and gentlemen, I'll go back to page 47 where I

20   started the discussion of this count, because I don't want you

21   to lose any of the context.  Picking up page 47 with Count

22   Three:  Aiding and Abetting Investment Adviser Fraud.

23           Count Three of the indictment charges that, from in or

24   about March 2009 through in or about June 2012, Mr. Amanat

25   aided and abetted Stephen Maiden -- an investment adviser as a

1    result of his position at Maiden Capital -- in committing

2    investment adviser fraud.

3           Federal law provides that it shall be unlawful for any

4    investment adviser by use of the mails or any means or

5    instrumentality of interstate commerce, directly or indirectly

6    (a) to employ any device, scheme, or artifice to defraud any

7    client or prospective client; (B) to engage in any transaction,

8    practice, or course of business which operates as a fraud or

9    deceit upon any client or prospective client; or (c) to engage

10   in any act, practice, or course of business that was

11   fraudulent, deceptive or manipulative.

12          You should be aware that an investment adviser has an

13   affirmative duty of utmost good faith, and full and fair

14   disclosure of all material facts, as well as an affirmative

15   obligation to employ reasonable care to avoid misleading his

16   clients.  An investment adviser's concealment of material

17   information which he or she is under a duty to disclose to

18   another, under circumstances where the nondisclosure can or

19   does result in harm to an investor, can constitute fraud.

20          In order to prove Mr. Amanat guilty of the crime of

21   aiding and abetting investment adviser fraud, the government

22   must prove the following elements:

23          First, that Stephen Maiden was an investment adviser;

24          Second, that Stephen Maiden did one of the following:

25   (a) employed a device, scheme, or artifice to defraud an actual

HcmWtuz5                    Charge

or prospective investor in Maiden Capital; (b) engaged in a

transaction, practice, or course of business which operated as

a fraud and deceit upon an actual or prospective investor in

Maiden Capital; or (c) engaged in an act, practice, and course

of business that was fraudulent, deceptive, and manipulative;

Third, that Stephen Maiden devised or participated in

such alleged device, scheme or artifice to defraud, or engaged

in such alleged transaction, practice, or course of business,

knowingly, willfully, and with the intent to fraud;

Fourth, that Stephen Maiden employed such alleged

device, scheme, or artifice to defraud, or engaged in such

alleged transaction, practice, or course of business, by use of

the mails or an instrumentality of interstate commerce; and

Fifth, that Mr. Amanat willfully and knowingly

associated himself in some way with Maiden's commission of

investment adviser fraud, willfully and knowingly sought by

some act to help make Maiden's crime succeed, and that he did

so with the specific intent to deceive Maiden's clients.

In addition to proving beyond a reasonable doubt all

of these elements of aiding and abetting investment adviser

fraud, the government must prove venue by establishing -- by a

preponderance of the evidence -- that an act in furtherance of

the alleged unlawful activity occurred within the Southern

District of New York.

With respect to Count Three, the first element the

HcmWtuz5                        Charge

 1    government must prove beyond a reasonable doubt is that Stephen

 2    Maiden was an investment adviser at the time Mr. Amanat is

 3    alleged to have aided and abetted Maiden's investment adviser

 4    fraud.

 5              Federal law defines "investment adviser" as follows:

 6              Investment adviser means any person who, for

 7    compensation, engages in the business of advising others,

 8    either directly or through publications or writings, as to the

 9    value of securities or as to the advisability to investing in,

10    purchasing or selling securities, or who, for compensation and

11    as part of a regular business, issues or promulgates analyses

12    or reports concerning securities.

13              In determining whether Stephen Maiden was an

14    investment adviser, you should consider the following:

15              Whether Maiden provided advice or was an adviser who

16    regarding who issued reports or analyses regarding securities;

17              Whether Maiden was in the business of providing such

18    advice; and

19              Whether Maiden was provided compensation for such

20    advice.

21              With respect to Count Three, the second element the

22    government must prove beyond a reasonable doubt is that Stephen

23    Maiden did one or more of the following:  (a) employed a

24    device, scheme, or artifice to defraud an actual or prospective

25    investor-client; (b) engaged in a transaction, practice, or

HcmWtuz5                    Charge

1   course of business which operated as a fraud and deceit upon

2   those investors or prospective investors; or (c) engaged in an

3   act, practice, and course of business that was fraudulent,

4   deceptive, and manipulative.  Any one of these types of alleged

5   fraudulent conduct, if proven by the government beyond a

6   reasonable doubt, is sufficient.  However, you must be

7   unanimous as to which type of unlawful conduct, if any, has

8   been proven by the government.  I have previously defined the

9   terms "device, scheme, or artifice to defraud," and you are to

10  follow those instructions here.

11          With respect to Count Three, the third element the

12  government must prove beyond a reasonable doubt is that Stephen

13  Maiden devised or participated in the alleged device, scheme,

14  or artifice to defraud, or engaged in the allegedly fraudulent

15  transaction, practice, or course of business, knowingly,

16  willfully, and with the specific intent to defraud.  I have

17  already defined "knowingly" and "willfully," and you are to

18  apply those same definitions here.  In order to prove that

19  Maiden acted with the intent to defraud, however, the

20  government need only prove that he acted with an intent to

21  deceive his clients.  The government need not show that he

22  acted with an intent to cause harm to those clients.

23          With respect to Count Three, the fourth element the

24  government must prove beyond a reasonable doubt is that Stephen

25  Maiden knowingly used or caused to be used the mails or an

HcmWtuz5                    Charge

instrumentality of interstate commerce, such as interstate

telephone or wire communications, in furtherance of the alleged

scheme to defraud, or the allegedly fraudulent conduct

specified in the indictment.

        The term "instrumentality in interstate commerce"

means instruments, devices and means of conducting trade,

commerce, transportation, or communication among any two

states, or between this country and a foreign country.  It is

not necessary that an investment adviser be directly or

personally involved in mailing or use of the interstate or

international instrumentality.  In an investment adviser was an

active participant in the scheme and took steps or engaged in

conduct which he knew or could reasonably foresee would

naturally and probably result in the use of the mails or

interstate wires, then you may find that he caused them to be

used.

        The items allegedly sent through the mails or

communicated through the instrumentality of interstate commerce

need not have contained fraudulent material or anything

criminal or objectionable, nor need they be central to the

execution of the alleged scheme to defraud or allegedly

fraudulent conduct.  All that is required is that the use of

the mails or instrumentalities must bear some relation to the

object of the alleged scheme or conduct.

        If the government proves each of the first four

HcmWtuz5                     Charge

elements described above beyond a reasonable doubt, it will

have established that Stephen Maiden committed investment

adviser fraud.  In order for you to find Mr. Amanat guilty of

aiding and abetting Maiden's commission of this crime, however,

the government must prove a fifth element beyond a reasonable

doubt -- namely, that Mr. Amanat aided and abetted Stephen

Maiden by (1) willfully and knowingly associating himself in

some way with Maiden's crime; (2) willfully and knowingly

seeking by some act to help make Maiden's crime succeed; and

(3) doing so with the specific intent to deceive Maiden's

clients.

          As I instructed you with regard to Count Two, a

defendant's "good faith," as I previously defined that term, is

a complete defense to a charge of aiding and abetting

investment adviser fraud.  All of the instructions I previously

gave you concerning the defendant's assertion of good faith

apply with equal force here.

          Count Four of the indictment charges that from in or

about December 2008 through in or about September 2011,

Mr. Tuzman, Mr. Amanat, and Stephen Maiden conspired to commit

securities fraud by manipulating KITDigital stock by

artificially inflating the stock's share price and trading

volume.

