UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

KALEIL ISAZA TUZMAN and
OMAR AMANAT,

Defendants.

S8 15 Cr. 536 (PGG)

---

**MEMORANDUM OF LAW IN SUPPORT OF KALEIL ISAZA TUZMAN'S
RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL AND RULE 33
MOTION FOR A NEW TRIAL**

GIBSON, DUNN & CRUTCHER LLP

AVI WEITZMAN
AMER S. AHMED
*aweitzman@gibsondunn.com*
*aahmed@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone:     (212) 351-4000
Facsimile:     (212) 351-4035

MARCELLUS ANTONIO McRAE (*pro hac vice*)
*mmcrae@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:     (213) 229-7000
Facsimile:     (213) 229-7520

*Attorneys for Defendant Kaleil Isaza Tuzman*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

I.  A JUDGMENT OF ACQUITTAL MUST BE ENTERED PURSUANT TO RULE 29
    BECAUSE THE GOVERNMENT DID NOT ADDUCE EVIDENCE OF THE
    COMMISSION OF AN OVERT ACT IN FURTHERANCE OF THE CHARGED
    MARKET MANIPULATION CONSPIRACY (COUNT FOUR) AFTER AUGUST
    12, 2010........................................................................................................................... 2

    A.  Applicable Law ................................................................................................... 3

        1.  Rule 29 Standard ..................................................................................... 3

        2.  Statute Of Limitations............................................................................. 4

    B.  Discussion ........................................................................................................... 6

        1.  At Most, The Evidence Shows That The Count Four Conspiracy Was
            Intended To Manipulate The Price Of KIT Digital Stock Prior To The August
            2009 NASDAQ Listing And Ended Immediately Thereafter......................... 6

        2.  The Post-August 12, 2010 Events That The Government Has Identified Were
            Not Overt Acts In Furtherance Of The Count Four Conspiracy................................ 11

            a)  August 2, 2011 Text Message .................................................... 11

            b)  Maiden's "Wash Trades"........................................................... 13

                (1) The Government Never Informed The Jury What A "Wash Trade" Was
                    And Adduced No Evidence Regarding Maiden's Wash Trading In KIT
                    Digital .................................................................................... 14

                (2) None Of The Supposed "Wash Trades" Had A Statistically Significant
                    Effect On KIT Digital's Stock Price. ........................................... 17

                (3) Maiden's Testimony Showed That Maiden Capital's KIT Digital Trades
                    Were Consistent With Other Trading Strategies Independent Of The
                    Count Four Conspiracy. ............................................................ 19

            c)  2011 Settlement Meeting In New York. ..................................... 23

        3.  Isaza Tuzman Can Prevail Without Proving That He Withdrew From The
            Count Four Conspiracy. ............................................................................ 24

II. A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON THE WIRE FRAUD
    CONSPIRACY COUNT (COUNT FIVE) PURSUANT TO RULE 29 BECAUSE
    THE GOVERNMENT'S THEORY WAS PREDICATED ON ALLEGED
    DECEPTION THAT DID NOT CONCERN ESSENTIAL ELEMENTS OF THE
    BARGAINED-FOR INVESTMENT. .................................................................... 25

III. ISAZA TUZMAN IS ENTITLED TO A NEW TRIAL UNDER RULE 33 DUE TO
     THE PROSECUTORS' PERVASIVE MISCONDUCT.......................................... 33

    A.  Rule 33 Standard............................................................................................... 33

B. The Prosecution Made Numerous False, Misleading, Inflammatory And Improper Statements During Its Summations.................................................................... 34

    1. Prosecutors *Repeatedly* And *Knowingly* Mischaracterized Testimony And Evidence Admitted At Trial............................................................................ 35

        a) Mischaracterization Regarding Allegedly Successful Market Manipulation ....... 35

        b) Improper Argument Falsely Implying Isaza Tuzman Received Criminal Fraud Proceeds........................................................................................... 37

        c) Improper Argument Regarding Facts Outside the Trial Record.......................... 41

    2. Prosecutors Relied On Inflammatory Rhetoric To Imply The Existence Of Inculpatory Evidence Not In The Record And Shift The Burden Of Proof. ............. 43

    3. Prosecutors Used Inflammatory Rhetoric To Improperly Denigrate Isaza Tuzman And Argue Guilt Solely By Association And Position................................. 45

    4. The *Modica* Factors Weigh In Favor Of A New Trial............................................. 47

C. Prosecutors Relied On And Failed To Correct Perjured Testimony................................ 50

    1. Legal Standards................................................................................................. 50

    2. Perjured Testimony of the Government's Cooperating Witnesses Permeated the Record. ...................................................................................................... 52

IV. A NEW TRIAL IS WARRANTED DUE TO PREJUDICIAL SPILLOVER RESULTING FROM THE JOINT TRIAL OF ISAZA TUZMAN AND AMANAT, PARTICULARLY IN LIGHT OF THE GOVERNMENT'S REBUTTAL CASE ALLEGING AMANAT'S FABRICATION OF EVIDENCE ............................................... 59

V. OTHER ERRORS AT TRIAL DEPRIVED ISAZA TUZMAN OF HIS RIGHTS TO DUE PROCESS, TO CONFRONT WITNESSES, AND TO PRESENT A DEFENSE, AND THUS WARRANT A NEW TRIAL...................................................... 64

CONCLUSION................................................................................................................ 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Protein Corp. v. AB Volvo*,
   844 F.2d 56 (2d Cir. 1988)................................................................................38

*Arizona v. Washington*,
   434 U.S. 497 (1978)........................................................................................64

*Barton v. United States*,
   263 F.2d 894 (5th Cir. 1959) ..........................................................................61

*Berger v. United States*,
   295 U.S. 78 (1935)...........................................................................34, 35, 48, 50

*Brown v. Wainright*,
   785 F.2d 1457 (11th Cir. 1986) ......................................................................51

*Carlson v. United States*,
   187 F.2d 366 (10th Cir. 1951) ..........................................................................5

*Davis v. Zant*,
   36 F.3d 1538 (11th Cir. 1994) ........................................................................37

*Flores v. United States*,
   379 F.2d 905 (5th Cir. 1967) ..........................................................................61

*Floyd v. Meachum*,
   907 F.2d 347 (2d Cir. 1990).............................................................34, 35, 43, 50

*Giglio v. United States*,
   405 U.S. 150 (1972)........................................................................................50

*Grunewald v. United States*,
   353 U.S. 391 (1957)..........................................................................................6

*Jackson v. Virginia*,
   443 U.S. 307 (1979)..........................................................................................3

*King v. United States*,
   372 F.2d 383 (D.C. Cir. 1966)..............................................................35, 48, 49

*McNally v. United States*,
   483 U.S. 350 (1987)........................................................................................32

*Mooney v. Holohan*,
   294 U.S. 103 (1935)........................................................................................50

*Napu v. Illinois*,
   360 U.S. 264, 269 (1959).................................................................................50, 51

*Reddy v. Commodity Futures Trading Comm'n*,
   191 F.3d 109 (2d Cir. 1999).............................................................................16, 41

*S.E.C. v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007)....................................................................21

*S.E.C. v. U.S. Envtl., Inc.*,
   No. 94 CIV. 6608 (PKL) (AJP), 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002)....................14

*Sanders v. Sullivan*,
   863 F.2d 218 (2d Cir. 1988)..............................................................................52

*Skilling v. United States*,
   561 U.S. 358 (2010)......................................................................................32

*U.S. v. Shellef*,
   507 F.3d 82 (2d Cir. 2007)......................................................................27, 28, 30

*United Bhd. of Carpenters & Joiners of Am. v. United States*,
   330 U.S. 395 (1947).......................................................................................3

*United States v. Aguiar*,
   737 F.3d 251 (2d Cir. 2013)...............................................................................33

*United States v. Ben Zvi*,
   242 F.3d 89 (2d Cir. 2001)..............................................................................4, 5

*United States v. Biasucci*,
   786 F.2d 504 (2d Cir. 1986)...........................................................................44, 50

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015)......................................................................27, 28, 30

*United States v. Burse*,
   531 F.2d 1151 (2d Cir. 1976).............................................................................44

*United States v. Cannon*,
   88 F.3d 1495 (8th Cir. 1996) ............................................................................46

*United States v. Cole*,
   755 F.2d 748 (11th Cir. 1985) ...........................................................................51

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012)..............................................................................3, 4

*United States v. D'Amato,*
   39 F.3d 1249 (2d Cir. 1994)...........................................................................4

*United States v. D'Angelo,*
   No. 02 CR 399 (JG), 2004 WL 315237 (E.D.N.Y. Feb. 18, 2004) .......................57

*United States v. Diaz,*
   176 F.3d 52 (2d Cir. 1999)...........................................................................5

*United States v. Farmer,*
   583 F.3d 131 (2d Cir. 2009)..........................................................................45

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001)..........................................................................33

*United States v. Fletcher,*
   928 F.2d 495 (2d Cir. 1991)........................................................................4, 6

*United States v. Francis,*
   170 F.3d 546 (6th Cir. 1999) .......................................................................45

*United States v. Freeman,*
   650 F.3d 673 (7th Cir. 2011) ....................................................................51, 59

*United States v. Gigante,*
   982 F.Supp. 140 (E.D.N.Y. 1997) ..............................................................5, 12

*United States v. Goldberg,*
   401 F.2d 644 (2d Cir. 1968)..........................................................................25

*United States v. Grimm,*
   738 F.3d 498 (2d Cir. 2013).......................................................................4, 5, 6

*United States v. Huang,*
   960 F.2d 1128 (2d Cir. 1992)........................................................................63

*United States v. Josephberg,*
   562 F.3d 478 (2d Cir. 2009)...........................................................................3

*United States v. Kapelioujnyj,*
   547 F.3d 149 (2d Cir. 2008)...........................................................................3

*United States v. Kojayan,*
   8 F.3d 1315 (9th Cir. 1993) .........................................................................42

*United States v. LaPage,*
   231 F.3d 488 (9th Cir. 2000) ..............................................................51, 52, 58

*United States v. LaSpina,*
   299 F.3d 165 (2d Cir. 2002)....................................................................5, 6

*United States v. Lincoln,*
   630 F.2d 1313 (8th Cir. 1980) ...................................................................33

*United States v. Lorenzo,*
   534 F.3d 153 (2d Cir. 2008)........................................................................4

*United States v. Manning,*
   23 F.3d 570 (1st Cir. 1994)........................................................................44

*United States v. Martinez-Medina,*
   279 F.3d 105 (1st Cir. 2002)......................................................................47

*United States v. Mittelstaedt,*
   31 F.3d 1208 (2d Cir. 1994)................................................................28, 29

*United States v. Modica,*
   663 F.2d 1173 (2d Cir. 1981)........................................................34, 35, 49

*United States v. Morgan,*
   394 F.2d 973 (6th Cir. 1968) .....................................................................61

*United States v. Mulheren,*
   938 F.2d 364 (2d Cir. 1991).........................................................................4

*United States v. Nerlinger,*
   862 F.2d 967 (2d Cir. 1988)......................................................................25

*United States v. Nersesian,*
   824 F.2d 1294 (2d Cir. 1987).....................................................................61

*United States v. Novak,*
   443 F.3d 150 (2d Cir. 2006)................................................................27, 29

*United States v. Odom,*
   888 F.2d 1014 (4th Cir. 1989) ...................................................................63

*United States v. Potter,*
   463 F.3d 9 (1st Cir. 2006).........................................................................44

*United States v. Price,*
   566 F.3d 900 (9th Cir. 2009) .....................................................................51

*United States v. Regent Office Supply Co.,*
   421 F.2d 1174 (2d Cir. 1970).............................................................27, 30, 31

*United States v. Richter*,
    826 F.2d 206 (2d Cir. 1987)...............................................................................35, 43

*United States v. Roberts*,
    618 F.2d 530 (9th Cir. 1980) ......................................................................................44

*United States v. Rodriguez*,
    738 F.2d 13 (1st Cir. 1984).........................................................................................33

*United States v. Ruggiero*,
    824 F. Supp. 379 (S.D.N.Y. 1993).............................................................................61

*United States v. Salmonese*,
    352 F.3d 608 (2d Cir. 2003)..........................................................................................5

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992).....................................................................................33

*United States v. Schwartz*,
    924 F.2d 410 (2d Cir. 1991).......................................................................................27

*United States v. Seijo*,
    514 F.2d 1357 (2d Cir. 1975).....................................................................................59

*United States v. Shareef*,
    190 F.3d 71 (2d Cir. 1999).........................................................................................34

*United States v. Stahl*,
    616 F.2d 30 (2d Cir. 1980).........................................................................................40

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987).........................................................................27, 28, 30, 31, 32

*United States v. Takhalov*,
    827 F.3d 1307 (11th Cir.) ...................................................................................28, 32

*United States v. Tarantino*,
    No. 08-CR-0655 (JS), 2012 WL 5430865 (E.D.N.Y. Nov. 7, 2012) .....................33

*United States v. Taylor*,
    464 F.2d 240 (2d Cir. 1972).........................................................................................3

*United States v. Universita*,
    298 F.2d 365 (2d Cir. 1962).................................................................................35, 37

*United States v. Valle*,
    301 F.R.D. 53 (S.D.N.Y. 2014) .........................................................................4, 5, 12, 18

*United States v. Valle*,
   807 F.3d 508 (2d Cir. 2015)................................................................4

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991)..............................................51, 52, 58, 59

*United States v. Young*,
   20 F.3d 758 (7th Cir. 1994) ...........................................................51

*United States v. Zauber*,
   857 F.2d 137 (3rd Cir. 1988) ...............................................27, 29, 30

*United States v. Zhou*,
   428 F.3d 361 (2d Cir. 2005)..............................................................3

*Zafiro v. United States*,
   506 U.S. 534 (1993)........................................................................61

**Statutes**

18 U.S.C. § 1343 .............................................................................25, 27

18 U.S.C. § 3282 ...................................................................................2

**Other Authorities**

Barbara Kollmeyer, "Why the 'big top' is already in for this stock market,"
   MarketWatch (May 24, 2016)........................................................12

Mary L. Shapiro, Testimony before the Permanent Subcommittee on
   Investigations Senate Committee on Governmental Affairs on the Securities
   Day Trading Industry (Sept. 16, 1999) ..........................................19

Press Release, "Kaleil Tuzman, Former Chairman And Ceo Of Technology Start-
   Up Company Kit Digital, And Omar Amanat Found Guilty In Manhattan
   Federal Court Of Securities Fraud Related Offenses" (Dec. 26, 2017)...................63

SEC, *Day Trading: Your Dollars at Risk* (Apr. 20, 2005) ...........................19

William Safire, "Bird-Dog Minute," New York Times, Feb. 24, 2008, *available at*
   http://www.nytimes.com/2008/02/24/magazine/24wwlnSafire-t.html..................47

**Rules**

Fed. R. Crim. P. 29 ...........................................................................1, 65

Fed. R. Crim. P. 33 ..........................................................................2, 33

Fed. R. Evid. 403 ............................................................................60, 61

## PRELIMINARY STATEMENT

Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, Kaleil Isaza Tuzman respectfully renews his motion for judgment of acquittal for all counts for failure to introduce sufficient evidence to satisfy the elements of each offense. Isaza Tuzman separately moves for an order for judgment of acquittal for Counts Four and Five, a new trial for Count Six, and a conditional order of a new trial for Counts Four and Five.[1]

During this eight-week trial, the government failed to introduce evidence necessary to satisfy its burden of proof for Counts Four and Five. As to Count Four, the evidence at trial did not show that the alleged market manipulation conspiracy was still at work within the applicable five-year statute of limitations. As to Count Five, the government did not introduce evidence— and the Court's jury instructions did not require the jury to find—that the alleged misstatements supporting the charged wire fraud conspiracy misrepresented an essential element of the bargain. The government's theory that Isaza Tuzman conspired to commit wire fraud merely by allegedly violating his fiduciary duties to shareholders is not enough under the wire fraud statute. Judgment of acquittal is thus appropriate for both Counts Four and Five.

