**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Avi Weitzman
Direct: +1 212.351.2465
Fax: +1 212.351.5265
AWeitzman@gibsondunn.com

March 21, 2018

VIA ECF

The Honorable Paul G. Gardephe
United States District Judge for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007-1312

Re:   United States v. Kaleil Isaza Tuzman, S8 15 Cr. 536 (PGG)

Dear Judge Gardephe:

On behalf of defendant Kaleil Isaza Tuzman, we respectfully request permission to file this letter in reply to the government's omnibus Opposition to the Defendants' Rule 29 Motions for Judgments of Acquittal (Dkt. 750) ("Gov't Br."). The government's opposition brief mischaracterizes the trial record, cites a number of cases incorrectly, and advances red herring contentions that fail to engage with fatal errors identified in our opening brief. While the Court did not specify a schedule for the filing of a reply brief (Dkt. 631, 732), we respectfully request the Court's permission to file this reply letter to provide critical corrections and amplifications to the record.

A.   **Mischaracterizing the Record To Falsely Suggest There Was Market Manipulation After August 2010, the Government's Opposition Does Not Demonstrate an Overt Act** *in Furtherance of* **the Charged Market Manipulation Conspiracy Within the Applicable Five-Year Statute of Limitations.**

In his opening brief, Isaza Tuzman demonstrated that the objective of the market manipulation conspiracy charged in Count Four was to boost the price and volume of KIT Digital's stock in advance of two events: (1) a capital raise involving Vision Capital in the first quarter of 2009, which did not ultimately consummate, and (2) KIT Digital's listing on the NASDAQ on August 12, 2009. Opening Br. 6–7. Isaza Tuzman further demonstrated that the communications introduced between Maiden and Isaza Tuzman immediately after the NASDAQ listing show that Maiden and Isaza Tuzman were no longer acting in concert in furtherance of the charged conspiracy and that Isaza Tuzman had communicated to Maiden that he was indifferent to Maiden's purchases and actively encouraged Maiden to sell KIT Digital stock. Opening Br. 7–8. Because the object of the charged conspiracy— propping up KIT Digital's stock to ensure a smooth NASDAQ listing—had been achieved by August 2009, the conspiracy to manipulate KIT Digital's stock had ended a ***full year***

**GIBSON DUNN**

March 21, 2018
Page 2

before the August 12, 2010 cut-off for the statute of limitations. *See United States v. Ben Zvi*, 242 F.3d 89 (2d Cir. 2001) (The "conspiracy must still have been ongoing within the [limitations] period preceding the indictment."). The government adduced no evidence at trial that shows any overt act undertaken by a co-conspirator after August 12, 2010, which the government concedes is the applicable date for the statute of limitations.[1]

In opposition, the government still fails to show any overt act ***in furtherance of*** the charged conspiracy within the limitations period. The thrust of the government's response is that Maiden Capital's trading in the limitations period was *per se* "facially manipulative" because it was, in the government's words, "uneconomic"—a euphemism the government invents to describe non-profitable day trading where Maiden bought and sold "roughly the same number of shares on the same day, at a loss." Gov't Br. 36. Maiden Capital engaged in over 4,000 trades of KIT Digital stock over a more than three-year period from June 2008 through September 2011, *see* GX 411-A & GX 411-B, and a great number of the trades were "uneconomic" and undertaken on the same day. If the trial showed anything it is that Maiden was an incompetent investment manager whose day trading activities—which he reluctantly admitted he sometimes undertook while drunk, Tr. 1488:5–21, 1501:15–1502:13, 1687:13–20—resulted in tremendous undisclosed losses to his investors. As Maiden described it on the witness stand, his trading spit his clients' money "out like a tornado grabbing my ankles, shaking, flinging wealth on to an open fire." Tr. 1092:1–10.

