**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KALEIL ISAZA TUZMAN, and<br>OMAR AMANAT<br><br>Defendants. | No. 15-cr-536 (PGG) |

**SENTENCING MEMORANDUM OF OMAR AMANAT**

Randall W. Jackson
Joanna Wright
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

June 18, 2018                    *Attorneys     for     Omar     Amanat*

## PRELIMINARY STATEMENT

Fully aware that the Court, having presided over a lengthy and complex trial, already is deeply familiar with Omar Amanat, we respectfully submit that Mr. Amanat is not fully defined by any of the crimes that he may have committed. Omar is a loving father of six children with whom he maintains a close and caring relationship. He is a devoted son who has served as a primary caretaker to his parents as they have dealt with serious medical issues. He is a person who has spent significant amounts of time working with domestic and foreign charities.

Omar has dealt with, and continues to deal with, serious emotional and psychological trauma from the time he was very young. He also continues to deal with severe health issues that have only been exacerbated by a difficult and lengthy period of pre-sentence detention in one of the harshest facilities in the country.

Moreover, even accepting the worst inferences that can be drawn from the evidence, Omar is not an individual who falls anywhere near the worst end of the culpability spectrum for fraud. Omar was not the principal of the Maiden Capital crimes. He was essentially convicted under complex aiding and abetting theories, even for the crimes that were not explicitly charged as such.

Finally, the Guidelines range set out in the PSR is incorrectly calculated, but even the correctly calculated range would be grossly excessive given the circumstances. For all of these reasons, as set out more fully below, we respectfully submit that the Court should exercise leniency and mercy at sentencing, and impose a sentence far below the appropriately calculated Guidelines range.

# I.    DISCUSSION[1]

## A.    The PSR Miscalculates the Guidelines Range

### 1.    The PSR Incorrectly Calculates the Loss Amount for Counts One, Two and Three

Based on information supplied by the Government, the PSR concludes that the appropriate loss amount for Counts One, Two, and Three is $7.3 million dollars. PSR ¶ 150. The PSR justifies this calculation by observing that: "[p]er the Government, Maiden testified that AMANAT was aware of the size of Maiden Capital and of the significance of the Enable investment to Maiden Capital. Therefore, it was reasonably foreseeable to AMANAT that Enable fraud could bring down Maiden Capital and case[sic] investors to lose all of their money." PSR ¶ 150.

As set forth at page 45 of the PSR, we objected to the initial PSR's calculation of an $8 million loss amount on the basis of (1) the PSR's and the Government's total failure to offer any explanation of how the $8 million dollar figure was determined, and (2) the fact that the PSR failed to account for the funds Omar Amanat sent to the purported victims, pursuant to Section 2B1.1, Application Note 3(E) ("loss shall be reduced by... [t]he money returned... by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."). The final PSR takes into consideration the amounts sent by Omar to the Maiden Capital investors, and therefore reduces the loss amount for these counts from $8 million to $7.3 million. It still fails, however, to offer any coherent

---

[1] This submission assumes the Court's familiarity with the facts of the case, as set out at trial and in our prior submissions, as well as with the defendant's personal background, as set out in the PSR ¶¶ 178 -213.

explanation of how the Government arrived at this figure. As we stated in our objections, the trial record does not support the conclusion that the applicable loss on these counts exceeded $6,500, so the base offense should be 7, and there should be no increase under 2B1.1(b). Even the most aggressive view of the evidence, taking into account all of the investor money that actually went to Enable, could not support any conclusion that the loss was more than $3.5 million.

While loss calculations need not be precise, the Government has the burden of demonstrating that the actual loss at issue was reasonably foreseeable to the defendant and that there is a causal link between the defendant's conduct and the loss amount. *See* U.S.S.G. § 2B1.1, app. note 3(A)(i); *United States v. Lacey*, 699 F.3d 710, 715 (2d Cir. 2012) ("'actual loss is in turn defined as 'the reasonably foreseeable pecuniary harm that resulted from the offense'") (quoting app. note 3(A)(i); *United States v. Simpson*, 538 F.3d 459, 464 (6th Cir. 2008) ("[t]he term 'loss' in § 2B1.1(b) does not encompass every harm resulting from a crime, no matter how attenuated the causal link."); *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006) (reversing sentence under Section 2B1.1 because of failure of government to establish sufficient causal link between loss amount and defendant's conduct).

