UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                                  :        S1 15 Cr. 536 (PGG)

KALEIL ISAZA TUZMAN,                        :

                 Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**THE GOVERNMENT'S SENTENCING MEMORANDUM**



                                   GEOFFREY S. BERMAN
                                   United States Attorney for the
                                   Southern District of New York
                                   One St. Andrew's Plaza
                                   New York, New York 10007

Damian Williams
Andrea M. Griswold
Joshua A. Naftalis
Assistant United States Attorneys
      -Of Counsel-

## **Table of Contents**

I.    PRELIMINARY STATEMENT ....................................................................................... 1

II.   THE OFFENSE CONDUCT IN THIS CASE...................................................................... 4

    A.   The Market Manipulation Scheme........................................................................... 4

    B.   The KITD-Maiden Capital Wire Fraud Scheme................................................... 6

    C.   The Accounting Fraud Scheme............................................................................. 10

III.  THE GUIDELINES CALCULATION.............................................................................. 14

    A.   Applicable Loss Amount – U.S.S.G. § 2B1.1 ...................................................... 15

       1.   Count Four – Market Manipulation Conspiracy Loss Amount .................................. 15

       2.   Count Five – Wire Fraud Conspiracy Loss Amount .................................... 19

       3.   Count Six – Accounting Fraud Loss Amount.................................... 20

    B.   Enhancement Because the Offense Substantially Endangered a Company's  Solvency or Financial Security – U.S.S.G. § 2B1.1(b)(16)(B)(ii)........................................ 23

IV.   Application of the Relevant Section 3553(a) Factors ........................................ 25

    A.   Nature and Circumstances of the Offenses, Seriousness of the Offenses, Need  to Promote Respect for the Law, and Need for Just Punishment.......................... 25

    B.   History and Characteristics of the Defendant ................................................. 30

    C.   Deterrence............................................................................................................. 31

    D.   Unwarranted Sentencing Disparity ..................................................................... 32

    E.   Isaza Tuzman's Incarceration in Colombia ...................................................... 33

V.    CONCLUSION.............................................................................................................. 34

## Table of Authorities

*United States* v. *Bernick*, 651 F. App'x 102 (3d Cir. 2016) ........................................................ 24

*United States* v. *Ebbers*, 458 F.3d 110 (2d Cir. 2006)........................................................ 18, 19

*United States* v. *Geevers*, 226 F.3d 186 (3d Cir. 2000) ........................................................ 16, 20

*United States* v. *Gushlak*, 728 F.3d 184 (2d Cir. 2013)........................................................ 18

*United States* v. *Heffernan*, 43 F.3d 1144 (7th Cir. 1994)........................................................ 31

*United States* v. *Keskes*, 703 F.3d 1078 (7th Cir. 2013) ........................................................ 32

*United States* v. *Kumar*, 617 F.3d 612 (2d Cir. 2010) ........................................................ 18

*United States* v. *Martinucci*, 561 F.3d 533 (2d Cir. 2009) ........................................................ 32

*United States* v. *Melton*, 870 F.3d 830 (8th Cir. 2017)........................................................ 25

*United States* v. *Rubashkin*, 655 F.3d 849 (8th Cir. 2011) ........................................................ 24

*United States* v. *Rutkoske*, 506 F.3d 170 (2d Cir. 2007)........................................................ 19

*United States* v. *Vilar*, 729 F.3d 62 (2d Cir. 2013)........................................................ 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                                  :          S1 15 Cr. 536 (PGG)

KALEIL ISAZA TUZMAN,                        :

               Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America respectfully submits this memorandum in advance of defendant Kaleil Isaza Tuzman's sentencing, which is scheduled for August 10, 2018 at 12:30 p.m.  In light of the defendant's long-running and brazen criminal conduct, which ultimately ruined KIT digital, a Guidelines sentence is warranted.

## I.     PRELIMINARY STATEMENT

For more than four years, Isaza Tuzman held a position of unparalleled power within KIT digital ("KITD"), a company he fashioned in his own image and named after himself.  As Chairman and CEO, the defendant led the company with a combination of flair and fraud—brashly presenting KITD to the world as the future leader of the emergent video asset management industry while quietly propping up the company with market manipulation, wire fraud and cooked books.  It did not have to be this way.  Instead of upholding his duties of loyalty, honesty and care, Isaza Tuzman chose to lie, cheat and steal—all to maintain the false image that, just like Isaza Tuzman himself, KITD was a rising star.

The defendant left a trail of devastation in the wake of his disastrous tenure.  KITD went bankrupt.  Thousands of KITD employees lost their jobs.  Shareholders lost tens of millions of

dollars.  These are direct consequences of the criminal choices that Isaza Tuzman made—quarter after quarter, year after year—and despite his best efforts to cover it up until the bitter end.

The trial in this case revealed the scope of Isaza Tuzman's schemes in devastating detail. Over the course of thirty-two trial days, the Government established beyond *any* doubt that the defendant spearheaded three schemes, each of which was designed to fake KITD's, and Isaza Tuzman's, way to the top.  Starting in 2008, the defendant began working with Stephen Maiden ("Maiden") and Omar Amanat ("Amanat") to manipulate KITD's stock.  Starting in 2009, the defendant began fraudulently inducing KITD to invest money with Maiden's hedge fund, Maiden Capital, in order to help fund the market manipulation scheme and keep Maiden Capital afloat. And starting in 2010, the defendant began working with Robin Smyth ("Smyth"), KITD's Chief Financial Officer, Gavin Campion ("Campion"), KITD's President, and others, to inject tens of millions of dollars of fake revenue into the company, an off-books operation that the defendant and his confederates code-named "the Elephant."

There was not a fraud-free year during the defendant's leadership at KITD.  That reality, and the overwhelming evidence presented at trial, led the jury to swiftly conclude that Isaza Tuzman was guilty of all crimes charged in the Indictment.  Yet Isaza Tuzman's sentencing submission, 78-pages in all, says nothing about what he did, why he did it and whether he accepts responsibility for his *criminal* conduct.[1]  That posture is consistent with his post-trial motions in which he blames everyone but himself for his frauds—down to advancing the desperate claim that he was only convicted because Maiden, Smyth and Campion committed perjury.  (Dkt. 738, at 59 ("[T]he government's reliance on perjured testimony of star witnesses infected the jury's

---

[1]     At one point, Isaza Tuzman gestures towards remorse by vaguely claiming that "he had failings as a CEO and he accepts responsibility for his conduct."  The defendant quickly adds, however, that these supposed failings (which he never enumerates) are different from "his conduct as CEO as it relates to the offenses of conviction."  (Isaza Tuzman Br. 2.)

consideration of the evidence and corrupted the truth-seeking function of the trial process. . . .  The government never should have relied on witnesses as patently lacking in credibility as Maiden, Smyth, and Campion were.  That it did so, then attempted to rehabilitate them, and even presented their testimony as truthful in summation arguments, shows how thin the government's case was without these witnesses. . . .  Under all the circumstances, the government's reliance on these perjurious witnesses warrants automatic reversal." (citations and internal quotation marks omitted).)

In short, on the eve of sentencing and despite the jury's verdict of guilt, the defendant concedes nothing.  His refusal to accept responsibility should be taken into account as the Court considers what sentence fully accounts for the defendant's conduct and sends a message to other corporate executives like Isaza Tuzman who corrupt the companies they lead.

The United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") recommend a sentence of 262 to 327 months' imprisonment.  That range is high because the United States Sentencing Commission has recognized the threat posed by corporate corruption like Isaza Tuzman's and because of the many egregious aspects of the defendant's crimes, including his role as a director and officer of KITD, his engagement in multiple corrupt schemes committed outside the United States and his endangerment of KITD's solvency and financial security.  While the Probation Office recommends a sentence of 132 months' imprisonment, the Government respectfully submits that a Guidelines sentence would be reasonable and just, in light of the defendant's conduct, which was brazen, sustained and difficult to detect.

