UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                    :

UNITED STATES OF AMERICA,       :

                                   :

           - v. -              :   S2 15 Cr. 536 (PGG)

                                   :

KHALIL ISAZA TUZMAN and       :
OMAR AMANAT,                 :

                                   :

                Defendants.      :

                                   :
-------------------------------------------------------------X

**DEFENDANT OMAR AMANAT'S RESPONSE IN OPPOSITION TO THE GOVERNMENTS DECEMBER 27, 2018 SUPPLEMENTAL FILING IN CONNECTION WITH THE DEFENDANT'S MOTION PURSUANT TO <u>RULES 29 AND 33 FOR JUDGMENT OF ACQUITTAL OR A NEW TRIAL</u>**

## PRELIMINARY STATEMENT

Shortly after the close of the Government's case at trial, after the defendants moved for judgment of acquittal, the Government made a startling application and implicit admission. (Tr. 6415). The application was for the Government to "reopen" its case to introduce new interstate wire evidence, after the Government had already rested and substantial briefing had already been filed outlining the deficiencies in the Government's proof. (Tr. 6415-17) ("We would want to offer that document *just to button up the record*, and it could be offered as part of our case in chief if the Court was open to allow us to do it") (emphasis added). As the Court is well aware, the Government does not commonly move to reopen its case after resting, and it does not do so casually. Despite the Government's protestations to the contrary, this application was an implicit admission on the part of the Government that it had simply failed to introduce evidence sufficient to sustain Counts One and Two of the Indictment.

Later in the trial, after the Government had submitted a written application requesting to reopen its case, while still persisting in claiming that sufficient wire evidence was already admitted in the record, the Government was incapable of identifying where in the record this evidence might be. (Tr. 6501 "THE COURT: That's kind of a problem, too, you make a representation, I think you said there are hundreds of text messages and emails that you believe satisfy, but you haven't been able to cite -- you haven't been able to give me exhibit numbers that I can go to and immediately say okay, this was in furtherance of the charged conspiracy. I don't understand why that's been difficult. If in fact there are hundreds of exhibits that,

according to you, satisfy this requirement, why has it been so hard to tell me -- give me some subset of the hundreds of exhibits so that we can just put that matter to bed? Why has that been so difficult?"). The Government, of course, failed to respond substantively to the Court's inquiry and then failed again to provide this information in its opposition to the defendant's post-trial motion for a new trial.

On December 27, 2018, the Government filed a submission in response to the Court's Order to "cit[e] evidence from the record demonstrating that the interstate wire element is satisfied, and to provid[e] legal authority supporting that assertion." (Dkt. No. 885, at 1). The Court also directed that "[t]o the extent that the Government contends this element is satisfied by circumstantial evidence in the record, the Government will submit relevant citations to the record as well as case citations demonstrating that such evidence is sufficient to satisfy the interstate nexus element of 18 U.S.C. §§ 1343 and 1349." *Id.* With this most recent submission, the Government has now failed, again, to identify any evidence that would allow any reasonable factfinder to conclude that the Government introduced sufficient evidence on Counts One and Two of the Indictment.

Indeed, Government's submission barely even attempts to follow the Court's instructions. This is not to suggest that the prosecutors are attempting to defy the Court – they simply do not have the evidence, and they long ago essentially admitted this fact. The instant Government submission ignores the law on this topic and urges the Court to draw improper inferences from the record. In short, as explained in more detail below, the Government has failed entirely in its

2

supplemental submission to demonstrate that the there is any proper course other than granting the defendant's motion.

## LEGAL STANDARD

Rule 29 requires the Court to "enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court's function is "to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). The court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Jackson*, 443 U.S. at 319).

A jury's guilty verdict must be supported by "substantial evidence," *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987), and a jury may not draw "specious inferences" or "be permitted to conjecture . . . or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972). Moreover, "[i]t is not enough that the inferences in the government's favor are permissible. A court must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that each element of the offense is established beyond a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 522

(2d Cir. 2015).  "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id*.  If a court finds that "reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration."  *Taylor*, 464 F.2d at 243.

