UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

KALEIL ISAZA TUZMAN and
OMAR AMANAT,

Defendants.

S8 15 Cr. 536 (PGG)

## SUPPLEMENTAL SENTENCING MEMORANDUM OF KALEIL ISAZA TUZMAN FOLLOWING THE *FATICO* HEARING

GIBSON, DUNN & CRUTCHER LLP

AVI WEITZMAN
JUSTINE GOEKE
DAVID SALANT
*aweitzman@gibsondunn.com*
*jgoeke@gibsondunn.com*
*dsalant@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone:     (212) 351-4000
Facsimile:     (212) 351-4035

*Attorneys for Defendant Kaleil Isaza Tuzman*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

I.  Governing Law ............................................................................................................ 5

    A.  The Burden of Persuasion Rests with the Government. .................................................. 5

    B.  The Government Must Show the Loss Amount Was Both Factually and
Proximately Caused by the Offenses of Conviction. ........................................................ 6

II.  Dr. Voetmann's Loss Amount Estimates Are Methodologically Unsound and
Unreliable. ....................................................................................................................10

    A.  Contrary to Binding Precedent, Dr. Voetmann's Methodology Improperly Equates
Stock Price Inflation with Alleged Losses to Investors...................................................12

    B.  There Is No Record Evidence to Support Dr. Voetmann's Assumptions of
Causation Underlying His Entire Analysis......................................................................16

    C.  Dr. Voetmann's Methodology Failed to Rule out Potentially Confounding News. .........20

    D.  Voetmann's Methodology Incorrectly Incorporated "Loss" to the Entire
Shareholder Base, Including Maiden and Isaza Tuzman.................................................24

    E.  Dr. Voetmann's Analysis Suffered from Multiple Additional Methodological
Flaws That Are Fatal to His Analysis. ...........................................................................27

        1.  Voetmann's Methodology Improperly Ignores Days on Which KIT Digital's
Stock Price *Decreased* More Than Expected. ........................................................27

        2.  Voetmann's Methodology Ignored Maiden's Sales of KIT Digital Stock. ..............29

    F.  Dr. Voetmann's First, Second, and Third Loss Amount Estimates Should Be
Summarily Rejected Because They Ignore Statistical Significance and
Confounding News.......................................................................................................31

        1.  Voetmann's First and Second Estimates of Loss Should Be Rejected Because
They Are Calculated without Regard for Statistical Significance. ...........................31

        2.  Voetmann's First and Third Loss Estimates Should Be Rejected Because They
Are Calculated without Regard for Confounding News...........................................33

III.  Dr. Niden's Analysis Suffers from Significant Methodological Flaws, and Must Be
Rejected as the Basis for a Loss Enhancement. ...............................................................34

A. Because the November 2012 8-K Cannot Serve as a Proxy for the Fraud, the Stock Price Drop That Followed Does Not Measure Loss to Investors Resulting from the Fraud of Conviction. ......................................................................34

B. The Government's Loss Amount Calculation for Count Six Fails to Account for Numerous Confounding Factors ..........................................................................37

C. Dr. Niden's Loss Calculation Improperly Assumes that the Price of the Stock was Inflated by the Same Amount Throughout the Conspiracy Period. ................................43

D. The Government's Loss Amount Calculation Overstates Investor Losses Because it Fails to Account for Recovery in Bankruptcy. ...........................................................44

IV. The Court May Use "Unlawful Gain" as a Reasonable Alternative to Loss. ........................46

CONCLUSION ...............................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*60223 Tr. v. Goldman, Sachs & Co.*,
    540 F. Supp. 2d 449 (S.D.N.Y. 2007) ................................................................ 14

*In re Barclays Bank PLC Sec. Litig.*,
    No. 09 Civ. 1989 (PAC), 2017 WL 4082305, at *23 (S.D.N.Y. Sept. 13, 2017) ................. 31

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
    853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom. Bricklayers & Trowel
    Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st
    Cir. 2014) .......................................................................................... 30

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ........................................................................ 32

*Cacciola v. Selco Balers, Inc.*,
    127 F. Supp. 2d 175 (E.D.N.Y. 2001) ............................................................... 24

*In re California Micro Devices Sec. Litig.*,
    965 F. Supp. 1327 (N.D. Cal. 1997) ................................................................ 43

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x 72 (2d Cir. 2013) .................................................................... 14

*In re Cigna Corp. Sec. Litig.*,
    459 F. Supp. 2d 338 (E.D. Pa. 2006) ............................................................... 14

*Daubert v. Merrell Dow Pharms.*,
    516 U.S. 869 (1995) ................................................................................ 12

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................... 2, 7, 12, 13

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ....................................................................... 13

*Gordon Partners v. Blumenthal*,
    293 F. App'x 815 (2d Cir. 2008) ................................................................... 13

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    688 F.3d 713 (11th Cir. 2012) ..................................................................... 38

*In re Initial Pub. Offering Sec. Litig.*,
  297 F. Supp. 2d 668 (S.D.N.Y. 2003) ...............................................................14

*In re Intelligroup Sec. Litig.*,
  468 F. Supp. 2d 670 (D.N.J. 2006) ...................................................................14

*Katyle v. Penn Nat. Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ............................................................................36

*Martone v. Robb*,
  902 F.3d 519 (5th Cir. 2018) ............................................................................36

*Ohio Pub. Emp's Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  No. 4:08CV0160, 2018 WL 3861840, at *7 (N.D. Ohio Aug. 14, 2018) .............24

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) .............................................................................36

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  244 F. Supp. 2d 247 (S.D.N.Y. 2003) ...............................................................36

*Rubinstein v. Marsh*,
  No. CV-80-0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec. 10, 1987) .....................24

*Teachers' Retirement System of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ...........................................................................36

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) ...............................................................................9

*In re the Bear Stearns Companies, Inc. Secs.*,
  No. 08 Civ. 2793, 2016 WL 4098385 (S.D.N.Y. July 25, 2016) ..................... 14, 32

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................................... 9, 33, 46

*United States v. Atilla*,
  No. S4 15 Cr. 867 (RMB) (S.D.N.Y. May 16, 2018) ...........................................4

*United States v. Butler*,
  970 F.2d 1017 (2d Cir. 1992) .............................................................................5

*United States v. Caballero*,
  93 F. Supp. 3d 209 (S.D.N.Y. 2015), *aff'd*, 672 F. App'x 72 (2d Cir. 2016) .........5

*United States v. Cuti*,
  No. 08 Cr. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) .............. 8, 46

*United States v. Deutsch,*
    987 F.2d 878 (2d Cir. 1993) ....................................................................................7

*United States v. Diallo,*
    710 F.3d 147 (3d Cir. 2013) ....................................................................................6

*United States v. Ebbers,*
    458 F.3d 110 (2d Cir. 2006) ..............................................................................7, 38

*United States v. Ferguson,*
    584 F. Supp. 2d 447 (D. Conn. 2008) ................................................................9, 32

*United States v. Geevers,*
    226 F.3d 186 (3d Cir. 2000) ..............................................................................5, 6

*United States v. Grabske,*
    260 F. Supp. 2d 866 (N.D. Cal. 2002) ........................................................37, 38, 43

*United States v. Gushlak,*
    728 F.3d 184 (2d Cir. 2013) ..............................................................................7, 13

*United States v. Hatfield,*
    795 F. Supp. 2d 219 (E.D.N.Y. 2011) .......................................................................9

*United States v. Hatfield,*
    No. 06 Cr. 0550 (JS)(AKT), 2014 WL 7271616, at *5
    (E.D.N.Y. Dec. 18, 2014) ..................................................................................32, 33

*United States v. Heine,*
    No. 3:15-cr-238-SI, 2018 WL 2986212, at *5 (D. Or. June 14, 2018) ...............................48

*United States v. Iwuala,*
    789 F.3d 1 (1st Cir. 2015) .......................................................................................6

*United States v. Jimenez,*
    513 F.3d 62 (3d Cir. 2008) .......................................................................................6

*United States v. Laurienti,*
    611 F.3d 530 (9th Cir. 2010) ..................................................................................30

*United States v. Lee,*
    818 F.2d 1052 (2d Cir. 1987) ...................................................................................5

*United States v. Levy,*
    No. 11 Cr. 62 (PAC) (S.D.N.Y. Feb. 19, 2014) ...........................................................4

*United States v. Lumiere,*
    No. 16 Cr. 483 (JSR) (S.D.N.Y. June 13, 2017) ......................................................8, 46

*United States v. Lundstrom*,
    880 F.3d 423 (8th Cir. 2018) ........................................................................25

*United States v. Mershon*,
    322 F. App'x 238 (3d Cir. 2009) ....................................................................6

*United States v. Nacchio*,
    573 F.3d 1062 (10th Cir. 2009) ....................................................................32

*United States v. Olis*,
    429 F.3d 540 (5th Cir. 2005) .....................................................................7, 8

*United States v. Olis*,
    No. H-03-217-01, 2006 WL 2716048, at *9 (S.D. Tex. Sept. 22, 2006) ................9

*United States v. Peppel*,
    No. 3:06-CR-196, 2011 WL 3608139, at *7 (S.D. Ohio Aug. 16, 2011), *aff'd*,
    707 F.3d 627 (6th Cir. 2013) .....................................................................9, 25

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007) .......................................................2, 7, 8, 14, 45

*United States v. Rutkoske*,
    No. 03 Cr. 1452 (LMM) (S.D.N.Y. Oct. 28, 2010) .......................................9, 46

*United States v. Schneider*,
    930 F.2d 555 (7th Cir. 1991) ..........................................................................8

*United States v. Shabudin*,
    701 F. App'x 599 (9th Cir. 2017) ..................................................................48

*United States v. Tanner*,
    No. 17 Cr. 61 (LAP) (S.D.N.Y. Oct. 30, 2018).................................................3

*United States v. Tzolov*,
    435 F. App'x 15 (2d Cir. 2011) ..................................................................4, 48

*United States v. Williams*,
    247 F.3d 353 (2d Cir. 2001) .......................................................................5, 6

*United States v. Wilmington Trust Corp.*,
    No. 15 Cr. 23 (D. Del. Oct. 5, 2018) .............................................................47

*United States v. Zangari*,
    677 F.3d 86 (2d Cir. 2012) ...........................................................................47

*United States v. Zolp*,
    479 F.3d 715 (9th Cir. 2007) ..........................................................................7

*In re Veritas Software Corp. Sec. Litig.*,
496 F.3d 962 (9th Cir. 2007) ...................................................................45

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (N.D. Okla. 2007)*, aff'd sub nom. In re Williams Sec.*
*litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) ...................................31

*In re Williams Sec. litigation-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ...............................................................14

**U.S. Sentencing Guidelines**

U.S.S.G. § 1B1.3 .....................................................................................20

U.S.S.G. § 2B1.1 ...........................................................1, 4, 6, 7, 12, 47, 49

**Regulations**

80 Fed. Reg. 25782,791 (May 5, 2015)...........................................................7

Defendant Kaleil Isaza Tuzman respectfully submits this memorandum of law following the *Fatico* hearing held on April 1–2, 2019, regarding the government's proffered loss amount under U.S.S.G. § 2B1.1 for Counts Four and Six of the Indictment.

## INTRODUCTION

It is now clear that the draconian sentence sought by the government in this case is built upon a wildly erroneous calculation of "loss amount" detached from the facts submitted at trial and contrary to binding caselaw. The government's sentencing request in this case (262–327 months' imprisonment) is propelled mainly by a 22-level loss amount enhancement based on a purported total loss amount of $25.2 million for Count Four and $31.4 million for Count Six. ECF No. 774 ("PSR") ¶¶ 151–154, 160, 162. This loss amount enhancement multiplies the advisory Guidelines sentencing range more than ten-fold. While the Probation Department recommended a sentence far below the applicable Guidelines range, its recommendation of a "significant custodial sentence" explicitly relied upon the extent of the loss amount asserted by the government. PSR at 59–61. For the reasons discussed below, the government's loss amount calculation is dramatically overblown, and as such, the foundational pillars of the sentencing recommendations by the government and the Probation Department have collapsed.

