UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

KALEIL ISAZA TUZMAN and
OMAR AMANAT,

Defendants.

S8 15 Cr. 536 (PGG)

## MEMORANDUM OF LAW IN SUPPORT OF KALEIL ISAZA TUZMAN'S SUPPLEMENTAL RULE 33 MOTION FOR A NEW TRIAL BASED ON NEWLY-DISCOVERED EVIDENCE

GIBSON, DUNN & CRUTCHER LLP

AVI WEITZMAN
*aweitzman@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

*Attorneys for Defendant Kaleil Isaza Tuzman*

PRELIMINARY STATEMENT ........................................................................................ 1

I.   PURSUANT TO RULE 33, ISAZA TUZMAN IS ENTITLED TO A NEW TRIAL
     WITH RESPECT TO COUNT SIX BECAUSE NEWLY DISCOVERED
     EVIDENCE REVEALS THAT THE GOVERNMENT WITHHELD *BRADY /
     GIGLIO* MATERIAL. ........................................................................................... 4

     A.   Applicable Legal Standard ..................................................................................... 4

          1.   Rule 33 ............................................................................................................ 4

          2.   Suppression of Favorable Evidence ................................................................ 5

     B.   The Government's Suppression of *Brady / Giglio* Evidence ................................ 6

          1.   Suppressed Statements and Documents of Kevin Cronin ................................. 8

               a)   Smyth's and Campion's Obstruction of Justice ..................................... 8

               b)   Smyth's Embezzlement of KIT Digital Assets ...................................... 10

               c)   Undisclosed Activities by Smyth Involving Digigov ............................ 13

               d)   Undisclosed Witnesses .......................................................................... 15

          2.   Suppressed Statements of Louis Schwartz .................................................... 16

               a)   Smyth's Responsibility for Revenue Recognition and M&A Contracts ............. 16

               b)   Campion, not Isaza Tuzman, Ran KIT Digital Day-to-Day and Engineered
                    M&A Deals ............................................................................................ 17

               c)   References to "Hail Mary" Were Innocuous ........................................ 18

          3.   Suppressed Statements of Buno Pati .............................................................. 18

          4.   Suppressed Statements of Sean McMann ...................................................... 20

          5.   Suppressed Statements of Paul DiPietro ....................................................... 22

     C.   Newfound Evidence of Maiden's Lies Regarding Prior Drug Use .................. 23

     D.   The Withheld Evidence Was Material and Caused Isaza Tuzman Prejudice .................. 24

     CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland,*
    373 U.S. 83 (1963)...................................................................................................3, 7, 31

*Kyles v. Whitley,*
    514 U.S. 419 (1995)...........................................................................................................8

*Leka v. Portuondo,*
    257 F.3d 89 (2d Cir. 2001)........................................................................................7, 9, 29

*Schledwitz v. United States,*
    169 F.3d 1003 (6th Cir. 1999) ................................................................................8, 27, 28

*Smith v. Cain,*
    565 U.S. 73 (2012)........................................................................................................8, 31

*Spicer v. Roxbury Corr. Inst.,*
    194 F.3d 547 (3d Cir. 1999)...............................................................................................7

*Strickler v. Greene*
    527 U.S. 263 (1999)........................................................................................................7, 8

*United States v. Aguiar,*
    737 F.3d 251 (2d Cir. 2013)...............................................................................................6

*United States v. Agurs,*
    427 U.S. 97 (1976)..............................................................................................................7

*United States v. Bagley,*
    473 U.S. 667 (1985)........................................................................................................7, 8

*United States v. Coppa,*
    267 F.3d 132 (2d Cir. 2001)...............................................................................................7

*United States v. Cuffie,*
    80 F.3d 514 (D.C. Cir. 1996)............................................................................................30

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001)...............................................................................................6

*United States v. Frost,*
    125 F.3d 346 (6th Cir. 1997) .............................................................................................8

*United States v. Giglio,*
    405 U.S. 150 (1972)........................................................................................................3, 7

*United States v. Payne*,
   63 F.3d 1200 (2d Cir.1995).............................................................................................7

*United States v. Rodriguez*,
   738 F.2d 13 (1st Cir. 1984)...........................................................................................6

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992).........................................................................................6

*United States v. Smith*,
   77 F.3d 511 (D.C. Cir. 1996).........................................................................................8

*United States v. Tarantino*,
   No. 08-CR-0655 (JS), 2012 WL 5430865 (E.D.N.Y. Nov. 7, 2012) ........................................6

## PRELIMINARY STATEMENT

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Kaleil Isaza Tuzman respectfully supplements his previously filed Rule 33 motion to vacate to incorporate newly discovered evidence that the government was required to disclose under *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Giglio*, 405 U.S. 150 (1972).

The government's failure to disclose *Brady* and *Giglio* materials is just the latest episode in a case marked by overzealousness and lack of proportionality.  At the beginning of its prosecution, the government needlessly caused Isaza Tuzman, a United States citizen traveling abroad on business, to be held in a maximum-security Colombian prison pending extradition. There, he was brutalized at knifepoint and—despite warnings by defense counsel of threatened extortion, rape, and murder—the government failed to take any meaningful action to protect one of its own citizens until this Court thankfully intervened.  Now, at the end of this case and having secured a conviction, the government has adopted an anachronistic "lock-'em-up-and-throw-away-the-key" approach to sentencing, seeking a sentence of 262–327 months based on a wildly aggressive (and erroneous) loss amount figure untethered from the facts and contrary to binding law.  *See* Dkt. 965.

Between these disheartening bookends, the government also repeatedly failed to meet its disclosure obligations under the United States Constitution and applicable law.  On multiple occasions, the defense discovered and has had to raise material failures by the government to make complete disclosures as required, including: the failure to produce a cooperating witness's laptop until weeks before the then-scheduled trial, Dkt. 378, 383, 396, 425; the failure to produce one dozen flash drives provided by a cooperating witness and produced only at the end of the trial after the witness testified, Dkt. 594; and the failure to timely produce a number of exculpatory and impeaching witness statements gathered years ago, but withheld from the

1

defense, which prevented use of the information at trial, *see, e.g.,* Dkt. 489.  These episodes were prejudicial both because of the delay in receiving important trial preparation materials, and also because rectifying these problems required diversion of substantial defense resources away from pressing substantive issues.

The defense only recently discovered that the government withheld even more *Brady* / *Giglio* material.  Following the October 2018 trial and conviction of co-defendant Irfan Amanat (whose trial had been severed from Isaza Tuzman's), defense counsel for Isaza Tuzman obtained a copy of the 3500 material produced to Irfan Amanat—which included approximately one dozen witness statements that preceded Isaza Tuzman's trial but had never been produced to him.  Those withheld witness statements contain a number of *Brady* / *Giglio* disclosures, as do other business records of KIT Digital, which the government indisputably possessed at the time of the Isaza Tuzman trial but inexplicably failed to produce before trial.  The government's failure to produce these materials undermines confidence in the integrity of Isaza Tuzman's trial and its resulting verdict.

