UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>KALEIL ISAZA TUZMAN and<br>OMAR AMANAT,<br><br>Defendants. | S8 15 Cr. 536 (PGG) |

**REPLY MEMORANDUM OF KALEIL ISAZA TUZMAN FOLLOWING THE**
***FATICO* HEARING**

GIBSON, DUNN & CRUTCHER LLP

AVI WEITZMAN
JUSTINE GOEKE
DAVID SALANT
*aweitzman@gibsondunn.com*
*jgoeke@gibsondunn.com*
*dsalant@gibsondunn.com*
200 Park Avenue
New York, NY 10166
Telephone:     (212) 351-4000
Facsimile:      (212) 351-4035

*Attorneys for Defendant Kaleil Isaza Tuzman*

# TABLE OF CONTENTS

**Page**

I. DR. VOETMANN'S COUNT FOUR LOSS AMOUNT ESTIMATE IS BASED ON AN UNRELIABLE METHODOLOGY REJECTED BY THE SUPREME COURT............. 1

    A. Supreme Court Precedent Forecloses Dr. Voetmann's Methodology. .............................. 1

    B. The Government and Dr. Voetmann Cannot Merely Presume Causation. ......................... 2

    C. The Government Cannot Defend Other Methodological Flaws in Dr. Voetmann's Analysis .................................................................................................................. 4

II. THE GOVERNMENT CANNOT RESOLVE THE MULTIPLE METHODOLOGICAL DEFECTS IN ITS LOSS ESTIMATE FOR COUNT SIX. ............... 6

CONCLUSION ................................................................................................................. 13

Defendant Kaleil Isaza Tuzman respectfully submits this reply memorandum of law following the *Fatico* hearing held on April 1–2, 2019.

**I.   DR. VOETMANN'S COUNT FOUR LOSS AMOUNT ESTIMATE IS BASED ON AN UNRELIABLE METHODOLOGY REJECTED BY THE SUPREME COURT.**

**A.   Supreme Court Precedent Forecloses Dr. Voetmann's Methodology.**

The government cannot avoid that its loss amount estimate for Count Four squarely violates the holding of *Dura Pharmaceuticals* and its progeny. The Supreme Court has stated: "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Dura*, 544 U.S. 336, 342 (2005). That is because, in order to suffer loss from securities fraud or market manipulation, shareholders must first buy the stock at an inflated price, and then sell the shares after the inflation dissipates. Dr. Voetmann's analysis did not undertake to estimate any such losses to KIT Digital investors from market manipulation, but merely measured the total dollar value of price inflation (abnormal stock returns) in KIT Digital. This violates binding Supreme Court precedent and cannot be used to measure loss amount here. *See* Opening Post-*Fatico* Br., ECF No. 965 ("Br.") 13–14 & n.4 (collecting Second Circuit law).

The government has not proffered—and the defense has not found—a single case supporting Dr. Voetmann's price-inflation methodology. The government instead claims that Professor Ferrell's trial testimony and event study somehow justify the government's approach. *See* Gov't Opp'n Br., ECF No. 993 ("Opp'n") 21. The government inexcusably misstates the record. Professor Ferrell did not purport to analyze loss amount or to attribute causation to any abnormal returns. Nor did Professor Ferrell testify to an appropriate methodology to quantify loss amount in a manipulation case. In any event, Professor Ferrell's testimony cannot serve to permit the government's reliance on a methodology rejected by the Supreme Court.

The government complains that calculating loss for market manipulation is difficult because "there was no corrective disclosure." Opp'n 22–23.  That is a non-sequitur.  To prove loss to third party shareholders, an analysis was needed to explore whether and to what extent shareholders purchased KIT digital stock at inflated prices and sold it after the inflation dissipated.  In a typical pump and dump manipulation case, that is easily done irrespective of a corrective disclosure because the price of the stock drops once the inflationary activity ends.  But here, there was no such stock drop.  The data needed to reasonably estimate shareholders' loss in this context—including "blue sheets" of KIT Digital trades—was available to the government but not provided to Dr. Voetmann.  Fatico Tr. 289–90.  The absence of a corrective disclosure does not relieve the government of its burden to reliably estimate *loss*, not just price inflation.

