**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 29, 2019

**BY ECF**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

       Re:    <u>United States</u> v. <u>Omar Amanat and Irfan Amanat,</u>
                     S8 15 Cr. 536 (PGG)

Dear Judge Gardephe:

       The Government respectfully submits this letter in response to defendant Irfan Amanat's ("Irfan") August 15, 2019 letter (Dkt. No. 1020, the "Irfan Letter"), and defendant Omar Amanat's ("Omar" and collectively with Irfan, the "Amanats") August 28, 2019 letter (Dkt. No. 1027, the "Omar Letter") regarding the *Fatico* hearing currently scheduled for September 5, 2019. Through their letters, the defendants essentially raise two issues. First, the defendants seek additional discovery in advance of the *Fatico* hearing. (*See, e.g.*, Irfan Letter at 2 (seeking additional *Giglio* material); Omar Letter at 1-2 (listing categories of documents)). Prior to filing their letters, neither counsel had expressed any concern with the discovery they had received from the Government, nor have they contacted the Government to make any discovery requests in the months leading up to the hearing. At this point, the Government submits that is appropriate for the parties to confer in the first instance about the propriety and scope of discovery, and the parties can bring any disputed matters to the Court's attention prior to the *Fatico* hearing.[1]

       Second, the defendants' letters, in particular the Irfan Letter, assert a variety speculative claims that sound in the realm of due process violations based on prosecutorial misconduct. These claims are baseless and outlandish, and entirely without merit. They raise no need for a hearing or any other relief. The remainder of this letter and the accompanying sworn declaration of FBI Special Agent Julie Amato ("Amato Decl.") will provide the Court with the relevant factual record, and the proper basis upon which the Government will seek an obstruction-enhancement in connection with both Irfan and Omar's sentencings.

---

[1] To that end, the Government does not object to a brief adjournment of the hearing.

I.        Procedural History

As the Court is aware, both Omar and Irfan were convicted following jury trials in 2017 and 2018, respectively.  On December 26, 2017, Omar was convicted of one count of conspiracy to commit wire fraud, one count of wire fraud, one count of aiding and abetting investment advisor fraud, and one count of conspiracy to commit securities fraud.  After trial, Omar was remanded based on, among other things, his risk of flight and his "disregard and disdain for the Court and for legal process" as evidenced by his fabrication of evidence at trial.  (Omar Tr. 7328).  Irfan was severed for trial, and his trial concluded on October 29, 2018, when the jury returned a verdict finding him guilty of one count of conspiracy to commit wire fraud, one count of wire fraud, one count of aiding and abetting investment advisor fraud, and one count of conspiracy to commit securities fraud, to make false statements in SEC reports, and to make false statements to auditors. Immediately following the jury's verdict, the Government sought to have Irfan remanded based on the fact that prior to the trial, Irfan (along with Omar) had attempted to fabricate evidence by creating a fraudulent affidavit for submission to this Court falsely reflecting that cooperating witnesses Steven Maiden and Robyn Smyth had been paid by a business rival of Omar to testify falsely against Omar (the "Obstruction Conduct")[2].

The Government had intended to present evidence of the Obstruction Conduct primarily through the testimony of an FBI confidential human source, Spyros Enotiades (the "CHS"), who is a percipient witness to Irfan and Omar's attempt to create the false affidavit concerning these purported payments.  Accordingly, on October 25, 2018, before the trial concluded and in anticipation of the need to present this evidence following the close of trial, the Government submitted an *ex parte* letter under seal to the Court informing the Court that the Government was in possession of evidence concerning the Obstruction Conduct, but would not be disclosing such evidence to Irfan until after the verdict because of "concerns that [Irfan] would flee if he learned that the Government had evidence of his obstruction (particularly, evidence obtained from the [CHS]) and intended to seek his remand based on such evidence."  In other words, the Government did not disclose the Obstruction Conduct to Irfan during trial because of the heightened risk of flight it would create.  Once the trial concluded, however, the Government immediately provided Irfan with approximately 10 hearing exhibits as well as the 3500 materials for the CHS, including approximately 17 recorded prior statements of the CHS that were relevant to the Obstruction Conduct, all in advance of the anticipated hearing.

