UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>KALEIL ISAZA TUZMAN and OMAR AMANAT,<br><br>                        Defendants. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>15 Cr. 536 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

          Defendants Kaleil Isaza Tuzman and Omar Amanat ("Amanat") are charged with

participating in fraudulent schemes involving Maiden Capital – a North Carolina-based hedge

fund – and KIT Digital, Inc. – a software management company based in Prague and New York

City.  ((S8) Indictment ("Indictment") (Dkt. No. 198))  The (S8) Indictment charges

> Amanat with conspiring to commit wire fraud in connection with a scheme to defraud Maiden Capital investors between March 2009 and June 2012 (Count One);

> Amanat with substantive wire fraud in connection with that scheme (Count Two);

> Amanat with aiding and abetting investment adviser fraud carried out by Stephen Maiden – who operated Maiden Capital – between March 2009 and June 2012 (Count Three);

> Amanat and Tuzman with conspiring to commit securities fraud by manipulating the market for KIT Digital stock between December 2008 and September 2011 (Count Four);

> Tuzman with conspiring to commit wire fraud between March 2009 and March 2011 by participating in a scheme to defraud KIT Digital shareholders by failing to disclose that KIT Digital's investments in Maiden Capital were not part of an arms-length relationship but instead were related-party transactions entered into for an improper purpose (Count Five); and

> Tuzman with conspiring to commit securities fraud between 2009 and 2012 by making false statements to auditors and in U.S. Securities and Exchange Commission ("SEC") filings to conceal KIT Digital's true operating and financial performance.  (Count Six)

(Id.)

Tuzman and Amanat proceeded to trial on October 23, 2017.  (Oct. 23, 2017 minute entry)  In its case-in-chief, the Government introduced more than 400 exhibits and called seventeen witnesses, including three cooperating witnesses:  former KIT Digital chief financial officer Robin Smyth; former KIT Digital president Gavin Campion; and Maiden, the manager of Maiden Capital.  In its rebuttal case, the Government called three witnesses, including FBI Special Agent Joel DeCapua, who offered testimony indicating that Amanat had introduced fabricated emails at trial.

On the defense case, Tuzman called former KIT Digital chief technology officer Andrew Steward; a summary witness who analyzed certain travel and phone records; and Harvard Law School professor Allen Ferrell, who offered expert testimony concerning Maiden's trading activities in KIT Digital.  Amanat called no witnesses, but introduced several dozen exhibits.  In response to the Government's rebuttal case alleging that Amanat had fabricated evidence, Amanat called Emma Rosen, a paralegal employed by defense counsel.

On December 26, 2017, the jury returned a verdict finding both Defendants guilty on all counts.  (Verdict (Dkt. No. 627); Trial Transcript ("Tr.") 7280-82)[1]

Tuzman and Amanat have moved for a judgment of acquittal or a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (Amanat Br. (Dkt. No. 735); Tuzman Br. (Dkt. No. 738))  Amanat argues that (1) the evidence against him is insufficient as to all counts (Counts One through Four) and insufficient to establish venue as to Counts One

---

[1] Amanat's brother Irfan Amanat was charged in Counts One, Two, Three, and Six.  (Indictment (Dkt. No. 198))  On August 9, 2017, this Court granted Irfan Amanat's severance motion.  (Aug. 9, 2017 Tr. (Dkt. No. 380) at 5)  Irfan Amanat proceeded to trial on October 22, 2018.  (Oct. 22, 2018 minute entry)  On October 29, 2018, a jury found him guilty on all four counts.  (Verdict (Dkt. No. 848))

through Three (Amanat Br. (Dkt. No. 735) at 11-35)[2]; (2) the Court erred in permitting Agent DeCapua to offer expert testimony concerning Amanat's alleged fabrication of email evidence (id. at 35-48); (3) Amanat was deprived of an impartial jury because a juror did not disclose her ties to law enforcement (id. at 48-52); and (4) the Government made improper arguments in summation.  (Id. at 53-59)

Tuzman argues that (1) the evidence is insufficient as to the market-manipulation conspiracy charged in Count Four, because no overt acts occurred within the statutory period (Tuzman Br. (Dkt. No. 738) at 11-34); (2) the wire fraud conspiracy charged in Count Five is legally deficient (id. at 34-42); (3) the Government engaged in pervasive misconduct at trial (id. at 42-68); (4) evidence that Amanat fabricated emails unfairly prejudiced Tuzman (id. at 68-73); and (5) "other errors" warrant a new trial.  (Id. at 73-74)  In a supplemental brief, Tuzman argues that his conviction on Count Six must be vacated because the Government withheld information in violation of Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Giglio, 405 U.S. 150 (1972).  (Tuzman Supp. Br. (Dkt. No. 999))  Tuzman also contends that newly discovered evidence regarding Maiden's past drug use warrants a new trial on all counts.  (Id. at 27-28, 34)  For the reasons discussed below, Defendants' motions will be denied in their entirety.

---

[2]  Citations to page numbers of docketed material correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.  Citations to the trial transcript correspond to the pagination generated by the court reporter.

## BACKGROUND

I.    **EVIDENCE AT TRIAL**

    A.    **Maiden Capital Fraud**

       1.    **Maiden's Investment in Enable and Enable's**
           **Issuance of Fabricated Monthly Statements**

Stephen Maiden managed Maiden Capital, a small hedge fund located in Charlotte, North Carolina. In June 2008, Amanat asked Maiden to make an investment in Enable Invest ("Enable"), a Dubai-based asset management firm operated by Amanat's brother, Irfan Amanat. (Tr. 576-77, 790) Amanat told Maiden that the investment was "essentially 'riskless'" and "[v]ery liquid." (Tr. 576-77) Maiden at first declined the invitation (Tr. 582), but in August 2008, he invested $1 million in Enable on behalf of Maiden Capital. (Tr. 544, 583-84, 676, 790) Before making that investment, Maiden confirmed with Amanat that Enable "would provide monthly statements" regarding the investment. (Tr. 584) Maiden asked about monthly statements because he "needed to know how those returns did each month so [that he] could reflect them in the returns [he] sent out to . . . Maiden Capital investors." (Id.)

After Maiden made the investment, he was sent monthly Enable statements, which generally came from Irfan Amanat. (Tr. 585-86, 588-89) The first such statement – issued on October 1, 2008 – showed that Maiden Capital's $1 million investment had grown to $1,025,666.67. (Tr. 589-90; GX 1507 (Oct. 1, 2008 Enable statement)) When Maiden received his monthly Enable balance, he "would send that exact dollar amount to SS&C, [his] fund administrator." (Tr. 590) SS&C "use[d] that number to come up with a combined return number to send out" to individual Maiden Capital investors. (Tr. 796)

In October 2008, Maiden discussed the status of his Enable investment with the Amanat brothers, and they assured him that it was "doing well." (Tr. 592) Maiden, in turn, reported to one of his investors that he was "making good profits." (Tr. 591-92)

In November 2008, Amanat asked Maiden to make an additional $2 million investment in Enable, explaining that Enable needed a one-week short-term loan. (Tr. 624-25) Amanat told Maiden that, if he made the loan, Amanat would cause other entities to invest $5 million in Maiden Capital. (Id.)

Amanat set forth the terms of the proposed short-term loan in a November 8, 2008 email to Maiden. (Tr. 623-24; GX 1509) That email – which includes the subject line "Term Sheet Binding Agreement" – reads as follows:

> Agreement between Steve Maiden and Omar Amanat
>
> $2 million short term (anticipated to be no more than one week) investment into Enable Invest by Maiden Capital.
>
> In return Omar Amanat will cause Trade Up and Saxon International to invest at least $5 million (minimum) into Maiden Capital upon signing of the transaction with Russel Deleon whereby he invests $250 million as per the attached term sheet previously sent (anticipated to be this week[)].
>
> regards
>
> Omar Amanat.

(GX 1509 (Nov. 8, 2008 Amanat email to Maiden); Tr. 624)

Given that Maiden Capital had assets of $8 to $10 million during this period, the proposed $2 million loan to Enable represented a significant percentage of the hedge fund's total assets. (Tr. 626) Maiden "couldn't afford to just not get [the $2 million] back because [he] needed to trade, possibly make redemptions [to his investors]." (Id.) Having those funds "gone" for only the agreed-upon "one week was critical" to Maiden. (Id.) Maiden expressed these

concerns to Amanat.  (Id.; see also GX 1510 at 3)  In the end, Maiden decided to make the loan, sending $2 million to Enable in three separate wire transfers in November 2008.  (Tr. 625, 635)  Based on his discussions with Amanat, Maiden's understanding was that Enable would not invest the funds "anywhere," and would instead maintain them in Enable's "bank account, to be wired right back."  (Tr. 631)  Amanat told Maiden that he intended to use the $2 million as "show money" to induce a much larger investment from Russell Deleon, another investor.  (Tr. 634)

At about this same time – early November 2008 – the Amanat brothers were discussing how Enable could satisfy a more than $1 million redemption request that Tuzman had made on behalf of KIT Digital.  (Tr. 621-23; GX 3051)  KIT Digital was a software technology company that provided "on-demand video management on the internet," and Tuzman served as the company's chief executive officer and chairman of the board.[3]  (Tr. 203, 205, 297, 315)  KIT Digital had previously invested in Enable, but in a November 5, 2008 email to Irfan Amanat, Tuzman requested that that investment be redeemed in light of "unacceptable delays in receiving cash upon request."  (GX 3051)  Irfan Amanat forwarded Tuzman's email to his brother, and asked for help in formulating a response:

Hi Om[ar],

Can you help me make a decision on how to respond best?

1) We are sorry to hear of your decision, but will be happy to process your account as always. Please note, as per my records, I received the request for $1,250,000 on Oct[ober] 28, and so we are still processing that request within our agreed upon two-week window.

---

[3]  KIT Digital was initially Roo Group.  (Tr. 568, 2282, 3061)  The company's name was changed to KIT Digital in 2007 when Tuzman became its CEO.  (Tr. 2284-85)  The new name reflects the initials of Tuzman's name.  (Tr. 2285)

2) Keep the story simple. "Sorry, guys. Have been busy on some matters. Got caught up. Remaining funds coming on X date. Nothing to worry about. How else can I help you?["]

(Id.)

Omar Amanat responded to Irfan as follows:

You need to respond that "we understand and will process the termination as soon as practicable.  Please bear in mind that due to recent historic and unanticipated market conditions[,] funds have been placed with one counter-party who has a history of long delays in payments to us but has historically always come through.  We apologize for any inconvenience this has caused your firm and are seeking ways to rectify it immediately.["]

(Id.)

Irfan Amanat responded to his brother's proposed language as follows:

You sure about this response?  Don't want to create any more concern, a little friendlier one would be better, no?

Anyway, trying to free up cash to pay the 1.05 million.  Any more funds you could get would be good. . . .

I think we triage on [KIT Digital] first.  Do you disagree?

(Id.)

Enable ultimately used the proceeds from Maiden's $2 million short-term loan to fulfill KIT Digital's redemption request.  (Tr. 678-79, 863-64)  As a result, Maiden's $2 million was not returned after the agreed-upon one week period.  (Tr. 635)  In subsequent weeks, Maiden asked Amanat when the $2 million would be returned, and Amanat "always" claimed that the money had not been returned because "the deal with Russ DeLeon still hadn't closed." (Tr. 635-37)

These conversations took place over the phone and at a "black tie" "charity event hosted by [Amanat's] wife, the super model, Helena Houdová . . . in Manhattan."  (Tr. 635-36) Maiden met Omar Amanat for the first time at this event.  (Tr. 636)  During an auction at this

charity event, Amanat bid $250,000 for a vacation on a "private island."  (Id.)  This bid made

"the room gasp[]" and comforted Maiden that Amanat would arrange for Enable to return

Maiden's investment.  (Id.)

On December 31, 2008 – before Maiden learned that his $2 million investment in

Enable had been used to redeem KIT Digital's investment in that company – Maiden, Amanat,

and Tuzman entered into an agreement to manipulate KIT Digital's stock price.[4]  (Tr. 637-40)

During discussions related to that agreement, Amanat convinced Maiden to delay redeeming his

Enable investment.  (Tr. 650-51)

In a January 5, 2009 email to Irfan Amanat, Maiden expressed concern about a

December 2008 Enable account statement.  (GX 2967)  In that email, Maiden states:  "I'm kind

of confused by the returns here.  I had 3,031,346.00 at the beginning of December.  According to

this I had 3,039,920.67 at the end of Dec.  So only made 8k over the month . . . on 3 million of

assets?"  (Id.)  The Amanat brothers discussed by email how to respond to Maiden's inquiry.

(Id.)  During this exchange, Amanat told Irfan Amanat to "[c]oordinate [with] me on this.  He

needs to show good year end returns.  Say you didn't include the waiving of fees or something."

(Id.)  Irfan Amanat responded, "what annual % return?  I am giving 9%, but what is agreed?"

Amanat then wrote, "[h]e wants to show closer to 17 percent.  It[']s all irrelevant since he can't

withdraw. . . ."  (Id.)

In a February 11, 2009 email to the Amanat brothers, Maiden requested the return

of $500,000 of Maiden Capital's money.  (GX 2975)  Maiden explained that he could not

"operate [his] business" and that he had "almost no free trading cash in [his] account and ha[d] to

---

[4]  That agreement is discussed in more detail below, in connection with an analysis of the
evidence concerning the charged market-manipulation conspiracy.

meet redemptions." (Id.)   After receiving Maiden's email, Irfan Amanat emailed his brother: "Om[ar], can we do anything?" (Id.)  Amanat responded:  "Yes send him back $500k asap.  Oh I forgot, we don't have it!!!!!!!!!!  That is why this an absurd question . . . ." (Id.)

### 2.   Maiden Is Told that His Investment in Enable Has Been Lost

In a March 8, 2009 telephone conference that included Maiden, the Amanat brothers, and Tuzman, Irfan Amanat informed Maiden that he "couldn't redeem any . . . of [his] Enable investment," because "the money wasn't there and they couldn't access the money." (Tr. 660-61)  During this call, Omar Amanat told Maiden that Maiden Capital's investment was inaccessible because "the bank where the funds were kept had frozen or gone out of business or something in the craziness of the market in the fall of 2008." (Tr. 661)  From that point forward, Maiden, the Amanat brothers, and Tuzman "started referring to [Maiden Capital's lost investment] as the Enable hole, money that had vanished, was gone." (Tr. 664; see also id. at 647 (testimony regarding an email from Amanat, to Maiden and Tuzman, referencing the "Enable hole"))

Later that day, Maiden called Omar Amanat and "expressed how urgently that money was needed to pay redemptions to just operate [Maiden Capital] legally." (Tr. 663-64)  During the call Amanat "very calmly," said to Maiden:  "Don't worry about it.  There are a lot of assets here in KIT Media.  Among the parties.  We'll figure out a way to deal with this."[5] (Tr. 663)

The morning after his call with Omar Amanat, Maiden spoke with a Maiden Capital investor and "lied to the investor" about the status of his investment, stating that

---

[5]  KIT Media was a special investment vehicle controlled by Tuzman that held digital media investments.  (Tr. 294-95, 3765)  KIT Media's primary asset was KIT Digital stock.  (Tr. 294, 568-69, 3765-66)

"everything was fine, the fund's doing well, having an OK month." (Tr. 676) Maiden called

Amanat and "told him that [he] had just lied to [his] investor, and [they] needed to figure this

out." (Tr. 677) Maiden told Amanat that he "was desperate for money," given the loss of "$3

million that [Maiden] thought [he] had in Enable." (Id.)

Amanat suggested that he and Maiden have a call with Tuzman that night to

discuss a "settlement agreement." (Tr. 677-78) During that call and in other March 2009

conversations, Maiden learned that the Amanat brothers had used Maiden Capital's investment

in Enable to satisfy KIT Digital's redemption request. (Tr. 678-79, 864)

On March 10, 2009, Tuzman arranged for KIT Digital to wire Maiden a $200,000

investment, which was designed – in part – to assist Maiden in satisfying pending redemption

requests. (Tr. 664, 675, 739, 1952) As discussed below, however, Maiden also used these funds

to buy KIT Digital stock, in furtherance of the charged conspiracy to manipulate KIT Digital's

stock price. (Tr. 1893)

### 3. Maiden Obtains Fabricated Enable Account Statements and Uses these Statements as the Basis for Fabricating Maiden Capital Investor Account Statements

In a September 2, 2009 email to the Amanat brothers, Maiden states in the subject

line: "guys, i need my [E]nable balance NOW – need to put out num[bers]." (GX 1625)

Maiden testified that he needed an account statement from Enable to "put out [Maiden Capital's]

returns to [his] investors." (Tr. 795-96) At this point, Maiden "knew that there was no money in

Enable." (Tr. 796)

Omar Amanat responded to Maiden's email by asking his brother, "[I]rfan can

[you] get this immediately?" (GX 1625) Irfan Amanat later sent Maiden a statement reflecting

Maiden Capital's balance in Enable at various dates in 2009. (GX 1624 (Enable statement); Tr.

796)  The statement Irfan Amanat sent to Maiden on September 2, 2009, indicates that, as of

August 31, 2009, Maiden Capital has an "[a]vailable [b]alance" of $2,120,132.67.[6]  (GX 1624)

Maiden testified, however, that he "knew" at the time that none of Maiden Capital's money was

actually "available."  (Tr. 796-97)  In 2009, Maiden told Omar Amanat that the numbers he was

providing to Maiden Capital investors "were false because Enable, which we all knew was

nonexistent, was in my numbers."  (Tr. 805)

### 4.      Omar Amanat's Loans to Maiden Capital to Fund Redemption Requests

In March 2011, Maiden received a $1 million redemption request from Alpine

Capital, which was "the first one that [he] absolutely could not meet."  (Tr. 872)  Maiden

reported the problem to Amanat, and Amanat agreed to provide a loan to Maiden Capital so that

it could pay investor redemptions.  (Tr. 873-79)

The loan was provided pursuant to a written agreement dated June 2, 2011.  (GX

1692)  In connection with the loan, Maiden provided Amanat with a list of Maiden Capital's

assets, including a purported $2,519,650.95 balance in Enable.  (Tr. 879; GX 1694 at 5)  Maiden

had been providing the same balance information to Maiden Capital investors, even though

Maiden Capital's investment in Enable lacked "any value whatsoever."  (Tr. 879-80, 1183)

The loan agreement was between Cornucopia – an entity that Omar Amanat

controlled – and Maiden Capital.  (Tr. 874, 1183-84; GX 1692 (June 2, 2011 loan agreement))

The agreement stripped Maiden of his role as Maiden Capital's sole managing member and gave

Cornucopia "control over operations and business decisions of" Maiden Capital.  (GX 1692 at 6)

---

[6]  The Enable statement reports that, as of January 1, 2009, Maiden Capital had an available balance of $3,100,620.67, but net "[w]ithdrawals" of $980,488 ($1,630,488 - $650,000) over subsequent months brought the balance down to $2,120,132.67 as of August 31, 2009.  (GX 1624)

The agreement also transferred Maiden Capital's assets to Cornucopia until the loan was repaid. (Tr. 878; GX 1692 §§ 2.9-2.11; GX 1694 (June 2, 2011 Pledge Agreement))  Amanat's wife Helena Houdová – who had "no experience working in the financial industry" (Tr. 636) – signed the agreement on Cornucopia's behalf.  (Tr. 875)  Amanat expressed concern during the negotiations for the loan that Maiden would steal the "money that he loaned to Maiden Capital," or "not use [it] for the redemption which it was specifically to be used for."  (Tr. 876) Accordingly, Amanat "wanted his wife installed as the signatory and controller of Maiden Capital."  (Id.)

Pursuant to the agreement between Cornucopia and Maiden Capital, in June 2011, Enable sent Maiden Capital $330,000 in four separate wires.  (GX 606 (Bank of America records) at 242 (documenting a $250,000 wire on June 2, 2011; a $50,000 wire on June 6, 2011; a $10,000 wire on June 20, 2011; and a $20,000 wire on June 30, 2011))  These wires came from Enable's account at First Republic Bank.  (Id.)

During 2011, Maiden and Omar Amanat "talked often," and redemption requests directed to Maiden Capital were "the principal topic" of their conversations.  (Tr. 883-84) Maiden explained that "[Omar Amanat] had a loan with a lot of money at Maiden Capital and so he was very interested to make sure that the money was being used for redemptions."  (Id.) Amanat "wanted to know when the redemptions occurred and . . . the status of any other investors that might want to redeem," and "direct[ed] any redemption payments with cash."  (Id. at 884, 917)   Amanat never suggested that Maiden should disclose to his investors that Maiden Capital's $2 million investment in Enable had been used to redeem KIT Digital's investment in Enable.  (Id. at 884)

Amanat sometimes suggested that Maiden "mark down" the value of Maiden Capital. (Tr. 884-85) Maiden rejected this idea, explaining that the required mark down would be such "a meaningful amount, that [he] would get sued, some investor would go to the authorities, the SEC, the FBI. They would all come back to Enable, to [the Amanats], to [Tuzman]. It would be a disaster." (Id. at 885) Amanat would respond to Maiden's argument by "back[ing] off and continu[ing] to work with [Maiden] on the loan and paying redemptions." (Id.)

### 5.    The July 2011 "Save Maiden Capital" Meeting

Between July 16 and 17, 2011, Tuzman, Omar Amanat, and Maiden met at KIT Digital's offices in Manhattan for the purpose of agreeing on how to "save Maiden Capital." (Tr. 886) In a July 16, 2011 text message to Maiden before that meeting, Omar Amanat urged Maiden to make his case as to why it was necessary to keep Maiden Capital afloat:

> Be aggressive today: Say it doesn't matter who did what. Paint a stark nightmare scenario if your fund goes under. Trustee is appointed – he will quickly realize all money was lost in KIT digital and everyone here will be sued. Securities laws violations have occurred. Criminal behavior jail time. Bottomline: Fund needs to be made whole or ship will sink.

(Id.; GX 1785-D (July 16, 2011 Omar Amanat text message to Maiden))

During the meeting, Maiden told Tuzman and Amanat that "[he] had no money to deal with redemptions" and that Maiden Capital "was mismarked, [and] that it was a mess." (Tr. 1955) The goal of the meeting was "to get more assets from . . . investors . . . to cover up the Maiden problem." (Tr. 890; see also Tr. 888 (noting that Maiden hoped that Tuzman would "convince the others . . . to help Maiden Capital . . . cover this hole and deal with my redemptions")) The meeting did not produce an effective agreement to rescue Maiden Capital. (Tr. 900)

### 6.      **Collapse of Maiden Capital**

After the July 2011 meeting, Enable continued to wire Maiden Capital funds, in part to cover redemptions.  For the remainder of 2011, Enable wired a total of $240,000 to Maiden.  (GX 606 (Maiden Capital's Bank of America records) at 246 ($10,000 wire on July 21, 2011), 250 ($40,000 wire on August 19, 2011), 253 ($10,000 wire on September 20, 2011), 257 ($10,000 wire on October 21, 2011), 260 ($10,000 wire on November 21, 2011), 264 ($150,000 wire on December 8, 2011 and $10,000 wire on December 23, 2011))  Maiden used most of the money "[f]or redemptions," except for $10,000 per month that went toward his living expenses. (Tr. 883)  Because he "used any money [he] had for redemptions," he "couldn't pay [his] mortgage" and other household expenses.  (Id.)  While all payments from Enable to Maiden up to this point appear to have come from Enable's First Republic account, on January 20, 2012, Enable sent Maiden $10,000 from its J.P. Morgan Chase account.  (GX 606 (Maiden Capital's Bank of America records) at 268; GX 653 at 6)  Enable's J.P. Morgan Chase account listed an Enable address on Fifth Avenue in Manhattan.  (GX 653 (J.P. Morgan Chase account statements); see also GX 650 (J.P. Morgan Chase account statements for another Enable entity with an address on West End Avenue in Manhattan))

Jesse Ellington – who operated Solaris Capital, a hedge fund located in Charleston, South Carolina – testified that Maiden failed to satisfy a redemption request that he made in August 2011, despite several follow-up phone calls and emails.  (Tr. 3519, 3533-38)  In 2012, Maiden arranged a call between Ellington and Omar Amanat.  (Tr. 916, 3542-43) According to Maiden, the purpose of the call was to "keep [Ellington] calm so he wouldn't go to the authorities."  (Tr. 917)  Amanat told Ellington to "hang in there" and that "things are going to be OK."  (Id.)  He "tried to minimize the impact of the issues that Maiden Capital" was facing.

(Id. at 918)  Ellington's redemption request was never satisfied.  (Tr. 3547)  In June or July 2012, Maiden Capital failed, and its investors lost the money that they had invested in the fund.  (Tr. 979-80)

### B.   Market Manipulation Conspiracy

The conspiracy to defraud Maiden Capital investors was closely related to a second conspiracy charged in Count Four, which alleged that Amanat and Tuzman had conspired to commit securities fraud by manipulating the market for KIT Digital's stock between December 2008 and September 2011.  ((S8) Indictment (Dkt. No. 198) ¶¶ 55-76)  The evidence at trial showed that Amanat, Tuzman, and Maiden all participated in the charged conspiracy to manipulate the market for KIT Digital stock by inflating its value, in order to position the company to be sold to private equity investors.  The proceeds from the sale of the company would be used to resolve the "Enable hole."  (Tr. 443-45 (KIT Digital director discussing "Project Kronos," "the secret name provided within the company for the sale of the company to . . . [a] private equity firm[]," and Tuzman's desire to sell the company); Tr. 4818-24 (Gavin Campion, KIT Digital's president, testifying about Project Kronos, Tuzman's desire to sell KIT Digital, and concern that due diligence associated with such a transaction could result in disclosure of the conspirators' fraudulent activities); Tr. 1634-36, 963 (Maiden testimony regarding Tuzman's efforts to position KIT Digital for a sale); Tr. 664, 758, 835 (Maiden testimony regarding the relationship between KIT Digital stock and efforts to "plug" the "Enable hole" and make Maiden Capital "whole"); Tr. 2501-04 (Robin Smyth, KIT Digital's chief financial officer, testifying about Tuzman's desire to sell the company to private equity investors))

On December 31, 2008, at Omar Amanat's suggestion, Maiden, Tuzman, and Amanat entered into a written agreement in which Maiden agreed to purchase at least $400,000 worth of KIT Digital stock in the open market over a thirty-day period and to hold the stock for at least ninety days.  (Tr. 637-40; GX 1517-A (Dec. 31, 2008 Agreement); GX 2970 (Jan. 5, 2009 email chain regarding Dec. 31, 2008 Agreement))  In exchange, Tuzman and Amanat agreed to compensate Maiden with a share of KIT Media's profits.  (Tr. 647-48)  Tuzman also promised to make efforts to retain Maiden in an investor-relations capacity at KIT Digital, and to pay him a monthly stipend.[7]  (Id.)

Amanat and Tuzman told Maiden that the purpose of his KIT Digital stock purchases was to support the stock price.  (Tr. 644-45)  At that time, Tuzman, Amanat, and Maiden Capital had millions invested in KIT Media, Tuzman's special investment vehicle (Tr. 574-75, 4526-27; GX 200 (KIT Digital 2008 10-K) at 36) – the value of which hinged on KIT Digital's stock price.  (Tr. 198, 295, 758, 3768, 4530-31)

Prior to signing the December 31, 2008 Agreement, Amanat told Maiden that RAM Capital was "shutting its fund" and "would have to sell its shares in KIT digital stock quickly," which "could really hurt the stock" price.  (Tr. 641, 645)  As a result, KIT Digital "was looking to raise money" in the "short term" from Vision Capital, which was watching "the stock closely."  (Tr. 645)  Tuzman told Maiden "very similar things" and said that "the stock needs to remain strong."  (Id.)

