**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Avi Weitzman
Direct: +1 212.351.2465
Fax: +1 212.351.5265
AWeitzman@gibsondunn.com

July 29, 2021

VIA ECF

The Honorable Paul G. Gardephe
United States District Judge for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007-1312

Re:   *United States v. Kaleil Isaza Tuzman*, S8 15 Cr. 536 (PGG)

Dear Judge Gardephe:

On behalf of Defendant Kaleil D. Isaza Tuzman, we write to respond to the government's July 28, 2021 letter seeking criminal forfeiture totaling $1,163,950 from Mr. Isaza Tuzman. The government's request for forfeiture—which was not raised with the defense in advance of the government's eleventh-hour submission—is precluded by applicable law and facts already in the record from testimony and documents presented at trial and during subsequent *Fatico* proceedings. The government has failed to carry its burden of proof on its forfeiture request because: (1) the money cited by the government as having been obtained from the sale by KIT Media Ltd. ("KIT Media") of shares in KIT Digital was received by *third-party investors* in KIT Media, not Mr. Isaza Tuzman; (2) the government cannot establish that the alleged "inflation" amount in November 2012 reflects the artificial inflation one year earlier, in November 2011 and thus it is not "traceable to the violation"; and (3) the government fails to account for Mr. Isaza Tuzman's net losses from the offenses of conviction. Because the government's requested forfeiture is based on a highly speculative theory not substantiated by record evidence, is contrary to controlling principles of law governing forfeiture, and contravenes basic principles of due process, it should be denied. To the extent that the Court does not reject the government's request based on evidence currently in the record, we respectfully request a hearing to present further evidence and/or an opportunity to reach a negotiated resolution with the government.[1]

---

[1] Under Rule 32.2 of the Federal Rules of Criminal Procedure, "[i]f the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." Fed. R. Crim. P. 32.2(b)(1)(B).

**GIBSON DUNN**

July 29, 2021
Page 2

I.     **Applicable Legal Standard to Criminal Forfeiture**

Pursuant to Title 18, United States Code Section 981(a)(1)(C), a court shall order the forfeiture of "[a]ny property . . . which constitutes or is derived from proceeds" of criminal securities fraud. In *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012), the Second Circuit set out the government's burden of proof to obtain criminal forfeiture. Specifically, the government must prove three elements: (1) the property (real or personal) sought was "traceable to the violation;" (2) the amount was money that Mr. Isaza Tuzman "received or had the ability to control;" and (3) the illicit proceeds sought by the government must have been "received by him" and not other individuals. *Id.* at 145–47. Because forfeiture is calculated based on a defendant's gains, the forfeiture amount "may not exceed the amount obtained through the wrongdoing." *United States v. Dobruna*, 146 F. Supp. 3d 458, 460 (E.D.N.Y. 2015) (quoting *S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014)). The government must demonstrate each element of criminal forfeiture by a preponderance of the evidence. *United States v. Finazzo*, 682 F. App'x 6, 14 (2d Cir. 2017) (citing *United States v. Daudergas*, 837 F.3d 212, 231 (2d Cir. 2016)); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (citing *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005)).

II.     **The Illicit Proceeds Were Received By Other Individuals, not Mr. Isaza Tuzman.**

The government's requested forfeiture of $913,950 in connection with a November 18, 2011 sale of KIT digital stock is based on the false assumption that Mr. Isaza Tuzman received the proceeds from this sale. He did not. As the cited Form 4 discloses (attached hereto as Exhibit A), the sale was made by KIT Media, in which Mr. Isaza Tuzman was one of many investors, for the purpose of redeeming investors in that entity unaffiliated with Mr. Isaza Tuzman. The government makes no effort to acknowledge these realities, either by calculating Mr. Isaza Tuzman's ownership percentage in KIT Media or by tracking the proceeds of the November 18, 2011 stock sale.