          To prove the securities fraud conspiracy charged in

Count Four of the indictment, the government must prove each of

1   the following elements beyond a reasonable doubt:

2            First, that the conspiracy charged in Count Four

3   existed -- that is, that from in or about December 2008 through

4   in or about September 2011, an agreement or understanding

5   between two or more people existed to commit securities fraud;

6            Second, that the defendant you are considering

7   willfully and knowingly joined and participated in that

8   conspiracy during the applicable time period;

9            Third, that during the existence of the conspiracy,

10  one of the conspirators, not necessarily the defendant you are

11  considering, knowingly committed at least one overt act in

12  furtherance of the conspiracy in the Southern District of New

13  York.

14            In addition to proving beyond a reasonable doubt all

15  of these elements of conspiracy to commit securities fraud as I

16  have explained them to you, the government must prove that an

17  act in furtherance of the alleged conspiracy took place in the

18  Southern District of New York.  As I have instructed you as to

19  venue and venue alone, the government's burden is proof by a

20  preponderance of the evidence -- more likely than not.

21            I have previously instructed you generally on the

22  requirements for finding a criminal conspiracy, and on the

23  government's obligation to show an unlawful agreement and a

24  defendant's willful and knowing participation in the charged

25  conspiracy.  My previous instructions apply with equal force

HcmWtuz5                    Charge

1    here.

2              In Count Four, however, the government charges that an

3    objective of the conspiracy was securities fraud.  Moreover,

4    before convicting on Count Four, the jury must find that the

5    government has proven that a conspirator committed an overt act

6    in furtherance of the charged conspiracy.  Accordingly, I will

7    instruct you on the elements of securities fraud, and on what

8    the government must prove to establish that a conspirator

9    committed an overt act in furtherance of the conspiracy charged

10   in Count Four.

11             In order to prove that a defendant is guilty of the

12   securities fraud conspiracy charged in Count Four, the

13   government must establish beyond a reasonable doubt that that

14   defendant agreed with others to commit securities fraud.

15             Federal law provides that, it shall be unlawful for

16   any person, directly or indirectly, by the use of any means or

17   instrumentality of interstate commerce or of the mails, or of

18   any facility of any national securities exchange...to use or

19   employ in connection with the purchase or sale of any security

20   registered on a national securities exchange, or any security

21   not so registered,...any manipulative or deceptive device or

22   contrivance in contravention of such rules and regulations as

23   the Securities and Exchange Commission may describe as

24   necessary or appropriate in the public of interest or for the

25   protection of investors.

HcmWtuz5                    Charge

1          Federal law also provides that it shall be unlawful

2     for any person, directly or indirectly, by use of any means of

3     instrumentality of interstate commerce, or of the mails or of

4     any facility of any national securities exchange (a) to employ

5     a device, scheme, or artifice to defraud; (b) to make any

6     untrue statement of a material fact or omit to state a material

7     fact necessary in order to make the statements made, in light

8     of the circumstances under which they were made, not

9     misleading; or (c) to engage in any act, practice, or course of

10    business which operates, or would operate, as a fraud or deceit

11    upon any person, in connection with the purchase or sale of any

12    security.

13         In order to prove that a defendant is guilty of

14    securities fraud, the government must establish beyond a

15    reasonable doubt the following three elements:

16         First, that in connection with the purchase or sale of

17    a security, the defendant did any one or more of the following:

18         (1) employed a device, scheme or artifice to defraud

19    or (2) made an untrue statement of material fact or omitted to

20    state a material fact that made what was said, under the

21    circumstances, misleading; or (2) engaged in an act, practice,

22    or course of business that operated, or would operate, as a

23    fraud or deceit upon a purchaser or seller.

24         Second, that the defendant acted willfully, knowingly

25    and with the intent to defraud; and

HcmWtuz5                    Charge

Third, that the defendant used, or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

I will now instruct you on each of these elements in more detail.

The first element of securities fraud that the government must prove beyond a reasonable doubt is that, in connection with the purchase or sale of a security, a defendant did any one of the following:

(1) employed an device, scheme, or artifice to defraud;

(2) made an untrue statement of material fact or omitted to state a material fact that made what was said, under the circumstances, misleading; or

(3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.

As an initial matter, you should be aware that KITDigital's shares are a "security" within the meaning of federal law.

In connection with proving a fraudulent act, it is not necessary for the government to prove all three types of unlawful conduct in connection with the purchase or sale of a security. Any one will be sufficient to satisfy this element

of the offense.  You must, however, be unanimous as to which

type of unlawful conduct was the alleged object of the

conspiracy.

          I will now plain explain a number of terms used in

this provision.  A "device, scheme or artifice to defraud" is

merely a plan for the accomplishment of any fraudulent

objective.  "Fraud" is a general term that embraces all efforts

and means that individuals devise to take unfair advantage of

others.  The law that the defendants are alleged to have

violated prohibits all kinds of manipulative and deceptive

acts.  The fraudulent or deceitful conduct alleged need not

relate to the investment value of the securities involved in

this case.

          A statement, representation, claim or document is

false if it is untrue when made and was known to be untrue by

the person making it or causing it to be made.  A

representation or statement is fraudulent if it is made with

the intent to deceive.  The concealment of material facts in a

manner that makes what is said or represented deliberately

misleading may also constitute false or fraudulent statements

under the statute.  The failure to disclose information may

also constitute a fraudulent representation if the defendant

was under a legal, professional or contractual duty to make

such a disclosure, the defendant actually knew such disclosure

was required to be made, and the defendant failed to make such

HcmWtuz5                    Charge

1    disclosure with the intent to defraud.

2              The deception need not be based upon spoken or written

3    words alone.  The arrangement of the words, or the

4    circumstances in which they are used, may convey the false and

5    deceptive appearance.  If there is deception, the manner in

6    which it is accomplished does not matter.

7              You cannot find that the government has proven the

8    first element unless you find that the defendant you are

9    considering participated, or agreed to participate, in

10   fraudulent conduct that was "in connection with" a purchase or

11   sale of securities.  The requirement that the fraudulent

12   conduct be in connection with the purchase or sale of

13   securities is satisfied so long as there was some nexus or

14   relation between the allegedly fraudulent conduct and the sale

15   or purchase of securities.  Fraudulent conduct may be "in

16   connection with" the purchase or sale of securities if you find

17   that the alleged conduct "touched upon" a securities

18   transaction.  You need not find that the defendant you are

19   considering actually participated in any specific purchase or

20   sale of a security if you find that the defendant participated,

21   or agreed to participate, in the fraudulent conduct that was

22   "in connection with" a "purchase or sale" of securities.

23             It is no defense to an alleged scheme to defraud that

24   the defendants were not involved in the scheme from its

25   inception or played only a minor role with no contact with the

1    investors and purchasers of the securities in question.  Nor is

2    it necessary for you to find that the defendants were the

3    actual sellers of the securities.  It is sufficient if the

4    defendants participated in the scheme or fraudulent conduct

5    that involved the purchase or sale of securities.  By the same

6    token, the government need not prove that the defendant

7    personally made the misrepresentation or that the defendant

8    omitted the material fact.  It is sufficient if the government

9    establishes that the defendant caused the statement to be made

10   or the fact to be ommitted.

11          With regard to the misrepresentations and omissions

12   that the government alleges, you must determine whether the

13   statements were true or false when made, and, in the case of

14   alleged omissions, whether the omissions were misleading.

15          If you find that the government has established beyond

16   a reasonable doubt that a statement was false, or that a

17   statement was omitted that rendered the statements that were

18   made misleading, you must next determine whether the statement

19   or omission was material under the circumstances.

20          Material information in this context is information

21   that a reasonable investor would have considered significant in

22   deciding whether to buy, sell or hold securities, and at what

23   price to buy or sell securities.  Put another way, there must

24   be a substantial likelihood that the information at issue would

25   have been viewed by the reasonable investor as having

HcmWtuz5                    Charge

significantly altered the total mix of information then

available.  When you assess whether a piece of information is

material, you may consider, among other things, whether that

information did or would have caused the price of KITDigital's

stock to increase or drop.

         Your consideration of the element of materiality must

be based on the facts existing at the time the actions alleged

by the government were committed; materiality cannot be judged

in hindsight.