The Court should also grant Isaza Tuzman a new trial for Counts Four, Five, and Six, for at least three separate reasons. First, the government made numerous false, misleading and inflammatory statements during its summations—from mischaracterizing evidence to improper burden shifting—that together deprived Isaza Tuzman of a fair trial. Second, the government elicited, and never attempted to correct, verifiably false testimony from its three cooperating witnesses. Third, the government's evidence that Isaza Tuzman's co-defendant, Omar Amanat,

---

[1] "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1).

submitted falsified evidence unfairly prejudiced Isaza Tuzman and likely resulted in the jury

inference that he too was involved in Omar Amanat's alleged obstruction of justice.  When faced

with such evidence, the Court respectfully erred when it failed either to exclude the evidence in

its entirety or to sever Omar Amanat from the trial.[2]

I.      **A JUDGMENT OF ACQUITTAL MUST BE ENTERED PURSUANT TO RULE 29 BECAUSE THE GOVERNMENT DID NOT ADDUCE EVIDENCE OF THE COMMISSION OF AN OVERT ACT IN FURTHERANCE OF THE CHARGED MARKET MANIPULATION CONSPIRACY (COUNT FOUR) AFTER AUGUST 12, 2010**

The Court correctly instructed the jury that the government bore the burden of proving

beyond a reasonable doubt that the alleged Count Four conspiracy to manipulate the market in

KIT Digital stock continued to operate within the five-year period before the government filed

the original indictment on August 12, 2015.[3]  But the government did not introduce evidence

sufficient to permit a reasonable jury to reach this conclusion.  Rather, the evidence admitted at

trial showed that any conspiracy had achieved its alleged goals by August 2009, when KIT

Digital was listed on the NASDAQ exchange.  And none of the overt acts that the government

has advanced within the limitations period—a text message exchange between Isaza Tuzman and

Maiden, Maiden's alleged "wash" trades, and a 2011 settlement meeting—were in furtherance of

an alleged agreement between Maiden and Isaza Tuzman to manipulate the stock of KIT Digital.

Isaza Tuzman's conviction under Count Four cannot stand and his Rule 29 motion to vacate that

conviction should be granted or, in the alternative, his Rule 33 motion granted and a new trial on

Count Four ordered.

---

[2]  Isaza Tuzman also adopts and incorporates by reference the arguments made in the motion for judgment of acquittal and for a new trial filed by Omar Amanat, Dkt. 735.

[3]  The government conceded for purposes of this case that this case was governed by the five-year statute of limitations in 18 U.S.C. § 3282, and the Court instructed the jury accordingly.

A.      **Applicable Law**

1.      **Rule 29 Standard**

"[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979).  The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have found each element of the charged offense to have been proven beyond a reasonable doubt.  *Id.* at 319.  Although the jury is "permitted to enter an . . . unreasonable verdict of 'not guilty,'" it does not have the "power to enter an unreasonable verdict of guilty." *Id.* at 317 n.10 (citing *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. 395, 408 (1947)).

To safeguard that bedrock constitutional guarantee, Rule 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  While the Court must draw all reasonable inferences in the government's favor, *United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009), the Court is nonetheless "obligated to 'consider the evidence presented at trial in its totality, not in isolation.'"  *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou*, 428 F.3d 361, 369–70 (2d Cir. 2005)).  "If the evidence is such that reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).  If the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012).

3

Accordingly, where the evidence is "in equipoise," a judgment of acquittal is required. *Id.* This requirement is designed to ensure that the jury does not convict merely because it determines that "'the defendant is **probably** guilty.'" *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)) (emphasis in original). In other words, "where the evidence viewed in the light most favorable to the government is 'at least as consistent with innocence as with guilt,' the Government has not met its burden" of proving the charged crime beyond a reasonable doubt. *United States v. Valle*, 301 F.R.D. 53, 97 (S.D.N.Y. 2014) (quoting *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994)), *aff'd in part, rev'd in part on other grounds*, 807 F.3d 508 (2d Cir. 2015) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

### 2.      Statute Of Limitations

Where a conspiracy statute requires proof of an overt act—like § 371 does—(1) the "conspiracy must still have been ongoing within the [limitations] period preceding the indictment, and (2) at least one overt act in furtherance of the conspiratorial agreement must have been performed within that period." *United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001) (alterations and citations omitted). "The crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *United States v. Grimm*, 738 F.3d 498, 502 (2d Cir. 2013) (citations omitted).

After the "main goals" of the conspiracy have been accomplished, the conspiracy has ended and the statute of limitations begins to run. *United States v. Fletcher*, 928 F.2d 495, 498 (2d Cir. 1991) (the "limitations period begins to run after the last overt act in furtherance of the **main goals** of the conspiracy") (emphasis added). Where those goals involve economic

motivations, the conspiracy ends when the conspirators realize the economic benefit of the conspiracy. *United States v. LaSpina*, 299 F.3d 165, 175 (2d Cir. 2002). When looking to the co-conspirators' alleged goals, courts must look to the "pleaded purpose" of the conspiracy, and not to the government's post-hoc explanations. *See United States v. Salmonese*, 352 F.3d 608, 615–16 (2d Cir. 2003).

Similarly, the conspiracy ends following the commission of the last overt act in furtherance of the pleaded objectives of the conspiracy. *United States v. Diaz*, 176 F.3d 52, 98 (2d Cir. 1999). Proof that particular conduct constitutes an overt act requires at least two showings. *First*, "the act must involve some affirmative conduct or deliberate omission on the part of" the defendant or his coconspirators, *Ben Zvi*, 242 F.3d at 97, that demonstrates that the conspiracy continued to be "actually 'at work.'" *Valle*, 301 F.R.D. at 82 (quoting *Carlson v. United States*, 187 F.2d 366, 370 (10th Cir. 1951)). This reference to "affirmative conduct" is distinct from "mere talk" among alleged coconspirators, and is intended to force the government "to demonstrate that the conspiracy was actually 'at work.'" *Valle*, 301 F.R.D. at 82; *see also United States v. Gigante*, 982 F.Supp. 140, 169 (E.D.N.Y. 1997), *aff'd,* 166 F.3d 75 (2d Cir. 1999) ("As an added protection to defendants against punishment for mere talk, in some instances an overt act must take place in furtherance of the conspiracy.").

*Second*, the government must point to actions taken "in furtherance of the conspiracy's pleaded purpose." *Salmonese*, 352 F.3d at 615–16 (emphasis omitted). This requirement means that an action taken as a "result of a completed conspiracy" does not constitute an overt act in furtherance of that conspiracy. *Grimm*, 738 F.3d at 503 (emphasis in original). This requirement also means that "typically noncriminal and unilateral" actions taken by one alleged co-conspirator are not overt acts in furtherance of the charged conspiracy where "the conspiracy has

completed its influence on an otherwise legitimate course of common dealing." *Id.* Indeed, even acts of "concealment" do not extend the statute of limitations if the conspiracy's objectives have been met. *Fletcher*, 928 F.2d at 498 ("[T]he life of a conspiracy cannot be extended for statute of limitations purpose by acts of concealment after the conspiracy's criminal objectives have been fully accomplished even if those acts are 'done in the context of a mutually understood need for secrecy.'") (quoting *Grunewald v. United States*, 353 U.S. 391, 402 (1957)).

Absent these limitations, conspiracy would become "an indefinitely continuing offense with an indeterminate statute of limitations." *LaSpina*, 299 F.3d at 175 (internal quotation marks and citation omitted). This strict limitation is consistent with the Supreme Court's "warn[ing] that it 'view[s] with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions.'" *Id.* at 174 (citing *Grunewald*, 353 U.S. at 404).

## B.    Discussion

### 1.    At Most, The Evidence Shows That The Count Four Conspiracy Was Intended To Manipulate The Price Of KIT Digital Stock Prior To The August 2009 NASDAQ Listing And Ended Immediately Thereafter.

According to the S8 Indictment, the purpose of the Count Four conspiracy involved the purchasing and selling of "KIT [Digital] through the Maiden Fund, at times for the purpose of manipulating the stock price and at times for the purpose of creating the illusion of greater volume in the trading for KIT [Digital] shares." S8 Indict. ¶ 56.

The evidence at trial—even taking all inferences in the government's favor—shows at most that there was a market manipulation conspiracy the purpose of which was fulfilled when KIT Digital was listed on the NASDAQ stock exchange in August 2009. According to Maiden's testimony, the initial conspiratorial agreement began on December 31, 2008 and was intended to prop up KIT Digital's stock in connection with an anticipated investment in KIT Digital by Vision Capital at the conclusion of the 90-day agreement window in March 2009. According to

Maiden, in early 2009, Vision Capital was interested in investing in KIT Digital, *see* Tr. 684:1-7;

Tr. 687:17-25; Tr. 1835:8-15, but that planned investment was imperiled due to a seller named

RAM Capital that was putting downward pressure on KIT Digital's stock via aggressive sales,

*see* Tr. 645:4-9.  Maiden testified that his purchases of KIT Digital stock were, according to

Isaza Tuzman, "helping hugely" in KIT Digital's efforts to market the stock to Vision Capital

during the due diligence period.  Tr. 685:14-19.

      However, the Vision Capital transaction did not close, and Maiden's testimony suggests

that the conspiracy—if any existed—shifted goals:  rather than any effort to manipulate the stock

in advance of an investment by Vision Capital, the alleged conspiracy was intended to prop up

KIT Digital's stock in advance of KIT Digital's August 2009 listing on the NASDAQ exchange.

For example, Maiden testified regarding an email exchange in which Maiden tells Isaza Tuzman

that Isaza Tuzman "need[s] to find a friend with some deeper pockets to help the cause cuz i'm

spent."  *See* GX 1597.  Through the date of the listing on August 12, 2009, Maiden and Isaza

Tuzman felt "pressure" to "prop[] the stock up to get a high price" in the NASDAQ listing.  *See*

Tr. 1946:21-1947:21.  Indeed, Maiden testified that, in this goal, the conspiracy had been

"successful."  *Id.*

      But Maiden testified that—starting as early as August 13, 2009—there was no longer any

pressure to keep KIT Digital's stock price high after the NASDAQ listing because the effort to

prop up the stock had been "successful."  Following the NASDAQ uplisting, Isaza Tuzman

offered Maiden many opportunities to sell his holdings in KIT Digital stock (without any

apparent concern that the sales may drive the stock price down).  Tr. 1945:4-14 ( Isaza Tuzman's

offers to Maiden to sell his stock in KIT Digital occurred "after the August 2009 NASDAQ

capital raise," and "the pressure . . . to keep the stock high" ended with the NASDAQ uplisting;

after that date, Isaza Tuzman said "okay. You can sell shares."). For example, on August 13,

2009, Isaza Tuzman asked Maiden whether Isaza Tuzman should "find a block buyer for some of

[his] shares." Tr. 1661:13-17; KIT Ex. 3159. This solicitation to sell KIT Digital shares was

repeated on August 18, 2009, August 28, 2009, September 1, 2009, and October 27, 2009—

when Maiden was approached to sell KIT Digital shares either by Isaza Tuzman directly or by

investors who had been referred to Maiden by Isaza Tuzman.[4] Tr. 1663:2-9; 1664:14-24;

1666:3-12; 1667:16-20; KIT Ex. 3127, 3128, 3160, 3166.

Maiden rebuffed each of these offers. As he was forced to acknowledge, Maiden was a

true believer in the value of KIT Digital's stock, not because of any urging on the part of Isaza

Tuzman, but because he believed in the fundamentals of the company and the future of the

industry. *See* Tr. 1631:17-1647:24; KIT Ex. 3158-A through KIT Ex. 3158-K. In rebuffing

Isaza Tuzman's August 18, 2009 offer to find a buyer for Maiden's stock, Maiden explained that

he believed that KIT Digital "has too much momentum and [was] still undiscovered" and that, in

his view, the company was "worth double current prices." Tr. 1665:2-14; KIT Ex. 3127.

Indeed, this is the same advice that Maiden gave his own father. Tr. 1650:3-8 ("Q. And then in

---

[4] The government elicited testimony from Maiden that Isaza Tuzman called him from the "floor" of the NASDAQ stock exchange on September 3, 2009 and instructed Maiden to purchase additional KIT Digital stock. Unlike the vast majority of the other communications between Maiden and Isaza Tuzman, the government did not produce a single document reflecting that this conversation ever took place, and relied solely on Maiden's word regarding this alleged phone call. But Isaza Tuzman conclusively demonstrated at trial that this conversation never took place. Summary fact witness Andrew Rosini reviewed the telephone toll records for both Isaza Tuzman and Maiden—records that were produced by the government in discovery—and showed that there were no toll records for calls from Kaleil's cell phone to any number associated with Mr. Maiden, or any number with a North Carolina area code on September 3, 2009 prior to the NASDAQ closing bell, even though Isaza Tuzman used that cellphone throughout the day. Tr. 5903:2-5904:16; KIT Ex. 1287-B. He also testified that there were no calls to any New York number from Maiden's cell phone prior to the closing bell. *Id.*

the last line [Maiden's father] wrote, 'Would you still hold any of these KIT digital or others might be better?'  And you responded on August 18, 2009, 'I would sell them all and buy KIT digital today ahead of a call tomorrow.'  Do you see that?  A. Yes."); KIT Ex. 3191.

Indeed, there can be no better proof of the conclusion of the market manipulation conspiracy than Isaza Tuzman's reaction when Maiden informed Isaza Tuzman that Maiden had sold a block of KIT Digital stock after the NASDAQ uplisting.  Specifically, on November 24, 2009, Maiden informed Isaza Tuzman that he had sold a block of KIT Digital stock at $10.86 per share.[5]  KIT Ex. 3073 at 2; Tr. 1677:4-1678:1.  Isaza Tuzman's response was: "Good for you. Would have been up another dollar had you not been there."  Tr. 1678:5-1679:1.  Maiden agreed that, in this response, Isaza Tuzman was congratulating Maiden for the profitable trade, even though it depressed the stock price.  Tr. 1678:5-:20.  In other words, far from propping up the stock, Maiden admitted that he took action in November 2009 that "put a downward pressure on the price of KIT Digital stock" with Isaza Tuzman's approval.  Tr. 1678:18-1679:1.

In addition to Isaza Tuzman's post-August 2009 offers to Maiden to sell his KIT Digital holdings, Isaza Tuzman repeatedly informed Maiden before August 2010 that he did not track KIT Digital's stock price and would not engage in any manipulative conduct.  On September 14, 2009, for example, in response to an unsolicited email from Maiden complaining about the stock price that day, Isaza Tuzman responded:  "Steve, I know you hate to hear this: I can't watch the stock every day.  I need to focus on the business.  No idea why we're down."  *See* Tr. 1694:13-1696:23; KIT Ex. 3066.  Then, in January 2010, Isaza Tuzman responded to an email from

---

[5]  Upon reviewing this document, Maiden acknowledged that his prior statements to prosecutors that he wanted to sell KIT digital stock but was "***always buying*** it since it was ***always*** under pressure" was false and "an overstatement."  Tr. 1673:20-1674:4, 1678:2-:4 (emphases added).

Maiden regarding the stock price: "Not sure what you want me to do with these notes, bro? Shit, cry, scream? I can't control the markets." Tr. 1697:7-1698:19; KIT Ex. 3077. Due to Maiden's constant pestering about KIT Digital's stock price, *see* Tr. 1694:2-4, Isaza Tuzman had to repeat these messages to Maiden throughout 2010. *See* Tr. 1699:12-1700:19; 1702:16-1704:23; 1706:8-1710:2; KIT Ex. 3078 (Jan. 15, 2010: "It's a market which I cannot control."); KIT 3143 at 1 (July 28, 2010: "I understand how this sort of thing is disconcerting to investors, but the best use of my time is heads-down, generating sales, working on the business."); KIT Ex. 3083 at 1 (Aug. 27, 2010: "That's why I don't get stressed about day-to-day stock price of KITD. In the end, we should be fine.").[6]

Indeed, both before August 2010 and thereafter, Isaza Tuzman made it abundantly clear to Maiden that Isaza Tuzman would not violate the securities law or otherwise engage in any manipulative conduct. In May 2010, after Maiden asked KIT Digital to disseminate favorable information to the market to "stabilize" the stock price, Isaza Tuzman refused, stating that "[a]s usual, we are not of the mind to time press releases for market/trading reasons. Fundamentals of our business are strong." *See* Tr. 1729:11-1731:4; KIT Ex. 3082. And repeatedly thereafter, Isaza Tuzman reaffirmed to Maiden that he insisted on strict adherence with the securities laws. *See, e.g.*, KIT Ex. 3323 (April 11, 2011 text message, in which Isaza Tuzman asks: "Steve, willing to be locked up for the day (Monday) so you can give some feedback on something?"); KIT Ex. 3348 (October 19, 2011 text message, in which Isaza Tuzman refuses to lie to Maiden's investors); KIT Ex. 3325 (May 29, 2012 text message: "Steve, I will not commit fraud for you."); KIT Ex. 3328 (June 14, 2012 text message: "There is nothing I can do to rush things

---

[6]  Similarly, Isaza Tuzman continued to tell Maiden that he was not focused on KIT Digital's stock price throughout 2011 as well. *See* Tr. 1710:11-1711:14; KIT Ex. 3321 ("I don't trade the stock or track it like you do. I focus on the operations.").

further.  This must be compliant with SEC rules and I am not going to do anything wrong.");

KIT Ex. 3329 at 3 (May 30, 2012 text message:  "Dude, you don't get it.  I don't 'decide' on KIT

Media dividend. . . . I am not committing fraud for you.").

> **2.** **The Post-August 12, 2010 Events That The Government Has Identified Were Not Overt Acts In Furtherance Of The Count Four Conspiracy.**

Because, by Maiden's own account, the Count Four conspiracy had succeeded as of

August 12, 2009, none of the actions that the government points to after that date—and certainly

none after August 12, 2010—could have been taken in furtherance of the Count Four conspiracy.