Indisputably, none of the open market trading by Maiden after the NASDAQ listing and within the limitation period presented any of the "traditional badges of manipulation," such as the use of fictitious accounts, wash sales, or dissemination of false literature, to name just a few. *See United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (reversing market manipulation conspiracy where open market trades did not involve hallmarks of manipulation). Thus, the government adopts a surprisingly expansive and dangerous theory of "uneconomic trading" as "facially manipulative." *See* Gov't Br. 36. The government's

---

[1] The government erroneously asserts that "the defendants appear to essentially concede" the sufficiency of the evidence of a market manipulation conspiracy. Gov't Br. 33. Omar Amanat squarely challenged the sufficiency of the Count Four evidence, Dkt. 735 at 24, and Isaza Tuzman incorporated that challenge by reference, Opening Br. 2 n.2. Moreover, the government's claim that the December 31, 2008 agreement is "remarkable written evidence of the conspiracy's genesis," is counter-intuitive. Gov't Br. 13. The evidence at trial showed that this investment contract, which included an arbitration provision that one would ***not*** expect to see in a written-criminal agreement, was entered into for an equally plausible lawful reason: Isaza Tuzman occasionally reached out to secure investments in KIT Digital from select professional investors whom he believed to be "value-added shareholder[s]." *See* KIT Ex. 2233 and Tr. 6385–86. The December 31, 2008 agreement was simply a concrete incarnation of that strategy.

GIBSON DUNN

March 21, 2018
Page 3

theory in effect converts almost every intraday bet that Maiden Capital wagered in KIT Digital (or any other stock) into market manipulation.  Whether or not profitable, day trading is legitimate and legal market activity, as both the SEC and FINRA have made clear.[2]  *See* Opening Br. 19–20.  Indeed, day traders make markets and thus provide necessary liquidity.  *See* Bank for Int'l Settlements, Committee on the Global Financial System, Market-making and proprietary trading: industry trends, drivers and policy implications, at 1, 6 (Nov. 2014) (market makers increase liquidity), https://www.bis.org/publ/cgfs52.pdf.  The government's efforts to equate unprofitable day trading with *criminal* market manipulation would create a precedent that threatens to chill market activity that the securities regulators have long permitted and that can benefit the securities markets.

As an example of "uneconomic trading" within the limitations period that the government contends is "facially manipulative," the government offers only a single day's trading activity:  that of September 8, 2011.  Gov't Br. 38.  It is telling, however, that the government did not elicit any testimony from Maiden regarding his trading in KIT Digital on this particular date, let alone any testimony that Maiden's sole intent in engaging in these "uneconomic" trades was to further the market manipulation conspiracy.  Indeed, only Mr. Melley, the government's highly flawed FINRA witness, was asked about the September 8, 2011 trades, and his testimony proved only that the trades on that day were not profitable, not that they were manipulative.  Tr. 5044:24–5045:21.  Indeed, given that the September 8, 2011 trades occurred at different times of day and at different prices, by definition they were not manipulative wash trades.  *See* Opening Br. 16.

Given the absence of any testimony by Maiden about the September 8, 2011 trade, the government resorts to mischaracterizing the record.  The government claims that "Maiden testified that *in August and September 2011*, he continued buying and selling KITD stock with the goal of 'supporting or pumping the stock even with the limited assets I had at this point.'"  Gov't Br. 38 (quoting Tr. 921) (emphasis added).  Maiden said no such thing, either about the September 8 trade or any other trade in September 2011.  In fact, the exchange on which the government relies concerned an August 2, 2011 text message in which Maiden noted that KIT digital "[s]tock very heavy today" but did not include *any communication* regarding Maiden's own trading activity.  Immediately after testifying about this text message, the government asked Maiden the leading question whether he continued to "buy and sell" KIT digital stock "in this time period."  Tr. 920:17–921:23.  But testimony about "this time period" cannot include every single trade after August 2, 2011, as the government

---

[2]  SEC, Day Trading: Your Dollars at Risk, Apr. 20, 2005, https://www.sec.gov/reportspubs/investor-publications/investorpubsdaytipshtm.html ("While day trading is neither illegal nor is it unethical, it can be highly risky. . . . **Be prepared to suffer severe financial losses**.") (emphasis in original).