Here, the trial record is devoid of information that could support the conclusion that Omar Amanat is responsible for a $7.3 million loss amount. In fact, the trial record supports the opposite conclusion, that the actual loss amount in this case is under $6,500. There are two reasons this is the case. First, the only witness at trial with any knowledge regarding the state of Maiden Capital's finances,

Stephen Maiden, testified that by the time the charged schemes began, he had already lost the bulk of his investor's money through "bad trading" and that he continued to lose the remainder of the money through reckless and negligent trading activities, not as a result of any conduct on the part of Omar Amanat. (Tr. 1089 (Maiden admitting he was "engaged in massive gambling" with client money); Tr. 1091 ("Q. Didn't you say in your book that in early 2008, your fund 'was getting cock-stomped, down double digits already on the year'?  A. I did write that, yeah."); Tr. 1092 ("Q. You said, "I had even used options to blow myself up. Money spit out like a tornado grabbing my ankles, shaking, flinging wealth on to an open fire." Right? A. Right.  Q. That's what you -- that's how you describe your own trading situation? A. It was an impossible trading environment."); Tr. 1094 ("Q. That's fine. But to be clear, when you were talking about all of this 'shaking, flinging wealth onto an open fire,' that's trading activity where you were losing massive amounts of money that has nothing to do with your allegations regarding the conspiracy alleged in this case? A. That's correct, yes."). Indeed, it is unclear from the trial record how much investor money even remained at Maiden Capital by the start of the charged schemes. (Tr. 1118 ("Q. You were down to zero money by the time we get to some of the events that you talk about on direct, right? A. Right. Q. You had nothing? A. Yeah.  No free cash.")). Indeed, Maiden himself admitted that the actual cause of almost all of the money going out of the Maiden fund were "bad trading" and "redemptions." (Tr. 1119 ("What I'm trying to understand is putting aside the monies that you invested in Enable and KIT, where did the rest of the money go?

A. Yeah.  Bad trading.  Redemptions.  Those two places."); Tr. 1120 ("Q. You can't quantify how much money you lost due to bad trading? A. I can estimate.  It's in the millions.  It's a significant amount.")).

Second, Stephen Maiden testified that in the period leading up to the charged scheme, he had defrauded Omar Amanat of many millions of dollars, a figure that dwarfed the amount of money that Omar Amanat purportedly extracted improperly from Maiden Capital. (Tr. 1166 ("Q. So the answer to the question is, yes, you defrauded Omar Amanat, right? A. Right. . . . Q. Right.  You know that Mr. Amanat brought millions of dollars to Blue Earth at your behest? A. Right. Q. And that money was lost as a result of you defrauding him, right? A. Right.")). That is all to say that to whatever extent as much as $3.5 million improperly went out of Maiden Capital to Enable, there is no reasonable way to conclude that these funds represented investor funds rather than funds that were improperly obtained by Maiden Capital by Stephen Maiden during his Blue Earth Solutions scheme to defraud Omar Amanat.

The actual loss amount is therefore under $6,500 dollars, pursuant to Section 2b1.1(b). At the very worst, Omar should be held responsible for the alleged amount that went out Maiden Capital, reduced by the approximately $700,000 that the Government concedes Omar sent to Maiden Capital investors, which would amount to approximately $2.8 million. Indeed, Maiden made explicit at trial that the amount lost in Maiden Capital apart from bad trading and redemptions did not exceed three or four million dollars. (Tr. 1124 ("Q. So your guess is $5 million was

paid in redemptions during this time period? A. Something like that. That would be my guess. Q. So that would leave approximately three or four million? A. Right.")). For the reasons described above, however, this is not the right loss amount. The correct loss amount is less than $6,500 dollars.

### 2.    The PSR Incorrectly Calculates the Loss Amount for Count Four

The final PSR calculates that the loss amount for Count for is $25.2 million. PSR ¶¶ 151-52. There are several serious problems with this loss calculation, and the Court must reject it. First, as noted in our objections, the Government failed to supply the Probation Department with any loss calculation for Count Four at the time of the initial release of the PSR. The methodology and conclusions regarding loss amount were first disclosed to the defendants in the final PSR. This is an improper process that has prevented the defendants from having an opportunity to appropriately contest the methodology used by the Probation Department. The failure of the Government to timely proffer a loss calculation and methodology for Count Four, even after extensions were granted by Your Honor, constitutes waiver. The Court should reject the Count Four loss calculation for this reason alone.

Second, the Government has adopted what purports to be a version of the complex methodology suggested in U.S.S.G. § 2B1.1, Application Note 3(F)(ix), but the Government has injected into that methodology illogical adjustments without any citation to authority or expert analysis supporting this methodology. Application Note 3(F)(ix) provides:

> In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—
>
> (I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II) multiplying the difference in average price by the number of shares outstanding.
>
> In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry specific or firm-specific facts, conditions, or events).