## II.      THE OFFENSE CONDUCT IN THIS CASE

The Court is well aware of the trial record in this case, which overwhelmingly established that the defendant orchestrated three long-running schemes that, taken together, caused KITD to collapse.  The Government here highlights the facts it respectfully submits are most pertinent to sentencing.

### A.      The Market Manipulation Scheme

As the jury unanimously found, Isaza Tuzman, working together with Maiden and Amanat, agreed on December 31, 2008 to begin manipulating the market in KITD stock.  The criminal compact was memorialized in a contract, which Isaza Tuzman subsequently hid from everyone, including KITD's auditors, who pointedly asked him for any agreements he had with Maiden. That agreement, GX 1517-A, featured heavily during the trial.  In it, Isaza Tuzman and Maiden agreed to compensate Maiden in exchange for Maiden's agreement to purchase $400,000 of KITD's common stock in the open market over a period of 90 days.  The plan worked.  KITD's trading volume and closing price skyrocketed the day Isaza Tuzman signed the market manipulation agreement and stayed elevated over the remainder of the agreement's term.

4



The manipulative conduct, however, continued well past that time. Between 2009 and 2012, the defendant worked with Maiden to prop up KITD's stock price and trading volume. (*See* GX 3036 (Amanat referring to "Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up").) Isaza Tuzman and Maiden stayed in close contact about the status of the manipulation, sometimes providing each other with play-by-play updates on their scheme, congratulating each other when the manipulation was boosting the stock and lamenting when they could not manipulate it more. (*See*, *e.g.*, GX 1540 (Maiden: "[KITD] still hasn't traded outside of me today—any progress there? Robyn and I working out getting 200k in – should come today I think – tx." Isaza Tuzman: "How much vol today? The steady trading action and market movement helps a lot. Did Robin get wire done?"); GX 1549 (Maiden: "9.25 last." Isaza Tuzman: "This is helping hugely."); Tr. 685 (Maiden, referring to GX 1549: "I think this was midday. I just emailed him because it was a new high. I had pushed it up quite high."); GX 1603 (Isaza

Tuzman: "We can't close at 7.35"; Maiden: "I can't do any more unfort[unately];" Isaza Tuzman: "Fuck"; Maiden: "Yup—shame—its half my fund—and I have no cash"; Isaza Tuzman: "You've done your best."); GX 1614 (Isaza Tuzman: "We desperately need the stock to stay strong during this process.").)

Isaza Tuzman knew that what he was doing was wrong. Indeed, he received training on the impropriety of market manipulation. (Tr. 5013, 5201.) He simply chose to toss the rules aside to serve his own interests, calculating that paying a corrupt hedge fund manager to prop up the KITD stock at key moments when he wanted to impress potential funders or acquirers was worth the risk of getting caught. The marketplace, including the analysts who covered KITD and made recommendations to investors about whether to invest in KITD, was kept in the dark. (*See, e.g.*, Tr. 2658 ("Q. In your career have you ever heard of a CEO of a public company paying a shareholder to buy its stock? A. I can't recall any – seeing anything like this before.").) And, as the Court will no doubt recall, and as the Government addresses below, Isaza Tuzman lied to KITD's independent auditors to obscure his criminal relationship with Maiden and the fact that he was using company money to fund the scheme.

### B.    The KITD-Maiden Capital Wire Fraud Scheme

On March 8, 2009, shortly after Isaza Tuzman, Maiden and Amanat commenced the market manipulation scheme, Isaza Tuzman participated in a conference call in which Maiden learned that Enable was insolvent. (*See* GX 2911 (conference call invite for Isaza Tuzman, Maiden, Omar Amanat, Irfan Amanat and Kamal Tayara); Tr. 661 (Maiden: "[Omar Amanat] told me that the money wasn't there and they couldn't access the money. I couldn't redeem any money of my Enable investment which by then was over $3 million. I asked him at one point: I can't get anything? 25,000? A hundred? No. Came the answer.").) The consequences for Maiden Capital were dire. At that point, Maiden Capital had invested more than $3 million with Enable. (Tr.

661.)  Without that money, Maiden Capital was in a cash crisis, which imperiled Maiden's ability to continue manipulating the KITD stock.  Isaza Tuzman, in breach of his obligations to KITD and with total disregard for the safety of KITD's money, caused KITD to wire $200,000 to Maiden Capital on March 10, 2009—two days after the critical March 8, 2009 conference call—in order to help keep Maiden Capital afloat.  The defendant lied to induce KITD to invest the money with Maiden and to keep it there.  He touted the $200,000 investment (and those that followed) as safe and falsely represented that KITD was "[j]ust investing in the normal operations of that hedge fund." (Tr. 2278.)   In reality, the defendant steered $200,000 to Maiden Capital on March 10, 2009 to help Maiden continue manipulating the stock. (*See* GX 1540 (Isaza Tuzman, on March 10, 2009: "The steady trading action and market movement helps a lot." Maiden: "[KITD] still hasn't traded outside of me today – any progress there? *Robyn and I working out getting 200k in – should come today I think – tx.*" (emphasis added)).  Other than the defendant, no other KITD director, officer or employee knew that KITD's "investments" with Maiden Capital were being used to prop up KITD stock and stave off Maiden Capital's financial collapse.  (Tr. 2278-79.)

In August 2009, the defendant represented to KITD's auditors that the $200,000 investment was an "inconsequential sum vis-à-vis both [Maiden's] general fund and his [KITD] ownership." (GX 1617.)  That was a lie.  Far from being inconsequential, on March 10, 2009, the same day Isaza Tuzman caused KITD to invest, Maiden told the defendant that he was struggling to meet margin calls.  (GX 1538-A ("No communication or wire from robyn so far.  Would be big to execute today – still have margin call. Tx.").)  And, significantly, the defendant lied to KITD's auditors to cover up the true nature of his criminal relationship with Maiden.  Michael Halkias, who was KITD's lead independent auditor in August 2009, pointedly questioned the defendant about the existence of any agreements between the defendant and Maiden.  At trial, Halkias testified that his "concern was that there was a possibility that the [March 2009] investment was

made in Maiden with the explicit understanding that Maiden would in return invest in KIT." (Tr. 2073.) Halkias's suspicions were correct. He informed the defendant that he was considering "disclos[ing to investors] that this investment may be deemed to be related party in nature." (GX 745.) Isaza Tuzman responded with lies. He falsely represented that "[t]here has never been any other relationship with [Maiden], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise. . . . No one at KIT digital or anyone associated with KIT digital has any suasion of any kind of his investments." (*Id.*) The defendant knew that he was misleading Halkias on a material matter that could end up being disclosed to shareholders, and made sure that Maiden was prepared to substantiate his lies. (*See id.* (Isaza Tuzman to Halkias: "I hope this note helps with respect to any information you needed around the relationship between Maiden Capital and KIT digital. I am 100% confident that Steve Maiden would verify the same."); Tr. 743 (Maiden's testimony that the defendant called him on August 12, 2009, explained that "we have an issue with the auditor related to the conflict" and asked that Maiden "minimize the impact of the shares and the money that [KITD] invested")).

Of course, the defendant did not tell Halkias about the market manipulation agreement, as he was required to do in response to Halkias's questions. Had he done so, Halkias would have recommended that KITD disclose it to its investors because, as Halkias testified at trial, the "nature of the relationship is so unique and the consequences of the investments may be profound." (Tr. 2089.) And, amazingly, the *same day* that the defendant was lying to Halkias about the lack of any secret relationship between anyone at KITD and Maiden, he wired approximately $200,000 of his personal funds to Maiden Capital to keep it on life support. (*See* GX 606 (August 12, 2009 wire from KIT Capital to Maiden Capital); Tr. 1591-2 (Maiden, referring to August 12, 2009 investment: "I told him I was desperate for cash. I had very, very little cash. I couldn't even purchase the stock at that point. . . "[T]hat's when he put in his personal over two hundred

8

thousand dollars.").)  Isaza Tuzman told Halkias nothing about this transfer, which only deepened the financial entanglements between the defendant and Maiden Capital.