## ARGUMENT

### A.   The Government Has Failed to Identify Any Wires Sent or Contemplated in Furtherance of the Count One Conspiracy that Could Sustain Mr. Amanat's Conviction

The Government's two-paragraph submission on Count One simply defies the Court's instructions, which were to "**cit[e] evidence from the record demonstrating that the interstate wire element is satisfied.**" (Dkt. No. 885, at 1) (emphasis added). The Government's submission on Count One, amazingly, includes no reference to any wires. Instead, the Government argues merely that it was not required to establish an overt act and that there were meetings in Manhattan, which the Government argues was sufficient to establish venue. (Br. 1-2). For several reasons, the Government's arguments must be rejected.

First**,** the Government's argument that "[t]he law does not require the Government to prove an overt act – in the form of an interstate wire that furthered the conspiracy or otherwise" is a straw man. (Br. 1).[1] The important legal point is the axiomatic principle that to sustain a wire fraud conviction the Government

---

[1] "Br." refers to the Government's supplemental letter.

must prove that an interstate wire in furtherance of the conspiracy was either sent, reasonably foreseeable, or contemplated, which was transmitted across state lines either from or into the Southern District of New York. *See United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005) ("we hold that venue for mail fraud is limited to where "the defendant 'places,' 'deposits,' 'causes to be deposited,' 'takes,' or 'receives' mail, or 'knowingly causes' mail 'to be delivered." *Id.* at 146; *see also United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002) (venue may only be established "in those locations where the wire transmission at issue originated, passed through, or was received, or from which it orchestrated.").

The Government correctly identifies the elements of wire fraud conspiracy, but as the Government's submission concedes, the crucial first element of a Section 1349 violation is that "an agreement or understanding between two or more people existed **to commit wire fraud**." (Br. 1). It is impossible to read the substantive requirements of wire fraud out of a wire fraud conspiracy. This is the very reason, of course, that the jury instructions for wire fraud conspiracy always include instructions on the substantive crime of wire fraud, as they did in this case. (Tr. 7168-69) ("In order for you to determine whether Mr. Amanat conspired to commit wire fraud, you must understand the elements of that offense. Accordingly, I will instruct you now on the elements of wire fraud. You will apply these same instructions concerning the elements of wire fraud when you consider Count Two, which charges Mr. Amanat with the actual commission of wire fraud."). The Court specifically instructed the jury on Count One that "[y]ou should also be aware that

only the wire communication must be reasonably foreseeable to the defendant, not its interstate or foreign component. Thus, if you find that the wire communication was reasonably foreseeable, and the interstate or foreign wire communications actually took place, then this element is satisfied even if it was not foreseeable that the wire communication would cross state or national lines." (Tr. 7177-78).

All of this is to say that the Government has cited no law to support the idea that for a wire fraud conspiracy conviction, the Government can simply ignore the requirement that proof be introduced of an interstate wire either sent or contemplated in furtherance of the conspiracy. That there is no overt act requirement does not mean that the elements of substantive wire fraud become irrelevant where the Government charges Section 1349. *The Government charged the defendant with conspiring to violate the substantive wire fraud statute.*

Second, the Government's references to its prior letters provide no help to the Government on its failure of proof on Count One. The Government states, in a footnote in the instant submission that, "[f]or the Court's convenience, the Government also refers the Court to its December 19, 2017 letter and to page 15 to 19 of its brief in opposition to the defendant's post-trial motions." (Br. 1). This is a surprising footnote since the Court's recent order indicated that it had already reviewed the parties' prior submissions. Regardless, the December 19, 2017 letter did not include any citation to evidence that would be sufficient to sustain the Government's burden. The letter claimed, incorrectly, that it was "establishe[d] that Amanat was based in Manhattan." (Gov. 12.19.17 letter at 2). The only proof the

letter offered that Mr. Amanat was "based in Manhattan," whatever that means, was a single document from December of 2008 in which a "registered address" on West End Avenue was scribbled into the document. *Id.* This document, of course, was created in the year prior to the start of the charged wire fraud conspiracy, which began later in 2009. The only proof of Mr. Amanat's residence that even possibly related to the time period of the conspiracy was evidence of an internet registration address that the Government indicated showed he lived in New Jersey. (Tr. 6525 ("Q. What is the name on the authorized signer information to this account? A. Omar Amanat. Q. What is the home address?  A. 68 Windsor Drive, Pine Brook, New Jersey 07058."). The December 19, 2017 letter does not even attempt to provide real location information for any specific communications. It simply suggests that the Court can speculate sufficient interstate wire communications were sent because Amanat purportedly "was based" in Manhattan and Maiden was based in North Carolina. This is insufficient. Similarly, pages 15-19 of the Government's Opposition to the defendants' post-trial motions provides no clarity on the evidence the Government claims establishes the defendant's guilt. Without reiterating the arguments the defense has already made with regard to the emails referenced on these pages, the defense emphasizes the important point that the Government failed to introduce location information for the participants or for the wire for *any* of the communications that they now claim were interstate wires. This is particularly important given the information that Maiden traveled to New

York on multiple occasions and that Mr. Amanat frequently traveled to various other states and countries. (*e.g.* Tr. 636, 886, 4261, 4343).