In our moving sentencing brief, we thoroughly discussed why the loss amount calculations urged by the government and adopted in the PSR were unsupported and defy applicable law. *See* ECF No. 793 at 31–49. The government did not defend that methodology in response, but instead introduced new methodologies, set forth in two expert reports, to bolster its previously proffered results. First, with respect to Count Four, Dr. Torben Voetmann opined that Stephen Maiden's trading in KIT Digital stock between December 31, 2008, and September 15, 2011 (the "conspiracy period") caused losses between $10.4 million and $82.0 million. ECF No. 808-1 ("Voetmann Report") ¶ 10. Second, with respect to Count Six, Dr. Cathy Niden opined

that estimated harm to shareholders resulting from the accounting fraud charged in Count Six was "at least $22.9 million." ECF No. 808-2 ("Niden Report") ¶ 10. Neither expert report adopted the PSR's stated methodologies or their full results. Indeed, Dr. Voetmann clarified that he was **not** "advancing the methodology" employed in the PSR to calculate the Count Four loss amount, but merely endorsing the results of that methodology as "reasonable." Tr.[1] at 271, 309; Voetmann Report ¶ 34.

Dr. Voetmann's and Dr. Niden's loss amount calculations are as flawed as the PSR's rudimentary first attempt. Dr. Voetmann wrongly uses stock price *inflation* to generate his estimate of the "actual loss" caused by the Count Four market manipulation conspiracy, in violation of black-letter Supreme Court and Second Circuit precedent. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007). His approach assumes that Maiden's trading was causally related to any abnormal positive returns and that every share purchased by Maiden was part of the stock manipulation conspiracy. Neither assumption, however, has any foundation in the record. Equally troubling, Dr. Voetmann uses Professor Ferrell's data in selective, one-sided ways that acts together to artificially boost his result: for example, considering Maiden's buys while ignoring his sells; and considering KIT Digital's positive daily residuals while ignoring negative daily residuals. Had Dr. Voetmann not employed such a one-sided methodology, his analysis would have offset buys against sells, and positive days against negative days, that would dampen if not eliminate all "loss." Moreover, each of Dr. Voetmann's high-end and low-end calculations are disabled by his failure to follow standard, precedent-mandated quality-control procedures: (i) that all potential confounding news is accounted for; (ii) that loss sustained by defendants

---

[1] "Tr." refers to the transcript of the *Fatico* hearing held April 1–2, 2019. "Trial Tr." refers to the trial transcript.

themselves is eliminated from the loss amount used to punish them; and (iii) that all results are statistically significant, that is, unlikely to be produced by random chance. For these reasons, Dr. Voetmann's study should not be accepted by this Court as a sound and reliable predicate for sentencing.

Dr. Niden's Count Six analysis fares no better. She assumed—contrary to the facts and the law—that the stock price decline following November 21, 2012, was an appropriate measure of the stock price inflation resulting from the offenses of conviction. But Dr. Niden failed to account for the fact that the November 21, 2012 8-K was overbroad and insufficiently detailed and thus cannot serve as a proxy for the fraud of which Isaza Tuzman was convicted. Moreover, Dr. Niden admittedly failed to exclude the effect of confounding news on the stock price, so her event study inflates the effect on the stock price. Dr. Niden also overestimated the loss amount by improperly assuming that the price of the stock was inflated by the same amount from November 9, 2011, through the November 2012 8-K.

The backdrop to this loss amount dispute is a government sentencing recommendation that is disproportionate, unwarranted, and unjust. At a time when there is overwhelming bipartisan recognition that automatically lengthy sentences are excessive, badly antiquated, and require substantial reform, the government in this case continues to pursue a "lock-'em-up-and-throw-away-the-key" approach, out of step with the stated positions of so many judges in this District. *See, e.g.,* Sentencing Tr. at 70:1–2, 78:19–22, 79:20–22, *United States v. Tanner*, No. 17 Cr. 61 (LAP) (S.D.N.Y. Oct. 30, 2018) (attached hereto as Weitzman Decl. Ex. 1) (guidelines in financial fraud cases "are truly out of whack at the higher ends"; there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective

3

'white-collar' offenders")[2]; Sentencing Tr. at 25, *United States v. Levy*, No. 11 Cr. 62 (PAC) (S.D.N.Y. Feb. 19, 2014), ECF No. 371 (attached hereto as Weitzman Decl. Ex. 2) ("the higher the loss amount, the more distorted is the guidelines advice to sentencing judges"); Sentencing Tr. at 26:6–7, *United States v. Atilla*, No. S4 15 Cr. 867 (RMB) (S.D.N.Y. May 16, 2018), ECF No. 520 (attached hereto as Weitzman Decl. Ex. 3) (sentencing defendant convicted at trial of conspiracy to violate U.S. sanctions law to 32 months despite government's requested 20-year sentence).

The defense had sought to avoid this debate altogether. In October 2018, the defense offered to avoid a *Fatico* hearing by using an alternative measure of loss authorized by the Guidelines—namely "gain resulting from the offense," *see* U.S.S.G. § 2B1.1 cmt. 3(B)—endorsed in similar cases by the Department of Justice and Second Circuit courts. *See, e.g.*, *United States v. Tzolov*, 435 F. App'x 15, 17 (2d Cir. 2011) (finding that where "amount of loss could not reasonably be determined," the district court "appropriately used the gain realized by Appellant . . . as an alternative measure of loss"). That offer was significant because our client was willing to use the salary and cash bonuses he earned at KIT Digital as a measure of "gain" even though his compensation was not tied to any sham licenses or other fraudulent activities. The government refused, forcing us to proceed with the *Fatico* hearing and challenge the government's "out of whack" loss amount estimates.

In sum, the astronomical sentence urged by the government is based upon a legally and factually flawed loss amount methodology and fits neither the offender nor the offense. Because the government has not met its burden, the 22-level loss-amount enhancement in the PSR should

---

[2] "Weitzman Decl." refers to the Declaration of Avi Weitzman in support of Isaza Tuzman's post-*Fatico* submission. In connection with the parties' agreement to close the record and proceed to briefing following the *Fatico* hearing, the government has consented to the defense supplementing the record by submitting additional exhibits with its opening brief. *See* Weitzman Decl. ¶ 2.

be rejected in its entirety.  In the alternative, we respectfully request that the Court use no more than a measure of "unlawful gain" as a reasonable substitute for loss.

## I.    Governing Law

### A.    The Burden of Persuasion Rests with the Government.

The law is clear that the government always bears the burden of persuasion with respect to Sentencing Guidelines enhancements.  *See United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001); *United States v. Caballero*, 93 F. Supp. 3d 209, 212 (S.D.N.Y. 2015), *aff'd*, 672 F. App'x 72 (2d Cir. 2016) ("There is no dispute that it is the government's burden to prove a sentencing enhancement under the Guidelines.").  That is because in advocating for increased punishment, the government must be tethered to: (1) the "presumption that the defendant who denies committing" the predicates to the enhancement is innocent; (2) its "greater resources to marshal proof in support of its allegations"; and (3) the unfairness of forcing upon a defendant "the inherent difficulty of proving a negative."  *United States v. Lee*, 818 F.2d 1052, 1056–57 (2d Cir. 1987); *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992).

In its sentencing brief, the government suggests that Defendants bear the burden of disproving a particular enhancement. Gov't Br. 16 (citing *United States v. Geevers*, 226 F.3d 186 (3d Cir. 2000)).  That is wrong, and *Geevers* stands for no such broad proposition.  In *Geevers*, the Third Circuit held that in, a check-kiting case, the presentation of the kited checks permitted the sentencing court to infer the defendant's subjective intent to cause a loss equal to the full face amount of the checks.  226 F.3d at 192–93.  *Geevers* merely stands for "the hoary rule that the face value of a fraudulent instrument may be treated as evidence of the amount that the fraudster intended to swindle."  *United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015).  Indeed, even the Third Circuit recognized that *Geevers* stands for a much more limited proposition than the broad burden shifting urged by the government here.  *United States v.*

*Diallo*, 710 F.3d 147, 151 (3d Cir. 2013) ("[T]he government always bears the burden of proving

by a preponderance of the evidence that the facts support a sentencing enhancement, and 'the

defendant does not have to prove the negative to avoid the enhanced sentence.'" (citation

omitted)); *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008) ("the burden of persuasion

remains with the Government").   The *Geevers* Court itself made clear, "[o]f course, the burden

of persuasion always remains with the government."   226 F.3d at 193 (citation omitted).

Moreover, the animating facts underlying *Geevers* bear no resemblance to this case, in which the

purported loss amount is rooted in complex econometrics.   *Cf. United States v. Mershon*, 322 F.

App'x 238 n.4 (3d Cir. 2009) ("In *Geevers*, the potential loss was easily ascertained based on the

face value of the deposited checks").   In sum, *Geevers* is out-of-Circuit, inapposite law that the

government stretches to place an improper burden on the defense.   The burden instead continues

to rest with the government.

### B.      The Government Must Show the Loss Amount Was Both Factually and Proximately Caused by the Offenses of Conviction.

For a loss enhancement to apply, the government must prove both the existence and the

amount of loss attributable to the offenses of conviction.   *United States v. Williams*, 247 F.3d at

358 n.7.   Under U.S.S.G. § 2B1.1(b)(1), "actual loss" means "the reasonably foreseeable

pecuniary harm that resulted from the offense." *Id*. cmt. 3(A)(i).   A suggested factor for

estimating loss in connection with securities fraud cases is "[t]he reduction that resulted from the

offense in the value of equity securities or other corporate assets." U.S.S.G. § 2B1.1 cmt.

3(C)(v).   The estimate of loss may not be based on speculation.   *United States v. Deutsch*, 987

F.2d 878, 886 (2d Cir. 1993).

In determining whether the loss "resulted from the offense," the Second Circuit has

adopted the civil securities fraud loss causation standard set forth by the Supreme Court in *Dura*

*Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  *See Rutkoske*, 506 F.3d at 179;

*United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006);  *United States v. Gushlak*, 728 F.3d

184, 197 (2d Cir. 2013) ("[A]s a general matter, it is necessary to a determination whether

particular losses were 'directly and proximately' caused by fraud, or instead by the

materialization of some non-fraud risk, against which investors are not protected by the securities

laws.") (citation omitted).

> In *Dura Pharmaceuticals*, the Supreme Court held that a misrepresentation must be both

the "but-for" and proximate cause of the economic loss.  Because "[m]any factors may cause a

decline in share price between the time of the fraud and the revelation of the fraud . . . 'losses

from causes other than the fraud must be excluded from the loss calculation.'"  *Rutkoske*, 506

F.3d at 179 (quoting *Ebbers*, 458 F.3d at 127).[3]  Appellate courts have stressed the importance of

attributing the portion of the stock drop specifically caused by the fraud in order to appropriately

establish loss amount.  *See, e.g.*, *Rutkoske*, 506 F.3d at 179;  *United States v. Zolp*, 479 F.3d 715,

719 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of

that value due to the fraud, and either inflation or deflation of that value due to unrelated

causes.");  *United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005).  As such, the failure to

disaggregate the stock price movements that may result from the charge of conviction from other

potential causes of the stock movement is reversible error.  *See Rutkoske*, 506 F.3d at 180 ("The

District Court's basic failure at least to approximate the amount of the loss caused by the fraud

without even considering other factors relevant to a decline in [the company's] share price

---

[3]   This principle accords with the Sentencing Guidelines commentary, which warns that simply estimating loss based on the change in price before and after the fraud may mistakenly capture "significant changes in value not resulting from the offense." U.S.S.G. § 2B1.1 cmt. 3(F)(ix).  *See also* U.S. Sentencing Comm'n, Sentencing Guidelines for United States Courts, 80 Fed. Reg. 25782,791 (May 5, 2015) (noting that what constitutes a reasonable estimate of loss "will often vary in these highly complex and fact-intensive [stock drop] cases").

requires a remand to redetermine the amount of the loss, both for purposes of the sentence and restitution."); *Olis*, 429 F.3d at 548–49 (vacating sentence "[b]ecause the district court's approach to the loss calculation did not take into account the impact of extrinsic factors on [the company's] stock price decline").

Similarly, when "other factors" render loss calculation "difficult and speculative"— because the decline in market price of the security cannot confidently be causally attributed to the offenses of conviction—district courts have held that the government has ***not*** met its burden. *See United States v. Cuti*, No. 08 Cr. 972 (DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) ("It is the Government's burden to prove loss and the Court must recognize that these 'other factors' make a determination of loss difficult and speculative."). Under such circumstances, a court ***must*** decline to apply any loss enhancement, since it is solely the government's burden to establish the propriety of a sentencing enhancement using reasonable methodologies.  *See United States v. Schneider*, 930 F.2d 555, 559 (7th Cir. 1991) (Posner, J.) (inability to calculate loss amount, resulting in no loss amount enhancement, does not let off a defendant "scot free"; instead, it "is simply that the Guidelines award bonus punishment points for different levels of proven loss . . . . The Government did not earn a bonus in this case."); Sentencing Transcript at 2:23–3:2, *United States v. Lumiere*, No. 16 Cr. 483 (JSR) (S.D.N.Y. June 13, 2017), ECF No. 105 (attached hereto as Weitzman Decl. Ex. 4) ("[T]he guidelines . . . take the position that if you can't reasonably calculate the loss, then you should treat it as zero even if common sense would say, well, there was some meaningful loss here."); Sentencing Transcript at 20:9–12, *United States v. Rutkoske*, No. 03 Cr. 1452 (LMM) (S.D.N.Y. Oct. 28, 2010), ECF No. 327 (attached hereto as Weitzman Decl. Ex. 5) (declining to apply loss enhancement on remand from Second Circuit); *United States v. Adelson*, 441 F. Supp. 2d 506,

509–10 (S.D.N.Y. 2006) (declining to adopt government's calculation of actual loss calculation when defendant proffered confounding factors).