Indeed, the government's reluctance and repeated failures to produce are so extensive that it calls into the question whether the government, to this day, has satisfied its disclosure obligations and whether there are additional *Brady* / *Giglio* materials in the government's possession that have been withheld.  The defense highlighted the risk of this very issue pre-trial when the defense—upon discovering never-before disclosed *Brady* material produced in a mass of 3500 disclosures and concerned about the "government's stilted interpretation of its disclosure obligations"—sought an order requiring production of statements for all other witnesses interviewed by the government.  *See* Dkt. 489 at 7–8.  As is often the case, the government repeated its boilerplate assertion that it "has complied and continues to comply with its

2

disclosure obligations."  Dkt. 501.  That was false, given what we have now learned the
government withheld from the defense pre-trial.  Under these circumstances, the government's
assessment of what may constitute *Brady / Giglio* evidence must be tested, and Mr. Isaza
Tuzman respectfully requests that the Court order the government to turn over to the defense any
other witness interview notes and documents related to this prosecution that have not previously
been produced.

Moreover, the withheld *Brady / Giglio* evidence that the defense *has* uncovered is
substantial and material, and the government's failure to disclose these materials pretrial was
highly prejudicial.  The newly obtained materials that the government withheld include hundreds
of pages of witness statements, including from a number of key executives and employees at KIT
Digital (such as its general counsel and a senior sales executive) and counterparties (such as the
CEO of Sezmi) who had personal interactions with Smyth and Campion related to their
fraudulent conduct, and/or unique insight into the fraud at KIT Digital and its organizational
structure—and whose testimony refutes in critical ways the government's indictment and
presentation to the jury regarding Isaza Tuzman's involvement in Smyth and Campion's
fraudulent activities.  Indeed, the material the government withheld would have badly impeached
cooperating witnesses Robin Smyth and Gavin Campion, and would have been instrumental in
proving that Smyth sought to embezzle millions of dollars from KIT Digital, likely destroyed
records relevant to the case, was engaged in other fraudulent activities not disclosed to the
government (or the jury), and falsely blamed Isaza Tuzman for Smyth's own wrongdoing.  The
information provided by these witnesses would also have shown that Isaza Tuzman's use of
phrases (such as "Hail Mary"), which Smyth and Campion testified were code words referring to
the fraudulent scheme, were commonly used and innocent phrases within KIT Digital that do not

implicate Isaza Tuzman in wrongdoing.  The suppression of this material evidence—which, again, the government has offered no valid explanation for failing to turn over—was highly prejudicial and would have fundamentally altered the proceeding.  *Vacatur* of Isaza Tuzman's convictions under Counts 4–6 is required to remedy the government's suppression of *Brady* / *Giglio* material.

## I.   PURSUANT TO RULE 33, ISAZA TUZMAN IS ENTITLED TO A NEW TRIAL WITH RESPECT TO COUNT SIX BECAUSE NEWLY DISCOVERED EVIDENCE REVEALS THAT THE GOVERNMENT WITHHELD *BRADY* / *GIGLIO* MATERIAL.

### A.   Applicable Legal Standard

#### 1.   Rule 33

A motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 may be granted "if the interest of justice so requires."  Fed. R. Crim. P. 33.  Whether to grant a motion for a new trial pursuant to Rule 33 rests within the broad discretion of the trial judge.  *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir. 1984).  The Court is not required to view the evidence in the light most favorable to the government.  *United States v. Tarantino*, No. 08-CR-0655 (JS), 2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012).  Unlike a Rule 29 motion, in deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses.  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  "'The ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice.'  To grant the motion, '[t]here must be a real concern that an innocent person may have been convicted.'"  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

### 2.      Suppression of Favorable Evidence

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87; *see also United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense.  The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.  Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant.") (citations omitted).

To establish a *Brady* violation, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (citing *Strickler v. Greene* 527 U.S. 263, 281–82 (1999)).

Suppressed evidence is "information which had been known to the prosecution but unknown to the defense" prior to the trial's conclusion. *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 557 (3d Cir. 1999) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Suppressed evidence also includes evidence that the government did not disclose "in time for its effective use at trial." *Coppa*, 267 F.3d at 146; *see also Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) (disclosures on the eve of trial that throw defense strategy into "disarray" constituted suppressed evidence).

Favorable evidence includes both exculpatory evidence and material that might be used to impeach key government witnesses. *See Giglio*, 405 U.S. 150; *United States v. Bagley*, 473

U.S. 667, 676 (1985). Particularly problematic are instances where the government suppresses impeachment evidence where the prosecution strongly rested on witness testimony or a critical element of the prosecution's case relied on a witness's credibility. *Id.*; *Payne*, 63 F.3d at 1209–10. The "fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial." *United States v. Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996).

Prejudice ensues when a material piece of evidence is withheld. *See Strickler*, 527 U.S. at 280. A piece of evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75–76 (2012) (internal citations omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Smith*, 77 F.3d at 514 (for materiality test "a reviewing court must focus on the fairness of the trial the defendant actually received rather than on whether a different result would have occurred had the undisclosed evidence been revealed"). "In determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the 'reasonable probability' test is met." *Schledwitz v. United States*, 169 F.3d 1003, 1012 (6th Cir. 1999) (*citing Kyles*, 514 U.S. at 436; *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997)).

### B.    The Government's Suppression of *Brady* / *Giglio* Evidence

In response to repeated and early demands that the government produce all Rule 16, *Brady*, and *Giglio* material, *see, e.g.*, Dkt. 133, 263, the government repeatedly affirmed to

6

defense counsel and this Court that the prosecution team was aware of, and would comply with, its disclosure obligations. *See, e.g.*, Dkt. 282 at 47 ("The Government understands and will comply with its obligations under *Brady* . . . , *Giglio* . . . , and the Jencks Act"); Dkt. 425 at 8 & Ex. H ("We are aware of our criminal discovery obligations under Rule 16 and have complied with those obligations. . . . We are also aware of our obligations under *Brady*" and "[t]he Government will also provide material under *Giglio* . . . in a timely manner.").

Despite these representations, the government repeatedly failed to satisfy its disclosure obligations, to Isaza Tuzman's detriment. Key examples of the government's previous disclosure failures include the following:

- The government failed to timely produce a laptop from Robin Smyth, the government's principal cooperating witness in connection with the securities fraud conspiracy charged in Count Six, until late August 2017, two years after indictment and just six weeks before the scheduled trial. *See, e.g.*, Dkt. 378, 383, 425. Given the large volume of material on the laptop (approximately a half-million non-duplicative emails and attachments, *see* Dkt. 396), the Court adjourned the trial date.

- The government failed to produce *Brady* material timely, including the statement of Petr Stransky, an alleged co-conspirator in the case, who denied and contradicted the government's accounting fraud allegations in an interview with law enforcement four years before trial. *See* Dkt. 489. Because the defense was unaware of Stransky's importance until mere days before trial, the defense was deeply prejudiced by the government's belated production because the defense was denied the opportunity to secure Stransky's cooperation and testimony for trial in light of his residence in Europe. *See also Leka*, 257 F.3d at 100–01 ("the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use. . . . When such a disclosure is first made on the eve of trial . . . [t]he opportunity to use it may be impaired.").