**B.     The Government and Dr. Voetmann Cannot Merely Presume Causation.**

Separate and apart from conflating stock price inflation with shareholder loss, Dr. Voetmann's analysis is missing another link in the chain: that the "particular losses were 'directly and proximately' caused by" the offense of conviction.  *United States v. Gushlak*, 728 F.3d 184, 197 (2d Cir. 2013) (citation omitted).  In its opening brief, the defense explained how Dr. Voetmann made two erroneous assumptions: *first*, that any positive residuals found by Professor Ferrell's event study were caused by Maiden's trading; and *second*, that all shares purchased by Maiden throughout the conspiracy period were inflationary trades within the scope of the charged market manipulation scheme.  Br. 16–20.

The government now acknowledges "an inference must be drawn to attribute causation to Maiden" and asserts it may be drawn from the trial record and the jury's conviction on Count Four.  Opp'n 15–17.  Not so.  The jury's conviction under Count Four was for the crime of conspiracy, not the substantive offense of market manipulation.  And Maiden's testimony that he sought to affect the market is neither proof that he did so nor probative of *how much* inflation he

2

might have caused. There was no proof offered at trial that Maiden's trading had any effect on the price of KIT Digital stock; in fact, the evidence was to the contrary. *See* KIT Ex. 3922.

The government concedes, as it must, that "there were occasions when [Maiden] manipulated KITD stock for purposes outside the market manipulation conspiracy." Opp'n 17. But Dr. Voetmann made no effort to distinguish Maiden's trading within the conspiracy from his manipulative trading outside the conspiracy, nor even from his non-manipulative trading during the same time frame. That alone renders Dr. Voetmann's methodology unreliable. The government wrongly contends that the $10.4 million loss amount is based on the 11 days where the trial record shows Maiden Capital traded in furtherance of the charged conspiracy. *Id.* The government tellingly cites nothing in the trial record to support that. The Maiden trading days the government highlighted at trial (based on testimony and documents from Maiden and Peter Melley) are listed on KIT Ex. 3922 (ECF No. 966-6); the evidence showed no statistically significant stock price increase on any of those alleged manipulation dates. In contrast, the 11 dates that Dr. Voetmann relied on came from KIT Ex. 3923, which reflects the days on which there was a statistically significant price increase in KIT Digital stock and *any* Maiden Capital trading without regard to claimed manipulation. *Compare* KIT Ex. 3923 (ECF No. 966-7) *with* DX F113 (showing Voetmann's "11 days"). With the exception of December 31, 2008, Maiden did not testify, and the government introduced no documents remotely suggesting, that Maiden attempted to manipulate the stock in furtherance of the charged conspiracy on those 11 days. In other words, there is a *complete disconnect* between the days Maiden claimed he attempted to manipulate the stock—days on which Professor Ferrell found no abnormal returns (KIT Ex. 3923)—and the days of actual statistically significant movements in KIT Digital stock.

3

Finally, the government mishandles the fact that Maiden's trading accounted for small—at times miniscule—proportions of KIT Digital's daily trading volume. The problem is not that Dr. Voetmann failed to "weight" his figures by Maiden's proportion of daily buy volume, Opp'n 17, but that Maiden's small-volume trading renders it extremely unlikely (if not impossible) that Maiden caused statistically significant movements in the price of KIT Digital stock on those dates. Dr. Voetmann offered no explanation for how a daily buy volume of 4%, 1% or even 0% (as listed in his work) could cause price inflation. *See* DX F113. The more likely cause of statistically significant movements on those days is inflows and outflows from larger players in the market—those trading the remaining 85–95% of the day's volume. Neither the government nor Dr. Voetmann addresses this methodological defect.

In a half-admission on this point, the government now offers to eliminate all days on which Maiden represented less than 5% of trading volume, Opp'n 17–18, but provides no principled basis (or expert testimony) for its arbitrary 5% line. Had the government chosen an equally arbitrary 15% cut-off, the result would be that only Maiden's trading on December 31, 2008, could have conceivably caused any harm. The Court should reject loss amount methodologies that presume causation based on arbitrary lines lacking economic rationale.