Shortly before the post-verdict hearing was set to occur, however, the CHS began to exhibit symptoms consistent with a heart attack.  Accordingly, he was rushed to the hospital by FBI agents and was unable to testify.[3]  The Government proceeded to introduce evidence of the Obstruction

_____

[2] With respect to Omar, the Obstruction Conduct provides an additional basis for an obstruction enhancement, as an enhancement would already be warranted based on Omar's introduction forged emails into evidence at trial.

[3] ████████████████████████████████████████████

Conduct through the hearsay testimony of Special Agent Julie Amato, the FBI's case agent for this matter, as well as documents, including a draft of the false affidavit that was sent to the CHS. (*See, e.g.*, Irfan Tr. 921-930; GX-4001). At the close of the hearing, the Court remanded Irfan based on his risk of flight, particularly in light of the "overwhelming" evidence presented against him at trial. (Irfan Tr. 948-51). In making that determination, the Court did not take into account the evidence of the Obstruction Conduct admitted through Special Agent Amato, but instead adjourned the hearing to a future date at which the Government could present its obstruction-related evidence to the extent that it was relevant to bail and/or an obstruction enhancement at sentencing. The Court then set the *Fatico* hearing for April 5, 2019, but subsequently adjourned the hearing until July 25, 2019 in order to allow Omar, who had obtained new counsel in the interim and to whom the enhancement would equally apply, to participate in the proceedings. (Dkt. No. 943).

On numerous occasions in the summer of 2019, Irfan's trial counsel ("prior counsel") informed the Government that the *Fatico* would not be necessary with respect to Irfan because he would not be objecting to the Government's application for an obstruction-enhancement at sentencing based on the Obstruction Conduct. However, on or about July 22 prior counsel advised the Government that Irfan now wished to contest the enhancement and further advised that communication with their client had broken down to the point that they would need to seek leave to withdraw as counsel. (Dkt. No. 1010). The Government understands that on July 24, 2019, the Court held an *ex parte* conference at which the Court relieved prior counsel of their CJA representation and appointed current counsel who had been newly retained by Irfan. At that time, the *Fatico* hearing was adjourned to September 5 at the request of Irfan's new counsel. Without prior consultation with the Government about the matters addressed therein, Irfan filed the Irfan Letter on August 15, followed by the Omar Letter on August 28.

## II.   The Government's Discovery of the Obstruction Conduct

As noted above, the Government's evidence about the Obstruction Conduct comes from the CHS.



The CHS has also testified at trials, including trials conducted by the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"), wholly unrelated to the Amanats (*see, e.g.*, Irfan Letter at 2).

In 2009, the CHS worked as a source for an FBI squad in Texas and was compensated for that work. (Amato Decl. ¶ 5). The FBI squad in Texas did not work on this matter, and the CHS's work with that squad had no relation to the Amanats. (*Id.*). In or about August 2011, the CHS

became a source for the FBI's New York squad that was involved in this matter and the CHS was supervised by a member of the squad (the "FBI Handling Agent"). (Amato Decl. ¶ 6). Between 2011 and 2013, as part of his work with the FBI New York squad, the CHS was tasked with "relatively few assignments." (*Id.*). None of these assignments had any relation to the Amanats, and the CHS was last paid for his work by the FBI New York squad in 2013. (*Id.*). Between 2011 and 2017, the CHS continued however to "provide the FBI Handling Agent with unsolicited information about matters of potential interest to the FBI." (*Id.* ¶ 7). No information provided during this time related in any way to the Amanats. (*Id.*). ██████████████████████████████
████████████████████████████████████████████████████████