---

[7]  As noted above, in connection with this agreement, Maiden also agreed that he would not seek to redeem his Enable investment.  This aspect of the parties' arrangement was "oral[]" and was not "memorialized" in writing.  (Tr. 651)

On March 10, 2009, KIT Digital wired Maiden $200,000, which Maiden used primarily to buy KIT Digital stock.[8]  (Tr. 739, 1893)  KIT Digital stock was thinly traded. Indeed, on March 10, 2009, Maiden told Tuzman that the company's stock "still hasn't traded outside of me today" (GX 1540), meaning that Maiden "participated in every trade of the stock that whole day."  (Tr. 682)  Tuzman responded, "how much [trading] vol[ume] today?  The steady trading action and market movement helps a lot."  (GX 1540; Tr. 683)  Maiden understood Tuzman to mean that Maiden was "pushing [the stock] up," which Tuzman saw as "a positive for Vision Capital."  (Tr. 684)

Maiden testified about a March 27, 2009 email he sent to Tuzman, stating "that there was just aggressive selling in KIT digital day after day," such that he "was sitting there sucking it up[,] buying it, trying to – trying to maintain the stock price."  (Tr. 656; see GX 1564)

In the second quarter of 2009, KIT Digital's outside auditor Michael Halkias became concerned about the company's investment in Maiden Capital.  (Tr. 743, 1998-99, 2061-62; GX 745 (Aug. 12, 2009 email from Halkias to Tuzman and others requesting information about Maiden investment))  Halkias was concerned that KIT Digital's "investment was made . . . with the explicit understanding that Maiden would in return invest in KIT."  (Tr. 2073)  When Halkias asked Tuzman about KIT Digital's relationship with Maiden Capital, Tuzman told Halkias that "KIT digital has never had any understandings or agreements with Maiden or Maiden Capital, implicit or explicit, of any buying or selling behavior of any stock, KIT digital or otherwise."  (Tr. 2092-93; GX 3202 (Aug. 14, 2009 Tuzman letter to Halkias))  Tuzman never disclosed the December 31, 2008 Agreement in which Maiden agreed to purchase at least

---

[8]  As discussed above, Maiden used a portion of these funds to pay investors who wished to redeem their investment in Maiden Capital.  (Tr. 664, 675, 1952)

$400,000 worth of KIT Digital stock.  (Tr. 2093)  Halkias testified that if he had know about this agreement, he would have recommended to the company that it be disclosed to shareholders, because the "consequences of the investment may [have] be[en] profound to . . . investors."  (Tr. 2089)

Maiden continued to purchase KIT Digital stock after the thirty-day period and ninety-day periods referenced in the December 31, 2008 Agreement, and Maiden discussed these purchases with both Tuzman and Amanat.  (Tr. 646, 657-58)  In a May 5, 2009 email chain that included Tuzman and Maiden, Amanat took credit for securing "Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up."  (GX 3036)  In a July 9, 2009 email to Tuzman, Maiden reported that the "[KIT Digital] hindenberg continues . . . there is unending supply that keeps being offered lower" (GX 1614), which "push[ed] . . . down" the stock price. (Tr. 658)  Tuzman responded, "We desperately need the stock to stay strong during this process." (GX 1614)  Maiden understood Tuzman to be directing him "to go buy the stock . . . to push the stock up."  (Tr. 659)

In July or August 2009, Maiden told Tuzman that he was "desperate for cash" – such that he "couldn't even purchase the stock," meaning that he could not "support the [KIT Digital stock price] anymore."  (Tr. 1951, 1953)  At about that time, Tuzman made a personal investment of $250,000 in Maiden Capital.  (Tr. 1787-89, 1951)

On September 3, 2009, Tuzman rang the closing bell at NASDAQ.  Tuzman called Maiden and the substance of what he said was that KIT Digital's share price was "down a little bit," and that "[i]t would really help our mood if you could push it up."  (Tr. 790)  Maiden said, "OK, I'll do it."  (Id.)  Tuzman responded by saying that they were "brothers in this."  (Id.) Maiden Capital's trading records show that Maiden bought KIT Digital shares that day, and he

testified that he did so "[t]o push the stock up at [Tuzman's] instruction."  (Tr. 790-91; GX 411-B (Maiden Capital trading records))

On February 3, 2010, KIT Digital wired Maiden $700,000, and Maiden continued his purchases of KIT Digital stock.  (Tr. 807, 1896, 5048)  Between February and July 2010, Maiden spoke with Tuzman approximately weekly about these purchases.  (Tr. 810)  In these conversations, the substance of what Tuzman told Maiden was "to keep the stock up and to – through trading, through volume, you know, push[] the stock."  (Tr. 811)  On July 29, 2010, Maiden bought approximately 16,063 shares of KIT Digital stock at $9.6239 per share and sold approximately 16,110 shares at $9.48463 per share.  (Id.)  Maiden thus sold the company's stock for less than he had paid for it, even before commissions on the trades were taken into account.  (Id.)  Maiden executed such trades "to generate volume" and to "create[] the appearance of strength for other investors looking at the stock."  (Tr. 812)

In February 2011, Tuzman sought to redeem his personal $250,000 investment in Maiden Capital.  (GX 1661-A (Feb. 22, 2011 Tuzman email to Maiden); Tr. 826-28)  At that time, Maiden Capital did not have sufficient liquid assets to satisfy Tuzman's redemption request.  (Tr. 1968-69, 2281)  To make the redemption possible, Tuzman arranged for KIT Digital to invest an additional $250,000 into Maiden Capital.  (Tr. 1969, 2281)  In causing KIT Digital to make this investment, Tuzman did not disclose his personal interest in the investment (Tr. 2280-81), and did not disclose Maiden Capital's liquidity problems.  (Tr. 2281-2282)  To the contrary, Tuzman told KIT Digital's chief financial officer Robin Smyth that Maiden Capital was "performing well."  (GX 878 (Feb. 24, 2011 Tuzman email to Smyth); Tr. 2280))

On March 1, 2011, KIT Digital wired $250,000 to Maiden Capital, and two days later Maiden Capital wired $288,101 to Tuzman ($250,000 plus a return of more than $38,000). (Tr. 1789; GX 3827 (chart of wire transfers))

Maiden's trading in KIT Digital stock continued through September 2011. (E.g. GX 3814 (chart showing Maiden Capital trading in KIT Digital on March 18, 2011, reflecting a sale of 600 shares for $7,166 and a purchase of 600 shares for $7,231); GX 3816 (chart showing Maiden Capital trading in KIT Digital on September 8, 2011, reflecting a sale of 1,950 shares for $19,950 and a purchase, that same day, of 1,950 shares for $20,200)) Maiden testified that his trading was designed to "support[] or pump[] the stock . . . with the limited assets [he] had at that point." (Tr. 921-22) Maiden also continued to discuss his purchases of KIT Digital stock with both Tuzman and Amanat. (Tr. 922) At trial, the Government introduced Maiden Capital trading records showing some 3,500 trades that Maiden made in KIT Digital stock between June 26, 2008 and September 15, 2011. (GX 411-B (Maiden Capital trading records))

## C.     KIT Digital Accounting Fraud

In 2010, Tuzman, Robin Smyth, and Gavin Campion – respectively, KIT Digital's chief executive officer, chief financial officer, and president (Tr. 2292, 3913) – launched a scheme to inflate the company's revenue. (Tr. 2254-58, 2273, 2301-04, 2310-11, 2319, 2323)) As discussed above, Tuzman was trying to facilitate a sale of KIT Digital to private equity investors, and the inflation of KIT Digital's revenue was part of an effort to make KIT Digital an attractive candidate for acquisition. The scheme involved "creat[ing] fake invoices and revenue" "to make up [for] shortfall[s] in quarterly revenue and profitability." (Tr. 2254-56, 2318-19, 3732) Tuzman, Smyth, and Campion "created transactions which generated cash that [they] could round trip to pay the commitments on those fake revenue transactions," and kept "records

to make sure that the commitments on the fake transactions were covered . . . so that [they] could hide the transactions from . . . auditors."  (Tr. 2254-55)

KIT Digital was listed on the NASDAQ in 2009 and, as a result, investor interest in the company's financial performance increased.  (Tr. 2299-2300)  In 2010, Tuzman told Smyth to ensure that "revenue and profitability were in line with [financial] analyst reports and to an extent in line with the high end of the analyst reports."  (Tr. 2301)  Tuzman also directed Smyth to "enter into transactions, fake or otherwise, to . . . [meet analysts'] expectations."  (Tr. 2302)  At Tuzman's instruction, Smyth created numerous "fake" "perpetual licenses for [KIT Digital] software" (Tr. 2314-16), and booked fake revenue for these fictitious licenses.  (Tr. 2255-56, 2312-17, 2398, 2442-43)

In exchange for a perpetual software license, customers were supposed to "pay [KIT Digital] a fee for the establishment of that perpetual license over twelve months."  (Tr. 2255)  To generate fake revenue for the fictitious licenses, KIT Digital issued "[f]ake invoices for . . . perpetual license[s]" to entities who did not intend to pay for any such license.  (Tr. 2256)  KIT Digital arranged for payment on the fake licenses by "round tripp[ing]" funds, meaning that KIT Digital would "give [the supposed purchasers of the fake licenses] the money to pay [KIT Digital]."  (Tr. 2261, 2317)  Thus, KIT Digital's own money would "come back to" it, completing "a circle" that began with a phony invoice and ended with a purported payment for a fake license.  (Tr. 2261)  KIT Digital improperly recognized "[t]ens of millions of dollars" in revenue from these "fake contracts" and "round tripping."  (Tr. 2316-17, 2261)

Tuzman, Smyth, and Campion used the term "elephant" to refer to "fake transactions . . . generated in the company."  (Tr. 2256-57, 4142)  The term "elephant" connoted

"the elephant in the room" – meaning "things that [they] knew of but no one else knew."  (Tr. 2257)

During a meeting with Tuzman and Campion in early February 2011, Smyth suggested that they "pay off the elephant" by adding artificial "restructuring" fees to the price of companies that KIT Digital acquired.  (Tr. 4179-80; see also Tr. 2520-21)  These fees would not be used to integrate KIT Digital and the acquired company; instead, the money would be deposited into a KIT Digital-controlled escrow fund and be used for round-trip transactions designed to pay off fake invoices.  (Tr. 2193, 2261, 2521-22, 2526-27, 4182-83)  When Smyth proposed this scheme at a February 2011 meeting, Tuzman was so "excited" that he "jumped up out of his seat, stood behind his chair, put his hands on the back of the chair and said:  Can we do it, Robin?  Can it work?"  (Tr. 4179-80)

In email exchanges with Smyth and Campion, Tuzman made repeated references to eliminating "elephants" when discussing transactions that could free cash to pay off fake software licenses.  (GX 855, Tr. 2462, 4189 (Tuzman stating in February 3, 2011 email that "a small elephant is slain as part of the deal"); GX 2862, Tr. 2465 (Tuzman stating in February 8, 2011 email that "I am trying to slay elephants, smiley face"); GX 863, Tr. 2460-61 (Tuzman stating in February 12, 2011 email that "we could slay a big elephant with this one," and Smyth replying, "Sounds like you are killing elephants with your bare hands."); GX 2867, Tr. 2477 (Tuzman stating in March 12, 2011 email "Let's kill elephants"); see also Tr. 4144 (Campion noting that Tuzman "ask[ed] for ways and look[ed] for ways to, quote, solve . . . the elephant, fix the issue, pay the elephant off," which meant "[f]ind[ing] a way of paying off the elephant, kind of getting money in from somewhere as if it was real revenue to reduce the size of the elephant and ultimately get rid of it"))

In September 2011, Tuzman, Smyth, and Campion met at KIT Digital's Manhattan office to discuss "the elephant." (Tr. 2482)  Before the meeting, Smyth created a spreadsheet that contrasted KIT Digital's "[r]eal revenue" (i.e. "revenue after deducting any fake transactions") with revenue that included "fake transactions." (Tr. 2484, 2486, 2493; see GX 2142)  As of September 2011, the size of the "elephant" – the amount of falsely reported revenue – was $37,607,000. (Tr. 2492)  At the meeting, Tuzman expressed no surprise at the numbers Smyth presented. (Tr. 2494)

As Smyth had proposed, KIT Digital began including phony "restructuring" fees in the transaction price of companies that it acquired, including Sezmi Corporation. (Tr. 2514, 4182-83, 5241)  In connection with Sezmi, Smyth and Tuzman discussed incorporating a $6 million restructuring fee into the acquisition. (Tr. 2515-20)  In a November 22, 2011 email to Smyth, Tuzman attached his edits to a term sheet for this acquisition, and added the following language:

> Consideration is also subject to the Buyer coming to the view that necessary restructuring and integration costs related to the Transaction will ultimately be $6 million or less over time.  (NOTE:  I have included the restructuring piece in the bid now so we have consistent internal and external messaging.)

(GX 1094 at KITD-AC-SEC-0010054 002 (emphasis in original); Tr. 2515)  Smyth responded as follows:  "We cannot put restructuring in like this as auditors would expect an accounting for it if they see this.  There really can be no external view."  (GX 1096)

At trial, Smyth explained that if the term sheet for an acquisition stated that KIT Digital was "going to spend money on restructuring," auditors "would expect to see and do auditing of the money we spent," which would be problematic since KIT Digital was not "going to be using the money for restructuring," but rather to "round trip to companies to repay commitments to KIT [Digital]." (Tr. 2516)  In response, Tuzman agreed that information

regarding the alleged restructuring expense should be kept from the company's auditors, but told Smyth that he would discuss the restructuring fee with Sezmi's sellers "on the side."  (Tr. 2516-17; GX 1096)

On December 7, 2011, Tuzman reported to Smyth that Sezmi's owners had agreed to "$6 million for restructuring . . . as long as it doesn't cost them anything from a tax perspective.  Perhaps this goes into escrow right away?  In your hands."  (Tr. 2518-19; GX 1110; see Tr. 2520 (Tuzman referring to Sezmi with a code name, Earthway, and to the $6 million restructuring fee))

In a December 14, 2011 memorandum to KIT Digital's board of directors, Tuzman described the price of the Sezmi acquisition as follows:  "$28M in total upfront consideration to [Sezmi] shareholders" – "$7 million in cash" and "$21 million in KIT common stock."  (GX1133 at KITD-AC-SEC-0091518 038; Tr. 2524)  In reality, however, Sezmi shareholders would not receive any cash from the deal; instead, the cash referenced in Tuzman's memorandum would be deposited into a KIT Digital-controlled "cash reserve" escrow account for restructuring expenses.  (Tr. 2524-27; see also Tr. 4450 (discussing KIT Digital cash reserves and a Dubai escrow account))

Sezmi resisted KIT Digital's proposed "cash reserve" account for restructuring expenses, which Smyth and Tuzman planned to memorialize in a "side letter" that would not be disclosed to KIT Digital's "auditors and investors."  (Tr. 2525, 2529)  In a December 17, 2011 email to Tuzman with the subject line "Restructuring," Smyth stated:

> I am hitting a brick wall in the restructuring in that they are pushing back as they want to know all the details of how we are going to use it and should stay in their escrow account and we draw against it.

(GX 2498; Tr. 2526)

At trial, Smyth explained what he meant in writing that he was "hitting a brick wall." Smyth testified that "[t]he way [KIT Digital's proposed] restructuring was supposed to work was that we would have it transferred to us at our discretion without having to advise the selling shareholders what the money was being used for. They [Sezmi] were insisting that they be part of the use of the restructuring money." (Tr. 2526) Sezmi "wanted it to go into their escrow account with [KIT Digital] drawing against their escrow account for the expenses [it] incurred." (Tr. 2527) If this structure was adopted, Smyth would lose "control" of the funds. (Id.)

Tuzman responded to Smyth's December 17, 2011 email as follows:

I wouldn't fall into the trap of showing them anything. I would keep it nonchalant and just say: we have no idea how difficult it is going to be to bring the businesses together in terms of product integration, etc., and we need this cushion to be able to feel safe doing this deal and not have to take integration charges over time.

. . . .

You have to be able to believe the bluff to carry it out.

(GX 2498; Tr. 2527-58) Smyth understood Tuzman to be saying that, "[i]f you're going to convince somebody of something that's not true, you have to act as if it is true so that they don't pick up that you're telling lies." (Tr. 2528)

KIT Digital and Sezmi ultimately agreed to a $7.85 million restructuring charge. This component of the transaction was memorialized in a "side letter," which stated that the funds would be placed in a KIT Digital-controlled escrow account for restructuring costs. (Tr. 3272-73, 5511-12) KIT Digital's board of directors approved the proposed acquisition, believing that the purchase price included $7.85 million in cash. (Tr. 2524-25, 2530; see also Tr. 236

(board member testifying that, in voting in favor of the acquisition, he believed that $7.85 million in cash went to Sezmi as part of the transaction))

Sezmi did not receive a "single cent" of the $7.85 million, however.  (Tr. 2533) Instead, KIT Digital used the money to "round trip to companies to pay license payments which were due."  (Tr. 2530; see also Tr. 2521-22, 4226 (Campion testifying that Tuzman told him that the purpose of the Sezmi "restructuring charge" was to "pay off the elephant"))  Entities that received portions of the $7.85 million submitted fake invoices to KIT Digital for restructuring-related services, none of which was performed.  (Tr. 2544-46)

In a December 28, 2011 email to Smyth, Tuzman asked whether he had "any luck with escrow funds getting around?"  (GX 1202)  Smyth testified that he understood Tuzman to be asking whether he had "been able to send out the escrow money to the people and get the money back into KIT digital."  (Tr. 2538; see also Tr. 4237)  Smyth responded:  "They are moving around[,] have process in place and happening." (GX 1202), meaning that Smyth had "sent the money out, and . . . was expecting [it] to now start coming back in."  (Tr. 2538) Tuzman responded, "Can I help in any way?"  (GX 1202)

KIT Digital's 2011 Form 10-K – which was certified by Tuzman and Smyth on March 30, 2012, and was then filed with the SEC – states that KIT Digital paid $7.85 million "in cash" as part of the Sezmi acquisition.  (GX 218; Tr. 2551, 2652)  Smyth testified that this was a false representation.  (Tr. 2551)  Smyth and Tuzman also sent a March 30, 2012 letter to KIT Digital's auditors stating that the Sezmi acquisition included consideration of "$7.85 million cash."  (GX 3276, ¶ 37)  Smyth understood this statement to mean that KIT Digital had "paid the shareholders of Sezmi $7.85 million cash," which was "false." (Tr. 2552)

The accounting fraud scheme perpetrated by Tuzman, Smyth, and Campion ultimately collapsed.  Tuzman, Smyth, and Campion's efforts to address the "elephant" failed. (Tr. 2558)  No sale of KIT Digital to private equity investors took place.  (Tr. 444-45, 2511)  And in the first quarter of 2012, KIT Digital's outside auditors, and ultimately the audit committee of the company's board of directors, began questioning Tuzman about KIT Digital's relationship with Enable, and the Dubai-based escrow account that had been used for the round-tripping transactions.  (Tr. 2567-70, 236-45, 250-55)  In March 2012, KIT Digital's board requested Tuzman's resignation.  (Tr. 961-63, 1958)  Campion resigned in April 2012. (Tr. 4452)  And Smyth was terminated for cause in November 2012.  (Tr. 2266-67).

## DISCUSSION

### I.      LEGAL STANDARDS

#### A.      Rule 29

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "A defendant challenging the sufficiency of the evidence to support his conviction carries a heavy burden."  United States v. Oguns, 921 F.2d 442, 449 (2d Cir. 1990).

"In evaluating a sufficiency challenge," this Court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"  United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)).  "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing

inferences.'"  United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v.

Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).  In assessing a sufficiency challenge, a court

"looks at 'the evidence in its totality,'"  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir.

2008) (quoting United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002)), "'not in isolation but in

conjunction.'"  United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (quoting United

States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969)).

       Under Rule 29, the critical question "is whether 'any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.'"  United States v.

Downing, 297 F.3d 52, 56 (2d Cir. 2002) (quoting Jackson v. Virginia, 443 U.S. 307, 319

(1979)) (emphasis in Jackson).  "Because rational people can sometimes disagree, the inevitable

consequence of this settled law is that judges will sometimes encounter convictions that they

believe to be mistaken, but that they must nonetheless uphold."  Cavazos v. Smith, 565 U.S. 1, 2

(2011) (per curiam).  "The Second Circuit has observed that '[t]hese strict rules are necessary to

avoid judicial usurpation of the jury function.'"  United States v. DiPietro, No. S502 Cr. 1237

(SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865).

       While a defendant raising a sufficiency challenge "carries a heavy burden,"

Oguns, 921 F.2d at 449, it is "not an impossible one."  United States v. Kapelioujnyj, 547 F.3d

149, 153 (2d Cir. 2008) (citing United States v. Jones, 393 F.3d 107, 111 (2d Cir. 2004)).  A

"conviction based on speculation and surmise alone cannot stand."  United States v. D'Amato,

39 F.3d 1249, 1256 (2d Cir. 1994) (citing United States v. Wiley, 846 F.2d 150, 155 (2d Cir.

1988)).

B.    <u>Rule 33</u>

Under Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  <u>United States v. Sanchez</u>, 969 F.2d 1409, 1413 (2d Cir. 1992).  Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, <u>see</u> <u>United States v. Leslie</u>, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence.  <u>United States v. Ferguson</u>, 246 F.3d 129, 136 (2d Cir. 2001).

The Second Circuit has explained that

> [t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  There must be a real concern that an innocent person may have been convicted.  Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

<u>Id.</u> at 134 (internal quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses."  <u>United States v. Autuori</u>, 212 F.3d 105, 120 (2d Cir. 2000) (citing <u>Sanchez</u>, 969 F.2d at 1413).  But "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury."  <u>Ferguson</u>, 246 F.3d at 133 (quoting <u>Autuori</u>, 212 F.3d at 120) (alteration in <u>Ferguson</u>).  Finally, in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the Government.  <u>United States v.</u>

Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (citing United States v. Ferguson, 49 F. Supp.

2d 321, 323 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001)).

## II.    ANALYSIS

### A.    Amanat's Insufficiency Arguments

#### 1.    Wire Fraud Counts, and Aiding and Abetting Investment Adviser Fraud

Omar Amanat was convicted of (1) conspiracy to commit wire fraud on Maiden

Capital investors (Count One); (2) committing wire fraud on Maiden Capital investors (Count

Two); and (3) aiding and abetting Maiden's investment adviser fraud (Count Three).  (Indictment

(Dkt. No. 198) ¶¶ 1-54; Verdict (Dkt. No. 627))  Amanat argues that the jury's verdict on these

counts must be vacated because there is insufficient evidence that he knew that Maiden Capital's

investors were being defrauded.  (Amanat Br. (Dkt. No. 735) at 11-26)  As explained below, this

argument is not persuasive.

##### a.    Enable Account Statements and Balances

Amanat contends that there is no evidence that he knew that false account

information from Enable was transmitted to Maiden Capital investors.  (Amanat Br. (Dkt. No.

735) at 18)  The jury could have reasonably found, however, that (1) Enable sent false and

fabricated account statements to Maiden; (2) Maiden used these false and fabricated account

statements to prepare statements for Maiden Capital investors; and (3) Amanat knew both that

Enable was providing false and fabricated account statements to Maiden, and that Maiden was

providing statements to his clients that relied on this false and fabricated information.

In 2008, before investing $1 million in Enable, Maiden confirmed with Omar

Amanat that Enable would issue monthly statements concerning his investment.  (Tr. 584).

Maiden told Omar Amanat that he needed this information because the performance of the

Enable investment would be reflected "in the returns [Maiden] sent out to [his] Maiden Capital investors." (Id.) In January 2009, after Maiden expressed concern about an Enable statement, Amanat asked his brother Irfan Amanat to "[c]oordinate w[ith] me on this" because Maiden "need[ed] to show good year end returns." (GX 2967 (Jan. 5, 2009 Amanat email to I. Amanat) Moreover, in September 2009, Maiden emailed the Amanat brothers and requested his "[E]nable balance NOW" because he "need[ed] to put out num[bers]." (GX 1625 (Sept. 2, 2009 email chain between Maiden and the Amanat brothers)) Omar Amanat directed his brother to "get [to] this immediately." (Id.) In sum, there is ample evidence that Amanat knew that the account statements Enable provided to Maiden would be the basis for the account statements Maiden sent to Maiden Capital investors.

There is also ample evidence that Amanat knew that the numbers Enable was reporting to Maiden, and that the numbers Maiden was in turn reporting to Maiden Capital investors, were false. As an initial matter, Maiden testified that he told Omar Amanat that the returns he was reporting to his investors "were false because Enable, which we all knew was nonexistent, was in my numbers." (Tr. 805)

And Omar Amanat was well aware that Maiden Capital's investment in Enable had been lost. In February 2009, after Maiden requested a return of $500,000 of Maiden Capital funds to pay investor redemptions, Omar Amanat told his brother that the request was "absurd," because "we don't have" the money. (GX 2975 (Feb. 11, 2009 email chain between Amanat brothers)) And in March 2009, Omar Amanat was on the phone when his brother Irfan Amanat informed Maiden that he "couldn't redeem any . . . of [his] Enable investment which by then was over $3 million." (Tr. 660-61) After that disclosure, Omar Amanat and Maiden began referring to the lost Maiden Capital funds as "the Enable hole, money that had vanished, was gone." (Tr.

664)  In sum, the jury heard ample evidence demonstrating that Amanat was aware that Maiden was reporting false returns to Maiden Capital investors.  Indeed, for a number of years, Amanat (and Tuzman) funded redemptions requested by Maiden Capital investors so that the investors and law enforcement would not learn that Maiden Capital's investment in Enable had been lost, and that Maiden Capital's money had been used to redeem KIT Digital's investment in Enable. (Tr. 664, 675, 1952, 873, 883-85)

Amanat argues that "Maiden never mentioned Enable at all to his investors" (Amanat Br. (Dkt. No. 735) at 22), but this point is irrelevant.  Maiden testified that he forwarded Enable account balances to his "fund administrator SS&C," which would then "use that number to come up with a combined return . . . to send out individual asset accounts to [his] investors."  (Tr. 796; see also Tr. 3527-33)  Because the Enable balances were false, false information was conveyed to Maiden Capital investors.

Amanat contends that Maiden Capital's Enable investment was converted into a promissory note, and that Enable's statements accurately "reflected the value of the debt instruments and its guaranteed interest if the loan had been called," and "[t]here was therefore nothing false about the Enable statements in the first place."  (Amanat Br. (Dkt. No. 735) at 14) (emphasis omitted)  Although Amanat made this argument at trial (Tr. 7066-74), there was very little evidence to support it, and the jury rejected it.  Amanat's argument ignores ample evidence in the record demonstrating that Enable was insolvent, and that Amanat knew that it was false to represent that Maiden Capital's investment in Enable had any value at all.  The Amanat brothers' initial efforts to hide from Maiden the loss of Maiden Capital's investment – and the fact that Maiden Capital's infusion in Enable was used to redeem KIT Digital's investment – is also entirely inconsistent with the notion of a legitimate promissory note transaction.

b.    **Redemption Requests**

The jury could have also reasonably concluded that Omar Amanat helped defraud Maiden Capital investors by lending funds to satisfy Maiden Capital investors' redemption requests, thereby concealing Maiden Capital's true financial condition.  In 2011, Omar Amanat loaned about $500,000 to Maiden Capital, most of which Maiden used to pay redemption requests.  (Tr. 883)  While Amanat argues that there is nothing inherently illegal in a hedge fund "tak[ing] a loan out on its assets and pay[ing] redemptions from that loan" (Amanat Br. (Dkt. No. 735) at 12), he was well aware that funding the redemptions was necessary to prevent the conspirators' fraudulent scheme from being discovered.  As he told Maiden in a July 16, 2011 text message, "Securities laws violations have occurred.  Criminal behavior jail time.  Bottomline:  Fund needs to be made whole or ship will sink."  (Tr. 886; GX 1785-D)

In sum, the Government offered ample evidence that Amanat understood that – as a result of Maiden Capital's lost Enable investment – Maiden needed cash to pay Maiden Capital investors' redemption requests, and that it was necessary for Amanat to fund those redemptions in order to prevent disclosure of the fraud committed on Maiden Capital investors by the Amanat brothers and Maiden.  As Maiden testified, he asked Amanat to fund the Maiden Capital redemption requests because Amanat "had a lot to lose . . . if Maiden Capital failed," including "criminal consequences."  (Tr. 873)

The evidence concerning Amanat's exchange with Jesse Ellington – a Maiden Capital investor who sought a redemption – is not to the contrary.  (See Amanat Br. (Dkt. No. 735) at 20-21)  Although Amanat disclosed to Ellington that he had loaned money to Maiden Capital to cover Maiden Capital redemption requests, Amanat did not disclose to Ellington the dire state of Maiden Capital's finances, nor did he disclose to Ellington the criminal activity that had led to Maiden Capital's collapse.  Indeed, in his phone call with Ellington, Amanat sought to

deceive Ellington by "minimiz[ing]" the issues facing Maiden Capital and by convincing him that "things will work out." (Tr. 917-18) In sum, Amanat's contact with Ellington is merely further evidence of his criminal intent.