"'[A] defendant may be ordered to forfeit all monies received *by him* as a result of the fraud.'" *Contorinis* 692 F.3d at 147 (citation omitted). "[T]he property must have, at some point, been under the defendant's control or the control of his co-conspirators in order to be considered 'acquired' by him." *Id.* When the proceeds of a fraud of are paid to unrelated third parties, without passing through the hands of the defendant, forfeiture of these amounts by a defendant is inappropriate. *Id.* (forfeiture is not available "where the proceeds go directly to an innocent third party and are never possessed by the defendant"); *see also Dobruna*, 146 F. Supp. 3d at 461 (declining to impose forfeiture "since no evidence has been presented that [the defendant] *personally* derived any 'ill-gotten gains' from his criminal conduct").

GIBSON DUNN

July 29, 2021
Page 3

Mr. Isaza Tuzman did not acquire the alleged proceeds from the November 2011 stock sale. As the SEC Form 4 cited by the government (Ex. A) makes clear, the seller of the 677,000 shares of KIT digital stock was KIT Media, "an investment fund that was formed in 2008 principally to make investments in" KIT digital. Ex. A at 2. KIT Media had numerous investors other than Mr. Isaza Tuzman, including various family offices, investment funds, and other individuals. While Mr. Isaza Tuzman held "controlling voting power" in KIT Media (through a separate voting class of stock in that entity), he was the beneficial owner of slightly less than 25% of KIT Media at this time. Moreover, "[t]he net proceeds from this sale by KIT Media [would] be used to redeem the equity interests of KIT Media held by certain persons that are not employees, officers, directors, or affiliates of" either KIT digital or Mr. Isaza Tuzman. *Id.* Thus the proceeds from the cited sale of 677,000 shares of KIT digital stock, including the alleged "estimate of artificial inflation" of $913,950, was mostly owned by and was distributed to entities and individuals other than Mr. Isaza Tuzman.

The government asserts that Mr. Isaza Tuzman "recognized" and "received" the entirety of the alleged illicit proceeds. This speculation is unproven, belied by the very document the government relies on, and wholly insufficient to establish a forfeiture of $913,950. *See United States v. Basciano*, 2007 WL 29439, at *4 (E.D.N.Y Jan. 4, 2007) (denying requested forfeiture "[b]ecause the nature of the evidence relied upon by the Government in making a forfeiture calculation is overly speculative").

### III.   The Government's Forfeiture Amount Is Not Traceable To the Violation.

The government tries to draw a direct line between the alleged "share price impact" of the announcement of accounting errors and irregularities in November 2012 and purported gains realized as a result of a sale of shares in KIT digital ***more than one year prior***, in November 2011. Specifically, the government argues that "KIT digital's stock was artificially inflated by at least $1.35 per share when Tuzman sold the 677,000 shares on November 18, 2011,"[2] so "Tuzman received at least approximately $913,950 in fraudulent profit." Dkt. 1175 at 1. The government's request for forfeiture should be denied based on such a speculative and thin reed of evidence. *See Basciano*, 2007 WL 29439, at *4.

*First*, as we explained in greater detail in post-*Fatico* briefing, the stock price reaction to the disclosure in the November 2012 8-K of overbroad "errors and irregularities" (to the extent it

---

[2] The government identifies two different dates for KIT Media's November 2011 sale of KIT digital stock: November 18 and November 21 of 2011. KIT Media sold 677,000 shares in KIT digital on the former date. The Form 4 reflecting this sale of stock was filed on November 21, 2011 (Ex. A).

**GIBSON DUNN**

July 29, 2021
Page 4

can be disentangled from other confounding news on November 21, 2012) overstated the stock price inflation resulting from the fraud of conviction. *See* Dkt. 965 at 34–43.