         In determining whether certain information is

material, you must consider this issue from the perspective of

a reasonable investor -- and not from the perspective of

KITDigital employees or other individuals who may possess

information and perspectives different than a reasonable

investor.  Any testimony that you may have heard with respect

to whether a particular fact would or would not have been

important to him or to investors in general reflect that

witness's individual views.  Although you may consider such

testimony, it is not controlling.  It is for you to determine

whether a particular fact would have been significant to a

reasonable investor in making an investment decision.

         In considering whether a statement or omission was

material, let me caution you that it is not a defense if the

material misrepresentation or omission would not have deceived

a person of ordinary intelligence.  Once you find that the

HcmWtuz5                    Charge

offense involved the making of material misrepresentations or

omissions of material facts, it does not matter whether the

intended victims were gullible buyers or sophisticated

investors, because the securities law affect gullible and

unsophisticated as well as the experienced investor.

Nor does it matter whether the alleged unlawful

conduct was successful or not, or whether the defendant

profited or received any benefit as a result of the alleged

scheme.  Success is not an element of the crime charged.  If

you find that the defendant you are considering expected to or

did profit from the alleged scheme, however, you may consider

that in relation to the element of intent, which I will discuss

in a moment.

With respect to the first element of conspiracy to

commit securities fraud, the government claims that Mr. Tuzman

and Mr. Amanat conspired to manipulate the market for

KITDigital stock by arranging for Stephen Maiden to purchase

KITDigital stock in a manner that was intended to artificially

inflate the price of KITDigital stock and to artificially

increase trading volume in KITDigital stock.

In connection with this first element, the government

must prove that Mr. Tuzman and Mr. Amanat agreed to engage in

intentional and willful conduct designed to deceive or defraud

KITDigital investors by artificially distorting the price of

KITDigital stock, such that the price of that stock was not

HcmWtuz5                    Charge

determined by the natural interplay of supply and demand.   The

purchase or sale of stock may, of course, be engaged in for

entirely legitimate economic reasons.   Accordingly, the

government must prove beyond a reasonable doubt that each

defendant agreed to engage in conduct with the sole intent to

(1) create a false impression of market activity regarding

KITDigital stock, and (2) artificially distort the price of

KITDigital stock, rather than for legitimate investment

purposes.   Manipulative intent must be demonstrated as to each

defendant, but can be inferred from conduct that a defendant

engaged in.

          The second element of securities fraud that the

government must establish beyond a reasonable doubt is that the

defendant participated in the scheme to defraud knowingly,

willfully, and with the intent to defraud.   My previous

instructions concerning "knowingly" and "willfully" apply with

equal force here.

          In the context of securities laws, "intent to defraud"

means to act knowingly and with the intent to deceive.

          Since an essential element of securities fraud is

intent to defraud, good faith, as I have previously defined

that term, is a complete defense to a charge of securities

fraud.   My prior instructions concerning good faith apply with

equal force here.

          The third element of securities fraud that the

HcmWtuz5                    Charge

government must prove beyond a reasonable doubt is that the

defendant knowingly used, or caused to be used, an

instrumentality of interstate commerce in furtherance of the

scheme to defraud.

        Examples of instrumentalities of interstate commerce

include an interstate telephone call, use of the mails, or use

of a facility of a national securities exchange, such as a

stock or options trade made on the NASDAQ, the New York Stock

Exchange, or over-the-counter markets.

        The government need not prove that a defendant was

directly or personally involved in the use of an

instrumentality of interstate commerce.  If the defendant was

an active participant in the scheme and took steps or engaged

in conduct that he knew or could reasonably foresee would

naturally and probably result in the use of an instrumentality

of interstate commerce, this element would be satisfied.

        Nor is it necessary that the items sent through the

mails or communicated through an instrumentality of interstate

commerce did or would contain the fraudulent material, or

anything criminal or objectionable.

        The use of the mails or instrumentality of interstate

commerce need not be central to the execution of the scheme or

even be incidental to it.  All that is required is that the use

of the mails or instrumentality of interstate commerce bear

some relation to the object of the scheme or fraudulent

HcmWtuz5                         Charge

1    conduct.

2           Moreover, the actual purchase or sale of a security

3    need not be accompanied by the use of the mails or an

4    instrumentality of interstate commerce, so long as the mails or

5    instrumentality of interstate commerce are used in furtherance

6    of the scheme and the defendant is still engaged in actions

7    that are part of a fraudulent scheme when the mails or the

8    instrumentalities of interstate commerce are used.

9           The third element of Count Four that the government

10   must prove beyond a reasonable doubt is the commission of an

11   overt act by the defendant you are considering or a

12   coconspirator.  To sustain its burden of proof, the government

13   must show beyond a reasonable doubt that at least one overt act

14   was committed in furtherance of the conspiracy by at least one

15   of the coconspirators -- but not necessarily the defendant you

16   are considering.

17          The purpose of the overt act requirement is clear.

18   There must have been something more than mere agreement; some

19   overt step or action must have been taken by at least one of

20   the conspirators in furtherance of the conspiracy.  The

21   government must prove beyond a reasonable doubt that a member

22   of the conspiracy charged in Count Four took some step or

23   action in furtherance of the conspiracy in the Southern

24   District of New York during the life of the conspiracy.

25          In order for the government to satisfy the overt act

HcmWtuz5                    Charge

requirement, it is not necessary for it to prove any particular

overt act, or even that the defendant you are considering

committed an overt act.  It is sufficient for the government to

show that the defendant you are considering or one of his

alleged coconspirators knowingly committed an overt act in

furtherance of the conspiracy.

Although a number of overt acts are alleged in the

indictment, in order to satisfy the overt act requirement, the

government is not required to prove any of these alleged overt

acts.  An overt act is sufficient, whether alleged in the

indictment or not, if you are convinced beyond a reasonable

doubt that it was committed by a coconspirator in furtherance

of the conspiracy, while the conspiracy was in existence, and

within the Southern District of New York.

However, you must all agree on at least one overt act

that a conspirator committed to satisfy this element.  In other

words, it is not sufficient for you to agree that some overt

act was committed without agreeing on which overt act was

committed.  You must all agree on the same overt act.

You should also bear in mind that the overt act,

standing alone, may be an innocent, lawful act.  What matters

is whether the overt act is a step in carrying out, promoting,

aiding or assisting the conspiratorial scheme.

Finally, there is an additional element that the

government must prove beyond a reasonable doubt with respect to

HcmWtuz5                    Charge

1     the conspiracy charged in Count Four.  That element relates to

2     timing.  The government must prove beyond a reasonable doubt

3     that Mr. Tuzman, Mr. Amanat, or one of their alleged

4     coconspirators committed at least one overt act in furtherance

5     of the charged conspiracy to manipulate the market for

6     KITDigital's stock after August 12, 2010.

7              Count Four of the indictment charges that from in or

8     about December 2008 through in or about September 2011,

9     Mr. Tuzman and Mr. Amanat conspired to commit securities fraud

10    in connection with a scheme to manipulate the shares of

11    KITDigital by artificially inflating the share price and

12    trading volume of KITDigital shares.  The government is not

13    required to prove that the alleged conspiracy started and ended

14    on any specific date.  It is sufficient if you find that the

15    conspiracy was formed and that it existed for some time within

16    or around the dates set forth in the indictment.

17             Count Five of the indictment charges that between in

18    or about 2009 and in or about March 2011, Mr. Tuzman and others

19    conspired to commit wire fraud.  The wire fraud conspiracy

20    charged in Count Five relates to an alleged scheme to defraud

21    KITDigital's shareholders by failing to disclose that

22    KITDigital's investments with Maiden Capital were not part of

23    an arm's-length relationship, but rather were related-party

24    transactions entered into for an improper purpose.  The

25    government claims that Mr. Tuzman falsely represented to

HcmWtuz5                    Charge

1    KITDigital that a $250,000 KITDigital investment with Maiden

2    Capital was a legitimate investment, whereas Mr. Tuzman and

3    Maiden had agreed it was instead to be paid to Mr. Tuzman for

4    his personal use.