Specifically, the government pointed during summation to three acts that, it claims, show that the

conspiracy was still "at work" after August 12, 2010:  (1) an August 2, 2011 text message

between Maiden and Isaza Tuzman; (2) Maiden's subsequent uneconomical trades in KIT

Digital; and (3) the 2011 settlement meeting held in New York.  As explained below, the

evidence at trial demonstrates that none of these acts constitute an overt act in furtherance of the

Count Four conspiracy to manipulate KIT Digital stock.

> **a)** **August 2, 2011 Text Message**

In summation, the government directed the jury to GX 1786-I, a text exchange between

Maiden and Isaza Tuzman dated August 2, 2011.  Tr. 6880:4-7.  The government read one text

from the exchange:

> Maiden: "Stock very heavy today.  Hearing any specific investor concerns that could be causing it?"

GX 1786-I.  This exchange cannot itself suffice to extend the conspiracy into the statute of

limitations for at least two reasons.

*First*, the text message exchange was "mere talk" among alleged co-conspirators, and

does not provide the type of affirmative action necessary to show that the conspiracy was still

operational.  *See Gigante*, 982 F. Supp. at 169.  In this exchange, Isaza Tuzman and Maiden did

not discuss manipulation, let alone any stock trading of Maiden Capital.  Rather, Maiden merely

noted his views of KIT Digital's performance, using the phrase "stock very heavy today," which

is innocuous on its face and commonly used by investors and commentators.  *See, e.g.*, Nov. 13,

2017 Nightly Bus. Rep., PBS, 2017 WLNR 35426379 ("Today, after announcing GE's

turnaround strategy, the stock lost 7 percent of its value on very heavy volume. Its worst day

since 2009."); June 23, 2017 MT Newswires, Street Color: US Treasuries End A Bit Higher

With Flows Light, 2017 WLNR 19461706 ("Stocks were very heavy into the close."); Barbara

Kollmeyer, "Why the 'big top' is already in for this stock market,"  MarketWatch, May 24,

2016, *available at* https://www.marketwatch.com/story/why-the-big-top-is-already-in-for-this-

stock-market-2016-05-24 ("'One just cannot help feeling that these markets are beginning to

look very heavy, and unless there is a raft of M&A activity, a modest correction cannot be ruled

out this summer,' says Panmure Golden's David Buik, in a note to clients.").  These text

messages are certainly more innocuous than the internet chats that this Court addressed in

*Valle*—which discussed discrete plans to commit the crimes in question—but which were not

paired with any conduct.  *Valle*, 301 F.R.D. at 104.  So, too, here.  Indeed, the government has

not presented any evidence that Maiden traded KIT Digital stock on August 2, 2011, let alone

engaged in any manipulative trading of KIT Digital stock on that day.  *See* GX 411, GX 412

(reflecting no trades by Maiden Capital on August 2, 2011).[7]  His text message to Isaza Tuzman

that day was not in furtherance of any alleged manipulation conspiracy.

---

[7]  Recognizing this problem with its case, the government attempted to elicit testimony from
Maiden that he was broadly supporting the stock "in this time period." Tr. 921:19-21.
During rebuttal summation, the government quoted Maiden's testimony that he "was laser
focused on the stock and supporting or pumping the stock even with the limited assets I had

*Second*, given that Maiden also was a long-term and bona fide investor in KIT Digital's stock, *supra* pp. 8-9, this exchange raises the equally strong inference that this exchange was simply a commonplace communication between investor and company management.  Maiden agreed that, in his experience as an investor, he "did have occasion to speak to CEOs of companies about their companies," and that it was "common" for CEOs to "encourage people to buy their stock."  Tr. 649:18-650:2.  Other government witnesses—Peter Carpi and Richard Ingrassia—similarly testified that investors regularly spoke with CEOs, and that these communications are not inherently unlawful or fraudulent.  Carpi testified that, as an investor, it was "part of [his] job … [to] communicate with the CEOs and the CFOs in the public companies in which [he] invest[ed]," and that while he was a KIT Digital investor, he "ha[d] regular communications with [Isaza Tuzman]."  Tr. 4518:1-4519:4.  Ingrassia—an analyst who covered KIT Digital—testified that "it's not unusual for a CEO to call an analyst and see if they're hearing anything that … hasn't been communicated to the company yet."  Tr. 2692:6-14.  So even if talk alone could qualify as an overt act—and it cannot—the conversation here is equally (if not more) consistent with a common communication between investor and CEO as it is with an unlawful conspiracy.

### b)      Maiden's "Wash Trades"

The government also asserted in summation that, after August 12, 2010, Maiden was "still doing wash trades and all sorts of things that don't make any sense with the stock unless you're trying to manipulate it."  Tr. 7119:7-9.  The government did not specify which trades it

---

at the time."  Tr. 921:25-922:2; 6880:7-10.  What the government did not quote to the jury on rebuttal summation was the qualification Maiden made before this testimony: "KIT, as I mentioned before, was my only -- essentially my only asset *so* I was laser focused…."  Tr. 921:24-25 (emphasis added).  Maiden was not laser focused on market manipulation at this time; instead, he was laser focused on supporting the value of his own fund.

was referring to, and there was no testimony by Maiden of any "wash trades" in KIT Digital after August 12, 2010. Indeed, the government did not define "wash trades," did not elicit testimony from Maiden about any "wash trades," and in fact objected when defense counsel questioned Maiden about his efforts to engage in undisclosed wash trading in stocks other than KIT Digital. Tr. 1850:15-:25. While the government has not identified a single "wash trade" after August 12, 2010, it cannot rely on its vague and amorphous theory of wash trading because (1) none of Maiden's trading after August 12, 2010 had any statistically significant effect on KIT Digital's share price—undermining the government's theory that these trades were made in furtherance of a scheme to manipulate the stock; (2) Maiden admitted that he day-traded KIT Digital— including buying and selling the stock in roughly the same amounts on the same day—for a variety of reasons, and thus did not do so with the sole intent to manipulate as required by law, and (3) the jury had no basis to conclude that supposed "wash trades" were manipulative because the government adduced no evidence at trial explaining what a wash trade even was.

### (1) The Government Never Informed The Jury What A "Wash Trade" Was And Adduced No Evidence Regarding Maiden's Wash Trading In KIT Digital

The government's reliance on Maiden's so-called "wash trades" fails for an elemental reason: the government never adduced any evidence regarding what it termed in summation as "wash trades," so the jury was not equipped to find any overt acts based on Maiden Capital's alleged "wash trades" into the limitations period. At the outset, the issue of whether a trade constitutes a "wash trade" is a hotly contested issue and not one within the ken of the average juror. *See S.E.C. v. U.S. Envtl., Inc.*, No. 94 CIV. 6608 (PKL) (AJP), 2002 WL 31323832, at *2–3 (S.D.N.Y. Oct. 16, 2002) (federal courts have admitted expert testimony explaining how alleged "wash trades" "were inconsistent with those of a lawful market maker" because such testimony "can prove helpful to the trier of fact by providing him with indirect evidence of the

market manipulation").  Nowhere in the indictment did the government use the phrase "wash

trade" to describe Maiden's trading activities; instead, the government described that Maiden

was occasionally "on both sides of the purchase and sale of KITD stock . . . including at prices

that were not to Maiden's economic advantage."  S8 Indict. ¶ 63.  That description encompasses

lawful day trading activity as well, not just wash trading.  Indeed, the government never asked

Maiden in its direct examination about any "wash trades."  Nor did the government ask its

summary witness, FINRA lawyer Peter Melley, a single question about wash trading, such as

describing what constitutes a wash trade or identifying any particular trading by Maiden Capital

as wash trades.[8]  It is no surprise that, in the absence of any record evidence regarding wash

trading in KIT Digital by Maiden Capital within the statute of limitations, the government

instead advanced in its summations vague and unsubstantiated allegations of wash trading

without identifying which trades by Maiden Capital within the statute of limitations constituted

manipulative wash trades and why.

Admittedly, Melley did testify about certain non-profitable trading that Maiden Capital

engaged in over two particular days within the statute of limitations period.  Specifically, Melley

testified that Maiden Capital bought and sold the same number of shares on two particular days,

March 18, 2011 and September 8, 2011.  Tr. 5044:16-5055:21; GX 3814, GX 3816.  Melley did

not describe these trades as "wash trades."  For good reason:  Maiden Capital's trading on

September 8, 2011 was not simultaneous trading, as required for wash trades.  Rather, Maiden

---

[8]  The only time the government elicited any testimony about "wash trades" is during its cross-
examination of defense expert Professor Allan Ferrell, who acknowledged that he was not
testifying as an expert as to whether Maiden was trying to manipulate the market.  Tr.
6223:18-6224:6.  In response to the government's request that Professor Ferrell "tell the jury
what a wash trade is," Professor Ferrell testified only to his "understanding" that "a wash
trade is a trade at the same price in the same quantity at the same time."  Tr. 6200:6-8.

bought 1,950 shares of KIT Digital stock in the open market at 10:22 a.m. at prices ranging between $10.35 and $10.36; he sold the same number of shares in the open market at 11:59 a.m. at prices ranging between $10.21 and $10.27.  Thus, this was not a "*simultaneous* purchase and sale designed to negate each other so that there is *no change in financial position*."  *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 115 (2d Cir. 1999) (emphasis added). Indeed, Maiden Capital's trading on March 18 similarly reflected a change in financial position since he sold the stock at prices lower than he purchased it.  Far from wash trading activity, the evidence reflects that these trades were merely unprofitable—but lawful—"day trading" activity that Maiden acknowledged having engaged in for reasons that had nothing to do with the purpose of any conspiracy with Isaza Tuzman.  Tr. 1701:14-1702:15, 1842:24-1846:4; *infra* pp. 19-22.

If Maiden had intended to further a manipulation conspiracy through "wash trades" on March 18, 2011 and September 8, 2011, one would expect that the government would have elicited testimony from him about his trading in KIT Digital on those days.  But, tellingly, he was asked no questions and provided no testimony about his trading on those two days.  There is thus no evidence in the record to support that he undertook those trades with the specific purpose of furthering a market manipulation conspiracy—or, for that matter, to *rebut* the uncontroverted evidence at trial that Maiden engaged in many such trading strategies for personal reasons having to do with his trading *modus operandi* and the liquidity of his investment funds, *not* because of any agreement with Isaza Tuzman in regard to KIT Digital stock specifically.  *See infra* pp. 19-22.  That alone dooms any claim that these trades in particular constitute overt acts in furtherance of the charged Count Four conspiracy because the government did not satisfy its burden of connecting the acts to the allegedly criminal objectives of that conspiracy.

(2)     **None Of The Supposed "Wash Trades" Had A Statistically Significant Effect On KIT Digital's Stock Price.**

Indeed, any contention that the March 18, 2011 and September 8, 2011 trades were "wash trades" in furtherance of the market manipulation conspiracy is fatally undermined by the evidence proving that those trades could not plausibly have furthered any manipulation conspiracy.  As the government must concede, both trades by Maiden Capital were extremely low volume, particularly in comparison to the trading volume that day.  On trading volume of 634,662 shares of KIT Digital stock for March 18, 2011, Maiden Capital traded 600 shares (or roughly .094% of the day's trading volume).  *Compare* KIT Ex. 3922 *with* KIT Ex. 3937 row 559.  On trading volume of 201,542 shares, Maiden Capital traded 1,950 shares of KIT Digital stock on September 8, 2011 (or less than 1% of the day's trading volume).  *Compare* KIT Ex. 3922 *with* KIT Ex. 3937 row 679.  It is undisputed that trading by Maiden did not and could not cause a statistically significant move in KIT Digital's stock price.  KIT Ex. 3922.  According to Professor Ferrell, any price movements in KIT Digital stock on those days were "fully explained by the market, the industry, and the normal bouncing around in stock prices."  Tr. 6136:4-10.  In other words, neither set of transactions was large enough to affect the scheme that the government has alleged, and thus trading on those days by Maiden could not conceivably have been in furtherance of any market manipulation conspiracy.[9]

---

[9]  Indeed, Prof. Ferrell identified only eight dates after Aug. 12, 2010 on which there was a statistically significant price increase in KIT Digital stock.  But Maiden did not even buy or sell on four of these days.  On the other days, his buy volume as a percentage of market volume was 0%, 0.6%. 2%, and 9.3%.  KIT Ex. 3923.  If a market manipulation conspiracy existed after August 12, 2010, one would expect to see some sort of purchasing activity that tips the price, even a little.  But there was none.

Moreover, it is hardly the case that KIT Digital's stock tanked after Maiden ceased buying KIT Digital stock.  Professor Ferrell testified that during an approximately two month period after August 2010, the stock price of KIT Digital increased despite that fact that Maiden made no purchases or sales of KIT Digital stock.  Tr. 6069:10-24; Tr. 6070:19-6071:6; KIT Ex. 3931.  Nor did the stock price collapse at the end of the alleged conspiracy period, which the government dates to September 2011.  Tr. 6141:7-6142:16; KIT Ex. 3924.  Professor Ferrell's event study investigated "whether Maiden Capital trading during the December 31st, '08 to December 30, 2011 period was somehow propping it up, propping up the stock price.  If it was, then I was interested in seeing what the stock price afterward in fact does."  Tr. 6141:14-6142:16.  Professor Ferrell determined that, rather than collapse, the KIT Digital stock price "tend[ed] to increase overall."  *Id.*; *see also* KIT Ex. 3924.

The government may argue that a conspiracy need not result in the successful commission of the crime—and that, as a corollary, the corresponding overt act need not constitute successful market manipulation here.  But it is equally clear that, where the conduct at issue is "entirely inconsistent" with the government's theory, this Court need not credit it under Rule 29.  For example, in *Valle*, the government alleged that the defendant and two other individuals conspired to kidnap and harm several women, pointing to the fact that the defendant and his co-conspirators allegedly agreed to kidnap the women on certain dates.  But Your Honor refused to credit this evidence as representing a meeting of the minds actually to form a conspiracy because the defendant and his co-conspirators would allow the "dates for planned kidnappings [to] repeatedly pass without inquiry, comment or explanation," conduct that this Court found "entirely inconsistent with the notion that [the defendant] was involved in plotting real kidnappings."  301 F.R.D. at 90.  The same logic applies here.  Maiden's trading behavior—

at levels that could not possibly affect the price or trading volume of KIT Digital—shows that no rational jury could conclude that those infinitesimal trades were made in furtherance of the market manipulation conspiracy charged in Count Four.

**(3)**      **Maiden's Testimony Showed That Maiden Capital's KIT Digital Trades Were Consistent With Other Trading Strategies Independent Of The Count Four Conspiracy.**

During trial, Maiden also testified that he engaged in trading for numerous other reasons that had nothing to do with any conspiracy with Isaza Tuzman to manipulate KIT Digital's stock. In addition to Maiden's fundamental belief in the long-term value of KIT Digital's stock, *supra* pp. 8-9, Maiden testified to at least two other non-manipulative reasons why he traded KIT Digital stock on any given day.

*First*, Maiden's trading on these days is amply explained by the fact that he was a day trader—that is, a market participant who regularly buys and sells the same stock during the same day.  Tr. 1701:14-21 (Maiden's testimony); 6099:20-6100:17 (Ferrell's testimony).  According to the SEC, "[d]ay traders rapidly buy and sell stocks throughout the day in the hope that their stocks will continue climbing or falling in value for the seconds to minutes they own the stock, allowing them to lock in quick profits.  Day traders usually buy on borrowed money, hoping that they will reap higher profits through leverage, but running the risk of higher losses too."  SEC, *Day Trading: Your Dollars at Risk*, Apr. 20, 2005, https://www.sec.gov/reportspubs/ investor-publications/investorpubsdaytipshtm.html.  The Commission emphasizes that, while risky, "day trading is neither illegal nor is it unethical."  *Id.*  Indeed, Former SEC Chairwoman Mary Shapiro, during her tenure as the president of FINRA's predecessor, explained that legal day trading uses "round-trip" transactions "in a single day."  Mary L. Shapiro, Testimony before the Permanent Subcommittee on Investigations Senate Committee on Governmental Affairs on

19

the Securities Day Trading Industry, Sept. 16, 1999, http://www.finra.org/newsroom/speeches /091699-testimony-permanent-subcommittee-investigations-senate-committee.  After reviewing Maiden's trading records—not only relating to KIT Digital, but all his investments—Professor Ferrell concluded that Maiden exhibited this in-and-out day trading behavior with respect to "over a hundred" different stocks.  Tr. 6099:20-6100:17.  Maiden himself acknowledged that he engaged in such day trading with respect to KIT Digital, Tr. 1701:14-1702:15, 1842:24-1846:4, and his day trading activities provides an equally (if not more) plausible explanation for his non-profitable trading in KIT Digital stock after August 12, 2010.