GIBSON DUNN

March 21, 2018
Page 4

seems to suggest. Given the absence of any testimony from Maiden specifically about his trading on September 8, 2011, it is a far reach to contend, ***for the first time in post-trial briefing***,[3] that those specific trades are overt acts within the limitations period.[4]

Indeed, Maiden's testimony shows that any manipulative trading in the August 2011 time period was done for Maiden's independent reasons, not in furtherance of the charged market manipulation scheme. Maiden explained that he was "laser focused" on the price of KIT Digital stock because KIT Digital "was my [Maiden Capital's] only—essentially my only asset."[5] Tr. 921:24–25. Maiden notably did not mention being "laser focused" on KIT Digital due to a manipulation conspiracy entered into with Isaza Tuzman. Maiden's motivation to enhance the value of his own fund and present a better picture to his own investors, without any discussions with Isaza Tuzman about Maiden's trading activity, only highlights that his trading activity after August 2010 was ***not undertaken in furtherance*** of the charged conspiracy.[6]

Without any actual manipulative trading within the limitations period, the government cites the August 2, 2011 text message between Maiden and Isaza Tuzman—where Maiden

---

[3] The government did not identify Maiden's trading on September 8, 2011 as an overt act in furtherance of the Count Four conspiracy either in the indictment or in the May 1, 2017 letter from the government that purported to identify "examples of acts committed within the statute of limitations for Count Four." See S8 Indict. ¶ 76; Dkt. 399-1 at 1–2.

[4] The government's Rule 29 opposition brief did not reference as overt acts within the limitations period either of the post-August 2010 overt acts identified in the indictment (the March 2011 trades by Maiden Capital in KIT Digital or the July 2011 settlement meeting in Manhattan). That is because, as shown in our moving brief, the March 18, 2011 trades, which accounted for less than .01% of the volume of KIT Digital trading that day, could not have been in furtherance of any market manipulation conspiracy, and the July 2011 settlement meeting had nothing to do with the charged market manipulation scheme either. See Opening Br. 17, 23.

[5] The government does not dispute that Maiden traded in KIT Digital stock for numerous reasons aside from the Count Four conspiracy—because he was a true believer in the company, because he was a day trader, because he had to satisfy margin calls, and because he was trying to independently manipulate KIT Digital's stock to buoy his hedge fund's net value. Opening Br. 19–22.

[6] The government implicitly acknowledged its inability to link Maiden's post-August 2010 trading to Isaza Tuzman or the charged conspiracy when it asked Maiden, with respect to the August 2011 "time period," "did Mr. Isaza Tuzman tell you to stop buying KIT digital stock?" Tr. 922:3–8. Maiden's responsive "no" was demonstrably false, given the multiple offers from Isaza Tuzman after August 2009 to help Maiden Capital sell its KIT Digital holdings. See Opening Br. 8–10. But, more importantly, a CEO of a publicly traded company has fiduciary duties to investors that prohibit the CEO from "try[ing] to drive investors away" from the stock. See Tr. 1656:23–1658:11.

GIBSON DUNN

March 21, 2018
Page 5

commented that "[s]tock very heavy today"—as an overt act in the limitations period. Gov't Br. 38. But the government still offers no explanation for how that August 2 text message itself was *in furtherance* of the charged conspiracy. Even taking all inferences in favor of the government, that text message was precisely the type of innocuous communication that investors routinely have with CEOs, as Maiden acknowledged. *See* Tr. 1656:8–18 (Maiden agrees that "[i]nvestors . . . have literally hundreds of conversations with CEOs over the course of the year" and that "Kaleil wouldn't be doing his job if he didn't talk to investors"). Indeed, the rest of the August 2 communication reveals its innocent purpose, because Maiden asked if Isaza Tuzman was "[h]earing any specific concerns that could be causing it [the heaviness in the stock]?" GX 1786-I. In seeking information to understand recent events in the market, Maiden made clear that he was not looking to further a market manipulation scheme; had he merely sought to engage in market manipulation, he would have no need for such information and could simply engage in a large trade to counteract the heaviness in KIT Digital's stock. The fact that Maiden did not engage in any trades of KIT Digital on August 2, 2011 further confirms that Maiden's had no intention to further the manipulation conspiracy by sending that text message. Because the August 2, 2011 email is equally consistent with innocence, it cannot be an overt act in furtherance of the conspiracy. *Mulheren*, 938 F.2d at 372 (reversing market manipulation conviction of investor who made open market purchases of stock; court expressed "misgivings" about government's theory in context of open market purchases and reversed conviction because defendant's communications were equally consistent with an illicit manipulation scheme as they were made with a legitimate investment purpose).