U.S.S.G. § 2B1.1, Application Note 3(F)(ix). As is obvious, this is a methodology that is more appropriate for the types of liquid securities that are still being actively traded at the time that a market manipulation scheme is uncovered. The PSR ignores the part of the Application Note 3(F)(ix) formula that requires the Court to consider "the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market." Here, of course, the market manipulation scheme was never disclosed to the market while the stock was actively being traded, and therefore this entire metric is useless. Without any

7

explanation, the PSR simply leaves out any use of "the 90-day period after the fraud was disclosed to the market" and substitutes this data point with arbitrary information. There is no logic or explanation for the PSR's methodology. There is not a single case where any federal district court has employed this methodology.

The PSR states: "[t]he last Maiden Capital trade took place on September 15, 2011 . . . [t]herefore, utilizing U.S.S.G. § 2B1.1, Application Note 3(F)(ix), we have to determine the change or increase in market capitalization during the market manipulation conspiracy, which is between December 31, 2008 and September 15, 2011." PSR ¶ 152 The PSR continues:

> The next step is to estimate how much of that increase is reasonably attributable to trading by Maiden Capital in furtherance of the conspiracy . . . The closing price on September 15, 2011, was $9.95 with 42,476,000 shares outstanding, yielding a market capitalization of $422,636,200. Thus, during this period, the market capitalization from closing on December 30, 2008, to closing on September 15, 2011, increased by $410,029,100. Between December 31, 2008, and September 15, 2011, the total market volume was 137,763,007. Maiden Capital Volume was 8,273,274, or approximately 6.14 percent. Multiplying $410,029,100 by 6.14% yields an estimate of $25.2 million attributable to Maiden Capital.

PSR ¶ 152. Thus, rather than deploy the methodology set out in the application note, the Government suggests that the Court can appropriately determine the loss amount on the market manipulation scheme simply by determining how much KIT Digital stock rose during the time period of the conspiracy and simplistically attributing a percentage of that increase to the percentage of the market in KIT

digital stock representing Maiden Capital volume. In no way does this reflect a reasonable calculation of the actual loss as a result of the scheme.

The reality of the situation is that for certain economic crimes, there is no actual loss to victims, and this is precisely the situation that is presented here. The market manipulation scheme led to no measurable loss by victims, and there was no intended loss – therefore the Court should not impose a loss enhancement. *See United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998) ("In some cases of fraud, there will be a similar intent to deprive the victim of the full amount fraudulently taken. However, in other cases of fraud, the perpetrator may intend no loss . . . . If on remand the district court finds that there is no actual loss and no intended loss, then there should be no enhancement of the base offense level on account of the amount of the losses"); *cf. United States v. Krause*, 786 F. Supp. 1151, 1157 (E.D.N.Y. 1992) (refusing to impose a loss enhancement in tax fraud case where "no tax loss was intended or incurred and no tax credit was intended or incurred"). Indeed, the evidence at trial demonstrated that while he had attempted to manipulate the market, Maiden had overwhelmingly failed. *E.g.* Tr. 6136 (Ferrell direct: "Q. What is the T statistic? A. Negative .75, which means that the price movement on this day, the price movement in KIT Digital was fully explained by the market, the industry, and that normal bouncing around in stock prices").

Indeed, in both civil and criminal cases, the courts have rejected the type of illogical loss calculations suggested by the instant PSR which are disconnected from a reasonable metric for determining actual loss from a market manipulation. *See,*

*e.g., United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) (vacating sentence and remanding where district court's market manipulation loss calculation was improper, observing "we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss caused by a fraud is a critical determinant of the length of a defendant's sentence . . . . The District Court's basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in NetBet share price requires a remand to redetermine the amount of the loss, both for purposes of the sentence and restitution.") (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 340 (2005).  In *Dura*, the Supreme Court observed that:

> Normally, in cases such as this one (i.e., fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.
>
> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new

> industry-specific or firm-specific facts, conditions, or other
> events, which taken separately or together account for
> some or all of that lower price. (The same is true in
> respect to a claim that a share's higher price is lower than
> it would otherwise have been—a claim we do not consider
> here.) Other things being equal, the longer the time
> between purchase and sale, the more likely that this is so,
> i.e., the more likely that other factors caused the loss.