The defendant continued to use lies and omissions to cause KITD to pour money into Maiden Capital.  On February 3, 2010, he caused KITD to wire $700,000 to Maiden Capital after falsely telling Smyth—who had to formally authorize the investment but was not part of the defendant's wire fraud scheme—that the $700,000 was meant to reflect how "incredibly helpful" Maiden had been "through the last offering and over the last year and a half." (GX 1633.)  In reality, the defendant steered the money to Maiden in part to compensate Maiden for his past manipulative trading and in part to assist with future manipulation.  (Tr. 810-11.)

The last investment the defendant caused KITD to make with Maiden Capital reveals the defendant's total disregard of his duties and his view that KITD was his personal piggybank.  On February 22, 2011, Isaza Tuzman wrote an email to Maiden and asked him to redeem the August 12, 2009 *personal* investment he had made with Maiden Capital.  (GX 1661-AR.)  Maiden responded with alarm, largely because he was broke.  (Tr. 826 ("I was upset because I didn't have much money and I had been very supportive of KIT digital stock and we still hadn't completed a settlement and so for Kaleil to ask for his money back angered me and worried me.").  Maiden and Isaza Tuzman then spoke by phone, and Maiden made clear that he did not have enough money to meet the redemption request.  (Tr. 1968.)  Undeterred, the defendant developed an illegal work-around.  He offered to have KITD wire $250,000 to Maiden Capital so that Maiden Capital could, in turn, redeem Isaza Tuzman's personal investment in Maiden Capital.  (*See* Tr. 828 ("[H]e suggested . . . to have KIT digital send more company money to my fund, and for me to then wire him his personal investment out"); GX 3827.)  Once again, Isaza Tuzman lied to secure shareholder money.  On February 24, 2011, after he had developed this illegal plan, the defendant falsely told Smyth that the $250,000 was a "recognition" for Maiden's "extremely helpful" work

with Asian corporate development and that the money would fit well with KITD's "strategy of cash management diversification." (GX 878.)  Despite knowing full well that Maiden was broke and could not absorb the defendant's $250,000 redemption request (Tr. 1969), the defendant told Smyth that "Maiden Capital has been performing well" and suggested that "maybe $250k"—of all numbers in the world—would be "something quite small that sends a positive message" (GX 878). Smyth believed the defendant's lies (Tr. 2281-82) and wired Maiden Capital $250,000 on March 1, 2011, as the defendant directed.  The defendant, as planned, received his personal money from Maiden Capital the same day.  (GX 3827.)   Put simply, this was not a $250,000 investment by KITD into Maiden Capital.  It was an elegant way for the defendant to dip into KITD's bank account and take $250,000 for himself.

In April 2012, KITD requested a full redemption of the $1.15 million the defendant had caused it to invest with Maiden Capital.  Because the defendant and Maiden knew that the money was gone, they coordinated a cover up.  First, the defendant fed Maiden language for an intentionally misleading email response to KITD, in which, among other things, Maiden falsely told KITD that the company held "approximately $1.367 million" with Maiden Capital as of March 2012 and that an "overnight" redemption of those funds was "disappointing" and "harmful" to the fund.  (GX 1786-AR.)  Second, Isaza Tuzman directed Maiden to send his email response at a certain time so that it would not appear "too coordinated" with the defendant's own email to the company.  (GX 1786-AQ.)  Third, the defendant told Maiden to "copy and paste" Maiden's email response into a text message so that the defendant could be "aware" of what he told the company. (GX 1786-AR.)  This evidence simply underscores the lengths to which Isaza Tuzman went to tip-toe around the truth and keep KITD in the dark.

C.    The Accounting Fraud Scheme

In addition to manipulating KITD stock and steering KITD's money to Maiden Capital under false pretenses, the defendant engaged in a brazen, multi-year accounting fraud scheme designed to misrepresent KITD's financial performance to its shareholders and auditors. Obsessed with convincing the market that KITD was capable of meeting—and beating—analyst expectations, the defendant resorted to fraud to generate the financial results he wanted. (*See*, *e.g.*, Tr. 4118 (Campion: "[H]e used aggressive language, used aggressive body language, tell me I wasn't doing a good enough job and say the company at all times had to meet market expectations, the market is never wrong.").) While Isaza Tuzman relied on others—primarily Smyth and Campion—to execute the details of the scheme, he was the architect. For instance, Campion testified that the defendant was the person who conceived of the plan to use fake licenses to inflate the company's revenue. (Tr. 4124.) Smyth said the same. (Tr. 2301 (Smyth: "He told us to enter into transactions, fake or otherwise, to make sure that we made the expectations the analysts had.").) Smyth "regularly" discussed these fake contracts with the defendant. (Tr. 2311.) Smyth and Campion typically would present the defendant with KITD's true operating results, which often fell short of analyst expectations. As Campion testified, "Mr. Tuzman would be frequently dissatisfied with [the true numbers] because they didn't meet market expectation, would instruct a dodgy license be put into those financials to make up the revenue gap." (Tr. 4125.)

From late 2010 to 2012, the defendant caused KITD to recognize more than $25 million in fake revenue. This became known as "the Elephant." And without the fake revenue that the defendant demanded, KITD would have, with the exception of one quarter in early 2011, consistently missed analyst revenue expectations. (GX 3828.) And to keep the Elephant hidden, the defendant worked with Smyth and Campion to round trip millions of dollars in company money through foreign escrow accounts managed by Rima Jameel, the convicted felon and fugitive whom

11

the defendant hired as his and KITD's outside counsel.

While the Government's trial proof focused mostly on the fake licenses that boosted KITD's revenue in late 2010 and 2011, the proof also demonstrated that the accounting fraud started much earlier, in 2009. That is when Isaza Tuzman and his co-conspirators learned that KITD had lost at least $2 million of cash with Enable. (*See*, *e.g.*, Tr. 661 (March 8, 2009 conference call about Enable insolvency); Tr. 2572 (Smyth testimony that Enable bounced check in December 2008 and that "with all the problems I didn't believe that [$2.1 million] was in a cash management account"); Tr. 2571 (Smyth testimony that he considered round tripping KITD money to pay off the Enable balance).) The defendant, however, continued to account for that $2.1 million as cash on KITD's books and obtain false audit confirmations to substantiate that incorrect accounting treatment. For a time, in 2010 and 2011, it worked. (*See*, *e.g.*, GX 1676 (Isaza Tuzman: "Let me be clear: GAME FUCKING OVER. If we don't get an [Enable] audit confirmation, this matter leaves my hands and goes to our audit committee."); GX 1665 ("irfan needs to give us an audit confirmation on Enable position . . . within next couple of days. Request came from our auditors, via our CFO."); GX 1677 (The defendant, discussing his efforts to delay the auditors in order to obtain a false Enable confirmation: "I have been buying for time with Grant Thornton since then by talking about Dubai timezone stuff, Islamic weekend, blah blah.").)

The truth was finally revealed in 2012 when the defendant was unable to get a false confirmation for the 2011 audit. Speaking to Maiden, who knew of the Enable losses and had helped Isaza Tuzman secure previous, false audit confirmations from Enable, the defendant wrote, "We're cooked." (GX 1786-AD.) And he later told Maiden, "We are hanging off a cliff" and "We are spinning down the sewer." (GX 1786-AK.)