Third, even if one accepts the premise that Mr. Amanat spent significant time in Manhattan and that Maiden spent significant time in North Carolina, this is insufficient to establish that an interstate wire communication in furtherance of the conspiracy charged in Count One was contemplated or sent or even reasonably foreseeable. The Government cannot argue that an interstate wire was reasonably foreseeable when it has failed entirely to prove an interstate wire in furtherance of the conspiracy occurred.

The Court must also reject the Government's attempts to suggest an interstate wire was transmitted simply because the address of a bank or the address of an account holder was in a different state than the address of the recipient bank or account holder. Without any information about where the companies' servers or technological infrastructure is housed, it is simply pure speculation to suggest that an interstate wire was either sent or contemplated merely because addresses associated with the accounts were in different states.

This is all to say that, even after being provided with an opportunity for supplemental briefing, the Government has provided nothing but pure speculation. A wire fraud conspiracy conviction cannot be sustained where there is no actual proof of interstate wires. None of the cases cited by the Government are to the contrary. For example, *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015), stands for the uncontroversial premise that proof of an overt act is not required for

a Section 1349 conviction. The Second Circuit was not confronted in *Roy*, however, with the failure of proof at issue here – the defendant in Roy was convicted of three substantive counts of wire fraud for which the evidence was apparently sufficient. *See id.*

In this case, the Government was required, at a minimum, to introduce a witness who would provide some information about how the transfer of funds is accomplished. The Government failed to even attempt to meet its burden. It failed to even inquire of its cooperating witness as to whether the witness agreed or understood that the use of interstate wires would be a component of the conspiracy. The Government is asking the Court to simply assume that *something involving interstates wires must have happened*. This falls far short of the Government's burden.

**B.    The Government Has Failed to Identify Any Wires Sent or Contemplated in Furtherance of the Count Two Substantive Wire Fraud Charge that Could Sustain Mr. Amanat's Conviction**

Although the Court's Order was simple, the Government's supplemental brief engages in a complicated analysis with regard to the substantive wire fraud charge. The Government's failure to meet its burden is not complicated here. The Government concedes that on the substantive wire fraud charge it is required to introduce proof of an interstate wire sent in furtherance of the conspiracy that was initiated or terminated in the Southern District of New York.  (Br. 3-4). In the four pages of its letter that the Government devotes to this question, the Government fails to identify any such wire.

9

First, the Government repeats the incorrect premise that "the evidence plainly established that Maiden was based in North Carolina, and Amanat was primarily based in New York." As discussed above, there is no evidence that established that Mr. Amanat was "based in New York." There was no testimony whatsoever to this notion. No one described visiting a home or regular place of business of Mr. Amanat in New York. There were no surveillance videos, there were no property records based in New York. The only real property information in the record, in fact, indicated that Mr. Amanat lived in New Jersey. (Tr. 6525). The string cite of evidence purportedly showing Mr. Amanat was "based in New York" at page four of the Government's brief includes the aforementioned hand scrawled document that predates the time period of Counts One and Two (GX 1517-A), a bank account for Enable Invest Commodities that in 2012 had an address at a different location in Manhattan (GX 653), and bank records that purportedly show Mr. Amanat making "bank withdrawals and obtaining cashier's checks from bank locations in Manhattan," (GX 635), as literally millions of out of state commuters, business travelers, and tourist do every day in Manhattan. None of this establishes that Mr. Amanat was "based in New York." The various addresses of Enable are not the addresses of Mr. Amanat. Even more importantly, to the extent that GX 653 tells us anything reliable about the location of transactions at all, and this is questionable since no testimony supports this notion, GX 653 appears shows Mr. Amanat engaging in numerous transactions in New Jersey, California, Indiana, and

elsewhere. This document cannot demonstrate that Mr. Amanat was "based in" any particular location.