In the context of event studies, the Second Circuit has explained that "[a]n event study may be rejected . . . if it is methodologically unsound or unreliable." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 208 (2d Cir. 2008). On this basis, federal criminal courts across the country have rejected or ignored event studies proffered by the government that overstates the magnitude of the loss or fails to demonstrate a reasonable degree of certainty of actual loss to shareholders. *See, e.g.*, *United States v. Hatfield*, 795 F. Supp. 2d 219, 241 (E.D.N.Y. 2011) ("elect[ing] to ignore the [government's] two event studies"); *United States v. Peppel*, No. 3:06-CR-196, 2011 WL 3608139, at *7 (S.D. Ohio Aug. 16, 2011), *aff'd*, 707 F.3d 627 (6th Cir. 2013) (ignoring event study that "may overstate the magnitude of the loss actually caused by the offense conduct"); *United States v. Ferguson*, 584 F. Supp. 2d 447, 452–54 (D. Conn. 2008) (disallowing government's "leakage" event study that included "day[s] where movement is not statistically significant" but allowing analysis based on corrective disclosure days on which there was a statistically significant price decline attributable to the fraud); *United States v. Olis*, No. H-03-217-01, 2006 WL 2716048, at *9 (S.D. Tex. Sept. 22, 2006) (rejecting government's event study where the "over four-fold difference between [the expert's] low estimate of $161 and his high estimate of $714 million, persuade[d] the court that the government ha[d] not shown to a reasonable degree of certainty the actual loss to shareholders").

## II.    Dr. Voetmann's Loss Amount Estimates Are Methodologically Unsound and Unreliable.

Dr. Voetmann's expert report and testimony purported to offer an analysis of alleged "loss amount" for the market manipulation conspiracy charged in Count Four of the Indictment. His calculation proceeded in three steps.

*First*, beginning with Professor Ferrell's event study—which Dr. Voetmann did not dispute or endorse—Dr. Voetmann calculated KIT Digital's actual daily return compared to the "predicted" return given market and industry movement. *See* Voetmann Report ¶ 20. This result is KIT Digital's daily "abnormal return" or "residual": a measure of KIT Digital's performance over and above what would be expected given the day's market and industry movement. *See* Tr. 241. Notably, in this step, Dr. Voetmann restricted his analysis only to *positive* residuals (days on which KIT Digital stock performed *above* its predicted return), and ignored all *negative* residuals (days on which KIT Digital stock performed *below* its expected return). Tr. 247:25–248:3.

*Second*, Dr. Voetmann multiplied the daily residual, if greater than zero, by the number of all KIT Digital shares outstanding—that is, he applied any daily positive residual in KIT Digital's stock price across every outstanding share, irrespective of whether the share was bought, sold or just held during the relevant days of alleged manipulation. During the conspiracy period, KIT Digital's total shares outstanding ranged from about three million to 40 million. *See* Voetmann Report ¶ 20 & Appx. C at Column [9] (listing shares outstanding). Thus, rather than examine what the effect of any positive residual was on actual investors that may have bought KIT Digital at an inflated price, he examined the effect of the positive residual primarily on the market as a whole, largely comprised of shareholders who held the stock, did not trade, and thus never experienced any loss from the supposed inflation.

*Third*, Dr. Voetmann multiplied the result by the fraction of Maiden's share of buy volume that day, thus presuming (without conducting any actual confirmatory analysis) that Maiden **caused** stock price inflation in proportion to his contribution to the day's total purchase volume. Voetmann Report ¶ 20. For example: if KIT Digital stock increased by $1.00 above what would be "predicted" given broader market and industry movement on that day; and if there were 10 million shares outstanding; and if Maiden bought 2% of all KIT Digital shares purchased on that day, then Dr. Voetmann calculated a loss amount for that day of: $1.00 x 10,000,000 x 2% = $200,000. If KIT Digital's price *decreased* below the predicted return, Dr. Voetmann simply ignored such results and set the day's loss amount to $0. He justified an analysis that blames the charged conspiracy for **all** positive residuals, without regard to the insubstantial amount of trading Maiden had on any particular day and without examination of Maiden's actual trading activity, based on his mistaken belief that defense expert Allen Ferrell had concluded that "the conspiracy scheme was intended to inflate the stock price of KIT digital." Tr. 244:8–9.

Finally, to reach his loss amount estimates, Dr. Voetmann summed up the daily loss amount figures, each one calculated as above, under four sets of conditions. *See* Voetmann Report 31 & Appx. C at C-15. Summing up all daily results without any further restrictions yielded his $82.0 million loss amount estimate. *Id.* ¶ 23. Eliminating days in which Dr. Voetmann saw potentially confounding news yielded his estimate of $68.2 million. *Id.* ¶ 26. Confining his results to days on which KIT Digital's abnormal positive return was statistically significant reduced the estimate to $15.4 million. *Id.* ¶ 29. And applying both conditions— statistically significant results and removing potentially confounding news he reviewed—yielded his estimate of $10.4 million. *Id.* ¶ 30.

11

Dr. Voetmann's loss calculations are subject to numerous methodological flaws, any one of which requires the rejection of his entire analysis, and all of which collectively cast serious doubts under *Daubert v. Merrell Dow Pharms.*, 516 U.S. 869 (1995).

### A.    Contrary to Binding Precedent, Dr. Voetmann's Methodology Improperly Equates Stock Price Inflation with Alleged Losses to Investors.

Dr. Voetmann's methodology is fatally flawed, in that it presumes that aggregating the total market value of *inflation* in KIT Digital's stock price reasonably measures actual losses suffered as a result of the charged market manipulation scheme. But the Supreme Court has squarely rejected similar efforts to measure loss amount to investors based on price inflation.

Dr. Voetmann conceded his loss amount methodology measures inflation, not actual losses to investors. Tr. 244:5–7 ("Q: [Y]ou are using a measure of stock price inflation as an estimate of loss? A: That's correct."). Thus, rather than measure the stock price *decline* resulting from the charged offenses as required under the Guidelines, *see* U.S.S.G. § 2B1.1 cmt. 3(C)(v), Dr. Voetmann measures the ***increase in market capitalization*** that he presumes to be connected to Maiden's allegedly manipulative trades, without regard to any subsequent decreases in stock price or associated losses to investors. The Supreme Court has rejected precisely this method of calculating loss to investors. In *Dura Pharmaceuticals*, the Supreme Court rejected a Ninth Circuit holding that a securities fraud plaintiff can demonstrate loss causation "simply by . . . establishing that 'the price' of the security 'on the date of the purchase was inflated because of the misrepresentation.'" 544 U.S. 336, 338 (2005) (citation omitted, emphasis in original). *Dura Pharmaceuticals* involved a securities fraud class action alleging that the plaintiffs, in reliance on the integrity of market prices, "paid artificially inflated prices for Dura securities" and suffered "damage[s] thereby." *Id.* at 340. In rejecting such a theory of loss causation, the Supreme Court explained:

> Normally, . . . an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.
>
> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, . . . the more likely that other factors caused the loss.

*Dura*, 544 U.S. at 342–43 (citations omitted); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 198 (2d Cir. 2003) (inflation of purchase price alone cannot satisfy loss causation).

The Second Circuit has repeatedly applied *Dura Pharmaceuticals* in both the civil and criminal contexts, including market manipulation cases, for its straightforward proposition that stock price inflation alone cannot establish loss to shareholders. *See, e.g.*, *Gushlak*, 728 F.3d at 196 (citing *Dura;* in calculating losses caused by stock manipulation, the "'inflationary component of the price paid'" is "the amount of investors' *potential* losses," but that *actual* losses depend on how inflated the shares were when they were sold); *Gordon Partners v. Blumenthal*, 293 F. App'x 815, 817 (2d Cir. 2008) ("[T]o prove loss causation a plaintiff needs to allege more than that the purchase price was inflated due to the fraudulent statements.");

*Rutkoske*, 506 F.3d at 179 (applying *Dura's* rejection of the "'inflated purchase price' theory of loss causation" to loss calculation in a criminal stock manipulation case).[4]

The relationship between stock price inflation and loss to shareholders is even further attenuated in a market manipulation case such as this one. *First*, there is no obvious point at which the charged market manipulation was "discovered" or "revealed" to the market and produced a discrete stock drop that may be studied. Indeed, there is no record evidence to explain why the government chose September 15, 2011 as the end of the conspiracy period. The expected arc for market manipulation would be that manipulative conduct causes an inflation in the security price that dissipates after the manipulative conduct ceases or is disclosed. *See In re Initial Pub. Offering Sec. Litig.*, 297 F. Supp. 2d 668, 674 (S.D.N.Y. 2003) ("Manipulative conduct is different [from fraud based upon misstatements or omissions to the market]. A market manipulation is a discrete act that influences stock price. Once the manipulation ceases, however, the information available to the market is the same as before, and the stock price gradually returns to its true value."). But, here, there was no discrete or proven date in September 2011 when the charged conspiracy ended, and there was no drastic price drop following that date, as Professor Ferrell testified. *See* Trial Tr. 6141:14–6142:16; KIT Ex. 3924

---

[4] In civil securities fraud cases, courts routinely reject calculations that measure inflation rather than actual shareholder loss because "a purchase-time value disparity between the price paid for the security and its true investment quality," *i.e.*, the inflation in the stock price, "does not speak to the relationship between the fraud and the loss of the investment." *60223 Tr. v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 459 (S.D.N.Y. 2007); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75–76 (2d Cir. 2013) (affirming dismissal of securities fraud action for failure to plead loss causation when plaintiff pleaded merely that defendant's misrepresentations "contributed to its artificially inflated stock price"); *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1139 (10th Cir. 2009) (affirming exclusion of expert testimony because "expert's testimony that a security's value has been inflated by fraud throughout the class period . . . does not show loss causation"); *In re the Bear Stearns Companies, Inc. Secs.*, No. 08 Civ. 2793, 2016 WL 4098385, at *14 (S.D.N.Y. July 25, 2016) (recognizing that equating stock price inflation to loss is an "assumption" that would "vitiate the loss causation requirement contrary to controlling precedent"); *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 350 (E.D. Pa. 2006) ("[T]he artificial inflation must actually be 'lost' due to the alleged fraud—where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation."); *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 693–94 (D.N.J. 2006).

(attached hereto as Weitzman Decl. Ex. 8).  This case thus has no similarities to a classic pump-and-dump scheme, where the harm resulting to investors can be readily measured.

*Second*, the manipulation alleged here supposedly caused cycles of stock price inflation that waxed and waned; thus, it is unclear which shareholders, if any, were "harmed" by temporary inflation.  It cannot simply be assumed that all shareholders "lost," as Dr. Voetmann does.  In the context of market manipulation, an innocent shareholder may experience loss, if at all, only if he buys the stock at an already-inflated price and then sells it after the inflation dissipates.  *See* Tr. 246:25–247:15.  Similarly, a shareholder who holds through a cycle of inflation and deflation, starting and ending at the same stock price, has experienced no actual loss.

In light of these legal principles, Dr. Voetmann's report clearly falls short.  To the extent Maiden's manipulative trading caused increases in KIT Digital's share price, shareholders who sold during the inflationary period would have *gained*, not lost. Tr. 245:13–18.  Dr. Voetmann acknowledged that he did not measure any price *declines* in connection with the charged market manipulation and did not consider the purchases and sales of individual investors, even though the government possessed but did not provide to Dr. Voetmann the "blue sheets" for KIT Digital, which would have permitted such an analysis.  Tr. 247–48.  Because Dr. Voetmann confined his analysis to estimating solely stock price inflation,[5] he cannot, and did not, identify any person or class of persons who lost any money trading in KIT Digital as a result of the charged scheme.