- The government failed to timely produce, until after cooperating witness Robin Smyth concluded his trial testimony, 12 external USB drives that Smyth turned over to the government months earlier; those USB drives contained numerous relevant documents never before inventoried or disclosed to the defense. *See* Dkt. 594. Because these materials were produced just days before the government rested, the defense was unable to make use of them at trial.

Now again, the defense has discovered through its own outreach to Irfan Amanat's defense counsel a large amount of additional material that the government never disclosed—including extensive and detailed law enforcement interviews with a top executive at KIT Digital and sales associates with critical knowledge of the fraudulent schemes charged in the indictment, as well as hundreds of pages of database extracts from the KIT Digital accounting software at NetSuite that directly implicate Smyth in additional undisclosed fraudulent activities.  This is the proverbial tip of the iceberg.  The government failed to produce approximately one dozen witness statements, a number of which contain valuable impeachment evidence that the government was unquestionably required to produce consistent with its *Brady / Giglio* obligations.  We identify the most substantial omissions below.

### 1.    Suppressed Statements and Documents of Kevin Cronin

Kevin Cronin was a former sales employee at KIT Digital interviewed twice by the FBI and USPIS in September 2015, more than two years before Isaza Tuzman's trial.  None of the government's disclosures in advance of Isaza Tuzman's trial revealed that Cronin was interviewed by the government, let alone that he made statements and provided documents that constitute *Brady* / Giglio material.  A copy of Cronin's September 11, 2015 and September 14, 2015 interviews are attached as Exhibits 1 and 2 to the Supplemental Weitzman Declaration ("Suppl. Weitzman Decl.") filed herewith.

### a)    Smyth's and Campion's Obstruction of Justice

Cronin's materials would have provided critical support to the defense's contentions that government cooperators had destroyed evidence of their own culpability.  At trial, the defense sought to impeach Smyth and Campion, questioning both cooperators regarding their collusion

to destroy relevant records and to falsely implicate Isaza Tuzman in their fraudulent schemes.[1] While Smyth acknowledged telling the government that Campion had asked him to destroy a spreadsheet tracking false revenues at the Company, as well as his emails and other inculpatory documents, Trial Tr. ("Tr.") 3092–93, he never admitted destroying any such evidence, and Campion denied ever asking Smyth to destroy such evidence. Tr. 4602–04. Both flatly denied any improper collusion to falsely implicate Isaza Tuzman, even though they conceded that they had many conversations in the years after they left KIT Digital—in person, by phone, via Skype, and over email—in which they discussed their story that Isaza Tuzman was "the instigator" of the fraud in order to "spread the blame" in the event law enforcement sought their cooperation. Tr. 2756–57, 3059, 3064, 3069–74, 3085–86, 3089–90, 4452–54, 4622–30.

Cronin's materials belie the cooperators' stories. Cronin informed the government that in mid-2012, *after* Isaza Tuzman had left KIT Digital but when Smyth was still employed by KIT Digital and would have had administrative access to its accounting platform, someone deleted important fraud evidence from KIT Digital's electronic finance and accounting record-keeping database called "NetSuite." Specifically, after coming across evidence of sham licenses at KIT Digital, Cronin began to take a closer look, but soon realized that records of the sham contracts had been deleted and replaced with new entries some time shortly before June 1, 2012. Importantly, Isaza Tuzman was no longer working at KIT Digital in any capacity by April, 2012, but Smyth remained until Fall 2012. The Cronin interview notes further state as follows:

---

[1]  The defense sought evidence of this collusion pre-trial, including by subpoenaing Smyth, Campion, and the Bureau of Prisons. *See* Dkt. 458, 494. The Court quashed these subpoenas. *See* Dkt. 535.

When he was looking at this info, he thought he must have watched too much TV and he was just dreaming because people at his company wouldn't be faking sales. Then, he suddenly couldn't find any of the information. June 1, 2012, someone deleted these entries, then recreated new entries not connected to old entries. Someone very clearly went in and then changed the records and established brand new records with a company record and now these companies had new company record numbers as of possibly June 1, 2012. For him, that solidified that something strange and probably illegal was going on.

Suppl. Weitzman Decl. Ex. 2 at 2.

While Cronin did not know who specifically deleted these important records relating to sham licenses, the fact that NetSuite is a database operated and overseen by finance and accounting functions, which reported to Smyth, strongly implicates Smyth in the destruction and obstruction that Cronin witnessed.  Had the government disclosed this information pretrial, the defense would have been able to investigate this destruction of evidence, meaningfully confront Smyth and Campion about their denials of collusion and evidence destruction, and potentially call Cronin as a witness to impeach Smyth and Campion and demonstrate that records to which Smyth and his department had access were tampered with and destroyed after Isaza Tuzman's departure from the Company.

Such evidence impeaching Smyth as to destruction of evidence and obstruction of justice was highly material to Isaza Tuzman's defense that Smyth and Campion colluded to falsely implicate Isaza Tuzman in their frauds.

### b) Smyth's Embezzlement of KIT Digital Assets

Kevin Cronin's witness interview included references to KIT Digital documents that Cronin offered to turn over to the government.  *See* Suppl. Weitzman Decl. Ex. 2 at 3 (Cronin "has a lot of documents.  He can put them on a thumb drive and send it to us.  He will send it to Gavin Shea at the FBI.").  Before Isaza Tuzman's trial, the government produced to the defense neither Cronin's witness statements, nor any documents turned over by Cronin to the government, nor even a voucher reflecting the receipt of documents from Cronin.  In mid-

January 2019, after reviewing the Cronin 3500 material, counsel for Isaza Tuzman contacted the government to inquire whether any documents had actually been provided by Cronin to the government.  On January 29, 2019, the government for the first time acknowledged that it had obtained documents from Cronin, which the government subsequently produced.  The government offered no explanation for why these documents, which had long been in both the FBI's and US Attorney's office's possession, were not previously produced to the defense.[2]  This new production consisted of thousands of pages of documents, including excel spreadsheets with reams of KIT Digital financial data.  Because these suppressed documents contain critical impeachment of the government's lead cooperating witness Robin Smyth, the failure to produce these materials pretrial is highly prejudicial.

At trial, counsel for Isaza Tuzman cross-examined Smyth at length about his embezzlement of money from KIT Digital.  The defense discovered that Smyth had embezzled approximately $40,000 from KIT Digital (through an account in the name of "Jourdian Invest" that Smyth solely controlled), which he wired to his friend Robert Petty to help make payroll at a company called Sport195 that Petty and Smyth operated.  Tr. 3464–3474; KIT Exs. 4306, 4215, 4583.  After being confronted with documents proving his unauthorized wires, Smyth claimed, for the first time in the middle of trial, that he had received Tuzman's approval to make that $40,000 wire to Petty, despite the absence of any supporting documentary evidence.  Tr. 3474–75.  Only after the Court repeatedly questioned Smyth about whether he stole the money from KIT Digital did Smyth reluctantly acknowledge that he did steal the $40,000.  Tr. 3474–75.

---

[2]  In response to follow up questions from the defense, the government later acknowledged that Cronin's documents were in both the FBI's and USAO's files before the Isaza Tuzman trial, but offered no explanation for the government's failure to produce these documents pretrial as either Rule 16 discovery or *Brady* / *Giglio* evidence.  *See* Suppl. Weitzman Decl. Ex. 3.