### C. The Government Cannot Defend Other Methodological Flaws in Dr. Voetmann's Analysis.

The government does not respond to additional methodological defects that render Dr. Voetmann's estimate of loss amount fundamentally unreliable (and grossly inflated). The defense explained that Dr. Voetmann's methodology improperly examined only daily *increases* in KIT Digital's stock, without regard for *decreases*, creating a one-way ratchet that repeatedly charges defendants with the same price inflation over and over. Br. 27–29. Additionally, Dr. Voetmann's methodology considers only Maiden's *purchases* of stock and ignores his *sales*, thus

4

assuming all of Maiden's purchases were inflationary, but ignoring that his sales would have had an offsetting effect.  Br. 29–31.  By omission, the government tacitly acknowledges these defects.

In other instances, the government attempts to elide flaws in Dr. Voetmann's methodology by abandoning elements of his work altogether.  For example, the defense explained how two of Voetmann's estimates were calculated without regard for statistical significance, a breach of accepted practice in event studies and the field of econometrics.  Br. 31–32.  Although the government now purports not to rely on these estimates, Opp'n 12 n.2, it continues to tout his 11 day-estimate as a "conservative approach," Opp'n 14, 23.  Likewise, the government advanced a Count Four loss amount methodology to the Probation Department that even their proffered expert could not endorse, Fatico Tr. 270–21, which methodology the government now says it has abandoned, Opp'n 12 n.2.  The government's shifting positions do not reflect a principled analysis of loss amount—it shows a methodology that crumbles and must be dramatically modified or abandoned when properly pressure tested by the defense.

In similar fashion, the government now no longer seeks to include shares owned by Isaza Tuzman himself within its loss amount calculation after the defense highlighted that Dr. Voetmann's methodology evaluated price inflation across the entire shareholder base (Opp'n 20)—a tacit acknowledgement of this defect in Dr. Voetmann's original analysis.  Yet the defect remains uncured because the loss amount continues to include Maiden's stock ownership in KIT Digital, thus punishing Isaza Tuzman for price inflation experienced by Maiden.  This continued defect underscores an irony and lack of proportionality in this case, as the government effectively concedes that Isaza Tuzman did not sell a single share of stock during the charged inflationary period and made no trading profit whatsoever.  Br. 49.

The government also does not make any real effort to rebut the numerous pieces of confounding news that Dr. Voetmann failed to review.[1]  Opp'n 20–26.  The government instead abandons an additional 5 days from Dr. Voetmann's 11-day analysis.  Repeated abandonment of loss amounts advanced by Dr. Voetmann reflects the unreliability of Dr. Voetmann's methodology.[2]  *See United States v. Olis*, 2006 WL 2716048, at *9 (S.D. Tex. Sept. 22, 2006) (rejecting government expert's report given wide range in expert's low and high estimates).

A defendant whose life and liberty is at stake ought not be subject to the logical flaws in and constant moving-target of the government's latest loss amount methodology.  The government's unreasonable, roving positions on loss amount reflect over-reach, while unnecessarily multiplying these proceedings and wasting judicial resources.[3]  The government has failed to provide a reliable, accepted methodology to calculate loss amount for market manipulation, and its moving-target loss amount estimates should thus be rejected.  *See United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003) ("At sentencing, disputed factual allegations must be proven by the government by a preponderance of the evidence[.]" (citation omitted)).

## II.  THE GOVERNMENT CANNOT RESOLVE THE MULTIPLE METHODOLOGICAL DEFECTS IN ITS LOSS ESTIMATE FOR COUNT SIX.

As demonstrated in defendant's opening post-*Fatico* brief, the government's approach to calculating loss amount for Count Six is fundamentally and irrevocably flawed.  Among other things, Dr. Niden improperly relied on an overbroad and generalized November 2012 8-K as a

---

[1] The government scavenged to identify an April 7, 2009, earnings call captured in Dr. Voetmann's Factiva database.  But that is not one of the 11 days within Dr. Voetmann's "low-end" analysis, Opp'n 19, and does not rebut the other confounding events that Dr. Voetmann failed to identify or disentangle.

[2] The government contends that the confounding-news critique is "inconsistent with Professor Ferrell's event study."  Opp'n 18.  But Ferrell never sought to measure loss, and thus had no reason to identify confounding news.

[3] The government criticizes the defense for not advancing an alternative loss amount theory for Counts Four and Six, falsely contending that Isaza Tuzman advocates for a loss amount of zero.  *See* Opp'n 4, 11–12.  This ignores that the defense has suggested that "unlawful gain" substitute for an incalculable loss amount, Br. 46–49, and improperly shifts the burden of persuasion, which concededly rests with the government, Opp'n 3.