On or about July 20, 2018, the CHS first mentioned to the FBI Handling Agent that he had information related to the Amanats, and the FBI Handling Agent promptly informed Special Agent Amato of this fact. (*Id.* ¶ 9). Amato first spoke with the CHS about the Amanats on or about July 31, 2018, and spoke or met with the CHS over a dozen times between August and October 2018. (*Id.* ¶ 10). Amato also attended a few meetings with the CHS and the USAO-SDNY in August and October of 2018. (*Id.*). Each of these meeting was memorialized in FBI notes (the "FBI Reports"), and all of the FBI Reports were provided to the USAO-SDNY by October 29, 2018. (*Id.*). All of the information that the CHS provided to the FBI and the USAO-SDNY between July and October 2018 related to past events that had occurred in connection with the Amanats. (*Id.* ¶ 12). "At no time did the FBI task or direct [the CHS] to take any action relating to either Omar or Irfan Amanat." (*Id.* ¶ 13.). To the contrary, Amato instructed the CHS on more than one occasion that the FBI was specifically not asking or directing him to take any action with regard to the Amanats. (*Id.*). "At no time has the FBI compensated [the CHS] in any manner, financial or otherwise, for the information he provided regarding Omar and Irfan Amanat." (*Id.* ¶ 14). During his meetings with the FBI and the USAO-SDNY in August through October of 2018, the CHS provided information about the Obstruction Conduct as well as relevant documents and communications. (*Id.* ¶¶ 15-16).

As set forth above, the Government provided the FBI Reports to Irfan's prior counsel before it presented any evidence of the Obstruction Conduct following trial along with its proposed exhibits for the hearing. Based on the Obstruction Conduct, an obstruction enhancement is warranted at sentencing, and the Government remains ready to present the relevant evidence at a hearing.

III.    The Claims in the Letters are Baseless

As the foregoing chronology makes clear, the claims in the Irfan Letter and the Omar Letter raising the specter of due process violations based on prosecutorial misconduct are wholly without merit. The Irfan Letter suggests that the CHS was acting as a Government agent in his communications and interactions with Omar and Irfan in the spring of 2017 and thereby improperly interfered with Omar and Irfan's right to counsel, criminal defense, and other matters. (Irfan Letter at 2-3). At no time during the spring of 2017, however, was the Government improperly interfering with the Amanats through the CHS. In order to determine whether the Government engaged in any improper interference, the first task is to identify the relevant prosecution team. The prosecution team in this case consists of the USAO-SDNY, the FBI, and the U.S. Postal Inspection Service (the "Prosecution Team"). It was members of the Prosecution

Team that gathered evidence, made charging decisions, and participated in Omar and Irfan's trials. Up until July 31, 2018, the CHS never mentioned the Amanats to any member of the Prosecution Team, nor did the CHS take any instruction concerning the Amanats from any member of the Prosecution Team. Accordingly, the Prosecution Team had no knowledge of the CHS's interactions during this time, and no act or statement of the CHS can be imputed to the Prosecution Team. The Government, therefore, could not and did not engage in any prosecutorial misconduct with respect to any interactions between the CHS and the Amanats.

████████████████████████████████████████████████████████ In order to qualify as a member of the prosecution team, an individual or entity must be an "arm of the prosecution" which, at its core, requires the performance of investigative duties and making strategic decisions about the prosecution of the case. *United States v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015); *United States v. Barcelo*, 628 Fed. App'x 36, 39 (2d Cir. 2015). ████████████ Accordingly, the Prosecution Team could not possibly have effectuated any improper interference with the Amanats.