Amanat also cites evidence that he told Maiden that he should be transparent with his shareholders and mark down the value of his fund. (Amanat Br. (Dkt. No. 735) at 23-24; see also Tr. 884-85, 1189-90) What Amanat does not acknowledge, however, is that he abandoned his transparency arguments when Maiden reminded him that transparency would have criminal consequences. After Maiden pointed this out, Amanat "back[ed] off" and agreed to continue to "pay[] redemptions." (Tr. 885) A reasonable jury could have concluded that Amanat agreed to continue to pay for the redemptions submitted by Maiden Capital investors in order to forestall discovery of the fraud that he, his brother, and Maiden had perpetrated on those investors. Indeed, that is the most reasonable inference from the evidence.

### c.      Aiding and Abetting Investment Adviser Fraud

Amanat contends that the Government "offered no proof whatsoever to support the conclusion that Mr. Amanat had the requisite knowledge to be guilty as an aider and abettor" of Maiden's investment adviser fraud. (Amanat Br. (Dkt. No. 735) at 28)

"Section 206 of the [Investment Advisors] Act [of 1940] makes it 'unlawful for any investment adviser . . .' to engage in certain transactions, including 'any device, scheme, or artifice to defraud any client or prospective client,' 'any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client,' or 'any act, practice, or course of business which is fraudulent, deceptive, or manipulative.'" United States v. Tagliaferri, 820 F.3d 568, 571 (2d Cir. 2016) (quoting 15 U.S.C. § 80b–6).

Amanat does not dispute that Maiden was an investment adviser who engaged in investment adviser fraud. Amanat instead contends that he is not guilty of aiding and abetting

Maiden's fraud because he was not aware that Maiden was defrauding Maiden Capital investors. (Amanat Br. (Dkt. No. 735) at 28)  As discussed above, however, a reasonable juror could have found that Amanat knew that Maiden was defrauding Maiden Capital investors and that Amanat assisted him in committing this crime by securing false Enable account statements for Maiden and by lending Maiden money so that he could satisfy redemption requests and thereby forestall discovery of the fraud.  See United States v. Huezo, 546 F.3d 174, 179-80 (2d Cir. 2008) ("To prove that the defendant acted with specific intent, the government need not establish that he knew all of the details of the crime, only that he joined the venture, that he shared in it, and that his efforts contributed towards its success.'") (alterations and internal quotation marks omitted).[9]

### 2.   Market Manipulation

Count Four charges Amanat with conspiring to commit securities fraud in connection with a scheme to manipulate the market for KIT Digital stock.  (Indictment (Dkt. No. 198))  Amanat contends that his conviction on this count must be vacated, because the Government "introduced no evidence to support the conclusion that [he] had an intent to manipulate the market of KIT Digital stock."  (Amanat Br. (Dkt. No. 735) at 31)  As discussed below, however, the Government introduced sufficient evidence for a reasonable juror to find

---

[9]  Amanat further contends that a defendant can be found guilty of aiding and abetting investment adviser fraud only where "(1) the defendant had knowledge of the investment adviser's fiduciary duty to his clients; (2) the defendant had knowledge of the full scope of disclosures and omissions relevant to the investment adviser's fraud against his clients; (3) the defendant had the specific intent to aid in that criminal violation of the investment adviser's fiduciary duty to his clients, and not simply aid in some other generalized crime."  (Amanat Br. (Dkt. No. 735) at 28)  Amanat cites no case adopting his criteria, however.  And while Amanat states that there are no cases in which a defendant has been convicted of aiding and abetting investment adviser fraud (id. at 28), defendants have been convicted of this offense, both at trial (see United States v. Bergstein, No. 16-cr-746 (PKC), 2018 WL 2417845, at *1 (S.D.N.Y. May 29, 2018)), and as the result of guilty pleas.  See United States v. Renfrow, No. C17-1305 TSZ, 2017 WL 6389303, at *1 (W.D. Wash. Dec. 14, 2017) ("Defendant pleaded guilty to aiding and abetting investment advisor fraud. . . .").

that he knowingly participated in the charged scheme to manipulate the market for KIT Digital stock.  Indeed, the market manipulation scheme was Amanat's idea.

It was Amanat who first suggested that Maiden, Tuzman, and Amanat enter into a written agreement in which Maiden would purchase and agree to hold KIT Digital stock for ninety days.  (Tr. 637-40)  From Amanat's idea came the December 31, 2008 Agreement, in which Maiden agreed to purchase at least $400,000 worth of KIT Digital stock over a thirty day period, and to hold the stock for "at least 90 days."  (Id.; GX 1517-A (December 31, 2008 Agreement); GX 2970 (Jan. 2, 2009 Amanat email to Maiden and Tuzman transmitting the agreement))  Amanat explained to Maiden that the purpose of the December 31, 2008 Agreement was to artificially inflate KIT Digital's stock price to attract a potential investor in the company – Vision Capital – and to counteract downward pressure on the stock price from an aggressive seller, RAM Capital.  (Tr. 644)

Maiden's trading in KIT Digital stock continued long after the thirty and ninety day periods referenced in the Agreement, because of the need to continue supporting the share price so that the company would make an attractive acquisition.  (Tr. 646, 657-58, 790-91, 921-22)  As discussed above, Maiden discussed his purchases of KIT Digital stock with both Tuzman and Amanat.  (Tr. 646, 790-91, 810-12)  Indeed, in a May 5, 2009 email to Tuzman, Amanat took credit for recruiting Maiden to the market manipulation scheme:  "You wouldn't have had Maiden's $2.5 million in open market purchases which singlehandedly kept the stock up if I didn't spen[d] the time."  (GX 3036)  And before the July 2011 Manhattan meeting about saving Maiden Capital, Amanat told Maiden to remind Tuzman of Maiden's support of KIT Digital's stock price:  "Make sure you bring up aggressively that . . . [y]ou supported the stock, owned 400k shares."  (GX 1785-D (July 16, 2011 Amanat text message to Maiden)  Given such

evidence, Amanat's argument that the Government offered insufficient evidence of his knowledge and intent fails.

### B. Whether the Market Manipulation Conspiracy Charge Is Time-Barred, and Whether Tuzman Withdrew from the Conspiracy

Tuzman contends that Count Four – which charges him and Amanat with conspiring to manipulate the market for KIT Digital stock – is time-barred, because no overt act in furtherance of the conspiracy was committed within five years of August 12, 2015, when the case was first indicted.  (Tuzman Br. (Dkt. No. 738) at 11-34)  At trial, the Court instructed the jury that, in order to return a guilty verdict on Count Four, the jury was required to find "beyond a reasonable doubt that . . . Tuzman, . . . [Omar] Amanat, or one of their alleged coconspirators committed at least one overt act in furtherance of the charged conspiracy to manipulate the market for KIT Digital's stock after August 12, 2010."  (Tr. 7214)

Although Tuzman has no quarrel with the jury instruction, he contends that the market manipulation conspiracy charged in Count Four is time-barred, "because the evidence admitted at trial showed that any conspiracy had achieved its alleged goals by August 2009, when KIT Digital was listed on the NASDAQ exchange."  (Tuzman Br. (Dkt. No. 738) at 11) Tuzman further contends that "even if the [market] manipulation conspiracy had continued [beyond the NASDAQ listing in August 2009], the evidence was overwhelming . . . that . . . Tuzman withdrew from [that] manipulation conspiracy by August 2010."  (Id. at 33)

#### 1. Applicable Law

"For a conspiracy charge that requires proof of overt acts to be within the statute of limitations, the (1) conspiracy must still have been ongoing within the five year period preceding the indictment, and (2) 'at least one overt act in furtherance of the conspiratorial agreement [must have been] performed within that period.'"  United States v. Ben Zvi, 242 F.3d

89, 97 (2d Cir. 2001) (quoting <u>Grunewald v. United States</u>, 353 U.S. 391, 396-97 (1957)) (alteration in <u>Ben Zvi</u>).  "The crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."  <u>United States v. Grimm</u>, 738 F.3d 498, 502 (2d Cir. 2013) (internal quotation marks and alterations omitted).

"Where the government has presented sufficient evidence to show a conspiracy that has continuing purposes or goals, the burden is on the defendant to prove that the conspiracy was terminated or that he took affirmative steps to withdraw."  <u>United States v. Eppolito</u>, 543 F.3d 25, 49 (2d Cir. 2008).  "'Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators.'"  <u>Leslie</u>, 658 F.3d at 143 (quoting <u>United States v. Diaz</u>, 176 F.3d 52, 98 (2d Cir. 1999)).  "For a defendant to show that he withdrew from the conspiracy, proof merely that he ceased conspiratorial activity is not enough."  <u>Eppolito</u>, 543 F.3d at 49.  Instead, he must "also show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy" – "either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators[.]"  <u>Id.</u> (internal quotation marks omitted).

## 2.   <u>Analysis</u>

Tuzman's arguments that any market manipulation conspiracy ended when KIT Digital was listed on the NASDAQ in August 2009 or – alternatively – that Tuzman withdrew from the conspiracy as of August 2010 – are not persuasive.  (Tuzman Br. (Dkt. No. 738) at 33)

There is evidence that – after KIT Digital was listed on the NASDAQ in August 2009 – Tuzman's pressure on Maiden to manipulate the stock temporarily eased. Maiden testified that "we had been successful in propping the stock up to get a high price and then at that point . . . the pressure was off and [Tuzman] was helping me to sell shares, or he was suggesting a way [Maiden] could unload some of the stock [he] had accumulated over the previous months." (Tr. 1947) On August 13, 2009, for example, Tuzman asked Maiden whether he wanted him to "find a block buyer for some of your shares." (Tr. 1661). And on August 18, 2009, Tuzman told Maiden that he had "a buyer interested in five hundred thousand to one million block in KIT digital." (Tr. 1663) On August 28, 2009, and September 1, 2009, investors referred to Maiden by Tuzman inquired whether Maiden was interested in selling KIT Digital stock. (Tr. 1664, 1666)

But very soon after KIT Digital was listed on the NASDAQ, Tuzman again resumed asking Maiden to take steps to inflate the stock price. On September 3, 2009, for example – the day that Tuzman was invited to ring the NASDAQ closing bell – Tuzman told Maiden that "the stock is weak. It's down a little bit. It would really help our mood if you could push it up." (Tr. 790; see also Tr. 1947-48) Maiden said, "OK, I'll do it," and Tuzman replied, "We're brothers in this." (Tr. 790) Maiden proceeded to buy KIT digital stock that day.[10] (Tr. 790-92; GX 411-B (Maiden Capital trading records))

As discussed above, Maiden's manipulation of KIT Digital stock continued in 2010 and 2011, and was conducted with Tuzman's knowledge, approval and support. Indeed,

---

[10] Tuzman contends that he "conclusively demonstrated at trial that this conversation never took place," because Tuzman's cell phone records for that day did not reflect calls to phone numbers associated with Maiden. (Tuzman Br. (Dkt. No. 738) at 17 n.4) As discussed below, however, a reasonable juror could have credited Maiden's testimony about the call, because Tuzman could have made the call to Maiden on another phone line.

Tuzman solicited Maiden's manipulation of the stock and arranged for KIT Digital to fund this activity.  In February 2010, KIT Digital wired $700,000 to Maiden, which he used to execute trades in KIT Digital stock.  (Tr. 807, 1896, 5048-49)  And during the period between February and July 2010, Maiden spoke "weekly" with Tuzman about these purchases.  Tuzman instructed Maiden to "keep the stock up and to – through trading, through volume, . . . [keep] pushing the stock."  (Tr. 810-11)  And Maiden did so.  (Tr. 811-12)

Contrary to Tuzman's argument, there is no evidence that Tuzman told Maiden in August 2010 or at any time thereafter to stop his efforts to support KIT Digital stock and generate trading volume.  (Tr. 920-22)  Maiden continued his manipulative trading in KIT Digital into September 2011, and kept Tuzman and Amanat advised of his trading.  (See, e.g., id., 5044-45; GX 3814, GX 3816, GX 1786-I).

Because Maiden continued to make manipulative trades in KIT Digital stock after August 12, 2010 – for the purpose of increasing KIT Digital's stock price – a reasonable juror could conclude that overt acts in furtherance of the market manipulation conspiracy occurred after that date.  See United States v. Salmonese, 352 F.3d 608, 615 (2d Cir. 2003) ("[A] conspirator's 'participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators[.]'") (quoting Diaz, 176 F.3d at 98).

And given Maiden's testimony that he continued to communicate with Tuzman about his trades in KIT Digital stock in 2011, and Tuzman never discouraged him from continuing this activity, a reasonable juror could find that Tuzman never withdrew from the conspiracy.  See United States v. Martinez, 862 F.3d 223, 233 (2d Cir. 2017), judgment vacated sub nom. on other grounds, Rodriguez v. United States, 139 S. Ct. 2772 (2019) ("To effect a withdrawal, the defendant's disassociation with the conspiracy must be complete and

permanent. . . .”); <u>United States v. Berger</u>, 224 F.3d 107, 118 (2d Cir. 2000) (“[R]esignation

from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law[.]”);

<u>see</u> <u>also</u> <u>United States v. Jackson</u>, 335 F.3d 170, 180 (2d Cir. 2003) (“The traditional deference

accorded to a jury’s verdict ‘is especially important when reviewing a conviction for conspiracy

. . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all

aspects of a conspiracy can be laid bare in court with the precision of a surgeon’s scalpel.’”)

(quoting <u>United States v. Pitre</u>, 960 F.2d 1112, 1121 (2d Cir. 1992)).

    Tuzman’s arguments to the contrary are not persuasive.  He contends that

Maiden’s trades on March 18, 2011, and September 8, 2011 “could not have conceivably been in

furtherance of any market manipulation conspiracy,” because “neither set of transactions was

large enough to affect the scheme that the government has alleged.”  (Tuzman Br. (Dkt. No. 738)

at 26)  But conduct in furtherance of a conspiracy need not be successful to create criminal

liability.  <u>See</u> <u>United States v. Rosa</u>, 17 F.3d 1531, 1543 (2d Cir. 1994) (“Because it is the

conspiratorial agreement itself that is prohibited, the illegality does not depend on the actual

achievement of the coconspirators’ goal. . . . Thus, a defendant may be convicted of the crime of

conspiracy even if the substantive offense was not actually committed, and even if its

commission was impossible. . . .”); <u>United States v. Rosengarten</u>, 857 F.2d 76, 79 (2d Cir. 1988)

(“[T]o be actionable, a conspiracy need not be carried to a successful conclusion . . . ; it is

complete when any of the coconspirators commits an overt act.”).

    Tuzman argues that these transactions were not “wash trades” in furtherance of

the conspiracy, because “Maiden’s trading is amply explained by the fact that he was a day

trader – that is, a market participant who regularly buys and sells the same stock during the same

day.”  (Tuzman Br. (Dkt. No. 738) at 22-31 (citing Tr. 1701))  Given Maiden’s testimony that he

made these trades to "inflate the stock" (Tr. 737) and to "support[] or pump[] the stock" (Tr. 921-22), however, a reasonable juror could have concluded that Maiden sought to manipulate KIT Digital's stock price, and was not engaged in innocent day trading.

Tuzman cites occasions in which he told Maiden that he couldn't "watch the stock every day," and "need[ed] to focus on the business." (Tuzman Br. (Dkt. No. 738) at 18-19)[11] But these communications do not demonstrate that Tuzman – the CEO of KIT Digital – was indifferent to his company's stock price. Moreover, none of the communications cited by Tuzman suggest that he discouraged or expressed disapproval of Maiden's efforts to inflate KIT Digital's stock price. These communications therefore do not constitute "'affirmative action . . . to disavow or defeat the purpose of the conspiracy.'" United States v. Lebedev, 932 F.3d 40, 51 (2d Cir. 2019) (quoting United States v. Nerlinger, 862 F.2d 967, 974 (2d Cir. 1988)).

The cases Tuzman cites in support of his withdrawal argument (Tuzman Br. (Dkt. No. 738) at 34) are not to the contrary. In Nerlinger, the defendant "clos[ed] [an] account" that "disabled him from further participation" in the conspiracy "and made that disability known to [his co-conspirator]." Nerlinger, 862 F.2d at 974. And in United States v. Goldberg, 401 F.2d 644 (2d Cir. 1968), the "uncontroverted, affirmative evidence" showed that the defendant resigned from a brokerage company engaged in securities fraud, and informed his customers, his co-conspirators, and a licensing agency of his resignation. Thus, there was "no question that his

---

[11] See Tr. 1694-96 (Maiden testifying that Tuzman told him in September 2009 that "I can't watch the stock every day. I need to focus on the business. No idea why we're down."); Tr. 1696-700 (Maiden testifying that Tuzman told him in January 2010 that "I can't control the markets" and "It's a market which I cannot control"); Tr. 1730 (Maiden testifying that Tuzman stated in May 2010 that "[a]s usual, we are not of the mind to time press releases for market/trading reasons. Fundamentals of our business are strong"); Tr. 1709 (Maiden testifying that Tuzman told him in August 2010, "I don't get stressed about day-to-day stock price of KIT Digital. In the end we should be fine.").

co-conspirators knew of his withdrawal from [the company's] operations." Goldberg, 401 F.2d at 648-49.  There is no such evidence here.

Tuzman also cites text messages – sent during the period between October 19, 2011 and June 14, 2012 – in which he tells Maiden that he will not lie or commit fraud. (Tuzman Br. (Dkt. No. 738) at 19-20)[12]  But these self-serving messages were all sent after September 2011, and thus cannot constitute proof of a timely withdrawal from the charged market manipulation conspiracy.  According to the Indictment, the charged market manipulation conspiracy was no longer active at that time.  ((S8) Indictment (Dkt. No. 198) ¶ 56)  And most of the messages Tuzman cites – which have no connection to the charged market manipulation conspiracy – were sent after March 2012, when KIT Digital's board of directors asked Tuzman for his resignation.  (Tr. 961- 63, 1958)

In sum, the charged market manipulation conspiracy is not time-barred, and there is no evidence that Tuzman withdrew from the conspiracy.

### C.   Use of Interstate Wires and Venue

Amanat argues that his convictions for conspiracy to commit wire fraud on Maiden Capital investors (Count One) and substantive wire fraud with respect to Maiden Capital investors (Count Two), must be vacated, because the Government "failed to identify any use of interstate wires that furthered the specific scheme charged in the Indictment."  (Amanat Br. (Dkt. No. 735) at 26 (emphasis in original))  Amanat further contends that proof of proper venue is

---

[12]  Id. citing KIT Ex. 3348 (October 19, 2011 Tuzman text message in which he says that he will not "lie" to Maiden Capital investors); KIT Ex. 3325 (May 29, 2012 Tuzman text message stating, "I will not commit fraud for you"); KIT Ex. 3329 (May 30, 2012 Tuzman text message stating, "I am not committing fraud for you"); KIT Ex. 3328 (June 14, 2012 Tuzman text message stating that Tuzman intended to comply with "SEC rules" and was "not going to do anything wrong").

lacking for these counts and for Count Three (aiding and abetting investment adviser fraud), because the Government did not introduce evidence that wires and instrumentalities of interstate commerce used in furtherance of these fraud schemes touched the Southern District of New York.  (Id. at 34-35)

### 1.   Use of Interstate Wires

"To prove mail or wire fraud, the government must show (1) a scheme to defraud victims (2) by obtaining their money or property (3) furthered by the use of interstate mail or wires."  United States v. McGinn, 787 F.3d 116, 122 (2d Cir. 2015).  "These elements make clear that the regulated conduct is not merely a 'scheme to defraud,' but more precisely the use of the mail or wires in furtherance of a scheme to defraud."  Bascuñán v. Elsaca, 927 F.3d 108, 122 (2d Cir. 2019) (emphasis in original).  The Court concludes that the Government introduced ample evidence that Amanat and his co-conspirators used interstate wires in furtherance of the scheme to defraud Maiden Capital investors.

### a.   Bank Wires

In 2011, Amanat wired more than $500,000 to Maiden Capital's Bank of America account.  (Tr. 883, 4959-60; GX 606 (Maiden Capital's Bank of America statements) at 242, 246, 250, 253, 257, 260, 264; GX 3800-AA (chart of wire transfers from Enable to Maiden Capital between June and December 2011)).  There is evidence that Maiden Capital's Bank of America account was based in North Carolina, like Maiden Capital itself.  (E.g. GX 606 (Maiden Capital's Bank of America statements) at 1; GX 634 (Enable's First Republic records) at 129, 136, 145, 161, 179, 204, 219, 240, 272, 308 (listing "BK AMERICA NC" as recipient of wired funds))

Amanat's wires to Maiden Capital in 2011 came from Enable's First Republic Bank account.  (GX 11; Tr. 4921-22; GX 606 at 242, 246, 250, 253, 257, 260, 264; GX 633 at 23-25, 29, 33, 36, 41, 50, 52)  The evidence indicates that the wires originated from First Republic in San Francisco.  (GX 624, GX 626, and GX 632 (Wire Records))  The evidence also shows that Amanat used one of First Republic's New York City branches for Enable's banking. (GX 635 (Amanat First Republic cashier's checks) at 4; GX 625 at 5 (Amanat First Republic form, listing "Time Warner" office))  The First Republic statements for Enable's account list a New Jersey address for Enable.  (GX 633 at 1)

In January 2012, Amanat used Enable's J.P. Morgan Chase account to wire $10,000 to Maiden Capital.  (GX 606 (Maiden Capital Bank of America statements) at 268; GX 653 (Enable J.P. Morgan Chase statements) at 6)  Enable's J.P. Morgan Chase account shows an address for Enable on Fifth Avenue in Manhattan.  (GX 653 (Enable J.P. Morgan Chase statements) at 3; see also GX 650 (2008 J.P. Morgan Chase statements for another Enable entity located on West End Avenue in Manhattan) at 2)

Amanat contends that, absent evidence about "where the [banks'] servers or technological infrastructure is housed, it is simply pure speculation to suggest that an interstate wire was either sent or contemplated[.]"  (Amanat Supp. Br. (Dkt. No. 894) at 9; Amanat Jan. 24, 2020 Ltr. (Dkt. No. 1056))  While Amanat argued to the jury that the Government's evidence of interstate wires was lacking (Tr. 7004-05, 7089-91), a "verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable."  United States v. MacPherson, 424 F.3d 183, 190 (2d Cir. 2005); cf. United States v. Kim, 246 F.3d 186, 189-91 (2d Cir. 2001) (finding venue in the Southern District of New York where wires were "sent to and by Chase Manhattan bank," which was "headquartered in New

York," without any discussion of where bank's servers or technological infrastructure were housed).

Here, there was a sufficient basis for the jury to find that Amanat's bank wires to Maiden Capital crossed state lines, given evidence that Enable and Maiden Capital and the banks that they used were all located in different states.  See United States v. Bankston, 820 F.3d 215, 235 (6th Cir. 2016) ("The government was not obliged to prove the actual location of the . . . server, only that [the defendant's] transaction involved the use of an interstate wire."); United States v. Zayac, 765 F.3d 112, 117-18 (2d Cir. 2014) ("'[T]he jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence.'") (quoting United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008)); United States v. Beridze, 415 F. App'x 320, 326 (2d Cir. 2011) ("Testimony that some credit card transactions might be processed in 'other places,' which Beridze speculates could include New York, is insufficient to undermine this evidence [of an interstate wire].") (citation omitted); United States v. Gomez, 213 F.3d 627 (2d Cir. 2000) (unpublished table decision) ("A reasonable juror could have concluded from the record that [the defendant] directed the operations of . . . a company located in Puerto Rico . . . that . . . fraudulently billed . . . Medicare over interstate wires [via] . . . a billing company located in Florida. . . ."); see also United States v. Williams, 673 F. App'x 620, 623 (9th Cir. 2016) ("[The defendant] . . . argues that the government did not present sufficient evidence of the interstate nature of the wire transfers. . . . However, the use of the wire system is by its very nature interstate. . . ."); United States v. Robertson, 493 F.3d 1322, 1331 (11th Cir. 2007) ("[W]ire fraud . . . can be proved by circumstantial evidence."); United States v. Czubinski, 106 F.3d 1069, 1074 n.5 (1st Cir. 1997) ("We do not find that it was irrational for a trier of fact to

conclude beyond a reasonable doubt that [defendant's] searches caused information from the . . . master file in Martinsburg, West Virginia, to be sent to his terminal in Boston.  The interstate element could reasonably be inferred from circumstantial evidence.").

Amanat also argues that there was "no information about the nature or purpose of these transactions, and therefore no information that any reasonable factfinder could have used to determine they were sent in furtherance of the scheme."  (Amanat Reply Br. (Dkt. No. 755) at 6 (emphasis in original))  But Maiden testified that most of the $500,000 that was wired from Enable's bank accounts to Maiden Capital was used to fund redemption requests by Maiden Capital investors.  (Tr. 883)

On June 2, 2011, for example, Maiden Capital received a $250,000 wire from Enable's bank account, and that same day Maiden wired the same amount to Alpine Capital. (GX 633 at 23; GX 606 at 242; Tr. 1124, 4959-61, 4966)  And on June 6, 2011, Maiden Capital received a $50,000 wire from Enable's bank account, and that same day Maiden wired the same amount to Alpine Capital.  (GX 633 at 23; GX 606 at 242; Tr. 4959, 4961-62)  The purpose of these wires was clear:  Alpine Capital was a Maiden Capital investor, and Maiden sent these wires to partially satisfy his customer's $1 million redemption request.  (Tr. 872, 1124)  Indeed, Maiden specifically requested this money from Amanat for this purpose.  (Tr. 873)

### b.   **Phone Calls, Emails, and Text Messages**

The Government also offered evidence of numerous phone calls, text messages, and emails between Maiden and Amanat that furthered the scheme to defraud Maiden Capital investors.  For example, in a September 2, 2009 Maiden email to the Amanat brothers, Maiden asked for his "[E]nable balance NOW," because he "need[ed] to put out num[bers]," and Amanat responded to Maiden's message by asking his brother, "can [you] get this immediately?"  (GX

1625)  At Amanat's direction, Irfan Amanat sent Maiden a statement with a fabricated balance of $2,120,132.67.  (GX 1624 (Sept. 2, 2009 email chain between Maiden and Amanat brothers); Tr. 796-97)  Maiden and Amanat also exchanged numerous emails during 2011 and 2012 about redemption requests from Maiden Capital investors.[13]

Similarly, Maiden testified that in 2011 he spoke "often" with Omar Amanat, and that redemption requests from Maiden Capital investors were "the principal topic" of their conversations.  (Tr. 884)  For example, Maiden and Amanat discussed Ellington's redemption request "very often" between August and September 2011.  (Tr. 916)  And in June 2012, Maiden – who lived and worked in North Carolina – organized a phone call with Ellington – who lived in and worked in South Carolina – and Amanat who, as discussed below, lived in the New York metropolitan area, in which Amanat "tried to minimize the issues" facing Maiden Capital.  (Tr. 916-18, 3519).  Amanat spoke with Ellington to "[t]o keep him calm so he wouldn't go to the authorities," and to "buy time," as Ellington had "wanted [his] money back for a long time."  (Tr. 917)

In addition to numerous emails and telephone calls, Amanat and Maiden exchanged hundreds of text messages in 2011 and 2012 that were in furtherance of the scheme to defraud Maiden Capital investors.  Many of these text messages concerned redemption requests from Maiden Capital investors.[14]

---

[13]  See, e.g. GX 1725 (Oct. 12, 2011 email chain between Maiden and Amanat regarding Ellington's redemption request); GX 1729 (Nov. 17, 2011 email chain between Maiden and Amanat concerning Maiden's request for a $260,000 wire); Tr. 935-36 (Maiden testifying that he was requesting $260,000 "to pay redemptions" and "for [his] living stipend"); GX 1754 (Maiden forwarding to Amanat an April 24, 2012 email from Maiden Capital investor Adam Hynes, who had requested to redeem, and Amanat responding "Will call you").