*Second*, the government's argument depends on a fundamentally deficient apples-to-oranges comparison. The government presumes that the share price reaction to the November 2012 8-K is an appropriate proxy for the degree to which KIT digital's stock was artificially inflated a year earlier in connection with November 2011 sales of KIT digital stock. It is not. Dr. Cathy Niden agreed on cross-examination during the *Fatico* hearing that even though the "charged accounting fraud increased over time," her analysis "assumes that the price of the stock was inflated by the same amount during the entire period prior to the fraud's disclosure." Niden Tr. 64:22–65:3. The government seems to concede (as it must) that the artificial inflation was not "constant." Dkt. 1175 at 1. But the government's acknowledgement downplays the significant disconnect between the flat $1.35 measure and the putative share price impact of the fraud on the 677,000 shares sold more than a year prior. As detailed in our post-*Fatico* submission, the bulk of the Company's sham contracts were reported in Q4 2011, after the November 18, 2011 stock sale. *See* Dkt. 965 at 43 (citing Niden Tr. 66:12–20; GX 3828). As such, the inflation in KIT digital's stock price would have accrued over time, and there is no basis to conclude that the inflation as of November 18, 2011 is the same amount as the alleged inflation one year later. By conflating loss amount calculations with its forfeiture calculation, the government engages in an flawed analysis. *See United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir. 2006) (the calculation of the defendant's sentencing guidelines range is entirely independent of the jury's finding of the amount subject to forfeiture); *United States v. Love*, 134 F.3d 595, 605-06 (4th Cir. 1998) (there is no requirement that the jury's forfeiture verdict and court's factual finding in support of sentence be consistent). The government's theory of criminal forfeiture must be rejected as too speculative. *See United States v. Barajas*, 200 F. Supp. 2d 575, 576 (E.D.N.C. 2002) (denying government's motion for forfeiture where the alleged "connection between the defendant and property or proceeds of the conspiracy was entirely speculative").

**IV.    Under Controlling Second Circuit Caselaw, Forfeiture is Limited to Net Gains After Deducting Losses.**

The government's requested forfeiture amount also ignores controlling Second Circuit precedent that the correct measure of forfeiture is net gain after deducting losses. The Second Circuit has repeatedly held that Section 981(a)(2)(B) applies in securities fraud cases because the buying and selling of securities is not an inherently unlawful activity, but rather is a lawful activity that may be conducted in an unlawful way. *See Contorinis*, 692 F.3d at 145 n.2 (buying and selling securities is not inherently unlawful; in insider trading case, forfeiture is limited to the net gain after deducting the costs pursuant to Section

July 29, 2021
Page 5

981(a)(2)(B)); *United States v. Mahaffy*, 693 F.3d 113, 138 (2d Cir. 2012) (the "proper measure of forfeiture" for defendants was "net, not gross, gain" where defendants traded securities unlawfully by engaging in a scheme involving illegal bribery and frontrunning).

The definition of proceeds for securities fraud cases is "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(b). Here, the government makes no mention of the controlling statutory authority, nor does it undertake any analysis of the applicable definition of proceeds.

Instead, the government cherry-picks one sale of securities, by KIT Media on November 18, 2011, without considering the full scope of Mr. Isaza Tuzman's purchases and sales of KIT digital stock over the course of the alleged conspiracy period. Mr. Isaza Tuzman made numerous purchases and sales of KIT digital stock during this time period, he continued to purchase KIT digital stock as the stock price increased throughout 2011 and 2012, and he and his entities *purchased* at prices *above*, and *sold* at prices *below*, the cited $10.46 price point through mid-2012, following his departure as CEO. *See* ECF No. 793 at 4, 42, 67; KIT Trial Ex. 2897; Trial Tr. 5719–20. The government's analysis does not grapple with, among other things, the complexity of this purchase and sale history. Had it done so, it would be clear that Mr. Isaza Tuzman experienced net losses—not net profits—from his purchases and sales of KIT Digital stock during the conspiracy period. Thus, no forfeiture is warranted.