5           In order to prove the wire fraud conspiracy charged in

6    Count Five, the government must prove each of the following

7    elements beyond a reasonable doubt:

8           First, that the conspiracy charged in Count Five

9    existed -- that is, that from in or about 2009 through in or

10   about March 2011, an agreement or understanding between two or

11   more people existed to commit wire fraud; and

12          Second, that Mr. Tuzman willfully and knowingly joined

13   or participated in that conspiracy during the time period

14   charged in Count Five.

15          I instructed you on the elements of conspiracy to

16   commit wire fraud in connection with Count One.  Those

17   instructions apply with equal force here.

18          In addition to proving beyond a reasonable doubt all

19   of these elements of conspiracy to commit wire fraud as I have

20   explained them to you, the government must prove that an act in

21   furtherance of the alleged conspiracy occurred within the

22   Southern District of New York.  As I instructed you, as to

23   venue and venue alone, the government's burden is proof by a

24   preponderance of the evidence -- more likely than not.

25          As I instructed you in connection with the wire fraud

1    conspiracy charged in Count One, in order to prove that the

2    defendant committed wire fraud, the government must establish

3    beyond a reasonable doubt the following three elements:

4        First, that in or about the time period alleged in the

5    indictment, there was a scheme or artifice to defraud others of

6    money and property by false or fraudulent pretenses,

7    representations, or promises;

8        Second, that the defendant knowingly and willfully

9    devised or participated in the scheme or artifice to defraud,

10   with knowledge of its fraudulent nature and with a specific

11   intent to defraud; and

12       Third, that in the execution of that scheme, the

13   defendant used, or caused the use by others of, interstate or

14   international wires.

15       I have already defined each of these elements in my

16   instructions concerning Count One.  Those instructions apply

17   with equal force here.

18       The indictment alleges that the wire fraud conspiracy

19   charged in Count Five took place from at least in or about 2009

20   up to in or about March 2011.  The government is not required

21   to prove that the alleged conspiracy started and ended on any

22   specific date.  It is sufficient if you find that the

23   conspiracy was formed and that it existed for some time within

24   or around the dates set forth in the indictment.

25       Count Six:  Conspiracy to Commit Securities Fraud,

HcmWtuz5                    Charge

Make False Statements in SEC Filings, and Make False Statements
to Auditors.

          Count Six of the indictment charges that, from in or
about 2009 through in or about April 2012, Mr. Tuzman conspired
to:  (1) commit securities fraud; (2) make false statements in
KITDigital's annual and quarterly reports filed with the
Securities and Exchange Commission; and (3) make false
statements to KITDigital's auditors.

          In order to prove the conspiracy charged in Count Six,
the government must prove each of the following elements beyond
a reasonable doubt:

          First, that the conspiracy charged in Count Six
existed -- that is, that from in or about 2009 through in or
about April 2012, an agreement or understanding between two or
more people existed to commit the conspiracy charged in Count
Six;

          Second, that Mr. Tuzman willfully and knowingly joined
or participated in that conspiracy during the applicable time
period;

          Third, that during the existence of the conspiracy,
one of the conspirators, not necessarily Mr. Tuzman, knowingly
committed at least one overt act in furtherance of the
conspiracy in the Southern District of New York.

          I have previously instructed you generally on the
elements of criminal conspiracy and on the government's burden

HcmWtuz5                    Charge

1    to prove the unlawful agreement and a defendant's membership in

2    the charged conspiracy.  All of those instructions apply with

3    equal force here.

4              Count Six charges Mr. Tuzman with participating in a

5    conspiracy with three distinct objectives: securities fraud;

6    causing KITDigital to make misstatements in filings with the

7    Securities and Exchange Commission; and making misstatements to

8    KITDigital's auditors.

9              In order to convict on Count Six, you need not find

10   that Mr. Tuzman conspired to achieve all three objectives.  The

11   government must prove, however, that Mr. Tuzman and his

12   conspirators had a conspiratorial agreement as to at least one

13   of these objectives, and you must unanimously agree on which

14   objective that was.  You cannot find Mr. Tuzman guilty on Count

15   Six unless you unanimously agree as to at least one objective

16   alleged in Count Six.

17             I will now provide instructions regarding each of the

18   three objectives alleged in Count Six.

19             The first alleged objective of the conspiracy charged

20   in Count Six is securities fraud.  I instructed you on the

21   elements of securities fraud in connection with Count Four, and

22   you should follow those instructions here.  I do want to

23   expand, however, on my instructions as to what is material.

24             In assessing whether a misstatement or omission is

25   material, both quantitative and qualitative factors should be

HcmWtuz5                    Charge

considered.  In assessing whether a stated or omitted fact is

quantitatively material, you should consider the financial

magnitude of the misstatement or omission.  Under this inquiry,

an omission or misstatement of an item in a financial report is

quantitatively material if, in light of surrounding

circumstances, the magnitude of the item is such that it is

probable that the judgment of a reasonable person relying upon

the report would have been changed or influenced by the

inclusion or correction of the item.

However, the magnitude of a misstatement is only the

beginning of an analysis of materiality.  You should also

consider whether qualitative factors make a misstatement or

omission material.  With respect to financial statements,

qualitative factors may cause misstatements of quantitatively

small amounts to be material.

In assessing whether a misstatement or omission is

qualitatively material, you may consider, among other factors:

whether the misstatement masks a change in earnings or other

trends; whether the misstatement hides a failure to meet

analysts' consensus expectations for the enterprise; whether

the misstatement changes a loss into income or vice versa;

whether the misstatement affects the registrant's compliance

with regulatory requirements; whether the misstatement has the

effect of increasing management's compensation -- for example,

by satisfying requirements for the award of bonuses or other

HcmWtuz5                      Charge

forms of incentive compensation; whether the misstatement

involves concealment of an unlawful transaction.

This is not an exhaustive list.

The second alleged objective of the conspiracy charged

in Count Six is making, or causing to be made, false statements

in reports and documents required to be filed with the

Securities and Exchange Commission.

Federal law provides that any person who willfully and

knowingly makes, or causes to be made, any statement in any

application, report, or document required to be filed under

this chapter or any rule or regulation thereunder...which

statement was false or misleading with respect to any material

fact shall be guilty of a federal crime.

This statute makes it unlawful to willfully make

materially false and misleading statements in applications,

reports, and documents required to be filed with the SEC.

To establish that Mr. Tuzman conspired to violate this

provision, the government must prove each of the following

elements:

First, that federal law required KITDigital to file

annual and quarterly reports with the SEC; and

Second, that Mr. Tuzman agreed to knowingly and

willfully make, or cause to be made, a materially false or

misleading statement in an annual or quarterly report filed

with the SEC.

HcmWtuz5                          Charge

1          The government must first show that federal law

2    required KITDigital to file annual and quarterly reports with

3    the SEC.  I instruct you now that a corporation that has

4    publicly traded securities is required to file annual reports

5    on Form 10-K, quarterly reports on Form 10-Q, and reports on

6    Form 8-K regarding, among other things, any public announcement

7    or release that discloses material nonpublic information

8    regarding the company's results of operations or financial

9    condition for a completed quarterly or annual fiscal period.

10   Thus, if you conclude that shares of KITDigital were publicly

11   traded, the company was required to file these reports with the

12   SEC.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The government must next prove that

2    Mr. Tuzman agreed to knowingly and willfully make or cause to

3    be made materially false and misleading statements in the SEC

4    report you are considering.

5          As I have instructed you, a statement or

6    representation is false if it was untrue when made and known at

7    the time to be untrue by the person making it or causing it to

8    be made.  A statement is misleading if it is either an untrue

9    statement as to a material fact or if it omits to state a

10   material fact necessary in order to make the statement made in

11   light of the circumstances under which they were made not

12   misleading.