*Second*, Maiden testified that he often purchased and sold KIT Digital stock on the same day between his Maiden Capital and Saxon accounts in order to meet margin calls.  For example, Maiden testified that on March 9, 2009, he bought and sold 28,571 shares of KIT Digital stock "partially" "in order to satisfy a margin call."  Tr. 1896:7-11.  This admission on cross-examination that the March 9, 2009 trades were to satisfy a margin call—a fact he never told the government about despite dozens of meetings, Tr. 1889:15-22—fatally undermines his direct testimony that "the main purpose [of executing the trades in this way] was to inflate the stock by showing volume, buying and selling both sides of the same trade."  Tr. 737:25-738:2.

These equally plausible lawful explanations for same-day trading activity by Maiden Capital are fatal to the government's market manipulation charge.  The Court correctly instructed the jury that market manipulation requires the government to "prove beyond a reasonable doubt that each defendant agreed to engage in conduct with the ***sole intent*** to … artificially distort the price of KIT Digital stock, rather than for legitimate investment purposes."  Tr. 7210:3-9.  This instruction was consistent with case law precluding market manipulation charges "if a transaction would have been conducted for investment purposes or other economic reasons."

*S.E.C. v. Masri*, 523 F. Supp. 2d 361, 372–73 (S.D.N.Y. 2007).  Maiden testified to numerous other, perfectly legitimate, reasons why he traded in KIT Digital securities—and the government offered no evidentiary basis on which a rational juror could discount these admitted-to, alternative reasons for Maiden's trades.

Of course, the jury (and this Court) need not believe that Maiden was acting lawfully in order to grant Isaza Tuzman's motion.  Even if these trades by Maiden were intended to manipulate the market in KIT Digital stock specifically—and there is no evidence to support such an inference—the government has not shown that any such trading was in furtherance of the charged conspiracy, as compared to Maiden's own self-interested trading activities.  Maiden acknowledged that he was independently working, over the course of several years both before and after the beginning of the alleged Count Four conspiracy, to manipulate the price of various stocks in Maiden Capital's portfolio.  For example, Maiden testified that he manipulated the price of Blue Earth Solutions, in which his fund had a substantial position.  At the end of the month, Maiden would buy Blue Earth stock in order to inflate the monthly closing stock price; this inflated value would, in turn, increase the total value of Maiden's fund.  Tr. 1684:22-1685:9. He also periodically made mid-month purchases to artificially increase the price of Blue Earth stock at the end of a particular day in order to bolster his fund's position in Blue Earth.  Tr. 1685:15-19.

Maiden also admitted to similar, independent efforts to manipulate KIT Digital's stock beginning in September 2008, before any alleged conspiracy with Isaza Tuzman ever began. Over time, Maiden acquired a substantial position in KIT Digital's stock (without Isaza Tuzman's involvement) and, just as with his other holdings, Maiden began making trades intended to manipulate the price of KIT Digital's stock.  Like he did with Blue Earth, Maiden

testified that he purchased shares at the end of the month and mid-month in an effort to prop up KIT Digital's stock price.  Tr. 1686:14-1688:21.  According to Maiden's testimony, he did this in September, October, and December 2008.  Tr. 1689:18-1698:24 (September and October 2008); Tr. 1883:19-1884:5 (December 2008).  Furthermore, Maiden admitted that, on December 1, 2008, he engaged in wash trades in which Maiden Capital sold shares that were purchased by a fund called Saxon, which was also controlled by Maiden.  Tr. 1883:1-25.  Maiden admitted that Isaza Tuzman had nothing to do with these trades.  Tr. 1884:3-5.[10]  By Spring 2009, KIT Digital's importance to the total value of Maiden's fund portfolio grew when the Blue Earth company "tanked," leaving Maiden's fortunes inextricably tied to the rise and fall of KIT Digital's share price.  1692:12-1693:15.  His personal motive for keeping the KIT Digital share price high is plain, and in the absence of any testimony by Maiden as to the particular reasons why he engaged in trading in KIT Digital during the limitations period, the inferences are in equipoise as to whether those trading acts, even were they manipulative, were in furtherance of his personal manipulation scheme or pursuant to a mutual agreement with Isaza Tuzman.

These failings—together or separate—demonstrate that a rational juror could not conclude that the government's supposed "wash trades" (first mentioned in a rebuttal summation) constitute overt acts taken after August 12, 2010 in furtherance of the alleged conspiracy to manipulate the price and volume of KIT Digital stock.

---

[10]  On cross-examination, Maiden acknowledged his solitary, non-conspiratorial efforts to manipulate numerous other stocks, including Blue Earth Solutions, Electronic Game Card, Global Med Technologies, A-Power, Broad Wind Energy, Nascent Wine Company, Northern Oil and Gas, and Triton Distribution Systems.  Tr. 1848:10-1850:14.  These manipulation efforts were done without any involvement or knowledge by Isaza Tuzman.  Tr. 1851: 23-25. Remarkably, Maiden never disclosed the full extent of his manipulative efforts to the government prior to his guilty plea.  Tr. 1852:9-20.

c)      **2011 Settlement Meeting In New York.**

In its rebuttal summation, the government also alleged that a 2011 settlement meeting held in New York was an overt act within the statute of limitations.  Tr. at 7118:25-7119:9; *see also* S8 Indict. ¶ 76(d) ("In or about July 2011, OMAR AMANAT and TUZMAN met with Maiden and others in Manhattan in part to discuss the losses sustained in Enable.").  But again, the government's own evidence proves that this meeting was not in furtherance of the charged manipulation conspiracy.  The government conceded in its rebuttal summation that the purpose of the settlement meeting was "to save Maiden Capital."  Tr. at 7119:4-5 ("They met in New York in 2011 to save Maiden Capital."); Tr. 7125:18-:22 (describing settlement meeting's purpose "to save Maiden Capital").  Similarly, Maiden testified that the meeting was intended to discuss a resolution of issues pertaining to his fund.  *See, e.g.*, Tr. 1954:20-1955:7 (according to Maiden, purpose of settlement meeting was "to rescue Maiden Capital"); Tr. 1814:18-22 (Maiden testifying that the meeting "was about my fund").  Contemporaneous emails from Isaza Tuzman—introduced by the government—confirm that Isaza Tuzman understood the meeting to concern "a straight 'rescue plan'" for Maiden Capital.  GX 1713-A at 1.  The government adduced no evidence or testimony that this settlement meeting had anything to do with an effort to manipulate KIT Digital's stock, or that anything occurred at the settlement meeting that was in furtherance of the alleged manipulation scheme.  To the contrary, it is implausible that the meeting had anything to do with alleged market manipulation, given that two innocent third parties who had nothing to do with the alleged manipulation scheme—Jonathan Jackson and Jason Karp—also attended this meeting.  Tr. 1813:21-1814:20.  Indeed, the conceded purpose of the settlement meeting demonstrates that it was, at most, in furtherance of the entirely distinct Maiden Capital fraud scheme charged in Count One of the Indictment (in which Isaza Tuzman is not charged), not in furtherance of Count Four's market manipulation conspiracy.

23

### 3. Isaza Tuzman Can Prevail Without Proving That He Withdrew From The Count Four Conspiracy.

The government's December 18, 2017 opposition to Isaza Tuzman's initial Rule 29 motion, Dkt. 612, contends that Isaza Tuzman bore the additional burden at trial to prove that he "took affirmative steps to withdraw" from the Count Four conspiracy prior to August 12, 2010. Dkt. 612 at 4. The government is mistaken. Separate and apart from any withdrawal defense, it was the government's burden to prove that the alleged manipulation conspiracy continued to operate after August 2010, and the government failed to do that. Rather, the evidence at trial showed that Maiden's trading in KIT Digital after August 2010 was undertaken for his own self-interested purposes, as to which Isaza Tuzman had no knowledge (let alone assent). In other words, by August 2009, there no longer existed any continuing conspiracy Isaza Tuzman was a part of and, consequently, from which he could withdraw.

But even if the government had shown that the manipulation conspiracy had continued, the evidence was overwhelming—and largely uncontradicted—that Isaza Tuzman withdrew from any manipulation conspiracy by August 2010. As the Court correctly instructed the jury, a conspiracy is presumed to continue until _either_ "its objective is accomplished or there is some affirmative act of termination by its members." Tr. 7181:16-18. A defendant is "presumed to continue his membership in the venture until its termination, unless it is shown by some affirmative proof that he withdrew and disassociated himself from it, such as a communication of abandonment in a manner reasonably calculated to reach coconspirators." Tr. 7181:18-24. Here, Isaza Tuzman repeatedly communicated to Maiden that he had withdrawn and disassociated himself from the alleged market manipulation conspiracy. After August 13, 2009, Isaza Tuzman repeatedly asked Maiden to sell his shares and even praised Maiden for selling activity that depressed the price of KIT Digital. _See supra_ Part I.B.1. Isaza Tuzman also repeatedly informed

24

Maiden that he would not engage in fraud for Maiden, that he would not time press releases to stabilize the stock price, that he did not track the stock price and had no ability to affect the stock price, and that he was instead focused solely on the fundamentals of the business.  *See supra* Part I.B.1.  This further demonstrates that the government failed to adduce sufficient evidence that Isaza Tuzman continued to participate in a manipulation conspiracy after August 12, 2010.  The jury's verdict on Count Four must therefore be vacated.  *See, e.g.*, *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (defendant withdrew from conspiracy where he "clos[ed bank] account [used in the conspiracy] in the face of [co-conspirator's] invitation to continue"); *United States v. Goldberg*, 401 F.2d 644, 648-49 (2d Cir. 1968) (reversing conviction based on defendant's statute of limitations defense where defendant stopped working as salesman in a "boiler room" trading scheme 5 years and 4 months before indictment).

II.    **A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON THE WIRE FRAUD CONSPIRACY COUNT (COUNT FIVE) PURSUANT TO RULE 29 BECAUSE THE GOVERNMENT'S THEORY WAS PREDICATED ON ALLEGED DECEPTION THAT DID NOT CONCERN ESSENTIAL ELEMENTS OF THE BARGAINED-FOR INVESTMENT.**

Section 1343 makes it a crime to use interstate wire communications to commit a scheme to defraud for the purpose of obtaining money or property.  18 U.S.C. § 1343.  At trial, the government asserted that Isaza Tuzman committed wire fraud against KIT Digital's *shareholders* by deceiving KIT Digital's *auditors* regarding a "related party" relationship with Maiden Capital.  The government described to the jury its theory in its opening summation:

> Count Five charges Isaza Tuzman only, and it charges him with conspiring with Maiden to commit wire fraud. As with Count Four, this is a conspiracy, and this conspiracy was about hiding the nature of the relationship between KIT Digital and Maiden Capital. As you know from this trial, the true relationship -- the true relationship -- was codependent, it was dirty and it was hidden. Is that what Isaza Tuzman told his auditors? No. He lied to his auditors. He said it was just a normal business relationship.

Tr. 6881.  The government advanced this same theory of wire fraud multiple times in its

summations,[11] just as it advanced the same theory in its Indictment, *see* S8 Indict. ¶ 78 (Isaza

Tuzman "misled KITD's shareholders . . . by failing to disclose that KITD's 'investments' with

Maiden Capital were not part of an arms-length relationship but were actually related party

transactions for an improper purpose").  Indeed, the government told the jury that this act of

deceit on the auditor alone was sufficient to convict Isaza Tuzman of wire fraud.  *See* Tr. 7115

(failing to disclose the alleged manipulation agreement with Maiden was "a lie.  You can convict

him [of Count Five] based on the fact that he knows that he can't tell the truth to Halkias.  That's

his consciousness of guilt.").

The government's theory of wire fraud was insufficient as a matter of law.  In his

capacity as CEO of KIT Digital, Isaza Tuzman had the authority to make unilateral decisions

regarding where to invest up to 10% of the Company's cash on hand without having to comply

with overall investment guidelines at KIT Digital.  S*ee* Tr. 3440:18–3441:3.  Each of KIT

Digital's investments in Maiden Capital fell well below that 10% threshold.[12]  Thus, far from

needing to lie to others to invest KIT Digital's cash in Maiden Capital, Isaza Tuzman had the

---

[11]  *See* Tr. 6884:19–21 ("What matters here is the nature of the relationship between KIT and
Maiden, and this was not an arm's length relationship.  They were in bed together."); Tr.
7114:10–7115:3 (in describing the Count Five theory, government contended in rebuttal that
Isaza Tuzman was guilty because he lied to KIT Digital's auditor by not telling Halkias about
the relationship between Isaza Tuzman and Maiden Capital and the 12/31/08 "market
manipulation agreement").

[12]  KIT Digital's $200,000 investment in Maiden Capital on March 10, 2009 represented 3.4%
of the Company's available cash of $5,878,000 as of December 31, 2008.  *See* GX 200 at 16.
Its investment of $700,000 on February 3, 2010 represented 1.85% of the company's
available cash of $37,823,000 as of March 31, 2010.  *See* GX 207 at 2.  Finally, the Company
invested $250,000 in Maiden Capital on March 1, 2011, which was only 0.23% of KIT
Digital's available $109,665,000 cash at that time.  *See* GX 212 at 2.  Even cumulatively,
KIT Digital's meager investments in Maiden Capital relative to total cash on hand never
approached a total of 10% when they were made.

unilateral discretion to make those investment decisions on his own.  And, indeed, Isaza Tuzman

accurately reported Maiden Capital's holdings in KIT Digital to KIT Digital's auditors, *see* Tr.

1873:2–1876:21; GX 1617; KIT Ex. 3387, so the auditors were well aware that KIT Digital was

investing money in one of its own shareholders.  That Isaza Tuzman used his discretion to invest

in Maiden Capital without disclosing that a purported (but unproven) "related-party" relationship

was the reason for the investments is not a scheme to defraud cognizable under 18 U.S.C.

§ 1343.  *See, e.g.*, *United States v. Zauber*, 857 F.2d 137, 147 (3rd Cir. 1988) (pension fund

trustees who "had the power and the authority to invest the fund's monies with others" did not

engage in wire fraud by failing to disclose their receipt of kickbacks as the true reasons for the

investment).

At most, the government's allegations showed deceit, not fraud.  But an intent to deceive

alone—when the alleged misrepresentation or omission is immaterial under the circumstances—

is ***not*** sufficient to demonstrate a scheme to defraud under the wire and mail fraud statutes.[13]  *See*

*United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a

deceit are insufficient to maintain a mail or wire fraud prosecution."); *United States v. Regent*

*Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("we have found no case in which an

intent to deceive has been equated with an 'intent to defraud'").  Rather, in addition to deceptive

conduct, "'the government must, at a minimum, prove that defendants contemplated some actual

harm or injury to their victims.'"  *Binday*, 804 F.3d at 569 (quoting *United States v. Novak*, 443

F.3d 150, 156 (2d Cir. 2006)); *see also U.S. v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) ("[T]he

indictment . . . is required to allege that the defendant contemplated actual harm that would befall

---

[13]  The Second Circuit analyzes identical language in the mail and wire fraud statutes in the
same way.  *See United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015); *United States v.*
*Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991).

victims due to his deception in order to meet the 'scheme to defraud' prong." (citation omitted)). To demonstrate such intent to harm through deception, the government must show that the misrepresentation goes to "an essential element of the bargain." *Shellef*, 507 F.3d at 108.  It is not enough "to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentation." *Binday*, 804 F.3d at 570. Instead, "the information withheld . . . must bear on the ultimate value of the transaction."[14] *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994); *see Starr*, 816 F.2d at 98 (requiring, as a result of misrepresentation, a "discrepancy between benefits reasonably anticipated" and "the actual benefits which the defendant delivered, or intended to deliver" (citation omitted)); *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir.), *as revised* (Oct. 3, 2016), *modified*, 838 F.3d 1168 (11th Cir. 2016) ("[A] 'scheme to defraud,' as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself.").

The government's theory of prosecution sought, and the Court's jury instructions permitted, conviction based on deceit that did not concern an essential element of the bargain between KIT Digital investors and the Company.  None of Isaza Tuzman's alleged misrepresentations and omissions regarding the related party relationship with Maiden Capital

---

[14]   The defense preserved its objection to the wire fraud jury instructions and specifically requested instructions regarding the need for the alleged misrepresentations to concern an essential element of the bargain.  *See* Tr. 6718:1–6730:12.  The Court rejected that instruction, and instead advised the jury that a mere act of deceit is sufficient to show a scheme to defraud.  *See* Tr. 7170:12–18 (first element of wire fraud, proving a scheme to defraud, "has been satisfied if the statements and/or conduct of the defendant were deceptive. You may also find the existence of such a scheme if you find that the defendant conducted himself in a manner that departed from traditional notions of fundamental honesty and fair play in the general business life of society, and that this conduct was deceptive.").

concerned the essential elements of the investment, because none concerned the terms or conditions of the investment or Maiden Capital's returns to investors.[15]  Similarly, Isaza Tuzman's failure to disclose his own personal investment in Maiden Capital, as well as his subsequent redemption from Maiden Capital, did not go to the essence of why investors invested in KIT Digital as a company in a manner sufficient to constitute a scheme to defraud.  *See Novak*, 443 F.3d at 159 (failure to disclose personal kickback as motivation for transaction did not constitute wire fraud, even if counterparties might have refused the bargain "had they been aware that [defendant] would receive a portion of the money"); *Zauber*, 857 F.2d at 146 (pension fund trustees' failure to disclose kickbacks, despite fiduciary duties owed to pension, does not constitute wire fraud).  The government expressly advanced a theory of conviction by which Isaza Tuzman could be found guilty of wire fraud merely because his alleged deceit regarding the related party relationship with Maiden Capital "prevent[ed] them [KIT Digital's investors] from making an informed decision about what to do with their money."[16]  Tr. 6726:13–14.