The government distorts the record in multiple additional ways in opposition to Isaza Tuzman's statute of limitations motion. The government, for example, asserts that "Maiden testified that he continued to purchase KITD shares, pursuant to his agreement with the defendants, *in 2010*, and that he regularly spoke with Isaza Tuzman about his continued purchases of KITD." Gov't Br. 35–36 (citing Tr. 810–11) (emphasis added). Maiden offered *no such testimony* about communications into the limitations period. Rather, the government cites solely testimony from Maiden about his trading in "th[e] period of time between February 2010 and July 2010," Tr. 810:24–811:5, which is the period directly before the five-year statute of limitations ran (August 12, 2010).[7]

---

[7] The government even distorts the record about Maiden Capital's trading outside the limitations period. The government claims that Maiden testified that his trading on July 29, 2010—when Maiden engaged in "uneconomic" day trading of KIT Digital—was manipulative because Maiden "did so 'to generate volume . . . it creates volume and volume creates the appearance of strength for other investors looking at the stock.'" Gov't Br. 36 (ellipsis in original). But hidden in the government's ellipsis is Maiden's rank speculation, seven years after the fact, that he "*may have thought*" he was "pushing the stock up" through this trade. Tr. 812:2–8 (emphasis added). Maiden's

GIBSON DUNN

March 21, 2018
Page 6


Similarly, the government continues to twist Professor Ferrell's testimony. Without any record citations, the government asserts that Professor Ferrell "testified about numerous dates that Maiden did, in fact, have a statistically significant impact on KITD's stock price, *including eight dates* after August 12, 2010." Gov't Br. 39. This is simply not true. Professor Ferrell did not and could not offer testimony about whether Maiden was the cause of any statistically significant movements in KIT Digital stock. Opening Br. 35–37. Rather, his testimony and expert analysis showed only that there were eight days after August 12, 2010, when there were statistically significant movements in KIT Digital's stock price, without any attribution of cause. Furthermore, Maiden Capital only traded on four of those eight dates, and Maiden Capital did not trade a single share of KIT digital stock on the remaining four dates. *See* KIT Ex. 3923. Even on those dates Maiden Capital did trade KIT Digital stock, on two of those four dates (8/16/10 and 6/13/11) Maiden Capital was a ***net seller***, not a net buyer. *See id.* Nothing in Professor Ferrell's analysis supports the government's assertion that Maiden undertook any trading in furtherance of the charged manipulation scheme after August 2010.

Finally, the government misconstrues Isaza Tuzman's argument, asserting that "Isaza Tuzman[] claims that he withdrew from the conspiracy after the NASDAQ listing." Gov't Br. 37. Rather, Isaza Tuzman argued that, after the NASDAQ listing, there was no conspiracy from which Isaza Tuzman needed to withdraw, for it had completed its objective. In any event, the evidence was sufficient to show that Isaza Tuzman withdrew from the conspiracy before August 12, 2010 because he repeatedly communicated directly to his alleged co-conspirator, Maiden, that he did not care whether Maiden continued to purchase KIT Digital stock. Opening Br. 7–10. The government derides these statements as "sporadic," Gov't Br. 37, but a defendant is not required to "hire[] a calligrapher to print formal notices of withdrawal to be served upon coconspirators." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988). Just as the defendant in *Nerlinger* successfully withdrew from a conspiracy by "closing [an] account [used to commit the crimes] in the face of [the co-conspirator's] invitation to continue" the conspiracy, *id.* at 975, Isaza Tuzman repeatedly acted contrary to the ends of the purported conspiracy by supplying opportunities for Maiden to sell his stock, Opening Br. 7–9, and by declining to engage with Maiden regarding the price of KIT Digital's stock, Opening Br. 9–10.