*Dura*, 544 U.S. at 342-43. Based on this logic, the Second Circuit in *Rutkoske*
rejected the analysis of the district court in determining the loss calculation. Here,
as in these cases, the eventual drop in value of KIT Digital stock cannot be
reasonably connected to the market manipulation scheme. Certainly the
Government has not identified evidence that would allow the Court to do so.

In sum, the burden in on the Government to demonstrate by a preponderance
of the evidence that a loss enhancement on Count Four should apply. The
Government has not identified any evidence that would support to imposition of a
loss enhancement. The calculation the Government has suggested to the Probation
Department, which is adopted in the PSR, is not the methodology set out in the
Guidelines, and it has no logical connection to any actual loss from the market
manipulation scheme. The Court should reject this analysis.

### 3.   The PSR Incorrectly Imposes a Two-Level Enhancement For A Substantial Part of the Scheme Being Committed Outside of the United States

First, again, the final PSR has improperly included in this enhancement an
additional justification that did not appear in the initial PSR, namely the portion
that states "and/or the offense otherwise involve sophisticated means and the
defendant intentional engaged in or cause the conduct consisting sophisticated

means." PSR ¶ 162. In the initial PSR, the enhancement was based only on the allegation that "a substantial part of the scheme was committed from outside the United States, pursuant to USSG § 2B1.1(b)(1)(B)." We submit that it is improper, where the defendants had no opportunity to offer objections, to offer an entirely new basis for a sentencing enhancement only in the final PSR.

Regardless, neither the enhancement for a substantial part of the scheme being committed from outside the United States or the sophisticated means enhancement applies. For the crimes involving Omar Amanat, nearly all of the fraudulent conduct during the charged conspiracy took place in North Carolina or possibly New York or New Jersey. The trial record is bereft of any description of substantial parts of either of the schemes taking place outside of the United States. Indeed, Omar Amanat and Maiden were in the United States throughout the time period of the charged crimes. Maiden conducted all of his fraudulent trading activity and fraudulent communications with investors from within the United States. There is no evidence at all of where Irfan Amanat was located when he engaged in the minor activities that the Government alleges were part of the scheme. Even if the record did establish that Irfan was overseas for any of these activities, and it does not, this would not constitute a "substantial part of the scheme."

Moreover, nothing in the record supports the imposition of a sophisticated means enhancement for Omar Amanat. The Application Note to Subsection (b)(10) provides that "[f]or purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution

or concealment of an offense." But even accepting the most incriminating version of the Government's narrative, nothing about Omar Amanat's role in the instant crime was "especially complex." Essentially, with regard to Counts One through Three, he and his brother are alleged to have made up a fake number for the value of the Enable investment and emailed it to Maiden. This is not "especially complex or especially intricate." With regard to the market manipulation scheme, it is unclear what the Government claims was Omar's role, but certainly he was not the person engaged in any of the trading or in any complex activity designed to hide the trading. Moreover none of the trading on Count Four was complex. It seems Omar was convicted on Count Four for, according to the Government, encouraging Maiden to engage in a rudimentary stock inflation scheme that merely involved repeatedly purchasing the stock. None of this could appropriately be the basis of a sophisticated means enhancement. Indeed, nothing in the PSR indicates that either of the schemes was more than a typical scheme of its type.

### 4.  The PSR Incorrectly Imposes a Four-Level Enhancement For the Defendant Being a Person Associated With an Investment Advisor

As a matter of black letter law, Omar Amanat cannot be subjected to the four-level enhancement the PSR ¶ 163 suggests for being "a person associated with an investment advisor." *See* Application Note 15, 2B1.1 ("'Person associated with an investment adviser' has the meaning given that term in section 202(a)(17) of the Investment Advisers Act of 1940 (15 U.S.C. § 80b-2(a)(17))"); *United States v. Longo*, 184 Fed. Appx. 910, 914 (11th Cir. 2006). ("Under the plain language of that

enhancement it requires a showing that (1) the defendant violated a securities law and (2) that the defendant was a qualifying individual at the time of the violation. Securities law is defined as '18 U.S.C. §§ 1348, 1350, and the provisions of law referred to in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)); and . . . includes the rules, regulations, and orders issued by the Securities and Exchange Commission pursuant to the provisions of law referred to in such section.' *Id.*, comment (n.14(A)). A person associated with an investment advisor includes partners, officers, or directors of an investment advisor and employees of an investment advisor, except (in some instances) those whose functions are clerical or ministerial. Id., 15 U.S.C. § 80b-2(a)(17).").