When the company's auditors finally discovered the Enable losses, they directed that KITD remove the $2 million from its books. Peter Carpi, an analyst who covered KITD, testified that he

had never heard of a company writing off cash.  (Tr. 4492.)  He further explained that inflating cash by $2 million would have been important to his investment recommendation because, at a minimum, it would have caused "a credibility issue" and changed his valuation of KITD.  (Tr. 4492-93.)

The accounting fraud lasted multiple years because the defendant refused to stop. Campion, for instance, confronted the defendant in Prague and asked him "what would happen if [Isaza Tuzman] was found out"—meaning if "people found out about the elephant."  (Tr. 4225.) The defendant "smiled and said they would be OK."  (Tr. 4226.)  However, the defendant predicted "[t]he company would fail."  (Tr. 4226.)  And fail it did.  On November 15, 2012, after the defendant was fired from the company, KITD issued a Form 8-K announcing that there were "errors and irregularities identified by the Company in its historical financial statements" for the years ending 2009, 2010 and 2011 and that the "accounting errors and irregularities relate primarily to recognition of revenue related to certain perpetual software license agreements entered into by the prior management team in 2010 and 2011."  (GX 223.)  In other words, the Elephant came to light.  The market's reaction was swift and negative.  The first trading day following the announcement, the KITD stock price plummeted.  It was ultimately delisted from NASDAQ and later declared bankruptcy.

*      *      *

In sum, the defendant abused his power and position to betray KITD's shareholders, auditors and employees.  His bad actions destroyed a good company, all because he could not admit that KITD was not the success story he had sold the world.  And, as set forth above, there is no excuse for, or mitigating aspect of, his conduct.

### III.    THE GUIDELINES CALCULATION

The parties and the Probation Department agree that Counts Four through Six are grouped for Guidelines calculation purposes pursuant to U.S.S.G. § 3D1.2(d), and that the group has a base offense level of seven.  (PSR ¶ 160.)

The PSR calculates a Guidelines range of 262 to 327 months' imprisonment, based on a Criminal History Category of I and a total offense level of 35, calculated as follows: (a) a base offense level of seven, pursuant to U.S.S.G. § 2B1.1(a)(1); (b) a 22-level increase for a total loss amount for Counts One through Four of $25,000,000 to $65,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(L); (c) a two-level enhancement because a substantial part of the scheme was committed from outside the United States or the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(2)(10)(B); (d) a four-level enhancement because the offense endangered the solvency or financial security of an organization, pursuant to U.S.S.G. § 2B1.1(b)(16)(ii); and (e) a four-level enhancement because the defendants was an officer or director of a publicly traded company, pursuant to U.S.S.G. § 2B1.1(b)(19)(A)(i).

The Government agrees with the Guidelines range outlined in the PSR.

The defendant challenges two of these enhancements.  Specifically, he argues that (a) "no loss amount enhancements are appropriate in connection with Counts Four and Six, and the unlawful gain in connection with Count Five totals at most $38,000, yielding a[ ] loss amount enhancement of four levels"; and (b) a four-level enhancement for endangering the solvency or financial security of an organization is not warranted.  The defendant thus contends that the total offense level is 17, and that the appropriate Guidelines range is 24 to 30 months' imprisonment.

The Government addresses each component of the Guidelines calculation in turn.

### A.      Applicable Loss Amount – U.S.S.G. § 2B1.1

The PSR calculates the loss amount as more than $25,000,000 but less than $65,000,000, resulting in a 22-level increase, pursuant to U.S.S.G. § 2B1.1(b)(1)(L).  (PSR ¶ 161.)  This loss amount includes a total of $57.75 million, consisting of: (a) $25.2 million attributable to Count Four; (b) $1.15 million attributable to Count Five; and (c) $31.4 million attributable to Count Six. (PSR ¶ 160.)

The Government agrees that a 22-level increase is appropriate.  As set forth below, the Government calculates a total loss of at least $34.45 million, consisting of: (a) $10.4 million attributable to Count Four; (b) $1.15 million attributable to Count Five; and (b) $22.9 million attributable to Count Six.

### 1.      Count Four – Market Manipulation Conspiracy Loss Amount

The PSR calculates a loss of $25.2 million, using U.S.S.G. § 2B1.1, application note 3(F)(ix) as a starting point for quantifying the loss amount from Maiden's manipulative trading. The application note provides, in relevant part, that "[i]n a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the Court in determining loss may use any method that is appropriate and practicable under the circumstances."  The application note includes one example of a reasonable method:

> An example of one such method under which the actual loss attributable to the change in the value of the security is determined by (a) calculating the difference between the average price of the security during the period that the fraud occurred and the average price of the security during the 90-day period after the fraud was disclosed to the market, and (b) multiplying the difference in average price by the number of shares outstanding.

(*Id.* (quoted in PSR ¶ 151).)

Here, the PSR began by calculating the increase in market capitalization during the manipulation period, defined as December 31, 2008, the day the manipulation agreement was

signed, until September 15, 2011, the date of the last Maiden Capital trade in KITD.  (PSR ¶ 151, 152.)  The PSR next estimated how much of that increase was reasonably attributable to trading by Maiden Capital in furtherance of the conspiracy.  (*Id.*)  The calculation adjusted for consistency due to the 1:35 reverse split that occurred in March 2009.  (*Id.*)  This calculation results in a reasonable estimate of $25.2 million in inflated market capitalization attributable to Maiden Capital's manipulative trading in KITD during the charged conspiracy.  (*Id.*)

As reflected in the PSR, the Government made clear to Probation that Isaza Tuzman's market manipulation expert, Professor Ferrell, testified at trial that he believed a different stock split calculation that reduced Maiden's percentage volume of KITD should be used.  (PSR ¶ 153.)  Substituting Professor Ferrell's stock split figures would reduce the loss estimate to $11.5 million attributable to Maiden Capital.  The above methodology results in a loss amount for Count Four of between $11.5 million and $25.2 million, depending on the stock-split methodology.

A defendant challenging the Government's loss figure has the burden of coming forward with "persuasive evidence" to the contrary.  *See United States* v. *Geevers*, 226 F.3d 186, 193-94 (3d Cir. 2000).  Isaza Tuzman falls far short.  Isaza Tuzman relies on Professor Ferrell to argue that any apparent loss to investors from Maiden's trading is explained by other forces and the loss should be zero.  Isaza Tuzman is wrong.

Isaza Tuzman incorrectly argues that there is no amount of actual loss to investors who purchased KITD stock at an inflated price that can reasonably be attributable to Maiden because it is impossible to segregate the impact of other potentially confounding forces.  (Isaza Tuzman Br. 45.)  As support for this position, he relies on Professor Ferrell's report, which included an event study.  The Government retained Torben Voetmann, Ph.D., a Principal at The Brattle Group, who has ample experience with event studies, to examine and consider Dr. Ferrell's work and prepare a report (the "Voetmann Report," which is attached hereto as Exhibit A).  The Voetmann

Report takes Professor Ferrell's "approach and results as given." (Voetmann Report ¶ 17.)   Dr. Voetmann concludes that there is at least $10.4 million in actual loss that can be attributed to Maiden's manipulative trading.

Dr. Voetmann calculated the loss amount in three different ways, each designed to exclude market, industry and firm-specific factors that may have contributed to an increase in stock price. The most conservative approach focused on days Maiden traded where Dr. Ferrell acknowledged there was both a "statistically significant positive abnormal return to the KITD stock price" and "potentially confounding positive news about KITD" could be excluded. (Voetmann Report ¶ 30.) Dr. Voetmann identified 22 trading days on which KITD's actual stock price return was higher than the predicted return by a statistically significant amount according to Dr. Ferrell's event study. (Voetmann Report ¶ 28.) Dr. Voetmann then removed the 11 of these days on which there was a potential alternative explanation—other than Maiden's manipulative trading—for the statistically significant price increase. Using this conservative approach, Dr. Voetmann was able to isolate approximately $10.4 million in actual loss to investors who purchased inflated KITD shares directly attributable to Maiden's trading.