Certain items cited by the Government as proof of this idea make no sense whatsoever. The Government argues that the fact that certain meetings between Amanat, Tuzman, and Maiden took place in Manhattan proves that Mr. Amanat was based in Manhattan. These meetings, however, are no more proof of that fact that they are proof that Mr. Tuzman or Maiden was "based in Manhattan." There is no testimony in the record indicating that the meeting locations were selected because Mr. Amanat was based in Manhattan. Indeed, it is a universally recognized fact that New York is the foremost business center in the world and a great many business meetings are held there because of this fact and because of its easy accessibility from nearly any city in the world.

Second, it cannot be overstated that even had the Government established that Mr. Amanat was "based in New York," this would be insufficient to demonstrate it had met its burden of proving that at least one wire was transmitted in furtherance of the conspiracy across state lines to or from the Southern District of New York. The Government cannot establish wire fraud by simply arguing anyone who lives in the Southern District of New York doing business with persons out of state must have sent communications in furtherance of that business across state lines. The burden requires the Government to introduce some actual evidence of the necessary wire transmission, not simply invite the jury to speculate. *See, e.g. United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (affirming grant of Rule 29

motion and observing: "[a] Rule 29 motion calls on the court to **distinguish between reasonable inferences and speculation**. Each step in the inferential chain must be supported by evidence that allows the jury to 'draw reasonable inferences from basic facts to ultimate facts.'") (quoting *Coleman v. Johnson*, 566 U.S. 650, 655 (2012)*; United States v. Valenti*, 207 F.2d 242, 246-47 (3d Cir. 1953) (reversing denial of motion for acquittal where Government's proof of acts in the district "f[e]ll into the preparation category" and observing "[o]n the evidence, a choice of either of the first two alternatives, which would show venue in New Jersey, rather than the third, which would not, could have been achieved **only by speculation.** Hence the government failed to establish venue in the District of New Jersey and the defendant's motion for acquittal should have been granted.") (emphasis added). It is typical in wire fraud cases for the Government to introduce location information for the senders and actual data showing the interstate transmission of specific wire communications sent in furtherance of the scheme. Indeed, it is typical for this information to be set out in the Indictment. That was not done here. The Government's motion to reopen its case underscores the Government's immediate realization that it had failed to make a very basic and required showing in this case.

Third, the specific wires that the Government claims are among the "numerous examples of particular interstate wires sent in furtherance of Count Two" fail to sustain the Government's burden – none of them were shown to have been an interstate wire sent in furtherance of the scheme that began or terminated

in the Southern District of New York. The wires now identified by the Government are as follows:

| Purported Wire | Evidence of Location of Sender/Recipient | Evidence of transmission across state lines | Evidence of transmission to/from Southern District of New York |
| --- | --- | --- | --- |
| Unspecified 2011/2012 Wires of "More than $500,000 to Maiden Capital in North Carolina (Br. 4) | None in the Record | None in the Record | None in the Record |
| August 10, 2011 "exchange between Maiden and Amanat" (Br. 5) | None in the record | None in the Record | None in the Record |
| November 17, 2011 "email chain between Amanat and Maiden" (Br. 5) | None in the record | None in the record | None in the record |
| "More than one hundred text messages between Amanat and Maiden" (Br. 5-6) | None in the record | None in the record | None in the record |

The Government has not even seriously attempted to identify the wires it contends satisfy its burden, but there can be no dispute that there is no location information even for the generalized wires it describes as set out above.

13

The Government also makes much of the fact that a JP Morgan Chase account and a First Republic Enable Account were used for certain transmissions to Maiden Capital, and that one of these accounts "was associated with an address in Manhattan" while the other "was associated with an address in New Jersey." (Br. 4). But as the Court is aware, and as the Government surely knows, the address associated with an account tells us nothing about the location of specific wire transmissions for that account. This is true because modern bank accounts can be accessed telephonically or electronically from anywhere, and the IT infrastructure a bank uses to accomplish a wire transfer can be housed almost anywhere. *See, e.g.* Rich Miller, "Dimon: JP Morgan Spends $500 Million per Data Center," Data Center Knowledge, August 13, 2012 ("Wall Street firms have always invested heavily in their data center infrastructure. But they don't often talk about the details of those facilities or investments. JPMorgan Chase operates two large data centers in Delaware and a 400,000 square foot facility in Bergen County, N.J. It also acquired data center properties in its deals for distressed rivals Bear Stearns and Washington Mutual in the early days of the 2008 financial crisis."), available at https://www.datacenterknowledge.com/archives/2012/08/13/dimon-jpmorgan-spends-500-million-on-its-data-centers; Ed Sperling, "Data Centers in the Desert," Forbes, June 15, 2009 ("Building a data center in the Arizona desert sounds counterintuitive . . . . But that hasn't stopped most of the major banks and some of the other large corporations in America from situating data centers in the Phoenix area . . . . Many of the largest companies have data centers here. That includes JP