---

[5]  Dr. Voetmann's explanation for why he measured inflation to estimate shareholder loss was: "[b]ecause, as Professor Ferrell wrote in his report, the conspiracy scheme was intended to inflate the stock price of KIT Digital." Tr. 244.  Dr. Voetmann misinterprets Professor Ferrell's testimony and analysis.  Professor Ferrell's explanation of the charged offense for his analysis set the parameters of his examination—meaning, he sought to determine whether KIT Digital stock was in fact manipulated on the days claimed by government witnesses. Professor Ferrell in no way calculated loss amount or the appropriate methodology for measuring loss amount in a market manipulation case.  *See infra* Section II.B.

*See* Tr. 263.  The price of KIT Digital stock increased from $5.25 to $9.95—or 89.52%—over the conspiracy period, such that any shareholder who held continuously from December 31, 2008, through September 15, 2011, experienced no loss, only substantial gains.  Indeed, KIT Digital's stock price continued to increase after September 15, 2011, which marked the end of the charged conspiracy period.  *See* DX F110; Tr. 249.  Because Dr. Voetmann failed to conduct any analysis of losses as opposed to inflation, his expert report bears no relevance to the "loss amount" calculations urged in this case.

**B.  There Is No Record Evidence to Support Dr. Voetmann's Assumptions of Causation Underlying His Entire Analysis.**

Dr. Voetmann made two fundamentally erroneous assumptions about causation that doom his analysis.  *First*, he assumes that any *positive* residuals (days on which KIT Digital stock performed *above* its predicted return) found by Professor Ferrell's event study were proportionately causally related to trading by Maiden.  *Second*, he assumes that all shares purchased by Maiden throughout the conspiracy period were inflationary trades within the scope of the market manipulation scheme.  Because neither assumption is correct, Dr. Voetmann's analysis is fatally flawed.

*First*, Professor Ferrell's event study resulted in four principle conclusions, none of which permit an assumption that any residual price increases were presumptively caused by Maiden's trading.  Professor Ferrell's four conclusions were: (a) after accounting for overall market and industry movement, KIT Digital had only 22 days of statistically significant price increases; (b) on 11 of those days, Maiden either did not trade KIT Digital stock or was a net seller; (c) there was no statistically significant stock price increase on any of the 21 days Maiden and government expert Peter Melley testified were days on which Maiden engaged in manipulative behavior; and (d) there was no stock price collapse following the Count Four

conspiracy period.[6]  *See* KIT Exs. 3922, 3923, 3924 (attached hereto as Weitzman Decl. Exs. 6, 7, and 8).

But Professor Ferrell did not attribute causation to any abnormal stock returns because his event study could do no such thing.  He specifically testified that his event study cannot tell *why* stock price abnormally moves by a statistically significant amount.  Trial Tr. at 6193.  As Professor Ferrell explained:  "looking at the event study, you're not going to know what caused" the stock movement.  *Id*.  Indeed, the defense proffered to the Court that Professor Ferrell's event study "can't provide a causation analysis to say that Mr. Maiden's stock trading caused this statistically significant increase in the stock . . . .  Dr. Ferrell's can't do that."  Tr. at 6032. Indeed, the government understood this point full well, and advanced it in their cross-examination of Professor Ferrell, establishing that his event study cannot ascribe causation to abnormal price movements and that Professor Ferrell's "event study may not be able to distinguish between a random change in KIT Digital's stock price unrelated to Maiden's trading and the potential trading in KIT Digital stock price related to Maiden's trading."  *See* Trial Tr. at 6188–89.

Despite this record, Dr. Voetmann incorrectly assumed that Professor Ferrell's event study was intended to, and did in fact, measure the effect the charged market manipulation conspiracy had on KIT Digital stock movements.  *See* Voetmann Report ¶ 14 ("the purpose of

---

[6]  At the *Fatico* hearing, the government repeatedly claimed that Dr. Voetmann's work represented a straightforward, uncontroversial application of Professor Ferrell's event study, and therefore that by criticizing Dr. Voetmann's approach, the defense was "impeaching its own witness."  *See, e.g.*, Tr. 253, Tr. 279.  Dr. Voetmann's analysis went far beyond Professor Ferrell's event study.  Professor Ferrell did not engage in any loss amount analysis.  He did not perform any analysis of confounding news.  He did not calculate the amount by which KIT Digital was purportedly inflated as a result of Maiden's trading, as opposed to by other non-fraud factors.  And, most critically, Professor Ferrell in no way concluded that any purported inflation, net of market, industry and firm-specific movements, were necessarily caused by Maiden's stock trading—a conclusion that Dr. Voetmann falsely imputes to Professor Ferrell's analysis.  The defense's critique is not with Professor Ferrell's event study, but with Dr. Voetmann's analysis and methodology following the event study.

Dr. Ferrell's event study was to remove from KIT Digital's daily stock price returns overall market and industry effects *in order to measure the stock price impact of the conspiracy scheme*." (emphasis added)).  Dr. Voetmann's only support for this assumption is the following statement in Professor Ferrell's sentencing declaration: "Other factors aside from stock manipulation affect the price of a publicly traded stock. These include market, industry and firm-specific factors. The Government's method of calculating losses related to Count Four is flawed because it does nothing to account for these other factors." ECF No. 793-9 ¶ 7.  Dr. Voetmann badly misinterprets this statement.  Far from attributing stock manipulation as a cause for KIT Digital stock price movements, Professor Ferrell merely critiqued the Count Four loss amount calculation in the PSR for its failure to control for market, industry, and firm-specific factors that may cause stock price movements.  Professor Ferrell *did not* say that, after controlling for those market, industry, and firm-specific factors, the only remaining explanation for stock price movement is Maiden's market manipulation.  That position would flatly contradict his actual trial testimony cited above.

The flawed assumption made by Dr. Voetmann is amply evidenced in the result of his event study analysis.  In presuming that any positive residuals were proportionately caused by Maiden's manipulative trading, Dr. Voetmann illogically ascribes to Maiden the ability to artificially inflate the price of KIT Digital stock, even where his trading activity is a miniscule amount compared to the daily volume.  Almost all of the days showing statistically significant increases in KIT Digital's stock indicate that Maiden was well below 15% of the day's buy volume.  Even worse, some of the days involve Maiden's trading less than 1% of the day's buy volume.  For example, on September 21, 2009, and June 10, 2010—two of the "eleven days" comprising Dr. Voetmann's "most conservative" estimate of $10.4 million—Maiden was

responsible for less than 0.5% of buy volume, a result rounded down to 0% in Dr. Voetmann's results. *See* DX F113 at Column [11]. He was also a net seller of KIT Digital stock or had a net position of 0 shares on both days, so it defies reality to conclude that Maiden's trading maintained an inflationary impact through his net selling activities, as Dr. Voetmann himself acknowledged. *See* DX 3923; Tr. at 296 (acknowledging that a net seller is likely to have a "deflation effect" on the stock price). On May 10, 2011—another of Dr. Voetmann's "eleven days"—Maiden was responsible for only 1% of volume. On these days and all others on which Maiden traded relatively small amounts, Dr. Voetmann attributes some portion of the inflation amount to Maiden. He offers no analysis or economic literature that could explain how and whether Maiden in fact inflated the price of KIT Digital stock on days when he was such a small purchaser. Tr. at 339. He did not, for example, analyze the intraday timing of Maiden's trades and intraday movement in the stock price. Tr. at 290. The Court should reject the presumption, made without any basis in the literature, caselaw, or evidence, that Maiden's trading was the proximate cause of stock price increases proportional to his share of the buy volume.

*Second*, in using the entirety of Maiden's daily buy volume in his loss amount analysis, Dr. Voetmann—who did not review a single page of Maiden's trial testimony (Tr. at 296)—incorrectly presumes that all shares purchased by Maiden throughout the conspiracy period were trades within the scope of the market manipulation scheme. The evidence at trial, however, showed, and the government and Maiden never disputed, that Maiden Capital frequently traded KIT Digital stock during this manipulation period for reasons unrelated to the charged market manipulation scheme, consistent with Maiden's day-trading strategy, *see* Trial Tr. 1701:14–1702:15, 1842:24–1846:4, as well as to meet margin calls, *see* Trial Tr. 1896:7–11. Moreover, Maiden conceded at trial that there were times he was attempting to manipulate the stock of KIT

Digital—among other stocks—on his own and for his own purposes, without the participation of Isaza Tuzman and independent of the charged manipulation conspiracy. *See* Trial Tr. 1686:14–1688:21, 1689:18–1698:24, 1883:19–1884:5. Maiden also admitted that he engaged in wash trades in which Maiden Capital sold shares of KIT Digital that were purchased by a fund he controlled called Saxon, and that Isaza Tuzman had nothing to do with these trades. *See* Trial Tr. 1883:1–25, 1884:3–5. Thus, the record plainly shows that Maiden was not *always* buying KIT Digital stock in connection with the charged market manipulation scheme, and often because he was a true believer in KIT Digital who in good faith endorsed its purchase to family and friends. *See generally* ECF No. 738 at 7–22.

Dr. Voetmann made no effort to investigate the purpose of Maiden's trades or to dissociate Maiden's trades in connection with the market manipulation scheme from those admittedly unrelated to the scheme. Because Isaza Tuzman may not be held responsible for Maiden's trading activity independent of the charged conspiracy, *see* U.S.S.G. § 1B1.3(a)(1) (relevant offense includes acts and omissions of others within the scope of, in furtherance of, and reasonably foreseeable in connection with a conspiracy), Dr. Voetmann's loss estimates are over-inclusive and should be rejected.

## C.   Dr. Voetmann's Methodology Failed to Rule out Potentially Confounding News.

Dr. Voetmann conceded that failure to properly identify and exclude confounding news that may result in an abnormal price movement and instead ascribing the abnormal movement to fraud or manipulation "is a critical error" in an expert's methodology. *See* Tr. at 278–79; DX F111. Dr. Voetmann himself, however, engaged in such critical errors. The methodology he employed to identify confounding news was sorely lacking. At the *Fatico* hearing, it quickly

became clear that Dr. Voetmann's analysis of confounding news did not include all firm-specific events that may have influenced the stock of KIT Digital during the conspiracy period.

Dr. Voetmann's identification of confounding news was limited and relied solely on a database that demonstrably failed to capture all potential confounding news. Specifically, Dr. Voetmann downloaded "from Factiva any news stories between December 30, 2008, and September 16, 2011, in which KIT Digital was mentioned in a headline or lead paragraph" and relied solely on that database to identify confounding news. Voetmann Report ¶ 25. But Factiva did not capture all relevant company-specific developments that may have affected KIT Digital's stock price. Specifically, Dr. Voetmann performed no search and did not separately review: KIT Digital's SEC filings; investor conference calls held by KIT Digital's management; public appearances and other statements by KIT Digital management; blog posts such as those on the website "Seeking Alpha," which Dr. Voetmann acknowledged has historically been market moving news (*see* Tr. 350–53); news articles not appearing on Factiva (*see* Tr. 326, 359, 362–63); news articles appearing on Factiva but not mentioning KIT Digital in a headline or lead paragraph; analyst reports not reflected on Factiva[7]; and other developments in the market for KIT Digital stock such as insider purchases of stock and/or large institutional buyers placing or executing orders—which can also be highly influential in small-cap stock price trading.

Gaps in Dr. Voetmann's confounding news analysis are observed even on his "most conservative" loss analysis based on 11 trading days. *See* Voetmann Report ¶ 30; DX F113 (narrowing Voetmann Report to only the 11 days comprising his $10.4 million estimate). If Dr.

---

[7] Dr. Voetmann believed that he reviewed about 10 analyst reports that were captured in the Factiva database, but there were dozens more in the government's possession that were not provided to or reviewed by Dr. Voetmann. *See* Tr. 284–86; GX 3302–3304.

Voetmann could not demonstrate that he properly excluded all confounding news for each of those 11 trading days, his entire methodology is infirm.

At the hearing, Dr. Voetmann was confronted with unreviewed news coverage, analyst reports, and SEC filings that confounded even his most "conservative" analysis relating to the 11 trading days.

**May 10, 2011**: Dr. Voetmann attributes stock price inflation on May 10, 2011, to Maiden's trading despite his failure to review and analyze the following company-specific events:

- KIT Digital filed a Form 10Q that day at 10:44 am. *See* DX F119 & F120.

- A favorable equity research note was published that day regarding KIT Digital. *See* GX 3302 at 520 (attached hereto as Weitzman Decl. Ex. 9).

- A news article published that day mentioned KIT Digital in a positive light. *See* DX F121.

**September 21, 2009**: Dr. Voetmann attributes stock price inflation on September 21, 2009 to Maiden's trading despite his failure to review and analyze:

- A news article published on September 21, 2009 that favorably mentioned "[t]he explosion of digital media" and specifically referenced KIT Digital within that "explosion." *See* DX F122.