The defense suspected that $40,000 was the tip of the proverbial iceberg and that Smyth had embezzled or attempted to embezzle millions more from KIT Digital without Isaza Tuzman's knowledge—a fact that, if proven, would have devastated Smyth's credibility, proven Smyth's ability to engage in fraud without Isaza Tuzman's knowledge, and greatly undermined the credibility and completeness of the government's investigation.  The defense's suspicion was based, in part, on a March 2012 document in which Smyth told Rob Petty that he had $3 million stuck in a bank account in Dubai.  *See* KIT Ex. 4583, Tr. 3468–69.  Smyth, however, denied any intention to embezzle that money to help his friend Petty.  *See* Tr. 3470.

Cronin's records, suppressed by the government, confirm the defense's embezzlement suspicions.  One of the excel spreadsheets that Cronin provided to the government (USAO_TUZMAN_0347248.xlsx) included entries reflecting invoices Smyth submitted *on his own behalf* seeking payment of over $2.8 million between March 2011 and June 2012, including over $1.4 million requested ***after*** Isaza Tuzman resigned as CEO of KIT Digital in March 2012. A snapshot of the entries on the spreadsheet Cronin provided follows below:[3]

---

[3]  The red highlighting in the snapshot appears in the spreadsheet produced by the government uniquely on the entries relating to requested payments to Smyth.  We do not know whether the original spreadsheet was highlighted in red when Cronin downloaded it or whether he added the red highlighting, perhaps to indicate suspicious entries.

| Date | Number | Name | Status | Tracking Numbers | Memo | Currency | Amount (Foreign Currency) | Amount |
|---|---|---|---|---|---|---|---|---|
| | | | | | Sezmi Holding Invoice 00046.ftr | | | |
| 5/23/2012 | PO#21000527 | VEN000182 Smyth, Robin | Pending Receipt | | PO to Enter Accrued Liability Invoices for Payments made to UK and US Amex in February for Chambers Charges | US Dollars | $715,978.74 | 715,978.74 |
| 5/11/2012 | PO#21000497 | VEN000182 Smyth, Robin | Fully Billed | | PO to Enter Accrued Liability Invoices for Payments made to UK and US Amex in January for Chambers Charges | US Dollars | $532,299.73 | 532,299.73 |
| 5/14/2012 | PO#21000746 | VEN000182 Smyth, Robin | Pending Supervisor Approval | | PO to enter Payments made to Amex for Chambers Charges in May | US Dollars | $489,287.95 | 489,287.95 |
| 4/30/2012 | PO#21000668 | VEN000182 Smyth, Robin | Pending Supervisor Approval | | PO to enter Payments made to Amex for Mar+Apr Chambers Charges in April | US Dollars | $280,668.00 | 280,668.00 |
| 5/31/2012 | PO#21000664 | VEN000182 Smyth, Robin | Pending Supervisor Approval | | PO to Enter Accrued Liability Invoices for Payments made to UK and US Amex in March for Chambers Charges | US Dollars | $348,685.64 | 348,685.64 |
| 4/30/2012 | PO#21000636 | VEN000182 Smyth, Robin | Pending Supervisor Approval | | PO to enter Payments made to Amex by KIT Prague for Chambers Charges | US Dollars | $233,108.50 | 233,108.50 |
| 4/30/2012 | PO#21000625 | VEN000182 Smyth, Robin | Pending Supervisor Approval | | PO to enter Payments made to Amex for Chambers Charges in April | US Dollars | $190,879.31 | 190,879.31 |
| 6/1/2011 | PO#21000166 | VEN000182 Smyth, Robin | Fully Billed | | Chambers expenses for 6.8-6.17 | US Dollars | $44,678.60 | 44,678.60 |
| 6/1/2011 | PO#21000165 | VEN000182 Smyth, Robin | Fully Billed | | May 28 - Jun 9 | US Dollars | $36,181.40 | 36,181.40 |
| 12/5/2011 | PO#21000049 | VEN000182 Smyth, Robin | Fully Billed | | | US Dollars | $13,766.55 | 13,766.55 |
| 11/7/2011 | PO#21000408 | VEN000182 Smyth, Robin | Fully Billed | | Expenses approved by Gavin for 10.6.11 - 11.2.11 | US Dollars | $4,900.26 | 4,900.26 |
| 6/15/2011 | PO#21000197 | VEN000182 Smyth, Robin | Rejected by Supervisor | | KITs for KIT digital video competition | US Dollars | $2,600.00 | 2,600.00 |
| | | | | | Expenses from Jan 2011 - | | | |

Suppl. Weitzman Decl. Ex. 4 at 17.  In his interview, Cronin specifically noted that many of the NetSuite entries lacked sufficient back-up documentation.  *See* Suppl. Weitzman Decl. Ex. 2 at 3.  Cronin stated that the Amex reimbursement requests in particular were "ridiculous"— presumably meaning unsupported or unreasonable.  *See id.* at 2 ("There are many other . . . ridiculous things with senior management.  Payment things like sending $100k to AMEX.").

Armed with this information, the defense could have directly impeached Smyth's denials of embezzlement, which would have further shown that Smyth was capable of concealing his fraudulent and criminal activities from Isaza Tuzman, as well as from the government.  These business records (for which Cronin could have laid a proper foundation) would have been independently admissible to impeach Smyth even if he refused to acknowledge the obvious import of these entries.

### c)      Undisclosed Activities by Smyth Involving Digigov

The Indictment in the case alleged that Tuzman and Smyth caused $7.85 million to be fraudulently round-tripped following the Sezmi transaction, including a $2.648 million wire in late December 2011 to Digigov Operations Ltd. to further such round-tripping.  Smyth testified

that "Digigov was related to -- associated with Nigel Regan so that included some -- a transfer so

they could make some further payments against Crosshaven and Wolfgang licenses, as well as I

wanted to round trip from there to other–other people."  Tr. 2534.  Smyth and Campion testified

that Nigel Regan was one of their co-conspirators who assisted with the round-tripping.

Undisclosed to the defense, however, was that Robin Smyth authorized two additional payments

to Digigov in July 2011, months before the round-tripping he authorized and understood in

connection with the Sezmi transaction. A copy of the entries in the documents Cronin produced

to the government but withheld from the defense are below:

| Date | Number | Name | Status | Tracking Numbers | Memo | Currency | Amount (Foreign Currency) | Amount | Solutions Interested In | Finance Approve |
|------|--------|------|--------|------------------|------|----------|---------------------------|--------|-------------------------|-----------------|
| 7/27/2011 | POK17000364 | VEN005045 Digigov Operations Ltd. | Fully Billed | | Software Licence - Initial Fee - requested by R.Smyth; Per my discussions with Robin, this purchase is in accordance with furthering the interests of KIT Digital | US Dollars | $800,000.00 | 789,888.84 | | No |
| 7/15/2011 | POK17000363 | VEN005045 Digigov Operations Ltd. | Fully Billed | | Software Licence - Initial Fee - requested by R.Smyth; per my discussions with Robin, I am aware of this purchase and that it is in accordance with the requirements of KIT Digital | US Dollars | $700,000.00 | 691,915.62 | | No |

Suppl. Weitzman Decl. Ex. 4A.  These records reflect that, on July 15, 2011, Smyth requested a

payment of $700,000 to Digigov, and on July 27, 2011, he requested another payment of

$800,000 to Digigov.  These payments to Digigov requested by Smyth months before the Sezmi

transaction were highly material to the defense.  Based on our review of his 3500 material,

Smyth and Campion did not disclose to the government (and did not testify at trial about) any

round-tripping of funds through the Digigov account in July 2011.  The only round-tripping with

Digigov disclosed to the government was the December 2011 wires in connection with the Sezmi

transaction.  Smyth's use of the Digigov account in July 2011, without any involvement by Isaza

Tuzman, further buttresses Isaza Tuzman's defense that Smyth engaged in round-tripping

without Isaza Tuzman's knowledge or involvement.  It further shows that Smyth did not disclose

to the government the full extent of his own criminal conduct.  The government's failure to

produce these records deprived Isaza Tuzman of valuable exculpatory and impeachment evidence.