6

proxy for the fraudulent scheme of which Isaza Tuzman was convicted; failed to disentangle numerous pieces of confounding news announced in and alongside the November 2012 8-K; improperly assumed that the price of the stock was inflated by the same amount throughout the conspiracy period; and failed to account for investors' recovery through the bankruptcy process. The government's response does nothing to rebut these defects, each of which is independently fatal to the government's Count Six loss amount calculation.

**(1) *Overbroad 8-K***:  The government does not dispute that the November 2012 8-K was a generic disclosure of accounting "errors and irregularities" that went far beyond the accounting fraud in Count Six, in both timeframe and scope, and lacked sufficient detail regarding the severity and potential ramifications of the issues.  Nor does the government deny that the November 2012 8-K failed to disclose the degree of change to the Company's historic financial statements.  Indeed, by stating without elaboration that the accounting errors concerned "perpetual software license agreements entered into by the prior management team in 2010 and 2011," which Dr. Niden acknowledged was a "large component" of the Company's legitimate business, Fatico Tr. 82, the November 2012 8-K left investors to assume the worst about the scope of the problem.  It is thus no surprise that the ensuing stock price drop was so dramatic, as investors had no ability to measure the scope of the accounting errors.[4]

In fact, the government's response does not attempt to defend, or even quote, the actual *language* in the November 2012 8-K, or otherwise explain how the 8-K can stand in for a disclosure of the accounting errors at issue.  The government instead repeats the mantra that Dr. Niden "conduct[ed] an event study" and analyzed the "total mix of information." Opp'n 5.  But

---

[4]  The ambiguity and overbreadth in KIT Digital's November 8-K is in stark contrast to the announcement at issue in the *Ebbers* ruling, which identified with precision the potential impact of the restatement on WorldCom's financial results.  *See* Reply Declaration of Avi Weitzman dated July 26, 2019, Ex. 1 ("The amount of these transfers [that were not in accordance with GAAP] was $3.055 billion for 2011 and $797 million for first quarter 2002").

7

her use of an event study to calculate stock price decline does not mean that the stock drop is an acceptable measure of loss to investors *resulting from* the fraud.  It is no answer to emphasize that the government need only show a "reasonable estimate of loss."  That standard in no way relieves the government from demonstrating the necessary causal link between the stock price drop and the crime of conviction.  *United States v. Grabske*, 260 F. Supp. 2d 866, 871 n.2 (N.D. Cal. 2002); *United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000).

The government further repeats Dr. Niden's testimony that a "full and complete disclosure . . . might have been worse than what was reported here in the 8-K."  Opp'n at 6 (quoting Fatico Tr. 83).  Dr. Niden conceded that there was no "quantitative analysis" to support her testimony, Fatico Tr. 83–84; her conjecture about how the market "might" have reacted to a hypothetical announcement is far outside her claimed expertise and thus irrelevant.  *The Upper Decl Co. v. Breakey Int'l*, 390 F. Supp. 2d 355, 361 (S.D.N.Y. 2005) ("expert's opinion is not a substitute for a [party's] obligation to provide evidence of facts . . . .").

The government also contends that the stock price did not rebound on the next trading day, Opp'n 6, but that is a red herring.  Of course there was no stock price rebound since successor management did not amend its disclosure or restate its financial statements on the next trading day (or ever).  With no new information in the market, investors continued to overreact.

**(2) *Confounding News*:**  The defense's post-*Fatico* brief showed the numerous pieces of news confounding the announcement of accounting errors that Dr. Niden did not disentangle, as required by law.  Br. 37–43.  The government's response only highlights the fundamental flaws in her analysis.  *First*, the government ignores several pieces of confounding news, including the following forward-looking statements contained in the November 2012 8-K:  that KIT Digital is straining to "conserve cash," may need to undertake "additional personnel reductions," is