Likewise, the CHS – who never played any role in directing the investigation or prosecution of this matter – cannot be considered an arm of the prosecution and his knowledge cannot be imputed to the Prosecution Team. *See Barcelo*, 628 Fed. App'x at 38 (noting that even an actively cooperating witness is not part of the "prosecution team" for *Brady* purposes unless s/he plays a role in "the investigation or in determining investigation or trial strategy"). Instead, the CHS – who had prior success gathering information and bringing it to the attention of governmental agencies – began communicating with Omar of his own volition in 2017 because the CHS was under the impression that he might be able to get valuable information from Omar regarding terrorism. (Amato Decl. ¶ 15(a)). The decision to engage with Omar was made solely by the CHS, who apparently believed that he could profit if he was able to gather actionable information from Omar. Over the subsequent months, the Amanats communicated with the CHS about their legal issues with the Securities and Exchange Commission as well as criminal authorities, *i.e.*, the instant matter. (*Id.* ¶ 15(c)-(e)). Critically, however, none of these communications or interactions was in any way directed by the Prosecution Team or any other member of the Government. In fact, it had been years since the CHS had received payment from the FBI for any work with which he was tasked. Accordingly, the words or actions of the CHS cannot be imputed to the Government, and there is no basis upon which to conclude that the Government was improperly interfering with a criminal defendant through the CHS.

In addition, any communications between the CHS and the Amanats about the Amanats' defense and/or their counsel occurred without instruction or awareness by the Prosecution Team. In fact, the last time the CHS communicated with the Amanats about anything was in February or March of 2018 – approximately four months before the CHS brought the Obstruction Conduct to the attention of the Prosecution Team. (*Id.* ¶ 15(h)). Simply put, the Government had no role in providing input to the Amanats about their choice of counsel. There is thus no "'Pandora's Box' of possible constitutional violations" that could arise from these interactions. (Irfan Letter at 3). Instead, as noted above, the CHS was interacting with the Amanats in 2017 with the hope of having a mutually beneficial relationship with the Amanats and without the instruction of any

governmental agency.  Months after that relationship ended, the CHS came to understand that the Amanats were involved in fraud and brought their intention to fabricate evidence to the FBI's attention.[4]   It was at that point that the Prosecution Team – based on purely historical information – evaluated what criminal activity it could pursue as a result.

Similarly, Irfan's stated "concerns" about the CHS being involved in advising the Amanats about plea negotiations is misplaced.  (Irfan Letter at 3).  For one thing, the Government cannot fathom what motive Irfan believes the Prosecution Team would even have to instruct someone to advise "Irfan Amanat not to take the plea offer that another representative of the Government was making."  (*Id.* at 4).  More fundamentally though, and as set forth above, any such conversations occurred in the middle of 2017, well before the CHS was ever in communication with the Prosecution Team about the Amanats.  Accordingly, the CHS cannot be considered to have been acting as a Government agent during that time.  In fact, the FBI *never* gave the CHS any instructions with respect to the Amanats.  (Amato Decl. ¶ 13).  The CHS's role in this case vis-à-vis the Prosecution Team was strictly limited to providing historical, incriminating information and being willing to testify regarding the Amanats' serious and well-documented attempt to obstruct justice.  Accordingly, there is no concern that the Government improperly interfered with the Amanats' cases or defenses.

Notwithstanding the dramatic and suggestive rhetoric in the Irfan Letter, no further factual development of these facts is necessary.  In light of the factual record, it is clear that the Prosecution Team had no knowledge or awareness of the CHS's interactions with the Amanats in 2017, and the Government acted properly at all times in its dealings with the CHS in this case.  There is thus no need for a hearing, and no relief is warranted.

---

[4] Likewise, there is no concern of a "lack" of a *Hammad* memo here.  As the Court knows, a *Hammad* memo is required where the Government intends to instruct someone to engage with an individual represented by counsel.  Obviously, there is no need for a *Hammad* memo where the Government never instructs any such interaction.

Conclusion

In sum, the defendants have raised no credible concerns of due process violations, let alone issues that "go to the very integrity of the convictions." (Irfan Letter at 1). To the extent the defendants believe they are entitled to additional discovery before the *Fatico* hearing – including additional 3500 or potential *Giglio* material – the Government will receive and consider any such requests in good faith.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     _____/s/_____
Andrea Griswold / Daniel Tracer
Assistant United States Attorneys
(212) 637-1205/2329