[14]  See, e.g., GX 1785-F (Aug. 10, 2011 Maiden text message to Amanat stating that Maiden Capital investor Kris "[P]eavey needs 150k redemption. . . . Will talk through tomorrow but timing important on this one."); GX 1785-P (Aug. 28, 2011 Maiden text message to Amanat

Given that Maiden and Amanat had extensive communications about the Maiden Capital fraud by telephone, text message, and email, a rational juror could find that the scheme "was facilitated by use of the interstate . . . wires."  United States v. Kitchen, 213 F.3d 627 (2d Cir. 2000) (unpublished table decision); see also McGinn, 787 F.3d at 122 (to prove wire fraud, Government must show that scheme was "furthered by the use of interstate mail or wires").

Amanat complains, however, that the Government did not provide "location information for any specific communications."  (Amanat Supp. Br. (Dkt. No. 894) at 8)  There is ample evidence that Maiden lived and worked in North Carolina, however,[15] and there is no evidence that any of Amanat's communications with Maiden took place while Amanat was in North Carolina.  And, as discussed in more detail below, all addresses associated with Amanat are in New York or New Jersey.

In sum, a reasonable juror could have found that Maiden and Amanat were not in the same state when their numerous wire communications in furtherance of the fraud on Maiden Capital investors took place.  See United States v. Napier, 787 F.3d 333, 346 (6th Cir. 2015) ("[Defendant] argued . . . that the government must prove where the recipient of any particular email was physically located when the email transmission was received.  This is not the relevant inquiry.  The relevant inquiry is whether there is enough circumstantial evidence that these

---

stating "Peavy needs 150 tomorrow"); GX 1785-Q (Aug. 29, 2011 Amanat text message to Maiden stating, "We need a full game plan on redemptions"); GX 1785-AY (Jan. 22, 2012 text message exchange between Maiden and Amanat:  MAIDEN: "Can u send 150 tomorrow. Critical bro." AMANAT: "Why?" MAIDEN: "To pay 2 guys . . . Cant wait anymore. . . ."  AMANAT:  "Pay who[?]"  MAIDEN:  "Partial redemp 2 Investors that been waiting 9 months and won't wait any more. . . .").

[15]  See, e.g., Tr. 549, 676, 790, 995, 1911, 5887; GX 606 (Bank of America statement listing Charlotte, North Carolina address for Maiden Capital); GX 1517-A (December 31, 2008 Agreement listing Charlotte, North Carolina address for Maiden Capital; GX 1625 (Maiden's email signature listing a North Carolina address and North Carolina area codes for work phone, cell phone, and telefax))

electronic communications were transmitted through interstate wires.  Given the omnipresent nature of the Internet, this is not a difficult burden for the government to satisfy."); <u>United States v. Griffith</u>, 17 F.3d 865, 874-75 (6th Cir. 1994) ("[T]here is no requirement that the government produce direct proof in the form of telephone bills. . . . If the government's circumstantial evidence will permit a reasonable inference that parties to a telephone conversation were located in different states at the time of the call, . . . there is substantial evidence to support the conviction.").

## 2.      <u>Venue</u>

Amanat argues that evidence of proper venue is lacking.  As to Counts One and Two – conspiracy to commit wire fraud and wire fraud – Amanat asserts that the Government "introduced no proof of actual interstate wires sent into the Southern District of New York in furtherance of the scheme charged[.]"  (Amanat Br. (Dkt. No. 735) at 33)  As to Count Three – aiding and abetting investment adviser fraud – Amanat contends that the "Government failed entirely to identify any use of the mails or instrumentality of interstate commerce by Stephen Maiden to execute the fraud scheme . . . in the Southern District of New York."  (Amanat Br. (Dkt. No. 735) at 34-35)

### a.      <u>Legal Standards</u>

"Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that defendants be tried in the district where their crime was 'committed.'"  <u>United States v. Ramirez</u>, 420 F.3d 134, 138 (2d Cir. 2005) (citing U.S. Const. amend. IV; Fed. R. Crim. P. 18). "When a federal statute defining an offense does not specify how to determine where the crime was committed, [courts] look to the nature of the crime alleged and the location of the act or acts constituting it."  <u>United States v. Rutigliano</u>, 790 F.3d 389, 395 (2d Cir. 2015) (internal quotation

50

marks omitted).  "'Venue is proper only where the acts constituting the offense – the crime's

'essential conduct elements' – took place.'"  United States v. Abdullaev, 761 F. App'x 78, 83 (2d

Cir. 2019) (summary order) (quoting United States v. Tzolov, 642 F.3d 314, 318 (2d Cir. 2011)).

　　　　　"Both wire fraud and conspiracy are continuing offenses."  Bergstein, 2018 WL

2417845, at *8 (citing Rutigliano, 790 F.3d at 395-96).  As such, "venue may be proper in more

than one location."  Rutigliano, 790 F.3d at 395.  Moreover, "[v]enue is proper in 'any district in

which an offense was begun, continued, or completed.'"  United States v. Williams, 736 F.

App'x 267, 271 (2d Cir. 2018) (summary order) (quoting United States v. Lange, 834 F.3d 58,

69 (2d Cir. 2016)).  "[F]or purposes of [a] conspiracy [charge], venue may be grounded in any

act performed by any conspirator undertaken to further the object of the conspiracy."  Rutigliano,

790 F.3d at 397.

　　　　　Under the Investment Advisers Act, "venue is proper 'in the district wherein any

act or transaction constituting the violation occurred.'"  Bergstein, 2018 WL 2417845, at *7

(quoting 15 U.S.C. § 80b-14).  Where, as here, a defendant is charged with aiding and abetting,

"[v]enue is proper where the defendant's accessorial acts were committed or where the

underlying crime occurred."  United States v. Smith, 198 F.3d 377, 383 (2d Cir. 1999) (emphasis

omitted).  And "'where a crime consists of distinct parts which have different localities[,] the

whole may be tried where any part can be proved to have been done.'"  Lange, 834 F.3d at 70

(quoting United States v. Rowe, 414 F.3d 271, 278 (2d Cir. 2005)).

　　　　　"Because venue is not an element of a crime, the government must prove its

propriety by only a preponderance of the evidence."  United States v. Kirk Tang Yuk, 885 F.3d

57, 71 (2d Cir. 2018).  "In challenging the sufficiency of the government's venue evidence,

defendants 'bear[] a heavy burden, because the reviewing court is required to draw all

permissible inferences in favor of the government.'" Rutigliano, 790 F.3d at 396 (quoting

United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011)).  Finally, "venue may be proved by

circumstantial evidence." United States v. Potamitis, 739 F.2d 784, 791 (2d Cir. 1984).[16]

### b.    Application

As to the conspiracy to defraud Maiden Capital investors (Count One) and aiding

and abetting investment adviser fraud (Count Three), a reasonable jury could have found that

venue was proper in the Southern District of New York based on the July 16 and 17, 2011

meeting at "KIT digital's offices in midtown . . . Manhattan." (Tr. 886)  At that time, "over a

million" dollars worth of Maiden Capital investor redemption requests were outstanding.  (Tr.

889)  At the meeting, Maiden, Amanat, and Tuzman "discuss[ed] [ways] to cover up the Maiden

[Capital] problem." (Tr. 886, 890)  Before the meeting, Amanat advised Maiden to "[p]aint a

stark nightmare scenario if [Maiden Capital] goes under . . . . [E]veryone here will be sued.

Securities laws violations have occurred.  Criminal behavior jail time.  Bottom line:  fund needs

to be made whole or ship will sink." (GX 1785-D)  Prior to the meeting, Amanat had been

helping Maiden to cover Maiden Capital investor redemptions.  The purpose of the midtown

---

[16] The Second Circuit has "'occasionally . . . supplemented [its] venue inquiry with a
"substantial contacts" test that takes into account a number of factors . . . including the site of the
defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal
conduct, and the suitability of the venue for accurate factfinding.'" Kirk Tang Yuk, 885 F.3d at
70 (quoting Lange, 834 F.3d at 71) (alterations omitted).  Such an "inquiry is made[, however,]
only if 'the defendant argues that his prosecution in the contested district will result in a hardship
to him, prejudice him, or undermine the fairness of his trial.'" Rutigliano, 790 F.3d at 399
(quoting Coplan, 703 F.3d at 80).  Amanat has made no such argument here.  Accordingly, the
"substantial contacts" test has no application.  See, e.g. United States v. Magassouba, 619 F.3d
202, 205 n.2 (2d Cir. 2010) ("Although this Circuit often applies a 'substantial contacts test'
. . . , we need not apply that test here, . . . because [defendant] does not argue that his prosecution
in the Southern District of New York . . . resulted in a hardship to him, prejudiced him, or
undermined the fairness of his trial.").

Manhattan meeting was "to get more assets from . . . other[s]" to fund investor redemptions (Tr. 890), and thus forestall disclosure of the fraud.

A reasonable juror could readily conclude by a preponderance of the evidence that the midtown Manhattan meeting among Maiden, Amanat, and Tuzman was an act in furtherance of the conspiracy to defraud Maiden Capital investors.  Moreover, in attending and participating in this meeting, Amanat aided and abetted Maiden's investment adviser fraud.  There is thus sufficient evidence to demonstrate proper venue for Counts One and Three.[17]  See United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007) ("[V]enue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme."); United States v. Tomasetta, No. 10 Cr. 1205(PAC), 2012 WL 2064978, at *6-7 (S.D.N.Y. June 6, 2012) ("[T]he Government need only show one act, which itself may be innocent, occurred in this District that was 'done in furtherance of the object or purpose of the conspiracy.' . . . [A] communication in a district that furthers the conspiracy is sufficient to establish venue there.") (quoting Tzolov, 642 F.3d at 319-20).

As to Count Two, the substantive wire fraud charge, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends."  Rutigliano, 790 F.3d at 397. Although the Government did not offer direct proof that any specific communication was sent from or received in the Southern District of New York, the record contains sufficient circumstantial evidence for a reasonable juror to conclude – by a preponderance of the evidence – that at least one of the many wire communications that Amanat and Maiden exchanged in furtherance of the Maiden Capital fraud scheme was connected to this District.

---

[17]  Although evidence of the July 2011 midtown Manhattan meeting is sufficient to demonstrate proper venue as to both Counts One and Three, the evidence discussed below regarding Count Two also demonstrates that venue is proper as to Counts One and Three.

The Government's evidence at trial indicates that Amanat had multiple home and work addresses in Manhattan.  For example, the December 31, 2008 Agreement lists a "registered address" for Omar Amanat at 33 West End Avenue in Manhattan.  (GX 1517-A) And the J.P. Morgan Chase bank records from August 2008 for Enable Invest LLC list the same 33 West End Avenue address.  (GX 650)  A May 2009 draft settlement agreement among Tuzman, KIT Capital, MNA Partners Limited, Irfan Amanat, Omar Amanat, Afzal Amanat, Amanat Capital, and Maiden Capital lists Omar Amanat's residence as 15 East 69th Street in Manhattan.  (GX 1822)  And 2012 bank statements for the Cornucopia entity controlled by Amanat list an address of 712 Fifth Avenue in Manhattan.  (GX 651 at 4; Tr. 874)  2012 bank statements for another Enable entity – Enable Invest Commodities Hedge Fund I LLC – also list an address of 712 Fifth Avenue in Manhattan.  (GX 653 at 4)  Still other evidence links Amanat to 306 East 51st in Manhattan.  (GX 694-A; GX 694-E)

The Government also introduced evidence demonstrating that Amanat conducted his banking activities in Manhattan.  (See, e.g., GX 629 at 3 (Aug. 24, 2010 First Republic cashier's check from Manhattan branch of First Republic); GX 1510 (Nov. 10, 2008 Amanat email to Maiden asking that Maiden wire $2 million to a J.P. Morgan Chase bank in Manhattan)) First Republic bank records also list phone and fax numbers with New York area codes for Amanat.  (GX 622 (First Republic bank records) at 10)  The record also includes evidence that Amanat met with Maiden, Tuzman, Maiden Capital investor Kris Peavy, and KIT Digital board member Joseph Mullin in Manhattan.  (Tr. 241-42, 636, 886, 892)

Given Amanat's connections with Manhattan and his countless communications with Maiden – by phone, email, and text – about the fraud being perpetrated on Maiden Capital investors, a reasonable juror could have found – by a preponderance of the evidence – that

Amanat was in Manhattan on at least one occasion when he engaged in an interstate communication in furtherance of the Maiden Capital wire fraud.

### D.     Special Agent DeCapua's Testimony

As noted above, the Government offered rebuttal testimony indicating that Amanat had introduced fabricated emails at trial. Amanat contends that he is entitled to a new trial because – during the Government's rebuttal case – FBI Special Agent Joel DeCapua was permitted to offer unreliable expert testimony concerning the allegedly fabricated emails. (Amanat Br. (Dkt. No. 735) at 35-48; Tuzman Br. (Dkt. No. 738) at 70 n.24 (joining Amanat's arguments as to Agent DeCapua)) Amanat's arguments are not persuasive.

### 1.     Background

On November 6, 2017, about a week after trial began, Amanat's counsel provided the Government with "a stack of email chains marked for identification, including Amanat Exhibits 9002, 9010, 9013, and 908." (Nov. 28, 2017 Govt. Ltr. (Dkt. No. 615) at 7) On November 15, 2017, Amanat's counsel produced another email dated May 8, 2009, which was purportedly authored by Tuzman. (Id. at 2-3)

Over the next two weeks, the four emails produced by Amanat's counsel on November 6, 2017 (the "Amanat Emails"), were introduced by Amanat into evidence. (Tr. 1484, 1495, 1962, 2501; Amanat Exs. 908, 9002, 9010, 9013) These exhibits included emails between Omar Amanat and his father addressing "Maiden and Kaleil [Tuzman] issues." (Amanat Ex. 908) In these emails to his father, Amanat forwarded purported email exchanges he had had with Maiden. (Id.; Amanat Ex. 9002, 9010, 9013) The emails were offered to show Amanat's state of mind, and tended to exculpate him. For example, in a purported March 10, 2009 email to his father (Amanat Ex. 908), Amanat wrote that he was

> taking care of Maiden and Kaleil issues and re-assuring them that we will be there at the end of the day provided they live up to their promises and disclose everything to their investors . . . .

(Id.)  Portions of the Amanat Emails had been transmitted over Yahoo.com.

Amanat's counsel had alluded to the statements contained in these emails in his opening (see Tr. 182), but they had not been produced to the Government as part of reciprocal Rule 16 discovery.  (Tr. 1240-41 (describing the emails as "pure impeachment"))  Moreover, during the Government's investigation in 2016, it had obtained a search warrant for Omar Amanat's email account hosted on Yahoo, and the Amanat Emails had not been produced in response to the Government's search warrant.  (Nov. 28, 2017 Govt. Ltr. (Dkt. No. 615) at 5; Tr. 3395 (discussing Yahoo search warrant response))

In a November 28, 2017 letter, the Government asserted that the Amanat Emails contained numerous irregularities, which led the Government to conclude that they were "not authentic" and were apparently "fabricated by [Amanat]."  (Nov. 28, 2017 Govt. Ltr. (Dkt. No. 615) at 1)  After the close of the trial day on December 5, 6, and 8, 2017, the Court conducted an evidentiary hearing – outside the presence of the jury – concerning the Government's allegations that the Amanat Emails had been fabricated (the "Evidentiary Hearing").  Five witnesses testified at the Evidentiary Hearing concerning the authenticity of the Amanat Emails.  (Tr. 3932-4093, 4279-4427, 4678-4705)  Following the Evidentiary Hearing, the Court directed the parties to submit additional briefing.  (See Dkt. Nos. 617-20; Dec. 11, 2017 Def. Ltr.)

After conducting the Evidentiary Hearing and reviewing the parties' supplementary briefing, the Court concluded that the Government had offered compelling evidence that the Amanat Emails had been fabricated.  (Tr. 5136-37)  A Yahoo representative testified "that the emails were not in the relevant Yahoo accounts when the government served

its search warrant in the summer of 2016," and Maiden testified "that he never received the emails" at issue.  Maiden's testimony was corroborated by evidence that the Amanat Emails "were not found on Maiden's computers."  (Tr. 5136)  Accordingly, the Court ruled that the Government would be permitted to offer evidence that the Amanat Emails had been fabricated, reasoning that such evidence was probative of Amanat's "consciousness of guilt," and finding that this evidence was "more probative than prejudicial under Rule 403."  (Tr. 5138, 5146, 6439)

As discussed below, to ensure that Tuzman would not suffer any unfair prejudice as a result of this ruling, the Court gave an agreed-upon instruction to the jury – both at the time that the evidence was admitted, and in the jury charge – that the evidence regarding fabricated emails "may only be considered by you as to Mr. Amanat, and only on the issue of whether it demonstrates Mr. Amanat's consciousness of guilt."  (Tr. 6445-46, 7152-53)  The Court also did not permit the Government to argue before the jury that the email produced by Amanat's counsel to the Government on November 15, 2017 – which purportedly had been authored by Tuzman – was fabricated.[18]

In support of its argument that the Amanat Emails were fabricated, the Government called Agent DeCapua, who was permitted to offer expert testimony concerning the Amanat Emails.  Neither Defendant objected at trial to the Court's ruling that Agent DeCapua was qualified to offer expert testimony.  (Tr. 6546)

---

[18]  Unlike the Amanat Emails, the email purportedly authored by Tuzman had not been introduced into evidence.  (See Nov. 28, 2017 Govt. Ltr. (Dkt. No. 615) at 2)

2.     **Legal Standards**

a.     **Rule 702**

Whether expert testimony should be admitted is a matter committed to the trial

judge's "broad discretion."  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).

Under Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will
> > help the trier of fact to understand the evidence or to determine a fact in
> > issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts
> > of the case.

Fed. R. Evid. 702.

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), "a

court's Rule 702 inquiry involves the assessment of three issues:  (1) the qualifications of the

expert, (2) the reliability of the methodology and underlying data employed by the expert, and

(3) the relevance of that about which the expert intends to testify."  Washington v. Kellwood Co.,

105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) (citations omitted).  The party seeking to rely on

expert testimony bears the burden of establishing by a preponderance of the evidence that all

requirements for admissibility have been met.  United States v. Williams, 506 F.3d 151, 160 (2d

Cir. 2007).

"Whether a proposed expert has the requisite qualifications depends on his or her

educational background, training, and experience in the field(s) relevant to the opinions he or she

seeks to give."  S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).  "[C]ourts in this

circuit have noted that an expert should not be required to satisfy an overly narrow test of his

own qualifications." Arista Records LLC v. Lime Grp. LLC, No. 06 CV 5936 (KMW), 2011

WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (internal quotation marks and citations omitted).

"Thus, [i]f the expert has educational and experiential qualifications in a general field closely

related to the subject matter in question, the court will not exclude the testimony solely on the

ground that the witness lacks expertise in the specialized areas that are directly pertinent."

Washington, 105 F. Supp. 3d at 305 (internal quotation marks and citations omitted); see also

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 691 F. Supp. 2d

448, 457 (S.D.N.Y. 2010) ("[T]he Second Circuit [has] allowed an expert to testify as to matters

within his general expertise even though he lacked qualifications as to certain technical matters

within that field." (citing McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042-43 (2d Cir. 1995))).

　　　　In assessing reliability, "the district court must focus on the principles and

methodology employed by the expert, without regard to the conclusions the expert has reached

or the district court's belief as to the correctness of those conclusions." Amorgianos v. Nat'l

R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002). To determine whether the expert's

opinion is reliable, a trial court should consider, among other things, "the theory's testability, the

extent to which it 'has been subjected to peer review and publication,' the extent to which a

technique is subject to 'standards controlling the technique's operation,' the 'known or potential

rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" United

States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015) (quoting Daubert, 509 U.S. at 593-94). The

inquiry is "a flexible one," however, and there is no "definitive checklist or test" for determining

the reliability of expert testimony. Id. (internal quotation marks and citations omitted).

Moreover, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Amorgianos, 303 F.3d at 267. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Id. (internal quotation marks and citations omitted). "As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596).

At the same time, there must be "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions." Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005). "[I]t is critical that an expert's analysis be reliable at every step." Amorgianos, 303 F.3d at 267. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

### b.     Plain Error Standard

Because neither Defendant objected to Agent DeCapua offering expert testimony at trial (see Tr. 6546), the Court reviews the admission of his testimony for plain error. See United States v. Cummings, 858 F.3d 763, 771 (2d Cir. 2017) (where the defendant "fails to preserve an evidentiary challenge by lodging a timely objection, we review for plain error" (internal quotation marks and citation omitted)). Under the plain error standard, "a defendant is not entitled to relief unless there is (1) error that (2) is plain and (3) affects his substantial rights." United States v. Dupree, 870 F.3d 62, 71 (2d Cir. 2017) (citation omitted). "If all three conditions are met, [a court] may then exercise [its] discretion to notice a forfeited error, but only

if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial

proceedings." Id. (internal quotation marks and citations omitted).

### 3.     **Agent DeCapua's Trial Testimony**

At the outset of his trial testimony, Agent DeCapua discussed his training in the

forensic analysis of email communications and listed numerous certifications he had received

from a professional organization that offers certifications for forensic digital analysis.  (Tr. 6539-

44, 6597)  Agent DeCapua further testified that, in the course of his work with the FBI's

cybercrime unit, he had analyzed hundreds of email headers.  (Tr. 6544)

More generally, Agent DeCapua testified about remote webmail servers – such as

Gmail, Yahoo, and Hotmail – and how they communicate with local email clients, such as

Outlook and Apple mail.  He also explained the types of software that facilitate the

synchronization of emails on a laptop computer with a remote email server.  Agent DeCapua also

addressed "spoofing," which involves tampering with an email header to introduce false

information regarding the sender, the date the email was sent, or the recipient of the email.  (Tr.

6544-46)

Without objection from the Defendants, the Court ruled that Agent DeCapua

"could offer an opinion related to the analysis of electronic evidence, including email headers

and email platforms."  (Tr. 6546)

Agent DeCapua then addressed Amanat Exhibits 908 and 9002, both of which

had been offered by Amanat and received in evidence.[19]  (Tr. 1484, 1962)  Agent DeCapua

opined that each of these emails had been fabricated because – in contrast to hundreds of other

---

[19]  During Agent DeCapua's testimony, Amanat Exhibits 908 and 9002 are also referenced as
GX 3550 and 3552, respectively.  (Tr. 6308, 6567, 6569, 6575)

email messages between Maiden and Amanat found on Maiden's computer – the date and time information set forth in the email header of these emails did not match the "epoch time stamp," which Agent DeCapua described as a "hidden time stamp."  (Tr. 6569-77, 6583, 6599-00)

In connection with Amanat Exhibit 9013 – which had likewise been offered by Amanat and received in evidence (Tr. 2501)[20] – Agent DeCapua addressed Universal Unique Identifiers or "UUIDs," which he described as message identifier numbers.  (Tr. 6565)  He explained that Amanat Exhibit 9013 is a message from the Apple mail email service, and that it contains – on the face of the message – a UUID, or message identifier number.  The UUID for this message contains the character "V."  But a true UUID for an Apple email cannot contain the character "V."  Accordingly, Agent DeCapua concluded that this email had likewise been fabricated.  (Tr. 6586-91)

### 4.      Analysis

Amanat's challenge to Agent DeCapua's trial testimony is narrow.  Amanat contends that Agent DeCapua's trial testimony regarding "epoch time stamps" is unreliable, because it is inconsistent with his testimony at a December 18, 2017 Daubert hearing (the "Daubert Hearing").  (Amanat Br. (Dkt. No. 735) at 36-38)  Amanat further contends that Agent DeCapua's testimony regarding UUIDs is "objectively false" and therefore unreliable.  (Id. at 38)

### a.      Epoch Time Stamps

During the Daubert Hearing, Agent DeCapua testified that an "[e]poch time stamp" reflects the number of seconds that have elapsed since January 1, 1970, and that these

---

[20]  Amanat Exhibit 9013 is referenced in Agent DeCapua's testimony as GX 3551.  (Tr. 6567, 6586)

stamps are a "standard way that computers communicate times to each other." (Tr. 6301-02) Agent DeCapua reviewed hundreds of emails between Maiden and Amanat found on the hard drive of Maiden's computer.  Amanat's emails had been sent over his Blackberry email account. (Tr. 6308-20)  The epoch time stamps for these emails invariably matched the date and time sent information set forth in the email headers.  (Tr. 6313-14, 6320)

By contrast, Amanat Exhibit 908 – purportedly sent on March 10, 2009 – and Amanat Exhibit 9002 – purportedly sent on December 2, 2008 – had epoch time stamps that were "different than the stated sent date on the email."  (Tr. 6314, 6318-20)[21]  These were "the only two emails that had an epoch time stamp that didn't align with the date and time the emails were sent."  (Tr. 6320)  This discrepancy led Agent DeCapua to conclude that Amanat Exhibits 908 and 9002 were "fake."  (Tr. 6315, 6320)

At trial, however, Agent DeCapua testified that the epoch time stamps for all Maiden-Amanat Blackberry emails that he had examined from Maiden's computer – other than Amanat Exhibits 908 and 9002 – matched the sent times "within an approximation."  (Tr. 6574, 6577)  For all such emails other than Amanat Exhibits 908 and 9002, the epoch time stamps were "consistently a few seconds to maybe like a minute or two, at most, different from the actual sent time of the email."  (Tr. 6602)

Amanat contends that Agent DeCapua's testimony concerning the significance of the epoch time stamps is unreliable because it differs from his testimony at the Daubert Hearing. (Amanat Br. (Dkt. No. 735) at 36)  According to Amanat, Agent DeCapua did not suggest at the Daubert Hearing that he "had observed anything other than a precise correlation between the

---

[21]  Amanat Exhibit 908 – purportedly sent on March 10, 2009 – had an epoch time stamp corresponding to July 23, 2009 (Tr. 6314), and Amanat Exhibit 9002 – purportedly sent on December 2, 2008 – had an epoch time stamp corresponding to October 29, 2087.  (Tr. 6318-19)

supposed epoch time stamps and the sent times." (Id. at 37)  At trial, however, Agent DeCapua testified that the epoch time stamps and sent times matched "within an approximation."  (Id.)

The Court concludes that the difference in Agent DeCapua's testimony was an appropriate ground for cross-examination, but did not render his testimony inadmissible.  It is true that at the Daubert Hearing, Agent DeCapua indicated that there was a precise correlation between the epoch time stamps and the sent times reflected in email headers – for all but Amanat Exhibits 908 and 9002 – whereas at trial he testified that the match seen in the unchallenged emails might differ by as much as "a minute or two."  As to the alleged "fake emails," however, the difference between the epoch time stamps and the sent times reflected in the email headers was quite significant.  As to Amanat Exhibit 908, for example, there was a four-month discrepancy between the epoch time stamp and the sent time (Tr. 6314, 6574-75), and, as to Amanat Exhibit 9002, there was a 79-year discrepancy.  (Tr. 6318-19, 6583-84)  In this context, the core of Agent DeCapua's testimony remained unchanged.  See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.").