Similarly, the government fails to take into account the economic realities of the $250,000 investment in Maiden Capital in 2011. First, the appropriate measure of forfeiture is *gains* by Mr. Isaza Tuzman, not *losses* by KIT digital or anyone else. *Contra* Gov't Forfeiture Letter at 1 ("the Government seeks forfeiture of $250,000, reflecting the amount of KIT digital assets that Tuzman caused the company to invest in Maiden Capital in 2011").[3] Second, the amount Mr. Isaza Tuzman gained should be netted against the amount Mr. Isaza Tuzman invested into the Maiden Fund in the first instance. 18 U.S.C. § 981(a)(2)(b). Because Mr. Isaza Tuzman invested $250,000 in Maiden Capital, and received $288,000 in returns, his total net proceeds were $38,000, not $250,000. Dkt. 793 at 49 (citing Trial Tr. 1788-89; GX 1786C).

---

[3] The government did not allege and never proved that Mr. Isaza Tuzman knew that Maiden Capital was a Ponzi scheme and that KIT Digital's investments in Maiden Capital would be lost. As described in greater detail in Mr. Isaza Tuzman's June 22, 2018 sentencing submission, the evidence at trial amply demonstrated that Mr. Isaza Tuzman was informed and believed that Maiden Capital was earning favorable returns for its investors, including KIT digital. Dkt. 793 at 48.

GIBSON DUNN

July 29, 2021
Page 6

This amply satisfies Mr. Isaza Tuzman's burden of demonstrating the costs incurred that offset gains from the unlawful conduct. *See* 18 U.S.C. § 981(a)(2)(B). If the Court believes additional evidence is needed, Mr. Isaza Tuzman should be provided an adequate opportunity to respond to the government's requested forfeiture amount and to supplement the record with detailed evidence of associated losses.

**V.      Imposition of Forfeiture at this Stage Would Result in a Denial of Due Process.**

The government did not file its submission identifying a forfeiture amount and purported rationale until the eleventh hour—just over 36 hours before sentencing. The government's slapdash approach is counter to Constitutional due process protections and statutory procedure.

"Procedural due process requires that an individual receive adequate notice and procedures to contest the deprivation of property rights " that result from criminal forfeiture under 21 U.S.C. § 853. *United States v. Shakur*, 691 F.3d 979, 988 (8th Cir. 2012) (citation omitted). If the Court were to enter an order at sentencing on July 30, 2021—tomorrow—prescribing the *amount* of forfeiture, Mr. Isaza Tuzman will have been denied the opportunity to adduce evidence contravening the government's theory and further substantiating the statements in this letter.

The government's last-minute letter requesting a specific (and substantial) forfeiture amount and delineating the government's meager rationale for that amount is also contrary to the procedures prescribed by applicable statute. Specifically, Mr. Isaza Tuzman is being denied the entry of a preliminary order "sufficiently in advance of sentencing" to allow him to seek revisions. Fed. R. Crim. P. 32.2(b)(2)(B). Mr. Isaza Tuzman should be provided a meaningful opportunity to contest the government's request to deprive Mr. Isaza Tuzman of his property rights.

Under the circumstances, and in light of the complexity in calculating a precise amount of forfeiture at the time of sentencing, as described herein, the Court should either deny the government's requested forfeiture or enter a general order of forfeiture and state that the order will be amended when the amount has been calculated.[4] *See* Fed. R. Crim. P. 32.2(b)(2)(C); *see also United States v. Percoco*, No. 16 Cr. 776 (VEC), 2019 WL 1593882, at *2 (S.D.N.Y. Apr. 15, 2019).

---

[4] Deferring decision on the amount of forfeiture is consistent with principles of judicial economy, as the government has already requested that the Court defer ordering restitution until ninety days after Irfan Amanat is sentenced. Gov't Forfeiture Letter at 2.

GIBSON DUNN

July 29, 2021
Page 7

### VI.    Conclusion

The government has failed to demonstrate the requirements for forfeiture established by the Second Circuit. For the reasons stated herein, Mr. Isaza Tuzman respectfully requests that the Court deny the government's request for forfeiture.

Respectfully submitted,

*Avi Weitzman*

Avi Weitzman

cc.    All Counsel of Record (publicly filed version via ECF)