13         I have defined the term "material" for you in

14   connection with Count Four in connection with this count.  I

15   have also previously defined the terms "knowingly" and

16   "willfully."  Those same definitions apply here.

17         To establish this element, the government need not

18   prove that Mr. Tuzman himself physically made or otherwise

19   personally prepared the SEC reports in question.  It is

20   sufficient if the government proves beyond a reasonable doubt

21   that Mr. Tuzman causes materially false information to be filed

22   by some person.

23         The third illegal objective of the conspiracy charged

24   in Count Six is making or causing to be made materially false

25   and misleading statements to KIT Digital's auditors.

HCMTTUZ6                    Charge

1          Federal law provides that no director or officer of an

2     issuer shall, directly or indirectly, make or cause to be made

3     a materially false or misleading statement, or, two, omit to

4     state or cause another person to omit to state any material

5     fact necessary in order to make statements made, in light of

6     the circumstances under which such statements were made, not

7     misleading to an accountant in connection with, one, any audit,

8     review or examination of the financial statements of the issuer

9     required to be made pursuant to this subpart, or two, the

10    preparation or filing of any document or report required to be

11    filed with the SEC.  Federal law also provides that anyone

12    violating this provision of is guilty of a crime.

13          Accordingly, to prove a defendant is guilty of the

14    substantive offense of making false statements to auditors, the

15    government must establish the following elements beyond a

16    reasonable doubt:

17          First, that the defendant was a director or officer of

18    a corporation that publicly traded securities; second, that the

19    defendant made or caused to be made a materially false or

20    misleading statement to an auditor, either in connection with

21    an audit or an examination of the company's financial

22    statements or the preparation or filing of any document or

23    report required to be filed with the SEC; and third, that the

24    defendant acted willfully.

25          "Willfully" has the same meaning I provided to you

1    earlier.  A person acts willfully if he acts deliberately and

2    with the intent to do something that the law forbids, that is,

3    with a bad purpose to disobey or disregard the law.

4            I have also already described for you the concepts of

5    falsity and materiality and have explained that a public

6    company is required to file financial statements with the SEC.

7    You should apply those same instructions here.

8            Count Six of the indictment charges that Kaleil Isaza

9    Tuzman conspired to commit securities fraud, make false

10   statements in SEC filings, and make false statements to

11   auditors in connection with the scheme to deceive KIT Digital

12   shareholders members of the investing public, KIT Digital's

13   auditors, and others from in or about 2009 through in or about

14   April 2012.

15           The government is not required to prove that the

16   alleged conspiracy started and ended on any specific date.  It

17   is sufficient if you find that the conspiracy was formed and

18   that it existed for some time within or around the dates set

19   forth in the indictment.

20           With respect to Counts One, Four and Six, Mr. Tuzman

21   and Mr. Amanat contend the government has not proven the single

22   conspiracy charge in each count, but, at best, has offered

23   proof of several separate and independent conspiracies with

24   different members.  Whether there existed a single unlawful

25   agreement or many such agreements, or indeed no agreement at

HCMTTUZ6                    Charge

1    all, is a question of fact for you, the jury, to determine in

2    accordance with my instructions on the law.

3            When two or more people join together to further one

4    common unlawful design or purpose, a single conspiracy exists.

5    By way of contrast, multiple conspiracies exist when there are

6    separate unlawful agreements to achieve distinct purposes.  You

7    may find that there was a single conspiracy despite the fact

8    that there were changes in either personnel or activities or

9    both, so long as you find that some of the co-conspirators

10   continued to act for the entire duration of the conspiracy for

11   the purpose or purposes charged in the count you are

12   considering.  The fact that the members of a conspiracy are not

13   always identical does not necessarily imply that separate

14   conspiracies exist.

15           On the other hand, if you find that the single

16   conspiracy charged in the count you are considering did not

17   exist, you cannot find any defendant guilty of the single

18   conspiracy charged in that count.  That is so even if you find

19   that some conspiracy, other than the one charged in the count

20   you are considering, existed even though the purpose of both

21   conspiracies may have been same, and even though there may have

22   been some overlap in membership.

23           Similarly, if you find that a particular defendant was

24   a member of another conspiracy, and not the one charged in the

25   count you are considering, then you must acquit the defendant

1    on that conspiracy charge.

2              As you know, Omar Amanat is charged in Counts One

3    through Three with wire fraud, wire fraud conspiracy, and

4    aiding and abetting investment advisor fraud by Stephen Maiden.

5    As to each alleged crime charged in counts one through three,

6    the indictment alleges that Mr. Amanat's criminal conduct took

7    place between March 2009 and 2012.

8              As you also know, Mr. Tuzman is not charged in Counts

9    One through Three.

10             In connection with Counts One through Three, you heard

11   evidence regarding alleged events that took place in 2008 and

12   early 2009.  Some of this evidence was in the form of emails.

13   Proof regarding events that took place in 2008 and early 2009

14   is outside the time period charged in Counts One through Three.

15   This evidence was admitted for the limited purpose of providing

16   background to the crimes alleged in this case, and you may not

17   rely on this evidence for any other purpose.

18             I want to emphasize that Mr. Amanat and Mr. Tuzman are

19   not charged in this case with defrauding Mr. Maiden.

20   Mr. Amanat is also not charged in Counts One through Three with

21   any fraudulent activity that took place before March 2009.

22             Mr. Amanat is also not charged with defrauding KIT

23   Digital.  He is charged with allegedly working with Mr. Maiden

24   to defraud Maiden Capital investors beginning in March of 2009.

25             As I have instructed throughout the case, the

1   background evidence admitted in this case was admitted for

2   limited purposes.  You may consider this evidence only for the

3   purpose of deciding whether a defendant had the state of mind,

4   knowledge, or intent necessary to commit the crimes charged in

5   the indictment or had a motive to commit the crimes charged in

6   the indictment.

7          The defendants are not on trial for committing any of

8   the acts that predate the time period of the charged crimes.

9   You may not consider this background evidence as a substitute

10  for proof that the defendants committed the crimes charged.

11  You may not consider this evidence as proof that the defendant

12  has a bad character or any propensity to commit crimes.  You

13  also are prohibited from using this evidence to conclude that

14  because the defendant may have committed some other act, he

15  must have also committed the crimes charged in the indictment.

16         Final instructions concerning procedure.

17         If, during your deliberations, you have any doubt as

18  to any of the testimony, you will be permitted to request that

19  portions of the trial transcript be sent back to you in the

20  jury room.  If you want any testimony, please remember that it

21  is not always easy to locate what you might want, so be as

22  specific as you possibly can be in requesting portions of the

23  testimony.  All of the documentary exhibits that have been

24  received in evidence will be sent into the jury room.  You may

25  also request non-documentary evidence, and that will be shown

HCMTTUZ6                    Charge

1   to you here in the courtroom.

2            Certain exhibits that are too voluminous for printing,

3   such as trading records and Excel spreadsheets, will be made

4   available to you here in the courtroom upon your request.

5            An index reflecting materials received in evidence

6   will be provided you to.

7            If you want any further explanation of the law as I

8   have explained it to you, you may also request that.  As I

9   noted earlier, however, you may all take into the jury room

10  your copy of these instructions.

11           Any communication to me should be made in writing,

12  signed by your foreperson, include the date and time, and be

13  given to one of the marshals.

14           Please make any notes as clear and precise as

15  possible.  Do not tell me or anyone else how the jury stands on

16  any issue until after a unanimous verdict is reached.

17           Your function is to weigh the evidence in this case

18  and to decide whether the government has proven beyond a

19  reasonable doubt each of the essential elements of the crimes

20  with which the defendants are charged.  If the government has

21  succeeded in meeting its burden, your verdict should be guilty.

22  If it has failed do so, it should be not guilty.  You must base

23  your verdict solely on the evidence and these instructions as

24  to the law, and you are obligated under your oath as jurors to

25  follow the law as I instruct you, whether you agree or disagree

HCMTTUZ6                         Charge

with the particular law in question.