The Court of Appeals has rejected that very theory of prosecution.  Merely because an act of deception may have *caused* a victim to enter into harmful transactions does not prove an intent to defraud.  *See Novak*, 443 F.3d at 159 (reversing conviction for mail fraud even though purported victims might have refused the bargain "had they been aware that [defendant] would receive a portion of the money" as a personal kickback); *Mittelstaedt*, 31 F.3d at 1218 (reversing

---

[15]  To the contrary, the evidence amply demonstrated that Isaza Tuzman was deceived by Maiden regarding his fund's returns. *See, e.g.*, GX 1555 & Tr. 1759:9–25; KIT Ex. 3177 & Tr. 1763:12–1764:2; GX 1824 & Tr. 1764:6–20; KIT Ex. 3361 & Tr. 1766:4–9.

[16]  The instructions similarly advised the jury that "a person is also deprived of money or property when that person is provided false or fraudulent information that, if believed, would prevent him from being able to make informed decisions about what to do with his money or property," without further explaining that the information had to concern an essential element of the investment.  Tr. 7171:24–7172:3.

mail fraud conviction when instructions permitted conviction if jury found that, had purported

defrauded victim, a local government, known the truth of defendant's misrepresentations, it

"would have refused to deal with him on general principles"). The Second Circuit has

distinguished "between schemes that do no more than cause their victims to enter into

transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—

and schemes that depend for their completion on a misrepresentation of an essential element of

the bargain—which do violate the mail and wire fraud statutes." *Shellef*, 507 F.3d at 108. A

defendant whose misrepresentation induces a party into a transaction, but who nevertheless does

not deprive that party of "the full economic benefit of its bargain," *Binday*, 804 F.3d at 570, is

not guilty of wire fraud. *See also Zauber*, 857 F.2d at 146–47 (depriving pension fund of

"control over how money is spent" through the improper receipt of kickbacks was "too

amorphous" a theory to support wire fraud conviction).

　　　Where, as here, the government advanced—and the jury instructions permitted—a theory

of conviction that does not require the alleged misrepresentations to concern an essential element

of the bargain, the wire fraud conviction must be vacated. In *Shellef*, for example, the Second

Circuit vacated the wire fraud convictions of defendants who induced companies to sell them a

highly-regulated industrial chemical by falsely representing they would not resell the products

domestically. 507 F.3d at 90, 93. The indictment was legally insufficient because it failed to

allege that defendant's misrepresentation "had 'relevance to the object of the contract.'" *Id.* at

109 (quoting *Starr*, 816 F.2d at 100).

　　　Similarly, in *Regent Office Supply Co.*, 421 F.2d 1174, the Second Circuit reversed the

mail fraud conviction of defendant stationary suppliers who directed their salespeople to

misrepresent their identities to prospective customers (such as by falsely claiming they had been

referred by a friend of the prospective stationary customer) in order to sell stationary.  But the

Second Circuit "found no case in which an intent to deceive has been equated with an 'intent to

defraud' where the deceit did not go to the nature of the bargain itself."  *Id.* at 1182.

Misrepresentations about the reason why the seller was "able to offer the bargain" was not the

same as a misrepresentation about the essence of the bargain.  *Id.*  Because the misrepresentation

was "not directed to the quality, adequacy, or price of goods to be sold, or otherwise to the nature

of the bargain," there could be no accompanying intent to defraud.  *Id.* at 1179.

Finally, in *Starr*, defendants were convicted of mail and wire fraud in connection with a

postage pay scheme in which they "buried" higher-rate mail within lower-rate mail sacks,

misappropriating their customers' money intended to be used to pay for postage owed to the U.S.

Postal Service and pocketing the marginal difference themselves.  816 F.2d at 96.  The record

amply demonstrated the defendants' deception of their customers: the defendants represented

that their customers' moneys would be used only to pay postage fees, when, in fact, the

defendants used only a portion of the funds to pay postage and misappropriated the remainder for

their own benefit; the defendants also "caused fraudulent postal receipt forms to be sent to their

customers in order to avoid detection of their scheme."  *Id.* at 99.  Despite this deception and

theft of customers' money, the Second Circuit nonetheless reversed the convictions and

dismissed the indictment, reasoning that the customers "received exactly what they paid for"

because the customers' mail was delivered promptly as promised and at the correct destination.

*Id.*  The Court made clear: "Misrepresentations amounting only to a deceit are insufficient to

maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a

contemplated harm to the victim.  Moreover, the harm contemplated must affect the very nature

of the bargain itself."  *Id.* at 98.  Because the defendants did not "misrepresent[] to their

customers the nature or quality of the service they were providing," the government failed to show an intent to defraud the customers.[17]  *Id.* at 99.

At its core, the government's wire fraud charge seeks to punish Isaza Tuzman for breaching his alleged fiduciary duties to inform KIT Digital's auditors and shareholders of his relationship with Maiden Capital.  Over and over again, to support its charge, the government accused Isaza Tuzman of failing to disclose collateral information to auditors that Isaza Tuzman was supposedly duty-bound to disclose.  *See, e.g.*, Tr. 7114:10–20 (Isaza Tuzman "had an obligation at that point . . . to tell the truth to Halkias.  He had an obligation, right?  He could have said:  Halkias, it's OK . . . let me show you my market manipulation agreement that I just signed with Maiden . . . .  He could have told the truth.  He had to tell the truth.  That was his obligation.").  That theory of prosecution, at bottom, is no different than the honest services fraud theory that the Supreme Court gutted in *McNally v. United States*, 483 U.S. 350, 356 (1987), and *Skilling v. United States*, 561 U.S. 358, 408–10 (2010).  However unsavory one may find the December 31, 2008 Agreement and Isaza Tuzman's failure to disclose it to the auditors, it does not make the omission a ***wire fraud*** on KIT Digital's shareholders.  Isaza Tuzman lawfully exercised the discretion provided him to invest modest amounts of KIT Digital's excess cash in Maiden Capital, and KIT Digital got precisely what it bargained for: a risky investment in a hedge fund that purportedly provided historical positive returns to its investors.  That Maiden duped KIT Digital ***and*** Isaza Tuzman to believe that his investment returns were higher than they were does not make Isaza Tuzman complicit in any scheme to defraud KIT Digital of

---

[17]  *See also Takhalov*, 827 F.3d at 1314–15 (reversing conviction for wire fraud where defendants hired women to pose as tourists and lure men to come into their clubs and to purchase drinks, and court failed to instruct jury that it must acquit defendants if it found defendants had tricked victims into entering transactions but that the victims nevertheless received the drinks they asked for and were charged only what they agreed to pay).

money or property.  The government's theory of conviction and the Court's decision not to provide an "essential element of the bargain" instruction risked conviction on this flawed theory. The conviction on Count Five should be vacated.

### III. ISAZA TUZMAN IS ENTITLED TO A NEW TRIAL UNDER RULE 33 DUE TO THE PROSECUTORS' PERVASIVE MISCONDUCT

#### A.   Rule 33 Standard

A motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 may be granted "if the interest of justice so requires."  Fed. R. Crim. P. 33.  Whether to grant a motion for a new trial pursuant to Rule 33 rests within the broad discretion of the trial judge.  *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir. 1984).  Unlike a Rule 29 motion, in deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses.  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  The Court is not required to view the evidence in the light most favorable to the government.  *United States v. Tarantino*, No. 08-CR-0655 (JS), 2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012).  The Court's discretion is limited in that it should only grant a new trial when it "concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).  "'The ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice.'  To grant the motion, '[t]here must be a real concern that an innocent person may have been convicted.'" *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

**B.     The Prosecution Made Numerous False, Misleading, Inflammatory And Improper Statements During Its Summations.**

Prosecutors' opening and rebuttal summations were rife with comments, including intentionally misleading statements of the factual record, misstatements of legal standards, and improper and inflammatory appeals for the jury to look to extra-record considerations rather than the evidence presented.  These compound errors so tainted the proceedings as to require granting Isaza Tuzman a new trial.

More than eighty years ago, the Supreme Court made clear that federal prosecutors are not mere advocates, but stand in a privileged position and must therefore exercise proper restraint to ensure that justice shall be done:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).  Prosecutorial misconduct is a ground for reversal and a new trial when it "causes the defendant 'substantial prejudice,' . . . by 'so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (citations and quotation marks omitted). Second Circuit courts apply "a three-factor test in determining the existence of 'substantial prejudice' where a prosecutor's summation is challenged: 'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981)).  Crucial to the court's analysis is "whether the

improper comments were 'minor aberrations in a prolonged trial' or"—as here—"'cumulative evidence of a proceeding dominated by passion and prejudice.'"  *Modica*, 663 F.2d at 1181 (citation omitted).  Repeated "excessive and inflammatory" remarks in a summation and rebuttal warrant reversal and a new trial.  *Floyd*, 907 F.2d at 355.

"[T]he particular vice of misconduct on the part of a prosecutor is the confidence of the average jury that the prosecuting attorney is faithfully observing his obligation as the representative . . . of an impartial sovereign, whose interest 'in a criminal prosecution is not that it shall win a case, but that justice shall be done.'"  *King v. United States*, 372 F.2d 383, 396 (D.C. Cir. 1966) (quoting *Berger*, 295 U.S. at 88).  Prosecutors here repeatedly abused the jury's confidence in the government's search for justice by making incorrect, misleading, and inflammatory statements distorting the record, the burdens of proof at trial, and the jury's task in rendering its verdict.

1.      **Prosecutors *Repeatedly* And *Knowingly* Mischaracterized Testimony And Evidence Admitted At Trial.**

"Although the inherent controversial nature of litigation permits substantial latitude in the closing arguments of counsel, the prosecutor in a criminal case has a 'special duty not to mislead,' and should not deliberately misstate the evidence."  *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987) (citations omitted); *see also United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("[T]he government should, of course, never make affirmative statements contrary to what it knows to be the truth.").  Despite this clear duty, the government prosecutors repeatedly and knowingly misstated the evidence in their summations.

a)      **Mischaracterization Regarding Allegedly Successful Market Manipulation**

With respect to Count Four's market manipulation charge, the prosecutors distorted the trial record.  In their main summation, the government stated:

35

> And while Maiden's trading didn't move the market in KIT every day, it did on some days.
>
> Look at that, first day of the market manipulation agreement, Government Exhibit 3802. The volume and the price take off like a rocket. That is the market manipulation agreement in action. Even the defendants' expert, the Harvard-MIT professor, he spent a day testifying about how he did not believe Maiden had a big impact on price each day. Even he testified that there were a number of days where Maiden did impact the price.

Tr. 6875:24–6876:8.  The government's claim that "even" defense expert Professor Ferrell "testified that there were a number of days where Maiden did impact the price" was simply false. There was no such testimony, nor any testimony at all that that Maiden Capital actually "move[d] the market" in KIT Digital stock.  Indeed, the government expressly and repeatedly insisted that Professor Ferrell be precluded from testifying about the impact Maiden Capital's trading had on the price of KIT Digital stock.  *See* Tr. 5820:7–5821:15, 6030:6–6036:5, 6130:11–6131:15, 6188:2–6, 6217:23–6219:8; Dkt. 465 at 20–21.

In light of the government's objections, the defense did not elicit and Professor Ferrell did not testify regarding any conclusions he reached about the effect Maiden Capital's trading had on KIT Digital's stock price.  *See* Tr. 6032:10–12 (counsel for Isaza Tuzman noting in the *Daubert* hearing that Professor Ferrell could not "provide a causation analysis to say that Mr. Maiden's stock trading caused this statistically significant increase in the stock").  Professor Ferrell further testified that he had no opinion, based on his event study results, regarding the reason(s) for a statistically significant stock price movement on any particular day.  *See* Tr. 6188:12–6194:19.  Although Professor Ferrell had an opinion as to whether Maiden Capital's trading in KIT Digital stock caused a stock price change, *see* Tr. 6188:2–5, the government objected to any such testimony on redirect and the Court precluded it.  *See* Tr. 6217:23–6219:10. Despite the clear record contradicting the prosecutors' characterization of Professor Ferrell's

testimony and two defense objections, the Court declined to provide any corrective instruction directed to the prosecutors' misstatement.  Tr. 6912:7–20, 7029:19–7033:6.

Where, as here, the government is "successful in excluding" a particular line of testimony or evidence, "a prosecutor may not make intentional misrepresentations to the jury" about that same excluded evidence, and "the clearly intentional nature of the misrepresentations" will weigh heavily in favor of the defendant because "such a patently dishonest argument brings this case close to the more traditionally established forms of misconduct such as the proscription against a prosecutor's knowing use of false testimony . . . ."  *Davis v. Zant*, 36 F.3d 1538, 1549–50 (11th Cir. 1994); *cf. Universita*, 298 F.2d at 367 (improper for prosecutor "to attempt affirmatively to build up [a witness] on summation as a witness free from crime when the prosecutor knew to the contrary").

### b)    Improper Argument Falsely Implying Isaza Tuzman Received Criminal Fraud Proceeds

The prosecutors also repeatedly and incorrectly invited the jury to assume that KIT Digital and KIT Capital were synonymous with and indistinguishable from Isaza Tuzman as an individual, and that as a result, Isaza Tuzman profited from the alleged criminal conduct—including criminal conduct committed by others and which victimized KIT Digital.  For example, the government advanced this false equivalence to suggest that Isaza Tuzman personally benefitted from the Enable fraud Omar Amanat allegedly perpetrated on KIT Digital.  *See* Tr. 6888:11–12 (with respect to the $2 million that Omar Amanat had Maiden send to Enable, the prosecutor stated: "Ladies and gentlemen, the $2 million had been sent to Isaza Tuzman.").  This was false, as the government's own evidence showed that the $2 million had been sent to KIT Digital as a company—not to Isaza Tuzman—to honor a redemption request.  *See* Tr. 862:24–864:16; 892:9–21; 4943:7–4945:9; GX 650.

Defense counsel twice objected to this false equivalence and false accusation, *see* Tr. 6912:21–6913:4, 7033:7–18, and the government objected to any curative instruction, arguing that the jury was capable of distinguishing between KIT Digital as a corporate entity and Isaza Tuzman as an individual.  Tr. 7033:20–7034:1.

On rebuttal, however, prosecutors doubled down on their misstatements by expressly asking the jury *not* to distinguish between Isaza Tuzman, KIT Digital, and KIT Capital:  "Mr. McRae says, if you look at the market manipulation agreement, it actually says KIT Capital, not KIT Digital.  It says KIT Capital.  Right?  Come on.  He is KIT Capital, he is KIT Digital.  You know that.  You know that."  Tr. 7115:8–11; *see also* Tr. 7096:16–19 ("Kaleil Isaza Tuzman was KIT Digital. Right? When he took over KIT Digital, he looked in the mirror and he decided of all the names in the world I could possibly give this company, I'm going to name it after me. I'm going to name it after me.").

This was improper.  The law presumes corporate separateness, *see Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988) ("Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." (citation omitted)), and there was no evidence to suggest that KIT Digital and KIT Capital did not observe normal corporate formalities,[18] were under-capitalized, improperly co-mingled funds, or engaged in any other conduct to support an alter-ego finding.  *See id.*  Thus, in the face of an actual defense that Isaza Tuzman signed the December 31, 2008 agreement in his KIT Capital capacity,

---

[18]  To the contrary, the evidence at trial showed that KIT Digital observed normal corporate formalities*.  See, e.g.*, KIT Exs. 655, 657, 722, 723, 784, 786 (KIT Digital Board of Directors meeting minutes).

not as CEO of KIT Digital, the government improperly advanced arguments that had no support in the record.