For these reasons, the Court should order a judgment of acquittal on Count Four.

---

complete testimony thus only confirms the uncontroversial proposition that a purchase of stock results in increased volume.

**GIBSON DUNN**

March 21, 2018
Page 7


B. **The Government's Opposition Fails to Articulate Any Cognizable Theory of Wire Fraud Based on Isaza Tuzman's Exercise of Discretion To Invest a Small Amount of KIT Digital's Surplus Cash in Maiden Capital.**

In his opening brief, Isaza Tuzman demonstrated that the government's theory of prosecution improperly sought conviction based solely on alleged deceit and fiduciary breach that did not concern an essential element of the bargained-for investment in Maiden Capital. *See generally* Opening Br. 25–33. The government's opposition does nothing to rebut this ground for reversal. The government instead morphs its wire fraud theory beyond all recognition: it now contends that "the defendants deprived KITD shareholders of economically valuable information that would have been material to their decisions ***as to whether to invest in KITD***."[8] Gov't Br. 42 (emphasis added). The government thus now claims that Isaza Tuzman's non-disclosure of information about Maiden Capital was material to shareholders' decision to invest in KIT Digital—essentially a theory of securities fraud presented as a wire fraud. But this wire fraud theory was never noticed in the indictment and thus constitutes an impermissible constructive amendment. *See Stirone v. United States*, 361 U.S. 212, 217 (1960) (reversing conviction where indictment was constructively amended). The government further engages in improper bootstrapping to the market manipulation scheme, by claiming that the December 2008 "market manipulation agreement" itself reflects a scheme to "defraud[] KIT Digital's shareholders." Gov't Br. 4. The government's ever-shifting theory of wire fraud shows the fundamental flaws in the government's charges here. Under their new theory of wire fraud, what was the money or property Isaza Tuzman allegedly schemed to defraud? Was it money controlled by KIT Digital, which Isaza Tuzman caused to invest in Maiden Capital, or was it the money of shareholders, who invested in KIT Digital without knowledge of Isaza Tuzman's relationship with Maiden Capital? No theory of constitutional jurisprudence permits the government's wire fraud theory to morph in this way.

Even the original theory of prosecution contained in the indictment cannot support Isaza Tuzman's wire fraud conviction. The government's opposition brief makes no real effort to distinguish any of the "essence of the bargain" cases cited in our opening brief, *see* Opening Br. 27–31, and does not explain in what ways Isaza Tuzman's decision to invest KIT Digital money in Maiden Capital was based on misrepresentations that went to the essence of the bargain. The bargained-for exchange was that KIT Digital invested in Maiden Capital to secure whatever market returns the hedge fund obtained. The information ***not disclosed*** that

---

[8] Given that only one defendant was charged with wire fraud in Count Five, the government's use of the plural "defendant*s*" is curious, and only highlights again the prejudicial spillover that inevitably followed from the government's repeated efforts to lump Isaza Tuzman and Amanat together.

GIBSON DUNN

March 21, 2018
Page 8

concerned the material terms of that bargained-for exchange was that Maiden was engaged in a fraudulent Ponzi scheme using made-up investment returns.