Omar Amanat does not fall into any of these categories and this enhancement cannot be applied. The Final PSR adopts, after a "discussion . . . with the Government," a version of the argument that the Government has made in its Opposition to the Rule 29 Motion – that Omar was essentially an investment advisor because the set of loans he made to Maiden made him essentially the owner in Maiden's mind. (PSR pg. 47). The Court should reject this argument. Under the clear language of the Guidelines and pursuant to logic, one cannot "essentially" be an investment advisor – one either is or isn't. Indeed the Court instructed the jury at trial that Omar Amanat was not an investment advisor, because he is not. The Guideline enhancement is designed to address individuals who have assumed the special fiduciary duties associated with being an investment advisor and then violated that trust. Omar, regardless of what crimes he may have committed,

14

simply does not fall within that category. It is not the case that every person who is guilty of aiding and abetting an investment advisor thus becomes subject to a four-level enhancement under Section 2B1.1(b)(19)(A)(iii). If the sentencing commission had intended to apply the enhancement this broadly, it would not have narrowly defined the scope of the enhancement to the official employees and directors identified in the Application Note.

### B.   The Guidelines Calculation Overstates the Severity of the Offense Conduct

As this Court is well aware, the Guidelines are advisory and are merely one factor to consider in determining an appropriate sentence. *See United States v. Gall*, 552 U.S. 38 (2007). Judges must consider all of the 18 U.S.C. § 3553(a) factors to make an "individualized assessment" of what sentence would be "sufficient, but not greater than necessary" to achieve the various purposes of the criminal justice system in a particularly case. *Id*. at 49-50; *see Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."). In other words, district courts "have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in § 3553(a), including the advisory Guidelines range." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

This Court "has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime" and is "generally free to impose sentences outside the recommended range" of imprisonment suggested by the advisory Guidelines. *Cavera*, 550 F.3d at 188-89. A decision to issue a non-

Guidelines sentence may be "based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also Pepper v. United States*, 562 U.S. 476, 501 (2011) ("[A] district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views"); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (the "irrationality" of the Guideline's focus on loss amount was clear where 20 of the defendant's 30 offense level points were due solely to the loss calculation).

Courts in this Circuit have increasingly recognized the problems associated with sentences in which the loss amount dwarfs all other relevant factors.  Even before *Booker*, courts expressed concern that the "Guidelines place undue weight on the amount of loss involved in the fraud," which may be "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."  *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).  Judge Rakoff was sharper in *United States v. Adelson* two years later, when he stated that "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss" rendered the Guidelines calculation "wildly off-base" and found that, in that case, "the calculations under the guidelines have so run amok that they are patently absurd on their face."  441 F. Supp. 2d 506, 508-09, 515 (S.D.N.Y. 2006).  He added:  "What this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract

arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Id.* at 512.

Judicial criticism of the Guidelines' over-emphasis on loss amount has continued to build since then.  In a concurrence in *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), Judge Underhill, sitting by designation, noted the flawed nature of the Guidelines for high-loss cases:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb.  ***The higher the loss amount, the more distorted is the guideline's advice to sentencing judges***.  As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."

*Id.* at 380 (Underhill, J., concurring) (quoting Bowman, 20 Fed. Sent'g Rep. at 168) (emphasis added).  Other judges have described Guidelines' myopic focus on loss amount as "a black stain on common sense," *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008), "of no help," *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010), and "almost useless," *United States v. Faibish*, No. 12-cr-265 (E.D.N.Y.), Sent'g Tr., Mar. 10, 2016, Dkt. 271 at 23:1-12 ("[T]he guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table.").

The Second Circuit responded to these criticisms in 2016 and held that the idiosyncratic nature of the loss amount enhancement was alone sufficient to justify consideration of a non-Guidelines sentence:

> [T]he Commission valued fraud (and theft and embezzlement) at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider. Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.

*United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citations omitted) (remanding to "permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence").

Two months ago, Judge Garaufis accepted the Second Circuit's advice in *Algahaim* to "consider the 'unusualness' of this enhancement in its determination of a reasonable sentence." *United States v. Johnson*, No. 16-cr-457-1, 2018 WL 1997975, at *3-4 (E.D.N.Y. Apr. 27, 2018) (quoting *Algahaim*, 842 F.3d at 800). He recounted the history of criticism of the loss amount enhancement, and explained his own concerns about its inability to yield a reasonable sentence:

> Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less <u>solely</u> responsible for a white-collar offender's

18

Guidelines sentence. . . . That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators. The problems with the loss enhancement have been evident since the inception of the Guidelines. In 2004, then-District Judge Gerard Lynch generously called the loss enhancement a "questionable" aspect of the Guidelines. He identified all of the problems with this scheme: the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on. These concerns have continued unabated.