As detailed in the report, Dr. Voetmann offers the following opinions relating to the loss amount calculation contained in the PSR for Count Four:

    a.  The Government's calculation for losses related to Count 4 is reasonable. Using Dr. Ferrell own analysis and event study to account for market, industry, and firm-specific factors, I estimate losses related to Count 4 to be between $10.4 million and $82.0 million. The Government's calculation of $11.5 million to $25.2 million in losses is within this range.

    b.  The low end of my range represents a conservative estimate of the losses related to the market manipulation conspiracy under Count 4. It is based on only 11 trading days between December 31, 2008 and September 15, 2011.  These were the days on which the positive difference between the actual and predicted KITD stock price return was statistically significant with no confounding news events.

> Alternatively, the loss related to Count 4 based on only the 22 trading days on which the positive difference between the actual and predicted KITD stock price return was statistically significant, regardless of news events, is $15.4 million.  During this time, Maiden traded on 541 days out of a total of 694 trading days.
>
> c.  The $82.0 million high end of my range is based on all 242 Maiden trading days on which the difference between the actual and predicted KITD stock price return was positive, regardless of statistical significance.
>
> d.  The Government's calculated loss related to Count 4 is conservative because it is at the low end of my range.

(Voetmann Report ¶ 7.)

Isaza Tuzman argues that the Government is asking the Court to "blindly use changes in public stock price."  (Isaza Tuzman Br. 33-34.)  For example, Isaza Tuzman cites *United States* v. *Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006), for the proposition that relying solely on changes in market capitalization to calculate loss amount may be a "simplistic analysis," including if it ignores the possibility that a portion of a change in stock price may have been attributable to other factors. Here, Dr. Voetmann's conservative approach, which controls for potentially confounding factors, addresses this concern.

Moreover, the Court in *Ebbers* emphasized that "some estimate must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall," 458 F.3d at 128, thus rejecting a primary argument advanced by both Isaza Tuzman and Amanat that the loss amount must be zero if an exact loss figure cannot be determined.   Since *Ebbers*, the Second Circuit has accepted models as reliable methods for approximately calculating loss amount, as long as those models are reasonably applied.  *See*, *e.g.*, *United States* v. *Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013); *United States* v. *Kumar*, 617 F.3d 612, 632–33 (2d Cir. 2010) (accepting expert's calculation and noting that "courts frequently calculate loss in securities fraud cases 'by relying on the change of market

capitalization as a result of the disclosure of the fraud,' . . . in order to prevent 'perpetrators of [the] fraud' from 'get[ting] a windfall'" (quoting *Ebbers*, 458 F.3d at 127)).

The remaining cases cited by Isaza Tuzman, such as *United States* v. *Rutkoske*, 506 F.3d 170 (2d Cir. 2007), stand for the proposition that the Court should *consider* factors other than the fraud that may have contributed to a decline in share price. The Government agrees. Dr. Voetmann calculated that Maiden caused at least $10.4 million in actual loss to third-party investors by causing statistically significant price increases in KITD on days where there were no confounding news events.

Dr. Voetmann emphasized that his approach "likely understates the true magnitude of loss amount due to the manipulation scheme" because it eliminates any loss amount that is not both exclusively attributable to Maiden and statistically significant. (Voetmann Report ¶ 30.) The Government respectfully suggests that the Court adopt Dr. Voetmann's conservative $10.4 million figure as the loss amount for Count Four.

### 2. Count Five – Wire Fraud Conspiracy Loss Amount

The PSR applies a $1.15 million loss amount for Count Five, which charged Isaza Tuzman with conspiring to commit wire fraud in connection with KITD's "investments" in Maiden Capital. (PSR ¶ 160.) The defendant states that this calculation "incorrectly presumes that the entirety of those losses were foreseeable to Mr. Isaza Tuzman." (Isaza Tuzman Br. 47.)

While Isaza Tuzman is correct that the Guidelines hold him responsible only for the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1, application note 3(A)(i), that amount here is the $1.15 million in losses sustained by KITD from the loss of the entirety of the investments in Maiden Capital. By March 2009, when the defendant first caused KITD to send money to Maiden Capital, he was well aware of Maiden Capital's precarious financial position. Maiden testified that Tuzman agreed to wire money to Maiden for

two purposes:  (a) to facilitate the market manipulation scheme; and (b) to prevent Maiden Capital from imploding. (Tr. 736-42.)  Because Isaza Tuzman caused KITD to wire $1.15 million to Maiden Capital, knowing that Maiden Capital was knee-deep in fraud and on the brink of collapse, it was foreseeable to him that KITD investors could lose this money.

### 3.  Count Six – Accounting Fraud Loss Amount

The PSR calculates a loss of $31.4 million "based on price declines that occurred in November 2012, once KIT Digital announced to the market that there were errors and irregularities in its historical financial statements."  (PSR ¶ 154.)  The PSR continues:  "After controlling for other market effects, the KIT digital stock price declined by $1.47 per share.  This decline was used as a measure of inflation to estimate which investors purchased the stock at inflated prices and then sold shares subsequent to the disclosure.  The inflation period was pegged as starting on March 17, 2011, when the company started reporting revenue from fake contracts.  This estimate only captures 75% of the shares outstanding:  therefore, the ultimate loss amount could be higher." (*Id.*)

In his sentencing submission, Isaza Tuzman boldly contends that although he led a multi-year and multi-million dollar accounting fraud, the loss amount should be zero.  (Isaza Tuzman Br. 35-42; *id*. at 42 ("Because the Government cannot demonstrate how the loss amount can be reasonably determined, this sentencing enhancement should be rejected.")  But instead of offering "persuasive evidence" to the contrary, *Geevers*, 226 F.3d at 193-94, Isaza Tuzman effectively throws up his hands and asks for another sentencing windfall.

Isaza Tuzman suggests that the proper way to measure Count Six losses is an event study. (Isaza Tuzman Br. 35-37; *id*. at 36 "(Any effective event study would address this issue in detail.").)  Despite the defendant's concession that an event study would be an appropriate way to estimate losses, he surprisingly did not conduct one—even though he had Professor Ferrell conduct

20

one in connection with the market manipulation analysis.

The Government asked Cathy M. Niden, Ph.D. to conduct an event study to estimate the losses associated with Count Six.  Dr. Niden is a Financial Economist with the Office of Litigation Economics in the Division of Economic and Risk Analysis of the Securities and Exchange Commission ("SEC").  She holds a Ph.D. and M.B.A. from the University of Chicago.  Attached hereto as Exhibit B is Dr. Niden's expert report (the "Niden Report").  In summary, Dr. Niden concluded:

- KIT digital's $1.35 per share (65.4%) stock price decline, net of market and industry effects, on November 23, 2012 in response to the November 21, 2012 8-K disclosure was statistically significant;

- $1.35 per share (65.4%) is a reasonable estimate of the share price impact of the announcement of accounting errors and irregularities described in the November 21, 2012 8-K as related to Count Six; and,

- Estimated harm to shareholders from the Count Six accounting errors and irregularities is at least $22.9 million.

(Niden Report ¶ 10.)  Dr. Niden's estimate of investor harm ($22.9 million) is more conservative than the PSR's estimate ($31.4 million).  (PSR ¶ 154.)

Dr. Niden's thorough report addresses the various complaints that Isaza Tuzman raised in his sentencing submission.  First, Dr. Niden used an event study, the methodology Isaza Tuzman asserts should be used.  (Isaza Tuzman Br. 35-37.)