14

Morgan Chase , United Airlines, Bank of America , State Farm Insurance and Toyota"), available at https://www.forbes.com/2009/06/12/data-centers-desert-technology-cio-network-data-centers.html#140c660977e2. The notion that the address associated with a bank account tells us anything about where a specific wire transmission for the account happens is simply false. The Government introduced no evidence at trial supporting such a notion.

The Government's supplemental letter offers no information whatsoever about the actual transmission of any of the wires, or how any reasonable factfinder could conclude that any of these wires were, in fact, transmitted across state lines. The closest the brief comes to identifying location information for any wire is the Government's argument that the voluminous bank records associated with the Chase account "specifically notes Maiden Capital and 'NC'," in connection with a $10,000 wire sent in June 2012. (Br. 4). The Government absurdly suggests that "a jury could have concluded" that the NC reference "was North Carolina, the location of the Maiden Capital Account." (Br. 4). This is a spurious argument – the "NC" in GX 653 is not even next to the portion of the one-line notation that references Maiden Capital, the notation references "BK America NC," which is the telegraphic name of Bank of America and can appear on any fedwire transfer involving the bank, no matter where the wire actually terminates or originates. *See Saudara Taufan*, Bank Routing Number Information, April 22, 2017, available at https://www.abaroutingnumber.info/2017/04/bank-routing-number-053000196.html; *see also* "Fedwire," Wikipedia ("Today, three data processing centers support the

Fedwire services. One site supports the primary processing environment with on-site backup. A second site serves an active, "hot" backup facility with on-site backup. A third site serves as a "warm" backup facility. The three data processing centers are located a considerable distance from one another (i.e., hundreds of miles) in order to mitigate the effects of natural disasters, power and telecommunication outages, and other wide-scale, regional disruptions."), available at https://en.wikipedia.org/wiki/Fedwire. In short, the notion that the "NC" in a single notation in GX 653 indicates anything about the location or movement of the wire is not only pure conjecture unsupported by any testimony or evidence, it is simply nonsense in conflict with the reality of the operation of modern banking systems. That the Government advances this argument only underscores the extent to which the Government is aware it has failed to meet its burden. It is an improper suggestion that the jury could have engaged in pure speculation in order to determine whether the critical element in the wire fraud charge had been satisfied. The Court should reject it.

The Government's reliance on *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016), is misplaced. The Government cites *Lange* for the premise that "the Second Circuit has upheld convictions where venue was premised on [the] jury drawing the reasonable inference that individuals send and receive wire communications to and from where they maintain an address, live or work." (Br. 3). First, there was actual evidence in *Lange* that the conspirators made telephone calls directly to the Eastern District of New York, and these were the key communications of the conspiracy –

calls to the victims to solicit investments in the fraudulent scheme. *See id.* at 71 ("The Government presented direct and circumstantial evidence that BSMI personnel telephoned and emailed residents of the EDNY to solicit investments"). The "circumstantial evidence" in *Lange* included call lists of investors that showed the conspirators were making calls directly to the Eastern District of New York. *See id.* This is nothing like the case at hand. The Government has identified no evidence whatsoever that would allow a reasonable factfinder to conclude that a wire in furtherance of the conspiracy was made to the Southern District of New York. Perhaps more importantly, the objects of the conspiracy count in *Lange* were both securities fraud and wire fraud, but the Second Circuit focused its analysis only on the sufficiency of the evidence with regard to the securities fraud object. *See id.* at 70-75. The Court of Appeals did not even discuss the sufficiency of the evidence with regard to the wire fraud component of the conspiracy. *Id.* As the Court is well aware – wire fraud conspiracy and securities fraud conspiracy are entirely different in terms of this analysis. Moreover, the Government has cited this case in support of the purported validity of its substantive wire fraud charge, but *Lange* did not even feature a substantive wire fraud charge. *Id.* at 63.