- A favorable equity research note published the day before, without any evaluation of whether it was published before or after the close of trading. *See* GX 3305 at 305 (attached hereto as Weitzman Decl. Ex. 10).

**June 25, 2009**: Dr. Voetmann attributes stock price inflation on June 25, 2009, to Maiden's trading, despite the fact that:

- KIT Digital filed for a registration of public offering of common stock at 3 PM on June 24, 2009, and Dr. Voetmann did no analysis of whether that news was fully

impacted in the price of the stock within the remaining one hour of trading on June 24.  *See* DX F115; Tr. 354.[8]

**July 2, 2010**: Dr. Voetmann attributes stock price inflation on July 2, 2010, to Maiden's trading, but failed to consider confounding news:

- A news article published on July 2, 2010, stating that KIT Digital had partnered with Italian Tecnoconsult International on a large video-production complex in Rome, Italy, that was "expected to become Europe's premier, one-stop destination for innovative and "New TV" video productions."  *See* Weitzman Decl. Ex. 12.

**June 10, 2010**: Dr. Voetmann attributes stock price inflation on June 10, 2010, to Maiden's trading, despite the following unanalyzed confounding events:

- A favorable equity research note was published on June 9, 2010, that he never reviewed, and Dr. Voetmann undertook no analysis to determine whether it was published during or after the close of the trading day.  *See* GX 3304 at 115 (attached hereto as Weitzman Decl. Ex. 11) & Tr. 347.

- A SEC Form 4 was filed by Isaza Tuzman on June 10, 2010, and publicly disclosed on a website on June 10, 2010, at 10:57 am that revealed a substantial purchase of KIT Digital stock by the Company's CEO. *See* KIT Exs. F116 (Form 4); F117 (SEC website showing Form 4 filed On June 10, 2010, at 10:57 AM); F118 (article dated June 10, 2010, at 10:57 am noting filing of Form 4).

Notably, Dr. Voetmann repeatedly attempted to explain away the confounding news on June 10, 2010, and was repeatedly impeached.  When confronted with an SEC filing showing Isaza Tuzman's purchase of stock on June 10, 2010, Dr. Voetmann speculated that the market only "learned about this [stock] order" on June 11, the following day.  Tr. 357.  When confronted with the filing date and time of the Form 4 reflecting its filing at 10:57 am ET on June 10 (Ex. F117), Dr. Voetmann testified that the filing date and time "may not be the time [the filing is]

---

[8]  To exclude the confounding news on June 24, 2009, Dr. Voetmann simply assumed without any study that KIT Digital was a fully liquid stock on June 24, 2009, before it was listed on the NASDAQ, such that any price impact of newly disclosed information would be absorbed within the hour. Tr. 354.  Even the government's expert Dr. Niden could not endorse that position, explaining that "it's conceivable that a stock might take a couple of days to react to the [new] information" particularly if it is a micro-cap stock and traded on the Over the Counter market as KIT Digital was. Tr. 72, 166-170; DX F108.

actually released on [the SEC's] Edgar" database, and that even if filed on Edgar at that time, "it might not have been publicly available at that time," Tr. 358. He thus emphatically proclaimed: "that's my testimony, that it was picked up by the press on the 11th." *Id.* When confronted with an actual news story proving the press reported Isaza Tuzman's stock purchase on June 10, 2010, at exactly 10:57 am, Dr. Voetmann finally had to concede that "had I had access to the additional article you found, it's possible [he] would have changed" his analysis and concluded that June 10 was a confounding date that should not be in his analysis. Tr. at 359.

Dr. Voetmann's handling of these and similar questions revealed his biased advocacy to support the loss amount (based on a flawed methodology) in the PSR. *Ohio Pub. Emp's Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *7 (N.D. Ohio Aug. 14, 2018) (rejecting event study where expert artificially selected dates to support hypothesis; expert is "supposed to hypothesize and then see . . . results," not vice versa). Respectfully, Dr. Voetmann was not acting like a "detached scholar[] . . . motivated by the sole purpose of assisting the fact-finder with an objective evaluation of the relevant data" that courts expect from an expert. *Rubinstein v. Marsh*, No. CV-80-0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec. 10, 1987); *see also Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001) ("When expert witnesses become partisans, objectivity is sacrificed to the need to win. Testimony which is prompted by that need and that goal may . . . wreak havoc upon . . . the defendant." (citation omitted)). We respectfully submit that a heightened level of scrutiny of Dr. Voetmann's testimony is necessary.

> **D.    Voetmann's Methodology Incorrectly Incorporated "Loss" to the Entire Shareholder Base, Including Maiden and Isaza Tuzman.**

Dr. Voetmann's loss amount estimates are additionally excessive because they attribute loss across the entire shareholder base. Dr. Voetmann wrote that he was retained by the

government to "assist the court in determining the approximate loss amount to *third-party investors* in KIT digital." Report ¶ 4 (emphasis added). By "third-party investors," he meant investors who are not Defendants in this case. Tr. 262:14–16. Yet to generate the "loss" suffered on each trading day, Dr. Voetmann multiplied: (a) any positive residual determined by Ferrell, times (b) *the number of all shares outstanding*, times (c) Maiden's share of all buy volume on that day. Voetmann Report ¶ 20. In this second step—multiplying the per-share loss amount by all shares outstanding—Dr. Voetmann presumes any "loss" on a given day was felt by the entire shareholder base. This presumption is flawed.

*First*, as noted above, only those shareholders who purchased at inflated peaks and held through to inflated troughs could have even arguably suffered any loss. KIT Digital was a thinly traded stock, with 1–2% of the shares outstanding traded each day. *See* DX F112 (daily trading volume chart showing "Total Daily Volume" generally at tens of thousands of shares, and "Total Shares Outstanding" at millions of shares). Given these low share turnover ratios, it is a metaphysical impossibility for all 100% of shareholders to realize a loss on days when Dr. Voetmann assumed Maiden inflated the price, or in the days thereafter.

*Second*, Dr. Voetmann admittedly included within his loss estimate the shares held by Isaza Tuzman and Maiden, two active KIT Digital shareholders. It is well-established that a defendant may not have his sentence enhanced by "loss amounts" that he or any conspirators caused to themselves. *See, e.g., United States v. Lundstrom*, 880 F.3d 423, 444 (8th Cir. 2018) (calculating loss amount based upon stock price decline and number of "shares outstanding during the fraud period, *excluding the number of shares owned by the conspirators*") (emphasis added); *United States v. Peppel*, 2011 WL 3608139, at *11 (S.D. Ohio Aug. 16, 2011), *aff'd*, 707

F.3d 627 (6th Cir. 2013) ("[C]ommensurate with the task of reaching a reasonable estimate of loss, the Court will exclude the shares held by [codefendants and unindicted coconspirators.]").

The trial record established that Isaza Tuzman and entities he controlled were large shareholders of KIT Digital during the conspiracy period. As of December 31, 2008, they owned 3,550,579 shares of KIT Digital common stock, or 57.82% of the Company's total outstanding shares. *See* GX 200 at 35 (attached hereto as Weitzman Decl. Ex. 13) (KIT Digital 2008 Form 10-K). On August 18, 2009, KIT Media, an entity controlled by Isaza Tuzman, purchased an additional $4 million in KIT Digital common stock. *See* GX 210 at F-24 (attached hereto as Weitzman Decl. Ex. 14) (KIT Digital 2010 Form 10-K). On March 9, 2010, KIT Media purchased an additional $1.75 million in KIT Digital common stock. *Id.* On April 27, 2010, KIT Capital purchased an additional $1.4 million in KIT Digital common stock. *Id.* Indisputably, Isaza Tuzman was among the largest shareholder of KIT Digital stock in the period of December 31, 2008, to September 15, 2011.

Maiden, too, was a substantial buyer and seller of KIT Digital stock, and his holdings were similarly captured within Dr. Voetmann's assumption that "loss" was felt across the entire shareholder base. Specifically, in the period of December 31, 2008, to September 15, 2011, Maiden purchased 7.6 million shares of KIT Digital stock. *See* DX F112 at 31. KIT Digital's shares outstanding ranged from 3.28 million shares to 42.48 million shares during this same period. *See* Voetmann Report Appx. C at Column [9]. But Dr. Voetmann took no steps to remove Maiden's share of the "loss" from his estimate; he simply used total "reported shares outstanding" without "any further adjustment." Tr. 267:13–20. In these ways, even if Dr. Voetmann correctly used stock price inflation as a proxy for shareholder loss, his analysis is over

inclusive and does not deliver on its promise to estimate the "loss amount to *third-party investors* in KIT digital."

### E. Dr. Voetmann's Analysis Suffered from Multiple Additional Methodological Flaws That Are Fatal to His Analysis.

#### 1. Dr. Voetmann's Methodology Improperly Ignores Days on Which KIT Digital's Stock Price *Decreased* More Than Expected.

Dr. Voetmann's methodology is flawed for the additional reason that he examined only daily increases in KIT Digital's stock, without regard for decreases, creating a one-way ratchet that repeatedly charges defendants with the same loss amount over and over.

Dr. Voetmann eliminated from his analysis all negative daily residuals present in Dr. Ferrell's event study. Tr. 248 ("I did not look at negative residuals, that's correct."). Because Dr. Voetmann's analysis charged stock price increases to the market manipulation scheme while ignoring stock price decreases, Dr. Voetmann's approach presumes stockholders repeatedly experienced the same loss every time the stock price increased, retreated, and then increased again to the same level. An examination of a three-week portion of the conspiracy period represents the one-sided methodology and results derived therefrom:

| Date [1] | Price ($) [2] | Ferrell Predicted Return [3] | Maiden Trading Day [4] | Confounding News Event? [5] | Statistically Significant Price Increase [6] | Predicted Price ($) [7] | Abnormal Return ($) [8] | Shares Outstanding (Millions) [9] | Market Cap ($ Millions) [10] | Maiden Volume Share [11] | All Maiden Trading Days [12] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/20/2009 | 8.50 | -0.01 | Yes | No | No | 8.90 | -0.40 | 4.20 | 35.70 | 29% | 0.00 |
| 03/23/2009 | 8.90 | 0.02 | Yes | No | No | 8.66 | 0.24 | 4.20 | 37.38 | 100% | 1.00 |
| 03/24/2009 | 8.20 | 0.00 | Yes | No | No | 8.86 | -0.66 | 4.20 | 34.44 | 41% | 0.00 |
| 03/25/2009 | 8.35 | 0.01 | Yes | No | No | 8.26 | 0.09 | 4.20 | 35.07 | 32% | 0.12 |
| 03/26/2009 | 8.70 | 0.02 | Yes | No | No | 8.48 | 0.22 | 4.20 | 36.54 | 37% | 0.34 |
| 03/27/2009 | 8.45 | 0.01 | Yes | No | No | 8.77 | -0.32 | 4.20 | 35.49 | 34% | 0.00 |
| 03/30/2009 | 8.50 | -0.01 | Yes | No | No | 8.40 | 0.10 | 4.20 | 35.70 | 34% | 0.15 |
| 03/31/2009 | 9.20 | 0.01 | Yes | No | No | 8.60 | 0.60 | 4.20 | 38.64 | 68% | 1.72 |
| 04/01/2009 | 9.00 | 0.01 | Yes | No | No | 9.27 | -0.27 | 4.20 | 37.80 | 64% | 0.00 |
| 04/02/2009 | 8.98 | 0.03 | Yes | No | No | 9.23 | -0.25 | 4.20 | 37.72 | 49% | 0.00 |
| 04/03/2009 | 8.90 | 0.01 | Yes | No | No | 9.10 | -0.20 | 4.20 | 37.38 | 74% | 0.00 |
| 04/06/2009 | 8.70 | -0.01 | Yes | No | No | 8.84 | -0.14 | 4.20 | 36.54 | 80% | 0.00 |
| 04/07/2009 | 8.48 | -0.01 | Yes | Yes | No | 8.65 | -0.17 | 4.20 | 35.62 | 93% | 0.00 |
| 04/08/2009 | 8.50 | 0.01 | Yes | Yes | No | 8.59 | -0.09 | 4.20 | 35.70 | 57% | 0.00 |
| 04/09/2009 | 8.40 | 0.02 | Yes | No | No | 8.63 | -0.23 | 4.20 | 35.28 | 6% | 0.00 |
| 04/13/2009 | 8.80 | 0.00 | Yes | No | No | 8.43 | 0.37 | 4.20 | 36.96 | 91% | 1.41 |
| 04/14/2009 | 8.40 | 0.00 | Yes | No | No | 8.77 | -0.37 | 4.20 | 35.28 | 59% | 0.00 |

*See* Voetmann Report Appx. C at C-2.