#### d)      Undisclosed Witnesses

Cronin advised the FBI that, in or about early 2011, Cronin saw in the company's electronic Netsuite files that there had been a number of suspicious sales licenses entered into by the Company with Sollett, Bimini Trading, CP Rights, and Reckord Outside Broadcasting—the very companies with which the government alleges KIT Digital entered into sham licenses.  *See* Suppl. Weitzman Decl. Ex. 1 at 1.  Cronin, however, saw that most of these sham licenses "were entered by Abner Mendez," an accounting employee who reported directly to Smyth and resided in Dubai.  *See* Suppl. Weitzman Decl. Ex. 2 at 2; Tr. 5337–38.  The government, however, did not identify Mendez as a co-conspirator, *see* Suppl. Weitzman Decl. Ex. 5, thus the defense was unaware that Mendez may have had material information regarding the creation of the sham licenses, including evidence demonstrating that Isaza Tuzman was not involved in the creation of the sham licenses—the core of Isaza Tuzman's defense.  Indeed, Smyth's previously produced 3500 material indicates that Mendez was an innocent "bookkeeper in Dubai" who worked for Smyth (including at Smyth's company Sport195) and "knew nothing of what was going on" with respect to fraud at KIT Digital.  *See, e.g.,* Suppl. Weitzman Decl., Ex. 9 at 11.  Thus, the defense was led to believe that Mendez had no relevant knowledge.  But armed with Cronin's witness statement, the defense would have been able to question and impeach Smyth regarding his supervision of Mendez and Mendez's involvement in the sham transactions, which would have again shown that Isaza Tuzman was not involved in or responsible for the sham licenses—none of which were ever signed by or sent to Isaza Tuzman—and that Smyth had misrepresented to the government the scope of Mendez's involvement in the fraudulent activities.

### 2.     Suppressed Statements of Louis Schwartz

Louis Schwartz, the former General Counsel and CEO of the Americas for KIT Digital, was interviewed by the FBI and USPIS on May 21, 2014, over three-and-a-half years before the trial of Isaza Tuzman.  The government, however, never disclosed the interview or provided counsel for Isaza Tuzman with a copy of the Memorandum of Interview ("MOI"), which was first disclosed in the 3500 material provided to Irfan Amanat.  On multiple levels, Schwartz's statements to the government constitute *Brady* and *Giglio* material that the government improperly suppressed, and it is especially egregious that the government would suppress the witness statement from such a high-level and critical KIT Digital executive:

### a)     Smyth's Responsibility for Revenue Recognition and M&A Contracts

Schwartz advised the government that Robin Smyth and one of his underlings in the accounting department, David Vogel, "gave him [Schwartz] guidance" regarding "revenue recognition and contract structuring so that revenue recognition could be maximized" and that Vogel in particular (not Isaza Tuzman) "was the revenue recognition expert" at KIT Digital.  *See* Weitzman Suppl. Decl. Ex. 6 at 2; *see also id.* at 3 ("SCHWARTZ said VOGEL was the revenue recognition officer and would tell them how to recognize revenue in order to optimize it. SCHWARTZ advised that when VOGEL started working at KIT, revenue that was recognized aggressively began to accelerate.  . . . SCHWARTZ stated that it was a combination of VOGEL and SMYTH that focused on revenue recognition, but VOGEL eventually became the revenue recognition 'officer.'").  Had Isaza Tuzman known of these statements, he would have called Schwartz to testify at trial to support Isaza Tuzman's defense that Smyth—not Isaza Tuzman—made revenue recognition decisions and settled on the structure of the merger and acquisitions that Smyth used to round-trip money without Isaza Tuzman's knowledge.

        **b)**     **Campion, not Isaza Tuzman, Ran KIT Digital Day-to-Day and Engineered M&A Deals**

At trial, the defense contended that Isaza Tuzman's responsibilities as CEO were limited and that Campion, as President of the Company, primarily ran the Company on a day-to-day basis. Smyth and Campion, however, went to great lengths to minimize their respective roles in the Company and to implicate Isaza Tuzman in their fraudulent dealings, including by falsely suggesting that Isaza Tuzman micro-managed the Company's operations. At times their efforts bordered on the absurd, such as when Campion asserted that every single airline ticket purchased for any of the Company's approximately 1500 employees had to be approved and routed by Isaza Tuzman. Tr. 3922–23 (Campion testified that "[if you wanted to book a flight, it went through Mr. Tuzman who would then work out the cheapest flight, even if it meant flying around the world the long way. . . . He would approve payments to suppliers" and all "[t]hird-party payments to outside people, outside of the company"). The government elicited from Campion that it was Isaza Tuzman, not Campion, "[w]ho was in charge of mergers and acquisitions at KIT Digital," Tr. 4106, and that Campion's "primary focus was integration restructuring," Tr. 4195. Campion denied that as President of the Company he was responsible for all operations at the Company, Tr. 4740, and attempted to pin responsibility for various functions at the Company on Isaza Tuzman, Tr. 4741.

Schwartz's statements to the government directly impeach the cooperators' testimony, as Schwartz informed the government that "CAMPION was primarily involved in the day-to-day operations of the business" and Smyth, as CFO, was responsible for all revenue recognition and accounting decisions. *See* Suppl. Weitzman Decl. Ex. 6 at 2. Indeed, Schwartz told the Government that it was Campion, not Isaza Tuzman, who "engineer[ed] the merger and acquisition deals." *Id.* at 3. Furthermore, Schwartz stated that "CAMPION AND SMYTH were

very close," *id.* at 3, further supporting the defense that Campion and Smyth worked together to execute fraud without Isaza Tuzman. Had the defense known of these prior statements, they could have called Schwartz as a trial witness to impeach the cooperators' testimony regarding Isaza Tuzman's knowledge of and responsibility for the cooperators' misconduct.

### c) References to "Hail Mary" Were Innocuous

At trial, Gavin Campion testified that emails sent with the phrase "Hail Mary" were references to their fraud scheme. Tr. 4271. Schwartz, however, directly contradicted that allegation, stating that he saw references to "Hail Mary" in his unit's general ledger and thought they were references to revenue enhancement, *see* Weitzman Suppl. Decl. Ex. 6 at 2, not some illegal fraud as Campion testified. In his witness interview, Schwartz also explained that, despite being the former CEO of the Americas for KIT who "closely managed" his region, Schwartz had no knowledge of any fraud at the Company. *Id.* at 2. This further confirms that Smyth and Campion were able to hide their fraudulent scheme from high level executives in the Company, consistent with Isaza Tuzman's defense, and that the emails referencing Hail Mary were not, as Campion testified, references to the fraud scheme.