considering "a broad set of strategic alternatives . . . including a sale of the Company," and may be unable "to operate its business."  The November 2012 8-K thus signaled that KIT Digital was on the verge of bankruptcy or a distressed sale.  To an investor, there is no more alarming announcement from a company.  Each of these disclosures is obviously confounding.  *See* Fatico Tr. 102 (Dr. Niden acknowledged that confounding news is "when there are multiple items of new information that are relevant to the stock value that are disclosed at the same time").  No wonder the stock price dropped far below what would have been expected by a non-confounded accounting errors announcement.  Br. 40–41.  The government's failure to address these individual pieces of confounding news thus confirms the "critical error[s]" in Dr. Niden's analysis, to use Dr. Voetmann's own words.[5]  Fatico Tr. 278–79 & Ex. F111.  Under settled law, her analysis must therefore be rejected.  *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("[T]he court must disentangle . . . inflation of [the stock's] value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *United States v. Olis*, 429 F.3d 540, 548–49 (5th Cir. 2005) (vacating sentence "[b]ecause the district court[] . . . did not take into account the impact of extrinsic factors on [the company's] stock price decline").

*Second*, the government's response to other pieces of confounding news is baseless.  The government attempts to redefine "confounding news" to exclude any items that are "not independent of the company's accounting errors and irregularities, restatement and resulting event of default."  Opp'n 8.  As Dr. Niden acknowledged, however, this re-definition is unprecedented and finds no support in the economic literature.  *See* Fatico Tr. 106–07.  And even though there have been over 1,000 securities class actions involving accounting fraud allegations

---

[5] The government does not attempt to defend Dr. Niden's suggestion that the Company's cash position was public months earlier based on an unidentified analyst's forecast.  As noted, there is a difference between a Company's disclosures and some unidentified analyst's supposed predictions of future cash positions.  Br. 41.

filed in the past decade alone,[6] the government has not identified a single case or court that has accepted its newfound definition of confounding news.

The Second Circuit's decision in *Ebbers* illustrates how unprecedented the government's approach is.  In *Ebbers*, the Second Circuit held that the government's event study and loss calculation was "flawed" because it failed to account for the decline in WorldCom's stock resulting from negative business disclosures announced in the very same disclosure regarding WorldCom's accounting errors.  Notably, the business disclosures in *Ebbers* that confounded the government's analysis included, as here, sharp reductions in capital expenditures, anticipated lay-offs, and the abandonment of non-core business.  Yet the Second Circuit did not explore whether those business issues were "independent of" or "flowed from" the accounting errors disclosed in the same announcement.  See *Ebbers*, 458 F.3d at 128.

Even accepting *arguendo* its definition of "confounding news," the government fails to provide a factual basis to conclude that the Company's cash position (or any other identified confounding events) was the direct result of the accounting fraud.  Mr. Isaza Tuzman had already resigned as CEO of KIT Digital in March 2012; the Company's cash spending in the six months thereafter could not have been caused by his conduct, but rather was driven by successor management's business decisions.  Indeed, it has been amply demonstrated that vulture fund JEC Capital undertook efforts to acquire the company at a "fire-sale price" through bankruptcy, which is consistent with JEC Capital's business model and explains why the Company's cash position was quickly dwindling.  ECF No. 794 ¶¶ 35-40; *see also* ECF No. 793 at 49–50.

---

[6]  *See* Elaine Harwood, Frank Mascari & Laura Simmons, Accounting Class Actions Filings and Settlements—2018 Review and Analysis, Harvard Law School Forum on Corporate Governance and Regulation (May 2, 2019), https://corpgov.law. harvard.edu/2019/05/02/accounting-class-actions-filings-and-settlements-2018-review-and-analysis/.

The government has not provided any analysis of the Company's books and ledgers to show the cause for the cash depletions.[7] Indeed, any number of circumstances separate from the accounting fraud may have caused the reduction in KIT Digital's cash after June 2012. For instance, in its prior quarterly report the Company warned investors of risks to customer renewals if KIT Digital failed to develop new products and technologies to keep up with industry changes or if the KIT Video Platform saw a reduction in performance or functionality. Weitzman Declaration dated Apr. 25, 2019 (ECF No. 966) ("Weitzman Decl."), Ex. 21 at 37–38. Analysts and investors understood that the cash disclosures by the Company showed that KIT Digital had "burned $26.3M since June 30" (after Isaza Tuzman left the Company). Weitzman Decl. Ex. 16. That is a business problem unrelated to the fraud.

In fact, the actual evidence contained in the November 2012 8-K shows that the Company's cash position was distinct from the accounting errors and irregularities. The cash depletion disclosure was in the "Item 8.01" section of the November 2012 8-K titled "Other Events," which separates it from the "Item 4.02" disclosure regarding accounting errors and irregularities. Company management knew how to assert that an adverse event was arguably "caused" by the accounting errors. *See* GX F2 at 2 ("as a result of the restatement discussed above, there is an Event of Default under the secured loan facility"). There was no similar assertion relating to the Company's cash position.