Amanat further contends that Agent DeCapua's testimony regarding epoch time stamps is unreliable because all of the emails that he reviewed were Blackberry messages (Tr. 6600), and Agent DeCapua "admitted in his testimony [1] that he had not conferred with anyone at Blackberry about his findings and [2] that he had identified no literature or other data related to his epoch time observation."  (Amanat Br. (Dkt. No. 735) at 37-38 (citing Tr. 6605-06))[22]

---

[22]  On December 28, 2020, Amanat filed a Rule 33 motion (Dkt. No. 1112), and a Supplement to the pending Rule 29 motion for a new trial, on the basis of alleged newly discovered evidence related to his Blackberry devices.  (Dkt. No. 1113)  On March 12, 2021, Amanat moved to

Acknowledging that Agent DeCapua did not consult with Blackberry and could not cite literature stating that hidden time stamps appear in Blackberry messages (Tr. 6605-06), these facts do not render his testimony inadmissible, especially on plain error review.  See Romano, 794 F.3d at 330 ("'[T]here are many different kinds of experts, and many different kinds of expertise'; and in some 'cases, the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999))); United States v. Sherry, 100 F.3d 943 (2d Cir. 1996) (unpublished table decision) ("We have defined plain error as an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." (internal quotation marks and citation omitted)); United States v. Gore, 154 F.3d 34, 43 (2d Cir. 1998) (same).

Agent DeCapua offered uncontroverted testimony that "there is literature that [states] that time stamps are sometimes embedded in [the] Message-IDs" of emails (Tr. 6606), and Amanat offered no evidence indicating that Blackberry messages do not, in fact, contain time stamps.[23]  That Agent DeCapua did not offer further support for his opinion goes to the weight, and not the admissibility, of his testimony on this point.  See Amorgianos, 303 F.3d at

---

withdraw those motions "to narrow the issues . . . and proceed to the sentencing stage."  (Mar. 12, 2021 Liebesman Ltr. (Dkt. No. 1125) at 1)  Amanat requested, however, that a portion of his withdrawn Rule 33 Motion be treated as a Supplemental Rule 29 Motion.  In this portion of Amanat's papers, he argues that Agent DeCapua's testimony is undermined by blog posts and internet articles in which Blackberry users complain that (1) some of their emails appeared to have been sent with timestamps "from the future"; and (2) some of their incoming emails and inboxes were "lost," "missing," or "deleted."  (Id. at 1-2)  But the materials cited by Amanat were available as early as 2008 or 2009 (id. at 3), and Amanat chose not to use these materials to cross-examine Agent DeCapua at trial.  In any event, that some Blackberry users have experienced issues with their devices does not alter this Court's conclusion that Agent DeCapua's opinion was sufficiently reliable to be laid before the jury.

[23]  Amanat called his own forensic expert during the Evidentiary Hearing (Tr. 4371), but offered no testimony at trial disputing Agent DeCapua's assertion that Blackberry messages contain epoch time stamps.

267 ("[L]ack of textual support may go to the weight, not the admissibility of the expert's testimony." (internal quotation marks and citation omitted)); Peerless Ins. Co. v. Marley Engineered Prods., LLC, No. CV 05-4848(AKT), 2008 WL 7440158, *6 (E.D.N.Y. June 12, 2008) ("To the extent Defendant contends that further testing should have been conducted, those concerns go to the weight of the testimony.").

### b.     UUIDs

At trial, Agent DeCapua testified that "UUID stands for Universal Unique Identifier," which is "like a serial number" that can be used to identify, inter alia, email messages, with a "very specific," recognizable format.  (Tr. 6565)  He further testified that all UUIDs appear in hexadecimal format – a base-16 counting system which starts with the digits 0 to 9 and continues to the letters A to F.  (Tr. 6565-66, 6587, 6611)  When asked for the "source of [his] understanding that all UUIDs are . . . hexadecimal," Agent DeCapua testified:  "[F]irst, it's just been through observation, and second, it's been through research.  I believe the Wikipedia post[] for UUID says [it] 'is in hexadecimal.' . . .  [Third,] other sources that don't come to mind right now, but it's an established standard."  (Tr. 6611-12)  When the Court asked him whether he had "ever seen" or had "experience with either base 32 or base 64" formats for UUIDs, Agent DeCapua testified that he had not "see[n] them in practice in digital forensics." (Tr. 6613)

In connection with Amanat Exhibit 9013 – an email purportedly sent on March 26, 2012 – Agent DeCapua determined that "it was created most likely with an Apple Mail client," which is used on iPhones and Apple computers, because he "identified the Message-ID as being the format that Apple Mail uses."  (Tr. 6586-87)  Agent DeCapua concluded that the email had been fabricated, because it had a Message-ID in the format of a UUID, meaning that it

should have been hexadecimal (including only the numbers 0 to 9 and the letters A to F).  (Tr. 6589)  Because the UUID for this message includes two V's, Agent DeCapua opined that the email was "fake."  (Id.)

Amanat contends that "[a]lmost every component" of Agent DeCapua's testimony concerning Amanat Exhibit 9013 "was objectively wrong."  (Amanat Br. (Dkt. No. 735) at 39)  Amanat first complains that the "conclusion that the message ID format meant that it had to be an Apple Mail client email was wrong."  (Id.)  But Agent DeCapua did not testify that Amanat 9013 was "definitively" an Apple Mail client email.  (Tr. 6611)  Instead, he testified that, based on his research and experience reviewing "[h]undreds" of email headers in his career (Tr. 6544), "common sense" dictated that it was "most likely . . . an Apple Mail client" email. (Tr. 6587, 6631)  While Agent DeCapua's inability to state "definitively" that the email was an Apple Mail client email presented an issue for cross-examination, it did not render his testimony concerning Amanat Exhibit 9013 inadmissible.  See Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) ("[G]aps or inconsistencies in . . . reasoning . . . go to the weight of the evidence, not to its admissibility." (internal quotation marks and citation omitted)).

Moreover, Agent DeCapua's conclusion that Amanat Exhibit 9013 had been fabricated did not hinge on whether it was an Apple Mail client email.  Instead, his opinion that the email had been fabricated was premised on his determination that the Message-ID for this email contained a UUID with non-hexadecimal characters – that is, two V's:

> Q. So you testified that the hexadecimal can only have zero through 9 or A through F.  Do I have that right?
>
> A. That's correct.
>
> Q. And in this case, what did you notice about this Message-ID that struck you, based on those parameters?

A. I noticed that in the, in the fifth set of numbers after the fourth hyphen, it does not conform to a standard for UUID, which I would expect it all to be hexadecimal.  There's two characters, they're V's, which there's no reason a V should be there, in a hexadecimal number.

Q. Based on your review of this Message-ID and your familiarity with hexadecimal characters, are you able to offer an opinion as to whether or not this Message-ID was fabricated?

A. Yes. It's fake.

(Tr. 6589)

Omar Amanat contends that "no appropriate basis" existed "for Agent DeCapua's . . . testimony that a UUID had to appear in a hexadecimal format."  (Amanat Br. (Dkt. No. 735) at 40)  According to Amanat,  Agent DeCapua could not "determine[] that all UUIDs had to appear in hexadecimal on the basis of 'observation,'" because he "had only worked in the cyber field for a relatively brief period of time, and . . . had no university training in computer science, . . . or any related field."  (Id.)

Although Amanat now challenges Agent DeCapua's qualifications to offer an opinion concerning this matter, he did not object at trial when the Court ruled that Agent DeCapua could offer opinion testimony concerning "the analysis of electronic evidence, including email headers and email platforms."  (Tr. 6546)  In any event, "courts [in this Circuit] have construed the inquiry into an expert's qualifications with an eye towards the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony."  In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 230, 250 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  Accordingly, courts "will not exclude . . . testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent," provided that "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question."  Washington, 105 F. Supp. 3d at 305

(internal quotation marks and citations omitted).  Moreover, "because 'there are many different kinds of experts, and many different kinds of expertise,' 'the relevant reliability concerns may focus upon personal knowledge or experience.'"  United States v. Gil, 680 F. App'x 11, 13 (2d Cir. 2017) (quoting Kumho Tire, 526 U.S. at 150); see also United States v. Litvak, 808 F.3d 160, 180 n.25 (2d Cir. 2015) (observing that "expert testimony does not have to rest on traditional scientific methods" (internal quotation marks, alterations, and citation omitted)).

Here, Agent DeCapua testified that he had served nine years in the FBI, including three years in the Bureau's cybercrimes squad.  (Tr. 6539)  He had obtained a variety of certifications from Global Information Assurance Certification ("GIAC"), an entity that tests and certifies digital forensics practitioners, including FBI cyber agents.  (Tr. 6542-43)  Between 2015 and 2017, Agent DeCapua had obtained certifications for (1) completing a "course of study that involve[d] the analysis of emails and email headers"; (2) a "forensic examiner" course of study "that involved analysis of digital evidence and email headers"; (3) a "forensic analyst" course of study that included instruction on "how to analyze email headers"; and (4) a "network forensic analyst" course of study that addressed "additional topics in how to analyze email headers."  (Tr. 6543-44)  In addition to this coursework, Agent DeCapua had reviewed "[h]undreds" of email headers as part of his work with the FBI's cybercrimes task force.  (Tr. 6539, 6544)  In his training and investigative work, the analysis of Message-IDs has been a "focus" of his efforts to determine whether emails have been fabricated.  (Tr. 6584-85)

At trial this Court concluded – without objection from either Defendant – that Agent DeCapua's training and experience qualified him to offer opinions concerning digital forensics, including in connection with the format of the UUIDs that he had observed in Message-IDs.  Any challenge to his qualifications was properly left to cross-examination.  See In

re Zyprexa Prod. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("Assertions that the

[expert] witness lacks particular educational or other experiential background, 'go to the weight,

not the admissibility, of [the] testimony.'" (quoting McCullock, 61 F.3d at 1044)).

          Amanat also contends that the basis for Agent DeCapua's testimony was

"flimsy," because he cited Wikipedia as one source for his understanding that all UUIDs are

hexadecimal.  (Amanat Br. (Dkt. No. 735) at 40-41)  But "there is no requirement in the Federal

Rules of Evidence or controlling case law that requires an expert to draw from published

materials in crafting an opinion."  Indiaweekly.com, LLC v. Nehaflix.com, Inc., No. 07-CV-

0194 (TLM), 2011 WL 13228299, at *2 (D. Conn. Jan. 21, 2011).  "Moreover, the trial courts of

the Second Circuit have rejected attempts to disqualify an expert based on his reliance of internet

sources generally, and Wikipedia in particular."  Id. (denying motion to preclude expert from

testifying on computer forensics issues where expert "did not rely on 'authoritative sources' in

preparation of his expert report, and used the website Wikipedia to define terms of art"); see also

Alfa Corp. v. OAO Alfa Bank, 475 F. Supp. 2d 357, 361-62 (S.D.N.Y. 2007) (observing that

many judicial opinions cite Wikipedia and that a "recent and highly-publicized analysis in the

magazine Nature found that the error rate of Wikipedia entries was not significantly greater than

in those of the Encyclopedia Britannica"; concluding that, "despite reasonable concerns about

the ability of anonymous users to alter Wikipedia entries, the information provided there is not so

inherently unreliable as to render inadmissible any opinion that references it").

          Amanat also exaggerates the extent to which Agent DeCapua's opinion

concerning UUIDs rested on Wikipedia.  Agent DeCapua testified that his opinion about the

hexadecimal nature of UUIDs was based on personal "observation" and "research," as well as on

an understanding that the hexadecimal nature of UUIDs was "an established standard" that

would be referenced in any "introductory computer science textbook." (Tr. 6612) As further evidence of this "established standard," Agent DeCapua noted that it was referenced in a "Wikipedia post for UUID." (Id.) Agent DeCapua's reference to Wikipedia does not render his testimony regarding UUIDs unreliable or inadmissible.[24]

Finally, Amanat argues that there is an "enormous amount of publicly available information indicating the UUIDs do not need to appear in hexadecimal, and therefore can easily contain a 'v.'" (Amanat Br. (Dkt. No. 735) at 45) But at trial, Amanat chose not to lay this allegedly "enormous amount of publicly available information" before the jury. Instead, he called a paralegal – with no training or experience in digital forensics – who testified merely that she had conducted an internet search for "publicly available articles discussing base 32 and base 64 UUIDs," and saw a "number" of such articles. (Tr. 6856)[25] But the paralegal did not provide any details about these articles, nor did she dispute Agent DeCapua's testimony that base 32 and base 64 may exist in "concept," but they are not actually used "in practice." (Tr. 6613)

---

[24] Although Amanat asserts that "nowhere on the UUID [W]ikipedia page does it indicate that a UUID . . . can only be represented in hexadecimal" (Amanat Br. (Dkt. No. 735) at 41 n.10 (emphasis in original)), he acknowledges that the Wikipedia entry states that "'[i]n its canonical textual representation, the sixteen octets of a UUID are represented as 32 hexadecimal (base 16) digits.'" (Id.)

[25] In support of his arguments regarding UUIDs, Amanat cites several articles and blog posts. (Amanat Br. (Dkt. No. 735) at 42-44) None of this material was introduced at trial, however. Moreover, Amanat retained a digital forensics expert, who testified at the Evidentiary Hearing. (Tr. 4371) But Amanat did not use this expert to challenge Agent DeCapua's testimony regarding UUIDs. (Tr. 6673 ("Well, without getting into the details of whether it's true or not, [Agent DeCapua] testified to that at the [Evidentiary Hearing], so you have known for some time that that was his position. And so if you thought it was wrong or incorrect, as you're saying now, then presumably the expert that you retained on this issue could testify that Agent DeCapua is wrong. In other words, my point is [that] . . . it could not have been a surprise to you that he testified in the fashion he did about UUIDs, because he testified to that before. . . . [T]o the extent he was wrong on that point, you knew he was wrong, or you had a basis for your belief that he was wrong after he testified at the [Evidentiary Hearing] outside the presence of the jury.")))

Amanat did not show at trial, and has not shown in his post-trial motions, that Agent DeCapua's testimony was false or unreliable. Accordingly, his testimony provides no basis for this Court to grant Amanat's post-trial motions.

E. **Whether Tuzman Suffered Spillover Prejudice as a Result of the Fabricated Email Evidence Admitted Against Amanat**

Tuzman argues that the admission of evidence that Amanat had fabricated emails caused Tuzman to suffer "spillover prejudice" that warrants a new trial. (Tuzman Br. (Dkt. No. 738) at 68-73) Although Tuzman did not seek a severance or a mistrial at the time, he now contends that this Court should have <u>sua</u> <u>sponte</u> "severed Amanat from the trial and allowed [] Tuzman to proceed alone before the empaneled jury." (<u>Id.</u> at 73)

1. **Background**

As discussed above, on November 6, 2017, about a week after the trial began, Amanat produced to the Government four allegedly fabricated emails, parts of which he had authored. On November 15, 2017 – two weeks into the trial – Amanat produced a fifth allegedly fabricated email, which had purportedly been authored by Tuzman. (Nov. 28, 2017 Gov't Ltr (Dkt. No. 615) at 2, 7) The four emails Amanat produced on November 6 were introduced into evidence. (Tr. 1484, 1495, 1962, 2501)

On November 28, 2017, the Government advised the Court that it believed that the Amanat Emails were "fabricated by [Amanat]." (Nov. 28, 2017 Gov't Ltr (Dkt. No. 615) at 1)

After the Government asserted that the Amanat Emails had been fabricated, Amanat announced that, "for strategic reasons," he would not seek to introduce the May 8, 2009 email purportedly authored by Tuzman. (Dec. 11, 2017 Amanat Ltr. at 2 n.1, 9) The Government, however, sought to introduce the May 8, 2009 email, arguing that it had likewise

been fabricated, and likewise demonstrated Amanat's consciousness of guilt.  (Dec. 13, 2017 Gov't Ltr. (Dkt. No. 618) at 2)

On December 15, 2017, this Court heard argument concerning the admissibility of the May 8, 2009 email.  During argument, Tuzman's counsel stated that he would not move for a severance or a mistrial based on the evidence that had been admitted concerning Amanat's alleged fabrication of emails:  "At this point in the trial if I sought a severance we would get a mistrial.  I don't want that.  We have tried this case, we want to take this case to the jury.  We don't want a mistrial."  (Tr. 5978)  That same day, the Court denied the Government's application to introduce the May 8, 2009 email on the ground that admission of the email might unfairly prejudice Tuzman.  (Tr. 5978-79)  The Court explained:  "If you accept the government's theory that Mr. Amanat fabricated the e-mail from Mr. Tuzman, it immediately raises questions about how Mr. Amanat thought he could get away with that because if Mr. Tuzman was not part of the fabrication, Mr. Amanat would face the risk that Mr. Tuzman would immediately say I had nothing to do with this e-mail."  (Tr. 5978)

The Government's evidence concerning Amanat's fabricated emails was offered in the Government's rebuttal case.  Before any such evidence was offered, the Court and the parties agreed to the text of a limiting instruction (Tr. 6434-38), which was read to the jury at the outset of the Government's rebuttal case:

> The government intends to offer evidence that defendant Omar Amanat introduced into evidence earlier in this trial emails that had been fabricated.  Mr. Amanat denies that any of the emails he introduced were fabricated.
>
> First, let me instruct you that the government's evidence concerning allegedly fabricated emails has no application whatsoever to Mr. Tuzman.  It is being offered solely as against Mr. Amanat.  The government does not claim that Mr. Tuzman was involved in any way in the alleged fabrication of the email. You may not consider this evidence for any purpose as to Mr. Tuzman.

Secondly, the evidence concerning allegedly fabricated emails is being offered for a limited purpose. That limited purpose is on the issue of whether it demonstrates Mr. Amanat's consciousness of guilt. If you find that Mr. Amanat introduced fabricated emails into evidence, you may, but need not, infer that he believed that he was guilty of the charged crimes. You may not, however, infer on the basis of this evidence alone that Mr. Amanat is, in fact, guilty of the crimes with which he's been charged.

To repeat, the evidence you are about to hear concerning allegedly fabricated emails may only be considered by you as to Mr. Amanat, and only on the issue of whether it demonstrates Mr. Amanat's consciousness of guilt. You may not infer on the basis of this evidence alone that Mr. Amanat is guilty of the charged crimes.

As with all factual questions, it is the jury's responsibility to determine whether this evidence does or does not show consciousness of guilt on the part of Mr. Amanat. Whether evidence that Mr. Amanat introduced fabricated emails into evidence shows that he believed that he was guilty of the charged crimes and the significance, if any, to be given to such evidence are matters for you, the jury, to decide.

(Tr. 6445-46) (emphasis added)

In its jury charge at the close of the case, the Court gave similar

instructions:

The government offered evidence that at this trial defendant Omar Amanat introduced emails into evidence that had been fabricated. Mr. Amanat denies that any of the emails introduced were fabricated.

As I have instructed you previously, the government's evidence concerning allegedly fabricated emails has no application whatsoever to Mr. Tuzman. It was offered solely as against Mr. Amanat. The government does not contend that Mr. Tuzman was involved in any fashion in the fabrication of email, and you may not consider this evidence for any purposes as to Mr. Tuzman.

. . . .

To repeat, the evidence you heard regarding allegedly fabricated emails may only be considered as to Mr. Amanat. . . .

(Tr. 7152-53)

2.       <u>**Analysis**</u>

As an initial matter, Tuzman waived any argument that this Court should have <u>sua sponte</u> granted him a severance or a mistrial when the fabrication issue arose at trial.  As discussed above, Tuzman's counsel stated at that time that his client was not moving for a severance or a mistrial:  "We have tried this case, we want to take this case to the jury.  We don't want a mistrial . . . ."  (Tr. 5978)  Having made a strategic decision not to seek a severance or a mistrial, Tuzman has waived any argument that this Court should have <u>sua sponte</u> granted him a severance based on the fabrication issue.  <u>See</u> <u>United States v. Williams</u>, 930 F.3d 44, 64-65 (2d Cir. 2019) ("[a] claim is waived . . . when a defendant makes an 'intentional decision not to assert a right' or, put another way, 'act[s] intentionally in pursuing, or not pursuing, a particular course of action.'") (quoting <u>United States v. Spruill</u>, 808 F.3d 585, 597 (2d Cir. 2015)).

Even if this Court were to conclude that Tuzman has not waived his severance argument, any such argument would be subject to plain error review, given Tuzman's failure to seek a severance after the fabricated email issue emerged.  The Court's failure to <u>sua sponte</u> sever Tuzman does not constitute plain error.

The Court took pains to insulate Tuzman from any unfair prejudice.  The Court barred the Government from introducing the only fabricated email purportedly authored by Tuzman.  The Court gave an extensive limiting instruction before any evidence regarding the fabricated emails was received, and repeated that admonition in the jury charge.  The Court's instructions made crystal clear that "the government's evidence concerning allegedly fabricated emails has no application whatsoever to Mr. Tuzman," that this evidence could "only be considered [by the jury] as to Mr. Amanat," that the jury could "not consider this evidence for

any purpose as to Mr. Tuzman," and that the "government does not claim that Mr. Tuzman was involved in any way in the alleged fabrication."  (Tr. 6445-46, 7152-53)

The "law recognizes a strong presumption that juries follow limiting instructions," United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006), and there is no reason to doubt that the jury adhered to the Court's instructions here.  See United States v. Downing, 297 F.3d 52, 59-60 (2d Cir. 2002) (stating that risk of "spillover" prejudice can be cured by limiting instructions, and that "[a]bsent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions." (citing Zafiro v. United States, 506 U.S. 534, 540-41 (1993); United States v. Rosa, 11 F.3d 315, 341-42 (2d Cir.1993))).

Tuzman incorrectly asserts that the Court acknowledged that it would be "almost impossible" for jurors to follow its limiting instruction.  (Tuzman Br. (Dkt. No. 738) at 72 (quoting Tr. 5978))  The language cited by Tuzman concerned not the efficacy of the limiting instruction, but rather the rationale for precluding the allegedly fabricated May 8, 2009 email, which Tuzman had purportedly authored.  (See Tr. 5978 ("If you accept the government's theory that Mr. Amanat fabricated the e-mail from Mr. Tuzman, it immediately raises questions about how Mr. Amanat thought he could get away with that because if Mr. Tuzman was not part of the fabrication, Mr. Amanat would face the risk that Mr. Tuzman would immediately say I had nothing to do with this e-mail."))  This reasoning does not apply to the allegedly fabricated Amanat Emails, because they do not purport to be authored by Tuzman.

In arguing that he suffered unfair prejudice, Tuzman asserts that the email fabrication "topic consumed a large portion of the government's rebuttal summation."  (Tuzman Br. (Dkt. No. 738) at 70 (citing Tr. 7122-24))  This is not true.  The Government's rebuttal consumes thirty-two transcript pages, and only three of those pages are devoted to the email

fabrication issue.  (Tr. 7095-7127)  Moreover, the Government argued that the email fabrication

was evidence of Omar Amanat's consciousness of guilt, not Tuzman's.  (Tr. 7122 ("I want to

touch a little bit on the fake evidence that Omar Amanat put in this trial. . . . It's a window into

his guilty mind, that in order to get out of this mess, he actually decided to put fake evidence

right in front of you."))

   In sum, this Court did not err in failing to <u>sua</u> <u>sponte</u> sever Tuzman after the

fabricated email issue emerged at trial.

  **F.**  **<u>Juror Bias</u>**

   Amanat contends that a new trial is warranted because a juror "fail[ed] to disclose

significant law enforcement connections" during <u>voir</u> <u>dire</u>.  (Amanat Br. (Dkt. No. 735) at 48-52)

   **1.**  **<u>Background</u>**

   During <u>voir</u> <u>dire</u>, the Court asked prospective jurors, "Has anyone had any

experiences or seen or read anything that leads them to have any strong feelings for or against

the FBI, the SEC, the Postal Inspection Service, or the United States Attorney's Office?"  (Oct.

24, 2017 Tr. at 194)  The Court also asked, "Have you, a family member or a close friend ever

been employed by or sought employment with any other law enforcement agency, whether

federal, state, or local?"  (<u>Id</u>.)  The juror in question did not respond to either question.  (<u>Id</u>.)

   While the jury was deliberating, Amanat's counsel informed the Court that one of

Amanat's family members had "engaged in some online Googling" of that juror, and discovered

that the juror identified herself on her Facebook page as a former "security officer" at "the

Department of Homeland Security."  (Tr. 7251, 7273)  Amanat's counsel also reported that,

through Facebook, he had learned that the juror's father had worked for the New York City

Department of Corrections.  (Tr. 7251, 7256-57)

At sidebar, the Court questioned the juror, who explained that she had worked for the Department of Homeland Security as a Transportation Security Administration ("TSA") agent 10 years earlier, between 2005 and 2007.  (Tr. 7261)  The juror also stated that her father had previously worked for the New York City Department of Corrections as a corrections officer, but that he had retired more than 20 years ago.  (Tr. 7261-62)  When the Court asked whether she viewed her prior TSA employment as responsive to the Court's questions about law enforcement, she responded, "No, because we didn't consider ourselves law enforcement.  All I did was screen passengers."  (Tr. 7266)  When asked whether she viewed her father's prior employment as responsive, she answered, "No."  (Id.)  And when asked whether she had thought "of it at the time," she replied: " No, because it was so long ago.  I don't even remember when he was employed by the Department of Corrections."  (Id.)

After questioning the juror, the Court stated:  "She struck me as extremely straightforward, and it's my conclusion, having observed her demeanor, that there was no intent to withhold anything responsive to those questions."  (Tr. 7267)

## 2. **Applicable Law**

Under "the McDonough standard for analyzing allegations that a juror's false voir dire concealed bias that affected the fairness of the trial," the "party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's voir dire response was false and second, that the correct response would have provided a valid basis for a challenge for cause." United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006) (citing McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)).  Under the first prong, "'[t]he failure to answer honestly must be deliberate; a juror's good faith failure to respond, though mistaken,'" is not enough.  United States v. Ventura, No. 09 Cr. 1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y.

Jan. 21, 2014) (quoting United States v. Sattar, 395 F. Supp. 2d 66, 72 (S.D.N.Y. 2005)).  Under

the second prong, "the district court must 'determine if it would have granted the hypothetical

challenge [for cause].'"  Stewart, 433 F.3d at 304 (citation omitted).  This test is "an exacting

hurdle because . . . motions to set aside a jury verdict are disfavored." Ventura, 2014 WL

259655, at *3; see also Stewart, 433 F.3d at 303 (observing that the Second Circuit "has never

found reason to overturn a verdict on the basis of juror nondisclosure under McDonough[,] and

only once . . . has [the Second Circuit] remanded for an evidentiary hearing on the matter.  Our

ruling here does not change those statistics" (citations omitted)).

### 3.    Analysis

Here, the first prong of the McDonough test is not satisfied, because the juror was

not intentionally dishonest.  She admitted that she had previously been employed as a TSA

security screener, but credibly explained that she did not consider her work to constitute law

enforcement.  And her father's employment with the Department of Corrections did not come to

mind, because he had been retired for twenty years.  The Court concludes – as it did at trial – that

the juror's failure to respond during voir dire was a "good faith" mistake.  A "good faith"

"failure to respond" does not satisfy the first prong of the McDonough test.  Ventura, 2014 WL

259655, at *3; see also United States v. Nix, 275 F. Supp. 3d 420, 442 (W.D.N.Y. 2017) ("As

recognized by the Supreme Court, 'jurors are not necessarily experts in English usage.  Called as

they are from all walks of life, many may be uncertain as to the meaning of terms which are

relatively easily understood by lawyers and judges.'" (quoting McDonough, 464 U.S. at 555)).

The second prong of the McDonough test is likewise not met.  "'It is well settled

that a juror . . . is not excludable merely because he or she is a member of a particular occupation

or even of law enforcement.'"  United States v. Cean, No. 11 CR 449 (SJ), 2014 WL 1653200, at

*3 (E.D.N.Y. Apr. 24, 2014) (quoting United States v. Marji, 158 F.3d 60, 62 (2d Cir. 1998)).

Instead, the party challenging the juror must show that the juror is "'actual[ly] bias[ed].'"  Id.

(quoting Marji, 158 F.3d at 62); see also United States v. Morales, 185 F.3d 74, 84 (2d Cir.

1999) (finding that "jurors' connections to law enforcement . . . d[id] not, standing alone, suffice

to establish implied bias or bias conclusively presumed as a matter of law." (citation and

quotation marks omitted)).  Here, neither the juror's work screening airport passengers ten years

ago, nor her father's work as a corrections officer twenty years ago, would support a finding of

actual or implied bias against individuals charged with financial crimes.  Accordingly, this Court

would not have granted a "hypothetical challenge [for cause]."  Stewart, 433 F.3d at 304.