It is your duty as jurors to consult with one another
and to deliberate with a view towards reaching an agreement.
As you deliberate, please listen to the opinions of your fellow
jurors and ask for an opportunity to express your own views.
Every juror should be heard.  No one juror should hold center
stage in the jury room and no one juror should control or
monopolize the deliberations.

Each of you must decide the case for yourself, but you
should do so only after a consideration of the case with your
fellow jurors, and you should not hesitate to change an opinion
when convinced that it is erroneous.  Discuss and weigh your
respective opinions dispassionately, without regard to sympathy
or to prejudice or favor for either side, and adopt that
conclusion which in your good conscience appears to be in
accordance with the truth.

Your verdict must be unanimous as to each charge in
the indictment.  However, you are not bound to surrender your
honest convictions concerning the effect or weight of the
evidence for mere the purpose of returning a verdict or solely
because of the opinion of other jurors.  Each of you must make
your own decision about the proper outcome of this case based
on your consideration of the evidence and your discussions with
your fellow jurors.  No juror should surrender his or her
conscientious beliefs solely for the purpose of returning a

1    unanimous verdict.

2            Remember at all times you are not partisans, you are

3    judges, judges of the facts.  Your sole interest is to

4    determine whether the government has proven the defendants'

5    guilt beyond a reasonable doubt.  If you are divided, do not

6    report how the vote stands, and if you have reached a verdict,

7    do not report what it is until you are asked in open court.

8            A number of you have taken notes during the trial.

9    Your notes are to be used solely to assist you and are not to

10   substitute for your recollection of the evidence in the case.

11   Any notes that you may take are not evidence.  The fact that a

12   particular juror has taken notes entitles that juror's views to

13   no greater weight than those of any other juror, and your notes

14   are not to be shown to any other juror during your

15   deliberations.

16           I have prepared a verdict form for you to use in

17   recording your decision.  Please use that form to report your

18   verdict.

19           I referred a moment ago to a foreperson.  It is

20   customary for juror number one to serve as the foreperson, and

21   that is what we will do here.  The foreperson doesn't have any

22   more power or authority than any other juror, and her vote or

23   opinion doesn't count for any more than any other juror's vote

24   or opinion.  The foreperson is merely your spokesperson to the

25   Court.  She will send out any notes and when the jury has

HCMTTUZ6

reached a verdict, she will notify the marshal that the jury

has reached a verdict, and you will come into open court and

deliver your verdict.

          After you have reached a verdict, your foreperson will

fill in the form that has been given to you, sign and date it,

and advise the marshal outside your door that you are ready to

return to the courtroom.  Each of you must be in agreement with

the verdict, which is announced in court.  Once your verdict is

announced by your foreperson in open court and officially

recorded, it cannot ordinarily be revoked.

          During your deliberations, all the rules of conduct

concerning outside influences remain in effect.  As I have

instructed you, your verdict must be based solely on the

evidence presented in this courtroom.  Accordingly, you are

still not permitted to discuss this case with anyone but your

fellow jurors, and you may not read anything in the newspapers

or over the internet or anyplace else about this case.  Also,

do not listen or watch any reporting about this case if it

should be broadcast on TV or over the radio.

          Members of the jury, that concludes my instructions.

I ask you to remain seated while I confer with the lawyers to

see if there are any additional instructions that they wish me

to give.

          (At sidebar)

          THE COURT:  Are there any exceptions to the charge?

HCMTTUZ6

1          MR. JACKSON:  Your Honor, I'm sorry, I have one

2    request.  During the rebuttal summation, while I was looking at

3    the instructions, there was an argument that Mr. Amanat owned

4    Maiden Capital.  I don't believe there's any evidence to that

5    effect.  So I think it could create some real confusion in

6    terms of Count Three, which is aiding and abetting investment

7    advisor fraud.

8          I would ask for a very brief instruction that just

9    says that that there is no evidence that Mr. Amanat owned

10   Maiden Capital, and that the jury should not consider that in

11   determining whether or not the government has met its burden

12   with regard to Count Three the investment advisor fraud charge.

13         MS. GRISWOLD:  I believe there was testimony from

14   Mr. Maiden that he installed his wife, Mr. Amanat's wife, as

15   the managing member of Maiden Capital in that loan agreement

16   from June 2011.  The managing member of Maiden Capital I think

17   is consistent with regard to the argument of ownership.

18         MR. JACKSON:  I don't think so.  And Mr. Maiden

19   specific's testimony was that she was installed for about four

20   days as the management member where he made it clear it was

21   done in order to just to give some visibility to whether or not

22   a particular transaction had been completed.  He conceded that

23   immediately.

24         So either way, that's not Mr. Amanat, that's Helena

25   Houdova.  There's no evidence that Mr. Amanat ever owned Maiden

HCMTTUZ6

 1   Capital.  It's not a major point, but it makes a big difference

 2   in terms of Count Three, investment advisor fraud, and the jury

 3   may be very well confused and think Mr. Amanat can be held

 4   liable as an investment advisor, which he can't.

 5          THE COURT:  I would also comment that I believe I saw

 6   something, an email, perhaps, maybe a document, I don't know,

 7   in which Maiden referred to the fact that I think he meant -- I

 8   think he was referring to the fact that Amanat owned everything

 9   now.

10          MS. GRISWOLD:  Yes, your Honor.

11          THE COURT:  Was it an email?

12          MS. GRISWOLD:  Well, I don't know what you're

13   remembering, but there's an attachment to one of those loan

14   agreements in June 2011, and that attachment lists all the

15   holdings of Maiden Capital at the time, and the testimony was

16   under that set of agreements that Mr. Amanat had ownership and

17   control of everything that Maiden Capital had at that point.

18          THE COURT:  You don't remember that?

19          MR. JACKSON:  What I remember, your Honor, is an email

20   that says Mr. Maiden says, again, you have claim to all my

21   assets, and he makes a statement like something to the effect

22   of it's weird that you won't return my phone calls.

23          However, your Honor, the problem is there are banks

24   that have claim to all of the assets of a particular entity.

25   If a loan had been made, for example, and they're secured by

HCMTTUZ6

1    the loan, that doesn't make the bank the owner, and certainly

2    it wouldn't make them liable for investment advisor fraud

3    because they provided a loan that was secured by the assets of

4    the entity.  And I'm not asking for a lot of factual

5    instruction, I just really am concerned that the jurors could

6    think oh, well, Mr. Williams said he's the owner, so he's an

7    investment advisor, therefore he's guilty.

8           THE COURT:  So you're concerned the jury might think

9    that your client, Mr. Amanat, is actually an investment advisor

10   under the Investment Advisers Act, is that what you're saying?

11          MR. JACKSON:  Yes, your Honor.

12          THE COURT:  You don't contest that.

13          MS. GRISWOLD:  No, your Honor.

14          THE COURT:  Would you object to me instructing them

15   that the government does not contend that Omar Amanat is an

16   investment advisor?

17          MR. WILLIAMS:  We think that would be appropriate.

18          MS. GRISWOLD:  Yes, your Honor.

19          MR. JACKSON:  Your Honor, I would be happy with that

20   if we could just add:  Does not contend that he was the owner

21   of Maiden Capital or an investment adviser, because he is not

22   legally the owner and there's no evidence that he was owner of

23   the company.

24          MS. GRISWOLD:  We don't agree with that.  I think the

25   evidence establishes that he had de facto control.  Even if it

HCMTTUZ6

1    was for a small period of time, he controlled all the assets

2    and put his wife in as the managing member.  That's de facto

3    control, so I think the argument in rebuttal is consistent with

4    the record.  The first part of the instruction that he himself

5    is not an investment advisor, we're fine with.

6                MR. JACKSON:  We defer to the wisdom of the Court, but

7    that's our argument.

8                THE COURT:  So I'm going to instruct the jury now that

9    the government does not contend that Omar Amanat is himself an

10   investment advisor.