In addition to its improper reliance on extra-record arguments, the prosecutors' false equivalence of KIT Digital, KIT Capital, and Isaza Tuzman magnified the substantial and unfair prejudice resulting from the government's repeated efforts throughout trial to impugn Isaza Tuzman's character as one based in "greed." The very first line of the government's opening statement expressly accused Isaza Tuzman of greed. *See* Tr. 120:6–8 ("This is a case about greed, and it's a case about lies -- lies told by these two men, Kaleil Isaza Tuzman and Omar Amanat."). The government then attempted to put flesh on that rhetorical bone, eliciting from cooperating witness Gavin Campion that Isaza Tuzman attempted to earn $50 million from KIT Digital, *see* Tr. 3914:24–3920:9, and knowingly false testimony from cooperating witness Smyth that KIT Media received $20 million from KIT Digital in 2010,[19] Tr. 2292:4–6. The government's emphasis on "greed" was further buttressed by the methodologically flawed chart created by Agent Amato that purported to show over $25 million of cash transfers from KIT Digital to entities managed by Isaza Tuzman (KIT Capital and KIT Media). *See, e.g.*, GX 3828 at 9; Tr. 5543:10–5545:5. As demonstrated on cross-examination, however, Agent Amato had no knowledge of what those payments were for, did not actually know who the recipient of the payments were, did not review thousands of pages of credit card statements that demonstrate that

---

[19] This testimony was false since KIT Digital's own annual filings show that KIT Media and Wellington Management Company *together* received less than $23 million in connection with warrant buybacks, GX 218 at F-28, and the government's own analysis and the testimony of Agent Amato suggested that KIT Digital made only $5 million in cash transfers to KIT Media. *See* Tr. 5723:19–5724:5724:1. In any event, it is deeply misleading to elicit testimony about these alleged payments to KIT Media without also clarifying that KIT Media and KIT Capital invested over $19 million in KIT Digital. *See* Tr. 5716:19–5717:1, 5717:25–5719:3.

KIT Capital and Isaza Tuzman paid for KIT Digital's corporate travel and other expenses, and failed to appreciate the $19 million invested by KIT Media and KIT Capital *into* KIT Digital in the first place (which were investments subject to repayment obligations). *See* Tr. 5709:20– 5711:1, 5712:18–5713:18, 5713:24–5714:13, 5716:19–5717:1, 5717:2–5719:3, 5726:22– 5728:24, 5739:22–5740:11, 5740:24–5741:7. Nevertheless, by arguing that Isaza Tuzman **is** KIT Capital and KIT Digital, the jury was left with the misimpression that Isaza Tuzman personally profited from fraud at KIT Digital, receiving tens of millions of dollars through KIT Media and KIT Capital "cash transfers," when the trial record did not demonstrate **any profits** to Isaza Tuzman from the fraud at KIT Digital.

The government's repeated efforts to have its witnesses testify about factual issues that would inspire class prejudice were prevented during trial.[20] But, having promised to deliver a case "about greed," the government used its summation to mischaracterize Isaza Tuzman's relationship to KIT Digital and KIT Capital in a manner that left the jury with a misimpression that Isaza Tuzman personally received millions of dollars from Enable and KIT Digital. The government's "calculated and persistent efforts to arouse such [class] prejudice" must not be countenanced. *See United States v. Stahl*, 616 F.2d 30, 32 (2d Cir. 1980).

---

[20] The defense long feared that the government would attempt to inject class prejudice into the trial. *See, e.g.*, Dkt. 405 at 37–41. And, indeed, the government attempted to inject such issues into the trial. *See, e.g.*, Tr. 5742:2–5748:16 (attempting to elicit testimony about Isaza Tuzman's personal expenditures on jewelry, furs, luxury travel, and other personal expenditures); Tr. 3914:24–3920:9 (attempting to elicit testimony that Isaza Tuzman wanted to earn $50 million from KIT Digital to fund a senate campaign). The Court appropriately precluded the admission of such evidence by the government.

**c)      Improper Argument Regarding Facts Outside the Trial Record**

In its opening and rebuttal summations, the prosecutors also repeatedly made statements unsupported by any evidence, documentary or testimonial, before the jury.  Below are several examples of these prejudicial statements.

*False Claims of Wash Trades*: For the first time in its rebuttal summation, the government attempted to bolster its claim that Amanat, Isaza Tuzman, and Maiden were all conspiring to manipulate KIT Digital stock within the statute of limitations by contending that after August 2010 "Maiden [wa]s still doing wash trades and all sorts of things that don't make any sense with the stock unless you're trying to manipulate it."  Tr. 7119:7–9.  As discussed in greater detail *supra* Part I.B.2.b, there was no evidence in the record of any wash trading by Maiden Capital in KIT Digital stock after August 2010.  The evidence on which the government relied merely showed that Maiden Capital engaged in day-trading of KIT Digital—not the "simultaneous purchase and sale designed to negate each other so that there is no change in financial position."  *Reddy*, 191 F.3d at 115.  But by falsely characterizing Maiden's trading as manipulative wash trading, the government went outside the record to support its claim of market manipulation.

*False Claims that Isaza Tuzman knew of Maiden's efforts to manipulate other stocks*:  At the core of the defense to Count Four, Isaza Tuzman contended that Maiden Capital engaged in efforts to manipulate stocks to enhance his hedge fund's value long before Maiden met Isaza Tuzman, such that any actionable manipulative trading by Maiden Capital in KIT Digital (*e.g.*, after August 2010) was done as part of Maiden's self-interested manipulation schemes and not a supposed manipulation conspiracy with Isaza Tuzman.  In response to that defense, the prosecutor falsely claimed in rebuttal summation that Isaza Tuzman had actual knowledge of

41

Maiden's manipulative activities with regard to other stocks, and that this knowledge was the

reason why Isaza Tuzman chose Maiden to be his co-conspirator in a manipulation scheme:

> They've been charged with conspiracy and they literally signed a[n] agreement, so you only need to decide whether Stephen Maiden actually tried to manipulate the KIT Digital stock, and most of the defense arguments on this have been, Oh, well, maybe he was manipulating a whole bunch of other stocks. That's irrelevant.
>
> Actually, if anything, it goes to show why they're guilty. If you're a bank robber and you want to team up with some bank robbers to do a robbery, who do you go to? You go to a bank robber, right? That's who you team up with. If you're trying to manipulate a stock, who do you team up with? You team up with a stock manipulator. It makes sense. You think it's an accident that these two men joined up with Stephen Maiden? No. It makes perfect sense. That's exactly who you go to if you want to commit this kind of crime.

Tr. 7117:8–22. There was no evidence in the record, however, that Isaza Tuzman (or Amanat,

for that matter) had any pre-existing knowledge that Maiden was a "stock manipulator," nor that

Isaza Tuzman or Amanat sought Maiden out in order to "team up" with a known "stock

manipulator." Indeed, all the evidence was to the contrary. Tr. 1689:18–1690:24 (Maiden

acknowledged that, prior to December 2008, he manipulated Blue Earth and KIT Digital stock

on his own, without having informed Isaza Tuzman); Tr. 1848:7–1852:8 (Maiden acknowledged

engaging in efforts to manipulate over a dozen different stocks without involvement by Isaza

Tuzman).

* * *

These misstatements "went well beyond asking the jury to infer matters outside the

record"; rather, the prosecutors here "actually made unsupported factual claims," *United States v.*

*Kojayan*, 8 F.3d 1315, 1321 (9th Cir. 1993), most of which appeared to be improper and

unsubstantiated shortcuts to proving scienter. The errors were also compound. In addition to

misstating the evidence, the government's rebuttal argument regarding the market manipulation

conspiracy also improperly lowered the government's burden of proof by omitting another

essential element: the jury needed to find not only the existence of the conspiracy and whether

Maiden "actually tried to manipulate the KIT Digital stock," Tr. 7117:10–11, but *also* that the

conspiracy continued "for some time within or around the dates set forth in the indictment."  Tr.

7214:15–16 (jury charge on Count Four); *see Floyd*, 907 F.2d at 355 (finding prosecutorial

misconduct when prosecutor "misstated the law, 'in effect distort[ing] the burden of proof by

suggesting incorrectly what the jury must find in order to reach a certain verdict'" (citation

omitted)); *Richter*, 826 F.2d at 209 (addressing similar circumstances).

> **2.      Prosecutors Relied On Inflammatory Rhetoric To Imply The Existence Of Inculpatory Evidence Not In The Record And Shift The Burden Of Proof.**

In addition to misstating the factual record, in its rebuttal summation, the government

also improperly bolstered cooperating witness testimony by implying the existence of

inculpatory evidence not shared with the jury, while simultaneously appealing to inflammatory

and improper extra-record considerations.  AUSA Williams stated:

> The last thing I want to respond to you about, before I get into the counts, is this false notion that just because the government didn't call more witnesses, somehow there's a problem with our case.  ***We believe in a concept of mercy.  Do you want to be here in 2020?  No.  We all want to go home, and frankly, if there are any witnesses that they thought would help them*** -- obviously they have no burden to call anyone -- but you saw what they did.  When they thought that Andy Steward would help them, they flew all the way to England to hear from Andy Steward.

Tr. 7101:19–7102:21.

This statement was improper, for two reasons.  *First*, the government may not imply that

there were other witnesses it could have called to convict the defendants.  "[A] clear and

deliberate reference in closing to supposedly favorable evidence that the government says it

possesses but did not offer at trial is one of the worst sins a prosecutor can commit; and the effect

may be just as bad even though the jury is left to guess at the content." *United States v. Potter*, 463 F.3d 9, 24 (1st Cir. 2006); *see also United States v. Manning*, 23 F.3d 570, 573 (1st Cir. 1994) ("prosecutor may not imply that the government has inculpatory information that is not in evidence" (citation omitted)); *United States v. Roberts*, 618 F.2d 530, 534 (9th Cir. 1980) (similar); *United States v. Burse*, 531 F.2d 1151, 1155 (2d Cir. 1976) ("It should go without saying that successful—even zealous—prosecution does not require 'improper suggestions, insinuations and, especially, assertions of personal knowledge.'").  That the government also suggested it exercised "mercy" on the jury and that it otherwise could have substantially prolonged the trial is precisely the type of "undue solicitude for [jurors'] comfort or convenience" that prosecutors are prohibited from showing.  *See* ABA Criminal Justice Standard 3-6.4(b) (2015); *see also United States v. Biasucci*, 786 F.2d 504, 514 & n.10 (2d Cir. 1986) (prosecutor's suggestion to the jury that "the government could have prolonged the trial for three months" was "clearly . . . inappropriate"; court found new trial unwarranted because, *unlike here*, the trial court gave an "immediate curative instruction," struck the statement, and again gave another curative instruction in its final jury charge).  The prosecutor's "mercy" remark was made the day just before the Christmas holiday and long after the date the Court originally informed jurors the trial would likely conclude.  It could have had no purpose other than to divert the already-fatigued jury's attention away from the government's heavy burden, in clear derogation of the prosecutors' duty to "make only those arguments that are consistent with the trier's duty to decide the case on the evidence" and to avoid "divert[ing] the trier from that duty."  ABA Criminal Justice Standard 3-6.8(c) (2015).

   *Second*, this statement constituted improper burden shifting.  The government repeatedly implied that Isaza Tuzman bore burdens of proof and persuasion.  It was improper for the

government to suggest that, because the defense called no fact witnesses other than Andy

Steward, the defense must have been unable to find any other witnesses "that they thought would

help them."

### 3.   Prosecutors Used Inflammatory Rhetoric To Improperly Denigrate Isaza Tuzman And Argue Guilt Solely By Association And Position.

From the beginning, the government's rebuttal summation appealed to inflammatory

rhetoric to improperly denigrate Isaza Tuzman and encourage the jury to convict Isaza Tuzman

solely based on his position within KIT Digital, not the evidence admitted at trial.  The

prosecutor stated that Isaza Tuzman's defense requires the jury to "buy" that Isaza Tuzman was

unaware of Smyth's and Campion's fraud despite Isaza Tuzman's "living in a den of thieves."

AUSA Williams continued:

> As I sat here listening to those arguments, I kept being reminded of an ancient proverb. . . . The universal principle that stands behind it is this: the fish rots from the head down. That's a proverb about accountability and corruption. When an organization gets taken over with rot and fraud, look to the top. Look at the head. See what's happening there. Kaleil Isaza Tuzman was KIT Digital. Right? When he took over KIT Digital, he looked in the mirror and he decided of all the names in the world I could possibly give this company, I'm going to name it after me. I'm going to name it after me. And then when he got there, he handpicked Robin Smyth, he handpicked Gavin Campion, he handpicked Rima Jameel. These are his people that he put in charge, he put in place, and when he got his hands on that company, it started to stink with fraud: K3.

Tr. 7096:8–24.

Reliance on a proverb about a rotting fish was inflammatory and improperly invited the

jury to infer guilt merely from Isaza Tuzman's position within the company.  *Cf. United States v.*

*Farmer*, 583 F.3d 131, 148 (2d Cir. 2009) (prosecutor's repeated references in summation to

defendant's chosen nickname "Murder" violated due process rights and merited new trial for

attempted murder conviction); *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999)

(branding defendant a "liar" and "con man" not related to proof and constituted improper

denigration of defendant); *United States v. Cannon*, 88 F.3d 1495, 1503 (8th Cir. 1996) (repeated

reference to defendants as "bad people" reversible error), *abrogated on other grounds by Watson*

*v. United States*, 552 U.S. 74 (2007).

 The prosecutors also contended that Isaza Tuzman was a "hunter" who exploited Smyth

as a "bird dog" to engage in fraud:

> Now, obviously Robin Smyth is the CFO. You'd have to believe that Robin
> Smyth also hid the fraud from the defendant. That's a ridiculous proposition. Why
> is that? Because Robin Smyth was the bird dog in the relationship. That's the
> relationship between Tuzman and Smyth. Tuzman's the hunter. He's going out
> and hunting all these acquisitions. Robin Smyth was his bird dog . . . .
>
> Look, this makes sense, right? If a hunter is shooting birds, but the hunter doesn't
> want to go in the bushes, dig into the bushes and try to grab the bird, you might
> get your arms all cut up, maybe get poison ivy or a tick. He doesn't want that.
> That's why a hunter has a bird dog, a dog you can send into the bushes to get that
> bird so your hands don't get mud and blood on them, right? Robin Smyth was his
> bird dog.
>
> Do you think Smyth, he didn't tell you you were going to chase money all around
> the world? No. That's why you have a bird dog to do it for you, so when the time
> comes and the questions come up, Well, did you know about the fraud, he can
> say, No, I know my hands are clean, but look at that bird dog, his hands are all
> dirty. That's exactly the role that Smyth played. Don't be fooled.

Tr. 7106:14–7107:23.  This inflammatory rhetoric was particularly prejudicial given that

it was raised for the first time on rebuttal, which deprived the defense of an opportunity

to respond.  Indeed, the one email admitted in the case in which Isaza Tuzman used the

term "bird dog" could not support the unfair inferences advanced by the government on

rebuttal since Isaza Tuzman's use of the phrase in that email was benign.[21]  Indeed, "bird

---

[21]  In that email, Isaza Tuzman asked Smyth to "bird dog" a particular payment to Tomas
Petru—whom the evidence demonstrated had a legitimate integration services business with
which KIT Digital engaged in business transactions.  That email cannot support the inference
posed for the first time in the government's rebuttal that Isaza Tuzman asked Smyth to
engage in fraud to ensure that Isaza Tuzman's "hands" remain "clean," an allegation neither
Smyth nor Campion ever advanced.

dog" is a common business term used to ask colleagues to handle a particular task. *See* William Safire, "Bird-Dog Minute," New York Times, Feb. 24, 2008, *available at* http://www.nytimes.com/2008/02/24/magazine/24wwlnSafire-t.html ("The bird dog has been used as a metaphor for brokers, agents and talent scouts, especially in sports. The verb to bird-dog means 'to search for relentlessly' or, more aptly, 'doggedly,' but not 'speedily.'").  The prosecution's reliance on the hunter/bird dog rhetoric was thus inflammatory, unfairly prejudicial, and improper.  *Cf. United States v. Martinez-Medina*, 279 F.3d 105, 119 (1st Cir. 2002) (prosecutor's characterizing defendants as "hunting each other like animals" was impermissible because "reference to the defendants as animals is especially inflammatory").

### 4.    The *Modica* Factors Weigh In Favor Of A New Trial.

As described above, the government prosecutors included in their opening and rebuttal summations numerous misleading statements of the factual record, repeatedly injected extra-record material into their argument, attempted to shift the burden of proof, relied on improper and inflammatory arguments, and mischaracterized the defenses in the case.  These compound errors were severe and repeated throughout the government summations.  Indeed, given that the government summations were prepared in advance and scripted—the government had overnight to prepare a rebuttal to Isaza Tuzman's summation—the misstatements, improper arguments, and inflammatory rhetoric could have been avoided entirely.  The first *Modica* factor—the severity of the misconduct—weighs heavily in the defense's favor.

The second *Modica* factor—measures adopted to cure the misconduct—likewise weighs in Isaza Tuzman's favor.  The Court sustained few of Isaza Tuzman's objections, *see* Tr. 7099:20–22, 7102:4–9 (sustaining objections to improper burden shifting), and denied Isaza Tuzman's objections and requests for curative instructions based on the government's

misstatement of evidence, mischaracterization of defense arguments, improper rebuttal beyond the scope of the government's summation, and argument regarding evidence not in the record. *See* Tr. 6912:7–6913:17, 7029:18–7035:18, 7104:10–13, 7106:6–8, 7108:5–8.