Viewing the facts in the light most favorable to the government, the evidence at trial proved—and the government does not dispute—that Isaza Tuzman was deceived by Maiden about his hedge fund's returns, not that he withheld any information about those returns. *See* Opening Br. 29 n.15. For example, Maiden sent Isaza Tuzman an email dated March 24, 2009, in which he falsely advised Isaza Tuzman that his "fund [was] up 3% or so this month on your 200k investment so far," to which Isaza Tuzman responded, "Glad to hear fund is up!" GX 1555. Maiden conceded that this was a lie, and that he did not disclose the truth to Isaza Tuzman. Tr. 1759:9–25. Then, in September 2010, Isaza Tuzman asked Maiden for the amount of "market appreciation" of Isaza Tuzman's personal holdings with Maiden Capital, revealing that Isaza Tuzman believed that there was actual market appreciation, not fabricated numbers. KIT Ex. 3177 & Tr. 1763:12–1764:2. Maiden repeatedly sent Isaza Tuzman fictitious market returns for his hedge fund, which Maiden conceded had the effect of deceiving Isaza Tuzman. GX 1824 & Tr. 1763:24–1764:20; KIT Ex. 3361 & Tr. 1766:4–9; KIT Ex. 3362 & Tr. 1786:16–1787:19; GX 1786-C & Tr. 1787:24–1789:21. Maiden conceded he never informed Isaza Tuzman of Maiden Capital's significant trading losses. Tr. 1764:13019. Indeed, as late as February 2011, Isaza Tuzman still believed Maiden Capital was "performing well" and that its returns warranted consideration for Maiden Capital to serve as Isaza Tuzman's primary personal money manager. GX 878, 1661-AR ("I promise to invest again ASAP, and if/when there is a positive exit event in KIT digital, you will be my primary money manager."). Because Isaza Tuzman himself was a victim of Maiden's fraud and had no knowledge of Maiden Capital's fictitious returns, he could not have deprived KIT Digital or its shareholders of any information that was material to the essential terms of the investment bargain.

Unable to articulate any material misrepresentations relevant to the Maiden Capital investment, the government instead relies on self-serving bromides. The government asserts that its theory "was text book wire fraud." Gov't Br. 40. Not true. At its core, the government's theory was a "right to control" theory of wire fraud—that Isaza Tuzman deprived KIT Digital shareholders of the right to control the company's money. Those "right to control" cases uniformly concern misrepresentations made by a defendant to the actual decision makers who exercised discretionary authority over the investments. *See, e.g.*, *United States v. Tagliaferri*, 648 F. App'x 99, 104 (2d Cir. 2016) (summary order); *United States v. Binday*, 804 F.3d 558, 566–67 (2d Cir. 2015); *United States v. Levis*, 488 F. App'x 481, 486 (2d Cir. 2012) (summary order); *United States v. Dinome*, 86 F.3d 277, 279 (2d Cir. 1996). Here, however, Isaza Tuzman himself—not KIT Digital's Board, executives, employees, accountants, or shareholders—exercised the discretion whether to invest small amounts of KIT Digital's cash on hand with Maiden Capital. *See* Opening Br. 26–27 & n.12.

**GIBSON DUNN**

March 21, 2018
Page 9

Whatever alleged misrepresentations Isaza Tuzman made to subordinates, auditors, or shareholders could not have been for the purpose of obtaining control over KIT Digital's investments with Maiden Capital, because Isaza Tuzman already had that control. Thus, his statements were, at most, a deceit, not intentional fraud.

Given Isaza Tuzman's right to unilaterally invest in Maiden Capital, this case is more akin to *United States v. Zauber*, 857 F.2d 137 (3d Cir. 1988), which we cited twice in our opening brief but which the government did not address. In *Zauber*, the government argued that pension fund trustees vested with authority to make investment decisions deprived the fund of its right to control its money when they concealed the personal bases (kickbacks) for those decisions. The Third Circuit held that the defendants did not "deprive[] the pension fund of control over its money" because they had already been given "the power and the authority to invest the fund's monies with others" and so had not fraudulently "appropriated" anything even if they deceived the fund about the true motivations for their decisions. *Id.* at 147. The same is true of Isaza Tuzman, who had already been granted discretion and control over these investments under the KIT Digital investment policy. He could not have deprived KIT Digital of any right to control simply by concealing from his subordinates the purpose behind his own discretionary decisions.