*Id.* at \*3-4 (citations omitted).

For all of the reasons described in the case above, particularly where, as here, the Probation Department has recognized that a Guidelines sentence is not warranted, the Court should reject the absurdly high Guidelines range.

## C.   The Court Should Depart Downwards Based on Extraordinary Family Circumstances and Omar Amanat's General Health

The Court is empowered to impose a downward departure for extraordinary family circumstances. *See United States v. Johnson*, 964 F.2d 124, 125, 129 (2d Cir. 1992) ("The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom . . . . Extraordinary family circumstances are widely accepted as a valid reason for departure"). Here, three factors militate in favor of a downward departure on this basis. First, Omar is

a father to six children with whom he has a close relationship. PSR ¶ 182. The fact that he is a supportive father to six children alone is extraordinary – the emotional and financial burden that will be placed on his family and on his children by a lengthy term of imprisonment would be devastating. Second, one of Omar's youngest children, Daveed, who is only six years old, had a significant brain injury in recent times. PSR ¶ 183. As a result, he remains under medical care and attends physical and cognitive therapy regularly. PSR ¶ 183. For a child with a developmental challenge such as this, the lack of support of his father will be particularly difficult, both for him and the entire family. Third, Omar's parents, who are advanced in age, have both dealt with significant health challenges in recent years. PSR ¶ 185. Omar has been a primary caregiver for his parents. PSR ¶ 185. A lengthy prison sentence will have an extraordinary impact on the quality of life of his parents as they advance in age and deal with their health challenges.

Moreover, Omar's personal health warrants a departure under the circumstances. *See, e.g.*, *United States v. Hammond*, 37 F. Supp. 2d 204, 207 (E.D.N.Y. 1999) (imposing downward departure where defendant's "medical status would make service of a long sentence exceptionally onerous"). Omar has suffered from congenital heart disease since he was 26 years old. PSR ¶ 192. His family has an extraordinary history of heart disease, including the deaths of three of Omar's uncles in their 40s and early 50s. PSR ¶ 192. Omar's mother and father have both suffered from circulatory system problems, including strokes. PSR ¶ 192. Indeed, Omar himself has been hospitalized for stroke since he has been detained at the

MCC. PSR ¶ 194. In January, the Bureau of Prisons had to take Omar out of the prison to a local hospital to be treated for stroke symptoms. PSR ¶ 194. Unquestionably, the stress of prison and the limited facilities for exercise have exacerbated Omar's health issues. A lengthy prison sentence would not only impose a undue health penalty for Omar, but given his heart disease and family history, it would very likely constitute a sentence of life imprisonment.

> **D.   The Court Should Depart Downwards Based on Omar's Lengthy and Difficult Period of Pre-Sentence Detention**

Since his conviction, Omar has spent several difficult months in one of the harshest federal facilities in the country, where he has been subject to various lockdowns and frequent lack of access to items as basic as toilet paper. PSR ¶ 197. The Second Circuit has held "that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *See United States v. Carty*, 264 F.3d 191 (2d Cir. 2001). We submit that, relative to the nature of the crimes for which he was convicted, Omar's period of pre-sentence detention has been particularly harsh. Numerous commentators have discussed the extent to which detention in the MCC is extraordinarily harsh. *See, e.g.* Joseph Goldstein, "Manhattan Jail That Holds El Chapo Is Called Tougher Than Guantánamo Bay," The New York Times, available at https://www.nytimes.com/2017/01/23/nyregion/el-chapo-guzman-manhattan-jail.html. All of the worst difficulties that one can face in the MCC have been components of Omar's detention.

### E.       Consideration of the Section 3553(a) Factors Indicates That a Sentence Well Below the Guidelines Range is Appropriate

We submit that consideration of several facts, in light of the Section 3553(a) factors, militate in favor of a sentence well below the Guidelines range. First, the Court is required to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Here, the Court should take account of the fact that Omar Amanat has no criminal history and that, by the admission of the Government's chief witness, Omar repeatedly suggested to Maiden that he should disclose all facts to Maiden's investors. Regardless of whether that fact altered Omar's criminal liability, it undercuts the notion that he was a pure villain deadest on defrauding the victims of the crimes at issue here. He is not Bernie Madoff – indeed he was not the principal of Maiden Capital. In the worst version of the events of the fraud, Omar was an individual whose brother's investment company failed and who helped Maiden buy time with his investors by loaning him money. All of this was undisputedly done under circumstances where Omar believed Maiden's investors were being positioned for a windfall from the KIT Digital investment. None of this excuses any criminal conduct, but we submit that the Court has to consider Omar in light of what he actually was convicted for doing. The aiding and abetting type crime at issue here simply does not warrant anything like a decade in prison. The Government would be hard pressed to identify a defendant who engaged in conduct similar to Omar's who ever served any sentence approaching that.