Isaza Tuzman next argued that the stock drop on November 21, 2012 was not a "reliable proxy for the loss resulting from the charged fraud" (*id.* at 37-38), including because there were "a variety of confounding factors in and around November 21, 2012 [which] contributed to KIT Digital stock 'price declines that occurred in November 2012'" (*id.* at 39-40), and because "the history of KIT Digital's stock price and market analysts' estimates clarify that the transactions at

issue in Count Six did not inflate KIT Digital's stock price to the extent claimed by the government" (*id.* at 40-41).

Dr. Niden's report considers these claimed issues. Dr. Niden explains why the stock drop on November 21, 2012 of $1.35 per share is a "reasonable estimate of the share impact of the announcement of accounting errors and irregularities described in the November 21, 2012 8-K as related to Count Six." (Niden Report ¶ 10.) Dr. Niden found that KITD's Form 8-K "contains several pieces of information that reflect that KIT digital's disclosure of accounting errors and irregularities . . . associated with a significantly negative impact on KIT digital's share price." (*Id.* ¶¶ 18-19.) Moreover, Dr. Niden found that "it is reasonable to conclude that the November 21, 2012 8-K's disclosure of KIT digital's cash availability and outstanding debt was related to the company's accounting errors and irregularities and the resulting event of default." (*Id.* ¶¶ 15-20.) The Niden Report further explains why KITD's stock drop on November 21, 2012 of $1.35 actually "*understates* what the share price reaction would have been to an announcement of the company's accounting misstatements," finding that full disclosure of the misconduct would have resulted in stock drop of $3.33 per share. (*Id.* ¶¶ 21-25 (emphasis added).)

Isaza Tuzman also contends that "any reasonable estimate of the loss amount must exclude shareholders who did not rely on the misrepresentations or omissions during the inflation period" and that "even those shareholders who purchased during the inflationary period would have purchased at different times in the inflationary period" (Isaza Tuzman Br. 41). The defendant cites no authority to support his claim that a Guidelines estimate should take these factors into account, and, of course, reliance is not an element of criminal securities fraud. *See*, *e.g.*, *United States* v. *Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) ("Indeed, it has long been the law that the government, as opposed to a private plaintiff, need prove only materiality, meaning that 'there is a substantial likelihood that a reasonable investor would find [the omission or misrepresentation] important in

making an investment decision,' *United States* v. *Contorinis,* 692 F.3d 136, 143 (2d Cir.2012), and not that a victim did, in fact, rely on it.").  In any event, Dr. Niden seeks to make a reasonable estimate of loss to shareholders by making various adjustments.  (Niden Report ¶¶ 27-33.)

Thus, Dr. Niden's report supports a finding that $22.9 million is a reasonable estimate of the loss suffered by KITD investors as a result of the defendant's accounting fraud.

### B. Enhancement Because the Offense Substantially Endangered a Company's Solvency or Financial Security – U.S.S.G. § 2B1.1(b)(16)(B)(ii)

The PSR applied a four-level increase, pursuant to U.S.S.G. § 2B1.1(b)(16)(B)(ii).  This four-point enhancement is applied if the offense "substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees."  U.S.S.G. § 2B1.1(b)(16)(B)(ii).  In determining whether an organization's solvency or financial security were substantially endangered, the Court considers factors including whether "[t]he organization became insolvent or suffered a substantial reduction in the value of its assets," whether "[t]he organization filed for bankruptcy under Chapters 7, 11, or 13 of the Bankruptcy Code (title 11, United States Code)," and whether "[t]he liquidity of the equity securities of a publicly traded company was substantially endangered. For example, the company was delisted from its primary listing exchange, or trading of the company's securities was halted for more than one full trading day." U.S.S.G. § 2B1.1, application note 13(B)(ii).  Isaza Tuzman argues that, "at the time of [its Chapter 11] bankruptcy filing, KIT Digital was not insolvent, as KIT Digital's assets dwarfed its liabilities," (Isaza Tuzman Br. 50), and that several intervening causes, but not his fraud, proximately caused the bankruptcy (*id.* at 51-56).

Under the factors courts consider in assessing financial security under the applicable Guideline, KITD's financial security was endangered whether or not it had significant assets.  Although Isaza Tuzman argues that KITD showed some signs of solvency, § 2B1.1 notes that a

factor to consider in determining financial endangerment is whether KITD "became insolvent *or* suffered a substantial reduction in the value of its assets."   U.S.S.G. § 2B1.1, application note 13(B)(ii)(I).   The defendant cannot, and does not, dispute that KITD suffered a substantial reduction in the value of its assets.   Moreover, Isaza Tuzman does not dispute that KITD filed for Chapter 11 bankruptcy or that it was delisted from NASDAQ, both factors considered by the Court. Considering how clearly KITD's situation fits § 2B1.1(b)(16)(B)(ii)'s guidance, it is unsurprising that Isaza Tuzman offers no case in which a court found that a company in similar circumstances was in its economic prime.

Moreover, KITD's financial woes "resulted from" Isaza Tuzman's conduct within the meaning of § 2B1.1(b)(16)(B)(ii).   Isaza Tuzman correctly notes that any substantial endangerment must have been a foreseeable result of his crime. (Isaza Tuzman Br. 51).   In fact, he had foreseen potential fallout from his fraud.   When asked by his co-conspirator Campion what would happen if people found out about the Elephant, the defendant predicted that "[t]he company would fail." (Tr. 4226).   Indeed, financial insecurity is generally a foreseeable consequence of committing serious financial crimes against one's own company.   *See*, *e.g.*, *United States* v. *Bernick*, 651 F. App'x 102, 105–06 (3d Cir. 2016) (holding bank director responsible for bank's insolvency because he should have known that his embezzlement would cause the bank's insolvency); *United States* v. *Rubashkin*, 655 F.3d 849, 868 (8th Cir. 2011) ("Any reasonable person could have foreseen that [the defendant's] large scale fraud [against his company] could lead to collapse and insolvency if discovered.").

Additionally, Isaza Tuzman disputes that his crime "put into motion a chain of events" that resulted in the substantial endangerment and blames others, including successor management, for the financial ruin that resulted.   (*See* Isaza Tuzman Br. 54 (claiming that successor management "put KIT Digital at risk of defaulting on principal payments"); *id.* (questioning JEC Capital's

manner of handling the fraud's fallout).)  That argument stands against the overwhelming weight

of evidence presented at trial, and common sense.  Had Isaza Tuzman not cooked KITD's books,

defrauded its investors and manipulated its stock, the company would not have lost nearly all its

value, shed its employees and declared bankruptcy.  Thus, while the defendant may argue that

others should have better managed the fallout from his crimes, it was Isaza Tuzman's fraud that

put into motion a chain of events that devastated KITD.  And, of course, § 2B1.1(b)(16)(B)(ii)

does not require that the defendant's crime be the sole cause of any financial woes.  *See United*

*States* v. *Melton*, 870 F.3d 830, 844 (8th Cir. 2017) ("Though Melton was not solely responsible

for ThermoEnergy's financial hardship, given the effect of his crimes on the security and future of

the organization, the district court did not err in applying this enhancement.").  The enhancement

plainly applies.

**IV.     Application of the Relevant Section 3553(a) Factors**

Under the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits

that a Guidelines sentence would be sufficient, but not greater than necessary, to serve the goals

of sentencing.

> **A.      Nature and Circumstances of the Offenses, Seriousness of the Offenses, Need**
> **to Promote Respect for the Law, and Need for Just Punishment**

A substantial sentence is necessary in light of the nature and circumstances of the offenses,

the seriousness of the offenses, the need to promote respect for the law, and the need for just

punishment.  *See* 18 U.S.C. § 3553(a)(1) & (2)(A).

As Isaza Tuzman admits, he was convicted of "serious offenses."  (Isaza Tuzman Br. 2.)

He led brazen and years-long frauds at KITD: (a) a market manipulation scheme (Count Four),

(b) a wire fraud scheme (Count Five), and (c) an accounting fraud scheme (Count Six).