*United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008), is similarly inapposite. (Br. 6) ("In *Royer* and *Lange*, the Second Circuit upheld a conviction based on generalized evidence associating individuals with addresses in the Eastern District of New York."). First, although *Royer* featured a substantive wire fraud charge, the Second Circuit did not discuss these charges at all in their venue

analysis – the court discussed only the securities fraud charges, the extortion charges, the RICO charges, and the defendant's obstruction conviction. *See id.* at 894-97. It is thus unclear how *Royer* is even relevant here. Moreover, just as in *Lange*, there was nothing "generalized" about the evidence supporting venue on the securities fraud and other charges in *Royer*. In that case, venue on the related securities fraud and extortion charges was supported by, among other proof, evidence that key participants in the schemes were involved in specific activities in the Eastern District of New York that furthered the continuing offenses at issue in that case. *See id.* at 895. Regardless, none of this informs the specific venue issues that arise in wire fraud and wire fraud conspiracy cases. The Government cannot sidestep the specific evidentiary requirements of these charges, and it has not cited any case that says it can. The bottom line remains the same – the Government has failed to identify a single wire transmission in the case against Mr. Amanat that they can say crossed state lines and terminated or began in the Southern District of New York. This is the basic requirement of a wire fraud prosecution and it was not met.

The Government also improperly relies on Judge Caproni's decision in *United States v. Campos*, No. 16 Cr. 395 (VEC), 2017 WL 4402579, at *3 (S.D.N.Y. Oct. 3, 2017). In *Campos*, there was direct evidence of the necessary wire – Judge Caproni wrote: "The evidence at trial established that Mr. Alvarez's business was located in Manhattan, in the Southern District of New York, and that Mr. Campos himself sent one or more wire communications in furtherance of the fraud to Mr. Alvarez at

his business. See Tr. 928 (Mr. Campos faxed Ms. Pedroza's credit application to Mr. Alvarez's business)." *See id.* Thus, *Campos* could not be more different from the instant case – in *Campos* the Government introduced proof that the defendant sent a key communication, one of the fraudulent credit applications, directly across state lines to the defendant's key co-conspirator. Again, this is exactly the proof that is lacking in the instant case. Judge Caproni's observations about the reasonable foreseeability of more communications from the key coconspirator in that case has no application here. In *Campos*, the "hub" of the conspiracy was an individual whose business received the fraudulent applications that were necessary for the scheme directly in Manhattan, and the defendant's awareness of this fact was proven by his transmission of one such wire. *See id.* There is no analogous proof in this case.

Finally, the Court must reject the Government's argument that wires sent from Mr. Tuzman to Mr. Maiden were somehow wires in furtherance of the Count One and Count Two crimes involving a scheme to defraud the Maiden Capital Investors. (Br. 6-7). The theory under which these wires somehow connect to these counts is so convoluted and attenuated, it is difficult to articulate all of the ways in which it is objectionable. These are wires literally involving a separate conspiracy for which Mr. Amanat was not charged. The Government never pressed this theory at trial or elsewhere and the defendant had no opportunity to rebut it. This theory is not only unfair, it simply makes no sense. It cannot be the case that *anything anyone* did that helped Maiden Capital is a wire fraud on the part of Mr. Amanat.

The Government has not even attempted to coherently explain how these wires actually furthered the fraud or how they could have been reasonably foreseeable to Mr. Amanat, who was not a participant in that scheme.

Putting these problems aside, even if the Tuzman wires identified in Government's supplemental brief could somehow be considered to have been in furtherance of the Count One and Count Two crimes, the Government has failed to explain how the fact that the account was "domiciled at the HSBC office" in Manhattan demonstrates that an interstate wire occurred. As discussed above, the address associated with a particular bank account does not tell us anything about the actual transmission of wires involving that account. Based on the exhibits cited by the Government, we have no idea where the Tuzman wires were initiated or terminated. Indeed, the Government has not even endeavored to explain how GXs 606, 611, 619, 645, 649-A, and 649-E, 2793 establish this theory, leaving it to the Court to wade through these voluminous exhibits and sort out the Government's final theory of venue. Regardless, the more important point is that there is simply no reasonable connection between these wires and the Count One and Two crimes.

## <u>CONCLUSION</u>

For the reasons described above, the Defendant's post-trial motions should be granted.


Dated:      January 2, 2019
              New York, New York

Respectfully Submitted,

/s/ Randall W. Jackson
_____
Randall W. Jackson
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Telephone:   (212) 728-8216

*Attorney for Defendant Omar Amanat*