Graphing KIT Digital's daily stock price during these 17 days shows the following result:



During the period from March 23, 2009, to April 13, 2009, KIT Digital's stock price *decreased* by 10 cents, from $8.90 to $8.80 per share. Yet Dr. Voetmann's daily inflation estimates total $4.73 million: the sum of the values in Column [12] of his chart. That is because as the price of KIT Digital stock repeatedly increased, decreased, and increased again, Dr. Voetmann incorporated the increases, but not the decreases, into his calculations.

The effect of this one-sided approach accumulated quickly over time, to the point of absurdity. For example, Column [8] of Dr. Voetmann's Appendix C represents the dollar-per-share "abnormal return" of KIT Digital stock on each trading day. *See* Voetmann Report Appx. C. The sum of *all* of Column [8]—which includes positive and negative residuals and incorporated all data from Professor Ferrell's event study—is negative $3.16 per share, indicating that KIT Digital's daily returns during the conspiracy period *underperformed* its predicted return given market and industry movement by $3.16 per share, and reflecting that the market manipulation conspiracy likely failed to achieve its intended result. In stark contrast,

summing Column [8] but ignoring all negative residuals, as Dr. Voetmann did in his analysis, gives a result of positive $78.38 per share. In other words, under Dr. Voetmann's approach of ignoring all negative abnormal returns, during the conspiracy period, the price of KIT Digital stock experienced total abnormal returns of +$78.38 per share, and Maiden is charged with having contributed to inflation in this amount based on his respective proportion of each day's trading volume. Obviously, KIT Digital stock—which hovered between approximately $4 and $17 per share during this period—did not experience abnormal positive returns of $78.38 per share. Instead, positive and negative days had offsetting effects on KIT Digital's stock price. Counting only the positive days, without regard for negative days creates an unnatural, one-way ratchet, repeatedly holding Isaza Tuzman responsible for stock *increases* without offsetting *decreases* on other days that Maiden also traded. This methodological flaw results in an overinflated loss amount calculation and is an independent basis to reject Dr. Voetmann's analysis.

## 2.  Voetmann's Methodology Ignored Maiden's Sales of KIT Digital Stock.

Dr. Voetmann's methodology makes the biased choice to consider only Maiden's purchases of stock, and ignore his sales. *See* Tr. 304. In so doing, Dr. Voetmann assumes all of Maiden's purchases were inflationary, but that Maiden's sales did not have an equal and opposite effect. If Maiden's purchases tended to inflate the stock price of KIT Digital as Dr. Voetmann assumed, Maiden's sales would have tended to deflate its stock price. A fair study of the effect of Maiden's trading on KIT Digital's stock price would incorporated Maiden *sales*. Dr. Voetmann's failure to do so leads—ironically—to inflationary results.

For example, Dr. Voetmann uses days when Maiden is a net seller of stock—at times by large margins—and charges him with fraudulently *increasing* KIT Digital's stock price. *See,*

*e.g.*, Tr. 302 (Dr. Voetmann charges Maiden with inflating the price of KIT Digital stock on June 10, 2010, despite being a *net seller* of the stock by 45,500 shares); KIT Ex. 3923 (listing six trading days during the conspiracy period for which KIT Digital stock showed a statistically significant price increase, but Maiden was a *net seller*).

Dr. Voetmann's rationale for using Maiden's buys but not sells is that, "the activity to run the conspiracy scheme was to manipulate the stock to inflate the price. And that is typically done by buying the security." Tr. 304. Dr. Voetmann's reasoning defies common sense and Maiden's actual trading activity. There was only a short period in early 2009 when Maiden primarily purchased stock to inflate the price of KIT Digital. That was the 90-day period after entering into the December 31, 2008, agreement. *See* GX 2970 (attached hereto as Weitzman Decl. Ex. 22). Thereafter, Maiden engaged in rampant day trading, buying and selling KIT Digital stock. *See, e.g.*, Tr. 1701:14–21 (day trading in KIT Digital stock), 1686–89 (trading to prop up KIT Digital stock price at month-end to month-end), 1883–84 (wash trading in KIT Digital stock). The fact that Maiden was incompetent at actually manipulating the price of the stock was well established. *See, e.g.*, Tr. 1091–92 (Maiden acknowledging that he was an "impressively bad trad[er]" and that he "bl[e]w himself up" and was "flinging wealth on to an open fire"); *see also* Trial Tr. 1501–02 (Maiden traded while drunk). While the government alleged that Maiden's trading was intended to further the manipulation scheme, the actual data shows that the net effect of his trading activities, both his buys and sales, may have resulted in actual gains to investors that should not have been summarily ignored. *United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) (district court erred in failing to calculate the net gain or loss to victims—the calculation "that truly accounts for the actual loss to the victim as a result of the scheme to defraud"—because "it is the net loss that matters; there is no basis for

selectively offsetting gains for some [aspects of the fraud] but not others"). The biased, results-oriented nature of Dr. Voetmann's analysis renders it inadmissible. *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 188 (D. Mass. 2012) (precluding expert's testimony where "event days . . . appear[ed] to have been selected more for their volatility than for their actual relationship to defendants' alleged fraud"), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014).

> ### F.    Dr. Voetmann's First, Second, and Third Loss Amount Estimates Should Be Summarily Rejected Because They Ignore Statistical Significance and Confounding News.

An independent basis to reject three of Dr. Voetmann's four estimates is their failure to abide by two quality control procedures that are standard practice in event studies: (1) confining results to those that are statistically significant, and (2) accounting for confounding news.

> #### 1.    Dr. Voetmann's First and Second Estimates of Loss Should Be Rejected Because They Are Calculated without Regard for Statistical Significance.

As Dr. Voetmann admits, his first two loss amount estimates of $82.0 million and $68.2 million were calculated without regard to the statistical significance of figures used to reach them. *See* Voetmann Report ¶ 31; Tr. 272, 274–75. Statistical significance addresses the question of whether or not an observed result is the product of chance. *See* Tr. 273. Results that are found to be statistically significant are results that are unlikely to be due to chance. *Id.*

Courts demand that event studies present dates that show statistically significant results. Because by definition an "event study identifies statistically significant residual price movement dates," courts reject event studies that fail to omit dates on which price movements may be the product of ordinary stock volatility. *In re Barclays Bank PLC Sec. Litig.*, No. 09 Civ. 1989 (PAC), 2017 WL 4082305, at *23 (S.D.N.Y. Sept. 13, 2017) (rejecting challenge that expert

"overlook[ed] . . . statistically insignificant residual price decline days" because he "had a sound basis for concluding the . . . dates were not relevant"); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1291 (N.D. Okla. 2007), *aff'd sub nom. In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) (excluding expert report that failed to account for statistical significance because it "cannot be reconciled with any accepted definition of an event study"). A determination of statistical significance is necessary to reduce "the probability that an abnormal return . . . could have occurred by chance." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86–87 (1st Cir. 2014). Only when the "probability is small enough" can the expert "reject the hypothesis that normal market fluctuations, as opposed to company-specific events . . . explain the movement in the share price." *Id.*

Statistical significance is therefore crucial to a just sentencing determination. "[I]t is axiomatic that a critical objective of federal sentencing is the imposition of punishment on the defendant that reflects his or her culpability for the criminal offense (rather than for the unrelated gyrations of the market)." *United States v. Nacchio*, 573 F.3d 1062, 1077 (10th Cir. 2009). Courts routinely require that a price decline be statistically significant before including it in a loss amount. *See, e.g., United States v. Hatfield*, No. 06 Cr. 0550 (JS)(AKT), 2014 WL 7271616, at *5 (E.D.N.Y. Dec. 18, 2014); *United States v. Ferguson*, 584 F. Supp. 2d 447, 453 (D. Conn. 2008).

Because Dr. Voetmann's $82.0 million and $68.2 million loss amount estimates failed to rely upon statistically significant daily results, they should be summarily rejected.[9]

---

[9]   Dr. Voetmann's makes no effort to test his cumulative results for statistical significance, an independent flaw that disqualifies all four of his loss amount estimates as a reliable basis for criminal punishment. *See In re Bear Stearns*, 2016 WL 4098385, at *11 (excluding expert testimony in part because the "cumulative abnormal

2.     **Dr. Voetmann's First and Third Loss Estimates Should Be Rejected Because They Are Calculated without Regard for Confounding News.**

Whenever loss amount is based upon movement in public security prices, analysis of potential confounding factors is crucial.  That is because the government must establish the proffered loss amount was caused by the offenses of conviction, and not by other market, industry, or firm-related developments.  As Dr. Voetmann himself acknowledged, the failure to control for confounding news is "a critical error." DX F111 at 5.  Courts thus have been clear that a failure to consider confounding factors is a basis to reject a government's loss amount calculation.  *See United States v. Hatfield*, No. 06 Cr. 0550 (JS)(AKT), 2014 WL 7271616, at *3 (E.D.N.Y. Dec. 18, 2014) ("[O]ne must disentangle the price changes associated with those [loss-inducing] events from other, 'ordinary' price movements."); *Adelson*, 441 F. Supp. 2d at 509–10 (declining to adopt government's calculation of actual loss calculation when defendant proffered confounding factors).

But Dr. Voetmann inexplicably presents to this Court two of his four loss estimates without regard for potential confounding news, based on his view that they make for appropriate "extreme" high-level estimates. Tr. 281. The failure to follow well-established, reliable methodology is not a step in producing a reasonable loss amount range; it is a basis to reject these "extreme" measures—if not his entire analysis—out of hand.

---

return" presented was not statistically significant, and therefore "did not rule out the possibility that the cumulative abnormal return was caused by chance and, consequently, it did not establish that the alleged fraud caused [the company's] stock price to decline").

III.    **Dr. Niden's Analysis Suffers from Significant Methodological Flaws, and Must Be Rejected as the Basis for a Loss Enhancement.**

The government's position that Isaza Tuzman caused $22.9 million worth of losses in connection with Count Six is based on a methodologically flawed analysis. It is unsupportable and should be rejected.

A.    **Because the November 2012 8-K Cannot Serve as a Proxy for the Fraud, the Stock Price Drop That Followed Does Not Measure Loss to Investors Resulting from the Fraud of Conviction.**

The government maintains that the stock price decline following the November 21, 2012, 8-K is a "reasonable estimate of the share impact" of the offense of conviction related to Count Six.   *See* ECF No. 808 at 22.  The government is mistaken.  As Professor Ferrell observed, the substantive disclosures in the 8-K were different from, and far broader than, the offense of conviction.   *See* ECF No. 793-9 ¶¶ 11–13.

The November 21, 2012 Form 8-K did not specifically identify the fraud of which Isaza Tuzman was convicted in Count Six.  Instead, the November 2012 8-K made sweeping pronouncements far broader than the fraud of conviction:  that there were "accounting errors and irregularities . . . in its historical financial statements"; that the financial statements for 2009, 2010, 2011, and the quarters in 2012 "will be restated"; and that "investors should no longer rely upon the Company's previously issued financial statements."  This disclosure suggested to investors a much more extensive problem than what the government alleged or proved at trial.  At most, the government proved that there were 12 "sham licenses" between 2010 and 2011, totaling approximately $26 million in improperly-recognized revenue.  (*See* GXs 828, 829, 875, 877, 883, 992, 1049, 1089, 1129, 1130, 2149, 3212.)  Over that same period, KIT Digital recognized revenues of approximately $321,529,000.  (*See* GX 218 at F-4 (attached hereto as Weitzman Decl. Ex. 15).)  Thus, approximately 8% of KIT Digital's revenue was over-

reported.[10]  While this is not a nominal amount, it is far less significant than the broad (and unquantified) "accounting errors and irregularities" investors were led by the November 2012 8-K to believe occurred.

Additionally, the November 2012 8-K summarized the "accounting errors and irregularities" as relating "primarily to recognition of revenue related to certain perpetual software license agreements," without qualification or explanation of the scope of the problem. This is a far broader charge than the crime of conviction.  Perpetual software license agreements "were a large component of [] KIT Digital's business," as Dr. Niden acknowledged.  Tr. at 82:2–5.  In failing to explain that only a relatively small portion of those perpetual license agreements involved errors and irregularities, the 8-K cast doubt broadly on all of KIT Digital's perpetual software license agreements, falsely amplifying to the investing public the potential scale of the improperly recognized revenue.  Tr. at 82:6–9 (Dr. Niden acknowledged that "investors reading the November 2012 8-K don't know what percentage or amount of this large component of KIT Digital's business has to be restated.")