### 3. Suppressed Statements of Buno Pati

As the Court will recall, the government alleged, in connection with the Count Six securities fraud conspiracy charge, that Isaza Tuzman and co-conspirators round-tripped approximately $7.85 million through an escrow account created to cover expected integration costs resulting from the acquisition of Sezmi's assets. *See* S8 Indict. ¶¶ 122–136. The defense, by contrast, contended that the Sezmi transaction was legitimate, that any round-tripping was done by Smyth and his co-conspirators without Isaza Tuzman's knowledge or direction, and that the Sezmi side letter that created the $7.85 million restructuring reserve escrow was lawful, and

indeed had been reviewed and authorized by outside counsel for KIT Digital and Sezmi, including respected outside counsel like Wilson Sonsini. *See* Tr. 3206–10, 6940–48.

While the government disclosed that it interviewed Buno Pati, the former CEO of Sezmi, the 3500 produced in connection with that interview drastically downplayed both the extent and the significance of that interview. As part of its 3500 production in Isaza Tuzman's case, the government produced only a single heavily redacted email dated December 20, 2013, in which SEC attorneys recount a short conversation with FBI Agent Gavin Shea regarding his prior interview of Pati. That email is attached as Exhibit 7 to the Supplemental Weitzman declaration accompanying this supplemental motion. The only non-redacted portion of the email included an anodyne, two-sentence disclosure reflecting that Mr. Pati had little involvement or recollection regarding the Sezmi transaction and, while interested in cooperation, he "was concerned about his exposure."

Undisclosed to Isaza Tuzman, however—but later disclosed by the government to Irfan Amanat prior to his trial—was that Mr. Pati's interview was much more detailed and, in critical respects, favorable to the defense. Specifically, in the interview conducted on December 11, 2013 and memorialized in a six-page FBI-302 date January 7, 2014 (attached as Suppl. Weitzman Decl. Ex. 8), Pati informed the FBI, among other things, that: (1) he thought KIT Digital's acquisition of Sezmi was "complementary" because both Sezmi and KIT Digital "built out a similar platform as a service business" (*id.* at 2); (2) there was nothing "unusual" in KIT Digital's request to restructure Sezmi's contracts with customers during the acquisition process to permit KIT Digital to "recognize revenue with the restructuring of the deal" and that there was "work" to be done in connection with "software integration" (*id.* at 4); (3) most of his interactions with KIT Digital during the due diligence and acquisition process were with Smyth

19

and Michael John-Baptiste, a KIT employee who reported to Smyth (*id.* at 4–5); and (4) Pati only relayed a single meeting with Tuzman which occurred at the initiation of the deal and Pati did not relay any nefarious or inappropriate conduct or deal structure at that meeting (*id.* at 5).

In failing to disclose these prior statements by Sezmi's own CEO, the government deprived Isaza Tuzman of highly material evidence relating to the Sezmi transaction, a key aspect of the government's case on Count Six.  Isaza Tuzman's defense was that, at inception, the Sezmi deal was not illegal and that use of restructuring and integration fees, side letters, and escrow accounts are common in such mergers and acquisitions.  The illegal portions of the deal as alleged by the government primarily involved round-tripping, which Smyth perpetrated without Isaza Tuzman's knowledge or participation.  (Indeed, while the Sezmi transaction was closing in late 2011 and Smyth was round-tripping funds, Isaza Tuzman was undergoing medical treatments in Utah for a serious medical condition.  *See* Tr. 3682.)  Pati's statements to the FBI squarely placed Smyth in the center of the illegal elements of the Sezmi deal and, consistent with his defense, placed Isaza Tuzman uninvolved in those illegal elements.  As such, Pati was an eyewitness who could have offered exculpatory evidence regarding Isaza Tuzman's non-involvement in the criminal elements of the Sezmi deal.

### 4.    Suppressed Statements of Sean McMann

As charged in the indictment, the government alleged that Smyth, Isaza Tuzman, and others engaged in accounting fraud in connection with its account on behalf of The Country Network ("TCN").  *See* S8 Indict. ¶¶ 101–115.  The government alleged in the indictment that Isaza Tuzman, Smyth and others improperly recorded $1.3 million of revenue from TCN in Q2 2010 because the product and services had not been delivered to TCN.  *Id.* ¶ 103.  The government further alleged that Isaza Tuzman, Smyth, and Campion covered-up the improper revenue in Q2 2011 through misrepresentations to auditors and through round-tripping KIT

Digital money through a Jourdian Invest account to make it appear as though TCN had paid KIT Digital the money it owed. *Id.* ¶¶ 109–115. The defense, by contrast, contended that KIT Digital had provided technology and services to TCN and that any unlawful round-tripping through the Jourdian Invest account had been done by Smyth alone, not Isaza Tuzman.

Included among the 3500 material that the government produced to Irfan Amanat was a detailed, 46-page handwritten memorandum of a May 6, 2015 proffer interview of Sean McMann attended by the U.S. Attorney's Office, FBI, USPIS, and SEC. *See* Suppl. Weitzman Decl. Ex. 13. McMann was an account manager responsible for the TCN account, and thus one of the people with most knowledge of facts relevant to the TCN allegations. Despite that, the government never produced the McMann interview notes to Isaza Tuzman's defense team, even though McMann made multiple statements that were exculpatory/impeachment and undermined several of the government's core Indictment allegations. Specifically, McMann informed the government that: (a) the original deal "structure" was negotiated with Campion and McMann did not speak to "K" (referring to Isaza Tuzman) about the deal structure (*id.* at 9); (b) later, Smyth "had a lot of involvement in structuring [the] contract" with TCN (*id.* at 13) and Smyth pressured McMann (again, without reference to Isaza Tuzman) to have the TCN contract signed to provide to the auditors in Prague (*id.* at 16–17); (c) Smyth asked McMann to backdate the contract with TCN in order to record the revenue for Q2 2010 (*id.* at 40–41 ("Robin was directing backdating"); (d) when McMann was in Prague, he met with Smyth alone (without Isaza Tuzman) to discuss a solution to the TCN issues (*id.* at 14); (e) Smyth and Campion operated as a team in the "same office" (without any reference to Isaza Tuzman) such that it was difficult for McMann to even "delineat[e]" their different responsibilities (*id.* at 14, 18); (f) at the time that TCN signed a confirmation of delivery in Q2 2011, McMann believed that KIT Digital's

21

software solution had been delivered to TCN (*id.* at 17); (f)  McMann met with Smyth and Campion alone to "figure out" Q2 2011 revenue recognition issues for TCN, and had multiple communications with them on this issue without Isaza Tuzman (*id.* at 36–39); (g) McMann rarely spoke to Isaza Tuzman and, notably, when they did speak Isaza Tuzman seemed genuinely interested in helping McMann fix the deployment issues at TCN (*id.* at 23–24, 28–29); (h) once KIT Digital figured out a plan to fix the deployment issues at TCN, McMann did not have further communications with Isaza Tuzman and did not keep Isaza Tuzman in the "loop[]" (*id.* at 25).