The government also concedes that Dr. Niden failed to make any effort to disentangle the effect of the concededly "potential negative news" resulting from the filing of the November 21, 2012 Form NT 10-Q, announcing the indefinite delay of the Company's Q3 10-Q filing. DX

---

[7] Indeed, as revealed by withheld documents from former KIT Digital employee Kevin Cronin, Robin Smyth submitted $2.8 million dollars for "reimbursement" from KIT Digital, more than $2 million of which was still pending as of May or June 2012, after Isaza Tuzman left the Company. ECF No. 999 at 10–13. If successful, Smyth's embezzlement efforts would have had a substantial effect on the Company's balance sheet.

11

F105; Fatico Tr. 153–54.  The government contends this is non-confounding because it was "the direct result of the need to restate, not a separate and independent piece of news."  Opp'n 8.  The government's claim relies on the government's never-before-accepted definition of confounding news.  And there is no evidence in the record to support its assertion,[8] as companies routinely restate after announcing accounting errors and irregularities, ECF No. 794, ¶ 48, and the evidence shows that JEC Capital sought to depress the price of KIT Digital stock, *id.* ¶¶ 35–40, to which a Form NT 10-Q certainly would have contributed, DX F106 at 29 ("late 10-Q filings have distinct valuation implications," "thus demonstrat[ing] the importance of timely release of accounting information, even when it is unaudited").

Likewise, the government did not inquire why Dr. Niden failed to account for the confounding news of Isaza Tuzman's press release issued on November 23, 2012.  *See* Br. 39.  So the government now invents a false explanation nowhere in the record—that the press release was "perceived as at least neutral or positive news."  Opp'n 8.  But the thrust of the press release "disparag[ed] current management for mismanaging the business," as analysts well understood.  *See* DX F101; Weitzman Decl. Ex. 28 (Isaza Tuzman's press release complained about "deficient management" at KIT Digital, "poor business execution," and "mismanagement").  The disparaging press release was undoubtedly confounding.

**(3) *Presumed Uniform Inflation*:**  Courts regularly reject as imprecise and unfair a loss amount analysis that "assumes that the price of the stock was inflated by the same amount during the entire period prior to the fraud's disclosure."  *Grabske*, 260 F. Supp. 2d at 870; *see also In re California Micro Devices Sec. Litig.*, 965 F. Supp. 1327, 1333 (N.D. Cal. 1997).  The

---

[8] The Court gave the government an opportunity to examine Dr. Niden on redirect about the reasons for her failure to disentangle KIT Digital's report Form NT 10-Q, *see* Fatico Tr. 151–52, but the government elected not to inquire on this point on redirect.  The government cannot now fill that evidentiary gap with its own *ipse dixit*.

12

government does not dispute this principle, but instead contends that Dr. Niden "concluded that KITD's stock was inflated by *at least* $1.35 per share, not that it was constant." Opp'n 9. But that is no answer—as Dr. Niden acknowledged, Fatico Tr. 64:22–65:3, her analysis still "assume[d] that the price of the stock was inflated by the same amount during the entire period prior to the fraud's disclosure," *Grabske*, 260 F. Supp. 2d at 870. Indeed, Dr. Niden also agreed that the "charged accounting fraud increased over time," revealing why it was improper to assume a uniform increase in price. For this additional reason, Dr. Niden's loss amount methodology is unreliable and should be rejected.

## CONCLUSION

For the foregoing reasons, Isaza Tuzman respectfully requests that this Court reject the government's proffered loss amounts, hold that no loss can reasonably be determined, and alternatively use unlawful gain as a substitute for loss.

Date:  July 26, 2019
       New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: **/s/ Avi Weitzman**
    Avi Weitzman
    (aweitzman@gibsondunn.com)
    Justine Goeke
    (jgoeke@gibsondunn.com)
    David Salant
    (dsalant@gibsondunn.com)

200 Park Avenue
New York, NY  10166
Telephone:   (212) 351-4000
Facsimile:   (212) 351-4035

*Attorneys for Defendant Kaleil Isaza Tuzman*