### G.     Whether the Government's Theory of Wire Fraud as to Tuzman Is Insufficient as a Matter of Law

Count Five of the (S8) Indictment charges that, between March 2009 and March

2011, Tuzman conspired to commit wire fraud in connection with a scheme to defraud KIT

Digital shareholders by "failing to disclose that KIT[ Digital] 'investments' with Maiden Capital

were not part of an arms-length relationship but were actually related party transactions entered

into for an improper purpose."  ((S8) Indictment (Dkt. No. 198) ¶ 78)  Tuzman argues that his

conviction on Count Five must be vacated, because the "government's theory of wire fraud was

insufficient as a matter of law."  (Tuzman Br. (Dkt. No. 738) at 35)

"The elements of wire fraud are (1) a scheme to defraud, (2) money or property as

the object of the scheme, and (3) use of the . . . wires to further the scheme."  Lebedev, 932 F.3d

at 48 (citation and quotation marks omitted).  "The Court of Appeals has explained that a

cognizable harm sufficient to support a scheme to defraud occurs where the defendant's scheme

denies the victim the right to control its assets by depriving it of information necessary to make

discretionary economic decisions."  United States v. Davis, No. 13-CR-923 (LAP), 2017 WL

3328240, at *8 (S.D.N.Y. Aug. 3, 2017) (citation and quotation marks omitted); see also United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015) (same).

Here, the evidence at trial showed that, in March 2009, KIT Digital invested $200,000 in Maiden Capital, and that Maiden used most of this money to purchase KIT Digital stock.  (Tr. 675, 737, 744, 749, 5176)  Michael Halkias, a KIT Digital outside auditor, began to inquire about KIT Digital's investment in Maiden Capital later that year.  (Tr. 743, 2061-62; GX 745 (Aug. 12, 2009 emails between Tuzman and Halkias))  Halkias was concerned that KIT Digital's $200,000 "investment was made . . . with the explicit understanding that Maiden would in return invest in KIT [Digital]."  (Tr. 2073)

In an August 2009 letter to Halkias regarding the relationship between Maiden Capital and KIT Digital, Tuzman reported that "KIT [D]igital has never had any understandings or agreements with Maiden or Maiden Capital, implicit or explicit, of any buying or selling behavior of any stock, KIT [D]igital or otherwise."  (Tr. 2092-93; GX 3202 (Aug. 14, 2009 Tuzman letter to Halkias))  Tuzman did not disclose the December 31, 2008 Agreement to Halkias, in which Maiden had agreed to purchase at least $400,000 worth of KIT Digital stock in the open market over the next thirty days, and to hold the stock for at least ninety days, in exchange for, inter alia, a share of KIT Media's profits.  (Tr. 637-40, 647-48, 2087, 2093; GX 1517-A (Dec. 31, 2008 Agreement); GX 2970 (Jan. 5, 2009 email chain regarding Dec. 31, 2008 Agreement))

Had Halkias been aware of the December 31, 2008 Agreement, he would have recommended that it be disclosed to shareholders.  (Tr. 2089)  According to Halkias, it would have been "important for the shareholders to understand this activity" because the "consequences of the investment may [have] be[en] profound to . . . investors . . . ."  (Id.)

In March 2011, Tuzman caused KIT Digital to invest $250,000 in Maiden Capital so that Tuzman could redeem his personal $250,000 investment in Maiden Capital.  (GX 878 (Feb. 24, 2011 Tuzman email to Smyth concerning Tuzman's $250,000 investment); GX 1786-C (Mar. 2, 2011 text messages between Maiden and Tuzman); GX 3827 (chart of March 2011 wire transfer); Tr. 826-31, 1753-54, 1788-89, 1968-69, 5056-57)  In March 2011, Maiden Capital was illiquid.  Accordingly, absent KIT Digital's $250,000 investment in Maiden Capital, the hedge fund could not have satisfied Tuzman's request to redeem his personal investment.  (Tr. 1968-69, 2280-82)  Tuzman did not disclose to KIT Digital that Maiden Capital was illiquid, nor did he disclose that he had a personal interest in KIT Digital making a $250,000 investment in Maiden Capital.  (Tr. 2280-82)  Tuzman instead simply told KIT Digital's chief financial officer, Robin Smyth – who managed KIT Digital's relationships with its outside auditors – that Maiden Capital was "performing well."  (GX 878 (Feb. 24, 2011 Tuzman email to Smyth); Tr. 2281, 3204)

Tuzman contends that the "government's allegations [merely] showed deceit, not fraud."  (Tuzman Br. (Dkt. No. 738) at 36)  But based on the above evidence, a reasonable juror could have found that Tuzman defrauded KIT Digital shareholders by withholding material and valuable economic information about their investment in KIT Digital.  Lebedev, 932 F.3d at 48 ("[A] wire fraud charge . . . can be predicated on a showing that the defendant, through the withholding or inaccurate reporting of information that could impact on economic decisions, deprived some person or entity . . . of potentially valuable economic information." (citation and quotation marks omitted)).  Given the Government's evidence that, inter alia, Tuzman had caused KIT Digital to invest $250,000 in an illiquid and failing hedge fund – in order to permit Tuzman to extract $250,000 he had personally invested in that hedge fund – there was a more

than ample evidentiary basis for convicting Tuzman of conspiring to defraud KIT Digital shareholders.

Tuzman argues, however, that the Court improperly "advised the jury that a mere act of deceit is sufficient to show a scheme to defraud." (Tuzman Br. (Dkt. No. 738) at 37 n.14) According to Tuzman, the Court instructed the jury that the "first element of wire fraud, proving a scheme to defraud, 'has been satisfied if the statements and/or conduct of the defendant were deceptive.'" (Id. (quoting Tr. 7170))  But the language cited by Tuzman is taken out of context. The Court instructed the jury that "[e]ven where statements allegedly made in furtherance of a scheme to defraud were literally true, you can still find that the first element of the wire fraud statute has been satisfied if the statements and/or conduct of the defendant were deceptive." (Tr. 7170)  This proposition is hardly controversial, and does not imply that deception alone is sufficient to establish a scheme to defraud.  See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 240 (2d Cir. 2016) ("[L]iterally true statements that create a materially misleading impression . . . will support claims for securities fraud." (citation and quotation marks omitted)).

Finally, Tuzman argues that the Government's theory of liability is invalid because Tuzman's alleged misrepresentations were not "an essential element of the bargain." (Tuzman Br. (Dkt. No. 738) at 39; see id. ("Where, as here, the government advanced—and the jury instructions permitted—a theory of conviction that does not require the alleged misrepresentations to concern an essential element of the bargain, the wire fraud conviction must be vacated."))  In support of this argument, Tuzman cites cases where – notwithstanding a defendant's misrepresentations – the victims still received what they bargained for in terms of price and quality.  (Id. at 39-40 (citing United States v. Starr, 816 F.2d 94 (2d Cir. 1987); United States v. Regent Office Supply Co., 421 F.2d 1174 (2d Cir.1970); United States v. Shellef, 507

F.3d 82 (2d Cir. 2007))  But a reasonable juror could have found that KIT Digital's shareholders did not receive what they had bargained for.  They did not know that they were investing in a company in which the CEO used $250,000 of the company's money to invest in an illiquid and failing hedge fund, so that he could extract his own $250,000 investment in that same hedge fund.

### H.        Alleged Prosecutorial Misconduct

Tuzman contends that he is entitled to a new trial because the Government engaged in "pervasive misconduct."  (Tuzman Br. (Dkt. No. 738) at 42)  According to Tuzman, the prosecutors (1) "made numerous false, misleading, inflammatory[,] and improper statements during [their] summations" (id. at 43); and (2) "relied on and failed to correct perjured testimony" at trial.  (Id. at 59)  Tuzman's allegations are baseless.

### 1.        Government Summations

#### a.        Applicable Law

"[A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a heavy burden."  United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011) (citation and quotation marks omitted).  "The defendant must show not simply that a particular summation comment was improper, but that the comment, viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, such that the resulting conviction was a denial of due process."  United States v. Williams, 690 F.3d 70, 74-75 (2d Cir. 2012) (citation, quotation, and alteration marks omitted); see also United States v. Mandell, 752 F.3d 544, 553

(2d Cir. 2014) ("Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct." (citation and quotation marks omitted)).

"In determining whether an inappropriate remark amounts to prejudicial error, [the Second Circuit] look[s] to the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." United States v. Caracappa, 614 F.3d 30, 41 (2d Cir. 2010) (citation and quotation marks omitted). "Flaws in the government's summation will require a new trial only in the rare case in which improper statements – viewed against the entire argument to the jury – can be said to have deprived the defendant of a fair trial." Id.

Critical to the court's analysis is "whether the improper comments were minor aberrations in a prolonged trial or cumulative evidence of a proceeding dominated by passion and prejudice." United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981) (citation and quotation marks omitted). "Among the elements weighed in this inquiry are the extent to which the misconduct was intentional and the extent to which the statements were made in response to defense contentions." Id. The Second Circuit has also "long recognized that summations – and particularly rebuttal summations – are not detached expositions, with every word carefully constructed . . . before the event." Farhane, 634 F.3d at 167 (citations and quotation marks omitted). Thus, "courts will not lightly infer that every remark is intended to carry its most dangerous meaning." Id. (citation and quotation marks omitted).

"[A] prosecutor [may not, however,] mischaracterize the evidence or refer in summation to facts not in evidence." Rosa, 17 F.3d at 1548-49; see United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987) ("Although the inherent controversial nature of litigation permits substantial latitude in the closing arguments of counsel, the prosecutor in a criminal case has a

special duty not to mislead, and should not deliberately misstate the evidence." (citations and quotation marks omitted)).  Likewise, a prosecutor may not improperly shift the burden of proof.  See Floyd v. Meachum, 907 F.2d 347, 353-54 (2d Cir. 1990).

### b.     **Challenged Summation Remarks**

#### (i)     **Professor Ferrell's Testimony**

Tuzman contends that the Government mischaracterized the testimony of his expert witness, Professor Allen Ferrell.  In its summation, the Government stated:

> [W]hile Maiden's trading didn't move the market in KIT every day, it did on some days.
>
> Look at that, first day of the market manipulation agreement . . .  [t]he volume and the price take off like a rocket.  That is the market manipulation agreement in action.  Even the defendants' expert, the Harvard-MIT professor, he spent a day testifying about how he did not believe Maiden had a big impact on price each day.  Even he testified that there were a number of days where Maiden did impact the price.

(Tr. 6875-76)

According to Tuzman, "[t]he government's claim that 'even' defense expert Professor Ferrell 'testified that there were a number of days where Maiden did impact the price' was simply false,'" because Professor Ferrell never testified "that Maiden Capital actually 'move[d] the market' in KIT Digital stock."  (Tuzman Br. (Dkt. No. 738) at 45)  Tuzman adds that "the government expressly and repeatedly insisted that Professor Ferrell be precluded from testifying about the impact Maiden Capital's trading had on the price of KIT Digital stock."  (Id.)

The Government responds that "even though Professor Farrell never affirmatively attributed the statistically significant market movement . . . to Maiden's

trading, that was the obvious implication of the testimony."  (Gov't Br. (Dkt. No. 750) at

50)  The Court agrees.

   Professor Ferrell testified that he "investigat[ed] whether Maiden Capital trading

[in KIT Digital stock] during the December 31st, '08 to December 30, 2011 period was

somehow propping it up, propping up the stock price."  (Tr. 6142)  Professor Ferrell testified on

direct that, between December 31, 2008 and September 30, 2011, KIT Digital's stock price

increased by a statistically significant amount on twenty-two days, and that Maiden Capital

accounted for more than 60 percent of the trading value on two of those days:  December 31,

2008 and August 31, 2009.  (Tr. 6139-40)

   On December 31, 2008, Tuzman, Amanat, and Maiden entered into the December

31, 2008 Agreement, the purpose of which was to strengthen and support KIT Digital's stock

price.  (Tr. 637, 645)  That day, Maiden was responsible for 64 percent of the trading volume in

KIT Digital's stock.  (Tr. 5074)

   Although this Court precluded Professor Ferrell from opining as to whether

Maiden's trading affected KIT Digital's stock price (Tr. 6227), the implication of his testimony

was that – on certain days – it may have done so.  Accordingly, it was not improper for the

Government to draw this inference.[26]  See United States v. Roldan-Zapata, 916 F.2d 795, 807

(2d Cir.1990) ("In summation counsel are free to make arguments which may be reasonably

inferred from the evidence presented.").  And as the Court noted at sidebar (Tr. 6913), Tuzman's

counsel was free to respond to the Government's arguments regarding Professor Ferrell's

---

[26]  Moreover, the Government reminded the jury that Professor Ferrell "spent a day testifying about how he did not believe Maiden had a big impact on price each day."  (Tr. 6876) Accordingly, there is no chance that the Government's summation misled the jury about the core of Professor Ferrell's testimony.

testimony in the defense summation.  See United States v. Suarez, 588 F.2d 352, 354 (2d Cir.

1978) ("Both prosecution and defense are entitled to broad latitude in the inferences they may

suggest to the jury during closing arguments."); see also United States v. Bonventre, 646 F.

App'x 73, 88 (2d Cir. 2016) (rejecting claim of prosecutorial misconduct based on government's

summation where the defendants "were entitled to . . . argue for opposing inferences on the basis

of the same evidence").

   In short, there was no misconduct in the Government's references to Professor

Ferrell's testimony.

**(ii) Alleged Suggestion that Tuzman<br>Had Received Fraud Proceeds**

   Tuzman asserts that the Government improperly "invited the jury to assume that

KIT Digital and KIT Capital were synonymous with and indistinguishable from . . . Tuzman,"

falsely suggesting that Tuzman personally "profited from the alleged criminal conduct" and

"inspir[ing] class prejudice."  (Tuzman Br. (Dkt. No. 738) at 46, 49)

   Tuzman complains, in particular, about the Government's remark during

summation that Maiden Capital could not redeem its $2 million investment in Enable because

"the $2 million had been sent to . . . Tuzman."  (Tr. 6888)  Tuzman points out that "the

government's own evidence showed that the $2 million had been sent to KIT Digital as a

company – not to . . . Tuzman – to honor a redemption request."  (Tuzman Br. (Dkt. No. 738) at

46)  But the money had been sent to KIT Digital at Tuzman's request, and it is reasonable to

assume that the jury would have understood the prosecutor's comment in that way.  In any event,

at this point in the Government's summation, the prosecutor was addressing the Maiden Capital

fraud alleged in Counts One, Two, and Three, in which Tuzman is not charged, as the

Government made clear.  (See Tr. 6887 ("Amanat only is charged in these counts, not . . .

88

Tuzman.")) Prior to that point in the summation, the Government had also directed the jury to an exhibit that showed that the $2 million was wired to KIT Digital's HSBC account, and not to any personal account. (Tr. 6869; GX 3053 (Nov. 10, 2008 email chain between Amanat brothers)) Indeed, the Government never suggested that Tuzman was personally enriched as a result of this transaction.

Tuzman also now objects to the Government's remark that Tuzman "is KIT Capital, he is KIT Digital." (Tr. 7115) Given that Tuzman caused these companies to be named after him (see, e.g., Tr. 3909 (Campion testifying that ROO Group's name was changed to KIT Digital, and that "KIT" stood for Tuzman's initials); Tr. 198 (Mullin testifying that "KIT" in KIT Media stood for Tuzman's initials); Tr. 201 (Mullin testifying that "KIT" in KIT Capital stood for Tuzman's initials)), it was obvious to everyone at trial that KIT Digital and the other KIT entities were closely identified with Tuzman.

In any event, the Government made this remark in connection with Count Five and Tuzman's representations to KIT Digital outside auditor Michael Halkias about the nature of KIT Digital's relationship with Maiden Capital. (Tr. 2073, 7114) Tuzman had told Halkias that "[n]o one at KIT [D]igital or anyone associated with KIT [D]igital has any suasion of any kind over Maiden Capital's investments." (GX 745 (Aug. 12, 2009 emails between Tuzman and Halkias); Tr. 2079) Tuzman's counsel argued in summation that this statement was true, because Tuzman signed the December 31, 2008 Agreement "on behalf of . . . KIT Capital," not "KIT Digital." (Tr. 6963) It was in this context that the Government responded that Tuzman "is KIT Capital . . . [and] KIT Digital." (Tr. 7115)

The evidence at trial showed that although KIT Digital and KIT Capital were distinct corporate entities (Tr. 2161), Tuzman controlled both of them. (Tr. 786 (Maiden

testimony that he "understood [that Tuzman] was the controller of KIT Capital"); Tr. 1753

(Maiden testimony that "KIT Capital is [Tuzman's] wholly owned investment vehicle" and that

KIT Capital is "basically just his money"); Tr. 2285 (Smyth testimony that Tuzman controlled

both KIT Media and KIT Capital); Tr. 2292-93 (Smyth testimony that, "[a]s CEO [of KIT

Digital, Tuzman] oversaw the whole company.  In particular, he controlled the merger and

acquisitions of the company but also investor relations, [he] also had [a] very hands on role in all

other areas, including sales as well as finance."))

       In sum, the Government's argument in rebuttal that Tuzman was, in effect, KIT

Capital and KIT Digital merely highlighted his control over these entities, and was a fair

response to defense counsel's effort to distance Tuzman from the entities that he did in fact

control.[27]

### (iii)    Tuzman's Knowledge of Maiden's Prior Manipulative Trading

       Tuzman argues that "the prosecutor falsely claimed in rebuttal summation that . . .

Tuzman had actual knowledge of Maiden's manipulative activities with regard to" non-KIT

---

[27]  Tuzman also complains that the Government made this case "about greed," and led the jury to believe that Tuzman personally profited from his alleged criminal activity.  (Tuzman Br. (Dkt. No. 738) at 49)  As the CEO of KIT Digital, however, Tuzman's financial interest in the success of the company was obvious, and the Government did not belabor that fact, nor did it fan the flames of class prejudice, as Tuzman argues.  (See id. at 48-49)  Cf. United States v. Weiss, 914 F.2d 1514, 1524 (2d Cir. 1990) ("In his summation, the prosecutor made several highly critical comments about the defendants.  He stated that 'money is what this case is all about, money,' characterized the defendants as 'merchants of greed, deceit and corruption,' told the jury that '[g]reed, that's what this case is about,' and stated:  'Money is what they wanted; greed, fraud. "Greed is good," that's the motto that they prepared. . . . They wanted that money. . . .' Although, standing alone, some of this language is quite hyperbolic and inflammatory, in the context of the entire summation we cannot say that it was so prejudicial as to require reversal of [the] conviction.").

Digital stocks, and chose to work with Maiden for this reason.  (Tuzman Br. (Dkt. No. 738) at 50-51)

In summation, Tuzman's counsel said:  "If [Maiden] was doing the same thing by himself, without [Tuzman], in many other stocks, don't you think that raises a question as to whether or not when he did it with KIT Digital he was just acting pursuant to his M.O.?"  (Tr. 6967)

In its rebuttal, the Government responded to this argument that Maiden "was manipulating a whole bunch of other stocks," and therefore may have manipulated KIT Digital stock on his own, without Tuzman's involvement.  (Tr. 7117)  The Government argued that "if anything," Tuzman's choice to work with Maiden tended to show Tuzman's guilt:  "If you're trying to manipulate a stock, who do you team up with?  You team up with a stock manipulator." (Tr. 7117)

The Court understands the Government's response to emphasize Tuzman's decision to work with a corrupt individual willing to commit illegal acts.  Tuzman learned as early as December 2008 of Maiden's willingness to illegally manipulate KIT Digital's stock, and he continued working with Maiden in this effort for years thereafter.  The Government's response to defense counsel's argument was within the bounds of proper rebuttal.  United States v. Aiyer, No. 18CR333 (JGK), 2020 WL 3636048, at *19 (S.D.N.Y. July 6, 2020) ("The Government is entitled to present its own theory of the case and 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" (quoting United States v. Zackson, 12 F.3d 1178, 1183 (2d Cir. 1993))).[28]

_____

[28]  Tuzman also complains that the Government's "rebuttal argument regarding the market manipulation conspiracy . . . improperly lowered the government's burden of proof by omitting

### (iv)    Alleged Improper Bolstering and Burden Shifting

Tuzman complains that the Government "improperly bolstered cooperating

witness testimony by implying the existence of inculpatory evidence not shared with the jury."

(Tuzman Br. (Dkt. No. 738) at 52)  Tuzman cites the following remarks from the Government's

rebuttal summation:

> . . . I want to respond to . . . this false notion that just because the government
> didn't call more witnesses, somehow there's a problem with our case.  We believe
> in a concept of mercy.  Do you want to be here in 2020?  No.  We all want to go
> home, and frankly, if there are any witnesses that they thought would help them –
> obviously they have no burden to call anyone – but you saw what they did.  When
> they thought that Andy Steward would help them, they flew all the way to
> England to hear from Andy Steward.

(Tr. 7101-02)

Tuzman contends that the Government implied that it could have called "other

witnesses . . . to convict the defendants."  (Tuzman Br. (Dkt. No. 738) at 52)  The Government's

remark, however, was a response to defense counsel's argument that the Government had not

called numerous witnesses.  (Gov't Br. (Dkt. No. 750) at 55)  Indeed, in his summation,

---

an essential element: . . . that the conspiracy continued for some time in or around the dates set
forth in the indictment."  (Tuzman Br. (Dkt. No. 738) at 51-52 (citation and quotation marks
omitted))  But the remark that Tuzman challenges – that the jury "only need[ed] to decide
whether Stephen Maiden actually tried to manipulate the KIT Digital stock" (Tr. 7117) – was not
a recitation of the elements necessary to convict Tuzman on Count Four.  Moreover, the cases
cited by Tuzman in support of this argument (Tuzman Br. (Dkt. No. 738) at 52) are not on point,
as they involve circumstances in which the prosecutor equated a credibility determination with
proof of guilt beyond a reasonable doubt.  See Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir.
1990) (prosecutor argued that "You have a man who has lied up and down. . . . Ladies and
gentlemen, if that is not proof beyond a reasonable doubt, then . . . there can't be a case with
proof beyond a reasonable doubt"); United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987)
(prosecutor argued that "if . . . the FBI agents are telling the truth, then Mr. Richter is guilty").
In any event, the jury was properly instructed on the elements of the Count Four market
manipulation conspiracy, and the jury is presumed to have followed those instructions.

Tuzman's counsel displayed "a PowerPoint slide depicting dozens of nameless, faceless people connected to KIT[] [Digital]" (id.) and questioned why they were not called as witnesses:

> Look at who [the Government] didn't call. How come they didn't call the other board members and executives at KIT Digital, the corporate development team, other people in account and finance, outside auditors, lawyers, M&A counterparties, other coconspirators of Robin Smyth? Because they're trying to create a false picture as if [Tuzman] only knows people that do things that are illegal. Look at all these other people that they could have called. You know what they all would have said? They would have said the same thing as every other category of witnesses the government called: We can't tell you what [Tuzman] did or didn't know. And that would have eclipsed, drowned out, the already unreliable testimony of the felon witnesses.

(Tr. 6953-54)

Here, defense counsel acted improperly in "put[ting] forward [his] own views as to the possible testimony of witnesses not called . . . ." United States v. Dardi, 330 F.2d 316, 334 (2d Cir. 1964); see also Ashley v. Burge, No. 05 Civ. 4497 (JGK), 2006 WL 3327589, at *10 (S.D.N.Y. Nov. 3, 2006) (noting that there is no authority "permit[ting] defense counsel to invite speculation as to what absent witnesses would have testified to, if called as witnesses"). The Government, in responding, merely pointed out that the trial had lasted nearly two months already, and that the Government was aware of the passage of time and the need to bring the trial to an end. The Court also instructed the jurors that they "should not draw any inference or reach any conclusions as to what [uncalled individuals] would have testified to had they been called" and that "[t]heir absence should not affect your judgment in any way." (Tr. 7149-50)

Tuzman also complains that the Government's comment "implied that . . . Tuzman bore burdens of proof and persuasion." (Tuzman Br. (Dkt. No. 738) at 53) That argument fails because the Government explicitly reminded the jury that the Defendants "have no burden to call anyone." (Tr. 7101) And when defense counsel objected to the Government's remark, the Court immediately instructed the jury that "the defendants have no obligation to

offer any evidence at all, so keep that in mind as you listen to these arguments." (Tr. 7102) The Court repeated this same instruction at multiple points in the jury charge. (See Tr. 7135 ("[T]he government has the burden of proving the charges . . . beyond a reasonable doubt. This burden of proof never shifts to a defendant for the simple reason that the law never imposes upon a defendant in a criminal case the burden or duty of testifying, of calling any witness, or of locating or producing any evidence."); Tr. 7150 ("[T]he law does not impose on a defendant the burden or duty of calling any witnesses or producing any evidence. It is the government's burden to prove beyond a reasonable doubt each element of the crimes charged in the indictment."))

In any event, as long as the Government is careful to point out that a defendant has no obligation to call any witnesses and no burden to offer evidence, it may point out the obvious fact that – under the circumstances here – the defendant could have also called the witnesses he or she claims in summation could or should have been called by the Government.[29]

---

[29] See United States v. McDermott, 918 F.2d 319, 327 (2d Cir. 1990) ("While it is axiomatic that the Government may not comment on a defendant's failure to testify at trial, we have held that a prosecutor is entitled to comment on defendant's failure to call witnesses to contradict the factual character of the Government's case, as well as on defendant's failure to support his own factual theories with witnesses . . . . Here, the Government's remarks amounted to no more than an allusion to appellants' failure to call witnesses to support their theory. . . . [P]articularly in light of the district court's curative instruction, we cannot deem that the remarks in question were anything other than harmless constitutional error."); see also United States v. Drescher, 77 F. App'x 45, 47-48 (2d Cir. 2003) ("The prosecutor was entitled to point out in response that the defendant 'also has a . . . right to call witnesses if he wants to,'" where "the defendant had suggested to the jury in his summation that by not calling certain witnesses the prosecutor had effectively concealed from the jury evidence that would have been favorable to the defense" (quoting United States v. Panza, 750 F.2d 1141, 1153 (2d Cir. 1984))); Panza, 750 F.2d at 1153 ("The government properly argued in its rebuttal summation, after a defendant had asked the jury to infer from the government's failure to call certain witnesses that they would not have been helpful to it, that the witnesses were equally available to be subpoenaed by the defendants, from which the jury could infer that they would not have been helpful to the defendants."); United States v. Caruso, 358 F.2d 184, 186 (2d Cir. 1966) (motion for mistrial properly denied where prosecutor argued in summation that the defendant "could have called any

### (v)     <u>Alleged Inflammatory Rhetoric</u>

Tuzman argues that the Government's "rebuttal summation appealed to inflammatory rhetoric to improperly denigrate . . . Tuzman and encourage the jury to convict [him] solely based on his position with KIT Digital, not the evidence admitted at trial." (Tuzman Br. (Dkt. No. 738) at 54)  In support of this argument, Tuzman cites the Government's "[r]eliance on a proverb about a rotting fish." (<u>Id.</u>)  In its summation, the Government referenced a proverb that tracks "back to ancient China" or "to ancient Greece," which states that "the fish rots from the head down." (Tr. 7096)  The Government explained that it is a "proverb about accountability and corruption.  When an organization gets taken over with rot and fraud, look to the top.  Look at the head." (<u>Id.</u>)  The implication was that Tuzman was the head and a source of corruption at KIT Digital.