11               MR. JACKSON:  Thank you, your Honor.

12               THE COURT:  Okay.

13               MS. GRISWOLD:  Thank you.

14               THE COURT:  There's more to come.

15               (In open court)

16               THE COURT:  Ladies and gentlemen, one other

17   instruction I wanted to give you after consulting with the

18   lawyers, that is the government does not contend that Omar

19   Amanat is himself an investment advisor.

20               (At sidebar)

21               THE COURT:  Then what I propose to do is bring up the

22   jurors who have said that they have a problem and allocute them

23   on that problem and make sure it's still a problem; if so, with

24   respect to Mr. Sabogal, I will excuse him, but telling him that

25   he has to follow all the rules of conduct, because it's

HCMTTUZ6

1      conceivable he could be asked to come back to serve on the jury

2      if one of the jurors dropped out.

3              MR. JACKSON:  That's fine, Judge.

4              THE COURT:  As to Mr. Morgan, based on the parties'

5      agreement, it's my intention to just excuse him without saying

6      that he will come back.

7              MS. GRISWOLD:  Yes, your Honor.

8              MR. JACKSON:  Yes, your Honor.

9              THE COURT:  As to Ms. Mueller, I would tell her that

10     she would be excused with the understanding she has to obey the

11     rules of conduct, because there is some possibility that she

12     might be asked to come back.

13              Okay?

14              MR. WEITZMAN:  Yes, your Honor.

15              MR. WILLIAMS:  We agree.

16              MR. JACKSON:  Yes, your Honor.

17              (Juror present)

18              THE COURT:  Hi, Mr. Sabogal.

19              I received a note earlier indicating that you are

20     going to be out of the country between December 24 and

21     January 6.  Is this preplanned travel that you have?

22              JUROR:  Yes.

23              THE COURT:  All right.  Then I'm going to excuse you

24     on the following conditions:  You need to follow all the rules

25     of conduct that I previously described, which means you can't

HCMTTUZ6

1    expose yourself to any information about the case, you can't do

2    any investigation on your own, you can't read, listen to, or

3    look at anything about the case until we are back in touch with

4    you.

5            And the reason for that, sir, is that in the event

6    that another juror had to drop out because of health problem or

7    some other unanticipated emergency, it is conceivable that we

8    might come back to you and ask to come back.  It's not a great

9    possibility of that, but it is a possibility.  And so we need

10   to make sure that in the meantime you haven't exposed yourself

11   to any information about the case or gotten any information

12   about the case.

13           So I also wanted to bring up you here to thank you for

14   your participation.

15           JUROR:  Thank you, guys.

16           THE COURT:  It was greatly appreciated by everyone

17   here, and I regret that you won't have the opportunity to

18   participate, but I understand that you have -- I think you

19   alerted us to this during jury selection, and I probably told

20   you don't worry, there's no way we'll be doing this at

21   Christmas.  So you made it known to us, and we're going to

22   honor the representation we made to you at the time that we

23   would not interfere with the trip.

24           So sir, thank you very much, and as I said, we'll be

25   back in touch with you when you're no longer subject to the

HCMTTUZ6

```
1    limitations I mentioned.
2                JUROR:  Thank you.  It was an honor, guys.
3                THE COURT:  Thank you, sir.
4                JUROR:  Thank you.
5                (Juror not present)
6                THE COURT:  Mr. Morgan, could you please approach,
7    sir.
8                (Juror present)
9                THE COURT:  Mr. Morgan, how are you, sir?
10               JUROR:  All right.
11               THE COURT:  First of all, I have a note, Court Exhibit
12   20, which identified you as someone who couldn't return as
13   December 22nd.  And then you, sir, sent a follow-up note, which
14   I marked Court Exhibit 21, which gives more information about
15   the reasons why you could not continue.
16               So what I'm prepared to tell you is that if you still
17   feel the way you set forth in your note, I am prepared to
18   excuse you at this point in time.  Is it still your wish?
19               JUROR:  Yes.
20               THE COURT:  All right.  So before excusing you, sir, I
21   wanted to tell up how much we appreciate your participation.  I
22   know it was an enormous financial burden on you, and everyone
23   here very much appreciates your willingness to serve despite
24   the financial sacrifice imposed on you.  So I will excuse you
25   at this time.  I want to thank you, sir --
```

 1                JUROR:  Thank you very much.

 2                THE COURT:  -- and you wish you the best.

 3                JUROR:  Thank you very much.

 4                (Juror not present)

 5                THE COURT:  Ms. Mueller, would you please approach,

 6   ma'am?

 7                (Juror present)

 8                THE COURT:  How are you, ma'am?

 9                JUROR:  Good, how are you?

10                THE COURT:  We have been told that you have plans to

11   be away from --

12                JUROR:  Next week.

13                THE COURT:  Right.  And I do want to sit next week

14   after Christmas.  Of course we're not going to sit on

15   Christmas, but I do want to pick up with deliberations on

16   Tuesday, assuming there's not a verdict today, because I am

17   sensitive to the burdens this case has presented on the jury.

18                And so my intention at this point, given the fact that

19   you have told us that you have pre-arranged travel between

20   December 26 and January 1st, would be to excuse you on the

21   following conditions:  All the rules of conduct that I told you

22   about would remain in effect, so that you couldn't discuss the

23   case with anybody, you couldn't expose yourself to any

24   information about the case, you couldn't read, listen to, or

25   look at anything about the case until we're back in touch with

HCMTTUZ6

1    you to release you of that obligation.

2            The reason for that is that in the event that another

3    juror was forced to drop out during deliberations because of a

4    health problem or some or emergency that could not have been

5    anticipated, it is possible that we would reach back out to

6    you.  So if it's still your wish to be excused, I am prepared

7    to excuse you on those conditions.

8            JUROR:  We have plans, so yes, I will have to be

9    excused.

10           THE COURT:  So before excusing you on the conditions

11   that I mentioned, I do want to thank you on behalf of myself

12   and all the lawyers here for your attendance and your focus on

13   the trial.  I regret that you won't be able to and deliberate

14   unless --

15           JUROR:  Me, too.

16           THE COURT:  -- someone drops out.  But nonetheless, I

17   wanted you to know how much we all appreciate the sacrifices

18   that you made in order to participate as a juror on the matter.

19   So ma'am, thank you very much.

20           JUROR:  Thank you very much.  It was very interesting.

21           THE COURT:  Thank you.

22           JUROR:  Have a nice holiday.

23           (Juror not present)

24           THE COURT:  So I'm going to swear -- Mike will swear

25   the marshal and I will tell the jury that it's my -- I'm going

HCMTTUZ6

1   to keep them until 5 o'clock today, and if they -- I suspect

2   they want to go home at 5 o'clock, and we'll resume at 9:30 on

3   Tuesday.

4           MR. JACKSON:  But your Honor will tell them they could

5   stay if they want to deliberate later today?

6           THE COURT:  I was going to leave it open.  Everybody

7   is okay with that?

8           MR. NAFTALIS:  Of course, your Honor.

9           (In open court)

10          (Marshal sworn)

11          THE COURT:  Ladies and gentlemen, in just a moment you

12  will be escorted back to the jury room.  It is my intention

13  that we would have you deliberate until 5 o'clock today.

14  However, if there's a feeling on the jury to continue longer

15  than 5 o'clock today, we're at your service.  You are in

16  control.  I ask you to deliberate at least until 5 o'clock, but

17  if there's a consensus on the jury you would like to stay later

18  than that, let us know and we will accommodate you.

19          So with that, ladies and gentlemen, thank you very

20  much.  You may begin your deliberations.

21          (Jury retired to deliberate, time noted 3:32 p.m.)

22          (Jury not present)

23          THE COURT:  I need the lawyers to put together the

24  documentary exhibits going back to the jury room.  With those

25  exhibits will go a copy of the verdict sheet.