Further, the Court's instructions to the jury did not sufficiently or directly address the particular misconduct. The prosecutors' numerous misstatements of evidence and inflammatory remarks "called for stern rebuke and repressive measures," especially in light of the broader record of misconduct. *Berger*, 295 U.S. at 85. The Court instead relied on its standard charge that the jury rely on its own recollection of the evidence rather than arguments of counsel. Tr. 7032:9–7033:6, 7138:13–24. Where, as here, prosecutors' misstatements are pervasive and "the case is close, prejudice cannot be avoided by [such] 'mild judicial action,' and reversal is necessary to obviate the consequence of [the] prosecutor's persistent departure from his 'duty to refrain from improper methods' to obtain conviction." *King*, 372 F.2d at 396 (quoting *Berger*, 295 U.S. at 85, 88).

Nor could defense counsel's opportunity to address the prosecution's misstatements and other errors in the defense summation protect Isaza Tuzman. Some of the most prejudicial misconduct was reserved for the government's rebuttal summation, when the defense had no opportunity to respond. *See, e.g.*, Tr. 7101:19–7102:21 (invoking on rebuttal the government's "mercy" and implying the existence of evidence not before the jury), 7115:8–11 (contending in rebuttal that there was no difference between KIT Digital, KIT Capital, and Isaza Tuzman himself). In addition, the prosecutors' erroneous, misleading, and otherwise improper statements were too numerous to permit objection on each and every point. The Court placed strict time limits on summation (two hours), and in this highly complex and lengthy trial that contained thousands of exhibits, it would have been highly prejudicial to require the defense to spend the

48

bulk of that limited time rebutting improper arguments and misstatements. "A prosecutor cannot fairly put defense counsel to the task of correcting a persistent course of assertion and misrepresentation, and thereby shoulder the risk that the jury might gain an impression of defense tactics as fly-specking and dilatory." *King*, 372 F.2d at 396; *cf.* Tr. 6912:7–9 (noting Isaza Tuzman's counsel's desire to "be respectful . . . and not object during the government's summation").

Finally, with respect to the third *Modica* factor—whether conviction absent the improper statements was "certain"—it can hardly be doubted that the prosecutors' numerous factual misrepresentations, inflammatory accusations, and improper appeal to the jurors' desire to go home on the eve of the Christmas holiday—after a lengthy trial extending weeks past its original projected end date—indelibly tainted the jury's verdict. Without unambiguous documentary evidence on which to build their case, prosecutors relied almost entirely on oral testimony of cooperating witnesses whose credibility and testimony was bolstered improperly by the prosecutors' misleading and erroneous summation and rebuttal statements. Given that the government's case was far from overwhelming and Isaza Tuzman presented robust and substantial defenses to the government's charges, the prejudicial effect of the prosecutors' improper statements is substantial. *Modica*, 663 F.2d at 1181 ("Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tend to be insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal.").

The jury deliberated for less than one day, despite seven weeks of testimony and thousands of exhibits. While the jury requested thousands of pages of cooperating witness testimony, it received the bulk of the transcripts minutes (perhaps only a single hour) before

announcing that it had reached a verdict.  And the jury reached that blanket verdict without

asking a single question about the jury instructions, and only one question about the evidence.

*See* Tr. 7267:23–25 (Ct. Ex. 26: requesting the cooperating witnesses' agreements with the

government). The jury's rushed, undiscerning verdict surely does not evince the kind of

"meticulous care . . . in weighing the evidence and reaching [a] verdict" that would allow a court

to conclude "that the prosecutor's remarks did not undermine the jury's ability to view the

evidence fairly and free from passion and prejudice."  *United States v. Biasucci*, 786 F.2d at 515

(improper remarks did not require reversal where jury acquitted some defendants, demonstrating

careful consideration of each count for each defendant).

In short, the cumulative effects of the prosecutors' remarks, which included both

inflammatory comments and erroneous statements of fact and law and repeatedly implied an

improper burden shift, "diverted the jury from the charges on which [Isaza Tuzman] was being

tried, and from the fundamental principles by which a jury must discharge its duty."  *Floyd*, 907

F.2d at 356–57; *accord Drummond*, 481 F.2d at 64.  As in the seminal *Berger* case, "we have not

here a case where the misconduct of the prosecuting attorney was slight or confined to a single

instance, but one where such misconduct was pronounced and persistent, with a probable

cumulative effect upon the jury which cannot be disregarded as inconsequential."  295 U.S. at

89.  A new trial is required to remedy these manifold errors.

### C.      Prosecutors Relied On And Failed To Correct Perjured Testimony.

#### 1.      Legal Standards

In *Giglio v. United States*, 405 U.S. 150, 153 (1972), the Supreme Court said, "[a]s long

ago as *Mooney v. Holohan*, 294 U.S. 103 (1935), this court made clear that deliberate deception

of a court and jurors by the presentation of known false evidence is incompatible with

'rudimentary demands of justice.'"  That ruling was reaffirmed in *Napue v. Illinois*, where the

Supreme Court made clear that conviction through the knowing use of false testimony violates a

defendant's due process rights. 360 U.S. 264, 269 (1959).  Indeed, reversal is mandated where,

even though the prosecution does not itself solicit false evidence, the government nonetheless

"allows it to go uncorrected when it appears."  *Id.*  This rationale extends to impeachment

evidence.  *United States v. Cole*, 755 F.2d 748, 763 (11th Cir. 1985).  Thus, "[t]he thrust of

*Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate a

witness in giving testimony . . . ."  *Brown v. Wainright*, 785 F.2d 1457, 1465 (11th Cir. 1986).

"[W]hen the government learns that part of its case may be inaccurate, it must

investigate."  *United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011); *see also United*

*States v. Price*, 566 F.3d 900, 910 n.11 (9th Cir. 2009) ("[w]hen a prosecutor suspects perjury,

the prosecutor must at least investigate further") (internal quotation marks and citations omitted);

*United States v. Young*, 20 F.3d 758, 764 (7th Cir. 1994) ("a prosecutor's office cannot get

around *Brady* by keeping itself in ignorance") (citation omitted); *United States v. Wallach*, 935

F.2d 445, 457 (2d Cir. 1991) (prosecutors may not "consciously avoid[] recognizing the

obvious—that is, that [the witness] was not telling the truth").

The prosecutor's duty does not conclude with its investigation of the potential false

testimony; the prosecutor has ongoing duties to the Court and the administration of justice to rely

on and advance witnesses who tell the truth, not lies.  Thus, "the government's duty to correct

perjury by its witnesses is not discharged merely because defense counsel knows, and the jury

may figure out, that the testimony is false.  Where the prosecutor knows that his witness has lied,

he has a constitutional duty to correct the false impression of the facts."  *United States v.*

*LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).  This duty is particularly important given the jury's

inherent skepticism of defense counsel's cross examinations and arguments:

51

> All perjury pollutes a trial, making it hard for jurors to see the truth. No lawyer, whether prosecutor or defense counsel, civil or criminal, may knowingly present lies to a jury and then sit idly by while opposing counsel struggles to contain this pollution of the trial. The jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism. A prosecutor has a special duty commensurate with a prosecutor's unique power, to assure that defendants receive fair trials.

*LaPage*, 231 F.3d at 492.

The Second Circuit has articulated two discrete standards that govern when to grant a motion for a new trial based on perjury by the government's central witness. *First*, if the government knew *or should have known* about the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Wallach*, 935 F.2d at 456 (emphasis added and citation omitted). Reversal in that situation is "virtually automatic." *Id.* (citation omitted). *Second*, where the government was unaware and should not have known of a witness's perjury, "a new trial is warranted only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (citing *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988)). Here, as demonstrated below, because documents and information exposing the cooperating witnesses' lies were in the possession of the government, they should have known of the repeated perjury. Reversal is thus virtually automatic given the centrality of the cooperating witnesses' testimony to the government's case.

### 2. Perjured Testimony of the Government's Cooperating Witnesses Permeated the Record.

The government repeatedly solicited false testimony from its star witnesses on core issues, and failed to take any curative steps, despite having documents in their possession that provided constructive knowledge of the false testimony. The following examples from the

testimony of cooperating witness Stephen Maiden demonstrate the egregious nature of the false

testimony elicited:

(a) ***KIT Digital Investments in Maiden Capital***:  Maiden falsely testified that, after

receiving a $700,000 investment by KIT Digital in Maiden Capital on February 3, 2010, he

purchased additional KIT Digital stock.  Tr. 807:6–807:22.  The government's theory, as charged

in the S8 Indictment and Maiden's Information, was that Maiden Capital used the KIT Digital

investment (***including the $700,000 in particular***) to purchase KITD shares as part of an effort

to manipulate the stock.  S8 Indict. ¶ 64; Maiden Information (3512-31) ¶ 19 ("Tuzman induced

KITD to make investments in the Maiden Fund of $200,000 in or about March 2009 and

$700,000 in or about February 2010 . . . in order to help fund purchases of KITD shares by

STEPHEN E. MAIDEN . . . as part of an effort to manipulate the market for KITD shares.").  In

reality, though, as the records in the government's possession showed, Maiden embezzled nearly

all of the $700,000 and was a net seller of KIT Digital stock.  The evidence in the government's

possession showed that, after KIT Digital wired $700,000 to Maiden for investment in his hedge

fund, Maiden stole $584,474 to pay one investor's redemption requests, embezzled $50,000 to

pay his personal credit card debts, and Maiden used another $52,108 to pay off another investor.

*See* Tr. 1896:12–1900:4; 1902:16–1903:21; GX 606 at 177; KIT Ex. 3450.  Although the

government had the records that undermined their theory and proved that Maiden did not use the

$700,000 investment to purchase KIT Digital stock as he testified, prosecutors never showed

those documents to Maiden, did not inquire about Maiden's theft of KIT Digital's investment,

and made no other effort to correct his testimony.  Tr. 1902:5–14.

Indeed, on redirect, rather than concede Maiden's false testimony regarding the KIT

Digital investment, prosecutors elicited testimony from Maiden that he used $200,000 of the

$700,000 wire from KIT Digital to buy KIT Digital stock:

> Q. Mr. Maiden, at any point did you tell the government that you had used all 700,000 of that money to execute trades in KIT digital?
>
> A. No.
>
> Q. And isn't it a fact that you used over $200,000 to execute trades in KIT digital on February 3 and February 4 of 2010, the day of the wire transfer and the next day? . . .
>
> A. Yes, it's true.

Tr. 1909:8–13.  This was a distortion, well outside the scope of fair advocacy.  The indisputable

documentary record showed that, after the $700,000 investment from KIT Digital was wired to

Maiden's bank account, Maiden next wired to his brokerage account at Goldman Sachs only

$13,418 on February 5, 2010 and $11,000 on February 10, 2010.  GX 606 at 177.  Thus, the

government's contention that $200,000 of the $700,000 was used to purchase KIT Digital stock

was a physical impossibility.  Indeed, Maiden's trading records reveal that he sold $378,473 of

KIT Digital stock on February 3 and 4, making him a net *seller*—not a net buyer—of KIT

Digital on those days, contrary to the government's misleading redirect.  *See* GX 411A & 411B

(net sales of KIT Digital stock of $158,935 on February 3 and 4).

**(b)  *Trading on March 9, 2009***:  On direct, the government elicited from Maiden

testimony that Maiden Capital sold 28,571 shares of KIT Digital stock on March 9, 2009, and on

that same day Saxon Strategic Funds bought the same number of KIT Digital shares, at a net loss

inclusive of commissions.  Tr. 736:8–737:23.  When asked by the prosecutor why he executed

these trades, Maiden responded:  "The main purpose was to inflate the stock by showing volume,

buying and selling both sides of the same trade."  Tr. 737:24–738:2.  However, evidence in the

government's possession showed that the true reason for these trades was that Maiden's brokerage firm had issued a margin call for the Maiden Capital account and that Maiden sold the shares to cover the margin call, but then purchased the shares in his Saxon account because he continued to believe in KIT Digital and desired to keep his net position in KIT Digital. *See* Tr. 1885:2–1889:7; KIT Ex. 3436, 3437. Once again, the government never asked Maiden about this margin call, even though it possessed documents showing that the margin call was the true reason for the purchase and sale of KIT Digital stock on March 9, 2009. Tr. 1889:15–25. The incomplete inquiry by the government thus permitted Maiden to offer false testimony that the purchase and sale was part of a manipulation scheme.

(c) *September 3, 2009 Call*: On direct examination, Maiden testified that Isaza Tuzman called Maiden from the "floor of the NASDAQ" at the closing bell on September 3, 2009 to ask Maiden to "push [KIT Digital's stock price] up." Tr. 790:2–15. The government then elicited from Maiden testimony that he purchased an unidentified number of shares in KIT Digital "[t]o push the stock up at Kaleil's instruction." Tr. 790:17–791:2. Surprisingly, the government did not introduce any telephone record or conduct any toll analysis to confirm Maiden's testimony— even though such phone analysis is a core investigative technique. In reality, the phone record evidence in the government's possession, when analyzed by defense witness Andrew Rosini, showed that there was no telephone call between Maiden and Isaza Tuzman on September 3, 2009.[22] *See* Tr. 5900:17–5904:21 (telephone toll analysis by Andrew Rosini); KIT Ex. 1287-B,

---

[22] In addition to eliciting this false testimony from Maiden, the government attempted to rehabilitate Maiden's testimony regarding the September 3, 2009 phone call by advancing a theory that Isaza Tuzman and Maiden had a secret conference line that they used for criminal communications that were not reflected on Maiden's phone records. Tr. 5937:8–5941:25; GX 2977. But the government's cross examination on this issue crumbled when the defense showed on redirect that the conference line referenced in GX 2977 was KIT Digital's

1413-B.  Furthermore, the undisputed testimony from Professor Ferrell was that any trading by

Maiden Capital on that day had no statistically significant effect on KIT Digital's stock price.

Tr. 6133:19–6135:14; KIT Ex. 3922.

In addition to the false testimony offered by Maiden in the government's case, the

government also presented testimony from cooperating witnesses Smyth and Campion that was

false and, indeed, so contradictory that the government should have known that one or both of

the witnesses were committing perjury.  For example:

- Smyth informed the government that there was no fraud at ROO Group before Isaza Tuzman arrived at the Company and that he had not made any inaccurate statements to the public in ROO Group's SEC filings.  Tr. 3147:6–12.  He further testified that ROO Group's representations in SEC filings prior to 2007 that it was among the 10 largest broadcasters in the world was true.  Tr. 3133:6–3134:5.  But that was a lie, as demonstrated by the fact that, long before Isaza Tuzman's arrival at ROO Group, Smyth and other executives presented falsely inflated streaming video numbers to investors in order to artificially inflate ROO's advertising revenues.  Tr. 3130:18–3143:3; KIT Ex. 4371, 4385.

- Smyth testified that he was "certain" that he did not "deceive[] Mr. Campion into signing sham licenses without [Campion] knowing that they were sham licenses," Tr. 3078:2–12, but Campion was "surprised," "upset," and "furious" when he found out between 2012 and 2015 that Smyth had "given [him] sham license agreements to sign without [Campion] knowing that they were sham licenses," Tr. 4647:10–22.

- Campion falsely testified on direct examination that an email Isaza Tuzman sent on February 3, 2011 referencing "a small elephant" concerned a fraudulent restructuring reserve when the government's own theory was that the restructuring reserve was proposed by Smyth for the first time on February 7 or 8, 2011, days after Isaza Tuzman sent the email.  Tr. 4188:14–4189:22, 4789:8–4792:11; GX 855.

- While Smyth testified that Campion instructed him to "delete all of your emails and get rid of everything" and "to destroy a spreadsheet containing all suspect revenue versus real revenue of [KIT Digital]," Tr. 3092:6–3093:18, Campion had "absolutely no recollection" of telling Smyth to destroy documents or delete emails.  Tr. 4602:7–4604:7.

---

corporate conference line, so the existence of phone calls into that conference line in Isaza Tuzman's phone records does not reflect a call with Maiden, as the government suggested. Tr. 5951:25–5959:18; KIT Ex. 5006.