Finally, the government's cited cases are no help to its cause. They only serve to highlight the deprivation of "necessary information" required to establish intent to defraud but absent here. In *United States v. Dinome*, for example, the misrepresentations at issue concerned an indisputably material part of the bargained-for exchange: a witness from the victim bank testified that the bank loan would not have been made had the bank been informed of the defendant's true income, since the lower income "significantly diminished 'the ultimate value of the mortgage transaction' to the bank." 86 F.3d at 284 (brackets and citation omitted). Similarly, the conduct at issue in *United States v. Tagliaferri* (an unpublished summary order) was recognized as "the kind of conduct 'clearly proscribed' by the wire fraud statute" because it involved failure to disclose "kickbacks, cross-trading, and creation of fictitious sub-notes" that "unquestionably" concealed from the victim the "economic risk" of the transaction. 648 F. App'x at 103–04. In contrast, in this case, the concealed information did not bear directly on economic risk. The purported "improper purpose" for which Isaza Tuzman invested in Maiden Capital was to reward the hedge fund for its assistance to KIT Digital (i.e., the December 31, 2008 agreement). That motivation does not go to the economic risk of the investment. Nor does the fact that Isaza Tuzman sought a personal redemption of his $250,000 investment at the same time that he caused KIT Digital to invest that amount in Maiden Capital. There is nothing uncommon or suspicious about a hedge fund seeking to keep its AUM (assets under management) at a consistent level in the face of a redemption, so it would be unsurprising for a professional manager to request that an investor help the investment manager obtain another investment of similar size at the

GIBSON DUNN

March 21, 2018
Page 10

same time as a redemption. And, even if Isaza Tuzman had been informed that Maiden Capital was illiquid at the time of his requested investment—and there is no evidence in the record to support that Maiden ever told him that—this information would not reveal anything new or nefarious because KIT Digital was already informed that Maiden Capital invested in illiquid securities. *See, e.g.*, Tr. 1127:24–1129:21; AX 6016 at 12 (Maiden Capital "will invest a significant portion of its assets in the stocks of companies with small market capitalizations . . . [which] involve higher risks . . . . [D]ue to thin trading . . . , an investment in these stocks may be more illiquid."). Indeed, liquidity risk is endemic to any hedge fund investment.

In short, the government has not shown that Isaza Tuzman had any intent to defraud KIT Digital—the company that Isaza Tuzman built and in which he was the largest shareholder over time—because no representations from Isaza Tuzman caused KIT Digital's investments in Maiden Capital. Isaza Tuzman had sole and unilateral discretion to authorize those investments. Count Five is, at bottom, a breach of a fiduciary duty claim masquerading as wire fraud. The government's efforts to change that theory at this late stage to a more traditional securities fraud theory further exposes the inherent defects in the original claim. The Court should order a judgment of acquittal on Count Five.

C.   **The Government's Improper Summation Statements, Taken Together, Amount to Insurmountable Prejudice.**

The government's opposition brief attempts to downplay the impact of its myriad improper statements, including with respect to its improper attempt to lower its burden of proof by referencing witnesses it could have called and its supposed "mercy" in declining to offer additional evidence. Gov't Br. 48–50. But the Second Circuit recently vacated a conviction because the prosecution did just that. In *United States v. Ballard*, No. 17-427-CR, 2018 WL 1357392 (2d Cir. Mar. 16, 2018) (summary order), the prosecution "insinuated that it had more evidence incriminating [the defendant] in the charged crimes that it had not been allowed to offer in evidence," which the Second Circuit explained improperly "appear[ed] to reduce the government's burden to prove guilt beyond a reasonable doubt at trial." *Id.* That error, along with an additional error,[9] was not harmless because the prosecution's case "principally relied on the testimony of three victims, whose credibility was disputed, and whose testimony, as the government acknowledged, presented occasional irreconcilable differences on material matters." *Id.* That is exactly the case here, where the only witnesses

---

[9] The other error concerned the government's mischaracterization of the defendant's defense as one in which the FBI and investigators actively attempted to frame the defendant, whereas the actual defense was that one investigator permitted one victim-witness "to feel protected and immune from harm if she lied about Defendant's role." *Ballard*, 2018 WL 1357392.

**GIBSON DUNN**

March 21, 2018
Page 11

that had incriminated Isaza Tuzman were the three cooperating witnesses—Maiden, Campion, and Smyth—all of whom had serious credibility issues.  This error, in addition to the others outlined in Isaza Tuzman's Opening Brief, support a new trial.

Respectfully submitted,

Avi Weitzman

cc:  All Counsel of Record (via ECF)