Indeed, the trend in white collar fraud cases, even where defendants are convicted at trial, has been towards significantly lower sentences than those suggested by the Guidelines. Statistics provided by the U.S. Sentencing Commission show that in 2017 courts in the Second Circuit imposed a below-Guidelines sentence for 70.7% of all fraud defendants.  *See* Federal Sentencing Statistics (2017), Tbl. 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/2c17.pdf (hereinafter, "Federal Statistics").  Of these below-Guidelines sentences, nearly 60% were not government-sponsored.  *Id.*

Courts have imposed significantly below-Guidelines sentences in circumstances in various cases where the fraudulent conduct was much more significant than Omar's conduct. For example:

- In *United States v. Lumiere*, No. 16-cr-483 (S.D.N.Y.), a former portfolio manager at Visium Asset Management was convicted of securities and wire fraud for orchestrating a complex scheme to overvalue securities to inflate the value of the fund.  Gov't Sentencing Mem., No. 16-cr-483, Dkt. 98 at 1-2.  The government argued that the scheme caused a $9.5 to $25 million in loss to investors, *id.* at 3, and the parties agreed that it resulted in millions of dollars in unlawful gain.  Sentencing Tr., June 14, 2017, Dkt. 117 at 2.  Judge Rakoff varied from the Guidelines range of 87 to 108 months despite the defendant's "highly significant" role in the scheme for months and his "attempt at blackmail" to conceal his crimes, imposing after trial a sentence of 18 months of imprisonment, *id.* at 29;

- In *United States v. Block*, No. 16-cr-595 (S.D.N.Y), the former CFO of a publicly traded real estate investment trust was convicted of being the mastermind of a fraud to manipulate the company's financial results by fraudulently inflating a key metric used by investors.  *Former Chief Financial Officer of American Realty Capital Partners Sentenced For Accounting Fraud*, Dep't of Justice Press Release (Nov. 8, 2017), https://www.justice.gov/usao-sdny/pr/former-chief-financial-officer-american-realty-capital-partners-sentenced-accounting.  The Court accepted the Government's calculation of roughly $300 million in

shareholder loss and stated that the defendant had "brazenly" falsified key accounting numbers, but rejected the Government's proposed sentence of at least seven years' imprisonment. *Brian Block Sentenced To 18 Months In Prison*, Investment News (Nov. 8, 2017), http://www.investmentnews.com/article/20171108/FREE/171109929/brian-block-sentenced-to-18-months-in-prison. Noting, among other things, the defendant's clean criminal record prior to the offense and his "personal history" as a good father and friend, the court imposed a sentence of 18 months' imprisonment, *id.*;

- In *United States v. Cervino*, No. 15-cr-00171 (S.D.N.Y.), following his conviction at a three-week jury trial, Judge Carter sentenced Cervino to one year and a day for his role in a complex scheme to profit from the manipulation of the price of securities, through which the defendant received cash payments and large commissions while clients lost their entire investment. Judgment, No. 15-cr-00171, Dkt. 367 at 3. Cervino also lied to the SEC during the course of its investigation. Gov't Sentencing Mem., No. 15-cr-00171, Dkt. 362 at 3-7. Cervino's Guidelines range was 135-168 months (*id.* at 8), and thus his sentence represented a 91% reduction, after trial, from the bottom end of the Guidelines;

- In *United States v. Ghavami*, No. 10-cr-1217 (S.D.N.Y.), defendant Ghavami was the supervisor of a desk at UBS engaged in conduct that the court described as a "very serious" bid-rigging fraud scheme that "spanned years" and "victimized many municipalities as well as other bond issuers across the United States and the IRS and the U.S. Treasury." Sentencing Tr., July 24, 2013, Dkt. 426 at 123:11-17. The Government sought a Guidelines sentence of at least 210 months' imprisonment, but the court rejected much of the government's claimed loss, determined a Guidelines range of 41 to 51 months' imprisonment, and varied to a sentence of 18 months' imprisonment. *Id.* at 109:8-11, 158:19-22;