A bedrock principle of the country's financial markets is that a company's stock reflects

the free and fair operation of the market—that when investors buy and sell securities, they do so at prices and volumes that are legitimate and not manipulated.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  As the jury found, Isaza Tuzman, despite leading KITD as its Chairman and CEO, worked with Maiden and Omar Amanat to prop up KITD's stock price and trading volume. Beginning with the written December 31, 2008 agreement (GX 1517-A), Isaza Tuzman paid Maiden to engage in open market purchases of KITD to manipulate the company's stock.  (GX 3037 (Amanat to Isaza Tuzman and Maiden: referring to "Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up")).)  There was nothing legitimate about this arrangement.  It was designed to deceive investors and rig the game in Isaza Tuzman's favor.  (GX 1614 (Isaza Tuzman: "We desperately need the stock to stay strong during this process.").  Investors made trading decisions believing, as they were entitled, that KITD's stock was trading without improper influence.  (*See, e.g.*, Tr. 2658 ("Q: In your career have you ever heard of a CEO of a public company paying a shareholder to buy its stock?"  Ingrassia:  "A. I can't recall any — seeing anything like this before.").)  Moreover, when KITD's auditors started to ask questions about the relationship between KITD and Maiden Capital, Isaza Tuzman lied to cover up his illicit scheme to manipulate KITD's stock and his criminal relationship with Maiden.  (GX 745 (Isaza Tuzman to Halkias:  "There has never been any other relationship with Steve [Maiden], no understandings or agreements, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise.").)  Serious punishment is necessary when the CEO and Chairman of a publicly traded company engages in a multi-year scheme to secretly manipulate his company's stock and to mislead auditors to prevent these lies from coming to light.

Another bedrock principle of the country's financial markets is that public companies are required to provide their investors with true and accurate report of their financial performance. Isaza Tuzman betrayed his investors' trust, telling them lie after lie to make KITD appear that it

was the success that Isaza Tuzman touted. As set forth in more detail above, Isaza Tuzman did so

in many ways, including the following:

- Isaza Tuzman hid the Enable hole. (GX 1676 (Isaza Tuzman: "Let me be clear. GAME FUCKING OVER. If we don't get an audit confirmation."); GX 1665 (Isaza Tuzman: "Irfan needs to give us an audit confirmation on Enable position"); Tr. 4490-93 (Carpi).)

- Isaza Tuzman created sham contracts with sham companies so that KITD could book millions of dollars in fraudulent revenue to meet analyst expectations—and even had a name for this naked fraud, the Elephant. (GX 768 (Isaza Tuzman: "We obviously need/want to be at the top of the [analyst expectations] range however humanly possible."); Tr. 2302 (Smyth: "[Isaza Tuzman] told us to enter into transactions, fake or otherwise, to make sure that we made the expectations the analysts had."); GX 2862 (Isaza Tuzman: "I am trying to slay elephant. :)"); GX 863 (Isaza Tuzman: "Pull the levers!!!!" Smyth: "Sounds like you are killing elephants with your bare hands."); Tr. 2257 (Smyth: "I understood it [the Elephant] to mean the fake transactions which were generated in the company. . . . It was like the elephant in the room. It was things that we knew of but no one else knew."); GX 2142 (Smyth spreadsheet showing $37.607 million in "elee," *i.e.*, Elephant); GX 3828 (summary chart).)

- Isaza Tuzman added fraudulent restructuring or integration charges to KITD's acquisitions to conceal the accounts receivable associated with the fake contracts. (GX 1096 (Isaza Tuzman: "There really can be no external view" regarding the fraudulent Sezmi integration charges); GX 2498 (Isaza Tuzman: "I wouldn't fall into the trap of showing them anything. . . . You have to be able to bluff to carry it out.").)

- Isaza Tuzman created a "cookie jar" of millions of dollars in cash that he could cycle— or launder—through "escrow" accounts in Dubai and Cyprus, before it came back into KITD to pay down the Elephant. GX 3468 (Isaza Tuzman approving $7.5 million be sent to Rima Jameel "escrow" account); GX 2351 (Rima Jameel escrow account balance); (Tr. 2261 (Q. "So the money would just move in a circle?" Smyth: "Correct.").)

- And, of course, Isaza Tuzman concealed all of these frauds and made repeated misstatements to his investors—swearing to the accuracy of KITD's financials as reported to the market in SEC filings, knowing full well that they failed to disclose the Enable hole, the fake revenue he had pulled out of the air and the fake integration charges. (*E.g.*, GX 200, 218.)

When Isaza Tuzman's lies were revealed, the company's stock plummeted, and investors

lost millions. This conduct—and the harm that resulted—call out for a substantial sentence.

In his sentencing submission, Isaza Tuzman claims that he "acknowledges that he had

failings as a CEO and accepts responsibility for his conduct."  (Isaza Tuzman Br. 2.)  That is wordplay, a way to gesture towards contrition without actually admitting that he broke the law. After all, the defendant fails to address his central role in deceiving investors for years with his web of lies and frauds, which ultimately caused millions of dollars in losses and the collapse of his company.  Instead, he asks the Court to parse the jury's verdict as a finding that he merely *agreed* to break the law, not a conclusion that he did anything to advance the schemes.  (*See id.* at 30 ("Yet the jury's conclusion that Kaleil agreed to commit these offenses is *not* also a finding that he executed them in fact." (emphasis added).)  That argument is blind to the overwhelming proof of his guilt.[2]

Isaza Tuzman also argues that "only" between 8% and 11.5% of KITD's reported revenue was fake, and that the company was not a "house of cards" because it had legitimate businesses. (Isaza Tuzman Br. 37 & n.8, 66.)  This argument is both absurd and tone-deaf—another demonstration that, at this late hour, the defendant still doesn't "get it."  *All* of KITD's revenue should have been real and reportedly accurately.  Investors were told that KITD was a successful company, consistently growing and meeting analysts' expectations.  Investors were entitled to rely on the company's representations and its financial statements.  (Tr. 4487 (Carpi:  "I can't trust the numbers if they're inflated or inaccurate, and then again, I don't know what my clients hold…I couldn't even try to put a right valuation on it.").)  When 10% of a company's revenue is make-believe to support a CEO's made-up narrative of success, that is an egregious fraud that deserves real punishment.

---

[2]      As the Court will recall, the Government originally charged the defendant in the S1 Indictment with a combination of substantive and conspiracy offenses.  The Supreme Court of Colombia granted extradition on the conspiracy offenses only.  There is no doubt that the jury would have convicted the defendant of the substantive offenses, had the Government been allowed to proceed on those charges.

The reason Isaza Tuzman engaged in these overlapping frauds was simple: arrogance and greed. He misled the public and the market to make his company look like it was a success, always growing and meeting and exceeding market expectation, when it wasn't. And he did so to line his own pockets and perpetuate his false image as a successful business man. Isaza Tuzman was KITD's largest shareholder, and by cooking the books and inflating the company's stock, he stood to gain the most upon an ultimate sale of the company. His suggestion that he "did not gain personally from the offenses of conviction" is ridiculous. (Isaza Tuzman Br. 66.) Isaza Tuzman made millions of dollars running KITD and he stood to make millions more if he had been able to continue to perpetuate his frauds. (Tr. 2266 (Q. "Why did you do it?" Smyth: "Kaleil asked me to do it, I wanted the company to be successful, and ultimately to make money.").) And he used that money to support his jet-setting lifestyle, complete with luxury cars, apartments, watches, furs, ski trips, and fancy clothes.

Moreover, Isaza Tuzman placed his interests ahead of the company's and his shareholders. As but one example, he directed that KITD invest $250,000 dollars into Maiden Capital so that he could take his own money out of the failing hedge fund. These crimes were not the acts of an honest fiduciary. They were *not*, as Isaza Tuzman claims in his sentencing submission, the mere "failings" of a "CEO." (Isaza Tuzman Br. 2.) They were the result of a concerted effort, over years, to commit fraud after fraud to put himself first, no matter the cost.