As a result of the 8-K's omission of details regarding the scope of the accounting errors and irregularities—details that leading accounting firm Ernst & Young recommends for inclusion in a corrective disclosure (see ECF No. 794 ¶ 43; ECF No. 794-32)—investors naturally assumed the worst, that all of the Company's financials were affected, and fled the stock, causing a precipitous decline in stock price.  ECF No. 794 ¶¶ 43-45.  Not surprisingly, analysts remarked on KIT Digital's failure to "quantify the impact of the errors," and suggested

---

[10]  At trial, Robin Smyth claimed that "the fake contracts" totaled $37 million worth of revenue.  See PSR ¶ 138. We object to this assertion as contrary to the evidence at trial.  In any event, even if the amount of wrongfully-recognized revenue totaled $37 million, that would amount to 11.5% of KIT Digital's total reported revenues in 2010 and 2011.

that investors exercise "a cautious approach to KITD . . . until the impact of the restatements is disclosed." Weitzman Decl. Ex. 16.

Indeed, as detailed in the expert declaration from restructuring expert John Young, vulture fund JEC Capital had its own motivations to "depress[] the Company's share price" through an overbroad 8-K in order to "acquire the majority of KIT Digital's equity through a bankruptcy proceeding at a significantly reduced price." ECF No. 794 ¶¶ 27, 35-48.

Given that overbroad revelations of potential fraud may cause an "overcorrection in the market price," *In re Oxford Health Plans, Inc. Sec. Litig.*, 244 F. Supp. 2d 247, 250–51 (S.D.N.Y. 2003); *see also Martone v. Robb*, 902 F.3d 519, 527 (5th Cir. 2018), the stock price reaction to the disclosure in the November 2012 8-K of overbroad "errors and irregularities" (to the extent it can be disentangled from other confounding news on November 21, 2012) overstated the stock price inflation resulting from the fraud of conviction. In order to show the "necessary causal link" required in *Dura Pharmaceuticals*, the government must establish that that the corrective disclosure (here the November 2012 8-K) "reveal[ed] to the market in some sense the fraudulent nature of the . . . practices" at issue. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011); *see also Teachers' Retirement System of LA v. Hunter*, 477 F.3d 162, 187–88 (4th Cir. 2007) (to allege loss causation "plaintiffs would have to allege that the market reacted to new facts . . . that revealed Cree's previous representations to have been fraudulent," and dismissing securities claim on loss causation grounds because the alleged corrective disclosure failed to "reveal the 'true facts' of these transactions"). Where the corrective disclosure does not articulate "the specific misrepresentations alleged in the complaint concerning the [fraudulent] transaction" but instead "implied accounting or other problems in addition to the [fraudulent] transaction," an event study regarding that corrective disclosure does

not "suffice to draw the requisite causal connection" between the charged fraud and the stock price drop. *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010). While it is true that the corrective disclosure "need not precisely identify the misrepresentation or omission," *Katyle*, 637 F.3d at 473, our research has not uncovered support for the proposition that a corrective disclosure that discloses errors and irregularities much broader than the charged fraud could fairly approximate the losses to investors for purposes of a criminal sentencing. *See, e.g.*, *United States v. Grabske*, 260 F. Supp. 2d 866, 868 (N.D. Cal. 2002) (government's expert acknowledged "that an event study is not useful because the fraud disclosure was not clean; that is, other negative information about the company was released contemporaneously with the fraud disclosure").

### B.   The Government's Loss Amount Calculation for Count Six Fails to Account for Numerous Confounding Factors.

On November 21, 2012, KIT Digital made multiple disclosures of non-fraud related news that were confounding, but Dr. Niden's analysis—and thus the government's loss amount calculation—does not account for or disentangle such confounding news, resulting in a "critical error" fatal to Dr. Niden's analysis.

Dr. Niden agreed that confounding news occurs "when there are multiple items of new information that are relevant to the stock value that are disclosed at the same time." Tr. 102:5–10. Confounding news is "news disclosed concurrently . . . relevant to the value of the stock." Tr. 28:18–22. As an example, Dr. Niden explained:

> So if a company announces on one day that its earnings are higher than expected and also announces that it's won a big new contract and the stock price goes up, it might be difficult or even ***impossible to disentangle the separate impacts of those two announcements on stock price, and to know which one of them moved the stock price and by how much.***

Tr. 28:23–29:3.   On the flip side, two pieces of negative news included in a single disclosure—hypothetically "financial irregularities" and "massive layoffs"—must be disentangled in order to measure the effect of one disclosure on the company's stock price.  Tr. 102:18–103:2.   Dr. Niden could not identify any economic literature that endorses an approach that fails to disentangle "unrelated items of news that happen at the same time and affect the value of the stock."  Tr. 105:1–7.  As Dr. Voetmann explained, in assessing the effect of a disclosure on the stock price, an expert "must parse out the fraud elements of an announcement from other non-fraud elements of the announcement."  Tr. 280:23–281:1.  Failure to exclude confounding news would be a "critical error."  Tr. 280:6–9.

Courts routinely reject loss amount calculations based on an event study where the analysis does not disentangle confounding news, *i.e.*, the "other negative information about the company . . . released contemporaneously with the fraud disclosure." *Grabske*, 260 F. Supp. 2d at 868; *see also Olis*, 2006 WL 2716048, at *8; *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 728 (11th Cir. 2012).  For example, in *Ebbers*, the Second Circuit described as "flawed" expert analyses of stock price drops that do not consider whether the decline was "attributable to factors other than accounting fraud."  458 F.3d at 128.  Specifically, the court criticized the government expert's failure to account for confounding factors, including: (1) planned sharp reductions in capital expenditures, (2) lay-offs affecting 17,000 employees, (3) the abandonment of non-core businesses, and (4) the deferral or elimination of dividends.  *Id.* (internal quotation marks omitted).[11]

---

[11]   The Second Circuit ultimately concluded that remand for resentencing was not necessary, because—notwithstanding the flaws in the loss amount calculation—the loss amount "is still well above $1 billion, or ten times greater than the $100 million dollar threshold for the 26-level enhancement." *Worldcom*, 458 F.3d at 128.

Similarly, investors received confounding news about KIT Digital on November 21, 2012, the effect of which Dr. Niden failed to disentangle from disclosure of the accounting errors and irregularities. For example, on the same day that KIT Digital filed the November 2012 8-K, it also submitted a notification of late filing of a quarterly report. DX F105; Tr. 150:15–151:3. Economic literature shows that stock markets react negatively when a company discloses that it anticipates a late filing of its quarterly report. DX F106. Dr. Niden conceded that the information that KIT Digital would not be able to file its third quarter 10-Q within the prescribed time period was "potential negative news." Tr. 155:19–25. But she made no attempt to disentangle the stock price effect resulting from the notice of late filing. Nor did she make any effort to disentangle the effect of a press release that Isaza Tuzman issued on November 23, 2012, before the opening bell, complaining that new management at the company (led by JEC Capital) "refused to engage with us and certain private equity firms regarding a strategic transaction for the Company"—a report that Dr. Niden had in her Factiva database which the government disclosed after the *Fatico* hearing. *See* Weitzman Decl. Ex. 28. Dr. Niden agreed that any press release from Isaza Tuzman issued before the open of trading on the 23rd may be confounding, and that she did nothing in her analysis to disentangle the stock price reaction to Isaza Tuzman's press release. Tr. 138:12-139:8.

Nor did Dr. Niden even attempt to disentangle confounding news contained within the November 2012 8-K itself. *See generally*, Ferrell Report ¶ 13. Dr. Niden's loss amount analysis failed to account for numerous pieces of negative confounding news in the November 2012 8-K (listed under "Other Events"), including:

- "As of today, the Company has approximately $10.6 million of cash and cash equivalents, of which approximately $4.0 million is restricted cash."

39

- "[B]ased on the Company's forecast, the Company expects to continue to incur significant cash expenditures."

- "[T]he Company is considering a broad set of strategic alternatives including financing transactions as well as other strategic transactions including a sale of the Company or its assets."

- "The Company continues to examine the reduction of working capital requirements to further conserve cash and may need to take additional actions in the near-term, which may include additional personnel reductions and suspension of certain development activities."

- "The above actions may or may not prove to be consistent with the Company's long-term strategic objectives, which have shifted in the current year, as the company discontinued certain non-core assets, among other things."

- "No assurance can be given that the Company will be able to enter in to an agreement for a sale of the Company or its assets or obtain financing on favorable terms, if at all, or to successfully further reduce costs in such a way that would continue to allow the Company to operate its business."

GX F2 at 2.

These pieces of confounding news in the November 2012 8-K—separately and collectively—were highly material to investors. The severity of the decline in the stock price suggests that investors reacted to more than the accounting irregularities described in Section 4.02 of the November 2012 8-K. Economic literature, cited by Dr. Niden in her expert report, indicates that financial restatement announcements, on average, result in negative cumulative abnormal returns of between 2.3% to 9.2%, depending on the study. Tr. 147:5–148:6; 149:3–150:14; DX F103; DX F104. Dr. Niden acknowledged that KIT Digital's price decline of 65% was "exceedingly rare," and "one of the larger, if not the largest," that Dr. Niden had previously seen. Tr. 148:2–6; 150:12–14. KIT Digital's extremely anomalous price decline of 65% likely reflects investor reactions to the confounding news on November 2012, which included disclosure of the need for "strategic alternatives" (a euphemism for a sale, restructuring, or

bankruptcy), personnel reductions, suspension of development activities, the Company's low cash position, and the risk that the company would not continue as a going concern.

Indeed, analyst reports, published in the days following the November 2012 8-K, suggest that investors reacted to the confounding news incorporated in the 8-K disclosure—not just "errors and irregularities." For example, Dougherty & Company LLC ("Dougherty") released an analyst report on November 25, 2012, which described KIT Digital's "Perilous Balance Sheet" and "serious cash crunch," specifically noting that the company "reported that as of last week the cash balance was $10.6M." DX F101. While the analyst report observed that management said it "continues to consider asset sales and/or strategic alternatives," Dougherty expressed "skeptic[ism]" that "these asset sales can generate material proceeds." *Id.* And Northland Capital Markets zeroed in on the fact that the company's cash position of $10.6 million meant that the company had "burned $26.3M since June 30 [2012]." Weitzman Decl. Ex. 16. Clearly, the company's cash position and other disclosures in the 8-K—including that the Company may not continue as a going concern—were critical pieces of news to investors that confounded the subsequent stock price drop.

When confronted with the incoherence in that position, Dr. Niden asserted, without support, that the company's cash position was not new information disclosed for the first time in the November 2012 8-K, because "back in August, at least one of the analysts had forecasted that the company might end up with less than 10 million of cash." Tr. 109:12–17. This is irrelevant. As Dr. Niden acknowledged, "of course there is a difference" between disclosures made by a company and predictions made by an analyst. Tr. 110:25–111:3. And the last time KIT Digital had disclosed its cash position—in August of 2012—the company's cash position was over $30 million—triple what it was in November 2012. Tr. 110:2–14; Weitzman Decl. Ex. 21. Dr.

Niden's efforts to ignore confounding news by redefining what is confounding and then collapsing multiple discrete pieces of news into a single event is unprecedented and unsupportable.

Indeed, Dr. Niden's failure to disentangle confounding news is best exemplified by her flawed assumptions and analysis regarding KIT Digital's stock price movement following its November 9, 2011 quarterly earnings report (10-Q), press release, and earnings call. GX F1 ¶¶ 23-26. Dr. Niden maintained that, even though the company released multiple items of good news on that day in its SEC filing, press release and conference call, they were "really part of the same event"—namely, "extreme optimism . . . about the prospects for future performance." Tr. 67:2; 67:18–23, 160:23–161:7. Dr. Niden attempted to shoehorn all of the information disclosed on November 9, 2011 into a single amorphous disclosure regarding "optimism," but failed entirely to parse the information disclosed to investors on November 9, 2011 that may have created "optimism" and resulted in an uptick in the stock price.

Not all the optimism was related to the Company's meeting revenue expectations, a central assumption of her analysis. Dr. Niden did not, for instance, consider that KIT Digital's announcement that it was hiring an advisory firm to look into maximizing value for shareholders through a sale process (*i.e.*, a private equity sale that would sell shares at a premium) was a significant piece of good news for investors. *See* Tr. 164:15–20. She also did not disentangle the effect of the disclosure—picked up by analysts—that KIT Digital's new client momentum had increased (*See* DX F109; Tr. 171:17–20; Weitzman Decl. Ex. 17; *see also* Weitzman Decl. Ex. 18). Additionally, Dr. Niden did not disentangle the effect of KIT Digital's launch of two editions of the KIT Video Platform, which enabled video delivery to any connected device, Social TV, and a video distribution operations management system. Weitzman Decl. Ex. 19.