These statements from McMann, who was at the center of the TCN relationship, were exculpatory of Isaza Tuzman and greatly undermine the government's core allegations.  In failing to disclose these statements obtained two years prior to trial, the government deprived Isaza Tuzman of highly material and exculpatory evidence relating to the TCN allegations at the heart of Count Six of the Indictment.  McMann's statements largely implicated Smyth and Campion in any fraudulent misdeeds and exonerated Isaza Tuzman.  As such, the government violated its *Brady* / *Giglio* obligations.

### 5.    Suppressed Statements of Paul DiPietro

At Isaza Tuzman's trial, the defense sought to prove that Smyth and Petty caused ROO Group (the publicly traded company that was the predecessor to KIT Digital) to fraudulently and artificially inflate its unique visitors through pop-under windows that reported false visitor numbers.  Tr. 3137–47.  The defense contended that these artificially inflated reported visitor logs constituted securities fraud that Smyth was involved in before Isaza Tuzman ever got involved with ROO Group, and proved that Smyth's statements to the government that "there wasn't anything improper at ROO Group before Kaleil arrived" were false.  Tr. 3147.  Smyth, however, denied knowledge of the artificial inflation of numbers, any false statements in public

filings, or his lies to the government about his involvement in such fraud at ROO Group.  Tr. 3140, 3145, 3147.

But ROO Group was not the only time Smyth and his companies were involved in fraudulent reporting of web traffic, as the government well knew.  In October 2014, the government interviewed Paul DiPietro, a former employee at Sport195, an online company that Rob Petty and Smyth operated.  DiPietro informed the government that Sport195 was involved in fraudulently paying "people in Nigeria to click on [Sport195's] website to make it look like the website has volume visits."  Suppl. Weitzman Decl. Ex. 10 at 3.  This evidence and testimony was never disclosed to the defense, yet was highly material to impeach Smyth.  While the jury might have believed Smyth's lack of knowledge about the fraudulent purchase of fake web visits to ROO Group in the time before Isaza Tuzman arrived at the Company, evidence that Smyth's company (Sport195) had been involved in yet another scheme to artificially inflate web traffic would have exposed the lie behind Smyth's false denials, and again undermined the thoroughness of the government's investigation.

### C.    Newfound Evidence of Maiden's Lies Regarding Prior Drug Use

In addition, the government's 3500 material to Irfan Amanat demonstrate that cooperating witness Stephen Maiden lied to the government and the jury about his prior drug use.  In his proffers before Isaza Tuzman's trial, Maiden told the government that he had used recreational drugs "including marijuana, cocaine, ecstasy, mushrooms and acid" and that he stopped using any drugs "about ten years ago."  Suppl. Weitzman Decl. Ex. 11 at 31; *see also* Tr. 1001–02.  Repeatedly during trial, Maiden claimed that his frequent messages about continued cocaine use (which he referred to as "slitch," "snitch," "whiff," "white," "ballski," and "cane"), Tr. 1003–1018, 1062–69, were just a "bad attempt at humor" and "crude humor."  *E.g.*, Tr. 1009, 1011, 1013, 1015, 1065, 1068, 1911.  But, in preparation for Irfan Amanat's trial, Maiden

acknowledged using drugs even more addictive than cocaine, such as crack cocaine and meth. *See* Suppl. Weitzman Decl., Ex. 12 at 1. This newly admitted drug use puts Maiden's credibility in a far different light than did his cocaine use, which juries might have excused as a "party drug." Had the jury learned of Maiden's prior crack and meth use, they would have better understood Maiden's serious drug issues as well as the falsity of his denials of continued cocaine use up to his arrest. Isaza Tuzman respectfully requests that the Rule 29/33 record be supplemented to include this additional evidence demonstrating Maiden's unreliability, in further support of Isaza Tuzman's Rule 29/33 motion. *See generally* Dkt. 738 at 52–56, 57–59.

### D. The Withheld Evidence Was Material and Caused Isaza Tuzman Prejudice

Isaza Tuzman's conviction should be vacated to remedy the government's withholding of substantial *Brady* / *Giglio* evidence, discussed in greater detail above. The statements and evidence were undisputedly suppressed: they were not produced to Isaza Tuzman before trial, despite the government's actual possession of the statements and evidence at the time. The sole remaining inquiry is whether the government's suppression of this evidence resulted in prejudice to the defense. For the following reasons, the only reasonable conclusion is that the withheld evidence was material and its suppression was unfair and prejudiced the defense.

The evidence detailed above—viewed separately but even more so collectively—would have fundamentally altered the proceeding and resulted in impeaching the government's key cooperating witnesses on critical issues. The statements and evidence went to the heart of Isaza Tuzman's defense to the Count Six charge—namely, that Smyth and Campion were able to and did commit fraud without Isaza Tuzman's knowledge—and would have further undermined Maiden's credibility. And the sum would have been even greater than the individual parts, as the separate pieces of impeachment evidence would have had a multiplying effect that would have

further weakened the government's case and bolstered the defense's.  *See Schledwitz*, 169 F.3d at 1012 (reversing conviction based on cumulative effect of exculpatory and impeaching statements that individually did not raise a reasonable probability that the defendant was denied a fair trial).

A witness who can speak to the defendant's intent and would help establish that the defendant was *outside* the fraud scheme is quintessential *Brady* material that the government is obligated to turn over in advance of trial.  Armed with these helpful witness statements, a defendant is more likely to succeed in its pretrial investigation and in proving its defense through witness testimony at trial.  In *Schledwitz*, for example, the defendant's conviction for mail fraud was premised on an allegation that the defendant acted as a "nominee" for co-conspirators in obtaining loans that were used to benefit the co-conspirators' personally, including in order to manipulate the stock of a bank owned by the co-conspirators.  169 F.3d at 1007.  However, the government had failed to disclose a number of exculpatory and impeaching statements in its files, including a statement from the defendant's former law firm partner and a statement from one of the co-conspirators that collectively, if credited, would have undermined an inference that the defendant had acted as a "nominee" in connection with the loans.  *Id.* at 1014.  The Sixth Circuit set aside the conviction on the basis of the "total cumulative effect" of the *Brady* violations, explaining that the withheld statements would have undermined the evidence of intent presented by the government and that reversal was required because "[t]oo many doubts arise from the government's *Brady* violations."  *Id.* at 1017.