Tuzman also complains that the Government described him as a "hunter" and Smyth – the company's chief financial officer – as his "bird dog" when it came to finding opportunities to commit fraud. (Tuzman Br. (Dkt. No. 738) at 55)  In this regard, the Government stated the following in rebuttal:

> If a hunter is shooting birds, but the hunter doesn't want to go in the bushes, dig into the bushes and try to grab the bird, you might get your arms all cut up, maybe get poison ivy or a tick.  He doesn't want that.  That's why a hunter has a bird dog, a dog you can send into the bushes to get that bird so your hands don't get mud and blood on them, right?  Robin Smyth was his bird dog. . . . [S]o when the

witness he wanted," where it was "clear from the record that the prosecutor was only rebutting defense counsel's claim on his argument that the jury should draw an inference adverse to the Government because the Government had failed to call" certain witnesses); <u>see</u> <u>also</u> <u>United States v. Kragness</u>, 830 F.2d 842, 872 (8th Cir. 1987) ("We . . . disagree that it was improper for the prosecutor, in response to the defendants' assertion that the government should have called [additional] witnesses . . . , to point out that the defendants could also have called those witnesses had they thought that their testimony would be helpful."); <u>United States v. Flynn</u>, 196 F.3d 927, 930-31 (8th Cir. 1999) (where the defense "repeatedly chastised the government for not calling a number of witnesses," the Government was permitted to note that the defense also had the subpoena power).

> time comes and the questions come up, Well, did you know about the fraud[?]
> [H]e can say, No, I know my hands are clean, but look at that bird dog, his hands
> are all dirty.

(Tr. 7107)  The Government's rhetoric harkened back to a Tuzman email that had been

introduced into evidence, in which Tuzman asked Smyth to "bird-dog" an alleged $1 million

round-trip payment.  (GX 2568 (Jan. 12, 2020 Tuzman email to Smyth); Tr. 2541-43)

The prosecutor's references to the "rotten fish" proverb and Tuzman's "bird dog"

terminology did not deprive Tuzman of a fair trial.  "The government is not barred from using

rhetorical devices during . . . trial."  United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986);

see also United States v. LaMorte, 950 F.2d 80, 85 (2d Cir. 1991); United States v. Jean, 164

F.3d 620 (2d Cir. 1998) (unpublished table decision) (finding no error in prosecutor's use of

"rhetorical device").[30]

## 2.   Alleged Use of Perjured Testimony

Tuzman claims that the Government "repeatedly solicited false testimony . . . on

core issues" from cooperating witnesses Maiden, Smyth, and Campion, "and failed to take any

curative steps, despite having documents in their possession that provided constructive

knowledge of the false testimony."  (Tuzman Br. (Dkt. No. 738) at 61, 65)

---

[30]  Tuzman also complains that the Government's references in summation to Maiden's "wash
trades" lacked an evidentiary basis.  (Tuzman Br. (Dkt. No. 738) at 50)  But Maiden testified that
he bought and sold the same amount of KIT Digital on certain days, in an effort to create trading
volume that would suggest that investors were interested in the stock.  See Reddy v. Commodity
Futures Trading Comm'n, 191 F.3d 109, 115 (2d Cir. 1999) ("A wash trade is a transaction made
without an intent to take a genuine, bona fide position in the market, such as a simultaneous
purchase and sale designed to negate each other so that there is no change in financial position.
. . . Wash trades may be used . . . to manipulate prices."); see also Tr. 1850-51 (Maiden defining
"wash trading").

### a.   **Legal Standard**

"Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances."  United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000) (citation and quotation marks omitted)).  "Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991).

"With respect to this latter inquiry, there are two discrete standards of review that are utilized."  Id.  "Where the government was unaware of a witness' perjury, . . . a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  Id.  (citation, quotation, and alteration marks omitted)).

By contrast, where the Government knew or should have known of the witness's perjury, "a defendant must show that '(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial.'"  Kirk Tang Yuk, 885 F.3d at 89 (quoting United States v. Josephberg, 562 F.3d 478, 494 (2d Cir. 2009)).  Under this second standard, "perjury is material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  United States v. Cromitie, 727 F.3d 194, 221-22 (2d Cir. 2013) (citation and quotation marks omitted).

"Simple inaccuracies or inconsistencies in testimony" arising from "confusion, mistake, or faulty memory . . . do not rise to the level of perjury."  United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001).  Rather, "a witness commits perjury if he gives false testimony

concerning a material matter with the willful intent to provide false testimony . . . ." Id.
Moreover, "[d]ifferences in recollection do not constitute perjury, and when testimonial
inconsistencies are revealed on cross-examination, the jury is entitled to weigh the evidence and
decide the credibility issues for itself.'" Josephberg, 562 F.3d at 494 (citations, quotation marks,
and alteration marks omitted); see also Kirk Tang Yuk, 885 F.3d at 89 ("Where the alleged
perjury came to light during the trial and the defendant had ample opportunity to undermine the
witness's credibility, [the court] will not supplant the jury as the appropriate arbiter of the truth
and sift falsehoods from facts." (citation and quotation marks omitted)).  The movant bears the
burden of proving perjury by a preponderance of the evidence.  United States v. Sessa, No. 92-
CR-351 (ARR), 2011 WL 256330, at *44 (E.D.N.Y. Jan. 25, 2011), aff'd, 711 F.3d 316 (2d Cir.
2013).

### b.   Analysis

Tuzman cites the following examples of perjury:  (1) Maiden's testimony that "on
February 3, 2010, he purchased additional KIT Digital stock" after receiving a $700,000
investment from KIT Digital; (2) Maiden's testimony that on March 9, 2009, he bought and sold
28,571 shares of KIT Digital stock with the intention of manipulating the stock; (3) Maiden's
testimony that on September 3, 2009, Tuzman called him from the NASDAQ floor; and (4)
various statements made by Smyth and Campion during their testimony.  (Tuzman Br. (Dkt. No.
738) at 62-67)  The Court concludes that Tuzman has not demonstrated that the Government
solicited any perjured testimony at trial.

As to Maiden's February 3, 2010 stock purchases, Tuzman argues that "Maiden
did not use the $700,000 [KIT Digital] investment to purchase KIT Digital stock as he testified."
(Tuzman Br. (Dkt. No. 738) at 62)  Maiden testified that he received $700,000 from KIT Digital

on February 3, 2010, and that he traded in KIT Digital stock thereafter.  (Tr. 807)  At sidebar conferences during Maiden's direct and cross-examination, defense counsel accused Maiden of misleading the jury, arguing that Maiden did not use all of KIT Digital's $700,000 to purchase KIT Digital stock.  (Tr. 807-09, 1905)  But Maiden never testified that he used all of KIT Digital's $700,000 to purchase KIT Digital stock.  Instead, Maiden testified that he "execut[ed] additional trades in KIT digital" after receiving the $700,000.  (Tr. 807)  And, as discussed above, there is ample evidence – including Maiden Capital trading records – demonstrating that Maiden traded in KIT Digital stock after February 3, 2010.

Tuzman also cites Maiden's testimony that he "used over $200,000 to execute trades in KIT digital on February 3 and February 4 of 2010, the day of [the $700,000] wire transfer [from KIT Digital] and the next day."  (Tr. 1908-09)  Tuzman argues that this testimony was false, because Maiden also "sold $378,473 of KIT Digital stock on February 3 and 4, making him a net seller – not a net buyer – of KIT Digital on those days, contrary to the government's misleading redirect."  (Tuzman Br. (Dkt. No. 738) at 63 (emphasis in original))  In his testimony concerning these trades, however, Maiden never purported to be a "net buyer," and he was never asked if he was a net buyer on February 3 and 4, 2010.  In short, there is no evidence that Maiden willfully provided false testimony on this point.

As to Maiden's purchase and sale of 28,571 shares of KIT Digital stock on March 9, 2009, Tuzman claims that Maiden lied when he testified that the "'main purpose'" of these trades "'was to inflate the stock by showing volume, buying and selling both sides of the same trade.'"  (Tuzman Br. (Dkt. No. 738) at 63 (quoting Tr. 737-38))  According to Tuzman, the Government's evidence showed that Maiden made these trades because his "brokerage firm had issued a margin call for the Maiden Capital account and . . . Maiden sold the shares to cover the

margin call, but then purchased the shares in [another] account because he continued to believe in KIT Digital and desired to keep his net position in KIT Digital." (Tuzman Br. (Dkt. No. 738) at 64) But Maiden testified that he sold 28,571 shares of KIT Digital stock "partially" to satisfy the margin call. (Tr. 1889) In sum, Maiden's testimony indicates that he had more than one motive for his trades in KIT Digital stock that day. (Tr. 737-38, 1889) Tuzman has not demonstrated that Maiden's testimony on this point was knowingly false.

Tuzman also claims that Maiden lied in testifying that Tuzman had called him from the NASDAQ floor on September 3, 2009, with instructions to "push . . . up" KIT digital's stock price. (Tr. 790; Tuzman Br. (Dkt. No. 738) at 64) Tuzman contends that "the phone record evidence in the government's possession, when analyzed by defense witness Andrew Rosini, showed that there was no telephone call between Maiden and . . . Tuzman on September 3, 2009." (Tuzman Br. (Dkt. No. 738) at 64) Rosini testified that he examined records associated with Tuzman and Maiden's cell phones (Tr. 5882, 5884, 5898, 5903-04), however, and Maiden testified that he received the call on his land line. (Tr. 1891, 5928) Given this fact, and the possibility that Tuzman used a phone other than his cell phone to call Maiden from the NASDAQ floor, Tuzman has not demonstrated that Maiden's testimony on this point was false, much less intentionally false.

Tuzman further argues that the Government "presented testimony from cooperating witnesses Smyth and Campion that was false and, indeed, so contradictory that the government should have known that one or both of the witnesses were committing perjury." (Tuzman Br. (Dkt. No. 738) at 65) Tuzman contends that Smyth lied about whether the ROO Group – KIT Digital's corporate predecessor (Tr. 1617) – inflated its streaming video numbers before Tuzman joined the company. (Tuzman Br. (Dkt. No. 738) at 65) But Smyth did not deny

100

that he took measures to increase ROO Group's streaming numbers.  He instead testified that he did not believe that ROO Group's methods of increasing numbers were "illegitimate" at the time, noting that video streaming was then at "an early stage."  (Tr. 3145)  Tuzman has not demonstrated that Smyth's testimony on this point was knowingly false.

Tuzman also points to discrepancies between Smyth's and Campion's testimony as to whether Campion knew that Smyth had asked him to sign sham licenses.  (Tuzman Br. (Dkt. No. 738) at 65)  Smyth testified that "he . . . believed [Campion] knew" that the licenses were false (Tr. 3078), while Campion testified that he had not initially realized that the software licenses he was signing – as the president of KIT Digital – were sham licenses.  (See Tr. 4647 (Campion testimony that he was "surprised," "upset," and "furious" when Smyth told him "that he had given [him] sham license agreements to sign without [Campion] knowing that they were sham licenses")).  Tuzman has not demonstrated that either Smyth or Campion gave false testimony on this point.  Even assuming that Smyth's belief regarding Campion's knowledge was mistaken, his mistaken belief does not amount to perjury.  See United States v. Catano-Alzate, 62 F.3d 41, 43 (2d Cir. 1995) ("[Witness] did not commit perjury, even if his belief was irrational or mistaken.").

Tuzman claims that Campion perjured himself in testifying that a February 3, 2011 email concerned a "fraudulent restructuring reserve" – "when the government's own theory was that the restructuring reserve was proposed by Smyth" a few days later, on February 7 or 8, 2011.  (Tuzman Br. (Dkt. No. 738) at 65)  Any discrepancy related to these dates can be reasonably attributed to "confusion, mistake, or faulty memory," which "do[es] not rise to the level of perjury."  Monteleone, 257 F.3d at 219; see also United States v. Glover, 588 F.2d 876, 879 (2d Cir. 1978) ("[Witness's] testimony concerned events that were four years distant, and it

is clearly possible that the substance of his testimony was accurate though mistaken by a few months with regard to specific dates.").  Moreover, Tuzman's counsel cross-examined Campion about this inconsistency (Tr. 4789-92) and cited it in summation as a reason to discount Campion's testimony.  (Tr. 6944-45)  These factors weigh against overturning the jury's verdict.  See United States v. Faison, 555 F. App'x 60, 64 (2d Cir. 2014) ("[Defendant] merely highlights various inconsistencies in the testimony, which were or could have been brought to the jury's attention on cross-examination.  Whether such inconsistencies indicated deliberate deception, or otherwise undermined the witnesses' credibility, was for the jury to decide."); United States v. Sanzo, 673 F.2d 64, 68 (2d Cir. 1982) (rejecting defendant's argument that the Government solicited false testimony where the defendant "had a full opportunity to cross-examine and contradict the witnesses").

Tuzman also points to discrepancies between Smyth's and Campion's testimony regarding whether Campion ever instructed Smyth to "'delete all of [his] emails and get rid of everything,'" and "'destroy a spreadsheet containing all suspect revenue versus real revenue of [KIT Digital].'"  (Tuzman Br. (Dkt. No. 738) at 65 (quoting Tr. 3092-3093; citing Tr. 4602-04)) Given that more than five years had passed between trial and the alleged communications cited by Tuzman, it is hardly surprising that there were differences in the testimony of these witnesses. Such inconsistencies do not prove perjury.  Moreover, defense counsel cross-examined both witnesses about this issue and "cross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony."  United States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000), decision clarified on denial of reh'g, 313 F.3d 40 (2d Cir. 2002) ("Even if her testimony was perjurious, however, cross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony."); Josephberg, 562 F.3d at

494 ("[W]hen testimonial inconsistencies are revealed on cross-examination, the jury is entitled to weigh the evidence and decide the credibility issues for itself." (citation, quotation marks, and alteration omitted)).

Finally, as to all of Tuzman's claims of perjury, he has not shown that the Government knowingly solicited falsehoods from any witness.  Nor has Tuzman shown that there is a reasonable likelihood that any allegedly false testimony could have affected the judgment of the jury.  See Cromitie, 727 F.3d at 221-22.  For these reasons, Tuzman's perjury-based arguments fail.

### 3.      Amanat's Challenges to the Government's Rebuttal

Amanat contends that "[t]wo aspects of the Government's rebuttal summation require a new trial."  (Amanat Br. (Dkt. No. 735) at 53)  Amanat first argues that "the Government improperly and inaccurately argued that Omar Amanat was 'the owner' of Maiden Capital and therefore had an affirmative duty to find the Maiden Capital investors and alert them to any fraud being committed by Mr. Maiden."  (Id.)  Second, Amanat complains that, in its rebuttal, the Government made a "last minute disclosure of [the] theory as to which wires demonstrated a wire fraud in Counts One and Two."  (Id. at 58)

### a.      Assertion that Amanat "Owned" Maiden Capital

In support of his first claim of prosecutorial misconduct, Amanat cites the following excerpt from the Government's rebuttal summation:

> [O]ne thing we have proven to you is that Omar Amanat actually took over Maiden Capital.  Remember, he installed his wife as the head of Maiden Capital. If Omar Amanat is some disinterested dude who didn't know what was going on, he literally owned Maiden Capital.  If he wanted to disclose something to the investors, he could tell them, Oh, hey, there's this Enable thing you should be aware of – he was the owner – he could have done it.

(Tr. 7120)  Amanat complains that "there was no evidence that Mr. Amanat ever 'owned' Maiden Capital."  (Amanat Br. (Dkt. No. 735) at 53)  The Government responds that "[t]here was ample support in the record for the fact that Amanat controlled Maiden Capital and its assets as of June 2, 2011[,] when Amanat and Maiden entered into a loan agreement, with Maiden himself having testified that this arrangement essentially transferred ownership of Maiden Capital."  (Gov't Br. (Dkt. No. 750) at 35)

As discussed above, the agreement at issue was between Maiden Capital and Cornucopia – a corporate entity "controlled" by Amanat.  (Tr. 874)  Pursuant to the agreement, Cornucopia was to loan Maiden Capital $1,250,000.  (GX 1692 (June 2, 2011 loan agreement))  In exchange, Maiden transferred control of Maiden Capital's operations, business decisions, and assets to Cornucopia.  Section 2.12(b) of the agreement provides that

> [o]n the Closing Date, [Maiden Capital LLC and Maiden Capital Opportunity Fund LP] shall appoint [Cornucopia LTD. or its] designee as the sole managing member of [Maiden Capital LLC] until full repayment of the Loan . . . . Such appointment shall effectively give [Cornucopia LTD. or its] designee control over operations and business decisions of [Maiden Capital LLC and Maiden Capital Opportunity Fund LP].

(GX 1692 § 2.12(b))  Sections 2.9 to 2.11 of the agreement required Maiden to transfer or pledge all of Maiden Capital's assets to Cornucopia until the loan was repaid.  (Id. §§ 2.9-2.11; see also GX 1693 (stock pledge and assignment agreement); GX 1694 (pledge agreement); Tr. 878 (Maiden testifying that the purpose of the stock pledge agreement and pledge agreement "was to assign all of the value of Maiden Capital, all of the assets Maiden Capital owned . . . to Cornucopia"))

Although Amanat arranged for his wife – who was a model with "no experience working in the financial industry" to sign the agreement on behalf of Cornucopia (Tr. 876, 636)

– this fact did not undermine the evidence demonstrating that Amanat controlled Cornucopia, and thus controlled all assets of Maiden Capital.

Given these circumstances, the Government's remark that Amanat "owned" Maiden Capital does not warrant a new trial. "It is well established that the Government has broad latitude in the inferences it may reasonably suggest to the jury during summation." Coplan, 703 F.3d at 87 (citation and quotation marks omitted). Here, one could reasonably infer that Amanat had effective ownership and control over Maiden Capital given (1) his control over Cornucopia; (2) the terms of the loan that gave Cornucopia control over Maiden Capital's operations and assets; and (3) Maiden's testimony that the agreement assigned "all of the value of Maiden Capital . . . to Cornucopia." (Tr. 878) Even assuming arguendo that the Government's remark was inaccurate, Amanat has not carried his "heavy burden" to show that "the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudice him, depriving him of a fair trial." Farhane, 634 F.3d at 167 (citations and quotation marks omitted); see id. (noting that a "defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation . . . must show more than that a particular summation comment was improper").

### b.   **Constructive Amendment**

Amanat also complains that, in its rebuttal, the Government made a "last minute disclosure of [the] theory as to which wires demonstrated a wire fraud in Counts One and Two." (Amanat Br. (Dkt. No. 735) at 58)

In summation, Amanat's counsel argued that "[t]his is a wire fraud case where you never heard about the interstate wire." (Tr. 7005) In rebuttal, the Government responded by

pointing out that the record contained evidence of "wires from Omar Amanat and Enable over to Maiden Capital, California to North Carolina.  Last time I checked, California and North Carolina are not the same state."  (Tr. 7121)

"[I]t is well established that rebuttal provides the government with the opportunity to respond to defendant's arguments."  Coplan, 703 F.3d at 86 (citation, quotation marks, and alteration marks omitted)).  That is what the Government did here.  After Omar Amanat argued that evidence of an interstate wire was lacking, the Government argued that it had presented sufficient evidence to conclude that wires between Maiden Capital and Amanat and Enable had crossed state lines.

Amanat's claim that the Government "hid[] the ball on its theory as to the wires up until the rebuttal summation" is belied by the record.  (Amanat Br. (Dkt. No. 735) at 58-59) Days before summations, the parties briefed whether the record contained sufficient evidence of interstate wires to support Counts One and Two.  (Dec. 19, 2017 Gov't Ltr. (Dkt. No. 622); Dec. 14, 2017 Amanat Ltr. (Dkt. No. 605))  In its submission, the Government argued that it had "introduced a substantial number of wire communications – specifically, email and text messages – between the New York-based Amanat and North Carolina-based Maiden in which they discuss meeting investor redemptions in order to stave off discovery of the fraud."  (Dec. 19, 2017 Gov't Ltr. (Dkt. No. 622) at 2)  The next day, during oral argument before the Court, the Government contended that the record included "sufficient evidence" of "wires and the location of wires back and forth," including "wires from Enable to Maiden Capital, between San Francisco and North Carolina, wires from Maiden Capital into Manhattan."  (Tr. 6499-500)

In sum, the Government's rebuttal arguments regarding proof of interstate wires were nothing new, and there was nothing improper in the Government repeating these arguments

106

in response to defense counsel's contention that evidence of interstate wires was lacking.  See

United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) ("[W]here the defense summation

makes arguments and allegations against the government, the prosecutor may respond to them in

rebuttal."); United States v. Lumiere, 249 F. Supp. 3d 748, 764 (S.D.N.Y. 2017) ("'[A]

prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded

by the defense. . . .'" (quoting United States v. Marrale, 695 F.2d 658, 667 (2d Cir. 1982))).

## I.   **Tuzman's Conclusory Claims of Judicial Error**

Tuzman argues that he is entitled to a new trial because the Court made

"[m]ultiple other errors at trial [that] undermined [his] constitutional rights to a fair trial, to due

process of law, to confront the witnesses against him, and to present a defense."  (Tuzman Br.

(Dkt. No. 738) at 73)  As explained below, Tuzman's complaints – most of which are wholly

conclusory – have no merit.

Tuzman first argues that the Court erred in excluding the proposed expert

testimony of Dr. Albert Lyter III.  (Id.)  The Court excluded Dr. Lyter's proposed testimony in a

December 18, 2017 Memorandum Opinion and Order (Dkt. No. 614), following a November 20,

2017 Daubert hearing.  Tuzman has not articulated any basis to disturb this Court's decision.

Tuzman next contends that the Court erred in precluding Tuzman from

"confront[ing] Gavin Campion regarding his false accusations that . . . Tuzman had orchestrated

[from prison] . . . a theft from Campion's car in Australia."  (Tuzman Br. (Dkt. No. 738) at 73)

Before Campion was called to testify, however, Tuzman's counsel asked the Government to

confirm that it did "not intend to elicit any testimony from Gavin Campion that remotely

suggests or implies that [Tuzman] was involved in the alleged 2016 break-in of Mr. Campion's

car in Melbourne or any other alleged act of intimidation or violence against Mr. Campion."

(Dec. 4, 2017 email chain (Dkt. No. 751-1))  The Government agreed not to elicit any such testimony (id.), and it did not do so.  Given these circumstances, Tuzman cannot complain that he was not permitted to cross-examine Campion about a subject that he wanted precluded from the trial.

Tuzman also argues that "[t]he Court's refusal to dismiss the S8 Indictment . . . violated the Rule of Specialty in derogation of international and U.S. constitutional law." (Tuzman Br. (Dkt. No. 738) at 74)  The Court rejected this argument in an October 19, 2017 Memorandum Opinion and Order.  (Oct. 19, 2017 Order (Dkt. No. 508) at 32-39)  Tuzman has not articulated any error in that ruling.

Finally, Tuzman argues that the Court erred in denying his requests for Rule 17(c) subpoenas to Parker Poe, Maiden's counsel; Smyth; Campion; the Bureau of Prisons; and Morgan Lewis, the outside counsel that conducted internal investigations of ROO Group and KIT Digital.  (Tuzman Br. (Dkt. No. 738) at 74)  Again, Tuzman's argument is wholly conclusory.  Because Tuzman has not pointed to any error in the Court's ruling, it will not be re-examined.

### J.      Tuzman's *Brady* and *Giglio* Claims

In July 2019, Tuzman filed a supplemental motion for a new trial based on the Government's alleged failure to disclose evidence as required by Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Giglio, 405 U.S. 150 (1972).  (Tuzman Supp. Br. (Dkt. No. 999)) Tuzman obtained a copy of materials that the Government produced to Irfan Amanat pursuant to 18 U.S.C. § 3500 in advance of Irfan Amanat's October 2018 trial,[31] and contends that this

---

[31]  As noted above, the Court granted a severance to Irfan Amanat, and his trial proceeded separately, after Tuzman and Omar Amanat's trial ended.

material includes witness statements and copies of KIT Digital business records that the
Government did not produce to Tuzman prior to Tuzman's trial.  (Id. at 6, 12)  Tuzman argues
that, in failing to produce this material to Tuzman, the Government violated Brady and Giglio,
and that accordingly he is entitled to a new trial on the securities fraud conspiracy charged in
Count Six.  (Id. at 8)

Tuzman cites the following materials that were produced to Irfan Amanat but not
to him:  (1) FBI reports concerning interviews of former KIT Digital sales employee Kevin
Cronin on September 11 and 14, 2015, and documents that Cronin produced in conjunction with
those interviews (see Tuzman Supp. Br. (Dkt. No. 999) at 12-19; FBI Form 302 for Sept. 11,
2015 Cronin Interview (Dkt. No. 1000-1); Sept. 14, 2015 Cronin Interview Notes (Dkt. No.
1000-2)); (2) statements made by former KIT Digital general counsel and CEO for the Americas
Louis Schwartz to federal investigators on May 21, 2014 (Tuzman Supp. Br. (Dkt. No. 999) at
20-22; May 21, 2014 Schwartz Interview Mem. (Dkt. No. 1000-6)); (3) Sezmi CEO Yagyensh
"Buno" Pati's statements to federal investigators on December 11, 2013 (Tuzman Supp. Br.
(Dkt. No. 999) at 22-24; FBI Form 302 for Dec. 11, 2013 Pati Interview (Dkt. No. 1000-8)); (4)
KIT Digital account manager Sean McMann's statements to federal investigators on May 6,
2015 (Tuzman Supp. Br. (Dkt. No. 999) at 24-26; May 6, 2015 McMann Interview Notes (Dkt.
No. 1000-13)); and (5) former Sport 195 employee Paul DiPietro's statements to federal
investigators on October 31, 2014.  (Tuzman Supp. Br. (Dkt. No. 999) at 26-27; Oct. 31, 2014
DiPietro Interview Notes (Dkt. No. 1000-10))

### 1.   **Applicable Law**

"The government has a duty to disclose evidence favorable to the accused when it
is material to guilt or punishment."  United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005)

(citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963)).  To prove a <u>Brady</u> violation, a defendant

must establish that (1) the evidence at issue is "favorable to the accused"; (2) the evidence was

"suppressed by the State, either willfully or inadvertently"; and (3) "prejudice . . . ensued" from

the lack of disclosure such that it is "material."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82

(1999); <u>United States v. Coppa</u>, 267 F.3d 132, 140 (2d Cir. 2001).

   As to the first element, evidence that is "favorable to the accused" "includes not

only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the

credibility of a government witness," that is, <u>Giglio</u> material.  <u>Coppa</u>, 267 F.3d at 139

(citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)).

   As to the second element, a defendant must show that the Government suppressed

evidence, meaning that the Government violated its "affirmative duty to disclose favorable

evidence known to it."  <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995).  "[T]he

[G]overnment cannot be required to produce that which it does not control and never possessed

or inspected."  <u>United States v. Hutcher</u>, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting <u>United

States v. Canniff</u>, 521 F.2d 565, 573 (2d Cir. 1975)).  A prosecutor, however, is "presumed . . . to

have knowledge of all information gathered in connection with his office's investigation of the

case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the

government's behalf in the case, including the police.'"  <u>United States v. Avellino</u>, 136 F.3d 249,

255 (2d Cir. 1998) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995)).

   As to prejudice and materiality, a defendant must show that "there is a reasonable

probability that, had the evidence been disclosed, the result of the proceeding would have been

different."  <u>Turner v. United States</u>, 137 S. Ct. 1885, 1893 (2017) (quoting <u>Cone v. Bell</u>, 556

U.S. 449, 469-70 (2009)).  "A reasonable probability of a different result is one in which the

suppressed evidence undermines confidence in the outcome of the trial."  Id. (internal quotation marks omitted) (quoting Kyles, 514 U.S. at 434); see also Strickler, 527 U.S. at 281 ("[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").  "Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin."  United States v. Gil, 297 F.3d 93, 103 (2d Cir. 2002).

   "Where impeachment evidence is at issue, such evidence generally is material when 'the witness at issue supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case.'"  United States v. Teman, No. 19-CR-696 (PAE), 2020 WL 3034034, at *44 (S.D.N.Y. June 5, 2020) (quoting Payne, 63 F.3d at 1210).  "'In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony" or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'"  Id. (quoting Payne, 63 F.3d at 1210).

  2. **Analysis**

   a. **Evidence of Guilt**

   As an initial matter, the evidence of Tuzman's guilt on Count Six was overwhelming.  Tuzman argues that Smyth and Campion's "credibility was the lynchpin of a successful prosecution," and that the undisclosed material calls their credibility into question.  (Tuzman Supp. Br. (Dkt. No. 999) at 32)  But Smyth and Campion's testimony was fully corroborated by countless emails and other documents introduced at trial.  The phony

restructuring expenses inserted into the Sezmi transaction provide an example of how Smyth and Campion's testimony was corroborated by written materials.