HCMTTUZ6

1             Do you have the exhibits prepared?

2             MS. GRISWOLD:  We have the government exhibits, and I

3   believe we consulted, all sides have their own exhibits ready

4   to go.

5             THE COURT:  Excellent.

6             MR. WILLIAMS:  Your Honor, housekeeping question, do

7   you have a preference as to where we are?

8             THE COURT:  It's entirely up to you, as long as we can

9   reach you quickly and you can return to the courtroom quickly,

10  but I don't require the lawyers to stay in the courtroom.  If

11  they want to go to some convenient location, I'm fine with that

12  as long as we can reach you quickly.

13            MR. WILLIAMS:  We should write down our cell phone

14  numbers for Mr. Ruocco?

15            THE COURT:  Yes, that would be very helpful.

16            (Recess taken)

17            THE COURT:  We have received a note from the jury,

18  which I marked as Court Exhibit 22, dated today, reads as

19  follows:  We would like Stephen Maiden's full testimony on

20  direct to include his background information, signed by the

21  foreperson.

22            So we need to pull together Stephen Maiden's testimony

23  on direct examination.

24            MR. JACKSON:  Your Honor, we prepared a redacted

25  version of that.  We planned to confer with the government, but

HCMTTUZ6

1    time didn't allow so we could share that with them.

2              I don't know if you already have a redacted version.

3              MS. GRISWOLD:  No.

4              MR. JACKSON:  So we redacted a version, we redacted

5    colloquy and objections sustained, and we'll pass a copy to the

6    government if they want to take a look at that.

7              THE COURT:  Great.

8              MR. JACKSON:  Actually we have an electronic copy.

9    Ms. Rosen is going to send the electronic copy now to the

10   government so they can review it as we print -- as we begin to

11   print the direct, just the direct, because it is longer than I

12   thought it was.  So she's going to send that to the government

13   now for them to review and then print that, and we can

14   substitute any pages.

15             So if it's all right, I will ask Ms. Rosen to do that

16   now.

17             THE COURT:  Okay.  You sent it electronically to the

18   government?

19             MR. JACKSON:  We're sending it electronically to the

20   government, unless it would be easier for you to print it.

21             MR. NAFTALIS:  It's easier for us to print it because

22   we would be looking at our phones.  We don't have internet

23   access, so we would be looking at it --

24             MS. GRISWOLD:  Or if we could look at it -- unless

25   that's the printing computer.  Whatever is most efficient.  If

HCMTTUZ6

```
 1    you have redacted version to look at on your computer --
 2              MR. JACKSON:  We do.
 3              MR. WILLIAMS:  How long will it take to print?
 4              MR. JACKSON:  I think the direct is -- it's few
 5    hundred pages, so it may be faster --
 6              MR. NAFTALIS:  Would you like us to print it?
 7              MR. JACKSON:  It may be faster.
 8              MR. NAFTALIS:  You forward it to us.
 9              MR. JACKSON:  We're forwarding it to you now.
10              I just the note the version that's been sent to
11    government, to Mr. Urbanczyk, it has a few things highlighted
12    that Ms. Rosen wasn't sure what the parties' positions would be
13    in terms of colloquy and motions to strike in terms of what was
14    stricken, so as you look at that you can make a determination
15    to whether or not you're in agreement with us.  But there are a
16    couple of things highlighted, everything else I think should be
17    non-controversial.
18              MR. WILLIAMS:  Your Honor, for sake of efficiency, we
19    think Ms. Griswold and I should go back with the paralegals.
20    Mr. Naftalis will stay here.
21              MR. NAFTALIS:  I'll make sure nothing happens.
22              MR. WILLIAMS:  And we'll hustle our way back.
23              THE COURT:  Does that make sense, Mr. Jackson?
24              MR. JACKSON:  It's not who we would choose for ransom,
25    but it will work.
```

HCMTTUZ6

1          MR. NAFTALIS:  I think it was pretty clear from the

2     first day of trial that Maiden and I were not -- I didn't have

3     much to do with Maiden.

4          THE COURT:  You left that privilege to Ms. Griswold.

5          MR. NAFTALIS:  Yeah.

6          (Pause)

7          MR. NAFTALIS:  For some reason, Mr. Jackson's email

8     isn't going out.  We'll start to redact over in our office, but

9     to the extent there are issues in dispute, the question is

10    whether the parties are okay if we do a black marker here.  So

11    we won't redact anything if it's move to strike, but we wanted

12    to see how people wanted to handle this.

13         THE COURT:  What's the problem with the email, is it

14    too large a file?

15         MR. JACKSON:  It may be.  I think we're having a

16    little bit of problem because as it's being converted over into

17    this, into the email, some of the redactions are not coming

18    across, it's too big, but we're trying to fix it now.  But

19    we're happy -- I think we'll be able to fix it very shortly,

20    but we're happy with any other solution.

21         MR. WEITZMAN:  Your Honor, I appreciate the practice

22    of not doing readbacks of the entire direct testimony.

23         THE COURT:  You guys want to work on the transcript

24    together?

25         MR. WEITZMAN:  Yeah.

HCMTTUZ6

1           (Pause)

2           THE COURT:  I have received a note from the jury,

3    which I am marking as Court Exhibit 23.  Reads as follows:  We

4    have not reached a verdict.  We will return Tuesday,

5    December 26, 2017 at 9:30 a.m.

6           So I'm going bring the jury out and tell them that

7    we're still working on their request, but we'll have it ready

8    for them first thing tomorrow morning.

9           MR. JACKSON:  We'll send some other ones we have been

10   preparing.  The parties can continue, I think, to confer over

11   the weekend.

12          THE COURT:  All right.

13          (Jury present)

14          THE COURT:  I see you all have your coats on, so I

15   will make this quick.

16          First of all, ladies and gentlemen, I wanted you to

17   know we're working on our response.  It does take us a little

18   bit of time because we have to redact out all the colloquy I

19   had with the lawyers and there was some sustained objections in

20   there, so that's what we're doing.  We will have that portion

21   of the transcript ready for you on Tuesday morning.

22          I do want to tell you that on Tuesday morning your

23   deliberations cannot begin until all twelve of you are there,

24   so please no discussion about the case until all twelve of you

25   are present.

HCMTTUZ6

1          As always, don't discuss the case with anyone.  All

2     the rules of conduct remain in place.  You can't read, listen

3     to, or look at anything about the case, can't do any

4     investigation on your own, can't talk about the case with

5     anyone else.

6          Please leave all materials here.  So your notes, the

7     jury instructions I gave you today, everything stays here.  And

8     then finally, and most importantly, merry Christmas, and thank

9     you very much, I hope you have a very pleasant weekend.

10          Thank you.

11          (Jury not present)

12          THE COURT:  Anything anyone wants to raise before we

13     break?

14          MR. JACKSON:  Just curious, Judge, I know different

15     practices in courtrooms, do you expect us to come and check in

16     at 9:00 a.m.?  So you will call us if -- we'll be nearby, you

17     will call us.

18          THE COURT:  As I said, as long as you're accessible

19     and can come over quickly, you can be wherever you want to be.

20          MR. JACKSON:  I guess for this particular Monday we

21     probably need to just -- because we have some exhibits, I mean

22     we have a document we need to give to the marshal, but I assume

23     the Court doesn't have to bring them in.

24          THE COURT:  No, if there's any dispute between the

25     parties about what should be sent back there, I obviously will

HCMTTUZ6

1    need to get involved in that, but if there is agreement between

2    the parties about what should be sent back, please give the

3    transcript to Mr. Ruocco, Mr. Ruocco will give it to the

4    marshal, and that's all that has to happen.

5             MR. JACKSON:  Thank you, Judge.

6             THE COURT:  Anything else?

7             MR. JACKSON:  Have a great holiday, Judge.

8             THE COURT:  Thank you very much.  Same to all of you.

9             MR. JACKSON:  Thank you, Judge.

10            (Adjourned to December 26, 2017 at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25