The inconsistencies between Smyth and Campion cannot possibly be explained by a failure of recollection, as the government suggested in summation.  Tr. 7100:14–16 ("Different witnesses remember different things because that's how human memory works.").  Rather, the inconsistencies concerned essential details of the charges and matters of credibility that reflect "irreconcilable conflicts" that expose one or both cooperating witnesses as perjurers.  *United States v. D'Angelo*, No. 02 CR 399 (JG), 2004 WL 315237, at *19–20 (E.D.N.Y. Feb. 18, 2004) (government presented perjured testimony; among other things, "irreconcilable conflicts" in cooperators' testimony regarding critical facts shows "that two perjurers made up facts about a murder without having had a chance to get their stories straight").  Despite these dramatic inconsistencies, the government nevertheless endorsed the testimony of these non-credible witnesses as the principal evidence in support of the accounting fraud conspiracy charged in Count Six.[23]

Under well-established case law, the government's continued reliance on testimony from Maiden, Smyth, and Campion was improper because these witnesses had lied to the jury. Indeed, two witnesses (Maiden and Campion) even acknowledged having lied to the jury in their testimony.  *See, e.g.*, Tr. 1898:5–1899:4 (Maiden acknowledged lying to the jury about KIT Digital's $700,000 investment in Maiden Capital); Tr. 4613:12–15 (when asked "So when you sat there and you told this jury twice that you would not lie for Robin Smyth, you lied about lying, didn't you?" Campion responded, "I guess so. I don't know.")  Under these circumstances,

---

[23]  To call the testimony of these witnesses flawed would be a gross understatement.  Campion could not recall elemental facts despite 22 preparation sessions. Tr. 4787.  For example, he could not recall being the President of ROO Group, *see* Tr. 4632:4–7 ("Was I ever president of Roo Group? I don't think so. Was I? I don't know."), or having signed any of ROO Group's SEC filings, Tr. 4440:12–4441:18.  The prosecutor even had to lead Campion in order to remind him to include Isaza Tuzman when asked "who was involved in setting up these fake licenses at KIT Digital?"  Tr. 4128:12–16.

the prosecutors could not fulfill their duty to the Court and the jury while continuing to rely on

these witnesses' testimony—and defense counsel's opportunity to cross-examine these witnesses

could not adequately protect Isaza Tuzman's constitutional rights.  *See, e.g.*, *LaPage*, 231 F.3d at

492 (reversing conviction where prosecutor knew of government witness's perjury, even though

defense counsel was similarly aware of the perjury and attempted to impeach witness).

The facts here are far more egregious than those in the seminal Second Circuit case of

*Wallach.*  There, the government's primary witness committed perjury in the trial of three

defendants convicted of engaging in a pattern of racketeering activity in connection with their

efforts to lobby for government contracts.  935 F.2d at 455.  The witness testified that he

previously had been involved in illegal gambling activities, but he had stopped his compulsive

gambling one year before the trial.  *Id.*  After the trial, the parties learned that the witness had in

fact gambled during that year.  *Id.* at 456. The Second Circuit held that the government "knew or

should have known" about the perjury and ordered a new trial pursuant to that standard.  *Id.* at

456–57.  While the witness's perjured testimony did not directly concern the substance of his

allegations against the defendants, his "false testimony regarding his gambling directly calls into

question the veracity of the rest of his statements."  *Id.* at 458.  Core to the Court's decision was

the centrality of the witness to the case:

> [The witness] was the centerpiece of the government's case.  Had it been brought
> to the jury's attention that [the witness] was lying after he had purportedly
> undergone a moral transformation and decided to change his ways, his entire
> testimony may have been rejected by the jury. It was one thing for the jury to
> learn that [the witness] had a history of improprieties; it would have been an
> entirely different matter for them to learn that after having taken an oath to speak
> the truth he made a conscious decision to lie.

*Id.* at 457.  In addition, the opinion noted that the government "made much of [the witness's]

motive for telling the truth" by explaining the terms of the cooperation agreement in its redirect

and closing.  *Id.* at 459.  Thus the perjury, although only related to the witness's credibility and

not to the substantive offenses, was "material" under the stringent standard in *Wallach* and

warranted a new trial as a matter of law.  *Id.*

Here, too, the government's reliance on perjured testimony of star witnesses infected the

jury's consideration of the evidence and "corrupt[ed] 'the truth-seeking function of the trial

process.'"  *Freeman*, 650 F.3d at 680–81 (affirming grant of new trial where government witness

falsely claimed he saw defendant at a particular drug house despite the fact that drug house was

only used during certain dates when witness was incarcerated, a fact to which the government

stipulated).  The government never should have relied on witnesses as patently lacking in

credibility as Maiden, Smyth, and Campion were.  That it did so, then attempted to rehabilitate

them, and even presented their testimony as truthful in summation arguments, shows how thin

the government's case was without these witnesses.  And because the documents and

information exposing the cooperating witnesses' lies were in the possession of the government, it

should have known of their perjury. Under all the circumstances, the government's reliance on

these perjurious witnesses warrants automatic reversal.  *See, e.g.*, *United States v. Seijo*, 514 F.2d

1357, 1364–65 (2d Cir. 1975) (vacating conviction where cooperating witness lied that he never

had been convicted of a prior criminal offense).

## IV.   A NEW TRIAL IS WARRANTED DUE TO PREJUDICIAL SPILLOVER RESULTING FROM THE JOINT TRIAL OF ISAZA TUZMAN AND AMANAT, PARTICULARLY IN LIGHT OF THE GOVERNMENT'S REBUTTAL CASE ALLEGING AMANAT'S FABRICATION OF EVIDENCE

Prior to trial, Isaza Tuzman moved to sever his trial from that of Omar Amanat's.  Dkt.

262, 263.  The principal grounds for that motion was that Isaza Tuzman would be subject to

considerable spillover prejudice, both from the evidence introduced germane to the charges

against his co-defendants and also from any so-called "other act" evidence that may later be

noticed and introduced.  *See* Dkt. 263 at 15-21.  The Court denied Isaza Tuzman's severance

motion, but acknowledged that a showing of "substantial prejudice" from a joint trial may

require severance, particularly where "a jury may have difficulty in considering the evidence

against each man separately."  Dkt. 508 at 16, 18.  Thereafter, Isaza Tuzman renewed his request

for severed trials, including on the ground that evidence inadmissible against Isaza Tuzman may

become part of the trial solely due to the presence of Amanat.  *See* Ltr. from Avi Weitzman to

Hon. Paul G. Gardephe (Oct. 9, 2017) (filed under seal).

      During trial, the Court allowed the government to present evidence that Omar Amanat

had fabricated three emails.  The email fabrication issue then took center stage as a principal

focus of the final days of trial.  Indisputably, the evidence was inadmissible against Isaza

Tuzman.  Because the government accused Isaza Tuzman of acting in concert with Amanat to

commit and conceal illegal activity throughout the trial, this evidence of fabrication was unfairly

prejudicial to Isaza Tuzman and risked tainting the jury to believe that Isaza Tuzman also was

involved in the fabrication.  The spillover prejudice against Isaza Tuzman pervaded the structure

of the government's case here and could not be ameliorated by a limiting instruction.  The only

way to avoid this unfair prejudice would have been to exclude that fabrication evidence entirely,

or if the Court determined that the government should be permitted to use this evidence against

Amanat, to sever Amanat from the trial and allow Isaza Tuzman to proceed to verdict before the

current jury.  By adopting neither option, the Court subjected Isaza Tuzman to unfair,

overwhelming prejudice, and a new trial should now be granted.

      Rule 403 allows a court to "exclude relevant evidence if its probative value is

substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  Allegations of

obstruction of justice are particularly powerful and unquestionably carry a substantial risk of

prejudice.  *See United States v. Ruggiero*, 824 F. Supp. 379, 389–90 (S.D.N.Y. 1993) (precluding

cross-examination regarding obstruction under Rule 403).  In a joint trial, when a court

determines that it will admit evidence against one defendant, "[a] district court [still] has a

continuing duty to protect [the other] defendant from substantial prejudice resulting from

improper joinder and to consider whether severance is necessary."  *United States v. Nersesian*,

824 F.2d 1294, 1304 (2d Cir. 1987); *see also United States v. Morgan*, 394 F.2d 973, 978 (6th

Cir. 1968); *Flores v. United States*, 379 F.2d 905, 909 (5th Cir. 1967).  In both cases, the law's

purpose is to protect the other defendant where the prejudicial evidence might "prevent the jury

from making a reliable judgment about guilt or innocence."  *Zafiro v. United States*, 506 U.S.

534, 539 (1993).  Although courts often employ limiting instructions, where the potential

spillover prejudice is substantial, a curative instruction may not be sufficient when there is

"'doubt whether it [is] at all possible to carry out that instruction[ because t]o do so would

certainly require twelve minds more disciplined than those of the average human juror.'" *Flores*,

379 F.2d at 908 (quoting *Barton v. United States*, 263 F.2d 894, 898 (5th Cir. 1959)).

Here, the evidence regarding alleged email fabrication by Amanat should have been

excluded based on, among other reasons, the unfair prejudice to Isaza Tuzman resulting from its

admission.[24]  The fabrication evidence was unquestionably influential on the jury:  the

government surely believed so, as the topic consumed a large portion of the government's

rebuttal summation.  *See* Tr. 7122:3–7124:25.  Although the Court offered a limiting instruction

that the fabrication was not being offered against Isaza Tuzman, *see* Tr. 6434:21–6438:20, no

instruction could have erased the message that the government consistently hammered

---

[24]  Isaza Tuzman also adopts the grounds identified in the post-trial motions of Amanat to
exclude the government's fabrication evidence, including its speculative nature, unreliability,
and lack of expertise of Agent Decapua.

throughout trial—that Isaza Tuzman and Amanat "banded together to commit fraud," Tr. 122:14—and the necessary inference that actions reflecting a consciousness of guilt by Amanat reflected also on Isaza Tuzman's guilt.

The government's rebuttal summation only magnified the risk that the jury might improperly attribute the fabrication to Isaza Tuzman. It argued that it is inconceivable that the allegedly fabricated emails—which presented exculpatory evidence for Amanat—would "magically appear out of nowhere in the middle of trial" and that "no one would have seen" them "until Maiden had finished his cross-examination." Tr. 7123:22–7124:2. The unmistakable implication of this argument was that Isaza Tuzman—who is a sender or recipient of a number of emails in the exhibits that the government alleged were fabricated (*e.g.*, AX 9013, AX 908)— must have known that the emails were allegedly fabricated once they were offered by Amanat or perhaps even participated in or encouraged the fabrication. This is precisely why the Court excluded evidence of the alleged fabrication of a May 8, 2009 email (GX 3553), and the reasoning is equally probative as to all the evidence of fabrication:

> One reason for my concern [with the admission of fabrication evidence regarding the May 8 email] is that *it seems to me that a reasonable juror could conclude that even if Mr. Tuzman did not fabricate the e-mail himself, he cooperated with the fabrication or agreed not to disclose it.* If one accepts the government's theory that Omar Amanat fabricated this e-mail allegedly from Mr. Tuzman, it would be extremely reckless for him to do so without Mr. Tuzman's cooperation because he would be at risk of the fabrication being brought to light if Mr. Tuzman chose to come forward and assert that he never sent the e-mail.

Tr. 5847:3–12 (emphasis added).

Indeed, the Court correctly recognized during trial that this case may be one where it is "almost impossible" for jurors to follow a limiting instruction.[25]  Tr. 5978:13.  Having recognized the certainty of spillover prejudice and the limited utility of a limiting instruction, the proper course for this joint trial would have been to exclude the fabrication testimony entirely, as Isaza Tuzman argued.  Tr. 5849:19-5850:21, 5977:17-5978:8.

But having determined to admit the government's email-fabrication evidence over the defendants' objections, the Court at the very least should have severed the trials of Isaza Tuzman and Amanat, and allowed the presently constituted jury to consider Isaza Tuzman's guilt or innocence untainted by the fabrication allegations.  A district court may grant a mistrial and sever a non-moving defendant from the ongoing criminal trial, and that determination of which particular defendant to sever is consigned to the Court's discretion.  *United States v. Odom*, 888 F.2d 1014, 1018 (4th Cir. 1989).  Although the Second Circuit has held that severing a non-moving defendant may present double-jeopardy concerns upon retrial absent "manifest necessity," *see United States v. Huang*, 960 F.2d 1128, 1134 (2d Cir. 1992), courts have found manifest necessity where the prejudicial actions are attributable to the non-moving defendant, a consideration not present in *Huang*.  *See Odom*, 888 F.2d at 1018-20 (counsel for severed

---

[25]  Not only was it impossible for the jury to ignore fabrication allegations when deliberating about Isaza Tuzman despite the Court's limiting instruction, the government's own post-conviction press release highlighted the likelihood of that spillover prejudice.  The government's press release quoted Acting U.S. Attorney's statement that Amanat **and Isaza Tuzman** were "tangled" in a "web of lies" that included email fabrication: "The evidence of **their** criminal schemes was so overwhelming that Amanat actually tried to fool the jury by introducing fake emails into the record as exculpatory 'evidence' in this trial.  **Unfortunately for Tuzman and Amanat**, the jury saw through **their tangled web of lies**, convicting them on all counts."  Dec. 26, 2017 Press Release, "Kaleil Tuzman, Former Chairman And CEO Of Technology Start-Up Company Kit Digital, And Omar Amanat Found Guilty In Manhattan Federal Court Of Securities Fraud Related Offenses," *available at* https://www.justice.gov/usao-sdny/pr/kaleil-tuzman-former-chairman-and-ceo-technology-start-company-kit-digital-and-omar (emphasis added).

defendant introduced prejudicial evidence and argument regarding co-defendant, thus warranting severance of non-moving party); *cf. Arizona v. Washington*, 434 U.S. 497, 505 (1978) (finding "manifest necessity" to grant prosecution's request for a mistrial where defense counsel referenced prosecutorial misconduct in prior trial that itself had resulted in a mistrial).  Here, the circumstance that gave rise to the email-fabrication evidence was Amanat's introduction of evidence that the government contended was falsified.  The Court was thus fully empowered to sever Amanat and allow the government to present its fabrication testimony in a separate proceeding.  In light of the spillover prejudice to Isaza Tuzman, the Court should have followed this path once it found the fabrication evidence admissible against Amanat.

When confronted by highly prejudicial evidence of obstruction instigated by Isaza Tuzman's co-defendant, the Court could either have excluded that evidence entirely, or severed Amanat from the trial and allowed Isaza Tuzman to proceed alone before the empaneled jury. Neither option was pursued, and Isaza Tuzman is entitled to a new trial as a consequence.

## V.   OTHER ERRORS AT TRIAL DEPRIVED ISAZA TUZMAN OF HIS RIGHTS TO DUE PROCESS, TO CONFRONT WITNESSES, AND TO PRESENT A DEFENSE, AND THUS WARRANT A NEW TRIAL.

Multiple other errors at trial undermined Isaza Tuzman's constitutional rights to a fair trial, to due process of law, to confront the witnesses against him, and to present a defense. *First*, the Court's exclusion of Dr. Albert Lyter as a defense expert in this case frustrated Isaza Tuzman's ability to present reliable and highly relevant testimony that evidence central to the government's case—and which the government relied heavily on in its rebuttal summation—had been falsified.  *See* Dkt. 492.  *Second*, the Court's preclusion of Isaza Tuzman's right to confront Gavin Campion regarding his false accusations that Isaza Tuzman had orchestrated (while imprisoned in Colombia) a theft from Campion's car in Australia; the inability to confront Campion with this line of cross examination deprived Isaza Tuzman of highly probative

impeachment of a crucial government witness. *See* Isaza Tuzman's Ex Parte Suppl. Opp'n to the Govt.'s Mot. in Limine #2 (Sept. 19, 2017). The Court's refusal to dismiss the S8 Indictment—which added numerous factual allegations and theories against Isaza Tuzman in violation of the Colombian Supreme Court's ruling on extradition—violated the Rule of Specialty in derogation of international and U.S. constitutional law. *See* Dkt. 263 at 3–13; Dkt 405 at 6–15. Finally, in denying Isaza Tuzman's numerous requests for subpoenas—including but not limited to requested subpoenas to Parker Poe (Maiden's counsel) (Dkt. 534), Smyth and Campion (Dkt. 535), the Bureau of Prisons (Dkt. 478) and ROO Group's / KIT Digital's former outside counsel conducting internal investigations (Dkt. 534; *see also* Mem. of Law in Support of Rule 17(c) subpoena to Morgan Lewis, dated Oct. 6, 2017), Isaza Tuzman was deprived of the opportunity to confront the witnesses against him and to present a full and fair defense to the charges against him.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment of acquittal for Isaza Tuzman on Counts Four and Five, grant Isaza Tuzman a new trial for Count Six, and conditionally grant a new trial for Counts Four and Five. *See* Fed. R. Crim. P. 29, 33.

Date:   February 12, 2018          Respectfully submitted,
        New York, New York

                                   GIBSON, DUNN & CRUTCHER LLP


                                   By:   /s/ Avi Weitzman
                                         Avi Weitzman
                                         (aweitzman@gibsondunn.com)
                                         Marcellus McRae
                                         (mmcrae@gibsondunn.com)
                                         Amer S. Ahmed
                                         (aahmed@gibsondunn.com)

                                   200 Park Avenue
                                   New York, NY  10166
                                   Telephone:    (212) 351-4000
                                   Facsimile:    (212) 351-4035

                                   333 South Grand Avenue
                                   Los Angeles, CA  90071
                                   Telephone:    (213) 229-7000
                                   Facsimile:    (213) 229-7520

                                   *Attorneys for Defendant Kaleil Isaza Tuzman*

66

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 12, 2018, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

    */s/ Avi Weitzman*
Avi Weitzman