- In *United States v. Collins*, No. 07-cr-1170 (S.D.N.Y.), the defendant lawyer had prepared "legal documents over years for the transactions planned by company insiders to effect the fraud." Sentencing Tr., July 15, 2013, Dkt. 244 at 21:8-14. The Government contended that there were thousands of victims, billions of dollars in losses, and that the defendant's participation in the scheme was longstanding. *Id.* at 17:7-9, 20:6-12. Although the Guidelines called for life imprisonment, *id.* at 20:23-21:1, Judge Preska imposed a sentence of one year and one day in prison, *id.* at 36:1-2;

- In *United States v. Bonventre*, et al., No. 10-cr-228 (S.D.N.Y.), the defendants were convicted at trial and faced Guidelines ranges of life imprisonment for orchestrating the Madoff Securities fraud – the largest,

24

longest-running, and most damaging Ponzi scheme in history. The court imposed far below-Guidelines sentences for each of the several defendants, sentencing two of the defendants to just thirty months' imprisonment and two others to terms of six years' imprisonment, after literally decades of complex, fraudulent conduct facilitating the Madoff scheme. Dkts. 1225, 1232, 1233, 1243. One of the six-year sentences was for Annette Bongiorno, one of the earliest employees at Madoff, who personally reaped many millions of dollars from the fraud and perjured herself at trial. Gov. Sentencing Mem., Dkt. 1082 at 18-22, Dkt. 1225;

- In *United States v. Litvak*, No. 13-cr-19 (D. Conn.), the court rejected the government's request after trial for a Guidelines sentence of 108 months' imprisonment and imposed a sentence of two years for sophisticated fraudulent conduct affecting numerous victims, and causing millions of dollars in loss, in over 55 securities transactions over the course of three years. Sentencing Tr., July 25, 2014, Dkt. 273 at 61:13-17, 158:15-19;

- In *United States v. Graham*, No. 06-cr-137 (D. Conn.), the defendant, an in-house lawyer, was convicted of conspiracy and fraud charges for his role in a fraudulent reinsurance transaction. Judge Droney determined that the fraud caused a loss of over $500 million and that the defendant affirmatively concealed the fraudulent nature of the transaction. Order of Oct. 31, 2008, No. 06-cr-137, Dkt. 1164 at 15. The court varied from a Guidelines sentence of life imprisonment and imposed a sentence of one year and one day, along with two years of supervised release. Judgment, No. 06-cr-137, Dkt. 1269 at 1.

In each of the above cases, the defendants engaged in fraudulent conduct that was more significant and extensive than the conduct for which Omar was convict. A lengthy term of imprisonment here would run afoul of the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Third, we respectfully submit that, in consideration of both the history and characteristics of the defendant and in terms of the need to for the sentence to provide just punishment, the court should take into account the difficult aspects of Omar's family history addressed at Paragraphs 181, 189 and 196. While trauma

early in life cannot justify any improper decisions made by adults, experience has demonstrated that it can sometimes constitute a partial explanation. Assuming the worst allegations of the Government are true, so much of the decision-making in this case seems the likely product of an improper relationship to stress and poor methods of coping with difficult situations. Rather than a lengthy sentence, a substantial period of supervised release with mental health treatment as a condition would seemingly be a better use of government resources and a substantial step towards addressing the psychic injuries that may have poorly positioned the defendant from the start.

Finally, in consideration of the Section 3553(a) factors, we would ask the Court to take into consideration the significant charitable activities in which Omar has participated throughout his life. We respectfully submit that there are very few defendants who come before Your Honor for sentencing who have been significant participants in Human Rights Watch's work all over the world. (*e.g.* PSR 190). Omar was the vice president for several years of the Acumen Fund, and in that capacity spearheaded numerous efforts targeted at attacking the problems of global poverty. PSR ¶ 208. Omar worked to address malaria and other issues in poor communities in Pakistan, Indonesia, Egypt, Jordan, and Ethiopia. PSR ¶ 208. As the evidence at trial demonstrated, he later went on to participate in various charitable efforts with his then-wife Helena, in connection with Sunflower Children, in various countries throughout the world.

In sum, Omar unquestionably has made a number of mistakes in business and in life, but these mistakes are not the full measure of the man. In so many respects, he has been a devoted father, son, and member of his community.  He has been a person who has contributed much good to his family and his community, and has the potential to contribute even more. He is a man whose children and family need him and will need him for many years to come. We ask the Court to take these facts into consideration and impose a fair, lenient sentence.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should impose a sentence well beneath the Guidelines range.


Dated:  June 18, 2018                           Respectfully submitted,

<u>/s/ *Randall W. Jackson*</u>
Randall Jackson
Joanna Wright
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

*Attorneys for Omar Amanat*