Isaza Tuzman also argues that he is "not accused of any crime of violence" and "has no history of violence whatsoever," and therefore he should not be incarcerated. (Isaza Tuzman Br. 66). Isaza Tuzman's argument echoes the testimony of Andy Steward, the defendant's first defense witness. As the Court will recall, Steward testified, incredibly, that white-collar criminals merit special treatment and should not be sent to prison: "It's a horrible environment. *It's not the sort of place you should put a businessman, we should be treated in a different way, a more*

29

*appropriate way, a more tax efficient way for the Government.* It's a horrible situation." (Rule 15 Tr. 300 (emphasis added); (Tr. 5798-99).) Apparently, that is the defendant's view as well.

In sum, the defendant's serious crimes of conviction require a significant sentence.

### B.    History and Characteristics of the Defendant

A substantial sentence is necessary in light of the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

In his sentencing submission, as he did at trial, Isaza Tuzman boasts about his supposed professional accomplishments and success, from Harvard, to Goldman Sachs, to govWorks, to JumpTV, to KITD, and to Colombian real estate. (Isaza Tuzman Br. 9-15.) In Isaza Tuzman's telling, his "career history shows a lifetime of success through honest hard work." (Isaza Tuzman Br. 10.) Assuming this were true—which it is not—it merely underscores that the defendant did not need to commit years of fraud. He had a pedigree that would have allowed for honest work and an honest living. Instead, Isaza Tuzman took a criminal shortcut.

Moreover, Isaza Tuzman's claim of success in Colombia real estate, the "Obra Pia" project, is misleading and ironic. (Isaza Tuzman Br. 14-15.) Isaza Tuzman fails to advise the Court that he is presently under criminal investigation in Colombia in connection with this project, including for misappropriating millions of dollars of investor funds. The Colombian project has barely progressed, which also raises questions about the veracity of Isaza Tuzman's claims at his bail hearings and at trial that his lavish purchases of furs and watches were for the hotel:

> [Isaza Tuzman's Counsel]:  KIT Capital has multiple subsidiaries. One of the businesses is a luxury goods business. That was a tag-along business to the hotel business that he's creating in Colombia. We actually put in the brochures for the luxury goods, and we moved to exclude evidence that he was buying furs, jewelry, and so on because they are still KIT Capital business expenses.

(Tr. 5746.) Far from handling this project with "professionalism and dignity," as he claims (Isaza

Tuzman Br. 15), Isaza Tuzman's venture into real estate may well be another fraud.

Isaza Tuzman makes various other claims that can be easily rejected.  First, he contends that he should not be incarcerated because he "is needed to support his young daughter [ ] and his brother [ ]."  Isaza Tuzman's claim about his close relationship with his daughter ring hollow.  The fact that Isaza Tuzman has a daughter is hardly unique.  Furthermore, nothing about this distant relationship, which is apparently limited to "phone and video chats," will be interrupted by a prison term.  And while Isaza Tuzman's brother may need support, that is not a basis for a reduced sentence.  Second, Isaza Tuzman contends, fancifully, that he intends to become a lawyer.  (Isaza Tuzman Br. 65.)  This is also ironic, given his use of a felon attorney (Rima Jameel)—who remains a fugitive from justice in connection with charges in this very case—to execute his scheme.  In any event, he can pursue educational opportunities in prison.  *See* 18 U.S.C. § 3553(a)(2)(D).

### C.  Deterrence

A substantial sentence is necessary to afford adequate deterrence and to protect the public from future crimes of this defendant.  *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

Because securities fraud schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct.  *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").  General deterrence is all the more important to send a message to corporate executives that corporate frauds will be seriously punished.

Moreover, considerations of specific deterrence are particularly relevant here.  While Isaza Tuzman claims that he "is extraordinary[ily] unlikely to commit future offenses" (Isaza Tuzman Br. 68), he ignores that he was not deterred from engaging in fraud after fraud to cover up his lies

at KITD for years.  It is also important to note that the defendant's continuing claims of innocence demonstrate a lack of remorse or acceptance of responsibility, which are relevant considerations when determining the sentence necessary to promote deterrence and respect for the law.  *See*, *e.g.*, *United States* v. *Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under section 3553(a)); *United States* v. *Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform . . .).'" (citation omitted)).  And Isaza Tuzman's claim that his age is a consideration or that the SEC civil penalties are sufficient (Isaza Tuzman Br. 69-70), ignores that important deterrent role played by a significant sentence.

Isaza Tuzman also points to his interview in the *New York Times* as a factor that militates against a severe sentence because "thousands, if not millions, of people in the business world have heard of what happened" to him.  (Isaza Tuzman Br. 69.)  As the Court will recall, Isaza Tuzman agreed to be interviewed by Andrew Ross Sorkin and other journalists on the condition that the stories be released on the eve of trial.  This article should thus be seen for what it was:  a transparent effort to seek to influence the jury pool in the defendant's favor.

A substantial sentence is thus necessary to send the message to white-collar criminals generally and to Isaza Tuzman specifically that those who commit white collar crimes will be punished firmly.

### D.    Unwarranted Sentencing Disparity

Isaza Tuzman also argues that a substantial sentence will result in unwarranted sentencing disparities, under 18 U.S.C. § 3553(a)(6).  (Isaza Tuzman Br. 70-72.)  He claims that Maiden, Smyth and Campion provided "cooperation [that] was far from total."  (Isaza Tuzman Br. 71.)  In other words, Isaza Tuzman claims that he should not receive a significant sentence because three

cooperating witnesses—each of whom testified under oath that Isaza Tuzman committed various frauds with them—lied on the stand.  There is no support in the record for this claim.  And in any event, Isaza Tuzman is not similarly situated with them.  Each pled guilty, cooperated with the Government, and accepted responsibility.  Isaza Tuzman went to trial, was convicted on all counts, and still proclaims his innocence.

Isaza Tuzman also claims that "similarly situated white collar defendants in this Circuit regularly receive far short sentences for similar offenses than the term recommended by Probation."  (Isaza Tuzman Br. 72; *id.* at 58-63.)  The fact that certain judges in this District sometimes may vary downwards in fraud cases is certainly not determinative here.  And, to the Government's knowledge, none of the cases that Isaza Tuzman cites involved the CEO and Chairman of a public company who both cooked his own company's books and manipulated his own company's stock price.

### E.   Isaza Tuzman's Incarceration in Colombia

Isaza Tuzman also contends that his alleged mistreatment while incarcerated in Colombia "warrants additional consideration militating against a substantial sentence of imprisonment." (Isaza Tuzman Br. 72.)  The Court is, of course, familiar with the defendant's incarceration in Colombia, including the fact that he challenged his extradition after he was transferred to a different facility.  (*E.g.*, Nov. 16, 2017 Order (denying Tuzman's motion "for discovery and an evidentiary hearing concerning the Government's alleged outrageous conduct") (Dkt. 562).)  The Government has no objection to the defendant receiving full credit for the time he was incarcerated awaiting extradition.  The government defers to the Court's wisdom in determining whether additional credit is warranted in light of the defendant's allegations.[3]

---

[3]     The Government has been advised that Colombia denies that Isaza Tuzman was mistreated in prison.

## V.      CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence on Kaleil Isaza Tuzman that reflects the seriousness of his crimes, the immense harm he has caused to KITD, and the need to deter other corporate executives who might consider taking a similar path.

Dated:      July 27, 2018
            New York, New York

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:      _____/s/_____
            Damian Williams
            Andrea M. Griswold
            Joshua A. Naftalis
            Assistant United States Attorneys