Dr. Niden's failure to account for the effect of confounding news on KIT Digital's stock price is a critical error that necessitates rejection of the government's loss amount calculation for Count Six.

### C.   Dr. Niden's Loss Calculation Improperly Assumes that the Price of the Stock was Inflated by the Same Amount Throughout the Conspiracy Period.

Courts routinely reject as not "realistic or reasonable" a loss analysis that "assumes that the price of the stock was inflated by the same amount during the entire period prior to the fraud's disclosure, such that every investor who purchased during that period was affected to the same extent." *Grabske*, 260 F. Supp. 2d at 870; *see also In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327, 1333 (N.D. Cal. 1997) ("Because a number of misstatements were made over a period of months, Ross needed to apportion the total inflation among the various alleged misstatements."). Dr. Niden's analysis makes this fatal error. Dr. Niden agreed that even though the "charged accounting fraud increased over time," her analysis "assumes that the price of the stock was inflated by the same amount during the entire period prior to the fraud's disclosure." Tr. 64:22–65:3.

Dr. Niden elected to include in her analysis institutional investors that purchased KIT Digital stock after November 9, 2011. Her methodology assumed that each purchase of KIT Digital stock between November 9, 2011 and November 21, 2012 was inflated by a flat amount of $1.35. But this assumption ignores that KIT Digital had not reported revenue from all sham contracts by November 9, 2011. The sham revenue reported in Q4 2011 was a substantial portion of all sham revenue reported—roughly equal to the total of all sham revenue reported in prior quarters. Tr. 66:12–20; GX 3828 (attached hereto as Weitzman Decl. Ex. 26). As such, the inflation in KIT Digital's stock price would have accrued over time, as financial reports incorporating inflated revenues from Q4 2011 were published. Therefore, even assuming the

November 21, 2012 8-K is an appropriate corrective disclosure for purposes of loss amount calculation (it is not), shareholders who had purchased KIT Digital stock at different times would have experienced a different amount of deflation after November 21, 2012. They could not all have uniformly experienced the same $1.35 per share loss.

Because Dr. Niden's analysis assumed improperly that KIT Digital's stock was inflated by the same amount during the entire "inflationary period," her loss amount calculation is not realistic or reliable. The Court should reject it.

### D.   The Government's Loss Amount Calculation Overstates Investor Losses Because it Fails to Account for Recovery in Bankruptcy.

The government's analysis on Count Six likewise failed to accurately measure the losses resulting from the charged offenses that investors *actually realized* and *offset* by any realized gains in bankruptcy. Instead, Dr. Niden measured the loss of market capitalization over one day of trading, to extrapolate losses for investors who bought after November 9, 2011 and held until November 23, 2012. But as Dr. Niden conceded on cross-examination, she failed to analyze whether investors (including institutional investors incorporated in her analysis) sold after November 23, 2012 or held—and ultimately "recover[e]d from the bankruptcy proceeding." Tr. 176:11–17.

This is a fundamental flaw in Dr. Niden's analysis, given the unique features of the KIT Digital bankruptcy. As defense expert John Young explained in his expert report, at the time of the bankruptcy petition, KIT Digital had assets in excess of $310 million, versus liabilities of only $23 million. ECF No. 794 ¶ 56. Thus, on a balance sheet basis, KIT Digital was highly solvent. *Id.* ¶ 57. Moreover, KIT Digital's investment banker, Deutsche Bank, calculated a future equity value of between $96 million and $127 million. *Id.* In light of these realities, a provision of KIT Digital's plan of reorganization provided for the issuance of warrants to

prepetition shareholders, which could be exercised at a low strike price to allow prepetition shareholders to purchase common stock of reorganized KIT Digital, upon emerging from bankruptcy, at a favorable price. *Id*. ¶ 60. Prepetition shareholders exercised 100% of the issued warrants, allowing the prepetition shareholders to maintain an equity stake in reorganized KIT Digital—now Piksel—and signifying the market view that the equity in reorganized KIT Digital overwhelmingly had value that could offset prior losses. *Id*. ¶ 61. An equity stake in Piksel— now a privately held company and "a leading provider of software solutions to the broadcast and media industry"—has significant value. *See* Weitzman Decl. Ex. 27.

In civil cases, there is a recognition that "[c]alculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages." S.Rep. No. 104–98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699. As such, courts in securities cases do not solely "calculate damages based on the single day decline in price, but instead allows the security an opportunity to recover." *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007) (citing 15 U.S.C. § 78u–4(e)(2)). Here too, calculating losses based on a one-day stock price decline overestimates losses resulting from the offenses of conviction, since shareholders recovered value in the bankruptcy process and subsequent ownership of equity in Piksel. And yet, Dr. Niden failed to undertake any analysis to determine whether institutional shareholders recovered in bankruptcy, Tr. 176:11–17, and the government failed to ascertain the value of post-reorganization equity in Piksel. The government's failure to do so further undermines Dr. Niden's methodology and demonstrates that the posited loss amount of $22.9 million in connection with Count Six is itself inflated.

\* \* \*

In sum, these complications and deficiencies demonstrate that the methodology used to calculate loss amount for Count Six does not yield a reasonably accurate and methodologically sound estimate. *See Rutkoske*, 506 F.3d at 180. Because it is solely the government's burden to establish the propriety of a sentencing enhancement, and because the government has not reasonably determined a loss amount, the Court should decline to apply any loss enhancement. *See Cuti*, 2011 WL 3585988, at *4; Sentencing Transcript at 20:9–12, *Rutkoske*, No. 03 Cr. 01452 (S.D.N.Y. 2010 Oct. 28, 2010), ECF No. 327 (Weitzman Decl. Ex. 5); *Adelson*, 441 F. Supp. 2d at 509–10; *Schneider*, 930 F.2d at 559 (Posner, J.) (inability to calculate loss amount, resulting in no loss amount enhancement, does not let off a defendant "scot free"; instead, it "is simply that the Guidelines award bonus punishment points for different levels of proven loss . . . . The Government did not earn a bonus in this case."); Sentencing Transcript at 2:23–3:2, *United States v. Lumiere*, No. 16 Cr. 483 (JSR) (S.D.N.Y. June 13, 2017), ECF No. 105 (Weitzman Decl. Ex. 4) ("[T]he guidelines . . . take the position that if you can't reasonably calculate the loss, then you should treat it as zero even if common sense would say, well, there was some meaningful loss here."); Sentencing Transcript at 20:9–12, *Rutkoske*, No. 03 Cr. 1452 (LMM) (S.D.N.Y. Oct. 28, 2010), ECF No. 327 (Weitzman Decl. Ex. 5) (declining to apply loss enhancement on remand from Second Circuit); *United States v. Adelson*, 441 F. Supp. 2d 506, 509–10 (S.D.N.Y. 2006) (declining to adopt government's calculation of actual loss calculation when defendant proffered confounding factors).

## IV.    The Court May Use "Unlawful Gain" as a Reasonable Alternative to Loss.

Courts frequently look to unlawful gain where, as here, the amount of loss cannot be ***reasonably*** determined. In light of the impossible loss-calculation task the government asked the Court to perform, and the extreme sentencing result produced by the government's analysis, we offered to avoid a *Fatico* hearing by using an alternative measure: Isaza Tuzman's salary and

46

cash bonuses during the offense period. We did so noting that the government had done exactly that less than two months before in a recent Delaware case. *See* Ltr. to Court regarding Sentencing Hrg. at 2–3, *United States v. Wilmington Trust Corp.*, No. 15 Cr. 23 (D. Del. Oct. 5, 2018), ECF No. 843 (attached hereto as Weitzman Decl. Ex. 23).

The *Wilmington Trust* case addressed one of the worst bank collapses in Delaware history. The defendants, executives at the bank, were convicted on numerous counts arising from a scheme to hide the underperformance of hundreds of millions of dollars of loans and soliciting hundreds of millions of dollars of investments on false premises. The PSR calculated an offense level of 43 for all defendants—based in large part on a 26-level enhancement, given the government's stated intention to present expert testimony establishing a loss amount of $196 million—which would have resulted in life sentences for all defendants. However, the U.S. Attorney's Office consented to the use of defendants' compensation during the offense period— of between $294,000 and $583,000, or enhancements of 12–14 levels—as a substitute for loss "[w]ithout conceding that it would have been unable to establish a loss amount through its proffered expert testimony." *Id.* at 2. The *Wilmington Trust* Court thereafter sentenced the four defendants to between three and six years in prison, instead of life sentences. *See* Weitzman Decl. Exs. 24, 25.

When approached with the *Wilmington Trust* materials, the government rejected our offer out of hand and refused to engage on the possibility of using unlawful gain in lieu of losses for calculating the enhancement. However, for the following reasons, we respectfully submit that the Court may still use this measure to avoid the problems of causation and unfairness underlying the government's unduly harsh sentencing recommendation.

The Guidelines authorize judges to use a defendant's pecuniary "gain resulting from the offense" in lieu of loss caused by the offense when the amount of loss "reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. 3(B); *see, e.g.*, *United States v. Zangari*, 677 F.3d 86, 92 (2d Cir. 2012) (noting that where the loss was "amorphous" the district court correctly "substituted [defendant's] gain from unlawful kickbacks in the place of the victims' losses"); *United States v. Tzolov*, 435 F. App'x 15, 17 (2d Cir. 2011) (finding that where "amount of loss could not reasonably be determined," the district court "appropriately used the gain realized by Appellant . . . as an alternative measure of loss"). It is not unusual for Courts to conclude that loss amounts cannot reasonably be determined, particularly when the offenses of conviction involve declines in the price of public securities and proximate cause is difficult to determine. *See* ECF No. 793 (Sentencing Submission) at 31–34. Courts have then used a defendant's remuneration during the offense period as a reasonable measure of the economic impact of financial offenses. *See, e.g.*, *United States v. Shabudin*, 701 F. App'x 599, 601 (9th Cir. 2017) (affirming Shabudin's sentence using his $348,000 salary "as an alternate measure of loss" where it was impossible to determine which portion of a purported $970 million loss was attributable to him).

For example, in *United States v. Heine*, the court substituted defendants' gains—their salaries and benefits—for the purposes of Guidelines calculation. *See* No. 3:15-cr-238-SI, 2018 WL 2986212, at *5 (D. Or. June 14, 2018). In that case, the defendants were bank executives convicted at trial of a scheme in which they concealed the bank's financial condition, resulting in the bank's collapse when the fraud came to light. The court observed that it was impossible to calculate the loss attributable to the fraud, separate from "mismanagement and the resulting problems" as well as "the severe economic downturn of 2007–2008." *Id.* at *6. Even after

substituting the alleged loss amount with the lower figure of the defendants' salaries and benefits while employed at the bank, the court sentenced the defendants to 18 and 24 months' imprisonment—terms approximately 80% shorter than the Guidelines recommendations. *Id.* at *7, *10.

In this case, for all the reasons discussed here, the methodological difficulties inherent in the governments' expert analysis and the confounding factors make a market capitalization-driven proximate cause analysis inherently unreliable. The losses estimated by the government are far disproportionate to the harms caused by the offenses of conviction. Under the circumstances, unlawful gain is an appropriate means of determining the appropriate § 2B1.1 enhancement. It is undisputed that Isaza Tuzman did not extract a profit from the offenses of conviction, and an appropriate monetary value for the purposes of Guidelines calculation would be his salary and bonuses from KIT Digital during the offense periods. This approach would be in line with the emerging consensus that sentences in securities cases driven by large loss amount enhancements are unfair and unjust.

## CONCLUSION

For the foregoing reasons, Isaza Tuzman respectfully requests that this Court reject the government's proffered loss amounts and hold that no loss amount enhancement can reasonably be determined, or, in the alternative, that a measure of unlawful gain may be substituted for loss.

Date:   April 25, 2019             Respectfully submitted,
        New York, New York
                                   GIBSON, DUNN & CRUTCHER LLP


                                   By:   */s/ Avi Weitzman*
                                         Avi Weitzman
                                         (aweitzman@gibsondunn.com)
                                         Justine Goeke
                                         (jgoeke@gibsondunn.com)
                                         David Salant
                                         (dsalant@gibsondunn.com)

                                   200 Park Avenue
                                   New York, NY 10166
                                   Telephone:    (212) 351-4000
                                   Facsimile:    (212) 351-4035

                                   *Attorneys for Defendant Kaleil Isaza Tuzman*