Several of the witness statements that the government withheld from Isaza Tuzman were exculpatory and constitute *Brady* material.  For example, statements from Buno Pati, the former CEO of Sezmi, would have undermined the government's case by establishing that the Sezmi transaction was a lawful transaction at inception (which is when Isaza Tuzman was involved)

and that the illegal round-tripping portions of the transaction were solely handled by Smyth and

his team.  The witness statement of Sean McMann, the KIT Digital employee in charge of the

TCN account, similarly undermined the government's allegations with respect to TCN because

he would have established, among other things, that the TCN revenue recognition discussions he

had, including the request to backdate a contract, were with Smyth, not Isaza Tuzman, and by

contrast, Isaza Tuzman genuinely sought to fix the issues relating to TCN.  Similarly, Louis

Schwartz, the former KIT Digital General Counsel and CEO of the Americas, would have helped

establish that Smyth and Campion—not Isaza Tuzman—were responsible for the M&A activities

and revenue recognition at the heart of the government's fraud allegations; that Campion's

denials of running the company day to day were false; and that allegedly incriminating phrases

used by Isaza Tuzman (such as "Hail Mary") were innocent and had legitimate business

explanations.  Collectively, these statements would have greatly buttressed the defense that

Smyth and Campion were responsible for the criminal elements of certain M&A transactions,

round-tripping, and sham licenses, and that Isaza Tuzman was not involved.[4]  Given that the

government contended that Isaza Tuzman was "the hunter" and Smyth was "his bird dog" in the

fraud scheme, Tr. 7106, and further argued for Isaza Tuzman's conviction because "the fish rots

from the head down," Tr. 7096, the witness statements withheld from the government would

have painted a very different picture: one in which Smyth and Campion were working together

and in control, while Isaza Tuzman was outside their circle.  The government's failure to

produce evidence that undermines its theory of the case deprived the defense of a fair chance to

---

[4]  The government's partial disclosure of only a few cherry-picked statements of Pati and
Schwartz led the defense to believe that Pati and Schwartz had nothing favorable to say and were
not worthy of follow up or development as witnesses.  But the truth was that other statements
Pati and Schwartz made to the government—which the government inexplicably failed to
disclose—would have substantially aided Isaza Tuzman's defense.

fight back and exculpate Isaza Tuzman.  *See Schledwitz*, 169 F.3d at 1014 (reversing conviction

for mail fraud when defense testimony and theory "would have been bolstered" by witness

statements suppressed by government); *Leka v. Portuondo*, 257 F.3d 89, 96–101 (2d Cir. 2001)

(government's failure to turn over particularized statements by off-duty police officer who had

witnessed shooter fire gun from inside car, not outside car as eyewitnesses had testified, warrants

reversal on habeas review because the officer's testimony "would have furnished the defense

with promising lines of inquiry for the cross-examination of" the prosecution's key witnesses).

Moreover, where a prosecution depends as heavily on cooperator testimony, the

suppression of evidence impeaching the cooperator's testimony causes prejudice that warrants

*vacatur*.  The government's prosecution in this case hinged on Smyth and Campion's testimony

that Isaza Tuzman was involved in, or as they claimed, was the "instigator" of, the fraud.  There

was no "smoking gun" evidence or other independent documentary proof placing Isaza Tuzman

squarely within the fraud and proving his alleged criminal intent.  While the government

introduced thousands of documents as trial exhibits, none showed any instructions by Isaza

Tuzman relating to sham licenses, which had been signed solely by Smyth and Campion.  There

were no emails or other documents demonstrating Isaza Tuzman's involvement and criminal

intent in the illegal round-tripping wires that undisputedly were arranged by Smyth.  And

documents the government claimed implicated Isaza Tuzman in the fraud scheme—such as the

handwritten notebook that Smyth provided to the government, *e.g.*, GX 2188-B, or the purported

code-words for fraud such as "elephant" and "Hail Mary"—were neutral on their face and had to

be interpreted by Smyth and Campion in order to implicate Isaza Tuzman.  *E.g.*, Tr. 2386–87.

Thus, the government's proof of Isaza Tuzman's supposed involvement in and knowledge of the

accounting fraud scheme relied on the word of Smyth and Campion; their credibility was the lynchpin of a successful prosecution.

The evidence the government withheld would have badly impeached Smyth and Campion.  Cronin's statements and evidence, for example, would have shown that, despite Smyth's denials at trial, Smyth in fact endeavored to embezzle millions of dollars from KIT Digital, and likely deleted records relevant to the government's sham license allegations after Isaza Tuzman left the Company.  Proving Smyth's involvement in such conduct, which he hid from the government, Isaza Tuzman, and the Court, would have greatly supported Isaza Tuzman's defense that Isaza Tuzman was unaware of the wrongdoing in which Smyth was engaged.  Cronin's statements would have also shown that Smyth was involved in fraudulent round-tripping activities through a Digigov account much earlier than he had testified at trial (or even told the government), and that Smyth was lying to protect Abner Mendez, one of his underlings.

The prejudice resulting from suppression of Cronin's evidence was greatly magnified by suppression of other witness statements.  Paul DiPietro, a former employee at Sport195, would have helped demonstrate that Smyth had been involved in artificial web traffic inflation at Sport195, thereby undermining Smyth's denial at trial of involvement in similar fraudulent conduct (and securities fraud) at ROO Group.  Had Smyth been impeached on this score, it would have undermined his testimony that he had not been involved in any wrongdoing before Isaza Tuzman arrived at KIT Digital, making clear that Smyth was perfectly capable of fraudulent conduct without direction from Isaza Tuzman.  And Sean McMann's testimony would have further shown that Smyth asked McMann to back-date the TCN contract, a fraud that appears nowhere in Smyth's voluminous 3500 material.  Thus, armed with the evidence the

government withheld, the defense would have been able to prove that Smyth and Campion had "lied under oath" in numerous ways—proof that "is almost unique in its detrimental effect on a witness' credibility." *United States v. Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996) (government's failure to disclose prior perjury by government witness requires reversal despite availability to defense of substantial other impeachment evidence); *see also Smith*, 565 U.S. at 74 (reversing conviction where prosecution failed to disclose that trial witness who identified defendant as one of the shooters in homicide case had initially told police that he could not identify any of the perpetrators).

It has been over a half-century since the Supreme Court made clear that government prosecutors stand in a unique position in the criminal justice system. Their duty is to do justice and ensure that the accused is treated fairly—not to win at all costs, including by withholding material evidence. As the Supreme Court emphasized:

> Society wins not only when the guilty are convicted but when criminal trials are fair . . . . An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' A prosecution that withholds evidence on demand of an accused, which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with the standards of justice, even though . . . his action is not the result of guile.

*Brady*, 373 U.S. at 87–88 (citations omitted).

In short, the government's failure to comply with its constitutional obligations under *Brady* and *Giglio* must be remediated, and the only remedy appropriate under the circumstances is *vacatur*. Anything less would present a moral hazard that permits the government to systematically (and even intentionally) withhold exculpatory and impeachment evidence and then beg for forgiveness later.

**CONCLUSION**

For the reasons stated herein and in Isaza Tuzman's other post-trial submissions, the

Court should grant Isaza Tuzman a new trial for Counts Four, Five and Six.  *See* Fed. R. Crim. P.

33.


Date:  July 19, 2019                          Respectfully submitted,
       New York, New York


                                              GIBSON, DUNN & CRUTCHER LLP


                                              By*:*   ___*/s/ Avi Weitzman*_____
                                                     Avi Weitzman
                                                     (aweitzman@gibsondunn.com)

                                              200 Park Avenue
                                              New York, NY  10166
                                              Telephone:    (212) 351-4000
                                              Facsimile:    (212) 351-4035

                                              *Attorneys for Defendant Kaleil Isaza Tuzman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19, 2019, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.

    <u>  /s/ Avi Weitzman      </u><br>
Avi Weitzman