When Smyth told Tuzman that Sezmi executives had balked at including a restructuring fee in Sezmi's sale price, Tuzman sent an email to Smyth with a phony cover story. (GX 2498; Tr. 2527 ("[K]eep it nonchalant and just say:  we have no idea how difficult it is going to be to bring the businesses together in terms of product integration, etc., and we need this cushion . . . .")) He also advised Smyth that "[y]ou have to be able to believe the bluff to carry it out."  (GX 2498; Tr. 2528)  And when Smyth told Tuzman about the importance of keeping any mention of the phony restructuring fee from the auditors, Tuzman immediately removed the problematic language from a draft term sheet.  (GX 1096 (Nov. 22, 2011 email chain in which Smyth tells Tuzman "[w]e cannot put restructuring in like this as auditors would expect an accounting for it if they see this" – "[t]here really can be no external view"; Tuzman responds, "OK"))  And in a December 28, 2011 email, Tuzman asks Smyth about the status of round-trip transactions made possible by the phony restructuring expense included in the Sezmi acquisition, inquiring whether Smyth had had "any luck with escrow funds getting around," and volunteering to "help" Smyth "in any way."  (GX 1202)

The trial record is also replete with email communications in which Tuzman refers to the "elephant" – the code word used by Tuzman, Smyth, and Campion for phony transactions associated with fake software licenses.  (GX 855, Tr. 2462, 4189 (Tuzman stating in February 3, 2011 email that "[a] small elephant is slain as part of the deal"); GX 2862, Tr. 2465 (Tuzman stating in February 8, 2011 email that "I am trying to slay elephants.  :-)"); GX 863, Tr. 2460-61 (Tuzman stating in February 12, 2011 email that "we could slay a BIG elephant w/ this one," and Smyth replying, "Sounds like you are killing elephants with your bare hands.");

GX 2867, Tr. 2477 (Tuzman stating in March 12, 2011 email "Let's kill elephants!"); see also

Tr. 4144 (Campion noting that Tuzman "ask[ed] for ways and look[ed] for ways to, quote, solve

. . . the elephant, fix the issue, pay the elephant off," which meant "[f]ind[ing] a way of paying

off the elephant, kind of getting money in from somewhere as if it was real revenue to reduce the

si[z]e of the elephant and ultimately get rid of it."))

        Where, as here, evidence of guilt is overwhelming, a defendant carries a heavy

burden in attempting to demonstrate that withheld evidence is material – i.e., that it is reasonable

to conclude that disclosure of the evidence could have altered the jury's verdict.  See Gil, 297

F.3d at 103 ("Where the evidence against the defendant is ample or overwhelming, the withheld

Brady material is less likely to be material than if the evidence of guilt is thin.").

        The Court considers below each category of documents that Tuzman claims was

improperly withheld.

### b.      Kevin Cronin Witness Statements and Related Documents

        Former KIT Digital sales employee Kevin Cronin spoke with federal investigators

on September 11 and 14, 2015, but the Government did not provide Tuzman with the FBI reports

memorializing those interviews.  (Tuzman Supp. Br. (Dkt. No. 999) at 12)  Nor did the

Government provide to Tuzman documents that Cronin produced to investigators after the

interviews.  (Id.)

        Tuzman argues that Cronin's statements "provided critical support to the

defense's contentions that [Smyth and Campion] had destroyed evidence of their own

culpability."  (Id.)  Had the Government produced Cronin's statements, Tuzman asserts that "the

defense would have been able to investigate this destruction of evidence, meaningfully confront

Smyth and Campion about their denials of collusion and evidence destruction, and potentially call Cronin as a witness to impeach Smyth and Campion . . . ."  (Id. at 14)

During his interviews, Cronin told investigators that certain entries in KIT Digital's finance and accounting database – "NetSuite" – had been deleted.  According to Cronin, "'someone deleted . . . entries, then recreated new entries not connected to old entries,'" which led Cronin to believe that "'something strange and probably illegal was going on.'"  (Id. at 14 (quoting Sept. 14, 2015 Cronin Interview Notes (Dkt. No. 1000-2) at 3))  This activity allegedly occurred in June 2012, when Tuzman was no longer at KIT Digital.  Tuzman posits that Smyth was responsible.  (Id.)

Cronin did not say that Smyth had made the deletions, however, and it is speculative to assert that his statements would have led to additional impeachment material.  See Karron v. United States, No. 07 CR 541 RPP, 2012 WL 1570849, at *7 (S.D.N.Y. May 4, 2012) ("Mere speculation is not sufficient to support a claim for a Brady violation.").  Moreover, the jury heard testimony that Smyth and Campion had discussed destroying evidence to conceal their fraud.

Smyth gave the following testimony on this point:

Q.  Now, in fact, sir, in January of 2011, during one of your conversations with Mr. Campion, in the Kickapps building on 17th Street, Mr. Campion told you to delete your personal email account, correct?

A.  Yes.

. . . .

Q. . . . . [O]n December 3, 2015, . . . you told prosecutors that Gavin Campion told you to destroy the spreadsheet containing the suspect revenue versus real revenue of KIT Digital?

A.  Yes.

114

. . . .

Q.  Does this refresh your recollection that on February 1, 2016, you told prosecutors that Gavin Campion told you to delete all of your emails and get rid of everything?

A.  Yes.

(Tr. 3092-93)

Tuzman argues that Cronin's statements indicate that Smyth and Campion not only discussed destroying evidence, but actually did so.  (Tuzman Supp. Br. (Dkt. No. 999) at 12-13)  But "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable . . . , the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial."  United States v. Persico, 645 F.3d 85, 111 (2d Cir. 2011); see also Tankleff v. Senkowski, 135 F.3d 235, 251 (2d Cir. 1998) ("When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a Brady claim.").  Because Cronin did not identify Smyth or Campion as the person who deleted the entries, and because the credibility of both of these witnesses was already subject to attack on this point, the failure to disclose Cronin's statements does not warrant a new trial.

Cronin produced documents to investigators, including a spreadsheet that now bears the Bates stamp "USAO_TUZMAN_0347248.xlsx."  (Tuzman Supp. Br. (Dkt. No. 999) at 16; Weitzman Decl., Ex. 4 (Dkt. No. 1000-4))  According to Tuzman, certain entries in this spreadsheet indicate that Smyth embezzled funds from KIT Digital.  (Tuzman Supp. Br. (Dkt. No. 999) at 16-17)  Tuzman contends that entries reflecting Smyth's "Amex reimbursement requests" are particularly suspicious.  (Id. at 17)

115

The Government concedes that it should have produced Cronin's documents to Tuzman, but it maintains that the failure to produce them was inadvertent, and that Tuzman was not materially prejudiced.  (Govt. Supp. Opp. (Dkt. No. 1019) at 16)  The Government notes that a "version of this spreadsheet containing the cited transactions – bates number SEC-TUZMAN-EPROD-001945426 . . . – was produced to [Tuzman] in May 2016," long before trial.  (Id. at 21)  The SEC produced the spreadsheet to Tuzman in connection with a parallel civil enforcement action it had brought against Tuzman.  (Id. at 8 n.6)  "Because Omar Amanat was not charged by the SEC, and thus did not receive discovery from the SEC," the Government explains that it "produced [the SEC] documents to Amanat" but not to Tuzman, who had already received them.  (Id.)

Given that the relevant information was produced to Tuzman by the SEC prior to the criminal trial, there can be no Brady violation.  See Pizzuti v. United States, No. 02CR1237LAPHBP, 2019 WL 10371606, at *33 (S.D.N.Y. Sept. 30, 2019), report and recommendation adopted, 2020 WL 5505384 (S.D.N.Y. Sept. 11, 2020) ("'[E]vidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" (quoting Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001))).

Although Tuzman complains that the spreadsheet was a small part of a voluminous SEC production (Tuzman Supp. Reply Br. (Dkt. No. 1024) at 8), Tuzman received the production more than a year before the criminal trial, giving his counsel ample time for review.  See Nigro v. United States, No. 09-CR-1239 (PKC), 2016 WL 3211968, at *3 (S.D.N.Y. June 9, 2016) ("Although the production was sizable, given the length of time that

defendant's counsel had to review the material, the Court concludes that it was disclosed in time to be effectively used at trial.").

Tuzman further contends that the U.S. Attorney's Office had an independent obligation to produce the spreadsheet and cannot rely on the SEC's production (Tuzman Supp. Reply Br. (Dkt. No. 1024) at 8-9), but (1) it should have been obvious to Tuzman that discovery provided in the parallel SEC civil enforcement action – which was premised on the same facts as the criminal case – might be pertinent to the criminal case; and (2) in telling the Court that it had produced the SEC discovery material to Omar Amanat, the U.S. Attorney's Office plainly signaled that the SEC material was potentially relevant to the criminal case.  (Nov. 21, 2016 Conference Tr. (Dkt. No. 191) at 3-4 ("[A]t the last conference, . . . the government didn't have all of the documents that were produced to Mr. Tuzman in the SEC case, but recognizing that this is a unique case where one defendant, Mr. Tuzman, had documents that the other . . . defendant didn't have, we decided to obtain the SEC's entire production and produce it to Mr. Amanat.  We expect to have that today, and once we have it and copy it, we will promptly produce it to Mr. Amanat."))

Tuzman cannot claim ignorance of the potential relevance of the SEC's discovery material simply because the U.S. Attorney's Office did not give him a second copy of it. Because Tuzman had access to the spreadsheet at issue, there is no Brady violation.  See United States v. Clark, 928 F.2d 733, 738 (6th Cir. 1991) ("No Brady violation exists where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' . . . or where the evidence is available to defendant from another source. . . .") (quoting United States v. Grossman, 843 F.2d 78, 85 (2nd Cir. 1988)).

Tuzman also cites entries from another spreadsheet produced by Cronin. According to Tuzman, these entries show that Smyth approved two fraudulent "round-trip" transactions without Tuzman's involvement.  (Tuzman Supp. Br. (Dkt. No. 999) at 17-18)  The SEC also produced this spreadsheet to Tuzman in 2016, however.  (Got. Supp. Br. (Dkt. No. 1019) at 8-9, 21-22)  Accordingly, the spreadsheet was not "suppressed" within the meaning of Brady.

Finally, Tuzman contends that Cronin identified Abner Mendez – a KIT Digital accounting employee who reported to Smyth – as a witness with potentially relevant knowledge. (Tuzman Supp. Br. (Dkt. No. 999) at 19)  Cronin told investigators that Mendez was responsible for "enter[ing]" sham licenses, and Tuzman contends that "Mendez may have had material information regarding the creation of the sham licenses, including evidence demonstrating that . . . Tuzman was not involved in the creation of the sham licenses – the core of . . . Tuzman's defense."  (Id.)

But Cronin's statement does not suggest that Mendez had exculpatory information.  Cronin described Tuzman as a hands-on executive who was involved in the minutiae of KIT Digital's operations, as someone who worked closely with Mendez, and as a "con man":

> [w]hen [Mendez] would fill out an expense report for a printer, he would have [Tuzman] approve it.  Even small purchases, like a $400 printer, needed [Tuzman's] approval. . . . The only reason the [D]ubai office existed is because [Tuzman] would go there.  [Tuzman] was a millionaire, but he wanted to be a billionaire and play like a billionaire. . . . [Tuzman] was a con man in reality and nothing but smoke and mirrors.  [Mendez] worked with [Tuzman] sometimes in [D]ubai.

(Sept. 14, 2015 Cronin Interview Notes (Dkt. No. 1000-2) at 3)  Because there is no indication in Cronin's statement that Mendez's testimony would have been exculpatory of Tuzman, Tuzman

118

has not met his burden of showing that he was prejudiced by the Government's failure to disclose that statement.[32]  See United States v. Raniere, 384 F. Supp. 3d 282, 326 (E.D.N.Y. 2019) ("'The rationale underlying Brady is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government.'" (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982))).

### c.      Louis Schwartz Witness Statement

In May 2014, Federal investigators interviewed Louis Schwartz, KIT Digital's former general counsel and CEO for the Americas.  The Government did not disclose the interview to Tuzman, nor did it produce the agent's report to him.  (Tuzman Supp. Br. (Dkt. No. 999) at 20)  Tuzman argues that Schwartz's statements constitute Brady and Giglio material "[o]n multiple levels."  (Id.)

Schwartz told investigators that Smyth and KIT Digital accounting department employee David Vogel "'gave . . . [Schwartz] guidance' regarding 'revenue recognition and contract structuring so that revenue recognition could be maximized[,]' and that Vogel . . . 'was the revenue recognition expert' at KIT Digital."  (Id. (quoting May 21, 2014 Schwartz Interview Mem. (Dkt. No. 1000-6)))  Tuzman states that had he "known of these statements, he would have

---

[32]  Tuzman also knew, from the exhibits produced by the Government prior to trial, that Mendez was involved in the handling of the sham software licenses.  (See GX 1270 (Feb. 16, 2020 forwarded email from Smyth to Mendez, the forwarded message referencing Bimini and Solet); see Tr. 2403 (Smyth testifying, when asked about various names on a document, including Bimini, that they were "referring to other fake perpetual licenses that were set up")) (See United States v. Torres, 129 F.3d 710, 717 (2d Cir.1997) ("It is well settled that evidence 'is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known of the essential facts permitting him to take advantage of [that] evidence.'" (quoting United States v. Gonzalez, 110 F.3d 936, 944 (2d Cir.1997))).

called Schwartz to testify [in] support [of] Tuzman's defense that Smyth – not . . . Tuzman – made revenue recognition decisions and settled on the structure of the merger and acquisitions that Smyth used to round-trip money without . . . Tuzman's knowledge."  (Id.)

But Schwartz never said that Tuzman was unaware of fraudulent revenue recognition at KIT Digital, and there is no indication that Schwartz's testimony would have been exculpatory of Tuzman.  To the contrary, Schwartz told agents that Tuzman "had to know" about the sham software licenses and accounting fraud at KIT Digital.  (May 21, 2014 Schwartz Interview Mem. (Dkt. No. 1000-6) at 4 ("SCHWARTZ stated that he was aware that CAMPION, SMYTH and possibly TUZMAN were creating fictitious contracts.  SCHWARTZ said that he knows CAMPION and SMYTH were creating fictitious contracts, and TUZMAN had to know."))

To the extent that Schwartz told agents that Smyth was involved in accounting fraud at KIT Digital, there was ample evidence of that fact at trial.  Indeed, Smyth testified at trial that he had "create[d] fake invoices" and "schemed to recognize revenue" at KIT Digital.  Accordingly, Smyth's involvement in the fraud at KIT Digital was clear to the jury.  (Tr. 2255, 2739)

As to Vogel, he was on the Government's witness list, and Tuzman hired a private investigator to interview him.  (Govt. Supp. Br. (Dkt. No. 1019) at 25)  Moreover, prior to trial, the Government produced to Tuzman an agent's report summarizing a November 25, 2013 interview of Vogel.  The report indicates that Vogel told investigators about his role in revenue recognition at KIT Digital, under Smyth's supervision.  (Vogel Interview Mem. (Dkt. No. 1019-11) at 5-6)  In sum, the key information in Schwartz's witness statement was already known to the defense and therefore cannot support a Brady claim.  Payne, 63 F.3d at 1208 ("[E]vidence is

not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." (internal quotation marks and alteration omitted)).

Schwartz also told investigators that Campion ran KIT Digital's "day-to-day operations." (May 21, 2014 Schwartz Interview Mem. (Dkt. No. 1000-6) at 4)  According to Tuzman, this statement could have been used to impeach Smyth and Campion's trial testimony, to the extent that they "minimize[d] their respective roles in [KIT Digital] . . . to implicate . . . Tuzman in their fraudulent dealings." (Tuzman Supp. Br. (Dkt. No. 999) at 21)  But the jury heard extensive testimony about Smyth and Campion's roles at KIT Digital, beginning with the fact that Smyth was the company's chief financial officer and Campion was its president.  (Tr. 203, 2285-86, 2292-93, 4743)  Smyth testified that Campion "was responsible for the operation, the day-to-day operations of the company." (Tr. 2293)  And Campion testified that – except for a three- to four-month period during which he focused on a "major restructuring" project – KIT Digital's "operations reported to [him]." (Tr. 4743)  Because the information conveyed by Schwartz was already known to the defense and was laid before the jury, Schwartz's statements cannot form the basis of a Brady claim.

Schwartz also described Campion and Smyth's relationship as "'very close,'" which Tuzman contends "support[s] the defense that Campion and Smyth worked together to execute fraud without [him]." (Tuzman Supp. Br. (Dkt. No. 999) at 21-22 (quoting May 21, 2014 Schwartz Interview Mem. (Dkt. No. 1000-6) at 4))  But the jury heard about Smyth and Campion's friendship.  (Tr. 3063 (Smyth testifying that he and Campion were "friends"))  Indeed, Smyth's wife testified that when Campion's wife had a baby, the Smyths bought baby gifts and visited Campion's family in the hospital.  (Tr. 1322)

Finally, Tuzman contends that Schwartz's statements could have been used to impeach Campion's testimony that the phrase "Hail Mary" – as used in certain email correspondence – was a reference to fraud, as Schwartz "saw references to 'Hail Mary' in his unit's general ledger and thought they were references to revenue enhancement." (Tuzman Supp. Br. (Dkt. No. 999) at 22 (citing May 21, 2014 Schwartz Interview Mem. (Dkt. No. 1000-6) at 3)) Although Campion testified that, on one occasion, he had used the term in an email to refer to fraud (Tr. 4271), he denied that he had generally used "Hail Mary" as a code word for fraud. (Tr. 4764 ("Q. Do you remember on direct examination you testified that hail Mary was a code word that you, [Tuzman], and Mr. Smyth used to describe the elephant? / A. I didn't say that."; "Q. [Are you] saying 'hail Mary' was not used as a code word? /A. I didn't use it as a code word."); see also Tr. 4768 "Q. No one who was in the K11 numbers four through eleven, whoever those people were, none of them ever responded to you that they understood hail Mary to be a reference to fraud, right? / A. No, Mr. Tuzman was the only one.")) Because Campion denied that "Hail Mary" was a generally understood code word for fraud, Schwartz's statements in this regard are immaterial.

### d.   **Buno Pati Witness Statement**

Count Six alleges that Tuzman and his co-conspirators round-tripped $7.85 million through an escrow account created for purported restructuring expenses associated with KIT Digital's acquisition of Sezmi. (S8 Indictment (Dkt. No. 198) ¶¶ 122-136) Tuzman complains that the Government did not provide him with an investigators' report of a December 11, 2014 interview of Sezmi CEO Buno Pati. (Tuzman Supp. Br. (Dkt. No. 999) at 23; FBI Form 302 for Dec. 11, 2013 Pati Interview (Dkt. No. 1000-8)) Pati told investigators that KIT Digital had legitimate business reasons for acquiring Sezmi, that he had met Tuzman only once,

and that most of Pati's communications about the acquisition were with Smyth.  (Tuzman Supp.

Br. (Dkt. No. 999) at 23-24 (citing FBI Form 302 for Dec. 11, 2013 Pati Interview (Dkt. No.

1000-8) at 3-6))  According to Tuzman, Pati's statements are evidence that "the Sezmi deal was

not illegal" at "inception," and that Smyth was "in the center of the illegal elements of the Sezmi

deal . . . ."  (Id. at 24)

    But the Government did not contend at trial that there was no legitimate business

reason for KIT Digital to acquire Sezmi, nor did it argue that the Sezmi transaction was

fraudulent at its inception.  And Smyth testified about his communications with the "sellers of

Sezmi" and "Sezmi executives."  His role as the point person for the transaction was clear.

(Tr. 2517, 2525, 2527)

    Moreover, Pati's statements were inculpatory to the extent that he told

investigators that he found suspicious the $7.85 million restructuring fee sought by KIT Digital.

Pati said that KIT Digital's insistence on the $7.85 million escrow "stuck out to him as odd" and

"it was also his impression that this was not legal."  (FBI Form 302 for Dec. 11, 2013 Pati

Interview (Dkt. No. 1000-8) at 6)  Pati also told investigators that it was "unusual" that KIT

Digital issued a press release announcing that it had paid $28 million for Sezmi, even though

Sezmi's shareholders only received $21 million from the transaction.  (Id. at 5)

    In short, the Government's failure to produce the Pati interview report to Tuzman

does not constitute a Brady violation.

### e.  Sean McMann Witness Statement

    Count Six alleges that Smyth, Tuzman, and others engaged in accounting fraud by

improperly recognizing revenue from The Country Network ("TCN").  (See S8 Indictment (Dkt.

No. 198) ¶¶ 101-15)  On May 6, 2015, federal investigators interviewed Sean McMann, the KIT

Digital employee responsible for the TCN account.  (May 6, 2015 McMann Interview Notes

(Dkt. No. 1000-13))  Tuzman contends that "McMann's statements largely implicated Smyth and

Campion" in the alleged TCN-related fraud and that McMann said little about Tuzman's

involvement.  (Tuzman Supp. Br. (Dkt. No. 999) at 26)  Tuzman argues that – by "failing to

disclose" McMann's statements – the Government "deprived . . . Tuzman of highly material and

exculpatory evidence relating to the TCN allegations at the heart of Count Six of the

Indictment."  (Id.)

What Tuzman does not say is that the Government did not seek to prove the TCN

allegations at trial, and the jury heard no substantive evidence related to these allegations.  (Govt.

Supp. Br. (Dkt. No. 1019) at 29-30; Tr. 5448 ("MR. NAFTALIS: This has to do with TCN . . .

which . . . we agreed we would walk away from."))  Accordingly, any TCN-related alleged

exculpatory evidence is immaterial.

### f.   Paul DiPietro Witness Statement

In October 2014, federal investigators interviewed Paul DiPietro, who previously

worked for Sport195, a company operated by Smyth and Rob Petty between 2009 and 2012,

when Smyth also worked at KIT Digital.  (Oct. 31, 2014 DiPietro Interview Notes (Dkt. No.

1000-10); Tr. 3459, 3464)  DiPietro told investigators that Sport195 was involved in paying

"people in Nigeria to click on [Sport195's] website to make it look like the website has volume

visits."  (Oct. 31, 2014 DiPietro Interview Notes (Dkt. No. 1000-10) at 4)  At trial, "the defense

sought to prove that Smyth and Petty caused ROO Group (the publicly traded company that was

the predecessor to KIT Digital) to fraudulently and artificially inflate its unique visitors through

pop-under windows that reported false visitor numbers."  (Tuzman Supp. Br. (Dkt. No. 999) at

26 (citing Tr. 3137-47))  Tuzman states that the purpose of this evidence would have been to

show that Smyth was lying when he said that "there wasn't 'anything improper at ROO Group before [Tuzman] arrived.'"  (Id. (quoting Tr. 3147))

But Smyth admitted at trial that he had been involved in inflating web views in this manner at ROO Group (Tr. 3141-47), while stating that he did not believe that this was an improper practice at the time.  (Tr. 3144-45 (Q: "Did you view . . . the inclusion of pop under views . . . as illegitimate at the time?" / A: "I personally did not."))  Given Smyth's admission that he had been involved in inflating web views at ROO Group, nothing in DiPietro's statement is material.

*     *     *     *

There was overwhelming evidence of Tuzman's guilt at trial, including not only testimony from his co-conspirators Smyth and Campion – KIT Digital's chief financial officer and president – but also copious amounts of highly incriminating documentary evidence, including emails and sham license agreements, that fully corroborated the cooperators' testimony.  Given the ample evidence of guilt and the immaterial nature of the materials withheld, Tuzman has not shown that a new trial is warranted, even when the withheld material is considered collectively.  See Moses v. United States, No. 97 Civ. 2833 (RPP), 1998 WL 255401, at *8 (S.D.N.Y. May 20, 1998) ("Courts considering a claim of a Brady violation are to consider the 'cumulative effect of suppression,' weighing the suppressed evidence 'collectively . . . .'" (quoting Kyles, 514 U.S. at 436)).

### K.    Tuzman's Request for a New Trial Based on Alleged Newly Discovered Evidence of Maiden's Drug Use

In his July 2019 submission, Tuzman cites "newfound evidence" of Maidan's drug use, which he contends entitles him to a new trial.  (Tuzman Supp. Br. (Dkt. No. 999) at 27-28)  Prior to trial, the Government provided to Tuzman an extensive amount of Section 3500

125

concerning Maiden.  The Section 3500 material discloses that Maiden told the Government, in

December 2014, that he had used drugs, "'including marijuana, cocaine, ecstasy, mushrooms and

acid,' and that he [had] stopped using . . . drugs 'about ten years ago.'"  (Tuzman Supp. Br. (Dkt.

No. 999) at 27 (quoting Dec. 2-3, 2014 Maiden Interview Mem. (Dkt. No. 1000-11) at 32))  The

Section 3500 material also shows that, on October 30, 2017, Maiden told the Government that he

had used "a variety [of] drugs" in his twenties, that he had "cleaned up" when he got married and

had children in 2005 and 2006, and that he had engaged in "occasional cocaine use" between

2008 and 2012, "at most a couple of times a year."  (Oct. 30, 2017 Maiden Interview Notes (Dkt.

No. 1019-6) at 2)

> At trial, defense counsel cross-examined Maiden at length about his cocaine use,

focusing on text messages from between 2010 and 2012 in which Maiden referred to cocaine as

"slitch," "snitch," "whiff," "white," "ballski," and "cane."  (Tr. 1003-05, 1009-1018, 1062-69,

1911)  Maiden testified that he recalled using cocaine only twice since 2010.  (Tr. 1070)

According to Maiden, his text messages about cocaine were "bad attempt[s] at humor" and

"crude humor."  (Tr. 1009-15, 1062-68, 1911)  Defense counsel argued to the jury, however, that

Maiden had a serious drug problem.  (Tr. 183 (referring to Maiden's "crippling cocaine

problem"); Tr. 7054 ("[Maiden] is a drug addict, it's pretty clear."))

> In October 2018, in preparation for Irfan Amanat's trial, Maiden told the

Government that he used the following drugs during college:  "[m]arijuana, LSD, mushrooms,

cocaine, ecstasy, crack (1 time), meth (1 time)."  (Oct. 9, 2018 Maiden Interview Notes (Dkt. No.

1000-12))

> Tuzman notes that Maiden had not previously disclosed his "prior crack and meth

use" and that – had jurors learned this information – "they would have better understood

126

Maiden's serious drug issues as well as the falsity of his denials of continued cocaine use up to his arrest." (Tuzman Supp. Br. (Dkt. No. 999) at 28)

### 1.    Applicable Law

"'A motion for a new trial on the ground of newly discovered evidence is granted 'only in the most extraordinary circumstances.'" United States v. Jones, 965 F.3d 149, 164 (2d Cir. 2020) (quoting United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007)) (emphasis omitted). "'Newly discovered evidence supports the grant of a new trial only if the defendant demonstrates,' inter alia, 'that the evidence is "so material and noncumulative that its admission would probably lead to an acquittal."'" Id. (quoting Parkes, 497 F.3d at 233). "New evidence that is merely impeaching will not ordinarily justify a new trial." United States v. Reyes, 49 F.3d 63, 68 (2d Cir. 1995). "'[N]ew impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'" Jones, 965 F.3d at 164 (quoting Parkes, 497 F.3d at 233 (internal quotation marks and emphasis omitted)).

### 2.    Analysis

Defense counsel cross-examined Maiden at length about his prior cocaine use. (Tr. 1003-1018, 1062-69) Evidence that Maiden had once used two other drugs while in college – in addition to the many other drugs that Maiden admitted using – "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." Jones, 965 F.3d at 164. Because evidence that Maiden once used crack cocaine and methamphetamine during college would not have changed the outcome of the trial, Tuzman's request for a new trial on this basis will be denied. See id.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' motions for a judgment of

acquittal or for a new trial (Dkt. No. 735, 737) are denied.

Dated:  New York, New York
        May 3, 2021

                             SO ORDERED.

                             _____
                             Paul G. Gardephe
                             United States District Judge

128